**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket No.: C.A. No. 22-941-GBW |
| v. | ) | |
| | ) | |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ANSWER TO COMPLAINT FOR
PATENT INFRINGEMENT, DEFENSES, AND COUNTERCLAIMS**

Defendant Avadel CNS Pharmaceuticals, LLC in response to the Complaint for Patent Infringement of Jazz Pharmaceuticals, Inc. regarding U.S. Patent No. 8,731,963 (the "'963 patent" or "the patent-in-suit") states as follows:

**PRELIMINARY STATEMENT**

This case is nothing more than Plaintiff Jazz Pharmaceuticals, Inc.'s ("Jazz") latest effort in its continued assault on Defendant Avadel CNS Pharmaceuticals, LLC's ("Avadel") revolutionary *once-nightly* formulation of sodium oxybate, LUMRYZ™.  As stated in Avadel's Answers to Jazz's previously-filed Complaints (C.A. No. 21-691-GBW, C.A. No. 21-1138-GBW, C.A. No. 21-1594-GBW), after years of failed efforts, Jazz still does not have its own once-nightly sodium oxybate formulation.  Jazz therefore has resorted to various tactics to block or delay LUMRYZ's entry into the market, including Jazz's decision to baselessly list and maintain the listing of the '963 patent in the Orange Book and to file the instant lawsuit despite having already asserted infringement of the '963 patent in an ongoing litigation (C.A. No. 21-691-GBW).  As described in Avadel's Answers to Jazz's previously-filed Complaints, Avadel's Motion and Renewed Motion for Partial Judgment on the Pleadings (D.I. 20 and 117 in C.A. No. 21-691-

GBW), and in this pleading below, the '963 patent is not directed to an approved method of using a drug, is improperly listed in the Orange Book, and must be de-listed pursuant to the pertinent statute. But the FDA required that Avadel certify to the '963 patent, and that certification now lies in the way of Avadel obtaining FDA approval for its novel drug formulation.

Avadel denies that it infringes, has infringed, or will infringe any valid claim of the asserted patent, denies that there is any legitimate basis for the lawsuit brought by Jazz, denies that Jazz is entitled to any relief, and denies the allegations and characterizations in Jazz's Complaint unless expressly admitted as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. §100, *et seq.,* arising from Avadel's filing of a New Drug Application ("NDA") with the United States Food and Drug Administration ("FDA") seeking approval to commercially market a version of Jazz Pharmaceuticals' XYREM® drug product prior to the expiration of United States Patent No. 8,731,963 (the "'963 patent" or "the patent-in-suit") owned by Jazz Pharmaceuticals.

**ANSWER**:  Avadel admits that the Complaint purports to allege an action for patent infringement under the patent laws of the United States, 35 U.S.C. §100, *et seq*., involving the '963 patent, which states on its face that it is assigned to Jazz Pharmaceuticals, Inc. Avadel admits that it filed an NDA with the FDA seeking approval to commercially market LUMRYZ, a once-nightly formulation of sodium oxybate for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy. Avadel admits that the patent-in-suit has not yet expired. Avadel denies that the Complaint properly states a claim for patent infringement. Avadel further denies that Avadel's LUMRYZ product is a "version" of Jazz's XYREM® drug product. Except as otherwise admitted, the allegations are denied as stated.

2

## THE PARTIES

2.      Plaintiff Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 3170 Porter Drive, Palo Alto, California 94304.

**ANSWER**:  Avadel lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 2, and therefore denies them.

3.      On information and belief, Defendant Avadel CNS Pharmaceuticals, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having a principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.

**ANSWER**:  Avadel admits that Avadel CNS Pharmaceuticals, LLC is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.   Except as otherwise admitted, the allegations are denied as stated.

4.      On information and belief, following any FDA approval of NDA No. 214755, Defendant Avadel will make, use, offer to sell, and/or sell the products that are the subject of NDA No. 214755 throughout the United States, and/or import those products into the United States.

**ANSWER**:  Avadel admits that it filed an NDA No. 214755 seeking approval to engage in the commercial manufacture, use, sale, offer for sale, or importation into the United States of LUMRYZ, a once-nightly formulation of sodium oxybate for the treatment of cataplexy or excessive daytime sleepiness in adults with narcolepsy.  Avadel denies the remaining allegations in Paragraph 4.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

**ANSWER**:  The allegations in Paragraph 5 state legal conclusions to which no response is required.  To the extent a response is required, Avadel does not dispute subject matter jurisdiction

3

under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.  Except as otherwise admitted, the allegations

are denied as stated.

6.     On information and belief, Avadel is subject to personal jurisdiction in Delaware because Avadel has purposely availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being haled into court in Delaware. Avadel is a limited liability company organized and existing under the laws of the State of Delaware. On information and belief, Avadel manufactures, markets, imports, offers for sale, and/or sells drug products throughout the United States, including within the State of Delaware and, therefore, transacts business within the State of Delaware related to Plaintiff's claims, and/or has engaged in systematic and continuous business contacts within the State of Delaware.

**ANSWER**:  Avadel admits it is a limited liability company organized and existing under

the laws of the State of Delaware.  The remaining allegations in Paragraph 6 state legal conclusions

to which no response is required.  Except as otherwise admitted, the allegations are denied as

stated.

7.     On information and belief, Avadel is registered to do business in Delaware (business identification number 7734658) and has appointed Corporate Creations Network Inc., located at 3411 Silverside Road, Tatnall, Building, Suite 104, Wilmington, Delaware 19810, as its registered agent for the receipt of service of process.

**ANSWER**:  Avadel admits it is registered to do business in the State of Delaware and has

appointed Corporate Creations Network Inc., located at 3411 Silverside Road, Tatnall Building,

Suite 104, Wilmington, Delaware 19810, as its registered agent for the receipt of service of

process.  Except as otherwise admitted, the allegations are denied as stated.

8.     On information and belief, by virtue of, inter alia, Defendant's continuous and systematic contacts with Delaware, and Defendant's actions in connection with NDA No. 214755, this Court has personal jurisdiction over Defendant. These activities satisfy due process and confer personal jurisdiction over Defendant consistent with Delaware law.

**ANSWER**:  The allegations in Paragraph 8 state legal conclusions to which no response is

required.  To the extent a response is required, Avadel does not dispute that it is subject to personal

jurisdiction in Delaware for purposes of this action only.  Avadel denies the remaining allegations in Paragraph 8.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1400(b).

**ANSWER**:  The allegations in Paragraph 9 state legal conclusions to which no response is required.  To the extent a response is required, Avadel does not challenge venue for purposes of this action only.  Avadel denies the remaining allegations in Paragraph 9.

### THE PATENT-IN-SUIT

10.     On May 20, 2014, the USPTO duly and lawfully issued the '963 patent entitled, "Sensitive Drug Distribution System and Method." A copy of the '963 patent is attached hereto as Exhibit A.

**ANSWER**:  Avadel admits that the USPTO issued the '963 patent on May 20, 2014, and that the patent is entitled "Sensitive Drug Distribution System and Method."  Avadel admits that Exhibit A appears to be a copy of the '963 patent.  Avadel denies that the '963 patent was duly and lawfully issued.  Avadel denies the remaining allegations in Paragraph 10.

### THE XYREM DRUG PRODUCT

11.     Jazz Pharmaceuticals holds an approved NDA under Section 505(a) of the Federal Food Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. § 355(a), for sodium oxybate oral solution (NDA No. 21-196), which it sells under the trade name XYREM®. The claims of the patent-in-suit cover, *inter alia,* methods of use of sodium oxybate. Jazz Pharmaceuticals owns the patent-in-suit.

**ANSWER**:  On information and belief, Avadel states that Jazz is the purported holder of NDA No. 21-196 for sodium oxybate oral solution.  On information and belief, the product that is the subject of NDA No. 21-196 is marketed under the trade name XYREM.  The remaining allegations in Paragraph 11 state legal conclusions to which no response is required.  To the extent a response is required, Avadel refers to the patent-in-suit for its contents and denies any allegations inconsistent with those contents.  Avadel lacks sufficient information to form a belief as to whether

5

Jazz owns the patent-in-suit, and notes that Jazz Pharmaceuticals, Inc., is listed on the face of the patent-in-suit. Avadel denies the remaining allegations in Paragraph 11.

12.     Pursuant to 21 U.S.C. § 355(b)(1) and attendant FDA regulations, the patent-in-suit is listed in the FDA publication, "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book"), with respect to XYREM®.

**ANSWER**: Avadel states that the patent-in-suit is listed in the FDA publication Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book"), with respect to XYREM. Avadel denies that the patent-in-suit is listed properly pursuant to 21 U.S.C. § 355(b)(1) and attendant FDA regulations. Avadel denies the remaining allegations in Paragraph 12.

## ACTS GIVING RISE TO THIS SUIT

13.     Pursuant to Section 505 of the FFDCA, Avadel filed NDA No. 214755 ("Avadel's NDA") seeking approval to engage in the commercial manufacture, use, sale, offer for sale, or importation of 4.5 g, 6 g, 7.5 g, and 9 g packets of sodium oxybate oral solution ("Avadel's Proposed Product"), before the patent-in-suit expires.

**ANSWER**: Avadel admits that it filed an NDA pursuant to Section 505(b)(2) of the FFDCA seeking approval to engage in the commercial manufacture, use, sale, offer for sale, or importation into the United States of LUMRYZ, a once-nightly formulation of sodium oxybate for the treatment of cataplexy and excessive daytime sleepiness in adults with narcolepsy. Avadel admits that the patent-in-suit has not yet expired. Avadel denies the remaining allegations in Paragraph 13.

14.     On information and belief, in connection with the filing of its NDA as described in the preceding paragraph, Avadel has provided a written certification to the FDA, as called for by Section 505 of the FFDCA, 21 U.S.C. § 355(b)(2)(A)(iv) ("Avadel's Paragraph IV Certification"), alleging that the claims of the patent-in-suit are invalid, unenforceable, and/or will not be infringed by the activities described in Avadel's NDA.

**ANSWER**: Avadel admits that it has provided a written certification to the FDA, as described by Section 505 of the FFDCA, 21 U.S.C. § 355(b)(2)(A)(iv), but denies that the FFDCA requires the written certification. Avadel refers to that certification for its contents and denies any

6

allegations inconsistent with those contents.  Avadel denies the remaining allegations in paragraph

14.

15.     No earlier than June 7, 2022, Jazz Pharmaceuticals received written notice of Avadel's Paragraph IV Certification ("Avadel's Notice Letter") pursuant to 21 U.S.C. § 355(b)(3). Avadel's Notice Letter alleged that the claims of the patent-in-suit are invalid and/or will not be infringed by the activities described in Avadel's NDA. Avadel's Notice Letter also informed Jazz Pharmaceuticals that Avadel seeks approval to market Avadel's Proposed Product before the patent-in-suit expires.

**ANSWER**:  Avadel admits that on June 6, 2022, Avadel sent written notice of its Paragraph

IV Certification Amendment to Jazz Pharmaceuticals.  Avadel refers to its Notice Letter for its

contents and denies any allegations inconsistent with those contents.  Avadel denies the remaining

allegations in Paragraph 15.

## COUNT FOR INFRINGEMENT OF THE '963 PATENT

16.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as though fully set forth herein.

**ANSWER**:  Avadel incorporates its responses to the allegations in Paragraphs 1-15 as if

fully set forth in this paragraph.

17.     Avadel's submission of its NDA to obtain approval to engage in the commercial manufacture, use, sale, offer for sale, or importation of sodium oxybate oral solution, prior to the expiration of the '963 patent, constitutes infringement of one or more of the claims of that patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER**:  Denied.

18.     There is a justiciable controversy between the parties hereto as to the infringement of the '963 patent.

**ANSWER**:  Avadel admits that there is an actual case or controversy between Jazz and

Avadel but denies that Jazz's allegations are valid or sustainable.  Avadel denies the remaining

allegation in Paragraph 18.

19.     Unless enjoined by this Court, upon FDA approval of Avadel's NDA, Avadel will infringe the '963 patent under 35 U.S.C. § 271(a) by making, using, offering to sell, importing, and/or selling Avadel's Proposed Product in the United States.

**ANSWER**:  Denied.

20.     Unless enjoined by this Court, upon FDA approval of Avadel's NDA, Avadel will induce infringement of the '963 patent under 35 U.S.C. § 271(b) by making, using, offering to sell, importing, and/or selling Avadel's Proposed Product in the United States. On information and belief, upon FDA approval of Avadel's NDA, Avadel will intentionally encourage acts of direct infringement with knowledge of the '963 patent and knowledge that its acts are encouraging infringement.

**ANSWER**:  Denied.

21.     Unless enjoined by this Court, upon FDA approval of Avadel's NDA, Avadel will contributorily infringe the '963 patent under 35 U.S.C. § 271(c) by making, using, offering to sell, importing, and/or selling Avadel's Proposed Product in the United States. On information and belief, Avadel has had, and continues to have, knowledge that Avadel's Proposed Product is especially adapted for a use that infringes the '963 patent and that there is no substantial noninfringing use for Avadel's Proposed Product.

**ANSWER**:  Denied.

22.     Jazz Pharmaceuticals will be substantially and irreparably damaged and harmed if Avadel's infringement of the '963 patent is not enjoined.

**ANSWER**:  Denied.

23.     Jazz Pharmaceuticals does not have an adequate remedy at law.

**ANSWER**:  Denied.

24.     This case is an exceptional one, and Jazz Pharmaceuticals is entitled to an award of its reasonable attorneys' fees under 35 U.S.C. § 285.

**ANSWER**:  Denied.

## JAZZ'S PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(A)     A judgment that Avadel has infringed the patent-in-suit by submitting NDA No. 214755;

8

(B)     A judgment that Avadel has infringed the patent-in-suit, and that Avadel's making, using, selling, offering to sell, or importing Avadel's Proposed Product will infringe one or more claims of the patent-in-suit;

(C)     An order that the effective date of FDA approval of NDA No. 214755 be a date no earlier than the later of the expiration of the patent-in-suit, or any later expiration of exclusivity to which Plaintiff is or becomes entitled;

(D)     Preliminary and permanent injunctions enjoining Avadel and its officers, agents, attorneys, and employees, and those acting in privity or concert with them, from making, using, selling, offering to sell, or importing Avadel's Proposed Product until after the expiration of the patent-in-suit, or any later expiration of exclusivity to which Plaintiff is or becomes entitled;

(E)     A permanent injunction be issued, pursuant to 35 U.S.C. § 271(e)(4)(B), restraining and enjoining Avadel, its officers, agents, attorneys and employees, and those acting in privity and/or concert with them, from practicing any methods as claimed in the patents-in-suit, or from actively inducing or contributing to the infringement of any claim of the patent-in-suit, until after the expiration of the patent-in-suit, or any later expiration of exclusivity to which Plaintiffs are or become entitled;

(F)     A declaration that the commercial manufacture, use, sale, or offer for sale, and/or importation into the United States of Avadel's Proposed Product will directly infringe, induce, and/or contribute to infringement of the patent-in-suit;

(G)     To the extent that Avadel has committed any acts with respect to the methods claimed in the patent-in-suit, other than those acts expressly exempted by 35 U.S.C. § 271(e)(1), that Plaintiffs be awarded damages for such acts;

(H)     If Avadel engages in the commercial manufacture, use, or offer for sale, or importation into the United States of Avadel's Proposed Product prior to the expiration of the patent-in-suit, a Judgment awarding damages to Plaintiffs resulting from such infringement, together with interest;

(I)     Attorneys' fees in this action as an exceptional case pursuant to 35 U.S.C. § 285;

(J)     Costs and expenses in this action; and

(K)     Such further and other relief as this Court may deem just and proper.

**ANSWER:** Paragraphs (A)-(K) set forth Jazz's prayer for relief to which no response is required.  To the extent that responses to these paragraphs are required, Avadel denies any allegations set forth therein and denies that Jazz is entitled to any relief, including a permanent injunction pursuant to 35. U.S.C. § 271(e)(4)(B) as, *inter alia*, Jazz is not entitled to relief under said provision.

## DEFENSES

Subject to the responses above, on information and belief, Avadel alleges and asserts at least the following defenses in response to Jazz's allegations, undertaking the burden of proof only

9

as to those defenses deemed affirmative defenses by law, regardless of how such defenses are named herein.  In addition to the defenses described below, subject to the responses above, Avadel specifically reserves all rights to allege additional defenses that are not required to be pleaded or that become known through the course of discovery.

### FIRST DEFENSE
### (Non-Infringement)

25.     Avadel has not infringed, does not directly or indirectly infringe (either by induced infringement or contributory infringement), and upon approval of the NDA for LUMRYZ, will not infringe any valid, enforceable, asserted claim of the '963 patent, either literally or under the doctrine of equivalents, or under any theory of infringement.

### SECOND DEFENSE
### (Invalidity)

26.     Each of the asserted claims of the '963 patent is invalid for failure to comply with one or more conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103, 112, 115, and/or 116.

### THIRD DEFENSE
### (Failure to State A Claim Upon Which Relief Can Be Granted)

27.     Jazz's Complaint fails to state a claim upon which relief can be granted.

### FOURTH DEFENSE
### (Patent Misuse)

28.     By its conduct, Jazz has engaged in patent misuse by asserting infringement claims it knows or should have known are meritless.

### FIFTH DEFENSE
### (No Willfulness)

10

29.     Jazz is barred from seeking and/or obtaining a finding of willfulness or receiving enhanced damages because Jazz has failed to allege Avadel engaged in any willful infringement or reprehensible conduct and Avadel has engaged in no such conduct, which is a prerequisite for a finding of willfulness and an award of enhanced damages.

### SIXTH DEFENSE
### (Attorneys' Fees)

30.     Jazz has failed to state facts sufficient to support an award of attorneys' fees.

### SEVENTH DEFENSE
### (Limitations on Costs)

31.     To the extent that Jazz prevails on any of its allegations, its demand for costs is limited or barred pursuant to 35 U.S.C. § 288 because the claims of the patent-in-suit are invalid.

### EIGHTH DEFENSE
### (Improper Orange Book Listing)

32.     Jazz's infringement claims brought pursuant to the Hatch-Waxman Statute are improper, including because Jazz is not entitled to any relief under that Statute, including a permanent injunction pursuant to 35 U.S.C. § 271(e)(4)(B), at least because the patent-in-suit is improperly listed in the Orange Book.

### NINTH DEFENSE
### (Other Defenses)

33.     Avadel reserves the right to supplement or amend this Answer and reserves all defenses set out in Rule 8(c) of the FEDERAL RULES OF CIVIL PROCEDURE, the Patent Laws of the United States, and any other defenses, at law or in equity, which become applicable during the course of discovery or otherwise in the course of litigation.

11

## AVADEL'S COUNTERCLAIMS

34.     Avadel's Counterclaims arise under the Patent Laws of the United States, 35 U.S.C. § *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, pursuant to which Avadel brings causes of action based on Jazz's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

35.     This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1337, and 1338.

36.     Jazz is subject to general and specific personal jurisdiction in this judicial district based upon its purposeful, systematic, and continuous contacts with the State of Delaware, including due to its sale and offer for sale of the oxybate products to customers within the state, its decision to maintain an office, and its previous registration to do business in the state.

37.     Jazz's decision to file this case in the United States District Court for the District of Delaware for Avadel's purported infringement of the '963 patent further subjects Jazz to specific personal jurisdiction in this judicial district.

38.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

39.     Counterclaim-Plaintiff Avadel CNS Pharmaceuticals, LLC ("Avadel") is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.

40.     On information and belief, Counterclaim-Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business sat 3170 Porter Drive, Palo Alto, California 94304.

12

## PRELIMINARY STATEMENT

41.     Jazz Pharmaceuticals, Inc. filed this case as yet another step in its unlawful scheme to protect its monopoly.  For seventeen years, Jazz has repeatedly shielded its oxybate drugs from competition using various exclusionary methods and, in particular, by manipulating the regulatory and litigation apparatuses.  As a result, over 100,000 Americans with narcolepsy are suffering from cataplexy and excessive daytime sleepiness ("EDS") have long been bereft of choice.  Using unsavory practices, Jazz has fended off numerous attempts for others to gain approval for and market competitive versions of its oxybate drug, XYREM.  Its signature move is to abuse the FDA's approval process.  To that end, and in order to erect as many roadblocks as possible to timely approval by the FDA of competing products, Jazz has improperly listed in the Orange Book patents that it says relate to the Risk Evaluation and Mitigation Strategy (REMS) for XYREM. And now that generic competition is finally on the horizon, Jazz is scrambling to switch as many XYREM patients as possible to its new, mixed salts formulation, XYWAV.

42.     The mortal competitive threat facing Jazz's oxybate monopoly, however, is not generic entry.  It is Avadel, which has achieved what Jazz never could—successful development of a clinically proven, once-nightly oxybate formulation, named LUMRYZ, that patients with narcolepsy suffering from EDS or cataplexy need take just once, right before bed.  By contrast, any patient taking XYREM or XYWAV must take a first nightly dose just before going to bed and set an alarm to forcefully awaken in the middle of the night to take a second dose.  Analysts and industry observers have thus characterized LUMRYZ as "Jazz Pharmaceuticals' Worst Nightmare" and "not just . . . a competitor but [a drug that] could displace XYREM's market share completely."  This is no surprise.  The requirement that a person suffering from a sleeping disorder set an alarm for, say, 2:00 or 3:00 a.m.—every night—or else miss a necessary dose and suffer the

13

consequences is antithetical to the precept of a restful night's sleep.  And there are safety issues to Jazz's twice-nightly oxybate products.  Patients may forget how many doses they have taken resulting in incidents of double dosing, or a child or roommate might drink or divert a previously prepared dose left by the side of the bed.  Because once-nightly LUMRYZ presents none of these drawbacks, physicians and patients recognize it as a game-changer.  *See, e.g.,* Alex Keown, *Jazz's Toehold on Sleep Market Slips with Tentative Avadel FDA Approval*, BIOSPACE (Jul. 20, 2022).

43.     Jazz has endeavored to snuff out competition from Avadel.  To that end, Jazz has abused the FDA's regulatory drug approval process by improperly listing in the Orange Book U.S. Patent No. 8,731,963 (the '963 patent), which does not claim XYREM's active pharmaceutical ingredient, formulation, or an approved method of using XYREM (or indeed, any method at all). It merely claims a distribution system, and thus cannot—as a matter of black-letter law—be listed in the Orange Book.  And Jazz has maintained that improper listing over the pertinent time period.

44.     By taking these steps, Jazz erected a regulatory barrier to Avadel's ability to secure timely FDA approval for LUMRYZ.  The net result is that Jazz has delayed competition from Avadel by at least one and a half years.  And, as the coup de grâce, Jazz filed this lawsuit in order to trigger an automatic stay that prevents the FDA from granting final approval to Avadel's superior product.  Unless the Court acts on Avadel's pending motion for judgment on the pleadings, that stay presumptively will not expire until the expiration of the '963 patent.

45.     Jazz's unlawful actions do not merely have commercial consequences.  Real people are suffering as a result.  Avadel frequently hears from prospective patients who are desperate to get LUMRYZ as soon as they can, including patients who have trouble waking to take the second dose of XYREM.  These patients' lives are being disrupted and put at risk without access to a

14

treatment that works for them.  These patients will not be able to get LUMRYZ this year because, absent urgent action by this Court, Jazz has made that impossible.

46.     The facts behind Jazz's exclusionary conduct are undisputable, and the law is clear. Jazz is a monopolist.  According to Jazz's own 2021 10-K, "Xywav and Xyrem are currently the only products approved by FDA and marketed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy[.]"  As Jazz's CEO observed in 2010 with respect to XYREM, "[w]e do think we have substantial pricing power still in the product.  It is a unique product.  There is nothing else that does what it does.  There is no substitute."  He was equally blunt a year later, "There's really no competition."  In the decade since, nothing has changed.  Jazz's market dominance remains undisturbed.

47.     Jazz's bottom line hinges on XYREM and XYWAV, which accounted for over $1.8 billion (or over a third) of the company's total revenues in 2021.  Until it took significant steps to diversify its revenue base, Jazz's financial fortunes were even more closely tied to oxybate. As recently as 2018, XYREM represented 75% of Jazz's net product sales.  Thus, Jazz has an overwhelming incentive to protect its golden goose.

48.     Jazz is particularly concerned about competition from Avadel.  Jazz warned its investors earlier this year that "Xywav and Xyrem may face competition in the future from other new sodium oxybate formulations for the treatment of narcolepsy.  In February 2021, FDA accepted for filing an NDA submitted by Avadel Pharmaceuticals plc, or Avadel, for an extended-release formulation of sodium oxybate which uses its proprietary technology for the treatment of EDS and cataplexy in patients with narcolepsy . . . . [I]n any event, we expect to face competition from Avadel, if its product candidate is approved."

49. Jazz has successfully blocked all attempted entry to date, despite the fact that XYREM was first approved twenty years ago. As Jazz recently told its investors, "[W]e have settled all patent litigation against the nine companies that filed ANDAs" challenging "our U.S. patents for Xyrem." Notably, it has achieved this exclusion despite a 2018 decision by the Federal Circuit that affirmed the invalidation of a host of REMS patents related to the '963 patent and asserted by Jazz in defense of XYREM. *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347 (Fed. Cir. 2018). As a result of these settlements with generic competitors, there will be no generic entry for XYREM until at least 2023. And, even then, the only possible generic entry would entail a limited number of "authorized generics." Indeed, full generic entry may not occur until 2026. Even this prospect of competition is too much for Jazz, accustomed as it is to having an unchallenged monopoly. It is taking steps now to limit the effect of potential future generic competition on its monopoly by transitioning as many of its patients as possible to its other oxybate drug, XYWAV.

50. A favorite exclusionary tactic employed by Jazz is to list patents claiming a REMS distribution system in the Orange Book. In 2010, for example, Roxane Laboratories sought marketing approval from the FDA for a generic version of XYREM. But Jazz frustrated that entry by listing three REMS patents in the Orange Book and subsequently filing a complaint under the Hatch-Waxman Act in order to obtain an automatic stay under 21 U.S.C. § 355(j)(5)(B)(iii). In response to that anticompetitive conduct, in late 2010, Roxane filed a pleading alleging that Jazz's REMS "patents have all been listed in the Orange Book relating to Plaintiff's XYREM drug product, thereby improperly serving to block or delay approval of Roxane's ANDA[.]" Case No. 10-cv-6108-ES-JAD, D.I. 10. Shortly afterward, Jazz settled with Roxane by offering an entry

16

date in January 2023 for sales of Jazz's XYREM product as an authorized generic, once again denying consumers the benefits of timely competition.

51.     Contrary to Jazz's listing practices, a company may only file a drug-substance, drug-product, or method-of-use patent in the Orange Book—not a patent that claims a method of (or system for) *distributing* a drug.   Specifically, the applicable statute requires a drug manufacturer to list in the Orange Book "each patent . . . that (I) *claims the drug* for which the applicant submitted the application and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or (II) *claims a method of using such drug* for which approval is sought or has been granted in the application[.]"   21 U.S.C. § 355(b)(1)(A)(viii)(II) (emphasis added).  As set forth *infra*, the de-listing statute, 21 U.S.C. § 355(c)(3)(D)(ii)(I), requires de-listing of a patent that, like the '963 patent, fails to claim a drug or an approved method of using the approved drug product.

52.     In particular, Jazz's '963 patent expressly claims a "computer-implemented system[.]"  Hence, the patent does not claim a drug or method of using a drug.  Jazz admitted as much in its own proposed claim construction, which asserts that the '963 patent claims are directed to "*methods of using a computer-implemented system* to safely distribute gamma-hydroxybutyrate for treatment of a narcoleptic patient[.]"  C.A. No. 21-691, D.I. 118 at 6-7.

53.     Jazz nevertheless listed the '963 patent in the Orange Book and maintained that listing over the pertinent time period, with a use code improperly representing the '963 patent as claiming a "method of treating a patient with a prescription drug using a computer database in a computer system for distribution[.]"   The FDA's role here is purely ministerial; it does not undertake any review of whether a patent is properly listed in the Orange Book or whether the use code provided accurately represents the listed patent claims.

17

54.     On August 8, 2019, Avadel submitted a patent listing dispute regarding the '963 patent to the FDA pursuant to the agency's patent listing dispute regulations at 21 C.F.R. § 314.53(f).  In that submission, Avadel explained that the '963 patent claims were directed to "a system" and not a method and that the '963 patent was therefore improperly listed in the Orange Book.  The FDA thereafter provided Avadel with Jazz's response, which recited Jazz's refusal to delist the '963 patent or to correct the erroneous use code allegedly describing same.

55.     Jazz's listing and maintenance of the '963 patent in the Orange Book have delayed the FDA's final decision on approval of Avadel's NDA for LUMRYZ by over a year, already. Avadel filed the NDA for LUMRYZ on December 15, 2020.  By agreement with Avadel, the FDA set an initial review completion deadline of October 15, 2021.  Instead of resolving Avadel's NDA, however, the FDA in September 2021 inquired about the '963 patent and associated use code in the Orange Book.  Long after the October 2021 deadline, the FDA concluded on May 24, 2022, that Avadel had to file a certification for the '963 patent.  Were it not for Jazz's decision to initially list the '963 patent and to maintain that listing in the Orange Book even after Avadel's patent listing dispute, the FDA likely would have approved the NDA for LUMRYZ by October 15, 2021.

56.     Finally, Avadel filed its Paragraph IV certification under protest on June 6, 2022, after which Jazz filed the complaint in this case, thus triggering an automatic stay on the FDA's ability to approve Avadel's NDA.

57.     These facts present a clear-cut violation of U.S. antitrust law.  Were it not for Jazz's decision to wrongfully list and maintain the '963 patent in the Orange Book, Avadel would have launched LUMRYZ by April 2022.  Absent prompt action by this Court, Jazz's conduct has delayed—and will continue to delay—Avadel's entry from April 2022 until at least the third quarter of 2023.  Among the counterclaims below, Avadel brings causes of action under Sections

18

4 and 16 of the Clayton Act based on Jazz's unlawful monopolization and attempted monopolization in violation of Section 2 of the Sherman Act.

58.     This case warrants the Court's most urgent attention.  Each day that passes without the '963 patent being delisted from the Orange Book means that patients with narcolepsy have to wait even longer for a superior treatment.  Avadel continues to receive a host of urgent messages from real people suffering from this disease, asking when LUMRYZ will be available.  Absent relief from this Court, the statutorily mandated stay triggered by Jazz's assertion of the '963 patent will prevent Avadel from obtaining final FDA approval of its NDA for LUMRYZ until the expiration of the '963 patent in June 2023.  Given that it cannot complete many preparations for launching LUMRYZ, which must be distributed under a REMS, until after it receives final FDA approval, Avadel does not now expect to launch LUMRYZ until the third quarter of 2023 unless this Court grants expeditious relief.

## STATEMENT OF FACTS

### I.     Avadel Has Developed an Unprecedented, Superior Drug for Treating EDS and Cataplexy in Patients with Narcolepsy

59.     Approximately one out of every 2,000 Americans, and many more people around the world, suffer from narcolepsy—a chronic sleep disorder that causes, among other symptoms, overwhelming bouts of drowsiness ( EDS) and sudden loss of muscle control (cataplexy).  No known cure exists for this disease, which wreaks havoc on people's lives.  EDS causes people to experience difficulty maintaining attention and focus (e.g., brain fog) and staying awake and alert, no matter what they are doing or where they are.  Cataplexy is a likewise frightening condition; its symptoms occur unpredictably and range from slurred speech to a sudden loss of muscle control.

60.     For nearly twenty years, only a single, FDA-approved drug existed for patients with narcolepsy suffering from EDS and cataplexy–oxybate.  Launched in 2002 by Orphan Medical,

Inc. under the brand name XYREM, the drug is believed to work by suppressing central nervous system responses.  It is a prescription medication that cannot be purchased at retail pharmacies. On account of its susceptibility to diversion, misuse, and abuse (oxybate can be used as a date rape drug), the FDA requires that it be distributed exclusively through a restricted distribution program known as a REMS.

61.     Jazz neither invented XYREM nor played any role whatsoever in bringing XYREM to market.  Rather, Jazz bought Orphan Medical, Inc.—and, with it, XYREM—for $122.6 million in 2005.  From the outset, Jazz engaged in an aggressive monetization strategy premised on steadily raising the price of XYREM, while doing everything possible to foreclose any generic version of XYREM or the introduction of any other competitive oxybate formulation.  Today, the typical patient and any associated insurer must pay significantly over $10,000 per month for XYREM or Jazz's newer oxybate drug product, XYWAV.  Jazz has earned well over a billion dollars in revenue from selling its oxybate products for each of the past 6 years.  Last year, sales of XYREM and XYWAV amounted to more than $1.8 billion, an amount that currently represents over a third of the company's total revenues.

62.     For all of XYREM's success, however, the drug brings significant drawbacks for patients.  XYREM, like its recently introduced mixed salts version, XYWAV, is a twice-nightly oxybate formulation.  Jazz's branded oxybate drug products are oral solutions that must be taken at night in two doses.  Patients must take one dose at bedtime and forcefully awaken 2.5 to 4 hours later to take a second dose.  This is a terrible hardship for patients whose signature malady is sleep disruption.  Even when the drug otherwise works well, users are denied a full night's sleep, every single night.  If a user fails to take a second dose, Jazz's oxybate products will not deliver the necessary relief against EDS and cataplexy.  Moreover, XYREM and XYWAV bring significant

20

dangers.  For example, if users take a second dose too early either due to mistake or inability to remember when they took their first dose, it can result in serious harm like respiratory depression. If patients take their second dose too late, it can result in a hangover effect and impairment the next day.  Further, because XYREM and XYWAV are formulated as clear liquids, they may endanger children, roommates, and/or pets if not safely and securely stored, as can happen if a user leaves a second dose by the bed in an unsecured container.

63.     The narcolepsy community has been desperately demanding a better product, in particular a once-at-bedtime oxybate formulation that would not require the dreaded middle-of-the night alarm, disrupting the sleep of the patient and loved ones.  Avadel has answered that call.

64.     Flamel Technologies S.A. ("Flamel"), the predecessor company to what is now Avadel's parent company, Avadel Pharmaceuticals, plc, developed the proprietary drug-delivery technology used in its once-nightly oxybate formulation, previously known as FT218, for a single dose before bedtime for patients suffering from narcolepsy, obviating the need for a second dose in the middle of the night as Jazz's oxybate drugs require.  Flamel published the results of its first-in-man (FIM) clinical study in healthy volunteers in April 2014, demonstrating that patients could potentially forgo a second, middle-of-the-night dose with FT218.   Another clinical study, published in December 2014, provided further confirmation.  Recognizing the dramatic patient benefits associated with a single-dose solution, Avadel moved with all possible haste toward securing regulatory approval for FT218, a once-nightly formulation of oxybate for the treatment of EDS and cataplexy in patients suffering from narcolepsy.

65.     To that end, on March 31, 2016, Avadel submitted a Special Protocol Assessment (SPA) to the FDA, subsequently agreeing with the agency about the design, endpoints, and analyses of the Phase 3 clinical trial for FT218.

66.     In December 2016, Avadel began enrolling patients for the pivotal clinical trial for FT218.  The "REST-ON" (Randomized study Evaluating the efficacy and SafeTy of a Once Nightly formulation of oxybate) trial was a double-blind, randomized, placebo-controlled, two-arm, multicenter, Phase 3 clinical trial evaluating FT218.  Enrolling 212 patients in clinical sites in North America, Western Europe, and Australia, the clinical trial assessed FT218's safety and efficacy for the once-nightly treatment of EDS and cataplexy in patients with narcolepsy.  Avadel announced positive top-line data from the REST-ON trial on April 27, 2020.

67.     Prior to completion of the REST-ON study, in January 2018, Avadel announced that the FDA had granted Orphan Drug Designation to FT218 on the plausible hypothesis that it may be clinically superior to the then only other approved oxybate product, Jazz's XYREM, because FT218 "may be more safe due to the ramifications associated with the dosing regimen for [XYREM] in treating patients with narcolepsy."  The FDA grants Orphan Drug Designations to advance drug development for rare diseases.

68.     On December 16, 2020, Avadel announced the submission of its new drug application (NDA) for FT218 to the FDA.  On February 26, 2021, the FDA notified Avadel that it had formally accepted the NDA with an assigned Prescription Drug User Fee Act or PDUFA target action date of October 15, 2021.

69.     In 2020 and afterward, in light of positive results from its Phase 3 clinical trial of FT218 and ensuing NDA submission to the FDA, Avadel widely proclaimed its intent to market FT218 as soon as possible—what became LUMRYZ.

## II.     Jazz Reacted with Alarm to an Existential Threat Posed by Avadel's Superior Oxybate Drug

70.     Jazz saw, and continues to see, Avadel's NDA submission to the FDA for LUMRYZ as an existential threat.

71.     On April 7, 2014, Flamel first announced favorable results from its FIM clinical study for FT218.  This development marked a serious competitive threat to Jazz's oxybate monopoly.  An article published in June 2014 aptly captured the significance of Flamel's single-dose product.  Titled, *Is This Jazz Pharmaceuticals' Worst Nightmare?*, it noted that a "serious rival formulation is showing promise in clinical trials."  It continued, "Little-known French biopharma Flamel Technologies has been busy developing an alternative treatment for narcolepsy based on its Micropump technology.  Presently, Xyrem is dosed in two stages each night: once before bed time and again 2.5 to 4 hours later.  What this means is that you may have to wake up to take the second dose, interrupting nighttime sleep.  The goal of Flamel's Micropump approach is to deliver a dose of oxybate (Xyrem) in a manner that would allow it to be taken only once. Although the company is still in the early stages of developing this technology, Flamel believes it could push it into a registration study by 2015. . . .  Jazz shareholders should definitely keep a keen eye on this device as it progresses in clinical studies."

72.     Jazz listed the '963 patent in the Orange Book on May 30, 2014—less than two months after Flamel announced the successful study for FT218.

73.     The competitive threat posed by Flamel/Avadel grew with each passing year, as the company cleared successive regulatory hurdles, while Jazz's efforts to develop a once-per-night version of XYREM failed.  Indeed, in May 2015, Jazz announced that it had abandoned efforts to develop an extended-release version of its oxybate formulation.  Meanwhile, Flamel/Avadel pressed ahead.

74.     An analyst commented in March 2016, "Jazz's valuable XYREM franchise is at a big risk because of a looming competitive branded threat from Flamel Technologies," not least because "Jazz has been unable to develop its own extended-release formula for XYREM."  Given

23

that it "would only require a single dose before bedtime," the author predicted that Flamel "could not just be a competitor but could displace XYREM's market share completely."

75.     Indeed, Avadel's FT218 product posed such an acute risk to XYREM that Jazz could not hide the danger from its investors.  In its 2017 10-K, for example, Jazz warned, "If Avadel is successful in developing a[n] oxybate formulation that could be effectively used with its delivery technology and is able to obtain FDA or other regulatory approval for its product to treat patients with narcolepsy, we expect the launch of such a product would compete directly with Xyrem and could have a material adverse effect on our business, financial condition, results of operations and growth prospects."

76.     Most recently, in its 2021 10-K, Jazz again underscored the threat posed by Avadel's superior, once-nightly oxybate product, warning investors that "Avadel will have to show clinical superiority to Xywav and Xyrem," implying that it would petition the FDA against such claims of superiority, and concluding that, "in any event, we expect to face competition from Avadel, if its product candidate is approved."

## III.     Jazz Manipulated the FDA's Regulatory, Drug-Approval Process in Order to Delay Approval of LUMRYZ and Other Competitive Drug Products

77.     Any company that wishes to sell a new drug must obtain FDA approval by filing an NDA under the Federal Food, Drug, and Cosmetic Act (FDCA).

78.     Orphan Medical, Inc. filed an NDA for XYREM (oxybate) oral solution with the FDA in October 2000.  As part of that application, and like any other applicant, Orphan Medical, Inc. had to include "the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted [by an licensed person that manufactured, used, or sold] the drug, and that . . . (I) *claims* the drug for which the applicant submitted the application and is *a drug substance (active ingredient) patent or a drug product (formulation or composition)*

24

*patent; or* (II) *claims a method of using such a drug* for which approval is sought or has been granted in the application." 21 U.S.C. §355(b)(1)(A)(viii) (emphasis added).

79.     For any approved NDA, each such patent is listed in the FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*, colloquially known as the Orange Book.  If an NDA holder obtains a new patent that claims the drug or a method of using the drug that is the subject of the NDA, then it must list that patent within 30 days of issuance.  21 U.S.C. § 355(c)(2).

80.     The Orange Book serves a critical function.  It identifies drug products for which the FDA has approved an NDA and that have not been withdrawn for safety or efficacy reasons. Particularly relevant to this antitrust action, it provides information concerning patents that claim the active pharmaceutical ingredient, formulation or composition, or method of using approved drug products.  The statute has always made clear that only those patents—and those patents alone—are to be listed in the Orange Book.  21 U.S.C. § 355(b)(1)(A)(viii), (c)(2).  In particular, there is no statutory or other legal basis to list any patent that claims a method of manufacturing an approved drug product or a system or method for distributing such a drug product.

81.     Improperly listing and maintaining a patent in the Orange Book can have serious, anticompetitive effects.  Under the Hatch-Waxman Act of 1984, a company filing an ANDA or an NDA that implicates a patent listed in the Orange Book for an FDA-approved drug product must file a patent certification.  21 U.S.C. § 355(b)(2)(A).  In particular, a "Paragraph IV certification" that the listed patent is invalid or not infringed by the applicant's drug product creates a cause of action for patent infringement.  21 U.S.C. § 355(c)(3)(C).  If the incumbent NDA holder files a complaint for patent infringement within 45 days of the NDA or ANDA filer's Paragraph IV

certification, then the FDA's ability to authorize the pending NDA or ANDA is stayed for 30 months by operation of law, unless the patent expires or is invalidated first. *Id.*

82.     Critically, the FDA undertakes no review whatsoever as to whether an NDA holder properly listed a patent in the Orange Book or included an appropriate use code describing any such listed patent. This creates strong incentives for brand drug manufacturers to list patents in the Orange Book beyond those claiming the active pharmaceutical ingredient, formulation or composition, or method of using an FDA-approved drug product. Doing so can delay entry by the seller of a competitive drug product by up to two-and-a-half years.

83.     As the Federal Trade Commission explained almost twenty years ago in alleging antitrust violations based on the false and misleading listing of a patent by an NDA holder in the Orange Book:

> The FDA views its role in listing patents in the Orange Book as purely ministerial, because it has neither the expertise nor the resources to resolve complex patent coverage issues. Consequently, the FDA does not scrutinize a party's bases for listing patents in the Orange Book, as long as all the information required by statute has been submitted. Should one company challenge the validity of the NDA holder's Orange Book listing, the FDA requests only that the NDA holder provide written confirmation that the patent is properly listed. . . . Through its wrongful listing in the Orange Book of the '365 patent, BMS illegitimately acquired the ability to trigger a 30-month stay, thereby delaying entry of generic buspirone, and depriving consumers of lower prices and other benefits of competition.

Complaint at 3, 12, *Bristol-Myers Squibb Co.*, 135 F.T.C. 444 (2003) (FTC Dkt. No. C-4076).

84.     The FDA approved Orphan Medical, Inc.'s NDA for XYREM on July 17, 2002. From that point, Orphan Medical, Inc. (acquired by Jazz in 2005) and, later, Jazz could list only those newly issued patents that claimed the drug or a method of using the drug in the Orange Book within 30 days. 21 U.S.C. §355(c)(2).

85.     In August 2012, Jazz filed an application for what would become the '963 patent. The '963 patent, which describes the underlying invention as a "drug distribution system and

26

method [that] utilizes a central pharmacy and database to track all prescriptions for a sensitive drug," claims a "*computer-implemented system* for treatment of a narcoleptic patient with a prescription drug that has potential for misuse, abuse, or diversion[.]" (emphasis added).  The '963 patent was issued on May 20, 2014.  Jazz listed it in the Orange Book ten days later with respect to XYREM.

86.  Despite knowing that the '963 patent does not claim the active pharmaceutical ingredient in XYREM, the formulation or composition of XYREM, or a method of using XYREM, Jazz nevertheless listed and maintained the '963 patent in the Orange Book in contravention of 21 U.S.C. § 355(b)(1)(A), (c)(2).  The '963 patent recites a "computer-implemented system" for distribution of a "drug that has a potential for misuse, abuse, or diversion."  Although there was no basis to list the '963 patent in the Orange Book, Jazz did so because it knew that (a) the FDA would not evaluate the merit of that listing and (b) the listing would likely force any competitors, including Avadel, seeking FDA approval to market a new oxybate drug competitive with XYREM to file a Paragraph IV certification.  At that point, Jazz would merely have to file a patent infringement complaint within 45 days of any such future certification, thus triggering an automatic stay on the FDA's ability to issue final approval.  This is exactly what Jazz did here after Avadel filed a Paragraph IV certification after the FDA's requirement to do so.

87.  The '963 patent claims are directed to a computer-implemented system for distributing a drug, and thus the '963 patent is not properly listed because it does not claim a drug, drug product, or method of using a drug.  But, even if the '963 patent claims somehow fell within one of those listable categories (they clearly do not), the applicable regulations would still require that Jazz, in submitting the '963 patent for listing, "descri[be] each approved method of use and related patent claim of the patent being submitted" and to "identif[y] the specific section(s) and

27

subsection(s) of the approved labeling of the drug product that describes the method of use claimed by the patent." 21 CFR § 314.53(c)(2)(ii)(P).  But, on information and belief, Jazz's REMS for XYREM does not practice any valid claim of the '963 patent.  On March 22, 2017, the Patent Trial and Appeal Board ("PTAB"), an arm of the U.S. Patent and Trademark Office, invalidated certain claims of the '963 patent.  *Amneal Pharm., LLC v. Jazz Pharm., Inc.*, IPR2015-01903, 2017 WL 1096638, at \*1 (Mar. 22, 2017).  The Federal Circuit later affirmed that decision.  *Jazz Pharm. Inc. v. Amneal Pharm., LLC*, 895 F.3d. 1347, 1350 (Fed. Cir. 2018).  Each claim that was not invalidated requires a database capable of at least one of following: (1) identifying that a patient with narcolepsy is a cash payer and using that to notify the physician as an indicator of a potential misuse, abuse, or diversion (the "cash payer limitations"); or (2) reconciling inventory of the prescription drug before the shipments for a given time period are sent (the "inventory reconciliation limitations.").  The fact that the '963 patent requires hardware and a database for purposes of the cash payer or inventory reconciliation limitations further demonstrates that the '963 patent does not cover any "approved use" as required to avoid de-listing.  *See* Michael J. Strunc *et al.*, *The XYREM® (Sodium Oxybate) Risk Evaluation and Mitigation Strategy (REMS) Program in the USA: Results From 2016 to 2017*, 8 DRUGS – REAL WORLD OUTCOMES 15 (2021) (evaluating Jazz's REMS program and making no mention of either capability).

## IV.    Jazz Filed This Case Pursuant to an Anticompetitive Scheme to Exclude Avadel

88.    In December 2020, Avadel submitted an NDA for LUMRYZ pursuant to Section 505(b)(2) of the FDCA, which provides a streamlined pathway for approval of drugs that are based on the same active ingredient as—but that are not identical to—a previously approved drug.

89.    LUMRYZ will be distributed under a REMS that Avadel has developed on its own. Avadel will not use Jazz's REMS system.  Thus, rather than certifying to the '963 patent, Avadel

28

included in its LUMRYZ NDA a "patent statement" regarding the '963 patent, stating that it does not cover any method of using oxybate for which Avadel seeks approval for LUMRYZ.  As that patent statement explained, Avadel's LUMRYZ labeling describes no method of treating a patient with the drug using a computer system and, so, the LUMRYZ REMS was "materially different" from the '963 REMS patent.

90.     In addition to patent numbers and expiration dates, the Orange Book contains "use codes" submitted by incumbent patent owners to describe the uses covered by their patents.   For the '963 patent, Jazz had submitted a use code listed in the Orange Book describing a "method of treating a patient with a prescription drug using a computer database in a computer system for distribution."  As alleged above, this use code is not aligned with how Jazz has asserted its claims should be interpreted during claim construction.

91.     On August 8, 2019, Avadel submitted a patent listing dispute regarding the '963 patent to the FDA pursuant to the agency's patent listing dispute regulations at 21 C.F.R. § 314.53(f).  In that submission, Avadel explained that the '963 patent claims were directed to "a system" and not a method and that the '963 patent was therefore improperly listed in the Orange Book.  The FDA thereafter provided Avadel with Jazz's response, which refused to delist the '963 patent.

92.     With Avadel's agreement, the FDA set its initial review completion deadline for Avadel's LUMRYZ NDA as October 15, 2021.  Just five weeks before the October deadline, however, the FDA requested information from Avadel about its patent statement concerning Jazz's '963 patent.  Avadel provided the requested information on September 16, 2021.

93.     On May 24, 2022, more than seven months after the October 15 deadline, the FDA concluded that Jazz's "use code" for the '963 patent—Jazz's description of the scope of its patent

29

that Jazz submitted into FDA's Orange Book—implicated LUMRYZ's NDA.  The FDA did not make any inquiry, let alone any determination, into whether Jazz had properly listed the '963 patent in the Orange Book for XYREM or whether Jazz's use code was accurate.  Taking Jazz at its word, the FDA ordered Avadel to file a patent certification for the '963 patent as a final agency action, which Avadel did—under protest—on June 6, 2022.  As a result, Jazz's decision to list the '963 patent caused the FDA not to issue a final approval decision regarding the LUMRYZ NDA when the agency would otherwise have done so.  Hence, even before it filed this lawsuit, Jazz wrongly delayed the launch of LUMRYZ by listing the '963 patent and then maintaining that listing.

94.     Within 45 days of Avadel's filing its Paragraph IV certification, on July 15, 2022, Jazz filed this lawsuit against Avadel for alleged infringement of the '963 patent.  The complaint in this case thus triggered an automatic stay, precluding approval of the LUMRYZ NDA until the '963 patent expires and the related term of pediatric exclusivity ends in June 2023.  *See* 21 U.S.C. § 355(c)(3)(C).  Further, demonstrating that it filed this lawsuit purely to trigger the automatic stay on the FDA's ability to approve the LUMRYZ NDA, Jazz did not even bother to serve the complaint on Avadel until September 20, 2022.

## V.     Jazz Has Delayed Avadel's Launch of LUMRYZ

95.     Were it not for Jazz's anticompetitive conduct preventing a final approval decision for LUMRYZ as of the October 15, 2021, PDUFA date, Avadel would have launched LUMRYZ by April 2022.  By listing the '963 patent in the Orange Book and refusing to delist it, Jazz will further delay Avadel's launch of LUMRYZ until the third quarter of 2023 absent relief from this Court.

96.     In May 2021—five months before the FDA's initial review completion deadline in October—Avadel reported to its board, "Currently we believe any long-term (+12 month) launch

delays remain highly unlikely due to clinical data, SPA agreement and overall filing strategy."  In describing its launch plan, Avadel projected that a "successful October 15 PDUFA will trigger our early FT218 launch . . . with product being shipped to patients before the end of April [2022]."  In updating its board in August 2021, Avadel again explained that any long-term launch delays remain highly unlikely.  It projected launching LUMRYZ in mid-March 2022 and shipping product in April 2022.

97.    But for Jazz's decision to improperly list and maintain the '963 patent and associated improper use code in the Orange Book, the FDA would have likely approved Avadel's NDA for LUMRYZ by the deadline of October 15, 2021.  Indeed, the circumstances surrounding the FDA's failure to act by that deadline—in particular, the FDA's questions about the '963 patent and seven-month ensuing delay while the agency figured out how to proceed in light of that patent listing—make clear that the '963 patent's listing and corresponding use code in the Orange Book caused the FDA not to reach its deadline.

98.    LUMRYZ is clinically superior to XYREM and XYWAV on account not only of its greater safety attributes (no second dose left out by the bed, or mis-dosed by patients, or taken by patients at the correct time but causing patients who get up to experience falls or other injuries), but because it represents a major contribution to patient care by virtue of being a once-nightly product.  Moreover, LUMRYZ is not the same drug as Xywav within the meaning of applicable law.  For all these reasons, the FDA will almost certainly grant LUMRYZ final approval notwithstanding XYWAV's orphan-drug exclusivity.  The FDA, however, will not grant final approval while the '963 patent remains listed.  Hence, Jazz's decision to list the '963 patent and refusal to delist it has delayed, and will continue to delay, final approval of LUMRYZ, thus denying consumers the benefits of a superior product and greater competition.

31

99.     The FDA did not approve Avadel's NDA for LUMRYZ by the deadline of October 15, 2021.  Instead, the agency encountered Jazz's '963 patent listing in the Orange Book.  Because the FDA, as a matter of official policy, does not evaluate the propriety of such a listing, the agency accepted it and thus took issue with the patent statement accompanying Avadel's NDA for LUMRYZ.  Jazz, for its part, refused to delist the '963 patent.  And, in response to Avadel's challenge of Jazz's use code for the '963 patent, Jazz refused to change that code, too.  As alleged above, this process resulted in a significant delay and an FDA decision that Avadel had to file a certification to the '963 patent.  Ultimately, the FDA tentatively approved Avadel's NDA for LUMRYZ, pending expiration of the automatic stay triggered by Avadel's Paragraph IV certification, which it filed under protest, and Jazz's subsequent filing of this lawsuit.

100.     Absent urgent action by this Court, the FDA will not be able to finally approve Avadel's NDA for LUMRYZ until the pediatric exclusivity associated with the '963 patent expires in June 2023.  Although Avadel has taken, and continues to take, all possible steps to prepare to launch LUMRYZ as quickly as possible after its NDA obtains final FDA approval, it will realistically take several weeks following the approval date for Avadel to begin shipping LUMRYZ to patients.  Standing up the LUMRYZ REMS will require training doctors and specialty pharmacies, something that can be undertaken only with final FDA approval.  Moreover, because the oxybate in LUMRYZ is a Schedule I drug prior to FDA approval, and LUMRYZ will be manufactured in France, Avadel expects to face challenges importing commercial quantities of the drug before it receives final FDA approval.

101.     Unless it obtains an order delisting the '963 patent in Case No. 21-691 (D.I. 11) and dismisses the claims alleging infringement of the '963 patent in that case and this one, Avadel

32

does not currently expect to launch LUMRYZ until at least the third quarter of 2023—almost 24 months after the original PDUFA date.

## VI.   Jazz Has Monopoly Power in the Relevant Market for the Sale of FDA-Approved Drugs to Treat EDS and Cataplexy in Narcolepsy

102.   Narcolepsy is an orphan disease affecting one out of every 2,000 Americans.  In seeking FDA-approved treatment for their EDS and cataplexy symptoms, patients with narcolepsy have long been bereft of choice.  For almost twenty years, they could look only to Jazz's oxybate product(s).  Through XYREM and XYWAV, which are liquid oxybate formulations that are dosed twice per night, Jazz alone sells FDA-approved, oxybate drugs treating both EDS and cataplexy.

103.   Various non-oxybate drugs, such as stimulants and wakefulness promoting agents (WPAs), exist for treating EDS associated with narcolepsy.  For example, the FDA has approved stimulants like amphetamine and methylphenidate to treat EDS in narcolepsy, as it has WPAs like armodafinil and modafinil.  But none of those drugs is indicated to treat cataplexy in narcolepsy, and so cannot relieve the full array of narcolepsy patients' symptoms.  Moreover, physicians often prescribe stimulants or WPAs alongside oxybate drugs for people suffering from narcolepsy.  For that reason, drugs not indicated for cataplexy in narcolepsy do not act as a competitive constraint on Jazz's pricing of XYREM and XYWAV.

104.   The only FDA-approved drug other than oxybate that is indicated to treat patients suffering from EDS and cataplexy is pitolisant, which is a WPA the FDA approved in 2019 to treat EDS in adults and in 2020 for an adult cataplexy indication in the United States.  But because of pitolisant's wake-promoting properties, it is often prescribed as part of a multi-pharmacy treatment approach in conjunction with oxybate.  Pitolisant, therefore, acts as an economic complement, rather than a substitute, for XYREM or XYWAV.  In particular, a doctor would prescribe XYREM or XYWAV for the patient to take at night as well as pitolisant (or another WPA) for the patient

33

to take in the morning upon awaking.  Sold under the brand name WAKIX® by Harmony Biosciences, pitolisant has not been the object of any head-to-head clinical trial with oxybate and thus lacks evidence of any clinical superiority over what has long been the established, prescribed treatment.  Its timing of use, dosing, and purpose all differ from oxybate.  To that end, as the long-term seller of the only FDA-approved oxybate drug indicated for treating EDS and cataplexy in narcolepsy, Jazz benefits from strong brand recognition in XYREM—which the company is seeking to leverage into demand for its new, mixed salt drug product, XYWAV.

105.    For these and other reasons, neither pitolisant nor any other FDA-approved non-oxybate drugs competitively constrain Jazz in selling oxybate.  Indeed, as Jazz told its investors in an SEC filing earlier this year, "To date, we have not seen a material impact to our business from the introduction of these new market entrants."  In short, no FDA-approved drug or other treatment is currently reasonably interchangeable with oxybate for patients with narcolepsy suffering from both EDS and cataplexy.

106.    Jazz itself has made clear, repeatedly, that there is no substitute—reasonable or otherwise—for its FDA-approved drugs to treat EDS and cataplexy.  In its 2021 10-K, Jazz informed its investors that "Xywav and Xyrem are currently the only products approved by FDA and marketed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy[.]"  And in 2020, in announcing the FDA's approval of XYWAV with respect to treating "both cataplexy and excessive daytime sleepiness in people living with narcolepsy," Jazz observed that oxybate is "a current standard of care for this patient population as designated by the American Academy of Sleep Medicine Guidelines."

107.    Jazz has not always been so restrained in describing its monopoly.  For instance, its CEO observed in 2010 with respect to XYREM, "We do think we have substantial pricing power

34

still in the product.  It is a unique product.  There is nothing else that does what it does.  There is no substitute."  He was equally blunt a year later, "There's really no competition."  More recently, the arrival of successive, though thus far unsuccessful, ANDA filers seeking to market generic versions of XYREM has raised the potential for antitrust scrutiny, likely leading Jazz's CEO to be less strident in describing the company's monopolistic position.

108.   In defining the relevant market, antitrust law sometimes asks whether a hypothetical monopolist of the candidate product market (here, FDA-approved drugs used to treat EDS and cataplexy in narcolepsy) could raise prices by 5% to 10% above the competitive level without suffering a critical loss of sales that would render the attempted price increase unprofitable. The facts here would amply support a relevant product market limited to the sale of FDA-approved, oxybate drugs used to treat EDS and cataplexy in narcolepsy.  Today, Jazz is not a hypothetical monopolist—but an actual monopolist—seller of FDA-approved, oxybate drugs used to treat narcolepsy-related EDS and cataplexy.  It has proven time and again that it can profitably raise prices even beyond its prior, elevated levels.  Indeed, since 2007, Jazz has raised the price of XYREM by more than 1000%.  And, during that time, its revenues and profits have soared to ever-new heights.  Until 2020, XYREM represented around three-quarters of Jazz's total revenue.  Since launching XYWAV in the United States in November 2020 and transitioning as many of its customers as possible from XYREM in order to blunt the anticipated effect of generic versions of XYREM arriving on the market in 2023, Jazz's profits have continued to rise, reaching $992.8 million in 2021 (from $165 million in 2011).

109.   The price that Jazz charges for its oxybate drugs has led to downstream efforts to limit or condition insurance coverage in order to mitigate the rising costs of treatment on a patient population with inelastic demand, providing further evidence of anticompetitive effects flowing

35

from its monopoly power.  In particular, distortions have arisen on account of insurers' and other payors' efforts to minimize the circumstances in which they will cover Xyrem and Xywav treatments, indicating that these drugs are sold at supracompetitive prices.  Indeed, in its 2021 10-K, Jazz conceded that "payors often require patients to try [branded or generic medications for cataplexy] medications before they will cover XYWAV or XYREM, even if they are not approved for this use."  This conditioning indicates a recognition of payors and their insured population's inability to switch away from Jazz's products in the face of steep price increases.

110.    These facts amply support a relevant product market limited to the sale of FDA-approved oxybate drugs for patients with narcolepsy.  In that market, and by its own admission, Jazz has a literal monopoly, with 100% share of sales.  Remarkably, Jazz has preserved that monopoly for almost two decades.

111.    Expanding the relevant product market to include all drugs approved by the FDA to treat patients suffering from narcolepsy-related EDS with or without cataplexy does not change the result.  Jazz has monopoly power in that market, too, accounting for over 90% of sales. Harmony Biosciences Holdings, Inc. reported $305.4 million in revenue for sales of its pitolisant drug WAKIX in 2021, although much of that reported revenue likely represents sales of doses prescribed alongside, rather than as an alternative to, Jazz's oxybate drugs.  Moreover, at the end of 2021, only about 3,800 patients were taking WAKIX—a figure representing less than 10% of Americans taking narcolepsy medications and approximately 2% of the number of Americans estimated to have narcolepsy.  Even within a relevant market of drugs approved by the FDA to treat patients suffering from narcolepsy and cataplexy, and assuming that it were an alternative treatment rather than an adjunct treatment to oxybate, pitolisant would represent at most a distant substitute to Jazz's XYREM and XYWAV products.

112.     Entry barriers into the market for drugs approved by the FDA to treat patients suffering from narcolepsy are significant.  FDA regulatory approval, even in abbreviated form for generic versions of FDA-approved drugs, requires a lengthy and costly process.  It can take years for a pharmaceutical company to launch a competitive drug after deciding to do so.  Moreover, Jazz has a number of patents that it claims cover, for example, distribution systems, various methods of using its oxybate drugs and the formulation of XYWAV.  Although a number of those patents have been declared invalid or found not to have been infringed, Jazz has a long history of aggressively asserting intellectual property of dubious merit in order to deter entry.

113.     The relevant geographic market for drugs approved by the FDA to treat suffering from narcolepsy and cataplexy is the United States.  Because of U.S. law and FDA regulatory requirements, U.S. consumers would not respond to a small, but significant, nontransitory increase in the price of drugs approved by the FDA to treat patients suffering from symptoms of narcolepsy by switching to drugs sold outside of the United States.

## VII.   Avadel Has Suffered Antitrust Injury and Has Standing to Bring Counterclaims

114.     Jazz abused the FDA's regulatory process by improperly listing and maintaining the '963 patent in the Orange Book, actions that caused the FDA to postpone review of Avadel's NDA for LUMRYZ beyond October 15, 2021—the date the FDA set for its initial review completion deadline.  By listing and maintaining the '963 REMS patent, along with an overly broad use code  inconsistent with Jazz's own claim construction of the '963 patent, Jazz ultimately caused the FDA to determine on May 24, 2022, that Avadel had to file a patent certification.  The FDA, as Jazz knew, does not undertake any analysis of whether a patent was properly or improperly listed in the Orange Book or whether Jazz's use code for the '963 patent was correct.

115.    Were it not for Jazz's anticompetitive conduct, Avadel would have likely received a final approval decision from FDA on or by October 15, 2021, and launched LUMRYZ in the United States in April 2022.  LUMRYZ's introduction would have brought desperately needed competition in the sale of oxybate products, breaking up Jazz's monopoly, bringing a superior, once-at-bedtime drug to patients with narcolepsy, and pressuring Jazz to reduce prices in order to preserve sales in the face of competition from a clearly superior product.  As alleged above, scores of people suffering from narcolepsy are desperate for LUMRYZ over the inferior XYREM and XYWAV products.  Indeed, in a recent LUMRYZ trial, 92.5% of switched patients said they preferred dosing once-nightly rather than twice-nightly.

116.    Had Avadel been able to launch LUMRYZ, it would have forced Jazz to reduce prices to attempt to hold onto some market share.  Thus, by delaying the introduction of LUMRYZ until at least the third quarter of 2023, Jazz has caused consumers to suffer a loss of both quality and price competition.

117.    These anticompetitive effects flow directly from the injury that Jazz has inflicted on Avadel.  The listing and maintenance of the '963 patent and associated use code in the Orange Book by Jazz has delayed Avadel's launch of LUMRYZ, denying Avadel hundreds of millions of dollars in revenue.  The cost of this delay is particularly devastating to Avadel as a small company whose principal focus has been on getting LUMRYZ to market as quickly as possible.  On account of Jazz's exclusionary conduct, Avadel had to lay off almost one-half of its workforce during the summer of 2022.  Moreover, Avadel has suffered, and continues to suffer, antitrust injury through the costs and attorneys' fees it must pay in order to (a) defend against the anticompetitive lawsuit Jazz has filed with this action, (b) litigate its delisting counterclaims (D.I. 11) in Case No. 21691 in this Court, and (c) bring APA litigation against the FDA (D.I. 1) in Case No. 222159 with

38

respect to the FDA's final agency action directing Avadel to file a Paragraph IV certification, all of which are the direct result of Jazz's unlawful decision to list and maintain the '963 patent in the Orange Book.

118.    In short, Avadel has suffered injury of the type the antitrust laws were intended to prevent and that flows from the unlawful nature of Jazz's acts.  As the direct victim of Jazz's efforts to exclude competition in the sale of (a) FDA approved oxybate-based drugs for treatment of narcolepsy, and/or (b) FDA-approved drugs to treat patients with narcolepsy and cataplexy, Avadel has standing to bring counterclaims under the antitrust laws.

### Count I:  Declaratory Judgment of Non-Infringement of the '963 Patent

119.    Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

120.    An actual controversy exists between Avadel and Jazz over the alleged infringement of at least one claim of the '963 patent.  Jazz holds itself out as the owner of the '963 patent.  Jazz has filed suit against Avadel alleging that the submission of Avadel's NDA infringes at least claim 1 of the '963 patent in violation of 35 U.S.C. § 271(e).  Jazz has also alleged that the making, using, offering to sell, selling, and/or importation of Avadel's Proposed Product in the United States infringes at least claim 1 of the '963 patent in violation of 35 U.S.C. §§ 271(a), 271(b), and/or 271(c).

121.    The submission of Avadel's NDA does not infringe the '963 patent in violation of 35 U.S.C. § 271(e), either literally or under the doctrine of equivalents.  The making, using, offering to sell, selling, and/or importation of Avadel's Proposed Product in the United States would not infringe any valid claim of the '963 patent in violation of 35 U.S.C. §§ 271(a), 271(b), and/or 271(c), either literally or under the doctrine of equivalents.  Avadel hereby seeks a

declaration that the submission of Avadel's NDA, and the making, using, offering to sell, selling, and/or importation of Avadel's Proposed Product in the United States does not infringe and/or will not infringe any valid claim of the '963 patent.

122.    Avadel has not infringed, is not infringing, and will not infringe any valid claim of the '963 patent, directly, indirectly, by inducement, contributorily, literally, under the doctrine of equivalents, or in any other manner.  A judicial declaration is necessary and appropriate so that Avadel may ascertain its rights regarding the '963 patent.

## Count II:  Declaratory Judgment of Invalidity of the '963 Patent

123.    Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

124.    An actual controversy exists between Avadel and Jazz over the invalidity of the '963 patent.  Jazz has filed suit against Avadel alleging that the submission of Avadel's NDA infringes at least claim 1 of the '963 patent in violation of 35 U.S.C. § 271(e).  Jazz has also alleged that the making, using, offering to sell, selling, and/or importation of Avadel's Proposed Product in the United States infringes at least claim 1 of the '963 patent in violation of 35 U.S.C. §§ 271(a), 271(b), and/or 271(c).

125.    All claims of the '963 patent are invalid because they fail to comply with one or more requirements of the United States Code Title 35, including, without limitation, one or more requirements of 35 U.S.C. §§ 102, 103, 112, 115, and/or 116.  Avadel expressly reserves all rights to identify and assert additional invalidity positions in this case.

126.    Avadel hereby seeks a declaration that the claims of the '963 patent are invalid.

## Count III:  Declaratory Judgment Requiring Delisting of the '963 Patent

40

127.    Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

128.    An actual controversy exists between Avadel and Jazz over the listing of the '963 patent in the Orange Book.

129.    Under 21 C.F.R. § 314.53(c), only patents claiming a drug product, drug substance, or method of using the drug may be listed in the Orange Book.

130.    The '963 patent only includes claims to a "computer-implemented system for treatment of a narcoleptic patient with a prescription drug . . . ," which are neither method claims nor claims to a drug product or drug substance.

131.    The FDA requires patent holders who list patents in the Orange Book to submit a Use Code, which is a code to designate a method patent that covers the approved indication or use of a drug product.  Jazz characterized the "computer system" claimed in the '963 Patent according to the use code "U-1110: METHOD OF TREATING A PATIENT WITH A PRESCRIPTION DRUG USING A COMPUTER DATABASE IN A COMPUTER SYSTEM FOR DISTRIBUTION."

132.    The '963 patent does not claim an approved method of using the approved drug product as required by 21 U.S.C. § 355(c)(3)(D)(ii)(I) and thus should be removed from the Orange Book.

133.    Avadel hereby seeks a declaration pursuant to 21 U.S.C. § 355(c)(3)(D)(ii)(I) ordering Jazz to remove the '963 patent from the Orange Book.

**Count IV:  Monopolization, Improper Orange Book Listing, Section 2 of the Sherman Act (15 U.S.C. § 2)**

41

134.    Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

135.    Jazz unlawfully maintained its monopoly in violation of Section 2 of the Sherman Act by engaging in exclusionary conduct that has had—and continues to cause—unjustifiable, actual anticompetitive effects in the relevant market for (a) FDA approved oxybate-based drugs for treatment of narcolepsy and/or (b) FDA-approved drugs to treat patients with narcolepsy and cataplexy in the United States.  Moreover, as the direct, proximate target of Jazz's exclusionary conduct, Avadel has suffered antitrust injury and has standing to bring claims under Sections 4 and 16 of the Clayton Act based on Jazz's monopolization.

136.    Unless it is expeditiously enjoined, Jazz will continue to subject consumers in the relevant market to harms in the form of reduced product quality, higher prices, and diminished choice through its anticompetitive conduct.  In particular, Jazz listed and refuses to delist the '963 patent—a REMS patent that claims a distribution system—in the Orange Book.  Jazz did this, even though the owner of an FDA-approved drug product may only list in the Orange Book patents that claim the active pharmaceutical ingredient, composition or formulation, or method of using that drug.  There was no mistake.  Nor is there any legitimate, procompetitive business reason for Jazz to have listed the '963 patent, refuse to delist it, and file this lawsuit.

137.    Consistent with its past playbook of improperly listing REMS patents in the Orange Book, and further to its long-running, aggressive efforts to guard its prized monopoly, Jazz listed the '963 patent in order to impede any pharmaceutical company that may try to launch a competitive oxybate product.  This act had the desired effect on Avadel, whose NDA for LUMRYZ—a far superior, once-at-bedtime oxybate product—was delayed when the FDA encountered Jazz's inappropriate Orange Book listing and mischaracterization of the '963 patent

42

and ultimately decided that it could not approve Avadel's NDA unless Avadel filed a Paragraph IV certification. That certification, in turn, allowed Jazz to file this lawsuit, further delaying the FDA's ability to grant final approval to LUMRYZ by triggering an automatic stay.

138.   Jazz knew that it could get away with this anticompetitive scheme—if only until it faced scrutiny years later in court—because the FDA does not evaluate whether patent listings and their associated use codes are legitimate. Rather, the FDA trusts patentees like Jazz to abide by black-letter law. Having abused the FDA's regulatory drug approval process, Jazz continues to reap the rewards in the meantime. It earned over $1.8 billion in revenue in 2021 selling oxybate drugs that would have faced disruptive competition from Avadel's LUMRYZ product beginning in April 2022 were it not for Jazz's decision to list the '963 patent in the Orange Book.

139.   The anticompetitive harms created by Jazz's conduct are no mere abstractions. Nor are they limited to financial harms. Thousands of Americans are suffering today needlessly, relying on Jazz's inferior, twice-nightly oxybate products and enduring sleep disruption, each and every night. As alleged above, patients suffering from narcolepsy are crying out for Avadel's revolutionary, once-at-bedtime product. Were it not for Jazz's decision to list the '963 patent, they would have had access to Avadel's game-changing drug more than half a year ago. Instead, absent relief from this Court, they will have to wait until at least the third quarter of 2023.

140.   A relevant market exists for the sale of a) FDA-approved oxybate drugs to treat narcolepsy-related EDS and cataplexy and/or b) FDA-approved drugs for treatment of narcolepsy-related EDS and cataplexy in the United States. No reasonable substitutes exist for those drugs, which today are limited to oxybate (which only Jazz sells) and, under the broadest conceivable market definition, pitolisant (which Harmony Biosciences alone sells, and only since late 2019). A hypothetical monopolist of FDA-approved oxybate and pitolisant could profitably raise price

43

beyond the competitive level by 5-10% without suffering a critical loss of sales.  People suffering from narcolepsy-associated EDS and cataplexy would not switch in sufficient numbers in response to such a price increase to render it unprofitable.  Stimulants and WPAs (other than, to a limited degree, pitolisant) used to treat EDS do not alleviate cataplexy symptoms and are thus not a good alternative.  Nor do they (or other available drugs or treatments) address the issue of disturbed nighttime sleep, and in fact exacerbate this symptom.  In contrast, drugs like oxybate improve nocturnal sleep, albeit at the expense of disrupting patients' sleep in the middle of the night with currently available products.  Indeed, Jazz itself has had a monopoly over the sale of FDA-approved oxybate drugs for 17 years and has profitably increased price substantially and consistently over that time.

141.   The relevant geographic market is the United States.  The FDA regulates the sale of drugs, meaning that consumers could not respond to an increase in the price of FDA-approved drugs to treat patients with narcolepsy in the United States by switching to equivalent drugs sold outside of the United States.

142.   Jazz has monopoly power even in a relevant market broadly defined as the sale of FDA-approved drugs to treat patients with narcolepsy in the United States.  Until 2020, it had 100% market share.  Harmony Biosciences launched pitolisant in late 2019 under the brand name WAKIX, for which the FDA approved indications for both EDS and cataplexy in narcolepsy the next year.  But pitolisant remains at most a distant substitute to oxybate in the relevant market.  It is, in the first place, a WPA taken during the day in order to address EDS and cataplexy.  Unlike oxybate, it does nothing to address the root cause of people's symptoms because it does not help patients achieve deep, restorative sleep.  Because pitolisant is heavily differentiated from oxybate, physicians often prescribe it alongside—rather than instead of—XYREM or XYWAV.   In

addition, WAKIX (pitolisant) has thus far achieved limited penetration among patients suffering from narcolepsy-related EDS and cataplexy. Harmony Biosciences itself estimates that less than 10% of patients taking narcolepsy medications use WAKIX.

143.    For these reasons, pitolisant does not competitively constrain Jazz's pricing in selling XYREM and XYWAV. That is why Jazz reported to its investors earlier this year that "[t]o date, we have not seen a material impact to our business from the introduction of these new market entrants." Jazz fears competition not from the sale of WPAs like pitolisant, but from other oxybate drugs, particularly a superior, once-at-bedtime, extended-release version of the kind developed by Avadel. Again, Jazz has made clear in SEC filings where it sees danger from competition, warning in its 2017 10-K, for example, "If Avadel is successful . . . the launch of such a product would compete directly with XYREM and could have a material adverse effect on our business, financial condition, results of operations and growth prospects."

144.    Jazz's decision to list the '963 patent in the Orange Book was no mistake or good-faith misreading of applicable law, but a deliberate effort to preserve its monopoly—consistent with its overall practice of delaying and excluding all competition with its lucrative oxybate drugs over the past 17 years. Those actions have delayed the FDA's approval decision on Avadel's NDA for LUMRYZ, depriving Avadel of hundreds of millions of dollars of sales and subjecting consumers to severe anticompetitive effects in the form of reduced quality and price competition. Jazz's decision to file this case in order to secure an automatic stay on the FDA's ability to approve the NDA for LUMRYZ was similarly an unlawful, exclusionary act undertaken not to secure a judgment from this Court, but simply to trigger the statutory automatic stay. Indeed, Jazz did not even bother to serve the complaint in this case on Avadel until September 20, 2022 —more than two months after filing the case. Filing a lawsuit pursuant to an overall scheme to monopolize,

and in an effort to use the litigation process itself—as opposed to the outcome of the process—as a means to harm competition, is itself actionable under the antitrust laws.  Moreover, the allegations of infringement of the '963 patent that Jazz levels against Avadel here are objectively baseless and clearly brought for the purposes of excluding competition.

145.     Jazz has inflicted antitrust injury on Avadel by listing the '963 patent, refusing to delist it, and by bringing this lawsuit.  Those actions, both individually and in combination, have deprived Avadel of hundreds of millions of dollars in sales, forced Avadel to expend its limited resources on litigation costs and attorneys' fees, and compelled Avadel to lay off almost one-half of its workforce in the summer of 2022.  These harms may begin with Avadel, as the direct target of Jazz's exclusionary conduct, but they extend to consumers, whom Jazz has denied a superior treatment for narcolepsy and the benefits of steep price reductions that Jazz would have to make to XYREM and XYWAV in order to protect share after Avadel launches its superior product.  In short, Avadel's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

146.     Avadel is entitled to a judgment from this Court for all damages incurred by Jazz's antitrust violations, including treble damages.  Avadel is also entitled to injunctive relief requiring Jazz to refrain from its continued anticompetitive conduct, including any further assertion of baseless patent infringement claims against Avadel.

**Count V:  Attempted Monopolization, Improper Orange Book Listing, Section 2 of the Sherman Act (15 U.S.C. § 2)**

147.     Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

148.     Jazz has attempted to monopolize the relevant market for the sale of a) FDA-approved oxybate drugs to treat narcolepsy-related EDS and cataplexy and/or b) FDA-approved

drugs for treatment of narcolepsy-related EDS and cataplexy in the United States in violation of Section 2 of the Sherman Act.  It has done so by taking anticompetitive actions that carry a dangerous probability of successfully producing a monopoly and delaying the onset of competition.  Moreover, as the direct, proximate target of Jazz's exclusionary conduct, Avadel has suffered antitrust injury and has standing to bring claims under Sections 4 and 16 of the Clayton Act based on Jazz's attempted monopolization.

149.    As alleged in detail above, Jazz has engaged in exclusionary, anticompetitive conduct designed to prevent competition between Jazz and Avadel, including, but not limited to, 1) improperly listing the '963 patent in the FDA's Orange Book; 2) refusing to delist the '963 patent; and 3) bringing this lawsuit pursuant to an overall anticompetitive scheme to exclude competition in the sale of FDA-approved oxybate (or all FDA-approved) drugs to treat narcolepsy-related EDS and cataplexy by delaying FDA approval of LUMRYZ and other competitive drugs, including by triggering an automatic stay with this action based on the improper listing of the '963 patent.  The result of Jazz's unlawful conduct has been to delay and preclude the entry of Avadel's competing product, LUMRYZ.

150.    Jazz clearly acted with the specific intent to monopolize the relevant market.  It has warned its investors for years about the danger that Avadel's LUMRYZ drug poses to Jazz's oxybate monopoly.  Industry analysts have correctly observed that LUMRYZ is "Jazz Pharmaceuticals' Worst Nightmare" and "not just . . . a competitor but [a drug that] could displace XYREM's market share completely."  If this were not enough, Jazz's conduct in preserving its monopoly for more than a decade through prior listings of REMS patents in the Orange Book and the aggressive assertion of patents found invalid by the Federal Circuit speaks to an unmistakable intent to achieve and preserve monopoly.

47

151.    As alleged above, Jazz has monopoly power in the relevant market.  Its market share far exceeds the 50% threshold typically required for an attempted monopolization to have a dangerous probability of success.  Jazz's conduct obviously carries a greater-than-dangerous probability of resulting in a monopoly—the company's actions from listing the '963 patent in the Orange Book and improper use code through filing this case have successfully kept Avadel's superior drug, and all other oxybate drugs, off the market.  Even if Jazz succeeded on its baseless claims that Avadel has infringed the '963 patent, that improbable outcome would not cure its improper listing of the '963 patent in the Orange Book because that act carried with it a dangerous probability of success in preserving Jazz's oxybate monopoly.  Moreover, even if one or more generic versions of XYREM enter the market in 2023 and later, and even if pitolisant grew to achieve greater sales among patients with narcolepsy than it does today, no such event would change the dangerous probability that Jazz's conduct will delay the onset of competition (indeed, it already has).  In fact, Jazz is switching as many of its customers from XYREM to XYWAV as possible in order to minimize the competitive impact of generic entry and, through the '963 patent listing and the filing this lawsuit, is delaying the arrival of competition from LUMRYZ for as long as possible.

152.    Avadel has been injured in its business and property by reason of Jazz's anticompetitive activities.  Avadel's customers have been denied the choice of a superior treatment for narcolepsy, and Avadel has incurred costs defending Jazz's lawsuits and from unjustly delayed approval of LUMRYZ.  As alleged above, Avadel's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

153.    Avadel is entitled to a judgment from this Court for all damages incurred by Jazz's antitrust violations, including treble damages.  Avadel is also entitled to injunctive relief requiring

Jazz to refrain from its continued anticompetitive conduct, including any further assertion of baseless patent infringement claims against Avadel.

## JURY DEMAND

154.    Avadel demands a trial by jury on all issues for which a trial by jury is available under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Avadel requests the following relief:

A.    That the Court enter judgment against Jazz and in favor of Avadel on the claims set forth in Jazz's Complaint and that each claim be dismissed with prejudice;

B.    That the Court enter judgment that Avadel does not infringe and/or will not infringe any valid claims of the asserted patent in violation of 35 U.S.C. §§ 271(a), 271(b), 271(c), and/or 271(e), either literally or under the doctrine of equivalents, or any other theory of infringement, and enter an order requiring Jazz to remove the '963 patent from the Orange Book;

C.    That the Court enter judgment that the asserted patent is invalid;

D.    That the Court enter judgment that the asserted patent is unenforceable;

E.    That the Court enter judgment that Jazz has violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

F.    That the Court award treble damages to Avadel under Section 4 of the Clayton Act, 15 U.S.C. § 15, for the damages sustained by Avadel as a result of Jazz's unlawful conduct;

G.    That the Court enter an order permanently enjoining Jazz from continuing the unlawful conduct alleged, and from engaging in related conduct in the future, including from monopolizing or attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26;

H.      That the Court enter judgment against Jazz and in favor of Avadel on the claims set

forth in Jazz's Complaint and that each claim be dismissed with prejudice;

I.      That the Court award Avadel its costs and attorneys' fees in connection with this

action, as provided by law, including 15 U.S.C. § 15(a) and 15 U.S.C. § 26, as well as pursuant to

35 U.S.C. § 285, because Jazz's conduct in commencing and pursuing this action renders this an

exceptional case; and

J.      That the Court grant Avadel such other and further relief, in law or equity, as the

Court deems just and proper.

Dated:  October 21, 2022                          McCARTER & ENGLISH, LLP

*Of Counsel*:                                     /s/ *Daniel M. Silver*
                                                  Daniel M. Silver (#4758)
Kenneth G. Schuler                                Alexandra M. Joyce (#6423)
Marc N. Zubick                                    Renaissance Centre
Alex Grabowski                                    405 N. King Street, 8th Floor
Sarah W. Wang                                     Wilmington, Delaware 19801
LATHAM & WATKINS LLP                              (302) 984-6300
330 North Wabash Avenue, Suite 2800               dsilver@mccarter.com
Chicago, IL 60611                                 ajoyce@mccarter.com
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com                                *Counsel for Defendants*
alex.grabowski@lw.com
sarah.wang@lw.com

Sarah Propst[1]
Audra Saywer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
(202) 637-1076
sarah.propst@lw.com
audra.sawyer@lw.com

---

[1] Admitted to practice in Texas only. All work supervised by a member of the DC Bar.

50

Herman Yue
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Herman.Yue@lw.com

Yi Ning
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 470-2153
Sunnie.ning@lw.com

Daralyn J. Durie
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 365-6666
ddurie@durietangri.com

Kira A. Davis
Katherine E. McNutt
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com

ME1 42955779v.1