IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-941 (GBW) |
| | ) | |
| AVADEL CNS PHARMACEUTICALS LLC, | ) | |
| | ) | |
| Counterclaim-Plaintiff. | ) | |

## ANSWER TO COUNTERCLAIMS

Counterclaim-Defendant Jazz Pharmaceuticals, Inc. ("Jazz"), hereby responds to the Counterclaims from Counterclaim-Plaintiff Avadel CNS Pharmaceuticals, LLC ("Avadel") as follows.  To the extent that the Counterclaims' headings or subheadings contain factual allegations, they are denied.  Any allegation not expressly admitted is denied.

## ANSWER TO COUNTERCLAIMS

## PARAGRAPH NO. 34:

Avadel's Counterclaims arise under the Patent Laws of the United States, 35 U.S.C. § *et seq*., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, pursuant to which Avadel brings causes of action based on Jazz's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE:**  Paragraph No. 34 consists of legal conclusions to which no response is required.

## PARAGRAPH NO. 35:

This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1337, and 1338.

**RESPONSE:** Paragraph No. 35 consists of legal conclusions to which no response is required.

**PARAGRAPH NO. 36:**

Jazz is subject to general and specific personal jurisdiction in this judicial district based upon its purposeful, systematic, and continuous contacts with the State of Delaware, including due to its sale and offer for sale of the oxybate products to customers within the state, its decision to maintain an office, and its previous registration to do business in the state.

**RESPONSE:** Paragraph No. 36 consists of legal conclusions to which no response is required.

**PARAGRAPH NO. 37:**

Jazz's decision to file this case in the United States District Court for the District of Delaware for Avadel's purported infringement of the '963 patent further subjects Jazz to specific personal jurisdiction in this judicial district.

**RESPONSE:** Paragraph No. 37 consists of legal conclusions to which no response is required.

**PARAGRAPH NO. 38:**

Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

**RESPONSE:** Paragraph No. 38 consists of legal conclusions to which no response is required.

**PARAGRAPH NO. 39:**

Counterclaim-Plaintiff Avadel CNS Pharmaceuticals, LLC ("Avadel") is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.

**RESPONSE:** Jazz admits the allegations in Paragraph No. 39.

**PARAGRAPH NO. 40:**

On information and belief, Counterclaim-Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 3170 Porter Drive, Palo Alto, California 94304.

**RESPONSE:** Jazz admits that it is a corporation organized and existing under the laws of the State of Delaware and that it has a principal place of business at 3170 Porter Drive, Palo Alto, California 94304. Jazz denies the remaining allegations in Paragraph No. 40.

**PARAGRAPH NO. 41:**

Jazz Pharmaceuticals, Inc. filed this case as yet another step in its unlawful scheme to protect its monopoly. For seventeen years, Jazz has repeatedly shielded its oxybate drugs from competition using various exclusionary methods and, in particular, by manipulating the regulatory and litigation apparatuses. As a result, over 100,000 Americans with narcolepsy are suffering from cataplexy and excessive daytime sleepiness ("EDS") have long been bereft of choice. Using unsavory practices, Jazz has fended off numerous attempts for others to gain approval for and market competitive versions of its oxybate drug, XYREM. Its signature move is to abuse the FDA's approval process. To that end, and in order to erect as many roadblocks as possible to timely approval by the FDA of competing products, Jazz has improperly listed in the Orange Book patents that it says relate to the Risk Evaluation and Mitigation Strategy (REMS) for XYREM. And now that generic competition is finally on the horizon, Jazz is scrambling to switch as many XYREM patients as possible to its new, mixed salts formulation, XYWAV.

**RESPONSE:** Jazz denies the allegations in Paragraph No. 41.

**PARAGRAPH NO. 42:**

The mortal competitive threat facing Jazz's oxybate monopoly, however, is not generic entry. It is Avadel, which has achieved what Jazz never could—successful development of a clinically proven, once-nightly oxybate formulation, named LUMRYZ, that patients with narcolepsy suffering from EDS or cataplexy need take just once, right before bed. By contrast, any patient taking XYREM or XYWAV must take a first nightly dose just before going to bed and set an alarm to forcefully awaken in the middle of the night to take a second dose. Analysts and industry observers have thus characterized LUMRYZ as "Jazz Pharmaceuticals' Worst Nightmare" and "not just . . . a competitor but [a drug that] could displace XYREM's market share completely." This is no surprise. The requirement that a person suffering from a sleeping disorder set an alarm for, say, 2:00 or 3:00 a.m.—every night—or else miss a necessary dose and suffer the consequences is antithetical to the precept of a restful night's sleep. And there are safety issues to Jazz's twice-nightly oxybate products. Patients may forget how many doses they have taken resulting in incidents of double dosing, or a child or roommate might drink or divert a previously prepared dose left by the side of the bed. Because once-nightly LUMRYZ presents none of these drawbacks, physicians and patients recognize it as a game-changer. *See, e.g.*, Alex Keown, *Jazz's Toehold on Sleep Market Slips with Tentative Avadel FDA Approval*, BIOSPACE (Jul. 20, 2022).

**RESPONSE:**  Jazz admits that Avadel markets an oxybate product under the brand name LUMRYZ and that Jazz markets oxybate products in the United States under the brand names XYREM and XYWAV.  To the extent Paragraph 42 references documents, the documents speak for themselves.  Jazz further responds that the term "safety issues" is vague and ambiguous, and denies the allegations on that basis.  Jazz otherwise denies or is without knowledge or information

sufficient to form a belief as to truth or falsity of the remaining allegations in this Paragraph and therefore denies them.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 43:**

Jazz has endeavored to snuff out competition from Avadel. To that end, Jazz has abused the FDA's regulatory drug approval process by improperly listing in the Orange Book U.S. Patent No. 8,731,963 (the '963 patent), which does not claim XYREM's active pharmaceutical ingredient, formulation, or an approved method of using XYREM (or indeed, any method at all). It merely claims a distribution system, and thus cannot—as a matter of black-letter law—be listed in the Orange Book. And Jazz has maintained that improper listing over the pertinent time period.

**RESPONSE:**  Jazz denies the allegations in Paragraph No. 43, including that it has "endeavored to snuff out competition from Avadel."  Jazz further responds that the phrase "the pertinent time period" is vague and ambiguous, and further denies the allegations on that basis.

**PARAGRAPH NO. 44:**

By taking these steps, Jazz erected a regulatory barrier to Avadel's ability to secure timely FDA approval for LUMRYZ. The net result is that Jazz has delayed competition from Avadel by at least one and a half years. And, as the coup de grâce, Jazz filed this lawsuit in order to trigger an automatic stay that prevents the FDA from granting final approval to Avadel's superior product. Unless the Court acts on Avadel's pending motion for judgment on the pleadings, that stay presumptively will not expire until the expiration of the '963 patent.

**RESPONSE:**  Jazz admits that it filed this lawsuit and that, only because Avadel first made a certification against the '963 patent as described in 21 U.S.C. § 355(b)(2)(A)(iv) and provided notice to Jazz, the timing of the lawsuit triggered a stay under 21 U.S.C. § 355(c)(3)(C).  Jazz is

without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in this Paragraph and therefore denies them.

**PARAGRAPH NO. 45:**

Jazz's unlawful actions do not merely have commercial consequences. Real people are suffering as a result. Avadel frequently hears from prospective patients who are desperate to get LUMRYZ as soon as they can, including patients who have trouble waking to take the second dose of XYREM. These patients' lives are being disrupted and put at risk without access to a treatment that works for them. These patients will not be able to get LUMRYZ this year because, absent urgent action by this Court, Jazz has made that impossible.

**RESPONSE:**  Jazz denies that its actions are or have been "unlawful."  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 45 and therefore denies them.

**PARAGRAPH NO. 46:**

The facts behind Jazz's exclusionary conduct are undisputable, and the law is clear. Jazz is a monopolist. According to Jazz's own 2021 10-K, "Xywav and Xyrem are currently the only products approved by FDA and marketed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy[.]" As Jazz's CEO observed in 2010 with respect to XYREM, "[w]e do think we have substantial pricing power still in the product. It is a unique product. There is nothing else that does what it does. There is no substitute." He was equally blunt a year later, "There's really no competition." In the decade since, nothing has changed. Jazz's market dominance remains undisturbed.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote from

documents, the documents speak for themselves.   Jazz otherwise denies the allegations in Paragraph No. 46, including the allegation that "Jazz is a monopolist."

**PARAGRAPH NO. 47:**

Jazz's bottom line hinges on XYREM and XYWAV, which accounted for over $1.8 billion (or over a third) of the company's total revenues in 2021.  Until it took significant steps to diversify its revenue base, Jazz's financial fortunes were even more closely tied to oxybate. As recently as 2018, XYREM represented 75% of Jazz's net product sales.  Thus, Jazz has an overwhelming incentive to protect its golden goose.

**RESPONSE:**  Jazz admits that net product sales for XYREM and XYWAV totaled over $1.8 billion in 2021 for Jazz Pharmaceutical plc and that XYREM represented 75% of Jazz Pharmaceutical plc's total net product sales in 2018.  Jazz otherwise denies the allegations in Paragraph No. 47.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 48:**

Jazz is particularly concerned about competition from Avadel. Jazz warned its investors earlier this year that "Xywav and Xyrem may face competition in the future from other new sodium oxybate formulations for the treatment of narcolepsy. In February 2021, FDA accepted for filing an NDA submitted by Avadel Pharmaceuticals plc, or Avadel, for an extended release formulation of sodium oxybate which uses its proprietary technology for the treatment of EDS and cataplexy in patients with narcolepsy . . . . [I]n any event, we expect to face competition from Avadel, if its product candidate is approved."

**RESPONSE:**  To the extent this Paragraph purports to reference or quote a document, the document speaks for itself.  Jazz otherwise denies the allegations in Paragraph No. 48. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 49**:

Jazz has successfully blocked all attempted entry to date, despite the fact that XYREM was first approved twenty years ago. As Jazz recently told its investors, "[W]e have settled all patent litigation against the nine companies that filed ANDAs" challenging "our U.S. patents for Xyrem." Notably, it has achieved this exclusion despite a 2018 decision by the Federal Circuit that affirmed the invalidation of a host of REMS patents related to the '963 patent and asserted by Jazz in defense of XYREM. *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347 (Fed. Cir. 2018). As a result of these settlements with generic competitors, there will be no generic entry for XYREM until at least 2023. And, even then, the only possible generic entry would entail a limited number of "authorized generics." Indeed, full generic entry may not occur until 2026. Even this prospect of competition is too much for Jazz, accustomed as it is to having an unchallenged monopoly. It is taking steps now to limit the effect of potential future generic competition on its monopoly by transitioning as many of its patients as possible to its other oxybate drug, XYWAV.

**RESPONSE:**  Jazz admits that XYREM was first approved by FDA in July 2002 as a treatment of cataplexy in adult patients with narcolepsy.  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz further denies Avadel's characterization of the facts in this Paragraph.  Jazz otherwise denies the allegations in Paragraph No. 49, including that is has "an unchallenged monopoly."

**PARAGRAPH NO. 50**:

A favorite exclusionary tactic employed by Jazz is to list patents claiming a REMS distribution system in the Orange Book.  In 2010, for example, Roxane Laboratories sought marketing approval from the FDA for a generic version of XYREM.  But Jazz frustrated that entry

by listing three REMS patents in the Orange Book and subsequently filing a complaint under the Hatch-Waxman Act in order to obtain an automatic stay under 21 U.S.C. § 355(j)(5)(B)(iii).  In response to that anticompetitive conduct, in late 2010, Roxane filed a pleading alleging that Jazz's REMS "patents have all been listed in the Orange Book relating to Plaintiff's XYREM drug product, thereby improperly serving to block or delay approval of Roxane's ANDA[.]"  Case No. 10-cv-6108-ES-JAD, D.I. 10.  Shortly afterward, Jazz settled with Roxane by offering an entry date in January 2023 for sales of Jazz's XYREM product as an authorized generic, once again denying consumers the benefits of timely competition.

      **RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz admits that in 2010, Roxane Laboratories—which was subsequently acquired by Hikma Pharmaceuticals PLC ("Hikma")—sought marketing approval from the FDA for a generic version of XYREM.  Jazz admits that Jazz submitted three patents relating to REMS (but not involving the '963 patent at issue here) for listing in the Orange Book in 2010.  Jazz admits that, in 2010, it filed suit against Roxane Laboratories with respect to five patents under the Hatch Waxman Act (including two non-REMS patents) and obtained a stay under 21 U.S.C. § 355(j)(5)(B)(iii).  Jazz admits that it subsequently sued Roxane on eleven additional patents, some of which were set to expire as late as 2033, and that, in 2017, it reached a settlement agreement with Hikma that granted Hikma the right to sell an authorized generic of XYREM beginning on January 1, 2023—years before the expiration of the last-to-expire Orange Book-listed XYREM patent.  Jazz denies Avadel's characterization of the facts in this Paragraph and otherwise denies the allegations in Paragraph No. 50.

**PARAGRAPH NO. 51:**

Contrary to Jazz's listing practices, a company may only file a drug-substance, drug-product, or method-of-use patent in the Orange Book—not a patent that claims a method of (or system for) *distributing* a drug. Specifically, the applicable statute requires a drug manufacturer to list in the Orange Book "each patent . . . that (I) *claims the drug* for which the applicant submitted the application and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or (II) *claims a method of using such drug* for which approval is sought or has been granted in the application[.]" 21 U.S.C. § 355(b)(1)(A)(viii)(II) (emphasis added). As set forth *infra*, the de-listing statute, 21 U.S.C. § 355(c)(3)(D)(ii)(I), requires de-listing of a patent that, like the '963 patent, fails to claim a drug or an approved method of using the approved drug product.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote statutes, the statutes speak for themselves. Jazz denies Avadel's characterization of the facts in this Paragraph and otherwise denies the allegations in Paragraph No. 51.

**PARAGRAPH NO. 52:**

In particular, Jazz's '963 patent expressly claims a "computer-implemented system[.]" Hence, the patent does not claim a drug or method of using a drug. Jazz admitted as much in its own proposed claim construction, which asserts that the '963 patent claims are directed to "*methods of using a computer-implemented system* to safely distribute gamma-hydroxybutyrate for treatment of a narcoleptic patient[.]" C.A. No. 21-691, D.I. 118 at 6-7.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves. Jazz admits that the words "computer-implemented system"

appear in the claims of Jazz's '963 patent.  Jazz otherwise denies the allegations in Paragraph No. 52.

**PARAGRAPH NO. 53**:

Jazz nevertheless listed the '963 patent in the Orange Book and maintained that listing over the pertinent time period, with a use code improperly representing the '963 patent as claiming a "method of treating a patient with a prescription drug using a computer database in a computer system for distribution[.]"  The FDA's role here is purely ministerial; it does not undertake any review of whether a patent is properly listed in the Orange Book or whether the use code provided accurately represents the listed patent claims.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz admits that it submitted the '963 patent for listing in the Orange Book and maintained that listing until March 2023.  Jazz admits that Jazz submitted a use code listed in the Orange Book describing a "method of treating a patient with a prescription drug using a computer database in a computer system for distribution."   Jazz further responds that the phrase "the pertinent time period" is vague and ambiguous, and denies the allegations on that basis.  Jazz denies that it was improper to list the '963 patent in the Orange Book prior to the Federal Circuit's decision affirming—after staying—this Court's delisting order.  *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373 (Fed. Cir. 2023).   Jazz is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph No. 53 and therefore denies them.

**PARAGRAPH NO. 54:**

On August 8, 2019, Avadel submitted a patent listing dispute regarding the '963 patent to the FDA pursuant to the agency's patent listing dispute regulations at 21 C.F.R. § 314.53(f). In that submission, Avadel explained that the '963 patent claims were directed to "a system" and not a method and that the '963 patent was therefore improperly listed in the Orange Book. The FDA thereafter provided Avadel with Jazz's response, which recited Jazz's refusal to delist the '963 patent or to correct the erroneous use code allegedly describing same.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves. Jazz admits that on August 8, 2019, Avadel submitted a patent listing dispute regarding the '963 patent to the FDA, and that the FDA thereafter provided Avadel with Jazz's response, which "confirm[ed] the correctness of the description of the approved method of using [XYREM] claimed by the '963 patent and included as the 'Use Code' for that drug product in the Orange Book" and stated that "[t]he argument put forward against the '963 patent's listing appears to be based upon an incorrect claim construction. Such a claim construction has not been presented or adjudicated. That dispute lacks merit." Jazz otherwise denies the allegations in Paragraph No. 54.

**PARAGRAPH NO. 55:**

Jazz's listing and maintenance of the '963 patent in the Orange Book have delayed the FDA's final decision on approval of Avadel's NDA for LUMRYZ by over a year, already. Avadel filed the NDA for LUMRYZ on December 15, 2020. By agreement with Avadel, the FDA set an initial review completion deadline of October 15, 2021. Instead of resolving Avadel's NDA, however, the FDA in September 2021 inquired about the '963 patent and associated use code in

the Orange Book.  Long after the October 2021 deadline, the FDA concluded on May 24, 2022, that Avadel had to file a certification for the '963 patent.  Were it not for Jazz's decision to initially list the '963 patent and to maintain that listing in the Orange Book even after Avadel's patent listing dispute, the FDA likely would have approved the NDA for LUMRYZ by October 15, 2021.

      **RESPONSE:**  Jazz admits that Avadel filed the NDA for LUMRYZ on December 15, 2020 and that the FDA assigned Avadel's NDA a Prescription Drug User Fee Act ("PDUFA") target action date of October 15, 2021.  Jazz admits that in September 2021, the FDA requested further information regarding Avadel's section 505(b)(2)(B) statement to the '963 patent.  Jazz admits that in a letter dated May 24, 2022, the FDA concluded that Avadel's proposed section 505(b)(2)(B) statement was inaccurate and Avadel was seeking approval for the method of use claimed by the '963 patent as reflected in the U-1110 use code.  Avadel then elected to make a Paragraph IV certification against the '963 patent, rather than following FDA procedures for challenging or appealing FDA's decision.   Jazz denies Avadel's characterization of the facts in this Paragraph and otherwise denies the allegations in Paragraph No. 55.  Jazz further denies Avadel's allegation that, were it not for Jazz's decision to list the '963 patent and to maintain that listing in the Orange Book, "the FDA likely would have approved the NDA for LUMRYZ by October 15, 2021" on the basis that the FDA documents show, instead, that any delay in FDA approval beyond October 15, 2021 was due to Avadel's regulatory strategies and the FDA initially concluding that Avadel could not overcome Jazz's Orphan Drug Exclusivity because Avadel had presented no evidence of clinical superiority for LUMRYZ, and not reversing that conclusion until May 2023.

**PARAGRAPH NO. 56:**

Finally, Avadel filed its Paragraph IV certification under protest on June 6, 2022, after which Jazz filed the complaint in this case, thus triggering an automatic stay on the FDA's ability to approve Avadel's NDA.

**RESPONSE:**  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations about whether Avadel filed its Paragraph IV certification "under protest."  Jazz denies that the stay under 21 U.S.C. § 355(c)(3)(C) prevented FDA from any action other than making a final approval of Avadel's 505(b)(2) effective during the stay.  Jazz otherwise admits the allegations in Paragraph No. 56.

**PARAGRAPH NO. 57:**

These facts present a clear-cut violation of U.S. antitrust law.  Were it not for Jazz's decision to wrongfully list and maintain the '963 patent in the Orange Book, Avadel would have launched LUMRYZ by April 2022.  Absent prompt action by this Court, Jazz's conduct has delayed—and will continue to delay—Avadel's entry from April 2022 until at least the third quarter of 2023. Among the counterclaims below, Avadel brings causes of action under Sections 4 and 16 of the Clayton Act based on Jazz's unlawful monopolization and attempted monopolization in violation of Section 2 of the Sherman Act.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that Avadel filed counterclaims against Jazz under Sections 4 and 16 of the Clayton Act alleging unlawful monopolization and attempted monopolization in violation of Section 2 of the Sherman Act.  Jazz otherwise denies the allegations in Paragraph No. 57.

**PARAGRAPH NO. 58:**

This case warrants the Court's most urgent attention.  Each day that passes without the '963 patent being delisted from the Orange Book means that patients with narcolepsy have to wait even longer for a superior treatment.  Avadel continues to receive a host of urgent messages from real people suffering from this disease, asking when LUMRYZ will be available.  Absent relief from this Court, the statutorily mandated stay triggered by Jazz's assertion of the '963 patent will prevent Avadel from obtaining final FDA approval of its NDA for LUMRYZ until the expiration of the '963 patent in June 2023.  Given that it cannot complete many preparations for launching LUMRYZ, which must be distributed under a REMS, until after it receives final FDA approval, Avadel does not now expect to launch LUMRYZ until the third quarter of 2023 unless this Court grants expeditious relief.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Answering further, Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations about messages Avadel receives from people or what Avadel expects.  Jazz further responds that the terms "host of" and "urgent messages" are vague and ambiguous, and denies the allegations on that basis.  Jazz otherwise denies the allegations in Paragraph No. 58.

**PARAGRAPH NO. 59:**

Approximately one out of every 2,000 Americans, and many more people around the world, suffer from narcolepsy—a chronic sleep disorder that causes, among other symptoms, overwhelming bouts of drowsiness (EDS) and sudden loss of muscle control (cataplexy).  No known cure exists for this disease, which wreaks havoc on people's lives.  EDS causes people to experience difficulty maintaining attention and focus (e.g., brain fog) and staying awake and alert,

no matter what they are doing or where they are.  Cataplexy is a likewise frightening condition; its symptoms occur unpredictably and range from slurred speech to a sudden loss of muscle control.

**RESPONSE:**  Jazz admits that narcolepsy is a chronic disorder characterized by excessive daytime sleepiness (EDS) and the inability to regulate sleep-wake cycles normally.  Jazz admits that narcolepsy affects an estimated one in 2,000 people in the United States.  Jazz admits that cataplexy, the sudden loss of muscle tone with retained consciousness, can be one of the most debilitating symptoms of narcolepsy.  Jazz admits that no known cure exists for narcolepsy, that narcolepsy may affect many areas of life, and that patients with narcolepsy may also suffer from significant medical comorbidities, including cardiac disorders and others.

**PARAGRAPH NO. 60:**

For nearly twenty years, only a single, FDA-approved drug existed for patients with narcolepsy suffering from EDS and cataplexy–oxybate.  Launched in 2002 by Orphan Medical, Inc. under the brand name XYREM, the drug is believed to work by suppressing central nervous system responses.  It is a prescription medication that cannot be purchased at retail pharmacies. On account of its susceptibility to diversion, misuse, and abuse (oxybate can be used as a date rape drug), the FDA requires that it be distributed exclusively through a restricted distribution program known as a REMS.

**RESPONSE:**  Jazz admits that XYREM was launched by Orphan Medical Inc. in 2002 as an FDA-approved treatment of cataplexy in adult patients with narcolepsy and that the FDA did not approve XYREM as a treatment for EDS in patients with narcolepsy or as a treatment for pediatric narcolepsy patients until years later.  The FDA-approved label at the time stated that the precise mechanism by which sodium oxybate produces an effect on cataplexy is unknown.  Jazz admits that XYREM is a prescription medication that cannot be purchased at retail pharmacies.

Jazz admits that distribution of XYREM in the United States is subject to a Risk Evaluation and Mitigation Strategy (REMS), which FDA requires to mitigate the risks of serious adverse outcomes resulting from, among other things, inappropriate prescribing, abuse, misuse and/or diversion.  Jazz otherwise denies the allegations in Paragraph No. 60.

**PARAGRAPH NO. 61:**

Jazz neither invented XYREM nor played any role whatsoever in bringing XYREM to market.  Rather, Jazz bought Orphan Medical, Inc.—and, with it, XYREM—for $122.6 million in 2005.  From the outset, Jazz engaged in an aggressive monetization strategy premised on steadily raising the price of XYREM, while doing everything possible to foreclose any generic version of XYREM or the introduction of any other competitive oxybate formulation.  Today, the typical patient and any associated insurer must pay significantly over $10,000 per month for XYREM or Jazz's newer oxybate drug product, XYWAV.  Jazz has earned well over a billion dollars in revenue from selling its oxybate products for each of the past 6 years.  Last year, sales of XYREM and XYWAV amounted to more than $1.8 billion, an amount that currently represents over a third of the company's total revenues.

**RESPONSE:**  Jazz admits that Jazz acquired Orphan Medical, Inc. for $122.6 million in 2005.  Jazz admits that annual net sales of Jazz Pharmaceutical plc's oxybate products have exceeded a billion dollars for each of the past 6 years.  Jazz admits that in 2021, net sales of XYREM and XYWAV amounted to more than $1.8 billion for Jazz Pharmaceutical plc.  Jazz further responds that the terms "typical patient" and "any associated insurer" are vague and ambiguous, and denies the allegations on that basis.  Jazz otherwise denies the allegations in Paragraph No. 61.

**PARAGRAPH NO. 62:**

For all of XYREM's success, however, the drug brings significant drawbacks for patients. XYREM, like its recently introduced mixed salts version, XYWAV, is a twice-nightly oxybate formulation.  Jazz's branded oxybate drug products are oral solutions that must be taken at night in two doses.  Patients must take one dose at bedtime and forcefully awaken 2.5 to 4 hours later to take a second dose.  This is a terrible hardship for patients whose signature malady is sleep disruption.  Even when the drug otherwise works well, users are denied a full night's sleep, every single night.  If a user fails to take a second dose, Jazz's oxybate products will not deliver the necessary relief against EDS and cataplexy.  Moreover, XYREM and XYWAV bring significant dangers.  For example, if users take a second dose too early either due to mistake or inability to remember when they took their first dose, it can result in serious harm like respiratory depression. If patients take their second dose too late, it can result in a hangover effect and impairment the next day.  Further, because XYREM and XYWAV are formulated as clear liquids, they may endanger children, roommates, and/or pets if not safely and securely stored, as can happen if a user leaves a second dose by the bed in an unsecured container.

**RESPONSE:**  Jazz admits that XYREM and XYWAV are oral solutions.  Jazz further admits that adverse events have been observed in clinical practice with XYREM and XYWAV. Jazz further admits that distribution of XYREM and XYWAV in the United States is subject to a REMS, which the FDA requires to mitigate the risks of serious adverse outcomes resulting from inappropriate prescribing, abuse, misuse and/or diversion.  Jazz further responds that the terms "significant drawbacks," "significant dangers," "too early," "too late," "hangover effect," and "impairment" are vague and ambiguous, and denies the allegations on that basis.  Jazz otherwise denies the allegations in Paragraph No. 62.

**PARAGRAPH NO. 63:**

The narcolepsy community has been desperately demanding a better product, in particular a once-at-bedtime oxybate formulation that would not require the dreaded middle-of-the night alarm, disrupting the sleep of the patient and loved ones.  Avadel has answered that call.

**RESPONSE:**  Jazz denies the allegations in Paragraph No. 63.  Jazz further responds that the terms "narcolepsy community" and "desperately demanding" are vague and ambiguous, and denies the allegations on that basis.

**PARAGRAPH NO. 64:**

Flamel Technologies S.A. ("Flamel"), the predecessor company to what is now Avadel's parent company, Avadel Pharmaceuticals, plc, developed the proprietary drug-delivery technology used in its once-nightly oxybate formulation, previously known as FT218, for a single dose before bedtime for patients suffering from narcolepsy, obviating the need for a second dose in the middle of the night as Jazz's oxybate drugs require.  Flamel published the results of its first-in-man (FIM) clinical study in healthy volunteers in April 2014, demonstrating that patients could potentially forgo a second, middle-of-the-night dose with FT218.  Another clinical study, published in December 2014, provided further confirmation.  Recognizing the dramatic patient benefits associated with a single-dose solution, Avadel moved with all possible haste toward securing regulatory approval for FT218, a once-nightly formulation of oxybate for the treatment of EDS and cataplexy in patients suffering from narcolepsy.

**RESPONSE:**  Jazz admits that Flamel announced purported results from clinical studies using FT218 in healthy volunteers in April and December 2014.   Jazz denies the allegations in Paragraph No. 64 or is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 64 and therefore denies them.

**PARAGRAPH NO. 65**:

To that end, on March 31, 2016, Avadel submitted a Special Protocol Assessment (SPA) to the FDA, subsequently agreeing with the agency about the design, endpoints, and analyses of the Phase 3 clinical trial for FT218.

**RESPONSE:** Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations in Paragraph No. 65 and therefore denies them.

**PARAGRAPH NO. 66**:

In December 2016, Avadel began enrolling patients for the pivotal clinical trial for FT218. The "REST-ON" (Randomized study Evaluating the efficacy and SafeTy of a Once Nightly formulation of oxybate) trial was a double-blind, randomized, placebo-controlled, two-arm, multicenter, Phase 3 clinical trial evaluating FT218. Enrolling 212 patients in clinical sites in North America, Western Europe, and Australia, the clinical trial assessed FT218's safety and efficacy for the once-nightly treatment of EDS and cataplexy in patients with narcolepsy. Avadel announced positive top-line data from the REST-ON trial on April 27, 2020.

**RESPONSE:** Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations in Paragraph No. 66 and therefore denies them.

**PARAGRAPH NO. 67**:

Prior to completion of the REST-ON study, in January 2018, Avadel announced that the FDA had granted Orphan Drug Designation to FT218 on the plausible hypothesis that it may be clinically superior to the then only other approved oxybate product, Jazz's XYREM, because FT218 "may be more safe due to the ramifications associated with the dosing regimen for [XYREM] in treating patients with narcolepsy." The FDA grants Orphan Drug Designations to advance drug development for rare diseases.

20

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves. Jazz is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph No. 67 and therefore denies them.

**PARAGRAPH NO. 68:**

On December 16, 2020, Avadel announced the submission of its new drug application (NDA) for FT218 to the FDA. On February 26, 2021, the FDA notified Avadel that it had formally accepted the NDA with an assigned Prescription Drug User Fee Act or PDUFA target action date of October 15, 2021.

**RESPONSE:** Jazz admits the allegations in Paragraph No. 68.

**PARAGRAPH NO. 69:**

In 2020 and afterward, in light of positive results from its Phase 3 clinical trial of FT218 and ensuing NDA submission to the FDA, Avadel widely proclaimed its intent to market FT218 as soon as possible—what became LUMRYZ.

**RESPONSE:** Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations in Paragraph No. 69 and therefore denies them. Jazz further responds that the term "widely proclaimed" is vague and ambiguous, and denies the allegations on that basis.

**PARAGRAPH NO. 70:**

Jazz saw, and continues to see, Avadel's NDA submission to the FDA for LUMRYZ as an existential threat.

**RESPONSE:**  Jazz responds that the term "existential threat" is vague and ambiguous, and denies the allegations on that basis.

**PARAGRAPH NO. 71:**

On April 7, 2014, Flamel first announced favorable results from its FIM clinical study for FT218.  This development marked a serious competitive threat to Jazz's oxybate monopoly.  An article published in June 2014 aptly captured the significance of Flamel's single-dose product.  Titled, *Is This Jazz Pharmaceuticals' Worst Nightmare?*, it noted that a "serious rival formulation is showing promise in clinical trials."  It continued, "Little-known French biopharma Flamel Technologies has been busy developing an alternative treatment for narcolepsy based on its Micropump technology.  Presently, Xyrem is dosed in two stages each night: once before bed time and again 2.5 to 4 hours later.  What this means is that you may have to wake up to take the second dose, interrupting nighttime sleep.  The goal of Flamel's Micropump approach is to deliver a dose of oxybate (Xyrem) in a manner that would allow it to be taken only once. Although the company is still in the early stages of developing this technology, Flamel believes it could push it into a registration study by 2015.  Jazz shareholders should definitely keep a keen eye on this device as it progresses in clinical studies."

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz admits that Flamel announced on April 7, 2014 purported results from a clinical study of FT218.  Jazz otherwise denies the allegations in Paragraph No. 71.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 72:**

Jazz listed the '963 patent in the Orange Book on May 30, 2014—less than two months after Flamel announced the successful study for FT218.

**RESPONSE:**  Jazz admits that the '963 patent issued on May 20, 2014 and, on or about May 30, 2014, it submitted to FDA a form FDA 3542 and accompanying documents relating the '963 patent and NDA 21-196.  Jazz denies Avadel's characterization of the facts in this Paragraph, and denies the remaining allegations in Paragraph No. 72.

**PARAGRAPH NO. 73:**

The competitive threat posed by Flamel/Avadel grew with each passing year, as the company cleared successive regulatory hurdles, while Jazz's efforts to develop a once-per-night version of XYREM failed.  Indeed, in May 2015, Jazz announced that it had abandoned efforts to develop an extended-release version of its oxybate formulation.  Meanwhile, Flamel/Avadel pressed ahead.

**RESPONSE:**  Jazz denies the allegations in Paragraph No. 73.  Jazz further responds that the terms "cleared successive regulatory hurdles" and "failed" are vague and ambiguous, and denies the allegations on that basis.

**PARAGRAPH NO. 74:**

An analyst commented in March 2016, "Jazz's valuable XYREM franchise is at a big risk because of a looming competitive branded threat from Flamel Technologies," not least because "Jazz has been unable to develop its own extended-release formula for XYREM."  Given that it "would only require a single dose before bedtime," the author predicted that Flamel "could not just be a competitor but could displace XYREM's market share completely."

**RESPONSE:**  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.   Jazz denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 75:**

Indeed, Avadel's FT218 product posed such an acute risk to XYREM that Jazz could not hide the danger from its investors.  In its 2017 10-K, for example, Jazz warned, "If Avadel is successful in developing a[n] oxybate formulation that could be effectively used with its delivery technology and is able to obtain FDA or other regulatory approval for its product to treat patients with narcolepsy, we expect the launch of such a product would compete directly with Xyrem and could have a material adverse effect on our business, financial condition, results of operations and growth prospects."

**RESPONSE:**  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz otherwise denies the allegations in Paragraph No. 75.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 76:**

Most recently, in its 2021 10-K, Jazz again underscored the threat posed by Avadel's superior, once-nightly oxybate product, warning investors that "Avadel will have to show clinical superiority to Xywav and Xyrem," implying that it would petition the FDA against such claims of superiority, and concluding that, "in any event, we expect to face competition from Avadel, if its product candidate is approved."

**RESPONSE:**  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz otherwise denies the allegations in Paragraph No. 76.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 77:**

Any company that wishes to sell a new drug must obtain FDA approval by filing an NDA under the Federal Food, Drug, and Cosmetic Act (FDCA).

**RESPONSE:**  Paragraph No. 77 consists of legal conclusions to which no response is required.

**PARAGRAPH NO. 78:**

Orphan Medical, Inc. filed an NDA for XYREM (oxybate) oral solution with the FDA in October 2000.  As part of that application, and like any other applicant, Orphan Medical, Inc. had to include "the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted [by an licensed person that manufactured, used, or sold] the drug, and that . . . (I) *claims* the drug for which the applicant submitted the application and is *a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or* (II) *claims a method of using such a drug* for which approval is sought or has been granted in the application." 21 U.S.C. § 355(b)(1)(A)(viii) (emphasis added).

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote a statute, the statute speaks for itself.  Jazz otherwise admits the allegations in Paragraph No. 78.

**PARAGRAPH NO. 79:**

For any approved NDA, each such patent is listed in the FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*, colloquially known as the Orange Book.  If an NDA holder obtains a new patent that claims the drug or a method of using the drug that is the subject of the NDA, then it must list that patent within 30 days of issuance.  21 U.S.C. § 355(c)(2).

**RESPONSE:**  Paragraph No. 79 consists of legal conclusions to which no response is required.

**PARAGRAPH NO. 80:**

The Orange Book serves a critical function.  It identifies drug products for which the FDA has approved an NDA and that have not been withdrawn for safety or efficacy reasons. Particularly relevant to this antitrust action, it provides information concerning patents that claim the active pharmaceutical ingredient, formulation or composition, or method of using approved drug products.  The statute has always made clear that only those patents—and those patents alone— are to be listed in the Orange Book.  21 U.S.C. § 355(b)(1)(A)(viii), (c)(2).  In particular, there is no statutory or other legal basis to list any patent that claims a method of manufacturing an approved drug product or a system or method for distributing such a drug product.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote a statute, the statute speaks for itself.  Jazz otherwise denies the allegations in Paragraph No. 80.  Jazz further responds that the term "critical function" is vague and ambiguous, and denies the allegations on that basis.

**PARAGRAPH NO. 81:**

Improperly listing and maintaining a patent in the Orange Book can have serious, anticompetitive effects.  Under the Hatch-Waxman Act of 1984, a company filing an ANDA or an NDA that implicates a patent listed in the Orange Book for an FDA-approved drug product must file a patent certification.  21 U.S.C. § 355(b)(2)(A).  In particular, a "Paragraph IV certification" that the listed patent is invalid or not infringed by the applicant's drug product creates a cause of action for patent infringement.  21 U.S.C. § 355(c)(3)(C).  If the incumbent NDA holder files a

complaint for patent infringement within 45 days of the NDA or ANDA filer's Paragraph IV certification, then the FDA's ability to authorize the pending NDA or ANDA is stayed for 30 months by operation of law, unless the patent expires or is invalidated first. *Id.*

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote a statute, the statute speaks for itself.  Jazz otherwise denies the allegations in Paragraph No. 81.

**PARAGRAPH NO. 82:**

Critically, the FDA undertakes no review whatsoever as to whether an NDA holder properly listed a patent in the Orange Book or included an appropriate use code describing any such listed patent.  This creates strong incentives for brand drug manufacturers to list patents in the Orange Book beyond those claiming the active pharmaceutical ingredient, formulation or composition, or method of using an FDA-approved drug product.  Doing so can delay entry by the seller of a competitive drug product by up to two-and-a-half years.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 82 and therefore denies them.

**PARAGRAPH NO. 83:**

As the Federal Trade Commission explained almost twenty years ago in alleging antitrust violations based on the false and misleading listing of a patent by an NDA holder in the Orange Book:

> The FDA views its role in listing patents in the Orange Book as purely ministerial, because it has neither the expertise nor the resources to resolve complex patent coverage issues.  Consequently, the FDA does not scrutinize a party's bases for listing patents in the Orange Book, as long as all the information required by statute has been submitted.  Should one company challenge the validity of the NDA holder's Orange Book listing, the FDA requests only that the NDA holder

provide written confirmation that the patent is properly listed. Through its wrongful listing in the Orange Book of the '365 patent, BMS illegitimately acquired the ability to trigger a 30-month stay, thereby delaying entry of generic buspirone, and depriving consumers of lower prices and other benefits of competition.

Complaint at 3, 12, *Bristol-Myers Squibb Co.*, 135 F.T.C. 444 (2003) (FTC Dkt. No. C-4076).

**RESPONSE:** To the extent this Paragraph purports to reference or quote a document, the document speaks for itself. Jazz otherwise denies the allegations in Paragraph No. 83.

**PARAGRAPH NO. 84:**

The FDA approved Orphan Medical, Inc.'s NDA for XYREM on July 17, 2002. From that point, Orphan Medical, Inc. (acquired by Jazz in 2005) and, later, Jazz could list only those newly issued patents that claimed the drug or a method of using the drug in the Orange Book within 30 days. 21 U.S.C. § 355(c)(2).

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote a statute, the statute speaks for itself. Jazz admits that the FDA approved Orphan Medical, Inc.'s NDA for XYREM on July 17, 2002 and that Jazz acquired Orphan Medical, Inc. in 2005.

**PARAGRAPH NO. 85:**

In August 2012, Jazz filed an application for what would become the '963 patent. The '963 patent, which describes the underlying invention as a "drug distribution system and method [that] utilizes a central pharmacy and database to track all prescriptions for a sensitive drug," claims a "*computer-implemented system* for treatment of a narcoleptic patient with a prescription drug that has potential for misuse, abuse, or diversion[.]" (emphasis added). The '963

patent was issued on May 20, 2014.  Jazz listed it in the Orange Book ten days later with respect to XYREM.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote a document, the document speaks for itself.  Jazz admits that a patent application was filed in August 2012 that led to the '963 patent, which issued on May 20, 2014.  Jazz admits that, on or about May 30, 2014, Jazz submitted to the FDA a form FDA 3542 and accompanying documents relating the '963 patent and NDA 21-196.  Jazz otherwise denies the allegations in Paragraph No. 85.

## PARAGRAPH NO. 86:

Despite knowing that the '963 patent does not claim the active pharmaceutical ingredient in XYREM, the formulation or composition of XYREM, or a method of using XYREM, Jazz nevertheless listed and maintained the '963 patent in the Orange Book in contravention of 21 U.S.C. § 355(b)(1)(A), (c)(2).  The '963 patent recites a "computer-implemented system" for distribution of a "drug that has a potential for misuse, abuse, or diversion."  Although there was no basis to list the '963 patent in the Orange Book, Jazz did so because it knew that (a) the FDA would not evaluate the merit of that listing and (b) the listing would likely force any competitors, including Avadel, seeking FDA approval to market a new oxybate drug competitive with XYREM to file a Paragraph IV certification.  At that point, Jazz would merely have to file a patent infringement complaint within 45 days of any such future certification, thus triggering an automatic stay on the FDA's ability to issue final approval.  This is exactly what Jazz did here after Avadel filed a Paragraph IV certification after the FDA's requirement to do so.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote a document, the document speaks for itself.  Jazz otherwise denies the allegations in Paragraph No. 86.

**PARAGRAPH NO. 87:**

The '963 patent claims are directed to a computer-implemented system for distributing a drug, and thus the '963 patent is not properly listed because it does not claim a drug, drug product, or method of using a drug.  But, even if the '963 patent claims somehow fell within one of those listable categories (they clearly do not), the applicable regulations would still require that Jazz, in submitting the '963 patent for listing, "descri[be] each approved method of use and related patent claim of the patent being submitted" and to "identif[y] the specific section(s) and subsection(s) of the approved labeling of the drug product that describes the method of use claimed by the patent." 21 CFR § 314.53(c)(2)(ii)(P).  But, on information and belief, Jazz's REMS for XYREM does not practice any valid claim of the '963 patent.  On March 22, 2017, the Patent Trial and Appeal Board ("PTAB"), an arm of the U.S. Patent and Trademark Office, invalidated certain claims of the '963 patent. *Amneal Pharm., LLC v. Jazz Pharm., Inc.*, IPR2015-01903, 2017 WL 1096638, at \*1 (Mar. 22, 2017).  The Federal Circuit later affirmed that decision. *Jazz Pharm. Inc. v. Amneal Pharm., LLC*, 895 F.3d. 1347, 1350 (Fed. Cir. 2018).  Each claim that was not invalidated requires a database capable of at least one of following: (1) identifying that a patient with narcolepsy is a cash payer and using that to notify the physician as an indicator of a potential misuse, abuse, or diversion (the "cash payer limitations"); or (2) reconciling inventory of the prescription drug before the shipments for a given time period are sent (the "inventory reconciliation limitations.").  The fact that the '963 patent requires hardware and a database for purposes of the cash payer or inventory reconciliation limitations further demonstrates that the '963 patent does not cover any

"approved use" as required to avoid de-listing.  *See* Michael J. Strunc *et al.*, *The XYREM® (Sodium Oxybate) Risk Evaluation and Mitigation Strategy (REMS) Program in the USA: Results From 2016 to 2017*, 8 DRUGS – REAL WORLD OUTCOMES 15 (2021) (evaluating Jazz's REMS program and making no mention of either capability).

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote statutes or documents, the statutes or documents speak for themselves.  Jazz admits that the words "computer-implemented system" appear in the claims of the '963 patent.  Jazz admits that, on March 22, 2017, the PTAB invalidated certain claims of the '963 patent, but declined to invalidate other claims, and that the Federal Circuit affirmed that decision.  Jazz otherwise denies the allegations in Paragraph No. 87.

**PARAGRAPH NO. 88:**

In December 2020, Avadel submitted an NDA for LUMRYZ pursuant to Section 505(b)(2) of the FDCA, which provides a streamlined pathway for approval of drugs that are based on the same active ingredient as—but that are not identical to—a previously approved drug.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that, in December 2020, Avadel submitted an NDA for LUMRYZ pursuant to Section 505(b)(2) of the FDCA.

**PARAGRAPH NO. 89:**

LUMRYZ will be distributed under a REMS that Avadel has developed on its own. Avadel will not use Jazz's REMS system.  Thus, rather than certifying to the '963 patent, Avadel included in its LUMRYZ NDA a "patent statement" regarding the '963 patent, stating that it does not cover any method of using oxybate for which Avadel seeks approval for LUMRYZ.  As that patent

statement explained, Avadel's LUMRYZ labeling describes no method of treating a patient with the drug using a computer system and, so, the LUMRYZ REMS was "materially different" from the '963 REMS patent.

**RESPONSE:**  To the extent this Paragraph purports to reference or quote a document, the document speaks for itself.  Jazz admits that Avadel included in its LUMRYZ NDA a "patent statement" regarding the '963 patent.  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 89 and therefore denies them.

**PARAGRAPH NO. 90:**

In addition to patent numbers and expiration dates, the Orange Book contains "use codes" submitted by incumbent patent owners to describe the uses covered by their patents.  For the '963 patent, Jazz had submitted a use code listed in the Orange Book describing a "method of treating a patient with a prescription drug using a computer database in a computer system for distribution."  As alleged above, this use code is not aligned with how Jazz has asserted its claims should be interpreted during claim construction.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that the Orange Book contains "use codes."  Jazz admits that Jazz submitted a use code listed in the Orange Book "U-1110 method of treating a patient with a prescription drug using a computer database in a computer system for distribution."  Jazz otherwise denies the allegations in Paragraph No. 90.

**PARAGRAPH NO. 91:**

On August 8, 2019, Avadel submitted a patent listing dispute regarding the '963 patent to the FDA pursuant to the agency's patent listing dispute regulations at 21 C.F.R. § 314.53(f).  In

that submission, Avadel explained that the '963 patent claims were directed to "a system" and not a method and that the '963 patent was therefore improperly listed in the Orange Book.  The FDA thereafter provided Avadel with Jazz's response, which refused to delist the '963 patent.

**RESPONSE:**  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz admits that on August 8, 2019, Avadel submitted a patent listing dispute regarding the '963 patent to the FDA, and that the FDA thereafter provided Avadel with Jazz's response, which "confirm[ed] the correctness of the description of the approved method of using [XYREM] claimed by the '963 patent and included as the 'Use Code' for that drug product in the Orange Book" and stated that "[t]he argument put forward against the '963 patent's listing appears to be based upon an incorrect claim construction.  Such a claim construction has not been presented or adjudicated.  That dispute lacks merit."  Jazz otherwise denies the allegations in Paragraph 91.

## PARAGRAPH NO. 92:

With Avadel's agreement, the FDA set its initial review completion deadline for Avadel's LUMRYZ NDA as October 15, 2021.  Just five weeks before the October deadline, however, the FDA requested information from Avadel about its patent statement concerning Jazz's '963 patent.  Avadel provided the requested information on September 16, 2021.

**RESPONSE:**  Jazz admits that the FDA set an original PDUFA date of October 15, 2021, and requested information from Avadel about its patent statement concerning Jazz's '963 patent before that deadline.  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in this Paragraph and on that basis denies them.

**PARAGRAPH NO. 93:**

On May 24, 2022, more than seven months after the October 15 deadline, the FDA concluded that Jazz's "use code" for the '963 patent—Jazz's description of the scope of its patent that Jazz submitted into FDA's Orange Book—implicated LUMRYZ's NDA.  The FDA did not make any inquiry, let alone any determination, into whether Jazz had properly listed the '963 patent in the Orange Book for XYREM or whether Jazz's use code was accurate.  Taking Jazz at its word, the FDA ordered Avadel to file a patent certification for the '963 patent as a final agency action, which Avadel did—under protest—on June 6, 2022.  As a result, Jazz's decision to list the '963 patent caused the FDA not to issue a final approval decision regarding the LUMRYZ NDA when the agency would otherwise have done so.  Hence, even before it filed this lawsuit, Jazz wrongly delayed the launch of LUMRYZ by listing the '963 patent and then maintaining that listing.

**RESPONSE:**   Jazz admits that in a letter dated May 24, 2022, the FDA concluded Avadel's proposed section 505(b)(2)(B) statement was inaccurate and Avadel was seeking approval for the method of use claimed by the '963 patent as reflected in the U-1110 use code, and that Avadel then elected to make a Paragraph IV certification against the '963 patent.  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of whether the FDA made any inquiry into the propriety of Jazz's patent listing or whether Avadel filed its Paragraph IV certification "under protest."  Jazz otherwise denies the allegations in Paragraph No. 93, including the allegation that Jazz's decision to list the '963 patent caused the FDA not to issue a final approval decision regarding the LUMRYZ NDA when the agency would otherwise have done so.

**PARAGRAPH NO. 94:**

Within 45 days of Avadel's filing its Paragraph IV certification, on July 15, 2022, Jazz filed this lawsuit against Avadel for alleged infringement of the '963 patent.  The complaint in this

case thus triggered an automatic stay, precluding approval of the LUMRYZ NDA until the '963 patent expires and the related term of pediatric exclusivity ends in June 2023. *See* 21 U.S.C. § 355(c)(3)(C). Further, demonstrating that it filed this lawsuit purely to trigger the automatic stay on the FDA's ability to approve the LUMRYZ NDA, Jazz did not even bother to serve the complaint on Avadel until September 20, 2022.

**RESPONSE:** To the extent this Paragraph purports to reference or quote a statute, the statute speaks for itself. Jazz admits that it filed this lawsuit against Avadel on July 15, 2022, within 45 days of receiving notice from Avadel that it made a Paragraph IV certification against the '963 patent, and served the complaint on Avadel on September 20, 2022. Jazz admits that the complaint in this case triggered a stay. Jazz otherwise denies the allegations in Paragraph No. 94. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 95:**

Were it not for Jazz's anticompetitive conduct preventing a final approval decision for LUMRYZ as of the October 15, 2021, PDUFA date, Avadel would have launched LUMRYZ by April 2022. By listing the '963 patent in the Orange Book and refusing to delist it, Jazz will further delay Avadel's launch of LUMRYZ until the third quarter of 2023 absent relief from this Court.

**RESPONSE:** Jazz denies the allegations in Paragraph No. 95.

**PARAGRAPH NO. 96:**

In May 2021—five months before the FDA's initial review completion deadline in October—Avadel reported to its board, "Currently we believe any long-term (+12 month) launch delays remain highly unlikely due to clinical data, SPA agreement and overall filing strategy." In describing its launch plan, Avadel projected that a "successful October 15 PDUFA will trigger our early FT218 launch . . . with product being shipped to patients before the end of April [2022]." In

updating its board in August 2021, Avadel again explained that any long-term launch delays remain highly unlikely.  It projected launching LUMRYZ in mid-March 2022 and shipping product in April 2022.

      **RESPONSE:**  To the extent this Paragraph purports to reference or quote a document, the document speaks for itself.  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 96 and therefore denies them.

**PARAGRAPH NO. 97:**

      But for Jazz's decision to improperly list and maintain the '963 patent and associated improper use code in the Orange Book, the FDA would have likely approved Avadel's NDA for LUMRYZ by the deadline of October 15, 2021.  Indeed, the circumstances surrounding the FDA's failure to act by that deadline—in particular, the FDA's questions about the '963 patent and seven-month ensuing delay while the agency figured out how to proceed in light of that patent listing—make clear that the '963 patent's listing and corresponding use code in the Orange Book caused the FDA not to reach its deadline.

      **RESPONSE:**  Jazz denies the allegations in Paragraph No. 97.

**PARAGRAPH NO. 98:**

      LUMRYZ is clinically superior to XYREM and XYWAV on account not only of its greater safety attributes (no second dose left out by the bed, or mis-dosed by patients, or taken by patients at the correct time but causing patients who get up to experience falls or other injuries), but because it represents a major contribution to patient care by virtue of being a once-nightly product.  Moreover, LUMRYZ is not the same drug as Xywav within the meaning of applicable law.  For all these reasons, the FDA will almost certainly grant LUMRYZ final approval notwithstanding XYWAV's orphan-drug exclusivity.  The FDA, however, will not grant final approval while the

'963 patent remains listed. Hence, Jazz's decision to list the '963 patent and refusal to delist it has delayed, and will continue to delay, final approval of LUMRYZ, thus denying consumers the benefits of a superior product and greater competition.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. Jazz admits that the FDA found in May 2023 that "[t]he benefits of Lumryz's once-nightly dosing rise to the level of making a major contribution to patient care" and approved LUMRYZ, but denies the approval was lawful. Jazz otherwise denies the allegations in Paragraph No. 98. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 99:**

The FDA did not approve Avadel's NDA for LUMRYZ by the deadline of October 15, 2021. Instead, the agency encountered Jazz's '963 patent listing in the Orange Book. Because the FDA, as a matter of official policy, does not evaluate the propriety of such a listing, the agency accepted it and thus took issue with the patent statement accompanying Avadel's NDA for LUMRYZ. Jazz, for its part, refused to delist the '963 patent. And, in response to Avadel's challenge of Jazz's use code for the '963 patent, Jazz refused to change that code, too. As alleged above, this process resulted in a significant delay and an FDA decision that Avadel had to file a certification to the '963 patent. Ultimately, the FDA tentatively approved Avadel's NDA for LUMRYZ, pending expiration of the automatic stay triggered by Avadel's Paragraph IV certification, which it filed under protest, and Jazz's subsequent filing of this lawsuit.

**RESPONSE:** Jazz admits that the FDA did not approve Avadel's NDA for LUMRYZ by October 15, 2021. Jazz admits that Jazz did not delist the '963 patent until March 2023 and did not change its use code for the '963 patent. Jazz admits that the FDA tentatively approved Avadel's NDA for LUMRYZ. Jazz is without knowledge or information sufficient to form a belief as to

truth or falsity of whether Avadel filed its Paragraph IV certification "under protest" or whether the FDA "took issue" with the patent statement accompanying Avadel's NDA for LUMRYZ. Jazz otherwise denies the allegations in Paragraph No. 99. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 100:**

Absent urgent action by this Court, the FDA will not be able to finally approve Avadel's NDA for LUMRYZ until the pediatric exclusivity associated with the '963 patent expires in June 2023. Although Avadel has taken, and continues to take, all possible steps to prepare to launch LUMRYZ as quickly as possible after its NDA obtains final FDA approval, it will realistically take several weeks following the approval date for Avadel to begin shipping LUMRYZ to patients. Standing up the LUMRYZ REMS will require training doctors and specialty pharmacies, something that can be undertaken only with final FDA approval. Moreover, because the oxybate in LUMRYZ is a Schedule I drug prior to FDA approval, and LUMRYZ will be manufactured in France, Avadel expects to face challenges importing commercial quantities of the drug before it receives final FDA approval.

**RESPONSE:** Jazz denies the allegation that, absent urgent action by this Court, the FDA will not be able to finally approve Avadel's NDA for LUMRYZ until the pediatric exclusivity associated with the '963 patent expires in June 2023. Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 100 and therefore denies them.

**PARAGRAPH NO. 101:**

Unless it obtains an order delisting the '963 patent in Case No. 21-691 (D.I. 11) and dismisses the claims alleging infringement of the '963 patent in that case and this one, Avadel does

not currently expect to launch LUMRYZ until at least the third quarter of 2023—almost 24 months after the original PDUFA date.

**RESPONSE:**  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations in Paragraph No. 101 and therefore denies them.

**PARAGRAPH NO. 102:**

Narcolepsy is an orphan disease affecting one out of every 2,000 Americans.  In seeking FDA-approved treatment for their EDS and cataplexy symptoms, patients with narcolepsy have long been bereft of choice.  For almost twenty years, they could look only to Jazz's oxybate product(s).  Through XYREM and XYWAV, which are liquid oxybate formulations that are dosed twice per night, Jazz alone sells FDA-approved, oxybate drugs treating both EDS and cataplexy.

**RESPONSE:**  Jazz admits that narcolepsy is an orphan disease estimated to affect one out of every 2,000 people in the United States.  Jazz admits that Jazz sells XYREM and XYWAV in the United States, which are twice-nightly liquid oxybate formulations and FDA-approved indications for narcolepsy.  Jazz admits that XYREM has been available in the United States for at least 20 years but not approved for its current indications and patient populations.  Jazz admits that as of the time Avadel filed its counterclaims, Jazz alone sold oxybate drugs approved by the FDA to treat both EDS and cataplexy.  Jazz otherwise denies the allegations in Paragraph No. 102.

**PARAGRAPH NO. 103:**

Various non-oxybate drugs, such as stimulants and wakefulness promoting agents (WPAs), exist for treating EDS associated with narcolepsy.  For example, the FDA has approved stimulants like amphetamine and methylphenidate to treat EDS in narcolepsy, as it has WPAs like armodafinil and modafinil.  But none of those drugs is indicated to treat cataplexy in narcolepsy, and so cannot relieve the full array of narcolepsy patients' symptoms.  Moreover, physicians often prescribe

stimulants or WPAs alongside oxybate drugs for people suffering from narcolepsy. For that reason, drugs not indicated for cataplexy in narcolepsy do not act as a competitive constraint on Jazz's pricing of XYREM and XYWAV.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. Jazz admits that various non-oxybate drugs exist for treating EDS associated with narcolepsy, and that the FDA has approved stimulants like amphetamine and methylphenidate, and Wakefulness-Promoting Agents ("WPAs") like armodafinil and modafinil, for that purpose. Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 103 and therefore denies them. Jazz further responds that the term "those drugs" is vague and ambiguous, and denies the allegations on that basis.

## PARAGRAPH NO. 104:

The only FDA-approved drug other than oxybate that is indicated to treat patients suffering from EDS and cataplexy is pitolisant, which is a WPA the FDA approved in 2019 to treat EDS in adults and in 2020 for an adult cataplexy indication in the United States. But because of pitolisant's wake-promoting properties, it is often prescribed as part of a multi-pharmacy treatment approach in conjunction with oxybate. Pitolisant, therefore, acts as an economic complement, rather than a substitute, for XYREM or XYWAV. In particular, a doctor would prescribe XYREM or XYWAV for the patient to take at night as well as pitolisant (or another WPA) for the patient to take in the morning upon awaking. Sold under the brand name WAKIX® by Harmony Biosciences, pitolisant has not been the object of any head-to-head clinical trial with oxybate and thus lacks evidence of any clinical superiority over what has long been the established, prescribed treatment. Its timing of use, dosing, and purpose all differ from oxybate. To that end, as the long-term seller of the only

FDA-approved oxybate drug indicated for treating EDS and cataplexy in narcolepsy, Jazz benefits from strong brand recognition in XYREM—which the company is seeking to leverage into demand for its new, mixed salt drug product, XYWAV.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. Jazz admits that pitolisant is a WPA which the FDA approved in 2019 to treat EDS in adult patients with narcolepsy and in 2020 to treat cataplexy in adult patients with narcolepsy in the United States. Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 104 and therefore denies them.

**PARAGRAPH NO. 105:**

For these and other reasons, neither pitolisant nor any other FDA-approved non-oxybate drugs competitively constrain Jazz in selling oxybate. Indeed, as Jazz told its investors in an SEC filing earlier this year, "To date, we have not seen a material impact to our business from the introduction of these new market entrants." In short, no FDA-approved drug or other treatment is currently reasonably interchangeable with oxybate for patients with narcolepsy suffering from both EDS and cataplexy.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote a document, the document speaks for itself. Jazz otherwise denies the allegations in Paragraph No. 105. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 106:**

Jazz itself has made clear, repeatedly, that there is no substitute—reasonable or otherwise—for its FDA-approved drugs to treat EDS and cataplexy. In its 2021 10-K, Jazz

informed its investors that "Xywav and Xyrem are currently the only products approved by FDA and marketed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy[.]"  And in 2020, in announcing the FDA's approval of XYWAV with respect to treating "both cataplexy and excessive daytime sleepiness in people living with narcolepsy," Jazz observed that oxybate is "a current standard of care for this patient population as designated by the American Academy of Sleep Medicine Guidelines."

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz otherwise denies the allegations in Paragraph No. 106. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 107:**

Jazz has not always been so restrained in describing its monopoly.  For instance, its CEO observed in 2010 with respect to XYREM, "We do think we have substantial pricing power still in the product.  It is a unique product.  There is nothing else that does what it does.  There is no substitute."  He was equally blunt a year later, "There's really no competition."  More recently, the arrival of successive, though thus far unsuccessful, ANDA filers seeking to market generic versions of XYREM has raised the potential for antitrust scrutiny, likely leading Jazz's CEO to be less strident in describing the company's monopolistic position.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves.  Jazz otherwise denies the allegations in Paragraph No. 107. Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 108**:

In defining the relevant market, antitrust law sometimes asks whether a hypothetical monopolist of the candidate product market (here, FDA-approved drugs used to treat EDS and cataplexy in narcolepsy) could raise prices by 5% to 10% above the competitive level without suffering a critical loss of sales that would render the attempted price increase unprofitable. The facts here would amply support a relevant product market limited to the sale of FDA-approved, oxybate drugs used to treat EDS and cataplexy in narcolepsy. Today, Jazz is not a hypothetical monopolist—but an actual monopolist—seller of FDA-approved, oxybate drugs used to treat narcolepsy-related EDS and cataplexy. It has proven time and again that it can profitably raise prices even beyond its prior, elevated levels. Indeed, since 2007, Jazz has raised the price of XYREM by more than 1000%. And, during that time, its revenues and profits have soared to ever- new heights. Until 2020, XYREM represented around three-quarters of Jazz's total revenue. Since launching XYWAV in the United States in November 2020 and transitioning as many of its customers as possible from XYREM in order to blunt the anticipated effect of generic versions of XYREM arriving on the market in 2023, Jazz's profits have continued to rise, reaching $992.8 million in 2021 (from $165 million in 2011).

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. Jazz further responds that the terms "price," "profits," "total revenue," "elevated levels," "[u]ntil 2020," and "soared to ever-new heights" are vague and ambiguous, and denies the allegations on that basis. Jazz otherwise denies the allegations in Paragraph No. 108, including that it is an "actual monopolist." Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 109:**

The price that Jazz charges for its oxybate drugs has led to downstream efforts to limit or condition insurance coverage in order to mitigate the rising costs of treatment on a patient population with inelastic demand, providing further evidence of anticompetitive effects flowing from its monopoly power. In particular, distortions have arisen on account of insurers' and other payors' efforts to minimize the circumstances in which they will cover Xyrem and Xywav treatments, indicating that these drugs are sold at supracompetitive prices. Indeed, in its 2021 10-K, Jazz conceded that "payors often require patients to try [branded or generic medications for cataplexy] medications before they will cover XYWAV or XYREM, even if they are not approved for this use." This conditioning indicates a recognition of payors and their insured population's inability to switch away from Jazz's products in the face of steep price increases.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent this Paragraph purports to reference or quote documents, the documents speak for themselves. Jazz otherwise denies the allegations in Paragraph No. 109. Jazz further denies Avadel's characterization of the facts in this Paragraph and points out that Avadel prices its oxybate products at parity.

**PARAGRAPH NO. 110:**

These facts amply support a relevant product market limited to the sale of FDA-approved oxybate drugs for patients with narcolepsy. In that market, and by its own admission, Jazz has a literal monopoly, with 100% share of sales. Remarkably, Jazz has preserved that monopoly for almost two decades.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent a response is required, Jazz denies the allegations in Paragraph No. 110.

**PARAGRAPH NO. 111:**

Expanding the relevant product market to include all drugs approved by the FDA to treat patients suffering from narcolepsy-related EDS with or without cataplexy does not change the result. Jazz has monopoly power in that market, too, accounting for over 90% of sales. Harmony Biosciences Holdings, Inc. reported $305.4 million in revenue for sales of its pitolisant drug WAKIX in 2021, although much of that reported revenue likely represents sales of doses prescribed alongside, rather than as an alternative to, Jazz's oxybate drugs. Moreover, at the end of 2021, only about 3,800 patients were taking WAKIX—a figure representing less than 10% of Americans taking narcolepsy medications and approximately 2% of the number of Americans estimated to have narcolepsy. Even within a relevant market of drugs approved by the FDA to treat patients suffering from narcolepsy and cataplexy, and assuming that it were an alternative treatment rather than an adjunct treatment to oxybate, pitolisant would represent at most a distant substitute to Jazz's XYREM and XYWAV products.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. Jazz admits that Harmony Biosciences Holdings, Inc. reported $305.4 million in revenue for sales of its pitolisant drug WAKIX in 2021 and that the average number of patients taking WAKIX was 3,800. Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 111 and therefore denies them.

**PARAGRAPH NO. 112:**

Entry barriers into the market for drugs approved by the FDA to treat patients suffering from narcolepsy are significant.  FDA regulatory approval, even in abbreviated form for generic versions of FDA-approved drugs, requires a lengthy and costly process.  It can take years for a pharmaceutical company to launch a competitive drug after deciding to do so.  Moreover, Jazz has a number of patents that it claims cover, for example, distribution systems, various methods of using its oxybate drugs and the formulation of XYWAV.  Although a number of those patents have been declared invalid or found not to have been infringed, Jazz has a long history of aggressively asserting intellectual property of dubious merit in order to deter entry.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that it can take years for a pharmaceutical company to launch a competitive drug after deciding to do so.   Jazz admits that, as of the time that Avadel filed its counterclaims, Jazz had patents that it claimed cover various methods of using its oxybate drugs and the formulation of XYWAV.  Jazz admits that some of its patents have been declared invalid. Jazz denies that it has a long history of aggressively asserting intellectual property of dubious merit in order to deter entry.  Jazz is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 112 and therefore denies them.  Jazz further responds that the terms "significant," "lengthy," "costly," "years" and "a number of patents" are vague and ambiguous, and denies the allegations on that basis.

**PARAGRAPH NO. 113:**

The relevant geographic market for drugs approved by the FDA to treat suffering from narcolepsy and cataplexy is the United States.  Because of U.S. law and FDA regulatory requirements, U.S. consumers would not respond to a small, but significant, nontransitory increase

in the price of drugs approved by the FDA to treat patients suffering from symptoms of narcolepsy by switching to drugs sold outside of the United States.

**RESPONSE:** Paragraph No. 113 consists of legal conclusions to which no response is required. To the extent a response is required, Jazz denies the allegations in Paragraph No. 113.

## PARAGRAPH NO. 114:

Jazz abused the FDA's regulatory process by improperly listing and maintaining the '963 patent in the Orange Book, actions that caused the FDA to postpone review of Avadel's NDA for LUMRYZ beyond October 15, 2021—the date the FDA set for its initial review completion deadline. By listing and maintaining the '963 REMS patent, along with an overly broad use code inconsistent with Jazz's own claim construction of the '963 patent, Jazz ultimately caused the FDA to determine on May 24, 2022, that Avadel had to file a patent certification. The FDA, as Jazz knew, does not undertake any analysis of whether a patent was properly or improperly listed in the Orange Book or whether Jazz's use code for the '963 patent was correct.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. Jazz admits that in a letter dated May 24, 2022, the FDA concluded Avadel's proposed section 505(b)(2)(B) statement was inaccurate and that Avadel was seeking approval for the method of use claimed by the '963 patent as reflected in the U-1110 use code. Jazz admits that Avadel then elected to make a Paragraph IV certification against the '963 patent. Jazz otherwise denies the allegations in Paragraph No. 114.

## PARAGRAPH NO. 115:

Were it not for Jazz's anticompetitive conduct, Avadel would have likely received a final approval decision from FDA on or by October 15, 2021, and launched LUMRYZ in the United States in April 2022. LUMRYZ's introduction would have brought desperately needed

competition in the sale of oxybate products, breaking up Jazz's monopoly, bringing a superior, once-at-bedtime drug to patients with narcolepsy, and pressuring Jazz to reduce prices in order to preserve sales in the face of competition from a clearly superior product.  As alleged above, scores of people suffering from narcolepsy are desperate for LUMRYZ over the inferior XYREM and XYWAV products.  Indeed, in a recent LUMRYZ trial, 92.5% of switched patients said they preferred dosing once-nightly rather than twice-nightly.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz otherwise denies the allegations in Paragraph No. 115, including that it engaged in anticompetitive conduct or somehow delayed Avadel's launch of LUMRYZ, or is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 115 and therefore denies them.

**PARAGRAPH NO. 116:**

Had Avadel been able to launch LUMRYZ, it would have forced Jazz to reduce prices to attempt to hold onto some market share.  Thus, by delaying the introduction of LUMRYZ until at least the third quarter of 2023, Jazz has caused consumers to suffer a loss of both quality and price competition.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz is otherwise without knowledge or information sufficient to form a belief as to truth or falsity of the allegations in Paragraph No. 117 and therefore denies them.

**PARAGRAPH NO. 117:**

These anticompetitive effects flow directly from the injury that Jazz has inflicted on Avadel.  The listing and maintenance of the '963 patent and associated use code in the Orange Book by Jazz has delayed Avadel's launch of LUMRYZ, denying Avadel hundreds of millions of

dollars in revenue.  The cost of this delay is particularly devastating to Avadel as a small company whose principal focus has been on getting LUMRYZ to market as quickly as possible.  On account of Jazz's exclusionary conduct, Avadel had to lay off almost one-half of its workforce during the summer of 2022.  Moreover, Avadel has suffered, and continues to suffer, antitrust injury through the costs and attorneys' fees it must pay in order to (a) defend against the anticompetitive lawsuit Jazz has filed with this action, (b) litigate its delisting counterclaims (D.I. 11) in Case No. 21691 in this Court, and (c) bring APA litigation against the FDA (D.I. 1) in Case No. 222159 with respect to the FDA's final agency action directing Avadel to file a Paragraph IV certification, all of which are the direct result of Jazz's unlawful decision to list and maintain the '963 patent in the Orange Book.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz otherwise denies or is without knowledge or information sufficient to form a belief as to truth or falsity of the remaining allegations in Paragraph No. 117 and therefore denies them.

## PARAGRAPH NO. 118:

In short, Avadel has suffered injury of the type the antitrust laws were intended to prevent and that flows from the unlawful nature of Jazz's acts.  As the direct victim of Jazz's efforts to exclude competition in the sale of (a) FDA approved oxybate-based drugs for treatment of narcolepsy, and/or (b) FDA-approved drugs to treat patients with narcolepsy and cataplexy, Avadel has standing to bring counterclaims under the antitrust laws.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 118.

**As Counts I, II, and III of Avadel's Counterclaims were dismissed, no response to Paragraph Nos. 119-133 is required.**

**Count IV: Monopolization, Improper Orange Book Listing,**

**Section 2 of the Sherman Act (15 U.S.C. § 2)**

**PARAGRAPH NO. 134:**

Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**RESPONSE:**  Jazz incorporates by reference its responses to Paragraphs Nos. 34-133.

**PARAGRAPH NO. 135:**

Jazz unlawfully maintained its monopoly in violation of Section 2 of the Sherman Act by engaging in exclusionary conduct that has had—and continues to cause—unjustifiable, actual anticompetitive effects in the relevant market for (a) FDA approved oxybate-based drugs for treatment of narcolepsy and/or (b) FDA-approved drugs to treat patients with narcolepsy and cataplexy in the United States.  Moreover, as the direct, proximate target of Jazz's exclusionary conduct, Avadel has suffered antitrust injury and has standing to bring claims under Sections 4 and 16 of the Clayton Act based on Jazz's monopolization.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 135, including that it unlawfully maintained a monopoly.

**PARAGRAPH NO. 136:**

Unless it is expeditiously enjoined, Jazz will continue to subject consumers in the relevant market to harms in the form of reduced product quality, higher prices, and diminished choice through its anticompetitive conduct.  In particular, Jazz listed and refuses to delist the '963 patent—

50

a REMS patent that claims a distribution system—in the Orange Book.  Jazz did this, even though

the owner of an FDA-approved drug product may only list in the Orange Book patents that claim

the active pharmaceutical ingredient, composition or formulation, or method of using that drug.

There was no mistake.  Nor is there any legitimate, procompetitive business reason for Jazz to have

listed the '963 patent, refuse to delist it, and file this lawsuit.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions,

no response is required.  To the extent a response is required, Jazz admits that on or about May 30,

2014, it submitted to FDA a form FDA 3542 and accompanying documents relating the '963 patent

and NDA 21-196, and it did not request the FDA to delist the '963 patent from the Orange Book

until March 2023.  Jazz otherwise denies the allegations in Paragraph No. 136.

**PARAGRAPH NO. 137:**

Consistent with its past playbook of improperly listing REMS patents in the Orange Book,

and further to its long-running, aggressive efforts to guard its prized monopoly, Jazz listed the '963

patent in order to impede any pharmaceutical company that may try to launch a competitive

oxybate product.  This act had the desired effect on Avadel, whose NDA for LUMRYZ—a far

superior, once-at-bedtime oxybate product—was delayed when the FDA encountered Jazz's

inappropriate Orange Book listing and mischaracterization of the '963 patent and ultimately

decided that it could not approve Avadel's NDA unless Avadel filed a Paragraph IV certification.

That certification, in turn, allowed Jazz to file this lawsuit, further delaying the FDA's ability to

grant final approval to LUMRYZ by triggering an automatic stay.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions,

no response is required.  Jazz otherwise denies the allegations in Paragraph No. 137.

**PARAGRAPH NO. 138:**

Jazz knew that it could get away with this anticompetitive scheme—if only until it faced scrutiny years later in court—because the FDA does not evaluate whether patent listings and their associated use codes are legitimate.  Rather, the FDA trusts patentees like Jazz to abide by black-letter law.  Having abused the FDA's regulatory drug approval process, Jazz continues to reap the rewards in the meantime.  It earned over $1.8 billion in revenue in 2021 selling oxybate drugs that would have faced disruptive competition from Avadel's LUMRYZ product beginning in April 2022 were it not for Jazz's decision to list the '963 patent in the Orange Book.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that Jazz Pharmaceutical plc's revenue from total oxybate sales was over $1.8 billion in 2021.  Jazz otherwise denies the allegations in Paragraph No. 138, including that it orchestrated an "anticompetitive scheme."

**PARAGRAPH NO. 139:**

The anticompetitive harms created by Jazz's conduct are no mere abstractions. Nor are they limited to financial harms.  Thousands of Americans are suffering today needlessly, relying on Jazz's inferior, twice-nightly oxybate products and enduring sleep disruption, each and every night. As alleged above, patients suffering from narcolepsy are crying out for Avadel's revolutionary, once-at-bedtime product.  Were it not for Jazz's decision to list the '963 patent, they would have had access to Avadel's game-changing drug more than half a year ago.  Instead, absent relief from this Court, they will have to wait until at least the third quarter of 2023.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 139.

**PARAGRAPH NO. 140:**

A relevant market exists for the sale of a) FDA-approved oxybate drugs to treat narcolepsy-related EDS and cataplexy and/or b) FDA-approved drugs for treatment of narcolepsy- related EDS and cataplexy in the United States.  No reasonable substitutes exist for those drugs, which today are limited to oxybate (which only Jazz sells) and, under the broadest conceivable market definition, pitolisant (which Harmony Biosciences alone sells, and only since late 2019).  A hypothetical monopolist of FDA-approved oxybate and pitolisant could profitably raise price beyond the competitive level by 5-10% without suffering a critical loss of sales.  People suffering from narcolepsy-associated EDS and cataplexy would not switch in sufficient numbers in response to such a price increase to render it unprofitable.  Stimulants and WPAs (other than, to a limited degree, pitolisant) used to treat EDS do not alleviate cataplexy symptoms and are thus not a good alternative.  Nor do they (or other available drugs or treatments) address the issue of disturbed nighttime sleep, and in fact exacerbate this symptom.  In contrast, drugs like oxybate improve nocturnal sleep, albeit at the expense of disrupting patients' sleep in the middle of the night with currently available products.  Indeed, Jazz itself has had a monopoly over the sale of FDA-approved oxybate drugs for 17 years and has profitably increased price substantially and consistently over that time.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz otherwise denies the allegations in Paragraph No. 140, including that it "had a monopoly over the sale of FDA-approved oxybate drugs."

**PARAGRAPH NO. 141:**

The relevant geographic market is the United States.  The FDA regulates the sale of drugs, meaning that consumers could not respond to an increase in the price of FDA-approved drugs to

treat patients with narcolepsy in the United States by switching to equivalent drugs sold outside of the United States.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz admits that the FDA regulates the sale of drugs in the United States.  Jazz otherwise denies the allegations in Paragraph No. 141.

**PARAGRAPH NO. 142:**

Jazz has monopoly power even in a relevant market broadly defined as the sale of FDA-approved drugs to treat patients with narcolepsy in the United States.  Until 2020, it had 100% market share.  Harmony Biosciences launched pitolisant in late 2019 under the brand name WAKIX, for which the FDA approved indications for both EDS and cataplexy in narcolepsy the next year.  But pitolisant remains at most a distant substitute to oxybate in the relevant market.  It is, in the first place, a WPA taken during the day in order to address EDS and cataplexy.  Unlike oxybate, it does nothing to address the root cause of people's symptoms because it does not help patients achieve deep, restorative sleep.  Because pitolisant is heavily differentiated from oxybate, physicians often prescribe it alongside—rather than instead of—XYREM or XYWAV.  In addition, WAKIX (pitolisant) has thus far achieved limited penetration among patients suffering from narcolepsy-related EDS and cataplexy.  Harmony Biosciences itself estimates that less than 10% of patients taking narcolepsy medications use WAKIX.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that Harmony Biosciences launched pitolisant in late 2019 under the brand name WAKIX, for which the FDA approved indications for both EDS (in 2019) and cataplexy (the next year).   Jazz admits that pitolisant is a WPA approved to be taken in the morning upon wakening to address EDS and cataplexy.  Jazz is without knowledge or information

sufficient to form a belief as to truth or falsity of the remaining allegations in this Paragraph and therefore denies them.

**PARAGRAPH NO. 143:**

For these reasons, pitolisant does not competitively constrain Jazz's pricing in selling XYREM and XYWAV.  That is why Jazz reported to its investors earlier this year that "[t]o date, we have not seen a material impact to our business from the introduction of these new market entrants."  Jazz fears competition not from the sale of WPAs like pitolisant, but from other oxybate drugs, particularly a superior, once-at-bedtime, extended-release version of the kind developed by Avadel.  Again, Jazz has made clear in SEC filings where it sees danger from competition, warning in its 2017 10-K, for example, "If Avadel is successful . . . the launch of such a product would compete directly with XYREM and could have a material adverse effect on our business, financial condition, results of operations and growth prospects."

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.   To the extent this Paragraph purports to reference or quote from documents, the documents speak for themselves.   Jazz otherwise denies the allegations in Paragraph No. 143.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 144:**

Jazz's decision to list the '963 patent in the Orange Book was no mistake or good-faith misreading of applicable law, but a deliberate effort to preserve its monopoly—consistent with its overall practice of delaying and excluding all competition with its lucrative oxybate drugs over the past 17 years.  Those actions have delayed the FDA's approval decision on Avadel's NDA for LUMRYZ, depriving Avadel of hundreds of millions of dollars of sales and subjecting consumers to severe anticompetitive effects in the form of reduced quality and price competition. Jazz's

decision to file this case in order to secure an automatic stay on the FDA's ability to approve the NDA for LUMRYZ was similarly an unlawful, exclusionary act undertaken not to secure a judgment from this Court, but simply to trigger the statutory automatic stay.  Indeed, Jazz did not even bother to serve the complaint in this case on Avadel until September 20, 2022—more than two months after filing the case.  Filing a lawsuit pursuant to an overall scheme to monopolize, and in an effort to use the litigation process itself—as opposed to the outcome of the process—as a means to harm competition, is itself actionable under the antitrust laws.  Moreover, the allegations of infringement of the '963 patent that Jazz levels against Avadel here are objectively baseless and clearly brought for the purposes of excluding competition.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  Jazz admits that it filed this lawsuit against Avadel in July 2022 and served the complaint on Avadel in September 2022.  Jazz otherwise denies the allegations in Paragraph No. 144, including that its decision to list the '963 patent in the Orange Book was "a deliberate effort to preserve its monopoly."

**PARAGRAPH NO. 145:**

Jazz has inflicted antitrust injury on Avadel by listing the '963 patent, refusing to delist it, and by bringing this lawsuit.  Those actions, both individually and in combination, have deprived Avadel of hundreds of millions of dollars in sales, forced Avadel to expend its limited resources on litigation costs and attorneys' fees, and compelled Avadel to lay off almost one-half of its workforce in the summer of 2022.  These harms may begin with Avadel, as the direct target of Jazz's exclusionary conduct, but they extend to consumers, whom Jazz has denied a superior treatment for narcolepsy and the benefits of steep price reductions that Jazz would have to make to XYREM and XYWAV in order to protect share after Avadel launches its superior product.  In

short, Avadel's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent a response is required, Jazz denies the allegations or is without knowledge or information sufficient to form a belief as to truth or falsity of the allegations in this Paragraph and therefore denies them.

**PARAGRAPH NO. 146:**

Avadel is entitled to a judgment from this Court for all damages incurred by Jazz's antitrust violations, including treble damages. Avadel is also entitled to injunctive relief requiring Jazz to refrain from its continued anticompetitive conduct, including any further assertion of baseless patent infringement claims against Avadel.

**RESPONSE:** Paragraph No. 146 consists of legal conclusions to which no response is required. To the extent a response is required, Jazz denies the allegations in Paragraph No. 146.

**Count V: Attempted Monopolization, Improper Orange Book Listing,**

**Section 2 of the Sherman Act (15 U.S.C. § 2)**

**PARAGRAPH NO. 147:**

Avadel incorporates by reference the allegations made in Avadel's Defenses and in the preceding paragraphs of the Counterclaims above.

**RESPONSE:** Jazz incorporates by reference its responses to Paragraphs Nos. 34-146.

**PARAGRAPH NO. 148:**

Jazz has attempted to monopolize the relevant market for the sale of a) FDA-approved oxybate drugs to treat narcolepsy-related EDS and cataplexy and/or b) FDA-approved drugs for treatment of narcolepsy-related EDS and cataplexy in the United States in violation of Section 2

of the Sherman Act.  It has done so by taking anticompetitive actions that carry a dangerous probability of successfully producing a monopoly and delaying the onset of competition. Moreover, as the direct, proximate target of Jazz's exclusionary conduct, Avadel has suffered antitrust injury and has standing to bring claims under Sections 4 and 16 of the Clayton Act based on Jazz's attempted monopolization.

**RESPONSE:**  Paragraph No. 148 consists of legal conclusions to which no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 148.

**PARAGRAPH NO. 149:**

As alleged in detail above, Jazz has engaged in exclusionary, anticompetitive conduct designed to prevent competition between Jazz and Avadel, including, but not limited to, 1) improperly listing the '963 patent in the FDA's Orange Book; 2) refusing to delist the '963 patent; and 3) bringing this lawsuit pursuant to an overall anticompetitive scheme to exclude competition in the sale of FDA-approved oxybate (or all FDA-approved) drugs to treat narcolepsy- related EDS and cataplexy by delaying FDA approval of LUMRYZ and other competitive drugs, including by triggering an automatic stay with this action based on the improper listing of the '963 patent.  The result of Jazz's unlawful conduct has been to delay and preclude the entry of Avadel's competing product, LUMRYZ.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 149.

**PARAGRAPH NO. 150:**

Jazz clearly acted with the specific intent to monopolize the relevant market.  It has warned its investors for years about the danger that Avadel's LUMRYZ drug poses to Jazz's oxybate

monopoly.  Industry analysts have correctly observed that LUMRYZ is "Jazz Pharmaceuticals' Worst Nightmare" and "not just . . . a competitor but [a drug that] could displace XYREM's market share completely."  If this were not enough, Jazz's conduct in preserving its monopoly for more than a decade through prior listings of REMS patents in the Orange Book and the aggressive assertion of patents found invalid by the Federal Circuit speaks to an unmistakable intent to achieve and preserve monopoly.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent this Paragraph purports to reference or quote from documents, the documents speak for themselves.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 150.  Jazz further denies Avadel's characterization of the facts in this Paragraph.

**PARAGRAPH NO. 151:**

As alleged above, Jazz has monopoly power in the relevant market.  Its market share far exceeds the 50% threshold typically required for an attempted monopolization to have a dangerous probability of success.  Jazz's conduct obviously carries a greater-than-dangerous probability of resulting in a monopoly—the company's actions from listing the '963 patent in the Orange Book and improper use code through filing this case have successfully kept Avadel's superior drug, and all other oxybate drugs, off the market.  Even if Jazz succeeded on its baseless claims that Avadel has infringed the '963 patent, that improbable outcome would not cure its improper listing of the '963 patent in the Orange Book because that act carried with it a dangerous probability of success in preserving Jazz's oxybate monopoly.  Moreover, even if one or more generic versions of XYREM enter the market in 2023 and later, and even if pitolisant grew to achieve greater sales among patients with narcolepsy than it does today, no such event would change the dangerous

probability that Jazz's conduct will delay the onset of competition (indeed, it already has).  In fact, Jazz is switching as many of its customers from XYREM to XYWAV as possible in order to minimize the competitive impact of generic entry and, through the '963 patent listing and the filing this lawsuit, is delaying the arrival of competition from LUMRYZ for as long as possible.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 151.

## PARAGRAPH NO. 152:

Avadel has been injured in its business and property by reason of Jazz's anticompetitive activities.  Avadel's customers have been denied the choice of a superior treatment for narcolepsy, and Avadel has incurred costs defending Jazz's lawsuits and from unjustly delayed approval of LUMRYZ. As alleged above, Avadel's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

**RESPONSE:**  To the extent the allegations in this Paragraph consist of legal conclusions, no response is required.  To the extent a response is required, Jazz denies the allegations in Paragraph No. 152.

## PARAGRAPH NO. 153:

Avadel is entitled to a judgment from this Court for all damages incurred by Jazz's antitrust violations, including treble damages.  Avadel is also entitled to injunctive relief requiring Jazz to refrain from its continued anticompetitive conduct, including any further assertion of baseless patent infringement claims against Avadel.

**RESPONSE:** To the extent the allegations in this Paragraph consist of legal conclusions, no response is required. To the extent a response is required, Jazz denies the allegations in Paragraph No. 153.

<u>**AFFIRMATIVE OR OTHER DEFENSES**</u>

Without assuming any burden of proof it would not otherwise bear, Jazz states the following affirmative or other defenses. The following statement of defenses is not intended to characterize any particular defense as "affirmative," nor to specify which party bears the burden of proof or persuasion on a particular defense. For avoidance of doubt, Jazz does not invoke advice of counsel or waive privilege by providing this statement of defenses.

<u>**FIRST DEFENSE**</u>

(Failure to State a Claim)

Avadel's counterclaims fail to state a claim against Jazz upon which relief may be granted.

<u>**SECOND DEFENSE**</u>

(Antitrust Standing)

Avadel's counterclaims are barred, in whole or in part, because Avadel lacks antitrust standing. Among other things, Avadel has failed to allege, and is incapable of demonstrating, that the FDA could have granted final approval for LUMRYZ by October 2021 and LUMRYZ could have lawfully or actually launched by April 2022. Independent regulatory or legislative bars against market entry precluded Avadel's counterclaims, including but not limited to Jazz's unexpired Orphan Drug Exclusivity; and Jazz's valid and infringed patents asserted in Civ. Nos. 21-691, 21-1138, and 21-1594.

## THIRD DEFENSE

(Antitrust Injury)

Avadel's counterclaims are barred, in whole or in part, because Avadel has not sustained antitrust injury by reason of any act or omission of Jazz.  Any injury suffered by Avadel is not an injury which the antitrust laws are designed to prevent, or which flows from that which would make Jazz's alleged conduct unlawful under the antitrust laws.  To the extent Avadel's alleged injury is caused by Jazz's decision to the list '963 patent in the Orange Book, Jazz had a reasonable basis for doing so; accordingly Avadel's alleged injury is not a recognized antitrust injury under the law.  Nor is Avadel threatened by an antitrust injury.

## FOURTH DEFENSE

(Cognizable Damages)

Avadel's counterclaims are barred, in whole or in part, because Avadel has not suffered any cognizable damage or injury, including because Avadel could not have launched LUMRYZ by April 2022 regardless of Jazz's decision to the list '963 patent in the Orange Book.

## FIFTH DEFENSE

(Adverse Effect on Competition)

Avadel's counterclaims are barred, in whole or in part, because the acts or omissions of Jazz did not have any adverse effects on competition in any properly defined relevant market(s), nor have they threatened to do so.  Various treatments other than oxybate exist to treat narcolepsy, including (without limitation) stimulants, depressants, and Monoamine Oxidase Inhibitors.

## SIXTH DEFENSE

### (Legitimate Economic Interests)

Avadel's counterclaims are barred, in whole or in part, because Jazz's actions were lawful, justified, procompetitive, taken in the pursuit of its own legitimate economic interests and the interests of its customers, not by wrongful means.  Jazz's actions were reasonable efforts to protect the value of Jazz's intellectual property and to allow Jazz to compete to offer innovative therapeutics at a competitive price.

## SEVENTH DEFENSE

### (Reasonable Basis for Conduct)

Avadel's counterclaims are barred, in whole or in part, because Avadel has failed to allege that Jazz lacked any reasonable basis for its conduct.  Jazz acted reasonably in listing the '963 patent in the Orange Book and maintaining that listing until March 2023.  For avoidance of doubt, Jazz does not invoke advice of counsel or waive privilege by asserting this defense.

## EIGHTH DEFENSE

### (Third-Party Conduct)

Avadel's counterclaims are barred, in whole or in part, because the injuries alleged by Avadel, to the extent any exist, were caused, in whole or in part, by the conduct of third parties for whom Jazz was not responsible, through forces in the marketplace over which Jazz has no control, or through acts or omissions on the part of Avadel.  Independent regulatory or legislative bars against market entry precluded Avadel's counterclaims, including because the FDA documents show that any delay in the launch of LUMRYZ was due to Avadel's regulatory strategies, and the FDA initially concluding that Avadel could not overcome Jazz's Orphan Drug Exclusivity as

Avadel had presented no evidence of clinical superiority for LUMRYZ and not reversing that conclusion until May 2023.

### NINTH DEFENSE

(Contributory Negligence)

Avadel's counterclaims are barred, in whole or in part, because the injuries alleged by Avadel, to the extent any exist, were caused, in whole or in part, by Avadel's own conduct, not acts or omissions on the part of Jazz.  Avadel delayed the launch of LUMRYZ with its own actions, including by filing its NDA for LUMRYZ under Section 505(b)(2) of the FDCA.

### TENTH DEFENSE

(Speculative Damages)

Avadel's counterclaims are barred, in whole or in part, because Avadel's alleged damages, if any, are too remote and/or speculative to allow recovery and because determining whether, or to what extent, Avadel was damaged is impossible, including because Avadel fails to allege that it could have launched LUMRYZ by April 2022 regardless of Jazz's decision to the list '963 patent in the Orange Book.

### ELEVENTH DEFENSE

(Relevant Markets)

Avadel's counterclaims are barred, in whole or in part, because Avadel has insufficiently alleged a relevant product market(s) and geographic market(s), and the counterclaims are so vague and ambiguous as to deny Jazz notice of the markets alleged by Avadel.

**TWELFTH DEFENSE**

(Monopoly Power)

Avadel's counterclaims are barred, in whole or in part, because Jazz lacks monopoly power in the relevant product market(s) and geographic market(s).  Narcolepsy treatments other than oxybate (including, without limitation, stimulants, depressants, and Monoamine Oxidase Inhibitors) are reasonably interchangeable with oxybate both by themselves or in combination with other treatment options.  Avadel fails to sufficiently allege the requisite market share or indirect evidence of monopoly power in a market that properly accounts for these other narcolepsy treatments.

**THIRTEENTH DEFENSE**

(Monopolization and Attempted Monopolization)

Avadel's counterclaims are barred, in whole or in part, because Avadel fails to allege that Jazz has engaged in predatory or anticompetitive conduct, has a specific intent to monopolize, or has a dangerous probability of achieving monopoly power.  Jazz has not engaged in predatory pricing or other anticompetitive practices to drive out competitors.  Jazz acted reasonably in listing the '963 patent in the Orange Book and maintaining that listing until March 2023.  For avoidance of doubt, Jazz does not invoke advice of counsel or waive privilege by asserting this defense.

**FOURTEENTH DEFENSE**

(*Noerr-Pennington*)

Avadel's counterclaims are barred, in whole or in part, by the immunity conferred on Jazz by the First Amendment and *Noerr-Pennington* doctrine.

65

## FIFTEENTH DEFENSE

### (Failure to Mitigate)

Avadel's counterclaims are barred, in whole or in part, by Avadel's failure to mitigate its alleged damages, including its failure to offset damages by rebates and co-pays.

## SIXTEENTH DEFENSE

### (Waiver, Laches, Estoppel)

Avadel's counterclaims are barred, in whole or in part, by the doctrines of waiver, laches, and estoppel.

## SEVENTEENTH DEFENSE

### (Injunctive Relief)

Avadel's claims for injunctive relief are invalid and improper in that Avadel has failed to allege, and is incapable of demonstrating, irreparable harm and/or the absence of any adequate remedy at law.

## EIGHTEENTH DEFENSE

### (Unjust Enrichment)

Avadel's counterclaims are barred in that any award in Avadel's favor in this action would constitute unjust enrichment.

## RESERVATION OF DEFENSES

Jazz has not knowingly or intentionally waived any applicable affirmative or other defenses and reserves the right to rely upon such defenses as may become available or apparent. Jazz reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law and equity, that may now be or in the future will become available based on discovery or any other factual investigation concerning this action or any related action.

## **PRAYER FOR RELIEF**

WHEREFORE, Jazz respectfully requests as follows:

A.  that Avadel's Counterclaims be dismissed with prejudice;

B.  that Jazz be awarded the costs, expenses, and disbursements which it incurs in defending this action;

C.  that Jazz be awarded the attorneys' fees which it incurs in defending this action; and

D.  that Jazz be awarded such further relief as this Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

F. Dominic Cerrito
Steig D. Olson
Gabriel P. Brier
Frank C. Calvosa
Avi Grunfeld
Nicolas Siebert
Andrew Faisman
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

William R. Sears
Lynette Lim
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA  90017
(213) 443-3000

June 7, 2024

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Counterclaim-Defendant*
*Jazz Pharmaceuticals, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 7, 2024, upon the following in the manner indicated:

Daniel M. Silver, Esquire                                    *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Counterclaim-Plaintiff*

Kenneth G. Schuler, Esquire                              *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Counterclaim-Plaintiff*

Herman H. Yue, Esquire                                     *VIA ELECTRONIC MAIL*
Franco Benyamin, Esquire
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020
*Attorneys for Counterclaim-Plaintiff*

Alan J. Devlin, Esquire                                       *VIA ELECTRONIC MAIL*
Ian Conner, Esquire
Anna M. Rathbun, Esquire
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
*Attorneys for Counterclaim-Plaintiff*

Daralyn J. Durie, Esquire       *VIA ELECTRONIC MAIL*
Eric P. Berger, Esquire
Rebecca E. Weires, Esquire
Tannyr Pasvantis, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Counterclaim-Plaintiff*

Kira A. Davis, Esquire        *VIA ELECTRONIC MAIL*
Henry Huttinger, Esquire
Katherine E. McNutt, Esquire
Rose S. Lee, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Counterclaim-Plaintiff*

David F. McGowan, Esquire      *VIA ELECTRONIC MAIL*
David F. Kowalski, Esquire
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA  92130
*Attorneys for Counterclaim-Plaintiff*

Andrew T. Jones, Esquire       *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Counterclaim-Plaintiff*

Stacy Cline Amin, Esquire       *VIA ELECTRONIC MAIL*
Haydn Forrest, Esquire
Alexander Okuliar, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Counterclaim-Plaintiff*

Matthew C. Hans, Esquire                                VIA ELECTRONIC MAIL
POLSINELLI PC
100 S. Fourth Street, Suite 1000
St. Louis, MO  63102
*Attorneys for Counterclaim-Plaintiff*


                                        */s/ Jeremy A. Tigan*
                                        _____
                                        Jeremy A. Tigan (#5239)