# EXHIBIT A

# Nos. 15-3559 & 15-3591

# United States Court of Appeals
## For the Third Circuit

---

Nos. 15-3559, 15-3591, 15-3681 & 15-3682

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

---

*On Appeal from the United States District Court
for the Eastern District of Pennsylvania*

Case Nos. 08-cv-2431, 08-cv-2433

---

## PLAINTIFFS-APPELLANTS'/CROSS-APPELLEES' SUBMISSION OF REDACTED FIRST- AND THIRD-STEP BRIEFS

---

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Nicholas Urban
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Thomas M. Sobol
David S. Nalven
Kristen A. Johnson
Kristie A. LaSalle
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

*\* additional counsel listed within*

Peter D. St. Phillip, Jr.
Richard W. Cohen
Gerald Lawrence
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY 10601
(914) 997-0500

Kenneth A. Wexler
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 346-2222

James G. Stranch, III
Joe P. Leniski
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Park Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801

*Counsel for End-Payor Class Plaintiffs-Appellants*

Pursuant to the Court's order dated August 19, 2016 (Doc. No. 003112386000), the Plaintiffs-Appellants/Cross-Appellees[1] ("Purchasers") in the above-captioned appeal hereby submit redacted copies of their first-step and third-step briefs. A redacted copy of the Purchasers' first-step brief is attached as Exhibit A; a redacted copy of the purchasers' third-step brief is attached as Exhibit B.

The Purchasers filed their first-step brief on March 4, 2016.[2] At the same time, they sought unopposed leave to file their brief under seal.[3] The Purchasers' first-step brief contains information derived extensively from documents, expert reports, deposition transcripts, and other materials designated as confidential or highly confidential by Defendants-Appellees/Cross-Appellants ("GSK")[4] and non-parties pursuant to protective orders entered by the district court. On June 22, 2016, the Purchasers filed their third-step brief.[5] Again, they sought

---

[1] The Plaintiffs-Appellants/Cross-Appellees are Professional Drug Company, Inc. ("Direct Purchaser Class Plaintiff"), Aetna Health of California Inc., Painters District Council No. 30 Health and Welfare Fund, and Plumbers and Pipefitters Local 572 Health and Welfare Fund ("Indirect Purchaser Class Plaintiffs"), and Proposed Intervenor Aetna, Inc.

[2] Doc. No. 003112225396.

[3] Doc. No. 003112224281.

[4] The Defendants-Appellees/Cross-Appellants are SmithKline Beecham Corporation n/k/a GlaxoSmithKline LLC and GlaxoSmithKline plc.

[5] Doc. No. 003112334039.

unopposed leave to file their brief under seal as it contained information designated by GSK and non-parties as confidential or highly confidential.[6]

On August 1, 2016, the Court denied the Purchasers' motions for leave to file under seal, as well as the unopposed seal motion filed by GSK for their second-step brief.[7]  The Court allowed the parties to file redacted copies of their briefs within 14 days of that order.[8]  The Court subsequently extended that deadline to August 25, 2016.[9]

As the Purchasers explained in their seal motions, the district court in this case entered a series of protective orders requiring documents designated by the parties and non-parties as confidential or highly confidential, and court submissions concerning such documents, to be filed under seal.[10]  Accordingly, the Purchasers sought to file their briefs under seal because of the briefs' frequent citation of material that had been designated by others as confidential or highly confidential.

Following this Court's Order denying the motions to seal, the Purchasers provided each third party whose claimed confidential information is cited in the

---

[6] Doc. No. 003112334036.

[7] Doc. No. 003112368489.

[8] *Id.*

[9] Doc. No. 003112386000 (filed Aug. 19, 2016).

[10] *See* No. 08-cv-2431, ECF No. 130 (filed Nov. 19, 2009); *id.*, ECF Nos. 142 (Feb. 12, 2010), 155 (Feb. 24, 2010), 187 (Apr. 5, 2010), and 188 (Apr. 5, 2010).

briefs with copies of the briefs reflecting their information, but omitting any other party's claimed confidential information.

Two of the third parties  removed their claims of confidentiality with respect to their materials as cited in the briefs, and reported that no redactions were necessary.  The remaining four third parties lifted many of their prior designations, but have directed purchasers to redact some information in the Purchasers' briefs based on claims of confidentiality under the protective orders. GSK has also requested certain redactions.

Purchasers have redacted their first-step and third-step briefs pursuant to the directions of other parties.[11]

---

[11] On August 22, 2016, the Purchasers filed an Unopposed Expedited Motion to File a Joint Revised Appendix, Doc. No. 003112387557.  That motion, which is unopposed, identified additional material (in addition to that previously identified by GSK) that should be included in a revised joint appendix.  Purchasers also requested 14 days, from the Court's order on the motion, to file the revised joint appendix and identify which documents should remain under seal.  That motion is pending.

Dated: August 25, 2016   Respectfully submitted,

/s/ David F. Sorensen
David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Nicholas Urban
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
dsorensen@bm.net
acurley@bm.net
ccoslett@bm.net
nurban@bm.net

Thomas M. Sobol
David S. Nalven
Kristen A. Johnson
Kristie A. LaSalle
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
tom@hbsslaw.com
davidn@hbsslaw.com
kristenj@hbsslaw.com
kristiel@hbsslaw.com

Peter R. Kohn
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 227-5770
pkohn@faruqilaw.com

Barry S. Taus
Archana Tamoshunas
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY  10038
(212) 931-0704
btaus@tcllaw.com
atamoshunas@tcllaw.com

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA  19107
(215) 923-9300
dnast@nastlaw.com

Don Barrett
Sterling Starns
Brandi Hamilton
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS  39095
(662) 834-2488
dbarrett@barrettlawgroup.com
sstarns@barrettlawgroup.com
bhamilton@barrettlawgroup.com

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

/s/ Peter D. St. Phillip, Jr.
Peter D. St. Phillip, Jr.
Richard W. Cohen
Gerald Lawrence
Uriel Rabinovitz
Noelle Ruggiero
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY  10601
(914) 997-0500
pstphillip@lowey.com
rcohen@lowey.com
glawrence@lowey.com
urabinovitz@lowey.com
nruggiero@lowey.com

Kenneth A. Wexler
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
(312) 346-2222
kaw@wexlerwallace.com
jnb@wexlerwallace.com

James G. Stranch, III
Joe P. Leniski
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Park Avenue, Suite 200
Nashville, TN  37203
(615) 254-8801
jims@bsjfirm.com
joeyl@bsjfirm.com

*Counsel for End-Payor Class Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, this motion was filed electronically

through the Third Circuit's CM/ECF system and served via CM/ECF system on all

counsel registered to receive such notice through the CM/ECF system.

Dated: August 25, 2016

**/s/David F. Sorensen**

# EXHIBIT A

# <u>REDACTED</u>

## Nos. 15-3559 & 15-3591

# United States Court of Appeals
## For the Third Circuit

---

Nos. 15-3559, 15-3591, 15-3681 & 15-3682

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

---

*On Appeal from the United States District Court*
*for the Eastern District of Pennsylvania*

Case Nos. 08-cv-2431, 08-cv-2433

---

## CONSOLIDATED BRIEF OF DIRECT PURCHASER AND END-PAYOR CLASS PLAINTIFFS-APPELLANTS

---

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Nicholas Urban
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Thomas M. Sobol
David S. Nalven
Kristen A. Johnson
Kristie A. LaSalle
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

Peter D. St. Phillip, Jr.
Richard W. Cohen
Gerald Lawrence
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY 10601
(914) 997-0500

Kenneth A. Wexler
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 346-2222

James G. Stranch, III
Joe P. Leniski
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Park Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801

*Counsel for End-Payor Class Plaintiffs-Appellants*

*\* Parties and additional counsel listed within*

No. 15-3559

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

AETNA HEALTH OF CALIFORNIA INC.; IBEW-NECA LOCAL 505 HEALTH
AND WELFARE PLAN; BRICKLAYERS AND MASONS UNION LOCAL UNION
NO. 5 OHIO HEALTH AND WELFARE FUND; MECHANICAL CONTRACTORS-
UNITED ASSOCIATION LOCAL 119 HEALTH AND WELFARE PLAN;
PAINTERS DISTRICT COUNCIL NO. 30 HEALTH AND WELFARE FUND;
PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND;
AETNA, INC.

Plaintiffs-Appellants

v.

SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE LLC
AND GLAXOSMITHKLINE PLC

Defendants-Appellees

No. 15-3591

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

PROFESSIONAL DRUG COMPANY, INC., individually and on
behalf of the Direct Purchaser Class

Plaintiff–Appellant

v.

SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE LLC
AND GLAXOSMITHKLINE PLC

Defendants-Appellees

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the consolidated plaintiffs-appellants make the following disclosures:

Plaintiff-Appellant Professional Drug Company, Inc. has no parent corporation, and no publicly traded company owns 10% or more of its stock.

Plaintiff-Appellant Aetna Health of California, Inc. is a wholly owned subsidiary of Aetna Health Holdings LLC, which is a wholly owned subsidiary of Aetna, Inc., a publicly traded company.

Proposed Intervenor-Appellant Aetna, Inc. is a publicly traded corporation that has no parent corporation, and no publicly traded company owns 10% or more of its stock.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES ......................................................................2

RELATED CASES AND PROCEEDINGS.....................................................5

STATEMENT OF THE CASE ........................................................................6

 I.  Regulatory background ....................................................................6

   A.  Generic drug economics. ................................................6

   B.  Hatch-Waxman Act gets low-cost generics to
      market sooner.....................................................................8

   C.  Hatch-Waxman patent infringement suits. ............................ 10

   D.  Baseless FDA petitions delay generic approval. ....................... 11

   E.  Reverse payment agreements undermine early
      generic entry....................................................................... 12

 II.  Facts ..................................................................................... 14

   A.  Hydrochloric acid stabilizes bupropion
      hydrochloride..................................................................... 14

   B.  Biovail acquires the '341 and '327 patents............................. 16

   C.  GSK and Biovail develop Wellbutrin XL................................ 18

   D.  Anchen develops generic Wellbutrin XL................................. 19

   E.  GSK and Biovail sue Anchen. ........................................... 20

   F.  Impax, Abrika, and Watson were sued. ................................ 23

   G.  With GSK's help, Biovail files a meritless FDA
      petition. ........................................................................... 26

   H.  The circumstances in mid-December 2006............................... 29

   I.  GSK and Biovail execute a pay-for-delay deal. ........................ 30

J.  Purchasers pay overcharges for Wellbutrin XL.......................... 33

III.  Procedural History ............................................................................ 34

STANDARDS OF REVIEW ............................................................................ 37

SUMMARY OF THE ARGUMENT.............................................................. 39

ARGUMENT.................................................................................................... 41

A.  The district court erred in granting summary
judgment on the sham *Anchen* suit theory................................. 41

1.  Objective baselessness is a question of fact. ................... 42

2.  The evidence shows that *Anchen* was a
sham. ..................................................................................... 43

3.  The court misapplied Rule 56............................................ 47

4.  The court erred in considering claim
construction to be dispositive. .......................................... 48

5.  The court erred by effectively ruling that
regulatory draftsmanship trumps
chemistry. ............................................................................. 49

6.  The court usurped the role of fact finder. ....................... 53

7.  The court erred by inverting the summary
judgment burden.................................................................. 54

B.  The district court erred in granting summary
judgment on the reverse payment theory.................................... 55

1.  The court erred in ruling the transaction
did not harm competition. ................................................. 56

2.  The court erred in ruling GSK's purported
justifications entitled it to summary
judgment................................................................................ 64

3.  The court erred in ruling the '708 patent
was, as a matter of law, a superseding cause
of delay. ................................................................................ 79

4.    The court erred in ruling Anchen could not
      have launched a generic before June 2007. ..................... 87

C.   The district court erred in finding some acts were
     not in furtherance of the conspiracy. ........................................... 89

     1.    A mere scintilla of evidence showing an
           unlawful conspiracy is enough. ........................... 90

     2.    GSK participated in a single conspiracy. ......................... 91

     3.    The court incorrectly rejected the
           conspiracy evidence. ........................................... 94

D.   The district court erred in granting summary
     judgment on the sham *Impax*, *Abrika*, and *Watson*
     litigation theories. ........................................................... 99

     1.    The evidence shows *Impax* was baseless and
           presented genuine issues of fact. ........................................ 99

     2.    The evidence shows *Abrika* was baseless
           and presented genuine issues of fact. .............................. 104

     3.    The evidence shows *Watson* was baseless
           and presented genuine issues of fact. .............................. 108

E.   The district court erred in granting summary
     judgment on the sham FDA petition theory. ........................... 108

     1.    A petition that fails to elicit FDA action is
           not immunized. ............................................................ 109

     2.    The district court erred in requiring the
           purchasers to parse the amount of delay. ....................... 111

F.   *Hanover 3201 Realty* warrants vacatur and remand
     here. ..................................................................................... 114

G.   The district court erred in precluding certain
     testimony of economist Dr. Jeffrey Leitzinger. .......................... 117

Case: 19-3559   Document: 003112391081   Page: 8   Date Filed: 08/29/2016

H.    The district court confused Article III standing with statutory standing............................................................. 120

I.    The district court erred in denying Aetna Inc.'s 2010 intervention motion............................................................. 122

CONCLUSION ........................................................................................... 128

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
    442 F. Supp. 2d 800 (N.D. Cal. 2006)................................................................82

*Abbott Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009)......................................................................85

*Abramson v. William Paterson Coll. of N.J.*,
    260 F.3d 265 (3d Cir. 2001)..........................................................................47

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
    183 F.3d 568 (7th Cir. 1999).........................................................................73

*Altria Grp. Inc. v. Good*,
    555 U.S. 70 (2008)........................................................................................73

*Alza Corp. v. Mylan Labs., Inc.*,
    388 F. Supp. 2d 717 (N.D. W. Va. 2005).....................................................85

*Am. Home Assurance Co. v. Sunshine Supermarket, Inc.*,
    753 F.2d 321 (3d Cir. 1985).........................................................................73

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 255 (1986)............................................................................103

*Andrx Pharm. Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001)......................................................................83

*Anesta AG v. Mylan Pharms., Inc.*,
    No. 08-cv-889, 2014 WL 3976456 (D. Del. Aug. 14, 2014)........................83

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015).....................................................................86

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*,
    844 F.2d 1050 (3d Cir. 1988).....................................................................123

*Biax Corp. v. Nvidia Corp.,*
  Nos. 13-cv-1649, 13-cv-1654, 2015 WL 755940 (Fed. Cir. Feb. 15,
  2015)....................................................................................................... 48

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*
  974 F.2d 1360 (3d Cir. 1992) .................................................*passim*

*Biovail Corp. Int'l. v. Hoechst,*
  49 F. Supp. 2d 750 (D.N.J. 1999) ......................................... 84

*Biovail Corp. v. FDA,*
  448 F. Supp. 2d 154 (D.D.C. 2006) ....................................... 112

*Birmingham Steel Corp. v. Tenn. Valley Auth.,*
  353 F.3d 1331 (11th Cir. 2003) ............................................ 126

*Bond v. United States,*
  131 S. Ct. 2355 (2011) ........................................................ 120

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.,*
  444 F.3d 1356 (Fed. Cir. 2006) ........................................... 43

*Brody v. Spang,*
  957 F.2d 1108 (3d Cir. 1992) ........................................... 37, 38

*Bromley v. Mich. Educ. Ass'n-NEA,*
  178 F.R.D. 148 (E.D. Mich. 1998) ....................................... 126

*Brown v. Pro Football, Inc.,*
  812 F. Supp. 237 (D.D.C. 1992) .......................................... 65

*Cal. v. Safeway, Inc.,*
  651 F.3d 1118 (9th Cir. 2011) ............................................ 64

*California Motor Trucking Co. v. Trucking Unlimited,*
  404 U.S. 508 (1972) ........................................................... 115

*Campbell-Ewald Co. v. Gomez,*
  136 S. Ct. 663 (2016) ......................................................... 121

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
  132 S. Ct. 1670 (2012) ......................................................... 6

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896 (6th Cir. 2003) ............................................................83, 86, 113

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999) ........................................................................ 108

*In re Cipro Cases I & II*,
    348 P.3d 845 (Cal. 2015) ............................................................................. 80

*Clomon v. Jackson*,
    988 F.2d 1314 (2d Cir. 1993) ...................................................................... 73

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second
    Mortg. Loan Litig.*,
    418 F.3d 277 (3d Cir. 2005) ..................................................... 122, 123, 124

*Consol. Express, Inc. v. N.Y. Shipping Assoc., Inc.*,
    602 F.2d 494 (3d Cir. 1979) .................................................................84, 88

*Danny Kresky Enters. Corp. v. Magid*,
    716 F.2d 206 (3d Cir. 1983) ........................................................................ 81

*De Lage Landen Operational Servs., LLC v. Third Pillar Sys.*,
    851 F. Supp. 2d 850 (E.D. Pa. 2012) ......................................................... 86

*Dr. Reddy's Labs, Ltd. v. aaiPharma, Inc.*,
    No. 01-cv-10102, 2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002) .................... 112

*In re DVI, Inc. Sec. Litig.*,
    No. 03-cv-5336, 2014 WL 4634301 (E.D. Pa. Sept. 16, 2014) ........................ 118

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ............................................................................ 42, 110

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992) ...........................................................................*passim*

*El v. Se. Pa. Transp. Auth.*,
    479 F.3d 232 (3d Cir. 2007) ........................................................................ 66

*Eon-Net LP v. Flagstar Bancorp*,
    653 F.3d 1314 (Fed. Cir. 2011) ................................................................. 102

*Ferring B.V. v. Watson Labs. Inc.*,
    764 F.3d 1382 (Fed. Cir. 2014) ................................................................... 22

*In re Flonase Antitrust Litig.*,
    795 F. Supp. 2d 300 (E.D. Pa. 2011) ............................................. 108, 110

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ................................................................... *passim*

*Fuller v. Volk*,
    351 F.2d 323 (3d Cir. 1965) ....................................................... 126

*In re Gabapentin Patent Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ............................................ 43

*Genentech, Inc. v. Wellcome Found. Ltd.*,
    29 F.3d 1555 (Fed. Cir. 1994) .................................................... 106

*Glob-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011) ..................................................................... 50

*Gonzalez-Posadas v. AG United States*,
    781 F.3d 677 (3d Cir. 2015) ................................................ 83, 85

*Good v. City of Phila.*,
    539 F.3d 311 (3d Cir. 2008) ....................................................... 37

*Graphic Prods. Distribs., Inc. v. ITEK Corp.*,
    717 F.2d 1560 (11th Cir. 1983) ................................................. 65

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ..................................... 3, 109, 115, 116

*Hill v. Reederei F. Laeisz G.M.B.H.*,
    435 F.3d 404 (3d Cir. 2006) ....................................................... 82

*Hines v. Consol. Rail Corp.*,
    926 F.2d 262 (3d Cir. 1991) ...................................................... 117

*Illinois Brick v. Illinois*,
    431 U.S. 720 (1977) ................................................................... 120

*Imhaeuser v. Buerk*,
    101 U.S. 647 (1879) ..................................................................... 83

*Indian Coffee Corp. v. Procter & Gamble Co.,*
    752 F.2d 891 (3d Cir. 1985)......................................................... 81

*J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997)................................................... 106

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
    451 U.S. 557 (1981)............................................................. 80, 113

*Johns Hopkins Univ. v. Datascope Corp.,*
    543 F.3d 1342 (Fed. Cir. 2008)................................................... 85

*In re K-Dur Antitrust Litig.,*
    338 F. Supp. 2d 517 (D.N.J. 2004)............................................... 84

*In re K-Dur Antitrust Litig.,*
    686 F.3d 197 (3d Cir. 2012).................................................*passim*

*In re K-Dur Antitrust Litig.,*
    No. 01-cv-1652, 2016 WL 22982 (D.N.J. Feb. 25, 2016)............ 60, 63, 78, 95

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.,*
    791 F.3d 388 (3d Cir. 2015)..................................................*passim*

*King Drug of Florence, Inc. v. Cephalon, Inc.,*
    88 F. Supp. 3d 402 (E.D. Pa. 2015)........................................... 59, 66

*Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.,*
    No. 04-cv-8042, 2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007)............... 66

*La. Wholesale Drug Co. v. Sanofi-Aventis,*
    No. 07-cv-7343, 2008 WL 4580016 (S.D.N.Y. Oct. 14, 2008)............... 41

*La. Wholesale Drug Co. v. Sanofi-Aventis,*
    No. 07-cv-7343, 2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009)............. 108

*Laitram Corp. v. Rexnord, Inc.,*
    939 F.2d 1533 (Fed. Cir. 1991)................................................. 29

*Lehigh Valley R.R. Co. v. Mellon,*
    104 U.S. 112 (1881)............................................................. 83

*Liberty Mut. Ins. Co. v. Treesdale, Inc.,*
    419 F.3d 216 (3d Cir. 2005).................................................. 122

*In re Lipitor Antitrust Litig.,*
    No. 12-cv-2389, 2013 WL 4780496 (D.N.J. Sept. 5, 2013) .................................. 84

*Liriana v. Hobart Corp.,*
    170 F.3d 264 (2d Cir. 1999)....................................................................... 80

*Little Caesar Ents., Inc. v. Smith,*
    172 F.R.D. 236 (E.D. Mich. 1997) ............................................................. 127

*In re Loestrin 24 FE Antitrust Litig.,*
    Nos. 14-2071, 15-1250, 2016 WL 698077 (1st Cir. Feb. 22, 2016).................. 57

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
    998 F.2d 1144 (3d Cir. 1993) .................................................................... 80

*Lugo v. Farmer's Pride Inc.,*
    No. 07-cv-0749, 2011 WL 2550376 (E.D. Pa. June 23, 2011) .......................... 118

*Lum v. Bank of Am.,*
    361 F.3d 217 (3d Cir. 2004)..................................................................... 90

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ..................................................................... 47, 90, 97

*McClune v. Shamah,*
    593 F.2d 482 (3d Cir. 1979)..................................................................... 126

*Medlin v. Prof'l Rodeo Cowboys Ass'n,*
    No. 91-cv-2082, 1991 WL 340303 (D. Colo. Dec. 13, 1991).............................. 65

*Meijer, Inc. v. Barr Pharms., Inc.,*
    572 F. Supp. 2d 38 (D.D.C. 2008) ............................................................. 73

*Meijer, Inc. v. Warner Chilcott Holdings Co. III,*
    246 F.R.D. 293 (D.D.C. 2007)................................................................... 119

*Miller v. Ind. Hosp.,*
    843 F.2d 139 (3d Cir. 1988)..................................................................... 66

*Montgomery v. De Simone,*
    159 F.3d 120 (3d Cir. 1998)..................................................................... 43

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.,*
    72 F.3d 361 (3d Cir. 1995)....................................................................... 123

*Mullaney v. Anderson,*
    342 U.S. 415 (1952) ........................................................................... 126

*N. Am. Soccer League v. Nat'l Football League,*
    670 F.2d 1249 (2d Cir. 1982) ............................................................ 65

*N. Tex. Specialty Physicians v. FTC,*
    528 F.3d 346 (5th Cir. 2008) ............................................................ 65

*Nat'l Soc'y Prof. Eng'rs v. United States,*
    435 U.S. 679 (1978) ........................................................................... 67

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) ..........................................65, 66

*NCAA v. Bd. of Regents Univ. Okla.,*
    468 U.S. 85 (1984) ............................................................................. 64

*Neale v. Volvo Cars N. Am.,*
    794 F.3d 353 (3d Cir. 2015) .............................................................. 121

*Nesbit v. Gears Unlimited, Inc.,*
    347 F.3d 72 (3d Cir. 2003) ................................................................ 121

*In re Neurontin Antitrust Litig.,*
    No. 02-1390, 2011 WL 286118 (D.N.J. Jan. 25, 2011) ...................... 119

*New York v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015) ............................................................... 6

*Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA"*
    *Litig.),*No. MDL-1446, 2004 U.S. Dist. LEXIS 8158 (S.D. Tex.
    Feb. 24, 2004) ................................................................................... 126

*In re Niaspan Antitrust Litig.,*
    42 F. Supp. 3d 735, 751-52 (E.D. Pa. 2014) ..................................13, 84

*Odyssey Waste Servs., LLC v. BFI Waste Sys. of N. Am., Inc.,*
    05-cv-1929, 2007 WL 674594 (E.D. Pa. Feb. 27, 2007) ..................... 76

*Orson Inc. v. Miramax Film Corp.,*
    79 F.3d 1358 (3d Cir. 1996) .............................................................. 64

*In re OSB Antitrust Litig.,*
No. 06-cv-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ............................... 127

*Out Front Prods, Inc. v. Magid,*
748 F.3d 166 (3d Cir. 1984) ..................................................................... 112

*In re Paoli R.R. Yard PCB Litig.,*
916 F.2d 829 (3d Cir. 1990) ..................................................................... 117

*The Personnel Dep't, Inc. v. Prof'l Staff Leasing Corp.,*
297 F. App'x 773 (10th Cir. 2008) .......................................................... 42, 55

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,*
998 F.2d 1224 (3d Cir. 1993) .................................................................. 91, 97

*Pineda v. Ford Motor Co.,*
520 F.3d 237 (3d Cir. 2008) ...................................................................... 37

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,*
508 U.S. 49 (1993) ........................................................................... *passim*

*In re Prograf Antitrust Litig.,*
No. 11-md-2242, 2014 WL 4745954 (D. Mass. June 10, 2014) ....................... 113

*Q-Pharma, Inc. v. Andrew Jergens Co.,*
360 F.3d 1295 (Fed. Cir. 2004) .......................................................... 102, 107

*Realcomp II, Ltd. v. FTC,*
635 F.3d 815 (6th Cir. 2011) ..................................................................... 65

*Reckitt Benckiser, Inc. v. Tris Pharma, Inc.,*
No. 09-cv-3125, 2011 WL 773034 (D.N.J. Dec. 21, 2011) .................................. 85

*Reckitt Benckiser Inc. v. Watson Labs., Inc.,*
430 F. App'x 871 (Fed. Cir. 2011) ............................................................... 85

*In re Relafen Antitrust Litig.,*
346 F. Supp. 2d 349 (D. Mass. 2004) ......................................................... 43

*Renchenski v. Williams,*
622 F.3d 315 (3d Cir. 2010) ...................................................................... 37

*Revision Military, Inc. v. Balboa Mfg. Co.*,
   700 F.3d 524 (Fed. Cir. 2012) ...................................................................... 83

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
   730 F.3d 1060 (9th Cir. 2013) ..................................................................... 43

*Rome Ambulatory Surg. Ctr. v. Rome Mem'l Hosp.*,
   349 F. Supp. 2d 389 (N.D.N.Y. 2004) ......................................................... 65

*Rossi v. Standard Roofing*,
   156 F.3d 452 (3d Cir. 1998) ......................................................................... 81

*Schering Corp. v. Geneva Pharms., Inc*,
   275 F. Supp. 2d 534 (D.N.J. 2002) .............................................................. 11

*SDK Invs. v. Ott*,
   No. 94-cv-1111, 1996 WL 69402 (E.D. Pa. Feb. 15, 1996) ......................... 76

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   No. 12-md-2343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013) ................. 80

*Spear Pharm., Inc. v. William Blair & Co.*,
   610 F. Supp. 2d 278 (D. Del. 2009) ........................................................... 112

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
   749 F. Supp. 2d 542 (E.D. Ky. 2010) .......................................................... 73

*Stewart v. Sonneborn*,
   98 U.S. 187 (1878) ........................................................................................ 43

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) ....................................................................... 121

*Sullivan v. Nat'l Football League*,
   34 F.3d 1091 (1st Cir. 1994) ....................................................................... 65

*Sunovian Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   No. 09-cv-01302, 2012 WL 6561760 (D.N.J. Dec. 14, 2012) ....................... 85

*Teva Pharm. USA, Inc. v. Abbott Labs*,
   252 F.R.D. 213 (D. Del. 2008) .................................................................... 119

*Teva Pharm. USA, Inc. v. Abbott Labs.*,
   580 F. Supp. 2d 345 (D. Del. 2008) .................................................... 102, 107

*Tivo Inc. v. EchoStar Corp.*,
  429 F. App'x 975 (Fed. Cir. 2011)............................................................. 70

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  No. 02-cv-4373, 2005 WL 724117 (E.D. Pa. Mar. 29, 2005)............................. 76

*Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008)...............................................................78, 94

*Tormenia v. 1st Investors Realty Co., Inc.*,
  251 F.3d 128 (3d Cir. 2000)................................................................ 118

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005).................................................................. 77

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co., Inc.*,
  762 F.3d 1338 (Fed. Cir. 2014)..........................................................43, 55

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)............................................................. 86

*United Airlines, Inc. v. McDonald*,
  432 U.S. 385 (1977).......................................................................... 127

*United Food & Commercial Workers v. Teikoku Pharma USA, Inc.*,
  74 F. Supp. 3d 1052 (N.D. Cal. 2014)..................................................... 13

*United Mine Workers of Am. v. Pennington*,
  381 U.S. 657 (1965)....................................................................42, 110

*United States v. Antar*,
  53 F.3d 568 (3d Cir. 1995)................................................................. 89

*United States v. Bobb*,
  471 F.3d 491 (3d Cir. 2006)............................................................... 96

*United States v. Brown Univ.*,
  5 F.3d 658 (3d Cir. 1993).................................................................. 64

*United States v. Bruno*,
  873 F.2d 555 (2d Cir. 1989)............................................................... 90

*United States v. Bryant*,
  655 F.3d 232 (3d Cir. 2011)............................................................... 63

*United States v. Flores,*
 454 F.3d 149 (3d Cir. 2006)........................................................ 50

*United States v. Kelly,*
 892 F.2d 255 (3d Cir. 1989)................................................95, 96, 97

*United States v. Kushner,*
 305 F.3d 194 (3d Cir. 2002)........................................................ 89

*United States v. Perez,*
 280 F.3d 318 (3d Cir. 2002)........................................................ 95

*United States v. Rigas,*
 605 F.3d 194 (3d Cir. 2010)........................................................ 96

*United States v. Russell,*
 134 F.3d 171 (3d Cir. 1998)........................................................ 95

*United States v. U.S. Gypsum Co.,*
 550 F.2d 115 (3d Cir. 1977)........................................................ 96

*Verizon Commc'ns v. Law Offices of Curtis v. Trinko, LLP,*
 540 U.S. 398 (2004) .................................................................... 84

*Warden v. Crown Am. Realty Trust,*
 No. 96-cv-25, 1998 WL 725946 (W.D. Pa. Oct. 15, 1998)................ 126

*In re Wellbutrin SR Antitrust Litig.,*
 Nos. 04–5525 & 05–396, 2010 WL 3488634 (E.D. Pa. Aug. 31,
 2010)........................................................................................ 41

*In re Wellbutrin XL Antitrust Litig.,*
 756 F. Supp. 2d 670 (E.D. Pa. 2010) ....................................... 125

*Wilk v. Am. Med. Ass'n,*
 895 F.2d 352 (7th Cir. 1990)....................................................... 64

*Williams v. Illinois,*
 132 S. Ct. 2221 (2012)............................................................... 118

*Young v. Martin,*
 801 F.3d 172 (3d Cir. 2015)........................................................ 37

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969) ........................................................................79, 80

**Statutes**

15 U.S.C. § 15 ............................................................................... 1, 79

21 U.S.C. §§ 301-92 ...............................................................................8

21 U.S.C. § 355 .............................................................................*passim*

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1332 ....................................................................................1

28 U.S.C. § 1337 ....................................................................................1

Drug Price Competition and Patent Term Restoration Act, Pub. L.
    No. 98-417, 98 Stat. 1585 (1984)..........................................................8

Medicare Prescription Drug, Improvement, and Modernization Act
    of 2003, Pub. L. No. 108-173 ......................................................10, 72

**Other Authorities**

21 C.F.R. §§ 10.25, 10.30 ................................................................... 11

149 Cong. Rec. S15,746 (daily ed. Nov. 24, 2003) ........................................9

149 Cong. Rec. S16,104 (daily ed. Dec. 9, 2003) ........................................ 10

*ABA Model Jury Instructions in Civil Antitrust Cases* (2005)....................................65, 97

CBO, *Effects of Using Generic Drugs on Medicare Prescription Drug
    Spending* vi (Sept. 2010),
    https://www.cbo.gov/sites/default/files/111th-congress-2009-
    2010/reports/09-15-prescriptiondrugs.pdf; ...........................................7

CBO, *How Increased Competition from Generic Drugs Has Affected Prices
    and Returns in the Pharmaceutical Industry* xiii (July 1998),
    https://www.cbo.gov/sites/default/files/105th-congress-1997-
    1998/reports/pharm.pdf.................................................................7

Comment of the Staff of the Bureau of Competition and of Policy
  Planning of the Federal Trade Commission (Mar. 2, 2000),
  http://www.ftc.gov/be/v000005.pdf ........................................................ 12

Fed. R. of Civ. P. 24.......................................................................... 122, 126

FTC, *Frequently Asked Questions About Filing Agreements with the FTC
  Pursuant to the Medicare Prescription Drug, Improvement, and
  Modernization Act of 2003,*
  https://www.ftc.gov/system/files/attachments/competition-
  policy-guidance/050210pharmrulesfaqsection.pdf.................................. 73

FTC, *Generic Substitution and Prescription Drug Prices: Economic Effects
  of State Drug Product Selection Laws* (1985),
  https://www.ftc.gov/sites/default/files/documents/reports/gen
  eric-substitution-prescription-drug-prices-economic-effects-state-
  drug-product-selection-laws/massonsteiner.pdf ....................................6

*The Generic Drug Maze: Speeding Access to Affordable Life-Saving
  Drugs: Hearing Before the Special Committee on Aging,* 109th Cong.
  6 (2006) (statement of Gary Buehler, Director, Office of Generic
  Drugs).................................................................................................... 12

H.R. Rep. No. 98-857, pt. 2 (1984) ...........................................................8

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed.
  Supp. 2015) ...................................................................... 13, 55, 57, 86

William O. Kerr & Cleve B. Tyler, *Measuring Reverse Payments in the
  Wake of Actavis*, Antitrust 29 (2013)..................................................... 55

Williston on Contracts (4th ed.) .............................................................. 77

# JURISDICTIONAL STATEMENT

The direct purchaser plaintiff-appellant, Professional Drug Company (08-cv-2431), alleged Biovail[1] and GSK[2] violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; the district court had subject matter jurisdiction under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331, 1332, & 1337. The end-payor plaintiffs-appellants[3] (08-cv-2433) alleged the defendants violated state law trade practices acts and common law; the district court had jurisdiction under 28 U.S.C. § 1332(d)(2).

On May 11, 2012, the district court granted partial summary judgment.[4] On September 23, 2015, it granted summary judgment on the remainder of the case.[5] The purchasers timely appealed.[6] GSK cross-appealed.[7]

This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] "Biovail" means Biovail Corporation, Biovail Laboratories, Inc., and Biovail Laboratories International SRL.

[2] "GSK" means the defendants-appellants SmithKline Beecham Corporation d/b/a GlaxoSmithKline and GlaxoSmithKline, plc.

[3] The state law plaintiffs-appellants, listed in the caption, sought class certification. An appeal from the end-payor class decertification is pending (No. 15-2875). Aetna Inc. is a proposed intervenor-appellant, and appeals denial of its motion to intervene. JA-302-25 (Mem. Op. & Order Intervention). The plaintiffs, collectively, are the "purchasers."

[4] JA-46-140.

[5] JA-142-230.

[6] JA-233-35 (Direct Purchaser Notice Appeal); JA-378-81 (End-Payor Notice Appeal).

[7] JA-236-38; JA-382-85.

## STATEMENT OF THE ISSUES

*Anchen sham litigation theory.*  Objective baselessness of patent lawsuits is a question of fact.  Here, the evidence raised disputed factual issues whether Wellbutrin XL brand seller GSK could realistically expect to prove the product of generic maker Anchen would infringe a patent claiming a formulation "free of stabilizer": the product was made with the common stabilizer hydrochloric acid; the formulation left residual, effective HCl in the product; and the final generic tablet was more stable than the brand.  Did the district court err in granting summary judgment?

*Reverse payment theory.*  In *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.* ("*Lamictal*"),[8] this Court held that a brand company's agreement not to compete using an authorized generic in exchange for a generic company's agreement to delay market entry is subject to the fact-intensive, rule-of-reason inquiry for reverse payment agreements under *FTC v. Actavis, Inc.*[9]  Here, the evidence showed GSK made a ████████ no-authorized-generic promise to Anchen Pharmaceuticals, Inc. (and its partner, Teva Pharmaceutical Industries, Ltd.) in exchange for Teva-Anchen delaying their imminent launch of generic 150 mg Wellbutrin XL; the parties disputed the factual and legal vitality of GSK's

---

[8] 791 F.3d 388, 394 (3d Cir. 2015).

[9] 133 S. Ct. 2223 (2013).

proffered justifications for the large reverse payment.  Did the district court err in granting summary judgment?

*Conspiracy theory.*  Where evidence exceeds the "mere scintilla" threshold, a court cannot credit the defendant's version of events; it remains the province of the fact finder to decide a conspiracy's scope.  Here, there is no dispute that GSK participated in events at the outset, and the court ruled GSK participated in the end of the alleged conspiracy and that it consulted with its co-conspirator, Biovail, on others.  Did the district court err in granting summary judgment on some acts?

*Other sham acts.*  Did the district court err in granting summary judgment where factual disputes were rife regarding other sham acts, including sham *Watson* and *Abrika* patent infringement suits and a sham petition to the FDA to impose heightened testing requirements for Wellbutrin XL generics?

*Serial sham petitioning.*  Should this case be remanded to consider whether the evidence is adequate, under *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,[10] to show an actionable overarching anticompetitive scheme, including serial events of at least five sham petitions and a reverse payment agreement?

*Article III standing.*  Did the district court err in holding certain end-payors lacked Article III standing?

_____

[10] 806 F.3d 162, 182 (3d Cir. 2015).

*Intervention.*  Did the district court err in 2012 by denying Aetna's motion to intervene as untimely?

*Expert admissibility.*  Did the district court err in excluding (without a hearing, and in a footnote) the testimony of an economist whose opinions were relevant, competent, and well-grounded in the facts of the reverse payment agreement?

## RELATED CASES AND PROCEEDINGS

On August 10, 2015, the end-payors appealed from the opinion decertifying their class.[11]  On November 4, 2015, the end-payors[12] and direct purchasers[13] appealed from the 2012 and 2015 summary judgment opinions, among other rulings.  The Court consolidated both summary judgment appeals[14] and ordered that those appeals be heard together with the end-payors' decertification appeal.[15]  Class decertification briefing is complete.  On November 19, 2015, GSK filed conditional cross-appeals related to the summary judgment appeals.[16]

---

[11] No. 15-2875 (end-payor decertification appeal).

[12] No. 15-3559 (end-payor appeal).

[13] No. 15-3591 (direct purchaser appeal).

[14] Clerk's Order, Nov. 4, 2015, No. 15-3559.

[15] Clerk's Order, Nov. 4, 2015, No. 15-3559.

[16] No. 15-3681 (GSK end-payor cross-appeal); No. 15-3682 (GSK direct purchaser cross-appeal).

# STATEMENT OF THE CASE

## I.    REGULATORY BACKGROUND

### A.    Generic drug economics.

A brand-name drug and its generic equivalent are essentially identical; the only difference is price.[17]  The first generic is priced below the brand.[18]  Prices drop further as more generics enter.[19]  Within a year, generics are priced, on average, 85% below the brand and take 90% of brand sales.[20]

State substitution laws requiring (or permitting) generic substitution foster this monopoly-to-commodity transformation.[21]  After a year, "the average consumer savings" are "approximately 77%[.]"[22]  The Congressional Budget

---

[17] *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1676 (2012).

[18] JA-27595 (Ex. 800, FTC, *Pay for Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (Jan. 2010) ("FTC *Pay-for-Delay* Study")).

[19] *See id.*

[20] *Id.*

[21] *See New York v. Actavis PLC*, 787 F.3d 638, 642-43 (2d Cir. 2015); FTC, *Generic Substitution and Prescription Drug Prices: Economic Effects of State Drug Product Selection Laws* 1 (1985), https://www.ftc.gov/sites/default/files/documents/reports/generic-substitution-prescription-drug-prices-economic-effects-state-drug-product-selection-laws/massonsteiner.pdf ("Generic Substitution").

[22] *See* Generic Substitution at 1.

Office estimates that generics reduced 2010 annual prescription drug costs by $33 billion.[23]

The first generic makes the most money; later generics will face a crowded market and lower prices.[24]  These market dynamics drive generics to launch as soon as possible.

But until a generic enters, there is no bioequivalent drug that can substitute for the brand; the brand commands the market and sets a supracompetitive price.[25]  Brand companies have strong incentives to delay generic competition.[26]

---

[23] CBO, *Effects of Using Generic Drugs on Medicare Prescription Drug Spending* vi (Sept. 2010), https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf; *see also* CBO, *How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry* xiii (July 1998), https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf (estimating $8-10 billion saved at retail pharmacies).

[24] JA-2302-03 (Pls.' Consol. Statement of Facts, Summ. J. II ("SOF") ¶¶ 104, 107).  Evidence further supporting the purchasers' factual assertions appears in the footnotes to the cited portions of the statement of fact and in the purchasers responses to the defendants' statements of fact; all exhibits are included in the joint appendix.

[25] JA-2303 (SOF ¶ 108).

[26] *Id.*

**B.    Hatch-Waxman Act gets low-cost generics to market sooner.**

Under the Food, Drug, and Cosmetic Act, drug manufacturers must obtain FDA approval to market new products.[27]  Until 1984, the only way to obtain approval was through the "long, comprehensive, and costly" New Drug Application ("NDA") process.[28]  The expense deterred generics, resulting in "the practical extension of the [brand-name drug maker's] monopoly position . . . beyond the expiration of the patent."[29]

Congress remedied this problem in the Hatch-Waxman Act.[30]  Congress sought to encourage generic companies "to challenge weak or invalid patents on brand name drugs so consumers can enjoy lower prices."[31]

Hatch-Waxman eliminates the need for generics to file an NDA; instead, generics may file a "less onerous and less costly" Abbreviated New Drug Application ("ANDA") showing the generic's bioequivalence to the brand.[32]  Bioequivalent generic drugs earn an "AB" rating, permitting (or requiring) pharmacies to substitute them for the brand.[33]

---

[27] 21 U.S.C. §§ 301-92.

[28] *Actavis*, 133 S. Ct. at 2228.

[29] H.R. Rep. No. 98-857, pt. 2, at 4 (1984).

[30] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

[31] *Lamictal*, 791 F.3d at 394 (citation omitted).

[32] *Id.* at 395 (citations omitted).

[33] JA-2301-03 (SOF ¶¶ 103, 106).

The Act encourages generics to challenge patents.  An ANDA filer can certify (through a "Paragraph IV certification") that the patents listed in the FDA's "Orange Book" as purportedly covering the brand drug are invalid, unenforceable, or will not be infringed by the generic.[34]  The Act rewards the first generic company filing an ANDA containing a Paragraph IV certification with "a 180-day period of exclusivity during which no generic manufacturer can enter the market."[35]  A first filer captures more sales and can charge more than if it faced other generic competitors.[36]  This exclusivity "can prove valuable, possibly worth several hundred million dollars."[37]

Some first filers "abused this exclusivity period" by delaying their launch in exchange for inducements from their brand competitor, thereby "bottlenecking" all generic competition.[38]  In 2003, Congress "close[d] some loopholes"

---

[34] 21 U.S.C. § 355(j)(2)(A)(vii)(IV).  The FDA plays only a ministerial role in such listings, "publish[ing] this information[ ] without verification." *Lamictal*, 791 F.3d at 395.

[35] *Lamictal*, 791 F.3d at 396.  This exclusivity period "does not, however, prevent the brand company from marketing its own 'authorized generic.' *Id.* (citation omitted).

[36] *Actavis*, 133 S. Ct. at 2229.

[37] *Id.*

[38] 149 Cong. Rec. S15,746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer).

permitting this practice,[39] and required first filers to forfeit their exclusivity if, for example, they fail to market their product within 75 days of final FDA approval and a favorable final ruling in infringement litigation.[40]

## C.   Hatch-Waxman patent infringement suits.

A generic filing a Paragraph IV certification must give the patentee a "detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed."[41]  A patentee with a (legitimate) claim may "sue within 45 days [of receiving notice] in order to trigger a 30-month stay of the FDA's potential approval of the generic."[42]

This feature of the Act – forestalling generic approval automatically for up to 30 months – incentivizes brand companies to obtain and list even weak patents, and to sue with no realistic likelihood of success.[43]  A brand can frustrate the ANDA filer's application simply by obtaining and listing *any* patent and filing *any* lawsuit, regardless of merit.

---

[39] 149 Cong. Rec. S16,104, 16,105-06 (daily ed. Dec. 9, 2003) (statement of Sen. Hatch); *see* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 ("MMA").

[40] 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA).

[41] JA-50 (Summ. J. I. Op.) (citing 21 U.S.C. § 355(j)(2)(B)).

[42] *Lamictal*, 791 F.3d at 395-96.  "If the courts decide the matter within that period, the FDA follows that determination."  *Actavis*, 133 S. Ct. at 2228.

[43] *See* JA-2301, 2303 (SOF ¶¶ 100-02, 108).

After 30 months, even if the suit is pending, the FDA may approve the ANDA and the first filer can launch "at risk" of infringement liability.[44]  To prevent generic competition after 30 months, a brand must obtain injunctive relief as in other patent cases.[45]

## D.    Baseless FDA petitions delay generic approval.

FDA regulations provide that a person or entity may petition the agency to take, or refrain from taking, administrative action.[46]  The process is meant to identify genuine matters about safety, scientific, or legal issues.[47]

During the years relevant here, the FDA's well known practice was to withhold ANDA approval until it considered and responded to a related petition, regardless of the petition's merit.[48]  (The FDA assumed if it denied a petition, the petitioner would sue, so the FDA spent time building an administrative record.[49])

---

[44] *Lamictal*, 791 F.3d at 396 n.8.

[45] *Cf. Schering Corp. v. Geneva Pharms., Inc*, 275 F. Supp. 2d 534, 536 (D.N.J. 2002) (noting "[i]f a suit is not filed in 45 days, the FDA may issue an approval for the generic drug").

[46] 21 C.F.R. §§ 10.25, 10.30.

[47] JA-1841-42, JA-1846-47 (Pls.' Corrected Consol. Statement of Facts, Summ. J. I ("SOF-SP") ¶¶293-98, 312).

[48] JA-1849 (SOF-SP ¶319).

[49] JA-1848-49 (SOF-SP ¶¶316, 318).

A number of brand companies abused the process, using baseless petitions to delay ANDA approval.[50] These petitions rarely raised legitimate safety or efficacy concerns,[51] but nevertheless delayed ANDA approvals.[52]

### E. Reverse payment agreements undermine early generic entry.

To further delay generic competition, brand companies sometimes "pay for delay," meaning the brand compensates the generic to delay launching, allowing the brand to maintain supracompetitive prices.[53] The agreed entry date that would otherwise be based on the patent dispute's merits instead becomes based on the size of the brand's payment.[54] And because of the first filer's 180-day exclusivity period, a payment for delay also delays all other generics.[55]

---

[50] *See* Comment of the Staff of the Bureau of Competition and of Policy Planning of the Federal Trade Commission 2 (Mar. 2, 2000) ("FTC Comment"), http://www.ftc.gov/be/v000005.pdf.

[51] *See The Generic Drug Maze: Speeding Access to Affordable Life-Saving Drugs: Hearing Before the Special Committee on Aging*, 109th Cong. 6 (2006) (statement of Gary Buehler, Director, Office of Generic Drugs) ("Buehler Statement") (Of 42 petitions concerning the approvability of generics, "very few . . . have presented data or analysis that significantly altered FDA's policies.").

[52] *See* FTC Comment at 4–5 ("The cost of filing an improper citizen petition may be trivial compared to the value of securing a delay of a year or more in a rival's entry into a lucrative market.").

[53] *Actavis*, 133 S. Ct. at 2237.

[54] *Id.* at 2234.

[55] *See In re K-Dur Antitrust Litig.*, 686 F.3d 197, 210–11 (3d Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2849 (2013), *class certification reinstated*, No. 10-2077, 2013 WL 5180857 (3d. Cir. Sept. 9, 2013).

A reverse payment to a first filer generic undermines the Hatch-Waxman Act's goal of speeding generics to market by "'remov[ing] from consideration the most motivated challenger, and the one closest to introducing competition.'"[56]

Reverse payments sometimes take the form of the brand's promise not to launch an authorized generic (a "no-AG" agreement).[57]  An AG launch during the first filer's exclusivity period cuts the first filer's sales in half and pushes down prices; if a brand agrees not to compete, the first filer reaps all generic sales at higher prices.[58]  But consumers are overcharged twice: first while the first filer delays launching and the brand maintains supracompetitive prices; then again when the generic maintains supracompetitive prices due to the authorized generic's absence.[59]

---

[56] *Actavis*, 133 S. Ct. at 2235 (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553 (2006)).

[57] *See Lamictal*, 791 F.3d at 394; *United Food & Commercial Workers v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069-70 (N.D. Cal. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751-52 (E.D. Pa. 2014).

[58] *Lamictal*, 791 F.2d at 404-05 & n.21 (citations omitted); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2046d6 (4th ed. Supp. 2015) ("Areeda & Hovenkamp").

[59] *Lamictal*, 791 F.3d at 405; Areeda & Hovenkamp ¶ 2046d6.

## II.     FACTS

### A.     Hydrochloric acid stabilizes bupropion hydrochloride.

In 1966, GSK discovered bupropion, an organic compound that inhibits the reuptake of neurotransmitters used to treat depression.[60]  Bupropion degrades in the presence of water, so, via common chemistry techniques, manufacturers stabilize bupropion into a salt form by adding hydrochloric acid (HCl) to form bupropion hydrochloride.[61]

But even the salt destabilizes in the presence of water: some salt disassociates into free-base bupropion, which can degrade when exposed to other elements (usually water).[62]  Adding HCl to a bupropion hydrochloride formulation inhibits this catalytic process and stabilizes the product.[63]  "[T]here is no dispute that bupropion hydrochloride can degrade in the presence of water or that HCl can act as a stabilizer in bupropion hydrochloride formulations."[64]

The first bupropion product was an instant release version, Wellbutrin IR ("IR"), formulated in the 1980s using a common wet granulation process: dry bupropion hydrochloride was mixed with dry excipients; a wet solution was sprayed on to create wet granules; and the granules were dried, pressed into

---

[60] JA-1750 (SOF-SP ¶¶1-3).

[61] JA-2271-73 (SOF ¶¶3-9).

[62] JA-2273 (SOF ¶11).

[63] JA-2273-75 (SOF ¶¶10-16).

[64] GSK Mem. Reply (Summ. J. I) 16, ECF No. 436; *see also* JA-2275 (SOF ¶17).

tablets, and coated.[65]  Not all moisture is removed from tablets prepared via wet

granulation.[66]  GSK added HCl to the wet solution because adding HCl was

"found to dramatically improve product stability."[67]  GSK thus knew by 1983 that

"use of [HCl] as a stabilizer for [b]upropion [h]ydrochloride is well

documented, and it is used in the current Wellbutrin tablet formulation."[68]  At

least one generic version of IR also used HCl as a stabilizer.[69]

HCl remained in GSK's finished IR product.[70]  Industry convention uses

symbols such as "--" or "**" to signify that a component remains in residual, but

non-quantified, amounts.[71]  GSK itself used "**" to signify residual HCl in its IR

product.[72]  Principles of basic chemistry – illustrated by GSK's testing on IR –

dictate that, so long as some moisture remains in the finished product, some HCl

will also remain.[73]

GSK formulated its second bupropion product, Wellbutrin SR ("SR"), by

using a well-known off-the-shelf, water-soluble cellulose derivative to form a

---

[65] JA-2275-76 (SOF ¶¶18-20).

[66] JA-2321 (SOF ¶164).

[67] JA-2276-77 (SOF ¶22).

[68] JA-2278-79 (SOF ¶28).

[69] JA-2279 (SOF ¶29).

[70] JA-2277 (SOF ¶23).

[71] JA-2326 (SOF ¶182 & n.232).

[72] JA-2296-97 (SOF ¶84).

[73] JA-2277-78 (SOF ¶¶23-27).

matrix core in its tablet which slowed bupropion release, creating a product for twice-a-day usage.[74]  Manufacturing used the same general approach as for the IR: it added a small amount of acid (cysteine hydrochloride) to the water before wet granulation, mostly dried the resultant granules (leaving acidic moisture), pressed the substance into tablets, then film-coated them.[75]  In 1993, GSK patented the cysteine hydrochloride approach, defining the term "stabilizer" as a "composition which inhibits (prevents) the decomposition of bupropion hydrochloride."[76]

## B.    Biovail acquires the '341 and '327 patents.

In 1998, Dr. Pawan Seth and his sole proprietorship, Pharma Pass, formulated a once-a-day bupropion product using the familiar wet granulation process and adding an extended-release coating.[77]  But patenting the formulation had obstacles – there were already patents for various bupropion formulations, and the techniques of creating delayed-release drugs were well known.[78]

Dr. Seth, however, omitted adding an acid during wet granulation.[79]  In October 1998, Dr. Seth filed a patent application, stating "[s]urprisingly, it was

---

[74] JA-2281 (SOF ¶37).

[75] JA-2281-82 (SOF ¶¶38-39).

[76] JA-2283 (SOF ¶43).

[77] JA-2284-85 (SOF ¶¶47-52).

[78] JA-2285-86 (SOF ¶¶53-54).

[79] JA-2286 (SOF ¶55).

discovered that the . . . formulation did not lead to any degradation of bupropion hydrochloride though no stabilizer was present in the formulation."[80]  The arguably patentable invention was a stable, delayed-release-coated bupropion hydrochloride composition "free of stabilizer" of any kind.[81]

In August 2000, the '341 and '327 patents issued.[82]  All claims in the patents limited the invention to a drug composition "free of stabilizer."[83]  The '341 patent covered a bupropion composition (i) "free of stabilizer" (ii) with a defined drug release profile (when dissolved in 0.1N HCl) achieved through (iii) a delayed-release coating.[84]  The '327 patent covered the same formulation with (i) a different release profile (in 0.1N HCl), and (ii) two coatings.[85]  (Would-be generic companies could design around these patents by using a stabilizer, omitting an extended-release coating, or having a different dissolution profile.)

With generic competition for SR nearing, Biovail Corporation acquired the rights to Dr. Seth's patent application (later buying Pharma Pass itself),[86] and

---

[80] JA-2287 (SOF ¶¶ 56-59).

[81] JA-2286 (SOF ¶ 55).

[82] JA-2292-93 (SOF ¶ 73).

[83] JA-2286-87, 2289 (SOF ¶¶ 55 n.60, 61, 64-66).

[84] JA-2292-93 (SOF ¶ 73).

[85] *Id.*

[86] JA-2293 (SOF ¶ 74).

partnered with GSK to develop a bupropion line extension to SR, now for a once-daily, extended-release formulation.[87]

## C.   GSK and Biovail develop Wellbutrin XL.

On August 26, 2002, GSK filed an NDA for 150 mg and 300 mg once-daily bupropion hydrochloride, called Wellbutrin XL.[88]



In September 2003, GSK and Biovail launched Wellbutrin XL.[91]  Biovail manufactured it; GSK marketed and distributed it.[92]  In 2004, GSK made ████ in revenue from Wellbutrin XL sales; Biovail made ████.[93]  For

---

[87] JA-2284-85, 2294-96 (SOF ¶¶47-50, 76-81).

[88] JA-2296 (SOF ¶82).

[89] JA-2296 (SOF ¶83).

[90] JA-2296-97 (SOF ¶84).

[91] JA-2298 (SOF ¶87).

[92] Id. (SOF ¶88).

[93] JA-2298-99 (SOF ¶90).

GSK, Wellbutrin XL was a "top five" product; for Biovail, it represented more than 75% of total profits as of December 2006.[94]

## D.   Anchen develops generic Wellbutrin XL.

In 2004, a generic company, Anchen Pharmaceuticals, Inc., formulated a generic version of Wellbutrin XL.[95]  Anchen designed around the '341 and '327 patents by *adding* HCl – a stabilizing agent – during wet granulation.[96]

In September 2004, Anchen filed an ANDA.[97]  In November 2004, Anchen sent a Paragraph IV notice to GSK and Biovail, stating its tablet contained "a stabilizing amount of [HCl] in the core."[98]



[100]

---

[94] JA-2299 (SOF ¶¶91, 93).

[95] JA-2320-21 (SOF ¶160).

[96] *Id.* (SOF ¶¶160-61, 164); JA-11757 (Ex. 235, Letter from Anchen to GSK enclosing Anchen ANDA Excerpt, ███████████████████ ("Anchen ANDA")).

[97] JA-2322 (SOF ¶165).

[98] *Id.*

[99] JA-11748-51, JA-11755, JA-11757, JA-11763-64 (Ex. 235, Anchen ANDA).

[100] JA-2321-23, JA-2325-26 (SOF ¶¶164, 167, 181-82).

In November and December 2004, Anchen sent GSK 160 pages of its

ANDA, including the ███████████████████████████████████

███████.[101]  Anchen offered GSK and Biovail product samples, but neither

accepted.[102]

## E.    GSK and Biovail sue Anchen.

In December 2004, GSK and Biovail sued Anchen, alleging infringement of

the '341 and '327 patents.[103]  This triggered a 30-month stay, until May 12, 2007,

unless Anchen prevailed in the patent suit earlier.[104]

Anchen presented evidence that it had selected the ingredients for its

ANDA product – including HCl – with the specific goal of avoiding

infringement.[105] ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████[106]

Although GSK and Biovail listed the '327 patent in the Orange Book and

asserted it against Anchen and others, GSK's own data revealed – and Biovail has

---

[101] JA-2322-23 (SOF ¶ 166, 170).

[102] JA-2324 (SOF ¶ 172).

[103] JA-2332, JA-2334 (SOF ¶¶ 200, 203).  GSK authorized filing the *Anchen* complaint.  JA-2334 (SOF ¶ 203).

[104] JA-2329-30 (SOF ¶ 193).

[105] JA-2334-35 (SOF ¶ 205 & n.263).

[106] JA-2325-27, JA-2334-35 (SOF ¶¶ 180-81, 185, 205); JA-4542-44 (Ex. 64, Baldwin Report ¶¶ 93-98); JA-5112-16 (Ex. 77, Baldwin Rebuttal Report ¶¶ 40-51).

admitted – the patent did not cover Wellbutrin XL.[107]  In January 2006, GSK

notified the FDA it wished to "de-list" the '327 patent,[108] and dismissed any

infringement claims based on that patent.[109]

On March 17, 2006, Anchen moved for summary judgment.[110]  Anchen

argued that "free of stabilizer" meant just that: free of *any substance* that tends to

prevent changes to the chemical integrity of the tablet, (*i.e.*, stabilizes).[111]  Biovail

argued that "free of stabilizer" should be construed as "free of *an effective amount* of

stabilizer."[112]  Anchen countered that, even under that construction, the

defendants could not show infringement because Anchen's tablet contained HCl,

an effective stabilizer, and Anchen's product was stable.[113]

In June 2006 – while not required to do so – Anchen submitted an amended

ANDA to the FDA ██████████████████████████████[114]  Anchen gave

Biovail a copy.[115]  Anchen's amended ANDA was the only version legally in effect

---

[107] JA-1784-88, 1791-92 (SOF-SP ¶¶ 114, 117-26, 133).

[108] JA-1784 (SOF-SP ¶ 115).

[109] JA-2305, JA-2312 (SOF ¶¶ 117, 135).

[110] JA-2337-38 (SOF ¶ 212).

[111] JA-10647 (Ex. 182, *Anchen* Am. Claim Construction Order).

[112] JA-2336 (SOF ¶ 207).

[113] JA-11113-23 (Ex. 195, *Anchen* Summ. J. Order).

[114] JA-2339 (SOF ¶ 216).

[115] *Id.*

from then on,[116] and "[t]here is no support for the proposition that the question of infringement must be addressed solely based on the initial ANDA filing, given that the statute contemplates that the ANDA will be amended as a matter of course."[117]

On August 1, 2006, the *Anchen* court granted summary judgment for Anchen.[118] The court's *Markman* decision construed "stabilizer" to mean "any substance or agent that tends to prevent changes to the chemical integrity of the tablet."[119] The meaning of "free of" was so plain it needed no construction, and the court rejected the defendants' "functional" claim construction of "stabilizer."[120] The court ruled as a matter of law that Anchen's product did not infringe the '341 patent because it was not "free of stabilizer."[121] The court added, "the question is not whether [HCl] is necessary as a stabilizer, but whether it is present and tends to act as one."[122] "The Court [found] no genuine issue of material fact as to

---

[116] *Id.*

[117] *Ferring B.V. v. Watson Labs. Inc.*, 764 F.3d 1382, 1390 (Fed. Cir. 2014).

[118] JA-2341 (SOF ¶220).

[119] JA-10647 (Ex. 182, *Anchen* Am. Order Claim Construction Hr'g).

[120] JA-10651 (*Id.*).

[121] JA-11110 (Ex. 195, *Anchen* Summ. J. Order).

[122] JA-11114 (*Id.*).

whether [HCl] acts as a stabilizer . . . . It [was] clear to the Court that it does."[123]

## F.   Impax, Abrika, and Watson were sued.

*The Impax Litigation.*  On November 30, 2004, Impax Laboratories, Inc. filed an ANDA for generic 150 mg Wellbutrin XL[124] (later adding the 300 mg).[125] Impax designed its product around the '341 patent by *not* using a coating to extend the release of bupropion hydrochloride.[126]

On March 7, 2005, Biovail nevertheless sued Impax, alleging that Impax's 150 mg generic infringed the '341 patent.[127]

On May 23, 2006, the court ruled for Impax on claim construction, construing "delayed release tablet" to require a delayed release coating as described in the '341 patent.[128]  Regarding the term "free of stabilizer," the *Impax* court, like the *Anchen* court, rejected Biovail's proposed functional construction.[129]

---

[123] JA-11115 (*Id.*).

[124] JA-2345-46 (SOF ¶¶232, 234).

[125] JA-2347 (SOF ¶235).

[126] JA-2346 (SOF ¶233).

[127] JA-2348 (SOF ¶237).  Biovail did not timely sue Impax on the 300 mg strength, so no 30-month stay consequently applied.  JA-2407 (SOF ¶457).

[128] JA-1979-80 (Pls.' Corrected Consol. Resp. to Defs.' Statement of Facts, Summ. J. I ("RSOF-SP")).

[129] JA-1829-30 (SOF-SP ¶¶251-53).  Impax argued for a common-sense interpretation of "free of stabilizer": "free of *any* substance that tends to prevent changes to the chemical integrity of the tablet."  JA-11012 (Ex. 191, *Impax* Claim

(*Continued*)

Impax moved for summary judgment on non-infringement.[130]  But before a decision, in February 2007, the parties settled.[131]

*The Abrika Litigation.*  On ████████████████ Abrika Pharmaceuticals, LLLP filed an ANDA for a generic 150 mg Wellbutrin XL[132] (later adding 300 mg).[133]



[134]

On December 21, 2004, Biovail and GSK nevertheless sued Abrika, ████████

[136]

Construction Order) (emphasis added).  Biovail reiterated the arguments regarding "an effective amount" of stabilizer.  *Id.*

[130] JA-1980 (RSOF-SP).

[131] JA-1981 (RSOF-SP).

[132] JA-2344 (SOF ¶228 & n.307).

[133] *Id.*

[134] JA-2343-44 (SOF ¶¶226-27).  ██████████████████████████
██████████████████████████.  *Id.*

[135] JA-1819, JA-1821 (SOF-SP ¶¶216, 224).

[136] JA-1820-21 (SOF-SP ¶¶219-23).

In August 2006, Biovail and GSK lost again.  The court adopted Abrika's proposed construction of "dissolution profile" because it "better reflects the disclosures in the specification and more closely conforms to the patentee's own expressed description of his invention."[137]  Biovail's proposed construction was "impermissibly broad" and had "no support in the intrinsic record."[138]  As in *Anchen* and *Impax*, the court found that "free of stabilizer" could be understood only by its plain meaning.[139]

*Abrika* settled in July 2007, before summary judgment.[140]

*The Watson Litigation.*  Watson Pharmaceuticals, Inc. filed an ANDA for 150 mg Wellbutrin XL,[141] later adding the 300 mg.[142]  Watson, like Anchen, designed around the '341 patent by ███████████████████████████████ ███████████████████████████████████████████████ [143]

In July 2005, Watson sent a Paragraph IV notice to Biovail and GSK, asserting its generic product █████████████████████████████ [144]

---

[137] JA-1821-22 (SOF-SP ¶225).

[138] *Id.*

[139] JA-1822 (SOF-SP ¶227).

[140] JA-1988 (RSOF-SP).

[141] JA-1813-14 (SOF-SP ¶196 & n.261).

[142] *Id.*

[143] *Id.* (SOF-SP ¶¶195-98).

[144] *Id.*

On September 6, 2005, Biovail sued Watson.[145]  *Watson* was not actively

litigated.[146]

## G.    With GSK's help, Biovail files a meritless FDA petition.

In 2006, Biovail and GSK collaborated on an FDA petition addressing the

FDA's review of controlled-release bupropion ANDAs.[147]

The FDA's then-longstanding practice required (1) showing bioequivalence

only to the reference drug (Wellbutrin XL);[148] (2) measuring only metabolites

that contribute meaningfully to drug  safety and efficacy (for bupropion, the

"hydroxy" metabolite);[149] and (3) single-dose testing for bupropion (per FDA

guidance).[150]  An FDA Advisory Committee had identified the potential for

alcohol-related dose dumping in controlled-release products (like Wellbutrin

XL),[151] determined that such products should be tested for potential dose

dumping,[152] suspended sales of one controlled-release drug,[153] prioritized

---

[145] JA-1814 (SOF-SP ¶ 199).

[146] *Id.*

[147] JA-1887-90 (SOF-SP ¶ ¶ 462-74).

[148] JA-1856 (SOF-SP ¶ 348).

[149] JA-1852 (SOF-SP ¶ 331).

[150] JA-1864 (SOF-SP ¶ 379).

[151] JA-2379 (SOF ¶ ¶ 350-51).

[152] JA-2380 (SOF ¶ 353).

[153] JA-2379 (SOF ¶ 349).

controlled-release products for testing,[154] and started requesting and analyzing dose dumping studies (including for Biovail's Tramadol).[155]

The petition made four demands. First, it demanded the FDA require bioequivalence comparisons to extended, sustained, and immediate release versions of Wellbutrin, to assure the absence of so-called "bioequivalence drift."[156] Second, it demanded the FDA require generic applicants to evaluate bioequivalence as to *all* active metabolites –the hydroxy, threo, and erythro metabolites.[157] Third, it demanded the FDA require "steady-state" (multiple dose) bioequivalence studies.[158] Fourth, it demanded that generics prove that alcohol consumption would not cause "dose dumping."[159]

On December 14, 2006, the FDA issued its final response, rejecting the first demand as "without merit."[160] The FDA found it "cannot reasonably conclude" that threo or erythro metabolites contribute meaningfully to safety and efficacy (the lone study accompanying the petition showed they did not meaningfully

---

[154] JA-2380 (SOF ¶353).

[155] JA-2380 (SOF ¶354).

[156] JA-1850-51, JA-1856-64 (SOF-SP ¶¶323, 347-78); JA-1858 (SOF-SP ¶354) (GSK theorized that "significant variations" in pharmacokinetics could arise between generic Wellbutrin XL and IR because of the allowed range on bioequivalence).

[157] JA-1850-56 (SOF-SP ¶¶323, 327-46).

[158] JA-1850-51, JA-1864-67 (SOF-SP ¶¶323, 379-89).

[159] JA-1850-51, JA-1867-70 (SOF-SP ¶¶323, 390-404).

[160] JA-1863 (SOF-SP ¶375).

contribute).[161]  The FDA nominally granted the hydroxy request, since that was already required by the FDA.[162]  The FDA rejected the steady-state request because single-dose testing was better at detecting small differences in formulation performance and Biovail had "not submitted any data to substantiate [its] claim" that multi-dose testing was better.[163]  Regarding dose dumping, the FDA's concern was well known *before* the petition was submitted; the petition merely cited the FDA's own minutes and Wellbutrin's label without providing new information.[164]

Four days later, Biovail moved to enjoin Wellbutrin XL ANDA approvals, alleging the petition was wrongfully "denied."[165]  In response, the FDA called Biovail's core argument – "that there are safety issues with generic versions of Wellbutrin XL that are unique to the generic drug" – "baseless."[166]  The district court denied Biovail's motion.[167]

---

[161] JA-12484 (Ex. 304, FDA Petition Resp.).

[162] JA-12482-84 (*Id.*).

[163] JA-12485-87 (*Id.*).

[164] JA-12487 (*Id.*).

[165] JA-2382 (SOF ¶363).

[166] *Id.* (SOF ¶364).

[167] *Id.* (SOF ¶365).

## H.   The circumstances in mid–December 2006.

By December 2006, the end of GSK and Biovail's monopoly over Wellbutrin XL was imminent.  GSK and Biovail had lost *Anchen*[168] and dropped their '327 patent claims.[169]  The *Anchen* loss terminated the 30-month stay.[170] Although Biovail appealed,[171] success on appeal was unrealistic,[172] and regardless, Biovail would still have to prove infringement.[173]  Biovail and GSK simply were not going to win.[174]

The FDA had denied Biovail's petition, rejecting the bioequivalence demands as "without merit."[175]  A court had declined to enjoin ANDA approval.[176] The petition could no longer delay generics.

███████████████████████████████████████

███████████████████████████████████

---

[168] JA-2341 (SOF ¶220).

[169] JA-2312 (SOF ¶135).

[170] 21 U.S.C. § 355(c)(3)(C)(i).

[171] JA-2423 (SOF ¶513).

[172] JA-2491-98 (SOF ¶¶751-73).

[173] *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("The patentee bears the burden of proving infringement by a preponderance of the evidence." (citation omitted)).

[174] JA-4881 (Ex. 69, Nusbaum Rebuttal Report ¶2) (concluding that defendants "could not have reasonably expected to prevail in the patent litigation").

[175] JA-2374-75, JA-2382 (SOF ¶¶332, 362).

[176] JA-2382-83 (SOF ¶¶363-66).

████████████████████████████████████████████████████

████████████████████████████████████████████.[177]  In mid-December

2006, they obtained final FDA approval and launched a generic 300 mg

Wellbutrin XL at-risk.[178]  The 150 mg generic launch was soon to follow.[179]

████████████████████████████████████████████████████

██████████████████████████████████████████.[180]

## I.     GSK and Biovail execute a pay-for-delay deal.

In mid-December 2006, Biovail (working with GSK) approached Anchen,

Teva, and Impax to discuss an agreement.[181]  The parties agreed to a short-term

████████████████████████████████████████████████████

████████████████████████████████████.[182]  GSK had exclusive rights to

launch an AG, and so had to approve any "no-AG" promise.[183]

---

[177] JA-2407-08 (SOF ¶¶457-59).

[178] JA-2432 (SOF ¶548).

[179] JA-2408-09 (SOF ¶¶460-63).

[180] ███████████████████████████████████████████
████████. *Id.*

[181] JA-2427-29 (SOF ¶¶533-41).

[182] *See* JA-2435 (SOF ¶557).

[183] JA-2294-95, JA-2412-14, JA-2443, JA-2446, JA-2485 (SOF ¶¶79, 470-77, 588, 597, 721).

On February 9, 2007, GSK, Biovail, and generics Teva, Anchen, and Impax consummated an agreement (the "February 2007 agreement" or "transaction").[184] Several documents memorialized the transaction.[185]

*An agreement to delay Anchen's first-to-file 150 mg product.* ███████████ ████████████████████████████████████████████████████████ ████████████████████████ [186] They could launch earlier if the Federal Circuit ███████████████; but given the stage of the appeal (still being briefed), GSK's own expert considered May 2008 the "most likely" date and any earlier date "unlikely."[187]

*An agreement not to launch a 150 mg or 300 mg AG.* In exchange, GSK and Biovail agreed not to launch a 150 mg AG during Anchen's 150 mg six-month exclusivity period (which would begin upon Teva-Anchen's delayed entry), or a 300 mg AG for six months after the Teva-Anchen-Impax at-risk launch on December 18, 2006.[188]

*The non-settlement aspects of the agreement.* Teva-Anchen were willing to shelve their imminent at-risk launch of the 150 mg to obtain protection from AG competition. But if the infringement suit were truly settled on February 9, 2007,

---

[184] JA-2410-11 (SOF ¶468).

[185] *Id.*; JA-2451(SOF ¶614).

[186] JA-2451-52 (SOF ¶¶615-17).

[187] JA-2487-88 (SOF ¶¶732-35).

[188] JA-2449 (SOF ¶606).

Teva-Anchen would have had to launch their generic within 75 days or forfeit their exclusivity.[189] The only way for Teva-Anchen (having obtained final FDA approval and won summary judgment in the patent case) to agree to delay launching until May 2008 (more than 75 days out), yet retain the 180-day exclusivity, was to keep an appeal pending before the Federal Circuit.[190] And so the agreement was structured such that it did ████████████████████████

████████████████ [191] In violation of a duty to do so, the parties did not advise the Federal Circuit of the altered consequences for its eventual decision of the pending appeal (to avoid an early denial for lack of subject matter jurisdiction and resulting obligation to launch within 75 days).[192] By prolonging lapse of the 180-day exclusivity, the transaction prolonged the bottleneck blocking other generic Wellbutrin XL 150 mg entrants.[193]

The February 2007 agreement was highly lucrative to both the brand companies (GSK and Biovail) and the generics (Teva and Anchen),[194] but very

---

[189] JA-2430 (SOF ¶543). When a judgment of non-infringement becomes final (*e.g.*, if an appeal is not filed or dismissed), the first filer must launch within 75 days of FDA approval of its ANDA or forfeit its 180-day exclusivity, allowing other generics to enter. 21 U.S.C. § 355j(5)(D)(i)(I)(bb)(AA).

[190] JA-2430 (SOF ¶543).

[191] JA-2452-53 (SOF ¶619) (quoting JA-3697 (Ex. 41, Anchen-Biovail Definitive Agreement § 1)).

[192] JA-2498-99 (SOF ¶¶776-77).

[193] JA-2464-66 (SOF ¶¶654-61).

[194] JA-2449, JA-2453-54, JA-2466-70 (SOF ¶¶606, 623, 662-70).

costly to drug purchasers.[195]  The transaction ensured Teva-Anchen would be
free from AG competition for the all-important first 180 days for both dosages,
doubling their generic sales and avoiding price competition from a second
generic.[196]  Likewise, the delay in 150 mg generic competition until May 30, 2008
was worth nearly ███████ to GSK, which far overshadowed any profits lost by
agreeing to withhold an AG.[197]

GSK acknowledges that its no-AG promise caused Teva-Anchen's
agreement to delay their then-imminent 150 mg generic launch.[198]  Absent that
agreement, GSK would have launched an AG.[199]  GSK's no-AG promise was
worth ███████ to Teva-Anchen.[200]

## J.     Purchasers pay overcharges for Wellbutrin XL.

The defendants' conduct – the sham litigations and petition, and unlawful
reverse payment – delayed market entry of generic Wellbutrin XL.  GSK did not
dispute that, if the jury found some or all of the challenged conduct illegal,
generic competition for 300 mg and 150 mg generic Wellbutrin XL (including

---

[195] JA-2470-71 (SOF ¶¶672-76).

[196] JA-2319, JA-2412-13, JA-2449 (SOF ¶¶156, 474, 606).

[197] JA-15910-15 (Ex. 589, GSK Presentation, "WXL Deal Summary"); JA-2467 (SOF ¶664 & n.948).  Dr. Leitzinger measured GSK's sacrifice from withholding its AG at ███████  *See* JA-31456-58, JA-31460-62 (Ex. 946, Leitzinger Second Suppl. Report ¶¶20, 26-28).

[198] JA-2447 (SOF ¶600).

[199] JA-2420-27 (SOF ¶¶503-32).

[200] JA-28892-94 (Ex. 838, Leitzinger Suppl. Report ¶¶10-15).

GSK's AG) would have begun as early as January 2006, with the other generic competitors entering after Anchen's 180-day exclusivity elapsed.[201]

GSK likewise did not dispute that – depending on whether the jury found some or all of the challenged conduct illegal – direct purchasers paid overcharges on their extended-release bupropion purchases as high as ███████ (and, if just the reverse payment agreement was found illegal, as high as ███████).[202]  An economist came to similar conclusions for the end-payor class.[203]

## III.   PROCEDURAL HISTORY

In May 2008, direct purchasers and end-payors of Wellbutrin XL sued GSK and Biovail, alleging that they conspired to prevent and delay generic competition by filing sham infringement lawsuits and a FDA petition, and

---

[201] JA-4382-84 (Ex. 62, Blume Report ¶ 34) (entry dates absent lawsuits and petition); JA-4427-28 (*Id.* ¶¶ 113-14) (entry dates absent just lawsuits); JA-4427-28 (*Id.* ¶¶ 115-16) (entry dates absent just petition), JA-4430-31 (*Id.* at app.) (entry date summary chart); JA-30267-68, JA-30272, JA-30274-77 (Ex. 892, Blume Suppl. Report ¶¶ 28, 30, 39, 44, 46, 51, 53) (entry dates absent pay-for-delay); JA-30473 (Ex. 913, Blume Second Suppl. Report ¶ 13) (entry dates absent pay-for-delay if Anchen did not launch until June of 2007).

[202] JA-4673-75 (Ex. 65, Leitzinger Report ¶¶ 107-09) (damages based on generic entry dates absent lawsuits and petition, absent just lawsuits, and absent just petition); JA-5007 (Ex. 71, Leitzinger Rebuttal Report at Ex. 5) (revised damages based on generic entry dates absent lawsuits and petition, absent just lawsuits, and absent just petition); JA-28895-96 (Ex. 838, Leitzinger Suppl. Report ¶¶ 19-20) (damages based on generic entry dates absent just pay-for-delay agreement)); JA-30587-88 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶ 70-71) (damages based on generic entry dates absent just pay-for-delay agreement, assuming Anchen did not launch until June 2007).

[203] JA-32127-47 (Ex. 963, Rosenthal Decl.).

entering into an unlawful reverse payment agreement with Teva-Anchen.[204]  On August 11, 2011, the district court certified the direct-purchaser class, and on August 15, 2011, the end-payor class.[205]

In late 2011, Biovail and GSK moved for summary judgment, arguing that their litigation and petitioning conduct is protected under the *Noerr-Pennington* doctrine and that the transaction is not independently actionable.[206]  GSK also argued it had no involvement in some of the allegedly anticompetitive conduct and so was not a co-conspirator on some acts.[207]

On May 11, 2012, the district court granted partial summary judgment, dismissing the purchasers' sham litigation and petitioning theories, but reserving ruling on the reverse payment theory.[208]

On November 7, 2012, the court approved the Biovail class settlements, leaving GSK as the only defendant.[209]  On February 22, 2013, the district court continued a stay pending the Supreme Court's decision in *Actavis*.[210]

---

[204] JA-175-76 (Summ. J. II Op.).

[205] The district court decertified the end-payor class on June 30, 2015.  *See* JA-176.

[206] *See* JA-48.

[207] *See id.*

[208] *Id.*; *see* Stip. & Sched'g Order, Aug. 6, 2012, ECF No. 471 (permitting additional discovery).

[209] JA-176 n.23.

[210] JA-177.

On June 17, 2013, the Supreme Court issued *Actavis.*[211]  The parties

conducted additional discovery[212] and served additional expert reports; GSK

moved for summary judgment; and the district court held oral argument on July

29, 2015.[213]

On September 23, 2015, the district court granted GSK's motion for

summary judgment on all claims.[214]  On October 21 and 22, 2015, the purchasers

appealed to the Third Circuit.[215]  On November 3, 2015, GSK cross-appealed.[216]

---

[211] 133 S. Ct. 2223.

[212] *See* Order, June 17, 2013, ECF No. 503.

[213] JA-177.

[214] *See generally* JA-142-230.

[215] JA-233-35 (Direct Purchaser Notice Appeal); JA-378-81 (End-Payor Notice Appeal).

[216] JA-236-38; JA-382-85.

## STANDARDS OF REVIEW

This Court reviews a grant of summary judgment *de novo*, applying the same standard as a district court,[217] and "will affirm only if 'drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact, and [] the moving party is entitled to judgment as a matter of law.'"[218]

This Court reviews a district court's decision to preclude expert testimony for abuse of discretion.[219]  It will reverse if the court's ruling "'rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact.'"[220]

This Court exercises plenary review of standing issues and will reverse clearly erroneous factual findings underpinning the standing determination.[221]

This Court reviews denial of a motion to intervene for abuse of discretion, although this review is "more stringent" when the district court denies a motion for intervention as of right.[222]  A district court's denial of intervention as of right

---

[217] *Renchenski v. Williams*, 622 F.3d 315, 324 (3d Cir. 2010).

[218] *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015) (alteration in original) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)).

[219] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

[220] *Id.* (quoting *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999)).

[221] *Good v. City of Phila.*, 539 F.3d 311, 316 (3d Cir. 2008).

[222] *Brody v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992) (citations omitted).

must be reversed if the court "applied an improper legal standard or reached a

decision [this Court is] confident is incorrect."[223]

---

[223] *Id.* (citations omitted).

## SUMMARY OF THE ARGUMENT

The purchasers alleged that GSK and Biovail violated antitrust laws by conspiring to keep generic versions of Wellbutrin XL off the market. Their anticompetitive scheme included (i) prosecuting sham patent infringement lawsuits against four generic manufacturers whose products, regardless of claim construction, did not infringe Biovail's patents; (ii) demanding (without scientific support) that the FDA not approve ANDAs until it changed long-established FDA practices; and (iii) an unlawful pay-for-delay deal.

At summary judgment, the purchasers presented evidence that – in light of GSK's earlier Wellbutrin patents, basic principles of chemistry, and longstanding FDA practices – no reasonable pharmaceutical company in GSK and Biovail's position could realistically expect to prevail in its litigations and petition. And the purchasers presented evidence that, in exchange for GSK's promise not to launch a competing AG, ███████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████ .

GSK and Biovail challenged some of this evidence. There were numerous disputes of material fact. Yet the district court granted summary judgment for GSK and Biovail in two opinions.

A central theme encompasses all of the court's errors: the district court repeatedly failed to faithfully apply the requirements of Rule 56. The court

ignored much of the purchasers' evidence, including fundamental principles of chemistry and the evidence of anticompetitive harm (higher prices). Sometimes, the court weighed the parties' competing evidence and sided with the defendants. Other times, it concluded that material factual disputes required *granting* summary judgment for the defendants. The court also applied heightened causation standards to the purchasers' FDA petition theory (by requiring purchasers to quantify the delay caused by the unsuccessful petition requests) and reverse payment theory.

The inquiries the court addressed – objective baselessness, rule-of-reason balancing, conspiracy, and causation – are archetypical factual issues resolved by juries, not judges. The record enables a rational jury to find for the purchasers. Summary judgment was not warranted on any theory or claim in the case.

Case: 15-3559   Document: 003112391081   Page: 62   Date Filed: 08/25/2016

# ARGUMENT

**A.    The district court erred in granting summary judgment on the sham *Anchen* suit theory.**

The district court rejected the purchasers' theory that *Anchen* was objectively baseless and filed to delay generic launch. But abundant evidence showed the sham nature of GSK and Biovail's suit against Anchen. The grant of summary judgment should be reversed.

The parties hotly disputed whether *Anchen* was baseless. They also contested subsidiary facts, including (i) whether a reasonable pharmaceutical manufacturer could dispute, under basic principles of chemistry and pharmaceutical formulation, ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████. These disputed facts (and others) preclude determining objective baselessness as a matter of law.[224] Put simply, if a jury resolved these disputes in favor of the purchasers, it could find the suit baseless.

---

[224] *E.g.*, *In re Wellbutrin SR Antitrust Litig.*, Nos. 04–5525 & 05–396, 2010 WL 3488634, at *2–3 (E.D. Pa. Aug. 31, 2010) (summary judgment denied because predicate facts concerning objective foreseeability of particular excipient prior to institution of suit were disputed (citing *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 360–62 (D. Mass. 2004))); *La. Wholesale Drug Co. v. Sanofi-Aventis* ("*Arava*"), No. 07-cv-7343, 2008 WL 4580016, at *5 (S.D.N.Y. Oct. 14, 2008) (denying summary judgment because "there [were] genuine issues of fact with respect to the Defendants' objective basis for filing the [Citizen] Petition").

### 1.    Objective baselessness is a question of fact.

The *Noerr-Pennington* doctrine provides limited protection for petitioning activity that has anticompetitive effects.[225]  Where "no reasonable litigant could realistically expect to secure favorable relief," and the petition is motivated by "an attempt to interfere directly with the business relationships of a competitor," petitioning has no immunity.[226]

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* ("*PRE*"), the Supreme Court held this immunity attaches only if the activity is "reasonably calculated" to "elicit a favorable outcome" or "favorable relief."[227] Neither *PRE* nor its progeny alters the summary judgment standard: "[n]othing in *PRE* compels [a court] to overrule the venerable principle that juries, not judges, decide disputed questions of fact even when First Amendment immunity is at issue."[228]  A court may resolve objective baselessness as a matter of law only if "there is no dispute over the predicate facts of the underlying legal

---

[225] *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 661 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961).

[226] 508 U.S. 49, 61-62 (1993) (setting forth a "two-part definition of 'sham'" petitioning).  The defendants have never disputed, for purposes of summary judgment, that their litigation and petitioning activity was subjectively motivated by an intent to interfere with competition.

[227] *Id.* at 60, 62.

[228] *See, e.g.*, *The Personnel Dep't, Inc. v. Prof'l Staff Leasing Corp.*, 297 F. App'x 773, 780-81 (10th Cir. 2008) (citations omitted).

proceeding."[229]  Material predicate facts include any facts tending to prove or disprove the objective baselessness of defendants' petitions.[230]

### 2. The evidence shows that *Anchen* was a sham.

The purchasers detailed the baselessness of *Anchen* in a lengthy fact proffer citing scores of exhibits[231] and supported by three experts (a Duke chemistry professor, an industry chemist of nearly 50 years, and a former supervisory patent

---

[229] *PRE*, 508 U.S. at 60-61; *see also Relafen*, 346 F. Supp. 2d at 364 (noting the court's "duty" to submit fact disputes regarding objective baselessness to a *jury*); *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 364 (D.N.J. 2009) ("Here, as in other cases, Warner-Lambert's knowledge and intent are disputed factual issues that the Court is duty-bound to submit to the *jury*." (emphasis added)); *cf. Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878) ("It is, therefore, generally the duty of the court, when evidence has been given to prove or disprove the existence of probable cause, to submit to the *jury* its credibility." (emphasis added)); *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998) ("We have held that the question of probable cause in a section 1983 damage suit is one for the *jury*." (emphasis added)).

[230] *See, e.g., Relafen*, 346 F. Supp. at 360-61 ("[T]he relevant 'predicate facts' are not only the facts determined in the prior lawsuit, but also those facts tending to prove or disprove the existence of probable cause.").  *See also Tyco Healthcare Grp. LP v. Mutual Pharm. Co., Inc.*, 762 F.3d 1338, 1347-50 (Fed. Cir. 2014) (vacating summary judgment because of disputed facts about whether Tyco's litigations and FDA petition were objectively baseless); *see also Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 730 F.3d 1060, 1069 (9th Cir. 2013) ("Because a *reasonable jury could conclude* that [the defendant's actions] satisfy both criteria of the sham exception, we cannot affirm the district court's grant of summary judgment to [defendant] on the [] basis of *Noerr-Pennington* immunity." (emphasis added)); *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1369 (Fed. Cir. 2006) ("Because the question of whether any statements in the letters were 'objectively baseless' is genuinely disputed and integrally related to the question of infringement, we vacate the grant of summary judgment.").

[231] JA-1792-1813 (SOF-SP ¶¶ 134-94).

examiner at the U.S. Patent and Trademark Office ("PTO")),[232] extensive briefing, and concessions from the defendants' own experts.[233]

In the underlying litigation, Anchen proposed that "free of stabilizer" meant just that: free of a substance that tends to prevent changes to the chemical integrity of the tablet, *i.e.* stabilizes.[234]  Under this "plain meaning" construction, GSK would have to prove Anchen's product contained *no HCl whatsoever.*  But the facts showed that Anchen added HCl during manufacture,[235] that HCl stabilizes bupropion hydrochloride,[236] ███████████████████████████████

████████████████████████.[237]

---

[232] *See generally* JA-4509-45 (Ex. 64, Baldwin Report ¶¶ 12-99); JA-5100-31 (Ex. 77, Baldwin Rebuttal Report ¶¶ 1-98); JA-4299-321 (Ex. 61, Kaplan Report ¶¶ 13-57); JA-5137-48 (Ex. 78, Kaplan Rebuttal Report ¶¶ 13-48); JA-4841-53 (Ex. 68, Nusbaum Report ¶¶ 55-86); JA-4881-902 (Ex. 69, Nusbaum Rebuttal Report ¶¶ 3-54).

[233] JA-1793-97, JA-1810-11 (SOF-SP ¶¶ 138 n.177, 142 n.186, 149 & n.192, 152 n.193, 155 n.196, 156 n.197, 187 & nn.246-48, 188 n.249).

[234] JA-10647 (Ex. 182, *Anchen* Am. Claim Constr. Order).

[235] *See, e.g.*, JA-1792 (SOF-SP ¶¶ 134-35); JA-11757 (Ex. 235, Anchen ANDA) (showing "Process Flow Chart").

[236] *See, e.g.*, JA-1796 (SOF-SP ¶¶ 152-53); JA-4522 (Ex. 64, Baldwin Report ¶¶ 38-41).

[237] *See, e.g.*, JA-1797 (SOF-SP ¶ 155 & n.196); JA-4533-38 (Ex. 64, Baldwin Report ¶¶ 68-83); JA-4317-19 (Ex. 61, Kaplan Report ¶¶ 46-51); JA-6695-96 (Ex. 107, Gribble Dep. 61:9-62:4).

GSK and Biovail proposed that "free of stabilizer" meant "free of an effective amount of a stabilizer."[238]  Under that "functional" construction, they would still have to prove that any remaining HCl did not affect the tablet's stability (*i.e.*, was not "effective").  ████████████████████████

██████████████[239] that the remaining HCl in the tablet must, as a matter of basic chemistry, contribute to its stability[240] (as there is no threshold amount below which HCl ceases to act as a stabilizer[241]); and that Anchen's product was stable.[242]

Under *either* construction of the term "free of stabilizer," GSK and Biovail would have to prove either that Anchen's product contained *no* HCl, or that fundamental principles of chemistry did not apply to Anchen's product.  Neither was possible.

████████████████████████████████████████████

██████████████████████████.[243]  As did GSK's expert in this

---

[238] JA-2336 (SOF ¶207).

[239] JA-2322-23, JA-2342-43 (SOF ¶¶165-67, 225); JA-1175 (Ex. 235, ██████████████████████████████████████████████████████).

[240] JA-2495 (SOF ¶767).

[241] *Id.* (SOF ¶766).

[242] JA-2321 (SOF ¶163).

[243] JA-6695-96 (Ex. 107, Gribble Dep. 61:9-62:4); JA-5108-09 (Ex. 77, Baldwin Report ¶¶24-30); JA-5176-77 (Ex. 79, Burgess Report ¶¶40, 42); JA-2316-17 (SOF ¶149).

case.[244]  Basic chemistry shows that the wet granulation process leaves HCl in the

final tablet.[245]  GSK used HCl for many years to stabilize its own bupropion

hydrochloride formulations; it knew the remaining moisture included HCl.[246]

████████████████████████████████████████████████████████████████,

which would lead any reasonable pharmaceutical manufacturer to conclude that

HCl was present.[247]  ████████████████████████████████████████

████████████████████████████████████████████████████████[248]  The

purchasers' experts testified that ████████████████████████████; the

defendants' experts testified similarly.[249]

Basic chemistry shows that — in any amount — HCl has a stabilizing effect

on bupropion hydrochloride.[250]  So even under a "functional" construction of the

patent — a construction unsupported by the patent itself,[251] contradicted by the

inventor,[252] abandoned by GSK's own experts,[253] and rejected by three courts[254] —

---

[244] JA-1796 (SOF-SP ¶ 152 n.193).

[245] JA-2494 (SOF ¶ 764).

[246] JA-1754-58 (SOF-SP ¶ ¶ 18-28).

[247] JA-2322-23, JA-2494 (SOF ¶ ¶ 165-67, 763).

[248] JA-2322-23 (SOF ¶ 167).

[249] JA-2326, JA-2340 (SOF ¶ ¶ 182 n.232, 183 n.233, 218 & n.290).

[250] JA-1752-54 (SOF-SP ¶ ¶ 10-17).

[251] JA-1766-71 (SOF-SP ¶ ¶ 60-72).

[252] JA-2492 (SOF ¶ 757).

[253] JA-1810-11 (SOF-SP ¶ 187).

GSK would have to prove the complete absence of HCl.  But that was impossible.

Anchen's ANDA ██████████████████████████████.[255]

Based on the record, a jury could conclude that a reasonable pharmaceutical

manufacturer could not realistically have expected to succeed.

### 3.    The court misapplied Rule 56.

In granting summary judgment, the court ignored evidence contradicting

the defendants' arguments, and fundamentally misapplied the *PRE* standard.[256]

On summary judgment, a court "must view the record as a whole

picture";[257] judgment is appropriate only if "the record *taken as a whole* could not

lead a rational trier of fact to find for the nonmoving party."[258]  But the district

court never even discussed the purchasers' evidence detailed above – it considered

only evidence favorable to the defendants.[259]

Not only did the court focus exclusively on the defendants' evidence, it

glossed over flaws in that evidence.[260]  It ignored the fact that Anchen's ANDA

---

[254] JA-2340-41, JA-2350-51 (SOF ¶¶218-20, 242-46).

[255] JA-2322-23 (SOF ¶¶165-68 & n.218) (noting the Anchen ANDA
████████████████████████████████████████████████████████
████████████████████████████████████).

[256] JA-61, JA-72.

[257] *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001).

[258] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[259] JA-65-72.

[260] *Cf. Abramson*, 260 F.3d at 276.

██████████████████████████████████████.[261]  It ignored the fact the

defendants' own experts conceded Anchen's product contained HCl.[262]  It ignored

Anchen's proof in its ANDA ████████████████████████.[263]  It ignored the

defendants' own experts' admissions the HCl acted as a stabilizer.[264]  And it

ignored GSK's own use of HCl as a functional stabilizer.[265]  This evidence, at

minimum, creates factual disputes for trial.

### 4. The court erred in considering claim construction to be dispositive.

The district court placed outsized importance on claim construction,

reasoning that because (it believed) the defendants' claim construction arguments

were "colorable," the defendants' claims were not a sham.[266]  But it failed to

appreciate that, regardless of the construction, a jury could conclude that the

defendants could not realistically expect to prove infringement.[267]

---

[261] *See* JA-1793-94 (SOF-SP ¶¶ 139-42).

[262] JA-6695-96 (Ex. 107, Gribble Dep.); JA-37581-83 (Ex. 77, Baldwin Report ¶¶ 24-30); JA-5176-77 (Ex. 79, Burgess Report ¶¶ 40, 42); JA-2316-17 (SOF ¶ 149).

[263] JA-1795 (SOF-SP ¶¶ 144-45).

[264] JA-2493 (SOF ¶¶ 760 & n.1062).

[265] JA-2276-79 (SOF ¶¶ 21-28).

[266] JA-66.

[267] Claim construction is not necessarily determinative.  *Cf., e.g., Biax Corp. v. Nvidia Corp.*, Nos. 13-cv-1649, 13-cv-1654, 2015 WL 755940, at *2-3 (Fed. Cir. Feb. 15, 2015) (finding that patentee might still prevail on the merits at summary judgment, even after the district court rejected its proposed claim construction).

The purchasers presented sufficient evidence from which a reasonable jury could conclude that the defendants could not have proved the residual HCl did not stabilize the tablet. The ANDA disclosed ████████████████

██████████████████████████████████████████████

████████████████ [268] A reasonable jury could conclude that the defendants' position was objectively baseless.

### 5. The court erred by effectively ruling that regulatory draftsmanship trumps chemistry.

The district court ruled that – even if HCl indisputably remained in Anchen's tablet, and even if any amount of HCl can contribute to stability – Biovail and GSK had a "colorable argument" that Anchen's final tablet had no HCl that could contribute to stability because (a) a draft FDA guidance arguably required Anchen to quantify the remaining HCl in each tablet if it performed any function, and (b) ████████████████████████.[269]

A jury could reject the argument and, in doing so, find the suit baseless. The *Anchen* court rejected it out of hand.[270] Given basic chemistry, a jury could easily reject the notion that HCl becomes inert merely because of the way it is labelled in an FDA application. A reasonable brand company cannot blind itself

---

[268] JA-2322-24, JA-2339-40, JA-2342-43, JA-2494 (SOF ¶¶ 165-71, 216, 225, 763).

[269] JA-68-72.

[270] *See* JA-1811-12 (SOF-SP ¶¶ 189-92).

to chemistry principles, and GSK's own expert admitted "there's nothing" in

Anchen's ANDA that ████████████████████████ [271]  One does not read an

ANDA in a scientific vacuum.

And, in context, the court's terminology of a "colorable" argument seems at

odds with the actual, result-predicting requirements of *PRE*: making a "colorable"

argument is a far cry from having a realistic expectation of ultimate victory.

The facts of Anchen's ANDA did not support the defendants' *post hoc*

theory.  The guidance's composition statement section requires (i) a list of

components, (ii) a statement of quality standard, (iii) a statement of function, and

(iv) a statement of target amount.[272]  Anchen ████████████████████

████████████████████████████████████ ██ ███

████████████████████████████ ██ ███████████████

████████████████████ ██ ████████████████████

---

[271] JA-9434 (Ex. 148, Lin Dep. 106:3-8).  The *Anchen* court found that the ANDA itself did not control the infringement inquiry.  *See* JA-11125 (Ex. 195, *Anchen* Summ. J. Op.); *cf. Glob-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) (doctrine of willful blindness applies in civil suits for induced infringement); *United States v. Flores*, 454 F.3d 149, 156 (3d Cir. 2006) ("[T]he jury could have inferred that [the defendant] was motivated to avoid learning the truth because the money laundering operation was profitable to him.").

[272] JA-26984-86 (Ex. 760, 2003 Draft Guidance for Industry) (listing requirements for the Composition Statement).

[273] JA-2497-98 (SOF ¶ 772); JA-11746-55 (Ex. 235, Anchen ANDA).

[274] JA-2497-98 (SOF ¶ 772).

[275] *Id.*

██████████████████████████████████████████████████████████████

████████████████████████.[276]  The defendants' FDA expert conceded that

Anchen's ANDA "complied" with these requirements.[277]  And the FDA approved

the Anchen ANDA.[278]  The ANDA satisfied all FDA standards.

The defendants were left to sophistry.  To them, a "processing agent"

means "an ingredient that has a function in the process of making the drug, but

none in the finished tablet."[279]  Since this definition appears *nowhere* in the

guidance, they argued the FDA "wants" a per-tablet, quantification of the

stabilizer.  But their own FDA expert Dr. Lin testified just the opposite:

> [FDA] reviewers don't necessarily care specifically
> what will stabilize the product.  What they look at is

---

[276] *See, e.g.*, JA-11748-52 (Ex. 235, Anchen ANDA); JA-1794, 1831 (SOF-SP ¶¶ 141, 256).  No reasonable pharmaceutical company would conclude from the

████████████  JA-1798 (SOF-SP ¶ 157).  The defendants' FDA expert admitted this. JA-2872 (Pls.' Slide No. 70); JA-9422-23, JA-9445-46 (Ex. 148, Lin Dep. 59:5-63:14, 153:3-154:13) ███████████████████████████████████████

███████████████████████████████████████████████ ; JA-9453 (*Id.* at 182:6-12) ("Q: Now, you recall that you reviewed portions of the ANDA for Anchen [produced to defendants in advance of *Anchen* litigation] that described ███████████████████████████████ A: Correct. Q: Okay. And that data told you that ███████████████████████████████ A: Correct.").

[277] JA-2342 (SOF ¶ 223).

[278] *Id.* (SOF ¶ 224).

[279] JA-30704 (Summ. J. I Tr.)

whether the stability data shows that the product is stable.[280]

And he further acknowledged that stability can be achieved through multiple means, so long as the final product is stable.[281]  Under Anchen's ANDA, 

[282]  This process results in a generic pill that has a longer shelf life than Wellbutrin XL.[283]

In short, expert testimony *from both sides* showed that the FDA only wants to know whether a drug *is* stable; the FDA *does not* require stabilizing agents present in small trace amounts to be quantified.[284]  The FDA's guidance states

---

[280] JA-9424 (Ex. 148, Lin Dep. 67:22–68:3); *see also* JA-9424 (*Id.* at 68:14–16) ("The way a product is – is developed or designed or formulated is not of particular concern to the FDA reviewer."); JA-9425 (*Id.* at 72:21-22) ("FDA does not care . . . how you produce a stable product."); JA-26984-86 (Ex. 760, Draft Guidance for Industry).

[281] JA-9453 (Ex. 148, Lin Dep. 183:1-11).

[282] JA-11748, JA-11750, JA-11755, JA-11757, JA-11776 (Ex. 235, Anchen ANDA) (                              .

[283] *Compare* JA-11930 (Ex. 242,                              *with* JA-3345 (Ex. 22, Wellbutrin XL NDA) (18 months).

[284] JA-2497-98 (SOF ¶772); JA-2516-19 (RSOF ¶6); JA-1959-60 (RSOF-SP).

that all components "should be listed in the composition statement, but the amount of [a processing agent] on a per unit basis *need not* be provided."[285]

A reasonable jury could find that GSK and Biovail used the alleged FDA issue as an excuse to ignore what the ANDA and science otherwise told them. If a jury made that finding, it could find the suit baseless. A litigant cannot pick out a few pages of an ANDA; base an infringement suit on a fanciful, unscientific interpretation of only those pages; and willfully disregard objective evidence that renders its infringement suit baseless. Resolution of these disputed facts was for a jury, not the judge.

### 6. The court usurped the role of fact finder.

The expression "usurp the role of the jury" typically is rhetoric. But here, the court wrote it "*finds* that Anchen does not fit the profile of objectively baseless sham litigation,"[286] and "*does not find* Biovail's argument [on claim construction] to be unreasonable."[287] And it wrote it "cannot say that it was objectively baseless" to argue for the defendants' "functional" claim construction.[288] In rejecting evidence that *Watson*, *Abrika*, and *Impax* were shams, the court again

---

[285] JA-26986 (Ex. 760, Draft Guidance for Industry) (emphasis added).

[286] JA-72.

[287] JA-66.

[288] JA-67.

saw its role to *find* facts – not just to gauge the sufficiency of the evidence.[289]  So too with the objective baselessness of the FDA petition.[290]

These are not simply shorthand uses of the word "find."  *Not once* in its objective baselessness opinion did the court refer to the role of the jury.  The court went far beyond Rule 56's boundaries by repeatedly "finding" facts.

### 7.   The court erred by inverting the summary judgment burden.

The district court determined that the defendants had raised "colorable" issues that were disputed by the purchasers.  But it then entered summary judgment, rather than denying it.  Under the court's approach, if there were undisputed issues, the court would decide; if there were disputed issues, the defendant wins.  The jury would never determine objective baselessness.

---

[289] Regarding *Watson*, the court wrote "[b]ecause the Court *finds* that the plaintiffs have not met their burden of showing objective baselessness as to *Anchen*, the Court concludes that the plaintiffs have also not met their burden with respect to Watson." JA-75 (emphasis added).  As to *Abrika*, it wrote it was "*not inclined to hold that the Abrika lawsuit was not reasonably calculated* to elicit a favorable outcome" and that it "*finds* that the plaintiffs . . . have not shown that this suit caused any delay in Abrika's entry into the market." JA-86-87 (emphasis added).  As to *Impax*, it wrote it "*finds* that the plaintiffs have not met their burden of showing that the Impax lawsuit was objectively baseless sham litigation."  JA-93 (emphasis added).

[290] As to the dose dumping request and hydroxy evaluation request, it wrote it "*finds* that Biovail's were successful and, thus, non-sham" and "*finds* that the FDA's awareness about the dangers of [the metabolites] . . . do not mean that those two requests were not 'reasonably calculated to elicit a favorable outcome.'" JA-109.

But *PRE* did not alter the summary judgment standard;[291] summary judgment is appropriate only if "there is no dispute over the predicate facts."[292]

## B. The district court erred in granting summary judgment on the reverse payment theory.

GSK's reverse payment to Anchen is a paradigm example of a brand company making a no-AG promise in exchange for the generic's agreement to delay market entry.

In *Actavis*, the Supreme Court ruled reverse payment agreements are subject to the fact-intensive inquiry under the rule of reason.[293]   In *Lamictal* this Court held that a no-AG promise is an actionable reverse payment under *Actavis*.[294]  A no-AG reverse payment is *more harmful* to competition than a plain cash payment because consumers are overcharged twice: first while the generic stays off the market and "the brand's monopoly remains in force"; and again when the generic belatedly enters but "faces no competition with other generics[.]"[295]

At summary judgment, GSK did not even dispute that its no-AG promise was worth ███████ to the generics, or that the payment was "large" under

---

[291] *The Personnel Dep't.*, 297 F. App'x at 780-81.

[292] *PRE*, 508 U.S. at 60-61; *Tyco*, 762 F.3d at 1347-50.

[293] 133 S. Ct. at 2237.

[294] 791 F.3d at 409.

[295] *Id.* at 405; *see* William O. Kerr & Cleve B. Tyler, *Measuring Reverse Payments in the Wake of Actavis*, 28 Antitrust 29, 34-35 (2013); Areeda & Hovenkamp ¶2046d6.

*Actavis*.  It offered no reason for why it paid the generics such a huge sum, and the generics provided nothing in return *other than delay*.  And the district court conceded a reasonable jury could find that, were it not for GSK's large payment, the Teva-Anchen partnership would have launched a 150 mg generic at risk in June 2007,[296] and GSK would have launched its AG.[297]  But *with* the no-AG promise that Teva demanded,[298] the generics instead agreed to delay launching until May 2008.[299]  As a result of this delay alone, the direct purchasers proved they overpaid for extended-release bupropion by more than ████████████ [300]

*Actavis*, *Lamictal*, and this abundant evidence should have led the district court to deny summary judgment and allow the jury to assess the anticompetitive consequences of the large, ████████ payment.  But instead the court erroneously granted summary judgment.

1. **The court erred in ruling the transaction did not harm competition.**

The court erred by concluding the evidence insufficient for a reasonable jury to conclude the February 2007 agreement harmed competition.  It ignored the basic inquiry required by *Actavis* and *Lamictal* – the size of the reverse

---

[296] JA-222-25.

[297] JA-194 n.38; JA-2674-79 (RSOF ¶99).

[298] JA-168-69.

[299] JA-204.

[300] JA-30587-88 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶70-71). Overcharges exceeded ████████ if entry had occurred in March 2007.  *Id.*

payment and its impact on generic delay.  And it ignored evidence of the *quid pro quo* of payment for delay.

### a.  The court ignored the size of the GSK reverse payment.

A fundamental precept of *Actavis* is the role of the payment.  Whether a reverse payment is anticompetitive "depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification."[301]

The evidence showed a huge payment.  Dr. Leitzinger (whose analysis was cited approvingly by this Court in *K-Dur*)[302] calculated the benefit of the no-AG promise to the generics at ███████.[303]  GSK did not dispute this figure far exceeded its saved litigation costs,[304] and its own expert admitted the payment

---

[301] *Actavis*, 133 S. Ct. at 2237; *see In re Loestrin 24 FE Antitrust Litig.*, Nos. 14-2071, 15-1250, 2016 WL 698077, at *10 (1st Cir. Feb. 22, 2016) (*Actavis* "emphasizes that the size of the reverse payment" is "central to the antitrust query and requires that the reviewing court or factfinder assess the value of the payment."); Areeda & Hovenkamp ¶2046d4 ("[T]he size of the payment [is] also an indicator of competitive harm.  A large payment would be an irrational act unless the patentee believed that generic production would cut into its profits.").

[302] *See K-Dur*, 686 F.3d at 220.

[303] JA-2636-37 (RSOF ¶75) (citing JA-28892-95 (Ex. 838, Leitzinger Suppl. Report ¶¶10-18 & tbls.1-2)).  The cost to GSK/Biovail (foregone AG revenues) was ███████.  JA-2637 (*Id.* at n.443) (citing JA-28994-95 (Ex. 838, Leitzinger Suppl. Report ¶¶16-18 & tbl.2)).  GSK's payment was large either way.

[304] *See Actavis*, 133 S. Ct. at 2236 (payment above brand's saved litigation costs is large); JA-31464-65 (Ex. 946, Leitzinger Second Suppl. Report ¶¶33-35) (GSK
*(Continued)*

exceeds the profits the generics could have earned by launching earlier.[305]  And GSK's other experts agreed that large payments necessarily delay generic competition.[306]

This evidence echoed the fundamental observation of *Actavis*.  A large reverse payment destroys a generic's incentive to compete, particularly where the payment exceeds the profits the generic could make by competing.[307]  And as *Actavis* noted, a "reverse payment settlement with the first filer . . . 'removes from consideration the most motivated challenger, and the one closest to introducing competition.'"[308]

But the district court ignored the evidence.  Reference to a "$200 million" payment appears exactly once, in a footnote.  The court refused to consider the payment's size, reasoning that, since GSK had "not moved for summary judgment on any grounds related to the value of the no authorized [generic] agreement . . .

---

saved, at most, $6 million); JA-32446 (Ex. 976, Am. Intellectual Prop. Law Ass'n, *Report on the Economic Survey* (2007)) ($4.5-5 million).

[305] *See* JA-2636-37 (RSOF ¶75) (citing JA-30545, JA-30544 (Ex. 916, Mnookin Dep. 167:4-19, 164:14-17)).

[306] *See* JA-29369, JA-29377 (Ex. 856, Willig Dep. 146:11-147:9, 180:18-23) (reverse payments move later into time the brand and generic company's "reservation entry dates," *i.e.*, the earliest date the brand would agree to and the latest date the generic would accept); JA-29484 (Ex. 857, Cremieux Dep. 230:3-7) (no-AG promises have same effect).

[307] *Actavis*, 133 S. Ct. at 2235.  Reverse payments delay generic competition 17 months on average.  *See* JA-27589, 27591 (Ex. 800, FTC *Pay-for-Delay* Study); JA-31453 (Ex. 946, Leitzinger Second Suppl. Report ¶10).

[308] *Actavis*, 133 S. Ct. at 2235 (citation omitted).

the plaintiffs [sic] continued reliance on it is misplaced."[309]  That was error.  The

court misapplied the summary judgment standard: a litigant cannot render an

opponent's evidence "misplaced" simply by not challenging it.

> ### b.  The court incorrectly discarded evidence showing generic delay was the *quid pro quo* for the no-AG provision, resulting in higher prices.

The evidence showed GSK provided a no-AG payment *in exchange for*

Teva-Anchen shelving their imminent at-risk launch of the 150 mg generic and

delaying their entry.[310]

First, there is the sheer size of GSK's ████████ payment.  A reasonable

jury could conclude that a payment exceeding what Teva-Anchen could have

earned launching earlier and competing with an AG is "large enough to induce

the [generic] to stay off the market."[311]

Second, there is the payment's "independence from other services for which

it might represent payment."[312]  A brand company might be able to prove a

payment was "fair value for services" rendered by a generic (rather than for

---

[309] JA-187 n.28.

[310] GSK's own expert testified a no-AG "giv[es] up some revenue on the authorized generic," so "if that's the *quid pro quo*, then in exchange for that [the brand is] going to want more days of exclusivity."  JA-29484 (Ex. 857, Cremieux Dep. 230:3-7).

[311] *King Drug of Florence, Inc. v. Cephalon, Inc.* ("*Provigil*"), 88 F. Supp. 3d 402, 417 (E.D. Pa. 2015).

[312] *Actavis*, 133 S. Ct. at 2237.

delay).[313]  In an analogous case from a district court in this Circuit, the brand

company contended it paid not for delay, but for a license to another product from

the generic.[314]  Yet, Judge Chesler denied summary judgment because, although

some of the reverse payment might have been for a license, a reasonable jury

could find some was not.[315]  Here, GSK identified *no products or services* the

generics agreed to provide in return for GSK's ████████ payment *other than*

*delay*.  A reasonable jury could conclude that GSK paid the generics for delay.[316]

Third, GSK admitted, through its witnesses and documents, that it

exchanged the no-AG payment for delay.  GSK's general counsel admitted the

company relinquished its right to launch an AG[317] *in exchange for* a delay in

generic competition:

> Q. [T]he agreements prohibited your company, GSK,
> from contemporaneously launching an authorized
> generic product; correct?

---

[313] *Id.* at 2236.  Like other justifications, proving "fair value" is defendant's
burden.  *Id.*; *Lamictal*, 791 F.3d at 412.

[314] *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2016 WL 22982, at *14-15
(D.N.J. Feb. 25, 2016).

[315] *Id.* at *12 ("at least a component"); *id.* at *17 ("at least in part").

[316] *Actavis*, 133 S. Ct. at 2235-36 (A reverse payment may "provide strong
evidence that the patentee seeks to induce the generic challenger to abandon its
claim with a share of its monopoly profits that would otherwise be lost in the
competitive market . . . .  [T]he payment (if otherwise unexplained) likely seeks
to prevent the risk of competition.").

[317] JA-163 ("GSK relinquished its right to launch an authorized generic during
the 180-day exclusivity period provided by the Hatch-Waxman Act.").

A. That sounds right.

. . . .

Q. Is it fair to say that the consideration that inured to the benefit of GSK was that GSK and Biovail would continue, for some period of time, to market a 150 mg dosage of Wellbutrin XL without generic competition?

A. That was certainly a significant term of the agreements.

Q. Do you recall any other consideration that inured to the benefit of GSK *in exchange for GSK relinquishing its exclusive licensing arrangement under these two patents*?

A. No.  There were releases, obviously.  I don't know if that counts as consideration.  But, no.[318]

GSK's CEO called the no-AG promise "*selling our exclusivity.*"[319]  A GSK

negotiator testified that Teva demanded a no-AG promise as a condition of

settling.[320]  GSK agreed Biovail could use the AG as a "settlement chip with

Anchen."[321]  And an internal GSK analysis of the transaction showed the no-AG

---

[318] JA-8546 (Ex. 131, Bondy Dep. 110:15-111:19) (emphasis added).  Even GSK's expert conceded that, "on its face," Mr. Bondy's testimony showed, absent the no-AG promise, GSK was expecting earlier generic competition.  JA-29467 (Ex. 857, Cremieux Dep. 162:18-163:25).

[319] *See* JA-8425 (Ex. 129, Garnier Dep. 144:17-145:3).  Another GSK official agreed that ██████████████████████████████████████████ ████████████ JA-28520 (Ex. 824, Davis Dep. 99:8-18).

[320] JA-195-96; JA-28198, JA-28202 (Ex. 810, Brannon Dep. 96:13-97:8, 112:13-23) (AG a "dealbreaker").

[321] *See* JA-13953 (Ex. 470, Aug. 3, 2006 Email).

61

provision delayed generic 150 mg entry from "2/1/07" ("No Deal") to "6/1/08" ("Deal").[322]

Much of this the district court conceded. It determined a jury could find that Teva insisted on a no-AG promise,[323] observed that harm to competition is shown if a jury could conclude "that absent the Wellbutrin Settlement, generic competition would have occurred earlier,"[324] and determined that, without the no-AG promise, a jury could find Teva-Anchen would have launched in June 2007.[325] Yet it held that no reasonable jury could find a *quid pro quo* relationship between GSK's ████████ no-AG payment and the generic delay. Instead, the court concluded, "at best" the evidence showed two purportedly unconnected facts – that GSK knew the transaction provided for a May 2008 generic entry date, and that it knew "a no authorized generic promise was made."[326]

The court engaged in impermissible fact finding by drawing its own inferences in favor of the movant. In the recent *K-Dur* decision, a settlement agreement providing a delayed entry date plus reverse payments in excess of (a) the brand's saved litigation costs and (b) the value of services provided by the

---

[322] *See* JA-32374 (Ex. 971, Mar. 13, 2007 Email & Analysis); *see also* JA-28511-12 (Ex. 824, Davis Dep. 65:7-66:7, 68:21-69:3) (describing presentation).

[323] JA-168, JA-195.

[324] JA-194.

[325] JA-222, JA-225; *see also* JA-2648-53 (RSOF ¶84) (collecting evidence of Teva-Anchen's ████████████).

[326] JA-193.

62

generic, permitted a reasonable jury, without more, to infer *quid pro quo*.[327]  Here, the purchasers produced far more.  No reasonable jury would be *required* to find the no-AG and delay were unrelated, or that GSK "sold" its valuable AG rights for nothing.  The *quid pro quo* was obvious and admitted.[328]

And the evidence showed the delay in generic competition and absence of GSK's AG caused purchasers to pay far higher prices.[329]  To illustrate, in 2008, just before generic entry, GSK's average price to direct purchasers for 150 mg Wellbutrin XL was approximately ▮▮▮▮▮  By 2009, after generic competition began, the generic price was ▮▮▮▮▮▮▮  and the

---

[327] *K-Dur*, 2016 WL 22982, at *14; *see also United States v. Bryant*, 655 F.3d 232, 242-43 (3d Cir. 2011) (*quid pro quo* can be implicit and proven through circumstantial evidence).

[328] With respect to the end-payors' claim under California's Cartwright Act, the court recognized evidence of a connection between the no-AG payment and the generic delay was enough to "satisfy the plaintiffs' prima facie burden" of showing "anticompetitive effects."  JA-193 n.35 (citing *In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015)).  As to this claim, therefore, the only question before this Court is whether the court erred by weighing the evidence of purported procompetitive justifications against the anticompetitive aspects of the agreements.

[329] *See* JA-28995-96 (Ex. 838, Leitzinger Suppl. Report ¶¶ 19-20) ▮▮▮▮ ▮▮▮▮ overcharges for direct purchasers); JA-31450, 31462-64, 31466-67 (Ex. 946, Leitzinger Second Suppl. Report ¶¶ 4, 30-31, 36-38) (higher prices from the transaction); JA-30587-88 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶ 70-71); JA-32842, 32879 (Ex. 1004, Rosenthal Rebuttal Decl. ¶ 20 & attachment C.13.a.); JA-32129-47 (Ex. 963, Rosenthal Decl. ¶¶ 5-51).

generic substitution was ███.[330]  That evidence satisfied the purchasers' initial

burden of production under the rule of reason.[331]

> ### 2. The court erred in ruling GSK's purported justifications entitled it to summary judgment.

The court's next error was to rule GSK's purported justifications for its

large reverse payment entitled it to judgment as a matter of law.

> #### a. GSK bore the burden to prove cognizable procompetitive justifications for its large reverse payment.

Where a plaintiff produces evidence of harm to competition, the burden

shifts to the defendant "'to show that the challenged conduct promotes a

sufficiently pro–competitive objective.'"[332]  Any proffered procompetitive

justification must be legally cognizable;[333] real, not speculative;[334] and logically

---

[330] JA–4661–62 (Ex. 65, Leitzinger Report ¶77).

[331] *Lamictal*, 791 F.3d at 412.  Plaintiff satisfies its initial burden of production with evidence of "actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services."  *Orson Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996) (citation omitted).  A plaintiff may also satisfy its burden by showing the defendant's market power.  *Id.*  GSK did not dispute it possessed monopoly power.

[332] *Lamictal*, 791 F.3d at 412 (citation omitted).

[333] *See, e.g., NCAA v. Bd. of Regents Univ. Okla.*, 468 U.S. 85, 116–17 (1984) ("'The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.'" (quoting *Nat'l Soc'y Prof. Eng'rs v. United States*, 435 U.S. 679, 696 (1978))); *United States v. Brown Univ.*, 5 F.3d 658, 669 ("A restraint on competition cannot be justified solely on the basis of social welfare concerns.").

[334] *See Cal. v. Safeway, Inc.*, 651 F.3d 1118, 1160 (9th Cir. 2011) (rejection of "speculative" justification); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 361–62 (7th Cir.

*(Continued)*

connected to the restraint,[335] such that the restraint is *necessary* to achieve the

alleged benefit.[336]  Asserted procompetitive justifications that fail these

requirements are not credited.[337]

Even if procompetitive justifications meet these requirements, summary

judgment is rarely appropriate, because the defendant bears the burden of proof as

---

1990) (same); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1149 (N.D. Cal. 2014); *Medlin v. Prof'l Rodeo Cowboys Ass'n*, No. 91-cv-2082, 1991 WL 340303, at *2 (D. Colo. Dec. 13, 1991).

[335] *See Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 835 (6th Cir. 2011) (defendant "has not demonstrated a connection between" restraint and proffered justification); *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 369 (5th Cir. 2008) (defendant had "no theory as to how its proffered procompetitive effects . . . result from or are in any way connected to" challenged restraint); *Rome Ambulatory Surg. Ctr. v. Rome Mem'l Hosp.*, 349 F. Supp. 2d 389, 411 (N.D.N.Y. 2004); *Brown v. Pro Football, Inc.*, 812 F. Supp. 237, 238 (D.D.C. 1992).

[336] *See K-Dur*, 686 F.3d at 218 ("[T]he patent holder may attempt to rebut the prima facie case by demonstrating that the reverse payment offers a competitive benefit that could not have been achieved in the absence of a reverse payment"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1103 (1st Cir. 1994) ("[A] given restriction is not reasonable, that is, its benefits cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits as the current restraint."); *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1577 (11th Cir. 1983); *N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1261 (2d Cir. 1982).

[337] *See ABA Model Jury Instructions in Civil Antitrust Cases*, Instruction 3C, "Rule of Reason – Evidence of Competitive Benefits," at A-10 (2005) ("If the plaintiff proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.")

to its affirmative defenses.[338]  And a plaintiff may show a defendant's claimed

procompetitive justification is mere pretext; such evidence independently

precludes summary judgment.[339]  "If genuine issues of material fact remain after

discovery, the rule-of-reason analysis is for the finder of fact, not the court as a

matter of law."[340]

> **b.    GSK's "the payment was needed for settlement" justification cannot support summary judgment.**

The district court essentially concluded that, given Teva's pressure for a

no-AG, there would have been no settlement absent the no-AG payment.[341]  But a

jury would not be compelled by the facts, nor permitted by law, to conclude the

---

[338] *E.g.*, *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (summary judgment on an affirmative defense "inappropriate . . . unless a reasonable juror would be compelled to find [defendants'] way").

[339] *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 483-84 (1992) (factual questions concerning pretextual justifications precluded summary judgment); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1360, 1368-70, 1377 & n.15 (3d Cir. 1992) (reversing summary judgment because the defendants' proffered justifications were "conjured up" (citations omitted)); *Provigil*, 88 F. Supp. 3d at 419 ("A reasonable jury could conclude that the payments were aimed at delaying generic entry and that Defendants' justifications are pretextual.").

[340] *Lamictal*, 791 F.3d at 411 & n.36 (collecting cases); *see also Eastman Kodak*, 504 U.S. at 483 ("Factual questions exist, however, about the validity and sufficiency of each claimed justification, making summary judgment inappropriate."); *Miller v. Ind. Hosp.*, 843 F.2d 139, 144-45 (3d Cir. 1988); *NCAA Student-Athlete*, 37 F. Supp. 3d at 1148 ("[C]onflicting expert evidence regarding the alleged procompetitive benefits" foreclosed summary judgment.); *Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*, No. 04-cv-8042, 2007 WL 2254721, at *8 (S.D.N.Y. Aug. 6, 2007) (denying summary judgment "[b]ecause substantial questions of fact exist" regarding defendants' "procompetitive justifications[.]").

[341] JA-169; JA-204.

no-AG promise and generic delay were procompetitive because they were needed to reach a settlement.[342]

First, GSK and Biovail were always *able* to settle the infringement suit against Anchen by dismissing the case, and saving all future litigation costs, as they did with *Watson* and ███ [343] Perhaps Teva-Anchen would not settle *and* delay their generic launch without receiving a ██████ reverse payment; but this does not mean an alternative settlement was impossible. ████████ ████████████████████████████████████████████████████████ [344]

As did GSK's expert.[345]

Second, no jury would be *permitted* to find the no-AG promise procompetitive as necessary for settlement.  It would render *Actavis* a dead letter if the "special incentives for collusion" recognized by the Court,[346] were refashioned into a justification for pay-for-delay agreements.  Every generic would demand a pay-off, and every brand would happily oblige.  The Supreme

---

[342] It is the reverse payment and delay that require justification, not the "settlement."  *Actavis*, 133 S. Ct. at 2236 ("explain[] the presence of the *challenged term* and show[] the lawfulness of *that term* under the rule of reason."); *Prof'l Eng'rs*, 435 U.S. at 695 ("It is this restraint that must be justified."); *K-Dur*, 686 F.3d at 218 (A "reverse payment [must] offer[] a competitive benefit.").

[343] JA-179 & n.26.

[344] ████████████████████████████████████████████████████
████████████████████████████

[345] JA-29408, JA-29398 (Ex. 856, Willig Dep. 302:22-303:18, 264:9-18).

[346] 133 S. Ct. at 2235.

Court recognized this: the "desirability of settlements" was *rejected* as a basis to avoid liability.[347]  Instead, the Court stated that drug companies can settle *without* reverse payments "as in other industries"; the *only* justifications the Court mentioned (payment below the brand's saved litigation costs or "fair value" for services) suggest that, to avoid antitrust condemnation, a payment must be for something other than delay.[348]

### c.   GSK's "supply promise" justification cannot support summary judgment.

The district court held that GSK's no-AG promise and Teva-Anchen's delay were justified by Biovail's so-called "supply promise" to Teva – ostensibly guaranteeing a Wellbutrin XL supply under certain conditions – and concluded the purchasers had produced "no evidence" that "would allow a reasonable jury to find" that this purported procompetitive justification was "'unnecessary,' 'illusory,' or 'pretextual.'"[349]  That was error.

From the evidence, a reasonable jury could conclude the "supply promise" was unnecessary, illusory, or pretextual. ████████████████████████████  ████████████████████████████████████████████ GSK's

---

[347] *Id.* at 2237.

[348] *Id.* at 2236–37.

[349] JA-204.

[350] ████████████████████████████████████████ ████████████████████████████████.

expert was noncommittal about its utility.[351]  Teva-Anchen did not need the
"supply promise" because the petition had already been denied without imposing
on Anchen any barriers to manufacture,[352] and Anchen's manufacturing was ███

███ [353]  And from the fact no supply agreement was ever executed,[354] a jury
could conclude none was needed.

Even if a jury were to disregard this evidence, ████████████████

████████████████████████████████████████████████████

████████████████████████████████ [355]  And even if a jury
*might* disregard this evidence as well, it would hardly be *required* to find that the
unquantified, alleged procompetitive benefits of the "supply promise" outweighed
the concrete, quantified harm to competition caused by the reverse payment and
delay.

---

[351] *See* JA-29405 (Ex. 856, Willig Dep. 290:22-291:11).

[352] *See* JA-12475 (Ex. 304, FDA Denial Letter).  ████████████████████
████████████████████████████████████

[353] As the district court recognized, "Anchen had manufactured product for an
at risk launch."  JA-224; *see also* JA-2627-30 (RSOF ¶70) (Anchen manufacturing
progress).

[354] *See* JA-28152 (Ex. 809, Bauer Dep. 191:2-10).  ████████████████████
████████████████████████████████████.  JA-28152-53 (*id.* 193:20-194:22).

[355] *See* JA-29402-03 (Ex. 856, Willig Dep. 280:22-282:4); JA-28136, JA-28143
████████████████████████████

     **d.**     **GSK's "an appeal was pending" justification cannot support summary judgment.**

The district court concluded that procompetitive benefits outweighed the anticompetitive harm of the reverse payment as a matter of law because the agreement "preserved for consumers the benefits of Teva-Anchen's immediate entry should Anchen prevail in the Biovail appeal."[356]  This was error.

The evidence showed the transaction averted the imminent at-risk launch, and delayed entry well into 2008.  GSK *and* its experts expected that Teva-Anchen's delay would continue until May 30, 2008, because the Federal Circuit would not rule before then (and GSK wanted to avoid that).[357]  In February 2007 the briefing was not even concluded.

---

[356] JA-203.

[357] JA-29510 (Ex. 857, Cremieux Dep. 334:19-336:4).  Despite their duty to do so, *Tivo Inc. v. EchoStar Corp.*, 429 F. App'x 975, 976 (Fed. Cir. 2011), GSK-Biovail did not tell the Federal Circuit of the "settlement," *i.e.*, that now a ruling by the court would only be relevant to the parties' rights if it were made before May 2008, and then only if Anchen prevailed.  *E.g.*, JA-2623-26 (RSOF ¶68).  It was not for the parties, but the Federal Circuit, to decide if its offices should be used as a device to delay generic entry.  And the omission was purposeful: GSK feared provoking an early decision in Anchen's favor, which would allow generics to launch; and

*(Continued)*

The court posited that the continuing appeal might have allowed earlier generic entry;[358] but Teva-Anchen had *already* won summary judgment, obtained FDA approval, and were ready and willing to launch at risk.  Teva-Anchen were *paid* not to launch.

And the district court had backwards the motivations behind, and consequences of, the parties' structuring the transaction as a "settlement/non-settlement" that maintained a Federal Circuit appeal of little or no consequence.

When a first filer with FDA approval prevails before the district court and there is no appeal, it must launch its generic within 75 days or forfeit its 180-day exclusivity, allowing other generics to enter the market.[359]  Here, Teva-Anchen were willing to shelve their at-risk launch of a 150 mg generic to enjoy the later bonanza of 180-day exclusivity without AG competition from GSK; but if they truly settled in February 2007 (*i.e.*, if Biovail dismissed the appeal), they would have had to launch in 75 days or forfeit the exclusivity.  The only way GSK could delay generic competition until May 2008 and Teva-Anchen could enjoy their no-

---

█████████████████████████████████████  When the parties finally informed the Federal Circuit on May 30, 2008, they stated the appeal was mooted "this day," failing to disclose that the transaction had been signed sixteen months earlier. *See* JA-12553 (Ex. 324, May 30, 2008 Letter to Federal Circuit).

[358] JA-182-83.  *K-Dur* recognized that reverse payment agreements that keep patent litigations pending retain and even augment their anticompetitive character.  686 F.3d at 210-11.

[359] 21 U.S.C. § 355j(5)(D)(i)(I)(bb)(AA).

AG and 180-day exclusivity thereafter was to maintain the façade of a pending appeal.[360]  In short, a reasonable juror could find that leaving an appeal (that had little or no consequence to the parties) pending was, itself, anticompetitive.

### e.   GSK's "we submitted the agreement to the FTC" justification cannot support summary judgment.

The district court lauded GSK's submission of the February 2007 agreement to the FTC.[361]  But the FTC expressly declined to approve the transaction, as GSK's counsel conceded.[362]

The law *requires* submission of all Hatch-Waxman settlement agreements to the FTC.[363]  And the law forbids precisely the inference GSK urged and the court drew: the FTC's inaction with respect to the deal (and its reservation of rights to act in the future) has no bearing on the legality of the transaction:

> [A]ny failure of the [FTC] to take action[] under this subtitle shall not at any time bar any proceeding or any action with respect to any agreement between a brand name drug company and a generic drug applicant . . . under any other provision of law.[364]

---

[360] JA-4378 (Ex. 62, Blume Report ¶25); JA-28147 (Ex. 809, Bauer Dep. 170:8-172:1); JA-27581 (Ex. 771, May 30, 2007 Letter from Biovail to Abrika).

██████████████████████████████████████████████████████████
██████████████████████████████████████████████

[361] JA-207 n.40.

[362] JA-2458 (SOF ¶633).

[363] JA-173.

[364] MMA § 1117, Pub L. 108-173, 117 Stat. 2461 (2003).

The FTC has reiterated this expressly,[365] and courts forbid the conclusion

that FTC inaction following submission represents tacit approval (it is also

inadmissible).[366]  The FTC tried to explain this below in an *amicus* filing the

district court rejected.[367]

### f.  GSK's "the Andrx patent bars entry" justification cannot support summary judgment.

The district court ruled that the no-AG payment and delayed generic entry

in the transaction were justified because the same transaction also contained a

license to an unrelated party, generic maker Andrx, for its '708 patent (a patent it

asserted ostensibly might cover 150 mg Wellbutrin products).[368]  And the court

decided that a jury would be compelled to find that, were it not for the

transaction, Teva-Anchen could not have obtained a license from Andrx on their

---

[365] FTC, *Frequently Asked Questions About Filing Agreements with the FTC Pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003*, https://www.ftc.gov/system/files/attachments/competition-policy-guidance/050210pharmrulesfaqsection.pdf.

[366] *See Altria Grp. Inc. v. Good*, 555 U.S. 70, 89-90 (2008) (FTC "nonenforcement of a statute is not the same as a policy of approval."); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999) (FTC's "failure to object" not "conclusive" of "legality"); *Clomon v. Jackson*, 988 F.2d 1314, 1322 (2d Cir. 1993) (FTC inaction not "tacit approval"); *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 53 n.18 (D.D.C. 2008); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 749 F. Supp. 2d 542, 556 (E.D. Ky. 2010) ("[I]naction [by the FTC] cannot be used to prove innocence" and is "irrelevant.").  *See Am. Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir. 1985) ("evidence of non-prosecution" not admissible).

[367] FTC *Amicus Curiae* Br. 16-17, ECF 510-2.

[368] JA-204-05.

73

own.[369]  It also held that the purchasers could not prove antitrust injury.[370]  These were errors.[371]

First, there was no evidence showing (or at least it was a genuine issue of fact whether) GSK's no-AG payment or the generic delay in the deal were necessary in order secure a ██ Andrx license.[372]  GSK *admitted* that Teva did *not* need "help" in obtaining a '708 license from Andrx.[373] ████████████████ ████████████████

Second, Andrx had an independent economic interest in giving a royalty-bearing license to Teva-Anchen regardless of whether Teva-Anchen had an agreement with GSK-Biovail.  GSK's own expert acknowledged Andrx was a non-practicing entity, meaning it did not have a product to sell, and it could only profit from its '708 patent through licenses.[375]  The district court disregarded this undisputed fact, finding that Andrx was *not* a nonpracticing entity because, in

---

[369] JA-220 n.48.

[370] JA-147.

[371] We address the causation issue in Subsection B.3.

[372] *K-Dur*, 686 F.3d at 218 (reverse payment must be necessary to achieve asserted procompetitive benefit).

[373] JA-2723-24 (GSK Reply Mem., Summ. J. II); *see also* JA-29402 (Ex. 856, Willig Dep. 278:21-280:21); JA-30031 (Ex. 882, GSK Suppl. Resp. Direct Purchaser Pls.' 3d Interrogs.).

[374] ████████████████████████████████ ████████████████████████████████

[375] *See* JA-29463 (Ex. 857, Cremieux Dep. 147:13-22, 148:22-149:11).

November 2006, Watson acquired Andrx, and Watson had filed an ANDA for generic Wellbutrin XL.[376]  But even if this Court were to credit the district court's (improper) fact finding, a jury still could find Teva-Anchen would have obtained a license without GSK's help.  It was undisputed that Anchen, the first filer, was entitled to block all other generic versions of Wellbutrin XL (including Watson's) for 180 days after it entered the market.  So if Watson or Andrx denied Teva-Anchen a license, they *would only be delaying their own launch.*[377]  GSK's experts agreed.[378]

Third, the district court inferred that GSK's intervention was necessary in part because "no bilateral agreement was ever reached" between Teva and Andrx.[379]  But the inquiry is not *what happened*; it is *what would have happened.*  And a jury would not be compelled to conclude GSK's intervention was needed for an Andrx license. ██████████████████████████████████

█████████████████████████████████████████████████████

---

[376] JA-158 n.7.

[377] The record belies any suggestion that Watson-Andrx sought to frustrate generic competition ████████████████████████████████████████████████████████████ ██ ███████ JA-4379 (Ex. 62, Blume Report ¶ 27 tbl.2); JA-32888-94 (Ex. 1005, Mylan, Wockhardt & Zydus Data).

[378] *See* JA-29414 (Ex. 856, Willig Dep. 328:14-20, 326:20-24).

[379] JA-204-05.



███████.[380]  From this, a jury could infer that, were it not for the transaction,

Teva-Anchen and Andrx would have reached a direct agreement.[381]

    A jury could also infer the ████████████████████████

████████████████████████████████████████ in the

transaction was intended to create a pretext for the pay-for-delay deal.[382]  ███

██████████████████████,[383] and the settling parties'

████████████████████████████████

██████████████████████ [384]  Teva-Anchen

got *exactly the same deal* they could have obtained directly from Andrx.[385]  And the

---

[380] JA-29550-606 (Ex. 864, Email & Draft Agreement).

[381] *E.g.*, *Odyssey Waste Servs., LLC v. BFI Waste Sys. of N. Am., Inc.*, 05-cv-1929, 2007 WL 674594, at *7 (E.D. Pa. Feb. 27, 2007) ("[U]nsigned draft contracts and testimony regarding contract negotiations" would allow jury to find contract would have resulted.); *SDK Invs. v. Ott*, No. 94-cv-1111, 1996 WL 69402, at *13 (E.D. Pa. Feb. 15, 1996) (same); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, No. 02-cv-4373, 2005 WL 724117, at *11-12 (E.D. Pa. Mar. 29, 2005) (evidence of negotiations, even without draft contract, sufficed to create jury question).

[382]*See Big Apple BMW*, 974 F.2d at 1368 (defendants' "abrupt reversal" tended to show defendants' justifications were pretextual).

[383] ████████████████████████████████████████████

[384] *See* JA-29757-66 (Ex. 871); JA29767-69 (Ex. 872).

[385] *Compare* JA-29567 (Ex. 864 § 4.1) *with* JA-29639 (Ex. 867 § 4(c)); *see also* JA-28163 (Ex. 809, Bauer Dep. 236:24-237:21).  Andrx's other licensees got the same ███ deal, too.  *See* JA-29611 (Ex. 865 § 3.1); JA-29624 (Ex. 866 § 3.1).

unexplained new arrangement did not avoid the need for a direct agreement between Andrx and Teva-Anchen.[386]  All this suggests pretext.

Finally, the district court accused the purchasers of "misrepresent[ing] the documentary evidence" because, it found as a fact,[387] "Teva and Anchen were having discussions with Andrx subject to the [transaction], not apart from it."[388] But again, this focuses on the wrong question.  The relevant question is whether Teva would have negotiated a license with Andrx regardless of whether GSK promised not to market an AG.  The record, and common sense, would permit a reasonable jury to answer, "yes."[389]  Summary judgment was error.

### g.    A reasonable jury would not be required to find the anticompetitive effects of the delay were outweighed by procompetitive justifications.

The district court concluded a reasonable jury would be compelled to find that GSK's asserted procompetitive justifications outweighed the evidence of

---

[386] *See* JA-29533-37 (Ex. 861, Andrx/Teva-Anchen Agreement).

[387] Whether one transaction is necessarily related to another is not a legal question to be resolved by a court.  *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (It is "typically a question of fact for the jury" whether writings are part of a single transaction or not.); 11 Williston on Contracts § 30:26 (4th ed.) ("[W]hether separate agreements are actually part of a single transaction is a question of fact, dependent on the intent of the parties.").

[388] JA-205.

[389] To find otherwise, a jury would be required to conclude that ███████ ███████████████████████████████████ *conditioned* its willingness to take Andrx's license on GSK paying with a no-AG promise for delay.  That interpretation makes no sense and is supported by nothing.

anticompetitive harm that the purchasers produced.[390]  But the district court improperly weighed the evidence to balance the alleged procompetitive justifications against the admitted anticompetitive effect of the settlement.[391]  And it disregarded evidence refuting the existence or necessity of them, or revealing them as pretexts.

A jury, not the judge, should have decided whether, on balance, GSK's no-AG promise and Teva-Anchen's delay were anticompetitive or procompetitive.[392] Even if, *arguendo*, GSK mustered some evidence suggesting the no-AG provision had some procompetitive benefit, the court erred by finding the *only* reasonable conclusion a jury could reach is that the ███████████ in overcharges inflicted upon the purchasers were necessarily outweighed by vague, unquantified "benefits" from (a) a sublicense Teva could have gotten directly from Andrx, (b) an illusory supply promise, or (c) the possibility that GSK could revise the deal in response to an FTC objection.

---

[390] JA-146; JA-203-04.

[391] JA-2594-98 (RSOF ¶52) (anticompetitive effects).

[392] *See Lamictal*, 791 F.3d at 410 (balancing is for the jury); *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) (reversing directed verdict for defendants because a factfinder weighs harm versus benefits); *K-Dur*, 2016 WL 22982, at *17.

3.   **The court erred in ruling the '708 patent was, as a matter of law, a superseding cause of delay.**

The district court also justified summary judgment on the reverse payment theory by ruling the purchasers could not show the transaction caused delay. It found Andrx's '708 patent to be an "independent bar to [Anchen's] marketing of generic Wellbutrin XL," because "no reasonable juror could find that Anchen would have succeeded in the *Andrx* litigation."[393] This misapplied the law and ignored contrary evidence.

a.   **Antitrust causation only requires proof of some delay of generic entry.**

To establish causation under Section 4 of the Clayton Act, a plaintiff must show that "by reason of" a violation he or she has suffered injury to "business or property."[394] As the Supreme Court explained in *Zenith Radio Corp. v. Hazeltine Research, Inc.*:

> [A Plaintiff's] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible

---

[393] JA-216.

[394] 15 U.S.C. § 15.

alternative sources of injury in fulfilling his burden of
proving compensable injury under § 4.[395]

Generic delay cases apply the same standards.  The method of "assessing

anticompetitive harm" in reverse payment cases "is not materially different from

that applied in any other garden-variety antitrust case."[396]  Showing causation

requires evidence from which a reasonable jury can conclude there was *some*

generic delay.[397]  As in other antitrust contexts, the *extent* of delay is a damages

question.[398]

"[O]nce a violation has been established," the burden of proving antitrust

injury and damages "is to some extent lightened."[399]  Antitrust causation is highly

---

[395] 395 U.S. 100, 114 n. 9 (1969) (citations omitted) (emphasis in original).
Once causation is established, the jury is permitted to calculate the actual
damages suffered using a "'reasonable estimate, as long as the jury verdict is not
the product of speculation or guess work.'"  *In re Lower Lake Erie Iron Ore
Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) (citations omitted).

[396] *Cipro*, 348 P.3d at 864.

[397] *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2013 WL
2181185, at *14-18 (E.D. Tenn. May 20, 2013).

[398] *Zenith Radio*, 395 U.S. at 114 n. 9.

[399] *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 568 (1981); *see also
Liriana v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir. 1999) (When a defendant's act
is "deemed wrongful precisely because it has a propensity to cause the type of
injury that ensued, that very causal tendency is evidence enough to establish a
*prima facie* case of cause-in-fact.").

fact dependent, and typically is left to a jury. This Court reverses where the district court incorrectly finds causation evidence lacking.[400]

> **b.** **The purchasers' evidence showed the February 2007 agreement delayed generic entry regardless of the '708 patent.**

The evidence showed the February 2007 agreement caused Teva-Anchen to shelve plans for the immediate launch of a 150 mg generic.[401] Indeed, the district court *ruled* a jury could find that Teva-Anchen would have launched at risk in June 2007 were it not for the February 2007 agreement.[402] That sufficed to preclude summary judgment based on causation.

But the purchasers' evidence went further (likely beyond their initial burden) to show how the Andrx '708 patent would not slow the Teva-Anchen entry. A jury could conclude that, without the February 2007 agreement with GSK and Biovail, rational actors in the shoes of Teva-Anchen and Andrx would have continued their direct negotiations and concluded a ▮ royalty license agreement.[403] And even without the direct license, the evidence showed Teva-Anchen would proceed with their at-risk launch of the 150 mg regardless of the

---

[400] *See, e.g.*, *Rossi v. Standard Roofing*, 156 F.3d 452, 484 (3d Cir. 1998); *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 903 (3d Cir. 1985); *Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 209-10 (3d Cir. 1983).

[401] JA-2648-53 (RSOF ¶84).

[402] JA-222.

[403] JA-2472-79 (SOF ¶¶680, 683-95).

Andrx '708 patent.[404] 

[405]  And the fact that GSK gave Teva-Anchen a

( ) shows GSK, too, had no expectation

the Andrx patent would stall .[406]

### c.    The court misapplied the causation standard.

The district court argued that "[t]he existence of a valid and uninfringed

patent would interfere with the plaintiffs' chain of causation," because "a valid

patent independently 'preclude[s]' competition.'"[407]

This was incorrect.  The court impermissibly reversed the summary

judgment burden.  The purchasers' burden was to provide evidence from which a

jury could find an earlier entry likely; they did so.  GSK then asserted

superseding cause, an affirmative defense on which GSK − not the purchasers −

bore the burden of proof.[408]

---

[404] *Id.*

[405] *See* JA-28942-43, JA-28947-48 (Ex. 844 §§ 1.1, 3.3); *see also* JA-2648-53
(RSOF ¶84) ).

[406] JA-2472-74 (SOF ¶¶680-83).

[407] JA-214.

[408]*See Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 421 (3d Cir. 2006) (As
to "superseding cause, the defendant has the burden of proof by a preponderance
of the evidence."); *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800,
810 (N.D. Cal. 2006) ("Defendant has the burden regarding its affirmative
defense" of antitrust immunity.).

And the mere existence of patents does not, as the court suggested, break the "chain of causation."[409]  A patent is not presumed infringed; infringement must be proven.[410]  The district court treated a patent as self-enforcing, as did the "scope of the patent" test rejected by *Actavis*.  In reality, to prevent Teva-Anchen's launch, Andrx needed an injunction: it would have to show, *inter alia*, its likelihood of success on the merits.[411]

The district court ruled an "'at risk launch' is unlawful absent a later finding of patent invalidity or non-infringement."[412]  But this, too, was incorrect.  An at-risk launch is not illegal.[413]  Delaying or preventing an at-risk launch cognizably violates the antitrust laws.[414]  GSK and Teva agreed consumer

---

[409] JA-214.

[410] *Lehigh Valley R.R. Co. v. Mellon*, 104 U.S. 112, 119 (1881) (infringement "cannot be presumed"); *Imhaeuser v. Buerk*, 101 U.S. 647, 662 (1879) (burden on infringement "never shifts").

[411] *See Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525-26 (Fed. Cir. 2012) (To prove likelihood of success, patentee must prove infringement is "more likely than not."); *Gonzalez-Posadas v. AG United States*, 781 F.3d 677, 684 (3d Cir. 2015) ("More likely than not" means "more than a 50% chance.").

[412] JA-214 (citations omitted).

[413] *See, e.g., Anesta AG v. Mylan Pharms., Inc.*, No. 08-cv-889, 2014 WL 3976456, at *2 (D. Del. Aug. 14, 2014) ("[A]lthough their launch was at risk, it was not illegal when it took place.").

[414] *E.g., In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) ("[A] trier of fact may well find that the [brand's] $89 million payment renders incredible the defendants' claim that [the generic] would have refrained from marketing [during litigation] simply because of its fear of infringement damages."); *Andrx Pharm. Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 813 (D.C. Cir. 2001) (reversing dismissal on antitrust injury grounds because a reasonable juror

*(Continued)*

83

savings from an at-risk launch are permanent and procompetitive.[415]  So a

"mistaken inference" that an at-risk launch is illegal is "'especially costly,'"

because it "'chill[s] the very conduct the antitrust laws are designed to

protect.'"[416]  And the district court's ruling ignored the abrogation of "illegality"

defenses in antitrust cases.[417]

### d.   GSK's own evidence showed the '708 patent would not bar early generic entry.

Finally, even GSK's evidence showed the '708 patent would not bar the

early Teva-Anchen 150 mg generic launch.

The district court incorrectly read the record.  Misquoting GSK's expert as

opining that Andrx was 80% likely to prove the Anchen product infringed the

'708 patent, the court decided, as a fact, that "Anchen's success was unlikely."[418]

---

could conclude that, but for the reverse payment, the generic would have launched at risk); *Niaspan*, 42 F. Supp. 3d at 756 (allegations of generics' at-risk launch plans support antitrust injury claims); *In re Lipitor Antitrust Litig.*, No. 12-cv-2389, 2013 WL 4780496, at *24 (D.N.J. Sept. 5, 2013) (same); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 534-35 (D.N.J. 2004) (same); *Biovail Corp. Int'l. v. Hoechst*, 49 F. Supp. 2d 750, 767-68 (D.N.J. 1999) (same).

[415] *See* JA-29731-32 (Ex. 870, Holding Dep. 76:16-24, 78:17-79:10); JA-29441-42 (Ex. 857, Cremieux Dep. 60:4-15, 63:11-14).

[416] *Verizon Commc'ns v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 414 (2004) (quoting *Matsushita*, 475 U.S. at 594).

[417] *See Consol. Express, Inc. v. N.Y. Shipping Assoc., Inc.*, 602 F.2d 494, 508, 525-26 (3d Cir. 1979).

[418] JA-217; JA-221.

But in fact, that expert, Martin Adelman, gave Andrx only a 35% chance of prevailing.[419]  Andrx could not have obtained an injunction against Anchen.[420]

Even that 35% estimate is high.  Adelman candidly admitted he assumed that since Anchen's product would be bioequivalent to Biovail's, it would infringe.[421]  But he conceded this assumption was improper, and it is: mere bioequivalence is insufficient to show infringement.[422]

The court offered only one other reason for its fact finding: "inventor estoppel."  JA-221.  But GSK never moved for summary judgment on inventor estoppel; its expert witness never mentioned it; and the issue was never even raised in *Andrx*.

In contrast, a reasonable jury could conclude that Anchen was likely to *succeed* if Andrx continued to litigate against it.  Adelman believed this; he gave

---

[419] *See* JA-30194 (Ex. 889, Adelman Second Report ¶ 126).

[420] *Gonzalez-Posadas*, 781 F.3d at 684 (requiring "more than a 50% chance.").

[421] *See* JA-30184 (Ex. 889, Adelman Second Report ¶ 104).

[422] *See* JA-29326 (Ex. 855, Adelman Dep. 290:6-13); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (en banc); *Reckitt Benckiser Inc. v. Watson Labs., Inc.*, 430 F. App'x 871, 878 (Fed. Cir. 2011) (citing *Abbott*, 566 F.3d at 1298).  *See also Sunovian Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 09-cv-01302, 2012 WL 6561760, at *3 (D.N.J. Dec. 14, 2012) (citing *Abbott*, 566 F.3d at 1298); *Reckitt Benckiser, Inc. v. Tris Pharma, Inc.*, No. 09-cv-3125, 2011 WL 773034, at *8 (D.N.J. Dec. 21, 2011) (quoting *Abbott*, 566 F.3d at 1298)); *Alza Corp. v. Mylan Labs., Inc.*, 388 F. Supp. 2d 717, 723 (N.D.W. Va. 2005); *Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1349 n.3 (Fed. Cir. 2008) (bioequivalence and infringement are "fundamentally different inquiries").

Anchen a 65% chance of success.[423]  And, as *Actavis* tells us, evidence of a large reverse payment is a workable surrogate for a patent's weakness.[424]  A jury could reasonably infer from GSK's large payment that the '708 patent was a "paper tiger,"[425] which GSK knew could *not* prevent generic competition.  It could infer, also, Teva-Anchen was of the same view, since their pact ███████████ ███████████████████████████████████████████████████████████ ██████████.  And Andrx accepted a ██ royalty, ████████████████████ ███████████████████████████████████████████[426]  A jury could infer – as GSK's expert did[427] – that ████████████████████████████ ███████████████████████[428]



---

[423] "The weight of authority favors allowing [plaintiffs] to introduce the opinion testimony of [defendants'] expert."  *De Lage Landen Operational Servs., LLC v. Third Pillar Sys.*, 851 F. Supp. 2d 850, 853 (E.D. Pa. 2012) (citing cases).

[424] 133 S. Ct. at 2236-37 ("[I]t is normally not necessary to litigate patent validity to answer the antitrust question . . . .  [T]he size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness.").

[425] *Cardizem*, 332 F.3d at 915; Areeda & Hovenkamp ¶2046d2 ("The size of the payment operates as a surrogate for" and "may actually be a more reliable indicator" of "patent quality.").

[426] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312-16 (Fed. Cir. 2011).

[427] *See* JA-29463-64 (Ex. 857, Cremieux Dep. 149:12-151:22) (agreeing the royalty rate suggested Andrx considered its case weak, was cash-starved, or was being "held up" by generics).  There is no evidence supporting the latter two possibilities.

[428] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015) (The "royalty rate . . . is typically low" when "an infringer can easily design

*(Continued)*

In the end, the district court decided that, absent an existing judgment in Anchen's favor, a jury would be *compelled* to assume Anchen would lose (and Andrx would not license Teva-Anchen before or after launch),[429] so at-risk launch would be "illegal."[430]  These were all errors, and no basis for summary judgment.

### 4.    The court erred in ruling Anchen could not have launched a generic before June 2007.

The district court also erred in finding that "the FDA's independent action cuts off the plaintiffs' requisite chain of causation" before June 2007.[431]  In addition to erring by "finding" a superseding cause as a basis for partial summary judgment, the court cited no evidence of any such FDA "action."  There is none.

GSK argued that Anchen could not have launched at risk in March 2007 because ███████████████████████████████████████████████████████ ████████████████████████████████████.  But that argument, and the court's acceptance of it, rest on a flawed premise.  No law, regulation or action by the FDA prevented Anchen or Teva from launching in March 2007, and GSK

---

around a patent and replace its infringing goods with non-infringing goods[.]" (citations omitted)).

[429] Teva has launched-then-settled a number of times.  *See* JA-30478-79, JA-30489-99 (Ex. 913, Blume Second Suppl. Report ¶ 19 & Ex. 3).

[430] JA-214-15.

[431] JA-222-23.

produced no evidence that the FDA ever took that position.[432]  Anchen launched a

300 mg generic in December 2006 and June 2007 

without any concern expressed

by the FDA.[433]  To the contrary, FDA inspectors ███████████ an absolutely

clean bill of health in a January 2007 inspection which, GSK's regulatory expert

agreed, served as the retroactive basis for FDA's acceptance of █████████████

████████████████████████████████████████████ [434]

GSK's argument is its attorneys' invention and was never voiced by FDA.

Even GSK's regulatory expert's testimony necessarily implied ███████████████

███████████████████████████████████████ [435] meaning

that ████████ faced no further FDA reporting requirements.  No jury would be

required to find otherwise.  The court's ruling was error.

---

[432] Even if FDA had taken such a position, it would be legally irrelevant under
*Consolidated Express*'s abrogation of illegality defenses.  *See* 602 F.2d at 508, 525–
26.

[433] JA-29144–46 (Ex. 848, Foster Dep. 269:25–271:20, 273:8–275:24); JA-29168
(Ex. 849, Sporn Dep. 42:9–43:4); JA-32895 (Ex. 1006, Apr. 29, 2008 Letter from
FDA to Anchen) (███████████████████████ .

[434] JA-29107–08 (Ex. 848, Foster Dep. 120:14–122:13).

[435] JA-29121, JA-29126, JA-29111 (Ex. 848, Foster Dep. 175:24–176:9, 197:8–
18, 135:17–137:2); JA-29069 (Ex. 847, 2004 FDA Guidance).

## C. The district court erred in finding some acts were not in furtherance of the conspiracy.

The court erred in granting summary judgment on some acts (the *Impax* and *Watson* sham suits, and the sham petition) that were in furtherance of the conspiracy.

GSK and Biovail shared one common goal: to suppress generic competition to their Wellbutrin XL monopoly by any means possible – including anticompetitive means.[436]  They jointly filed the sham *Anchen* suit and (the district court found) GSK conspired with Biovail in the unlawful reverse payment agreement.  It is legally irrelevant that GSK did not personally file the other sham suits or the petition in between.[437]

In any event, GSK did not dispute that, if the *Anchen/Abrika* suits could be found to be shams, it could be liable as a co-conspirator regarding the *Impax/Watson* suits and petition.[438]  A jury could find the *Anchen/Abrika* suits were shams, and so GSK may be found liable for all acts of its co-conspirator,

---

[436] GSK's direct involvement is detailed in JA-2303-05, JA-2314-17, JA-2321-24, JA-2353-63, JA-2396-2413, JA-2416-66 (SOF-SP ¶¶ 107-16, 143-51, 161-74, 216-18, 254-85, 410-74, 486-661).

[437] *United States v. Kushner*, 305 F.3d 194, 198 (3d Cir. 2002) ("[A] defendant is liable for his own and his co-conspirators' acts for as long as the conspiracy continues unless he withdraws prior to the conspiracy's termination.").  GSK did not argue it withdrew (and could not prove it regardless, as GSK received all "fruits" of generic delay).  *See United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995).

[438] *See* GSK Mem. Supp. Mot. Summ. J. (Summ. J. I), ECF No. 411; GSK Reply Mem. (Summ. J. I), ECF No. 436.

Biovail.  A jury could find that the other suits and petition were done in furtherance of the conspiracy to block generics.[439]

There is also sufficient evidence to find GSK a co-conspirator regardless of the *Anchen/Abrika* and petition shams.  The district court erred in finding otherwise.

### 1.    A mere scintilla of evidence showing an unlawful conspiracy is enough.

In an antitrust conspiracy case, the "non-movant's burden in defending against summary judgment . . . is no different than any other case."[440]  A non-movant "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action."[441]  Where there is evidence of a motive to conspire, a plaintiff need only point to evidence tending to exclude the possibility of independent action.[442]  Where a plaintiff "has exceeded the 'mere scintilla' threshold," "the court cannot credit the [defendant's] version

---

[439] *See United States v. Bruno*, 873 F.2d 555, 560 (2d Cir. 1989) ("Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury.").

[440] *Big Apple BMW*, 974 F.2d at 1363; *see also Eastman Kodak*, 504 U.S. at 456 (applying traditional standard).

[441] *Matsushita*, 475 U.S. at 586.

[442] *Lum v. Bank of Am.*, 361 F.3d 217, 230 (3d Cir. 2004).

of events" and it "remains the province of the fact finder" to decide whether a conspiracy exists.[443]

But a defendant "bears a substantial burden."[444]  It cannot simply suggest independent action; it "must show that an inference of concerted action" – an inference of conspiracy – "is unreasonable."[445]

And when considering an antitrust conspiracy claim, a court "must not 'tightly compartmentalize the evidence,' but review it 'as a whole to see if it together supports an inference of concerted action.'"[446]

### 2.     GSK participated in a single conspiracy.

Evidence shows overt acts by GSK in furtherance of a single conspiracy to delay generic competition, as it memorialized its involvement in a Common Interest Agreement,[447] jointly filed two lawsuits,[448] collaborated with Biovail on all four lawsuits,[449] developed the baseless arguments in the petition,[450] and made

---

[443] *Big Apple BMW*, 974 F.2d at 1363.

[444] *Eastman Kodak*, 504 U.S. at 469.

[445] *Big Apple BMW*, 974 F.2d at 1363-64.

[446] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

[447] JA-2327-28 (SOF ¶ 187).

[448] JA-2332-45 (SOF ¶ ¶ 200, 229).

[449] JA-2329-32, JA-2345, JA-2346-48, JA-2349-50 (SOF ¶ ¶ 192-200, 229-31, 234-36, 241).

[450] JA-2383-2401 (SOF ¶ ¶ 367-431).

the no-AG promise.[451]  And, of course, GSK benefited from the conspiracy: it admitted that each month of generic delay "result[ed] in an add'l ███████ of profit."[452]

In 2001, GSK expected that generic competition would soon threaten its ██ ████████ Wellbutrin XL franchise.[453]  So it collaborated with Biovail – the holder of the '327 and '341 patents – "to make both companies much better off."[454] Their Common Interest Agreement encompassed not only the to-be-filed *Anchen* and *Abrika* lawsuits, but all future lawsuits.[455]  Through the same lawyers, they jointly filed *Anchen* and *Abrika*.[456]

GSK helped Biovail in the lead-up to filing the *Impax* and *Watson* complaints, and it reviewed the Paragraph IV notices and ANDAs and consulted with its in-house counsel, and, on *Impax*, with Biovail's counsel.[457]  GSK strategically left its name off the complaints,[458] but it supported the suits and

---

[451] JA-2421-29, JA-2435-63 (SOF ¶¶508-41, 558-647).

[452] JA-2362-63 (SOF-SP ¶¶282-83).

[453] JA-2282, JA-2284 (SOF ¶¶42, 45); JA-2521-23 (RSOF ¶10).

[454] JA-2294 (SOF ¶76).

[455] JA-2327-28 (SOF ¶187 & n.239).

[456] JA-2332, JA-2345 (SOF ¶¶200, 229); JA-2521-23 (RSOF ¶10).

[457] JA-2346-48 (SOF ¶¶234-36 & nn.321-23, 239-41).

[458] JA-2348 (SOF ¶237 n.326).

reaped the benefits,[459] appeared in court in *Impax*,[460] helped negotiate the transaction, and made the no-AG promise.[461]

GSK collaborated with Biovail on the sham petition.  A senior GSK official strategized with Biovail's CEO and general counsel on arguments in a petition.[462] GSK conceptualized the sham bioequivalence drift argument, even though its own scientists did not accept its validity,[463] which it considered a "generic defense strategy,"[464] exclaiming "[h]ow do we get these arguments in front of the FDA? Citizens petition?  We need to act fast!"[465]  It gave Biovail the idea,[466] and Biovail used it.[467]  GSK worked with Biovail on the metabolites request.[468]  And GSK later redoubled its efforts frustrate generic competition through a petition.[469]

GSK's in-house counsel attempted to downplay GSK's involvement in a letter to Biovail, but not even Biovail believed GSK's disclaimer, responding, "it

---

[459] JA-2329-30, JA-2346-47, JA-2349-50 (SOF ¶¶193, 234, 241).

[460] JA-2438 (SOF ¶571).

[461] JA-2427-29, JA-2439-49 (SOF ¶¶533-41, 573-606).

[462] JA-2383-88, JA-2394-98 (SOF ¶¶367-82, 402-18).

[463] *See, e.g.*, JA-2387-94, JA-2396-98 (SOF ¶¶382-401, 409-15).

[464] JA-2396 (SOF ¶408).

[465] JA-2383 (SOF ¶367).

[466] JA-2384 (SOF ¶369).

[467] *Id.*; JA-2399 (SOF ¶424).

[468] JA-2395 (SOF ¶405).

[469] JA-2396-98 (SOF ¶¶408-18).

was Mr. Stout [of GSK] who sought and initiated the interaction between GSK and Biovail scientific and technical staff," and confirmed that "[t]his interaction" had "taken place."[470]

And not only did GSK participate in negotiating and drafting the transaction,[471] it held the critical "settlement chip" – the right to launch an AG (and therefore, the sole ability to promise not to).[472]

If a jury finds *Anchen* to be a sham, then it can find GSK is liable for all its co-conspirator's acts regardless of GSK's specific involvement in those acts. No jury would be *required* to find that, while GSK conspired with Biovail on *Anchen* and the reverse payment, the other suits and petition were *not* in furtherance of the common goal of delaying generic competition.

### 3. The court incorrectly rejected the conspiracy evidence.

The court correctly held that a jury could find GSK a co-conspirator as to the reverse payment transaction,[473] but, having found *Anchen* not a sham, erroneously rejected GSK's broader conspiratorial role. It "compartmentalize[d]" evidence that should have been viewed "as a whole."[474]

---

[470] JA-2401 (SOF ¶431).

[471] JA-2410-46 (SOF ¶¶467-596).

[472] JA-2419 (SOF ¶¶496-97).

[473] JA-227-28.

[474] *Toledo Mack*, 530 F.3d at 218.

And it removed GSK's "substantial burden"[475] to show an inference of conspiracy was "unreasonable,"[476] improperly weighing evidence, finding facts, and choosing among inferences.[477]

> ### a. The court failed to evaluate the evidence of a single overarching, conspiracy.

A conspiracy "often casts a wide net," and a single conspiracy can encompass multiple events.[478]  The existence of an overarching conspiracy is a jury question.[479]  When the evidence is viewed "as a whole," rather than being "compartmentalize[d]," there is sufficient evidence of a single, overarching conspiracy to reach a jury.

In *United States v. Kelly*, this Court set forth a three-step test to distinguish single from multiple conspiracies.[480]  All three factors support a finding that GSK participated in a single, overarching conspiracy.

---

[475] *Eastman Kodak*, 504 U.S. at 469.

[476] *Big Apple BMW*, 974 F.2d at 1363-64.

[477] *Cf. Eastman Kodak*, 504 U.S. at 456 (requiring a court to draw conspiracy-related inferences in non-movant's favor).

[478] *United States v. Russell*, 134 F.3d 171, 182 (3d Cir. 1998).

[479] *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002).

[480] 892 F.2d 255, 259-60 (3d Cir. 1989); *see K-Dur*, 2016 WL 22982, at *18-19 (applying *Kelly* to a pharmaceutical antitrust conspiracy).

First, *Kelly* asks whether the co-conspirators shared a common goal, looking to the "underlying purpose" of the activity.[481]  A single conspiracy exists if there is "one overall agreement among the parties to carry out the objective."[482] Here, each act– the sham litigations, sham petition, and reverse payments – all served one underlying purpose: to delay generic competition.

Second, *Kelly* asks whether the agreement sought to achieve "a continuous result" made possible by "the continuous cooperation of the conspirators."[483] Courts consider whether "the activities of one group . . . were necessary or advantageous to . . . the overall success of the venture."[484]  Here, GSK's and Biovail's cooperation continuously blocked generic competition.  GSK's support and cooperation was advantageous – and sometimes critical – to maintaining the generic block.[485]  And, even discounting the purchasers' evidence of GSK's specific involvement in *Impax, Watson,* and the petition, a jury would be entitled to infer that the conspiracy incorporated the *Watson/Impax* suits, and the petition.[486]

---

[481] *United States v. Rigas*, 605 F.3d 194, 214 (3d Cir. 2010).

[482] *United States v. Bobb*, 471 F.3d 491, 494–95 (3d Cir. 2006).

[483] *Kelly*, 892 F.2d at 259.

[484] *Id.* (citation omitted).

[485] *Id.*

[486] *See United States v. U.S. Gypsum Co.*, 550 F.2d 115, 128 & n.13 (3d Cir. 1977) (An antitrust defendant is "chargeable with the acts of his or its fellow defendants" if they "are done in furtherance of the joint venture," and fall within

*(Continued)*

96

Third, *Kelly* asks the extent to which the participants in the scheme

overlap.[487]  Here, they did – the conspiracy involved GSK and Biovail from the

outset through conclusion.[488]

Evidence of conspiracy need not show that its members entered into any

formal agreement: it need only show the conspirators "in some way came to an

agreement to accomplish a common purpose."[489]  The purchasers' evidence

exceeds this threshold and could support a jury verdict.  GSK was a full

participant and enjoyed the fruits of the conspiracy.  A conspiracy inference "is

reasonable in light of the competing inferences of independent action or collusive

action."[490]  Viewing the evidence as a whole,[491] and considering the facially

---

the "reasonable intendment of the common agreement or understanding.").  The
two may still engage in a conspiracy, even if GSK disagreed with Biovail's
decision to file a lawsuit or petition.  *Kelly*, 892 F.2d at 260.

[487] *Kelly*, 892 F.2d at 259.  This does not require proof that "each defendant
knew all the details, goals, or other participants."  *Id.* at 260.

[488] *Id.* at 260 (internal citation omitted).

[489] *ABA Model Jury Instructions in Civil Antitrust Cases*, Instruction 1,
"Definition, Existence, and Evidence," at B-2 (2005).

[490] *Matsushita*, 475 U.S. at 586; *see also Big Apple BMW*, 974 F.2d at 1377-80
(possibility of independent action excluded by evidence suggesting that supplier's
stated reasons for its conduct were pretextual).

[491] *Petruzzi's*, 998 F.2d at 1230.

97

anticompetitive nature of the scheme,[492] GSK may be found liable for all conduct at issue (the lawsuits, petition, and transaction).

### b. The court failed to see GSK's complicity in *Impax*, *Watson*, and petition.

Even if each event were viewed in isolation (apart from the overall conspiracy), the evidence showed GSK's complicity in *Impax* and *Watson*, and in the petition.

The court found the evidence of a conspiracy in *Watson* and *Impax* "equally consistent" with its support for GSK's contrary inference,[493] yet credited GSK's "version of events over" the purchasers', usurping the jury's opportunity to "ascertain the weight and believability" of the evidence.[494]  And it found evidence of a conspiracy as to the petition "at the very least, equally consistent" with an inference of independent action,[495] but "credit[ed]" GSK's inference.

The court ignored evidence GSK consulted with Biovail on the suits and, collaborated on the petition (even conceiving its bogus bioequivalence drift argument).  It weighed evidence, acknowledging Biovail's rejection of GSK's claims of non-involvement, but nevertheless construing the evidence in GSK's

---

[492] *Eastman Kodak*, 504 U.S. at 478 (scheme is "facially anticompetitive" where it causes higher prices and market foreclosure).

[493] JA-132.

[494] *Big Apple BMW*, 974 F.2d at 1363.

[495] JA-139.

favor.[496]  And it acknowledged Biovail's admission that collaboration "had occurred," but credited other testimony favoring GSK.[497]  Since the purchasers exceeded the "mere scintilla threshold,"[498] the district court erred by taking this from the jury.

## D.  The district court erred in granting summary judgment on the sham *Impax*, *Abrika*, and *Watson* litigation theories.

The purchasers provided evidence from which a jury could conclude that no reasonable pharmaceutical company could have expected success on the merits in *Impax*, *Abrika*, and *Watson*.  The purchasers chronicled this evidence in their extensive fact proffer,[499] citing opinions from industry and regulatory experts and numerous exhibits.

### 1.  The evidence shows *Impax* was baseless and presented genuine issues of fact.

#### a.  The '341 patent describes a tablet with its rate-release mechanism in the coating, not the core.

The '341 patent always describes its invention by referencing the tablet's controlled release coating.  The Summary of Invention announced "the controlled release" was "obtained thanks to a semi-permeable release coating."[500]  The

---

[496] JA-137-38, JA-140.

[497] JA-138.

[498] *Big Apple BMW*, 974 F. 2d at 1363.

[499] *See* JA-1813-30 (SOF-SP ¶¶195-253).

[500] JA-1827 (SOF-SP ¶245).

Detailed Description described "a tablet comprising a core and coating," explaining the "coating [is] designed to achieve a controlled release of bupropion hydrochloride."[501]  Claim 1 described "a delayed release tablet" with a "core" and a "coating."[502]  The purchasers' experts, the inventor, and even Biovail's own expert agreed – the '341 patent required a rate-controlling coating.[503]

The '341 patent expressly disclaimed other controlled release mechanisms, including a matrix core, which it called "not suited" to the invention because "it implies the use of a stabilizer."[504]

### b.  Impax's generic Wellbutrin XL controlled release through a matrix core, not a coating.

Impax avoided infringement by returning to a rate-controlling matrix core (a stabilizer) that the '341 patent disavowed.[505]

### c.  Biovail knew Impax's product did not infringe.

Impax's Paragraph IV certification advised that its product was "not a tablet in which the delayed release of a drug is obtained by a controlled release

---

[501] JA-1827 (SOF-SP ¶246).

[502] *Id.* (SOF-SP ¶245 n.327).

[503] JA-4858-59 (Ex. 68, Nusbaum Report ¶¶106-08); JA-5898 (Ex. 94, Seth *Impax* Dep. 136:13-16); JA-3941 (Ex. 56, Williams *Anchen* Decl. ¶9).

[504] JA-1828 (SOF-SP ¶247).

[505] JA-1822, JA-1824 (SOF-SP ¶¶228, 234).  Additionally, Impax omitted the use of a rate-controlling coating.  JA-1823 (SOF-SP ¶¶230-32).

coating (as required by every claim of the '341 patent)."[506]  Impax provided access to its ANDA, which described its matrix core technology and an *immediate-release* coating.[507]  Biovail filed suit anyway.[508]

Biovail argued that the '341 patent covered all controlled-release bupropion products[509] – even though such an "invention" could not be patented.[510]  The *Impax* court rejected this argument, explaining, "in light of the specification, it is clear that 'delayed release tablet' must be construed to require . . . a coating that controls the release of the drug."[511]

### d. The district court erred in finding Biovail's infringement claim was not objectively baseless.

The district court made a finding that a reasonable pharmaceutical company could have expected to prove Impax's product infringed the '341 patent.[512]

The district court erred, however, in reading the coating requirement out of the '341 patent.[513]  An infringement claim is objectively baseless if the "written

---

[506] JA-1824 (SOF-SP ¶234).

[507] *Id.* (SOF-SP ¶235).

[508] JA-1826 (SOF-SP ¶244).

[509] JA-1828 (SOF-SP ¶249).

[510] *Id.* (SOF-SP ¶250).

[511] JA-11011 (Ex. 191, *Impax* Claim Constr. Order).

[512] JA-91-95.

[513] JA-93-94 (focusing on the "plain meaning" of "delayed release tablet").

description clearly refutes [the patentee's] claim construction"[514] and is not
"reasonably supported by the *intrinsic* record."[515]  The court acknowledged the
patent-law principle that claims "must be read in view of the specification."[516]  But
it didn't apply this rule.  If it had, it would have joined the *Impax* court in
acknowledging the specification's statement that the "controlled release tablet"
had controlled-release properties *thanks to a semi-permeable release coating.*"[517]
Instead, it credited a claim construction that "contradicted the express definition
in the specification."[518]

The district court placed outsized importance on Claim 30's lack of the
word "coating."[519]  It rejected the purchasers' evidence that a reference to "free of
a pore-forming agent" only makes sense if there is a coating,[520] finding "the
phrase 'free of pore-forming agent'" did not "control the inquiry" because Biovail

---

[514] *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324–25 (Fed. Cir. 2011);
*see also Teva Pharm. USA, Inc. v. Abbott Labs.*, 580 F. Supp. 2d 345, 365 (D. Del.
2008) (claim was objectively baseless where proposed claim construction
"contradict[s] the express definition in the specification").

[515] *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1301 (Fed. Cir. 2004)
(emphasis added); *see also Teva*, 580 F. Supp. 2d at 365 (interpretation was
objectively baseless where it "exceed[ed] all reasonable interpretations of the
major tenets of claim construction").

[516] JA-94 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir.
2005)).

[517] JA-1827 (SOF-SP ¶245) (emphasis added).

[518] *Teva*, 580 F. Supp. 2d at 365.

[519] JA-92–95.

[520] JA-93.

argued "Claim 30 covers *any* delayed release tablet" regardless of "whether the release mechanism is in the coating or elsewhere."[521]  Put differently, the court acknowledged the purchasers' evidence, but discounted it because the defendants disagreed with it – a classic summary judgment error.

The court also erred in crediting the *Impax* judge's charitable comment that infringement was a "close call,"[522] yet ignored contrary evidence that, to a reasonable pharmaceutical manufacturer, the question was "[n]ot even close."[523]

These missteps flowed from the district court's overarching error: usurping the jury's role and deciding, as a fact, *Impax* was not objectively baseless.[524]  The court conducted fact finding itself.  It determined it "cannot say" Biovail's Claim 30 arguments were "baseless"[525] – but that was for a jury to decide.  It claimed it was "not persuaded" that Biovail's claim construction was objectively baseless.[526] And it "*finds* that the plaintiffs have not met their burden of showing that the *Impax* lawsuit was objectively baseless sham litigation"[527] – but the jury, not the judge, finds facts.

---

[521] *Id.*

[522] JA-95.

[523] JA-1979-80 (RSOF-SP).

[524] *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 255 (1986).

[525] JA-93.

[526] JA-95.

[527] JA-92.

2.   The evidence shows *Abrika* was baseless and presented genuine
     issues of fact.

a.   

[528] JA-1815 (SOF-SP ¶200).

[529] *Id.*

[530] JA-1820 (SOF-SP ¶220).

[531] JA-1820-21 (SOF-SP ¶221).

[532] JA-1815 (SOF-SP ¶201).

[533] JA-1816-17 (SOF-SP ¶¶204-05).



The *Abrika* court rejected this argument, because it "[found] no support in the intrinsic record," and held that the defendants were "not entitled to a claim construction divorced from the context of the written description."[539] The court observed that the defendants' arguments would render the patents "impermissibly broad" (covering *any* once-a-day bupropion hydrochloride product) and allow the

---

[534] JA-13258 (Ex. 400, Nov. 30, 2004 Email).

[535] JA-1816-17 (SOF-SP ¶¶204–05).

[536] JA-1817 (SOF-SP ¶206).

[537] JA-1817, JA-1819 (SOF-SP ¶¶207, 217).

[538] JA-1819, JA-1821 (SOF-SP ¶¶216, 224).

[539] JA-1821-22 (SOF-SP ¶225).

defendants "to gerrymander specific tests for infringement dependent on the characteristics of the accused product at issue."[540]

### c. The court erred in finding extrinsic evidence altered testing conditions ███████████████████.

The district court granted summary judgment regarding the *Abrika* sham theory, apparently concluding a jury would be required to find the defendants had a realistic ability to prove that Abrika's product (███████████████ ████████████) infringed their patents ████████████████████████ ████████████████).[541]

The court acknowledged the "bedrock principle of patent law" that a patent's terms define its scope; the "well-settled" rule that courts must look to intrinsic evidence (the patent's language, specification, and prosecution history); and the admonishment that, if that evidence is unambiguous, "reliance on extrinsic evidence is improper."[542]  It conceded the purchasers had presented "two forms of intrinsic evidence" that the defendants' arguments in *Abrika* were baseless: the examples all recited the 0.1N HCl testing conditions, and the patent

---

[540] *Id.* (SOF-SP ¶¶225-26).

[541] JA-77-86.

[542] JA-79-80 (citations omitted).  When a patent recites a test result that varies based on the methodology used to obtain it, the patent is interpreted to incorporate that methodology.  *J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1570 (Fed. Cir. 1997); *Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1563 (Fed. Cir. 1994).

prosecution history showed the dissolution profile was intended to limit the invention.[543]

Nonetheless, the district court found *extrinsic* evidence dispositive.  It cited the USP, which proposed a different test for enteric-coated products, while acknowledging the patents did not incorporate that portion of the USP.[544]

The district court credited a claim construction not "reasonably supported by the intrinsic record"[545] that "contradict[ed] the express definition in the specification" and "exceed[ed] all reasonable interpretations of the major tenets of claim construction."[546]  This alone warrants reversal.  The court also wrongly rejected evidence supporting the purchasers in favor of evidence supporting defendants.

The district court again turned the summary judgment standard on its head, finding summary judgment *appropriate* because there *were* issues of disputed fact and again invaded the province of the jury, "declin[ing] to find" objective baselessness.[547]

---

[543] JA-82-83.

[544] *Id.* n.11; JA-83-84.

[545] *Q-Pharma*, 360 F.3d at 1301.

[546] *Teva*, 580 F. Supp. 2d at 365.

[547] JA-78.  The court also "f[ou]nd[]" that the purchasers had not proven *Abrika* delayed generic entry.  Once again, that issue was for a jury.  JA-86-87.

3. **The evidence shows *Watson* was baseless and presented genuine issues of fact.**

Watson avoided infringing the defendants' patents 
But Biovail sued anyway, recycling its arguments in *Anchen.*[551]

The district court improperly applied its (flawed) logic regarding *Anchen* to the *Watson* sham allegations.[552]

E. **The district court erred in granting summary judgment on the sham FDA petition theory.**

The same two-part *PRE* sham test applies to petitioning administrative agencies;[553] GSK never contested the purchasers' claim that the petition was subjectively baseless. Again, whether a petition is objectively baseless is a fact question for the jury.[554]

---

[548] JA-1813-14 (SOF-SP ¶ 196).

[549] *Id.*

[550] JA-1814 (SOF-SP ¶ 198); JA-3456 (Ex. 26, Watson ANDA).

[551] JA-1814 (SOF-SP ¶ 199).

[552] JA-74.

[553] *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123 (3d Cir. 1999).

[554] *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-cv-7343, 2009 WL 2708110, at *4 n.4 (S.D.N.Y. Aug. 28, 2009).

The district court rejected the defendants' argument that the threo and erythro metabolite request, bioequivalence drift request, and the steady-state request were not objectively baseless,[555] and it rebuffed the argument that the FDA was to blame for any delay[556] (so we do not re-argue these matters here).[557] But the district court erred in considering some requests "successful" and requiring the purchasers to parse the delay caused only by the requests the FDA denied.[558]

### 1.    A petition that fails to elicit FDA action is not immunized.

GSK cannot find immunity in "success."  Any old success will not do.[559]  A "victorious moment" is like "hitting a single in the second inning"; it does not speak to whether the petition achieved its ostensible goals.[560]

---

[555] JA-103-04, JA-109, JA-121-25.

[556] JA-116.

[557] *But see* Pls.' Opp'n Summ. J. I at 85-99 (discussing objective baselessness of petition demands); JA-1851-67 (SOF-SP ¶¶324-89) (same); JA-2643-60, 2664-65, 2673-79 (RSOF ¶¶78-82, 84-87, 90-91, 98-99) (same); JA-4764-79 (Ex. 67, Morrison Report ¶¶32-54) (same); JA-5043-46, 5048 (Ex. 73, Morrison Rebuttal Report ¶¶20-26, 30) (same); Pls.' Opp'n Summ. J. I at 107-11 (FDA did not delay); JA-1890-92 (SOF-SP ¶¶475-81) (same); JA-2023-27 (RSOF-SP) (same); JA-4758-60 (Ex. 67, Morrison Report ¶¶20-23) (same); JA-5035-37 (Ex. 73, Morrison Rebuttal Report ¶¶9-11) (same).

[558] JA-104-10.

[559] *Hanover 3201 Realty*, 806 F.3d at 182; *see also PRE*, 508 U.S. at 68 (Stevens, J., concurring).

[560] *Hanover 3201 Realty*, 806 F.3d at 182.

*Noerr-Pennington* limited immunity exists because asking the government for *change* should not always be actionable.[561]  It applies when the petition "*elicit[s]* a favorable outcome," "*influence[s]* governmental action," "motivate[s]" the FDA's decision, or is "connect[ed]" to the "FDA's change in position."[562]

Here, the district court labeled the hydroxy and dose dumping requests "successful" because they were nominally "granted."[563]  But the FDA labels requests "granted" even when it has already decided to adopt the requested requirements, or when it would have done so regardless.[564]  The FDA's pre-petition guidance instructed applicants to measure hydroxy.[565]  And the FDA started the process of evaluating dose-dumping for extended-release drugs long before the petition was filed.  Quoting the FDA to the FDA did not change what the FDA was already doing.[566]  These requests did not influence the FDA's

---

[561] *Pennington*, 381 U.S. at 670 (referencing "a concerted effort to influence public officials."); *Noerr*, 365 U.S. at 135 (referencing "attempts to influence the passage or enforcement of laws.")

[562] *PRE*, 508 U.S. at 59, 60–61 (emphasis added, citation omitted); *Flonase*, 795 F. Supp. 2d at 314–15 (emphasis added).

[563] JA-104.

[564] As the Director of the Office of Generic Drugs explained, "when petitions are granted, wholly or in part, it is often because FDA already has the proposed scientific or legal standard in place or is already planning to take the action that the petition requests." JA-4761-62 (Ex. 67, Morrison Report ¶¶26-27) (quoting Buehler Statement).

[565] JA-1853 (SOF-SP ¶333).

[566] JA-1867 (SOF-SP ¶391).

actions, and so are not immunized under *Noerr-Pennington*.  A reasonable jury
could conclude the entire petition was objectively baseless.

### 2. The district court erred in requiring the purchasers to parse the amount of delay.

A reasonable jury could also conclude that the petition delayed generic
entry.

First, it was foreseeable that generic approval would be delayed until after
the FDA issued its response.  The FDA had "already seen several" petitions "that
appear[ed] designed not to raise timely concerns" regarding an ANDA, "but
rather to try to delay the approval" by forcing the FDA to "consider arguments
raised in the petition whatever their merits[.]"[567]  The OGD Director had
explained that the "FDA comprehensively assess[es] the scientific issues prior to
approval of the ANDA," even though "[i]t is very rare that petitions present new
issues that [the FDA] has not fully considered."[568]  Here, the FDA confirmed it
was constrained to engage in "a complete assessment" of the petition before
approving Anchen's ANDA, even though "none of Biovail's arguments [had]
merit."[569]

---

[567] JA-1891 (SOF-SP ¶477).

[568] JA-1843-44 (SOF-SP ¶303).

[569] JA-11292 (FDA Opp'n Pls.' 2d Mot. TRO & Prelim Inj., *Biovail v. FDA*).

Second, there were no other regulatory obstacles; the FDA ████████
████████████████████████████████████████████████████████████ [570]

Third, Biovail – who earlier protested delays caused by "sham petitioning before the FDA"[571] – timed its petition to maximize delay, filing *after* the first generic manufacturer had received tentative approval (a year after it knew generics had filed ANDAs).[572]

The district court erred in requiring the purchasers to parse the delay caused *only* by the denied requests.[573]

A defendant is liable for the harm caused by its anticompetitive conduct. A plaintiff's causation burden is "not a heavy one."[574] "*It is enough* that the illegality is shown to be *a material cause of the injury*; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury."[575]

---

[570] *See* JA-1892 (SOF-SP ¶481).

[571] JA-12140-41 (Ex. 263, Pls.' Opp'n to Mot. Dismiss, *Biovail v. Hoechst Aktiengesellschaft*, No. 98-cv-1434 (D.N.J. Oct. 23, 1998)).

[572] *See Biovail Corp. v. FDA*, 448 F. Supp. 2d 154 (D.D.C. 2006) (Biovail "knew there were pending Wellbutrin XL ANDAs for more than a year before it filed its petition."); JA-5036 (Ex. 73, Morrison Rebuttal Report ¶10).

[573] JA-126-28.

[574] *Out Front Prods, Inc. v. Magid*, 748 F.3d 166, 169 (3d Cir. 1984).

[575] *Zenith Radio*, 395 U.S. at 114 n.9 (emphasis added); *see also Spear Pharm., Inc. v. William Blair & Co.*, 610 F. Supp. 2d 278, 280-81 (D. Del. 2009) (FDA delay in approving an ANDA due to petition did not break chain of causation); *Dr.*

(*Continued*)

112

The harm here is delay.[576]  So long as the plaintiff can show that the defendants' conduct caused some delay, it is the *defendant's* responsibility to show some other "alternative source[] of injury," or else they are responsible for the harm.[577]

All demands in the petition are inextricably intertwined with the year-long wait for the FDA's response and its ensuing generic approval.  The responsibility for trying to disentangle them falls to the defendants, not the purchasers.[578]  In *In re Prograf Antitrust Litigation*, the court denied the defendant's summary judgment motion, even though the FDA nominally granted one request.[579]  It rejected the argument that the plaintiffs should have parsed the delay caused only by the unsuccessful requests, citing plaintiffs' evidence that the "successful" request concerned an uncontroversial issue, so the "successful" demand was "certainly not enough to occupy the FDA for two years."[580]  The evidence was "sufficient to raise a genuine issue of material fact as to whether Astellas's

---

*Reddy's Labs, Ltd. v. aaiPharma, Inc.*, No. 01-cv-10102, 2002 WL 31059289, at *10-11 (S.D.N.Y. Sept. 13, 2002) (same).

[576] *See Cardizem*, 332 F.3d at 911.

[577] *Zenith Radio*, 395 U.S. at 111 n.9; *see J. Truett Payne*, 451 U.S. at 568 (plaintiffs' burden of proving antitrust injury and damages is "to some extent lightened").

[578] *J. Truett Payne*, 451 U.S. at 565-66.

[579] No. 11-md-2242, 2014 WL 4745954, at *7 (D. Mass. June 10, 2014).

[580] *Id.*

113

allegedly sham requests caused any delay in generic approval beyond the successful request."[581]

Here, the district court disregarded evidence that none of the requests were successful. Therefore, none of the FDA's time was spent on "successful" requests. Moreover, the district court disregarded evidence the FDA was not preoccupied with the requests the district court called successful. As to the hydroxy demand, the FDA's response acknowledged its earlier practices, with little discussion.[582] And the FDA was in the process of requiring dose-dumping testing for extended-release drugs, said as much in two sentences, and later called the demand "moot."[583] The FDA never attributed any delay to either of these demands. Nor did GSK or its experts.

The jury could reasonably conclude that the FDA spent the better part of twelve months addressing the denied requests and preparing to be sued – the net effect of which was unduly delayed ANDA approvals.

F.   *Hanover 3201 Realty* **warrants vacatur and remand here.**

In 2012, the district court in this case rejected the purchasers' sham petitioning and litigation claims under *PRE*'s "single petition" exception to

---

[581] *Id.*

[582] JA-23996-97 (Ex. 729, *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products – General Considerations* (March 2003)).

[583] JA-12487 (Ex. 304, FDA Petition Resp.); *see* JA-11289 (FDA Opp'n Pls.' 2d Mot. TRO & Prelim Inj., *Biovail v. FDA*).

*Noerr-Pennington* immunity.  In 2015, this Court decided *Hanover 3201 Realty,*[584]

endorsing the standard applied in *California Motor Trucking Co. v. Trucking*

*Unlimited*[585] for assessing allegations of serial petitioning.  This case should be

remanded for review under this intervening, controlling precedent.

     *Hanover 3201 Realty* clarified that, where a party files multiple petitions or

suits to frustrate competition, an antitrust plaintiff need not prove each filing

objectively baseless.[586]  The issue becomes "not whether any one [petition] has

merit – some may turn out to, just as a matter of chance – but whether they are

brought pursuant to a policy of starting legal proceedings *without regard to the*

*merits* and for the purpose of injuring a market rival."[587]  A court "should employ a

holistic review," evaluating "circumstantial evidence of the defendant's subjective

motivations."[588]  "[E]ven if a small number of the petitions turn out to have some

objective merit, that should not automatically immunize defendants from

liability."[589]

---

[584] 806 F.3d at 179-80.

[585] 404 U.S. 508, 512 (1972).

[586] *Hanover 3201 Realty*, 806 F.3d at 179-80 (rejecting defendants' argument
for *PRE*'s application to each petition).

[587] *Id.* at 180.

[588] *Id.*

[589] *Id.*

While the pre-*Hanover 3201 Realty* briefing below focused primarily on objective baselessness, the purchasers alleged from the start that the defendants' petitioning activity was both serial and for an improper anticompetitive goal.[590] The evidence shows that GSK and Biovail conspired to block generic competition through four lawsuits and a petition (in addition to the transaction) without regard to the merits for the purpose of delaying generic entry. The purchasers raised disputed issues of material fact under the *California Motor* serial petition standard adopted by this Court in *Hanover 3201 Realty*.[591]

This Court should vacate summary judgment and remand to the district court for application of the *Hanover* standard.

---

[590] *See* Direct Purchaser Consol. Compl. ¶ 113, July 10, 2008, ECF No. 21 ("The actions were filed by the Defendants for the improper purpose of preventing entry of the competing generic products into the market."); End-Payor Consol. Compl. ¶ 111, No. 08-cv-2433, July 10, 2008, ECF No. 23 (same); *see Hanover 3201 Realty*, 806 F.3d at 179 n.13 (plaintiff did not waive application of the *California Motor* serial petitioning exception because plaintiff consistently argued for a "sham exception" to *Noerr-Pennington*'s limited immunity: "[Plaintiff's] failure to cite particular cases within its broader argument for the sham exception does not amount to a waiver").

[591] *Hanover 3201 Realty*, 806 F.3d at 180 (adopting "a more flexible standard" when faced with "a pattern of petitioning.").

## G.   The district court erred in precluding certain testimony of economist Dr. Jeffrey Leitzinger.

The district court's exclusion of portions of the testimony of the purchasers' economist, Dr. Leitzinger,[592] should be reversed.

This Court will reverse a decision excluding expert testimony as an abuse of discretion where the district court precludes expert testimony without holding an *in limine* hearing, "particularly when a summary judgment may result":[593] otherwise the court has failed to "provide □ the plaintiffs with sufficient process for defending their evidentiary submissions."[594]

Dr. Leitzinger opined on, *inter alia*, (i) the anticompetitive effects of the transaction, and (ii) whether GSK raised any legitimate procompetitive justifications for the reverse payment.[595]   The court excluded these opinions in a short footnote, stating that he failed to (i) "analyze when and whether the generic manufacturers would have entered the market," and (ii) "evaluate *any*

---

[592] Dr. Leitzinger has extensive experience in economics and the effects of delayed generic competition. This Court has cited his analysis with approval. *See K-Dur*, 686 F.3d at 220.

[593] *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 272 (3d Cir. 1991).

[594] *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 854 (3d Cir. 1990).

[595] JA-28889, JA-28895-96 (Ex. 838, Leitzinger Suppl. Report ¶¶2, 19-20); JA-31451-56, JA-31462-67 (Ex. 946, Leitzinger Second Suppl. Report ¶¶7-18, 30-38); JA-30567-70, JA-30577-88 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶24-31, 47-71).

procompetitive justifications[.]"[596]  The court apparently overlooked Dr. Leitzinger's Supplemental Rebuttal Report, which expressly evaluated GSK's purported procompetitive justifications.[597]

Dr. Leitzinger was not required to personally verify the 'but-for' generic entry date.  Proof of earlier generic entry comes from other evidence, including the defendants' statements and the expert testimony of Dr. Cheryl Blume.[598] Dr. Leitzinger opines on the anticompetitive effects of delayed generic entry, assuming the jury finds certain earlier generic launch dates.

This approach is perfectly proper: a plaintiff is not required to prove its entire case through one expert, and experts can answer hypothetical questions premised on facts a party will establish independently.[599]  In numerous analogous pharmaceutical antitrust cases, Dr. Leitzinger or another economist made factual

---

[596] JA-194 n.36.

[597] JA-30579-80 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶51-53) (Andrx license); JA-30581-83 (*id.* ¶¶54-59) (Biovail potential supply); JA-30567-70 (*id.* ¶¶24-31) (saved litigation costs); JA-30577-78 (*id.* ¶¶47-48) (claimed consumer benefits from the Biovail license); *see also* JA-31464-67 (Ex. 946, Leitzinger Second Suppl. Report ¶¶33-38).

[598] *E.g.,* JA-2501-07 (SOF ¶¶784-805); 4380 (Ex. 62, Blume Report ¶¶28-30).  The district court itself held that a jury could find Anchen would have launched at risk after June 2007 based on this evidence.  JA-225.

[599] *See, e.g, Williams v. Illinois,* 132 S. Ct. 2221, 2228 (2012); *Tormenia v. 1st Investors Realty Co., Inc.,* 251 F.3d 128, 135 (3d Cir. 2000); *In re DVI, Inc. Sec. Litig.,* No. 03-cv-5336, 2014 WL 4634301, at *4, *5-6 (E.D. Pa. Sept. 16, 2014); *Lugo v. Farmer's Pride Inc.,* No. 07-cv-0749, 2011 WL 2550376, at *4 (E.D. Pa. June 23, 2011).

assumptions, including the generic entry date.[600]  The court's exclusion ruling

should be reversed.

---

[600] *See, e.g.*, *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at
*9 (D.N.J. Jan. 25, 2011) (expert assumed generic entry on "the date Plaintiffs
contend generics would have entered the market absent Warner-Lambert's
challenged conduct"); *Teva Pharm. USA, Inc. v. Abbott Labs*, 252 F.R.D. 213, 228
(D. Del. 2008) (Dr. Leitzinger made several assumptions in developing his
analysis); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 312 n.19
(D.D.C. 2007) (rejecting defendants' argument that "Dr. Leitzinger's proposed
methodology is flawed because it assumes facts disproved by the evidence in this
case").

## H.     The district court confused Article III standing with statutory standing.

The original end-payor plaintiffs, health and welfare union funds, reside at the end of the pharmaceutical distribution chain as the "end-payors" for prescription drugs.  Bereft of a federal antitrust claim under *Illinois Brick v. Illinois*,[601] these purchasers invoked state trade practices acts and common law principles of unjust enrichment to recover restitution and damages.[602]  The court dismissed their state law claims save those "under the laws of those states where the plaintiffs are located or their members reside" because their "Article III standing is insufficient" as to the dismissed claims.[603]  The court confused statutory standing with Article III standing.

"[T]he question whether a plaintiff states a claim for relief goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion."[604]  The Supreme Court has "criticized the implications of treating the validity of a cause of action as jurisdictional" as this approach would "essentially eviscerate[e] the distinction between the

---

[601] 431 U.S. 720 (1977).

[602] JA-1100-10 (End-Payor Pls.' 1st Am. Consol. Class Action Compl.).

[603] JA-243 (End-Payor Pls.' Opp'n Mots. Dismiss).

[604] *Bond v. United States*, 131 S. Ct. 2355, 2362 (2011) (citation omitted).

jurisdictional and merits inquiry[.]"[605]  This *en banc* Court – in the context of reviewing end-payor antitrust claims – has made the same point.[606]

A "would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted."[607]  The court's error deserves correcting because by concluding that it lacked subject matter jurisdiction over the state law claims in several states, it prevented these purchasers from seeking to represent absent class members who resided or paid for Wellbutrin XL in those jurisdictions – 37 in total.[608]  The claims should not have been "shoehorn[ed] . . . into an Article III analysis" but rather evaluated under "Rule 23 to ensure that classes are properly certified."[609]

This Court should vacate the court's dismissal and permit these purchasers the opportunity to seek certification of a class including persons or entities with claims under the dismissed jurisdictions' laws.

---

[605] *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 80 (3d Cir. 2003) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998)).

[606] *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 303-07 (3d Cir. 2011) (*en banc*) (Rule 23(b) predominance inquiry can be met even if indirect purchasers cannot establish statutory standing at trial).

[607] *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016).

[608] JA-239-43, JA-251-70 (Mem. Op. Mots. Dismiss).

[609] *Neale v. Volvo Cars N. Am.*, 794 F.3d 353, 368 (3d Cir. 2015).

121

# I.    The district court erred in denying Aetna Inc.'s 2010 intervention motion.

Aetna sought mandatory and permissive intervention under Federal Rule of Civil Procedure 24 in May 2010.[610]  As a purchaser of brand and generic Wellbutrin XL in all 50 states, Aetna had standing to cure the jurisdictional deficiencies of the existing class representatives.  Because absent class member intervention prior to an opt-out deadline is "presumptively timely,"[611] the court erred by concluding that Aetna's motion – filed more than five years before final judgment, nine months after the district court's motion to dismiss decision, and months before any class certification hearing – was untimely.

A prospective intervenor in a non-class case must demonstrate that (1) its application is timely, (2) it has a sufficient interest in the case, (3) there is a threat that this interest will be impaired by the action, and (4) the existing parties do not adequately represent its interests.[612]  "In the class action context, the second and third prongs of the Rule 24(a)(2) inquiry are satisfied by the very nature of Rule 23 representative litigation."[613]

---

[610] JA-315-23 (Mem. Op. Intervention).

[611] *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 314 (3d Cir. 2005).

[612] *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005).

[613] *Cmty. Bank*, 418 F.3d at 314.  There can be no dispute Aetna has a sufficient interest in the litigation to satisfy these two prongs.  JA-320 n.4 (Mem. Op. Intervention).  But, by prematurely dismissing several of the end-payors' state law claims at the motion to dismiss stage, the district court was able to ignore

*(Continued)*

"Timeliness of an intervention request is determined by the totality of the circumstances."[614]  In deciding whether to permit intervention, district courts consider three factors: (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay.[615]  "[T]he mere lapse of time by itself does not make an application untimely.  The court must weigh the lapse of time in the light of all the circumstances of the case."[616]

In *Community Bank*, this Court held that an intervention motion filed 29 months after the case began and 6 weeks before the fairness hearing for the proposed class settlement was "presumptively timely" because it was filed within the opt out period.[617]  The Court rejected the notion that the intervention request would "likely delay the proceeding to the prejudice of the Class," reasoning that a class member has no "duty to take note of [a] suit or to exercise any responsibility with respect to it" before the contours of the class has been defined

---

this rule by holding that those claims are outside the scope of the action.  (*id.* at 546 & n.5).

[614] *Cmty. Bank*, 418 F.3d at 314 (citation omitted).

[615] *See, e.g., Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369-70 (3d Cir. 1995) (reversing denial of appellants' motion to intervene for abuse of discretion, rejecting argument that "case [was] in an advanced stage").

[616] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 844 F.2d 1050, 1056 (3d Cir. 1988) (reversing district court's untimeliness decision) (citation omitted).

[617] 418 F.3d at 314-15.

and it has been properly notified by a class action notice.[618]  Aetna's intervention motion was made well before the presumptive *Community Bank* deadline.  Aetna's intervention was timely as a matter of law, having occurred not just prior to the expiration of a deadline to opt-out of the class, but prior to the close of class certification discovery or proceedings.[619]

The court nevertheless reasoned that Aetna's intervention – filed nine months after the motion to dismiss decision – would "prejudice the defendants by delaying the progress of this case," require defendants to "analyze a large number of new claims," and "require a new motion for class certification from the plaintiffs and a significant amount of additional discovery, including volumes of documents and additional depositions, briefing and expert reports."[620]  This rationale was unfounded in 2010 when Aetna made the motion, and proven incorrect over the course of the next six years.

Nor did Aetna seek to introduce "new claims" through intervention; these claims were first brought by the original end-payors.  Aetna sought to cure the jurisdictional defects perceived by the district court by broadening the states within which the end-payor representatives had purchased Wellbutrin XL.  The

---

[618] *Id.* at 314.

[619] *Id.*

[620] JA-316-17 (Mem. Op. Intervention).

underlying facts and the nature of these claims tracked closely with the five state-law claims the court had already sustained.[621]

In September 2010, two months after it denied intervention, the court granted the purchasers' motion to substitute Aetna Health of California, Inc. as representative for the pending, not yet certified, California claims.[622]  Two months later – in December 2010 – the court granted plaintiffs' motion to *add* claims under New York's Donnelly Act.[623]  These additions did not upend class certification,[624] lead to significant discovery burdens, or prejudice defendants.

Finally, Aetna met the remaining element – the inadequacy of the existing plaintiffs in representing its interests.  The court had already held that those purchasers did not present a case or controversy as to the claims Aetna sought to bring.  But the district court rejected Aetna's inadequacy argument, citing

---

[621] *Compare* JA-1100-10 (End-Payor Pls.' 1st Am. Consol. Class Action Compl.) *with* JA-1391-1402 (Aetna's Compl. Intervention).

[622] JA-327 (Order Aetna Substitution) ("The Court appreciates the defendants' concern that Aetna's involvement in this case may require additional time to review and analyze documents.  Nevertheless, the Court notes that Aetna is willing, and is hereby required, to abide by the Court's discovery schedule and to be amendable to the defendants' discovery needs.").

[623] *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670 (E.D. Pa. 2010).

[624] Class certification hearings were ultimately held on April 29, 2011, ECF No. 315, and May 27, 2011, ECF No. 326.  Class certification was granted on August 15, 2011, ECF No. 354 – one year and three months *after* Aetna first sought to intervene in this action.

*McClune v. Shamah*,[625] because a "motion for intervention under Rule 24 is not an appropriate device to cure a situation in which plaintiffs may have stated causes of action that they have no standing to litigate."[626]  *McClune* was not a class action.[627]  And as this Court has previously held, even though intervention "contemplates an existing suit in a court of competent jurisdiction," if claims have been dismissed for lack of jurisdiction, the court should treat the intervention pleading as a separate action where the intervenor has an independent basis for jurisdiction and failure to adjudicate the claim will only result in unnecessary delay.[628]

Courts routinely permit substitution to cure standing deficiencies to ensure cases are decided on the merits.[629]  To this end, the Supreme Court has granted

---

[625] 593 F.2d 482, 486 (3d Cir. 1979).

[626] JA-322 (*WXL Intervention Decision*) (quoting *McClune*, 593 F.2d at 486).

[627] *See Bromley v. Mich. Educ. Ass'n-NEA*, 178 F.R.D. 148, 157 (E.D. Mich. 1998) ("*McClune* does not hold that plaintiffs cannot intervene prior to class certification as party representatives in a class action to cure a deficiency."); *Warden v. Crown Am. Realty Trust*, No. 96-cv-25, 1998 WL 725946, at *5 (W.D. Pa. Oct. 15, 1998) (*McClune* rule applies "outside the class action context"); *cf. Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, No. MDL-1446, 2004 U.S. Dist. LEXIS 8158, at *31 n.24 (S.D. Tex. Feb. 24, 2004).

[628] *Fuller v. Volk*, 351 F.2d 323, 328-29 (3d Cir. 1965) ("By allowing the suit to continue with respect to the intervening party, the court can avoid the senseless delay and expense of a new suit, which at long last will merely bring the parties to the point where they now are." (citation omitted)).

[629] *See, e.g., Mullaney v. Anderson*, 342 U.S. 415, 417 (1952).  This rationale extends to class certification decisions.  *Birmingham Steel Corp. v. Tenn. Valley Auth.*, 353 F.3d 1331 (11th Cir. 2003) (allowing a reasonable opportunity to

*(Continued)*

126

plaintiffs leave to substitute new representatives in cases where the class

representative becomes inadequate even *after* final judgment.[630]

 This Court should reverse the district court's denial of Aetna's motion for

intervention.

---

substitute an adequate class representative is generally favored); *Little Caesar Ents., Inc. v. Smith*, 172 F.R.D. 236, 244 (E.D. Mich. 1997) (district court may condition class certification upon "plaintiffs' production of an adequate representative within a fixed period of time"); *In re OSB Antitrust Litig.*, No. 06-cv-826, 2007 WL 2253425, at *5 (E.D. Pa. Aug. 3, 2007) (certifying multistate class, and allowing plaintiffs a "reasonable period" in which to substitute new representatives for states excluded from class due to "inadequate class representatives" (citation omitted)).

[630] *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395 n.15 (1977) (affirming appellate court's ruling that respondent's motion to intervene was timely filed and should have been granted where putative class member sought to intervene only *after* entry of final judgment, noting that requiring intervention at an earlier point in time would result in "the very multiplicity of activity which Rule 23 was designed to avoid" (citations omitted)).

# CONCLUSION

The summary judgment, intervention, Article III, and expert preclusion rulings should be vacated, and the matter remanded to the district court for trial.

Dated: March 4, 2016                     Respectfully submitted,

                                         **/s/ Thomas M. Sobol**
                                         Thomas M. Sobol
                                         David S. Nalven
                                         Kristen A. Johnson
                                         Kristie A. LaSalle
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         55 Cambridge Parkway, Suite 301
                                         Cambridge, MA  02142
                                         Tel.: (617) 482-3700
                                         tom@hbsslaw.com
                                         dnalven@hbsslaw.com
                                         kristenj@hbsslaw.com
                                         kristiel@hbsslaw.com

                                         David F. Sorensen
                                         Andrew C. Curley
                                         Caitlin G. Coslett
                                         Nicholas Urban
                                         BERGER & MONTAGUE, P.C.
                                         1622 Locust Street
                                         Philadelphia, PA  19103
                                         Tel.: (215) 875-3000
                                         dsorensen@bm.net
                                         acurley@bm.net
                                         ccoslett@bm.net
                                         nurban@bm.net

Peter R. Kohn
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
Tel.: (215) 227-5770
pkohn@faruqilaw.com

Barry S. Taus
Archana Tamoshunas
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY  10038
Tel.: (212) 931-0704
btaus@tcllaw.com
atamoshunas@tcllaw.com

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA  19107
Tel.: (215) 923-9300
dnast@nastlaw.com

Don Barrett
Sterling Starns
Brandi Hamilton
BARRETT LAW OFFICES
P.O. Box 987
Lexington, MS  39095
Tel.: (662) 834-9168
dbarrett@barrettlawgroup.com
sstarns@barrettlawgroup.com
bhamilton@barrettlawgroup.com

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

Peter D. St. Phillip, Jr.
Richard W. Cohen
Gerald Lawrence
Uriel Rabinovitz
Noelle Ruggiero
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY  10601
Tel.: (914) 997-0500
pstphillip@lowey.com
rcohen@lowey.com
glawrence@lowey.com
urabinovitz@lowey.com
nruggiero@lowey.com

Kenneth A. Wexler
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Tel.: (312) 346-2222
kaw@wexlerwallace.com
jnb@wexlerwallace.com

James G. Stranch, III
Joe P. Leniski
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Park Avenue, Suite 200
Nashville, TN  37203
Tel.: (615) 254-8801
jims@bsjfirm.com
joeyl@bsjfirm.com

*Counsel for End-Payor Class Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the foregoing brief is in 14-point Bell MT proportional font and contains 27,876 words (exclusive of the caption, table of contents, table of authorities, signature block, and certifications) and thus is in compliance with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B).

Pursuant to 3d Cir. R. 31.1(c), the electronic version of this brief was checked for computer viruses using Sophos Antivirus version 10.3. No virus was detected.

**CERTIFICATE OF BAR MEMBERSHIP**

In accordance with 3d Cir. R. 28.3(d), I certify that I am a member of the

bar of the United States Court of Appeals for the Third Circuit.

March 4, 2016                                    **/s/Thomas M. Sobol**
                                                 Thomas M. Sobol

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, certify that, on this date, the foregoing document was served by filing it on the court's CM/ECF system and additionally via electronic mail to all counsel of record.

March 4, 2016

**/s/Thomas M. Sobol**
Thomas M. Sobol

# EXHIBIT B

# REDACTED

## Nos. 15-3559 & 15-3591

# United States Court of Appeals
## For the Third Circuit

Nos. 15-3559, 15-3591, 15-3681 & 15-3682

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

*On Appeal from the United States District Court*
*for the Eastern District of Pennsylvania*

Case Nos. 08-cv-2431, 08-cv-2433

### CONSOLIDATED REPLY BRIEF OF DIRECT PURCHASER AND END-PAYOR CLASS PLAINTIFFS-APPELLANTS/CROSS-APPELLEES

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Nicholas Urban
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Thomas M. Sobol
David S. Nalven
Kristen A. Johnson
Kristie A. LaSalle
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

Peter D. St. Phillip, Jr.
Richard W. Cohen
Gerald Lawrence
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY 10601
(914) 997-0500

Kenneth A. Wexler
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 346-2222

James G. Stranch, III
Joe P. Leniski
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Park Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801

*Counsel for End-Payor Class Plaintiffs-Appellants*

* *Parties and additional counsel listed within*

No. 15-3559

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

AETNA HEALTH OF CALIFORNIA INC.; IBEW-NECA LOCAL 505 HEALTH
AND WELFARE PLAN; BRICKLAYERS AND MASONS UNION LOCAL UNION
NO. 5 OHIO HEALTH AND WELFARE FUND; MECHANICAL CONTRACTORS-
UNITED ASSOCIATION LOCAL 119 HEALTH AND WELFARE PLAN;
PAINTERS DISTRICT COUNCIL NO. 30 HEALTH AND WELFARE FUND;
PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND;
AETNA, INC.

Plaintiffs-Appellants

v.

SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE LLC
AND GLAXOSMITHKLINE PLC

Defendants-Appellees

No. 15-3591

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

PROFESSIONAL DRUG COMPANY, INC., individually and on
behalf of the Direct Purchaser Class

Plaintiff–Appellant

v.

SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE LLC
AND GLAXOSMITHKLINE PLC

Defendants-Appellees.

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   THE DISTRICT COURT'S SUMMARY JUDGMENT
      DECISIONS SHOULD BE REVERSED. ......................................... 2

      A.    The jury must decide if *Anchen* was a sham because the
            predicate facts of that lawsuit are genuinely disputed. .......... 2

            1.    "Predicate facts" include all facts tending to prove or
                  disprove the existence of probable cause, and many are
                  disputed. ......................................................................... 2

                  a.    The defendants' narrow enumeration of "predicate
                        facts" is wrong. ....................................................... 2

                  b.    Some of the "undisputed facts" the defendants rely
                        on are not only disputed – they are not facts. ............. 16

            2.    The district court erred by crediting the defendants'
                  argument that their *Anchen* infringement claims were
                  "colorable" and disregarding the purchasers' conflicting
                  evidence. ........................................................................ 17

            3.    Factual disputes must be resolved by juries, not judges. ......... 21

      B.    The purchasers produced sufficient evidence on the reverse-
            payment theory. ...................................................................... 24

            1.    The purchasers' case was built on abundant direct
                  evidence. ......................................................................... 24

            2.    GSK's arguments distort controlling law. .......................... 31

                  a.    *Actavis* is about competition delayed by reverse
                        payments, not the unwarranted termination of
                        patent litigation. .................................................... 31

                        (1)    The appeal facilitated the paid-for delay. ............. 33

                        (2)    The appeal could not have facilitated
                               "immediate" generic entry. .............................. 35

i

b. Whether Andrx's patent was a superseding cause of delayed 150 mg generic entry was for the jury. ........ 35

    (1) The purchasers produced substantial evidence that Andrx would have licensed the '708 patent to all generics. ............................... 37

    (2) GSK, not the purchasers, bears the burden of showing that Andrx would have successfully used the '708 patent to block Anchen and Teva's at-risk launch, and a dispute remains. ...................................................... 41

    (3) The purchasers produced substantial evidence that Anchen's product did not infringe Andrx's '708 patent. ................................. 44

c. Whether GSK's procompetitive justifications outweigh the harm to competition the purchasers showed required weighing of disputed facts by the jury. ........................................................................ 47

    (1) The purchasers produced abundant evidence that GSK's no-AG promise was unnecessary for Andrx to license the '708 patent. .......................................................... 49

    (2) The purchasers produced abundant evidence that GSK's no-AG promise was unnecessary for Biovail to give a supply "promise." ...................................................... 50

    (3) The purchasers produced abundant evidence that the no-AG promise was unnecessary as a matter of economics .................. 54

d. GSK's "illegality" defense does not compel partial summary judgment on the issue of antitrust injury prior to June 2007. .................................... 55

C. A reasonable jury could find the defendants conspired with Biovail to delay generic entry through sham filings and the reverse payment agreement. ...................................................... 60

ii

1.   The defendants do not contest a single overarching conspiracy exists where co-conspirators pursue a conspiratorial objective. ................................... 61

2.   A reasonable jury could find the defendants conspired to file a sham petition, delaying generic entry. .............................. 64

   a.   A jury could find the defendants were involved in the petition post-2004........................................... 65

   b.   The 18-month delay between the defendants' creation of the arguments and submission of the petition is not exculpatory.................................. 67

   c.   A reasonable jury could find the petition was a sham and caused delay........................................ 68

3.   A reasonable jury could find the defendants conspired to file *Impax* and *Watson*, which, together with *Abrika*, were shams. ................................................ 70

   a.   The defendants conspired on *Impax* and *Watson*............ 70

   b.   A reasonable jury could find *Abrika*, *Impax*, and *Watson* were shams. ............................. 71

      (1)   *Abrika* .......................................... 71

      (2)   *Impax* ........................................... 73

      (3)   *Watson* .......................................... 73

D.   *Hanover 3201 Realty* warrants reversal because a reasonable jury could find that the defendants engaged in a pattern of sham filings "without regard to the merits" and for an improper purpose. ......................................... 73

1.   This Court should apply *Hanover 3201 Realty*............................ 74

2.   The defendants misconstrue *Hanover 3201 Realty*.................... 78

E.   A jury resolving these factual disputes should have the benefit of Dr. Leitzinger's full opinion................................... 82

III. THE DISTRICT COURT'S DISMISSAL OF END-PAYOR
CLAIMS BASED ON STANDING AND DENIAL OF AETNA
INC.'S INTERVENTION SHOULD BE REVERSED. ............................... 87

    A.    The district court erred in concluding that the end-payors
lacked standing to bring certain claims. ................................ 87

    B.    Aetna Inc. should be permitted to intervene. ......................... 90

        1.    Aetna's appeal is timely. ........................................ 90

        2.    The district court abused its discretion in denying
Aetna's intervention. .......................................... 91

IV. DIRECT PURCHASER CLASS CERTIFICATION SHOULD BE
AFFIRMED. ........................................................... 93

    A.    Counterstatement of the issue. ...................................... 93

    B.    Standard of review. ................................................. 93

    C.    Counterstatement of the case and summary of argument. ................ 94

    D.    Argument. .......................................................... 96

        1.    A 32-member class is sufficiently numerous to render
joinder impracticable. ......................................... 96

        2.    The district court acted within its discretion in finding
geographic dispersion and judicial economy favored
certification. ................................................. 97

        3.    Class certification promotes enforcement of the antitrust
laws. ......................................................... 100

        4.    The district court acted within its discretion to place
less weight on other factors. .................................. 101

V. END-PAYOR CLASS CERTIFICATION SHOULD BE
AFFIRMED. ........................................................... 104

    A.    Counterstatement of the issues. ..................................... 104

    B.    Standard of review. ................................................. 105

C.    Summary of argument...............................................................105

D.    Argument. ..............................................................................106

    1.    The defendants did not challenge Professor Rosenthal's
       methods under Rule 702.................................................106

    2.    The district court's factual predominance findings do
       not constitute clear error..............................................108

         a.    Professor Rosenthal's "yardstick" analysis was
            reliable. .......................................................109

         b.    Professor Rosenthal's generic overcharge
            opinions were credible......................................111

    3.    The defendants' failure to challenge the district court's
       conclusions concerning the other common issues of law
       or fact dooms their predominance argument.......................113

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. Inc. v. Torpharm, Inc.,*
300 F.3d. 1367 (Fed. Cir. 2002)..................................................................9, 10

*In re Abbott Labs. Norvir Anti-Trust Litig.,*
442 F. Supp. 2d 800 (N.D. Cal. 2006)....................................................... 42

*Abramson v. William Paterson Coll. of N.J.,*
260 F.3d 265 (3d Cir. 2001)........................................................................ 19

*Ace Heating & Plumbing Co. v. Crane Co.,*
453 F.2d 30 (3d Cir. 1971)........................................................................... 91

*Am. Home Prods. Corp. v. Johnson & Johnson Corp.,*
No. 91-cv-5594, 1994 WL 46522 (E.D. Pa. Feb. 15, 1994).....................3

*Am. Key Corp. v. Cole Nat'l Corp.,*
762 F.2d 1569 (11th Cir. 1985) .................................................................. 85

*Am. Sales Co. v. SmithKline Beecham Corp.,*
274 F.R.D. 127 (E.D. Pa. 2010) ................................................................. 97

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) .................................................................................... 103

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
133 S. Ct. 1184 (2013)............................................................................... 113

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
256 F.3d 799 (Fed. Cir. 2001) ................................................................... 34

*Anesta AG v. Mylan Pharms., Inc.,*
No. 08-cv-889, 2014 WL 3976456 (D. Del. Aug. 14, 2014)................. 43

*Ark. Educ. Ass'n v. Bd. of Educ.,*
446 F.2d 763 (8th Cir. 1971) ..................................................................... 97

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) ...................................................................................... 80

*AstraZeneca AB v. Mylan Labs., Inc.,*
    No. 00-cv-6749, 2010 WL 207922 (S.D.N.Y. May 19, 2010) ........................20, 81

*Aventis Pharma S.A. v. Amphastar Pharms., Inc.,*
    Nos. 03-cv-887 & 04-cv-333, 2009 WL 8727693 (C.D. Cal. Feb.
    17, 2009) .............................................................................................................. 82

*Barefoot Architect, Inc. v. Bunge,*
    632 F.3d 822 (3d Cir. 2011) ................................................................................ 76

*Beazer East, Inc. v. The Mead Corp.,*
    525 F.3d 255 (3d Cir. 2008) .............................................................................77, 78

*Bergen Drug Co. v. Parke, Davis & Co.,*
    307 F.2d 725 (3d Cir. 1962) .............................................................................. 100

*Biovail Labs. Inc. v. Anchen Pharms. Inc.,*
    No. 04-cv-1468, 2006 WL 8071250 (C.D. Cal. Aug. 1, 2006)................... 7, 10, 17

*Bond v. United States,*
    564 U.S. 211 (2011) ............................................................................................ 87

*Bouriez v. Carnegie Mellon Univ.,*
    585 F.3d 765 (3d Cir. 2009) ............................................................................... 36

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.,*
    444 F.3d 1356 (Fed. Cir. 2006) ........................................................................3, 18

*Brill v. Mirandola,*
    540 F. Supp. 2d 563 (E.D. Pa. 2008) ................................................................. 84

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ........................................................................................... 43

*Cal. Dental Ass'n v. FTC,*
    526 U.S. 756 (1999) ........................................................................................... 31

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ........................................................................................... 98

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
    132 S. Ct. 1670 (2012) ....................................................................................... 81

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 297 (E.D. Mich. 2001) .......................................................... 103

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896 (6th Cir. 2003) ...........................................................34, 72

*Carlough v. Amchem Prods., Inc.*,
    5 F.3d 707 (3d Cir. 1993) ...............................................................90, 91

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    MDL No. 1917, 2013 WL 5428139 (N.D. Cal. June 20, 2013) .......................... 83

*Celgene Corp. v. KV Pharm Co.*,
    No. 07-cv-4819, 2008 WL 2856469 (D.N.J July 22, 2008) ................................. 20

*In re Cendant Corp. PRIDES Litig.*,
    235 F.3d 176 (3d Cir. 2000) ................................................................ 94

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
    6 F.3d 177 (4th Cir. 1993) .................................................................. 98

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...................................................... 34

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) ................................................................ 56

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005) ................................................................ 92

*In re Cmty. Bank of N. Va.*,
    622 F.3d 275 (3d Cir. 2010) ...........................................................91, 92

*In re Cmty. Bank of N. Va.*,
    795 F.3d 380 (3d Cir. 2015) ............................................................... 105

*Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*,
    765 F.3d 1205 (10th Cir. 2014) .......................................................93, 94

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .............................................................. 36

*Consol. Express, Inc. v. N.Y. Shipping Ass'n, Inc.*,
    602 F.2d 494 (3d Cir. 1979) ...........................................................42, 56

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*,
    375 F.2d 648 (4th Cir. 1967) .................................................................94, 95, 97

*California* ex rel. *Davis v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ................................................................ 53

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) ................................................................... 80

*Deary v. Three Un–Named Police Officers*,
    746 F.2d 185 (3d Cir. 1984) ................................................................... 22

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod.*
    *Liab. Litig.*, 706 F.3d 217 (3d Cir. 2013) ........................................... 104

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    No. 02-md-1486, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ......................... 110

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992) ............................................................................ 48

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
    543 F.3d 665 (Fed. Cir. 2008) ............................................................... 42

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) ................................................................... 99

*El v. Se. Pa. Transp. Auth (SEPTA)*,
    479 F.3d 232 (3d Cir. 2007) ................................................................... 36

*Eldredge v. United States*,
    62 F.2d 449 (10th Cir. 1932) .................................................................. 62

*In re Flonase Antitrust Litig.*,
    795 F. Supp. 2d 300 (E.D. Pa. 2011) ...............................................22, 68, 77

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ....................................................................*passim*

*In re Gabapentin Patent Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ..........................................................4

*Glaxo, Inc. v. Novopharm Ltd.*,
    110 F.3d 1562 (Fed. Cir. 1997) .............................................................. 20

*Greater Rockford Energy & Tech Corp. v. Shell Oil Co.,*
    998 F.2d 391 (7th Cir. 1993) .......................................................... 36

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.,*
    806 F.3d 162 (3d Cir. 2015)...................................................*passim*

*Harris v. City of Phila.,*
    35 F.3d 840 (3d Cir. 1994).............................................................. 76

*Hasbrouck v. Texaco, Inc.,*
    842 F.2d 1034 (9th Cir. 1987)........................................................ 36

*Hill v. Reederei F. Laeisz GmBH, Rostock,*
    435 F.3d 404 (3d Cir. 2006)........................................................... 36

*Hoffman-La Roche Inc. v. Genpharm Inc.,*
    50 F. Supp. 2d 367 (D.N.J. 1999) ................................................. 20

*Huber v. Taylor,*
    469 F.3d 67 (3d Cir. 2006)............................................................. 76

*Ill. Brick Co. v. Illinois,*
    431 U.S. 720 (1977) ............................................................... 100, 101

*In re Indus. Diamonds Antitrust Litig.,*
    167 F.R.D. 374 (S.D.N.Y. 1996)................................................... 101

*In re Ins. Brokerage Antitrust Litig.,*
    579 F.3d 241 (3d Cir. 2009)................................................... 89, 107

*In re Ins. Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010).......................................................... 48

*In re K-Dur Antitrust Litig.,*
    338 F. Supp. 2d 517 (D.N.J. 2004) ............................................... 57

*In re K-Dur Antitrust Litig.,*
    686 F.3d 197 (3d Cir. 2012).............................................34, 47, 48, 110

*In re K-Dur Antitrust Litig.,*
    No. 01-cv-1652, 2008 WL 2699390 (D.N.J. Apr. 14, 2008).................96, 99, 103

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.,*
    702 F. Supp. 2d 514 (E.D. Pa. 2010) ............................................ 57

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
88 F. Supp. 3d 402 (E.D. Pa. 2015) .......................................................... 48

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015)......................................................*passim*

*King Drug of Florence, Inc. v. Cephalon, Inc.*,
309 F.R.D. 195 (E.D. Pa. 2015) ................................................................ 43

*La. Wholesale Drug Co. v. Sanofi–Aventis*,
No. 07-cv-7343, 2008 WL 4580016 (S.D.N.Y. Oct. 14, 2008)..............................3

*La. Wholesale Drug Co. v. Sanofi–Aventis*,
No. 07-cv-7343, 2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009)........................... 23

*Laitram Mach., Inc. v. Carnitech A/S*,
901 F. Supp. 1155 (E.D. La. 1995) .......................................................... 21

*LePage's, Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)..................................................................... 51

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ...................................................................................... 99

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002)..................................................................... 113

*In re Loestrin 24 Fe Antitrust Litig.*,
814 F.3d 538 (1st Cir. 2016).................................................................... 29

*Marcus v. BMW of N. Am. LLC*,
687 F.3d 583 (3d Cir. 2012)...................................................................... 98

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
246 F.R.D. 293 (D.D.C. 2007)................................................................... 96

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*,
Nos. 06-cv-52 & 06-cv-71, 2010 WL 1485328 (D. Del. Apr. 13,
2010)....................................................................................................... 57

*Miller v. Ind. Hosp.*,
843 F.2d 139 (3d Cir. 1988)...................................................................... 49

*Mylan Pharms., Inc. v. Warner Chilcott Public Ltd. Co.,*
No. 12-cv-3824, 2014 WL 631031 (E.D. Pa. Feb. 18, 2014)................................ 96

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,*
247 F.R.D. 253 (D. Mass. 2008)................................................................. 100

*NCAA v. Bd. of Regents of Univ. Okl.,*
468 U.S. 85 (1984) ..................................................................................... 47

*In re Neurontin Antitrust Litig.,*
Nos. 02-cv-1830, 02-cv-2731 & 02-cv-5583, 2009 WL 2751029
(D.N.J. Aug. 28, 2009).................................................................................. 23

*In re Nexium (Esomeprazole) Antitrust Litig.,*
296 F.R.D. 47 (D. Mass. 2013) ............................................................. 96, 100

*In re Nexium (Esomeprazole) Antitrust Litig.,*
42 F. Supp. 3d 231 (D. Mass. 2014)............................................................. 59

*In re Nexium (Esomeprazole) Antitrust Litig.,*
777 F.3d 9 (1st Cir. 2015) .................................................. 111, 112, 113

*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. and
Research Found. v. PricewaterhouseCoopers, LLP,*
607 F.3d 346 (3rd Cir. 2010) ........................................................................ 78

*In re Opana ER Antitrust Litig.,*
No. 14-cv-10150, -- F. Supp. 3d --, 2016 WL 521005 (N.D. Ill.
Feb. 10, 2016)................................................................................................ 43

*Perretta v. Prometheus Dev. Co., Inc.,*
No. 05-cv-02987, 2005 WL 3445627 (N.D. Cal. Dec. 15, 2005) ........................ 16

*Personnel Dep't, Inc. v. Prof'l Staff Leasing Corp.,*
297 F. App'x 773 (10th Cir. 2008) ....................................................... 18, 22

*Peterson v. Lehigh Valley Dist. Council,*
676 F.2d 81 (3d Cir. 1982)............................................................................ 18

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.,*
508 U.S. 49 (1993) ..................................................................... 2, 3, 18, 68

*In re Prograf Antitrust Litig.,*
No. 11-cv-10344, 2013 WL 2395083 (D. Mass. Apr. 23, 2013)......................... 97

*In re Prograf Antitrust Litig.,*
  No. 11-md-2242, 2012 WL 293850 (D. Mass. Feb. 1, 2012) .............................. 68

*In re Prograf Antitrust Litig.,*
  No. 11-md-2242, 2014 WL 4745954 (D. Mass. June 10, 2014) ........................ 70

*In re Pronetlink Sec. Litig.,*
  403 F. Supp. 2d 330 (S.D.N.Y. 2005) ........................................................ 36

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
  148 F.3d 283 (3d Cir. 1998)........................................................................ 90

*Rannis v. Recchia,*
  380 F. App'x 646 (9th Cir. 2010) ..........................................................94, 97

*In re Relafen Antitrust Litig.,*
  346 F. Supp. 2d 349 (D. Mass. 2004) ....................................................3, 23

*Reyes v. Netdeposit, LLC,*
  802 F.3d 469 (3d Cir. 2015)........................................................................ 93

*Riordan v. Smith Barney,*
  113 F.R.D. 60 (N.D. Ill. 1986) ................................................................... 99

*Ritz Camera & Image, LLC v. SanDisk Corp.,*
  700 F.3d 503 (Fed. Cir. 2012) ................................................................... 80

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993)...................................................................... 100

*Rochester Drug Co-op., Inc. v. Braintree Labs.,*
  796 F. Supp. 2d 560 (D. Del. 2011) ......................................................... 100

*Salerno v. Corzine,*
  449 F. App'x 118 (3d Cir. 2011) ................................................................ 76

*Salvation Army v. Dep't of Cmty. Affairs of State of N.J.,*
  919 F.2d 183 (3d Cir. 1990)........................................................................ 77

*Schneck v. Saucon Valley Sch. Dist.,*
  340 F. Supp. 2d 558 (E.D. Pa. 2004) ........................................................ 18

*SEC v. Teo,*
  746 F.3d 90 (3d Cir. 2014)........................................................................ 36

*Selected Risk Ins. Co. v. Bruno,*
    718 F.2d 67 (3d Cir. 1983) .................................................................... 77

*Shehee v. City of Wilmington,*
    67 F. App'x 692 (3d Cir. 2003) ........................................................... 61

*SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.,*
    772 F. Supp. 2d 660 (E.D. Pa. 2011) ................................................ 65

*Stewart v. Abraham,*
    275 F.3d 220 (3d Cir. 2001) ................................................................ 96

*Stewart v. Sonneborn,*
    98 U.S. 187 (1878) ................................................................................ 21

*Sullivan v. DB Invs., Inc.,*
    667 F.3d 273 (3d Cir. 2011) ............................................... 88, 89, 90

*Sullivan v. DB Invs., Inc.,*
    No. 04-cv-2819, 2008 WL 8747721 (D.N.J. May 22, 2008) ............... 88

*Teen-Ed, Inc. v. Kimball Int'l, Inc.,*
    620 F.2d 399 (3d Cir. 1980) ................................................................ 83

*In re Terazosin Hydrochloride Antitrust Litig.,*
    220 F.R.D. 672 (S.D. Fla. 2004) ...................................................... 110

*In re Terazosin Hydrochloride Antitrust Litig.,*
    335 F. Supp. 2d 1336 (S.D. Fla. 2004) ........................................ 81, 82

*Teva Pharm. Indus., Ltd. v. Apotex, Inc.,*
    No. 07-cv-5514, 2008 WL 3413862 (D.N.J. Aug. 8, 2008) ................. 4

*Teva Pharm. USA, Inc. v. Abbott Labs.,*
    252 F.R.D. 213 (D. Del. 2008) ........................................................... 99

*Teva Pharms. USA, Inc. v. Abbott Labs.,*
    580 F. Supp. 2d 345 (D. Del. 2008) .................................................. 20

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,*
    482 F.3d 1330 (Fed. Cir. 2007) ......................................................... 81

*Tivo Inc. v. EchoStar Corp.,*
    429 F. App'x 975 (Fed. Cir. 2011) .................................................... 34

*TK-7 Corp. v. Estate of Barbouti*,
    993 F.2d 722 (10th Cir. 1993)..................................................................84, 85

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008)........................................................................ 48

*Town of New Castle v. Yonkers Contracting Co.*,
    131 F.R.D. 38 (S.D.N.Y. 1990) ................................................................. 100

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*,
    No. 07-cv-1299, 2015 WL 3460790 (D.N.J. May 29, 2015)................................. 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016).......................................................... 104, 105, 107

*U.S. Gypsum Co. v. Lafarge N. Am.*,
    670 F. Supp. 2d 737 (N.D. Ill. 2009) ......................................................... 84

*Ungar v. Dunkin' Donuts of Am., Inc.*,
    68 F.R.D. 65 (E.D. Pa. 1975)................................................................... 103

*United Food & Commercial Workers Local 1776 & Participating Emp'rs
Health & Welfare Fund v. Teikoku Pharma USA, Inc.*,
    74 F. Supp. 3d 1052 (N.D. Cal. 2014)........................................................ 43

*United States v. Antar*,
    53 F.3d 568 (3d Cir. 1995)...........................................................62, 64, 67

*United States v. Berger*,
    224 F.3d 107 (2d Cir. 2000)...................................................................... 67

*United States v. Fausnaught*,
    380 F. App'x 198 (3d Cir. 2010) ............................................................... 61

*United States v. Geraci*,
    557 F. App'x 611 (8th Cir. 2014) .............................................................. 95

*United States v. Jackson*,
    308 F. App'x 899 (6th Cir. 2009) .............................................................. 60

*United States v. Kushner*,
    305 F.3d 194 (3d Cir. 2002)...................................................................... 61

*United States v. Lowell,*
  649 F.2d 950 (3d Cir. 1981)............................................................... 62

*United States v. Russell,*
  134 F.3d 171 (3d Cir. 1998)............................................................... 61

*United States v. Vallone,*
  698 F.3d 416 (7th Cir. 2012)............................................................. 63

*Valley Drug Co. v. Geneva Pharms.,*
  344 F.3d 1244 (11th Cir. 2003) ....................................................... 42

*In re Warfarin Sodium Antitrust Litig.,*
  214 F.3d 395 (3d Cir. 2000).............................................................. 30

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004).............................................................. 90

*We, Inc. v. City of Phila.,*
  174 F.3d 322 (3d Cir. 1999).............................................................. 74

*Weiss v. York Hosp.,*
  745 F.2d 786 (3d Cir. 1984)..........................................................96, 97

*In re Wellbutrin SR Antitrust Litig.,*
  749 F. Supp. 2d 260 (E.D. Pa. 2010) ...........................................3, 20

*In re Wellbutrin SR Antitrust Litig.,*
  Nos. 04-cv-5525 & 05-cv-396, 2010 WL 3488634 (E.D. Pa. Aug.
  31, 2010)........................................................................................... 23

*In re Wellbutrin SR/Zyban Antitrust Litig.,*
  281 F. Supp. 2d 751 (E.D. Pa. 2003) ............................................. 36

*In re Wellbutrin XL Antitrust Litig.,*
  756 F. Supp. 2d 670 (E.D. Pa. 2010) ............................................. 92

*Wilk v. Am. Med. Ass'n,*
  895 F.2d 353 (7th Cir. 1990)............................................................ 53

*Williams v. Illinois,*
  132 S. Ct. 2221 (2012)....................................................................... 83

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003) ........................................................................ 95

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ............................................................................ 70, 72

## Statutes

21 U.S.C. § 356a ................................................................................................. 57

28 U.S.C. § 1404 ................................................................................................. 99

28 U.S.C. § 1407 ................................................................................................. 99

Cal. Bus. & Professions Code § 4073(a) ..................................................... 111

FDA Amendments Act of 2007, Pub. L. 110-85, 121 Stat. 823 .............. 67

Fla. Stat. § 465.025 .......................................................................................... 111

N.Y. Educ. Law § 6816-a(1) .......................................................................... 111

Nev. Rev. Stat. Ann. § 639.2583 .................................................................. 111

Tenn. Code Ann. § 53-10-204(a) ................................................................. 111

Wis. Stat. § 450.13 ........................................................................................... 111

## Other Authorities

21 C.F.R. § 314.70 ....................................................................................... 57, 58

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed.
    2002) ............................................................................................... 101, 110

Am. Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases* (2005) ...... 24

H.R. Rep. No. 98-857 (1984) ......................................................................... 43

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2013
    & Supp. 2015) ........................................................................... 21, 31, 42

William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg
    on Class Actions* (5th ed. 2013) ....................................................... 103

## I.    INTRODUCTION

The district court dismissed the purchasers' allegations that the defendants, sellers of Wellbutrin XL, hatched a scheme to delay generic competition through a series of sham litigations, a sham citizen petition, and an unlawful reverse payment.  In so ruling, the district court weighed the evidence, resolved factual disputes, heightened the purchasers' summary judgment burden, and drew inferences against the purchasers.  This contravenes settled summary judgment principles and constitutes error.

The defendants repeat these errors.  They say that facts are undisputed, ignoring the purchasers' substantial evidence demonstrating countless material factual disputes.  They advocate an unsupported interpretation of antitrust law guaranteeing the defendants judgment as a matter of law on sham litigation claims, regardless of material disputes over probable cause to sue.  And they advance an interpretation of the fact-intensive rule of reason that contradicts *FTC v. Actavis, Inc.*[1] and *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.* ("*Lamictal*")[2] and ignores substantial evidence that their ███████ payment to their would-be generic competitor had enormous anticompetitive effects far outweighing the defendants' pretextual procompetitive justifications.

---

[1] 133 S. Ct. 2223 (2013).

[2] 791 F.3d 388 (3d Cir. 2015).

Where, as here, the record reveals genuine disputes of material fact, it is the jury – not the judge, and not the defendants – that weighs the record evidence and resolve disputes.  Summary judgment should be reversed.

## II.    THE DISTRICT COURT'S SUMMARY JUDGMENT DECISIONS SHOULD BE REVERSED.

## A.    The jury must decide if *Anchen* was a sham because the predicate facts of that lawsuit are genuinely disputed.

On whether the *Anchen* patent litigation was objectively baseless, the defendants offer three arguments: (1) the only material "predicate facts" are the '341 patent, Anchen's ANDA, and the rulings in the *Anchen* patent litigation, and they are not in dispute; (2) the district court could decide summary judgment regardless of the purchasers' submission of contrary facts, if it "found" *Anchen* "colorable;" and (3) whether a lawsuit is objectively baseless is a legal question for the court, not a factual question for the jury.  All are wrong.

### 1.    "Predicate facts" include all facts tending to prove or disprove the existence of probable cause, and many are disputed.

#### a.    The defendants' narrow enumeration of "predicate facts" is wrong.

As *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* ("*PRE*")[3] and the cases it cites explain, material predicate facts "are not only the facts determined in the prior lawsuit, but also the facts *tending to 'prove or disprove*

---

[3] 508 U.S. 49 (1993).

*the existence of probable cause.*"[4]  Facts informing probable cause are "predicate

facts" to be considered on summary judgment.[5]  Suppose the antitrust plaintiff

and defendant dispute whether a fact in the underlying patent case is "X" or "Y,"

and a finding of "X" would support a finding of probable cause, while a finding of

"Y" would support a finding of *no* probable cause.  That is a dispute over a

material "predicate fact" requiring denial of summary judgment.

The context is critical: the objective baselessness prong of *PRE* looks to

whether a "reasonable litigant *in the defendant's position* could realistically expect

success on the merits of the challenged lawsuit."[6]  What a reasonable

---

[4] *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 361 (D. Mass. 2004) (quoting *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878)) (all emphases added unless stated otherwise); *see also Am. Home Prods. Corp. v. Johnson & Johnson Corp.*, No. 91-cv-5594, 1994 WL 46522, at *1 (E.D. Pa. Feb. 15, 1994) ("[A] fact finder must consider [on] what information [the plaintiff] relied, before filing the suit.").

[5] *See In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 266 (E.D. Pa. 2010) (predicate facts concerning GSK's knowledge of an alternative excipient going to reasonableness of infringement action were disputed); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-cv-7343, 2008 WL 4580016, at *4 (S.D.N.Y. Oct. 14, 2008) (dispute concerning "[t]he information at hand and the circumstances surrounding the filing of the Citizen Petition" and probable cause generally); *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1368-69 (Fed. Cir. 2006) (whether statements in letters describing patents were disputed predicate facts).

[6] *PRE*, 508 U.S. at 63.

pharmaceutical company in the defendants' position would know is itself a
predicate fact.[7]

Determining whether the defendants had probable cause to allege Anchen's
generic was "free of stabilizer" hinges on numerous factual disputes. Basically,
would a reasonable pharmaceutical manufacturer in the defendants' position
realistically expect to prove that:

1. HCl is not a stabilizer of bupropion hydrochloride.

2. Anchen did not use HCl in its generic bupropion hydrochloride
   product.

3. No moisture remained in Anchen's finished tablet.

4. No HCl remained in the moisture in Anchen's finished tablet.

5. There was too little HCl remaining in the Anchen product for it to
   contribute to the stability of the finished tablet.

6. The HCl remaining in the finished tablet would not contribute to
   stability merely because the ANDA ███████████ by ████
   rather than by ████

The evidence permitted a reasonable jury to answer all these questions "no"; such
"no" answers would support a finding that *Anchen* was objectively baseless. Hence

---

[7] *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 364 (D.N.J. 2009)
("Warner-Lambert's knowledge and intent are 'disputed factual issues that the
Court is duty-bound to submit to the jury.'" (quoting *Relafen*, 346 F. Supp. 2d at
362)); *Teva Pharm. Indus., Ltd. v. Apotex, Inc.*, No. 07-cv-5514, 2008 WL 3413862,
at *6 n.4 (D.N.J. Aug. 8, 2008) ("Teva's knowledge is relevant to the 'objectively
baseless' inquiry because it is goes to whether Teva had 'a reasonable belief that
there is a chance that a claim may be held valid upon adjudication.'" (quoting
*PRE*, 508 U.S. at 62-63)).

summary judgment should not have been granted.

     1.     *Would a reasonable pharmaceutical manufacturer realistically expect to prove that HCl is not a stabilizer of bupropion hydrochloride?*

The parties presented substantial evidence that HCl has long been recognized as a stabilizer of bupropion hydrochloride.[8]  A reasonable jury could answer this question "no."

     2.     *Would a reasonable pharmaceutical manufacturer realistically expect to prove that Anchen did not use HCl in manufacturing generic bupropion hydrochloride?*

Anchen's ANDA, including excerpts provided to the defendants pre-suit, disclosed that Anchen ▮▮▮▮▮▮▮ in manufacturing its generic bupropion hydrochloride.[9]  The defendants' experts agreed.[10]  A reasonable jury could answer this question "No."

     3.     *Would a reasonable pharmaceutical manufacturer realistically expect to prove that no moisture remained in Anchen's finished tablet?*

---

[8] JA-1751-58 (SOF-SP ¶¶18-28); *see also* JA-5171 (Ex. 79, Burgess Report ¶26) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; JA-1751-54 (SOP-SP ¶¶6-17); JA-1758-62 (SOF-SP ¶¶29-44).

[9] JA-11748, JA-11757, JA-11761 (Ex. 235, Letter from Anchen counsel to Biovail counsel) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[10] JA-9451 (Ex. 148, Lin Dep. 177:12-21) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; JA-6630 (Ex. 106, Jerussi Dep. 31:16-20) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The purchasers' evidence shows that any reasonable pharmaceutical

company would know that ██████████████████████████████████

████████████████ [11]  The defendants' expert Dr. Lin conceded that "there is *always*

*residual moisture.*"[12]  Another defense expert, Dr. Illum, determined that residual

moisture accounted for ████████████████████████████████████ [13]  A

reasonable jury could answer this question "No."

4.    *Would a reasonable pharmaceutical manufacturer realistically expect to prove that no HCl remained in Anchen's finished tablet?*

The purchasers' evidence shows that a reasonable pharmaceutical company

would know that, because ████████████████████████████████████████

██████████████.  Anchen's ANDA discloses ████████████████████████

████████████████████████████████████████████████████████.[14]

Experts for both the purchasers[15] and defendants[16] agreed that basic scientific

---

[11] JA-1792-93, JA-1795, JA-1796-97 (SOF-SP ¶¶ 134-38, 149, 154-55); JA-4534 (Ex. 64, Baldwin Report ¶ 70).

[12] JA-9420 (Ex. 148, Lin Dep. 52:14-17).

[13] JA-5279-80 (Ex. 82, Illum Report ¶ 21).

[14] JA-1792-96 (SOF-SP ¶¶ 134-51); JA-1953-54 (RSOF-SP ¶¶ 6-7).

[15] JA-4534-35 (Ex. 64, Baldwin Report ¶ 72) ██████████████████████████████████████████████████████████████████████████; *see also* JA-4534-36 (¶¶ 70-77); JA-9131 (Ex. 145, Baldwin Dep. 49:17-19) ████████████████████████████████████████████████████████████ JA-1795 (SOF-SP ¶¶ 147-49); JA-1796-97 (SOF-SP ¶¶ 154-55).

principles established that 

. The defendants themselves knew from using

.[17]  "[I]t would be impossible for a person skilled in the art to conclude that HCl is not present."[18]

In both *Anchen* and here, the defendants "offered no evidence" to rebut the proposition that the "use of hydrochloric acid leaves residual hydrochloric acid in the final product."[19]  At oral argument in the district court, the defendants conceded that HCl remained in Anchen's finished tablet.[20]

---

[16] JA-6706 (Ex. 107, Gribble Dep. (*Anchen*) 104:2-4)  ("If there is moisture, hydrochloric acid would be present to some extent in the moisture."); JA-5177 (Ex. 79, Burgess Report ¶42) ("[A]s a matter of scientific principles . . . trace amounts of hydrochloric acid are likely to remain in the finished tablet.").  *See* JA-9420 (Ex. 148, Lin Dep. 52:15-17) ("[I]n general for my experience of oral dosage forms, is that there is always residual moisture.").

[17] JA-1755-58 (SOF-SP ¶¶21-28); JA-1775 (SOF-SP ¶¶83); *see* JA-9421 (Ex. 148, Lin Dep. 57:17-22) █████████████████████████████████
████████████████████████████████ .

[18] JA-4536 (Ex. 64, Baldwin Report ¶77); *See* JA-1795 (SOF-SP ¶¶148-49).

[19] *Biovail Labs. Inc. v. Anchen Pharms. Inc.*, No. 04-cv-1468, 2006 WL 8071250, at *8 (C.D. Cal. Aug. 1, 2006); JA-5112 (Ex. 77, Baldwin Rebuttal Report ¶39) ████████████████████████████████████████████████
████████████████████████████████████████████████
; *see* JA-1795, (SOF-SP ¶¶147-49).

[20] JA-622-23 (Mar. 20, 2012 Oral Arg. Tr.).

Despite this evidence, the defendants imply that they were confused
because Anchen's ANDA was allegedly ████████████████████████████
██████.[21]  But the defendants submitted no evidence whatsoever that they were
actually "confused" by any alleged "ambiguity," and, moreover, no jury would be
*required* to credit this argument.  To the contrary, a jury could conclude that no
reasonable pharmaceutical company would have been confused, given the
evidence, and the defendants' "ambiguity" defense is contrived and tantamount to
willful blindness.

Defendants cite the ███ used by Anchen to ████████████████ in its
ANDA product,[22] but the defendants' expert admitted that the use of ████ nd
similar symbols "means residual and unquantified" – not zero – and is a
widespread industry convention, used by GSK itself[23] and other Wellbutrin XL
ANDA filers.[24]

The defendants seek to distinguish the asterisks in the defendants'
Wellbutrin XL NDA to denote unquantified residual amounts for water or

---

[21] Def. Br. 42.

[22] Def. Br. 42, 47.

[23] *See* JA-3325 (use of asterisks in Wellbutrin XL NDA); *see* JA-9422-23 (Ex.
148, Lin Dep. 61:4-63:1) (asterisks in the Wellbutrin XL NDA "means residual
and unquantified"); JA-9423 (*id.*) (agreeing that "as a person who used to work in
the FDA" he would "say, okay, double asterisk means residual, not quantified").

[24] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

alcohol from Anchen's use of ███████████████████████████████ in its

ANDA.[25]  Again, a jury could find that defendants understood fully that HCl

remained and their "asterisk" argument is another flimsy fig-leaf for a baseless

suit.

Defendants cite Anchen scientist Maggie Chang's deposition to argue that

"someone reading the ANDA would ██████████████████████████████████████

██████████████████[26] even though two pages later in her deposition, Dr. Chang

explained that the ANDA ███████████████.[27]  And they criticize the purchasers'

expert Dr. Baldwin for clarifying that the █████ in Anchen's ANDA mean

████████████████████ after saying previously that he was uncertain about

their meaning.[28]  The defendants' arguments spotlight a material factual dispute

as to what a reasonable pharmaceutical manufacturer would have understood.

The defendants cite *Abbott Laboratories Inc. v. Torpharm, Inc.*[29] to argue that

"Anchen's ANDA is controlling on the question of infringement,"[30] and that all

other evidence may be ignored.  But *Torpharm* teaches that an ANDA

specification controls the infringement inquiry *only* if it "defin[es] a proposed

---

[25] Def. Br. 47 n.14.

[26] Def. Br. 42.

[27] JA-6176 (Ex. 99, M. Chang Dep. (*Anchen*) 70:15-24).

[28] Def. Br. 46-47.

[29] 300 F.3d. 1367 (Fed. Cir. 2002).

[30] Def. Br. 44.

generic drug in a manner that *directly addresses* the issue of infringement."[31]  Here, as the defendants' experts admitted, Anchen's ANDA contains ███████████

███████████████████████████████.[32]  Thus, as the *Anchen* court ruled, "the infringement inquiry is not answered by the ANDA specification."[33]

A jury could conclude, based on this record, that no reasonable pharmaceutical company would realistically expect to prove no HCl remained in Anchen's finished tablet.  A reasonable jury could, therefore, answer this question "No."

The defendants devote pages trying to justify the district court's claim construction ruling.[34]  As the purchasers previously explained, the district court's ruling was wrong and contrary to the rulings of three judges who construed precisely the same patent language in the *Anchen, Impax, and Abrika* litigations.[35]  If the defendants' proposed construction of "free of an effective amount" is rejected, the jury's inquiry ends with the preceding four questions.  If the plain

---

[31] 300 F.3d at 1372.

[32] JA-9433-34 (Ex. 148, Lin Dep. 105:5-106:8)  ██████████████████
████████████████████████████; *see also* JA-6630 (Ex. 106, Jerussi Dep. (*Anchen*) 31:15-32:6); JA-6619 (Ex. 105, Fleischer Dep. 62:7-13 (*Anchen*)); JA-1794 (SOF-SP ¶142).

[33] *Biovail Labs.*, 2006 WL 8071250, at *11.

[34] Def. Br. 28-29, 37-41.

[35] *See* Pl. Br. 48-49, 53-54; JA-1806-08, 1822, 1829-30 (SOF-SP ¶¶177-82, 227, 251-53).

10

meaning of "free of stabilizer" is rejected, then the jury must resolve the

remaining two questions.

> 5. *Would a reasonable pharmaceutical manufacturer realistically expect to prove that there was too little HCl remaining in the Anchen product for it to be able to contribute to the stability of the finished tablet?*

On the fifth question, the purchasers proffered scientific evidence showing

there is *no threshold* amount of HCl below which it will stop acting as a stabilizer

of bupropion hydrochloride.[36]



The scientific evidence shows that

[38]

No defense witness, expert or otherwise, ever stated that there is a

threshold amount below which HCl will stop acting as a stabilizer of bupropion

---

[36] *See, e.g.,* JA-1752-54, JA-1792-93 (SOF-SP ¶¶ 10-17, 138); JA-9318 (Ex. 147, Kaplan Dep. 99:12-22) (███████████████████████████████ ██████████████████████████████████████████████████████).

[37] JA-4514 (Ex. 64, Baldwin Report ¶ 14).

[38] JA-5115-16 (Ex. 77, Baldwin Rebuttal Report ¶ 49) (███████████ ████████████████████████████████████████████████████████████ ███████████████).

hydrochloride.  Instead, the defendants cite a GSK study that, they claim, shows "below certain amounts, hydrochloric acid is 'insufficient . . . for stability of bupropion hydrochloride.'"[39]  The defendants' citation is misleading.  The study shows that *any* amount of HCl – even the lowest concentration tested – significantly *increased* stability compared to the formulation without HCl.[40]  The study's conclusion was *not* that the lowest amount of added HCl did not increase stability (it did), but only that it was insufficient by itself to *completely* stabilize the product.[41]  This study would support a jury's finding that, however much HCl remains in Anchen's tablet, it is an "effective" amount because it is contributing to stability and the tablet is stable.  Thus, a reasonable jury could answer this question "No."

> 6. *Would a reasonable pharmaceutical manufacturer realistically expect to prove that the HCl remaining in the finished tablet would not contribute to stability merely because the ANDA ████████████ added on a ████, rather than a ████ basis?*

The defendants argue that, even if HCl indisputably remains in Anchen's tablet and the HCl could contribute to stability, they had a reasonable basis to claim Anchen's product was "free of stabilizer" because (a) a draft FDA guidance

---

[39] Def. Br. 48.

[40] *See* JA-16815-17 (Ex. 623, GSK Memo re: Wellbutrin brand hydrochloride tablets).

[41] *Id.* (noting that higher HCl concentrations led to higher stability levels).

supposedly required Anchen to quantify the HCl in each final tablet and (b) Anchen's ANDA ███████████.[42]

This entire "guidance" issue is a classic red herring.  Even assuming Anchen should have specified the amount of HCl on a ███████ basis, a regulatory drafting error cannot change core, controlling principles of chemistry that any reasonable pharmaceutical manufacturer would have known: ████ ████████████████████████████████████████████ ████████████████████.  As with the defendants' ████████ argument, a reasonable jury could find the "guidance" argument is merely a contrivance.[43]

Moreover, the guidance does not support the defendants' *post hoc* theory.  It requires only that the composition statement include (i) a list of components, (ii) a statement of quality standard, (iii) a statement of function, and (iv) a statement of target amount.[44]  Regarding the target amount, the guidance states all components "should be listed in the composition statement, but the amount of [a

---

[42] Def. Br. 41-42.

[43] The defendants offered no evidence the guidance was considered before suit. The expert through whom the defendants laundered this argument was hired 15 months *after* they sued Anchen; and then offered this opinion less than 36 hours later – citing *nothing* in support.  JA-5516-23 (Ex. 86, Fleischer Suppl. Decl. (*Anchen*) Ex. D).  *See* JA-1809-10 (SOF-SP ¶¶ 185-86).

[44] JA-26984-86 (Ex. 760, 2003 Draft Guidance for Industry – Drug Product: CMC Information).

processing agent] on a per unit basis *need not* be provided."[45]  The defendants

*agree* that "processing agents" need *not* be quantified on a per-tablet basis.[46]  And

sufficient evidence exists for a jury to find that no reasonable pharmaceutical

company would realistically expect to prove that Anchen did not satisfy these

requirements.  Anchen: ████████████████████████████ ██

████████████████████████ █ ███████████████████

████████████████ █ ████████████████████████

██████████████████████████████████████

████████████████████████████████

---

[45] *See* JA-26986 (*id.* at ll. 335-39).

[46] *See* JA-624 (Mar. 20, 2012 Oral Arg. Tr.) (citing 2003 Draft Guidance).

[47] JA-11748-52 (Ex. 235, Letter from Anchen counsel to GSK counsel enclosing presentation) (five instances where Anchen did so).

[48] *Id.*

[49] JA-11755 (*id.*); JA-9431, JA-9445 (Ex. 148, Lin Dep. 94:5-12, 150:22-151:9).

[50] *See, e.g.,* JA-11748, JA-117450 (Ex. 235, Letter from Anchen counsel to GSK counsel enclosing presentation).  No reasonable pharmaceutical company would conclude from the phrase ████████████████████████████████████████ ██████████████████████████.  JA-6108 (Ex. 98, Tan Dep. (*Anchen*) 69:11-18) (████████████████████████████████████████████; *see also* JA-1793-94 (SOF-SP ¶¶ 139-42); JA-9420 (Ex. 148, Lin Dep. 53:14-17) ████████████████████); JA-9453 (*id.* at 182:6-12) (acknowledging that ANDA portions produced to and reviewed by the defendants in advance of *Anchen* litigation ██████████████████████████████████████████████ ████████████████████████████████████████).

The defendants' FDA expert, Dr. Lin, conceded that ███████████

███████████████████████.[51]  The defendants cite their expert's claim

that HCl cannot be a "processing agent" if it performs a function in the finished

tablet,[52] but no jury would be *required* to credit this opinion.

The defendants' unsupported claim that "the FDA would want assurance

that the necessary amount of stabilizer would be in every tablet"[53] is belied by the

testimony of their own expert.  Dr. Lin testified just the opposite: the FDA

"reviewers don't necessarily care specifically what will stabilize the product.

What they look at is whether the stability data shows that the product is stable."[54]

Besides, the defendants offer no evidence to contest the facts that every tablet

would contain ██████████ and that every tablet is stable.  The FDA approved

Anchen's ANDA, including for purposes of stability,[55] so a jury could obviously

conclude the ANDA satisfied all FDA standards, including those in the guidance.

---

[51] JA-9444-45 (Ex. 148, Lin Dep. 146:8-149:17) ██████████

████████████); JA-9431 (*id.*)

(███ ████); JA-9444-45 (*id.* at 149:18-151:9) ██████████

████ ).

[52] Def. Br. 45.

[53] Def. Br. 46.

[54] JA-9424 (Ex. 148, Lin Dep. 67:22-68:3); *see also* JA-9424-25 (*id.* at 68:14-18,
72:21-73:7).

[55] JA-35400 (GSK SJ-2 Ex. 53, Dec. 14, 2006 FDA Letter).

A reasonable jury could find that no reasonable pharmaceutical company would realistically expect to prove that the HCl remaining in Anchen's finished tablet did not contribute to stability merely because the ANDA (which alone is not controlling) ███████████████████████████████████.  A reasonable jury thus could answer this question "No."

The defendants' effort to artificially limit the "predicate facts" to the patent, ANDA, and patent opinions finds no support in *PRE*, its precedents, or progeny. When all predicate facts are considered, multiple disputes compel reversal of the decision on summary judgment.

### b.   Some of the "undisputed facts" the defendants rely on are not only disputed – they are not facts.

The defendants not only wrongly restrict what counts as a "predicate fact," they also cite things that are not actually facts.

*First*, the defendants cite the *Anchen* court's tentative minute order issued to facilitate preparation for oral argument as evidence that the *Anchen* court viewed the case as close.[56]  But under procedural rules in California, where *Anchen* was filed, tentative rulings have no legal effect and may not be relied upon.[57]  The

---

[56] Def. Br. 36.

[57] *Perretta v. Prometheus Dev. Co., Inc.*, No. 05-cv-02987, 2005 WL 3445627, at *3 (N.D. Cal. Dec. 15, 2005) ("'[A] 'tentative decision shall not constitute a judgment and shall not be binding on the court . . . a court may enter a wholly different judgment than that announced in its statement of intended decision.'" (quoting *Homing v. Shilberg*, 130 Cal. App. 4th 197, 203 (2005))).

16

*Anchen* court stated expressly that it would not permit its tentative ruling to be used as evidence.[58]

*Second*, the defendants cite questions at oral argument on the *Anchen* appeal.[59]  But questions are not evidence of a judge's opinion.

*Third*, the defendants say Anchen's filing of a proposed Minor ANDA Amendment shows Anchen had not sufficiently identified HCl in its original submission.[60]  But the amendment did not change any of the facts detailed above, known to any reasonable manufacturer in the defendants' shoes, including that

███████████████████████████████████████████████████████

███████████████████  Nor did it change, as the *Anchen* court noted, "the formulation or the manufacturing process."[61]

> ### 2. The district court erred by crediting the defendants' argument that their *Anchen* infringement claims were "colorable" and disregarding the purchasers' conflicting evidence.

The defendants say there is a special defendant-friendly standard for deciding summary judgment motions in sham cases.[62]  They say that "a case

---

[58] JA-11527 (Ex. 216, Aug. 24, 2006 *Anchen* Order) ("[T]entative rulings are just that.  The Court does not regard itself as invested in tentative rulings, and neither should the parties.").

[59] Def. Br. 36-37.

[60] Def. Br. 42-43.

[61] *Biovail Labs.*, 2006 WL 8071250, at *14.

[62] Def. Br. 31.

based on a colorable legal position by definition is not objectively baseless," and summary judgment is appropriate if an antitrust defendant can posit "at least a colorable argument."[63]  The defendants, however, offer no legal or logical support for adopting a different summary judgment standard in sham cases.

*PRE* did not alter the summary judgment standard;[64] the Supreme Court explained that judgment as a matter of law is appropriate only where "there is *no dispute over the predicate facts*."[65]  "When there is a disagreement about the facts *or the proper inferences to be drawn from them*, a trial is required to resolve the conflicting versions of the parties."[66]  A court cannot determine whether a reasonable petitioner could realistically expect to secure favorable relief *as a matter of law* when the parties dispute material predicate facts.[67]

---

[63] Def. Br. 28, 31 (quoting JA-65-72).

[64] *Personnel Dep't, Inc. v. Prof'l Staff Leasing Corp.*, 297 F. App'x 773, 780-81 (10th Cir. 2008) (rejecting defendant's argument that objective baselessness was a question of law for the court and that factual disputes mean a lawsuit had a reasonable basis).

[65] *PRE*, 508 U.S. at 63.

[66] *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).

[67] *PRE*, 508 U.S. at 63; *see also Breckenridge Pharm.*, 444 F.3d at 1369 (vacating grant of summary judgment due to genuine issues of material fact concerning whether statements were objectively baseless); *Schneck v. Saucon Valley Sch. Dist.*, 340 F. Supp. 2d 558, 574 (E.D. Pa. 2004) (the court may decide *PRE* objective reasonableness as a matter of law only if there is no dispute regarding the predicate facts).

Excusing the underlying infringement suit as "colorable" impermissibly waters down *PRE*'s "realistic likelihood of success" standard. And it begs the relevant question: are there *undisputed* predicate facts that would *require* a jury to reach that conclusion? And is the antitrust defendant's reliance on its support for its claims about those facts reasonable?[68] All competing evidence must be considered, and the record must be viewed as a whole and construed in the non-movant's favor.[69] A court cannot, as the district court did here, focus exclusively on the defendants' evidence, ignore its flaws, and fail to consider it in light of the purchasers' challenges to it.[70]

The defendants suggest a different standard applies in a Hatch-Waxman context "because the patent holder is necessarily proceeding with incomplete information regarding the allegedly infringing product."[71] But *PRE* applies to Hatch-Waxman cases, and patent holders still must have a realistic chance of success on the merits. Moreover, a patent holder is not *required* to sue based on

---

[68] *Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, No. 07-cv-1299, 2015 WL 3460790, at *3 (D.N.J. May 29, 2015) ("[T]he summary judgment decision turns on whether there are factual disputes about Tyco's predicate facts supporting its infringement theory" and "whether [Tyco's] reliance on that support was reasonable.").

[69] *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001).

[70] *See* Pl. Br. 47-48.

[71] Def. Br. 34.

an ANDA; the patentee can wait until the generic has launched before suing if it desires more "complete" information.

The mere filing of an ANDA with a paragraph IV certication does not provide an objectively realistic chance of success against the alleged infringer.[72] Defendants ignore *Glaxo, Inc. v. Novopharm, Ltd.*,[73] where the Federal Circuit advised that the mere filing of an ANDA "does not determine the ultimate question whether what will be sold will infringe any relevant patent." Thus, the patentee's burden of proving infringement is not met by the filing of the ANDA. Multiple courts in this circuit have denied summary judgment in Hatch-Waxman ANDA cases because of disputed facts.[74]

---

[72] The defendants cite *AstraZeneca AB v. Mylan Labs. Inc.*, Nos. 00-cv-6749 & 03-cv-6057, 2010 WL 2079722 (S.D.N.Y. May 19, 2010), where the court found four bases for probable cause and "[f]or *all* these reasons" – not simply the filing of a paragraph IV certification – the infringement action "was not objectively baseless." *Id.* at *4. And *Celgene Corp. v. KV Pharm Co.*, No. 07-cv-4819, 2008 WL 2856469 (D.N.J July 22, 2008), did not hold that the paragraph IV certification alone constituted probable cause to initiate suit – it just declined to impose sanctions on a patentee for failing to conduct a more rigorous pre-suit investigation. *Id.* at *4–5.

[73] 110 F.3d 1562 (Fed. Cir. 1997).

[74] *See, e.g., Wellbutrin SR*, 749 F. Supp. 2d at 268 (denying summary judgment because plaintiffs presented evidence sufficient to create material issues of fact); *Teva Pharms. USA, Inc. v. Abbott Labs.* ("*Tricor*"), 580 F. Supp. 2d 345, 362 (D. Del. 2008) (denying summary judgment on the *PRE* claims because the plaintiffs had adduced sufficient facts of objective baselessness to counter the defendants' expert's opinion); *Hoffman-La Roche Inc. v. Genpharm Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (reasonableness determination underlying a sham litigation claim "is a question of fact").

### 3.  Factual disputes must be resolved by juries, not judges.

The defendants argue that the district court properly precluded jury consideration of the case because objective baselessness "is a legal question for the court – not a factual question for the jury."[75]  But this is contrary to the law; even contrary to the defendants' own citations.

The defendants quote *Stewart v. Sonneborn*, but omit its explanation that it is "generally the duty of the court, when evidence has been given to prove or disprove the existence of probable cause, to submit to the *jury* its credibility."[76] The defendants' quotation from the *Antitrust Law* treatise is similarly incomplete: the treatise explains that when the sham claim is "based on facts that the complainant knew or should have known to be false," jury inquiry may be appropriate.[77]

Just as *PRE* does not alter the summary judgment standard, neither *PRE* nor its progeny alters the role of the fact finder:

> [T]he existence of probable cause is often a question of fact . . . .  Nothing in *PRE* compels us to overrule the venerable principle that *juries, not judges, decide disputed*

---

[75] Def. Br. 32.

[76] 98 U.S. at 194; *see also Laitram Mach., Inc. v. Carnitech A/S*, 901 F. Supp. 1155, 1161 (E.D. La. 1995) (denying summary judgment because ultimate fact of probable cause required *jury* determination in light of undisputed prior publication of patent disclosing trade secrets).

[77] 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶207c (4th ed. 2013).

*questions of fact.*[78]

This Circuit's probable cause jurisprudence is in accord.  For example, in

*Deary v. Three Un-Named Police Officers,*[79] a malicious prosecution case, "despite

considerable evidence which, in our view, would lead to a finding of probable

cause," this Court *reversed* a grant of summary judgment because

> [T]o grant judgment for the defendant police officers at
> this juncture . . . would be to usurp the role which a jury
> must play in fact finding – here, determining the
> ultimate fact of probable cause or the lack of it. . . . We
> therefore reverse the grant of summary judgment.[80]

Courts in this circuit and elsewhere have consistently held that, when

predicate facts are disputed (as here), objective baselessness is a question for the

jury:

- *Flonase*: the court identified numerous disputed facts and concluded,
  "[t]he question whether a petition is a sham is generally a question of
  fact for the jury."[81]

- *Wellbutrin SR*: the court explained "GSK's knowledge is the material fact
  at issue, and the state of GSK's knowledge will determine at trial
  whether it had probable cause to file the infringement lawsuits" and
  reiterated its earlier holding that a *jury* could find that GSK's lawsuit

---

[78] *Personnel Dep't,* 297 F. App'x at 780-81.

[79] 746 F.2d 185 (3d Cir. 1984).

[80] *Id.* 191-92.  Significantly, in *Deary,* "[t]he facts leading up to Deary's arrest
[were] not in dispute."  *Id.* at 188.

[81] *In re Flonase Antitrust Litig.,* 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011)
(quoting *Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.,* 760 F.2d 607,
612 n.9 (5th Cir. 1985)) (alteration in original).

was baseless.[82]

- *Neurontin*: the court concluded that "when the predicate facts of an allegedly sham lawsuit are disputed, sham litigation claims should not be decided by the court as a matter of law," and referred to "a *jury* trial."[83]

- *Arava*: the court denied plaintiffs' motion for judgment as a matter of law, stating "[b]ecause I found, at the summary judgment stage, that there were genuine issues pertaining to the 'predicate facts' surrounding the Citizen Petition, I declined to take the question of objective baselessness away from the *jury* before trial and similarly decline to do so here."[84]

- *Relafen*: the court ruled that the disputed "state of SmithKline's knowledge at the time of filing" was relevant to assessing objective baselessness, denied summary judgment "in light of the disputed factual issues," and noted it was his "duty" to submit these disputed issues to a *jury*.[85]

- *Tricor*: "the court finds that *a jury* could find defendants' infringement allegations objectively baseless, such as to render the capsule litigation a sham."[86]

---

[82] *In re Wellbutrin SR Antitrust Litig.*, Nos. 04-cv-5525 & 05-cv-396, 2010 WL 3488634, at *3 (E.D. Pa. Aug. 31, 2010).

[83] *In re Neurontin Antitrust Litig.*, Nos. 02-cv-1830, 02-cv-2731 & 02-cv-5583, 2009 WL 2751029, at *17 n.42, *22 (D.N.J. Aug. 28, 2009).

[84] *La. Wholesale Drug Co. v. Sanofi-Aventis*, 2009 WL 2708110, at *4 n.4 (S.D.N.Y. Aug. 28, 2009).

[85] *Relafen*, 346 F. Supp. 2d at 362.

[86] *Tricor*, 580 F. Supp. 2d at 364.

Moreover, the ABA's pattern jury instructions for civil antitrust cases contain a jury charge regarding sham litigation.[87]

Resolution of the ultimate question of probable cause in *Anchen*, as well as the predicate facts and other subsidiary disputes, are for a jury.

## B. The purchasers produced sufficient evidence on the reverse-payment theory.

On the purchasers' pay-for-delay theory, the defendants and their amici mischaracterize the purchasers' case, ask this Court to rewrite longstanding rule-of-reason law, and ignore large portions of the purchasers' evidence. They accuse the purchasers of conducting a "truncated" rule of reason analysis utilizing "presumptions" of anticompetitive harm and "inferences" of causation. GSK is incorrect.

### 1. The purchasers' case was built on abundant direct evidence.

The purchasers' reverse-payment case starts with Teva, Anchen, and Impax's at-risk launch of the 300 mg generic product. Biovail had not sued Impax for infringement within 45 days after Impax filed its 300 mg Wellbutrin XL ANDA, so no 30-month stay of FDA approval blocked Impax's 300 mg product.

---

[87] *See* Am. Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases* D-69 (2005) (Part D, Instruction 2, "Sham Enforcement") ("A lawsuit is objectively baseless only if it was so baseless that no reasonable litigant could realistically expect to win. . . . if . . . you find that [defendant's] infringement suit was objectively baseless[.]").

To exploit the absence of a stay, Teva (Impax's partner) and Anchen (which held the 180-day exclusivity that otherwise blocked Impax) entered into an agreement.[88]  The 300 mg agreement provided that once Impax obtained FDA approval for its 300 mg product, Anchen would ███████████ ████████, then Teva would █████ Impax's 300 mg product (or Anchen's, if Impax could not make the 300 mg product), and Teva, Anchen, and Impax would ███████████.[89]  Thus, on December 14, 2006, once the citizen petition was denied and Anchen's FDA approval was converted from "tentative" to "final," Anchen triggered its 180-day exclusivity ████████████████ ████████████████████████████████[90] ████████████ ████████████████████████████████████████ ████████████████[91]

---

[88] JA-2558-59 (RSOF ¶23); JA-5428-29 (Ex. 85, Cremieux Report ¶24(ii)).

[89] JA-9611-12, JA-9619-20, JA-9620, JA-9626, JA-9627 (Ex. 151, Guilder Dep. 32:4-34:4, 63:6-67:21, 68:20-69:14, 90:7-92:8, 91:4-92:8, 94:25-95:8) (explaining deal); JA-28789-90 (Ex. 835, Master 300mg Agreement) (final "whereas" clause); JA-28798 (*id.* § 2.2)████████████████████████████████████████ ███████████████████████████).  GSK incorrectly implies that Anchen, not Impax, was to █████ the 300 mg product.  Def. Br. 17.

[90] JA-28336 (Ex. 815, Tan Dep. 75:24-76:20).

[91] JA-28255 (Ex. 812, Press Release of Teva at-risk launch); JA-28138-39 (Ex. 809, Bauer Dep. 136:23-138:15); GSK's Summ. J. Reply Mem. 47, No. 08-cv-2431 (E.D. Pa. Feb. 23, 2012), ECF No. 436 ("Teva/Impax/Anchen had launched the 300 mg product over two months before the execution of the settlement agreements[.]").

This at-risk launch set the stage for the reverse payment.  A second

agreement had been signed between Teva and Anchen, in December 2006,

*requiring* Teva 

[██████████].[92]  Anchen was [████████████]

[████████].[93]  Anchen [████████████████]

[██████████].[94]  GSK's own experts believed that Teva and

Anchen would launch at risk.[95]  Teva and Anchen were insistent that they would

---

[92] JA-28947-49, JA-28942-43, JA-28961 (Ex. 844, Distribution & Supply
Agreement §§ 3.3, 1.1, 9.3, 9.3.1).  GSK's expert admitted that Teva and Anchen
knew about the '708 patent when they entered into the 150 mg agreement.  JA-
29472 (Ex. 857, Cremieux Dep. 83:3-12).  Under the agreement, only in the case
of an [████████████████████████]
and an [██████████] did *not* include anything involving Andrx's '708
patent.  JA-28942-43 (Ex. 844, Distribution & Supply Agreement § 1.1).  GSK
and the amici do not dispute that Teva and Anchen [████████]
[███].

[93] JA-30268-69 (Ex. 892, Blume Suppl. Report ¶¶ 30-32); JA-30439-41 (Ex.
910, Blume Second Suppl. Report ¶ 17).

[94] JA-29523-24 (Ex. 859, White Decl. (*Andrx*) ¶ 5); JA-29527 (Ex. 860, White
Decl. (*Andrx*) ¶ 9); JA-29528 (Ex. 860 ¶ 13).

[95] JA-29171 (Ex. 849, Sporn Dep. 55:22-56:6); JA-30541 (Ex. 916, Mnookin
Dep. 150:17-151:15).

█████████████████████████████████████████████[96] ████████████████ was

therefore the purchasers' but-for world theory.[97]

To avert the at-risk launch of the 150 mg product and buy time for

negotiations, Biovail first entered into a ███████ agreement with

Teva/Anchen that foreshadowed the pay-for-delay deal: Teva/Anchen would ███

███████████████████████████████████████████████, and in exchange GSK

and Biovail would ███████ authorized generics ("AGs") of either the ███████

███████.[98] GSK had launch quantities of AGs ready to go,[99] but had earlier

agreed that Biovail could use GSK's AGs as a "settlement chip" in this way, the

earliest evidence that the no-AG promise would be used as a quid pro quo

---

[96] JA-30501-02 (Ex. 915, January 2007 Anchen email) ███████████████████
████████████████████████; JA-27577-78 (Ex. 770, Email from
Anchen to Teva █) ████████████████████████████████████████.

[97] GSK spends several pages talking about the purchasers' "Settlement
Scenario" and "Litigation Scenario." Def. Br. 76–82. This is not the purchasers'
terminology. The purchasers' but-for world absent the pay-for-delay agreement
was an at-risk launch on the 150 mg product, just as Teva did with the 300 mg
product. GSK's repeated argument that the purchasers and their expert Dr.
Leitzinger failed to support their "Alternative Settlement Scenario" but-for world
with any evidence of delayed generic entry, Def. Br. 77, is a straw man.

[98] ████████████████████████████████; JA-28908-27 (Ex. 839
draft ██████████ agreement); JA-28928-28933 (Ex. 840, draft ███████ agreement);
JA-28210 (Ex. 810, Brannon Dep. 145:11-15); JA-7868 (Ex. 122, Cancellara Dep.
252:18-19); JA-14512 (Ex. 507, Email from Biovail to GSK counsel). Despite all
of this evidence, GSK disputes the existence of a ███████ agreement. Def. Br. 83
n.29.

[99] JA-29508 (Ex. 857, Cremieux Dep. 326:25-327:6); JA-7375 (Ex. 115, Carro
Dep. 82:25-83:9).

(payment) for delay.[100]  GSK's experts conceded this no-AG reverse payment was large.[101]

    Like the ███████ agreement, the final settlement agreement exchanged GSK's no-AG promise for ████████████████████████████. A GSK negotiator repeatedly testified that, without GSK's promise to refrain from launching AGs during Anchen's 180-day exclusivity periods, Teva would not have agreed to settle.[102]  As if that were not enough evidence that the no-AG promise was given to delay Anchen and Teva's at-risk launch, a GSK finance employee prepared a presentation shortly after the settlement, after consulting with a GSK lawyer involved in the negotiations, to illustrate the effect of GSK's no-AG promise.[103]  His presentation (which GSK ignores in its brief) illustrates how without the no-AG promise ("No Deal"), GSK's AGs would have launched simultaneously with Anchen's at-risk launch of its 150mg generic on February 1,

---

[100] JA-13953 (Ex. 470, GSK email).

[101] JA-30545, 30550, 30544 (Ex. 916, Mnookin Dep. 167:4–19, 188:17–20, 164:14–17).

[102] JA-28198, JA-28202-03, JA-28206, JA-28216, JA-28226 (Ex. 810, Brannon Dep. 96:13-97:8, 112:13-23, 114:13-14, 114:24, 116:15-17, 129:23-24, 166:13, 206:20); *see also* JA-30266 (Ex. 892, Blume Suppl. Report ¶23); GSK Resp. Pls.' Post-Hr'g Submission Opp'n Summ. J. 5, No. 08-cv-2431 (E.D. Pa. May 14, 2012) ECF No. 455 (Anchen "would not have agreed to settle" without freedom from AG during 180-day exclusivities); JA-29769 (Ex. 872, outline by Biovail counsel to GSK & Teva counsel) ("[T]his term is essential to getting the deal done.").

[103] JA-28566, JA-28575, JA-28567-68, JA-28576 (Ex. 826, Sutherland Dep. 40:11-17, 77:19-25, 45:5-48:16, 78:8-14).

2007; but with the "Deal," GSK's AGs would be delayed during Anchen's 180-day
exclusivities (the no-AG promise) and Anchen's 150 mg generic would be delayed
until June 1, 2008 (the paid-for delay).[104]   GSK's general counsel testified that
what GSK got in the deal was delayed generic competition, and nothing else of
significance.[105]

Given the straightforward contemporaneous evidence that Teva/Anchen
would have launched at risk ██████████████████, the purchasers did not
need expert economic evidence that the ████████████ necessarily caused
delayed generic competition.[106]   Nevertheless, GSK's own experts readily supplied
that evidence.[107]

---

[104] JA-32374 (Ex. 971, GSK presentation) ("Assumptions" for "No Deal" and
"Deal"); JA-28511-12 (Ex. 824, Davis Dep. 65:7-66:7, 68:21-69:3); JA-4424-25
(Ex. 62, Blume Report ¶ 111).

[105] JA-8546 (Ex. 131, Bondy Dep. 111:6-19); *see also* JA-28520 (Ex. 824, Davis
Dep. 99:8-18); JA-14615 (Ex. 521, outline from Biovail counsel to Teva and GSK
counsel) ("brief delay" in introduction of both the 150 mg generic and the
authorized generics).

[106] GSK and amici argue that the purchasers relied solely on evidence of
reverse-payment size and inferences of resulting delay to show harm to
competition, but the purchasers obviously did not.  Evidence of payment size is,
however, highly probative, and the district court erred in ignoring it.  *See Actavis*,
133 S. Ct. at 2236-37; *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 551 (1st
Cir. 2016).  Critically, defendants here *did not contest* that the ████████████ was
worth ████████ to Teva/Anchen, *did not contest* that a payment of that size is
"large" under *Actavis*, and defendants have never identified anything that
Teva/Anchen provided in ██████████████████.

[107] JA-29377, JA-29369, JA-29484 (Ex. 856, Willig Dep. 180:18-23, 146:11-
147:14); (Ex. 857, Cremieux Dep. 228:20-230:12); JA-2639 (RSOF ¶ 76 nn.446-
*(Continued)*

As a consequence of this pay-for-delay deal, not just Teva/Anchen's at-risk launch but also the generics bottlenecked by Anchen's 180-day exclusivity were delayed,[108] including Watson, Impax, and Abrika.[109]  The defendants conceded that, without GSK's AGs, generic price competition was further suppressed.[110]

The higher prices for extended-release bupropion brought about by the delay of generic launches are archetypical harm to competition,[111] which the purchasers showed with evidence, not just inferences based on the size of the reverse payment.  GSK itself argued that anticompetitive effects in this case "are not difficult to measure."[112]  The purchasers in fact measured those effects.[113]

---

47).  Both Professor Willig and Dr. Cremieux's works are cited by amici Antitrust Economists.

[108] As the district court recognized, JA-193 (Summ. J. II Op. n.35), the end-payors' evidence of a connection between the no-AG payment and generic delay also meets their *prima facie* burden of showing "anticompetitive effects" under California's Cartwright Act.  Pl. Br. 63 (citing *In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015)).

[109] JA-27580-81 (Ex. 771, email from Biovail counsel to Abrika counsel) ("other generic products are precluded from marketing earlier based on Anchen/Impax/Teva's 180-day exclusivity").  GSK stipulated that Abrika's 150 mg product would otherwise have launched in August of 2008, three months earlier than actually occurred.  *See* JA-32694 (Abrika Stip. Facts Concerning Actavis).

[110] JA-30861 (Ex. 920, Hr'g Tr. 171:1-7).

[111] *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) ("difficult to imagine a more formidable demonstration of antitrust injury" than purchaser overcharges caused by impeded generic entry).

[112] JA-2715 (GSK Reply Br. on All Claims).

[113] Pl. Br. 63-64 & nn.329-331.

30

The substantial record the purchasers presented cannot be disposed of on summary judgment.  At minimum there are genuine disputes of material fact.

### 2.   GSK's arguments distort controlling law.

GSK and amici distort controlling law, finding license to do so in *Actavis*'s statement "[w]e therefore leave to the lower courts the structuring of the present rule-of-reason antitrust litigation."[114]  That language does not permit the distortions of the century-old rule of reason that GSK urges here; rather, the Court was referring to the "sliding scale" language of *California Dental Association v. FTC*,[115] which teaches that the quantum of proof plaintiffs and defendants are required to adduce to meet their respective burdens (harm to competition and procompetitive justification) varies with the circumstances.[116]  This Court has recognized this meaning of *Actavis*'s language.[117]

### a.   ***Actavis* is about competition delayed by reverse payments, not the unwarranted termination of patent litigation.**

In its first distortion, GSK asks this Court to ignore the delay in Teva/Anchen's at-risk launch, because Biovail's appeal of the *Anchen* summary

---

[114] Def. Br. 66-67 (citing *Actavis*, 133 S. Ct. at 2238).

[115] 526 U.S. 756, 780-81 (1999).

[116] *Actavis*, 133 S. Ct. at 2237-38; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶2046d4 (4th ed. 2013 & Supp. 2015) ("Here, the Court was clear that more abbreviated proof than ordinarily attends the full rule of reason was available for both power and anticompetitive effects.").

[117] *Lamictal*, 791 F.3d at 413 n.38.

judgment remained pending after the settlement. GSK asks this Court to construe *Actavis* and *Lamictal* as directed solely to the unwarranted termination of patent litigation, rather than to delays in competition brought about by large reverse payments.

GSK's interpretation is incorrect. As this Court said in *Lamictal*, "[t]he thrust of the Court's reasoning [in *Actavis*] is not that it is problematic that money is used *to effect an end to the patent challenge*, but rather that the patentee leverages some part of its patent power (in *Actavis*, its supracompetitive profits) to cause anticompetitive harm – namely, elimination of the risk of *competition*."[118]

This Court's teaching follows *Actavis*. Describing a reverse payment's general structure, the Supreme Court explained how "Company A, the patentee," pays Company B "many millions of dollars" and "Company B, the claimed infringer," promises "*not to produce the patented product*[.]"[119] Recounting the allegations in *Actavis*, the Court explained, "the plaintiff agreed to pay the defendants many millions of dollars *to stay out of its market*,"[120] and later remarked the case revolved around a "payment in return for *staying out of the market*."[121] In discussing why reverse payments were anticompetitive, the Court explained,

---

[118] *Id.* at 406-07.

[119] *Actavis*, 133 S. Ct. at 2227.

[120] *Id.* at 2231.

[121] *Id.* at 2234.

"[t]he payment in effect amounts to a purchase by the patentee of the *exclusive right to sell its product*[.]"[122] When observing that the existence of a payment is a "strong indicator of [a brand's] market power," the Court notes that "a firm without that power" was unlikely "to pay 'large sums' to induce 'others to *stay out of its market.*'"[123] *Actavis*'s focus is on delayed competition: here, Teva and Anchen's delayed at-risk launch of 150 mg generic and GSK's delayed authorized generics. Termination of patent lawsuits is but one means to that end. GSK betrays its argument when it says, repeatedly, that the purchasers failed to show delayed generic competition.[124]

### (1) The appeal facilitated the paid-for delay.

Moreover, GSK's argument that the pendency of the *Anchen* appeal protected against harm to competition and purportedly allowed the '341 patent to control the date of Teva/Anchen's launch is disputed. As shown above, it was the no-AG promise (not the '341 patent) that forestalled Teva/Anchen's at-risk launch, and it was *the length of time the Federal Circuit took to rule on Biovail's appeal* (aided by the parties' concealment of the settlement from the Federal Circuit[125])

---

[122] *Id.*

[123] *Id.* at 2236 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2046 (3d ed. 2010)).

[124] *See* Def. Br. 67, 74, 81, 88 n.34, 107.

[125] GSK suggests that if *Anchen* was not technically moot, there was no reason to inform the Federal Circuit of the settlement. Def. Br. 73 n.25. But the duty of
(*Continued*)

that allowed Teva/Anchen to delay at all.  Perversely, the pending appeal that

GSK casts as inoculating against anticompetitive harm is the very thing that

allowed Teva/Anchen to "park" Anchen's 180-day exclusivity and delay entry in

exchange for the no-AG promise in the first place; without the appeal,

Teva/Anchen (having secured a summary judgment of noninfringement of the

'341 patent) would have been forced to launch or suffer forfeiture of Anchen's

180-day exclusivity for failing to do so.[126]  As several decisions refuting GSK's

argument have observed, a pay-for-delay agreement that keeps the underlying

patent litigation alive can *exacerbate* anticompetitive harm, for this very reason.[127]

---

candor to the Federal Circuit required by cases like *Tivo Inc. v. EchoStar Corp.*, 429 F. App'x 975, 976 (Fed. Cir. 2011) demands far more than that.

[126] *See* JA-4378 (Ex. 62, Blume Report ¶25 & n.29); JA-4424-25 (*id.* ¶111); JA-4929-30 (Ex. 70, Blume Rebuttal Report ¶27); *see also* ███████████████

[127] *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 902-03, 908 n.12 (6th Cir. 2003) (keeping patent litigation pending created the antitrust harm from the pay-for-delay agreement, because it left the first-filing generic's 180-day exclusivity intact); *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 210-11 (3d Cir. 2012) (acknowledging this feature in *Cardizem* and in *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (Fed. Cir. 2001)); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp.2d 188, 242-43 (E.D.N.Y. 2003) ("the agreements at issue in *Cardizem* and *Terazosin* did not resolve the underlying patent disputes . . . . *This fact*, in connection with the agreements' other restraints, *underscores the anticompetitive nature of the agreements* in *Cardizem* and *Terazosin*.  By agreeing both not to end the underlying patent dispute and not to market a generic drug

(*Continued*)

34

### (2) The appeal could not have facilitated "immediate" generic entry.

The evidence belies GSK's repeated argument that the settlement posed no "risk to competition" because it allowed for "immediate entry" if Anchen won its Federal Circuit appeal.[128] GSK's argument implies that the agreement could have resulted in no delay in generic competition if the Federal Circuit somehow ruled in Anchen's favor the day after the agreement (February 10, 2007). However, contrary to GSK's argument, *GSK's own experts* testified that it was "unlikely" that there would be a decision before May 30, 2008, 14 months after Teva/Anchen's planned at-risk launch absent the no-AG promise.[129] Oral argument on the appeal did not occur until September 2007, after all.[130] Whether the appeal could have facilitated "immediate" generic entry is disputed.

### b. Whether Andrx's patent was a superseding cause of delayed 150 mg generic entry was for the jury.

GSK's next legal distortion is its suggestion that, rather than the usual allocation of the burden of proof on an affirmative defense of superseding cause, *the purchasers* had to show that the '708 patent did *not* break the chain of causation between GSK's no-AG promise and Teva and Anchen's delayed 150 mg generic

---

product in the relevant domestic market, Andrx and Geneva effectively precluded or seriously delayed . . . trigger[ing] of the 180-day exclusivity period.").

[128] *E.g.*, Def. Br. 70.

[129] JA-29510 (Ex. 857, Cremieux Dep. 334:19-336:4).

[130] JA28365-73 (Ex. 818, Transcript of Argument).

launch (instead of GSK showing that it did break that chain). That is not the law. Superseding cause is an affirmative defense, and so GSK bears the burden of proof,[131] as numerous federal circuits have held.[132] This Court has repeatedly applied this uncontroversial principle.[133] Judgment as a matter of law should not be entered against the non-moving party on an affirmative defense on which the moving party bears the burdens of proof and production.[134]

Nevertheless, the purchasers adduced substantial evidence disputing that the '708 patent broke the chain of causation, because, in the but-for world, (1) Andrx would have issued a royalty-bearing license even if Teva and Anchen had launched at risk, and, alternatively, (2) Andrx would not have prevailed in the '708 litigation, either by way of preliminary injunction or judgment on the merits.

---

[131] *See In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 756 (E.D. Pa. 2003) (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶338b at 320 (2d ed. 2000)).

[132] *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000); *Greater Rockford Energy & Tech Corp. v. Shell Oil Co.*, 998 F.2d 391, 402 (7th Cir. 1993); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1987).

[133] *See, e.g., SEC v. Teo*, 746 F.3d 90, 105-06 (3d Cir. 2014); *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009); *Hill v. Reederei F. Laeisz GmBH, Rostock*, 435 F.3d 404, 421 (3d Cir. 2006).

[134] *See El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007); *In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330, 336 (S.D.N.Y. 2005).

### (1) The purchasers produced substantial evidence that Andrx would have licensed the '708 patent to all generics.

GSK's own experts rejected the idea that Andrx had any interest in using the '708 patent to block Anchen or Teva from the market,[135] and testified that Andrx was, in fact, a non-practicing entity whose interests were in issuing royalty-bearing licenses to its '708 patent with any and all makers of 150 mg generic extended-release bupropion hydrochloride.[136]  That is not the purchasers' mere "theory";[137] at minimum GSK's position is in dispute.[138]

Andrx's motivation to license its '708 patent is also shown by its agreements with other generics (Impax and ████ .[139]  The purchasers' evidence

___

[135] JA-29414 (Ex. 856, Willig Dep. 328:8-20, 326:25-327:7).

[136] JA-29463 (Ex. 857, Cremieux Dep. 147:13-22, 148:22-149:11).

[137] Def. Br. 86.

[138] The licenses that Andrx gave to its '708 patent were effective immediately. JA-29634 (Ex. 867, Andrx-GSK license agreement § 3(c)) (generic license effective as of the "Execution Date" of February 9, 2007)).  Andrx neither sought nor obtained any delay in the inception of those licenses to allow Watson to "leapfrog" over Anchen, contrary to GSK's theory.  *See also* JA-29414 (Ex. 856, Willig Dep. 326:20-24) (Watson would have to await the elapsing of Anchen's 180-day exclusivity).

[139] JA-29607-18 (Ex. 865, Andrx-Impax license agreement); ████████████ Impax and ████ ████████████████████████████ .  GSK for the very first time on appeal argues that it obtained the Andrx licensing agreements *for* Impax and ████ Def. Br. 86 n.33; *id.* at 96 ("authorized Biovail, in turn, to provide a sublicense to the generic companies.").  This argument is waived and wrong.  The Impax and ████████████ do not mention GSK or

(*Continued*)

showed that, in pursuit of its undisputed economic interests, Andrx was

separately negotiating with Teva/Anchen for royalty-bearing licenses of ██.[140]

These negotiations resulted in a near-final agreement between Andrx and

Teva/Anchen.[141]  GSK does not address the purchasers' cited decisions holding

that a reasonable jury could conclude from this near-final agreement that it would

have been consummated even if Teva/Anchen had launched at risk.[142]

Instead, GSK argues that Andrx would only have issued the licenses to

Teva/Anchen if the reverse payment deal were consummated.  Apart from

making no sense given what GSK's experts have conceded about Andrx's

---

Biovail even once.  *See* JA-29635-36 (Ex. 867, Andrx-GSK license agreement §§ 3f(i)-(ii)) (required language).  Even GSK's experts identify only Teva and Anchen as purported "Biovail Third Party Licensees."  JA-29956 (Ex. 881, Willig Report ¶ 84); JA-28453 (Ex. 823, Mnookin Report).

[140] JA-29365 (Ex. 856, Willig Dep. 132:9-133:5); JA-29547-48 (Ex. 863, Andrx notice withdrawing TRO application (*Andrx v. Anchen*)) (on December 19, 2006, Andrx withdrew its application for TRO against Anchen, announcing that "[t]he parties have now agreed to discuss a possible resolution of the matter.").

[141] JA-29550-606 (Ex. 864, emails between Teva counsel and Andrx counsel) (██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████ ⎵ ████████████████████████████).  Teva's email says: ██████████████████████████████ █████████████████████████████████████  JA-29550 (*Id.*).  Contrary to GSK's theory, Andrx agreed to block itself and its affiliate Watson from the market in exchange for the ██ royalty.  JA-29563 (*Id.* §2.2).

[142] Pl. Br. 76 n.381.

economic interests,[143] not a single term in the draft or final agreement conditions the license in that way. This argument lacks evidence to support it, and at best creates a disputed issue of fact.

The only reason that there is *anything* about the '708 patent license in the final version of the Wellbutrin settlement is that, five days before the settlement transaction was signed, the license agreement between Andrx and Teva/Anchen – ███████████████████████████████████████████████ ██████████████████████ – was suddenly and without explanation grafted onto the ██████████████.

The purchasers assert this was merely a cosmetic change to create a pretext that the pay-for-delay agreement had purportedly procompetitive features. No other explanation has been given by GSK, Biovail, Teva, or Anchen for why, between February 4 and February 9, 2007, the ███████████ to Teva/Anchen suddenly "turned into" a sublicense from Biovail that "got put into" the ██████████████, as Teva's negotiator put it. Biovail's transactional

---

[143] *See also infra* Part 2.c.(1) (no evidence that Andrx was interested in, much less conditioned its willingness to issue royalty-bearing licenses upon, GSK's giving Teva and Anchen a no-AG promise).

[144] ████████████████████████████████████████████████ Ms. Bauer, general counsel and negotiator for Teva, was designated to testify concerning the negotiations. JA-28107-09, JA-28127 (*id.* at 13:4-14:25, 20:18-21:2, 91:12-93:1).

lawyer expressed surprise that this even occurred.[145]  Contrary to GSK's theory,

███████████████████████████████████████████████████

█████████████████████[146]  GSK even admitted on page 38 of its summary

judgment reply brief, "GSK has not argued that Teva 'needed' GSK's 'help' to

obtain a license from Andrx."[147]

GSK retorts that Teva's cover email to the draft Anchen-Teva-Andrx

license agreement supposedly shows that Andrx would not have issued a license

to Teva/Anchen without GSK's ████ promise, because Teva used the phrase

"overall deal process."[148]  No jury would be required to accept this argument.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████[149]  Teva obviously

knows more about its own negotiations with Andrx than does GSK.  Second, the

interpretation that GSK urges is nonsensical: it rests on the unsupportable

---

[145] JA-8297 (Ex. 127, Deeth Dep. 204:5-205:4) (discussing JA-29533 (Ex. 861, ████████████████████████████████); JA-8279, JA-8304 (*id.* at 132:10-25, 231:24-232:5).

[146] ███████████████████████████████

[147] JA-2724 (GSK Reply Mem. Supp. Summ. J.)

[148] Def. Br. 86; JA-29550 █████████████████████████ .

[149] ███████████████████████████ .

contention that Teva (whose lawyer wrote the email) wanted to condition its own willingness to take Andrx's license on Teva's being permitted to be paid a ▮▮▮▮▮ by GSK for delaying generic launch. "I, Teva, want your license, Andrx, but I will only take it if GSK ▮▮▮▮▮▮▮▮▮▮▮▮▮ in exchange for my ▮▮▮▮▮▮▮▮▮▮▮▮" GSK's argument portrays Teva as saying. A reasonable jury could reject this reading; no such condition appears in the draft agreement.

GSK's argument that Andrx would not have issued a royalty-bearing license to Teva/Anchen absent GSK's no-AG promise and a delay in generic competition at most creates a triable issue of fact on causation.

> **(2)** **GSK, not the purchasers, bears the burden of showing that Andrx would have successfully used the '708 patent to block Anchen and Teva's at-risk launch, and a dispute remains.**

GSK and the amici claim *the purchasers* were required to show that Anchen's product did *not* infringe the '708 patent, and that absent such proof, a reasonable jury would be required to find that Anchen's product did infringe, and that Teva/Anchen's at-risk launch would have been "illegal."[150] GSK misstates the law.[151]

---

[150] Def. Br. 93.

[151] *See* Pl. Br. 83-84.

First, this Court abrogated illegality antitrust defenses in *Consolidated Express, Inc. v. New York Shipping Association, Inc.*,[152] which relied on a Ninth Circuit case that "disapproved" of and described as "confused" the idea that damages could not be based on lost sales of a product whose sales constituted theft of intellectual property.[153]

Second, the purchasers do not bear the burden of disproving infringement.[154] Even pre-*Actavis*, the "right of exclusion conferred by a patent" was a defense to an antitrust claim, not an element of the plaintiff's case.[155] Post-*Actavis* cases confirm that patent noninfringement (and invalidity and unenforceability) need not be shown by the antitrust plaintiff at all.[156]

---

[152] 602 F.2d 494, 508, 525-26 (3d Cir. 1979).

[153] *Id.* at 526 (citing *Memorex Corp. v. IBM Corp.*, 555 F.2d 1379, 1382 & n.4 (9th Cir. 1977)).

[154] Pl. Br. 83 n.410; *see also Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) ("[T]he burden of proof as to infringement remains on the patentee.").

[155] *See Valley Drug Co. v. Geneva Pharms.*, 344 F.3d 1244, 1307 (11th Cir. 2003); *see also In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 808 (N.D. Cal. 2006) ("Defendant bears the burden of establishing its patent immunity affirmative defense").

[156] *See Lamictal*, 791 F.3d at 401 (antitrust liability can be found under the rule of reason "notwithstanding the possible validity or infringement of the patent in question." (citing *Actavis*, 133 S. Ct. at 2233)); *see also* Phillip E. Areeda & Herbert Hovenkamp ¶2046c2 (4th ed. & Supp. 2015) ("Under *Actavis*, purchasers seeking antitrust overcharge damages from an anticompetitive pay-for-delay settlement should be able to proceed without proving patent invalidity."); *id.* ¶2046d1 (same); *id.* ¶2046d2 (same); *id.* ¶2046d3 (same); *id.* ¶2046d5 (same).

Third, contrary to GSK's and amicus GPhA's argument, Teva and Anchen's at-risk launch would not have been illegal,[157] or even preventable, absent Andrx's securing an injunction.[158]  The purchasers previously cited several appellate cases holding that pay-for-delay agreements that forestall at-risk launches cause cognizable antitrust injury.[159]  In other words, at-risk competition is worthy of protection by the antitrust laws.[160]  GSK and the amici simply ignore

---

[157] *See Anesta AG v. Mylan Pharms., Inc.*, No. 08-cv-889, 2014 WL 3976456, at *2 (D. Del. Aug. 14, 2014) ("[A]lthough their launch was at risk, it was not illegal when it took place[.]").

[158] In Part B.2.b.(3) below, we review the evidence showing that Andrx could not have obtained an injunction.  GSK's suggestion that Andrx had a pending motion for a preliminary injunction at the time of the settlement, and that a hearing was purportedly set for Feb. 26, 2007, Def. Br. 83, is false.  The dockets and their attached orders clearly show that Andrx had withdrawn its motion on Dec. 19, 2006 so that Andrx and Anchen could discuss settlement, and the Feb. 26, 2007 proceeding was a routine Rule 16 conference.  *See* Order, *Andrx Pharms. LLC v. Anchen Pharms., Inc.*, No. 06-cv-07552 (C.D. Cal. Dec. 19, 2000), ECF No. 7 (denying Andrx's TRO application and schedules preliminary injunction hearing for January 15, 2007); Notice Withdrawal *Ex Parte* Application, Dec. 19, 2006, ECF No. 24 (Andrx *withdraws* application for TRO and preliminary injunction because it and Anchen were discussing settlement);Order, Dec. 27, 2006, ECF No. 12 (setting *scheduling conference* for Feb. 26, 2007, after Anchen answers complaint).

[159] Pl. Br. 83-84 n.414; *see also In re Opana ER Antitrust Litig.*, No. 14-cv-10150, -- F. Supp. 3d. --, 2016 WL 521005, at *10 (N.D. Ill. Feb. 10, 2016) (same); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1075 (N.D. Cal. 2014) (same); *King Drug of Florence, Inc. v. Cephalon, Inc.*, 309 F.R.D. 195, 201 (E.D. Pa. 2015) (class certified on this theory).

[160] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also* Pl. Br. 84 n.415 (at-risk launches are procompetitive); H.R. Rep. No. 98-857, part 2, at 10 (1984) (rejecting a proposed amendment to the bill that would

(*Continued*)

43

these decisions, stating without citation that an at-risk launch forestalled by a large reverse payment does not create cognizable antitrust injury.[161]  Bald statements are unpersuasive.  At minimum they leave material facts disputed.[162]

### (3) The purchasers produced substantial evidence that Anchen's product did not infringe Andrx's '708 patent.

The purchasers previously set forth the evidence that Anchen's product did not infringe the '708 patent.[163]  A primary item of that evidence was the expert report of Martin Adelman, a lawyer, who gave Andrx a mere 35% chance of prevailing against Anchen, meaning that Anchen had a 65% chance of prevailing.[164]  Thirty-five percent is what GSK's other experts understood Mr.

---

become the Hatch-Waxman Act that would require generics to wait until after a final judgment on the merits in the patent suit, because it would "substantially delay generics from getting onto the market").

[161] *E.g.*, GPhA Br. 24.

[162] Amicus GPhA cites three examples where Teva was found to infringe after launching at risk; Plaintiffs showed that Teva settled after each at-risk launch: famciclovir (Teva settled by paying the patent holder money, without exiting the market), pantoprazole (Teva settled by paying money and exiting the market for only 9 months), and omeprazole (Teva settled by paying money and exiting the market for only 5 months).  GPhA Br. 14-15; JA-30478, JA-30491, JA-30495 (Ex. 913, Blume Second Rebuttal Report ¶19 & Ex. 3); JA-30577 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶48 n.74).

[163] *See* Pl. Br. 84-87.  GSK's argument that the purchasers failed to do so (Def. Br. 83) is simply incorrect.

[164] JA-30194 (Ex. 889, Adelman Second Report ¶126).  Andrx's chances should be lower still, because Mr. Adelman impermissibly judged Anchen's infringing potential on the sole basis that Anchen's product was bioequivalent to GSK's.  *See* Pl. Br. 85 & n.422.  GSK conspicuously does not respond to this

(*Continued*)

Adelman to say, as well.[165]  From Mr. Adelman's report a reasonable jury could (and likely would) conclude that Andrx would have lost the '708 patent litigation and could not show a high enough likelihood of success (since 35% is insufficient) to obtain an injunction.[166]

Effectively conceding the damage Mr. Adelman's opinion inflicts on its superseding cause defense, and citing nothing in the record whatsoever, GSK suggests that Mr. Adelman's opinion *would have been* that Andrx had an 80% chance of prevailing against Anchen, *if* GSK had asked him to consider the doctrine of "inventor estoppel."[167]  Even more telling is that Mr. Adelman – purportedly a giant in his field,[168] who was tasked with "provid[ing] an opinion, from the perspective of patent law, regarding Andrx's likelihood of prevailing in the Andrx/GSK and Andrx/Anchen litigations"[169] – did not include a single thing about "inventor estoppel" in his reports.  GSK's suggestion that he did not consider that doctrine merely because he purportedly was not asked to do so, if

---

argument, which the purchasers raised below, as well.  JA-2575 (RSOF ¶43) ("product by product"); Pls.' Mem. Opp'n GSK's Mot. Summ. J. Causation 28, No. 08-cv-2431 (E.D. Pa. June 1, 2015), ECF No. 582 (same).

[165] JA-30309 (Ex. 894, Cremieux Reply Report ¶12).

[166] Pl. Br. 83 n.411.

[167] Def. Br. 84 n.30.

[168] *See* GSK Mem. Opp'n Pls.' Mot. Exclude Adelman 4, No. 08-cv-2431 (E.D. Pa. May 29, 2015), ECF No. 580.

[169] *See* JA-30151 (Ex. 889, Second Adelman Report ¶15).

believed, places into question the basic competence either of Mr. Adelman for not recognizing the doctrine's applicability, or of GSK's lawyers for failing to detect the supposed oversight before submitting his report; neither conclusion is remotely plausible.

Moreover, the Court will search in vain for any assertion of the inventor estoppel doctrine by Andrx against Anchen anywhere in the dockets of that action. GSK's attempt to retroactively intervene and assert it on Andrx's behalf is absurd.[170]

As shown in this Part B.2.b., even if the purchasers bore the burden to show that the '708 patent was not a superseding cause of Teva/Anchen forestalled at-risk launch, the purchasers have raised sufficient facts to render summary judgment unfounded.

---

[170] The only mention of "inventor estoppel" here was when Teva was trying to justify the settlement to the FTC after it had already been entered into, and even then Teva's lawyer merely said it was a "potential . . . argument." JA-29728 (Ex. 870, Holding Dep. 64:5-65:20). That testimony supplies the entire basis for GSK's attempt to invoke "inventor estoppel" in this case. When GSK and Biovail drafted proposed submissions to Judge Brody to justify the settlement, no mention of "inventor estoppel" (or of the '708 patent whatsoever) was made. *See* JA-29757-66 (Ex. 871, email and draft court submission from GSK counsel to Biovail counsel); JA-29767-69 (Ex. 872, outline by Biovail counsel to GSK and Teva counsel).

c.   **Whether GSK's procompetitive justifications outweigh the harm to competition the purchasers showed required weighing of disputed facts by the jury.**

The next distortion of controlling law committed by GSK and the amici is their argument that any old (alleged) procompetitive feature of the Wellbutrin settlement can justify GSK's reverse payment.  This radically rewrites the rule of reason by eliminating the required connection between an alleged anticompetitive restraint and the asserted procompetitive benefit advanced to justify it,[171] consequently eradicating the longstanding stage in the rule-of-reason analysis where a plaintiff can rebut the defendant's asserted procompetitive justifications by showing that the alleged restraint was not reasonably necessary to achieve them.[172]  GSK and the amici propose nothing less than overturning *Actavis, K-Dur,* and *Lamictal,* all of which require that the defendant prove that the *reverse payment* – here, the no-AG promise – was necessary to achieve the asserted

---

[171] *See* Pl. Br. 64-65 & nn.332-337; *id.* at 66-67 n.342; *see also NCAA v. Bd. of Regents of Univ. Okl.,* 468 U.S. 85, 118-20 (1984) (while justification might be "legitimate and important," the NCAA had not shown that the "*specific restraints*" at issue actually served the goal, or were even designed or intended to do so); Def. Br. 92 (GSK identifies "the no-authorized generic provision" as "the alleged anticompetitive restraint").

[172] *See K-Dur,* 686 F.3d at 209 ("If the plaintiff meets the initial burden, 'the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective.'  Finally the plaintiff can rebut the defendant's purported pro-competitive justification *by showing that the restraint is not reasonably necessary to achieve the pro-competitive objective*" (quoting *United States v. Brown Univ.,* 5 F.3d 658, 668-69 (3d Cir. 1993)).

justifications.[173]  That is not the "structuring" that *Actavis*, citing *California Dental*, envisioned.

GSK needs to upend controlling law because the purchasers have presented substantial evidence showing that GSK's asserted justifications have no conceivable connection to the no-AG promise, and that the no-AG promise was not reasonably necessary to achieve them.  This, and the purchasers' other rebuttals, required jury resolution, making summary judgment inappropriate.[174]

---

[173] *See Actavis*, 133 S. Ct. at 2236 ("An antitrust defendant may show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the *challenged term* and showing the lawfulness of *that term* under the rule of reason."); *id*. at 2236 ("The reverse *payment*, for example, may amount to no more than a rough approximation of the litigation expenses saved through the settlement.  That *payment* may reflect compensation for other services that the generic has promised to perform[.]"); *id*. at 2237 ("one who makes such a *payment*" must be able to "explain and justify *it*."); *K-Dur*, 686 F.3d at 218 ("[T]he patent holder may attempt to rebut the prima facie case by demonstrating that *the reverse payment* offers a competitive benefit that could not have been achieved in the absence of a reverse payment"); *Lamictal*, 791 F.3d at 402-03 ("a *payment* may be justified if…."); *id*. at 409 ("we think this *no-AG agreement* . . . cannot be adequately justified"); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 416 (E.D. Pa. 2015) ("the defendant bear[s] the burden of providing evidence that the *reverse payment* is justified by procompetitive considerations"), *cited in Lamictal*, 791 F.3d at 412 n.37.

[174] *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 483 (1992) ("Factual questions exist, however, about the validity and sufficiency of each claimed [procompetitive] justification, making summary judgment inappropriate."); *id*. at 483-86 (same).  Even without this rebuttal evidence, summary judgment would be inappropriate, because the jury must engage in "comprehensive weighing," Economist Br. 4, of the purchasers' evidence of harm from delayed generic competition against GSK's cognizable justifications.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 & n.12 (3d Cir. 2010); *Toledo*
(*Continued*)

48

### (1) The purchasers produced abundant evidence that GSK's no-AG promise was unnecessary for Andrx to license the '708 patent.

The purchasers showed there is no connection between GSK's no-AG promise and Andrx's willingness or ability to issue royalty-bearing licenses to its '708 patent.[175]  GSK's experts and ████████████████████████ ████████████████████████████████████████[176]  Moreover, in verified interrogatory answers, GSK could supply no evidence that its no-AG promise was necessary for Teva/Anchen to obtain a license from Andrx to the '708 patent.[177]  It is impossible to even imagine a coherent reason why GSK's

---

*Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) (plaintiffs' evidence of harm to competition alone sufficient to create jury question); *Miller v. Ind. Hosp.*, 843 F.2d 139, 144–45 (3d Cir. 1988) (question whether doctor was terminated for incompetence or as a result of anticompetitive restraint was "for the fact finder").

[175] JA-30578-81, JA-30585 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶ 49-53, 64).

[176] JA-29402 (Ex. 856, Willig Dep. 278:21-280:21); ████████████ ████████████████████████

[177] JA-30031 (Ex. 882, GSK's Third Interrog. Resps. No. 5) (GSK cites no facts or evidence when asked to "⌈s⌉tate each and every fact . . . forming the basis for your contention, if any, that absent any or all of the representations or agreements listed in subparagraphs a. through c. of Interrogatory 1 above ⌈GSK's no-AG promise and ████████████████████████ ████████████████ (JA-30025-26)⌉, some or all of the agreements listed in subparagraphs a. through *l.* of Interrogatory 3 above would not have been reached in whole or in part, would have been reached at a different time, or would have been reached with different terms.")  Subparts "g" and "k" of Interrogatory No. 3 (JA-30029) pertained to GSK's license agreement with Andrx (JA-29632, Ex. 867), and Teva/Anchen's license agreement with Andrx (JA-29533, Ex. 861), (*Continued*)

promise to Teva/Anchen not to launch an authorized generic would be necessary for Andrx to be willing or able to license its '708 patent in exchange for a royalty.

> ### (2) The purchasers produced abundant evidence that GSK's no-AG promise was unnecessary for Biovail to give a supply "promise."

Similarly, the evidence produced by the purchasers showed that GSK's no-AG promise was not necessary to provide Teva with the so-called backup "supply promise."[178] ███████████████████████████████████████████

███████████████████████████████████████████.[179]  GSK's experts likewise could not articulate any connection.[180]  In sworn interrogatory answers, GSK could identify no evidence that its no-AG promise was necessary for Teva to obtain the supply promise.[181]  In its brief, GSK acknowledges this

---

respectively.  *See also supra* Part B.2.b(1) (evidence that Andrx would have licensed the '708 patent anyway).

[178] JA-30581-83 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶ 54-58).

[179] JA-28136, JA-28143 (Ex. 809, Bauer Dep. 127:8-16, 154:18-155:13, 155:24-156:8).

[180] █████████████████████████████████████████████
██████████████

[181] JA-30031 (Ex. 882, GSK's Third Interrog. Resps. No. 5 (citing no facts or evidence when asked to state facts supporting the contention that absent the no-AG promise or delayed generic entry of the 150 mg product the supply "promise" would not have been reached in whole or in part, would have been reached at a different time, or would have been reached with different terms.  Subpart "b" of Interrogatory No. 3 (JA-30028) pertained to the Teva License Agreement, in which the so-called supply "promise" is located.  JA-28414-15, JA-28418 (Ex. 822, Teva license agreement §§ 5.1(a) and 5.3(e)).  GSK thus effectively states that

(*Continued*)

issue, but still points to no evidence that its no-AG promise was necessary for Teva to obtain the supply promise.[182]

The purchasers also produced evidence showing that the supply "promise" was of no benefit to competition, or even to Teva,[183] to whose purported benefit the promise ran.  First, the purchasers' evidence showed that the so-called "supply promise" was not an agreement for supply, but a mere promise to later, at some indeterminate time, negotiate a supply agreement.[184]  *No actual supply agreement was ever entered into, at that time or later*.[185]  That no actual supply agreement was ever entered into is both suspicious and suggests pretext: ██████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████.[186]  The supply promise's triggering condition of a so-called "CP Impediment" was not contained in the drafts of the settlement

---

there is no evidence that the no-AG promise was necessary to reach the so-called supply promise.

[182] Def. Br. 99 n.38.

[183] To be cognizable, a justification must benefit competition, not just a competitor.  *See LePage's, Inc. v. 3M*, 324 F.3d 141, 163 (3d Cir. 2003) (en banc).

[184] JA-28414-15, JA-28418 (Ex. 822, Teva license agreement §§ 5.1(a) & 5.3(e)) (providing that Teva and Biovail "will . . . negotiate in good faith and enter into a supply agreement governing such supply").

[185] JA-28152 (Ex. 809, Bauer Dep. 191:2-10).

[186] JA-28152-53 (*id*. at 193:20-194:22).

transaction prepared before the citizen petition was denied; it was only inserted *after* the denial, also suggesting pretext.[187]

Second, the purchasers showed that Teva was unconcerned about Anchen's ability to supply the market with generic 150 mg Wellbutrin XL, another purported basis for the supply promise. ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████[188]  GSK's experts could recite no contemporaneous documents from Teva or GSK suggesting Teva's supposed lack of confidence in Anchen.[189] ███████████████████████████

---

[187] JA-28162 (*Id.* at 232:10-233:3). ████████████████████████████
█████████████████████████████. JA-29169 (Ex. 849, Sporn Dep. 48:1-49:5); █████████████████████████████. The post-settlement decision GSK cites, Def. Br. 98, is inapposite; it pertains to FDA's procedural failure to decide a petition, not the correctness of its decision on a scientific issue.

[188] JA-30268-69 (Ex. 892, Blume Suppl. Report ¶¶30-32); JA-30439-41(Ex. 910, Blume Second Suppl. Report ¶17).

[189] JA-29487 (Ex. 857, Cremieux Dep. 243:10-244:8).  *See also* JA-30441-43 (Ex. 910, Blume Second Suppl. Report ¶18); JA-30476-77 (Ex. 913, Blume Second Rebuttal Report ¶16).  Contrary to GSK's portrayal of Anchen as a novice, Def. Br. 98, Anchen's officers and employees were experienced generic drug company employees.  JA-2557-58 (RSOF ¶21).

███████████  [190]  If there was a supply issue between Teva and Anchen, it was that Anchen made *too much* 150 mg generic.[191]

Third, GSK's experts conceded that the usefulness of the so-called "supply promise" was speculative at best – that it "could" have been "helpful"[192] – which is insufficient support a cognizable procompetitive justification.[193]  The purchasers' experts demonstrated that the supply promise was of doubtful utility.[194]

Finally, Teva's own general counsel ████████████████████ ███████████████  [195]  GSK offers no answer to this in its brief.  Making it more useless still, GSK insisted on provisions that denied Teva any supply unless GSK's own requirements for brand and authorized generic product were satisfied.[196] ████████████████████████████████████████

---

[190] ███████████████████████████████████████████

[191] JA-30396 (Ex. 896, Teva email); JA-28353 (Ex. 815, Tan Dep. 145:5-13); JA-2627-35 (RSOF ¶¶70-73).

[192] JA-29405 (Ex. 856, Willig Dep. 290:5-291:11).

[193] *See Wilk v. Am. Med. Ass'n*, 895 F.2d 353, 361 (7th Cir. 1990) (rejecting claimed justification as "speculative"); *California* ex rel. *Harris v. Safeway, Inc.*, 651 F.3d 1118, 1160 (9th Cir. 2011) (rejection of "speculative" justification).

[194] JA-30581-83 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶54-58); JA-30474-77 (Ex. 913, Blume Second Rebuttal Report ¶¶14-17).

[195] JA-30106 (Ex. 886, Egosi email).

[196] *Compare* JA-28414-15, JA-28417-18 (Ex. 822, Teva license agreement §§ 5.1(a) (300 mg), 5.3(d)(iii) (150 mg)) *with* JA-30116-17 (Ex. 887, Third Amendment to Biovail-GSK Agreement §§ 4(c)-(d)).

███████████████████████████████████████  ██████

███████ .[198]

> ### (3)   The purchasers produced abundant evidence that the no-AG promise was unnecessary as a matter of economics.

GSK and the amici suggest that the no-AG promise was necessary to achieve the procompetitive justifications it identifies because without the no-AG promise, Teva would not have settled, and the settlement contains the provisions GSK says are procompetitive.[199]  As applied to the so-called "early entry" and "enhanced" FTC review provisions, this is not much more than a tautology;[200] and as shown above, the no-AG promise was not necessary for the Andrx patent license or the supply "promise."

---

[197] GSK suggests that the recall of the Impax 300 mg product was due to a reconsideration of the citizen petition.  Def. Br. 13, 8 & n.2.  The purchasers showed this was not so.  JA-2587-94 (RSOF ¶ 51).

[198]

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[199] Def. Br. 102 ("[P]laintiffs have no proof that any settlement was possible without the no-authorized generic commitment").

[200] The purchasers rest on their opening brief with respect to these two arguments.  *See* Pl. Br. 70-73; *see also supra* Part B.2.a.(2).

Moreover, GSK's own economic expert, Dr. Willig, forcefully disavowed the conclusion that a reverse payment was necessary as a matter of economics to reach a settlement in this case.[201]  So did the purchasers' expert, Dr. Leitzinger.[202]

A reasonable jury could conclude that the only thing that made the no-AG payment "necessary" was GSK's and Biovail's realization that, without it, Teva/Anchen would make good on ███████████████████████████████ ████████████████, just as they had on the 300 mg product.  But that is not a cognizable "necessity" to justify a restraint under the rule of reason:[203] *Actavis* says that a reverse payment to prevent the risk of competition is the very "forbid[den] arrangement" the antitrust laws prohibit.[204]

### d. GSK's "illegality" defense does not compel partial summary judgment on the issue of antitrust injury prior to June 2007.

GSK argues that ██████████████████████████████████████ ██████, and therefore damages to the plaintiff classes from GSK's reverse payment

---

[201] JA-29398, JA-29408 (Ex. 856, Willig Dep. 264:9-18, 302:22-303:18); JA-2638-40 (RSOF ¶ 76).

[202] JA-33033-35 (Ex. 1008, Leitzinger Dep. 40:21-46:24).  Dr. Leitzinger elaborated on his testimony in a later report.  JA-30571-72 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶ ¶ 32-34).

[203] Pl. Br. 67-68.

[204] 133 S. Ct. at 2237 ("If the basic reason is a desire to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement.").

cannot begin to accrue until then.  There are three problems with GSK's argument.

First, though it runs from it now, GSK has repeatedly characterized its argument as one of "illegality."[205]  But this Court abrogated such arguments in antitrust cases nearly four decades ago.[206]  GSK also cites *City of Pittsburgh v. West Penn Power Co.*,[207] but this Court warned that that decision be limited to its facts.[208]  The decision is particularly inapposite in the Hatch-Waxman context (a

---

[205] *See* GSK Reply Mem. Supp. Mot. Partial Summ. J. Causation 1, No. 08-cv-2431 (E.D. Pa. July 13, 2015), ECF No. 603 ("A but-for world cannot be predicated on illegal conduct"); *id.* at 2 ("Anchen's Launch of Generic Wellbutrin XL 150 mg Prior to June 12, 2007 Would Have Violated Federal Law"); *id.* at 9 ("[A] but-for world cannot be based on unlawful conduct."); *id.* at 11 (The plaintiffs "premise their claim for hundreds of millions of dollars in alleged damages on a but-for world that permits Teva and Anchen to act unlawfully.  The law makes no such allowances.").

[206] *See Consol. Express*, 602 F.2d at 508, 525-26 (rejecting argument that "because [plaintiffs] lacked ICC permits they cannot recover damages").  GSK attempts to distinguish *Consolidated Express* on the purported basis that the question there was not whether the business from which plaintiff was blocked by the alleged concerted refusal to deal would have been illegal to carry on in the but-for world, the (supposedly different) question GSK poses here. Def. Br. 105 n.40.  But that was *precisely* the antitrust question in *Consolidated Express.  See* 602 F.2d at 501 n.6 ("Where plaintiff's business is conducted unlawfully, that is, where it operates as a freight forwarder having been refused a license by the Interstate Commerce Commission to so operate, has it suffered injury to its business which is compensable under the Clayton Act?").

[207] 147 F.3d 256 (3d Cir. 1998).

[208] *Id.* at 263-64 (regulatory scheme "significantly restricts the nature of the competition which is permitted"); *id.* at 265 ("the regulatory scheme mandated that [Allegheny and Duquesne] not compete"); *id.* at 269 ("[w]e make clear that
(*Continued*)

statute enacted to *foster* competition in the prescription drug industry), as many district courts in this circuit have held.[209]

Second, GSK points to no law, regulation, or FDA directive that in fact prevented Anchen from launching generic Wellbutrin XL products from its ███████████████████████████ GSK cites 21 U.S.C. § 356a, but that statute simply authorizes the FDA to promulgate regulations on the subject of manufacturing changes.  GSK cites FDA regulation 21 C.F.R. § 314.70, but that simply provides that "*[d]epending on the type of change*, the applicant must notify FDA about the change in a supplement [to its NDA or ANDA] under paragraph (b) or (c) of this section *or by inclusion of the information in the annual report to the application under paragraph (d) of this section.*"[210]  It does not say whether shifting ███████████████████████████ falls under (b), (c), or (d). Significantly, it requires ("must") that applicants use a less burdensome notification of a change provided by a pertinent FDA Guidance over a more burdensome one, and uses the examples of inclusion in an annual report ██

---

this ruling is fact-specific to the current climate in which the instant facts developed, namely, in the era of 'regulated electric utility monopolies'").

[209] *See In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, Nos. 06-cv-52 & 06-cv-71, 2010 WL 1485328, at *5-7 (D. Del. Apr. 13, 2010); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 537 n.14 (E.D. Pa. 2010); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004) (all distinguishing *City of Pittsburgh*); *see also Actavis*, 133 S. Ct. at 2234 (noting Hatch-Waxman's "general procompetitive thrust").

[210] 21 C.F.R. § 314.70(a)(1)(i).

█████████████████████ and submissions that do not require the FDA's approval prior to distribution of the product, to illustrate that mandatory directive.[211] GSK points to the fact that the FDA asked, and Anchen agreed, █ ████████████████████████████████████ but that is a single instance of a regulatory interaction, not a regulation, and not even an interpretive rule.

GSK's regulatory expert identified the pertinent FDA Guidance that provided "the clearest picture of what to do" to inform the FDA of the ████ █████.[212] Under that Guidance, Anchen's ████████████ qualified as the ████████████████████████.[213] This was because, by definition in the Guidance, ██████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████.[214] Anchen's ████████████████████████████████████ █████████████ and the *same* FDA field office was responsible for inspecting the operations in both ████████████████, as GSK's expert

---

[211] 21 C.F.R. § 314.70(a)(3).

[212] JA-29121 (Ex. 848, Foster Dep. 175:24–176:9).

[213] JA-29048, JA-29069 (Ex. 847, FDA Guidance for Industry – Changes to an Approved NDA or ANDA ("FDA Guidance")).

[214] *Id.*

agreed.[215]  Yet, only manufacturing site changes for *different* manufacturing sites

need to be reported to FDA prior to their taking effect.[216]  GSK's regulatory

argument is therefore erroneous.

 Third, FDA's actions are inconsistent with GSK's argument.  GSK's expert

conceded that ███████████████████████████████████████████████████

███████████████████████████████████████████.[217]  These launches were

almost a year *before* the FDA formally accepted Anchen's official reporting of

██████████████████████████[218]  Yet, the FDA expressed no concern to Anchen

████████████████████████████████████████████████████████

██████████████████████████████ without FDA's having accepted Anchen's

official notification ████████████████████.[219]  Both of GSK's experts spoke with

FDA officials in preparing their expert reports here and neither reported the

---

 [215] JA-29126 (Ex. 848, Foster Dep. 197:8-18).

 [216] JA-29069 (Ex. 847, FDA Guidance).  The defendants' citation of *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231 (D. Mass. 2014), is thus inapposite.  Def. Br. 104.  There, a change to a different site, not to a different building at the same site, was contemplated.  *Nexium*, 42 F. Supp. 3d at 266.

 [217] JA-29145 (Ex. 848, Foster Dep. 273:8-25).

 [218] JA-29144-45 (*Id.* at 269:23-271:6).  ███████████████████████████████████
████████████████████████████████████  GSK Reply Mem. Supp. Mot. Partial Summ J. Causation 16, No. 08-cv-2431 (E.D. Pa. July 13, 2015),ECF No. 603.

 [219] JA-29145-46 (Ex. 848, Foster Dep. 273:8-25, 271:7-20, 274:2-5); JA-29168 (Ex. 849, Sporn Dep. 42:9-43:4); JA-30469-73 (Ex. 913, Blume Second Rebuttal Report ¶¶7-13).

FDA's saying that the FDA would have ███████████████████████████
███████████.[220]  So that on remand the purchasers may seek to prove a March
2007 launch of Teva/Anchen's generic 150 mg, the Court should reverse this
ruling.

### C. A reasonable jury could find the defendants conspired with Biovail to delay generic entry through sham filings and the reverse payment agreement.

The defendants do not challenge the sufficiency of the evidence they

conspired to delay generic entry by prosecuting the sham *Anchen* and *Abrika*

lawsuits,[221] and participating in the reverse payment agreement.[222]  These

bookends – *Anchen* in 2004 and the reverse payment in February 2007 – frame the

defendants' continuing agreement to delay generic competition to maintain their

Wellbutrin XL monopoly profits.[223]

---

[220] JA-29146 (Ex. 848, Foster Dep. 274:6-275:24); JA-29219 (Ex. 853, Sporn Report ¶97 (interview with FDA personnel).

[221] Def. Br. 52-59.

[222] *Id.*

[223] Pl. Br. 89-99; *see United States v. Jackson*, 308 F. App'x 899, 906 (6th Cir. 2009) ("Because the evidence showed that Hines was involved at both the beginning and the end of this time period, the district court found all criminal activity of ⌈his co-conspirators⌉ during this time was reasonably foreseeable to Hines . . . .").

1. **The defendants do not contest a single overarching conspiracy exists where co-conspirators pursue a conspiratorial objective.**

Whether the challenged conduct constitutes a single overarching conspiracy or multiple discrete conspiracies is a fact-specific inquiry. Juries have wide latitude to find the existence of an overarching conspiracy.[224]

The defendants pick at the purchasers' facts regarding events in the middle of the conspiracy, claiming they did not sign the *Impax*, *Watson*, and sham petition submissions, so they cannot be liable for those acts.[225] But conspiracy is not a fingerprint test.[226] A conspirator need only have shared the general conspiratorial objective – here to extend the Wellbutrin XL monopoly.[227] And each unlawful act in the middle of the conspiracy furthered that objective.

The defendants cannot claim they stepped back from the conspiracy.[228] Even if there were no evidence of the defendants' participation between the bookend events – which is not the case – withdrawal cannot be accomplished

---

[224] *United States v. Fausnaught*, 380 F. App'x 198, 201 (3d Cir. 2010) (Court affirms if there is substantial evidence to support the jury's determination); *United States v. Russell*, 134 F.3d 171, 182 (3d Cir. 1998) ("A conspiracy charge often casts a wide net . . . .").

[225] Def. Br. 52-59.

[226] *United States v. Kushner*, 305 F.3d 194, 198 (3d Cir. 2002) ("[A] defendant is liable for . . . his co-conspirators' acts" during the conspiracy "unless he withdraws prior to the conspiracy's termination.").

[227] *Shehee v. City of Wilmington*, 67 F. App'x 692, 697 (3d Cir. 2003).

[228] Def. Br. 9 (*Anchen*), 11 (*Abrika*), 58 (both).

through "[m]ere cessation of participation in the conspiracy . . . ."[229]  A defendant

must expressly "disavow[] the purpose of the conspiracy" or perform "acts

inconsistent with the object of the conspiracy."[230]  To borrow the Tenth Circuit's

evocative analogy: "[a] declared intent to withdraw from a conspiracy to

dynamite a building is not enough, if the fuse has been set; [the withdrawing

conspirator] must step on the fuse."[231]

 In *Lowell*, this Court affirmed a conviction for a conspiracy spanning 1971-

1979, even though the defendant only participated between 1971 and 1972 and

not again until 1977.[232]  The Court found the jury could have "believed" the

defendant "had, at one time, been a conspirator," "the same conspiracy remained

in existence" in 1977, and Lowell's 1977 actions were "in furtherance of the

conspiracy."[233]  Here, evidence shows the defendants conspired to delay generic

Wellbutrin XL competition in 2004 (with *Anchen* and *Abrika*), and again in 2007

(with the reverse payment agreement).

---

[229] *United States v. Lowell*, 649 F.2d 950, 957 (3d Cir. 1981).

[230] *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995).

[231] *Eldredge v. United States*, 62 F.2d 449, 451 (10th Cir. 1932).

[232] 649 F.2d at 958.

[233] *Id.* at 958.

Likewise, in *United States v. Vallone*,[234] the Seventh Circuit affirmed a conspiracy verdict, despite the defendant's claims he had left the business, Aegis, through which the conspiracy operated.[235] "By his own admission," the court observed, the defendant "did not completely end his active involvement . . . let alone take affirmative steps to defeat or disavow" the conspiracy.[236] There was "significant evidence, some of which [the defendant] himself cites" that he acted "in furtherance of the conspiracy," including "consult[ing] regularly" with his co-conspirators, "sign[ing] [a] resolution" memorializing his role, "receiv[ing] periodic distribution of profits" from the conspiracy – and, the court observed, "a jury could infer that he was the moving force behind" a "suit filed by" his co-conspirator.[237]

Here, the defendants filed the first sham litigations and never stepped on the fuse.[238] Instead, they took steps to further the conspiracy, including leveraging a no-AG promise into further delay,[239] then reaped the benefits – █████ ███████████.[240]

---

[234] 698 F.3d 416 (7th Cir. 2012).

[235] *Id.* at 511-12.

[236] *Id.* at 512.

[237] *Id.* at 512-13.

[238] JA-2332, JA-2345 (SOF ¶¶200, 229); JA-2521-23 (RSOF ¶10).

[239] JA-2427-29, JA-2439-49 (SOF ¶¶533-41, 573-606).

[240] JA-1839 (SOF-SP ¶¶282-83).

The evidence of the defendants' continued participation in the middle of the conspiracy – much of which the defendants themselves cite – is substantial.[241] And, as in *Vallone*, a jury could infer the defendants actively enabled the sham litigations and petition filed by Biovail.  Accordingly, a jury could find the defendants "remained a part of the conspiracy" because they "continue[d] to do acts in furtherance of the conspiracy and continue[d] to receive benefits from the conspiracy's operations."[242]

### 2. A reasonable jury could find the defendants conspired to file a sham petition, delaying generic entry.

The defendants do not dispute they initiated one claim made in the petition, and helped develop another.  They do not dispute the objective baselessness of much of the petition.[243]  And they do not dispute the petition delayed generic entry.  Instead, they argue about the extent of their involvement, the degree to which the petition was baseless, and which meritless argument caused delay.

---

[241] *See, e.g.*, Def. Br. 54 ("communicat[ions] about the Impax Paragraph IV certifications"); *id.* at 56-57 (communications regarding the petition); JA-2327-28 (SOF ¶ 187); JA-1839 (SOF-SP ¶¶ 282-83).

[242] *Antar*, 53 F.3d at 583.

[243] *See* Def. Br. 56-57 (admitting "there was insufficient clinical justification to raise" the bioequivalence drift argument and the metabolite effects were "not clinically significant enough to justify a citizen petition").

### a. A jury could find the defendants were involved in the petition post-2004.

The defendants contest their involvement in the petition, arguing it was Biovail's alone.[244]  The defendants cite *SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*,[245] arguing that their financial benefit derived from the petition-related delay is irrelevant.[246]  In *SigmaPharm*, the plaintiff alleged an antitrust conspiracy, describing four overt acts, including a sham petition.[247]  The court called the petition "self-interested action," which "[did] not *alone* suggest a conspiracy."[248]  But the purchasers do not rely on the defendants' windfall from the petition *alone* to establish they conspired on the petition.

As the purchasers explained,[249] the petition was the defendants' idea.  The defendants' president of U.S. pharmaceutical operations, David Stout, shared the bioequivalence drift idea with Biovail's CEO, asking "[h]ow do we get these arguments in front of the FDA?  Citizens petition?  We need to act fast!"[250]  Their involvement in the petition process did not end in 2004, as they suggest.  On

---

[244] Def. Br. 55-58.

[245] 772 F. Supp. 2d 660 (E.D. Pa. 2011).

[246] Def. Br. 55.

[247] 772 F. Supp. 2d at 671.

[248] *Id.*  "Nevertheless," the allegations "as a whole" were "sufficient" to state a conspiracy claim.  *Id.*

[249] *See* Pl. Br. 108-09.

[250] JA-2383 (SOF ¶367).

November 14, 2005, Anchen received tentative approval.[251]  Two days later, the

defendants began planning a petition,[252] contemplating the anticompetitive

effects.[253]  On December 1, they discussed "Wellbutrin XL and Generic

[Bioequivalence]"[254] – an argument they determined, in 2004, had an "insufficient

clinical justification to support a petition.[255]  On December 12, Stout inquired

whether Biovail would file a petition.[256]  He then instructed his staff to draft a

petition challenging the Wellbutrin XL bioequivalence standards.[257]  Biovail filed

the petition featuring the defendants' bioequivalence drift argument on December

20, 2005.[258]

     Biovail later memorialized the defendants' collaboration: when the

defendants pretended to "confirm" they did not "wish to participate in or be

associated with any" petition, Biovail called the defendants out for this

misstatement, writing "it was Mr. Stout who sought and initiated the interaction"

---

[251] JA-2361 (SOF ¶278 & n.385).

[252] JA-2398 (SOF ¶419 n.583) (citing privilege log entries showing "confidential email[s] seeking" and "rendering legal advice concerning a citizen petition" on November 16).

[253] JA-2400 (SOF ¶426) (antitrust counsel consulted about the petition).

[254] JA-2398-99 (SOF ¶420).

[255] Def. Br. 56.

[256] JA-2399 (SOF ¶421).

[257] JA-2399-400 (SOF ¶¶423-25).

[258] JA-2361 (SOF ¶278).

regarding a petition.[259]  The defendants could not (and did not) withdraw in an

after-the-fact letter – and the letter does not alter the fact they were involved in

the petition in the first place.[260]

> **b.    The 18-month delay between the defendants' creation of the arguments and submission of the petition is not exculpatory.**

The defendants claim "undisputed evidence" shows they considered filing a

petition in 2004, but did not file then, and did not sign the petition filed in

December 2005.[261]  This timing is inculpatory, not exculpatory.  When Congress

later investigated generic delay, it learned companies "abuse[d]" the "citizen

petition process to improperly delay competition" by forestalling filing until "the

eve of FDA approval of a generic product."[262]  So it enacted legislation to curb

this abuse,[263] invoking Wellbutrin XL to exemplify the law's necessity.[264]  The

---

[259] JA-12358 (Ex. 281, Fax from Biovail to GSK).

[260] *Cf. United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) (affirming conspiracy conviction, despite resignation letter, because "resignation . . . standing alone, does not constitute withdrawal as a matter of law"); *see also Antar*, 53 F.3d at 583 ("[R]esignation from the enterprise" alone does not "constitute withdrawal from a conspiracy as a matter of law" and "the defendant still may remain a part of the conspiracy" if he "continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations.").

[261] Def. Br. 57.

[262] *See, e.g.*, JA-6789 (*The Generic Drug Maze: Speeding Access to Affordance Life-Saving Drugs: Hearing Before the S. Special Comm. on Aging*, 109th Cong. 59-61 (2006)).

[263] FDA Amendments Act of 2007, Pub. L. 110-85, 121 Stat. 823 (requiring companies to disclose when "the information upon which [the petitioner has]

*(Continued)*

18-month delay *maximized* the likelihood that the petition would delay FDA

approval of Anchen's ANDA.[265]

> ### c.   A reasonable jury could find the petition was a sham and caused delay.

Despite the defendants' contention that two requests (the hydroxy-

metabolite and dose-dumping requests) were nominally a "success,"[266] the petition

did not "influence government action,"[267] "elicit a favorable outcome,"[268]

"motivate[]" the FDA's decision,"[269] or "connect[] to the FDA's change in

position."[270]  As an FDA official explained to Congress in 2006, usually, brand

---

based the action requested herein first became known.").  Under current law, the petition here would have to disclose the arguments were 18 months old.

[264] Consol. Class Action Compl. ¶6, No. 08-cv-2431 (E.D. Pa. July 10, 2008), ECF No. 21 (2006 congressional analysis reporting the delay in generic Wellbutrin XL approval from the petition cost consumers $37 million per month).

[265] *Cf. In re Prograf Antitrust Litig.*, No. 11-md-2242, 2012 WL 293850, at *6 (D. Mass. Feb. 1, 2012) (refusing to dismiss allegations that brand "purposely waited until the last possible moment to submit its citizen petition to the FDA").

[266] Def. Br. 61-62.

[267] Def. Br. 61 ("A successful effort to influence governmental action" cannot be "characterized as a sham." (quoting *PRE*, 508 U.S. at 58)).

[268] *PRE*, 508 U.S. at 60.

[269] *Flonase*, 795 F. Supp. 2d at 315.

[270] *Id.*  The defendants claim falsely the purchasers argue success on a petition is necessary to invoke *Noerr-Pennington* immunity.  Rather, the purchasers pointed to sufficient evidence for a jury to conclude no reasonable pharmaceutical manufacturer could have expected to influence FDA policy on any of the petition's issues.  Pl. Br. 110-11.

companies' "petitions are granted, wholly or in part," only "because FDA already has the proposed scientific or legal standard in place or is already planning to take the action the petition requests" – and he distinguished such petitions from those that actually "led to a change in Agency policy."[271]

The defendants claim there is "no evidence" two nominally-granted requests sought already-established action.[272]  But the hydroxy-metabolite request was pre-ordained: the FDA had already issued guidance requiring such testing,[273] and generic companies would follow this guidance to speed ANDA approval.[274]  The same goes for the dose-dumping request: the FDA had already spoken about requiring dose-dumping testing at an advisory committee meeting.[275]  The petition simply quoted the FDA's words back to the FDA, with no scientific evidence supporting the requests.  The defendants cannot claim success for FDA decisions *preceding* the petition.

---

[271] JA-6744 (*The Generic Drug Maze: Speeding Access to Affordance Life-Saving Drugs: Hearing Before the S. Special Comm. on Aging,* 109th Cong. 59-61 (2006)); *see also* JA-4761-62 (Ex. 67, Morrison Report ¶¶26-27).

[272] Def. Br. 61-62.  The defendants are incorrect in stating that the dose-dumping request was granted in part.  It was deemed "moot."  JA-12487 (FDA Petition Resp.); *see* JA-11289 (FDA Opp'n Pl. 2d Mot. TRO & Prelim Inj., *Biovail v. FDA*).

[273] JA-2363-64 (SOF ¶¶288-89); JA-4765-66 (Ex. 67, Morrison Report ¶35).

[274] JA-5042 (Ex. 73, Morrison Rebuttal Report ¶19).

[275] JA-2378 (SOF ¶348).

Nor can the defendants overcome the evidence of delay. They claim the purchasers must allocate to each petition request the days of delay each request caused. This misses the mark: all requests were shams, so the purchasers need not itemize the delay caused by each request. And even if a jury could find some requests were non-sham, the purchasers have met their burden of showing some delay.[276] The *defendants* must prove some "alternative source[] of injury,"[277] such as a non-sham request.

### 3. A reasonable jury could find the defendants conspired to file *Impax* and *Watson*, which, together with *Abrika*, were shams.

#### a. The defendants conspired on *Impax* and *Watson*.

The defendants contend there is no dispute they were not involved in *Impax* or *Watson*. But the purchasers' evidence shows the defendants entered into a common interest agreement covering those suits.[278] They never discouraged Biovail from filing *Impax* or *Watson*, nor encouraged Biovail to voluntarily dismiss

---

[276] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (requiring only a showing of "some damage"); *see* Pl. Br. 111-14. A jury could conclude no delay was caused by the nominally-granted requests, which just regurgitated existing requirements, and were quickly resolved. *See In re Prograf Antitrust Litig.*, No. 11-md-2242, 2014 WL 4745954, at *7 (D. Mass. June 10, 2014) ("successful" request concerning an uncontroversial issue "not enough to occupy the FDA for" the duration of delay).

[277] *Zenith Radio*, 395 U.S. at 114 n.9; *see* Pl. Br. 113.

[278] JA-2327-28 (SOF ¶ 187).

them.[279]  The defendants collaborated with Biovail in the lead-up to filing *Impax*,[280] and made court appearances in *Impax*.[281]  This evidence refutes the defendants' claims of non-involvement.

The defendants do not address this evidence.  Instead, they dismiss this collaboration as mere "communication."[282]  At best, this warrants submission to a jury.

### b. A reasonable jury could find *Abrika*, *Impax*, and *Watson* were shams.

#### (1) *Abrika*

Abrika's product – ███████████████████████████████ – did not infringe the defendants' patents.[283]  The defendants claim the *Abrika* court found their "initial assertions of patent infringement were 'reasonable.'"[284]  But it found "reasonable" their voluntary dismissal of claims asserting the '327 patent, not their assertion of the '341 patent.[285]  The defendants also argue *Anchen* and *Impax* accepted their "dissolution profile" construction.  But Anchen and Impax

---

[279] JA-1943-44 (SOF-SP ¶¶ 657-60).

[280] JA-2346-48 (SOF ¶¶ 234-36 & nn.321-23, 239-41).

[281] JA-2438 (SOF ¶571).

[282] Def. Br. 54.

[283] Pl. Br. 104-08.

[284] Def. Br. 51-52.

[285] JA-31492 (Ex. 948, *Abrika* Voluntary Dismissal Order) ("initial assertion of the '327 patent was reasonable," not "sanctionable").

*did not challenge* the defendants' "dissolution profile" construction, strategically arguing the defendants' interpretation rendered the patents invalid.[286]

The defendants principally argue *Abrika* caused no delay − no harm − citing a stipulation here that, absent the "conduct challenged," Abrika would have launched on August 18, 2008, after Abrika's 30-month stay expired.[287]  This makes no sense.  Abrika actually launched on November 26, 2008 − ██████████ ███████████████████████████████.  It was the "conduct challenged" in this case − including the *Anchen* suit and the reverse payment agreement − that caused this delay.  ████████████████████████████████████████████ ████; this delay, stems from "conduct challenged" by purchasers, so the purchasers demonstrated "some damage" flowing from the defendants' conduct,[288] rendering summary judgment improper.

---

[286] JA-37565-66 (BV Ex. 114, Amended Order Claim Constr. (*Anchen*)) (Anchen's arguments); JA-36598-600 (BV Ex. 53, Order Claim Constr. (*Impax*)) (Impax's argument).

[287] Def. Br. 50-51 (citing JA-32694).  The defendants suggest the purchasers "waive[d]" challenging this ruling.  Def. Br. 51.  Not so.  *See* Pl. Br. 107 n.547. The defendants' extensive response proves the purchasers' argument sufficient.

[288] *Zenith Radio*, 395 U.S. at 114 n.9; *Cardizem*, 332 F.3d at 911 (generic delay constitutes harm).

### (2)  *Impax*

The defendants say because Judge Brody called *Impax* claim construction a "close question," *Impax* was no sham.[289]  But she rejected the defendants' sophistic proposal to construe "delayed release" instead of "delayed release tablet"; their *untrue* assertion that "delayed release tablet" appeared only in the preamble (so could not limit the '341 patent's claims); and their proposed construction as superfluous.[290]  Ultimately, she concluded, she "cannot construe the patent" favorably to the defendants.[291]  This resounding loss was "[n]ot even close."[292]  So a jury could find *Impax* baseless despite Judge Brody's charitable comment.

### (3)  *Watson*

The purchasers agree: *Watson* stands or falls with *Anchen*.[293]  As explained above, *Anchen* was a sham.  So too, then, was *Watson*.

**D.  *Hanover 3201 Realty* warrants reversal because a reasonable jury could find that the defendants engaged in a pattern of sham filings "without regard to the merits" and for an improper purpose.**

Between final judgment here and before the purchasers' opening brief deadline, this Court decided *Hanover 3201 Realty, LLC v. Village Supermarkets,*

---

[289] Def. Br. 59.

[290] JA-1979-80 (RSOF-SP ¶47).

[291] *Id.*

[292] JA-1979-80 (RSOF-SP ¶47).  This expert's opinion is evidence, not merely a "contrary view" for the court to ignore.  *See* Pl. Br. 103.  *Contra* Def. Br. 59-60.

[293] Def. Br. 59.

*Inc.*[294]  The Court held that an antitrust defendant enjoys no First Amendment

petitioning immunity for filing serial petitions "without regard to the[ir] merits"

for the purpose of harming competition, even if some of those petitions have some

merit.[295]  *Hanover 3201 Realty* controls, and compels reversal.

## 1.    This Court should apply *Hanover 3201 Realty*.

The defendants ask the Court to ignore *Hanover 3201 Realty* because they

claim the purchasers did not argue serial petitioning below.[296]  But the defendants

raised the defense[297] that their First Amendment petitioning conduct provided a

bar to liability, and the purchasers extensively argued in the district court that it

did not.  In their complaints, the purchasers recounted a series of meritless

petitions filed to frustrate competition and prolong the defendants' monopoly.[298]

---

[294] 806 F.3d 162 (3d Cir. 2015).

[295] *Id.* at 180.

[296] Def. Br. 63-64.

[297] *We, Inc. v. City of Phila.*, 174 F.3d 322, 326 (3d Cir. 1999) ("[W]e conclude that the *Noerr–Pennington* doctrine does not provide an 'immunity from suit' but rather only a defense against liability . . . .").

[298] *See, e.g.*, Consol. Class Action Compl. ¶200, No. 08-cv-2431 (E.D. Pa. July 10, 2008), ECF No. 21 (describing an "anticompetitive scheme" that included "filing objectively and subjectively baseless patent infringement litigation regarding the '341 and '327 Patents against would-be sellers of generic Wellbutrin XL" and "an objectively and subjectively baseless Citizen Petition," which intentionally and wrongfully maintained their monopoly power with respect to Wellbutrin XL in violation of Section 2 of the Sherman Act"); End-Payor Consol. Compl. ¶¶ 3-4, No. 08-cv-2433 (E.D. Pa. July 10, 2008), ECF No. 23 ("Defendants embarked on a scheme to maintain monopoly profits generated by their control of the bupropion hydrochloride extended release market," which

*(Continued)*

74

Alleging this type of "an 'illegal scheme' through a 'series of sham litigations'" is enough to put a defendant "on notice" of the purchasers' "theory under *California Motor*."[299]  In opposing the defendants' motion to dismiss, the purchasers argued their complaints adequately alleged the "filing [of] a *series* of sham lawsuits and a sham citizen petition;"[300] and at summary judgment, they explained the defendants "conspired to execute a scheme" comprised of "four sham patent infringement lawsuits" and "a blocking petition" that they knew "would delay ANDA approvals and not lead the FDA to change any of its policies and practice[.]"[301]

The defendants' waiver argument rests on the purchasers' supposed failure to cite "particular cases within its broader argument for the sham exception."[302] But this same argument was rejected in *Hanover 3201 Realty* itself.  The

---

"involved at least three key facets," including that "after four generic pharmaceutical manufacturers … sought approval to sell generic versions of Wellbutrin XL, Defendants . . . commenced baseless patent infringement actions against them.").

[299] *Hanover 3201 Realty*, 806 F.3d at 179 n.13 (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)).

[300] Direct Purchasers' Corrected Consol. Mem. Opp'n Def. Mots. Dismiss 38, No. 08-cv-2431 (E.D. Pa. Nov. 12, 2008), ECF No. 61; *see also id.* at 2, 16, 25, 31 (describing a "series of lawsuits" that comprised an "anticompetitive scheme" and "monopolistic scheme").  The end-payors argued the same.  End-Payors' Opp'n Defs.' Mot. Dismiss 1, 4, No-08-cv-02433 (E.D. Pa. May 15, 2009), ECF No. 81.

[301] Pl. Corrected Consol. Opp'n 1, No. 08-cv-2431 (E.D. Pa. Feb 21, 2012), ECF No. 429.

[302] *Hanover 3201 Realty*, 806 F.3d at 179 n.13.

defendants there argued that this Court should not take up the question whether *California Motor* rather than *PRE* controlled because the plaintiff "waived its argument . . . because it never raised this issue before the District Court and did not raise the issue on appeal until its supplemental reply brief."[303]  This Court "disagree[d] that Hanover Realty has waived this argument" as "Defendants have consistently argued for *Noerr-Pennington* immunity and Hanover Realty has consistently responded that the sham exception applies."[304]  The facts here are identical.  Hence, *Hanover 3201 Realty* requires a finding of no waiver.

Even if it could be said that the purchasers were not specific enough about their argument below, this Court should still apply *Hanover 3201 Realty* now. This Court has recognized an exception to waiver where the parties had "the opportunity to offer all the relevant evidence and when they are not surprised by issues on appeal,"[305] or where justice or public policy supports hearing the argument.[306]  "Where, as here, a previously ignored legal theory takes on new

---

[303] *Id.*

[304] *Id.*

[305] *Huber v. Taylor*, 469 F.3d 67, 74–75 (3d Cir. 2006); *see also Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011) (exercising discretion to hear legal issue, finding no deprivation of the right to develop evidentiary support for the claim and no surprise).

[306] *See, e.g., Salerno v. Corzine*, 449 F. App'x 118, 123 (3d Cir. 2011) (addressing new argument because not doing so would "'result in . . . substantial injustice'" (quoting *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005))); *Harris v. City of Phila.*, 35 F.3d 840, 846 (3d Cir. 1994) (noting an issue first raised on appeal may
(*Continued*)

76

importance due to an intervening development in the law," this Court has taken

the issue.[307]

The defendants' own citations demonstrate that *Hanover 3201 Realty*

changed the First Amendment petitioning defense in this Circuit.  One 2011 case

the defendants cite[308] rejected an antitrust serial sham petitioning theory because

the plaintiffs identified "at most" "five petitions" while the existing case law had

rejected serial petitioning claim premised on "up to nine petitions."[309]  But in

*Hanover 3201 Realty*, this Court was "not convinced" that "four actions . . . are too

few to even qualify as a pattern or series."[310]

GSK cites *Beazer East, Inc. v. The Mead Corp.*[311] as an instance where the

"intervening change of law exception does not apply to a decision which was

issued prior to appellate briefing and of which the party had notice."[312]  In *Beazer*

*East*, though, this Court refused to consider the issue because it could have been

---

be considered if there is a "strong public interest in the subject matter"); *Selected Risk Ins. Co. v. Bruno*, 718 F.2d 67, 70 (3d Cir. 1983) (reviewing newly-raised issue involving "important public policies").

[307] *Salvation Army v. Dep't of Cmty. Affairs of State of N.J.*, 919 F.2d 183, 196 (3d Cir. 1990).

[308] Def. Br. 64.

[309] *Flonase*, 795 F. Supp. 2d at 309 n.10.

[310] 806 F.3d at 181.

[311] 525 F.3d 255 (3d Cir. 2008).

[312] Def. Br. 64.

raised *in an earlier appeal.*[313]  The purchasers here brought up *Hanover 3201 Realty* at the earliest opportunity.[314]

After *Hanover 3201 Realty,* serial petitioning has taken on "new importance."  So even if the Court could conclude that the purchasers did not adequately raise it below, it should consider it now, as it did in *Hanover 3201 Realty,* because doing so does not deprive the defendants of the opportunity to create a factual record surrounding the claim, nor result in unfair surprise.[315]

### 2.   The defendants misconstrue *Hanover 3201 Realty.*

The defendants argue the *Hanover 3201 Realty* serial petitioning standard applies only when serial petitions are lodged against a single defendant, not multiple defendants.[316]  But *Hanover 3201 Realty* is not expressly or implicitly so limited.

---

[313] 525 F.3d at 264 (intervening change in law "was issued about six months before our decision in *Beazer II,*" but "Mead made no effort to bring it to this Court's attention before the filing of *Beazer II*").

[314] *Id.*

[315] If the Court perceives any prejudice in applying *Hanover 3201 Realty* to the summary judgment record, the Court may vacate the ruling and allow the district court to consider application of this Court's precedent in the first instance.  *E.g., Official Comm. of Unsecured Creditors of Allegheny Health, Educ. and Research Found. v. PricewaterhouseCoopers, LLP,* 607 F.3d 346, 355 (3rd Cir. 2010) (vacating and remanding following intervening change of law).

[316] Def. Br. 64–65.

In considering whether the defendants engaged in anticompetitive serial petitioning, *Hanover 3201 Realty* examined "whether a series of petitions were filed with or without regard to the merit" and for the purpose of "restrain[ing] trade."[317]  This Court's rationale did not stem from offending conduct directed at a single competitor.  Rather, *Hanover 3201 Realty* instructed courts to calculate a defendant's "filing success – *i.e.*, win-loss percentage"[318] – *not* the expense or burden imposed on a specific party.  Defendants' three losses on claim construction, a fourth loss on summary judgment, and a repudiation of an FDA petition, are what matters.  A monopolist's objective is to defeat competition, regardless of how many competitors it harasses.  Holding an antitrust defendant liable for burying a business challenger under an avalanche of petitioning while immunizing a defendant who burdens multiple entities misses the point: both harm competition.

Nor can the defendants argue *Hanover 3201 Realty* applies only in antitrust suits brought by competitors, not purchasers.  Hanover 3201 Realty was, itself, "neither a competitor, nor a consumer" in the market the defendants there sought to monopolize – the "market for full-service supermarkets."[319]  Rather, this Court found Hanover 3201 Realty could advance its serial petitioning theory because its

---

[317] 806 F.3d at 180.

[318] *Id.*

[319] *Id.* at 172.

injuries were "inextricably intertwined" with the defendants' unlawful conduct – and relied on a suit involving consumers, not competitors, to do so.[320]  If burdened non-competitors have Sherman Act claims for anticompetitive serial petitioning then customers – the "primar[y]" beneficiaries of the antitrust laws – do too.[321]

Nor are four litigations and a petition insufficient to meet some numerosity threshold.[322]  *Hanover 3201 Realty* expressly "[did] not set a minimum number requirement for the applicability of" the serial petitioning rule.[323]  So "[i]t is sufficient" that a reasonable jury could find the four litigations and a citizen petition were filed against the defendants' competitors "at every opportunity to obstruct" the generic companies "from obtaining all necessary government approvals."[324]

---

[320] *Id.* (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982))

[321] *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983); *id.* at 538 ("[T]he Sherman Act was enacted to assure customers the benefit of price competition . . . ."); *accord Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503 (Fed. Cir. 2012) ("Because direct purchasers are generally permitted to bring antitrust actions . . . Ritz's status as a direct purchaser gives it standing to pursue its *Walker Process* claim."); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 687-92 (2d Cir. 2009) (same).

[322] Def. Br. 65.

[323] 806 F.3d at 181.

[324] *Id.* (internal quotation marks omitted).

Finally, the defendants invent an exception to the rule, claiming their repetitive lawsuits were "a product of Hatch-Waxman's unique regulatory structure[.]"[325]  But Hatch-Waxman's "procompetitive thrust" should not be invoked to excuse anticompetitive conduct.[326]  While Hatch-Waxman contemplates that a brand company may secure a 30-month stay by suing within a 45-day period,[327] it does not sanction "'institut[ing] the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases.'"[328] Congress enacted the statute with increased competition in mind.[329]

The non-binding, pre-*Hanover 3201 Realty*, cases GSK cites do not suggest otherwise.  For example, *AstraZeneca AB* did not find serial petitioning because of the brand company's acceptable success rate.[330]  Similarly, in *In re Terazosin Hydrochloride Antitrust Litigation*,[331] the brand company prevailed on "seven of the

---

[325] Def. Br. 66.

[326] *Actavis*, 133 S. Ct. at 2234-35.

[327] *Lamictal*, 791 F.3d at 395-96.  The 45-day window is *not* a statute of limitations.  *See, e.g., Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1341 (Fed. Cir. 2007) (The "45-day statutory window does not preclude [a brand company] from pursuing additional infringement suits" for paragraph IV certifications.).

[328] *Hanover 3201 Realty*, 806 F.3d at 183 (quoting *Cal. Motor*, 404 U.S. at 516).

[329] *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1676 (2012) (the Hatch-Waxman "process is designed to speed the introduction of low-cost generic drugs to market").

[330] 2010 WL 2079722, at *5.

[331] 335 F. Supp. 2d 1336 (S.D. Fla. 2004).

eleven lawsuits it filed: an impressive .636 batting average."[332]  The same goes for

*Aventis Pharma S.A. v. Amphastar Pharmaceuticals, Inc.*[333]: the court decided the

serial petitioning rule did not apply because *none* of those suits was objectively

baseless.[334]  *California Motors* and *Hanover 3201 Realty* do not permit a brand

company to claim a time-crunch to excuse a "policy of filing petitions with or

without regard to merit."[335]

## E.  A jury resolving these factual disputes should have the benefit of Dr. Leitzinger's full opinion.

As shown in the purchasers' opening brief,[336] the district court erred by

excluding portions of the expert testimony of the purchasers' economist, Dr.

Leitzinger, in connection with the reverse-payment agreement.[337]  The

defendants' attempt to support this decision fails for several reasons.

---

[332] *Id.* at 1367.

[333] Nos. 03-cv-887 & 04-cv-333, 2009 WL 8727693 (C.D. Cal. Feb. 17, 2009).

[334] *Id.* at *10.

[335] *Hanover 3201 Realty*, 806 F.3d at 180.

[336] Pl. Br. at 117-19.

[337] The district court excluded *only* Dr. Leitzinger's opinions about the anticompetitive effects and procompetitive justifications of the settlement transaction, JA-194 (Summ. J. II Op. n.36), *not* the quantification of the no-AG reverse payment, market power, or damages from the reverse payment, and none of his opinions related to the sham litigation/petitioning aspects of the case. Defendants' contrary suggestion, *see* Def. Br. at 106-07, is incorrect.  Defendants did not even challenge many of Dr. Leitzinger's opinions.  *See* Defs.' Mot. Exclude Leitzinger, No. 08-cv-2431 (E.D. Pa. Mar. 20, 2015), ECF No. 570; Pls.' Opp'n

(*Continued*)

First, the defendants insist that Dr. Leitzinger should have personally verified Teva/Anchen's but-for entry date.[338]  But it is "settled evidence law" that experts are free to answer hypothetical questions assuming facts a plaintiff will establish with *other* evidence.[339]  Here, the purchasers established Teva/Anchen's earlier entry date but for the reverse payment with documentary evidence[340] and the testimony of Dr. Blume,[341] and asked Dr. Leitzinger to opine only on harm to competition and procompetitive justifications assuming earlier entry was established.[342]  This is common and accepted practice.[343]

---

Defs.' Mot. Exclude Leitzinger, No. 08-cv-2431 (E.D. Pa. May 29, 2015), ECF No. 584.

[338] Def. Br. 107-06.

[339] *Williams v. Illinois*, 132 S. Ct. 2221, 2227-28 (2012); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 404 (3d Cir. 1980) ("The essential difference ⌈between a layman and an expert⌉ is that a qualified expert may answer hypothetical questions.").

[340] JA-2648-53, JA-2627-32, JA-2562-63 (RSOF ¶¶26, 70-71, 84).

[341] JA-30259, 30266-72, 30277 (Ex. 892, Blume Suppl. Report); JA-30429-443 (Ex. 910, Blume Second Suppl. Report); JA-30465-79 (Ex. 913, Blume Second Rebuttal Report).

[342] JA-28889, 28893, 28894, 28895 (Ex. 838, Leitzinger Suppl. Report ¶¶2, 12-13 & n.23, 16, 19); JA-31449, 31463, 31466-67 (Ex. 946, Leitzinger Second Suppl. Report ¶¶3, 31 nn.55, 37); JA-30573 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶38).  This is what Dr. Leitzinger was asked to do in his reports that focused on the sham litigation/petitioning theories, without any challenge by defendants.  JA-4629, 4638, 4669 (Ex. 65, Leitzinger Report ¶¶9, 30, 95); JA-4955, 4978 (Ex. 71, Leitzinger Rebuttal Report ¶¶3(b)-(c), 56 n.75).

[343] *See* Pl. Br. 118 n.599, 119 n.600 (citing cases); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5428139, at *7 (N.D. Cal. June 20, 2013) (same), *adopted*, No. 07-cv-5944, 2013 WL 5391159 (N.D. Cal. Sep. 19,
(*Continued*)

The defendants themselves cite a case that supports the purchasers' position. In *TK-7 Corp. v. Estate of Barbouti*,[344] an expert calculated a corporation's lost profits by assuming the truth of a market-share projection contained in another expert's report.[345] The Tenth Circuit found this perfectly acceptable; described it as "the classic form of the 'hypothetical question'";[346] and noted that the expert "did not have to establish the validity of the . . . claims that he assumed."[347] The plaintiffs there, however, failed to establish independently the facts assumed by the lost-profit expert, so his opinion was excluded.[348] By contrast, the district court here held that the purchasers *had* established a triable issue regarding the facts assumed by Dr. Leitzinger (*i.e.*, Teva/Anchen's early entry).[349] The passage cited by the defendants merely notes that the plaintiffs in *TR-7* could not avoid the hearsay bar by having the lost-profit expert shoehorn

---

2013); *U.S. Gypsum Co. v. Lafarge N. Am.*, 670 F. Supp. 2d 737, 741 (N.D. Ill. 2009) (same); *Brill v. Mirandola*, 540 F. Supp. 2d 563, 568, 570 (E.D. Pa. 2008) (same) (citing *Tormenia v. First Inv'rs Realty Co.*, 251 F.3d 128, 135 (3d Cir. 2000).

[344] 993 F.2d 722 (10th Cir. 1993).

[345] *Id.* at 730-31.

[346] *Id.* at 731.

[347] *Id.* (describing *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545-46 (1st Cir. 1988)).

[348] *Id.* at 732.

[349] JA-225 (Summ. J. II Op.).

the market-share expert's report into his own.[350]  Nothing like that is at issue here.[351]

Second, the defendants argue that Dr. Leitzinger failed to analyze various purportedly procompetitive features of the settlement.[352]  The defendants simply ignore Dr. Leitzinger's report on that subject,[353] which was largely dedicated to rebutting the defendants' procompetitive justifications.  The defendants cite deposition testimony that *preceded* Dr. Letizinger's timely rebuttal report, leaving the inaccurate impression that Dr. Leitzinger failed to address the Andrx license and the "supply promise."[354]

But as the Court can see, Dr. Leitzinger rebutted the purported procompetitive benefits of the Andrx license.  Dr. Leitzinger noted that "[a]

---

[350] *TK-7*, 993 F.2d at 732.

[351] The defendants' second case, *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985), makes a similar point: an expert's reliance on lay testimony did not render that testimony admissible.  Again, nothing like that is at issue here.

[352] Def. Br. 108-09.

[353] JA-30567-70, 30577-85 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶¶ 24-31, 47-59); *see also* JA-31464-67 (Ex. 946, Leitzinger Second Suppl. Report ¶¶ 33-38).

[354] Def. Br. 109.  The defendants chose to take Dr. Leitzinger's deposition on November 11, 2014 (JA-33023, Leitzinger Dep.), before they submitted a report on procompetitive justifications (JA-29913, Willig Report), and thus before Dr. Leitzinger's rebuttal report was due.  JA-33023 (Leitzinger Dep.). The Supplemental Rebuttal Report is dated February 16, 2015.  JA-30555 (Ex. 917, Leitzinger Suppl. Rebuttal Report).

procompetitive justification has [to] be tied to and otherwise unattainable without the anticompetitive restriction."[355]  Because there was "no economic evidence" indicating that the defendants' reverse payment "was a necessary predicate" of the Andrx settlement with the defendants or Anchen, the Andrx license was not a procompetitive benefit of the reverse payment.[356]  Dr. Leitzinger also noted that any consumer benefits created by the Andrx settlement were minimal.[357]

The Court can also see that Dr. Leitzinger also extensively rebutted the purported procompetitive benefits of the supply "promise," opining that the no-AG promise was not necessary for the supply promise to be made, and that there was no real need for the promise in the first place.[358]  From the absence of any discussion of Dr. Leitzinger's timely rebuttal report, the district court may have overlooked these opinions.[359]

---

[355] JA-30579 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶ 50).

[356] JA-30579-80 (*id.* ¶ ¶ 51-52); *see also* Pl. Br. 73-77.

[357] JA-30580-81, 30585 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶ ¶ 53, 64).

[358] JA-30581-83, 30602-03 (*id.* at ¶ ¶ 54-58, Exs. 3A, 3B).

[359] Dr. Leitzinger also rebutted the defendants' argument that generic entry was earlier with the settlement.  JA-31466-67 (Ex. 946, Leitzinger Second Suppl. Report ¶ ¶ 36-37); JA-30569, 30571-30576 (Ex. 917, Leitzinger Suppl. Rebuttal Report ¶ ¶ 29, 32-46).  And independent of Dr. Leitzinger, the purchasers rebutted the defendants' arguments that the reverse payment allowed

(*Continued*)

In any event, Dr. Leitzinger's analysis is complete and reliable, and should not have been excluded.

## III. THE DISTRICT COURT'S DISMISSAL OF END-PAYOR CLAIMS BASED ON STANDING AND DENIAL OF AETNA INC.'S INTERVENTION SHOULD BE REVERSED.

## A. The district court erred in concluding that the end-payors lacked standing to bring certain claims.

The end-payors could not move to certify a class including *all* end-payors of Wellbutrin XL because the district court dismissed the named plaintiffs' claims under 37 states' laws – excluding purchasers in those states – for lack of Article III standing.[360]  That was reversible error.  Contrary to the defendants' assertions,[361] a plaintiff's standing under Article III, and a federal court's subject matter jurisdiction, is an inquiry distinct from success on the merits.[362]

Article III standing requires: (i) a plaintiff must suffer a concrete, non-hypothetical injury-in-fact; (ii) the injury must have been caused by the

---

"immediate" entry or "enhanced" FTC oversight.  Pl. Br. 70-73; *see also supra* Part B.2.a.(2).

[360] The defendants' assertion that the end-payors' state law claims were not dismissed pursuant to Article III, Def. Br. 113 n.45, renders the district court's extensive Article III analysis utterly superfluous.  *See generally* JA-242-43, 251-58 (Mem. Op. Mots. Dismiss).

[361] Def. Br. 112-13.

[362] *See Bond v. United States*, 564 U.S. 211, 219 (2011) ("[The] question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion." (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92 (1998))).

defendant's conduct; and (iii) the injury must be redressable by a favorable judicial resolution.[363]  The end-payors adequately pleaded Article III injury,[364] which the district court recognized when it upheld claims in six states.[365]  However, the district court improperly analyzed the end-payors' *constitutional* standing on a claim-by-claim basis.[366]

The possibility that some end-payors may be unable to establish an element of a claim – referred to as "statutory standing requirements" – has no bearing on Article III standing.

> Statutory standing is distinct from jurisdictional standing in that "Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts," whereas "lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court."[367]

In *Sullivan* – where the plaintiffs pleaded diamond purchasers in several, but not all 50 states[368] – this Court affirmed the certification of a nationwide

---

[363] JA-251(Mem. Op. Mots. Dismiss).

[364] JA-1055-57, JA-1095-96, JA-1104, JA-1109 (End-Payor Pl. 1st Am. Consol. Class Action Compl.).

[365] JA-243 (Mem. Op. Mots. Dismiss).

[366] JA-243, 261 (*id.*).

[367] *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) (en banc) (quoting *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)).

[368] *See Sullivan v. DB Invs., Inc.*, No. 04-cv-2819, 2008 WL 8747721, at *1-2 (D.N.J. May 22, 2008).

settlement class of diamond purchasers, finding the plaintiffs had established
Article III standing, even though some indirect purchasers might not be able to
establish certain elements of their state-law claims at trial.[369]  "[E]ach member is
a Direct or Indirect Purchaser, harmed by what [the defendant] did.  These class
members, moreover, possess a legally cognizable injury[.]"[370]

The question of whether the named class representatives could assert
claims on behalf of Wellbutrin XL purchasers in every state should have been
reserved for class certification.[371]  *Sullivan* found this Court's "precedent provides
that 'variations in the rights and remedies available to injured class members
under the various laws of the fifty states [do] not defeat commonality and

---

[369] *Sullivan*, 667 F.3d at 307 ("[S]tatutory standing is simply another element
of proof for an antitrust claim, rather than a predicate for asserting a claim in the
first place.").  GSK's cases, Def. Br. 112 & n.44, are either out-of-circuit or precede
this Court's en banc *Sullivan* decision.

[370] *Sullivan*, 667 F.3d at 300-01; *see also In re Ins. Brokerage Antitrust Litig.*, 579
F.3d 241, 275 (3d Cir. 2009) ("The named plaintiffs only needed to allege that
they suffered an injury in fact and were not required to prove the merits of their
case against [the defendants] to establish standing.").

[371] JA-242-43 (Mem. Op. Mots. Dismiss) (rejecting end-payors' argument that
it would be "premature for the Court to make a determination as to their ability to
bring suit under the laws of those states where neither they nor their members
reside.  [End-payors] argue that such a determination is appropriately handled in
the class certification context.").

predominance,'" at class certification.[372]  This Court has continually addressed the issue of varying state-law claims through the lens of class certification.[373]

The Court should vacate the district court's dismissal and permit the end-payors to seek certification of a class including persons or entities with claims under the dismissed jurisdictions' laws.[374]

## B.   Aetna Inc. should be permitted to intervene.

### 1.   Aetna's appeal is timely.

Aetna has timely appealed the district court's order denying intervention.[375]  In *Carlough v. Amchem Products, Inc.*,[376] this Court held "parties who will be able to appeal from a final judgment will not be permitted to take an

---

[372] 667 F.3d at 301 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 530 (3d Cir. 2004)); *see also id.* at 300-01 (focusing "on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a 'colorable' claim.").

[373] *See Warfarin*, 391 F.3d at 529-30 (affirming nationwide settlement class certification, citing  "recent decisions elsewhere have certified nationwide or multistate classes under state laws in actions alleging overpayment for brand-name prescription drugs"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998) (affirming certification of nationwide settlement class under federal securities law and varying state common and statutory law).

[374] As discussed below and in the purchasers' opening brief, Pl. Br. 122-23 n.613, the district court's erroneous dismissal was then exacerbated by its improper denial of Aetna's intervention motion.

[375] JA-302-23 (Mem. Op. Intervention).

[376] 5 F.3d 707 (3d Cir. 1993).

immediate appeal from a denial of intervention."[377]  Absent class members can

only appeal a final judgment.[378]  Therefore Aetna, as an absent class member,

could not immediately appeal the district court's order, and timely appealed from

final judgment.[379]

### 2.   The district court abused its discretion in denying Aetna's intervention.

The district court abused its discretion in finding Aetna's intervention

motion untimely.[380]  The defendants suggest that Aetna overlooked the principal,

espoused by *In re Community Bank of Northern Virginia*,[381] that timeliness of an

---

[377] *Id.* at 714.

[378] *Id.* at 712-14 (holding that objecting class members "must wait until such final disposition to appeal any result, including the denial of intervention, that may be adverse to their interests," because while "an outsider denied intervention" may immediately appeal, "anyone who is involved in an action sufficiently to have a right of appeal from its final disposition does not have an immediate right of appeal from a denial or partial denial of intervention"); *see also Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 32 (3d Cir. 1971) ("[A]ggrieved class members may appeal any final order of a district court in proceedings held pursuant to Rule 23.").

[379] The cases the defendants cite, involving "outsider[s] denied intervention" are inapposite, because outsiders may immediately appeal, as *Carlough* recognized. *See* Def. Br. 114 (citing *Polak v. Lebron*, 61 F. App'x 807, 810 (3d Cir. 2003) (non-class case analyzing appellate rights of outside intervenors); *United States v. City of Oakland*, 958 F.2d 300, 302 (9th Cir. 1992) (same); *McClune v. Shamah*, 593 F.2d 482, 485 (3d Cir. 1979) (same)).

[380] Pl. Br. 122-27.

[381] 622 F.3d 275 (3d Cir. 2010).

91

intervention request is assessed under the "totality of the circumstances."[382] However, this principle was originally articulated in, and quoted directly from, the district court *Community Bank* case,[383] on which Aetna's appeal relies.[384]

The defendants also argue the district court properly found Aetna's motion untimely because Aetna "downplay[ed] the prejudice that its intervention would have caused."[385] The defendants ignore the events that transpired in the district court, chronicled in the purchasers' opening brief[386]: Aetna never sought to introduce "new claims,"[387] and the district court subsequently permitted the end-payors to amend their complaint to add new claims.[388] No version of the prejudice the district court prophesied actually came to be.

Although Aetna had sufficient interest in the litigation, with Wellbutrin XL purchases in all 50 states,[389] the district court found that Aetna could not show an impairment of its interests because "Aetna's rights under the laws of the states not represented in this case" – *i.e.*, the 37 state-law claims dismissed for

---

[382] *Id.* at 313; *see* Def. Br. 116-17.

[383] *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005).

[384] Pl. Br. 123-27.

[385] Def. Br. 116 n.49.

[386] Pl. Br. 124-25.

[387] Pl. Br. 124-25 n.621.

[388] *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677-82 (E.D. Pa. 2010).

[389] JA-320 (Mem. Op. Intervention).

lack of Article III standing – "will not be extinguished by any outcome here."[390]
The court's errant conclusion that it lacked jurisdiction over the state-law claims
in these states was heightened, as it led to denial of Aetna's intervention motion.

The Court should vacate the denial of Aetna's intervention motion.

## IV.   DIRECT PURCHASER CLASS CERTIFICATION SHOULD BE AFFIRMED.

The defendants do not dispute this case hinges on common issues and is
susceptible to common proof.  Nevertheless, the defendants say this case should
be tried up to *32 times* rather than once, because there are "only" 32 class
members.

### A.   Counterstatement of the issue.

Is it an abuse of discretion for a district court to certify a class of 32
geographically-dispersed direct purchasers in an antitrust case?

### B.   Standard of review.

This Court reviews the district court's finding that joinder is impracticable
under Rule 23(a)(1) for abuse of discretion.[391]  For this "'fact-specific inquiry,'" the
reviewing court must "'grant wide latitude to the district court'" and "defer to its
determination if the court 'made an appropriate judgment call.'"[392]  As to the

---

[390] JA-320-21 (*id.*).

[391] *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015).

[392] *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir.

(*Continued*)

district court's "weighing of the relevant factors" (here, under Rule 23(a)(1)), this Court is restricted to review for "a clear error of judgment."[393]  "[U]nless abuse is shown, the trial court's decision on [the Rule 23(a)(1)] issue is final[.]"[394]

## C.   Counterstatement of the case and summary of argument.

The direct purchaser class is composed of 32 entities spread across 15 states.[395]  Many class members are small wholesalers who purchased limited quantities of Wellbutrin XL.[396]  After extensive briefing, a full-day evidentiary hearing,[397] and post-hearing submissions, the district court certified the direct purchaser class.[398]  Applying established class-action law, it found joinder of 33 geographically dispersed class members would be "impractical," certification

---

2006)); *id.* at 1215-16 ("Overtur[n]ing the district court's class certification determinations would be substituting our discretion for that of the district court – something we are not empowered to do."); *see also Rannis v. Recchia,*  380 F. App'x 646, 651-52 (9th Cir. 2010) (district court had discretion to certify class of 20).

[393] *In re Cendant Corp. PRIDES Litig.*, 235 F.3d 176, 181 (3d Cir. 2000).

[394] *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967).

[395] JA-9; *see also* JA-39142 (class member map).  The class included 33 class members when certified, and only one entity opted out.  Decl. Not. Administrator Concerning Delivery 2, No. 08-cv-2431 (E.D. Pa. Jan. 20, 2012), ECF No. 416-1.

[396] JA-39790 (GSK expert declaration listing net purchases and percentages for various class members).

[397] *See* JA-435-609 (Apr. 5, 2011 Hr'g Tr.).

[398] JA-1-45 (Mem. Op. Class Certification).

would economize a lengthy and complex action, and these factors "more heavily
favor the use of a class action."[399]

The defendants admit that "there is no minimum number of members
needed to satisfy numerosity,"[400] and do not dispute that the factors considered by
the district court were the correct ones.[401]  The defendants concede that the Rule
23(a)(1) inquiry is entrusted to the district court's discretion,[402] yet they do not
identify a single *legal* error committed by the district court, nor challenge the
sufficiency of the evidence as to any of the court's findings.  Instead, the
defendants criticize the district court for placing "undue weight"[403] on the
geographic dispersion of class members and the burden on the judicial system of
individual actions. But a district court does not "abuse its discretion by weighing
factors differently than [appellant] would have liked[,]"[404] nor is there clear
error simply because an appellate court may "disagree with the district court's
factual findings[.]"[405]

---

[399] JA-8-9 (*id.*).

[400] Def. Br. 123.

[401] *Compare* JA-8 (Mem. Op. Class Certification) *with* Def. Br. 123.

[402] Def. Br. 120.

[403] *E.g.*, Def. Br. 121.

[404] *United States v. Geraci*, 557 F. App'x 611, 615 (8th Cir. 2014).

[405] *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 108 (2d Cir.
2003).

## D. Argument.

### 1. A 32-member class is sufficiently numerous to render joinder impracticable.

The defendants admit "there is no minimum number of members needed to satisfy numerosity,"[406] and Rule 23(a)(1) requires the consideration of several subjective factors identified by the district court, including geographic dispersion, judicial economy, the size of individual claims, and absentees' ability to bring suit.[407]

The district court cited other delayed generic entry cases involving similarly-sized classes.[408]  Even smaller classes have been certified in generic drug delay cases[409] and other contexts.[410]

---

[406] Def. Br. 123; *see also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("*No minimum number of plaintiffs* is required to maintain a suit as a class action . . . ."); *Weiss v. York Hosp.*, 745 F.2d 786, 808 n.35 (3d Cir. 1984) (there is no "hard and fast number rule").

[407] Def. Br. 123.

[408] JA-9-10 (Mem. Op. Class Certification) (citing *Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127, 133 (E.D. Pa. 2010)) (33-member class); *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2008 WL 2699390, at *3 (D.N.J. Apr. 14, 2008) (45-member class), *aff'd* 686 F.3d 197, 221 (3d Cir. 2012), *judgment vacated on other grounds sub nom.*, *Upsher-Smith Labs., Inc. v. La. Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013) and *Merck & Co., Inc. v. La. Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013), *reinstatement granted*, No. 10-2077, 2013 WL 5180857 (3d Cir. Sept. 9, 2013); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 306 (D.D.C. 2007) (29-member class).

[409] *See, e.g.*, *Mylan Pharms., Inc. v. Warner Chilcott Public Ltd. Co.*, No. 12-cv-3824, 2014 WL 631031, at *2 (E.D. Pa. Feb. 18, 2014) (23-member settlement class); *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 51-52 (D. Mass.

*(Continued)*

## 2. The district court acted within its discretion in finding geographic dispersion and judicial economy favored certification.

The defendants challenge the district court's "practical judgment" on the "particular facts" of this case,[411] arguing that joinder of all 32 class members might be accomplished.

The district court found "this complex case has involved numerous discovery disputes" and repeated delays, complications which "would be greatly increased if all direct purchasers were joined in this suit."[412]  And it found "the class members' geographic dispersion would cause substantial difficulty for the parties to conduct discovery efficiently and to coordinate the litigation."[413]

These factual findings, based on the court's experience with this case, are entitled to substantial deference, as the district court "'generally has a greater

---

2013) (24 or 29 class members dispersed throughout country); *In re Prograf Antitrust Litig.*, No. 11-cv-10344,  2013 WL 2395083, at *1 (D. Mass. Apr. 23, 2013) (25 members sufficient, where litigation is complex and members geographically dispersed).

[410] *Rannis*, 380 F. App'x 651-52 (20-member class); *Cypress*, 375 F.2d at 653 (18-member class); *Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765-66 (8th Cir. 1971) (20-member class).

[411] *Weiss*, 745 F.2d at 808 n.35.

[412] JA-9 (Mem. Op. Class Certification); *see also* JA-41(*id.*) ("Individual treatment of each class member['s] claims would require duplicative, expensive litigation, which would come at enormous expense to the parties and judicial economy."); *Am. Sales*, 274 F.R.D. at 137 (court and class members "would expend significant resources to resolve identical issues" absent class certification).

[413] JA-9 (Mem. Op. Class Certification).

familiarity and expertise' with the 'practical . . . and primarily . . . factual'
problems of administering a lawsuit 'than does a court of appeals.'"[414]

The district court's findings also accord with the Supreme Court's
admonition that class actions "sav[e] the resources of both the courts and the
parties by permitting an issue potentially affecting every [class member] to be
litigated in an economical fashion under Rule 23."[415]  And as the defendants
acknowledge, efficiency is a "core objective" of Rule 23(a)(1).[416]

The defendants' joinder proposal invites this Court to replace one
streamlined class case with as many as 32 individual cases spread across the
country.  Suits like this one are extremely costly, in time, resources, and money.
Discovery encompassed over 300,000 documents, more than 59 depositions, and
numerous expert reports.[417]  And the case has not yet reached trial.  The

---

[414] *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993)
(quoting *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977)) (alteration
in original).

[415] *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979).

[416] Def. Br. 122 (quoting *Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 594–95
(3d Cir. 2012)); *see also Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)
("Relevant considerations [under Rule 23(a)(1)] include judicial economy arising
from the avoidance of a multiplicity of actions[.]").  The defendants cite *Marcus*,
but there, the district court had engaged in "speculation," 687 F.3d at 597, a
contention the defendants have not and cannot make here.

[417] Decl. Co-Lead Counsel Supp. Direct Purchasers' Mot. Award Attorneys'
Fees 2, No. 08-cv-2431 (E.D. Pa. Sept. 17, 2012), ECF No. 476. This declaration
was submitted in connection with the settlement with Biovail; the litigation
continued thereafter.

defendants' joinder demand invites each class member (who can afford it) to bear these expenses, reopen document and deposition discovery, and retain its own counsel – all at the expense of judicial economy.

Moreover, geographic dispersion is a factor to be considered.[418]  Given the far-flung location of class members, absent certification, direct purchasers could file anywhere, risking duplicative, separate trials that could result in inconsistent verdicts.  That other district courts – on other records – may have exercised their discretion to give less weight to geographic dispersion[419] does not compel reversal here.

While the defendants imagine that some class members may "participate in joined litigation,"[420] there is nothing obligating them to do so.[421]  Nothing about

---

[418] *See Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985); *see also K-Dur*, 2008 WL 2699390, at *3 (45-47 class members "geographically dispersed . . . render[s] joinder of all members impracticable"); *Teva Pharm. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 225 n.26 (D. Del. 2008) ("Where, as here, potential class members are from disparate geographical areas, this also weighs towards class certification."); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) ("The 29 class members in this action are from nine different states.  This is enough geographical dispersion to justify a finding that joinder is impracticable in a securities case like this one.").

[419] Def. Br. 125-26.

[420] Def. Br. 121.

[421] Joint pretrial proceedings are not guaranteed, because this is not an MDL. Even were an MDL established here, 28 U.S.C. § 1407 requires remand for trial. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).  And the defendants can only speculate whether suits filed elsewhere would be transferred under 28 U.S.C. § 1404.

the efficiency of "modern discovery" or the amount of damages can avoid the need

for numerous trials in courts nationwide.  The standard is not whether joinder is

"impossible," but "impracticable."[422]

### 3.    Class certification promotes enforcement of the antitrust laws.

The importance of class actions to antitrust enforcement also favors

certification.[423]  "[D]irect purchasers sometimes may refrain from bringing a

treble-damage suit for fear of disrupting relations with their suppliers."[424]  So "'a

class action may be the only practical method for resolving [distributor class

members'] claims.'"[425] Class certification can ensure a defendant does not keep ill-

gotten gains merely because its customers may be reluctant to sue their

---

[422] *Robidoux*, 987 F.2d at 935.

[423] *See Nexium*, 296 F.R.D. at 52 (finding joinder impractical because of the "favorable treatment to class actions in the private enforcement of antitrust laws" (internal quotes and citation omitted)); *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) (joinder impractical in light of role of private enforcement of antitrust laws).

[424] *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977); *see, e.g., Rochester Drug Co-op., Inc. v. Braintree Labs.*, 796 F. Supp. 2d 560, 567 (D. Del. 2011) ("there is no dispute that defendant at bar terminated its business relationship with plaintiffs specifically as a result of plaintiffs' pursuit of [pharmaceutical antitrust] litigation"); *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725, 726 (3d Cir. 1962) (defendant discontinued sales to plaintiff for filing an antitrust case).

[425] *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 273 n.6 (D. Mass. 2008) (quoting *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 386 (S.D.N.Y. 1996)).

suppliers.[426]  Denying certification would, in turn, diminish the amount of overcharge liability the defendants would face, thwarting the deterrence goals upon which the Supreme Court in *Illinois Brick* rested its decision to exclusively vest the direct purchaser with the federal antitrust overcharge damage claim.[427] Indeed, the defendants have no quarrel with class certification here if summary judgment is upheld (meaning all class members lose).

### 4. The district court acted within its discretion to place less weight on other factors.

The defendants imply that because class members are identifiable and some might have the finances and inclination to litigate their own claims if class certification were vacated, the district court should have concluded that joinder of all class members here is somehow practicable.[428]  But this is just a quarrel with the district court's discretionary assignment of relative weights to the Rule 23(a)(1) factors, impermissible on appeal.

---

[426] *Cf. Indus. Diamonds*, 167 F.R.D. at 386 (finding class action superior where, among other things, some class members "still depend on [the defendants] for their supply of industrial diamond products and may be hesitant to disrupt those relationships."); 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:41 (4th ed. 2002) ("Class actions perform an important function in cases where individual franchisees or purchasers are reluctant to sue because they fear economic reprisal," and collecting cases.).

[427] *Ill. Brick*, 431 U.S. at 746–47.

[428] Def. Br. 122.

Nor would individual suits be as practicable as the defendants imagine. Many class members are small companies with small claims and limited resources.[429]  Even the defendants' expert had no opinion about which class members could feasibly file their own lawsuits, or even how much in damages a class member must sustain in order to make an individual lawsuit here economical.[430]  Fourteen class members had claims of less than ███████, and class members with less than .01% of class purchases can expect only ███████ ███████ in damages.[431]  Even assuming 100% recovery, these sums would not warrant an individual suit.

The defendants' notion that class members may wish to control their own litigation[432] is belied by this and other cases: few, if any, direct purchaser class members have opted out of any prior generic delay case to bring their own suits. Indeed, here, after receiving notice of class certification only one member of the direct purchaser class opted out[433] – and did not file its own lawsuit.

---

[429] JA-39790 (Joskow Decl.).

[430] JA-39605 (Joskow Dep.).

[431] These estimates use the calculations of the defendants' expert, Andrew Joskow, JA-39790 (Joskow Decl.), and multiply each member's share of the purchases against the class-wide damage figure of ███████.

[432] Def. Br. 122.

[433] Decl. Not. Administrator Concerning Delivery 2, No. 08-cv-2431 (E.D. Pa. Jan. 20, 2012), ECF No. 416-1.

Rule 23's efficiency is desirable even when the class contains large

claimants who could afford to sue individually. "Rule 23(b)(3) does not exclude

from certification cases in which individual damages run high[.]"[434] As Judge

Becker found, even where "plaintiffs might proceed on their own," certification is

appropriate because "the historic function of the common question suit – to

'achieve economies of time, effort and expense, and promote uniformity of

decision as to persons similarly situated' – remains a predominant element in the

rationale behind Rule 23(b)(3)."[435] Scholars agree: even "where claims are [large

but] few, class actions save scarce public enforcement resources by enabling

private enforcement through aggregate claiming."[436]

The defendants also suggest they have been deprived of "due process"

rights to confront absent class members,[437] but they "did not raise that argument

---

[434] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *K-Dur*, 2008 WL 2699390, at *20 (certifying a class even though it "is relatively small and comprised largely of sophisticated purchasers who are able to prosecute their claims independently"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 325 (E.D. Mich. 2001) ("'[T]he presence of large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own does not militate against class certification.'" (quoting *Paper Sys., Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 605 (E.D. Wis. 2000))).

[435] *Ungar v. Dunkin' Donuts of Am., Inc.*, 68 F.R.D. 65, 148-49 (E.D. Pa. 1975) (quoting *Moore's Federal Practice* ¶ 23.45 (2d ed. 1974)), *rev'd on other grounds*, 531 F.2d 1211 (3d Cir. 1976).

[436] 1 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1:9 at 27 (5th ed. 2013) (internal footnote omitted).

[437] Def. Br. 122.

below" and therefore "it is waived."[438]  Indeed, they do not identify *any* challenges they would have raised absent certification; and they admit the direct purchasers' individual documents are not useful.[439]  And their argument proves too much, for if the defendants can defeat certification merely by claiming a right to confront absent class members, no class would be large enough to certify, whether 32 or 32,000.

## V.   END-PAYOR CLASS CERTIFICATION SHOULD BE AFFIRMED.

### A.   Counterstatement of the issues.

1.    In certifying an end-payor class, the district court relied on the end-payors' expert, Professor Rosenthal's, antitrust impact methodologies.  The defendants "did not raise a challenge to [those] methodolog[ies] under *Daubert*, and as a result, there is no basis in the record to conclude that it was legal error to admit" Professor Rosenthal's conclusions which are "probative as to the" impact actually suffered by each class member.[440]  Can the defendants now assert this "legal error" on appeal?

---

[438] *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 706 F.3d 217, 226 (3d Cir. 2013).

[439] Def. Br. 121.

[440] *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016).

2.    Did the district court abuse its discretion by accepting Professor Rosenthal's economic analyses – tested through rigorous cross-examination during live testimony – concerning antitrust impact?

3.    Regardless, is affirmance required where the defendants failed to challenge the district court's finding that predominance was satisfied because every other issue in the case is susceptible to common proof?

## B.    Standard of review.

This Court "review[s] a class certification order for abuse of discretion," overturning only "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."[441]

## C.    Summary of argument.

The Supreme Court recently rejected a predominance challenge to admissible statistical evidence supporting inferences of class members' injuries, holding class certification could be denied only if no reasonable juror could draw those inferences.[442]  Below, the defendants did not argue that Professor Rosenthal's methodologies and the inferences flowing therefrom flunked the *Daubert* test.  There is, therefore, no basis for this Court to find legal error in admitting her analysis, from which a reasonable juror could find antitrust injury to the end-payor class.

---

[441] *In re Cmty. Bank of N. Va.*, 795 F.3d 380, 391 n.17 (3d Cir. 2015).

[442] *Tyson Foods*, 136 S. Ct. at 1049.

Although the defendants cloak their arguments in class-certification jargon, they ask this Court to reach different factual conclusions than the district court.[443] To succeed, the defendants must show the district court's factual findings to be "clearly erroneous,"[444] a hurdle they cannot vault.

Regardless, the defendants cannot prevail on appeal. They attack a single issue in this complex, multifaceted case –antitrust impact.[445] They effectively concede, therefore, every other issue is susceptible to common proof (as the district court held). Even if some degree of individual inquiry is required to assess antitrust impact, common issues otherwise predominate.

## D.  Argument.

### 1.  The defendants did not challenge Professor Rosenthal's methods under Rule 702.

The defendants make two arguments in support of their appeal: (1) the inference that end-payors would have purchased generics absent the anticompetitive conduct was improper; and (2) determining whether purchasers of generic Wellbutrin XL would have paid less absent the alleged misconduct

---

[443] Def. Br. 133-34 ("Factual determinations 'supporting Rule 23 findings,' including inferences, 'must be made by a preponderance of the evidence.'").

[444] *Cmty. Bank*, 795 F.3d at 391 n.17.

[445] Def. Br. 132-39.

requires an individual inquiry.[446]  Both arguments challenge the district court's acceptance of Professor Rosenthal's statistical evidence.[447]

*Tyson Foods* held: "[o]nce a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."[448]  So, while "[r]easonable minds may differ as to whether" an expert's analysis "is probative" as to each class member, "[r]esolving that question" is "the near-exclusive province of the jury."[449]  A court may deny certification "only if it concluded that no reasonable jury could have believed" the expert's analysis applicable on a class-wide basis.[450]

The defendants mount a similar argument here, but never sought to exclude Professor Rosenthal's antitrust-impact opinions in the district court.[451]  The district court rigorously analyzed the defendants' criticisms of Professor Rosenthal's evidence, rejected them, and found that end-payors provided evidence of class-wide antitrust impact.

---

[446] *Id.* 132–40.

[447] *Id.* at 136.

[448] *Tyson Foods*, 136 S. Ct. at 1049.

[449] *Id.*

[450] *Id.*

[451] Thus, "the record here provides no basis for this Court to second-guess that conclusion."  *Id.*  The defendants also did not challenge Professor Rosenthal's yardstick methodology itself before the district court, so to the extent they now disguise yardstick criticisms as attacks on but-for world "inferences," they have waived those arguments.  *See Ins. Brokerage*, 579 F.3d at 261.

## 2. The district court's factual predominance findings do not constitute clear error.

The district court recognized the end-payors provided evidence of two different types of antitrust impact: (1) generic overcharges, *i.e.*, the end-payors would have paid less for generic Wellbutrin XL sooner, but-for the defendants' misconduct; and (2) branded overcharges, *i.e.*, the end-payors would have substituted a vast majority of their brand Wellbutrin XL purchases for the less-expensive generic Wellbutrin XL sooner, but for the defendants' misconduct.[452] The end-payors offered Professor Rosenthal's analysis to support class-wide claims of antitrust impact.  Utilizing aggregate empirical data from IMS Health, a pharmaceutical data aggregator, and other industry sources, Professor Rosenthal applied a "yardstick" economic analysis to show the class-wide impact of generic price erosion and brand-to-generic substitution rates.[453]

After conducting a rigorous analysis of the evidence and testimony,[454] the district court concluded: (1) "class-wide evidence is available to show antitrust impact in the form of a generic overcharge[,]"and (2) "class-wide evidence is

---

[452] JA-357-58 (End-Payor Class Certification Op.).

[453] JA-359-59, 363-65 (*id.*); JA-40519-85 (Rosenthal Rebuttal Decl.).

[454] In total, the parties filed six briefs and expert declarations relating to class certification (excluding the defendants' subsequent "ascertainability" decertification efforts); Professor Rosenthal was deposed twice, Dr. Joskow once. The district court held a full-day evidentiary hearing and later heard another three hours of argument.

available to demonstrate that the price of generic extended-release bupropion hydrochloride would have been lower than Wellbutrin XL absent the defendants' anticompetitive conduct."[455]  The district court *sua sponte* narrowed the class definition to restrict "branded overcharges" recovery to only those purchasers that purchased both brand and generic Wellbutrin XL, finding this restriction necessary because Professor Rosenthal's probability analysis did not show it was more likely than not all end-payors with brand purchases would have made at least one generic purchase, absent the defendants' misconduct.[456]

### a.   Professor Rosenthal's "yardstick" analysis was reliable.

The defendants first argue the end-payors failed to provide adequate evidence that class members who purchased both brand and generic Wellbutrin XL in the actual world would have also purchased a generic version in the but-for world.[457]

Professor Rosenthal used a "yardstick" approach to analyze class-wide antitrust impact.  The "yardstick" approach – which compares actual prices and

---

[455] JA-360-65 (End-Payor Class Certification Op.).

[456] *Id.* (using aggregate empirical transaction data, Professor Rosenthal calculated that the probability of a purchaser with over 10 claims having no generic claims in the but-for world was 3 in 1 billion; the district court rejected this insufficient because one named plaintiff made 13 consecutive purchases of brand Wellbutrin XL before purchasing a generic).  The district court narrowed the class definition before having the benefit of *Tyson*, discussed above, which confirmed the acceptability of representative evidence in class cases.

[457] Def. Br. 132-37.

quantities in the market of interest to prices and quantities in a similar market untainted by the alleged conduct – is commonly applied in antitrust cases to simulate what would have occurred but for the anticompetitive activity.[458]

The defendants argue against the district court's inference that, if a class member purchased brand and generic Wellbutrin XL in the actual world, they would have purchased a generic in the but-for world.[459]  But the district court also employed this inference in granting certification of the direct purchaser class, where the defendants do not challenge it.[460]

And Professor Rosenthal rebutted this argument, explaining how economic forces and structural mechanics in the pharmaceutical industry assure generic substitution and price differentials.[461]  As she explained, in five of the six class states, mandatory generic substitution laws meant generics *had to be* substituted for brand prescriptions at the pharmacy counter unless the prescribing doctor

---

[458] *E.g.*, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-md-1486, 2006 WL 1530166, at *9-11 (N.D. Cal. June 5, 2006); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 699 (S.D. Fla. 2004) (accepting a similar yardstick analysis and noting that it is "widely accepted and ha[s] been used in numerous other antitrust class actions"); *see* 3 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 10.3 (4th ed. 2002) (collecting cases).

[459] Def. Br. 133-36.

[460] JA-32-33 (Mem. Op. Class Certification).  This Court subsequently expressed approval of just such an inference in *K-Dur*, 686 F.3d at 220-23.

[461] JA-40521-25 (Rosenthal Rebuttal Decl.).

expressly ordered otherwise.[462]  Neither formulary variances nor changes in

beneficiary membership alter mandatory generic substitution laws, or undermine

Professor Rosenthal's calculations – supported by the defendants' own

testimony[463] – showing that generic Wellbutrin XL market entry impacted

generic prices and brand sales volume.[464]  The defendants never attempted to

substantiate or quantify the prevalence of the alleged "variance" in generic

substitution rates it claims was caused by formulary differences.[465]

### b.  Professor Rosenthal's generic overcharge opinions were credible.

GSK posits that the class members with "generic overcharge" antitrust

impact cannot be identified without individual inquiry due to alleged variations in

---

[462] Fla. Stat. § 465.025; Nev. Rev. Stat. Ann. § 639.2583; N.Y. Educ. Law § 6816-a(1); Tenn. Code Ann. § 53-10-204(a); Wis. Stat. § 450.13.  Only in California is generic substitution at the discretion of the pharmacist.  Cal. Bus. & Professions Code § 4073(a).  However, as a practical matter, pharmacists with discretion substitute generics because it saves the customer money and pharmacies earn a higher profit margin on generic drugs.

[463] JA-40520 (Rosenthal Rebuttal Decl.) (highlighting deposition testimony from two defense witnesses).

[464] JA-40519-40 (*id.*).

[465] *See In re Nexium (Esomeprazole) Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) (rejecting defendants' attack on antitrust impact where they failed to quantify alleged uninjured class members, as "[t]he defendants' speculation cannot defeat the plaintiffs' showing").

pricing.[466]  According to the defendants, Professor Rosenthal's yardstick methodology "masks" these variations.[467]

The district court rejected this argument: "The use of averages in this case *does not mask* meaningful variations in overcharges, and it provides a reliable method to provide a reasonable estimate of the damages based on relevant purchase data."[468]  The district court recognized the defendants' expert improperly drew conclusions from contemporaneous prices only, ignoring that generic prices would have been lower without the antitrust violation.[469]

The defendants claim that one plaintiff, D&C 30, suffered no antitrust impact because it only proved one overcharge.[470]  But one overcharge *is* antitrust impact,[471] rendering GSK's example supportive of class certification.

---

[466] Def. Br. 137-39.

[467] *Id.* at 138.

[468] JA-370 (End-Payor Class Certification Op.).  Professor Rosenthal rebutted the defendants' current arguments in her report addressing Dr. Joskow's criticisms.  JA-40519-40 (Rosenthal Rebuttal Decl.).

[469] JA-359 (End-Payor Class Certification Op.) (citing Professor Rosenthal's testimony that Dr. Joskow's "comparisons don't take account of the fact that in the so called, but for scenario, the generic would have launched a year to a year and a half earlier and all of those contemporaneous prices would also have been affected").

[470] Def. Br. 137-39 ("[P]laintiff D&C 30 *in all but one instance*, paid less for generic Wellbutrin XL than Professor Rosenthal's but-for prices[.]").

[471] *Nexium*, 777 F.3d at 27 ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show − as a legal and factual matter − [antitrust] impact or fact of damage.").

### 3. The defendants' failure to challenge the district court's conclusions concerning the other common issues of law or fact dooms their predominance argument.

Even if the defendants' antitrust impact arguments were correct, certification must be affirmed. Individualized proof of *one* element of a claim does not defeat predominance.[472] Nor, this Court has held, does the possibility of some uninjured class members.[473]

The district court found "[t]he issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members" and "the Plaintiffs have set forth a satisfactory methodology to estimate class-wide damages resulting from the alleged generic overcharges."[474]

---

[472] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t]' of [her] claim is susceptible to class wide proof.' What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" (quoting Fed. R. Civ. P. 23(b)(3)) (emphasis and alterations in original)); *see, e.g.*, *Nexium*, 777 F.3d at 21 ("[T]he Supreme Court in *Amgen* and the circuits in other cases have made clear that the need for some individualized determinations at the liability and damages stage does not defeat class certification. Rule 23(b)(3) 'does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof.'" (quoting *Amgen*, 133 S. Ct. at 1196)).

[473] *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 158 (3d Cir. 2002) (certifying class where uninjured members were merely "limited exceptions relating to purchasers whose contracts were tied to a factor independent of the price of linerboard").

[474] JA-356, 370 (End-Payor Class Certification Op.).

113

This alone supports predominance.  Hence, the defendants' contentions regarding

antitrust impact cannot demonstrate the district court abused its discretion in

certifying the class.


Dated: June 22, 2016                     Respectfully submitted,

                                         /s/ Thomas M. Sobol
                                         Thomas M. Sobol
                                         David S. Nalven
                                         Kristen A. Johnson
                                         Kristie A. LaSalle
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         55 Cambridge Parkway, Suite 301
                                         Cambridge, MA  02142
                                         (617) 482-3700
                                         tom@hbsslaw.com
                                         davidn@hbsslaw.com
                                         kristenj@hbsslaw.com
                                         kristiel@hbsslaw.com

                                         David F. Sorensen
                                         Andrew C. Curley
                                         Caitlin G. Coslett
                                         Nicholas Urban
                                         BERGER & MONTAGUE, P.C.
                                         1622 Locust Street
                                         Philadelphia, PA  19103
                                         (215) 875-3000
                                         dsorensen@bm.net
                                         acurley@bm.net
                                         ccoslett@bm.net
                                         nurban@bm.net

Peter R. Kohn
Faruqi & Faruqi, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
(215) 227-5770
pkohn@faruqilaw.com

Barry S. Taus
Archana Tamoshunas
Taus, Cebulash & Landau, LLP
80 Maiden Lane, Suite 1204
New York, NY  10038
(212) 931-0704
btaus@tcllaw.com
atamoshunas@tcllaw.com

Dianne M. Nast
NastLaw LLC
1101 Market Street, Suite 2801
Philadelphia, PA  19107
(215) 923-9300
dnast@nastlaw.com

Don Barrett
Sterling Starns
Brandi Hamilton
Barrett Law Group, P.A.
404 Court Square
P.O. Box 927
Lexington, MS  39095
(662) 834-2488
dbarrett@barrettlawgroup.com
sstarns@barrettlawgroup.com
bhamilton@barrettlawgroup.com

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

115

/s/ Peter D. St. Phillip, Jr.
Peter D. St. Phillip, Jr.
Richard W. Cohen
Gerald Lawrence
Uriel Rabinovitz
Noelle Ruggiero
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY  10601
(914) 997-0500
pstphillip@lowey.com
rcohen@lowey.com
glawrence@lowey.com
urabinovitz@lowey.com
nruggiero@lowey.com

Kenneth A. Wexler
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
(312) 346-2222
kaw@wexlerwallace.com
jnb@wexlerwallace.com

James G. Stranch, III
Joe P. Leniski
BRANSTETTER STRANCH & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Park Avenue, Suite 200
Nashville, TN  37203
(615) 254-8801
jims@bsjfirm.com
joeyl@bsjfirm.com

*Counsel for End-Payor Class Plaintiffs-Appellants*

116

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certify that:

- The foregoing brief is in 14-point Bell MT proportional font and contains 27,918 words (exclusive of the caption, table of contents, table of authorities, signature block, and certifications) and thus is in compliance with the type-volume limitations set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and this Court's Order of May 23, 2016;

- The electronic version of the brief filed via the Court's CM/ECF system on June 22, 2016 is identical to the paper copies filed; and

- Pursuant to Third Circuit Local Rule 31.1(c), the electronic version of this brief was checked for computer viruses using Sophos Antivirus version 10.6.  No virus was detected.

Dated: June 22, 2016

/s/ Thomas M. Sobol
Thomas M. Sobol

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

/s/ Peter D. St. Philip, Jr.
Peter D. St. Phillip, Jr.

*Counsel for End-Payor Class Plaintiffs-Appellants*

## CERTIFICATE OF BAR MEMBERSHIP

In accordance with Third Circuit Local Rule 28.3(d), the undersigned counsel hereby certify that they are members of the bar of the United States Court of Appeals for the Third Circuit.

Dated: June 22, 2016

/s/Thomas M. Sobol
Thomas M. Sobol

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

/s/ Peter D. St. Philip, Jr.
Peter D. St. Phillip, Jr.

*Counsel for End-Payor Class Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, certify that, on this date, the foregoing document was served by filing it on the court's CM/ECF system and electronic mail to all counsel of record.

Dated: June 22, 2016

/s/Thomas M. Sobol
Thomas M. Sobol

*Counsel for Direct Purchaser Class Plaintiffs-Appellants*

/s/ Peter D. St. Philip, Jr.
Peter D. St. Phillip, Jr.

*Counsel for End-Payor Class Plaintiffs-Appellants*