# EXHIBIT B

Nos. 15-3559, 15-3591, 15-3681 & 15-3682

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

*On Appeal from the United States District Court*
*for the Eastern District of Pennsylvania*

Case Nos. 08-cv-2431, 08-cv-2433

## APPELLEES/CROSS-APPELLANTS' MOTION FOR AN ORDER DIRECTING THAT APPELLEES'/CROSS-APPELLANTS' BRIEFS BE FILED IN REDACTED FORM

Dated: August 25, 2016

Leslie E. John
Edward D. Rogers
Stephen J. Kastenberg
Jason A. Leckerman
Jessica M. Anthony
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline plc*

Nos. 15-3559 & 15-3681

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

AETNA HEALTH OF CALIFORNIA, INC., et al. on behalf of the Decertified Indirect Purchaser Class

*Plaintiffs-Appellants*,

v.

SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE AND GLAXOSMITHKLINE PLC,

*Defendants-Appellees.*

Nos. 15-3591 & 15-3682

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

PROFESSIONAL DRUG COMPANY, INC., individually and on behalf of the Direct Purchaser Class

*Plaintiff-Appellant*,

v.

SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE AND GLAXOSMITHKLINE PLC,

*Defendants-Appellees.*

Appellees/cross-appellants, SmithKline Beecham Corporation d/b/a GlaxoSmithKline and GlaxoSmithKline plc (collectively "GSK"), respectfully move, through their undersigned counsel, for an order directing the Clerk of Court to file the redacted briefs attached to this motion as Exhibits A and B. GSK also requests that this Court keep under seal the unredacted briefs that the parties have filed.[1]  In support thereof, GSK states as follows:

1.      The briefing schedule in this matter concluded on July 25, 2016.[2]

2.      In compliance with protective orders entered by the District Court shielding confidential materials of the parties and nonparties from public disclosure, both Appellants and GSK moved to file their briefs under seal.

3.      On August 1, 2016, this Court denied all motions to seal the briefs. By order dated August 19, the Court directed the parties to file redacted briefs by August 25, 2016.

4.      In compliance with the Court's order, GSK has filed redacted versions of its second and fourth step briefs as exhibits to this motion.  These redactions seek to protect proprietary information and sensitive sales data that

---

[1]      The first, second, third and fourth step briefs filed by the parties are currently under seal.

[2]      On August 22, 2016, the Court denied Appellants' motion for leave to file a sur-reply brief.

would cause GSK competitive harm if disclosed.  In addition, GSK's proposed redactions to its briefs seek to protect from disclosure non-public information of third parties produced pursuant to confidentiality agreements.

5.     Establishing good cause overcomes the presumption that documents filed in judicial proceedings should be open for public inspection. Cipollone v. Liggett Grp., Inc., 785 F.2d 1108, 1121 (3d Cir.1986); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070–71 (3d Cir.1984) (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 598 (1978)).  "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." Publicker, 733 F.2d at 1071.

6.     The following factors may be considered to determine if good cause exists:

a.)    whether disclosure will violate any privacy interests;

b.)    whether the information is being sought for a legitimate purpose or for an improper purpose;

c.)    whether disclosure of the information will cause a party embarrassment;

d.)    whether confidentiality is being sought over information important to public health and safety;

e.)    whether the sharing of information among litigants will promote fairness and efficiency;

f.)    whether a party benefitting from the order of confidentiality is a public entity or official; and

g.)      whether the case involves issues important to the public. Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir.1995) (citing Pansy v. Borough of Stroudsburg, 23 F.3d 772, (3d Cir.1994)).

7.      The Supreme Court has long recognized that court records should not serve as sources of sensitive business information which "may harm a litigant's competitive standing." Nixon, 435 U.S. at 598. This Court has confirmed that "[d]ocuments containing trade secrets or other confidential business information may be protected from disclosure." Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157, 166 (3d Cir. 1993); *see also* Fed. R. Civ. P. 26(c)(1)(G) (permitting district courts to enter orders protecting "a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way."). This is true even if documents contain "old" information when "information may be extrapolated and interpreted from it to reveal a business' current strategy, strength and weaknesses." Phillips Petroleum Co. v. Rexene Products Co., 158 F.R.D. 43, 47 (D. Del. 1994).

8.      GSK attaches its redacted second and fourth step briefs as Exhibits A and B.

9.      These limited redactions seek to protect information related to GSK's sales data and business relationships, royalty terms, and proprietary product information contained in confidential filings with the U.S. Food and Drug

Administration ("FDA"), including information from GSK's New Drug

Application ("NDA"). The disclosure of this information would disadvantage

GSK's business interest by allowing competitors to determine competitive pricing

strategy and goals, and proprietary product development information. In addition,

at the request of Par Pharmaceuticals, GSK seeks to protect confidential

information relating to the manufacturing and development of Anchen

Pharmaceuticals' (acquired by Par) generic version of Wellbutrin XL and

proprietary product information included in the Abbreviated New Drug

Application ("ANDA") that Anchen submitted to the FDA.

      WHEREFORE, GSK respectfully requests that this Court issue an

order directing the Clerk of Court to file the redacted briefs in the form proposed in

Exhibits A and B. Furthermore, GSK requests that the Court continue to seal the

unredacted first through fourth step briefs filed by the parties.

Dated: August 25, 2016

*/s/ Leslie John*
Leslie E. John (PA ID No. 62290)
Edward D. Rogers (PA ID No. 69337)
Stephen J. Kastenberg (PA ID No. 70919)
Jason A. Leckerman (PA ID No. 87915)
Jessica M. Anthony (PA ID No. 203842)

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline*
*plc*

## CERTIFICATE OF SERVICE

I, Matthew Vahey, hereby certify that, on the date set forth below, I caused a true and correct copy of Appellees/Cross-Appellants' Motion for an Order Directing that the Appellees'/Cross-Appellants' Briefs Be Filed in Redacted Form in the above-referenced actions to be served via electronic notice to all parties, as provided by the CM/ECF electronic filing system.

Dated: August 25, 2016

/s/ Matthew Vahey
Matthew Vahey
**BALLARD SPAHR LLP**

**FILED UNDER SEAL**

**Nos. 15-3559, 15-3591, 15-3681 & 15-3682**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

---

*On Appeal from the United States District Court
for the Eastern District of Pennsylvania*

Case Nos. 08-cv-2431, 08-cv-2433

---

**CONSOLIDATED BRIEF OF
APPELLEES/CROSS-APPELLANTS**

---

Dated:  May 3, 2016

Leslie E. John
Edward D. Rogers
Stephen J. Kastenberg
Jason A. Leckerman
Jessica M. Anthony

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants
SmithKline Beecham Corporation d/b/a
GlaxoSmithKline and GlaxoSmithKline plc*

---

Nos. 15-3559 & 15-3681

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

---

AETNA HEALTH OF CALIFORNIA, INC., et al.
on behalf of the Decertified Indirect Purchaser Class,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE
AND GLAXOSMITHKLINE PLC,

*Defendants-Appellees/Cross-Appellants*.

---

Nos. 15-3591 & 15-3682

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

---

PROFESSIONAL DRUG COMPANY, INC., individually and on
behalf of the Direct Purchaser Class,

*Plaintiff-Appellant/Cross-Appellee*,

v.

SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE
AND GLAXOSMITHKLINE PLC,

*Defendants-Appellees/Cross-Appellants*.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, SmithKline Beecham Corporation n/k/a GlaxoSmithKline LLC and GlaxoSmithKline plc (together, "GSK") make the following disclosure:

1.      GlaxoSmithKline LLC (f/k/a SmithKline Beecham Corporation) is owned, through several levels of wholly-owned subsidiaries, by GlaxoSmithKline plc, a publicly-traded public limited company organized under the laws of England.  GlaxoSmithKline plc has no parent company.

2.      To the knowledge of GlaxoSmithKline LLC and GlaxoSmithKline plc, none of the shareholders of GlaxoSmithKline plc beneficially owns ten percent or more of its outstanding shares.  However, Bank of New York Mellon ("BNYM") acts as Depositary in respect to Ordinary Share American Depositary Receipts ("ADRs") representing shares in GlaxoSmithKline plc.  In that capacity, BNYM is the holder, but not the beneficial owner, of more than ten percent of the outstanding shares in GlaxoSmithKline plc on behalf of the ADR owners who are the beneficial owners of these shares, none of whom to GlaxoSmithKline plc's knowledge owns ten percent or more of its outstanding shares.

3.      No publicly held corporation that is not a party to the proceeding before this Court has a financial interest in the outcome of the proceeding.

Dated:  May 3, 2016                      */s/ Stephen J. Kastenberg*
                                         Stephen J. Kastenberg

i

# TABLE OF CONTENTS

**Page**

APPEAL NOS. 15-3559 & 15-3591 ................................................................ 1

I.     COUNTERSTATEMENT OF THE ISSUES ........................................ 1

II.    COUNTERSTATEMENT OF THE CASE .......................................... 5

    A.     Counterstatement Of Facts ...................................................... 5

        1.     The Drug Approval Process ........................................ 5

        2.     Wellbutrin XL Products and Patents ......................... 6

        3.     *Anchen* Lawsuit ........................................................ 8

        4.     *Abrika* Lawsuit ...................................................... 10

        5.     *Impax* Lawsuit ....................................................... 11

        6.     *Watson* Lawsuit ..................................................... 12

        7.     Biovail's Citizen Petition ......................................... 12

        8.     *Andrx* Litigation .................................................... 13

        9.     The Wellbutrin Settlement ....................................... 14

        10.    Anchen's Delay In Securing Manufacturing Approval From FDA ............................................................... 17

    B.     Procedural History ................................................................ 19

III.   COUNTERSTATEMENT OF THE STANDARD OF REVIEW .............. 21

IV.   SUMMARY OF ARGUMENT .................................................... 22

V.     ARGUMENT ............................................................................ 26

    A.     The District Court Correctly Held That *Anchen* Was Not A Sham Patent Infringement Case ............................................ 26

1. The District Court Properly Applied The Summary Judgment Standard To The *Anchen* Sham Litigation Claim ...................................................................... 31

2. The District Court Did Not Make Factual Findings, Nor Did It Ignore Evidence Cited By Plaintiffs ............................. 35

3. The District Court Properly Held That Biovail's Functional Construction Of "Free Of Stabilizer" Was Objectively Reasonable .......................................................... 37

4. The District Court Properly Held That GSK And Biovail Had A Reasonable Basis To Sue Anchen For Patent Infringement Based On Anchen's ANDA Under Either Biovail's Or Anchen's Claim Construction ........................... 41

B. *Abrika* Cannot Support An Antitrust Claim ........................................ 50

C. The Undisputed Evidence Shows That GSK Did Not Conspire With Biovail To Prosecute *Impax* Or *Watson,* Or To File A Citizen Petition ................................................................................. 52

1. There Is No Evidence Of Concerted Conduct On *Impax* Or *Watson* ........................................................................... 53

2. GSK Did Not Conspire With Biovail To Draft Or File Biovail's Citizen Petition ........................................................ 55

3. There Is No Evidence Of The Continuous Operation Of A Single Conspiracy ................................................................ 58

D. *Watson*, *Impax*, And The Citizen Petition Were Indisputably Not Shams ............................................................................................. 59

1. The District Court Correctly Held That *Watson* Was Not A Sham Patent Infringement Case ......................................... 59

2. The District Court Correctly Held That *Impax* Was Not A Sham Patent Infringement Case ......................................... 59

3. The District Court Correctly Held That the Biovail Citizen Petition Was Not A Sham ........................................... 61

E.    The District Court Correctly Held That Non-Sham Citizen Petition Requests Prevented Plaintiffs From Showing Antitrust Injury ................................................................... 62

F.    This Case Does Not Involve "Serial Petitioning" ............................. 63

G.    The District Court Correctly Granted Summary Judgment On Plaintiffs' Claims Concerning The Wellbutrin Settlement Based On Key Failures Of Proof ................................................. 66

    1.    The Rule Of Reason Legal Standard ....................................... 68

    2.    Plaintiffs Failed To Carry Their Burden Of Demonstrating The Anticompetitive Effects Of The Wellbutrin Settlement ............................................................ 70

        a.    The District Court Correctly Held Plaintiffs Could Not Show The Wellbutrin Settlement Presented The Anticompetitive Harm Identified By *Actavis* ......... 70

        b.    Plaintiffs Cannot Otherwise Establish Anticompetitive Harm Because They Lack Sufficient Evidence To Prove Delay In Generic Entry ............................................................................ 74

            i.    Plaintiffs Fail To Introduce Evidence That Generic Entry Would Have Occurred Earlier Under An Alternate Settlement ........................... 76

            ii.    The District Court Correctly Held Plaintiffs' Failure To Offer Evidence Of The Outcome Of The *Andrx* Patent Litigation Dooms Their "Litigation Scenario" ................................. 82

    3.    Because Plaintiffs Failed To Show Generic Entry Was Delayed, They Also Failed To Prove Antitrust Injury And Causation ......................................................................... 89

    4.    The District Court Correctly Held That Plaintiffs Had Not Raised A Triable Issue As To The Procompetitive Benefits Of The Wellbutrin Settlement .................................... 94

iv

5.    Plaintiffs Fail To Raise A Material Dispute That A
      Launch By Teva/Anchen Before June 12, 2007 Would
      Have Been Illegal................................................................. 102

H.    The District Court Properly Excluded Dr. Leitzinger's
      Testimony ............................................................................ 106

I.    Indirect Purchaser Plaintiffs Lack Standing To Bring Claims
      Under The Laws Of States In Which Neither They Nor Their
      Members Suffered Injury ..................................................... 111

J.    Non-Party Aetna, Inc.'s Appeal Of The District Court's Order
      Denying Its Intervention Is Untimely And Meritless....................... 113

      1.    Aetna, Inc.'s Appeal Is Over Five Years Late And Not
            Properly Before This Court.................................... 113

      2.    The District Court Did Not Abuse Its Discretion In
            Denying Aetna's Intervention................................ 115

VI.   CONCLUSION................................................................. 118

CONDITIONAL CROSS-APPEAL NO. 15-3682............................................ 119

VII.  JURISDICTIONAL STATEMENT ................................................. 119

VIII. STATEMENT OF THE ISSUE ................................................... 119

IX.   STATEMENT OF RELATED CASES .............................................. 119

X.    STATEMENT OF THE CASE ................................................... 119

XI.   STANDARD OF REVIEW....................................................... 120

XII.  SUMMARY OF ARGUMENT .................................................... 120

XIII. ARGUMENT................................................................. 122

A.    The DPP Class Is A Group Of 33 Sophisticated Direct
      Purchasers Seeking Multi-Billion Dollar Pre-Trebled Damages,
      Weighing In Favor Of The Practicability Of Joinder ...................... 123

B.    The Geographic Location Of The Direct Purchasers Is Not A
      Dispositive Factor In The Numerosity Analysis............................ 125

v

    C.    Joinder Of The DPPs Would Not Eliminate Judicial Economy ...... 127

XIV.  CONCLUSION............................................................................ 127

<u>CONDITIONAL CROSS-APPEAL NO. 15-3681</u>................................. 128

XV.  JURISDICTIONAL STATEMENT ........................................... 128

XVI.  STATEMENT OF THE ISSUE ................................................. 128

XVII. STATEMENT OF RELATED CASES...................................... 128

XVIII. STATEMENT OF THE CASE ................................................. 128

XIX.  STANDARD OF REVIEW....................................................... 130

XX.  SUMMARY OF ARGUMENT................................................. 130

XXI.  ARGUMENT............................................................................ 132

    A.    An "Inference" That Entities That Had Purchased Generics In the Actual World Would Have Made Those Purchases In The But-For World Cannot Satisfy the Predominance Requirement...... 132

    B.    Determining Whether Entities Who Paid For Generic Wellbutrin Suffered Antitrust Impact Requires An Individualized Inquiry ................................................... 137

XXII. CONCLUSION............................................................................ 140

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*800 Adept, Inc. v. Murex Secs., Ltd.*,
539 F.3d 1354 (Fed. Cir. 2008) ..........................................................................29

*Abbott Labs. v. TorPharm, Inc.*,
300 F.3d 1367 (Fed. Cir. 2002) ..........................................................................44

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
269 F.R.D. 252 (S.D.N.Y. 2010) ...............................................................124, 125

*Allergan, Inc. v. Watson Labs., Inc.*,
Case No. 09-511, slip op. (D. Del. Dec. 8, 2010) ...............................................39

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
432 F. Supp. 2d 1319 (S.D. Fla. 2006) ..............................................................103

*American Key Corp. v. Cole Nat. Corp.*,
762 F.2d 1569 (11th Cir. 1985) ........................................................................110

*Andrx Pharmaceuticals, LLC v. Anchen Pharmaceuticals, Inc.*,
No. 06-7552 (C.D. Cal. Dec. 27, 2006) ........................................................passim

*Ansari v. New York Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) ...............................................................124, 125

*Associated General Contractors v. California State Council of Carpenters*,
459 U.S. 519 (1983) .......................................................................................69, 91

*AstraZeneca AB v. Mylan Lab., Inc.*,
Nos. 00-6749 et al., 2010 WL 2079722 (S.D.N.Y. May 19, 2010) .......34, 51, 66

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ............................................................................................90

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.*,
No. 03-00887, 2009 WL 8727693 (C.D. Cal. Feb. 17, 2009) ............................66

*Bayer Healthcare, LLC v. United States Food & Drug Admin.*,
942 F. Supp. 2d 17 (D.D.C. 2013) ......................................................................98

*Beazer E., Inc. v. Mead Corp.*,
525 F.3d 255 (3d Cir. 2008) ..............................................................64

*Bell Atl. Network Servs., Inc. v. Covad Cmmc'ns Grp.*,
262 F.3d 1258 (Fed. Cir. 2001) ..........................................................60

*Benjamin v. Dep't of Pub. Welfare of Pennsylvania*,
432 F. App'x 94 (3d Cir. 2011) ...............................................22, 118

*Big Apple BMW, Inc. v. BMW of North America*,
974 F.2d 1358 (3d Cir. 1992) ............................................................52

*Biovail Corp. v. United States Food & Drug Admin.*,
No. 06-1487 (D.D.C. Dec. 18, 2006) ..................................................98

*Boulware v. State of Nev., Dept. of Human Res.*,
960 F.2d 793 (9th Cir. 1992) ..............................................................91

*Braintree Labs., Inc. v. Schwarz Pharma, Inc.*,
568 F. Supp. 2d 487 (D. Del. 2008) ...........................................30, 37

*Breakdown Servs., Ltd. v. Now Casting, Inc.*,
550 F. Supp. 2d 1123 (C.D. Cal. 2007) ............................................91

*Bristol-Meyers Squibb Co. v. Teva Pharm. USA, Inc.*,
288 F. Supp. 2d 562 (S.D.N.Y. 2003) ...............................................40

*Brody v. Spang*,
957 F.2d 1108 (3d Cir. 1992) ............................................................22

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
429 U.S. 477 (1977) ...........................................................................69

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998) .........................................................29

*California Motor Transportation Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .............................................................2, 63, 64

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.*,
334 F. Supp. 2d 197 (N.D.N.Y. 2004) ...............................................39

*Carlough v. Amchem Products, Inc.*,
    5 F.3d 707 (3d Cir. 1993) ...............................................................114

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) ..................................................122, 138

*Carruthers v. Flaum*,
    365 F. Supp. 2d 448 (S.D.N.Y. 2005) ............................................103

*CBC Cos. v. Equifax, Inc.*,
    561 F.3d 569 (6th Cir. 2009) ............................................................93

*Celgene Corp. v. KV Pharm. Co.*,
    No. 07-4819, 2008 WL 2856469 (D.N.J. July 22, 2008) ...................35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................31, 69

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999) ............................................................27

*Christiana Mortgage Corp. v. Delaware Mortgage Bankers Ass'n*,
    136 F.R.D. 372 (D. Del. 1991) ................................................125, 127

*City of Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998).................................................90, 93, 104

*Com. of Pa. v. Rizzo*,
    530 F.2d 501 (3d Cir. 1976) ...........................................................115

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013).....................................................................122

*Consolidated Express v. New York Shipping Ass'n, Inc.*,
    602 F.2d 494 (3d Cir. 1979) ...........................................................105

*Covad Cmmc'ns Co. v. Bell Atl. Corp.*,
    398 F.3d 666 (D.C. Cir. 2005)....................................................33, 36

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).........................................................................112

*Eichorn v. AT & T Corp.*,
    248 F.3d 131 (3d Cir. 2001) ...............................................................90

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000) .............................................................108

*ERBE Elektromedizin Gmbh v. Canady Tech. LLC*,
    629 F.3d 1278 (Fed. Cir. 2010) .........................................................33

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................112

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013)...............................................................passim

*Furlan v. Schindler Elevator Corp.*,
    516 F. App'x 201 (3d Cir. 2013) .......................................................21

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2005) ...............................................................68

*Grandalski v. Quest Diagnostics Inc.*,
    767 F.3d 175 (3d Cir. 2014) .............................................................136

*Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir.1987) .........................................................112

*Guerrero v. Bensalem Racing Ass'n, Inc.*,
    25 F. Supp. 3d 573, 586 (E.D. Pa. 2014)............................................90

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ......................................................passim

*Henry v. St. Croix Alumina, LLC*,
    572 F. App'x 114 (3d Cir. 2014) .....................................................110

*Hoffman-La Roche Inc., 213 F.3d at 1365*...............................................49

*Honeywell Intern., Inc. v. Universal Avionics Sys. Corp.*,
    343 F. Supp. 2d 272 (D. Del. 2004)...................................................30

*iLOR, LLC v. Google, Inc.*,
    631 F.3d 1372 (Fed. Cir. 2011) ............................................37, 39, 40

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) .......................................................54, 57

*In re Bressman*,
  327 F.3d 229 (3d Cir. 2003) ...............................................................95

*In re Canadian Import Antitrust Litig.*,
  470 F.3d 785 (8th Cir. 2006) ...................................................93, 105

*In re Community Bank of Northern Virginia*,
  418 F.3d 277 (3d Cir. 2005) ("*Community Bank I*") ........................116, 117, 118

*In re Community Bank of Northern Virginia*,
  622 F.3d 275 (3d Cir. 2010) ("*Community Bank II*")..............................116, 117

*In re Ditropan XL Antitrust Litig.*,
  529 F.Supp.2d 1098 (N.D. Cal. 2007)..............................................112

*In re Fine Paper Antitrust Lit.,*
  695 F.2d 494 (3d Cir. 1982) .............................................................115

*In re Flonase Antitrust Litig.*,
  692 F.Supp.2d 524 (E.D. Pa. 2010)..................................................111

*In re Flonase Antitrust Litigation,*
  284 F.R.D. 207 (E.D. Pa. 2012).........................................................139

*In re Flonase Antitrust Litigation,*
  795 F. Supp. 2d 300 (E.D. Pa. 2011)..................................................64

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litigation (No. II),*
  751 F.3d 150 (3d Cir. 2014) ................................................................51

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ..........................................120, 131, 134

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) ...............................................................63

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .................................................54, 58, 70

*In re K-Dur Antitrust Litig.,*
No. 01-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) .................................. 58

*In re Lamictal Direct Purchaser Antirust Litig.,*
18 F. Supp. 3d 560, 565 (D.N.J. 2014) ........................................................ passim

*In re Lidoderm Antitrust Litig.,*
74 F. Supp. 3d 1052, 1080 (N.D. Cal. 2014) ................................................ 111

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
998 F.2d 1144 (3d Cir. 1993) ....................................................................... 91

*In re Modafinil Antitrust Litigation,*
No. 15-3475 (3d Cir.) ................................................................................... 119

*In re Nexium (Esomeprazole) Antitrust Litig.,*
968 F. Supp. 2d 367 (D. Mass. 2013) ........................................................... 88

*In re Nexium (Esomeprazole) Antitrust Litigation,*
42 F. Supp. 3d 231, 266 (D. Mass. 2014) .............................................. 104, 105

*In re Niaspan Antitrust Litig.,*
42 F. Supp. 3d 735, 752 (E.D. Pa. 2014) ............................................... 69, 111

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action,*
678 F.3d 235 (3d Cir. 2012) .................................................................... 21, 112

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,*
No. 14-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015) ........................ 90

*In re Terazosin Hydrochloride Antitrust Litig.,*
160 F.Supp.2d 1365 (S.D. Fla. 2001) ............................................................ 112

*In re Terazosin Hydrochloride Antitrust Litig.,*
335 F. Supp. 2d 1336 (S.D. Fla. 2004) .................................................... 65, 66

*In re TWL Corp.,*
712 F.3d 886 (5th Cir. 2013) ......................................................................... 123

*In re Wellbutrin XL Antitrust Litig.,*
308 F.R.D. 134 (E.D. Pa. 2015) .............................................................. 20, 129

*InterVest, Inc. v. Bloomberg, L.P.*,
   340 F.3d 144 (3d Cir. 2003) ...................................................................90

*J. Truett Payne, Inc. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981)................................................................................90

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
   552 F.3d 1033 (9th Cir. 2009..................................................................65

*Keefe v. Prudential Prop. & Cas. Ins. Co.*,
   203 F.3d 218 (3d Cir. 2000) ...................................................................74

*Kelly v. Borough of Carlisle*,
   622 F.3d 248 (3d Cir. 2010) ...................................................................21

*Kim v. Conagra Foods, Inc.*,
   465 F.3d 1312 (Fed. Cir. 2006) ..............................................................39

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015) ...........................................................passim

*Lerma v. Univision Commc'ns, Inc.*,
   52 F. Supp. 2d 1011 (E.D. Wis. 1999) ...................................................91

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S.Ct. 1377 & 6 (2014)....................................................................112

*Leyse v. Bank of Am. Nat. Ass'n*,
   804 F.3d 316 (3d Cir. 2015) .................................................................113

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) .........................................................122, 125

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................52

*McCabe's Furniture, Inc. v. La-Z-Boy Chair Co.*,
   798 F.2d 323 (8th Cir. 1986) ................................................................101

*McClune v. Shamah*,
   593 F.2d 482 (3d Cir. 1979) .................................................................114

*Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*,
   22 F. Supp. 2d 447 (D. Md. 1998).......................................................................57

*Miller Pipeline Corp. v. British Gas PLC*,
   69 F. Supp. 2d 1129 (S.D. Ind. 1999)...............................................................50

*Mitek Surgical Prods., Inc. v. Arthrex, Inc.,*
   Nos. 99-1004, 99-1034, 2000 WL 217637 (Fed. Cir. Feb. 22, 2000)...............29

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984).........................................................................................54

*Neale v. Volvo Cars of N. Am., LLC*,
   794 F.3d 353 (3d Cir. 2015) ...........................................................112, 113, 138

*New York v. Actavis, PLC*,
   No. 14-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014)...............................5

*Nicini v. Morra*,
   212 F.3d 798 (3d Cir. 2000) ............................................................................21

*Nobelpharma AB v. Implant Innovations, Inc.*,
   141 F.3d 1059 (Fed. Cir. 1998) .......................................................................29

*Oddi v. Ford Motor Co*.,
   234 F.3d 136 (3d Cir. 2000) ..........................................................................110

*Pamintuan v. Nanticoke Mem'l Hosp.*,
   192 F.3d 378 (3d Cir. 1999) ..........................................................................106

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*,
   772 F.3d 111 (2d Cir. 2014) ..........................................................................123

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
   998 F.2d 1224 (3d Cir. 1993) ..........................................................................54

*Phillips Petrol. Co. v. Shutts*,
   472 U.S. 797 (1985).......................................................................................125

*Polak v. Lebron*,
   61 F. App'x 807 (3d Cir. 2003) ......................................................................114

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
 776 F.2d 185 (7th Cir. 1985) ...............................................................69

*Prado-Steiman ex rel. Prado v. Bush*,
 221 F.3d 1266 (11th Cir. 2000) .........................................................112

*Primavera Familienstiftung v. Askin*,
 178 F.R.D. 405 (S.D.N.Y. 1998) ........................................................124

*Primetime 24 Joint Venture v. National Broadcasting Company*,
 219 F.3d 92 (2d Cir. 2000) ...................................................................65

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49 (1993)........................................................................passim

*Profile Prod. LLC v. Encap, LLC*,
 No. 09-92, 2009 U.S. Dist. LEXIS 60282 (W.D. Wis. July 15, 2009) .............39

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
 360 F.3d 1295 (Fed. Cir. 2004) ...........................................................32

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
 614 F.3d 57 (3d Cir. 2010) ..........................................................69, 89

*Reyes v. Netdeposit, LLC*,
 802 F.3d 469 (3d Cir. 2015) .............................................................120

*Rockholt Furniture, Inc. v. Kincaid Furniture Co.*,
 No. 96-588, 1998 WL 1661384 (E.D. Tenn. July 6, 1998)...............................91

*RSA Media, Inc. v. AK Media Group, Inc.*,
 260 F.3d 10 (1st Cir. 2001)........................................................93, 105

*Shamrock Techs., Inc. v. Med. Sterilization, Inc.*,
 903 F.2d 789 (Fed. Cir. 1990) ......................................................84, 85

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline,
 PLC* (*"Wellbutrin SR"*),
 263 F.R.D. 205 (E.D. Pa. 2009)........................................................112

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline,
 PLC* (*"Wellbutrin SR"*),
 749 F. Supp. 2d 260 (E.D. Pa. 2010)..................................................30

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC* ("*Wellbutrin SR*"),
  No. 04-5898, 2010 WL 3855552 (E.D. Pa. 2010)...................................135, 138

*SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*,
  772 F. Supp. 2d 660 (E.D. Pa. 2011).........................................................55, 56

*SmithKline Beecham Corp. v. King Drug Co. of Florence*,
  No. 15-1055 (U.S. Feb. 19, 2016) ....................................................................67

*Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*,
  533 F.2d 96 (3d Cir. 1976) ..........................................................................51, 91

*Standard Oil Co. v. United States*,
  337 U.S. 293 (1949)...........................................................................................98

*Stewart v. Sonnenborn*,
  98 U.S. 187 (1879).............................................................................................32

*Stringfellow v. Concerned Neighbors in Action*,
  480 U.S. 370 (1987).........................................................................................114

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,
  No. 05-2133, 2007 WL 2318903 (N.D. Cal. Aug. 13, 2007)............................34

*Teva Pharms. USA, Inc. v. Abbott Labs.*,
  580 F. Supp. 2d 345 (D. Del. 2008)..................................................................30

*Tivo Inc. v. EchoStar Corp.*,
  429 F. App'x 975, 976 (Fed. Cir. 2011) ...........................................................73

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) ........................................................................110

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005) ...............................................................................86

*Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*,
  207 F. Supp. 2d 221 (S.D.N.Y. 2002) ..........................................................65, 66

*Tyco Healthcare Group LP v. Mutual Pharmaceutical Co., Inc.*,
762 F.3d 1338 (Fed. Cir. 2014) ...........................................................34

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co., Inc.*,
No. 07-1299, 2015 WL 3460790 (D.N.J. May 29, 2015) ...........................29, 34

*U.S. v. Brown Univ.*,
5 F.3d 658 (3d Cir. 1993) ............................................68, 69, 88, 102

*United Airlines, Inc. v. McDonald*,
432 U.S. 385 (1977)...........................................................117

*United States v. City of Oakland, Cal.*,
958 F.2d 300 (9th Cir. 1992) ..........................................114

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989) ...............................................58

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council*,
31 F.3d 800, 811 (9th Cir. 1994) ..........................................64

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...........................................................88

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
No. 06-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015) ...........................135

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*,
728 F.3d 354 (4th Cir. 2013) ...........................................65

*Weiss v. York Hosp.*,
745 F.2d 786 (3d Cir. 1984) ...........................................123

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969)...........................................................91

*Zimmerman v. HBO Affiliate Grp.*,
834 F.2d 1163 (3d Cir. 1987) ...........................................113

## STATE CASES

*Benjamin of Forest Hills Realty, Inc. v Austin Sheppard Realty, Inc.*,
    823 N.Y.S.2d 79 (N.Y. App. Div. 2006) ............................................................91

*In re Cipro I & II*,
    348 P.3d 845 (Cal. 2015) ...................................................................75, 92

## FEDERAL STATUTES

15 U.S.C. § 15 ...................................................................................89, 119

21 U.S.C. § 351(a)(2)(B) .................................................................104, 105

21 U.S.C. § 355(j) ...................................................................................passim

21 U.S.C. § 356a .........................................................................................104

28 U.S.C. § 1291 .................................................................................119, 128

28 U.S.C. § 1331 ........................................................................................119

28 U.S.C. § 1332 ........................................................................................128

28 U.S.C. § 1337 ........................................................................................119

35 U.S.C. § 271 ..............................................................................................6

Pub. L. No. 98-417, 98 Stat. 1585 (1984) ..................................................5

## RULES

Fed. R. Civ. P. 11 ....................................................................................32, 33

Fed. R. Civ. P. 12 ..................................................................................21, 113

Fed. R. Civ. P. 23 .....................................................................................passim

Fed. R. Civ. P. 24 .................................................................................113, 118

Fed. R. Civ. P. 56 .........................................................................................31

## REGULATIONS

21 C.F.R. § 314.70 .................................................................................19, 103

21 CFR 10.30 ..........................................................................................12

**FEDERAL REGISTER**

78 Fed. Reg. 16685-01 ..............................................................................8

79 Fed. Reg. 19626-01 ..............................................................................8

**OTHER AUTHORITIES**

David L. Schwartz, *Practice Makes Perfect?  An Empirical Study of Claim
    Construction Reversal Rates in Patent Cases*, 107 Mich. L. Rev. 223, 249
    (2008) ...............................................................................................40

7A Fed. Prac. & Proc. Civ. § 1762 (3d ed. 2005)................................................123

*Newberg on Class Actions* § 3:12 (5th ed.) ..........................................................123

<u>APPEAL NOS. 15-3559 & 15-3591</u>

## I.   COUNTERSTATEMENT OF THE ISSUES

*Sham Litigation Claims.*  The First Amendment robustly protects the right to petition the government for redress, including through filing a lawsuit.  A plaintiff trying to predicate antitrust liability on the filing of a patent infringement action must show that the lawsuit is objectively baseless – that is, that no reasonable litigant would perceive it had a chance to prevail or, put another way, that it lacked probable cause to sue.

- *Anchen Sham Litigation Claim.*  Did the District Court properly conclude that the *Anchen* patent infringement litigation was not "objectively baseless" based on its independently dispositive conclusions that (i) as a matter of law, the patent holder Biovail[1] had a reasonable basis for its claim construction of the phrase "free of stabilizer" in the applicable patent, and (ii) Biovail had a reasonable legal argument that Anchen's Abbreviated New Drug Application ("ANDA") controlled the infringement inquiry and Anchen's ANDA suggested that its product was not "free of stabilizer."

---

[1]   "Biovail" refers collectively to former defendants Biovail Corporation (n/k/a Valeant Pharmaceuticals International, Inc.) and Biovail Laboratories International SRL (n/k/a Valeant International Bermuda) and/or their affiliates.

- *Abrika Sham Litigation Claim.* Did the District Court properly conclude that the *Abrika* patent infringement litigation could not give rise to antitrust liability based on the parties' stipulation that the *Abrika* litigation did not delay launch of a generic version of Wellbutrin XL, and should its decision be affirmed on the separate ground that Biovail and GSK had probable cause to file the suit?

- *Other Alleged Sham Claims.* Did the District Court properly conclude that GSK cannot be held liable for the *Impax* and *Watson* patent infringement litigations, or the Biovail citizen petition, based on the independently dispositive grounds that (i) plaintiffs adduced insufficient evidence to support a finding that GSK conspired with Biovail as to those litigations and the citizen petition, and (ii) those litigations and the citizen petition were not "objectively baseless"?

- *Serial Sham Petitioning*. Should this Court remand the sham claims so that the District Court can consider whether these claims constitute "serial petitioning" under *California Motor Transportation Co. v. Trucking Unlimited*, 404 U.S. 508 (1972), as recently construed in *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015), even though plaintiffs failed to raise this issue below and the substantial weight of authority holds that the serial petitioning exception applies only when,

unlike here, a defendant files a series of petitions against a single
competitor?

*Reverse Payment Claim.*  The settlement of the patent infringement lawsuits
allowed the first generic challenger to continue to litigate patent validity and
infringement, providing for immediate generic entry if the challenger succeeded,
for a back-up supply for the generics, and for licenses for the generics to a patent
owned by another company.  Did the District Court properly grant summary
judgment on the reverse payment claim based on three independently dispositive
rulings that: (i) plaintiffs failed to prove anticompetitive harm under the rule of
reason because the settlement did not induce the generic challenger to abandon its
claim, providing for immediate generic entry if the challenger prevailed, and
because neither their alternative settlement nor litigation scenario demonstrated a
delay in generic entry; (ii) plaintiffs failed to prove either antitrust injury or
proximate cause because they did not adduce evidence demonstrating that the
allegedly improper settlement provision delayed generic entry, or that pending
patent infringement litigation brought by an unrelated generic company, Andrx
Pharmaceuticals, would not bar entry; and (iii) the settlement contained undeniably
procompetitive features – including a much desired backup supply provision,
licenses to the Andrx patent, and enhanced Federal Trade Commission review

provisions – and plaintiffs failed to prove that the procompetitive benefits were not reasonably necessary to achieve the stated objective?

*Expert Admissibility.*  Plaintiffs' economist Dr. Jeffrey Leitzinger, Ph.D. relied on an instruction from counsel instead of analyzing whether the settlement resulted in delayed generic entry and failed to consider the procompetitive aspects of the settlement because he did not know how to factor them into his analysis of the anticompetitive effects.  Even though the District Court's grant of summary judgment did not require resolution of GSK's motion to exclude the opinions of Dr. Leitzinger, should this Court affirm exclusion of his opinions as unreliable and affirm summary judgment as to the reverse settlement claim on the alternative ground that plaintiffs cannot rely on Dr. Leitzinger's inadmissible opinion to prove anticompetitive effects?

*Article III Standing.*  Did the District Court properly conclude that the named indirect purchaser plaintiffs lacked standing to assert claims under the laws of states in which neither third-party payers nor their members suffered any injury?

*Intervention.*  Should this Court affirm the District Court's denial of non-party Aetna, Inc.'s motion to intervene not only because Aetna's appeal is untimely, but also because Aetna's motion in the district court was untimely and failed to show that its interests were impaired and were not adequately represented by the named plaintiffs?

4

## II.   COUNTERSTATEMENT OF THE CASE

### A.   Counterstatement Of Facts

#### 1.   The Drug Approval Process

The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984) (amending the Federal Food, Drug & Cosmetic Act ("FDCA")) introduced critical reforms to the drug approval process:  "By creating benefits, limits, and incentives for both generic and branded pharmaceutical manufacturers, the Hatch-Waxman Act attempted to balance the competing policy goals of encouraging innovation and expediting patient access to less expensive [generic] versions of branded drugs." *New York v. Actavis, PLC*, No. 14-7473, 2014 WL 7015198, at *7 (S.D.N.Y. Dec. 11, 2014) (citations omitted).

For generic drugs, the Act allows an applicant that files an ANDA to rely on the safety and efficacy data developed by the brand (or innovator) company for its existing, Orange Book-listed drug.  21 U.S.C. §§ 355(j)(2)(A)(iv), (j)(8)(B). A filer of a generic ANDA must make one of four certifications regarding each patent associated with the listed drug:  (i) that the patent information has not been filed; (ii) that the patent has expired; (iii) that the patent is set to expire; or (iv) that the patent is invalid or will not be infringed by the generic drug.  21 U.S.C. § 355(j)(2).  Pursuant to a Paragraph IV Certification, a filer must provide the patent holder with a "detailed statement of the factual and legal basis of the

5

opinion of the applicant that the patent is invalid or will not be infringed."  21

U.S.C. § 355(j)(2)(B).

The first company that files an ANDA Paragraph IV Certification

receives a so-called "exclusivity" period of 180 days during which FDA does not

approve any later-filed Paragraph IV ANDAs for the same referenced drug.  21

U.S.C. § 355(j)(5)(B)(iv).  If, however, the patent holder files an infringement

lawsuit within 45 days of the generic company's Paragraph IV Certification, the

Act stays final FDA approval of the ANDA for 30 months, or the until the district

court enters judgment, whichever is shorter.  21 U.S.C. § 355(j)(5)(B)(iii).  If the

patent holder prevails in the patent litigation, the Act provides for an automatic

injunction barring approval of the generic challenger's drug.  *See* 35 U.S.C.

§ 271(e)(4)(A).

### 2.    Wellbutrin XL Products and Patents

In 2001, GSK and Biovail entered into an agreement (the "Co-

Promotion Agreement") to develop, manufacture, promote, and distribute a once-a-

day formulation of Wellbutrin XL® – a prescription antidepressant medication that

uses bupropion hydrochloride as its active ingredient and is taken once daily.  JA-

3552-602 (Co-Promotion Agreement).  Before entering into the Co-Promotion

Agreement with GSK, Biovail obtained two U.S. patents covering extended release

formulations of bupropion hydrochloride – U.S. Patent No. 6,096,341 ("the '341

6

patent") and U.S. Patent No. 6,143,327 ("the '327 patent"). JA-11435, JA-11440 (DPP Compl. ¶¶ 71-72, 86-87). These patents expire on October 30, 2018. JA-33148-49 (Patent Information for Wellbutrin XL). Biovail granted GSK an exclusive license to those patents. JA-3557-58 (Co-Promotion Agreement). GSK entered into the agreement because, despite being the innovator of Wellbutrin IR (the three-times-a-day version) and SR (the twice-a-day version), it had been unable to develop an extended release formulation. JA-8409-10 (Garnier Dep. 81:17-83:5).

The '341 patent covers bupropion hydrochloride tablets that do not require the addition of a stabilizer and that exhibit a specific dissolution profile. JA-3289 ('341 Patent at claim 1). The '341 patent's summary of invention describes a controlled release tablet as follows:

(i)     Core comprised of bupropion hydrochloride and conventional excipients, free of stabilizer; and

(ii)    A coating consisting essentially of a water-insoluble, water-permeable film-forming polymer, a plasticizer and a water-soluble polymer.

*Id.*

In August 2002, GSK filed a new drug application ("NDA") seeking FDA approval to market Wellbutrin XL in the United States and registered the '327 and '341 patents for listing in the Orange Book. JA-11442 (DPP Compl. ¶

91).  In August 2003, FDA approved the NDA, and GSK began to market

Wellbutrin XL for the treatment of major depression in two strengths: 150 mg and

300 mg.  *Id.* ¶¶ 92, 94.

Beginning a year after FDA approval, four generic manufacturers

filed ANDAs for generic Wellbutrin XL:  Anchen Pharmaceuticals, Inc.

("Anchen"), Abrika Pharmaceuticals LLP ("Abrika"), Impax Laboratories, Inc.

("Impax"), and Watson Pharmaceuticals, Inc. ("Watson").  JA-59-60 (2012 S.J.

Op.).  Although the generic companies claimed in their ANDAs that their generic

versions were bioequivalent to Wellbutrin XL, and FDA accepted those

representations at the time, FDA later took the rare step of conducting its own

studies following patient and doctor complaints and ultimately forced the

withdrawal of Impax's 300 mg pill and Watson's 300 mg pill, which it found were

not identical to the brand.[2]

### 3.    *Anchen* Lawsuit

On September 21, 2004, Anchen filed an ANDA with FDA seeking

approval of its generic version of Wellbutrin XL.  JA-35690-703 (Excerpts from

Anchen ANDA).  Anchen sent Biovail and GSK a Paragraph IV Certification on

---

[2]      Impax's generic generated a flurry of serious adverse event reports to FDA
that patients' symptoms of depression had returned and was later withdrawn
from the market after testing confirmed that it was not the same as the brand.
78 Fed. Reg. 16685-01.  Watson's generic was withdrawn for the same
reason.  79 Fed. Reg. 19626-01.

November 12, 2004 asserting that Anchen's product did not infringe the '341 patent "because it includes a stabilizing amount of hydrochloric acid in the core." JA-33337 (Anchen Para. IV Certification). As the first ANDA filer, Anchen qualified for the 180-day period of exclusivity set by the Hatch-Waxman Act during which no other generic manufacturer could enter the market. 21 U.S.C. § 355(j)(5).

On December 21, 2004, Biovail and GSK sued Anchen for patent infringement, triggering the 30-month stay of ANDA approval provided under the Hatch-Waxman Act. JA-33160-67 (Biovail and GSK Compl. for Patent Infringement). Anchen denied infringement and asserted counterclaims for noninfringement and invalidity. JA-35943-54 (Anchen Answer and Counterclaims).

GSK withdrew from *Anchen* on April 25, 2005, but Biovail continued to litigate the claims. A threshold dispute in the litigation involved construction of the patents. Biovail argued for a functional claim construction, construing the term "free of stabilizer" to mean free of a substance that was acting to stabilize. JA-35964 (Biovail Prelim. Claim Constr. Br.). Anchen argued that "free of stabilizer" should be construed to exclude tablets that had even trace amounts of stabilizer. JA-35990-93 (Anchen Opening Claim Constr. Br.).

In February 2006, the court issued a Claim Construction Order adopting Anchen's claim construction. The parties subsequently cross-moved for summary judgment. In a 39-page tentative decision denying Anchen's motion, the court found a genuine issue of material fact regarding whether Anchen's ANDA directly addressed the infringement inquiry. JA-11070-108 (Tentative S.J. Op.). After oral argument, the court changed positions, granting Anchen's motion for summary judgment in a 42-page decision. JA-11109-50 (Order on S.J.).

Biovail appealed to the Federal Circuit on September 13, 2006. JA-33666-71 (Biovail Notice of Appeal). On December 14, 2006, while the appeal was pending, Anchen launched a small amount of its 300 mg generic product, and assigned its first-filer exclusivity to Impax, which launched its 300 mg generic. JA-23858 (Background to Agreements Concerning Wellbutrin XL/Bupropion Hydrochloride XL). The parties fully briefed the appeal, and the Federal Circuit heard oral argument. Ultimately, when the appeal remained pending in May 2008, Biovail successfully moved to withdraw the appeal pursuant to a settlement, discussed *infra*. JA-36334-35 (Order Granting Mot. to Withdraw Appeal).

### 4. *Abrika* Lawsuit

Abrika filed its ANDA in September 2004. After receiving Abrika's Paragraph IV Certification, GSK requested access to Abrika's ANDA, but Abrika refused. JA-33252-53 (Letter from S. Judlowe (GSK) to J. New (Abrika)); JA-

33254 (Letter from S. Hsieh (Abrika) to S. Judlowe). On December 21, 2004, Biovail and GSK filed a patent infringement claim against Abrika. As with the *Anchen* case, GSK withdrew from the *Abrika* case on April 20, 2005, JA-9906-07 (GSK Withdrawal Stip.), but Biovail continued to litigate. JA-9970-88 (Biovail Opening Claim Constr. Br.).

At the heart of the case was the "dissolution profile" of Abrika's pill (*i.e.*, the percentage of the active ingredient released at particular time points as the tablet dissolves in an *in vitro* (laboratory) solution). JA-33168-72 (Abrika Para. IV Certification). The Court adopted Abrika's claim construction of "dissolution profile," and Biovail and Abrika settled the suit in July 2007, prior to any judgment. JA-33614 (Order on Claim Constr.); JA-34142-54 (Biovail/Abrika Settlement Agreement).

## 5. *Impax* Lawsuit

Impax filed its ANDA in November 2004. In January 2005, Impax sent Paragraph IV Certifications to Biovail and GSK. JA-36342-56 (Impax 300 mg Para. IV Notice); JA-36386-401 (Impax 150 mg Para. IV Notice).

In March 2005, Biovail filed a patent infringement suit against Impax, asserting that Impax's 150 mg generic Wellbutrin XL infringed its patent, beginning the 30-month stay for the approval of Impax's ANDA for its 150 mg product. JA-36403-04 (Compl. for Patent Infringement). In May 2006, the court

11

issued a claim construction ruling, upholding Impax's construction in part, but agreeing with Biovail's construction of the dissolution profile to mean a range of dissolution achieved under certain test conditions identified as suitable for the tablet at issue. JA-36599-60 (Order on Impax Claim Constr.). The litigation settled after the claim construction stage.

### 6. *Watson* Lawsuit

Watson filed its ANDA in May 2005. In its Paragraph IV Certifications, Watson claimed that its generic product would not infringe because it would "contain a stabilizer, namely hydrochloric acid." JA-37111 (Watson 300 mg Para. IV Notice); JA-37136 (Watson 150 mg Para. IV Notice). In September 2005, Biovail filed a patent infringement lawsuit against Watson. Before reaching the claim construction stage of litigation, the parties settled. JA-73 (2012 S.J. Op.).

### 7. Biovail's Citizen Petition

On December 20, 2005, Biovail filed a citizen petition, pursuant to 21 CFR 10.30, requesting that FDA require any ANDA for a generic version of Wellbutrin XL to satisfy four criteria:

(1) All bioequivalence trials should calculate and evaluate parameters based on concentrations of the parent drug (bupropion) and its three active metabolites;

(2)     Any generic formulation should be shown to be bioequivalent to

Wellbutrin XL, Wellbutrin SR, and Wellbutrin IR;

(3)     The bioequivalence studies should be conducted at steady-state,

evaluating the performance of the dosage form based on three criteria;

and

(4)     Data using the FDA's approach for evaluating the effect of alcohol on

the performance of the controlled-release dosage form should be

required to ensure the absence of "dose dumping."

JA-37217 (Biovail Citizen Pet.).  On December 14, 2006, FDA issued its decision,

granting requests 1 and 4 in part and denying requests 2 and 3.  JA-39053-70

(Letter from FDA to J. Dubeck (Biovail)).  Later, FDA reconsidered the arguments

raised by Biovail's petition and granted request 1 in larger part.  JA-29827-38

(FDA Response to Biovail citizen petition).

### 8.     *Andrx* Litigation

On December 21, 2005, in litigation unrelated to the Paragraph IV

litigation described above, Andrx Pharmaceuticals ("Andrx") sued GSK, claiming

that GSK's 150 mg Wellbutrin XL infringed its patent.  JA-10550-68 (Compl.,

*Andrx v. GSK*).  On November 28, 2006, Andrx sued Anchen, alleging that

Anchen's manufacture or sale of its generic version of 150 mg Wellbutrin XL

would infringe its patent.  JA-34731-50 (Compl., *Andrx v. Anchen*).  In both cases,

13

Andrx sought damages and injunctions preventing the sale of the allegedly infringing 150 mg products. JA-34735-36 (Compl., *Andrx v. Anchen*); JA-10554-55 (Compl., *Andrx v. GSK*). The lawsuits did not cover the 300 mg product.

GSK settled with Andrx, paying $35 million to cover past use of the technology described in Andrx's patent, plus an ongoing royalty in exchange for a license to that patent. JA-34043-47 (GSK/Andrx Settlement Agreement). As part of the below-described Wellbutrin Settlement of the Paragraph IV litigations, GSK bargained for and obtained the right to sublicense the Andrx patent. *Id.*

### 9. The Wellbutrin Settlement

In late 2006, Biovail discussed a global settlement with Impax and Anchen, their marketing partner, Teva Pharmaceuticals USA, Inc. ("Teva"), and Watson. At hearings on December 20 and 21, 2006 in the *Impax* litigation, the Honorable Anita B. Brody requested GSK's participation in a settlement conference based on the parties' representation that GSK was necessary to resolve the litigation because of its exclusive rights to Wellbutrin XL. JA-35460-62 (Letter from G. Cary (GSK) to W. Kelley (Biovail)). The Co-Promotion Agreement had granted GSK an exclusive license to sell Biovail-manufactured Wellbutrin XL and to market an authorized generic version of Wellbutrin XL. JA-33858-59. GSK complied with Judge Brody's request and participated in the settlement conference. JA-35460-62 (Letter from G. Cary to W. Kelley).

On February 9, 2007, Biovail, Teva, Anchen, Impax, and Watson entered into a settlement (the "Wellbutrin Settlement") involving the 150 mg and 300 mg generic versions of Wellbutrin XL. At the time, the following lawsuits were pending: Biovail's appeal of the summary judgment decision in the *Anchen* litigation; the *Watson*, *Impax*, and *Abrika* lawsuits; the patent infringement lawsuits brought by Andrx against GSK and Anchen; and a lawsuit filed by Biovail against FDA pertaining to Biovail's citizen petition (in which Teva, Anchen, and Impax had intervened). JA-163-64 (2015 S.J. Op.).

The Wellbutrin Settlement consisted of many complex terms, including licensing agreements, contingent generic entry dates, releases, and supply agreements involving multiple parties. The pertinent terms are:

- The Early Entry Provision: The agreement provided for immediate sale of the 150 mg generic by Teva if Anchen prevailed on Biovail's appeal of the summary judgment ruling in the *Anchen* infringement action and for generic entry in any event no later than May 30, 2008, JA-28413-14 (Biovail/Teva License Agreement § 3.16);

- The Back-Up Supply: Biovail agreed to provide a back-up supply to Teva of up to 75 million tablets of the 150 mg product at Teva's request; or an unlimited number of tablets of the 150 mg and/or the 300 mg product if the sale of the generic products were prohibited as a

15

result of the Biovail citizen petition and related lawsuit, *id.* at JA-28414-15 (§ 5.1), JA-28417-19 (§ 5.3);

- The Exclusive Licenses:  Biovail granted Teva an exclusive license to the Biovail patents effective from December 13, 2006 through June 12, 2007 to sell a 300 mg generic version of Wellbutrin XL, *id.* at JA-28416 (§ 5.2); and an exclusive license effective until 180 days after Teva begins to sell a 150 mg version of Wellbutrin XL, *id.* at JA-28419-20 (§ 5.4);

- Andrx Sublicenses:  Biovail granted the generics a sublicense that GSK obtained from Andrx for the 150 mg product, JA-29633-37 (GSK/Andrx License Agreement); JA-34127-31 (Andrx/Teva/Anchen Letter Agreement); and

- FTC Review:  The parties agreed to cooperate with the Federal Trade Commission ("FTC") and to modify the agreements in response to any FTC concerns (or to terminate the agreements), JA-34112-14 (Omnibus Agreement § 3).

Except for the settlement of the *Andrx* litigation against it and as the recipient of certain releases, GSK was not a party to any of the agreements that comprised the Wellbutrin Settlement.

After Biovail and the generic manufacturers submitted the settlement to the FTC, the parties met with the FTC to discuss the agreements. JA-35340 (Teva 30(b)(6) Dep. (Holding) 30:9-14). Upon review of the settlement, including thorough exploration of the exclusive licenses and generic-entry provisions, the FTC did not exercise its right to object, initiate further investigation, or file a lawsuit. *See* JA-35503-04 (Email from R. Rauchberg (Biovail)). Nor did the FTC object to any part of the settlement, which would have triggered the provision to modify the terms to address that concern. JA-34112-14 (Omnibus Agreement).

### 10. Anchen's Delay In Securing Manufacturing Approval From FDA

Anchen's ANDA listed a facility located at 5 Goodyear Drive, Irvine, CA (the "Goodyear facility") as its intended manufacturing site for its generic products. JA-35414 (Excerpts from FDA's Anchen ANDA Approval Package). The Goodyear test facility could not accommodate the manufacture of commercial-sized batches. JA-28322 (Tan (Anchen) Dep. 19:21-20:3). Nor had Anchen – a newly formed company – ever launched a drug before. JA-35526-27 (FDA Establishment Inspection Report). As a result, in January 2006, Anchen signed an agreement with Teva and Impax providing that (i) Anchen would manufacture and Teva would market Anchen's generic 300 mg Wellbutrin XL product or, if that was not possible, (ii) Anchen would relinquish or waive its first-to-file exclusivity in favor of Impax. JA-33904-05 (Impax/Teva/Anchen Master 300 mg Agreement)

17

("Teva Agreement").  ███████████████████████████████████████

████████████████████████████████████████  A few months later,

Anchen leased and began outfitting a larger building, located at 9601 Jeronimo

Road in Irvine, CA (the "Jeronimo facility").  JA-35380-35398 (Feb. 15, 2006

Jeronimo Construction Agreement).

Anchen did not amend its application to disclose that it intended to

manufacture the product at its Jeronimo facility, rather than at the Goodyear

facility.  JA-35532 (FDA Establishment Inspection Report).  Accordingly, when

Anchen received final approval of its generic Wellbutrin XL ANDA on December

14, 2006, the only manufacturing facility approved by the FDA was the Goodyear

facility.  JA-35399-404 (Anchen ANDA Approval Letter).  When the FDA visited

Anchen in January 2007 for an inspection triggered by Anchen's ANDAs for

unrelated products, the FDA learned ██████████████ that Anchen was

manufacturing generic Wellbutrin XL at ████████████████████████████

████████████████████████████████████████████████████

██████████

On May 29, 2007, Anchen received an official FDA report detailing

the results of the January inspection.  *Id.* at JA-35517-35548.  That report

concluded that "a change such as this [involving a manufacturing site] would

require a prior approval supplement if the facility had never been inspected by

18

FDA, as was the case." *Id.* at JA-35532. Ultimately, the FDA allowed Anchen to formally notify the FDA of its manufacturing site change through a different kind of supplement, known as "Changes-Being-Effected in 30 Days Supplement" ("CBE-30"). JA-35517 (June 1, 2007 CBE-30 Supplement). A CBE-30 allows the proposed changes to be made on the 31st day after the FDA accepts the CBE-30 or sooner, if the FDA permits. JA-35067 (Foster Expert Rpt. ¶ 52); *see also* 21 C.F.R. § 314.70(c). Although Anchen submitted its CBE-30 to add the Jeronimo facility to its ANDA, JA-35517-35562 (June 1, 2007 CBE-30 Supplement), ███ ███████████████████ the FDA required additional data from Anchen, which the company provided on June 9, 2007. JA-35572-73 (Amendment to CBE-30 Supplement). Anchen sold its first batch of generic Wellbutrin XL 300 mg from the Jeronimo facility soon after the FDA accepted the CBE-30. JA-35574 (June 11, 2007 Email from M. Choy (Anchen)).

### B. Procedural History

On May 23, 2008, the Direct and Indirect Purchaser Plaintiffs filed complaints asserting claims that GSK and Biovail violated the antitrust laws by filing patent infringement lawsuits against generic manufacturers of Wellbutrin XL and a citizen petition with the FDA. Case No. 08-2431, ECF 1, Case No. 08-2433, ECF 1. The Direct and Indirect Purchaser Plaintiffs separately filed consolidated class action complaints on July 10, 2008. Case No. 08-2431, ECF 21; Case No.

08-2433, ECF 23. The District Court certified classes of Direct Purchaser

Plaintiffs and Indirect Purchaser Plaintiffs in August 2011. JA-1-42 (DPP Class

Cert. Op.); JA-329-71 (IPP Class Cert. Op.). The District Court later decertified

the indirect purchaser class. *See In re Wellbutrin XL Antitrust Litig.,* 308 F.R.D.

134, 137 (E.D. Pa. 2015). The parties have briefed the appeal of that decision.

Appeal No. 15-cv-2875 (3d Cir.).

       In May 2012, the District Court granted partial summary judgment in

favor of defendants, dismissing plaintiffs' claims predicated on the filing of the

patent suits and Biovail's filing of the FDA citizen petition. JA-48 (2012 S.J. Op.).

The District Court deferred decision on the sole remaining claim that the

Wellbutrin Settlement was anticompetitive. The District Court stayed the case

pending appellate proceedings that culminated in the Supreme Court's ruling in

*FTC v. Actavis, Inc.,* 133 S. Ct. 2223 (2013).

       Following the *Actavis* decision and additional fact and expert

discovery regarding the Wellbutrin Settlement, GSK moved for summary

judgment. After briefing and oral argument, the District Court granted the motion.

JA-144 (2015 S.J. Op.). In addition to granting GSK's motion for summary

judgment based on *Actavis*, the District Court granted in part GSK's motion for

summary judgment based on causation and granted GSK's motion to exclude the

opinions of plaintiffs' principal economic expert, Dr. Leitzinger. The District

Court denied as moot GSK's Motions to Exclude the Expert Reports and

Testimony of Dr. Cheryl Blume, plaintiffs' manufacturing expert, and Professor

Meredith Rosenthal, an additional economic expert, and denied plaintiffs' motion

to exclude the opinion of GSK's patent law expert, Professor Martin Adelman.

This appeal followed.

## III.   COUNTERSTATEMENT OF THE STANDARD OF REVIEW

Reviewing summary judgment, the Court applies a plenary

standard.  *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).  The

Court "may affirm the District Court on any grounds supported by the record,"

even if the lower court did not rely on those grounds.  *Nicini v. Morra*, 212 F.3d

798, 805 (3d Cir. 2000).

The Court reviews "the decision to exclude expert testimony for abuse

of discretion."  *Furlan v. Schindler Elevator Corp.*, 516 F. App'x 201, 204 (3d Cir.

2013).

The Court exercises plenary review over the District Court's dismissal

of a complaint under Federal Rule of Civil Procedure 12(b)(6).  *In re Schering*

*Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir.

2012).

The Court "review[s] a district court's denial of permissive

intervention and intervention of right for abuse of discretion but applies a more

stringent standard to denials of intervention of right," under which it will reverse only if the district court "applied an improper legal standard or reached a decision that we are confident is incorrect." *Benjamin v. Dep't of Pub. Welfare of Pennsylvania*, 432 F. App'x 94, 97 (3d Cir. 2011) (citing *Brody v. Spang,* 957 F.2d 1108, 1115 (3d Cir. 1992)).

## IV.    SUMMARY OF ARGUMENT

In two extensive and thoughtful opinions, the District Court granted summary judgment to GSK on plaintiffs' antitrust claims, which sought to base liability on the filing of patent suits as well as the ultimate settlement of these suits. Although these two sets of claims were subject to different legal standards, the common thread running through the District Court's rulings was plaintiffs' failure to present bases sufficient to sustain either claim.

As the District Court properly recognized, a plaintiff seeking to predicate antitrust liability on the filing of a lawsuit faces a steep burden that the Supreme Court has erected to protect the First Amendment right to petition. Specifically, plaintiffs must show that the lawsuit is "objectively baseless," *i.e.*, no reasonable litigant would perceive it had a chance to prevail, or, stated alternatively, that the litigant lacked "probable cause" to sue. When, as here, the predicate facts of the underlying suit – the '341 patent, Anchen's ANDA, and the rulings in *Anchen* – were undisputed, the probable cause inquiry is purely legal.

The District Court's articulation of its ruling underscores its quintessentially legal nature. The District Court held that Biovail filed and prosecuted the *Anchen* case based on a reasonable claim construction of the patent, and an interpretation of the ANDA that, even under the claim construction ultimately adopted by the *Anchen* court, had a chance, or realistic expectation, of success. Plaintiffs seek to muddy the waters by pointing to other so-called "scientific" evidence they believe the District Court insufficiently credited, but that misconceives the relevant inquiry. This evidence and plaintiffs' criticism of the District Court's analysis might be appropriate were the parties litigating the underlying *Anchen* case, but they are not relevant to whether GSK and Biovail had a reasonable basis to file and litigate that case. Because the predicate facts underlying that discrete question were undisputed, and provided probable cause for the lawsuit, plaintiffs could not, as a matter of law, prove their sham claims.

Plaintiffs' claim based on the Wellbutrin Settlement, although subject to a different legal standard than their sham claims, also suffers from a failure of proof. As the District Court correctly concluded, this claim rested on the premise that the Wellbutrin Settlement harmed competition by delaying entry of generic versions of Wellbutrin XL. The District Court observed that the Wellbutrin Settlement did not implicate the concerns identified by the Supreme Court in *Actavis* and this Court in *King Drug Co. of Florence, Inc. v. SmithKline Beecham*

23

*Corp.*, 791 F.3d 388, 413 (3d Cir. 2015) (hereafter, "*Lamictal*") because, unlike in the typical Hatch-Waxman settlement, the generic company here (Anchen) did not abandon its claim, but rather continued to litigate the question of patent validity and infringement.  Under the Wellbutrin Settlement, had the Federal Circuit ruled in Anchen's favor, it could have entered the market immediately.

The District Court nonetheless applied the rule of reason and concluded that plaintiffs had not established a factual basis for a finding of anticompetitive harm.  Plaintiffs posited that GSK's agreement not to launch an authorized generic version of Wellbutrin XL during the first 180 days of generic competition, which plaintiffs characterized as a "payment for delay," necessarily delayed generic entry.  The District Court correctly held that, given *Actavis*'s rejection of a rebuttable presumption of illegality based on the existence of a payment, plaintiffs could not avoid summary judgment based solely on the so-called payment inference.  Instead, plaintiffs had to adduce sufficient evidence to show anticompetitive harm.  However, plaintiffs failed to put forth facts sufficient to prove that the so-called payment in fact caused delay in either of their two proposed "but-for" scenarios.

Under the first "but-for" scenario, plaintiffs posit that, absent the "no authorized generic provision," the parties would have entered into a settlement providing for earlier generic entry.  The District Court correctly concluded that

24

plaintiffs offered no evidence to prove that this scenario would have occurred, and
all of the evidence pointed in the other direction. It also held that plaintiffs had not
established any factual basis for the second "but-for" scenario – that earlier generic
entry would have occurred if the parties had continued to litigate the patent cases.
The District Court was especially persuaded by the fact that Anchen faced an
injunction risk from the separate patent infringement suit brought by Andrx,
another pharmaceutical company that had its own patent. Plaintiffs offered no
evidence that Anchen would have won the *Andrx* case. While the District Court
found a failure of proof even considering the testimony of plaintiffs' economist,
Dr. Leitzinger, it properly excluded his testimony as not based on economic
analysis.

      A failure of proof also plagued plaintiffs' remaining claims, including
that GSK conspired with Biovail to file other allegedly sham patent cases and an
allegedly sham FDA citizen petition. Not only was GSK not a party to these
petitions, but also they were not shams. Finally, as discussed below, the District
Court's legal rulings narrowing the scope of the indirect purchaser case based on
standing and denying intervention by Aetna, Inc were plainly correct.

      In sum, the District Court thoroughly reviewed the extensive briefing
and factual record created during the seven years that the case was pending before
it. It issued two detailed and careful opinions granting summary judgment that

were narrowly tailored to the specific circumstances presented in this antitrust litigation. The opinions should be affirmed.

## V. ARGUMENT

### A. The District Court Correctly Held That *Anchen* Was Not A Sham Patent Infringement Case

In granting summary judgment on the sham litigation claims, the District Court held that "plaintiffs have not met their burden of showing that the *Anchen* lawsuit was objectively baseless." JA-66 (2012 S.J. Op.). This ruling rested on the District Court's legal conclusions regarding Biovail's positions on claim construction and infringement.

In finding summary judgment appropriate, the District Court held that plaintiffs could not establish that the *Anchen* case fit within the so-called "sham exception" to the *Noerr-Pennington* doctrine. To satisfy the "sham" exception, an antitrust plaintiff must prove that (1) the lawsuit was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "the baseless lawsuit conceals 'an attempt to interfere directly' with the business relationships of a competitor through the 'use [of] the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon.'" *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.,*

*Inc. ("PRE")*, 508 U.S. 49, 60-61 (1993) (internal citations omitted).[3]  The court may not examine the subjective motivation for bringing suit unless it finds the suit objectively baseless.  *Id.* at 60.

In further defining the "sham" exception, the Supreme Court explained that the existence of "probable cause" to institute legal proceedings "irrefutably demonstrates that an antitrust plaintiff has not proved the objective prong of the sham exception and that the defendant is accordingly entitled to *Noerr* immunity." *Id.* at 63.  Probable cause "requires no more than a reasonabl[e] belie[f] that there is a ***chance*** that [a] claim may be held valid upon adjudication." *Id.* at 62-63 (quotation omitted) (emphasis added).  As this Court recently observed, *PRE* imposes an "exacting two-step test" so as to "prevent any undue chilling of First Amendment activity."  *Hanover 3201*, 806 F.3d at 180.

The Supreme Court has cautioned that determining whether a lawsuit is objectively baseless bears little relationship to whether the suit was ultimately unsuccessful:  "[W]hen the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or

---

[3]      Because *Noerr-Pennington* immunity is based on the First Amendment, a petitioning party has the same immunity from state law claims, such as those asserted by the Indirect Purchaser Plaintiffs here.  *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (holding that *Noerr-Pennington* doctrine also applies to state law claims).

without foundation." *PRE*, 508 U.S. at 61 n.5 (quotations omitted). Indeed, were it not for the distinction between an unsuccessful suit and an objectively baseless suit, the First Amendment protection afforded by *Noerr-Pennington* would largely disappear because sham litigation claims are only filed against a party who lost the underlying suit.

On claim construction, the District Court explained that "the *Anchen* lawsuit centered around the term 'free of stabilizer,' which appears in each claim of the '341 patent." JA-65 (2012 S.J. Op.). The court held that "Biovail put forth a colorable argument in the underlying proceeding that 'stabilizer' should have been construed as a functional term – something that actually stabilizes the tablet." *Id.* at JA-66. Because a favorable claim construction holding would have been case dispositive, this finding provided a sufficient basis for the District Court to conclude as a matter of law that the case was not objectively baseless, *i.e.*, not a sham.

With respect to infringement, the District Court held that "Biovail had at least a colorable legal argument in *Anchen* that under [Federal Circuit precedent], and the applicable FDA regulations and policy, Anchen's ANDA controlled the infringement inquiry and suggested that the Anchen product was not 'free of stabilizer,' as ultimately defined by [the court] on claim construction" in the *Anchen* case itself. *Id.* at JA-72.

Accordingly, this Court can affirm on *either* of two independently sufficient grounds: claim construction or infringement.

In their appeal, plaintiffs take issue with the District Court's opinion on two principal grounds. First, they argue that the District Court applied the wrong standard in assessing the *Anchen* sham litigation claim. Second, they quarrel with the District Court's analysis of the so-called "scientific" issues underlying the *Anchen* litigation. Plaintiffs are wrong in both respects.

As an initial matter, plaintiffs fail to acknowledge that (i) a plaintiff "seeking to invoke the sham exception . . . bears the burden of proof," *Tyco Healthcare Grp. LP v. Mutual Pharm. Co., Inc.*, No. 07-1299, 2015 WL 3460790, at *4 (D.N.J. May 29, 2015) (citing *PRE*, 508 U.S. at 61); and (ii) a plaintiff must prove objective baselessness by "***clear and convincing evidence***." *800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008) (emphasis added);[4] *see also Mitek Surgical Prods., Inc. v. Arthrex, Inc.,* Nos. 99-1004, 99-1034, 2000 WL

---

[4]     The District Court properly applied Federal Circuit law. JA-57 (2012 S.J. Op.) (quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998)). In applying *PRE's* two-part test to determine whether a patent infringement suit constitutes "sham" litigation, the Federal Circuit has explained that "under *PRE*, a sham suit must be both subjectively brought in bad faith and based on a theory of either infringement or validity that is objectively baseless." *Id.* at 1072; *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) (same).

217637, at *4 (Fed. Cir. Feb. 22, 2000) (endorsing the "clear and convincing" standard articulated in *PRE*).

As to the standard of proof, the District Court ultimately concluded that "[t]he Federal Circuit has not clarified in a published decision whether the clear and convincing evidence standard required to show objective baselessness in preemption cases also applies in the sham exception context." JA-58 (2012 S.J. Op.). "Nevertheless," the District Court determined it "need not decide in this case whether a clear and convincing evidence or a preponderance of the evidence standard" applies "because the Court's decision on summary judgment would be the same under either standard." *Id.* at JA-59. While the weight of authority plainly favors the clear and convincing evidence standard,[5] as discussed below, the *Anchen* case was not objectively baseless either under that standard or the preponderance of the evidence standard.

---

[5]     The District Court noted that "case law from other circuits adopted a clear and convincing evidence standard" as well. JA-59 n.7 (citing cases). Courts in this Circuit also have applied this heightened standard of proof. *See, e.g., Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 262 n.2 (E.D. Pa. 2010); *Teva Pharms. USA, Inc. v. Abbott Labs.*, 580 F. Supp. 2d 345, 362 (D. Del. 2008); *Braintree Labs., Inc. v. Schwarz Pharma, Inc.*, 568 F. Supp. 2d 487, 497 (D. Del. 2008); *Honeywell Intern., Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 325 (D. Del. 2004), *aff'd*, 488 F.3d 982 (Fed. Cir. 2007).

### 1. The District Court Properly Applied The Summary Judgment Standard To The *Anchen* Sham Litigation Claim

Plaintiffs argue that the District Court misapplied Rule 56 in granting summary judgment on the *Anchen* sham claim. They assert that "objective baselessness is a question of fact," Appellants' Br. 42-43, and accuse the District Court of "inverting the summary judgment burden" and "usurp[ing] the role of the fact finder." *Id.* at 53-54.

Plaintiffs' arguments rest on a fundamental misconception of how Rule 56 is applied in the sham litigation context. For example, they predicate their "inverted burden" argument on the District Court's conclusion that Biovail took colorable positions in the *Anchen* litigation regarding claim construction and infringement. Appellants' Br. 54. But a case based on a colorable legal position by definition is not objectively baseless.

Plaintiffs' argument to the contrary conflates the important difference between a dispute of fact *in* the underlying litigation and a dispute of fact of whether there was any *basis for* filing that litigation in the first place. Even the absence of such a dispute in the underlying litigation does not render that litigation objectively baseless. In a typical case, the moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). When, as here, the sham litigation claim turns on

31

legal positions taken in the underlying case, summary judgment will be appropriate

unless the court concludes that those positions were "frivolous."  *Q-Pharma, Inc.*

*v. Andrew Jergens Co.*, 360 F.3d 1295, 1301 (Fed. Cir. 2004) ("[I]t is not for us to

determine whether Q-Pharma's pre-filing interpretation of the asserted claims was

correct, but only whether it was frivolous.").  And the determination whether a

case is frivolous, or conversely, whether a plaintiff had probable cause to bring that

case, is a legal question for the court – not a factual question for the jury.  As the

Supreme Court observed more than a hundred years ago in a case relied upon in

*PRE* and cited by plaintiffs themselves:

> [W]hat amounts to probable cause is a ***question of law in
> a very important sense***. . . .  Whether the circumstances
> alleged to show it probable are true, and existed, is a
> matter of fact; but whether, supposing them to be true,
> they amount to probable cause, is a question of law.

*Stewart v. Sonnenborn*, 98 U.S. 187, 194 (1879) (emphasis added).  More recently,

leading antitrust commentators have explained:

> [P]articularly in the context of sham judicial positions,
> the question whether a lawsuit has an objectively
> unreasonable basis in law is hardly suitable to submission
> to the jury.  ***Only someone with legal training*** can
> rationally determine ***whether the pleading of a
> particular legal theory is justified by or a reasonable
> extension of existing law***.

1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 207c (2010) (emphasis

added).  *PRE*'s probable cause standard adopts language from Rule 11.  *See PRE*,

32

508 U.S. at 65 (holding, as a matter of law, that the defendant's infringement action could not be a sham because the action "was arguably 'warranted by existing law' or at the very least was based on an objectively 'good faith argument for the extension, modification or reversal of existing law'") (quoting Fed. R. Civ. P. 11).

The best evidence of the interplay between objective baselessness and Rule 11 is the litany of decisions granting summary judgment to defendants on sham litigation claims despite the fact that the court in the underlying case had granted summary judgment *against* that litigant. *PRE* itself was such a case. *See id.; see also, e.g., ERBE Elektromedizin Gmbh v. Canady Tech. LLC*, 629 F.3d 1278, 1292 (Fed. Cir. 2010) ("[a]lthough ERBE's arguments were not winning ones, our analysis demonstrates that ERBE presented non-frivolous arguments for its proposed construction of the disputed claim term"); *Covad Cmmc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (whether the accused infringer "ultimately prevailed, of course, tells us little about whether [the] patent suit lacked objective merit" and that the patentee "advanced reasonable arguments that each court went to some lengths to reject").

These cases reflect the sharp distinction – ignored by plaintiffs – between whether there is a genuine dispute of material fact in the underlying case and whether it was objectively baseless to have filed that case in the first place.

33

"[T]he Supreme Court [in *PRE*] . . . expressly rejected this ill-considered form of argument" in which a plaintiff in a sham case "erroneous[ly] equat[es] . . . [a] failure to demonstrate a triable issue of fact in the [patent infringement action] with the legal determination that [the] claims were 'objectively baseless' and therefore a sham." *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, No. 05-2133, 2007 WL 2318903, at *13 (N.D. Cal. Aug. 13, 2007) (granting summary judgment to defendants), *aff'd,* 301 F. App'x 959 (Fed. Cir. 2008).[6]  Objective baselessness is especially challenging to establish in a Hatch-Waxman ANDA case like those here, because the patent holder is necessarily proceeding with incomplete information regarding the allegedly infringing product.  ANDAs are central to the Hatch-Waxman scheme, and courts have held that the mere filing of an ANDA provides the patentee with an objectively reasonable basis to sue.  *See AstraZeneca AB v. Mylan Lab., Inc.*, Nos. 00-6749 et al., 2010 WL 2079722

---

[6]    Plaintiffs repeatedly cite to *Tyco Healthcare Group LP v. Mutual Pharmaceutical Co., Inc.*, 762 F.3d 1338 (Fed. Cir. 2014), which remanded the initial grant of summary judgment to the brand name manufacturer Tyco on the theory that it pursued sham infringement claims.  Appellants' Br. 43 n.230, 55 n.292.  Yet the Federal Circuit affirmed the summary judgment for Tyco on an alternative sham claim, holding Mutual "has not met its burden to  establish that Tyco's validity arguments were objectively baseless, even though those arguments were ultimately unsuccessful."  762 F.3d at 1346.  And, on remand, in the decision cited herein above, the District Court granted summary judgment to Tyco on the remanded sham claim.  *Tyco Healthcare*, 2015 WL 3460790.

(S.D.N.Y. May 19, 2010); *Celgene Corp. v. KV Pharm. Co.*, No. 07-4819, 2008

WL 2856469 (D.N.J. July 22, 2008).

> **2.     The District Court Did Not Make Factual Findings, Nor Did It Ignore Evidence Cited By Plaintiffs**

Plaintiffs seize on the District Court's use of the verb "find" to argue

that the court "usurped" the function of the jury.  Appellants' Br. 53.  By way of

example, plaintiffs quote the court's statements that "it finds that *Anchen* does not

fit the profile of objectively baseless litigation" and "does not find Biovail's

argument [on claim construction] to be unreasonable."  Appellants' Br. 53 (quoting

JA-66, 72).  The Court should disregard this exercise in semantics.  As the

foregoing examples make plain, the District Court did not use the term "find" to

describe a factual determination, but rather to express its legal conclusion

regarding the plausibility of legal arguments and positions taken by the litigants.

Equally misplaced is plaintiffs' reliance on language in *PRE* stating

that summary judgment is appropriate only when there is "no dispute over the

predicate facts of the underlying legal proceeding."  Appellants' Br. 55 (quoting

*PRE*, 508 U.S. at 63).  Here, the "predicate facts" of the allegedly sham case – the

patent, the ANDA, the decisions of the *Anchen* court – were before the District

Court and are not in dispute.  In this context, it was quintessentially the role of the

District Court to assess whether Biovail made objectively baseless arguments.

And contrary to plaintiffs' contention that a jury needs to sort through a multitude

of competing expert opinion testimony on the merits of the *Anchen* patent

litigation, the task of assessing whether the underlying litigation was baseless

rested principally on the District Court's review of the *Anchen* proceedings.

As the D.C. Circuit held in affirming dismissal of an antitrust case

based on allegations of sham patent litigation:

> Our review of the patent court's opinions convinces us
> that Bell Atlantic's case against Covad was not
> objectively baseless. Bell Atlantic advanced reasonable
> arguments that each court went to some lengths to reject.
> Nothing in their opinions suggests that "no reasonable
> litigant could [have] realistically expect[ed] success on
> the merits."

*Covad*, 398 F.3d at 677 (quoting *PRE*, 508 U.S. at 60). This makes perfect sense

because the decisions in the underlying action provide powerful objective evidence

regarding the strength of the arguments advanced in that action.

Like the *Covad* court, the District Court properly considered the

proceedings in *Anchen*. It noted that the *Anchen* court had issued a tentative

decision that "found a genuine issue as to what the FDA's ANDA requirements

were as to Anchen." JA-71 n.10. In addition, the District Court reviewed the

transcript of the oral argument in the Federal Circuit on the *Anchen* appeal, noting

that, "although the Court of Appeals did not have the opportunity to opine on the

*Anchen* case, the panel at oral argument repeatedly asked Anchen's counsel

questions [supportive of an infringement finding] about whether the FDA required

hydrochloric acid to be listed and quantified if it tended to stabilize the product." *Id.*

Plaintiffs are wrong in arguing that the District Court "considered only evidence favorable to defendants." Appellants' Br. 47. As a factual matter, the Court certainly considered "evidence" favorable to plaintiffs, *e.g.*, the *Anchen* court's rulings in Anchen's favor – as well as "evidence" cited by plaintiffs, *e.g.*, their experts' opinions concerning FDA guidance and the proper interpretation of the ANDA. JA-70 (citing Kaplan Dep.); JA-72 (citing Pl. Br. 46-47).

### 3. The District Court Properly Held That Biovail's Functional Construction Of "Free Of Stabilizer" Was Objectively Reasonable

For purposes of the sham test, "the question is whether [the] claim construction was so unreasonable that no reasonable litigant could believe that it would succeed." *iLOR, LLC v. Google, Inc.,* 631 F.3d 1372, 1378 (Fed. Cir. 2011). In other words, a validity or infringement argument based on the assertion of a "colorable claim construction" is not objectively baseless. *Braintree Labs.*, 568 F. Supp. 2d at 499. The functional interpretation of "free of stabilizer" adopted by GSK and Biovail easily satisfies this threshold.

The invention covered in the '341 patent arose out of the surprising discovery that a bupropion hydrochloride tablet could be formulated without adding a substance whose function was to stabilize the active ingredient, *i.e.*,

prevent a loss of potency over time. JA-3290 ('341 patent at column 3, lines 26-32). Thus, each claim of the '341 patent requires that the tablet be "free of stabilizer." For example, claim 30 requires a "bupropion hydrochloride delayed release tablet *free of stabilizer* and free of pore-forming agent…." *Id.* at JA-3294 (emphasis added).

In the patent litigation, Anchen sought to define "free of stabilizer" to exclude tablets that had even trace amounts of hydrochloric acid, *i.e.*, amounts too small to stabilize the tablet. JA-10647 (Am. Order on Claim Construction). Under this definition, even one molecule of hydrochloric acid would prevent Anchen's tablet from infringing. By contrast, in its Paragraph IV Certification, Anchen stated that Anchen's tablet "*includes a stabilizing amount of hydrochloric acid in the core*." JA-33337 (emphasis added).

Thus, the claim construction Anchen belatedly adopted when forced to defend the patent infringement case represented an abandonment of its earlier position. If, at the time Anchen served its Paragraph IV Certification, it truly believed that "free of stabilizer" meant free of *any amount* of stabilizer, there would have been no need for the qualifier that the tablet includes "a stabilizing amount" of hydrochloric acid in the core.

In *Anchen*, Biovail argued for a functional claim construction, *i.e.*, that the term "free of stabilizer" meant free of a substance that was acting to

stabilize.  In concluding that Biovail's claim construction was not objectively

baseless, the District Court correctly held that "as a matter of plain meaning, the

Court does not find Biovail's argument that a stabilizer ordinarily means

something that actually provides stability to be unreasonable."  JA-66.  Thus, as in

*iLOR*, "[o]n its face, the claim language does not preclude [Biovail's]

construction."  631 F.3d at 1378.[7]

As the District Court also observed, a functional interpretation of

"free of stabilizer" is supported by other courts construing terms akin to

"stabilizer" as requiring the designated function.  JA-66-7.  As one court explained,

the term "binder must do more than 'have the ability' to bind, it must actually

bind."  *Profile Prod. LLC v. Encap, LLC*, No. 09-92, 2009 U.S. Dist. LEXIS

60282, *11 (W.D. Wis. July 15, 2009).[8]  Finally, the District Court noted that the

---

[7]     Contrary to plaintiffs' assertion, GSK's experts have not abandoned this
functional definition.  Plaintiffs cite to expert testimony regarding the
presence of residual hydrochloric acid in Anchen's tablets.  Appellants' Br.
46 (citing JA-1810-11).  But that testimony does not address the issue of
infringement under Biovail's functional construction (*i.e.*, whether such
amount functions to stabilize Anchen's tablets), let alone indicate that
Biovail's experts "abandoned" a functional construction of stabilizer.

[8]     *See also Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1318 (Fed. Cir. 2006)
(rejecting argument that "potassium bromate replacer" can be any substitute
and holding that "the potassium bromate replacer must be functional");
*Allergan, Inc. v. Watson Labs., Inc.*, No. 09-511, slip op. at 3 n.10 (D. Del.
Dec. 8, 2010) ("The court rejects the plaintiffs' proposed construction . . . to
the extent that it suggests that 'release controlling' does not impose a
functional limitation.") (JA-33812); *Cargill, Inc. v. Sears Petroleum &*

Manual of Patent Examining Procedure ("MPEP") provides for the patentability of functional limitations, which it defines as "an attempt to define something by what it does, rather than by what it is." JA-37618 (MPEP § 2173.05(g)).

Thus, as the District Court concluded, defining "stabilizer" as a substance that actually performs this function in the tablet at issue "was [not] so unreasonable that no reasonable litigant could believe it would succeed." *iLOR*, 631 F.3d at 1378. Indeed, that claim construction may well have been correct, the trial court's disagreement notwithstanding, especially given the unpredictable nature of claim construction decisions at the district court level and high reversal rates by the Federal Circuit.[9] In sum, plaintiffs cannot prove by a preponderance of evidence, much less by clear and convincing evidence, that GSK and Biovail's proposed claim construction was objectively baseless. On appeal, plaintiffs seek to diminish the District Court's conclusion through the unsupported assertion that it

---

*Transp. Corp.*, 334 F. Supp. 2d 197, 222 (N.D.N.Y. 2004) (defining "thickener" to mean "a substance or material . . . which causes an increase in the composition's viscosity"); *Bristol-Meyers Squibb Co. v. Teva Pharm. USA, Inc.*, 288 F. Supp. 2d 562, 577 (S.D.N.Y. 2003) ("the plain and ordinary meaning of 'lubricant' . . . is 'a substance added during the manufacture of tablets having the function of reducing problems such as sticking to the punch tips during tableting'") .

[9] *See* David L. Schwartz, *Practice Makes Perfect? An Empirical Study of Claim Construction Reversal Rates in Patent Cases*, 107 Mich. L. Rev. 223, 249 (2008) (from 1996-2007, the Federal Circuit reversed 29.7% of cases due to claim construction errors at the District Court level).

"placed outsized importance on claim construction." Appellants' Br. 48. But they do not address the court's analysis at all. Nor do they address the language of the patent or the case law cited by the District Court or the MPEP, all of which materially contributed to the conclusion that Biovail pursued a claim construction that had a chance of success. In any event, as discussed immediately below, the District Court also held that, under either claim construction, the *Anchen* lawsuit was not objectively baseless.

> **4. The District Court Properly Held That GSK And Biovail Had A Reasonable Basis To Sue Anchen For Patent Infringement Based On Anchen's ANDA Under Either Biovail's Or Anchen's Claim Construction**

Quite apart from the issue of claim construction, because GSK and Biovail had a reasonable basis to file an infringement action against Anchen based on the ANDA itself, plaintiffs cannot establish that *Anchen* was objectively baseless. As noted, the construction of "free of stabilizer" proposed by Anchen would enable Anchen to avoid infringing if its tablet contained even the tiniest amount of hydrochloric acid. But Anchen's ANDA was ambiguous as to whether Anchen's tablets contained any hydrochloric acid at all. As the District Court correctly held, "(1) Biovail was entitled to rely on the representations in the ANDA when initiating suit, and that (2) Anchen had an obligation under FDA regulations and guidance to quantify even residual amounts of HCl if the ingredient tended to stabilize the final tablet." JA-68.

This holding was demonstrably correct. 

*Id.* at JA11748-51.  Moreover, footnotes next to HCl stated

*Id.*  In

addition, ingredients                                           *Id.* at JA-11748.

Indeed, the Anchen employee who prepared and submitted the ANDA

admitted

JA-33586 (Chang Dep. 69:4-10).  Not

surprisingly,

long after GSK withdrew from *Anchen*.  JA-36239 (Letter from Anchen to FDA).
With this amendment, ████████████████████████████████

████████████████████████████████████████

███████████████████████████████

███████████████████████████████████

█████████████████████

     Accordingly, even under *Anchen's* non-functional construction of
"stabilizer," it would have been reasonable to read the ANDA as not containing
HCl, thus providing a reasonable basis for suit.

     In light of this undisputed record, plaintiffs' attacks on the District
Court's conclusion are unpersuasive.  Plaintiffs first seek to marginalize the
ANDA, arguing that "[g]iven basic chemistry, a jury could easily reject the notion
that HCl becomes inert merely because of the way it is labeled in an FDA
application."  Appellants' Br. 49.  In a related vein, plaintiffs fault the District
Court for "effectively ruling that regulatory draftsmanship trumps chemistry."  *Id.*
They claim that Biovail was not entitled to interpret Anchen's ANDA "in a
scientific vacuum," and argue that, as a matter of chemistry, any amount of HCl,
no matter how small, had to remain in the tablet and contribute to stability.  *Id.* at
45, 50.

Under governing Federal Circuit authority that plaintiffs fail to cite,
Anchen's ANDA is controlling on the question of infringement. JA-68-69 (citing
*Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002)). The
District Court held that Biovail "had at least a colorable legal argument in *Anchen*
that under *Abbott Laboratories* and the applicable FDA regulations and policy,
Anchen's ANDA controlled the infringement inquiry and suggested that the
Anchen product" infringed, even under the *Anchen* court's non-functional
construction. JA-72.

The District Court could not have reached a different conclusion. In
*Anchen*, Biovail presented testimony from FDA experts that if Anchen had claimed
that any residual amount of hydrochloric acid performed a function in the tablet
(*i.e.*, stabilizing), Anchen would have needed to calculate a target amount and set a
specification in its ANDA.[10] As cited by the District Court, Biovail presented
additional evidence that a 2003 FDA guidance provides that any components not
quantified in the final drug product would have been considered "processing

---

10



agents" that "appear in the finished tablet only at residual levels and have *no function to perform* in the finished tablet." JA-70.[11]

Plaintiffs' argument that FDA does not require stabilizing agents present in such small trace amounts to be quantified, Appellant Br. 52, misreads the 2003 FDA guidance, which provides that "[t]he target amount of each component by definite weight or other measure should be provided on a per unit basis." JA-36107. Despite the requirement for a "definite weight" on a per unit basis, plaintiffs claim that a dash (" – ") satisfies this requirement for the amount of HCl per finished tablet. Appellants' Br. 51. This defies the expert evidence. Biovail's regulatory expert in *Anchen* opined, contrary to plaintiffs' argument, Appellants' Br. 51-52, that the ANDA is required to contain a target amount for an ingredient that performs a stabilizing function in the finished tablet. JA-36169-70 (Lin Report ¶ 11). Similarly, its FDA expert explained that only "processing agents[12] – [which] have a function in the manufacturing process but none in the finished product" – "may not need to be quantified in the finished tablet." JA-

---

[11]     *See also* JA-36107-8 (FDA Draft Guidance).

[12]     Rather than offering a definition of their own, plaintiffs assert that defendants' definition for "processing agent" "appears nowhere in the guidance." Appellants' Br. 51. However, Biovail's definition is supported by the unrebutted testimony of two FDA experts with over 25 years' experience working for FDA. JA-36087, 90 (Fleischer Decl. ¶¶ 11, 14); JA-36166, 69 (Lin Expert Report ¶¶ 2, 11).

36090 (Fleischer Decl. ¶ 14). Their testimony also makes common sense. If an ANDA applicant included a stabilizer in its tablet, the FDA would want assurance that the necessary amount of stabilizer would be in every tablet. JA-36090-91 (*id.* ¶ 15). Regardless, of "whether the FDA rules, regulations, and the 2003 guidance required Anchen to quantify the amount of hydrochloric acid on a per unit basis," "it was not objectively baseless to contend that if hydrochloric acid tended to stabilize the chemical integrity of the final product, it was not a 'processing agent' and, thus, needed to be quantified on a per unit basis." JA-71 (2012 S.J. Op.).[13]

And plaintiffs' argument that it is "standard industry convention" to use a symbol such as a '-' or '**' to signify that a component remains in a final pharmaceutical product in a residual, but non-numerically quantified, amount," Appellants' Br. 15, 46, is contradicted by Anchen's chemistry expert, Dr. Baldwin, who testified in the *Anchen* case that ███████████████████████████ ████████████████████████████████████ JA-33828-29 (Baldwin Dep. 97:18-98:14, *Anchen*). Dr. Baldwin, also engaged by plaintiffs here, changed his testimony in this litigation so that it now conforms to plaintiffs' theory, although there is no reason to credit this *post hoc* pivot, especially since

---

[13]   As the District Court noted, the reasonableness of Biovail's position was supported by the fact that the Federal Circuit appeals panel "repeatedly asked Anchen's counsel questions about whether the FDA required hydrochloric acid to be listed and quantified if it tended to stabilize the product." JA-71 (citing JA-34802-3, Oral Argument Tr.)

Dr. Baldwin's only explanation for the change was that he "misspoke" in the *Anchen* case, JA-9129 (Baldwin Dep. 39:5-41:1), despite submitting no corrective errata at the time.

Nor can plaintiffs bolster their position on the dashes with reference to GSK's earlier filings. Appellants' Br. 15 (claiming that "GSK itself used '**' to signify residual HCl in its IR product"). First, plaintiffs misstate the evidence. GSK's Wellbutrin IR NDA indicates that 0.5 mg of HCl remains in each 50 mg tablet. JA-33831 (Wellbutrin IR NDA) ("Hydrochloric Acid, AR 0.5 [mg per tablet]"). Second, GSK's earlier FDA filings support GSK's position that when a pharmaceutical manufacturer believes an acid is functioning to stabilize, it provides an amount of that acid on a ***per tablet*** basis. JA-33833 (Wellbutrin SR NDA) ("Cysteine Hydrochloride, USP 8.100 [mg per tablet] … Stabilizer"). Thus, Anchen's decision not to list the amount of hydrochloric acid on a per tablet basis makes it reasonable to construe Anchen's ANDA as not disclosing a stabilizing amount of hydrochloric acid.[14]

---

[14]   Moreover, plaintiffs' reference to GSK's use of "**" for the amounts of water, isopropyl alcohol, and denatured ethyl alcohol further supports GSK's position that such nomenclature indicates that at most only residual amounts of the component remain and do not perform a function in the tablet. Unlike with hydrochloric acid for Wellbutrin IR and cysteine hydrochloride for Wellbutrin SR, GSK is not claiming that water, isopropyl alcohol, and denatured ethyl alcohol perform a function in the final tablet, such as stabilization. JA-3325 (Wellbutrin XL NDA). Rather, such components are processing agents (used as solvents during the manufacturing process) and

Indeed, contrary to plaintiffs' argument, the *Anchen* court did not reject "out of hand" the argument that Anchen was required to quantify the remaining hydrochloric acid in each tablet if it performed a stabilizing function in its tablets. Appellants' Br. 49. Rather, the *Anchen* court made clear that it only considered whether hydrochloric acid ***was present***, not whether it ***was functioning*** as a stabilizer.[15]

Plaintiffs argue that any "remaining HCl in the tablet must, as a matter of basic chemistry, contribute to its stability (as there is no threshold amount below which HCl ceases to act as a stabilizer)." Appellants' Br. 45. But a GSK study, relied on by plaintiffs in the District Court, shows that below certain amounts, hydrochloric acid is "insufficient . . . for stability of bupropion hydrochloride." JA-16817 (Wellbutrin Brand Bupropion Hydrochloride Tablets); JA-5184-85 (Burgess Expert Report ¶ 58). Thus, it was not objectively baseless for GSK to conclude that any residual, non-quantifiable amount of hydrochloric acid was insufficient to play a stabilizing function in Anchen's tablets.

---

need not be quantified on a per tablet basis. JA-36107-08 (FDA Draft Guidance).

[15] JA-11128 (Order) ("[T]he Court finds that there is no genuine issue of material issue of fact as to whether hydrochloric acid is present in Anchen's ANDA."); JA-11526 (Order Denying Reconsideration) ("[T]he only question for the Court in determining whether Anchen's ANDA infringes on the '341 patent, is whether a stabilizer *is present* in that product, not whether and under what circumstances it *is activated*.").

48

Moreover, as discussed above, Anchen's ANDA was replete with references that there was *no* hydrochloric acid remaining in Anchen's final tablet formulation. JA-11748-11752, 11755, 11761, 11790 (Anchen ANDA). Accordingly, it was reasonable for GSK and Biovail to claim, based on their review of the limited portions of the ANDA provided by Anchen, that Anchen's tablet did not contain any hydrochloric acid. *See Hoffman-La Roche Inc.,* 213 F.3d at 1365 ("[T]he District Court here did not abuse its discretion in holding that, in the circumstance of this case, '[the patentee's] initial claim of infringement was not unreasonable in light of the available information at the time of filing.").

\* \* \*

In essence, plaintiffs argue that the only reasonable positions that could have been advanced in *Anchen* are as follows:

- the phrase "free of stabilizer" in the '341 patent can mean free of a single molecule of HCl, even if that molecule could not conceivably stabilize a bupropion hydrochloride tablet;

- the phrase "evaporated during processing" actually means "not totally evaporated during processing";

- a " – " in a table next to HCl *cannot* mean zero, even though Anchen's chemistry expert testified under oath that it *could* mean zero;

- HCl is part of the tablet even though the ingredients, absent HCl, add up to 100.00%; and

- the only reasonable reading of Anchen's ANDA is that HCl is acting as a stabilizer in Anchen's tablet, even though, in contrast to other bupropion hydrochloride tablet formulations that use an acid to

49

stabilize, Anchen did not provide an amount of HCl on a per tablet
basis.

If any one of the above points is subject to reasonable debate, GSK and Biovail

had probable cause to file suit and summary judgment must be affirmed.

At bottom, *Anchen* was "a relatively complicated patent infringement

case with sophisticated legal and factual arguments."  *Miller Pipeline Corp. v.

British Gas PLC*, 69 F. Supp. 2d 1129, 1142 (S.D. Ind. 1999).  The *Anchen* court

wrote lengthy opinions on complex matters of claim construction as well as

summary judgment, including a tentative ruling denying Anchen summary

judgment.  Anchen's ANDA, FDA guidance, and case law all supported Biovail's

position.  The Federal Circuit appeals panel seemed to have the same concerns as

Biovail.  JA-3408-3.  Under these circumstances, *Anchen* plainly cannot be

regarded as objectively baseless.

### B.   *Abrika* Cannot Support An Antitrust Claim

Although the District Court detailed many reasons why it was "not

inclined to hold that the *Abrika* lawsuit was not reasonably calculated to elicit a

favorable outcome," it determined that it "need not ultimately decide whether the

*Abrika* suit was objectively baseless" because plaintiffs stipulated that the suit did

not delay the entry of Abrika's generic Wellbutrin XL.  JA-86.  The Stipulation

states that, absent defendants' alleged wrongful conduct, Abrika would have begun

selling generic Wellbutrin XL on August 18, 2008, JA-32694, more than a year

*after* the alleged period of delay (the 30-month stay) triggered by the *Abrika* suit expired. As a result, the *Abrika* suit cannot form the basis of an antitrust claim. *See, e.g., Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 98 (3d Cir. 1976) ("Even if a defendant's acts are shown to be violative of the [antitrust] statute, [] a plaintiff may not recover unless a nexus to its own injury is also demonstrated.").

In view of this Stipulation, plaintiffs' argument that causation "was for a jury," Appellants' Br. 107 n.547, is groundless. In any event, their failure to argue in favor of reversal in the body of the brief or beyond a mere passing reference waives the argument. *In re Fosamax (Alendronate Sodium) Prods. Liab. Litigation (No. II)*, 751 F.3d 150, 157 (3d Cir. 2014).

Quite apart from the causation hurdle caused by their stipulation or the waiver of the argument, plaintiffs' argument that the *Abrika* litigation was a sham is ill-conceived. After receiving Abrika's Paragraph IV Certification, which only disclosed facts relevant to Abrika's claim construction position, GSK and Biovail requested additional information. JA 33252-53 (Letter from GSK Counsel to Abrika). After Abrika refused to produce such information under reasonable terms, JA-33254 (Letter from Abrika Counsel to GSK Counsel), GSK and Biovail sued. *See AstraZeneca*, 2010 WL 2079722, at *4 (noting importance of discovery in Hatch-Waxman cases). As even the *Abrika* court concluded, based on the

information known to GSK at the time, the initial assertions of patent infringement were "reasonable." JA-31492 (Order Granting Voluntary Dismissal).[16] Thus, to the extent the Court reaches this issue, it should conclude that *Abrika* was not objectively baseless.

### C. The Undisputed Evidence Shows That GSK Did Not Conspire With Biovail To Prosecute *Impax* Or *Watson*, Or To File A Citizen Petition

As the District Court articulated, "[t]o withstand a motion for summary judgment, a plaintiff must present evidence that tends to exclude the possibility that the alleged conspirators acted independently."[17] JA-128-129 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Plaintiffs try to salvage their conspiracy claim by now framing their case as a single conspiracy, beginning with *Anchen* and culminating in the Wellbutrin Settlement. But their citations to cases addressing whether a course of conduct

---

[16] This conclusion was demonstrably correct. Two of the three courts to consider this claim construction—the *Anchen* and *Impax* courts—agreed with Biovail's claim construction, and defined "dissolution profile" with reference to the appropriate dissolution test set forth by the United States Pharmacopoeia (USP) – the authoritative independent standard-setting body for drug manufacturing – for an enteric-coated tablet like Abrika's. JA-76, 77 (citing JA-37566 (*Anchen* Amended Order on Claim Construction); JA-36599 (*Impax* Order on Claim Construction)).

[17] Contrary to their misstatement of the law, plaintiffs must show more than a "mere scintilla" of evidence and, instead, must come forward with affirmative evidence that raises a genuine issue of material fact. *Big Apple BMW, Inc. v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

comprises a single conspiracy or multiple conspiracies, Appellants' Br. 91-98, improperly **assumes** the existence of a conspiracy. As the District Court held, plaintiffs have not raised a material dispute sufficient to overcome the evidence that GSK acted independently as to the *Impax* and *Watson* lawsuits or the Biovail citizen petition. Without evidence of concerted action, plaintiffs' claim that GSK conspired on those petitions fails.

### 1. There Is No Evidence Of Concerted Conduct On *Impax* Or *Watson*

The District Court held, based on the undisputed evidence, that GSK cannot be held liable as a co-conspirator with respect to either the *Impax* or *Watson* suits filed by Biovail. "GSK was not a party" to either case, and "[t]he record is consistent with a theory that GSK independently reviewed the paragraph IV notices and the ANDAs, came to a legal conclusion about infringement, and decided not to sue Impax and Watson." JA-132.

Although plaintiffs claim that GSK "helped Biovail in the lead-up to filing the Impax and Watson complaints," Appellants' Br. 92, all of the evidence plaintiffs cite points to independent action and a lack of conspiracy. For example, as GSK's CEO explained, GSK's decision not to join *Impax* and *Watson* reflected GSK's desire to control its litigation:

> It was of the utmost importance to me that we have clear
> control of litigation . . . we came to the realization we
> couldn't . . . play that role with newer generics coming

53

> on the market which we had decided not to sue, and with
> the previous litigation, we decided . . . we don't want to
> be part of it under those conditions.

JA-8424 (Garnier Dep. 141:8-24).

Plaintiffs' evidence, at best, is "[p]roof of opportunity to conspire, [which] without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc*., 998 F.2d 1224, 1235 (3d Cir. 1993). As recognized by this Court, "courts generally reject conspiracy claims that 'seek to infer an agreement from . . . communications despite a lack of independent evidence tending to show an agreement and in the fact of uncontradicted evidence that only information exchanges took place.'" *In re Baby Food Antitrust Litig*., 166 F.3d 112, 133 (3d Cir. 1999) (quoting District Court, alteration in original); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (in antitrust conspiracies "[t]here must be evidence that tends to exclude the possibility of independent action [on the part of the defendants]"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010) ("'a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently'") (citations omitted).

Here, GSK and Biovail communicated about the Impax Paragraph IV certifications, but that "[i]s insufficient to exclude the possibility that the defendants acted independently." *Id.* Given the absence of evidence tending to

show that GSK and Biovail conspired to file *Impax* or *Watson*, the District Court correctly granted summary judgment on plaintiffs' conspiracy claims.

### 2. GSK Did Not Conspire With Biovail To Draft Or File Biovail's Citizen Petition

The District Court also correctly concluded that GSK did not conspire with Biovail to file the citizen petition. The court emphasized that GSK had considered filing its own citizen petition, but ultimately decided against that course and also chose not to join Biovail's. Thus, the court held, "the facts . . . are at the very least, equally consistent – if not more consistent – with a theory that Biovail independently pursued" a citizen petition. JA-139.

Plaintiffs contend that GSK developed many of the arguments advanced in the petition, collaborated with Biovail on the petition before it was filed, and benefited from the filing of the petition. Appellants' Br. 93. Plaintiffs' arguments are unsupported by law and refuted by undisputed facts.

As a legal matter, the fact that GSK could benefit from Biovail's petition does not establish a conspiracy, as the District Court noted. JA-139. The decision in *SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*, 772 F. Supp. 2d 660 (E.D. Pa. 2011), *aff'd*, No. 11-1734, 2011 WL 6145370 (3d Cir. Dec. 12, 2011), is instructive. SigmaPharm sued the defendants for conspiring to keep additional generic versions of Skelaxin off the market, which would benefit both defendants given their licensing agreement. The court rejected the plaintiff's argument that

55

the benefit to both defendants from the citizen petition evidenced a conspiracy because the citizen petition was "self-interested action." *Id.* Similarly, here, although any alleged delay in generic approvals due to Biovail's citizen petition would have benefited both Biovail and GSK, Biovail's filing of the citizen petition was "self-interested action."

Plaintiffs also argue that GSK must be a co-conspirator in filing Biovail's citizen petition because it "conceptualized the sham bioequivalence drift argument," and because, "GSK worked with Biovail on the metabolites request." Appellants' Br. 93.[18] But the undisputed evidence is to the contrary.

In the spring 2004, GSK did review whether "bioequivalence drift" was a concern to raise with FDA. The undisputed evidence shows that some within GSK believed that there was insufficient clinical justification for raising the issue, that GSK shared that conclusion with Biovail, JA-7576, 7581 (Stout Dep. 115:16-25, 135:14-136:10), and that neither GSK nor Biovail filed a citizen petition on bioequivalence in 2004 (and GSK did not thereafter file one).

---

[18]     Generally, bioequivalence is shown when the proposed generic demonstrates that it is within certain, pre-specified limits when compared to the innovator drug. "Bioequivalence drift" refers to the circumstance in which the generic ("C") is comparing itself to an innovator drug ("B") that was itself approved based on bioequivalence to the original drug ("A"). *See* JA-7735 (Burch Dep. 106:16-108:24).

A similar pattern occurred with respect to the metabolite and food effect issues, which GSK scientists ultimately believed were not clinically significant enough to justify a citizen petition. JA-13279, 13281-82 (Internal GSK email). And underscoring the absence of coordination, GSK scientists noted that "[t]his information . . . has not been shared with Biovail, and *it is our recommendation not to share metabolite data with Biovail*." *Id.* at JA-13282. In any event, consistent with the views of GSK's scientists, neither GSK nor Biovail filed a citizen petition at that time.

In sum, the undisputed evidence shows that, more than a year before Biovail filed its citizen petition, GSK performed a scientific analysis of the issues and decided not to file a citizen petition. Plaintiffs have failed to cite any evidence tying GSK's review of the scientific issues in early 2004 to Biovail's filing of its citizen petition over 18 months later. The fact that GSK shared its conclusions with Biovail is entirely consistent with GSK's decision not to file. *See In re Baby Food Antitrust Litig.,* 166 F.3d at 133 (information exchanges without independent evidence of agreement cannot support conspiracy claims); *Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*, 22 F. Supp. 2d 447, 470 (D. Md. 1998) (despite "bursts" of interfirm communications, no conspiracy found where the plaintiff failed to exclude possibility of independent conduct on part of pharmacies refusing to join the plaintiff's plan). No wonder that, in the week prior to Biovail's filing,

GSK did not even know whether Biovail "ha[d] … filed a citizens [sic] petition on XL." JA-13586 (Internal GSK Email).

Put simply, there is no evidence of communications between the companies resulting in the drafting and filing of Biovail's citizen petition, let alone any "meeting of the minds" to collaborate on the petition. Plaintiffs have accordingly failed to carry their burden of presenting evidence that "tend[s] to rule out the possibility that defendants were acting independently." *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 321.

### 3. There Is No Evidence Of The Continuous Operation Of A Single Conspiracy

Even assuming, as plaintiffs contend, that the cases distinguishing a single conspiracy from multiple conspiracies were applicable, plaintiffs cannot prove a single conspiracy because they cannot show that GSK conspired with Biovail to achieve "a continuous result that will not continue without the continuous cooperation of the conspirators." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989); *see also In re K-Dur Antitrust Litig.,* No. 01-1652, 2016 WL 755623, at *1 (D.N.J. Feb. 25, 2016) (finding plaintiffs lacked sufficient evidence of single conspiracy because, *inter alia*, they failed to show that the alleged conspirators "sought to maintain the continuous operation of the single conspiracy"). As explained *supra*, all of the evidence negates the existence of ***continuous*** cooperation: GSK withdrew from the *Anchen* and *Abrika* litigations;

GSK independently reviewed and decided not to join the *Impax* or *Watson* lawsuits; and GSK did not join Biovail's citizen petition, instead considering its own petition that it ultimately decided not to submit.

### D. *Watson*, *Impax*, And The Citizen Petition Were Indisputably Not Shams

Because GSK had no involvement in (and, therefore, could not be liable for) *Watson*, *Impax*, and the Biovail citizen petition, the Court need not consider whether those petitions were shams. Were the Court to reach the issues, however, they indisputably were not shams.

#### 1. The District Court Correctly Held That *Watson* Was Not A Sham Patent Infringement Case

The District Court correctly recognized – and the plaintiffs do not dispute – that the *Watson* case presented the same issues as *Anchen*. JA-74. Because, as discussed above, *Anchen* was not "sham," neither was *Watson*.

#### 2. The District Court Correctly Held That *Impax* Was Not A Sham Patent Infringement Case

Although Judge Brody, who presided over *Impax*, described infringement as a "close question," JA-11008 (*Impax* Claim Construction Order), plaintiffs contend the District Court here erred by not agreeing with their expert's contrary view. Appellants' Br. 103. This was not a "misstep" by the District Court as plaintiffs contend, but the only possible step. A "close question" could not be a sham.

Even so, the District Court conducted its own analysis of *Impax*. Plaintiffs agree that the District Court correctly identified the key question: "whether the construction of the term 'delayed release tablet' should be construed to cover *only* tablets with the delayed release mechanisms in the coating, or whether it should be construed to cover any tablet that exhibited the specified dissolution profile." JA-91. In assessing the reasonableness of Biovail's argument supporting the latter construction, the District Court did not, as plaintiffs contend, simply ignore their arguments and evidence. Rather, relying on Federal Circuit law, the court held that Claim 30's omission of the term "coating" firmly supported Biovail's interpretation of the claim as "not limited to tablets with the release mechanisms in the coating." JA-93 (citing cases). In fact, as the District Court explained, Judge Brody pointed out that Impax and Biovail each "*agreed* that one skilled in the art would understand a 'delayed release tablet' to be any tablet that does not release its active ingredient immediately" and that understanding was supported by the plain meaning of Claim 30. JA-94 (citing JA-11008 (*Impax* Claim Construction Order)); *see also Bell Atl. Network Servs., Inc. v. Covad Cmmc'ns Grp.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (discussing the heavy presumption in favor of plain meaning). It is no surprise then that Judge Brody engaged in a thoughtful analysis of "considerable length," JA-95, given that it was a "close" – *i.e.*, colorable question.

### 3. The District Court Correctly Held That the Biovail Citizen Petition Was Not A Sham

The District Court correctly held that plaintiffs did not come forward with evidence creating a material issue of fact that Biovail's citizen petition was a sham. In their attack on the petition, plaintiffs mischaracterize all of the requests as unsuccessful. To the contrary, FDA *granted* two: (1) that FDA require ANDA sponsors to test the hydroxy-metabolite; and (2) that FDA require ANDA sponsors to include dose-dumping testing. JA-37518 (FDA Response). And, although at the time it denied the request to require testing of the threo- and erythro-metabolites, FDA granted the same requests in a subsequent petition filed by Valeant Pharmaceuticals (which purchased Biovail). JA-29835 (FDA Response to citizen petition). *See PRE*, 508 U.S. at 58 ("A successful effort to influence governmental action … certainly cannot be characterized as a sham.").

Plaintiffs' contention that FDA had already adopted each of the testing requirements is wrong. There is no evidence that, prior to the Biovail filing, FDA required ANDA sponsors to test the metabolites. As the District Court pointed out, FDA recommended, but did not require, hydro-metabolite testing, and it did not even recommend testing the other metabolites. JA-109. As for the dose-dumping request, only after filing the petition did FDA require it of the generic XL applicants, and FDA specifically referenced the Biovail petition when explaining its new position. JA-37528 (FDA Memorandum). What is more, plaintiffs'

argument that a citizen petition can never be a "success" if FDA was already considering the policy would impermissibly chill First Amendment petitioning rights exactly when input on policymaking should be encouraged.

Finally, plaintiffs err in contending that success – "eliciting FDA action," Appellants' Br. 109-10, is necessary for *Noerr-Pennington* immunity. The test is clear: a reasonable pharmaceutical company must "realistically expect success on the merits." *PRE*, 508 U.S. at 60-61. Because plaintiffs make no attempt to satisfy this test, their appeal on this issue should be rejected.

### E. The District Court Correctly Held That Non-Sham Citizen Petition Requests Prevented Plaintiffs From Showing Antitrust Injury

The District Court also rejected plaintiffs' attacks on the citizen petition for the independent reason that it is plaintiffs' burden to show the FDA's ANDA approvals were delayed by the supposedly sham requests, but they failed to do so. Plaintiffs' only proffered evidence that the petition caused FDA to delay approval of an ANDA is the testimony of their expert, Martha Bennett. However, Ms. Bennett admitted at her deposition she could not opine that the inclusion of the requests ultimately denied by FDA caused FDA to take any longer to decide the

petition than FDA would have taken without those requests.  JA-37551 (Bennett Dep. 242:1243:1).  As a result, plaintiffs cannot prove antitrust injury.[19]

## F.     This Case Does Not Involve "Serial Petitioning"

After extensively arguing the merits of their sham litigation claims under *PRE*'s "objective baselessness" standard, plaintiffs tack on an argument that this standard does not apply because the lawsuits and the citizen petition constitute "serial petitioning" under *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972), as recently applied in *Hanover 3201 Realty v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015).  They ask this Court to remand those claims for application of the "serial petition" standard.  The Court should reject this ploy.

As a threshold matter, plaintiffs did not argue serial petitioning in the District Court and have waived the argument on appeal.[20]  The serial petitioning

---

[19]   Plaintiffs contend that the *Anchen* suit delayed approval of Anchen's generic.  However, they admit that FDA would not finally approve Anchen's ANDA until answering the citizen petition. Appellants' Br. 111.  Because plaintiffs cannot prove any delay from the citizen petition was improper, they thus cannot, for this additional reason, prove antitrust injury attributable to the *Anchen* suit.

[20]   Plaintiffs' reference to "actions" in the Consolidated Complaint, and nowhere else in the seven-year course of the litigation is not sufficiently specific to place the District Court on notice that plaintiffs were claiming the serial litigation exemption to *Noerr-Pennington* immunity.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) (discussing requirements to preserve issues for appeal).

exception to *Noerr-Pennington* immunity has been firmly established since the

Supreme Court decided *California Motor* more than 40 years ago, and in fact was

unsuccessfully argued five years ago in another pharmaceutical antitrust case in

which plaintiffs' counsel herein participated. *See In re Flonase Antitrust

Litigation*, 795 F. Supp. 2d 300, 309 n.10 (E.D. Pa. 2011). Plaintiffs' counsel

should have asserted this theory in the District Court if they wished to preserve the

issue for appeal. *See Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir.

2008) (intervening change of law exception does not apply to a decision which was

issued prior to appellate briefing and of which the party had notice).

But even if the Court considers plaintiffs' serial petitioning argument,

it is inapplicable here, as illustrated by *Hanover 3201* itself. That case involved

the efforts of a ShopRite to block the entry of a Wegmans into the grocery store

market by filing administrative and court challenges to each permit application

filed by Wegmans' developer. 806 F.3d at 166. In applying the *California Motor*

serial petition test, the Court emphasized that successive petitioning "imposed a

significant expense" on a single competitor. *Id.* at 182. Other Courts of Appeals

have similarly held that the burden and expense faced by a single competitor

forced to defend multiple actions triggers the application of the *California Motor*

test. *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council*, 31

F.3d 800, 811 (9th Cir. 1994) ("Litigation is invariably costly, distracting and time-

consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business."); *see also Primetime 24 Joint Venture v. National Broadcasting Company*, 219 F.3d 92, 101 (2d Cir. 2000) (complaint claiming sham litigation should not have been dismissed when it alleged that the defendants filed voluminous challenges in order to "overwhelm PrimeTime 24 and make it difficult and expensive for PrimeTime 24"); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 364 (4th Cir. 2013) (applying *California Motor* in evaluating fourteen state and administrative actions filed against a single entity).

Unlike in these cases, Biovail filed one case against each of four individual generic manufacturers. Courts considering larger numbers of individual cases against different generic drug manufacturers have held that they do not constitute "serial litigation."  *See In re Terazosin Hydrochloride Antitrust Litig.*, 335 F. Supp. 2d 1336, 1367 (S.D. Fla. 2004) ("Here, Abbott sued seven different generic companies, in seventeen separate lawsuits involving five different patents. Thus, this case does not cast the shadow of 'serial litigation' used to injure a single competitor that occurred in *Primetime 24*."), *aff'd sub nom. Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033 (9th Cir. 2009); *Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 224 n.2 (S.D.N.Y. 2002) ("Whereas *Primetime* involved 'simultaneous and voluminous'

lawsuits brought against a single television provider, the lawsuits complained of in the Amended Complaint are simply individual actions against each of ten generic-drug applicants.").

As in *Terazosin* and *Twin City*, the number of Biovail's infringement actions was a product of Hatch-Waxman's unique regulatory structure, further distinguishing this case from *Hanover 3201*. *AstraZeneca AB*, 2010 WL 2079722, at *5 (citations omitted) (the filing of infringement actions against 11 generic manufactures was "dependent on the number of generic companies attempting to enter the [omeprazole] marketplace…."); *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, No. 03-00887, 2009 WL 8727693, at *10 (C.D. Cal. Feb. 17, 2009) (citations omitted) ("The volume of Aventis' suits in the Hatch–Waxman context matters little, if at all.").

Accordingly, Judge McLaughlin appropriately analyzed each infringement action and the citizen petition under the *PRE* standard.

### G. The District Court Correctly Granted Summary Judgment On Plaintiffs' Claims Concerning The Wellbutrin Settlement Based On Key Failures Of Proof

Plaintiffs contend that the settlement of the patent infringement suits violates the antitrust laws under the standards announced in *FTC v. Actavis*, 133 S. Ct. 2223 (2013). *Actavis* directed that certain large and unjustfied reverse payment settlements be analyzed under the rule of reason but "le[ft] to the lower courts the

structuring of the present rule-of-reason antitrust litigation," observing that, as in other areas of the law, trial courts can structure antitrust litigation to permit proper analysis. *Id.* at 2238. Indeed, the fashioning of the rule of reason inquiry to the circumstances of a case is generally left to the trial court. *Lamictal*, 791 F.3d at 413 ("On remand, we invite the District Court to proceed with the litigation under the traditional rule of reason, tailored, as necessary, to the circumstances of the case.").

The District Court correctly held that GSK was entitled to summary judgment under a rule of reason analysis on four, independent grounds.[21] First, plaintiffs had not met their initial burden under the rule of reason to demonstrate that the Wellbutrin Settlement produced anticompetitive effects. The settlement did not pose the anticompetitive harm the Supreme Court identified in *Actavis* – namely, that the patent holder paid the challenger to abandon the patent litigation –

---

[21] As set forth in GSK's District Court briefing (GSK Mem. 46-53, Case No. 08-2431, ECF 575), GSK contends that an agreement not to launch an authorized generic, resulting in an exclusive license to the first generic, does not pose the antitrust concerns expressed by *Actavis*. This Court recently rejected this argument in *Lamictal*, holding that an agreement not to launch an authorized generic qualifies as a "payment" under *Actavis*. 791 F.3d at 403. GSK's Petition for Certiorari is currently pending and, as such, GSK asserts here the argument in order to preserve it. Petition for Writ of Certiorari, *SmithKline Beecham Corp. v. King Drug Co. of Florence*, No. 15-1055 (U.S. Feb. 19, 2016).

and plaintiffs did not otherwise show that the settlement delayed generic entry.
Second, plaintiffs did not show that they suffered antitrust injury. Third, plaintiffs
did not show that the settlement was the proximate cause of any injury. Fourth,
plaintiffs did not rebut GSK's proof that the settlement had procompetitive
benefits.

Fundamentally, plaintiffs rested their case on presumptions and
speculation – as opposed to proof – and unreliable expert testimony. The
settlement kept alive the risk of a finding of noninfringement or invalidity, thus
preserving the risk of competition, and removed other hurdles to generic entry,
such as unrelated infringement suits and supply issues.

### 1. The Rule Of Reason Legal Standard

To prevail, plaintiffs carry the initial burden under the rule of reason
to demonstrate "significant unjustified anticompetitive consequences," *Actavis* 133
S.Ct. at 2238*; see also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 211 (3d Cir.
2005) (holding plaintiff must show conduct had substantial adverse effects on
competition in relevant market); *U.S. v. Brown Univ*., 5 F.3d 658, 668 n.8 (3d Cir.
1993) ("plaintiff bears an initial burden under the rule of reason of showing that
the alleged combination or agreement produced adverse, anti-competitive

effects").[22]  If the plaintiff does so, the burden shifts to the defendant "to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Lamictal*, 791 F.3d at 412. (quoting *Brown Univ.*, 5 F.3d at 668-69).  The plaintiff then has the opportunity to rebut any procompetitive justifications as "not reasonably necessary to achieve the stated objective." *Id.*

Private plaintiffs must also demonstrate antitrust injury, *i.e.*, an actual injury of the type protected by the antitrust laws. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75-76 (3d Cir. 2010) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977)).  Likewise, private plaintiffs must establish proximate cause. *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 536 (1983).

At summary judgment, if the nonmoving party fails to make "a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," "the moving party is entitled to summary judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 331.  Relatedly, if the moving party bears the burden of proof on an element, the nonmoving party must raise a

---

[22]  In conducting its rule of reason analysis, the District Court properly assessed the Wellbutrin Settlement at the time it was entered into. JA-186 (citing *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 189 (7th Cir. 1985)).  And the court evaluated the settlement as a whole, not in piecemeal fashion. *Id.* (citing *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 752 (E.D. Pa. 2014).)

"genuinely disputed issue of material fact" on that element to avoid summary judgment. JA-186 (2015 S.J. Op.) (citing *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 316 n.12).

### 2. Plaintiffs Failed To Carry Their Burden Of Demonstrating The Anticompetitive Effects Of The Wellbutrin Settlement

Plaintiffs failed to carry their initial burden under the rule of reason because (1) the Wellbutrin Settlement did not pose the anticompetitive harm identified in *Actavis* and *Lamictal*, and (2) plaintiffs otherwise failed to show anticompetitive harm through either their "Settlement" or "Litigation" Scenarios.

#### a. The District Court Correctly Held Plaintiffs Could Not Show The Wellbutrin Settlement Presented The Anticompetitive Harm Identified By *Actavis*

As the Supreme Court held in *Actavis* and as this Court reaffirmed in *Lamictal*, "it is the prevention of th[e] risk of competition" by "paying the challenger to stay out" of the market (for longer than the patent's strength would otherwise allow) – that "constitutes the relevant anticompetitive harm." *Actavis*, 133 S. Ct. at 2236; *Lamictal,* 791 F.3d at 404. That harm did not occur here because the Wellbutrin Settlement contained a unique feature that preserved the competitive benefits of a victory for Anchen in the *Biovail* patent suit: it allowed the appeal of that patent litigation to proceed (and the corresponding risk of patent invalidation or a finding of noninfringement to remain), thereby allowing for ***immediate generic entry*** if Anchen prevailed.

The anticompetitive harm the Supreme Court sought to prevent in *Actavis* originates from a brand manufacturer making a large and unjustified payment to induce a generic manufacturer to forgo its patent challenge. *Actavis*, 133 S. Ct. at 2235. The Supreme Court recognized that patents may provide a product with lawful exclusionary power. That lawful protection rests on the presumption that the patent is valid and cannot be infringed, but the Supreme Court recognized that presumption does not apply in Hatch-Waxman patent litigation, when infringement and validity are at issue. *Id.* at 2235. Thus, the Supreme Court identified the risk of reverse payment settlements as "seek[ing] to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market." *Id.* This Court highlighted that very point in *Lamictal*:

> "[I]t is the prevention of that risk of competition – ***eliminating the risk of patent invalidation or a finding of noninfringement***" by "paying the challenger to stay out" of the market (for longer than the patent's strength would otherwise allow) – that "constitutes the relevant anticompetitive harm," which must then be analyzed under the rule of reason.

791 F.3d at 411 (quoting *Actavis*, 133 S. Ct. at 2236-37) (emphasis added).

Notably, this Court in *Lamictal* was analyzing a reverse payment settlement that, like the instant appeal, included a no-authorized generic provision.

As the District Court correctly held, plaintiffs "cannot establish the anticompetitive harm contemplated by *Actavis*: that the defendant in the patent infringement lawsuit would abandon its patent claim, eliminating the risk of patent invalidation or a finding of non-infringement." JA-180 (2015 S.J. Op.) (citing *Lamictal*, 791 F.3d at 411).[23]  The District Court emphasized that the Wellbutrin Settlement "contains a provision not present in any other post-*Actavis* case of which the Court is aware" – that "if the generic manufacturer prevailed on its appeal in the Federal Circuit, it could immediately enter the market with generic Wellbutrin XL." *Id.* at JA-145; *see also* JA-28413-14 (Biovail/Teva License Agreement § 3.16).  Thus, a finding on invalidity or non-infringement (that is, a finding on the patent's strength) would dictate the entry date for the generic.

Conspicuously avoiding the District Court's analysis that they failed to meet their initial burden under the rule of reason to show anticompetitive harm

---

[23]   The FTC publicly has agreed with this key holding, stating "*Actavis* … makes clear that a reverse payment can violate the antitrust laws if it induces the generic to abandon its patent challenge."  FTC Amicus Br. (*Nexium*, Appeal No. 15-2005 (1st Cir.)) 18.  Recognizing that here the generic did not abandon its patent challenge the FTC switches gears, taking the novel position that the decision by the generic not to enter at risk of the Biovail patent while the patent litigation was pending constitutes anticompetitive harm.  FTC Amicus Br. (*Wellbutrin XL*) 14-15.  But this new position cannot be reconciled with either the language of *Actavis* on which the FTC relies in *Nexium* or with the facts of this case, where the settlement provided for immediate generic entry if the generic prevailed and provided a license to a patent owned by a third party, Andrx, that was separately suing Anchen for infringement.

in part because of this unique term of the settlement, plaintiffs couch that provision

solely as a procompetitive benefit (for which GSK bears the burden of proof).

They contend that it was unlikely that the Federal Circuit would resolve the

Anchen appeal prior to May 30, 2008, arguing that the appeal was only left

pending to avoid triggering a requirement by Anchen to launch its generic so that it

would not lose its 180-day exclusivity period,[24] and that leaving the appeal pending

"was of little or no consequence to the parties."  Appellants' Br. 70-71.  At the

time of the settlement in February 2007, the appeal had been pending since

September 2006.  It is of no moment that GSK employees may have hoped it

would still be pending as of May 2008.  What is significant for purposes of *Actavis*

is that the early trigger provision of the settlement maintained the risk to Biovail

and GSK that a successful patent challenge by Anchen would result in immediate

generic entry – and start the 180-day clock – ***before*** May 30, 2008.  Thus, the

provision had very real consequences, both for Anchen and GSK.[25]  Because of

---

[24]    The District Court correctly found this contention devoid of evidentiary
support.  JA-188 (2015 S.J. Op.).

[25]    Plaintiffs also claim that GSK had an obligation to inform the Federal
Circuit of the settlement.  *Tivo Inc. v. EchoStar Corp.*, however, merely
notes the parties' duty to inform the court of facts that could affect its
jurisdiction by rendering the case moot.  429 F. App'x 975, 976 (Fed. Cir.
2011).  The *Anchen* appeal was not moot.  Capping liability does not moot a
case because the parties "remain[ed] truly adverse with respect to the critical
legal issue that they ask[ed the court] to resolve, and the dispute between

this unique provision, plaintiffs cannot simply point to generalized statements from *Actavis* and other cases to presume anticompetitive harm.

> **b.    Plaintiffs Cannot Otherwise Establish Anticompetitive Harm Because They Lack Sufficient Evidence To Prove Delay In Generic Entry**

While the early entry provision of the settlement forecloses plaintiffs from demonstrating the anticompetitive harm set forth in *Actavis* and *Lamictal*, the District Court did not end its analysis there.[26]  Instead, it assessed whether plaintiffs' alternative theories satisfied their burden under the rule of reason to show anticompetitive harm.  The District Court correctly held that plaintiffs had not done so because they failed to adduce sufficient evidence that the settlement delayed entry of generic Wellbutrin XL.

This Court explained in *Lamictal*, "in the reverse payment context . . . to prove anticompetitive effects, the plaintiff must prove payment for delay, or, in other words, payment to prevent the risk of competition."  791 F.3d at 412 (citing

---

them was not feigned."  *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 224 (3d Cir. 2000).

[26]    GSK argued below that the Wellbutrin Settlement was not subject to antitrust scrutiny because this unique feature allowed the strength of the patent claims, not extra-litigation considerations, to control the entry date. In *Actavis*, the Supreme Court explained that parties may lawfully settle by agreeing to an entry date without any payment as the strength of the patent claims determines the agreed-upon entry date.  Contrary to the statements by the FTC in its amicus brief, FTC Amicus Br. 2, the District Court did not accept that view, choosing instead to analyze the Wellbutrin Settlement under the rule of reason, JA-184 (2015 S.J. Op.).

*Actavis*); *see also In re Cipro I & II*, 348 P.3d 845, 870 (Cal. 2015) ("what matters is whether a settlement postpones market entry beyond the average point that would have been expected at the time in the absence of agreement"). As the District Court noted, plaintiffs' "own expert Dr. Leitzinger recognized that '[t]he operative question is the manner in which the agreement – inclusive of the reverse payment – altered the date at which generic entry otherwise would have occurred.'" JA-194 (2015 S.J. Op.). Plaintiffs themselves concede that they must prove "**some delay**." Appellants' Br. 79-80 (emphasis added).

Despite these concessions, plaintiffs assert that the District Court erred by not inferring delay based on the supposed value of the no-authorized generic provision. Appellants' Br. 58-59. In so arguing, plaintiffs repeat their position that the size of the payment satisfies their burden to prove anticompetitive effects, *id.* at 57-58, but such presumptions or inferences are not enough under the rule of reason. If a finding of a "large" payment, without more, sufficed to demonstrate anticompetitive effects, the *Actavis* Court would not have directed lower courts to structure the rule of reason analysis. Similarly, the Court's mandate that the "FTC must prove its case as in other rule-of-reason cases" would have no purpose if the plaintiffs' initial burden consisted only of showing a "large" payment. *Actavis*, 133 S. Ct. at 2237. As the District Court observed, adopting plaintiffs' position would upend *Actavis,* leading to the conclusion that "every

reverse payment settlement presumptively has anticompetitive effects because there is a payment and a subsequent delay of generic entry."  JA-191 (2015 S.J. Op.).  In explicitly rejecting both the per se rule and a "quick look" analysis, the Supreme Court in *Actavis* required courts to apply a rule of reason analysis. Allowing a presumption of anticompetitive effects from a supposedly large payment would reinstate the "quick look" analysis squarely rejected in *Actavis*.

When it came to ***proving*** delay, the District Court correctly held that plaintiffs' case suffered from key failures of proof of the two alternative but-for scenarios that they posited:  (i) a "Settlement Scenario" under which the parties would have entered into a settlement without a no-authorized generic provision that would have resulted in earlier generic entry; and (ii) a "Litigation Scenario" under which the parties would have continued to litigate the patent infringement suits allegedly resulting in earlier generic entry.

i.      **Plaintiffs Fail To Introduce Evidence That Generic Entry Would Have Occurred Earlier Under An Alternate Settlement**

In lieu of evidence, plaintiffs' "Settlement Scenario" theory rests on speculation and discredited expert testimony that was untethered to the factual record.  Dr. Jeffrey Leitzinger, plaintiffs' principal economic expert, proposes that "one can fairly infer the presence of delay simply from the fact of a reverse payment that is not otherwise justified."  JA-35144 (Leitzinger Decl. ¶ 32).

Dr. Leitzinger admitted he made no effort "to answer the question of what specifically some alternative form of settlement would have looked like."  JA-33035 (Leitzinger Dep. 46:22-24).  Moreover, when asked what delay was occasioned by the no-authorized generic provision, Dr. Leitzinger testified, "*I don't have a view about that*."  *Id.* 46:7-19 (emphasis added).  As explained in Section V.H., Dr. Leitzinger *assumed* a delay in generic entry based on the instruction of counsel.  JA-33026 (*id.* 12:22-13:3) ("Q. What is the basis of your assumption that Teva would have launched at an earlier date?  [Objection omitted] [A.] That *assumption* . . . *is the product of an instruction by counsel*.") (emphasis added).

In place of presenting evidence to support Dr. Leitzinger's assumption, plaintiffs merely presume that if GSK and Biovail had not agreed to forgo the launch of an authorized generic during Anchen's 180-day period of exclusivity, the parties to the agreements would have entered into a settlement with an earlier date for generic entry.  As the District Court correctly concluded, plaintiffs' evidence "fail[s] to establish that the no authorized generic agreement caused the delayed entry."  JA-193 (2015 S.J. Op.).  In particular, plaintiffs offer no facts or expert opinion proposing a generic entry date or the terms of an alternative settlement without the no-authorized generic agreement.  Plaintiffs' expert Dr. Blume, in fact, conceded that no other settlement would have been

possible. JA-28666 (Blume Dep. 198:17-22). In short, "[t]here are no facts in the summary judgment record to support a contention that, absent the no authorized generic agreement, an alternate settlement would have been reached." JA-195 (2015 S.J. Op.).

The Court need not go beyond plaintiffs' failure of proof to affirm here, but the District Court also correctly held that the record refutes plaintiffs' contention that a different settlement – with an earlier entry date – would have been reached. As the District Court summarized, "Teva expressly and unwaveringly refused to settle the *Biovail* litigation unless the settlement contained a no authorized generic agreement." *Id*. Teva's position, which it repeatedly communicated to Biovail and GSK during the negotiations, was that the marketing of an authorized generic by the brand manufacturer during the first filer's 180-day period of exclusivity was anticompetitive and undermined incentives for generic competition. JA-28198, 28199, 28216 (Brannon Dep. 96:20-97:8, 98:14-99:10, 166:10-18, 167:8-24). As Biovail's counsel noted in an outline of a planned submission by all parties to Judge Brody at the settlement conference in *Impax*: "Teva views the Congressional intent of the Hatch Waxman act as assuring to generic companies 6 months of marketing exclusivity if they are first to file." JA-35465 (Jan. 6, 2007 email from R. Rauchberg). Teva antitrust counsel explained that Teva's view at the time was that "when Hatch-Waxman was passed in '84 and

created the 180 day exclusivity period, what Congress plainly intended was that the first filing generic would be the only generic on the market."  JA-35347-48 (Teva 30(b)(6) Dep. (Holding) 73:24-74:17, 74:21-75:4).

Not surprisingly in light of Teva's unequivocal position, the six-month no-authorized generic provision was part of the settlement structure before GSK became involved in December 2006.  All drafts of the settlement – including those circulated between Teva and Biovail only – contained that provision.  *See*, *e.g.*, JA-34161-62 (Draft Teva/Biovail License Agreement); *see also* JA-35242 (Teva 30(b)(6) Dep. (Bauer) 57:8-13).  Indeed, GSK's participation in the negotiations became necessary because of Teva's insistence that any settlement contain an exclusive license from Biovail that required GSK to relinquish its rights to launch an authorized generic during Anchen's exclusivity period.  JA-35310 (Brannon Dep. 129:14-130:5) ("Teva, as I mentioned before, was very adamant there were certain issues that were deal breakers for them, and they required GSK to waive certain rights if there was going to be any settlement at all.").  When GSK became involved in the settlement negotiations – at the *Impax* court's direction – Biovail and Teva had "essentially worked out the terms of their settlement, but they needed GSK to waive certain rights in order to make their settlement possible,

and without GSK doing that, there would be no settlement."[27]  JA-35308 (*id.*

95:23-96:12).

        In light of plaintiffs' failure to come forward with expert or fact

evidence to establish their "Settlement Scenario" – or that an alternative settlement

was even possible, much less one in which generic entry occurs earlier – plaintiffs

again fall back on the "sheer size" of the no-authorized generic commitment.  But

that cannot suffice to meet their burden of showing anticompetitive harm for the

reasons discussed earlier.  *See supra*, at V.G.2.  Plaintiffs secondarily cite

testimony that they claim the District Court "incorrectly discarded."  Appellants'

Br. 59-62.  For example, plaintiffs point to testimony from Rupert Bondy, GSK's

General Counsel at the time, for the proposition that GSK relinquished its

exclusive licensing rights under the Wellbutrin XL patents in exchange for the

benefit of marketing a "150 mg dosage of Wellbutrin XL without generic

competition."  *Id.* 61.  But the mere fact that the settlement provided for generic

entry at some point after the settlement does not prove unlawful delay*, i.e.*,

---

[27]    In addition, GSK has proffered an ***unrebutted*** expert opinion from Professor
Robert Mnookin, Chairman of the Program on Negotiation at Harvard Law
School, that "[t]here is no reason to assume that Teva would have accepted
an alternative settlement without that provision."  JA-35202, 35204
(Mnookin Decl.).

Mr. Bondy's statement would apply equally to a settlement with an agreed entry date and no other terms, a form of settlement explicitly sanctioned by *Actavis*.[28]

        To meet their burden of demonstrating anticompetitive effects, plaintiffs must show that without the alleged reverse payment, generic entry would have occurred earlier. As explained *supra*, plaintiffs have not even attempted to make such a showing. Thus, the District Court correctly found that "[a]t most, the evidence shows recognition on the part of GSK that generic Wellbutrin XL could not enter until either Anchen/Teva succeeded on the appeal or until the trigger date of May 30, 2008, whichever is earlier, and that a no authorized generic promise was made." JA-193 (2015 S.J. Op.).

---

[28]    Plaintiffs similarly misconstrue the testimony of Dr. Pierre Cremieux, GSK's economic expert. Appellants' Br. 59 n.310, 61 n.318. In plaintiffs' first example, Dr. Cremieux was asked a hypothetical **premised** on the notion of translating a no-authorized generic provision into a period of days. JA-29483-84 (Cremieux Dep. 227:24-230:7). Dr. Cremieux accepted that construct solely for purposes of answering plaintiffs' question. In plaintiffs' second example, Dr. Cremieux, when asked about a sentence from Rupert Bondy's testimony, disavowed knowledge of it and, as a result, made clear that any understanding he might have was limited to reading the one sentence presented to him. JA-29467 (*id.* 163:24-164:14).

Plaintiffs' reliance on the testimony of Jean-Pierre Garnier, GSK's CEO at the time of the Wellbutrin Settlement, is equally misplaced. Appellants' Br. 61 n.319. Mr. Garnier explained that GSK was not a "party to the settlement" and, therefore, GSK's role was limited to negotiating an agreement by which GSK agreed to waive back its exclusivity rights to Biovail. JA-8425 (Garnier Dep. 142:12-145:12).

Plaintiffs also argue that "Teva's witnesses disavowed that settlement was impossible without a no-AG payment," Appellants' Br. 67, but that misrepresents the cited testimony. Kirsten Bauer testified that she did not know whether Teva told GSK that the promise not to launch an authorized generic was a "deal breaker." JA-28138 (Bauer Dep. 135:22-136:2). Nor does Tina Guilder's testimony support that the settlement was an "attractive opportunity with or without authorized generic." Appellants' Br. 67 n.344. Ms. Guilder was only asked whether Teva would have the incentive to launch a generic if it knew an authorized generic would be on the market. JA-9617-18 (Guilder Dep. 57:3-58:8). In fact, at no time during her deposition was she asked about the settlement.

In short, the undisputed evidence refutes plaintiffs' hypothetical but-for world in which the parties would have entered into a different settlement, *i.e.*, a settlement that did not include a no-authorized generic provision.

> **ii.    The District Court Correctly Held Plaintiffs'
> Failure To Offer Evidence Of The Outcome Of
> The *Andrx* Patent Litigation Dooms Their
> "Litigation Scenario"**

As the District Court correctly concluded, plaintiffs have not offered evidence to support the alternative theory that had the patent litigation continued, generic entry would have occurred earlier. Plaintiffs assert that if a settlement had not been reached, the parties would have continued to litigate the Biovail patent suits, and Teva would have launched the generic 150 mg version of Wellbutrin XL

"at risk" of substantial damages in the pending litigation and in a separate patent infringement suit by Andrx.[29]  But plaintiffs' position suffers a fundamental, fatal flaw:  they offer no evidence to show that Anchen would have succeeded in defending against Andrx's patent litigation.  JA-220 (2015 S.J. Op.).  In fact, "plaintiffs do not even argue that the generic manufacturers could have succeeded in the *Andrx* litigation."  *Id.*  If, for example, Andrx had succeeded in obtaining an injunction – and a preliminary injunction hearing had been scheduled for February 26, 2007, (Order, *Andrx v. Anchen,* No. 06-7552 (C.D. Cal. Dec. 27, 2006), ECF 12) – Anchen's product would have been removed from the market for the remaining 15 years of the patent.  JA-34751 (Ex Parte Application for TRO, *Andrx v. Anchen*); JA-29521 (12/19/06 Civil Minutes)  (denying TRO solely on basis of lack of immediate irreparable injury).  Without any support in the record, no reasonable fact finder could conclude that the *Andrx* patent suit would not have barred generic entry.

In fact, the unrebutted evidence in the summary judgment record showed that Andrx would have succeeded in its patent claims against Anchen. Professor Martin J. Adelman, defendants' patent law expert, offered testimony

---

[29]    As explained above, while Anchen had launched the 300 mg version at risk of Biovail's lawsuit, it had not launched the 150 mg version at risk of both Biovail's lawsuit *and* Andrx's lawsuit (which involved only the 150 mg version).  Plaintiffs claim but cite no evidence of any standstill agreement preventing the at-risk launch of the 150 mg.

explaining that Andrx had an approximately 80 percent chance of prevailing in its patent litigation on infringement.[30] JA-38706-07 (Adelman Rep. ¶ 104); JA-217 (2015 S.J. Op.). Plaintiffs offered no witness or document to rebut Professor Adelman's testimony, nor did they even raise the topic during his deposition or the depositions of Anchen employees. JA-29253-331 (Adelman Dep.). Thus, plaintiffs made no showing to prevent summary judgment on this issue.

Plaintiffs ignore a further obstacle hamstringing Anchen's defense against the Andrx patent claims: the doctrine of assignor (or inventor) estoppel. This doctrine precludes a patent assignor such as an inventor, and those in privity with the assignor, from contending that the patent is invalid or unenforceable. *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). Here, Anchen's founder and CEO invented the patent at issue and assigned his rights to Andrx. Thus, Anchen would have been barred from asserting that the

---

[30] Although Professor Adelman opined that Andrx had an approximately 35 percent chance of prevailing overall in its cases against GSK and Anchen, JA-38716 (Adelman Second Rep. ¶ 126), Professor Adelman was not asked to take into account the doctrine of assignor estoppel for the *Andrx* case. As discussed below, the doctrine of assignor estoppel would have barred Anchen from asserting that the '708 patent was invalid or unenforceable. Professor Adelman's 35 percent estimate was based on, among other things, an opinion that Andrx was 80 percent likely to prevail on infringement. *Id.* ¶ 104. Because Anchen could not defend based on invalidity and unenforceability, Andrx's chance of prevailing on those issues – against Anchen – was 100 percent, and thus its overall chance of prevailing was 80 percent.

'708 patent was invalid or unenforceable. *See id.* (affirming decision to bar infringer from asserting invalidity and unenforceability due to assignor estoppel because infringer's vice president of operations (and share owner) was co-inventor on the asserted patent and assigned his rights to the patentee). In fact, Teva was at the time justifiably concerned about the adverse impact of the assignor estoppel doctrine on Anchen's ability to defend Biovail's patent suit. JA-29728 (Teva 30(b)(6) Dep. (Holding) 64:18-65:20).

In lieu of presenting evidence that Anchen would have succeeded in the *Andrx* litigation, plaintiffs instead hypothesize that Teva would have obtained a license from Andrx on its own, apart from the settlement. The District Court properly rejected this hypothesis because there was "no evidence in the summary judgment record that an agreement would have been reached absent the Wellbutrin settlement." JA-220 (2015 S.J. Op.).

Indeed, the evidence shows that the license was only ever proposed as part of the overall settlement.[31] In the weeks prior to execution of the Wellbutrin Settlement, Teva pressed GSK to negotiate with Andrx to obtain a license for the generic manufacturers. JA-35483 (Jan. 14, 2007 email from R. Egosi to G. Cary).

---

[31]     Plaintiffs' contention that GSK admitted that Teva did not need its help is sophistry. Appellants' Br. 74. GSK's brief was merely quoting plaintiffs' brief. JA-2723-24 (GSK Reply Mem.). Nor does the expert testimony plaintiffs cite suggest any opinion on the role GSK played in obtaining the Andrx license for Teva. JA-29402 (Willig Dep. 278:21-280:21).

Teva insisted that the Wellbutrin Settlement provide it and Anchen with the "freedom to operate" without risk of infringing the Andrx patent. *Id.* Against this backdrop, plaintiffs' argument that a draft license agreement exchanged between Teva and Anchen just five days before the settlement demonstrates that the two were "directly negotiating a 'bilateral' license" rings hollow. Appellants' Br. 75-76. At all relevant times, the Andrx license to Teva/Anchen was intended to be part of the ***overall*** settlement.[32] In the very email plaintiffs cite, Teva makes clear that the proposed Teva-Andrx license agreement is "subject of course to the overall deal process." JA-29550 (Feb. 4, 2007 emails between K. Taft and M. Zisk).[33]

Plaintiffs also repeat their theory that Andrx was a nonpracticing entity and, therefore, had a particular incentive to provide a license to Teva/Anchen. Appellants' Br. 74-75. But, as the District Court properly observed, it is undisputed that Watson acquired Andrx in November 2006, and Watson was not a non-practicing entity, having filed an ANDA for generic Wellbutrin XL. JA-

---

[32] Plaintiffs cite *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005), for the proposition that it is "typically a question of fact for the jury" whether writings are part of single transaction or not. But plaintiffs fail to quote the remainder of *TVT*'s holding, which provides that when "the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *Id.*

[33] Plaintiffs also cite to Impax-Andrx and Abrika-Andrx licenses, neglecting to acknowledge that GSK negotiated a license for all generics, including Impax. JA-34044 (GSK/Andrx License Agreement § 4(c)).

158, (2015 S.J. Op.). Plaintiffs also argue that Andrx/Watson would not have denied Anchen a license. They claim that a denial would have delayed Watson from launching its generic because Anchen was the first filer and entitled to the 180-day exclusivity period before other generics could enter the market. Appellants' Br. 75. This argument ignores the fact that Anchen would waive its 180-day exclusivity period if it did not launch within 75 days of receiving a final judgment. 21 U.S.C. § 355(j)(5)(D)(i)(I). Thus, if Anchen was compelled to launch but was blocked by the Andrx patent, it would have surrendered its 180-day exclusivity period, and Watson/Andrx would have been free to enter the market. For this reason, it was actually ***against*** Watson/Andrx's interest to grant a license to Anchen, independent of its deal with GSK.

In sum, as the District Court emphasized, plaintiffs have not raised a "question of material fact as to whether Andrx would have succeeded in its underlying patent claim." JA-221 (2015 S.J. Op.). A loss in *Andrx* would have blocked entry of a generic separate and apart from the settlement agreement, and separate and apart from any additional risk of injunction from the Biovail suit against Anchen, underscoring plaintiffs' failure to meet their burden that it was the settlement that caused anticompetitive harm. Nor have plaintiffs come forward with evidence that Anchen would have secured a license from Andrx absent the Wellbutrin Settlement. As a result, plaintiffs have not sustained their burden of

proving that generic entry would have occurred earlier in their Litigation

Scenario.[34]

---

[34]    Below plaintiffs argued they could satisfy their burden under the rule of reason by showing that GSK had "market power" in lieu of showing anticompetitive effects.  But the Supreme Court has explained, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quotation marks omitted).  *Actavis* confirms that market power, without more, does not obviate the need to show harm to competition.  While acknowledging that reverse payment settlements are associated with market power, the Supreme Court held that reverse payments must be analyzed under the rule of reason.  133 S. Ct. at 2236.  In so holding, the Court rejected the FTC's argument "that reverse payment settlement agreements are presumptively unlawful."  *Id.* at 2237.  At least two district courts post-*Actavis* in the reverse payment context have required plaintiffs to separately establish market power and anticompetitive effects.  *See In re Lamictal Direct Purchaser Antirust Litig.*, 18 F. Supp. 3d 560, 565 (D.N.J. 2014) (citing *Brown*, 5 F.3d at 679, and *Actavis*), *rev'd on other grounds*, No. 14-1243 (3d Cir. June 26, 2015); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389-390 (D. Mass. 2013).

In *Lamictal*, the Third Circuit stated that under *Actavis's* "initial guidance on how to structure rule-of-reason litigation in the reverse payment context . . . to prove anticompetitive effects, the plaintiff must prove payment for delay." 791 F.3d at 412.  While *Lamictal* also quoted *Brown* and referenced reliance on market power when anticompetitive effects are hard to assess, here, they can be assessed by whether the reverse payment provision delayed market entry.  Allowing market power alone to serve to prove anticompetitive effects would entirely eliminate the first step of the rule of reason analysis, in derogation of many Supreme Court cases including *Actavis*.

3. **Because Plaintiffs Failed To Show Generic Entry Was Delayed, They Also Failed To Prove Antitrust Injury And Causation**

Antitrust injury and causation are essential elements of plaintiffs' antitrust claim, in addition to the rule of reason analysis. As the FTC acknowledges in its amicus brief, "[t]o be entitled to damages, a private plaintiff must prove not only an antitrust violation but also that the violation caused actual antitrust injury." [35] FTC Amicus Br. 18.

To succeed on their Clayton Act claims, plaintiffs "must show that they suffered an antitrust injury and that the defendant's allegedly anticompetitive conduct was the actual and proximate cause of that antitrust injury." JA-209, (2015 S.J. Op.) (citing 15 U.S.C. § 15). Antitrust injury is defined as "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Race Tires Am.*, 614 F.3d at 76. The Third Circuit has recognized that "[t]he antitrust injury requirement . . . ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."

---

[35] The FTC argues that the rule of reason does not require proof that the settlement actually caused delay in generic entry in order to establish anticompetitive effects, but acknowledges that private plaintiffs, unlike (it asserts) the FTC, must prove antitrust injury. FTC Amicus Br. 16-19. Thus, even under the FTC's formulation, plaintiffs-appellants, as private plaintiffs, must prove actual delay to satisfy their burden of proving antitrust injury.

*Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001), *as amended* June 12, 2001, (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

The concept of antitrust injury is closely linked to the concept of harm to competition. *See InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003); *see also Guerrero v. Bensalem Racing Ass'n, Inc.*, 25 F. Supp. 3d 573, 586 (E.D. Pa. 2014) (plaintiffs did not demonstrate either an unreasonable restraint of trade or antitrust injury where they failed to demonstrate anticompetitive effects in the relevant market); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-02503, 2015 WL 5458570, at *9 (D. Mass. Sept. 16, 2015) ("Without a plausible allegation of delay caused by Defendants, the direct purchasers have not alleged a cognizable antitrust injury."). In the FTC's words, for private plaintiffs, the distinction between anticompetitive effects and antitrust injury is "often academic" because they must prove both. FTC Amicus Br. 19.

As the District Court recognized, Section 4 of the Clayton Act provides that injury may not be presumed because there is an agreement that results in harm. JA-210 (2015 S.J. Op.) (citing *J. Truett Payne, Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981)); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998)). The District Court noted that such a presumption would also conflict with the Clayton Act's causation requirement. *Id.*

To establish causation, the Clayton Act requires antitrust plaintiffs to demonstrate that their injuries were caused "by reason of" the allegedly anticompetitive conduct, requiring both a showing that the defendant's actions were the but-for and the proximate cause of the injury. *Assoc. Gen. Contractors*, 459 U.S. at 536; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 128-29 (1969) (holding the relevant antitrust causation question to be whether a competitor was actually deterred from the market during the damages period by the defendant's actions, or whether competitor's own business decisions led to its delayed entry); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) (plaintiffs must show damages caused by antitrust violation). In other words, "[e]ven if a defendant's acts are shown to be violative of the [antitrust] statute, . . . a plaintiff may not recover unless a nexus to its own injury is also demonstrated." *Sound Ship Building Corp.*, 533 F.2d at 98 (affirming grant of summary judgment).[36]

---

[36] The same standard applies to the Indirect Purchaser Plaintiffs' claims under state law. *See Breakdown Servs., Ltd. v. Now Casting, Inc.*, 550 F. Supp. 2d 1123, 1141 (C.D. Cal. 2007); *Boulware v. State of Nev., Dept. of Human Res.*, 960 F.2d 793, 800 (9th Cir. 1992) (Nevada); *Benjamin of Forest Hills Realty, Inc. v Austin Sheppard Realty, Inc.*, 823 N.Y.S.2d 79, 94 (N.Y. App. Div. 2006); *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1016 (E.D. Wis. 1999); *Rockholt Furniture, Inc. v. Kincaid Furniture Co.*, No. 96-588, 1998 WL 1661384, at *7 (E.D. Tenn. July 6, 1998).

Plaintiffs misleadingly characterize the District Court's statement about the possibility that plaintiffs could meet their *prima facie* burden under the

Plaintiffs concede that they must prove "some generic delay" to meet their burden of proving that GSK caused antitrust injury. Appellants' Br. 80. But contrary to their unsupported protestations, they have not done so. For the reasons explained *supra,* at Section V.G.2, plaintiffs have adduced no evidence to show that the Wellbutrin Settlement delayed generic entry, including because the risk of immediate generic entry remained under the settlement. Specifically, plaintiffs presented no evidence linking the alleged anticompetitive restraint (the no-authorized generic provision) to a delay in generic entry. Rather, by their expert's own admission, they did not even attempt to attribute any delay to the complained-of provision. JA-33038 (Leitzinger Dep. 58:5-12).

Nor can plaintiffs prove antitrust injury and causation without evidence that Anchen would have defeated the *Andrx* patent suit. As the District Court correctly held, the Clayton Act "does demand such an analysis [of patent validity], and nothing in *Actavis* altered the Clayton Act's causation requirement."

---

Cartwright Act by demonstrating a connection between the no-authorized generic provision and delayed generic entry. JA-193 (2015 S.J. Op.). For the same reasons plaintiffs have failed to meet their burden of proving delay under their Sherman Act claims—including the provisions allowing for the possibility of immediate generic entry—indirect purchasers' Cartwright Act claims also fail. The California Supreme Court requires plaintiffs to show "an agreement involving a reverse payment **and delay**." *Cipro,* 348 P.3d at 867 (emphasis added). This requires plaintiffs to demonstrate delay that extends beyond any exclusion that "is a function of the underlying patent strength." *Id.* at 864.

JA-214 (2015 S.J. Op. 73). The Supreme Court did not suggest otherwise when it observed in *Actavis* that "it is normally not necessary to litigate patent validity to answer the antitrust question." 133 S. Ct. at 2236. The "antitrust question" in *Actavis* did not include causation, because causation is not an element of a claim brought by the FTC. *See* FTC Amicus Br. 19. In any event, the Supreme Court was referring to the underlying patent case, not a separate one, like that brought by Andrx here.

A valid patent, such as the Andrx patent, interferes with the chain of causation because it can exclude competition apart from any agreement and because an "at risk" launch is unlawful absent a later finding of patent invalidity or non-infringement. JA-213 (2015 S.J. Op.) (citing *West Penn Power*, 147 F.3d at 269). There could be no antitrust injury from hypothetical generic sales made "at risk" because, absent proof that Anchen would have prevailed in the patent litigation, "at risk" sales would have been unlawful and thus could not inflict antitrust injury. *RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) (holding that private plaintiffs suffer no antitrust injury when statutory schemes break the chain of causation); *see also CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (same); *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006); *West Penn Power*, 147 F.3d at 268-269. Plaintiffs

must prove that a "competition-reducing aspect" of the Settlement Agreement – rather than an independent patent – caused them harm.

As explained *supra*, there was no dispute of material fact that Andrx would have succeeded in its litigation against Anchen. Dr. Adelman (upon whom plaintiffs themselves rely) so opined and there were no countervailing facts in the summary judgment record. On this record, the District Court stood on firm ground concluding that the Andrx patent constituted an independent regulatory bar to Anchen's launch and would have rendered an at risk launch unlawful, subjecting Anchen to damages and injunctive relief, including removal of the product from the market. As the District Court succinctly put it, "[i]t was the patent itself, therefore, and not the Wellbutrin Settlement, that caused generic Wellbutrin XL's lack of market presence." JA-221-222 (2015 S.J. Op.).

Thus, for the same reasons plaintiffs have failed to meet their burden of showing anticompetitive effects, they fail to prove antitrust injury and causation, providing independent justifications for affirming the District Court's decision.

### 4. The District Court Correctly Held That Plaintiffs Had Not Raised A Triable Issue As To The Procompetitive Benefits Of The Wellbutrin Settlement

The District Court correctly observed that "[t]o survive summary judgment, the plaintiffs have the burden of presenting evidence that raises a material dispute of fact regarding the procompetitive justifications offered by the

94

defendants." JA-203-204 (2015 S.J. Op.); *see also In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (explaining that non-moving party must raise a material dispute of fact on those issues as to which it does not bear burden of proof to survive summary judgment). As the District Court also correctly concluded, "plaintiffs have not met that burden." JA-204 (2015 S.J. Op.). "[P]laintiffs have not presented evidence to challenge GSK's procompetitive justifications on the grounds that the allegedly anticompetitive conduct was unnecessary to achieve the justifications." *Id.* As the District Court concluded, the record contains no evidence that would allow a reasonable jury to reach that conclusion. *Id.*

The Wellbutrin Settlement contained four undeniably procompetitive features: (i) a sublicense to a patent held by Andrx covering the 150 mg strength tablet that enabled the generics to enter the market free of the risk that they could be held liable for patent infringement; (ii) a back-up supply term obligating Biovail to supply Teva if Anchen faced regulatory or manufacturing hurdles, including any due to Biovail's success on its citizen petition; (iii) a provision requiring the parties to either modify the settlement to address any FTC objections, or to abandon the agreement if that was not possible; and (iv) a provision entitling Teva to enter immediately if Anchen prevailed in Biovail's appeal to the Federal Circuit in the *Anchen* patent suit. Notably, the first two of these four procompetitive features

were **not** achievable through successful litigation of the patent claims asserted by Biovail, a point the District Court noted in its decision. JA-146-47 (2015 S.J. Op.).

As the District Court recognized, "[t]here are no genuine issues of material fact as to the procompetitive nature of GSK's justifications." *Id.* at JA-199. Discussion of these terms featured prominently in the settling parties' meeting with the FTC, which decided not to challenge the settlement. JA-29731-32 (Teva 30(b)(6) Dep. (Holding) 75:21-78:2).

First, the settlement eliminated the significant patent risk for the potential generic entrants presented by the Andrx patent, which is not set to expire until 2022. *See supra*, at V.G.2.b.ii. As detailed earlier, plaintiffs have adduced no evidence in response to unrebutted evidence that Andrx was likely to succeed in its claims against Anchen.

As part of its settlement with Andrx, GSK obtained the right to sublicense to Biovail the license it received, and authorized Biovail, in turn, to provide a sublicense to the generic companies. *See* JA-34065 (GSK/Andrx Settlement Agreement § 6); JA-34043 (GSK/Andrx License Agreement § 4(a)(ii)). Biovail granted a sublicense to Teva as part of the Wellbutrin Settlement. JA-29728 (Teva 30(b)(6) Dep. (Holding) 64:5-65:20). As the District Court aptly summarized, "the Wellbutrin Settlement . . . eliminated the possibility that Andrx could prevent generic Wellbutrin XL from being marketed for the 15 years

remaining on its patent.  Absent a license for the Andrx patent or success in the

underlying litigation, it would have been impossible for Anchen/Teva lawfully to

market generic Wellbutrin XL."  JA-201 (2015 S.J. Op.) (emphasis added).

Second, the Wellbutrin Settlement obligated Biovail to supply

Wellbutrin XL to Teva in the event *either* that (i) Teva faced supply limitations

from Anchen's manufacturing; or (ii) the FDA ruled on Biovail's citizen petition in

a way that made the generic version of Wellbutrin XL non-compliant.

The procompetitive nature of the supply commitment is readily

apparent, as Teva's counsel explained to the FTC.  JA-29725 (Teva 30(b)(6) Dep.

(Holding) 52:7-16) ("[W]ith respect to the back-up supply, I said in substance that

this is among the pro-competitive benefits of this set of agreements, because the

back-up supply ensures that the generic will be able to be on the market if there's a

regulatory reason why it otherwise could not be.").[37]  The Supreme Court has

acknowledged the benefits of supply contracts, including that they "may assure

supply, afford protection against rises in price, enable long-term planning on the

basis of known costs, and obviate the expense and risk of storage in the quantity

---

[37]    Plaintiffs claim that "GSK's expert was noncommittal about [the] utility" of
the supply agreement.  Appellants' Br. 68-9.  What Professor Willig actually
said was that the supply agreement ensured that Teva would be "able to meet
demand with supply without going into a back-order situation which would
be destructive to its business, that all of that adds to the competitiveness of
the marketplace and so that makes it a procompetitive element of the gestalt
of the deal."  JA-29405 (Willig Dep. 290:5-291:11).

necessary for a commodity having a fluctuating demand." *Standard Oil Co. v. United States*, 337 U.S. 293, 306 (1949).

The Biovail/Teva supply provision was particularly important because Anchen was a new company that had never launched a product and there was a real risk that it would not be able to manufacture its product adequately. JA-35526-27 (Establishment Inspection Report). ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████ Moreover, if FDA had been required to adopt the testing urged by Biovail in its citizen petition, the need to conduct that testing could have delayed or prevented the launch of Anchen's product absent Biovail's back-up supply commitment. *See* Amended Compl. (ECF 13-2), *Biovail Corp. v. United States Food & Drug Admin.*, No. 06-1487 (D.D.C. Dec. 18, 2006) (requesting injunctive relief to prevent FDA approval of generic versions of Wellbutrin XL until testing complete); *see also, e.g.*, *Bayer Healthcare, LLC v. United States Food & Drug Admin.*, 942 F. Supp. 2d 17, 27 (D.D.C. 2013) (ordering FDA to suspend approval of product for failure to appropriately resolve request presented by citizen petition). For these reasons, Teva aggressively negotiated to ensure that it would have an ample product supply. JA-28129 (Teva 30(b)(6) Dep. (Bauer) 100:3-7) ("as a business matter, it would make sense that we would . . . want to have that

kind of back-up supply option under these circumstances"). Teva was so

concerned about the potential regulatory risk to its supply that it remained adamant

that if the citizen petition succeeded, there be no cap on the backup supply from

Biovail. JA-34078-79, JA-34081-83 (Biovail/Teva License Agreement § 5.1, 5.3).

      The back-up supply provision was especially important in view of the

settlement provision allowing immediate generic entry if Anchen prevailed in the

Federal Circuit on Biovail's appeal. ████████████████████████

████████████████████████████████████████

████████████ JA-28132 (Teva 30(b)(6) Dep. (Bauer) 112:6-13)

("there's concern if there was an earlier trigger that Anchen might not be able to

produce enough product to have continuous supply without a backorder situation").

The supply term ensured that, if Anchen faced regulatory or manufacturing hurdles

(which it did, *see supra,* Section II.A.10), Teva would still be able to market a

generic version of Wellbutrin XL, an unquestionably procompetitive benefit.[38]

---

[38]    Plaintiffs again misstate the record when they claim that "unrebutted
testimony" shows that the no-authorized generic provision was "not
necessary for Biovail to make a 'supply promise.'" Appellants' Br. 69
n.355. Ms. Bauer testified that she did not have knowledge on the question,
and Professor Willig testified that, other than the no-authorized generic
provision, he did not have an opinion as to whether the other provisions of
the settlement were "necessary." JA-28136, JA-28143 (Bauer Dep. 127:8-6;
154:18-156:8; JA-29402-03 (Willig Dep. 279:4-19; 281:14-282:4).

Plaintiffs make the fallacious argument that because "no supply agreement was ever executed, a jury could conclude none was needed." Appellants' Br. 69. The District Court properly rejected this narrow view, explaining that "[t]he provision was designed to achieve the seamless facilitation of a risk-free generic Wellbutrin XL launch by ensuring consistent supply of product to Teva, and thus to consumers." JA-202 (2015 S.J. Op.). As the District Court observed, "it is undisputed that Teva aggressively negotiated for the provision and that the provision remedied . . . possible supply hurdles." *Id*. The parties extensively negotiated the supply provision, and it remained one of the last areas in dispute. JA-34155-34375 (Drafts of Agreements). Leah Brannon, GSK's counsel during the settlement negotiations, recalls that "Teva made it clear through the negotiations that they were very concerned about Anchen's ability to produce the 150, and very aggressively negotiated for Biovail to supply the 150 product to Teva to sell." JA-28214-15 (Brannon Dep. 161:16-162:8).

Third, the provision allowing for immediate generic entry if the Federal Circuit ruled in Anchen's favor is undeniably procompetitive. The early entry provision preserved the benefit to consumers of affirmance on appeal by the Federal Circuit, which would permit Anchen immediately to enter the market free of risk of infringing Biovail's patent. *See* JA-29726 (Teva 30(b)(6) Dep. (Holding) 55:16-20) ("Q: And was the immediate entry or continuing sale by Teva without

risk of patent suit one of the features of the settlement that you explained to the FTC? A: Yes").)

Fourth, the Wellbutrin Settlement heightened the degree of FTC scrutiny of the agreements. Plaintiffs note that the "law *requires* submission of all Hatch-Waxman settlement agreements to the FTC" and prohibits an inference that the FTC's inaction reflects on the merits of the settlement. Appellants' Br. 72. Plaintiffs miss the point. GSK and the parties to the patent lawsuits not only submitted the agreements to the FTC in compliance with Hatch-Waxman but also included provisions – not required by Hatch-Waxman – by which the parties agreed to amend the terms of the settlement upon request by the FTC and gave the parties and GSK the right to abandon the settlement entirely if the FTC expressed concern. JA-28212-13 (Brannon Dep. 153:18-154:14). As the District Court observed, "the provisions for enhanced FTC review do tend to negate any anticompetitive aim of the parties, in particular GSK." JA-207 (2015 S.J. Op.).

Rather than present evidence to refute GSK's showing of procompetitive benefits, plaintiffs seek to marginalize them as "pretextual." Appellants' Br. 68. But plaintiffs offer no evidence to support this assertion of pretext, precluding a jury from finding in their favor. *See McCabe's Furniture, Inc. v. La-Z-Boy Chair Co.*, 798 F.2d 323 (8th Cir. 1986). Plaintiffs also erroneously argue that GSK has the burden to show that the so-called

anticompetitive "restraint" was necessary to achieve the procompetitive benefit.

Appellants' Br. 65. *But see Lamictal*, 791 F.3d at 412 (if a defendant shows "'that

the challenged conduct promotes a sufficiently pro-competitive objective . . . [t]o

rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary

to achieve the stated objective.'") (quoting *Brown*, 5 F.3d at 668-69). As discussed

*supra*, however, plaintiffs have no proof that any settlement was possible without

the no-authorized generic commitment, and their expert, Dr. Blume, opined that no

alternative settlement would have been possible. JA-28666 (Blume Dep. 198:17-

22). Accordingly, the District Court correctly held that plaintiffs cannot prevail

under the rule of reason because they have not raised a material dispute refuting

the substantial and undisputed procompetitive benefits presented by the Wellbutrin

Settlement.

> **5.     Plaintiffs Fail To Raise A Material Dispute That A Launch
>           By Teva/Anchen Before June 12, 2007 Would Have Been
>           Illegal**

While plaintiffs failed to prove antitrust injury and causation leading

the court to grant summary judgment on the patent settlement claims, their failure

to prove causation also led the District Court in the alternative to grant partial

summary judgment in GSK's favor for any damages prior to June 12, 2007.

Indeed, there is no dispute that Anchen could not have launched its product before

June 12, 2007 without running afoul of a stringent regulatory prerequisite and

violating federal law.  On this point, the District Court agreed, concluding

"Anchen/Teva was prevented under FDA regulations from a launch before June

2007."  JA-222 (2015 S.J. Op.).

Undeterred by these federal regulations, plaintiffs theorize that

Anchen would have acted unlawfully and consumers would have benefited from

that unlawful action.  ███████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████  But it is "beyond dispute" that illegal activity

cannot form the basis for plaintiffs' but-for world.  *Alphamed Pharms. Corp. v.

Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1348 (S.D. Fla. 2006) (damages

cannot be "predicated on the completion of illegal activity") (quoting *Carruthers v.

Flaum*, 365 F. Supp. 2d 448, 470 (S.D.N.Y. 2005)).

Teva could not have launched Anchen's product in March 2007 ***as a

matter of law*** because Anchen did not file its CBE-30 supplement notifying FDA

that it intended to manufacture its generic version of Wellbutrin XL at its Jeronimo

facility until June 1, 2007, and FDA did not accept the CBE-30 until it was

supplemented twice.  Contrary to plaintiffs' claim that no law, regulation or action

by FDA prevented Teva/Anchen from launching at risk in March, Appellants' Br.

87, GSK carefully explained the federal laws and regulations that would have

prevented a launch of a generic from Anchen's Jeronimo facility prior to June 12,

2007.  *See* 21 C.F.R. § 314.70(a) and (c)(4) ("Pending approval of the supplement

by FDA . . .  distribution of the drug product made using the change may begin not

less than 30 days after receipt of the supplement by FDA."); *see also* 21 U.S.C.

§ 351(a)(2)(B) (prohibiting sale of drug product manufactured at facility about

which FDA was not properly notified); *In re Nexium (Esomeprazole) Antitrust*

*Litig.*, 42 F. Supp. 3d 231, 266 (D. Mass. 2014) ("Ranbaxy's pending ANDA for

generic Nexium was filed out of its Paonta Sahib, India, facility.  This means that

any FDA approval to market generic Nexium only extended to production at the

Paonta Sahib facility.  To move production to another facility, Ranbaxy is required

to file and gain approval of a site transfer amendment to its ANDA.") (internal

citations omitted).

   The foregoing regulation was promulgated under 21 U.S.C. § 356a,

which, "[i]n the case of a manufacturing change to which paragraph (1)(B)

applies" (such as Anchen's belated addition of the Jeronimo facility to its ANDA),

prevents distribution of the drug until 30 days after FDA receives the supplemental

application for the change.  21 U.S.C. § 356a(d)(3)(B)(i); *see also* JA-35231

(Sporn Decl. ¶ 13) (explaining that Anchen's product could not have been

launched before June 12, 2007 as a matter of FDA regulation); JA-35069  (Foster

Decl. ¶ 58 & n.30) (same).[39]  To implement FDA's strict manufacturing and safety

standards the FDCA prohibits the distribution of a drug manufactured at a facility

without formal notification to and approval by FDA of that facility.  21 U.S.C.

§ 351(a)(2)(B).

Plaintiffs' contention that there is "no evidence that the FDA ever

took [the] position" that a launch in March 2007 was impermissible,[40] Appellants'

Br. 87-88, is belied by FDA's insistence on Anchen's submission of the CBE-30

supplement to add the Jeronimo facility to its ANDA, and FDA's subsequent

---

[39]  This regulatory prerequisite, just like any other, breaks plaintiffs' chain of causation.  *See, e.g.*, *West Penn. Power*, 147 F.3d at 267-68  ("The presence of the regulatory scheme and need for approval" may "cut[] the causal chain and convert[] what might have been deemed antitrust injury in a free market into only a speculative exercise.");  *RSA Media*, 260 F.3d at 11-15 (affirming summary judgment in favor of antitrust defendants because regulations broke causal chain);  *Canadian Import*, 470 F.3d at 791 (affirming dismissal because "[t]he absence of competition from Canadian sources in the domestic prescription drug market . . . is caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants");  *Nexium*, 42 F. Supp. 3d 231, 261-75 (granting defendant summary judgment because plaintiff failed to create a genuine issue of material fact as to whether "there [was] a 'way' for [the generic pharmaceutical company] to enter . . . considering both manufacturing and FDA approval requirements").

[40]  Plaintiffs' reliance on *Consolidated Express v. New York Shipping Ass'n, Inc.*, 602 F.2d 494 (3d Cir. 1979), Appellants' Br. 88 n.432, is misplaced.  In *Consolidated Express*, this Court held that the defendants could not rely on the illegality of conduct as a defense to that conduct also being an antitrust violation.  602 F.2d at 513.  The Court did not address the distinct question whether plaintiffs can premise damages on the presumption that the parties would have, in a hypothetical, but-for world, acted illegally.

demand to Anchen to provide drug release and stability data "in order for the CBE-30 to be granted."  JA-355722 (June 9, 2007 CBE-30 letter).  The FDA's actions also squarely contradict plaintiffs' legally unfounded position that "Anchen's Jeronimo Road facility qualified as the 'same facility' as the existing Goodyear facility," and that the Jeronimo facility "did not need to be separately approved" by FDA but instead could have been disclosed in Anchen's annual report.  Appellants' Br. 88.  For these reasons, FDA regulations provide an independent basis for the District Court's ruling that no at-risk launch could have occurred prior to June 2007.

### H.    The District Court Properly Excluded Dr. Leitzinger's Testimony

Plaintiffs offered the opinions and testimony of economist Jeffrey Leitzinger, Ph.D. to support their argument that the Wellbutrin Settlement was anticompetitive.  The court found that Dr. Leitzinger's analysis of the Wellbutrin Settlement was unreliable under *Daubert*.  JA-194 (2015 S.J. Op.).  The District Court noted that it could have decided GSK's motion for summary judgment "without deciding GSK's *Daubert* challenge of Dr. Leitzinger, because the Court relies on the undisputed facts in the summary judgment record."  *Id.*  On appeal, plaintiffs rely heavily on Dr. Leitzinger's excluded opinions.[41]  Because only

---

[41]    *See, e.g.*, Appellants' Br. n.197, n.200, n.202, n.300, n.303, n.304, n.307, n.329, n.330.

admissible evidence may be considered on summary judgment, *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999), accepting many of plaintiffs' arguments would require the Court to find that the District Court abused its discretion in excluding Dr. Leitzinger's testimony, which it did not.

The District Court excluded Dr. Leitzinger's analysis of the Wellbutrin Settlement for two demonstrably correct reasons.

First, the court did so because "Dr. Leitzinger failed to analyze when and whether the generic manufacturers would have entered the market but for the Wellbutrin Settlement." JA-194 (2015 S.J. Op.). The but-for generic entry date is a material economic factor for a rule of reason analysis because it controls the existence and duration of the alleged delay, which allegedly constitutes the principal anticompetitive effect of the Wellbutrin Settlement. JA-33028 (Leitzinger Dep. 20:14-18) (a later dated would potentially "change the calculation of the revenue effects of the no AG provisions"). Dr. Leitzinger did not investigate the merits of the date; rather, he accepted an instruction from counsel. JA-33026 (Leitzinger Dep. 12:22-13:3) ("Q. What is the basis of your assumption that Teva would have launched at an earlier date? [Objection omitted] [A.] That assumption here, and as it was in my previous supplemental report, is the product of an instruction by counsel."). Dr. Leitzinger lacked any understanding of how plaintiffs reached the date, testifying: "I can't speak to what the thought process

was on the part of plaintiff's counsel in giving me the instruction.  I don't know all of the evidence that it might have been grounded in"; that is, Dr. Leitzinger had not independently analyzed one of the most important factors for his rule of reason analysis. JA-33027 (*id.* 14:17-18, 12:11-16).  He merely understood that "some part of that involves the expert opinion and report of Cheryl Blume and the documents and testimony that is cited in that report."[42] *Id.* 14:20-21.  However, he "didn't specifically set out to – other than what's contained within a report go behind that and examine the evidence she references."  *Id.* 14:23-15:8).

Dr. Leitzinger also summarily assumed that a more procompetitive settlement was possible without a reverse payment, yet he had no opinion regarding the structure of such a settlement, nor did he point to any evidence to support that conclusion.  JA-33035 (Leitzinger Dep. 46:2-6) (disclaiming any opinion on the point); JA-33033-34 (*id.* 41:1-42:1) (presuming earlier entry); *see also Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir. 2000) (expert testimony based on assumptions lacking factual foundation inadmissible).

Second, the court excluded Dr. Leitzinger's testimony under *Daubert* for the separate reason that he "expressly failed to evaluate any procompetitive

---

[42]     As explained in GSK's Motion to Exclude the Expert Testimony of Cheryl Blume, Blume's testimony is inadmissible because it is unreliable and she is not qualified to offer the opinions contained in her report.  Mot. to Exclude Blume Test., No. 08-2431, ECF 572, at §§ IV.

justifications of the Wellbutrin Settlement, making his already conclusory analysis fatally incomplete." JA-194 (2015 S.J. Op.). In *Lamictal*, the Court explained that under the proper rule of reason analysis plaintiffs must rebut the procompetitive aspects of the settlement. 791 F.3d at 412. Dr. Leitzinger did not analyze key procompetitive features. JA-33044 (Leitzinger Dep. 85:13-22) ("I did not see any need in the work that I did to somehow incorporate that beyond simply being aware of it."). Perhaps that is why Dr. Leitzinger's opinions fail to analyze:

- the procompetitive effects of GSK obtaining a license from Andrx, JA-33038 (Leitzinger Dep. 58:14-59:7);

- whether Anchen would have been able to supply Teva in order to launch on his assumed but-for entry date, JA-33053 (*id*. 120:11-18);

- the likelihood that under the Wellbutrin Settlement Anchen could have entered immediately if it prevailed in the appeal pending before the Federal Circuit, despite acknowledging that the agreement allowed for this possibility, JA-33044 (*id*. 84:23-85:12); or

- the likelihood that any of the other trigger events could have resulted in immediate entry for Anchen and Teva, JA-33043 (*id*. 79:11-80:12).

Dr. Leitzinger's purported opinions regarding the anticompetitive effects of and lack of procompetitive justifications for the Wellbutrin Settlement are unreliable under *Daubert*, because, rather than conduct his own economic analysis, he blindly relied on instructions from counsel and failed to consider the procompetitive aspects of the Wellbutrin Settlement, both of which prejudiced his

opinions. *See, e.g., TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding testimony "where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert"); *American Key Corp. v. Cole Nat. Corp*., 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."). In sum, the District Court properly excluded Dr. Leitzinger's expert testimony.

Lastly, plaintiffs argue that the District Court abused its discretion by not holding an *in limine* hearing before excluding Dr. Leitzinger's testimony. Appellants' Br. 117. However, plaintiffs fail to note that they did not request such a hearing and recent precedent does not require one. "[A] hearing is not required where the District Court is presented with a full record." *Henry v. St. Croix Alumina, LLC*, 572 F. App'x 114, 118-19 (3d Cir. 2014). Whether to hold such a hearing rests in the sound discretion of the district court. *Id.*; *see also Oddi v. Ford Motor Co*., 234 F.3d 136, 154 (3d Cir. 2000) (finding that "the district court already had before it the depositions and affidavits of the plaintiff's experts. Nothing more was required."). As in *Henry*, the "record in this case is immense and was entirely before the District Court when it ruled on the expert testimony," plaintiffs "do not explain how a hearing would have benefited them." 572 F.

App'x at 119.  Nor did the District Court ignore Dr. Leitzinger's surrebuttal report – his opinions therein could not rewrite his prior report and testimony admitting that he failed to perform an independent economic analysis of the relevant factors when forming his opinion, as *Daubert* requires under these circumstances.

## I.    Indirect Purchaser Plaintiffs Lack Standing To Bring Claims Under The Laws Of States In Which Neither They Nor Their Members Suffered Injury

Apart from summary judgment and the related *Daubert* motion, the Indirect Purchaser Plaintiffs ("IPPs") appeal the District Court's dismissal for "lack of standing all claims arising in states where no named plaintiff is located and where no named plaintiff has members whose purchases of Wellbutrin XL it reimbursed."  JA-300 (Order on Mot. to Dismiss).  The IPPs now contend that the District Court should have permitted the named IPPs to maintain claims under the laws of "37" additional jurisdictions wholly unconnected to any alleged injuries they sustained.  Appellants' Br. 121.  In other words, they ask permission to assert claims under ***every*** state antitrust or consumer protection law in the country, even if no named plaintiff has any purchases in those states or rights to invoke the laws of those states.  Courts considering this exact issue in materially identical contexts – including two in this Circuit – have rejected the IPPs' position.[43]

---

[43]     *See*, *e.g.*, *In re Lidoderm Antitrust Litig.*, 74 F. Supp. 3d 1052, 1080 (N.D. Cal. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014); *In re Flonase Antitrust Litig.*, 692 F.Supp.2d 524, 533 (E.D. Pa.

The IPPs' argument is precluded by the settled principle that a

plaintiff must "'demonstrate standing for each claim he seeks to press.'" *Neale v.*

*Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (quoting

*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)); *see also Schering*

*Plough,* 678 F.3d at 245 ("'standing is not dispensed in gross' . . . a plaintiff who

raises multiple causes of action 'must demonstrate standing for each claim'").[44]

The IPPs claim that the District Court confused Article III standing

with "statutory standing," which, unlike Article III standing, is not jurisdictional

but rather requires an inquiry into whether the statute at issue conferred a "cause of

action." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S.Ct. 1377,

1387 n.4 & 6 (2014). Thus, "[a] dismissal for lack of statutory standing is

---

2010); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC ("Wellbutrin SR")*, 263 F.R.D. 205, 210 (E.D. Pa. 2009); *In re Ditropan XL Antitrust Litig*., 529 F.Supp.2d 1098, 1107 (N.D. Cal. 2007); *In re Terazosin Hydrochloride Antitrust Litig*., 160 F.Supp.2d 1365, 1370-71 (S.D. Fla. 2001).

[44]     *See also Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir.1987) ("a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim"); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000) ("It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert.'") (citations omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (stating it is "right to insist that a plaintiff must demonstrate standing separately for each form of relief sought").

effectively the same as a dismissal for failure to state a claim." *Leyse v. Bank of Am. Nat. Ass'n,* 804 F.3d 316, 320 (3d Cir. 2015).

The distinction between Article III standing and statutory standing does not help the IPPs.[45] The named IPPs lacked Article III standing under the laws of states where they were not injured because they lack "redressable injuries" for "each claim [they] seek[] to press." *Neale*, 794 F.3d at 359 (citations omitted); *see id.* at 360 (courts should resolve standing before class certification). They also lacked so-called "statutory standing," *i.e.*, a cause of action, because the complaint alleged no facts supporting any injury redressable by the named plaintiffs under the laws of those states. This problem was fatal because when a named plaintiff lacks a cause of action, the Court should dismiss the action before proceeding to class certification. *See Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987).

### J. Non-Party Aetna, Inc.'s Appeal Of The District Court's Order Denying Its Intervention Is Untimely And Meritless

#### 1. Aetna, Inc.'s Appeal Is Over Five Years Late And Not Properly Before This Court

Non-party Aetna, Inc. ("Aetna") seeks to appeal the District Court's denial of its motion for mandatory and permissive intervention under Federal Rule

---

[45] The District Court never concluded, as IPPs claim, that it "lacked subject matter jurisdiction," Appellants' Br. 121, over any claims. The dismissal was pursuant to Rule 12(b)(6), not 12(b)(1).

of Civil Procedure 24. JA-314-323 (Aetna Intervention Op.). This appeal is

untimely because "[a]n appeal from the denial of intervention cannot be kept in

reserve; it must be taken within thirty days of the entry of the order, or not at all."

*Polak v. Lebron*, 61 F. App'x 807, 811 (3d Cir. 2003) (internal citations and

quotations omitted).[46] Indeed, "[i]t has long been the law in this Circuit that

'[w]hen an absolute right to intervene in a lawsuit is claimed, and the claim is

rejected, the order denying intervention is considered final and appealable.'"

*McClune v. Shamah*, 593 F.2d 482, 485 (3d Cir. 1979) (internal quotations and

citations omitted). Moreover, "an appeal is well taken from both aspects of an

order denying intervention where it is claimed that the applicant had an absolute

right to intervene, and, alternatively, that the district court abused its discretion in

denying permissive intervention." *Id*. The District Court's decision foreclosed

Aetna from participating in the litigation, rendering it final and appealable under

the law of the Third Circuit.[47] Moreover, Aetna is not a proper party to the appeal

---

[46]     *See also United States v. City of Oakland, Cal.*, 958 F.2d 300, 302 (9th Cir.
         1992) ("[I]t is far more efficient to consider an appeal from a denial of
         intervention, perhaps on an expedited basis, than to encourage unsuccessful
         applicants to wait until after the case is decided in order to attempt an
         appeal.").

[47]     Following the July 2010 decision denying Aetna's intervention, Aetna had
         no further involvement in the proceedings and was "foreclosed entirely by
         the denial of intervention, and the order of denial thus ha[d] the requisite
         finality for appellate review." *Carlough v. Amchem Products, Inc.*, 5 F.3d
         707, 712 (3d Cir. 1993) (citing *Stringfellow v. Concerned Neighbors in*

because "one properly denied the status of intervenor cannot appeal on the merits

of the case." *Com. of Pa. v. Rizzo*, 530 F.2d 501, 508 (3d Cir. 1976).

### 2. The District Court Did Not Abuse Its Discretion In Denying Aetna's Intervention

Even overlooking the procedural infirmities in Aetna's appeal, the

Court should affirm the District Court's decision because the District Court did not

apply an improper legal standard, reach a decision that was incorrect in denying

Aetna's request for mandatory intervention, or abuse its discretion in deciding that

Aetna had not satisfied the test for permissive intervention. JA-314-323 (Aetna

Intervention Op.).

The District Court properly found that Aetna's motion to intervene did

not satisfy the timeliness factor.[48] "Aetna [sought] intervention . . . over two years

after the complaint was filed, nine months after several of the claims it seeks to

assert were dismissed from the case, after much of the class certification discovery

has been conducted, and five months after the plaintiffs filed their motion for class

---

*Action*, 480 U.S. 370 (1987)). That the District Court permitted a related entity, Aetna Health of California, to substitute as a plaintiff for state law claims under two states *after* Aetna's time to appeal expired is immaterial to Aetna's deadline for appealing the decision denying its motion to intervene. Order, 08-2433, ECF No. 200.

[48] A district court considers three factors to determine the timeliness of an intervention motion: (1) how far the proceedings have gone when the movant seeks to intervene, (2) the prejudice that delay may cause the parties, and (3) the reason for the delay. *In re Fine Paper Antitrust Lit.,* 695 F.2d 494, 500 (3d Cir. 1982).

certification." JA-316-17 (Aetna Intervention Op.). Even on appeal, Aetna fails to

address the District Court's concern that its belated intervention would have

required "a new motion for class certification from the plaintiffs and a significant

amount of additional discovery, including volumes of documents and additional

depositions, briefing and expert reports."[49] *Id.; see* Appellants' Br. 124. Aetna's

only excuse for the delay was that it "periodically evaluates" cases in which it has

interests and that such evaluation "takes time." JA-316 (Aetna Intervention Op.).

     Aetna claims that *In re Community Bank of Northern Virginia*, 418

F.3d 277 (3d Cir. 2005) ("*Community Bank I*") created a wide-sweeping rule that

all motions to intervene in class actions are "presumptively timely" if filed within

the opt-out period. Appellants' Br. 123. However, that argument ignores

*Community Bank II*, 622 F.3d 275, 313 (3d Cir. 2010), which rejected that

interpretation of *Community Bank I,* and "stressed" that "[t]imeliness of an

intervention request 'is determined by the totality of the circumstances.'" *Id.*

(internal citations and quotations omitted). Even though the intervention motion

---

[49]    Aetna downplays the prejudice that its intervention would have caused by claiming that the permitted substitution of Aetna of California into the suit for California and New York claims did not delay the litigation. Appellants' Br. 125. As the District Court pointed out, this substitution only applied to state law claims that the parties had already been litigating, and not the "wide swath of new claims" under every jurisdiction in the country for which Aetna sought to intervene. Order, 08-2433, ECF No. 200.

was filed before the opt-out deadline in *Community Bank II*, this Court affirmed

the district court's denial of the motion as untimely. *Id.*[50]

Aetna's motion also did not satisfy the third (impairment of interests)

and fourth (inadequate representation) factors. Aetna effectively conceded that its

interests were not impaired because its counsel told the court it had authority to file

a separate suit to recover under state laws not covered by this case. JA-320-321

(Aetna Intervention Op.). Nor does Aetna contend that the IPPs, which shared

counsel with Aetna, inadequately represented its interests under the state law

claims permitted by the District Court. *Id.* at JA-321. This Court recognizes a

presumption of adequate representation if the named IPPs shared Aetna's

objective, which they did: proving the antitrust liability of GSK and Biovail. *See*

*Community Bank I*, 418 F.3d at 315 ("When the party seeking intervention has the

same ultimate objective as a party to the suit, a presumption arises that its interests

---

[50] Aetna's reference to intervention being allowed "after final judgment" is specious. Appellants' Br. 127. The dicta that Aetna cites from *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 395 n.15 (1977) stands for the unremarkable proposition that putative class members who seek "only" to appeal denial of class certification need not intervene immediately after the denial, since such orders are not appealable until after final judgment and a class member would be a "superfluous spectator in the litigation" for years. The cases that Aetna cites, Appellants' Br. 126 n.629, that "permit substitution" are inapposite because those cases involved substitution under a Rule 23 analysis of inadequate representatives; they had nothing to do with an intervenor attempting to cure standing issues and drastically expand the case.

are adequately represented . . . .'"). And the other IPPs' unsuccessful attempt to

expand the litigation (because they lacked standing under the laws of numerous

jurisdictions) does not change the analysis. As the District Court recognized, this

Court has advised that "[a] motion for intervention under Rule 24 is not an

appropriate device to cure a situation in which plaintiffs may have stated causes of

action that they have no standing to litigate." *Id.* (quotation omitted).

For the above-stated reasons, the District Court also did not abuse its

discretion in denying permissive intervention. *See Benjamin*, 432 F. App'x at 99

("Because intervention of right is not available here, the District Court did not

abuse its discretion in finding that Intervenors are also not entitled to permissive

intervention.").

## VI.     CONCLUSION

Accordingly, the decisions of the District Court that plaintiffs

challenged should be affirmed in their entirety.

## CONDITIONAL CROSS-APPEAL NO. 15-3682

## VII. JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § § 1331, 1337. This Court has jurisdiction of Cross-Appeal No. 15-3682 under 28 U.S.C. § 1291.

## VIII. STATEMENT OF THE ISSUE

Did the proposed direct purchaser class comprising 33 sophisticated entities with resources and large individual claims satisfy the numerosity requirement of Rule 23(a)?[51]

## IX. STATEMENT OF RELATED CASES

On August 25, 2011, former defendant Biovail filed a Rule 23(f) Petition for Permission to Appeal the District Court's August 11, 2011 decision certifying the Direct Purchaser Plaintiff Class ("DPP Class"). The Court denied the Petition.

## X. STATEMENT OF THE CASE

The DPP Class consists of 33 wholesalers and retailers that purchased Wellbutrin XL directly from GSK from November 14, 2005 through August 31, 2009 (the "Class Period"). JA-8 (DPP Cert. Op.) (excluding two of 35 proposed

---

[51] This Court recently granted a Rule 23(f) petition for permission to appeal an order finding that a similarly composed direct purchaser class satisfied the numerosity requirement. *In re Modafinil Antitrust Litigation*, No. 15-3475 (3d Cir.).

class members because they did not purchase the generic); JA-39143 (Leitzinger DPP Decl.) (listing class members). Members of the DPP Class purchased ███ ███ of brand Wellbutrin XL during the Class Period. JA-39790 (Declaration of Andrew Joskow, GSK's Expert Economist ("Joskow DPP Decl.") Table 2). On August 11, 2011, the District Court certified the DPP Class. JA-1-42.

## XI. STANDARD OF REVIEW

This Court reviews a district court's findings of fact, its application of law to facts, and its decision regarding class certification for an abuse of discretion. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312, 320 (3d Cir. 2008) (citations omitted). "The district court abused its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483-84 (3d Cir. 2015) (internal quotations and citations omitted).

## XII. SUMMARY OF ARGUMENT

The numerosity requirement of Rule 23 prohibits a district court from certifying a class unless "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, key characteristics of the DPP Class render joinder practicable. The DPP Class comprises 33 sophisticated drug wholesalers and retailers. Three of those buyers collectively purchased over 90 percent of the ████ of brand Wellbutrin XL sold during the Class Period and

each remaining class member averaged over ▮▮▮▮▮▮ in purchases.  Indeed, four of the class members individually had total revenues that exceeded those of GSK.  All of these entities have the financial incentives and resources to participate in joined litigation.

In certifying the DPP Class, the District Court accepted plaintiffs' arguments attributing undue weight to two factors in the numerosity analysis:  the geographic locations of the direct purchasers and judicial economy.  The notion that plaintiffs will be burdened by "travel" is belied by the experience of the sole named plaintiff in this case, Professional Drug Company, Inc. ("PDC"), which has never traveled for depositions or attended proceedings of significance (such as the class certification proceeding itself).  Nor do judicial economy considerations suggest that joinder is impracticable.  Plaintiffs joined in an action have a significant incentive to coordinate, including using the same counsel and coordinating discovery.  The DPPs produced very little discovery in this case and, as their prosecution of the case shows, their own documents had little relevance to their theory of liability.

Accordingly, joinder is practicable because the direct purchasers have the financial resources and significant incentives to seek redress and district courts have the ability to conduct a joined action in a way that mitigates any concerns regarding geography and judicial economy.

# XIII. ARGUMENT

The class-action device is an exception to the rule that litigation is usually "'conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citations omitted). Among other requirements, the party proposing class certification bears the burden of affirmatively demonstrating that joinder is impracticable. Unless joinder is impracticable (*i.e.*, not just slightly more inconvenient for plaintiff), numerosity is absent and class certification must be denied. Defendants cannot be deprived of their traditional right to confront each plaintiff – through discovery and at trial – unless joinder is not a practical option. *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims").

In *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594-95 (3d Cir. 2012), this Court explained that numerosity has "three core objectives": (1) "ensur[ing] judicial economy"; (2) creating "access to judicial relief, particularly for those persons with claims that would be uneconomical to litigate individually"; and (3) preventing "putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claim."

While there is no minimum number of members needed to satisfy numerosity, this Court has observed that classes with membership "between twenty-one and forty have evoked mixed responses." *Weiss v. York Hosp.*, 745 F.2d 786, 808 n.35 (3d Cir. 1984); *see also In re TWL Corp.*, 712 F.3d 886, 895 (5th Cir. 2013) ("[A] putative class with only 130 members already might present a close question as to numerosity, depending on the particular circumstances of the case."). Courts considering certification of classes between 20 and 40 members are guided by a series of factors, including size of individual claims, financial resources of class members, the ability of claimants to institute individual suits, judicial economy, and geographic dispersion of class members. *Newberg on Class Actions* § 3:12 (5th ed.); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). This is a multi-factor test and "no single factor – the number of parties involved, the inexpediency of their joinder, or the inconvenience of trying individual suits – automatically will satisfy Rule 23(a)(1)." 7A Fed. Prac. & Proc. Civ. § 1762 (3d ed. 2005).

### A. The DPP Class Is A Group Of 33 Sophisticated Direct Purchasers Seeking Multi-Billion Dollar Pre-Trebled Damages, Weighing In Favor Of The Practicability Of Joinder

The sophisticated nature of the direct purchasers, the size of their individual claims, and the ease of identifying them for purpose of joining them in a single action render joinder practicable.

The members of the direct purchaser class – international and national corporations – could easily be joined in one action.  The "Big Three" drug wholesalers – absent class members Amerisource Bergen, Cardinal Health, and McKesson Corporation – each purchased over ███████ in Wellbutrin XL during the Class Period.  JA-39790 (Joskow DPP Decl.).  The remaining 30 members of the class also have significant claims and the resources and ability to sue separately.  The net sales attributable to those class members exceeds ██████████ meaning that they averaged over ██████████ in purchases of brand Wellbutrin XL during the Class Period; the median purchase was over ██████████ *Id.*[52]  In the aggregate, they are claiming over ████████ in damages.  JA-4955 (Rebuttal Expert Report of Jeffrey Leitzinger (Oct. 14, 2011)).  These entities all have the resources and financial incentives to pursue a joined action.  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 259 (S.D.N.Y. 2010), ("[E]ach is a sophisticated, institutional investor whose alleged losses range

---

[52]  *See, e.g., Primavera Familienstiftung v. Askin,* 178 F.R.D. 405, 411 (S.D.N.Y. 1998) ("The 38 to 40 potential plaintiffs here are sophisticated investors, with sufficient financial resources to protect their own interests . . . . [T]he majority of potential class members invested well over $1 million, with some investing in the tens of millions and none investing less than $100,000 . . . . [T]he principle of protection for weaker plaintiffs which underlies Rule 23 cannot be invoked, nor can joinder be said to be impracticable."); *see Ansari v. New York Univ.*, 179 F.R.D. 112, 116 (S.D.N.Y. 1998) (finding that potential award of approximately $90,000 "is hardly the type of de minim[is] recovery that would discourage individual class members from joining [plaintiff's] lawsuit").

in the multiple millions of dollars.  Where, as here, the size of the proposed class

members' respective claims is significant and individual plaintiffs are capable of

paying for and litigating their own action, joinder is practicable.").

       These incentives are heightened by the prospect of treble damages and

attorneys' fees under federal antitrust law.  *Christiana Mortgage Corp. v.*

*Delaware Mortgage Bankers Ass'n*, 136 F.R.D. 372, 378 (D. Del. 1991).

Permitting these sophisticated purchasers to proceed as a class fails to serve the

objective of class actions:  ensuring judicial access for persons with claims that are

uneconomical to litigate individually.  *Marcus*, 687 F.3d at 594-95; *Phillips Petrol.*

*Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class action "permit[s] plaintiffs to pool

claims which would be uneconomical to litigate otherwise").

### B. The Geographic Location Of The Direct Purchasers Is Not A Dispositive Factor In The Numerosity Analysis

       The geographic dispersion of the 33 class members, one-third of

which are located in Pennsylvania and Ohio, JA-39142 (Leitzinger DPP Decl.),

would not "cause substantial difficulty for the parties to conduct discovery

efficiently and to coordinate the litigation."  JA-9 (DPP Cert. Op.).

       Geographic dispersion is but one factor in the numerosity analysis.

*See Ansari,*179 F.R.D. at 115 (finding numerosity not met where 35 geographically

dispersed class members had financial resources to litigate); *Abu Dhabi*, 269

F.R.D. at 259 (dispersion of plaintiffs from State of Washington to Abu Dhabi not

dispositive).  The modernization of litigation has neutralized the impact of geography on litigants' ability to prosecute cases in other states.  Litigants share discovery with a click of a button; the Internet and cloud-based systems facilitate document review; depositions are conducted via videoconference while parties participate from different time zones; key documents and pleadings are served and filed electronically.

Any suggestion by plaintiffs that direct purchasers would decline to file or join a suit in an out-of-state court is proven wrong by the history of this case.  Representative PDC hails from Biloxi, Mississippi, while another direct purchaser that originally filed suit in Philadelphia is based in Rochester, New York (Rochester Drug Co.).  The named direct purchaser plaintiffs in *Lamictal*, a case filed in New Jersey, are from Louisiana and South Carolina.  Am. Compl. ¶¶ 32-33, *Lamictal*, No. 12-995 (D.N.J. June 25, 2012), ECF 55.

Additional travel obligations are unlikely to be imposed on the employees of direct purchasers in a joined action compared to a class action, contrary to plaintiffs' claim that joinder results in plaintiffs "flying in from 14 states every time anything significant is occurring."  DPP Corr. Reply Br. ISO Class Certification 26, ECF 306.  PDC, despite being the sole representative of the interests of 32 other entities in a purported multi-billion dollar antitrust action, has

never attended a single deposition other than its own and does not appear at significant hearings.

### C.    Joinder Of The DPPs Would Not Eliminate Judicial Economy

Judicial economy would not be undermined if the direct purchasers joined in one action.  JA-10 (DPP Cert. Op.).  In fact, plaintiffs' decision to bring a class action created additional complexities, such as significant fact and expert discovery on class issues, substantial briefing, an evidentiary hearing, complex legal arguments, and class notice, much of which would be avoided in a joined action.  *Christiana Mortgage Corp.*, 136 F.R.D. at 378 ("Courts have noted, for example, that joinder and intervention may be far simpler procedures because it is likely that not all the proposed class members will seek to join the suit.") (citations omitted).  Moreover, district courts have tools at their disposal to manage joined actions.  Plaintiffs have an incentive to coordinate.  The discovery in a joined action would not be substantially different or overwhelming.

In short, a determination that judicial economy supported numerosity is inconsistent with the realities of antitrust litigation and the ability of the court to manage litigation involving multiple parties.

## XIV.  CONCLUSION

Accordingly, the DPP Class cannot satisfy the numerosity requirement.

127

## CONDITIONAL CROSS-APPEAL NO. 15-3681

## XV.  JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  This Court has jurisdiction of Cross-Appeal No. 15-3681 under 28 U.S.C. § 1291.

## XVI.  STATEMENT OF THE ISSUE

Can an inference of antitrust injury satisfy the requirement that the IPPs – who failed to prove ascertainability – show predominance under Rule 23(b)?

## XVII.  STATEMENT OF RELATED CASES

On April 23, 2012, GSK filed a Rule 23(f) Petition for Permission to Appeal the District Court's August 15, 2011 decision ("Initial Certification Decision") certifying the Indirect Purchaser Plaintiff Class ("IPP Class").  (Appeal No. 12-8031.)  The Court denied the petition.

Plaintiffs appealed the District Court's June 30, 2015 decision decertifying the IPP Class (Appeal No. 15-2875, the "Wellbutrin Ascertainability Appeal"), which has been fully briefed and consolidated with the subject appeals.

## XVIII.  STATEMENT OF THE CASE

The decertified IPP Class consisted of:  (1) persons or entities who purchased generic Wellbutrin XL ("generic XL") in California, Florida, Nevada,

New York, Tennessee and Wisconsin ("Class States"); and (2) entities that purchased brand Wellbutrin XL before the generic was available *and* purchased generic XL in the same Class state after generic XL became available. JA-372 (2011 Class Cert. Order). Excluded from the IPP Class were "flat co-payers," *i.e.,* those persons who paid the same for the generic regardless of the retail purchase price. The Class Period began November 14, 2005 and ended on April 29, 2011.

A single prescription can have multiple payers (*e.g.*, health plan sponsors ("TPPs"), pharmacy benefit managers ("PBMs"), and consumers). In a retail transaction, an insured consumer pays a copay or coinsurance and the PBM engaged by the consumer's TPP pays the balance of the price it negotiated with the pharmacy. JA-40218-27 (Declaration of Andrew Joskow, GSK's Expert Economist ("Joskow IPP-Decl.") ¶¶ 30-44). The TPP later reimburses the PBM a previously negotiated amount less than, equal to, or more than the retail price. *Wellbutrin XL*, 308 F.R.D. at 148 (ascertainability opinion).[53] The amount paid or reimbursed to either the PBM or the insured by each TPP will vary depending on the individualized cost-sharing arrangements with its insured members and PBMs. JA-40218-27 (Joskow IPP-Decl. ¶¶ 30-44). PBMs and sometimes TPPs

---

[53] Large insurers like Aetna Health of California, unlike the majority of TPPs, directly administer prescription drug coverage to their members and negotiate with pharmacies on their own behalf to establish prices. JA-40234-35 (Joskow IPP-Decl. ¶ 59).

receive rebates from the brand manufacturer, but such rebates typically cease when the generic becomes available. JA-40254 (Joskow IPP-Decl. ¶ 79).

IPPs asserted two theories of antitrust impact. The "generic overcharge" theory claims that IPPs overpaid for generic prescriptions. IPPs claim that, but for the alleged delay, generic prices would have been lower during the Class Period. JA-333 (IPP Cert. Op.). The "branded overcharge" theory claims that the alleged delay caused IPPs to pay for the more expensive brand product during a time period when some IPPs would have switched to the cheaper generic, if it were available. *Id.* at JA-334. A key obstacle to this theory is the prevalence in the Class of uninjured "brand loyalists" – insured and uninsured consumers (and their TPPs) who purchased or would have continued purchasing the brand despite availability of a generic. JA-40252-53 (Joskow IPP-Decl. ¶ 76); JA-363 (IPP Cert. Op.).

## XIX. STANDARD OF REVIEW

This Court reviews a district court's findings of fact, its application of law to facts, and its decision regarding class certification for an abuse of discretion. *See supra,* at Section XI.

## XX. SUMMARY OF ARGUMENT

The District Court properly decertified the IPP Class on ascertainability grounds. Another basis upon which this Court should affirm the

District Court's decertification decision is that plaintiffs cannot meet the predominance requirement of Rule 23(b)(3) because numerous individual inquiries are required to determine whether class members were impacted by the alleged delay in generic entry. *See Hydrogen Peroxide,* 552 F.3d at 311-12.

Both theories of antitrust impact presented by the IPPs are untenable. Indeed, the District Court recognized in part that the branded overcharge theory was unreliable. The court rejected as unreliable the analysis of plaintiffs' expert, Professor Rosenthal, who posited that TPPs paying for only brand purchases would have necessarily purchased generics in the but-for world, JA-362, recognizing that "individual issues, such as formulary preference or brand loyalty" precluded such a finding, JA-363. Yet, as to TPPs who paid for at least one generic purchase in a Class State, the court did not consider the same individualized issues when it drew an "inference" – unsupported by expert reports or any other evidence – that "these entities would have purchased [the generic] in the 'but for world,' absent the alleged exclusionary conduct" in the same Class State. *Id.* The inference was inconsistent with the fact that TPPs reimburse for drugs based on the decisions resulting from the subjective preferences of those consumers (who may be brand loyalists) who are in the plan and the formulary design of the plan in effect *at the time the prescription is filled.* The record did not allow for an inference that the conditions that generated the generic prescription in the actual world, *e.g.*, a non-

brand loyal consumer and unfavorable formulary position for brand Wellbutrin

XL, would have been present, for example, years earlier.

Moreover, the evidence showed that some TPPs were not injured

under the generic overcharge theory because they actually paid less for generic

Wellbutrin XL than the "but-for" prices calculated by Professor Rosenthal.

Professor Rosenthal, who based her analysis on average prices, never applied her

methodology to determine whether any named plaintiffs were actually injured.

Quite the contrary, an examination of a named plaintiff's data showed that it paid

less than the but-for price. Plaintiffs' arguments also rested on a critical factual

error accepted by the court: that GSK's expert economist, Dr. Joskow, compared

"contemporaneous prices" in his analysis of generic purchases by plaintiff Painters

District Council No. 30 Health & Welfare Fund ("D&C 30"), when he did not.

A class requiring many individualized inquiries – in addition to failing

to prove ascertainability – cannot be certified.

## XXI.  ARGUMENT

### A.  An "Inference" That Entities That Had Purchased Generics In the Actual World Would Have Made Those Purchases In The But-For World Cannot Satisfy the Predominance Requirement

Many TPPs have only purchases (reimbursements) for brand

Wellbutrin XL in the Class States and did not have payments for the generic. JA-

360 (IPP Cert. Op.). For this reason, the District Court declined to infer that these

TPPs would have reimbursed for a generic product had the generic been available earlier and excluded them from the class. *Id.* JA-360-363. (Plaintiffs do not contend on appeal that the District Court erred.). The District Court recognized that "individual issues, such as formulary preference or brand loyalty," dictate whether a TPP has reimbursements for a brand or generic. *Id.* JA-363. The features of a formulary governing a named plaintiff were instructive:

> Local 505's members correspondingly continued to purchase branded Wellbutrin XL for nearly two years after initial generic entry [of the 300 mg]. . . . The example of Local 505 suggests that *individual issues, such as formulary preference or brand loyalty*, may impact whether a particular TPP would have switched from branded Wellbutrin XL to generic . . . in the but-for world, if a TPP did not actually purchase any generics.

*Id.* JA-362-363 (emphasis added).[54] Accordingly, plaintiffs could not prove their brand overcharge theory – the evidence did not show that entities that only reimbursed for brand purchases were impacted by the alleged delay.

The District Court did not consider these individualized issues, however, when it drew the mistaken "inference" that TPPs that reimbursed for generic Wellbutrin XL in a class state would also have done so had the generic been available earlier. Factual determinations "supporting Rule 23 findings,"

---

[54] Local 505 kept branded Wellbutrin XL 300 on formulary as a preferred drug, which means a lower cost, until at least May 2008. JA-40253 (Joskow IPP-Decl. ¶ 76 n.83).

including inferences, "must be made by a preponderance of the evidence." *Hydrogen Peroxide*, 552 F.3d at 307. The inference rests on several faulty assumptions rather than evidence put forward by the IPPs.

First, the inference assumes that the existing conditions that led a TPP to reimburse for a generic in the actual world would have been the *exact* same in the but-for world beginning in 2005. That assumption is at odds with the numerous variables that influence every prescription purchase, particularly for the many TPPs with a small number of purchases in the Class States. Determining impact requires examination of the formulary design in effect earlier in the Class Period (when the but-for purchase would have been made), which may have incentivized brand purchases notwithstanding availability of a generic, as shown by the evidence. JA-40252-53 (Joskow IPP-Decl. ¶¶ 76-77 & n.83) (discussing D&C 30 members facing same copay for generic and brand and Blue Cross Blue Shield of Alabama maintaining Wellbutrin XL 300 mg as a preferred drug post-generic entry); JA-39928 (BCBS-AL 2008 Preferred Brand Drug List). Other features of a formulary's structure, such as the use of step therapy (*e.g.*, the requirement that a plan member try and fail on a generic in a therapeutic category before a brand drug in that category will be covered), like that used here by Aetna, JA-39930 (Aetna National Pharmacy and Therapeutics Committee Minutes), also influence prescription choices and require analysis. *Wellbutrin SR*, No. 04-5898,

2010 WL 3855552, at *26 (E.D. Pa. Sept. 30, 2010) ("The impact of variable insurance plans affects whether many of the consumer plaintiffs suffered an injury . . . . [T]here are presumably significant numbers of third party payors and consumer plaintiffs, who, as a result of their applicable co-payment and co-insurance structures, did not suffer any out-of-pocket losses."). *See also Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 06-1833, 2015 WL 3623005, at *19 (E.D. Pa. June 10, 2015) (rejecting certification of indirect purchaser class because "when every class member has the potential to be a brand loyalist, a person with a flat copay . . . individualized inquiries would predominate.").

For example, named plaintiff Aetna Health of California, based on concerns throughout the industry that Teva's 300 mg product (manufactured by Impax) was not as safe and effective as the brand, *see supra* at Section II.A.2, grandfathered users of Wellbutrin XL on one of its formularies and did not require new patients receiving Wellbutrin XL prescriptions to first try generic Wellbutrin XL; rather, they could try another generic antidepressant. JA-39930 (Aetna National Pharmacy and Therapeutics Committee Minutes).

The court's inference also assumes that the insured consumer who bought a generic in the actual world (*i.e.*, after generic entry) would have been an insured of the TPP in the but-for world, or would have made the same choices as

the TPP's other members at that earlier time.[55]  The need to analyze "[s]uch specific evidence is incompatible with representative litigation."  *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 185 (3d Cir. 2014).

The District Court rested the inference on the 86 percent brand-to-generic conversion rate put forth by plaintiffs' economist, Professor Rosenthal. JA-360-61 (IPP Cert. Op.).  But, in the court's assessment of antitrust impact, it found that plaintiffs had not proven the reliability of Professor Rosenthal's application of the conversion rate as it applied to TPPs, particularly those with few purchases.  *Id.* at JA-362 ("Professor Rosenthal conceded that many TPPs had very few purchases in the six class states, and that such purchases are not fully independent.").[56]  The evidence showed that each purchase is not an independent event, *i.e.*, multiple prescriptions may be filled at once resulting from one choice of a single consumer, not several consumers making individual choices.  JA-40592

---

[55]    For example, if plan member A's only purchases are of brand 300 mg in 2006, and plan member B purchases a generic in 2010, the conduct of plan member B cannot be attributed to plan member A, thereby assuming the TPP suffered impact for plan member A's prescription.  As discussed, the actual experience of Local 505 shows that one could not assume that just because a TPP reimbursed for a generic in 2010 that it would have done so earlier in time.

[56]    Local 505 made 13 consecutive brand purchases; Professor Rosenthal's unreliable methodology views such an occurrence to be a virtual impossibility – at one in 100 billion.  JA-40597 (Defs. IPP Class Hearing Exhibits).

(Joskow IPP-Surrebuttal ¶ 10).  As a result, whether a TPP would in fact have had a generic purchase in the but-for world in place of the brand purchase it in fact made cannot be determined without an individualized consideration.

### B.  Determining Whether Entities Who Paid For Generic Wellbutrin Suffered Antitrust Impact Requires An Individualized Inquiry

Under the generic overcharge theory, plaintiffs contend that entities who paid for generic Wellbutrin XL after it entered the market would have paid less but for the alleged delay of the generic in entering the market.  Professor Rosenthal calculated lower but-for prices using a "yardstick," a methodology that estimates prices based on relationships or spreads between actual brand and generic prices.  Her methodology, however, conceals that some TPPs did not suffer antitrust impact for their purchases of generic.  JA-40246-51 (Joskow IPP-Decl. ¶¶ 71-74).

Professor Rosenthal never determined whether any individual members of plaintiffs' proposed class, including the named plaintiffs, were injured under the generic overcharge theory.  JA-40123-24 (Rosenthal Dep. 37:23-38:5).[57] Quite the contrary, plaintiff D&C 30 in all but one instance, paid *less* for generic Wellbutrin XL than Professor Rosenthal's but-for prices calculated for that time in

---

[57]    *See also* JA-40133 (Rosenthal Dep. 74:16-75:14) (conceding that she did not review any transactional data of three named plaintiffs or data relating to their reimbursements).

the class states. JA-40591 (Joskow IPP-Surrebuttal ¶ 8, Table 2). Plaintiffs never

proved that the experience of D&C 30, which plaintiffs claim is a typical

representative TPP, did not represent a significant portion of the IPP Class.

Because impact is intertwined with the merits (proof of an overcharge), the District

Court should have required proof that plaintiffs' methodology show injury to the

named plaintiffs. *Neale*, 794 F.3d at 370.

      Professor Rosenthal's use of a single yardstick masks the fact that

there are varying spreads between TPP reimbursements for branded and generic

Wellbutrin XL, reflecting individualized negotiations with PBMs and/or

pharmacies.[58] JA-40233 (Joskow IPP-Decl. ¶ 57). Without the use of numerous

yardsticks based on the varying prices and reimbursement arrangements, plaintiffs

cannot prove on a classwide basis whether there was an overcharge and, if so, how

much. JA-40234-40 (Joskow IPP Decl. ¶¶ 58-65); *see also Wellbutrin SR Antitrust

Litigation*, 2010 WL 3855552, at *30 ("Insurance plans vary across the class. . . .

The plaintiffs' use of average prices masks these individual variations. Just

because an average price was increased or decreased by the alleged foreclosure

does not mean that all members of the proposed class paid supra-competitive

---

[58]    *See Carrera*, 727 F.3d at 307 ("A defendant in a class action has a due
process right to raise individual challenges and defenses to claims, and a
class action cannot be certified in a way that eviscerates this right or masks
individual issues.").

prices . . . .").  In instances where courts have accepted the use of average prices, the economists "did much more" than compare simple averages, as Professor Rosenthal did.  *See In re Flonase Antitrust Litigation,* 284 F.R.D. 207, 229 (E.D. Pa. 2012) (distinguishing *Wellbutrin SR* because the *Flonase* plaintiffs' expert "did much more than simply compare a monthly average FP price in the actual and 'but-for' worlds").

The District Court's errors appear to have stemmed in part from a mistaken conclusion that Dr. Joskow's analysis of plaintiff D&C 30 failed to consider the downward trend of generic prices after generic entry and mistakenly thought his analysis was based on "contemporaneous prices."  JA-359 (IPP Cert. Op.).  The court conflated the D&C 30 analysis (actual generic payment was less than the but-for price) with the analysis of Aetna Health of California's data (actual brand payment was less than contemporaneous actual generic price).  JA-40262 (Joskow IPP-Decl. ¶ 88).  Dr. Joskow's pertinent analysis of D&C 30 did *not* compare two contemporaneous actual prices.  Rather, he compared the actual price paid by D&C 30 to Professor Rosenthal's "Applicable 'But-For' Price," which does account for the alleged "downward trend in generic prices over time," *see* JA-359-60 (IPP Cert. Op.); *see also* JA-40590-92 (Joskow Surrebuttal ¶¶ 8-9, Table 2).

Therefore, the District Court should have held that plaintiffs could not prove their generic overcharge theory on a classwide basis.

## XXII. CONCLUSION

Accordingly, the decertified IPP Class cannot satisfy the predominance requirement.

Respectfully Submitted,

Dated:   May 3, 2016   By:   */s/ Stephen J. Kastenberg*

Leslie E. John
Edward D. Rogers
Stephen J. Kastenberg
Jason A. Leckerman
Jessica M. Anthony

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline plc*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface font, Times New Roman font, 14 point.

2.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 28.1(e) because it contains 32,909 words as permitted by this Court's Order dated April 20, 2016, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

3.  I certify that the electronic version of this brief is identical to the paper copies that were hand-delivered to the Clerk of Court.

4.  This electronic brief was analyzed for computer viruses using System Center Endpoint Protection 4.3.220.0.  No computer virus was found.

Dated:   May 3, 2016          By:  */s/ Stephen J. Kastenberg*
Stephen J. Kastenberg
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline plc*

# CERTIFICATE OF BAR MEMBERSHIP

I, Stephen J. Kastenberg, certify pursuant to 3d Cir. LAR 46.1 that I

am a member of the bar of this Court.

Dated: <u>May 3, 2016</u>     By:  <u>*/s/ Stephen J. Kastenberg*</u>

Stephen J. Kastenberg
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline plc*

# CERTIFICATE OF SERVICE

I hereby certify that on this date I served a true and correct copy of the

Consolidated Brief of Appellees/Cross Appellants SmithKline Beecham

Corporation d/b/a GlaxoSmithKline and GlaxoSmithKline plc via the Court's

CM/ECF system and electronic mail upon all counsel of record.


Dated:  May 3, 2016          By:  */s/ Marcel S. Pratt*

Marcel S. Pratt
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline plc*

**FILED UNDER SEAL**

**Nos. 15-3559, 15-3591, 15-3681 & 15-3682**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

*On Appeal from the United States District Court
for the Eastern District of Pennsylvania*

Case Nos. 08-cv-2431, 08-cv-2433

**CONSOLIDATED REPLY BRIEF OF
APPELLEES/CROSS-APPELLANTS**

Dated: July 25, 2016

Leslie E. John
Edward D. Rogers
Stephen J. Kastenberg
Jason A. Leckerman
Jessica M. Anthony

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants
SmithKline Beecham Corporation d/b/a
GlaxoSmithKline and GlaxoSmithKline plc*

Nos. 15-3559 & 15-3681

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

AETNA HEALTH OF CALIFORNIA, INC., et al.
on behalf of the Decertified Indirect Purchaser Class,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE
AND GLAXOSMITHKLINE PLC,

*Defendants-Appellees/Cross-Appellants*.

Nos. 15-3591 & 15-3682

IN RE: WELLBUTRIN XL ANTITRUST LITIGATION

PROFESSIONAL DRUG COMPANY, INC., individually and on
behalf of the Direct Purchaser Class,

*Plaintiff-Appellant/Cross-Appellee*,

v.

SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE
AND GLAXOSMITHKLINE PLC,

*Defendants-Appellees/Cross-Appellants*.

# TABLE OF CONTENTS

Page

CONDITIONAL CROSS-APPEAL NO. 15-3682 (DIRECT PURCHASER PLAINTIFFS) ........................................................................... 1

I.     INTRODUCTION ........................................................................... 1

II.    ARGUMENT ................................................................................... 3

    A.    The DPPs Fail To Address The Impact That The Size Of Their Claims And Their Financial Resources Have On The Practicability Of Joinder ..................................................... 3

    B.    A 32-Member Class With Identified Members Is Not Sufficiently Numerous ......................................................... 7

    C.    The DPP Class Has Not Shown That The Geographic Location Of The Class Members And Promoting Judicial Economy Render Joinder Impracticable ............................................. 10

    D.    Plaintiffs' Antitrust Claims Do Not Ease Their Burden To Prove Numerosity ............................................................... 12

III.    CONCLUSION ............................................................................. 13

CONDITIONAL CROSS-APPEAL NO. 15-3681 (INDIRECT PURCHASER PLAINTIFFS) ........................................................... 13

I.     INTRODUCTION ......................................................................... 13

II.    ARGUMENT ................................................................................. 18

    A.    The IPPs Are Incorrect That GSK Needed To Raise a Daubert Challenge in Order To Argue That Professor Rosenthal's Testimony Was Insufficient To Meet the IPP's Burden To Prove That Class Certification Is Appropriate ................................... 18

    B.    The IPPs' Theories of Antitrust Impact Are Untenable .................... 22

        1.    The IPPs Are Unable to Defend the District Court's "Inference" ............................................................... 22

2. The Generic Overcharge Theory Is Unsound Because Average Prices Mask Variations ............................................. 26

C. The IPPs Incorrectly Contend That Their Class Can Survive If They Lack Proof That Antitrust Impact Can Be Shown Through Common Evidence ............................................................................ 28

III. CONCLUSION ............................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................ 2, 5, 6

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184, 1196 (2013) ................................................................ 29

*Ansari v. New York Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) ............................................................. 5

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ............................................................................. 12

*Block v. First Blood Ass'n*,
125 F.R.D. 39 (S.D.N.Y. 1989) .............................................................. 8

*Christiana Mortgage Corp. v. Delaware Mortg. Bankers Ass'n*,
136 F.R.D. 372, 378 (D. Del. 1991) ....................................................... 6

*Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co.*,
765 F.3d 1205 (10th Cir. 2014) ............................................................. 9

*Comcast Corp. v. Behrend*,
133 S.Ct. 1426 (2013) ........................................................................... 1

*Daniel v. American Bd. of Emergency Medicine*,
269 F. Supp. 2d 159 (W.D.N.Y. 2003) ................................................... 6

*Deen v. New Sch. Univ.*,
No. 05-7174, 2008 WL 331366 (S.D.N.Y. Feb. 4, 2008) ...................... 5

*Forde v. Waterman S.S. Corp.*,
No. 12-3396, 2013 WL 5309453 (S.D.N.Y. Sept. 18, 2013) ................. 8

*Hirsch v. CSX Transp., Inc.*,
656 F.3d 359 (6th Cir. 2011) ............................................................... 21

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................ 12, 13

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297, 325 (E.D. Mich. 2001) ............................................................6

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ...................................................................passim

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009) ...............................................................28

*In re Nexium (Esomeprazole) Antitrust Litig.*,
296 F.R.D. 47 (D. Mass. 2013) ............................................................9

*In re Prograf Antitrust Litig.*,
No. 11-cv-1034, 2013 WL 2395083 (D. Mass. Apr. 23, 2013) ..........................9

*In re TWL Corp.*,
712 F.3d 886 (5th Cir. 2013) ...............................................................8

*Leal v. Paramount Rests. Grp., Inc.*,
No. 12-38, 2013 WL 1363616 (N.D. Tex. Apr. 4, 2013)...................................8

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*,
149 F.R.D. 65 (D.N.J. 1993)...........................................................8, 9

*Mace v. Van Ru Credit Corp.*,
109 F. 3d 338 (1997)............................................................2

*Marcus v. BMW of N. Am.*,
LLC, 687 F.3d 583 (3d Cir. 2012)......................................................2

*Mullis v. Mountain State Univ., Inc.*,
No. 12-03158, 2014 WL 1276150 (S.D.W. Va. Mar. 27, 2014).........................5

*Mylan Pharma. Inc. v. Warner Chilcott Pub Ltd. Co.*,
No. 12-3824, 2014 WL 631031 (E.D. Pa. Feb. 18, 2014)...................................9

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) .............................................................17

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co., Inc.*,
772 F.3d 111 (2d Cir. 2014) ................................................3, 7, 8, 11

*Primavera Familienstiftung v. Askin*,
    178 F.R.D. 405 (S.D.N.Y. 1998) ...................................................................8

*Stoudt v. E.F. Hutton & Co., Inc.*,
    121 F.R.D. 36 (S.D.N.Y. 1988) ...................................................................5

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ...............................................................................22

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984) ........................................................................7

### FEDERAL STATUTES

28 U.S.C. § 1404(a) ......................................................................................12

28 U.S.C. § 1407 ..........................................................................................12

### OTHER STATUTES

Fla. Stat. Ann. § 465.025 ............................................................................25

N.Y. Educ. Law § 6816-a ...........................................................................26

Nev. Rev. Stat. Ann. § 639.2583 ...............................................................25

Tenn. Code Ann. § 53-10-205 ....................................................................25

Wis. Stat. Ann. § 450.13 .............................................................................26

### RULES

Fed. R. Civ. P. 20(a)(1) ..............................................................................12

Fed. R. Civ. P. 23(a)(1) .......................................................................passim

Fed. R. Civ. P. 23(b)(3) ........................................................6, 25, 28, 29

### OTHER AUTHORITIES

7A Charles Alan Wright et al., Federal Practice and Procedure § 1762 (3d
    ed. 2005) ......................................................................................................9

## CONDITIONAL CROSS-APPEAL NO. 15-3682

### (DIRECT PURCHASER PLAINTIFFS)

## I. INTRODUCTION

"The class action is an exception to the usual rule that litigation is
conducted by and on behalf of the individual named parties only." *Comcast Corp.
v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (internal quotation omitted). Federal
Rule of Civil Procedure 23 "reveals the legal system's preference that litigation be
conducted by present, joined, individual litigants rather than by class
representatives on behalf of class members." *Newberg on Class Actions*, 3:11
(referring to Fed. R. Civ. P. 23(a)(1)). Disregarding these principles, the direct
purchaser plaintiff class ("DPP Class") contends that their members are entitled to
bring their claims as a class because it is more convenient. The class certification
inquiry, however, does not hinge on convenience, but rather on the practicability of
joinder. The District Court erred in determining that joinder of the 32 identified
members of the DPP Class was impracticable.

The DPP Class is comprised of some of the nation's largest
corporations, many of which seek to recover millions of dollars in overcharges on
Wellbutrin XL purchases during the Class Period. These sophisticated
corporations with seven-figure damages claims differ starkly from the typical
claimants for whom the class action device was intended: plaintiffs who have low-

value claims relative to the high cost of individual litigation.  As the Supreme Court stated, "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F. 3d 338, 344 (1997)).  As the Court further explained, "[a] class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."  *See also id.* at 616 ("[A]mounts at stake for individuals may be so small that separate suits would be impracticable"); *Marcus v. BMW of N. Am.*, LLC, 687 F.3d 583, 594 (3d Cir. 2012) (class action device "creates greater access to judicial relief, particularly for those persons with claims that would be uneconomical to litigate individually.").  Members of the DPP Class have the financial means and incentive to pursue their claims individually and could easily facilitate joinder of their claims.  The amounts at issue are not so small that separate suits would be impracticable.

Notwithstanding that the DPP Class's significant resources and large claims weigh heavily against certification, the District Court focused its analysis primarily on the geographic location of the class members and concerns regarding judicial economy.  But geography is no impediment to the entities in the DPP class that do business all across the country and routinely file antitrust litigation outside

of their home states.  Nor is judicial economy a salient basis for class certification, as these entities have every incentive to coordinate their individual actions in joined litigation.  Indeed, the DPP Class members have resources to overcome any purported obstacles posed by geographical dispersion and judicial economy concerns.

Accordingly, this Court should vacate the District Court's order certifying the DPP Class.

## II.    ARGUMENT

### A.    The DPPs Fail To Address The Impact That The Size Of Their Claims And Their Financial Resources Have On The Practicability Of Joinder

The DPP Class does not deny that courts must consider the class members' financial resources and the size of their potential claims when assessing the practicability of joinder.  *See Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014).  These factors weigh heavily in favor of joinder and against class certification here.

The members of the DPP Class[1] stand in sharp contrast to the type of claimants that the class action device is intended to protect:  individuals with small

---

[1]    The District Court's analysis was based on the certification of a class with 33 members.  The DPP Class's reply brief refers to 32 class members because one class member, R&S Northeast LLC ("R&S"), opted out following certification.  Decl. Not. Administrator Concerning Delivery 2, No. 08-cv-2431 (E.D. Pa. Jan. 20, 2012) (ECF No. 416-1).

claims that are not economical to litigate individually.  Members of the DPP Class
are among the nation's largest corporations – and at least four of them have
revenues that exceed GSK's.  GSK Appellee Br. 121.  According to their own
allegations, the 32 members of the DPP Class have claims totaling ▮▮▮▮▮▮▮
Pls. Reply Br. 102 n.431.

Even though the District Court agreed that all of the DPPs had
"sufficient financial resources to pursue their own claims and that each member
could seek significant damages, if the claims are proven on the merits," it did not
assess how their financial resources and the size of their potential recoveries
affected the practicability of joinder.  JA-8.  This was reversible error.

Despite GSK's identification of several key features of the DPP Class
that militate in favor of joinder, the DPPs avoid addressing them in their opposition
brief.  Notably, the brief contains no mention of the Big Three wholesalers, *i.e.*,
those class members who each purchased over ▮▮▮▮▮▮ of brand Wellbutrin XL.
Nor do the DPPs acknowledge that the remaining members of their class averaged
over ▮▮▮▮▮▮ in purchases of brand Wellbutrin XL during the Class Period,
with the median purchase exceeding ▮▮▮▮▮▮  The DPP Class ignores these
critical facts, which underscore that class members have the financial resources
and potential for large recoveries that would support the practicability of joinder,
rendering class treatment inappropriate and unnecessary.

Instead, the DPP Class falsely attempts to portray their members as small plaintiffs, lamenting that "[f]ourteen class members had claims of less than ████████ and some class members "can expect only thousands of dollars in damages." Pls. Reply Br. 102. Plaintiffs file lawsuits every day for amounts much less than ████████ The DPP Class never offered any evidence that claims below the million dollar threshold would be uneconomical to litigate individually, nor that those class members lack the resources to litigate those claims. To the contrary, many courts have found that claims worth much less than ████████ and plaintiffs possessing fewer resources[3] supported the practicability of joinder.[4]

---

[2] *See Ansari v. New York Univ.*, 179 F.R.D. 112, 116 (S.D.N.Y. 1998) (finding that potential award of approximately $90,000 "is hardly the type of de minimis recovery that would discourage individual class members from joining [plaintiff's] lawsuit"); *Deen v. New Sch. Univ.,* No. 05-7174, 2008 WL 331366, at *4 (S.D.N.Y. Feb. 4, 2008) (finding potential damages award of up to $60,000 per individual as enough to incentivize suit and weigh against numerosity); *Mullis v. Mountain State Univ., Inc.*, No. 12-03158, 2014 WL 1276150, at *5 (S.D.W. Va. Mar. 27, 2014) (finding potential damages in excess of $60,000 as providing incentive to pursue individual actions).

[3] *Ansari*, 179 F.R.D. at 115 ("Each of the students that took part in the program is a licensed dentist who had the resources both to study abroad and to pay the $30,000 tuition for the program."); *see also Stoudt v. E.F. Hutton & Co., Inc.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (finding that Rule 23 was "not designed to permit large claimants, who are fully capable of proceeding on their own, to strengthen their bargaining position by threatening their adversaries with the prospect of class-wide relief.").

[4] The cases that the DPP Class cites are inapposite. The DPP Class partially quotes a sentence from *Amchem Products, Inc. v. Windsor* because the

Moreover, plaintiffs ignore that the antitrust laws provide treble damages and

attorneys' fees to prevailing plaintiffs precisely to incentivize suits and reduce the

burden on litigants. *Christiana Mortgage Corp. v. Delaware Mortg. Bankers*

*Ass'n*, 136 F.R.D. 372, 378 (D. Del. 1991) (noting that the availability of treble

damages and attorneys' fees in antitrust actions may make the certification of a

class inappropriate, because every class member has an incentive to enter into their

own action); *see also Daniel v. American Bd. of Emergency Medicine*, 269 F.

Supp. 2d 159, 205 n.19 (W.D.N.Y. 2003) (noting cases where the mere request of

treble damages "was held to place the action outside the parameters of class

certification.").

Indeed, here, the class members have demonstrated that they do not

need the class mechanism. Three of those class members initiated the litigation.[5]

---

complete principle undermines its position. 521 U.S. 591, 617 (1997). The complete quote states: "While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, *the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'*" *Id.* (emphasis added) (citations omitted). Further, the statement in *In re Cardizem CD Antitrust Litig.* regarding the presence of large claimants in the class membership related to the superiority requirement in Rule 23(b)(3), not numerosity. 200 F.R.D. 297, 325 (E.D. Mich. 2001).

[5] One of the named plaintiffs, Meijer, Inc., initiated the litigation with an assignment from one of the class members. Case No. 2:08-cv-02431(E.D. Pa. May 23, 2008)(ECF No. 1 ¶ 13).

One putative class member, R&S, opted out following certification. Decl. Not.

Administrator Concerning Delivery 2, No. 08-cv-2431 (E.D. Pa. Jan. 20, 2012),

ECF No. 416-1. R&S had the *lowest* claim of all the direct purchasers in the

certified class. JA-39790 (Joskow Decl., Table 2). The District Court excluded

from the class the two purchasers on Dr. Joskow's list, Allied Med Wholesale

Drug Co. and Goodwin Drug Co., because they did not purchase generic

Wellbutrin XL when it became available. R&S opting out of the class renders

joinder even more practicable because it removes the claimant with the smallest

claim from the analysis. It also disproves class plaintiffs' premise that a class

action is necessary to protect the rights of the members of the class with the

smallest claims that they presuppose would lack incentive to act on their own.

**B.** **A 32-Member Class With Identified Members Is Not Sufficiently Numerous**

The DPP Class contends that "[a] 32-member class is sufficiently

numerous to render joinder impracticable," Pls. Reply Br. 96, but this

misconceives the proper inquiry, which is whether joinder is impracticable based

on the specific circumstances of the case. As this Court has held, "no hard and fast

number rule can or should be stated" with respect to satisfying numerosity and

"numbers between twenty-one and forty have evoked mixed responses." *Weiss v.*

*York Hosp*., 745 F.2d 786, 808 n.35 (3d Cir. 1984). "[T]he numerosity inquiry is

not strictly mathematical but must take into account the context of the particular

case." *Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 772 F.3d at 120.  Indeed, the

Court of Appeals for the Second Circuit has found that the existence of over 100

potential class members did not satisfy the numerosity requirement where, like

here, "the class was limited and identifiable, and composed of sophisticated [ ]

investors, all of whom had millions of dollars at stake and were able to pursue their

own claims." *Id.; see also In re TWL Corp.*, 712 F.3d 886, 894-95 (5th Cir. 2013)

(denying certification to a class of 130 members); *Leal v. Paramount Rests. Grp.,*

*Inc.*, No. 12-38, 2013 WL 1363616, at *2 (N.D. Tex. Apr. 4, 2013) (refusing to

certify a potential class of at most 33 members).

Plaintiffs, in particular, overlook the importance of their ability to

identify class members.  They ignore the cases where joinder has been found

practicable when named plaintiffs have the ability to contact absent class members

and have knowledge of class members' locations.  *See also Block v. First Blood*

*Ass'n*, 125 F.R.D. 39, 43 (S.D.N.Y. 1989); *Liberty Lincoln Mercury, Inc. v. Ford*

*Mktg. Corp.*, 149 F.R.D. 65, 74 (D.N.J. 1993) (finding joinder to be more

practicable where plaintiff has knowledge of name and address of class members).

Some courts have even called this information the "most important" factor

regarding numerosity, because its existence renders joinder practicable.  *Forde v.*

*Waterman S.S. Corp.*, No. 12-3396, 2013 WL 5309453, at *6 (S.D.N.Y. Sept. 18,

2013) (quoting *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410-11

(S.D.N.Y. 1998)).  By contrast, impracticability results from the difficulty

associated with identifying and locating class members whose contact information

is unknown.  *See Liberty Lincoln*, 149 F.R.D. at 74 (finding known and readily

identifiable information regarding class members to make joinder more

practicable); *Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co*.,

765 F.3d 1205, 1215 (10th Cir. 2014) (finding that unknown class members would

have difficulty utilizing joinder).  Here, the identities and locations of the 32 class

members are known, JA-39142 (Leitzinger Decl., Ex. 3), facilitating joinder.

   The DPP Class's principal argument is that classes even smaller than

its class have been certified before, Pls. Reply Br. 96, but that proves nothing

because, as pointed out above and in GSK's opening brief, courts have also refused

to certify classes *larger* than the proposed class in this case.  *See* 7A Charles Alan

Wright et al., Federal Practice and Procedure § 1762 (3d ed. 2005) (collecting

cases in which numerosity was satisfied with as few as 25 putative class members,

but not satisfied with as many as 350, and explaining that this inconsistency

"graphically demonstrates that caution should be exercised in relying on a case as a

precedent simply because it involves a class of a particular size").[6]  Although there

---

[6] The purported generic delay opinions that the DPP Class cites are all
unhelpful to the Class.  Pls. Reply Br. 96 n.409.  One opinion involved
certification of a settlement class, *Mylan Pharma. Inc. v. Warner Chilcott
Pub Ltd. Co.*, No. 12-3824, 2014 WL 631031 (E.D. Pa. Feb. 18, 2014), and
the decisions in the other two cases, *In re Nexium (Esomeprazole) Antitrust*

is no magic number under the case law, there is a salutary principle that applies: a 32-member class does not satisfy the numerosity requirement where the location and identity of each of its class members is known.

### C. The DPP Class Has Not Shown That The Geographic Location Of The Class Members And Promoting Judicial Economy Render Joinder Impracticable

The District Court found that joinder was impracticable based on assumptions that members of the DPP Class would have difficulty coordinating the litigation because they were located in different states and there was potential for discovery disputes, schedule extensions, and delays in the case. JA-7-8. No evidence supports these assumptions.

To the contrary, GSK's opening brief illustrated how direct purchasers (*i.e.*, drug wholesalers) routinely file pharmaceutical antitrust cases in jurisdictions far from their home states, including the three direct purchasers who initiated the *Wellbutrin XL Antitrust Litigation*. GSK Appellee Br. 125-26. The named

---

*Litig.*, 296 F.R.D. 47 (D. Mass. 2013); *In re Prograf Antitrust Litig.*, No. 11-cv-1034, 2013 WL 2395083 (D. Mass. Apr. 23, 2013), like the District Court's decision here, failed to analyze the impact of the class members' sophisticated nature and high-value claims, and afforded too much weight to factors such as geographic dispersion and judicial economy. None of those courts examined in any detail the central question: why a group of sophisticated plaintiffs claiming, on average, overcharges on ████████ ████████ in purchases could not institute their own suits and join in coordinated litigation?

plaintiffs' own conduct proves that geographic location is no impediment to joinder.  The DPP Class declined to address this point in their brief.

The DPP Class's principal argument is that denying certification would result in "32 individual cases spread across the country"[7] and would risk "duplicative, separate trials that could result in inconsistent verdicts."  Pls. Reply Br. 98-99.  This argument grossly misconstrues this aspect of the numerosity inquiry; the question is whether the geographic locations of the class members render *joinder* impracticable.  Contrary to the DPP Class's contention, joinder would avoid the need for duplicative trials and obviate the risk of inconsistent verdicts.  Indeed, courts have held that factors facilitating joinder, such as the existence of an identifiable class of sophisticated parties, outweigh any concern raised by geographic dispersion.  *See*, *e.g.*, *Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 772 F.3d at 120.

The DPP Class's arguments regarding judicial economy fail for similar reasons.  The DPP Class claims that joinder "invites each class member (who can afford it) to bear . . . expenses, reopen document and deposition discovery, and retain its own counsel – all at the expense of judicial economy."  Pls. Reply Br. 99.  Nothing in the record suggests that members of the class would

---

[7]      The DPP Class neglects to note that one-third of their members are in Pennsylvania and Ohio.  JA-39142 (Leitzinger Decl., Ex. 3).

attempt to litigate the cases individually, and this assumption defies common sense.  The DPP Class also underestimates the abilities of district courts to encourage coordination among a group of plaintiffs asserting identical claims, utilizing the tools available to them, including the Federal Rules, *see* Fed. R. Civ. P. 20(a)(1), and the venue transfer and Multidistrict Litigation statutes, *see* 28 U.S.C. §§ 1404(a), 1407.

### D.  Plaintiffs' Antitrust Claims Do Not Ease Their Burden To Prove Numerosity

The DPP Class suggests that plaintiffs seeking to bring class actions under the antitrust laws should receive special treatment because of the "importance of class actions to antitrust enforcement."  Pls. Reply Br. 100.[8]  They cite no authority to support an antitrust exception for class certification, and none exists.  In contrast, as discussed above, the antitrust laws provide incentives to entities to bring suit by providing a prevailing plaintiff with treble damages and attorneys' fees and costs.  This is ample incentive for private enforcement of the antitrust laws.  There is no evidence that Congress intended the class action device as an additional incentive.

---

[8]     Plaintiffs' argument ignores that the Supreme Court has repeatedly warned of the dangers of certifying classes without assuring that the procedural safeguards established by the Federal Rules are met.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (observing the risk of "in terrorem" settlements that class actions entail).

In a related vein, the DPP Class contends that denying class certification would thwart the deterrence goals of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Pls. Reply Br. 101.  But *Illinois Brick* had nothing to do with class actions; it simply held that indirect purchasers cannot bring damages claims under the federal antitrust laws.  The "deterrence goals" served by the antitrust laws are not undermined by joinder of class members who on average can assert claims based on over ████████ in purchases.

## III.    CONCLUSION

Accordingly, the DPP Class cannot satisfy the numerosity requirement.

## CONDITIONAL CROSS-APPEAL NO. 15-3681

### (INDIRECT PURCHASER PLAINTIFFS)

## I.    INTRODUCTION

The decertified indirect purchaser class ("IPPs") should remain uncertified because, in addition to the ascertainability issues fully briefed in Appeal No. 15-2875, each of the theories of antitrust impact that the IPPs presented—the so-called branded overcharge and generic overcharge theories—suffered from economic and legal infirmities.

This Court articulated the guiding principle in *In re Hydrogen Peroxide Antitrust Litig.*:

> [T]he task for plaintiffs at class certification is to
> demonstrate that the element of antitrust impact is
> capable of proof at trial through evidence that is common
> to the class rather than individual to its members.
> Deciding this issue calls for the district court's rigorous
> assessment of the available evidence and the method or
> methods by which plaintiffs propose to use the evidence
> to prove impact at trial.

552 F.3d 305, 311-12 (3d Cir. 2008).  The District Court rejected the method by

which plaintiffs proposed to prove impact at trial, concluding that "admissions [by

their expert, Professor Rosenthal] undermine the reliability of her method to

demonstrate antitrust impact for [third party payors ("TPPs")] without showing

that the TPP purchased extended-release bupropion hydrochloride . . . ."  JA-362.

Despite rejecting  plaintiffs' proffered method to show impact, the District Court,

nevertheless, certified the class by redesigning the class definition to require that a

TPP that purchased brand Wellbutrin XL in a class state also have purchased

generic in that same state after it became available, concluding that "it is a

reasonable inference that these entities [which purchased generics in the actual

world] would have purchased [generic] extended-release bupropion hydrochloride

in the 'but for world.'"  JA-363.  However, the IPPs never offered any evidence to

support such an assumption and, indeed, the very evidence that led the District

Court to reject plaintiffs' proffered method of impact demonstrates that such an

assumption is unfounded.

The IPPs presented theories for impact for purchases of branded Wellbutrin XL and generic Wellbutrin XL. The IPPs' branded overcharge theory is that TPPs, many of whom had very few purchases of branded Wellbutrin XL in the six class states, would have purchased the generic versions had it been available earlier and that such TPPs were overcharged by purportedly paying more for the brand than they would have paid for the generic. In analyzing the branded overcharge theory, the District Court first found "there may be significant individual issues for class members regarding whether an individual TPP suffered antitrust impact." JA-362. These "individual issues, such as formulary preference or brand loyalty," impacted decision-making for drug purchasing and may have led a TPP's members to continue to purchase the brand after the generic becomes available. JA-363. Yet the court relied on the assumption that evidence of one generic purchase in the actual world was evidence that the TPP would have paid for a generic in the but-for world. Because plaintiffs offered no support for this assumption, the court erred in relying on it to show class-wide impact.

The IPPs' generic overcharge theory of antitrust impact is that TPPs would have paid less for generic versions of Wellbutrin XL had those versions been available earlier. The District Court approved this theory by misinterpreting the testimony of GSK's expert, Dr. Joskow. That testimony showed how the use of average prices hid that many TPPs paid less for generic Wellbutrin XL in the

actual world than in the but-for world constructed by IPPs' expert, Professor Rosenthal. The court mistakenly thought that Dr. Joskow compared contemporaneous prices, which would not account for downward trend in generic prices, when his analysis was in fact based on Dr. Rosenthal's but-for prices that accounted for that trend.

Much of the IPPs' third-step brief fails to engage GSK's cross-appeal on the merits. Their opening argument is that GSK is precluded from arguing that the District Court erred by finding that Professor Rosenthal's testimony was sufficient to support class certification because GSK never lodged a *Daubert* challenge. This contention contradicts well-established law and confuses the admissibility of evidence with its sufficiency. GSK need not raise a *Daubert* challenge to argue that evidence failed to satisfy plaintiffs' burden of proof. Indeed, based on GSK's challenges to the sufficiency of the evidence, the District Court itself found that key admissions by Professor Rosenthal undermined the reliability of her analyses.

With regard to the IPPs' branded overcharge theory of impact, instead of offering support from the record for the District Court's inference that a brand purchase in the actual world would have been a generic purchase in the but-for world, the IPPs offer a *post-hoc* rationale that generic substitution laws support the inference, even though the District Court's opinion did not reference those laws.

An examination of those laws, however, shows exactly why they were unimportant to the District Court: they do not override the influences of formulary preference, brand loyalty, or consumer choice, all of which could drive purchases of the brand.

With regard to the generic overcharge theory of impact, the IPPs do not explain how the record supports the conclusion the District Court drew from Dr. Joskow's testimony. Nor do they explain Professor Rosenthal's failure to determine whether any individual members of the IPP class, including the named plaintiffs, were injured under that theory. The IPPs overlook the significance of named plaintiff D&C 30, which paid less than Professor Rosenthal's but-for price in all but one instance. The example shows how her analysis masks meaningful variations in price and how individualized inquiry is necessary to determine impact. As the Third Circuit has said, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001).

Lastly, the IPPs submit that even if GSK is correct that they cannot prove antitrust impact through common evidence, the Court should still endorse class certification. This Court's decision in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008), squarely rejects that argument.

## II.    ARGUMENT

### A.    The IPPs Are Incorrect That GSK Needed To Raise A *Daubert* Challenge In Order To Argue That Professor Rosenthal's Testimony Was Insufficient To Meet The IPP's Burden To Prove That Class Certification Is Appropriate

The branded overcharge theory that the IPPs put forth to support class certification claimed that antitrust impact was suffered by all TPPs that purchased the brand product in one of the six class states.  The premise of this theory is Professor Rosenthal's opinion that these TPPs would have undoubtedly purchased generics in the but-for world if they had been available.  JA-362.  In reaching that opinion, Professor Rosenthal relied on a probability analysis, in which she calculated that the likelihood that any potential class member TPP with only 10 claims for the brand would have had no generic claims in the but-for world to be 3 in one billion.  In other words, Professor Rosenthal's probability analysis posited that it was statistically nearly impossible that a TPP with as few as 10 purchases would not have purchased the generic.

In contrast to this analysis, GSK pointed to the experience of named plaintiff  Local 505—who as a class member purports to be a "typical" member of the class—whose members made 13 consecutive purchases of the brand in the two-year period after generic entry during which time its members made no corresponding purchases of the generic.  Despite Professor Rosenthal's analysis that there was only a three in one billion chance that this could happen, the

purchases of the brand persisted for years after generic entry because Local 505 contracted with Blue Cross Blue Shield of Alabama for pharmacy benefits, which kept the brand on its preferred drug list for years after generic entry, during which period Local 505's members continued to purchase the brand.

The court found the experience of plaintiff Local 505 suggested that there may be "significant individual issues . . . regarding whether an individual TPP suffered antitrust impact." JA-362. Professor Rosenthal's probabilistic analysis stood in stark contrast to the experience of Local 505 because, as the District Court correctly found, that analysis was flawed. The court expressly observed that two admissions undermined the reliability of Dr. Rosenthal's opinion. First, Dr. Rosenthal admitted that "many TPPs had very few purchases in the six class states." JA-362. A probability analysis relies on a certain threshold number of events (here, purchases) to be valid.

Second, Professor Rosenthal admitted that a key assumption underpinning her probability analysis—that each purchase was an independent event—was not true in real life (where a number of purchases by a TPP may be, for example, a single insured refilling a prescription, rather than different insureds purchasing the drug). After noting that these issues undermined the reliability of Professor Rosenthal's analysis, the District Court held that it was "not persuaded that the plaintiffs have shown by a preponderance of the evidence that antitrust

impact under a given state's law can be demonstrated for every TPP class member without showing that the TPP purchased generics in that state after generics became available." JA-362. The District Court further held that "individual issues, such as formulary preference or brand loyalty," may have impacted whether a particular TPP would have switched from brand to the generic. JA-363. A TPP facing a formulary that maintains preferred treatment for the brand or has a brand-loyal consumer base does not suffer antitrust impact because the TPP would not have paid for the generic even if it was available earlier. In other words, without individualized inquiry, Plaintiffs could not rule out that the brand-only purchasing patterns were due to formulary design or the prevalence of brand loyalism.

Those same "individual issues" should have also precluded the court from inferring that TPPs who paid for at least one generic in a Class State would have done the same in the but-for world. GSK Appellee Br. 131. After finding Professor Rosenthal's probability analysis unreliable, the court engrafted this supposed fix to save the IPP's class despite the lack of record support for it. Just because a TPP made one generic purchase at one point in time in the actual world does not mean the same circumstances that caused that purchase would have been present in the but-for world. The District Court, however, drew an "inference" that a TPP with one actual generic purchase would have purchased the generic in the

but-for world based on the same analysis by Professor Rosenthal that it found

unreliable for the TPPs who only paid for the brand.

The IPPs incorrectly assert that GSK is now precluded from arguing

that the District Court erred by accepting Professor Rosenthal's methodology

because it did not file a *Daubert* motion. The IPPs conflate the admissibility of

evidence with its sufficiency. *See Hydrogen Peroxide,* 552 F.3d at 323 (3d Cir.

2008); *Hirsch v. CSX Transp., Inc*., 656 F.3d 359, 362 (6th Cir. 2011). GSK

argued at great length below—and indeed presented the very critiques the court

accepted—that Professor Rosenthal's method of impact was insufficient. JA-

40218-27, JA-40252-54 (Joskow Decl.).

The IPPs also misstate GSK's argument. GSK is not arguing on

appeal that the District Court committed "legal error in admitting [Professor

Rosenthal's] analysis," Pls. Reply Br. 105, but rather that the IPPs failed to satisfy

the predominance requirement of Rule 23 because Professor Rosenthal's opinions

were insufficient to establish impact and ignore the factors that influence

prescription drug purchasing.

Moreover, the IPPs fundamentally misunderstand the role of district

courts in analyzing expert testimony. An expert's testimony need not be deemed

inadmissible under *Daubert* for a party to argue as GSK did below, or for a court to

hold, that it does not satisfy the burden for class certification. As this Court stated

in *Hydrogen Peroxide*, "opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason." 552 F.3d at 323 (citations omitted). Indeed, "[l]ike any evidence, admissible expert opinion may persuade its audience, or it may not . . . . The district court may be persuaded by the testimony of either (or neither) party's expert with respect to whether a certification requirement is met." *Id.*[9] Here, GSK argued at great length below that Professor Rosenthal's analysis was insufficient to meet the IPP's burden; thus, IPP's argument that GSK cannot raise that issue on appeal is baseless.

## B. The IPPs' Theories of Antitrust Impact Are Untenable

### 1. The IPPs Are Unable to Defend the District Court's "Inference"

The District Court's unsupported inference that a generic purchase in the actual world would necessarily also have occurred in the but-for world, *see supra*, was erroneous because it incorrectly assumes that the conditions that led a

---

[9] The IPPs' reliance on *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016), is misplaced. The cited portion of *Tyson Foods* stands for the unremarkable proposition that once a district court deems evidence admissible, it can still deny certification if no reasonable fact finder would believe the evidence. Here, the record shows that the same individual issues (*e.g.*, formulary design, consumer preference and brand loyalty) that prevented the District Court from finding that certain TPPs suffered impact should have also precluded the District Court from adopting the unsupported inference that one generic purchase in the actual world equates to a generic purchase in the but-for world.

TPP to reimburse for a generic in the actual world would have been the exact same in the but-for world. But determining impact for the purchases of brand and generic Wellbutrin XL requires, among other things, individualized examination of the formulary designs that were in effect years earlier in the Class Period (*i.e.*, when the but-for purchase would have been made), which may have incentivized brand purchases notwithstanding availability of a generic. For example, a TPP could be a class member even if its first purchase of a generic in a given state was as late as 2010 or 2011. Yet plaintiffs bear the burden of showing that such a TPP would have purchased a generic back in 2006 (for the 300 mg) or 2007 (for the 150 mg). That cannot simply be assumed. One would need to know why the TPP did not have generic purchases until relatively late. Depending on the explanation— which can only be determined through an individualized analysis—it may or may not make sense to conclude that its plan members would have switched to a generic back in 2006 or 2007. For instance, if a TPP changed its policy in 2010 to increase the co-pay premium for branded Wellbutrin XL (relative to the generic), that would increase the incentive to buy the generic. But, the fact that a plan member bought the generic in 2010 cannot show, by itself, that this plan member or any other would have bought a generic in 2006 given the plan economics in existence at that time. These are individualized inquiries, as the Court recognized. JA-361-62 ("The example of Local 505 suggests that individual issues, such as

formulary preference or brand loyalty, may impact whether a particular TPP would have switched from branded Wellbutrin XL to generic . . . Wellbutrin XL . . . .").

The IPPs do not dispute this point. Nor do they respond to GSK's illustration that the formularies of named plaintiffs incentivized brand purchasing during the Class Period. *See* GSK Appellee Br. 134 (citing JA-40252-53 (Joskow IPP-Decl. ¶¶ 76-77 & n.83) (discussing D&C 30 members facing same copay for generic and brand and Blue Cross Blue Shield of Alabama, the PBM of Local 505, maintaining Wellbutrin XL 300 mg as a preferred drug post-generic entry); JA-39928 (BCBS-AL 2008 Preferred Brand Drug List)). In addition, the District Court's inference is undermined by record evidence showing that a TPP's purchases and reimbursements are subject to a complex system of payment that depends upon a host of other factors that wholesalers do not face, such as individual consumer preferences, contracts with pharmacy benefit managers, and the location of the pharmacy where the prescription is filled, among other things. JA-39928 (Blue Cross and Blue Shield of Alabama Preferred Brand Drug List), JA-39930 (AETNA National Pharmacy and Therapeutics Committee Meeting Minutes), JA-40252-53 (Joskow Decl. ¶ 76).

In short, IPPs fail to point to anything in the record to support the court's "inference." It was reversible error for the court to rely on this inference, supported only by an assumption, to grant class certification. *Hydrogen Peroxide*,

552 F.3d at 321 (citation omitted) ("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification." (quoting Fed. R. Civ. P. 23(b)(3))).

In lieu of relying on record evidence, the IPPs attempt to justify the inference by claiming that five of the six Class States have mandatory generic substitution laws that required pharmacies to substitute generics for brand prescriptions at the pharmacy counter, none of which the District Court cited in its opinion. Pls. Reply Br. 110. This *post-hoc* justification is irrelevant; generic substitution laws do not diminish the impact that formularies have on consumer decision-making and TPP reimbursements. If a consumer knows that the brand maintained a preferred status on his or her formulary and is available at a lower cost, the consumer can still obtain the brand at the pharmacy (as happened with the insured members of named plaintiff Local 505). Indeed, under Tennessee's generic substitution law, "[i]f a pharmacist has reason to believe that the brand name drug or drug product is less expensive to the patient or patient's drug plan than the generic equivalent, the pharmacist shall fill the prescription with the brand name drug or drug product." Tenn. Code Ann. § 53-10-205; *see also* Fla. Stat. Ann. § 465.025 (requiring pharmacist to explain price differential to consumer and allowing consumer to refuse substitution); Nev. Rev. Stat. Ann. § 639.2583 ("If a person refuses to accept the drug that the pharmacist intends to dispense in

substitution, the pharmacist shall dispense the drug prescribed by brand name."); Wis. Stat. Ann. § 450.13 (allowing substitution only if it is "lower cost"; not precluding consumer from refusing substitution); N.Y. Educ. Law § 6816-a (requiring substitution only if product is "less expensive"; not precluding consumer from precluding substitution). Thus, generic substitution laws do not support the District Court's inference, and therefore the IPP's *post-hoc* invocation of these laws cannot save their branded overcharge theory.

### 2. The Generic Overcharge Theory Is Unsound Because Average Prices Mask Variations

Under the generic overcharge theory, the IPPs contend that entities who paid for generic Wellbutrin XL after it entered the market would have paid less but for the alleged delay of the generic in entering the market. In response to GSK's arguments, the IPPs simply restate the District Court's holding regarding Professor Rosenthal's use of average prices. Pls. Reply Br. 112. The IPPs ignore Professor Rosenthal's failure to determine whether any individual members of plaintiffs' proposed class, including the named plaintiffs, were injured under the generic overcharge theory. JA-40123-24 (Rosenthal Dep. 37:23-38:5).

GSK's expert, Dr. Joskow, analyzed plaintiff D&C 30's purchase data in order to demonstrate how average prices can mask that TPPs paid less in the actual world than the but-for price. Dr. Joskow looked at each price per tablet that D&C 30 paid for generic Wellbutrin XL in a class state and compared that actual

price to Professor Rosenthal's applicable but-for price. JA-40590-91 (Joskow Surrebuttal ¶¶ 8-9, Table 2). In all but one instance, D&C 30 paid less for generic Wellbutrin XL than Professor Rosenthal's but-for prices calculated for that time in the class states. *Id*. For example, Dr. Joskow found that D&C 30 paid ████ per tablet for the generic on August 11, 2008, when Professor Rosenthal's but-for price for that purchase is ████ *Id.* In declining to accept Dr. Joskow's opinions, the District Court mistakenly concluded that he failed to consider the downward trend of generic prices after generic entry and mistakenly thought his analysis was based on "contemporaneous prices," which would be inappropriate for the generic overcharge analysis. JA-359.[10] Notably, the IPPs, in their brief, fail to address GSK's argument that the court made this mistake.

The IPPs claim that because D&C 30 paid more than the but-for price for only one generic prescription, that purchase is proof of antitrust impact and the experience of D&C 30 proves nothing. The IPPs miss the point entirely. The point of the D&C 30 example is not that it suffered no impact (even though it fared much better in the actual world than it would have in the but-for world). Rather, it

---

[10]    As GSK explained in its opening brief, Dr. Joskow's analysis of D&C 30 did not compare two contemporaneous actual prices, as the District Court thought. Rather, he compared the actual price paid by D&C 30 to Professor Rosenthal's "Applicable 'But-For' Price," a price that does account for the alleged "downward trend in generic prices over time." GSK Appellee Br. 139.

shows just how much Professor Rosenthal's use of average prices can mask meaningful variations in prices and why individualized inquiry is necessary to determine antitrust impact.

## C. The IPPs Incorrectly Contend That Their Class Can Survive If They Lack Proof That Antitrust Impact Can Be Shown Through Common Evidence

The IPPs also claim that a class of antitrust plaintiffs can be certified even if "[i]ndividualized proof" is required to prove antitrust impact. Pls. Reply Br. 113. This argument flies in the face of well-established precedent in this Circuit.

The law of this Circuit is that "the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual." *Hydrogen Peroxide*, 552 F.3d at 311; *id.* ("In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof.") (citations and internal quotations omitted); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 268 (3d Cir. 2009) ("In the context of class certifications, we have stated that 'impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s

28

predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof.'") (citations omitted).[11]

## III.   CONCLUSION

Accordingly, the decertified IPP Class cannot satisfy the predominance requirement.

Respectfully Submitted,

Dated:   July 25, 2016      By:   */s/ Stephen J. Kastenberg*
Leslie E. John
Edward D. Rogers
Stephen J. Kastenberg
Jason A. Leckerman
Jessica M. Anthony

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500

*Counsel for Appellees/Cross-Appellants*
*SmithKline Beecham Corporation d/b/a*
*GlaxoSmithKline and GlaxoSmithKline plc*

---

[11]   The IPPs misinterpret the principle in *Amgen Inc. v. Conn. Ret. Plans & Trust Funds* that Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim is susceptible to classwide proof.' What the rule does require is that common questions 'predominate over any questions affecting only individual [class] members.'"  133 S. Ct. 1184, 1196 (2013) (emphasis in original).  *Amgen*, while not an antitrust case, still requires that common questions predominate over individual ones with respect to antitrust impact.

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface font, Times New Roman font, 14 point.

2.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 28.1(e) because it contains 6,954 words as permitted by this Court's Order dated July 13, 2016, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

3.     I certify that the electronic version of this brief is identical to the paper copies that were hand-delivered to the Clerk of Court.

4.     This electronic brief was analyzed for computer viruses using System Center Endpoint Protection 4.3.220.0.  No computer virus was found.


Dated:   July 25, 2016           By:   */s/ Stephen J. Kastenberg*
                                     Stephen J. Kastenberg
                                     **BALLARD SPAHR LLP**
                                     1735 Market Street, 51st Floor
                                     Philadelphia, PA 19103
                                     Telephone: (215) 665-8500

                                     *Counsel for Appellees/Cross-Appellants*
                                     *SmithKline Beecham Corporation d/b/a*
                                     *GlaxoSmithKline and GlaxoSmithKline plc*

## CERTIFICATE OF BAR MEMBERSHIP

I, Stephen J. Kastenberg, certify pursuant to 3d Cir. LAR 46.1 that I

am a member of the bar of this Court.


Dated:  July 25, 2016          By:  /s/ Stephen J. Kastenberg
                                     Stephen J. Kastenberg
                                     **BALLARD SPAHR LLP**
                                     1735 Market Street, 51st Floor
                                     Philadelphia, PA 19103
                                     Telephone: (215) 665-8500

                                     *Counsel for Appellees/Cross-Appellants*
                                     *SmithKline Beecham Corporation d/b/a*
                                     *GlaxoSmithKline and GlaxoSmithKline plc*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served a true and correct copy of the

Consolidated Brief of Appellees/Cross Appellants SmithKline Beecham

Corporation d/b/a GlaxoSmithKline and GlaxoSmithKline plc via the Court's

CM/ECF system and electronic mail upon all counsel of record.

Dated:   July 25, 2016        By:  */s/ Barbara A. Schwartz*

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500