# Exhibit A

## Fully Redacted

EXHIBIT B

| | |
|---|---|
| **From:** | Alan.Devlin@lw.com |
| **Sent:** | Monday, September 9, 2024 11:36 AM |
| **To:** | Steig Olson; HHuttinger@mofo.com; Will Sears; Jazz Avadel Antitrust; JTigan@morrisnichols.com; Jack Blumenfeld |
| **Cc:** | MoFo-Avadel-Antitrust@mofo.com; avadelantitrust.lwteam@lw.com; DSilver@mccarter.com; ajoyce@mccarter.com |
| **Subject:** | RE: Jazz v. Avadel Antitrust - Honerkamp Deposition |

**[EXTERNAL EMAIL from alan.devlin@lw.com]**

Steig,

Thank you for agreeing to reschedule Mr. Honerkamp's deposition. We accept the September 27 date.

Best,

**Alan J. Devlin**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Direct Dial: +1.202.637.1071
Email: alan.devlin@lw.com
https://www.lw.com

**From:** Steig Olson <steigolson@quinnemanuel.com>
**Sent:** Monday, September 9, 2024 10:14 AM
**To:** Devlin, Alan (DC) <Alan.Devlin@lw.com>; HHuttinger@mofo.com; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; JTigan@morrisnichols.com; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust@mofo.com; #C-M AVADEL ANTITRUST - LW TEAM <avadelantitrust.lwteam@lw.com>; DSilver@mccarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

Alan,
While we continue to object to what occurred, and while reserving all rights, Jazz is prepared to present Mr. Honerkamp for a deposition on September 27 at our offices in New York.  Please let us know if Avadel would like to proceed.
Thanks,
Steig

**From:** Steig Olson
**Sent:** Wednesday, September 4, 2024 4:41 PM
**To:** Alan.Devlin@lw.com; HHuttinger@mofo.com; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; JTigan@morrisnichols.com; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust@mofo.com; avadelantitrust.lwteam@lw.com; DSilver@mccarter.com;

1

ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

Alan,

Your message, unfortunately, confirms that Avadel's prior representations were highly misleading, at a minimum.  After first suggesting that the deposition had to be unexpectedly cancelled at the last minute because of some "need," Avadel counsel then represented the following:  "It is not a matter of mere convenience or of needing more time, and certainly not for any tactical or strategic purpose."

If Avadel had been candid in the first instance, we could have had a professional conversation about whether Avadel's desire to cancel this deposition of a Jazz executive at the last minute so that Avadel's counsel could spend more time "dealing with Jazz's letter" in another case was warranted.  But that did not occur.  That is why we are in this situation now, and your attempt to blame this situation on Jazz is obviously baseless.

We will consider our options.

Thanks,
Steig

---

**From:** Alan.Devlin@lw.com <Alan.Devlin@lw.com>
**Sent:** Wednesday, September 4, 2024 4:27 PM
**To:** Steig Olson <steigolson@quinnemanuel.com>; HHuttinger@mofo.com; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; JTigan@morrisnichols.com; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust@mofo.com; avadelantitrust.lwteam@lw.com; DSilver@mccarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

[EXTERNAL EMAIL from alan.devlin@lw.com]

---

Steig,

We do not normally indulge the questioning of representations of counsel or witnesses when it comes to scheduling matters—we are all professionals and take our obligations seriously.

Since you insist on an explanation: we received an unexpected letter from Jazz after hours on Friday evening, at the start of a holiday weekend, that misinterpreted – and threatened Avadel with potential contempt of – the Court's August 27th Order. Although we clearly disagree with the contents of Jazz's letter and its misinterpretation of the Court's August 27th Order, Jazz's threats to bring a contempt action required Avadel's counsel to spend the next several days dealing with Jazz's letter, which resulted in the filing of a motion with the District Court yesterday. Avadel counsel taking Mr. Honerkamp's deposition was heavily – and unexpectedly – involved in assessing Jazz's letter, drafting the motions necessitated by it, and otherwise being prepared for filings and potential proceedings this week necessitated by Jazz's letter.

We were entirely justified in postponing Mr. Honerkamp's deposition under the circumstances, and the fact that you speculated to that as the basis for the postponement only confirms that conclusion. Jazz's ability to complain about rescheduling a deposition is further undercut by the fact that Jazz is responsible for the flurry of unexpected activity. That fact notwithstanding, we sought to inform you as soon as it become clear that the conflict was going to make the scheduled date for the deposition unworkable.

Please provide a new date for Mr. Honerkamp's deposition. To the extent Jazz can demonstrate that it incurred any reasonable, non-refundable costs associated with the rescheduling, Avadel is prepared to reimburse Jazz for such reasonable costs. We trust that this resolves your questions.

Best,

**Alan J. Devlin**

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Direct Dial: +1.202.637.1071
Email: alan.devlin@lw.com
https://www.lw.com

---

**From:** Steig Olson <steigolson@quinnemanuel.com>
**Sent:** Wednesday, September 4, 2024 9:38 AM
**To:** Huttinger, Henry <HHuttinger@mofo.com>; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust <MoFo-Avadel-Antitrust@mofo.com>; #C-M AVADEL ANTITRUST - LW TEAM <avadelantitrust.lwteam@lw.com>; DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

Henry,
This is obviously not a typical situation of the parties working together to identify a workable date for a deposition well in advance of the deposition. In the example you give, for example, we were working to find a date nearly two months before the deposition was to occur.

This is, instead, an unusual situation where Avadel abruptly cancelled a deposition just days before it was to occur, on Labor Day, which was the same day that lawyers and witnesses were planning to board planes to travel to the deposition. That was disruptive and inconvenient. Under those circumstances, the least that Avadel could have done was to provide a clear reason for such a disruptive event, but Avadel first failed to provide any reason at all and then, when we asked for one, Avadel's responses have been cagy and evasive.

At this point, we are left with the conclusion that Avadel cancelled the deposition because of events relating to its appeal before the federal circuit of the injunction issued by the Court. Assuming that is the case, we do not agree that is a valid reason to abruptly cancel this deposition at the last minute, and reserve all rights. If that is not the case, now would be the time to provide a clear explanation.

Thank you,
Steig

---

**From:** Huttinger, Henry <HHuttinger@mofo.com>
**Sent:** Tuesday, September 3, 2024 10:32 PM
**To:** Steig Olson <steigolson@quinnemanuel.com>; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust <MoFo-Avadel-Antitrust@mofo.com>; avadelantitrust.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

[EXTERNAL EMAIL from hhuttinger@mofo.com]

Steig,

The attorney planning to take Mr. Honerkamp's deposition had an unforeseen scheduling conflict. It has been the practice in this case for the parties to accommodate requested scheduling changes as a matter of professional courtesy—including Jazz's multiple requests to change the date of Mr. Honerkamp's deposition. *See* Grunfeld Email to Huttinger (July 17, 2024) (requesting to change date of P. Honerkamp deposition from September 5 to September 4); Huttinger Email to Grunfeld (July 22, 2024) (accepting date change for P. Honerkamp deposition); Grunfeld Email to Huttinger (July 23, 2024) (requesting to change the date of P. Honerkamp deposition back to September 5); Huttinger Email to Grunfeld (July 31, 2024) (accepting date change for P. Honerkamp deposition). Consistent with that practice, we request that you provide an alternative date for Mr. Honerkamp's deposition.

Thanks,

**Henry Huttinger**
Associate
hhuttinger@mofo.com
T +1 (213) 892-5200
M +1 (213) 587-3631

**MORRISON FOERSTER**

---

**From:** Steig Olson <steigolson@quinnemanuel.com>
**Sent:** Monday, September 2, 2024 1:05 PM
**To:** Huttinger, Henry <HHuttinger@mofo.com>; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust <MoFo-Avadel-Antitrust@mofo.com>; avadelantitrust.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

**External Email**

We would appreciate more clarity about what these "unforeseen circumstances" are. Is there a reason you can't tell us?
Thanks,
Steig

---

**From:** Huttinger, Henry <HHuttinger@mofo.com>
**Sent:** Monday, September 2, 2024 3:19 PM
**To:** Steig Olson <steigolson@quinnemanuel.com>; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust <MoFo-Avadel-Antitrust@mofo.com>; avadelantitrust.lwteam@lw.com;

DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

<mark>[EXTERNAL EMAIL from hhuttinger@mofo.com]</mark>

Steig,

We apologize for any inconvenience and emailed you as early as possible to avoid travel disruptions.  The need to reschedule Mr. Honerkamp's deposition is due to unforeseen circumstances. It is not a matter of mere convenience or of needing more time, and certainly not for any tactical or strategic purpose.  We request, and expect, that you will reschedule as a matter of professional courtesy.

Thank you,

Henry

**From:** Steig Olson <steigolson@quinnemanuel.com>
**Sent:** Monday, September 2, 2024 10:42 AM
**To:** Huttinger, Henry <HHuttinger@mofo.com>; Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust <MoFo-Avadel-Antitrust@mofo.com>; avadelantitrust.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** RE: Jazz v. Avadel Antitrust - Honerkamp Deposition

<mark>External Email</mark>

Henry,

This is obviously very inconvenient and very late notice, and we have now had to disrupt travel plans that were already in effect which will likely impose financial penalties and fees on the client.

Your message indicates that Avadel is adjourning the deposition because of some "need," so we assume that there has been some significant, unexpected event that makes it impossible for the deposition to happen anytime this week, rather than this being a litigation tactic to buy more time, for example, for Avadel to prepare for the deposition.  Can you please confirm that is the case, and let us know why it was necessary to adjourn the deposition at this late stage?

Thanks,
Steig

**From:** Huttinger, Henry <HHuttinger@mofo.com>
**Sent:** Monday, September 2, 2024 11:10 AM
**To:** Will Sears <willsears@quinnemanuel.com>; Jazz Avadel Antitrust <jazzavadelantitrust@quinnemanuel.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Cc:** MoFo-Avadel-Antitrust <MoFo-Avadel-Antitrust@mofo.com>; avadelantitrust.lwteam@lw.com;

DSilver@McCarter.com; ajoyce@mccarter.com
**Subject:** Jazz v. Avadel Antitrust - Honerkamp Deposition

[EXTERNAL EMAIL from hhuttinger@mofo.com]

Will,

We need to reschedule P.J. Honerkamp's deposition and cannot proceed this week on September 5.  Could you please provide some alternative dates for Mr. Honerkamp?

Thank you,

**Henry Huttinger**
Associate
hhuttinger@mofo.com
T +1 (213) 892-5200
M +1 (213) 587-3631

**ΙΙΙORRISON FOERSTER**

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express

permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

EXHIBIT C

| | |
|---|---|
| **From:** | Christine.Greeley@lw.com |
| **Sent:** | Monday, September 23, 2024 10:33 PM |
| **To:** | Jazz Avadel Antitrust; Jack Blumenfeld; JTigan@morrisnichols.com; Nicolas Siebert; Avi Grunfeld; Will Sears; Steig Olson |
| **Cc:** | MoFo-Avadel-Antitrust@mofo.com; avadelantitrust.lwteam@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com |
| **Subject:** | Jazz v. Avadel - Supplemental Productions |

[EXTERNAL EMAIL from christine.greeley@lw.com]



This message needs your attenti...
• jazzavadelantitrust@quinnemanuel.c

Counsel,

We are reaching out about the Court's order regarding the parties' post-launch document productions. D.I. 162. A production date of Friday, September 27, 2024 is not feasible for either party. Therefore, we propose that both parties agree to make a production of documents from June 6, 2023 (the day after LUMRYZ's launch) to August 30, 2024 by October 25, the date Jazz proposed for Avadel's custodial production. Please let us know if you will stipulate to this production date by close of business tomorrow, September 24, so that we may seek relief from the Court if necessary.

Please also let us know no later than close of business tomorrow, September 24, what categories of go-gets Avadel has requested, if any, that Jazz believes will require a custodial production. For any such categories, we ask that Jazz provide a hit report and estimates of review costs no later than September 27 so that Avadel can assess burden and meet and confer in advance of October 4, 2024.

Based on Jazz's prior correspondence and representations to the Court, Avadel understands that Jazz is seeking documents responsive to its RFP nos. 2, 3, 10, 11, 15, and 54. *See* July 19, 2024 email from T. Gruttadauria to K. Wu; D.I. 158 at 2. Please let us know your availability to meet and confer regarding the search terms that Avadel will run over the custodial files of Mr. Divis, Ms. Gudeman, Mr. Kim, Mr. Macke, and Mr. O'Brien for these RFPs.

Best,
Christie

**Christine Greeley**
Pronouns: She/Her/Hers

**LATHAM & WATKINS LLP**
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Direct Dial: +1.415.395.8836
Email: christine.greeley@lw.com
https://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

# EXHIBIT D

## FULLY REDACTED

# EXHIBIT E

## FULLY REDACTED

EXHIBIT F



## Avadel Pharmaceuticals PLC (AVDL)

13.80  ↑ +0.10 (+0.77%)          13.80  ↑ 0.00 (0.00%)
USD | NASDAQ | Sep 16, 16:00     After-Hours: 20:00

SWITCH TO:  Name 🔍

🔔 | 📄 REPORTS | ⋮

Quote    Performance    Key Stats    Financials    Estimates    News    Events    Y-Rating    Valuation    Multichart    Fundamental Chart    Scatter Plot

### Avadel Pharmaceuticals Market Cap: 1.329B for Sept. 16, 2024

VIEW 4,000+ FINANCIAL DATA TYPES:

Search                                                    ADD    📷 BROWSE

### Market Cap Chart                                      ⬈  VIEW FULL CHART



1D   5D   1M   3M   6M   YTD   1Y   3Y   5Y   10Y   MAX

Feb 14 '22
AVDL M Cap: 396.27M

### Historical Market Cap Data

View and export this data back to 1996. Upgrade now.

| Date | Value | Date | Value |
|---|---|---|---|
| September 13, 2024 | 1.319B | August 08, 2024 | 1.515B |
| September 12, 2024 | 1.342B | August 07, 2024 | 1.550B |
| September 11, 2024 | 1.314B | August 06, 2024 | 1.601B |
| September 10, 2024 | 1.385B | August 05, 2024 | 1.553B |
| September 09, 2024 | 1.371B | August 02, 2024 | 1.571B |
| September 06, 2024 | 1.395B | August 01, 2024 | 1.588B |
| September 05, 2024 | 1.408B | July 31, 2024 | 1.572B |
| September 04, 2024 | 1.417B | July 30, 2024 | 1.562B |
| September 03, 2024 | 1.442B | July 29, 2024 | 1.570B |
| August 30, 2024 | 1.460B | July 26, 2024 | 1.609B |
| August 29, 2024 | 1.433B | July 25, 2024 | 1.567B |
| August 28, 2024 | 1.431B | July 24, 2024 | 1.5 |
| August 27, 2024 | 1.521B | July 23, 2024 | 1.5 |

| Date | Value | Date | Value |
|---|---|---|---|
| August 26, 2024 | 1.585B | July 22, 2024 | 1.584B |
| August 23, 2024 | 1.588B | July 19, 2024 | 1.559B |
| August 22, 2024 | 1.557B | July 18, 2024 | 1.533B |
| August 21, 2024 | 1.567B | July 17, 2024 | 1.565B |
| August 20, 2024 | 1.550B | July 16, 2024 | 1.627B |
| August 19, 2024 | 1.555B | July 15, 2024 | 1.593B |
| August 16, 2024 | 1.535B | July 12, 2024 | 1.597B |
| August 15, 2024 | 1.478B | July 11, 2024 | 1.582B |
| August 14, 2024 | 1.515B | July 10, 2024 | 1.551B |
| August 13, 2024 | 1.563B | July 09, 2024 | 1.529B |
| August 12, 2024 | 1.540B | July 08, 2024 | 1.467B |
| August 09, 2024 | 1.493B | July 05, 2024 | 1.422B |

**Sponsored Financial Content**    Dianomi ▷

5 Weird Things To Do ASAP If You Have Amazon Prime  FinanceBuzz

Attend a Georgetown Master's in Applied Intelligence Webinar  Georgetown University

Time to Sell NVDA? 50-Yr Wall Street Legend Weighs In  Chaikin Analytics

QUICKFLOWS

**Market Capitalization Definition**

Market Capitalization measures the total value of a company based on their stock price multiplied by the shares outstanding. This metric is important because it gives you an idea of the size of a company, and how the size has changed over time. When studying companies from a relative basis, it would make sense to compare companies that have a similar market capitalization because factors like market share, economies of scale, and business models would also be similar.

Read full definition.

**Market Cap Range, Past 5 Years**

| 63.17M | 1.809B |
|---|---|
| Minimum | Maximum |
| MAY 26 2022 | MAY 03 2024 |

653.53M                                              468.20M
Average                                              Median

---

**Market Cap Benchmarks**

| | |
|---|---|
| Jazz Pharmaceuticals PLC | 6.764B |
| Medtronic PLC | 115.55B |
| Alkermes PLC | 4.581B |
| Perrigo Co PLC | 3.849B |
| Iterum Therapeutics PLC | 17.71M |

---

**Market Cap Related Metrics**

| | |
|---|---|
| PS Ratio | 13.32 |
| Price to Book Value | 18.91 |
| Price | 13.80 |
| Earnings Yield | -8.26% |

---

**Sponsored Financial Content**                                              Dianomi ▷

QUICKFLOWS

Rising Capital Needs: A Silver Lining for Active?   MFS Investment Management®

Time to Sell NVDA? 50-Yr Wall Street Legend Weighs In   Chaikin Analytics

7 Ways To Help Generate Income Once Your Portfolio Reaches $500,000   Fisher Investments

---

Terms of Use   |   Disclosure   |   Privacy Policy   |   Security

# EXHIBIT G

# MEMORANDUM

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PUBLIC HEALTH SERVICE**
**FOOD AND DRUG ADMINISTRATION**

---

**Division of Neurology 1**
**Office of Neuroscience**
**Center for Drug Evaluation and Research**

**Date: August 30, 2021**

**From: Eric Bastings, MD**
       **Division Director (Acting)**

**Subject:** <u>**Office of Orphan Products Development Consult Request #16-5302**</u>
**NDA 214755:**
**Lumryz (Sodium Oxybate Extended-Release for Oral Suspension [FT218])**
**Request for Orphan Drug Exclusivity**

**To: Director**
    **Office of Orphan Products Development**

**Document Type: Consult**

---

**Enclosed is the Division's response to your request**

## Review and Evaluation of Clinical Data

| | |
|---|---|
| **NDA:** | **214755** |
| **Sponsor:** | **Avadel** |
| **Product:** | **Lumryz*** |
| **Proposed Indication:** | **Narcolepsy** |
| **Material Submitted:** | **Consultation Request** |
| **Date Of Request:** | **7/6/21** |
| **Date Request Received By Reviewer:** | **7/6/21** |
| **Date Review Completed:** | **8/30/21** |
| **Reviewer:** | **Ranjit B. Mani, M.D.** |

*Sodium Oxybate Extended-Release for Oral Suspension (FT218)

## 1. Background

This consultation request has been received from the Office of Orphan Products Development (OOPD), and pertains to a request from the sponsor for <u>orphan drug exclusivity</u> for Sodium Oxybate Extended-Release for Oral Suspension (FT218), which carries the proprietary name "Lumryz™." This request for orphan drug exclusivity for Lumryz™ was submitted on December 15, 2020.

An original New Drug Application (NDA), #214755, seeking the approval of Lumryz™ for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy is currently under review by the Agency. That application was also submitted on December 15, 2020, and included a copy of the request for orphan drug exclusivity that was submitted on the same date.

A supplement to the main request (dated December 15, 2020) for orphan drug exclusivity for Lumryz™ was submitted on July 14, 2021, and is also currently under review by OOPD. That supplement was also submitted to NDA 214755 and its contents will also be addressed in this consultative review. That supplement is entitled "*Exclusivity Claim – Supplemental Information in Demonstration of Clinical Superiority of FT218.*"

Currently, two products are approved for the treatment of cataplexy or excessive daytime sleepiness, (both products) in patients 7 years and older with narcolepsy. These are Xyrem® (sodium oxybate oral solution) and Xywav™ (a low-sodium oxybate oral solution formulation containing a mixture of calcium, magnesium, potassium, and sodium oxybates); the manufacturer of both formulations is Jazz Pharmaceuticals, Inc. Generic formulations of sodium oxybate oral solution have also been approved for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy.

**While the currently-approved formulations of sodium oxybate, Xyrem® and Xywav™, are liquids, Sodium Oxybate for Extended-Release Oral Suspension (FT218) is a powder for oral suspension. Whereas the**

approved formulation Xyrem® **is administered in two separate doses nightly, separated by an interval of 2.5 to 4.0 hours, the sponsor anticipates that Sodium Oxybate for Extended-Release Oral Suspension (FT218) will be administered once nightly.**

In this review, the names "Lumryz™," "Sodium Oxybate Extended-Release for Oral Suspension," and "FT218," will be used interchangeably. The term "applicant" has also been interchangeably with sponsor.

## 2. Text Of Main Consultation Request

The full text of this consultation request, dated July 6, 2021, is copied verbatim below in purple font. That text is both comprehensive and self-explanatory.

**Background:**

The Office of Orphan Products Development (OOPD) granted orphan drug designation to sodium oxybate extended-release oral suspension on 1/08/2018 for the treatment of narcolepsy.  With input from the review division (consult dated 11/24/17), this designation was granted based on a plausible hypothesis that the drug may be clinically superior to the same drug that was already approved for the same indication because it "may be more safe due to the ramifications associated with the dosing regimen for the previously approved sodium oxybate in treating patients with narcolepsy."  On 12/15/2020, the sponsor, Avadel, submitted a marketing application for sodium oxybate extended-release oral suspension, with the proposed trade name Lumryz, for the treatment of cataplexy and excessive daytime sleepiness in adults with narcolepsy (NDA 214755).

Another sponsor, Jazz, has received marketing approval for the same active moiety, oxybate, for use in the treatment of narcolepsy.  Specifically, Xywav (calcium, magnesium, potassium, and sodium oxybates) was approved on 7/21/2020 and has orphan-drug exclusivity (ODE) until 7/21/2027 for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy. In addition, Xyrem (sodium oxybate) was previously approved for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy.  Xyrem has ODE only for the portion of the indication pertaining to pediatric patients until 10/26/2025.

In order for Lumryz to receive marketing approval for the treatment of cataplexy and EDS in adults with narcolepsy, it must be clinically superior, as defined in the orphan drug regulations, to the previously approved same drugs, Xywav and Xyrem, for the same indication.  If Lumryz is clinically superior to Xywav and Xyrem, it may also be eligible for its own 7-year period of ODE.  For the purpose of orphan drug exclusivity, clinical superiority can be based on greater effectiveness, greater safety in a substantial portion of the target population, or a major contribution to patient care (MCTPC), with

all else being equal (see definition below).  Please note that for orphan drug exclusivity purposes we apply the definition of clinical superiority from the regulations below and do not apply the substantial evidence standard as is required for a labeling claim.

Avadel submitted a request to the OOPD on 12/15/20 for orphan drug exclusivity for Lumryz based on clinical superiority over Xyrem and Xywav.  The same request was also submitted to the NDA on the same date (see NDA 214755 eCTD Sequence Number 0001).  In this document, the sponsor contends that Lumryz is clinically superior to Xyrem and Xywav with respect to safety and it also provides a major contribution to patient care (MCTPC).  Appendix 2 of Avadel's submission contains several letters from Key Opinion Leaders in the field of narcolepsy and patient advocacy groups which support Avadel's arguments.

Safety:
Avadel notes that both Xyrem and Xywav require a twice-nightly dosing regimen, once at bedtime and once again 2.5-4 hours later.  In contrast, Lumryz is an extended-release formulation of sodium oxybate that is given once nightly and therefore obviates the need for awakening to take a second dose.  Avadel argues that this provides a safety advantage for Lumryz because it reduces the risk of nighttime falls.  This is due to the fact that patients that forcibly wake after receiving one dose of Xyrem may get out of bed, ambulate, and fall because of a drug-induced groggy or stuporous state.  Also, because of the rapid onset of effects, patients are at risk of falls or other accidental injuries if the second dose of Xyrem is not consumed while they are in bed.  To support their argument, Avadel has provided an analysis of cases of falls in patients receiving Xyrem that were reported to the FDA Adverse Event Reporting System (FAERS) database.  Avadel indicates that for the time period from 1/01/03 to 6/30/20, there were 2,056 cases that reported a reaction of fall in patients receiving Xyrem, and they have reviewed 120 of these cases.  Of these, there were 14 (11.67%) in which a patient experienced a fall after the second dose of Xyrem.  Injuries reported include lacerations and various broken bones.  In some cases following these injuries, Xyrem was discontinued or the dose was reduced.

In addition, Avadel indicates that PK differences between these drugs result in Lumryz having lower rates of well-known adverse events compared to Xyrem.  They have provided a summary of reported rates of nausea, vomiting, dizziness, somnolence, and tremor for Lumryz and Xyrem.  Although it does not appear that these two drugs were compared in a head-to-head manner, and the orphan drug regulations do not necessarily require head-to-head studies to support clinical superiority based on safety, generally, the rates of nausea, vomiting, and dizziness provided appear to be lower with Lumryz versus Xyrem.

Avadel also indicates that there is a risk of misuse associated with the second dose of Xyrem because patients are supposed to measure out both nightly doses prior to

bedtime and place the second dose near the bed. They note that a child could consume the second dose if the child-resistant container is not used, the second dose could be stolen, or patients could accidently consume both doses.

Another argument presented by Avadel related to safety concerns, illicit use and diversion. They note that Lumryz will be formulated as white granules while Xyrem is a clear to slightly opalescent oral solution. Avadel states that Lumryz will be cloudy in solution and both its appearance and gritty consistency should alert individuals if it has been added to their drink. They also note that Lumryz tastes salty and bitter; however, they do not describe the taste of Xyrem or Xywav, and they do not describe the appearance of Xywav.

Avadel's last argument regarding safety concerns sodium content in Lumryz, Xyrem, and Xywav. Lumryz contains a similar amount of sodium as Xyrem. Avadel argues that the reduced sodium in Xywav does not render Xywav clinically superior to Xyrem. These arguments have already been evaluated in DN1 consult responses to OOPD dated 11/27/20 and 3/08/21 regarding Xywav. Avadel concludes that overall, the safety, efficacy, and quality of life issues related to the second dose of twice-nightly sodium oxybate present a greater risk to patients than sodium content, and each of these greater risks is significantly improved and addressed with the once-nightly formulation of Lumryz.

Major Contribution to Patient Care:
Avadel provides other arguments that appear to be aimed at making a case for Lumryz providing a MCTPC. The OOPD notes that a MCTPC can only be considered in cases where greater effectiveness or greater safety have not been demonstrated. To support their argument, Avadel references a survey of 1,350 individuals impacted by narcolepsy, the results of which were distributed at the September 24, 2013 FDA Meeting on Drug Development for Narcolepsy. This survey found that patients' ideal therapy was "a drug that would provide consistent and adequate control of the daytime sleepiness without the hard crash and one that would require one dose taken at bedtime resulting in 8 hours of restorative sleep." Avadel also conducted a study using publicly available digital Xyrem and narcoleptic-related data from 9/01/17 to 10/15/19. Sources included things such as blogs, forums, message boards, social media outlets, and OpenFDA. Data are provided from this study regarding the volume and type of quality of life issues that are associated with the need for a second nightly dose of Xyrem, such as trouble waking up to take the second dose.

Avadel also indicates that there is a food effect which appears to be more pronounced with Xyrem and Xywav compared to Lumryz. They note that both the Xyrem and Xywav labels instruct patients to take the first nightly dose at least two hours after eating. Examples are mentioned of patients reporting reduced effectiveness after taking Xyrem too close to a meal. Avadel states that Lumryz's reduced food effect and subsequent impact on blood levels, could result in greater efficacy and improved quality of life.

Ranjit B. Mani, MD, HFD-120 Medical Review
NDA 214755, Lumryz™, Consultation      8/30/21

In addition, Avadel conducted a Discrete Choice Experiment (DCE) to quantitatively characterize the preferred treatment attributes of narcolepsy patients.  This consisted of a 30-minute web-based survey of 75 narcolepsy patients that were past or current Xyrem users.  This survey found that dosing frequency (once nightly vs. twice nightly) was the single most important attribute when selecting a narcolepsy treatment, and the most common reasons for overall product preference were lack of need to wake up in the middle of the night to take a second dose (48%), fewer side effects (46%), and ease of taking/handling (32%).

The OOPD notes that most of the arguments provided regarding a MCTPC, suggest that Lumryz would provide greater convenience than Xyrem and Xywav, and that patients may prefer it over these other oxybate products.  Improved convenience and patient preference alone may not rise to the level to support a claim of clinical superiority for the purpose of orphan drug exclusivity.  However, given that narcolepsy is a chronic sleep disorder and requires long-term therapy, the impact that Lumryz's once-nightly dosing may have on patient quality of life may be substantial enough to constitute a MCTPC.  In addition, the fact that there is no second nightly dose for patients to potentially miss and effect the efficacy of the drug may also render Lumryz as a MCTPC compared to Xyrem and Xywav.

In summary, one of the definitions of clinical superiority that is stated in the orphan drug regulations is greater safety in a substantial portion of the target populations.  "Substantial" is not defined in the regulations.  Thus, it is not necessary for a drug to provide greater safety in all of the indicated population in order for it to be considered clinically superior.  This definition also  recently served as the basis for finding Xywav clinically superior to Xyrem since the differences in the sodium content of these two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated.  Among the arguments provided by Avadel, the OOPD finds most persuasive the argument for greater safety due to reduced fall potential with Lumryz compared to Xyrem and Xywav.  It appears that there may be a substantial portion of the indicated population of adult patients with narcolepsy that may achieve greater safety with Lumryz due to its once nightly dosing compared to the twice nightly dosing required for Xyrem and Xywav.

**Consult Questions:**
1. Is there any evidence to suggest that the efficacy of Lumryz may be substantially different from Xyrem or Xywav?  If so, please elaborate.

2. Does the review division agree that Lumryz provides greater safety in a substantial portion of the target population when compared to Xyrem and Xywav?  If so, what safety advantage does Lumryz provide?  Please elaborate.  (As a reminder, the orphan drug regulations do not require head-to-head studies for safety.)

Ranjit B. Mani, MD, HFD-120 Medical Review
NDA 214755, Lumryz™, Consultation          8/30/21

3.  Does the review division agree with the sponsor that Lumryz has less potential for illicit use and diversion compared to Xyrem and Xywav?  Please explain.

4.  Does the review division consider Lumryz to provide a major contribution to patient care (MCTPC) compared to Xyrem and Xywav?  If so, on what basis?

5. Are there any other issues not addressed above that the review division would like the OOPD to consider in its determination of eligibility for orphan-drug exclusivity for Lumryz?

**Regulations:**

21 CFR 316.3(b)(3) defines clinical superiority as follows:
> (3) Clinically superior means that a drug is shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug) in one or more of the following ways:
> (i) Greater effectiveness than an approved drug (as assessed by effect on a clinically meaningful endpoint in adequate and well controlled clinical trials). Generally, this would represent the same kind of evidence needed to support a comparative effectiveness claim for two different drugs; in most cases, direct comparative clinical trials would be necessary; or
> (ii) Greater safety in a substantial portion of the target populations, for example, by the elimination of an ingredient or contaminant that is associated with relatively frequent adverse effects. In some cases, direct comparative clinical trials will be necessary; or
> (iii) In unusual cases, where neither greater safety nor greater effectiveness has been shown, a demonstration that the drug otherwise makes a major contribution to patient care.

## 3.  Contents Of Review

The contents of this consultative review will be in the same consecutive order as below.

- Request for priority review designation for Lumryz™.

- Response to questions in original OOPD consultation request of July 6, 2021.

- Supplement to request for orphan exclusivity: July 14, 2021.

- Summary comments.

## 4.  Request For Priority Review Designation For Lumryz™

A request for priority review designation accompanied the original submission of NDA 214755. That request was denied by the Agency after full review of its contents. As many components of that request are pertinent to the current consultation, the Agency's criteria for priority review designation, the contents of that request, and the Agency's action in response to that request are further summarized below.

The full text of the applicant's priority review request is available at the following link

\\CDSESUB1\evsprod\nda214755\0001\m1\us\12-cov-let\priority-review-request.pdf

### 4.1  Criteria For Granting Priority Review Designation

The core criteria for granting priority review designation to a marketing application for a drug or biologic are as follows:

1.  The product is intended to treat a serious condition.

2.  The product if approved would provide a significant improvement in safety or effectiveness

These criteria are discussed in more detail in an Agency Guidance for Industry publication entitled "*Expedited Programs for Serious Conditions – Drugs and Biologics*" (May 2014) available at:

https://www.fda.gov/media/86377/download

### 4.2  Summary Basis For Applicant's Request For Priority Review Designation

The applicant's request for priority review designation for Lumryz™ was based on the following overall conclusion: the once-nightly dosing regimen for that product would provide a significant improvement in safety and effectiveness in the treatment of cataplexy and excessive daytime sleepiness in narcolepsy compared to currently available therapies, including Xyrem® and Xywav™.

The above overall conclusion was based in turn on the following summary assertions (for which additional data was provided in the request).

- A once-nightly dosing regimen, as with Lumryz™ would remove the anxiety and sleep disruption resulting from the need to awaken to take a second dose (as is the case with Xyrem® and Xywav™).

- A once-nightly dosing regimen would be less likely to result in missed doses, and would thus improve effectiveness and quality of life, as compared with a twice-nightly regimen.

- The need to awaken at night to take a second dose (as with Xyrem® and Xywav™) increases the risk of adverse events, such as falls. Since the $C_{max}$ of oxybate products may correlate with other adverse events such as nausea and vomiting, a second $C_{max}$ as occurs the twice-nightly formulations make increase the risk of those adverse events, too.

- Data from the key efficacy study of Lumryz™ (Study CLFT218-1501; REST-ON) indicate that the better known adverse events associated with sodium oxybate are less frequent with Lumryz™ than with Xyrem®.

- Data from a patient survey indicate a preference for a once-nightly dosing regimen (i.e., with Lumryz™) than for the twice-nightly regimen used for Xyrem® and Xywav™.

<u>It is readily apparent that the arguments used by the applicant in support of the priority review designation request for Lumryz™ were very similar to those used in support of the current request for orphan exclusivity currently under review.</u>

### 4.3  Agency Action In Response To Request For Priority Review Designation

The Agency was not persuaded by the arguments used in support of the applicant's request for priority review designation and in a letter dated February 26, 2021, assigned this application a standard review.

## 5.  Response To Questions In Original OOPD Consultation Request Of July 6, 2021

Please note that our responses to the question are based in part on our preliminary review of data submitted with NDA 214755, the review of which is ongoing, and of the available data for Xyrem® and Xywav™.

*Question 1. Is there any evidence to suggest that the efficacy of Lumryz may be substantially different from Xyrem or Xywav?  If so, please elaborate.*

**Division of Neurology 1 Response to Question 1**
There is no evidence suggesting that the efficacy of Lumryz™ is substantially different from that of Xyrem® or Xywav™.

Ranjit B. Mani, MD, HFD-120 Medical Review                                      Page 10 of 12
NDA 214755, Lumryz™, Consultation                8/30/21

*Question 2. Does the review division agree that Lumryz provides greater safety in a substantial portion of the target population when compared to Xyrem and Xywav?  If so, what safety advantage does Lumryz provide?  Please elaborate.  (As a reminder, the orphan drug regulations do not require head-to-head studies for safety.)*

## Division of Neurology 1 Response to Question 2.
The available data do not indicate that Lumryz™ provides greater safety in a substantial proportion of patients in the target population (i.e., patients who have narcolepsy with cataplexy and/or excessive daytime sleepiness) than Xyrem® or Xywav™, despite the arguments provided by the applicant. Very limited conclusions, if any, can be drawn from the comparison of the frequency of specific individual adverse events seen with Lumryz™ with those seen  with Xyrem® that has been presented by the sponsor. That comparison is flawed for a number of readily-evident reasons. In broad terms, the safety profiles of all 3 products (Lumryz™, Xyrem®, and Xywav™) are not substantially different.

*Question 3.  Does the review division agree with the sponsor that Lumryz has less potential for illicit use and diversion compared to Xyrem and Xywav?  Please explain.*

## Division of Neurology 1 Response to Question 3
We are not persuaded by the applicant's arguments that Lumryz™ has meaningfully less potential for illicit use and diversion compared with Xyrem® and Xywav™, based either on the appearance and taste of each these products, or on the administration of a once-nightly dose of Lumryz™ versus two nightly doses of Xyrem® and Xywav™.

*Question 4. Does the review division consider Lumryz to provide a major contribution to patient care (MCTPC) compared to Xyrem and Xywav?  If so, on what basis?*

## Division of Neurology 1 Response to Question 4
While the once-nightly regimen of Lumryz™ will be more convenient for patients than a twice-nightly regimen, that attribute cannot be considered a major contribution to patient care.

*Question 5. Are there any other issues not addressed above that the review division would like the OOPD to consider in its determination of eligibility for orphan-drug exclusivity for Lumryz?*

## Division of Neurology 1 Response to Question 5

From the perspective of this Division, there are no other issues that appear to warrant further consideration by OOPD when determining the eligibility of Lumryz™ for the grant of orphan drug exclusivity,

## 6.  Supplement To Request For Orphan Exclusivity: July 14, 2021

As noted earlier, this supplement to the original request for orphan exclusivity for Lumryz™ is being primarily reviewed by OOPD. However, this Division has been asked to review and comment on this supplement in conjunction with the response to the original consultation request of July 6, 2021.

### 6.1  Summary Of Supplement To Original Request For Orphan Exclusivity

As already noted, this supplement is entitled "*Exclusivity Claim – Supplemental Information in Demonstration of Clinical Superiority of FT218.*"

A full link to the contents of this supplement is available at the link below:

\\CDSESUB1\evsprod\nda214755\0022\m1\us\13-admin-info\exclusivity-ode.pdf

The key observations and assertions made by the applicant in this supplement are as follows.

- A proportion of the 67 patients who transitioned from twice-nightly Xyrem® or Xywav™ to once-nightly Lumryz™ in an interim analysis of an ongoing open-label uncontrolled study CLFT218-1901 reported the following while receiving the twice-nightly regimen: falls while taking the second nightly dose (6%), nausea and/or vomiting after taking the second nightly dose (23%), missing the second nightly dose at least once over a 3-month (85%), and "anxiety related to the second nightly dose" (21%). 28 out of 30 patients who had completed 3 months of stable dosing with FT218 preferred the once-nightly regimen of Lumryz™ to the twice nightly regimen of either Xyrem® or Xywav™.

- A market analysis of physicians experienced in prescribing Xyrem® and Xywav™ may have suggested that a once-nightly regimen may be preferred to a twice-nightly regimen by patients.

- Poor sleep quality, sleep interruption, short sleep duration, and other sleep disturbances may all be associated in themselves with an increased cardiovascular risk based on a review of the medical literature (further details are provided in this submission). A once-nightly dosing regimen, as with Lumryz™, is less likely to interrupt sleep than a twice-nightly regimen, as with Xyrem® and Xywav™, which cannot result a normal sleep pattern. Data from the efficacy study CLFT218-1501 included in NDA 214755 indicate that patients receiving Lumryz™ have an improvement in several

Ranjit B. Mani, MD, HFD-120 Medical Review                                   Page 12 of 12
NDA 214755, Lumryz™, Consultation          8/30/21

parameters that measure nocturnal sleep. Thus Lumryz™ has the potential to provide a cardiovascular safety benefit, unlike Xyrem® and Xywav™ which may be associated with an increased cardiovascular risk on account of the interruption in nighttime sleep associated with the need to taking a second dose.

### 6.2  Division Of Neurology 1 Comments

The contents of this supplement suggest, not unexpectedly, that patients may prefer a once-nightly dosing regimen (as with Lumryz™) to a twice-nightly dosing regimen (as with Xyrem® and Xywav™).

Any conclusions that Lumryz™ may have the potential for being associated with a lower cardiovascular risk than Xyrem® or Xywav™ on account of being administered only once-nightly are at best highly speculative.

## 7.  Summary Comments

In this Division's opinion, no evidence has been provided by the applicant that Lumryz™ is clinically superior to Xyrem® or Xywav™ as defined in the orphan drug regulations [21 CFR 316.3(b)(3)].

Ranjit B. Mani -S
Digitally signed by Ranjit B. Mani -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA,
ou=People, cn=Ranjit B. Mani -S,
0.9.2342.19200300.100.1.1=1300122852
Date: 2021.08.31 12:13:34 -04'00'

_____
Ranjit B. Mani, M.D.
Medical Reviewer

Eric P. Bastings -S
Digitally signed by Eric P. Bastings -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People,
0.9.2342.19200300.100.1.1=1300158815; cn=Eric P. Bastings -S
Date: 2021.08.31 14:01:43 -04'00'

_____
Eric Bastings, M.D.
Division Director (Acting)

cc:
HFD-120
IND

EXHIBIT H

## MEMORANDUM

### DEPARTMENT OF HEALTH AND HUMAN SERVICES
### PUBLIC HEALTH SERVICE
### FOOD AND DRUG ADMINISTRATION

---

**To: NDA 214755 File for Lumryz (Sodium Oxybate for Extended-Release Oral Suspension)**

**From:  Ranjit Mani, MD, Clinical Reviewer and Team Leader, Division of Neurology 1 (DN1), Office of New Drugs (OND), Center for Drug Evaluation and Research (CDER)**

**Teresa Buracchio, MD, Division Director, DN1, OND, CDER**

**Subject: Review of the Office of Orphan Products Development (OOPD) Consult Request (#16-5302)**

**Date: July 8, 2022**

---

The Division (DN1) received a consultation request from the Office of Orphan Products Development (OOPD) (dated July 6, 2021, but preceded by an emailed request dated July 1, 2021), which follows a request from the applicant for orphan drug exclusivity for Sodium Oxybate Extended-Release for Oral Suspension (Lumryz; FT218). The applicant's request for orphan-drug exclusivity for Lumryz was submitted on December 15, 2020, along with the submission of an original New Drug Application (NDA 214755), seeking the approval of Lumryz for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy is currently under review by the Agency. A supplement to the request for orphan-drug exclusivity was also submitted to NDA 214755 on July 14, 2021, and this supplement included arguments that orphan-drug exclusivity for Xyrem and Xywav should not block approval for FT218.

DN1's input regarding the orphan-drug exclusivity issues was initially considered in a consult memo dated August 31, 2021. In the August 31, 2021, consult memo, DN1 stated that DN1 would not consider the greater convenience of once-nightly dosing regimen of Lumryz as a major contribution to patient care (MCTPC) compared to a twice-nightly dosing regimen for Xyrem and Xywav. However, OOPD subsequently identified additional information for DN1's further consideration, and DN1's consideration of that information remains ongoing. In light of the upcoming tentative approval action for this application, this memorandum documents the fact that the August 31, 2021, consult review does

FDA-Jazz-000483

not represent DN1's final or current thinking on the matter, and that the orphan-drug exclusivity issues associated with this application remain under review.

Ranjit B. Mani -S

Digitally signed by Ranjit B. Mani -S
Date: 2022.07.08 12:02:01 -04'00'

Ranjit B. Mani, MD
Clinical Reviewer and Team Leader

Teresa Buracchio, MD
Division Director

FDA-Jazz-000484

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------------
/s/
----------------------------------------------------------

RANJIT B MANI
07/08/2022 01:02:06 PM

TERESA J BURACCHIO
07/08/2022 02:17:29 PM

FDA-Jazz-000485

EXHIBIT I

| Date: | April 29, 2023 | |
|---|---|---|
| From: | Mahadevappa Hunasikatti, MD FCCP | Mahadevappa Hunasikatti -S *Digitally signed by Mahadevappa Hunasikatti -S Date: 2023.04.29 08:46:03 -04'00'* |
| | Nargues Weir, MD FCCP FAASM ATSF | Nargues A. Weir -S *Digitally signed by Nargues A. Weir -S Date: 2023.04.29 06:53:17 -04'00'* |
| | Sleep Team/DSRA/OHT1/CDRH | |
| Through: | Rachana Visaria Ph.D. Assistant Director/Sleep Team/DSRA/OHT1/CDRH | Rachana Visaria -S *Digitally signed by Rachana Visaria -S Date: 2023.04.29 10:44:41 -04'00'* |
| To: | Sandra Retzky DO, JD, MPH Director, Office of Orphan Product Development | |
| OPCR: | DRU 16-5302 | |
| Subject: | Consult request on Lumryz (extended-release sodium oxybate) administered as an oral solution once at bedtime for treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy. | |

OOPD ("you") have consulted the Sleep Team/DSRA/OHT1/CDRH for input on whether Lumryz (extended-release sodium oxybate), with once nightly administration, is "clinically superior" to Xywav and Xyrem based on being a "major contribution to patient care" or MCTPC. Specifically, you seek our opinion, as board certified sleep specialists, on whether Lumryz, with once nightly dosing, makes a MCTPC over Xywav and Xyrem, both with twice nightly dosing, and if so, why. We understand that other factors may also inform the agency's MCTPC determination, and this memo considers solely Lumryz's once nightly dosing.

**Summary Response**

It is our opinion that Lumryz is clinically superior because it provides a significant therapeutic advantage over and above that of Xywav and Xyrem. The underpinning of our rationale is that patients with narcolepsy, a sleep disorder, will not need to awaken from sleep to take a second dose of Lumryz—which is dosed only once at bedtime—unlike Xywav and Xyrem, which are both labeled for twice nightly dosing.[1] From a therapeutic perspective, it is highly desirable to eliminate, or at least minimize, nocturnal arousals from sleep—especially for patients who have

---

[1] *See* Section 2.1, *Adult Dosing Information*, Xyrem labeling, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=926eb076-a4a8-45e4-91ef-411f0aa4f3ca); *See* Section 2.1 *Dosing Information in Adult Patients with Narcolepsy*, Xywav labeling (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e0ae43a-037f-42af-8e23-a0e51d75abe8).

1

a sleep disorder and seek treatment.[2] A nocturnal arousal from sleep to take a second dose of sleep medication will fragment sleep and disrupt sleep architecture.[3, 4, 5]

The goal of treatment for all sleep disorders—including narcolepsy—is to restore a normal sleep pattern. To that end, not awakening the patient to take a second dose of sleep medication is highly preferable from a clinical standpoint. Therefore, a once nightly dose of oxybate, makes a MCTPC because Lumryz, as compared to Xywav and Xyrem, avoids an arousal from sleep and will help to minimize sleep disruption.

**Normal sleep**

Adequate sleep is essential for humans as it physically and psychologically restores bodily functions.[6] Without adequate sleep, humans function poorly and may die prematurely.[7] Chronic sleep loss, sometimes called sleep debt, is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health.[8]

---

[2] The American Academy of Sleep Medicine (AASM) defines "arousal" as a finding on a sleep study using an electroencephalogram (EEG) to view brain wave patterns. An arousal leads to wakefulness and is a type of sleep disturbance in which the person awakens, or shifts to lighter sleep, preventing progression to deeper more restorative sleep. Richard Berry, et. al, *The AASM Manual for the Scoring of Sleep and Associated Events (ver 2.6)* American Academy of Sleep Medicine *(Jan 2020)* at 46 (describing rules in adults that define arousals by certain EEG wave patterns and behavioral cues, e.g., eyes open, chin movement, etc. Arousals shift sleep stages, N2, N3, and R, back to stage N1 or stage Wake, and this fragments and disrupts sleep.). Awakening to take a second dose of oxybate, and having to set an alarm to do so (*see* fn 5 on AASM terminology defining arousal by Berry; *see* fn 27 on Xyrem and Xywav labeling) will cause sleep disruption and negatively impact sleep consolidation which is important for restorative sleep.

[3] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (explaining that "[s]coring of sleep stages occurs in 30-second epochs based on current American Academy of Sleep Medicine (AASM) scoring rules."). *See* Richard Berry, et. al, *Arousal rule*, *The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications*, American Academy of Sleep Medicine (2020), version 2.6 at 46.

[4] Richard Berry, et. al, *Arousal rule, The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications*, American Academy of Sleep Medicine (AASM) (2020), version 2.6 at 46 (explaining that arousals are defined with EEG criteria during stages N1, N2, N3, or R and are based on "an abrupt shift of EEG frequency . . .  that lasts at least 3 seconds, with at least 10 seconds of stable sleep preceding this stage."). When an individual awakens to take a second dose of medicine an "arousal" occurs because "behavioral cues, including open eyes [and] movement  . . . demonstrates alertness"—a change in consciousness. *See* Douglas Kirsch, *Stages and architecture of normal sleep,* UpToDate (Sep 12 , 2022). These behavioral cues inevitably occur in order to take a second dose of medicine, and even if the awakening is not remembered, nonetheless, it will fragment or disrupt sleep and is counterproductive to the treatment of narcolepsy.

[5] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (stating that: "[s]leep is a rapidly reversible state of reduced responsiveness, motor activity, and metabolism. It is a phenomenon observed in all animals in some form; this universality suggests that the act of sleeping likely has some evolutionary relevance. Humans spend approximately one-third of their life, or about eight hours per night, sleeping. The purpose of sleeping is poorly understood, however, and multiple theories exist. These theories include restoration, energy conservation, and memory consolidation.") (internal citation omitted).

[6] Kiran Maski, *Insufficient sleep: evaluation and management*, UpToDate (May 23, 2022) at https://www.uptodate.com/contents/insufficient-sleep-evaluation-and-management?search=sleep&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1).

[7] Chiara Cirelli, *Insufficient sleep: Definition, epidemiology, and adverse outcomes*, UpToDate (Oct 10, 2022) at https://www.uptodate.com/contents/insufficient-sleep-definition-epidemiology-and-adverse-outcomes). (explaining that "individuals may experience reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health.").

[8] *Id*.

2

Normal sleep architecture is characterized in adults as a progression of 90 to 120 minute sleep cycles starting with non-REM Stage 1 sleep (NREM or N1 sleep), then non-REM Stage 2 (NREM or N2) sleep, then non-REM Stage 3 (NREM or N3) sleep, and ending in Rapid Eye Movement (REM or stage R) sleep.[9] "Stage R is characterized by the presence of rapid eye movements and . . . is a unique time of the night in that dreaming occurs during Stage R sleep."[10] After Stage R, the normal adult has a very brief return to stage Wake (stage W), in the transition of going from cycle to cycle, though this awakening is not typically remembered, is normal and does not contribute to sleep fragmentation, sleep loss, or daytime sleepiness.[11, 12] It is part of the normal structure of sleep.[13] The normal sleep cyclical pattern repeats 4-5 times per night allowing sufficient time for all the purposes of sleep to be met.[14] Cycling progression through these stages is the basic structural organization of normal sleep and is called "sleep architecture."[15]

Each sleep stage has unique features. Stage N1 sleep is light sleep (easily arousable), Stage N2 sleep is intermediate in depth (less light sleep), and Stage N3 is deep sleep, otherwise known as restorative sleep, slow-wave sleep (SWS), or delta sleep.[16] Brain activity is low during Stage N3 sleep, and importantly, many recovery functions in the body occur only in this stage of sleep.[17] "For an average individual in their second decade, Stage N1 is 2–5% of the total sleep

---

[9] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?source=history_widget) (stating that "[s]coring of sleep stages occurs in 30-second epochs based on current American Academy of Sleep Medicine (AASM) scoring rules." Figure 10 portrays a hypnogram [sleep study] of a 36-year-old man in a sleep laboratory and it "represents the movement of a patient through various sleep cycles over the course of a single night . . . .").

[10] James A. Rowley & M. Safwan Badr, *Normal Sleep* at 3-5 in Chapter 1, *Essentials of Sleep Medicine a Practical Approach to Patients with Sleep Complaints*, (Meir Kryger et al. eds., 6th ed. 2017)

[11] *See* Figure 1.2, James A. Rowley & M. Safwan Badr, *Normal Sleep* at 5 in Chapter 1, *Essentials of Sleep Medicine a Practical Approach to Patients with Sleep Complaints*, (Meir Kryger et al. eds., 6th ed. 2017) (depicting normal sleep architecture which includes 4-5 sleep cycles per night with five progressive stages, beginning at stage W and ending in stage R before the cycle begins anew).

[12] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (explaining that: "[t]he polysomnogram is the primary tool for assessing sleep in the laboratory for both clinical and research purposes. During a polysomnogram, electroencephalography (EEG) and other sensors are used to categorize sleep in discrete stages.").

[13] M. A. Carskadon & W. C. Dement. *Monitoring and staging human sleep*, Chapter 2, in *Principles and practice of sleep medicine*, (Meir Kryger, et. al eds., 5th ed. 2011) at 12 (accessed at http://apsychoserver.psych.arizona.edu/jjbareprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) (explaining that "[b]rief episodes of wakefulness tend to intrude later in the night, usually near REM sleep transitions, and they usually do not last long enough to be remembered in the morning".)

[14] C. S. Nayak, et. al, *EEG Normal Sleep*. (accessed at https://www.ncbi.nlm.nih.gov/books/NBK537023/) (explaining that "[i]n normal adults, each cycle lasts for about 90 to 120 minutes, and there are about 4 to 5 such cycles that occur during a normal 8 hour night sleep.").

[15] James A. Rowley and M. Safwan Badr, *Normal Sleep*, Chapter 1 at 3-5 in *Essentials of Sleep Medicine A Practical Approach to Patients with Sleep Complaints,* 2e (M. Safwan Badr ed., 2022) (describing sleep architecture as "the organization of the sleep stages over the course of the night.").

[16] M. A. Carskadon & W. C. Dement. *Monitoring and staging human sleep*, Chapter 2, in *Principles and practice of sleep medicine*, (Meir Kryger, et. al eds., 5th ed. 2011) (accessed at http://apsychoserver.psych.arizona.edu/jjbareprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) at 11 (explaining that "[i]nvestigators often refer to the combined stages 3 and 4 sleep as slow-wave sleep [SWS], delta sleep, or deep sleep."). In the most current sleep terminology, Stage 4 is now part of Stage 3 and is no longer considered an independent sleep stage.

[17] D-J Dijk, et. al, *Regulation and functional correlates of slow wave sleep*, Journal of Clinical Sleep Medicine (2009) (accessed at https://pubmed.ncbi.nlm.nih.gov/19998869/ at 1 (stating that "[d]eep nonrapid eye movement

3

time, Stage N2 is 45–55%, Stage N3 13–23%, and Stage R is 20–25%."[18] Normally, the sleep cycles progress through the night with increasing time in Stage N3 during initial sleep cycles and increasing REM sleep in each later sleep cycle during the night.[19]

Stage N3 sleep has a unique and important role in restoring the mind and body.[20] With sleep loss or deprivation or interruption, one enters Stage N3 sleep earlier and with increased quantity during the night.[21] Thus, the body attempts to achieve sleep equilibrium by rapidly restoring this critical stage of sleep.  On polysomnography (PSG)—a diagnostic full sleep study with an electroencephalogram (EEG)—REM sleep is a time of active brain EEG waves and physiological instability characterized by somewhat irregular heart rate and breathing patterns.[22,23] REM is associated with paralysis of all muscles except the essential respiratory muscles (the diaphragm).[24]

---

[18] (NREM) sleep, also known as slow wave sleep (SWS), is considered to be the most restorative sleep stage and to be associated with sleep quality and maintenance of sleep.").

James A. Rowley and M. Safwan Badr, *Normal Sleep*, Chapter 1 at 3-5 in *Essentials of Sleep Medicine A Practical Approach to Patients with Sleep Complaints* (M. Safwan Badr, ed., 2nd ed. 2022). The second decade of life is often used as a standard or heuristic in sleep medicine literature.  The percent of time spent in each sleep stage declines with age when adulthood is reached. *See, also*, *Kirsch* (explaining how "[s]leep architecture also varies across the lifespan."); Figure 11: graphic representation of the changes of sleep as humans age. The graph portrays "age-related trends for stage 1 sleep, stage 2 sleep, slow wave sleep, rapid eye movement sleep, wake after sleep onset, and sleep latency (in minutes)."

[19] *See* fn 13, Figure 2-7 at 11 (picturing a sleep histogram with the progression of sleep stages across a single night in a normal young adult). The text describes the ideal or average pattern of time spent per stage.

[20] Lixia Chen, *et. al, The association between sleep architecture, quality of life, and hypertension in patients with obstructive sleep apnea*, Sleep and Breathing  (2023) (accessed at https://doi.org/10.1007/s11325-022-02589-z at 192 (explaining  that "N3 or SWS sleep is considered the most 'restorative' type of sleep  . . . .").

[21] Douglas Kirsch, *Stages and architecture of normal sleep* UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?search=stage%20N3%20sleep%20and%20sleep%20loss&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1 (explaining "[p]rior acute or chronic sleep deprivation may cause increases in stage N3 sleep and REM sleep."). *See also* M.A Carskadon and W. C. Dement Monitoring and staging human sleep, Chapter 2, in *Principles and Practice of Sleep Medicine*, (Meir Kryger, et. al eds., 5th ed. 2011) accessed at http://apsychoserver.psych.arizona.edu/jjbarreprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) at 12, 15 (stating that "[t]he SWS pattern reflects the homeostatic sleep system, highest at sleep onset and diminishing across the night as sleep pressure wanes. . . . Therefore, with total sleep loss, SWS tends to be preferentially recovered compared with REM sleep, which tends to recover only after the recuperation of SWS".).

[22] Ye Zhang, *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*, Sleep Medicine Reviews (Aug 2021) at 1 (stating that: [p]olysomnography . . . is the gold standard for objectively assessing sleep quantity and sleep quality."). See also Carley, et. al *Physiology of Sleep* at 6 (explaining that: "[p]hysiologically, the gold standard for assessment of sleep and wake states is the laboratory polysomnogram (PSG)" and further describing the numerous noninvasive sensors are attached to a subject).

[23] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?search=stage%20N3%20sleep%20and%20sleep%20loss&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=10; M. A. Carskadon & W. C. Dement. *Monitoring and staging human sleep*, Chapter 2, in *Principles and practice of sleep medicine*, (Meir Kryger, et. al eds., 5e. 2011) (accessed at http://apsychoserver.psych.arizona.edu/jjbarreprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) at 3-4 (explaining that REM sleep is characterized by bursts of rapid eye movements, muscle twitches and cardiorespiratory irregularities. "The mental activity of human REM sleep is associated with dreaming, based on vivid dream recall reported after approximately 80% of arousals from this state of sleep. . . . A shorthand definition of REM sleep, therefore, is an activated brain in a paralyzed body.").

[24] *See* James A. Rowley & M. Safwan Badr, *Normal Sleep*, Chapter 1 in *Essentials of Sleep Medicine A Practical Approach to Patients with Sleep Complaints,* (ed. M. Safwan Badr, 2nd ed. 2022) at 5.

4

**Arousals**

When an arousal occurs, e.g., to take medication during the night after falling asleep, there is a shift in an EEG pattern—one that leads to a longer stage W with alertness or consciousness, even if not remembered.[25] Both Xyrem and Xywav labeling explain that after a dose, it usually takes at least 5 to 15 minutes to fall asleep, which means it usually takes at least 5 to 15 minutes to fall back asleep after taking the second dose.[26] Awakening to take a second dose necessarily disrupts sleep and causes fragmented sleep.[27, 28] That duration of time in stage W is prolonged and will adversely impact a clinical measure called Wake After Sleep Onset (WASO)—a metric of how much wakefulness happens in a night of sleep.[29] In treating sleep disorders, including

---

[25] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?search=stage%20N3%20sleep%20and%20sleep%20loss&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=10) (explaining that arousals "bring[] the individual from deeper to lighter sleep or to wakefulness." *See also* Pierre Philip, et. al, *Sleep Fragmentation in Normals: A Model for Sleepiness Associated with Upper Airway Resistance Syndrome.* Sleep (Apr 1994) at 244-245 (explaining that in an experiment simulating arousals in healthy young volunteers, "the mean duration of an EEG arousal was 11 seconds. Sleep architecture was significantly modified after sleep fragmentation [using the external stimulation]. There was a significant increase in stage 1 NREM sleep from a mean of $10.4 \pm 8\%$ to $23 \pm 6\%$. . . . [D]espite prolongation of sleep to avoid sleep deprivation and a protocol set up to obtain sleep fragmentation with transient arousals only, the sleep architecture was significantly altered compared to the baseline night."). This study demonstrates that even short arousals will significantly increase wakefulness and disrupt sleep leading to sleep fragmentation resulting with new daytime complaints of sleepiness. The authors state: "[t]his investigation thus indicates a progressive increase in daytime sleepiness from morning to evening after 1 night of sleep fragmentation."

[26] Section 2.3 *Important Administration Instructions for All Patients*, Xyrem, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=926eb076-a4a8-45e4-91ef-411f0aa4f3ca) (the product labeling stating that "[p]atients will often fall asleep *within 5 minutes of taking Xyrem, and will usually fall asleep within 15 minutes*, though the time it takes any individual patient to fall asleep may vary from night to night. Patients may need to set an alarm to awaken for the second dose. Rarely, patients may take up to 2 hours to fall asleep.) (emphasis added); Section 2.4 *Important Administration Instructions for All Patients*, Xywav, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e0ae43a-037f-42af-8e23-a0e51d75abe8) (explaining that "[p]atients will often *fall asleep within 5 minutes of taking XYWAV, and will usually fall asleep within 15 minutes*, though the time it takes any individual patient to fall asleep may vary from night to night." (emphasis added).

[27] The term "arousal" is based on PSG—a test used to diagnose sleep disorders—which is performed at night and "nocturnal arousals" are those arousals that occur at night. The definition of "arousal" is derived from the AASM Scoring Manual v 2.6, page 19 and fn 3 *supra*, defines wakefulness as Stage Wake. Arousals will lead to wakefulness or lighter stage sleep. Wakefulness also refers to a clinical term of the state of not being asleep with varying degrees of consciousness. *See* Jonathan R.L. Schwartz & Thomas Roth, *Neurophysiology of Sleep and Wakefulness: Basic Science and Clinical Implications*, Current Neuropharmacology (2008) at 367, 370 (accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2701283) (describing the states of sleep and wake as an "on-off switch" between these behaviors, called a "sleep-wake switch." Per Schwartz and Roth: "[t]hese findings suggest that when the self-reinforcing properties of the circuitry are weakened, individuals shift back and forth between sleep and wakefulness more frequently as well." *See, also* Figure 3 at 370—a schematic diagram of the "flip-flop switch model." This scientific explanation means that sleep and wake are two distinct states, when one is "on" the other must be "off." Arousals, like that for taking a second dose of oxybate, flips the switch from "off" to "on" and this undoubtedly will disrupt sleep, cause fragmented sleep, and sleep loss.

[28] *See* fn 2 for the American Academy of Sleep Medicine's definition of "arousal."

[29] *What Is Wakefulness After Sleep Onset (WASO)?* Sleep Foundation (accessed at https://www.sleepfoundation.org/sleep-studies/wakefulness-after-sleep-onset#:~:text=Wakefulness%20after%20sleep%20onset%20is,their%20WASO%20is%2025%20minutes) (explaining that "[w]akefulness after sleep onset [WASO] is a measurement used to assess a person's sleep. It is the total number of minutes that a person is awake after having initially fallen asleep. For example, if someone wakes up once during the night and is awake for 25 minutes, their WASO is 25 minutes.").

FDA-OOPD-May23-POSTING-000056

narcolepsy, the goal is to maximize the time in sleep and minimize wake time. i.e., minimize WASO.

Disruption of sleep leads to the inability to enter Stage N3, or disruption of N3, and such individuals will revert back to Stage W and subsequently progress to Stage N1 sleep and so forth.[30] The disruption changes sleep architecture and will increase WASO. This disruption is something to be avoided in the narcoleptic patient, if possible.

**Narcolepsy**

Narcolepsy is a disorder of REM intrusion into wakefulness.[31] Sudden REM sleep onset during wakefulness causes loss of motor tone (sleep paralysis) along with a dream like state called cataplexy.[32] REM intrusion can also occur during sleep, disrupting the normal sleep architecture described above.[33] Individuals with narcolepsy "generally fall asleep rapidly but can spontaneously awaken several times during the night and have difficulty returning to sleep. This sleep maintenance insomnia seems paradoxical in a disorder characterized by daytime sleepiness, and it may reflect a low threshold to transition from sleep to wakefulness."[34] REM intrusion shifts sleep stages and prevents sleep continuity (also called sleep consolidation), fragments normal sleep architecture, and prevents sufficient deep sleep (prevents N3 restorative sleep from occurring because the sleep stages keep shifting to lighter sleep).[35] Often Stage N1 increases at the debt of Stage N3 sleep given the increased number of shifts between sleep stages.[36] This is seen in many sleep disorders, including narcolepsy.[37] This results in daytime sleepiness with the

---

[30] Richard Berry, et. al, *Arousal rule*, The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications, American Academy of Sleep Medicine (AASM) (2020), version 2.6 at 22-32.

[31] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022) (accessed at https://www.uptodate.com/contents/clinical-features-and-diagnosis-of-narcolepsy-in-adults?search=narcolepsy%20&source=search_result&selectedTitle=1~120&usage_type=default&display_rank=1).

[32] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022).

[33] Imran Ahmed & Michael Thorpy, *Narcolepsy and Idiopathic Hypersomnia*, at 328 in Chapter 15 in *Essentials of Sleep Medicine* (M. Safwan Badr et. al, eds., 2nd ed. 2022) (explaining that "[t]he effects of narcolepsy can be considered a manifestation of REM sleep dissociation, with features of REM sleep that intrude into [the NREM stages of] sleep and wakefulness" , instead of progressing normally).

[34] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022).

[35] Michelle T. Cao, et. al, *Narcolepsy: Diagnosis and Management* (explaining that "[n]arcolepsy disrupts the maintenance and orderly occurrence of wake and sleep stages."); Ye Zhang, *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*, Sleep Medicine Reviews (Aug 2021) (accessed at https://pubmed.ncbi.nlm.nih.gov/33934047/) at 11 (stating that: "nighttime PSG changes . . . demonstrate[] poor sleep continuity and altered sleep architecture in narcolepsy. It has been suggested that some PSG changes in narcolepsy such as frequent SS [stage shifts] and short bouts of wakefulness occur primarily in the second NREM sleep episode which hinders slow wave activity and provides inadequate NREM intensity."). Slow wave sleep only occurs in N3 and when SWS does not occur with enough intensity, an individual does not get restorative sleep. *See* fn 18 (explaining that: "[d]eep nonrapid eye movement (NREM) sleep, also known as slow wave sleep (SWS), is considered to be the most restorative sleep stage and to be associated with sleep quality and maintenance of sleep.").

[36] Ye Zhang, *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*. Sleep Med Reviews. (Aug 2021) (accessed at https://pubmed.ncbi.nlm.nih.gov/33934047/) at 1 (stating "[m]eta-analyses revealed significant reductions in sleep latency, sleep efficiency**,** *slow wave sleep percentage*, rapid eye movement sleep (REM) latency, cyclic alternating pattern rate, and increases in total sleep time, *wake time after sleep onset (WASO), awakening numbers (AWN) per hour, stage shift (SS) per hour, N1 percentage*, apnea hyponea index, and periodic limb movement *index in narcolepsy patients* compared with [healthy controls]") (emphasis added).

[37] *Zhang* at 4 (explaining that a "meta-analysis revealed significantly decreased . . . SWS% . . . and increased . . . N1 percentage" in narcolepsy compared with healthy controls.").

6

consequences of sleep fragmentation or sleep deprivation, i.e., altered sleep architecture which may affect daytime performance.[38]

EDS is the most common and chronic symptom of narcolepsy.[39]  Per Scammell: "[t]he sleepiness may be so severe that patients with narcolepsy can rapidly doze off with little warning; these episodes are commonly referred to as 'sleep attacks.'"[40]  Another symptom of narcolepsy, cataplexy, is an "emotionally-triggered transient muscle weakness" that can cause a patient to collapse.[41]

**Xyrem, Xywav, and Lumryz**

The FDA-approved labeling for Xyrem and Xywav instructs patients to awaken to take a second dose approximately 2.5 to 4 hours after initial administration and falling asleep.[42]  If patients do not intentionally awaken to take the second dose (e.g., by setting an alarm), the effects of the drug will wear off, and the patients may awaken anyway and need the second dosing to return to sleep. It is our opinion that awakening to take a second dose of sleep medication, such as Xywav or Xyrem, is not optimally supportive of the continual sleep necessary to restore sleep architecture and daytime alertness with more normal functioning.

Lumryz combines both short-acting and long-acting salts of sodium oxybate allowing once nightly dosing.[43] Lumryz provides "a proprietary drug delivery technology . . . [and this] technology provides an early single peak, following a gradual decline in [oxybate] concentration . . . The premeasured dosing packets contain a mix of immediate-release and controlled-release microparticles of [oxybate]."[44] This formulation of oxybate provides a novel dosing characteristic of once nightly dosing, which in our expert opinion provides a MCTPC over the immediate-release formulations alone, i.e., Xyrem and Xywav.

As stated above, Xyrem and Xywav are both dosed twice nightly, which means patients experience a nocturnal arousal to take the medication.[45]  Such arousals lead to awakening, i.e., consciousness, and this awakening disrupts sleep with the detrimental and harmful consequences that are known to occur with sleep loss.[46] Even with a single nocturnal arousal, there can be

---

[38] *Id*. at 1 (stating "[n]arcolepsy . . . is one of the most common causes of excessive daytime sleepiness (EDS) and is associated with an increased risk of car accidents, occupational problems, and injuries.").

[39] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022).

[40] *Id*.

[41] *Id*.

[42] Section 2.1, *Dosage and administration*, Xyrem labeling, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=926eb076-a4a8-45e4-91ef-411f0aa4f3ca); Section 2.1, *Dosage and administration*, Xywav labeling (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e0ae43a-037f-42af-8e23-a0e51d75abe8).

[43] Clete A. Kushida, et. al, *Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy*, Sleep (Jun 2022) at 2 (accessed at https://pubmed.ncbi.nlm.nih.gov/34358324/).

[44] Clete A. Kushida, et. al, *Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy*, Sleep (Jun 2022) at 2 (accessed at https://pubmed.ncbi.nlm.nih.gov/34358324/).

[45] It is self-evident that an arousal occurs upon taking the second dose of Xyrem or Xywav because some degree of consciousness or alertness is needed for the voluntary movements involved in taking medicine.

[46] *See* fn 3, 5 *supra*.

7

impairment of alertness and decline in cognitive performance the following day.[47] It is known that disrupting sleep, even briefly, changes sleep architecture—the normal pattern of NREM and REM cycles requisite for daily restoration.[48] Nocturnal arousals should be avoided—especially in those with sleep disorders—as the goal of treatment is to restore normal sleep architecture.[49]

It is incorrect to assume that a person with disrupted sleep can simply return to sleep and resume their normal sleep cycle. Rather, upon taking a second dose of Xyrem or Xywav, it may take at least 5-15 minutes to return to sleep—and such sleep does not resume where the patient left off to take their medication.  Rather a new cycle of sleep must begin anew.[50] Thus, this disruption to take a second dose of Xyrem or Xywav should be avoided, if possible. An oxybate product that is dosed once nightly provides an opportunity for narcolepsy patients to achieve normal sleep architecture, which is not a possibility for a patient on Xyrem or Xywav who must either wake up to take a second dose (disrupting sleep architecture) or allow the drug to wear off after 2.5-4 hours (reverting patients back to their naturally occurring, disrupted sleep architecture)."[51]

**Conclusion**

In summary, in our opinion, Lumryz provides a MCTPC over Xyrem and Xywav due to its once nightly dosing because, in treating a sleep disorder, it is best to eliminate or minimize nocturnal arousals to improve sleep quality and sleep architecture. This is a significant therapeutic advantage over the short-acting oxybate products. We defer to OOPD and the DN1 to determine

---

[47] Chiara Cirelli, Insufficient sleep: Definition, epidemiology, and adverse outcomes, UpToDate (Oct 10, 2022) at https://www.uptodate.com/contents/insufficient-sleep-definition-epidemiology-and-adverse-outcomes) (stating that: "[s]leep has two dimensions: duration (quantity) and depth (quality). When individuals fail to obtain adequate duration or quality of sleep, daytime alertness and function suffer. In response to sleep deprivation, sleep is often both longer and deeper. In many cases, however, sleep intensity can change without major changes in sleep duration. Sleep duration alone is therefore not a good indicator of how much sleep is needed to feel refreshed in the morning and function properly. . . . Sleep insufficiency exists when sleep is insufficient to support adequate alertness, performance, and health, either because of reduced total sleep time (decreased quantity) or *fragmentation of sleep by brief arousals (decreased quality)*") (emphasis added).

[48] *See* fn 26 *supra*. Once an arousal occurs, falling back to sleep begins at N1, not where the person left off in their sleep cycle prior to the arousal, and therefore, arousals will change sleep architecture.

[49] Thomas E. Scammell, *Treatment of narcolepsy in adults*, UpToDate (Nov 14, 2022) accessed at https://www.uptodate.com/contents/treatment-of-narcolepsy-in-adults?source=history_widget (explaining that "[m]anagement of narcolepsy is symptomatic, and there are no disease-modifying therapies yet available. . . . Sleep deprivation [including nocturnal arousals] may worsen narcolepsy symptoms, and therefore patients should be counseled to maintain a regular and adequate sleep schedule.").

[50] This is because once arousal occurs, falling back to sleep begins at N1, not where the person left off in their sleep cycle prior to the arousal—a missed opportunity to get into deep sleep (N3) which is restorative sleep.

[51] *See* Figure 1, Emmanuel Mignot, et. al, *Sleep problems in narcolepsy and the role of hypocretin/orexin deficiency* in Steiner MA, (eds): *The Orexin System. Basic Science and Role in Sleep Pathology*, Frontiers in Neurol Neuroscience (2021) at 105 (depicting a 24-hour hypnogram (a sleep study which is read from left to right). Panels 1(a) and 1(b) are hypnograms from the same patient suffering from narcolepsy. In Figure (a), the patient is close to onset of disease; Figure (b) is the same patient 6 months after diagnosis. Figure c is a control (person with no sleep disease). Figures 1(a) and 1(b) represent the natural state of narcolepsy. During the day, the patient is falling asleep and has periods of daytime REM sleep (blue bars). The fine needle like projections during nighttime sleep (after 8pm) shows cycling between N1 and wake representing fragmented sleep. This is not restorative sleep because rapid cycling to wake and N1 prevent stable progression to deeper stages of restorative sleep. The patient will be impacted the following day because their sleep has been disrupted—even if they do not awaken during the night—and this is what occurs when oxybate wears off.).

8

whether and how considerations other than those considered in this consult may factor into the agency's MCTPC analysis.

9