**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., ) | |
| ) | |
| ) | |
| Plaintiff, ) | C.A. No. 22-941-GBW |
| ) | |
| v. ) | |
| ) | ███████████████ |
| AVADEL CNS PHARMACEUTICALS, ) | |
| LLC, ) | REDACTED PUBLIC VERSION |
| ) | FILED OCTOBER 28, 2024 |
| Defendant. ) | |

**DECLARATION OF ALAN J. DEVLIN IN SUPPORT OF AVADEL CNS**
**PHARMACEUTICALS, LLC'S ANSWERING BRIEF IN OPPOSITION TO JAZZ'S**
**SUPPLEMENTAL BRIEF IN SUPPORT OF JAZZ'S SUPPLEMENTAL MOTION TO**
**STAY**

I, Alan J. Devlin, hereby declare and state as follows:

1.       I am a partner at the law firm of Latham & Watkins LLP, and counsel of record for Avadel CNS Pharmaceuticals, LLC ("Avadel") in the above-captioned case.  I am admitted to practice before the Court *pro hac vice*.

2.       I make this declaration in support of Avadel's Answering Brief in Opposition to Jazz Pharmaceuticals, Inc.'s ("Jazz") Supplemental Brief in Support of Jazz's Supplemental Motion to Stay.

3.       I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.       Attached as **Exhibit 1** is a true and correct copy of a letter from Jazz's counsel to the FDA's Assistant Deputy Chief Counsel Shoshana Hutchinson, dated December 6, 2022, and Bates-stamped FDA-Jazz-001240 to FDA-Jazz-001288.

5.      Attached as **Exhibit 2** is a true and correct copy of the Statement of Chair Lina M. Khan at the September Open Commission Meeting on Brand Drug Manufacturers' Improper Listing of Patents in the Orange Book, dated September 14, 2023, and available at https://www.ftc.gov/system/files/ftc_gov/pdf/2023.09.14-statement-of-chair-lina-m-khan-at-sept-ocm-re-orange-book.pdf.

6.      Attached as **Exhibit 3** is a true and correct copy of ██████████████

████████████████████████████████████████████████████

████████████████████████████

7.      Attached as **Exhibit 4** is a true and correct copy of ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

8.      Attached as **Exhibit 5** is a true and correct excerpt of Jazz's Form 10-K for the fiscal year ended December 31, 2008, available at https://investor.jazzpharma.com/investors/sec-filings.

9.      Attached as **Exhibit 6** is a true and correct copy of ██████████████

████████████████████████████████████████████████████

██████████████████████

10.     Attached as **Exhibit 7** is a true and correct excerpt of ██████████████

████████████████████████████████████████████████████

11.     Attached as **Exhibit 8** is a true and correct excerpt of Jazz's Form 10-K for the fiscal year ended December 31, 2021, available at  https://investor.jazzpharma.com/investors/sec-filings.

2

12.  Attached as **Exhibit 9** is a true and correct copy of a press release by Avadel titled "Avadel Pharmaceuticals Provides Corporate Update and Reports Second Quarter 2024 Financial Results," dated August 8, 2024, and available at https://investors.avadel.com/node/14011/pdf.

13.  Attached as **Exhibit 10** is a true and correct copy of Avadel's Form 8-K dated March 30, 2023.

14.  Attached as **Exhibit 11** is a true and correct excerpt of the August 28, 2024 deposition transcript of Brian Werner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 21, 2024 in Washington, D.C.

*/s/ Alan J. Devlin*
Alan J. Devlin

# EXHIBIT 1

CONFIDENTIAL

December 6, 2022

**BY EMAIL**

Shoshana Hutchinson
Assistant Deputy Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993

 Re:    **Orphan Drug Exclusivity for NDA 212690**

Dear Shoshana,

 We write on behalf of Jazz Pharmaceuticals, Inc. ("Jazz") regarding new drug application No. 214755, which was submitted by Avadel CNS Pharmaceuticals LLP ("Avadel") to the U.S. Food and Drug Administration ("FDA" or "Agency") pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDCA"). Avadel's section 505(b)(2) application seeks marketing authorization for a proposed once-nightly sodium oxybate product ("FT218") in reliance on FDA's finding that Jazz's product, XYREM® (sodium oxybate) oral solution, is safe and effective. Avadel's section 505(b)(2) application for FT218 received a tentative approval earlier this year. *See* Ltr. from Teresa J. Buracchio, FDA to Maria E. Scarola, The Wienberg Group (July 18, 2022) ("TA Letter").[1]

 The TA Letter noted that FDA had not determined "whether any orphan drug exclusivity ("ODE") recognized for XYREM® under NDA 021196 or for XYWAV® (calcium, magnesium, potassium, and sodium oxybates) oral solution under NDA 212690 affects the approvability of Avadel's application." TA Letter at 1 n.1 (cleaned up).

 On November 28, 2022, we requested a meeting with the Office of Chief Counsel ("OCC") to address important aspects of the ODE question before FDA makes a final decision.  Responding to that request, you inquired whether Jazz had additional information to provide regarding the ODE issue.  This letter responds to your inquiry and is intended to ensure that FDA is aware of certain developments related to the ODE issue. As before, we would be pleased to meet at your convenience to discuss these matters.

---

[1] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/214755Orig1s000TA_ltr.pdf.

## I.    XYWAV Is Safer Than, And Clinically Superior To, FT218.

The highest approved dose of sodium oxybate is 9 g per night. For both XYREM and FT218, 9 g of sodium oxybate contains 1,640 mg of sodium. Because narcolepsy is an incurable, chronic condition (narcolepsy), patients prescribed XYREM or FT218 are expected to ingest up to 1,640 mg of sodium every night, potentially for the rest of their lives.

The sodium contained in sodium oxybate imposes a clinically significant burden on patients. American Heart Association (AHA) guidelines provide:

> Nine out of 10 Americans consume too much sodium. The average American eats more than 3,400 milligrams (mg) of sodium a day. …
>
> The American Heart Association recommends no more than 2,300 mg a day and an ideal limit of less than 1,500 mg per day for most adults, especially for those with high blood pressure. …
>
> Some over-the-counter and prescription medicines also contain lots of sodium. Ask your health care professional or pharmacist about the sodium in your medicines.

AHA, *Answers by Heart: Why Should I Limit Sodium?* (2021).[2] The Agency's guidelines are similar. *See, e.g.*, FDA, *Food Facts: Sodium in Your Diet*, at 3 (June 2021).[3] So are the guidelines jointly published by the U.S. Department of Agriculture ("USDA") and the U.S. Department of Health and Human Services ("HHS"). *See, e.g.*, USDA / HHS, Dietary Guidelines for Americans: Executive Summary, at 4 (2020 – 2025).[4]

The 1,640 mg of sodium in a 9 g nightly dose of sodium oxybate by itself exceeds AHA's ideal limit and represents more than 70% of the upper limit jointly recommended by FDA, USDA, HHS, and many others. Further, adding a 9 g nightly dose of sodium oxybate to the existing diet of the "average" American would increase that person's daily intake of sodium to more than 5,000 mg per day—more than double the recommended upper limit.

XYWAV dramatically improved upon that situation. XYWAV reduces the sodium burden associated with oxybate therapy by approximately 92 percent. In other words, choosing XYWAV over sodium oxybate *removes up to 1,500 mg of sodium* from the patient's daily sodium intake. Again, that is a clinically meaningful reduction that is in line with the efforts of the Agency and

---

[2] https://www.heart.org/-/media/files/health-topics/answers-by-heart/why-should-i-limit-sodium.pdf.

[3] https://www.fda.gov/media/84261/download.

[4] https://www.dietaryguidelines.gov/sites/default/files/2020-12/DGA_2020-2025_ExecutiveSummary_English.pdf.

CONFIDENTIAL

others to combat the acknowledged epidemic of hypertension and cardiovascular disease. *See, e.g.*, Susan T. Mayne, Robin A. McKinnon, Janet Woodcock, *Reducing Sodium Intake in the US, Healthier Lives, Healthier Future*, 326(17) JAMA 1675-76 (Oct. 13, 2021) ("[E]xcess sodium is a key contributor to high rates of hypertension and cardiovascular disease. Hypertension is epidemic in the US and affects more than an estimated 100 million adults, approximately half the adult population." (footnote omitted));[5] *cf.* AHA, *supra* ("Even cutting back by 1,000 mg a day can improve blood pressure and heart health."); National Academies of Sciences, Engineering, and Medicine, *Dietary Reference Intakes for Sodium and Potassium*, 323, 328-29 (2019) (1,000 mg/day reduction in sodium intake reduces risk of cardiovascular disease and hypertension by 27% and 20%, respectively).[6]

Consistent with those public health concerns, when FDA recognized the clinical superiority of XYWAV in 2021, the Agency wrote:

> XYWAV (calcium, magnesium, potassium, and sodium oxybates) is clinically superior to XYREM by means of greater safety because XYWAV provides a greatly reduced chronic sodium burden compared to XYREM. The differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated.

FDA, Clinical Superiority Findings (June 24, 2021).[7] Although the Agency's determination compares XYWAV to XYREM, that finding applies with equal force to FT218. Because Avadel's proposed sodium oxybate product will contain the same amount of sodium as XYREM, it follows that XYWAV is clinically superior to FT218 by means of greater safety because XYWAV "provides a greatly reduced chronic sodium burden." *Id.*

Avadel is clearly aware that XYWAV represents a significant improvement over ***all*** sodium oxybate products, including FT218. Avadel's primary response has been a concerted effort to downplay the health risk associated with elevated sodium and the importance of reducing chronic sodium intake. In taking this approach, Avadel is placing its private financial interest in breaking through XYWAV's ODE above the public health. We previously detailed some of Avadel's sodium denial in a complaint submitted to the Office of Compliance in the Center for Drug Evaluation and Research ("CDER-OC"). *See* Ltr. from Sidley Austin LLP to Dr. Catherine Gray, FDA (Mar. 22, 2022) ("Trade Complaint"). Jazz also identified several examples of

---

[5] https://jamanetwork.com/journals/jama/article-abstract/2785289.

[6] https://nap.nationalacademies.org/catalog/25353/dietary-reference-intakes-for-sodium-and-potassium.

[7] https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings.

Avadel's sodium denial in a submission to the Office of Orphan Drug Products ("OOPD") in September 2021. *See* Ltr. from Dennis Ahern, Jazz to Sandra Retzky, FDA, at 7, n.38-40, 20-21 (Sept. 16, 2021) ("OOPD Submission"). We incorporate both documents by reference.[8]

We wish to draw the Agency's attention to the fact that Avadel's disinformation campaign regarding the risks associated with elevated sodium intake continues. A prominent example is a letter published by two Avadel employees in June 2022, which states:

> [D]ebate exists over the appropriate recommended threshold for sodium intake; the European Society of Cardiology has asserted that a population-level mean target below 5,000 mg per day is reasonable [7].
>
> [7] O'Donnell M, et al. Salt and cardiovascular disease: insufficient evidence to recommend low sodium intake. Eur. Heart J. 2020; 41(35):3363–3373.

Clete A. Kushida, et al., *Letter to the Editor: Response to: Once-nightly sodium oxybate (FT218) in the treatment of narcolepsy: a letter to the editor commenting on the recent publication by C. Kushida et al.*, Sleep. J., at 2 (June 2022) (attached as **Exhibit A**). That statement is clearly false.[9] First, as we previously explained, the recommendations of the European Society of Cardiology ("ESC") are slightly more strict than those of the AHA, FDA, and the other U.S. authorities. Specifically, the ESC recommends an upper limit of 2,000 mg of sodium per day and an ideal limit of 1,200 mg of sodium per day. *See* Trade Complaint at 3. There is no material debate, and it is false and misleading for Avadel to pretend otherwise.

It also is concerning that Avadel presents the work of Martin O'Donnell as if he spoke for the ESC. Martin O'Donnell is an infamous sodium denier whose work has been thoroughly debunked. *See, e.g.*, Norm R.C. Campbell, *Dissidents and dietary sodium: concerns about the commentary by O'Donnell et al.*, 46(1) Int'l J. of Epidemiology 362 (2017);[10] Norm R.C. Campbell, *More on dissidents and dietary sodium*, 47(2) Int'l J. of Epidemiology 670 (2018);[11] Francesco P. Cappuccio et al., *Sodium and Health: Old Myths and a Controversy Based on Denial*,

---

[8] We also incorporate by reference Jazz's request for ODE for XYWAV. *See* Letter from Arthur M. Merlin d'Estreux, Jazz, to Janet Maynard, FDA (Apr. 24, 2020).

[9] Indeed, we believe this statement should be considered intentionally false. Prior to the publication of the above article, we alerted Avadel that this representation was false. *See* Ltr. from Sidley Austin LLP to Jerad G. Seurer, General Counsel, Avadel Pharms. (Apr. 8, 2022). Avadel has refused to make any correction and has doubled down on its misrepresentations. *See* Ltr. from Latham & Watkins to Sidley Austin LLP (Apr. 21, 2022); Ltr. from Sidley Austin LLP to Latham & Watkins (July 7, 2022). The correspondence on this issue is collected and attached for the Agency's review as **Exhibit B**.

[10] https://academic.oup.com/ije/article/46/1/362/2760167.

[11] https://academic.oup.com/ije/article/47/2/670/4903005.

CONFIDENTIAL

11(2) Current Nutrition Reports 172 (June 2022);[12] *see also* Department of Health and Human Services, *FDA Justification of Estimates for Appropriations Committees – Significant Items*, Item 31, at 275-276 (FY 2017) (explaining that two O'Donnell et al. studies were "inconsistent with the large body of evidence that consistently shows a dose-response relationship between sodium intake and blood pressure"; they suffered from "major limitations" and did not "shift the weight of the evidence" regarding the risks posed by elevated sodium intake).[13]

As another recent example, Avadel's Chief Commercial Officer claimed at the September 2022 Ladenburg Thalmann Healthcare Conference that "less than 10% of patients … might benefit from … lower sodium" and that the "vast majority" would not benefit. Tr. of Ladenburg Thalmann Healthcare Conference (attached as **Exhibit C**). That message is inconsistent with the established the public health consensus that 90% of Americans consume too much sodium and would benefit from reduced sodium intake. Avadel's message also is directly at odds with FDA's finding that XYWAV's reduced sodium burden will be a clinically meaningful benefit "for a *substantial portion of patients* for whom the drug is indicated."[14] In short, Avadel's messaging continues to be misleading and inconsistent with the public health.

## II.    To Obtain Approval, Avadel Must Demonstrate That FT218 Is Clinically Superior to XYWAV.

XYWAV is protected by orphan drug exclusivity through 2027. As amended in 2017, section 527(a) of the FDCA provides that the Agency "may not approve another application … for the same drug for the same disease or condition" until that exclusivity expires. 21 U.S.C. § 360cc(a); *see Depomed v. HSS*, 66 F. Supp. 3d 217, 233 (D.D.C. 2014) (Brown Jackson, J.) ("Congress ***forbade*** the FDA from granting any further approvals when the statutory conditions were met.") (emphasis in the original). Because all of the conditions in section 527(a) are met, FDA cannot approve FT218 until XYWAV's exclusivity expires, unless a statutory exception applies. *See, e.g.*, *Catalyst Pharms., Inc. v. Becerra*, 14 F. 4th 1299, 1312-13 (11th Cir. 2022) ("Because it is undisputed that none of the statutory exceptions to Catalyst's market exclusivity apply, the FDA was prohibited from approving for sale the same drug … to treat the same autoimmune disease …."").

There are only "three statutory exceptions to the seven-year period of exclusivity. The first two are found in 21 U.S.C. § 360cc(b)." *Id.* at 1303. They involve shortages and consent, respectively, and they do not pertain to Avadel's application. Thus, the clear and direct command of the statute is that the only way for Avadel to break the ODE protecting XYWAV would be for

---

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9174123/pdf/13668_2021_Article_383.pdf.

[13] https://www.fda.gov/media/96028/download.

[14] https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings (emphasis added).

CONFIDENTIAL

Avadel to demonstrate that FT218 is clinically superior to XYWAV pursuant to section 527(c). *See* 21 U.S.C. § 360cc(c).

Nevertheless, Avadel's current public position is that it does not need to demonstrate that FT218 is clinically superior to XYWAV to obtain approval for FT218. Public sources do not reveal the reasoning behind that claim. We do not believe that there is any plausible way for Avadel to deny that FT218 and XYWAV are intended "for the same disease or condition." 21 U.S.C. § 360cc(a). Both drugs received orphan drug designation ("ODD") as treatments for narcolepsy and their indications are, according to Avadel's public statements, materially identical. *See* Avadel, *Press Release – Avadel Pharmaceuticals Announces Tentative Approval of LUMRYZ TM (sodium oxybate) extended-release oral solution* (July 19, 2022) ("LUMRYZ is a once-at-bedtime investigational formulation of sodium oxybate for the treatment of excessive daytime sleepiness (EDS) or cataplexy in adults with narcolepsy").[15]

By the process of elimination, then, it seems that Avadel must be trying to deny that XYWAV and FT218 are the "same drug." No one can deny that the two drugs share the same active moiety. That should be the end of the matter, as the word "drug" in section 527(a) has long been interpreted to mean "active moiety." *See Baker Norton Pharm., Inc. v. FDA*, 132 F. Supp. 2d 30, 34-35 (D.D.C. 2001).

We understand that the 1992 orphan drug regulations provided that two drugs containing the same active moiety would no longer be considered the "same" if one was clinically superior. 21 C.F.R. § 316.3(b)(14). This "not-the-same" fiction was an essential part of the regulations—it enabled FDA to both break through unexpired exclusivities and award new exclusivities. *See, e.g.*, 57 Fed. Reg. 62076 (Dec. 29, 1992) ("a clinically superior subsequent drug otherwise identical to a pioneer" covered by unexpired ODE "might not have been approvable prior to … this rule"). But the "not-the-same" fiction was also the very thing struck down in the *Depomed* and *Eagle* cases. *See Depomed*, 66 F. Supp. 3d at 234 ("This Court will not impute to Congress an intention to authorize [a clinical superiority] exception that Congress itself did not think worth enacting."); *Eagle Pharms., Inc. v. Azar*, No. 16-790, 2018 WL 3838265, at *6 (D.D.C. June 6, 2018) ("The Court thus agrees with the conclusion in *Depomed* that [section 527(a)] leaves no room for the FDA's imposition of its clinical-superiority requirement …."); *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) (FDA's interpretation "reads a limitation into the text that is not there. Nor is any such limitation required by the statute's structure or purpose. In the absence thereof, we cannot do the Congress's job for it by adding one.").

It is also true that Congress responded to those cases by amending the statute in 2017 to include a clinical superiority concept. However, Congress's take on clinical superiority does not

---

[15] https://investors.avadel.com/node/12856/pdf. The only difference in indication is that XYWAV and XYREM are approved for pediatric use, whereas FT218 is intended only for use in adults.

rely on the "not-the-same" fiction. Congress's version of clinical superiority is an express exception to the prohibition of section 527(a). That exception affirmatively embraces the view that all drugs containing the same active moiety are "the same" for purposes of orphan drug exclusivity. Thus, section 527(c)(1) provides that a later-in-time applicant can break through unexpired exclusivity (or obtain new exclusivity) only by demonstrating that its proposed drug will be "clinically superior to *any already approved or licensed drug that is the same drug*." 21 U.S.C. § 360cc(c)(1) (emphasis added). The amended statute plainly requires Avadel to demonstrate that FT218 is clinically superior to XYWAV to obtain approval. *See, e.g.*, *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) (the word "any" ordinarily includes "every member of the class or group").

Congress further repudiated the "not-the-same" fiction by amending the statute to include a new subsection (d). Prior to 2017, the Orphan Drug Act did not explicitly authorize FDA to promulgate regulations to implement orphan drug exclusivity. The new subsection (d) provided such rulemaking authority, but cabined that authority in two express ways. Specifically, the new subsection provides:

> [FDA] may promulgate regulations for the implementation of subsection (c). *Beginning on August 18, 2017*, until such time as [FDA] promulgates regulations in accordance with this subsection, [FDA] *may apply any definitions set forth in regulations that were promulgated prior to such date*, *to the extent such definitions are not inconsistent with the terms of this section*, as amended by such Act.

21 U.S.C. § 360cc(d) (emphasis added). The emphasized language marks out two key limitations. First, the explicit grant of permission to rely on the 1992 regulatory "definitions" means that FDA may not rely on other pre-2017 regulations implementing section 527. *See, e.g.*, *TransAmerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979) ("'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode'").[16] Second, FDA may continue to rely on the regulatory definitions only to the extent they are consistent with the amended statute. Those portions of 1992 regulatory definitions that include the "not-the-same" fiction are plainly inconsistent with the amended statute.

Further, applying the "not-the-same" fiction in this situation would be to repeat the same mistake highlighted by then-Judge Brown Jackson in *Depomed*. There, the court recognized that Section 527 pairs an express prohibition with specific enumerated exceptions and that such statutes leave no room for the agency to create additional exceptions. *See Depomed*, 66 F. Supp. 3d at 233

---

[16] For instance, until the Agency promulgates new regulations as authorized by Congress, the plain text of 21 U.S.C. § 360cc(d) indicates that FDA may not apply Subpart D of Part 316, titled "Orphan-drug Exclusive Approval," 21 C.F.R. §§ 316.31 to 316.36.

CONFIDENTIAL

("'Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied …'") (quoting *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-617 (1980)); *see also Beverly H. & Rehab Servs. v. NLRB*, 317 F.3d 316, 321 (D.C. Cir. 2003) (In such cases, "'the cannons of avoiding surplusage and *expressio unius* are at their zenith' because 'they apply in tandem.'") (quoting *Independent Ins. Agents, Inc. v. Hawke*, 211 F.3d 638, 645 (D.C. Cir. 2000). Breaking through the exclusivity for XYWAV on the theory that it is no longer the same as other oxybate products would imply a new, non-statutory exception.

Moreover, an exception based on the "not-the-same" fiction would swallow the rule. In codifying clinical superiority, Congress determined (as FDA previously explained) that new periods of exclusivity should be awarded based on clinical superiority in order to encourage and reward innovation. *See, e.g.*, 78 Fed. Reg. 35117, 35122 (June 12, 2013) (clinical superiority "best reflects" the purpose of the Orphan Drug Act "by encouraging the development of potentially safer and more effective orphan drugs—rather than encouraging minor modifications to already approved drugs that confer no meaningful benefit to patients"). That incentive will be meaningless if the clinically superior product is thought to be no longer the same as prior drugs containing the same moiety. The exclusivity obtained by a demonstration of clinical superiority would be nullified because it could be evaded simply by referring to an inferior predecessor as the listed drug for a section 505(b)(2) application or the reference listed drug for an abbreviated new drug application ("ANDA"). *See, e.g.*, 57 Fed. Reg. 62076, 62078 (Dec. 29, 1992) ("FDA … believes the requirement is necessary in order to protect the value of the primary incentive that Congress created in the Orphan Drug Act. *If FDA allows exclusive marketing rights to be eliminated without evidence of clinical superiority* or based on shoddy evidence, *the incentive will be worthless*.") (emphasis added)

Finally, we note that requiring a demonstration of clinical superiority in this context will affect only Avadel and future applicants. The companies that previously filed ANDAs seeking approval to market generic versions of sodium oxybate have all entered into settlement agreements with Jazz. Pursuant to those settlement agreements, an authorized generic is expected to enter the market in early 2023 and regular generics are permitted to enter, at the latest, at the end of 2025. The settlement agreements specify that none of those ANDAs or the corresponding products are affected by XYWAV's orphan drug exclusivity.

## III.    Avadel Cannot Demonstrate That FT218 Would Be Clinically Superior to XYWAV.

For several reasons, we do not believe that Avadel can demonstrate clinical superiority versus XYWAV. First and most importantly, Avadel's product contains the same amount of sodium as XYREM and is therefore less safe than, and inferior to, XYWAV. Nor can the increased risk associated with a return to a high sodium product be offset by FT218's extended-release formulation. As Jazz has previously explained, clinical superiority cannot be demonstrated through

CONFIDENTIAL

tradeoffs—a later drug is not clinically superior if it sacrifices the safety or efficacy achieved by its predecessors. *See* OOPD Submission at 2 n.4 (collecting precedents).

Second, Avadel still does not appear to have generated the type of data necessary to establish clinical superiority. Congress mandated that, when a sponsor seeks to break ODE, FDA "shall require such sponsor" to "demonstrate … clinical superior[ity]." 21 U.S.C. § 360cc(c)(1). Such a demonstration generally requires head-to-head data comparing the relevant products. *See* 57 Fed. Reg. 62076, 62078 (Dec. 29, 1992) ("the kinds of data needed to demonstrate clinical superiority for purposes of the Orphan Drug Act will be the same as the kinds of data required to allow label claims of superiority"); *see also* 21 C.F.R. § 202.1(e)(6)(ii) (advertising claims "that a drug is safer or more effective than another drug" must be supported "by substantial evidence or substantial clinical experience"). Avadel's only pivotal trial compared FT218 to placebo, meaning there are no data directly comparing FT218 and XYWAV.

Avadel has conducted studies comparing the pharmacokinetic ("PK") profiles of FT218 and XYREM, *see, e.g.*, David Seiden, et al., *Pharmacokinetics of FT218, a Once-Nightly Sodium Oxybate Formulation in Healthy Adults*, 43(4) Clinical Therapeutics P672.E1 (2021). The authors concluded that, at a 6 g dose, FT218 and XYREM were within bioequivalence criteria for overall exposure (AUC$_{0-\infty}$ and AUC$_{0-8}$), while FT218 had lower C$_{max}$ and C$_{8h}$ values, below bioequivalence criteria. Obviously, data comparing FT218 *to XYREM* cannot help Avadel establish clinical superiority *over XYWAV*, which has a different PK profile, including a lower C$_{max}$. Moreover, the data in the Seiden 2021 article appear to be out of date. Avadel employees just recently published another study comparing the PK profiles of XYREM and FT218. The new study obtained different results and found that the two drugs "were within the 80%-125% no-effect boundary for bioequivalence" on all measures, including C$_{max}$. Richard Bogan et al., *Randomized, crossover, open-label study of the relative bioavailability and safety of FT218, a once-nightly sodium oxybate formulation: Phase 1 study in healthy volunteers*, 100 Sleep Medicine 442, 444 (Dec. 2022) (attached as **Exhibit D**).

Third, the available data provide no reasonable basis to speculate that FT218 will have a materially different adverse event ("AE") profile from XYWAV. For instance, the authors of the recent PK study observed that the "most frequently reported adverse events were the same for [FT218] and twice-nightly [XYREM]" and that the two drugs were both "generally well tolerated in this study, with similar safety profiles, and no new safety signals." Bogan, *supra,* at 442, 445. The authors of Avadel's pivotal trial similarly observed that the "safety profile" of FT218 "was consistent with [XYREM]" and that the adverse drug reactions seen in the trial "were consistent with known side effects of [XYREM]." Clete A. Kushida, *Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy*, 45(6) Sleep J. (2022). Regarding falls in particular, they noted that patients receiving FT218 reported falls, *id.* at 9, and later conceded that only "clinical practice" will be able to "elucidate whether a single bedtime dose mitigates this risk." Exhibit A at 2.

**CONFIDENTIAL**

\*        \*        \*

For the above reasons, and those discussed in Jazz's prior submissions, we believe Avadel is required to demonstrate that FT218 would be clinically superior to XYWAV, but cannot carry that burden. We thank the Agency for its careful consideration of these issues and would welcome a meeting to discuss our concerns and/or answer any questions FDA may have.

Warm Regards,

_____/s_____

Sean C. Griffin
Kwaku A. Akowuah
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
(202) 736-8000
(202) 736-8711 (fax)
sgriffin@sidley.com
kakowuah@sidley.com

FDA-Jazz-001249

**CONFIDENTIAL**

## List of Exhibits

| Document | Description |
|---|---|
| Exhibit A | Clete A. Kushida, et al., *Letter to the Editor: Response to: Once-nightly sodium oxybate (FT218) in the treatment of narcolepsy: a letter to the editor commenting on the recent publication by C. Kushida et al.*, Sleep. J. (June 2022) |
| Exhibit B | Ltr. from Sidley Austin LLP to Jerad G. Seurer, General Counsel, Avadel Pharms. (Apr. 8, 2022); Ltr. from Latham & Watkins to Sidley Austin LLP (Apr. 21, 2022); Ltr. from Sidley Austin LLP to Latham & Watkins (July 7, 2022) |
| Exhibit C | Tr. of Ladenburg Thalmann Healthcare Conference |
| Exhibit D | Richard Bogan et al., *Randomized, crossover, open-label study of the relative bioavailability and safety of FT218, a once-nightly sodium oxybate formulation: Phase 1 study in healthy volunteers*, 100 Sleep Medicine 442 (Dec. 2022) |

FDA-Jazz-001250

CONFIDENTIAL

# Exhibit A

FDA-Jazz-001251

CONFIDENTIAL




Sleep Research Society®

*SLEEPJ*, 2022, 1–2

https://doi.org/10.1093/sleep/zsac042
Letter to the Editor

## Letter to the Editor

# Response to: Once-nightly sodium oxybate (FT218) in the treatment of narcolepsy: a letter to the editor commenting on the recent publication by C. Kushida et al.

Clete A. Kushida[1,*], Thomas Roth[2], Colin M. Shapiro[3], Asim Roy[4], Russell Rosenberg[5], Akinyemi O. Ajayi[6], David Seiden[7] and Jennifer Gudeman[7]

[1]Department of Psychiatry and Behavioral Sciences, Stanford University Medical Center, Palo Alto, CA, USA, [2]Sleep Disorders and Research Center, Henry Ford Health System, Detroit, MI, USA, [3]University of Toronto, Toronto, ON, Canada, [4]Ohio Sleep Medicine and Neuroscience Institute, Dublin, OH, USA, [5]Neurotrials Research, Inc., Atlanta, GA, USA, [6]Florida Pediatric Research Institute, Winter Park, FL, USA and [7]Avadel Pharmaceuticals, Chesterfield, MO, USA

*Corresponding author. Clete A. Kushida, Stanford Sleep Medicine Center, 450 Broadway Street, Pavilion C 2nd Fl MC 5704, Redwood City, CA 94063, USA. Email: clete@stanford.edu.

Dear Editor,
We thank F. Skobieranda, S. Candler, and W. Macfadden from Jazz Pharmaceuticals, Inc. for their comment on "Once-Nightly Sodium Oxybate (FT218) Demonstrated Improvement of Symptoms in a Phase 3 Randomized Clinical Trial in Patients With Narcolepsy." We appreciate their recognition of how this research will expand the legacy of sodium oxybate, which is the established gold standard in the treatment of narcolepsy.

Skobieranda et al. comment on the study design and discussion of efficacy and safety of FT218, or ON-SXB, as well as other oxybate formulations. REST-ON was conducted under a Special Protocol Agreement (SPA) assessment with the Food and Drug Administration (FDA), which is reached when the FDA agrees with the "adequacy and acceptability of specific critical elements of overall protocol design (e.g., entry criteria, dose selection, endpoints, and planned analyses)" allowing the study to be considered adequate and well-controlled to support a New Drug Application [1]. The ON-SXB trial design used a placebo-controlled evaluation of three therapeutic doses (6, 7.5, and 9 g) of ON-SXB, with evaluation at three prespecified endpoints: week 3 for 6 g, week 8 for 7.5 g, and week 13 for 9 g [2], similar to the dose escalation used in clinical practice.

The second comment is about the discussion of efficacy and tolerability rates. As noted in the publication, the discussion section explicitly stated that cross-trial comparisons should be interpreted with caution owing to different trial designs [2]. Given that clinicians and their patients may have a choice of 3 oxybate therapies if ON-SXB is FDA approved, the recognition of efficacy and safety data generated through these separate trials is relevant. Skobieranda et al. attribute the lack of efficacy observed with the 6-g dose of immediate-release, twice-nightly sodium oxybate (Xyrem) [3], in part to the shorter duration (4 weeks compared to 13 weeks). As described in the REST-ON trial design, the evaluation of ON-SXB 6 g occurred at week 3 [2].

The third comment focused on the relative tolerability of once-nightly vs twice-nightly oxybate. The rates cited for ON-SXB were also treatment-emergent adverse events, not adverse reactions. Furthermore, the cited treatment-emergent

© Sleep Research Society 2022. Published by Oxford University Press on behalf of the Sleep Research Society.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted reuse, distribution, and reproduction in any medium, provided the original work is properly cited.

FDA-Jazz-001252

adverse events were obtained from the published Jazz litera-ture, in which events with a p value of <.05 were considered related [3].

The letter authors contest the notion that falls related to the middle-of-the-night dosing may potentially be lessened with a single bedtime dose and remind readers that the Xyrem and Xywav Prescribing Information advise patients to stay in bed after the second dose [4, 5], guidance that was added to the la-beling in 2014 based on postmarketing surveillance reports. Falls may occur with any oxybate formulation. If ON-SXB is FDA ap-proved, clinical practice will likely elucidate whether a single bedtime dose mitigates this risk.

The final comment focuses on the lower sodium included in the recently introduced mixed-salt oxybates. Sodium oxybate, which contains approximately 1600 mg of sodium at its highest dose, has been used in the United States for nearly 20 years and in Europe for more than 15 years, providing a robust dataset to analyze for potential correlation to cardiovascular disease. When a comprehensive review of the literature was undertaken, no association between sodium oxybate use and cardiovascular disease was identified [6]. Beyond these reassuring findings, de-bate exists over the appropriate recommended threshold for so-dium intake; the European Society of Cardiology has asserted that a population-level mean target below 5,000 mg per day is reasonable [7].

Sodium oxybate remains underutilized 2 decades later after its introduction in 2002. We realize that innovation in medi-cine is often incrementally achieved, evolving the status quo. It is our sincere hope that if ON-SXB is approved by the FDA, the 3 oxybate formulations will allow clinicians to have a more patient-centered, personalized medicine approach to narco-lepsy care by enabling them to prescribe the oxybate medication that best meets their patients' individual needs.

## Acknowledgments

The Curry Rockefeller Group LLC (Tarrytown, NY) provided edi-torial support, which was funded by Avadel Pharmaceuticals (Chesterfield, MO).

## Authors' Contributions

C.A.K. and J.G. wrote the draft. All authors participated in critic-ally revising the content.

## Disclosure Statement

D.S. and J.G. are employees of Avadel Pharmaceuticals. C.A.K. is a consultant of Avadel Pharmaceuticals and XW Pharma, has served on speakers bureaus for Avadel Pharmaceuticals and Jazz Pharmaceuticals, and has received research grant funding from Avadel Pharmaceuticals and Jazz Pharmaceuticals. T.R. is a consultant for Jazz Pharmaceuticals, Takeda Pharmaceutical Co., Orexo, Avadel Pharmaceuticals, Eisai, Merck & Co., and Idorsia. C.M.S. is a consultant and has served on speakers bureaus for Avadel Pharmaceuticals and Jazz Pharmaceuticals. A.R. has received grant/research support from Jazz Pharmaceuticals, Suven, Inspire, Nyxoah, LivaNova, and Avadel Pharmaceuticals; is a consultant for Jazz Pharmaceuticals, Suven, Inspire, and Avadel Pharmaceuticals; and has served on speakers bureaus for Jazz Pharmaceuticals and Eisai. R.R. received research grant funding from Avadel Pharmaceuticals to conduct the current study. He has also received research grant support from Jazz Pharmaceuticals, Eisai, Merck & Co., Apnimed, Inc., Idorsia, Biohaven, and Suven Life Sciences Ltd. He has participated in advisory boards for Jazz Pharmaceuticals, Eisai, and Harmony Biosciences. A.O.A. is a consultant for Avadel Pharmaceuticals and is a consultant and has served on speakers bureau for Jazz Pharmaceuticals.

## Disclaimer

At the time of publication, there is an ongoing litigation between Jazz Pharmaceuticals and Avadel Pharmaceuticals.

## Data Availability

All relevant data are included within the text.

## References

1. US Food and Drug Administration. *Special Protocol Assessment—Guidance for Industry*. 2018.
2. Kushida CA, *et al*. Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 ran-domized clinical trial in patients with narcolepsy. *Sleep*. 2021. doi:10.1093/sleep/zsab200.
3. U.S. Xyrem Multicenter Study Group. A randomized, double blind, placebo-controlled multicenter trial comparing the effects of three doses of orally administered sodium oxybate with placebo for the treatment of narcolepsy. *Sleep*. 2002;**25**(1):42–49.
4. Jazz Pharmaceuticals. *XYREM (sodium oxybate oral solu-tion, CIII)*. *Full Prescribing Information*. Palo Alto, CA: Jazz Pharmaceuticals; 2020.
5. Jazz Pharmaceuticals. *XYWAV (calcium, magnesium, potas-sium, and sodium oxybates)*. *Full Prescribing Information*. Palo Alto, CA: Jazz Pharmaceuticals; 2021.
6. Avidan AY, *et al*. The sodium in sodium oxybate: is there cause for concern? *Sleep Med*. 2020;**75**:497–501.
7. O'Donnell M, *et al*. Salt and cardiovascular disease: insuffi-cient evidence to recommend low sodium intake. *Eur Heart J*. 2020;**41**(35):3363–3373.

FDA-Jazz-001253

CONFIDENTIAL

# Exhibit B

FDA-Jazz-001254

CONFIDENTIAL

April 8, 2022

**BY EMAIL AND FEDERAL EXPRESS**

Jerad G. Seurer
General Counsel and Corporate Secretary
Avadel Pharmaceuticals
16640 Chesterfield Grove Road, Suite 200
Chesterfield, MO 63005
jseurer@avadel.com

Dear Mr. Seurer,

Jazz Pharmaceuticals, Inc. (Jazz) demands that Avadel Pharmaceuticals (Avadel) cease and desist (1) efforts to promote its investigational new drug FT218 (sodium oxybate); (2) false claims regarding the recommended levels of daily sodium intake; (3) misleading efforts to minimize the well-established risks associated with high sodium intake; and (4) false claims regarding Xywav® (calcium, magnesium, potassium & sodium oxybates).

I.    **Unlawful Preapproval Promotion of FT218**

Avadel recently caused a false and misleading article to be published online regarding the sodium content of sodium oxybate. *See* Alon Avidan & Clete Kushida, *Is the sodium in sodium oxybate a risk for heart health? A plain language summary of publication*, Future Medicine, EPUB ahead of print (Mar. 4, 2022).[1] This "Plain Language Summary" (PLS) states that it was "supported" by Avadel and that Avadel "funded the medical writing support and…reviewed the final draft for scientific accuracy." *Id.* at 1, 7.

"[P]eople with narcolepsy and their families" are the intended audience. *Id.* at 1. The journal in which the PLS was published targets "non-specialist readers, such as patients and their carers …," and it claims to be the first "to publish plain language summaries of publications as standalone articles."[2] PLSs are designed and intended to be "disseminated across social media."[3] Metrics indicate that this PLS has been downloaded 474 times,[4] has been disseminated through 11 tweets from eight Twitter users with an upper bound of 21,217 followers,[5] and has been the subject of at least one public Facebook post.[6]

The PLS defines "sodium oxybate" to include both Jazz's product Xyrem® and "formulations … currently in clinical studies that could offer once-nightly dosing and do not require the person to wake up to take their second dose," *id.* at 1, a clear reference to FT218. The PLS

---

[1] https://www.futuremedicine.com/doi/epdf/10.2217/fca-2021-0134 (visited Apr. 8, 2022).
[2] https://www.future-science-group.com/what-we-do/#publishing (visited Apr. 8, 2022).
[3] https://www.plainlanguagesummaries.com (visited Apr. 8, 2022).
[4] https://www.futuremedicine.com/doi/10.2217/fca-2021-0134 (visited Apr. 8, 2022).
[5] https://futuremedicine.altmetric.com/details/124194162/twitter (visited Apr. 8, 2022).
[6] https://futuremedicine.altmetric.com/details/124194162/facebook (visited Apr. 8, 2022).

FDA-Jazz-001255

claims to have "found" that "sodium oxybate was not linked to cardiovascular risks, such as heart attacks or strokes." *Id.* It concludes that, "The sodium in sodium oxybate should not be a cause for concern for most people with narcolepsy in terms of cardiovascular risk." *Id.* at 7. The PLS further tells patients that, "Most people taking sodium oxybate do not need to change their sodium oxybate medicine because of the sodium content." *Id.* In other words, the PLS promotes FT218 by telling narcolepsy patients that they should not be concerned about sodium and should not switch to a lower sodium alternative, such as Jazz's product Xywav®.

Any promotion of FT218 before it is approved by the Food and Drug Administration (FDA) is unlawful. FDA regulations state that "a sponsor or investigator, or any person acting on behalf of a sponsor or investigator, shall not represent in a promotional context that an investigational new drug is safe or effective for the purposes for which it is under investigation or otherwise promote the drug." 21 C.F.R. § 312.7. By promoting FT218 in violation of § 312.7, Avadel has violated the Federal Food, Drug, and Cosmetic Act (FDCA). *See, e.g.*, 21 U.S.C. §§ 331(a), 331(k), 352(f)(1), 21 C.F.R. § 201.115(b); *see also* FDA, Untitled Letter to Nascent Biotech, Inc., at 2 (Nov. 1, 2019).[7] For similar reasons, Avadel has violated multiple state laws, including the Sherman Food, Drug, and Cosmetic Law, *see* Cal. H. & Safety Code § 111595(e) (incorporating FDA's Part 312 regulations as a condition for distributing investigational drugs in California), and California's Unfair Competition Law, *see* Cal. Bus. & Prof. Code § 17200 *et seq.* (prohibiting "any unlawful, unfair or fraudulent business act or practice").

## II.    **False Claims Regarding Daily Sodium Recommendations**

The PLS includes several demonstrably false claims in violation of the FDCA, the Lanham Act, and state law equivalents. *See* 21 U.S.C. § 352(a); 15 U.S.C. § 1125(a); Cal. H. & Safety Code § 111330(e); Cal. Bus. & Prof. Code § 17500.

The premise of the PLS is a false claim that there is a "debate" about appropriate sodium intake as allegedly shown by differences in recommendations from the American Heart Association (AHA) and the European Society of Cardiology (ESC). In particular, page 2 of the PLS claims that the ESC recommends less than 5,000 mg of sodium per day:

> **There is debate about what amount of sodium is best for one's health.**
> It is not proven that a low sodium diet is good for all adults. The American Heart Association and European Society of Cardiology each recommend different amounts of sodium for a heart healthy diet.
>
> Daily sodium limits:
> • American Heart Association recommends less than 2,300 mg per day
> • European Society of Cardiology recommends less than 5,000 mg per day

The ESC does not recommend an upper daily limit of 5000 mg of **sodium**. Rather, the ESC recommends an upper daily limit of 5000 mg of **salt**:

---

[7] https://www.fda.gov/media/132641/download (visited Apr. 8, 2022).

> In most Western countries, salt intake is high (≈9−10 g/day), whereas the recommended maximum intake is 5 g/day. Optimal intake might be as low as ≈3 g/day. Salt reduction can be achieved by dietary choices (fewer processed foods) and the reformulation of foods by lowering their salt content (see *section 5.2.2*).

European Society of Cardiology, *2021 ESC Guidelines on cardiovascular disease prevention in clinical practice*, 42(34) EUROPEAN HEART JOURNAL 3227, 3270 (Aug. 2021).[8]

Salt and sodium are not the same. "Salt … is a crystalline compound consisting of sodium (Na) and chloride (Cl). One gram of salt contains about 0.4 g of sodium and 0.6 g of chloride. Likewise, in the context of salt content or intake, one gram of sodium equals approximately 2.5 g salt." European Commission, Health Promotion Knowledge Gateway, *Dietary Salt/Sodium: Defining dietary salt and sodium*.[9] The AHA and ESC recommendations use different units because food labeling in the United States uses mg of sodium, while food labeling in Europe uses salt equivalents. *See id*. Thus, to compare recommendations across jurisdictions, one must adjust "'using the formula: salt = sodium x 2.5.'" *Id*.

Here, then, are the actual recommendations from the AHA and ESC:

| | Comparison of Dietary Sodium Recommendations | | | |
|---|---|---|---|---|
| | **Upper Limit** | | **Ideal** | |
| | Sodium | Salt | Sodium | Salt |
| **AHA** | <2,300 mg / day | <5.8 g / day | <1,500 mg / day | <3.8 g / day |
| **ESC** | <2,000 mg / day | <5 g /day | ≈1,200 mg / day | ≈3 g /day |

The claim that the upper limit is 5,000 mg of sodium is patently false. The ESC recommends an upper limit of no more than 2,000 mg of sodium per day, the same as recommended by the European Food Safety Authority (EFSA) and the World Health Organization (WHO). *See* EFSA, *Dietary reference values for sodium* (Sept. 4, 2019) ("2.0 g sodium/day");[10] WHO, *Global Action Plan for the Prevention and Control of Noncommunicable Diseases 2013-2020*, at 62 n.3 ("less than 5 grams of salt or 2 grams of sodium per person per day").[11]

---

[8] https://academic.oup.com/eurheartj/article/42/34/3227/6358713 (visited Apr. 8, 2022).
[9] https://knowledge4policy.ec.europa.eu/health-promotion-knowledge-gateway/dietary-saltsodium_en (visited Apr. 8, 2022).
[10] https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2019.5778 (visited Apr. 8, 2022).
[11] https://www.who.int/publications/i/item/9789241506236 (visited Mar. 30, 2022).

That false claim leads to several additional misrepresentations. For example, page 2 of the PLS includes a graphic that falsely tells patients that the ESC recommendation is more than twice that of the AHA:



In reality, the ex-U.S. recommendations (the WHO, the ESC, and the EFSA) are all slightly lower than the corresponding recommendations from the AHA.

The graphic also falsely claims that average daily intakes of 3,400 or 3,600 mg of sodium are below the ESC recommendation. The text reiterates those false claims and further asserts that these daily averages are associated with "ideal health outcomes":

> **Ideal health outcomes are expected when sodium intake is between 2,300 and 5,000 mg per day.** Most people in the United States and in the world have a daily sodium intake in this range.

This is false. According to FDA, overwhelming majorities (up to 97% in some groups) consume more sodium than the recommended upper limits. *See* FDA, *Population Exceeding Recommended Sodium Limit* (Oct. 2021).[12] Far from being "expected" to yield "ideal" outcomes, elevated levels of sodium contribute to unnecessary illness and death:

> Strong scientific evidence supports lowering sodium intake from current levels. The science supporting the relationship between sodium reduction and health is clear: When sodium intake increases, blood pressure increases and high blood pressure is a major risk factor for heart disease and stroke – two leading causes of death in the U.S.

FDA, *Sodium Reduction* (Oct. 13, 2021).[13] Given these risks, reducing daily sodium intake "has the potential to prevent hundreds of thousands of premature deaths and illnesses in the coming years" and is a critical public health priority. *Id.*

---

[12] https://www.fda.gov/media/152751/download (visited Mar. 24, 2022).
[13] https://www.fda.gov/food/food-additives-petitions/sodium-reduction (visited Mar. 24, 2022).

III.     **Misleading Minimization Of The Risks Associated With High Sodium Intake**

The PLS appears to be part of a broader campaign by Avadel to create a "debate" about the public health benefits of reducing daily sodium intake. Sodium denial appears to be central to Avadel's intended promotional strategy for FT218. For instance:

- December 4, 2019, Evercore ISI 2nd Annual HealthCONx Conference. Jordan Dubow, Avadel's Chief Medical Officer, stated: "We've really looked into sodium at length and we actually dig into the data. There really isn't that big of a link between sodium and cardiovascular risk, anyway … We don't think it's really a health issue. We don't think it's a safety risk."

- April 27, 2020, Avadel Pharmaceuticals PLC REST-ON Phase 3 Trial Data Call. Mr. Dubow, stated: "This whole notion of 2.3 g a day put out by the American Heart Association is based on older data, it's based on limited data. And there's actually a lot of newer epidemiological data that shows there's really a j-shaped curve of the risk of kind of salt and so-called cardiovascular risk like really low salt, i.e. less than 1 gram a day, or really high salt like, over 5.5 grams a day."

- June 5, 2020, Avadel Pharmaceuticals PLC at Jefferies Healthcare Conference (Virtual). Mr. Dubow stated: "[W]hen you look at the salt data at large, we have talked to leading world-renowned experts in salt, there is a lot of recent publications showing this U-shaped curve with salt intake."

Avadel is repeating misleading claims from flawed and discredited studies. As a large group of experts recently wrote, "there is no authentic debate" about the risks associated with high sodium intake. Francesco P. Cappuccio et al., *Sodium and Health: Old Myths and a Controversy Based on Denial, Current Nutrition Reports*, Current Nutrition Reports, EPUB ahead of print, at 7 (Feb. 13, 2022).[14] They explain that "a small group of scientists" who rely on "flawed methods" have published "controversial results that are decisively discredited by reputable scientists and scientific authorities." *Id.* at 2. Such articles "create a controversy based on denial of the merits of the existing scientific consensus." *Id.* "[A]ffected by poor rigor in research methodology, consistent bias and misrepresentation," such articles create "'a false equivalence even when there is only one credible side.'" *Id.* at 7.[15]

Avadel's claims about a "J" or "U" shaped curve are particularly misleading. Several years ago, officials with the Centers for Disease Control and Prevention (CDC) explained that observational analyses suggesting a J- or U-shaped relationship relied on flawed methods "that unacceptably overestimate individual [sodium] intake at low levels and underestimate intake at

---

[14] https://link.springer.com/content/pdf/10.1007/s13668-021-00383-z.pdf (visited Apr. 8, 2022).

[15] The PLS suffers from a similar lack of rigor and misrepresentation. The PLS overstates the quality and utility of the available data regarding the relationship between sodium oxybate and the risk of cardiovascular disease. The adverse event data and studies cited in the article were neither designed to assess nor capable of assessing the cardiovascular impact of lifelong exposure to 1000-1600 mg/day of additional sodium. The PLS provides no legitimate support for its conclusion that the sodium in sodium oxybate should not be a concern for patients.

high levels, by plus or minus 3000 mg." Mary E. Cogswell et al., *Dietary Sodium and Cardiovascular Disease Risk--Measurement Matters*, 375(6) N. Eng. J. Med. 580, 581 (2016).[16] The Department of Health and Human Services (HHS) and FDA subsequently raised similar objections in a report to Congress. *See* HHS, *Food and Drug Administration – Justification of Estimates for Appropriations Committee*, 275-76 (FY 2017).[17] In its comprehensive review in 2019, the National Academy of Sciences, Engineering, and Medicine (NASEM) concluded that claims of "J- and U-shaped relationships of sodium intake and cardiovascular disease and mortality" stem from "methodological limitations of the individual observational studies," including "their sodium intake assessment methods." NASEM, *Dietary Reference intakes for Sodium and Potassium*, at 227 & 233 (2019);[18] *see also id.* at 69 (attributing observations of J- or U-shaped curves to "systematic biases"). A meta-analysis in 2021 reiterated that the relationship between sodium intake and blood pressure is "approximately linear … with no indication of a flattening of the curve at either the lowest or highest levels of sodium exposure." Tommaso Filippini et al., *Blood Pressure Effects of Sodium Reduction – Dose-Response Meta-Analysis of Experimental Studies*, 143 *Circulation* 1542 (2021).[19] Today, "continuing to insist upon the validity of the J-curve representation of data, without recognizing and addressing criticisms and making appropriate amendments" harms the public health by "reinforc[ing] misperceptions about the benefits and risks of reducing sodium consumption." Cappuccio, *supra*, at 2.

In short, Avadel's efforts to minimize the risks associated with high sodium intake are false, misleading, and contrary to the current recommendations of FDA, HHS, the CDC, the AHA, the ESC, the EFSA, the NAESM, and the WHO. Moreover, these efforts are a direct threat to patient safety in the United States and abroad.

## IV.    False and Misleading Claims Regarding Xywav®

Avadel also has made actionably misleading statements regarding Xywav®. On December 3, 2020, Avadel's Chief Executive Officer, Gregory Divis, falsely claimed that FDA had rejected orphan drug exclusivity (ODE) for Xywav—he claimed that "the FDA has ruled on this already and it wasn't convinced that [Xywav] offered any sort of safety or efficacy advantage or a major contribution [to] patient care." Mr. Divis further claimed that Avadel was "not surprised by that decision because … [there is] no evidence to support that there is any sort of increased risk or CV risk." A few months later, on March 9, 2021, Avadel's Chief Commercial Officer, Richard Kim, falsely claimed that "there's really been no clinical benefit" for those patients who had chosen to switch from Xyrem® to Xywav®.

Mr. Divis's statement was clearly false. FDA had not made any decision regarding ODE for Xywav in December 2020. Indeed, FDA granted ODE to Xywav in June 2021 based on a finding that Xywav is clinically superior to sodium oxybate by way of greater safety. In doing so, FDA also rebutted Mr. Kim's false claim that there is no clinical benefit associated with the switch to Xywav. As the agency put it, "Xywav provides a greatly reduced chronic sodium burden compared to Xyrem. The differences in the sodium content of the two products at the

---

[16] https://www.nejm.org/doi/pdf/10.1056/NEJMsb1607161?articleTools=true (visited Apr. 8, 2022).
[17] https://www.fda.gov/media/96028/download (visited Apr. 8, 2022).
[18] https://www.nap.edu/catalog/25353/dietary-reference-intakes-for-sodium-and-potassium (visited Apr. 8, 2022).
[19] https://www.ahajournals.org/doi/epdf/10.1161/CIRCULATIONAHA.120.050371 (visited Apr 8, 2022).

CONFIDENTIAL

recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients." FDA, *Clinical Superiority Findings – Jazz Pharms. Ireland Ltd. for Xywav (calcium, magnesium, potassium, and sodium oxybates)* (Jul. 21, 2020).[20]

\*       \*       \*

Jazz reserves the right to seek all appropriate judicial or administrative relief based on the above violations. In addition, as you are on notice regarding the possibility of litigation, we demand that Avadel and its representatives preserve all potentially relevant documents, including electronically stored information.

Sincerely,

Sheila A.G. Armbrust
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
(415) 772-1200
sarmbrust@sidley.com

Coleen Klasmeier
Sean C. Griffin
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
cklasmeier@sidley.com
sgriffin@sidley.com

*Attorneys for Jazz Pharmaceuticals, Inc.*

---

[20] https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings (visited Apr. 8, 2022).

FDA-Jazz-001261

CONFIDENTIAL

330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
Tel: +1.312.876.7700  Fax: +1.312.993.9767
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

## LATHAM & WATKINS LLP

April 21, 2022

**VIA FEDERAL EXPRESS AND E-MAIL**

Shelia A.G. Armbrust
Sidley Austin LLP
555 California Street, Suite 2000
San Francisco, CA 94104

Coleen Klasmeier
Sean C. Griffin
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005

Dear Counsel:

We serve as outside counsel to Avadel Pharmaceuticals LLC ("Avadel") and write in response to your letter of April 8, 2022, sent on behalf of Jazz Pharmaceuticals, Inc. ("Jazz"). Your letter accuses Avadel of promoting its investigational new drug FT218 (sodium oxybate for extended-release oral suspension) and making false and misleading claims regarding both medical recommendations for daily sodium intake and Jazz's product Xywav (calcium, magnesium, potassium, and sodium oxybates oral solution). Your letter specifically focuses on a single publication, Alon Y. Avidan & Clete A. Kushida, *Is the Sodium in Sodium Oxybate a Risk for Heart Health?  A Plain Language Summary*, Future Cardiology (ePub ahead of print) (Mar. 4, 2022) (the "PLS").[1]  Your letter also references certain public statements made by Avadel representatives.  Your letter mischaracterizes the publication and public statements, and your accusations are wholly without merit.

> *First*, Avadel has not engaged in preapproval promotion of FT218.  Food and Drug Administration ("FDA") regulations prohibit sponsors from "represent[ing] in a promotional context that an investigational new drug is safe or effective for the purposes for which it is under investigation or otherwise promote the drug."[2]  The regulations are "not intended to restrict the full exchange of scientific information" concerning investigational drugs, "including dissemination of scientific findings in scientific or lay media."[3]  You claim that the PLS promotes FT218 by concluding that the sodium content of Xyrem has not been linked to cardiovascular risks while also noting that "formulations

---

[1] https://www.futuremedicine.com/doi/epdf/10.2217/fca-2021-0134.

[2] 21 C.F.R. § 312.7(a).

[3] *Id.*

April 21, 2022
Page 2

**LATHAM&WATKINS**LLP

of sodium oxybate are currently in clinical studies that could offer once-nightly dosing." However, the PLS is not a "promotional context"—Future Cardiology is a peer-reviewed journal.[4]  Authors Avidan and Kushida used their prior publication as the basis for the PLS,[5] which was itself based on previously published studies, the majority of which discuss Jazz's own data.  Avadel provided funding for medical writing support but did not control the content or conclusions of the PLS.  Regardless, the PLS also does not state or imply that once-nightly sodium oxybate is safe or effective for any indication.

> *Second*, in any event, to Avadel's understanding, the PLS—which, again, is not a statement by Avadel—makes no false claims regarding daily sodium recommendations.  In your letter, you reference a publication by the European Society of Cardiology ("ESC") to claim that the PLS confuses the ESC recommendation on <u>salt</u> intake for a recommendation on <u>sodium</u> intake, and, based on this, that the PLS falsely states there is disagreement on recommended sodium intake between the ESC and the American Heart Association ("AHA").  However, the PLS does not reference the publication discussed in your letter, *2021 ESC Guidelines on Cardiovascular Disease Prevention in Clinical Practice* (a 111-page report that mentions sodium only two times in the context of dietary recommendations).  The PLS does reference Martin O'Donnel, et al., *Salt and Cardiovascular Disease, Insufficient Evidence to Recommend Low Sodium Intake*, which was published in the European Heart Journal (an ESC publication).[6]  The O'Donnel publication is a 14-page review that describes the ESC's recommendation for <u>sodium</u> based on a comprehensive and current review of the associated cardiovascular risk.  As a general matter, we note there is also abundant evidence in the literature of disagreement on appropriate daily sodium intake within the scientific community.

> *Third*, Avadel has not made misleading public statements regarding the risks associated with high sodium intake.  As examples of what your letter terms "sodium denial," your letter quotes three statements by Avadel representatives from 2019 and 2020 to allege that Avadel has misleadingly minimized the public health benefits of reducing daily sodium intake.  Each of the quotes in your letter is taken out of context, but in any event, they are factually correct and, thus, cannot be false and misleading.  A broader view of the discussion before and after the quoted statements (from public transcripts) shows that the statements communicated: (1) there is a lack of scientific consensus on sodium intake and risk, and (2) sodium oxybate has been marketed for two decades without sodium-related safety issues.

> *Fourth*, Avadel has not made false or misleading claims regarding Xywav.  On this point, your letter first quotes a statement from Avadel's Chief Executive Officer, Greg Divis, from December 30, 2020, to allege that Avadel falsely claimed that FDA had rejected

---

[4] Future Medicine, "Peer Review Information," https://www.futuremedicine.com/reviewers.

[5] Alon Y. Avidan & Clete A. Kushida (2020), *The Sodium in Sodium Oxybate: Is There Cause for Concern?*, Sleep Medicine 75:497-501.

[6] Martin O'Donnel, et al. (2020), *Salt and Cardiovascular Disease: Insufficient Evidence to Recommend Low Sodium Intake*, European Heart Journal 41(35):3363-3373.

CONFIDENTIAL

LATHAM&WATKINS LLP

orphan drug exclusivity for Xywav.  However, again, your letter's quote is egregiously incomplete.  What Mr. Divis actually said was: "[I]t appears that, at least per the Orange Book as well as the orphan drug database, that the FDA has ruled on this already and it wasn't convinced that, that formulation offered any sort of safety or efficacy advantage or a major contribution of patient care."  This statement was true based on the publicly available information at the time—i.e., the Orange Book and FDA's public orphan drug database—which Mr. Divis referenced explicitly in the statement.  Your letter also quotes a statement made by Avadel's Chief Commercial Officer, Richard Kim, from March 9, 2021, to allege that Avadel falsely claimed there was no clinical benefit for patients who switched from Xyrem to Xywav.  Yet again, the quote in your letter is incomplete.  What Mr. Kim actually said was: "[A]s far as our competitors sort of conversion from the sodium oxybate twice-nightly to the mixed salt twice-nightly, I'm not sure how I sort of view their early success.  They clearly had some patients convert.  But if we really think about this, there's really been no clinical benefit for that conversion that's going on.  There are a lot of drivers.  There's been a lot of marketing and efforts that have gone on.  There is a lower co-pay for commercial patients for the mixed salt formulation."  This statement was not made with regard to any specific FDA standard of clinical benefit, but rather reflected on the fact that there is no data or other evidence to date showing a comparative clinical benefit of Xywav over Xyrem.

In sum, your claims regarding purported violations of the Federal Food, Drug, and Cosmetic Act, the Lanham Act, and associated federal and state laws and regulations are without merit.  Avadel will vigorously defend against any efforts by Jazz to pursue such claims.  Avadel also reserves the right to pursue administrative and judicial action to prevent further harassing conduct by Jazz.

Respectfully,

Matthew W. Walch
John R. Manthei
of LATHAM & WATKINS LLP

CONFIDENTIAL

July 7, 2022

**BY EMAIL**

John R. Manthei
Latham & Watkins
555 Eleventh Street, N.W., Suite 1000
Washington, DC  20004
John.Mathei@lw.com

Matthew W. Walch
Latham & Watkins
333 N. Wabash Avenue, Suite 2800
Chicago, IL  60611

Dear Counsel,

We write on behalf of our client, Jazz Pharmaceuticals, Inc. (Jazz), in response to the letters you sent on June 15, 2022 to Neena Patil, Jazz's Chief Legal Officer, and on April 21, 2022 to us, both on behalf Avadel CNS Pharmaceuticals, LLC (Avadel).

**I.    Avadel's Misbranding Allegations Have No Factual Or Legal Basis**

In your letter of June 15th, you allege that Xywav® (calcium, magnesium, potassium, and sodium oxybates) oral solution is misbranded in violation of Sections 502(a) and 301(n) of the Federal Food, Drug, and Cosmetic Act (FDCA). The allegation is frivolous.

First, your allegation relies entirely on a partial photograph of a single panel of a three-sided poster displayed at one table of a multi-table space at a medical conference. We are left to wonder, based on your reliance on a partial photograph, whether you reviewed the full panel prior to sending your letter. Regardless, the full panel complied with all applicable requirements and was submitted to the Food and Drug Administration (FDA) pursuant to Form FDA 2253. *See* 21 C.F.R. § 314.81(b)(3)(i).

Second, the phrase "Individualized Twice- or Once-Nightly Dosing With Xywav" is not false or misleading in any way. To the contrary, that phrase is a near quote of the FDA-approved dosing instructions for idiopathic hypersomnia (IH)

> The dosage and regimen of XYWAV should be individualized based on clinical presentation [*see Clinical Studies (14.3)*]. XYWAV can be administered as a twice nightly or once nightly regimen.

Xywav Package Insert, Section 2.3. Relatedly, your assertion that "the data does not support robust efficacy of once-nightly dosing" in adult patients with IH is unsupported and without merit. It amounts to nothing more than an attempt to second guess FDA's approval.

FDA-Jazz-001265

CONFIDENTIAL

Third, your assertion that the panel "fail[ed] to disclose both approved indications" is inconsistent with FDA regulations. FDA's regulations do not require promotional labeling to disclose indications other than the one being promoted. Thus, a prescription drug advertisement "**is not required** to include information relating to all purposes for which the drug is intended." 21 C.F.R. § 202.1(e)(3)(ii) (emphasis added). Instead, a prescription drug advertisement "**may optionally be limited** to a true statement of the effectiveness of the drug for the selected purpose(s) for which the drug is recommended or suggested in the advertisement." *Id.* (emphasis added). This and similar FDA regulations[1] show that Jazz is entitled to promote Xywav as a treatment for IH in adults without also discussing its use as a treatment for cataplexy or excessive daytime sleepiness in patients with narcolepsy.

Finally, your attempt to link this panel to the "20-year marketing history" of Xyrem® (sodium oxybate) oral solution is absurd. The conference space in which this panel was displayed was devoted exclusively to Xywav:



The space was further subdivided into distinct sections for the IH indication (where the panel in question appeared) and the narcolepsy indication:

---

[1] *See, e.g.*, 21 C.F.R. § 202.1(e)(3)(iii)(a) ("side effects and contraindications disclosed **may be limited to those pertinent to the indications for which the drug is recommended or suggested in the advertisement** to the extent that such limited disclosure has previously been approved or permitted in drug labeling conforming to the provisions of §§ 201.100 or 201.105") (emphasis added).

FDA-Jazz-001266

CONFIDENTIAL



In sum, the implication that the audience (healthcare professionals with sleep expertise) could have been confused is baseless and reflects a failure to investigate.

## II.     Avadel Made And Continues To Make False And Misleading Claims About Sodium

### A.     Prior False and Misleading Claims

We also wish to address Avadel's continued false and misleading claims. As we previously explained,[2] Avadel published a consumer-oriented article—Alon Avidan & Clete Kushida, *Is the sodium in sodium oxybate a risk for heart health? A plain language summary of publication, Future Medicine*, EPUB ahead of print (Mar. 4, 2022)—that falsely claimed, among other things, that there is a debate between the professional cardiology societies in Europe and America about the appropriate level of daily sodium intake; that the European recommendation is more than double the American recommendation; that the European Society of Cardiology (ESC) recommends an upper limit of 5,000 mg of sodium per day; and that observed average daily intakes in the U.S. and worldwide were both below the ESC's recommended upper limit.

None of the above is true. The reality is that the ESC recommends an upper limit of 2,000 mg of sodium per day (and an ideal intake of 1,200 mg of sodium per day). The ESC's opinion is aligned with, and slightly less than, the corresponding recommendation from the American Heart Association (AHA), which is 2,300 mg of sodium per day (and an ideal intake of 1,500 mg of sodium per day). And the observed average daily intakes in the U.S. and worldwide are well above both society's recommendations.

Your letter of April 21st attempts to defend Avadel's false claims but only makes matters worse. For instance, your letter mistakenly asserts that the Plain Language Summary (PLS) "does

[2] Ltr. from Sidley Austin LLP to Jerard G. Seurer, General Counsel, Avadel Pharms. (Apr. 8, 2022).

CONFIDENTIAL

not reference" the ESC guidelines and instead "does reference" an article by Martin O'Donnell and others (O'Donnell Article).[3] Neither assertion is correct. On its face, the PLS purports to discuss what the "European Society of Cardiology recommends" and to recount the "European Society of Cardiology opinion," which are indisputably references to the many guidelines published on the ESC website, which generally recommend an upper limit of 2,000 mg of sodium (equivalent to 5 g of **salt**) per day.[4] At the same time, the PLS does not refer in any way to the O'Donnell Article. Indeed, the PLS contains no citations at all, beyond a closing reference to the underlying article in *Sleep Medicine* by Avidan and Kushida.

Next, your letter appears to imply that O'Donnell can speak for the ESC because his article "was published in … an ESC publication." Any suggestion that the views asserted in an *European Heart Journal (EHJ)* article can be attributed to the ESC is profoundly mistaken. The front matter of every issue of the *EHJ* states:

> The opinions expressed in the European Heart Journal are those of the authors and contributors, and do not necessarily reflect those of the European Society of Cardiology, the editors, the editorial board, Oxford University Press or the organization to which the authors are affiliated.

The actual ESC guidelines (including each of the guidelines identified in Exhibit A) contain the opposite statement:

> The ESC Guidelines represent the views of the ESC and were produced after careful consideration of the scientific and medical knowledge and the evidence available at the time of their publication.

As a result, there is no possible ambiguity as to which sources constitute a recommendation or opinion of the ESC.

The observation that *EHJ* articles do not represent the views of the ESC applies with special force to the O'Donnell Article. Far from claiming to speak for any professional society or public health agency, the authors of the O'Donnell Article presented themselves (in the abstract and on page 3365) as providing "**a counterpoint to** the current recommendation for low sodium intake" (emphasis added). Moreover, Mr. O'Donnell is an infamous sodium denier whose work has been criticized many times. *See, e.g.*, Norm R.C. Campbell, *Dissidents and dietary sodium: concerns about the commentary by O'Donnell et al.*, 46(1) Int'l J. of Epidemiology 362 (2017); Norm R.C. Campbell, *More on dissidents and dietary sodium*, 47(2) Int'l J. of Epidemiology 670 (2018); Francesco P. Cappuccio et al., *Sodium and Health: Old Myths and a Controversy Based on Denial*, Current Nutrition Reports, EPUB ahead of print (Feb. 13, 2022).[5]

---

[3] Martin O'Donnell, et al., *Salt and Cardiovascular Disease: Insufficient Evidence to Recommend Low Sodium Intake*, 41(35) European Heart Journal 3363 (2020).

[4] We have collected a number of such guidelines in the attached Exhibit A.

[5] Your letter also claims that the O'Donnell Article "describes the ESC recommendation for **sodium**" (emphasis in the original). To the extent that statement is an attempt to attribute Mr. O'Donnell's personal

CONFIDENTIAL

In short, the ESC recommendation for daily sodium intake is a public and objective fact. The ESC recommends a daily upper limit of 2,000 mg of sodium per day. Avadel's claim that the ESC recommends a daily upper limit of 5,000 mg of sodium per day is undeniably false, as are all of Avadel's other claims built on that foundation.

### B.    Additional False and Misleading Claims

Your letter of April 21st argued that the PLS "is not a statement by Avadel." That argument never had merit, and it has been disproven by subsequent events. Instead of correcting the clear misrepresentations in the PLS, Avadel has chosen to repeat and amplify its false claims.

First, in recent weeks, the PLS has become a central feature of Avadel's promotional and other activities. For instance, the PLS is now posted to Avadel's website, where it is described as "the latest research and information about once-nightly sodium oxybte (ON-SWB)."[6] As another example, Avadel's Chief Medical Officer emphasized the PLS as a "key peer-reviewed manuscript" during Avadel's earnings call on May 9, 2022. As a third example, Avadel representatives distributed the PLS at the June 2022 conference of the Associated Professional Sleep Societies (APSS). Such efforts show that Avadel has adopted and is using the PLS, thereby promoting a document that contains multiple false statements of fact.

Second, we recently learned that two Avadel employees have published a second article repeating the same false claim about the ESC's recommendation. Relying on the same O'Donnell Article mentioned in your letter, Avadel's employees wrote:

> Debate exists over the appropriate recommended threshold for sodium intake; the European Society of Cardiology has asserted that a population-level mean target below 5,000 mg per day is reasonable [7].

> [7] O'Donnell M, et al. Salt and cardiovascular disease: insufficient evidence to recommend low sodium intake. Eur Heart J. 2020; 41(35):3363–3373.

Clete A. Kushida, et al., *Letter to the Editor: Response to: Once-nightly sodium oxybate (FT218) in the treatment of narcolepsy: a letter to the editor commenting on the recent publication by C. Kushida et al.*, Sleep. J., at 2 (2022).

For all the reasons discussed above and in our prior correspondence, this is a false claim. To the best of our knowledge, the ESC has never endorsed an upper limit of 5000 mg of sodium per day. The ESC has instead consistently maintained that the upper acceptable limit is 2,000 mg

---

view (that the allegedly lowest risk is in the "region of … 3-5 g/day" of sodium) to the ESC, it is incorrect for the reasons discussed above. To the extent the statement instead refers to the one passage of the article that actually mentions the ESC (page 3370 of the article), we note that the article discusses only materials from 2012 and 2016, ignoring all of the current guidelines collected in Exhibit A. Even so, the O'Donnell Article concedes that the ESC determined in 2016 that reducing sodium intake to below 2,400 mg of sodium per day was "a key topic to include in patient education."

[6] https://avadelmedicalaffairs.com/resources/ (visited July 5, 2022).

FDA-Jazz-001269

CONFIDENTIAL

of sodium per day, with the ideal target being 1,200 mg per day. *See* Exhibit A. Similarly, for the reasons discussed, it is false and misleading to represent that Mr. O'Donnell or the O'Donnell Article in any way represent the views of the ESC.

*     *     *

It is disappointing that Avadel continues to disseminate blatantly false information about international sodium guidelines and to undermine public health. Jazz again asks that Avadel cease these activities and take immediate steps to correct its misstatements.


Sincerely,

Sean C. Griffin
SIDLEY AUSTIN LLP

**Cardiovascular Disease (CVD) Prevention (2021)**

- **Section 4.3.2.2** – "In most Western countries, __salt__ intake is high (≈ 9 – 10 g/day), whereas the recommended maximum intake is 5 g/day. Optimal intake might be as low as ≈ 3 g/day. Salt reduction can be achieved by dietary choices (fewer processed foods) and the reformulation of foods by lowering their salt content."

- **Table 8** – "<5 g total __salt__ intake per day"

**Heart Failure (2021)**

- **Table 12** – "avoid[] excessive __salt__ intake (>5 g/day)"

**Diabetes, Prediabetes and Cardiovascular Disease (2019)**

- **Section 6.3.2** – "Reduction of <mark>sodium</mark> intake (to <100 mmol/day)"

    - *Note: 100 mmol of sodium is equivalent to 2.3 g of sodium or 5.8 g of salt*

**Chronic Coronary Syndromes (2019)**

- **Table 8** – "≤5 – 6 g of salt per day"

**Arterial Hypertension (2018)**

- **Section 7.4.2** – "Globally, usual <mark>sodium</mark> intake is between 3.5 – 5.5 g per day (which corresponds to 9 – 12 g of __salt__ per day), with marked differences between countries and even between regions within countries. We recommend <mark>sodium</mark> intake to be limited to approximately 2.0 g per day (equivalent to approximately 5.0 g __salt__ per day) in the general population and to try to achieve this goal in all hypertensive patients."

- **Section 13** – "__Salt__ restriction to <5 g per day is recommended."

**Peripheral Arterial Disease (2017)**

- **Section 4.2.4** – "an appropriate lifestyle and __salt__ intake (<5 – 6 g/ day) are recommended"

**Acute Myocardial Infarction in Patients Presenting with ST-Segment Elevation (2017)**

- **Section 7.1.2** – "Current guidelines on prevention recommend: … __salt__ intake of < 5 g per day"

FDA-Jazz-001271

CONFIDENTIAL

# Exhibit C

FDA-Jazz-001272

CONFIDENTIAL

# Ladenburg Thalmann Healthcare Conference

**Raymond:** 00:00

Hi, everyone. My name is Raymond and I'm associate healthcare, researching a lot of reforming and our next presentation is from Avadel pharmaceuticals. And we currently have a [sysco 00:10] buyer waiting in a 14.50 price target. Let me introduce management team, Tom McHugh, Chief Financial Officer and Richard Kim, Chief Commercial Officer [unintelligible 00:19] . But to start out with the team give an overview of the level set audience.

**Tom McHugh:** 00:25

Yeah, sure. So the way we sometimes describe Avadel. We're 30 year old startup, we are currently focused on getting our lead candidate LUMRYZ [sysco 00:35] to market. We had filed our NDA back in December 2020. And we're looking forward to an approval. And I'll go into a little more detail. But once we do get that approval. We're very excited about the prospect and the performance LUMRYZ and the benefit we provide to patients.

**Raymond:** 00:53

I appreciate that overview, I guess, just wanted to switch over to some questions and perhaps focus on the ongoing legal cases and just perhaps provide outline each moving part for now just to help the audience understand.

**Tom McHugh:** 01:07

It's a question we're often asked, the moving timeline. But I'll start by saying that from where we sit today, we believe, we're within 12 months of launching LUMRYZ, it's the most important thing to understand from our perspective. Within 12 month window contemplates; what we refer to the base case, which is we get to and approval of LUMRYZ and June of 2023, we view that as the outside date for an approval or an A final decision by the FDA. With perspective to the legal proceedings that Raymond mentioned, there's two legal proceedings are ongoing today. One is a suit we're pursuing against the FDA to accelerate the approval LUMRYZ. The other is a suit against a competitor. They have a patent listed in the orange book, we don't believe should be listed in the orange book. But both of those hearings are scheduled for the month of October is a successful outcome for us. You know, success being defined as the judge in either case agrees with our position with potentially to an approval of a LUMRYZ prior to the end of this year. And approval part of the end of this year with potentially close position to launch LUMRYZ right into the market as early as queue to next year.

**Raymond:** 02:21

So I guess, clarified maybe to the FDA, they move on their own timelines. It's different from like the legal proceedings.

**Tom McHugh:** 02:28

CONFIDENTIAL

Yeah, that's exactly right. So the FDA case, the hearing is set for a week from tomorrow on the next Friday. You know, precedent would suggest that from the time of the hearing, it could take perhaps a month for the judge to rule on that case. In which case, if it gets a ruling in our favor. We would ask that the FDA reached a final decision within 14 days of that decision date from the judge. So that would, if you think about the timeframe there, that puts us into a potentially a mid to late November timeframe for a final decision on LUMRYZ. The other case we're pursuing which is in Delaware, is to delist the patent from the orange book. If again, if in that case, the judge rules in our favor. And that hearing is set for October 25. We would ask that the judge have that patent delisted from an orange book within two weeks, and then we're on timeline according to the FDA, but we would file an amendment almost immediately to move from a tentative approval which we currently have to a final approval, then we're on the FDAs timeline at that point. So no, predictors of an exact timeline. But you do expect from our standpoint to push for status.

**Raymond:**  03:35
Just a follow up. Yes. So there's no set time of converting approval from FDA to prevail.

**Tom McHugh:**  03:44
In that second case? That's exactly right.

**Raymond:**  03:47
Okay. And of course, you prepare to watch [inaudible 3:51]

**Tom McHugh:**  03:52
That's right. In any case, we are moving forward with launch preparations, be prepared to launch as soon as possible following a final decision.

**Raymond:**  04:00
Appreciate the call on the title. And I guess switching gears and one of the perhaps go deeper into the commercial preparation and opportunity, but when it gets the majority of questions, then only to pepper you-

**Richard Kim:**  04:14
Tom very well explained--

**Raymond:**  04:17
Now, feel free to both jump in, you know, LUMRYZ recently received an approval and I just want to ask for assess how the company can leverage that [inaudible 4:28].

**Richard Kim:**  04:24
Well. It's great question, Raymond. So, working backwards from the PDUFA, there was pitch of activities. And when we got into the delay, it was a little bit ambiguous for some of our customers. When the tentative approval is done, it's made it real again. We've really ignited our payer conversations. We had begun our contracting discussions with GPOs ready. Our team just came out of the fall PCMA [sysco 4:51] being meeting last week and we had a very full schedule. So I think what the

CONFIDENTIAL

tentative approval is made is very real for a lot of our customers again, and a set date to work backwards from this as tom had mentioned the later bookend of June of next year for potential final approval. But what it's also been very important for us has allowed us to prepare our supply chain, final packaging. So we're starting to blend our and pack our the LUMRYZ into actual the packages ready right now. And also importantly, we have, in essence, the final blueprint for our REMS programs. So we're that would have taken us more time to start to build from the previous case, we've already begun sort of the final preparations to have our rooms fully operational as soon as possible.

**Raymond:** 05:31
Yeah. So I guess building upon the REMS. You still do need the final approval in order to kind of flush out the final steps--

**Tom McHugh:** 05:40
We do. But like, we have, in essence, what we believe is the practically the near final blueprint like, even we've already received our tentative label as well. We believe there will be very little movement in either of those, if any. And that's why that tentative approval is so important for us so that we can start to kick off the final stages of development for those programs.

**Raymond:** 05:59
I appreciate that. And I guess, we believe that LUMRYZ is a differentiated products to get to other oxybate products in the market. I just wonder how the reception has [inaudible 6:12]

**Richard Kim:** 06:16
The cool thing is maybe even more so than in high school, but I feel like we're pretty popular now. Like people are very interested in learning about LUMRYZ. So from a payer perspective, let's face it, payers like competition, and there's been not so much in the last a while there's a little bit more now. But I think importantly, we've really stressed the clinical value proposition is goes well beyond what once at bedtime therapy does. But you know, there's likely a chance to take that not miss a second dose to get the full therapeutic effect. And I think they've been very convinced that we have a very clear value proposition here as well. So it's been really engaging to have those conversations. So I think it's been-- we're right where we need to do with the payers and as far as the providers are concerned, you know, what's really interesting about this field of narcolepsy is, every therapy that's approved or use today has the chance to disrupt the night. So most wakening agents or stimulants have a potential side effect of insomnia. And the current twice night these make me wake up a second time during the middle of night, two and a half hours after. So, you know, with ours, there's a chance for an uninterrupted night's sleep while still addressing the excessive daytime sleepiness and our cataplexy as well. So it puts us in a very unique, unique position from a clinical value proposition. And I think it's been really well received by physicians. And maybe one other caveat is, we see it very clearly with high volume oxybate prescribers, but where we're seeing it, maybe the largest delta is in current low volume Oxybate prescribers, who maybe were a little less sold and twice nightly therapy, and also potential some more new prescribers who may come into the mix as well.

**Raymond:** 07:49

CONFIDENTIAL

Now, definitely. I guess I have to ask you, though, I know you might not be able to talk about it now. But your current philosophy on pricing perhaps--

**Richard Kim:** 07:58
Tom talks about it all the time--[laughs] No. So for us, it really stems back down from what our payer strategy is, and what we believe philosophically, even beyond the payers is with our clinical value proposition. We're going to win with clinicians, and we're going to win with patients. And we're going to try for a draw with a payers. So our strategy is really to have parity access, you know, with the brand, twice nightly is as well. So that sort of means in general, we've been sort of suggesting that we'll be more in the range of visible pricing, compared to the branded twice nightly oxybate as well,

**Raymond:** 08:30
We see that as potentially accelerating the payer adoption.

**Richard Kim:** 08:33
 Yeah, I mean, including, what's been going on pressers. Already, as we began to GPO conversations for quite some time, and also working with the PBMs. Also, for us, we have a unique distribution strategy, where we're going to be leveraging a specialty pharmacy networks that that's affiliated with the three GPOs that exist already today, that sort of gives us a little bit more leverage within each of the pair of families as well. So we had good conversations, they sort of slowed down. And as I mentioned, with the tentative approval, they've definitely picked back up again as well.

**Raymond:** 09:02
Definitely a good sign-- I guess perhaps maybe more granular is, your current state of your build out and commercial organization, it could provide some details?

**Richard Kim:** 09:14
Absolutely. No. So you know, unfortunately, this year after we receive some of the timing information, we did do a restructuring. We reduced our overall headcount by about 50%, sort of starting in June. But what we did do is we kept our essential sort of launch capabilities quickly, Jennifer Goodman in a medical affairs team, but our payer team, our patient distribution team, marketing, data analytics. So that's been going on still so we're sort of leaner, but maybe meaner are still mighty here. But as Tom mentioned, we're also sort of now in the mindset of building backwards because June is not that far away from us, even though we're going to the fall right now. So we've got our plans for the structure to for that build out. But the good news is we kept our core capabilities to make sure that we want to skip a beat as well.

**Raymond:** 10:01
Yeah. So I guess maybe a follow up is, what would the commercial team look like falling for approval? What I'm asking for us, how many sales rep you might shortlist provision perhaps?

**Richard Kim:** 10:13
It's a great question, Raymond. So for us, we always work backwards in the marketplace. And what that looks like here. And we've done a lot of work on our analytics here. But the simple math is there's

FDA-Jazz-001276

CONFIDENTIAL

about 5000 physicians who've ever prescribed an oxybate in the last two years, 1600 of those make up 80% of the overall oxybate volume, and less than 500 make up 50%. So we know exactly where all those folks are. So, you know, our goal right now out of launches, we definitely anticipate switches, discontinue patient therapies, patients come on including elbows, but building backwards from this bypass, and it doesn't take an army to get there. So our plans are to have 50 representatives out of the gate, we're going to move or concentrate on the 1600 because that's where the majority of volume is here. And then we'll be able to sort of flex from there. So it's a nice, compact, sort of operation for us right now. And it allows us to be laser focused on where those patients are. And, you know, we already know where they are with the prescribers today.

**Raymond:** 11:13
I wanted to talk about perhaps you mentioned switches in certain populations, wondering whether certain populations are really the low hanging fruit that you can perhaps target. how would be  the launch dynamics?

**Richard Kim:** 11:27
There's actually a lot of preliminary for us to look at here, if we think about those patients who are sort of existing on oxybates today, those who have recently discontinued, and we sort of consider in the last couple of years, and obviously, the de-novo patients as well. From all of our research and the discussions we have with providers, they're all really good candidates, you know, within the switch population, we know that XYWAV patients today are early adopters of therapy and seek that they're not usually satisfied with treatment. And so I get asked, sometimes, you know, are they going to be the more difficult patients to switch. A year ago, I would have maybe thought that but our research continually tells us they're the ones who was actively treating improvements in therapy. And our data tells us they're probably going to be more early adopters, XYWAV patients, there's a little bit of stickiness there more so from fear of losing out of their current therapy, but the proposition for them with LUMRYZ is probably even more clear. And then if you think about so there's about 60,000 of those patients today, if you think about it in just the last couple of years, there's 10, or three or sorry, there's been 10 to 15,000 patients who have discontinued a twice nightly oxybate. And the main reasons why they discontinue is because it didn't work, or they couldn't take the therapy, from our research. And we believe those two are much intexwoven, because it may not work if you don't take your dosing all the time as well. So that's a population that we think is almost exclusively available for LUMRYZ upon launch. And then the last thing is, right this is a long answer. But the last thing is what we hear quite frequently and consistently, as far as de-nova patients are concerned, it would be a lot easier to explain the utilization of a once at bedtime therapy than a twice nightly for someone who has no context, who already has disrupted nighttime sleep, for example. So we feel very well positioned for all the segments. But we're definitely-- we know where all the current oxybate Patients are already from our analytics today.

**Raymond:** 13:19
And I guess, touching upon which patients I know you alluded to previous of patients service portal and websites, I was wondering how that might impact?

**Richard Kim:** 13:30

FDA-Jazz-001277

CONFIDENTIAL

Absolutely. Well, you know, one of the challenges is when you have products that are specially pharmacy distributed and have REMS, it's complicated to get access to them, and it's tough for the patient. It's tough for the office. So we have already begun our build out of our Patient Services Center. And the goal there is really to be evaluated one stop shop. So both the patient and the office knows who to talk to, they'll know the case across the board here as well and help them with everything from copay assistance to interruptions and access to therapy and clearly had to be the beginning of launch sort of helping getting getting the adjudication of claims through as well. Clearly also supporting the work, especially pharmacies, but we see a tremendous opportunity to add a lot more services there than what exists in the marketplace today. And that's what we've been hearing from offices and in the offices. It's mostly the medical assistants that do a lot of the work. So we've spent a lot of time listening to them about how we can provide more services to help them help their patients.

**Raymond:**  14:34
One question might be is, how should maybe investors look at the launch dynamics, if there's something you can look to or just something maybe idiosyncratic, how you're launching?

**Richard Kim:**  14:47
Maybe the questions sort of like analogues and things as well. So I mean, so I'm always cautious. I mean, Tom would like me to say there's lots of pent up demand and all these sorts of things, and there probably is we don't assume that they're like and our assumption is most patients will come see their sleep specialist in the normal course of their follow up. Now we get a lot of emails, we get questions from patients who are literally waiting, like, please tell us when it's coming here as well. But we will sort of see sort of a, you know, a, what I would call more of a normal ramp up will actually happen to have time to build up in the marketplace as well. But, what I would sort of expect is, like, good and steady because of the fact that there's such a concentrated prescriber audience, that's what we're going to be contacting or effort at the beginning of the launch as well. So, in considering that 1600 make up 80% of the volume, that's where we'd expect to see the initial utilization within the treatment audience today as well. So I don't want to sort of necessarily try to predict the future today. But we're, we feel pretty confident about the chances for LUMRYZ have a really solid uptake at right out of the gate.

**Raymond:**  15:50
It definitely makes sense. Now we'll go into the competitive dynamics, there are oxybate products in the market. So I wanted to ask, like, how you see Xyrem, XYWAV? How those patient will be switched from Xyrem to XYWAV? is it really the kind of the low salt is selling them? Are there other dynamics that conflicts with?

**Richard Kim:**  16:10
What our research tells us is, it's driven by the low salt message, and also, there's been some pharmacy assistance as far as getting those messages out to patients as well. So, what our data tells us as well, as patients haven't really seen any clinical difference, as far as switching from Xyrem to XYWAV. I mean, as far as looking at narcolepsy, it's the same, you know, GHB active ingredient there. And you know, to a candidate, there are probably some patients, you know, our data would tell us less than 10% of patients who might benefit from a lower sodium on controlled hypertension, renal patients, but for the vast majority, that's likely not the case as well. So they're going to do what they're going to

CONFIDENTIAL

do. And you can probably ask those companies what they're thinking there as well. But the one thing that's very clear, is around the unmet need that can be addressed from a once at bedtime therapy. And that's something that [unintelligible 17:01] can offer today.

**Raymond:** 17:03
Now, make sense. Yes. Another competition questions, more authorized generics are coming online soon? Has that kind of influence your thinking or any color on that?

**Richard Kim:** 17:15
Great question. And so we've assumed from day one, that the AG would be on the marketplace by the time we launch. So it's really been built into all of our conversations already that we're having with payers. So in general, what we believe and what we've heard so far is, most AG [ sysco 17:30] come in about a 50% visible discount compared to the branded products. And that's actually feedback that we've heard from a lot of our constituents as well. The thing to keep in mind is Xyrem is at about a half, eight and a half percent price premium over XYWAV today. They took a price increase in Xyrem last year that XYWAV didn't take. So that differential compared to at least XYWAV is probably a little bit truncated. What we've heard is there's a limited sort of volume agreement already with Hickman as well. So. and for us, it's still a twice-nightly, fundamentally the clinical value proposition hasn't changed. So we've already been working with the GPOs, as far as our contracting discussions with this in mind, so I'll never say it won't be an issue. But we've fully accounted for the fact that the AG would be on the marketplace,

**Raymond:** 18:16
More of an issue of already existed twice.

**Richard Kim:** 18:20
Potentially.

**Raymond:** 18:20
Yeah, definitely appreciate that. I guess, maybe. You know, maybe to ask about financial aspects, you have guided current, the current burn rate and financial runway, I was wondering if we want to reiterate it, if you might need additional cost reduction?

**Tom McHugh:** 18:42
You know, so quite the opposite in terms of cost reductions, you know, at this point, we know, we've secured the cash runway to get us to an outside the approval of June of 2023, quite frankly, a little bit beyond that, our attention is turning towards rebuilding the organization and preparing for launch. It's a tremendous opportunity for the products, tremendous opportunity for the company. You know, as I mentioned earlier, it's, you know, believe it's, we've been watching into what we decided for 3 billion plus market size, not suggest where our share goes from there. But, you know, to kind of put the math in place for you, you know, today the twice-nightly products on average per patient, per years, but 115 to 120,000 net revenue. For a company like us where we're coming from zero revenue, if you just do simple math, you take 1000 patients, and you round off to 100,000. So every 1000 patients is 100 million in revenue for our company. It's very, very meaningful. That's why we're fully turning our

CONFIDENTIAL

attention at this point to where we have a cash runway secured, to being prepared to watch as quickly as possible.

**Raymond:** 19:49
I appreciate that. So I guess more than spend would be the next year.

**Tom McHugh:** 19:57
We're going to be judicious with our resources of course you know, and practical. And, you know, some of the points that Richard has already mentioned. We are proceeding forward in all fronts and possibly can at this point like building commercial supply, completing the build of our REMS program, up to the point, you know, where we have to wait for final approval. So we can do a lot of activities. Now, it's already factored into our cash runway. But to your point, you know, we're looking at probably, spend to ramp, really into the second first half of next year.

**Raymond:** 20:36
Can you possibly describe the timeline for potential orphan drug designations to LUMRYZ? Or is it something we should expect before or after?

**Tom McHugh:** 20:44
Through our interaction with the FDA, and I certainly can't speak for them, but we believe they have everything they need to make the decision on orphan drugs. The timing of it would be-- we would expect it to be at around the time of the final decision on approval for LUMRYZ. So it's, again, as we talked about potential timelines for an approval, potentially as early as the end of this year, but by June of next year, that's how we expect the orphan drug decision to come.

**Raymond:** 21:13
Are you still having an open label extension study to restore study?

**Tom McHugh:** 21:15
We do.

**Raymond:** 21:15
Can I ask maybe, what's the perception of that? And I know you've had recent data come out since 2002. And I was wondering any potential databases?

**Richard Kim:** 21:34
Absolutely. So first, maybe the first thing I'm really proud of all of us at Avadel is despite the restructuring. And the time delays, the priority was to make sure that those patients didn't have interrupted supply of LUMRYZ. And I actually had a chance to meet a couple of our patients from restore last week, and it's been really cool to see and we have over 180 patients who are enrolling in the study. And, you know, there's one key question that's asked for patients, and about two thirds of them have switched from a twice nightly oxybate. And there's one key question that's asked the patients once they've had at least three months of LUMRYZ therapy, which is what your preferred agent regimen is. And in our last data cut is 92.4% said the once-nightly, in the survey says once-

nightly. Alright, so but some other really important data that's coming out from there. We know that from the survey from the study, two thirds of patients on twice-nightly have missed a dose within the last 60 days. 80% of them reported feeling worse the next day, because they miss that second dose. So these are the problems we're solving for or trying to solve a problem arise. And we also have NHS coming up in October, we're going to be having some updates to the data as well. So it's been really great to hear my quick story about one of the patients I met is she is a college student. And she tended to wake. Xyrem really helped her out. But she tended to wake up a little bit later per second dose. And her dilemma was, do I take a second dose and miss my morning classes? Or do I miss my second dose? And do I almost struggle to get through the day, and with LUMRYZ, she has been on for almost two years. She's now on track to graduate next year. And she told us something very simple and profound. She goes, "I can now make breakfast every morning. I have enough time". And you know, for her, she commutes. So her ability to eat before she goes is really important. And the last thing she said is, "I used to think my commute was 45 to 50 minutes and since I've been on LUMRYZ, I realized it's only 20-25 minutes". Because she's sort of a lot more mature and focus. So those are the things that really get us going. And it's just great to hear those stories from patients who have already had a chance to experience what LUMRYZ can offer.

**Raymond:** 23:41
Definitely achieve that. Stories are very important. Making a real impact. I guess, last minute. In the future, pipeline, contraindications. What are your thoughts on that?

**Richard Kim:** 23:55
I'll start with at least indications and maybe complicate the other. So, you know, we get asked a lot about other indications. IH is clearly an obvious one. What we hear from thought leaders is as strong as our proposition is in narcolepsy is probably even stronger in idiopathic hypersomnia as well. So we have spoken we've prepared but you know, Tom needs to give us some money. The medical team some money to get that going. But there's definitely high interest in IH across the board.

**Tom McHugh:** 24:21
Yeah, certainly. IH, you know, we've also commented previously, we're working on you know, low sodium. We're early stages, when it can go into large detail at this point, but, you know, we are working on things but we are laser focused on getting LUMRYZ approved and LUMRYZ for the patients who absolutely deserve it.

**Raymond:** 24:40
Yes, that's all the time we have. I want to thank the management team for giving such great detailed answers.

FDA-Jazz-001281

CONFIDENTIAL

# Exhibit D

FDA-Jazz-001282

Sleep Medicine 100 (2022) 442–447



Contents lists available at ScienceDirect

# Sleep Medicine

journal homepage: www.elsevier.com/locate/sleep



# Randomized, crossover, open-label study of the relative bioavailability and safety of FT218, a once-nightly sodium oxybate formulation: Phase 1 study in healthy volunteers



Richard Bogan [a], Michael J. Thorpy [b], John W. Winkelman [c], Jordan Dubow [d], Jennifer Gudeman [d, *], David Seiden [d]

[a] University of South Carolina School of Medicine, 1333 Taylor Street, Suite 6-B, Columbia, SC, 29201, USA
[b] Albert Einstein College of Medicine, 3411 Wayne Ave, Bronx, NY, 10467, USA
[c] Massachusetts General Hospital, 221 Longwood Avenue, Suite BL-438, Boston, MA, 02115, USA
[d] Avadel Pharmaceuticals, 16640 Chesterfield Grove Road, Suite 200, Chesterfield, MO, 63005, USA

ARTICLE INFO

Article history:
Received 3 June 2022
Received in revised form
1 September 2022
Accepted 15 September 2022
Available online 21 September 2022

Keywords:
Narcolepsy
Sodium oxybate
Pharmacokinetics
Once-nightly

ABSTRACT

Objectives: Treatment for narcolepsy with sodium oxybate (SXB) has required twice nightly dosing, at bedtime and 2.5–4 h later. This study evaluated the pharmacokinetics of FT218, an investigational, extended release, once nightly formulation of SXB (ON SXB), vs twice nightly SXB.
Methods: In this phase 1, open label study, healthy volunteers were randomized (1:1) to ON SXB 6 g or twice nightly SXB (two 3 g doses administered 4 h apart); minimum 3 day washout before crossover. Doses were administered 2 h post evening meal. Blood samples for pharmacokinetic assessments were collected predose and up to 14 h after the first dose during each treatment period.
Results: Twenty eight participants were enrolled (mean age, 39.6 years; 54% women; 93% white). Mean ± SEM area under the concentration time curve for ON SXB was 282.7 ± 30.2 μg·h/mL vs 273.3 ± 27.8 μg·h/mL for twice nightly SXB. Geometric mean ratio (GMR; 90% CI) was 102.9 (98.0 108.0). Maximum γ hydroxybutyrate (GHB) plasma concentration ($C_{max}$) was 65.8 ± 4.0 μg/mL for ON SXB vs 77.1 ± 4.9 μg/mL for twice nightly SXB (GMR [90% CI], 88.3 [80.5 97.0]). The GMR (90% CI) for GHB plasma concentrations 8 h post dose ($C_{8h}$) for ON SXB vs twice nightly SXB was 61.7 (45.8 83.0). The most frequently reported adverse events were the same for ON SXB and twice nightly SXB (nausea, dizziness, somnolence, vomiting).
Conclusions: GHB exposure and $C_{max}$ with one 6 g dose of ON SXB were bioequivalent to those with two 3 g doses of twice nightly SXB, whereas $C_{8h}$ was lower with ON SXB. If approved, ON SXB will provide a single bedtime oxybate option, with clinically relevant pharmacologic exposure during the entire sleep period.

© 2022 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY NC ND license (http://creativecommons.org/licenses/by nc nd/4.0/).

## 1. Introduction

Narcolepsy is a chronic neurologic disease that is characterized by symptoms that include excessive daytime sleepiness (EDS), abnormal rapid eye movement (REM) phenomena (eg, cataplexy), and disrupted nighttime sleep (DNS) [1,2]. The prevalence of

narcolepsy is estimated at 0.03%−0.05% [3,4]. Narcolepsy can have severe health and economic consequences, ultimately reducing quality of life for individuals with narcolepsy [5−8]. Treatment for narcolepsy generally includes lifelong pharmacologic therapy, along with nonpharmacologic interventions.

Sodium oxybate (SXB) is included in the 2021 American Academy of Sleep Medicine Clinical Practice Guidelines with a strong recommendation for the treatment of cataplexy and EDS in patients with narcolepsy [9]. Although its exact mechanism of action is unknown, SXB is the sodium salt of γ hydroxybutyrate (GHB), an endogenous active metabolite of γ aminobutyric acid (GABA) produced by central nervous system (CNS) neurons [10,11]. GHB is a

* Corresponding author.
E-mail addresses: Richard.Bogan@bogansleep.com (R. Bogan), michael.thorpy@einsteinmed.org (M.J. Thorpy), jwwinkelman@mgh.harvard.edu (J.W. Winkelman), jdubow@avadel.com (J. Dubow), jgudeman@avadel.com (J. Gudeman), dseiden@davidseidenmd.com (D. Seiden).

https://doi.org/10.1016/j.sleep.2022.09.011
1389-9457/© 2022 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

FDA-Jazz-001283

R. Bogan, M.J. Thorpy, J.W. Winkelman et al.

*Sleep Medicine 100 (2022) 442 447*

| Abbreviations | |
|---|---|
| AE | adverse event |
| AESI | AEs of special interest |
| ANOVA | analysis of variance |
| CNS | central nervous system |
| DNS | disrupted nighttime sleep |
| EDS | excessive daytime sleepiness |
| GABA | γ aminobutyric acid |
| GHB | γ hydroxybutyrate |
| GMR | geometric mean ratio |
| NIDA | National Institute on Drug Abuse |
| PK | pharmacokinetic |
| REM | rapid eye movement |
| SXB | sodium oxybate |

CNS depressant that appears to act as a $GABA_B$ receptor agonist [12]. GHB is rapidly absorbed and has a short half life of 30 min to 1 h [13]. After 4 to 5 half lives (2—5 h), twice nightly oxybate is essentially eliminated from the body and requires a second dose, which is recommended to be taken 2.5—4 h after the first bedtime dose. A newer calcium, magnesium, potassium, and sodium oxy bates (ie, mixed salt oxybates) formulation likewise requires the requisite awakening in the middle of the night [13,14]. FT218 is an investigational, extended release, once nightly formulation of SXB (ON SXB) that has received tentative approval from the US Food and Drug Administration (FDA) for the treatment of EDS and cat aplexy in adults with narcolepsy [15]. It is a blend of immediate release and controlled release microparticles for targeted phar macokinetics (PK) of a single bedtime dose. Results from a previous study showed lower overall GHB maximum plasma concentration ($C_{max}$) and plasma concentration at 8 h postdose ($C_{8h}$) with ON SXB vs twice nightly SXB sourced from the EU, while overall exposure was equivalent [16]. The present study assessed the PK, relative bioavailability, and safety of the 6 g dose of ON SXB vs two 3 g doses of twice nightly SXB available in the United States in healthy volunteers.

## 2. Methods

### 2.1. Study design

This randomized, open label, 2 sequence, single center, cross over phase 1 study was designed to evaluate the relative bioavail ability, safety, and tolerability of ON SXB compared with twice nightly SXB in healthy volunteers. Participants were randomized 1:1 to a single 6 g oral dose of ON SXB or 6 g twice nightly SXB (given as two 3 g oral doses 4 h apart) in 2 different sequential orders: ON SXB followed by twice nightly SXB or twice nightly SXB followed by ON SXB. Study drug administrations occurred on 1 night each and were separated by a washout period of at least 3 days. The first dose of twice nightly SXB or ON SXB was adminis tered at approximately 10:00 P.M., 2 h after a standardized meal. For twice nightly SXB, participants were awoken at approximately 1:55 A.M., and the second dose of SXB was administered at approximately 2:00 A.M. Study drug administrations were carried out in a clinical research center under investigator supervision.

### 2.2. Participants

Eligible participants were healthy volunteers aged 18—65 years with a body mass index of 18—32 kg/m$^2$ and weight of ≥60 kg. All participants were healthy as determined by the investigator based on full medical evaluation of participant medical history, physical examination, vital signs, laboratory tests, and electrocardiograms (ECGs). Participants willing to abstain from all prescribed medica tions (≥30 days before admission), alcohol, methylxanthine containing beverages or food, and grapefruit juice (≥48 h before admission), intensive muscular effort (≥96 h before admission), and smoking or consuming nicotine (during hospitalization pe riods) were eligible for enrollment.

Key exclusion criteria included history of suicidal ideation, sleep apnea, symptomatic hypotension, asymptomatic postural hypo tension, or succinic semialdehyde dehydrogenase deficiency; pos itive drug or alcohol screen results; use of hepatic or renal clearing drugs ≤30 days before study start; or use of over the counter medication, vitamin preparations, food supplements, or herbal medications ≤14 days before study start with the exception of acetaminophen for minor pain.

All participants provided written informed consent for partici pation in the study in accordance with the local institutional review board and before the initiation of any study procedures. The study was performed in accordance with the ethical principles of the Declaration of Helsinki and consistent with local regulatory re quirements and Good Clinical Practice guidelines of the Interna tional Council for Harmonisation.

### 2.3. Objectives and assessments

The primary objective was to quantitatively characterize the relative bioavailability of ON SXB (6 g) compared with two 3 g doses of SXB administered 4 h apart. The secondary objective was to evaluate the safety and tolerability profile of ON SXB at a single dose of 6 g.

Blood samples to determine GHB PK profiles were collected predose and at 10, 20, and 30 min postdose and at 1, 1.5, 2, 2.5, 3, 3.5, 4, 4.5, 5, 5.5, 6, 7, 8, 10, 12, and 14 h after the first dose. Blood samples were obtained within 1 min of the specified time point for those ≤1 h after dosing; within 3 min of the specified time points for those >1 and ≤ 3 h after dosing; within 9 min of the specified time points for those >3 and ≤ 6 h after dosing; and within 18 min of the specified time points for those >6 and ≤ 24 h after dosing. At each sampling time point, 4 mL of blood was drawn via indwelling intravenous catheter or by direct venipuncture into sodium hepa rinized tubes. A validated liquid chromatography—tandem mass spectrometry method was performed at Eurofins/ADME Bio analyses (Vergèze, France) to determine GHB concentrations in plasma samples as described previously [16].

Safety and tolerability were assessed throughout the study and during follow up (2—4 days postdose). Safety assessments con sisted of adverse event (AE) monitoring, clinical laboratory evalu ations, vital signs, pulse oximetry, 12 lead ECGs, and physical examinations. AEs were reported by preferred terms and system organ class following the Medical Dictionary for Regulatory Activ ities version 23.0. Adverse events were rated as mild, moderate, or severe. AEs of special interest (AESIs) were defined as significant AEs of particular clinical importance. These AESIs included respi ratory depression, major depression, sleep apnea, suicide attempt, suicidal ideation, euphoric mood, psychosis, paranoia, hallucina tion, abnormal thinking, agitation, convulsion or epilepsy, abuse and/or dependence, withdrawal syndrome, rebound effects, and medication error.

### 2.4. Statistical analyses

The PK analysis population was defined as all participants who received ≥1 dose of ON SXB or twice nightly SXB and had sufficient

FDA-Jazz-001284

*R. Bogan, M.J. Thorpy, J.W. Winkelman et al.*    *Sleep Medicine 100 (2022) 442   447*

bioanalytical assessment results to calculate reliable estimates of PK parameters. The PK evaluable population included participants with evaluable PK data for $\geq 1$ treatment regimen and those who did not experience vomiting at, or before, 2 times the median time to reach the maximum plasma concentration ($t_{max}$) during either treatment period. Participants that deviated significantly from the protocol or had incomplete PK data were excluded from the sta tistical analysis for that treatment period. The safety analysis population comprised all participants who received $\geq 1$ dose of ON SXB or twice nightly SXB.

Pharmacokinetic parameters derived from the plasma concen trations of GHB included area under the concentration time curve from 0 to the time of the last observed/measured non zero con centration ($AUC_{0-t}$), area under the plasma concentration time curve from time 0 extrapolated to infinity ($AUC_{0-inf}$), $C_{max}$, $t_{max}$, and $C_{8h}$. PK parameters were calculated using a noncompartmental analysis and summarized descriptively. An analysis of variance (ANOVA) was performed for the natural logarithm transformed PK parameters and compared to assess relative bioavailability between ON SXB and twice nightly SXB using SAS $\geq$ v9.4 (Cary, NC). The bioavailability model included sequence, treatment, and period as fixed effects and subject nested within sequence as a random effect. The FDA uses the geometric mean ratios (GMRs) and their corre sponding 90% CIs to assess bioequivalence [17]. GMRs and 90% CIs for least squares means were calculated as the back transformation of the 90% CIs obtained from ANOVA. Per FDA guidance, bioequiv alence was defined as being met if the 90% CIs of the GMRs fell within the 80%−125% no effect boundary [17]. Safety data were summarized.

## 3. Results

### 3.1. Patient disposition and demographic characteristics

Of the 70 volunteers who were screened, 10 failed to meet entry criteria, 32 were approved but not administered study drug, and 28 participated in the study. Study participants had a mean age of 39.6 years; approximately half (54%) were women, 93% were white, and 89% were Hispanic or Latino ethnicity (Table 1). Demographic characteristics were generally comparable in the cohort who received ON SXB prior to twice nightly SXB and the cohort who received twice nightly SXB prior to ON SXB, except that the mean age of participants in the group that received ON SXB first was approximately 10 years older than that of the second cohort.

No participants withdrew prematurely owing to AEs; all 28 (100%) participants completed the study. However, 1 (4%) partici pant did not have complete PK samples and was excluded from the PK population (PK population, n    27). Four (14%) participants vomited before twice the median $t_{max}$ was reached (ON SXB, n   2 [7%]; twice nightly SXB, n   2 [7%]) and were excluded from the PK statistical analysis (PK evaluable population, n    23). All enrolled participants completed both treatment sequences and were included in the safety analysis population.

### Pharmacokinetic Parameters

In the PK population, mean $C_{max}$ with ON SXB vs twice nightly SXB was 65.8 vs 77.1 μg/mL (Table 2). The geometric least squares mean values for $C_{max}$ were 62.8 vs 71.1 μg/mL, respectively (GMR [90% CI], 88.3% [80.5%−97.0%]). The mean plasma concentrations over time for ON SXB vs twice nightly SXB are shown in Fig. 1. The median $t_{max}$ was 1.5 h after ON SXB dosing, 0.5 h after the first dose of twice nightly SXB, and 1 h after the second dose of twice nightly SXB (ie, 5 h after the first bedtime dose). For ON SXB vs twice nightly SXB, the mean $AUC_{0-t}$ was 274.9 vs 272.7 μg·h/mL and the

mean $AUC_{0-inf}$ was 282.7 vs 273.3 μg·h/mL, respectively. In the PK evaluable population, the geometric least squares mean values for $AUC_{0-inf}$ were 241.8 vs 235.1 μg·h/mL, respectively, and the GMR was 102.9% (90% CI, 98%−108%), with low intrasubject variability between the 2 treatment sequences (9.57%; Table 3). In the PK population, mean $C_{8h}$ was 10.2 μg/mL for ON SXB vs 9.7 μg/mL for twice nightly SXB (Table 2). In the PK evaluable population, the geometric least squares mean values for $C_{8h}$ were 2.3 vs 3.7 μg/mL for ON SXB and twice nightly SXB, respectively (GMR [90% CI], 61.7% [45.8%−83.0%]; Table 3).

### 3.2. Safety

Eleven participants (39%) treated with ON SXB experienced a total of 32 AEs and 13 participants (46%) treated with twice nightly SXB experienced a total of 29 AEs (Table 4). During ON SXB treat ment, the most frequently reported AEs were nausea (29%), dizzi ness (25%), somnolence (11%), vomiting (11%), and headache (7%). For twice nightly SXB treatment the most common AEs were dizziness (25%), somnolence (14%), nausea (11%), vomiting (11%), and headache (7%). All AEs (100%) were mild or moderate in severity and resolved before the end of the study. Overall, 16 (57%) participants reported AEs that were considered related to the study drug (ON SXB, 36%; SXB, 46%). The most frequently reported treatment related adverse drug reactions were dizziness (25% each group), nausea (ON SXB, 29% and SXB, 11%), somnolence (ON SXB, 11% and SXB, 14%), vomiting (11% each group), and headache (7% each group). Three participants experienced an AESI, which included sleep apnea (ie, breathing pauses lasting 10−20 s; ON SXB and SXB, n   1 each) and respiratory depression (ie, shallow res pirations; ON SXB, n    1). All AESIs were considered mild in severity, possibly related to study drug, and resolved before the end of the study.

## 4. Discussion

One 6 g dose of ON SXB, taken at bedtime, was shown to have comparable systemic drug exposure to two 3 g doses of commercially available twice nightly SXB, given at 10 P.M. and 2 A.M. SXB can be increased by 1.5 g/night in weekly intervals to titrate to a therapeutic dose when used in treatment for narco lepsy. For this single dose study conducted in healthy volunteers, the 6 g total nightly dose was selected, as doses of 9 g and higher have potential safety risks in this cohort when administered without titration. Per FDA guidance, bioequivalence is established when the 90% CIs of the GMRs fall within the 80%−125% limit [17]. In a previous relative bioavailability study, the bioequivalence of a single 6 g dose of ON SXB to two 3 g doses of commercially available twice nightly SXB was also demonstrated, both the mean $AUC_{0-t}$ and the $AUC_{0-8}$ of ON SXB met the bioequivalence criteria vs twice nightly SXB [16]. However, the $C_{max}$ fell below the bioequivalence threshold (90% CI of the GMR between 80% and 125%). In the present study, the 90% CIs for $C_{max}$ of ON SXB vs twice nightly SXB did not cross 100 and were within the 80%− 125% no effect boundary for bioequivalence. Minor interindi vidual variability is likely the reason for this apparent difference, with the lower bound of the 90% CI in the present study being 80.5%, thus barely within the bioequivalence threshold.

Both this study and the previous study [16] found a lower geometric least squares mean concentration at approximately 8 h after the first and only dose of ON SXB compared to 8 h after the first dose of twice nightly SXB. This lower $C_{8h}$ hypothetically may translate to less next day sleepiness or grogginess upon awakening for patients who take ON SXB compared with twice nightly SXB. While only a total nightly dose of 6 g was evaluated in this study,

FDA-Jazz-001285

R. Bogan, M.J. Thorpy, J.W. Winkelman et al.

Sleep Medicine 100 (2022) 442 447

**Table 1**
Baseline demographics and participant characteristics (safety population).

| | ON-SXB → Twice-Nightly SXB (N   14) | Twice-Nightly SXB → ON-SXB (N   14) | Overall (N   28) |
|---|---|---|---|
| Mean age (range), y | 43.4 (23  60) | 35.8 (19  58) | 39.6 (19  60) |
| Sex, n (%) | | | |
| Female | 7 (50) | 8 (57) | 15 (54) |
| Male | 7 (50) | 6 (43) | 13 (46) |
| Race, n (%) | | | |
| White | 14 (100) | 12 (86) | 26 (93) |
| Black or African American | 0 | 1 (7) | 1 (4) |
| White, Black, or African American | 0 | 1 (7) | 1 (4) |
| Ethnicity, n (%) | | | |
| Hispanic or Latino | 13 (93) | 12 (86) | 25 (89) |
| Not Hispanic or Latino | 1 (7) | 2 (14) | 3 (11) |
| Height, mean (SD), cm | 165.8 (10.1) | 163.3 (9.0) | 164.5 (9.5) |
| Weight, mean (SD), kg | 80.0 (9.1) | 75.7 (9.5) | 77.9 (9.4) |
| BMI, mean (SD), kg/m$^2$ | 29.0 (1.2) | 28.4 (2.6) | 28.7 (2.0) |

BMI, body mass index.

**Table 2**
Summary of GHB pharmacokinetic parameters (PK population, n   25).

| Parameter[a] | ON-SXB (One 6-g Dose) | Twice-Nightly SXB (Two 3-g Doses) |
|---|---|---|
| $C_{max}$, µg/mL | 65.8 (4.0) [30.5] | 77.1 (4.9) [31.5] |
| $C_{max}$ dose 1, µg/mL | N/A | 51.9 (3.8) [36.5] |
| $C_{max}$ dose 2, µg/mL | N/A | 75.2 (5.4) [35.7] |
| $C_{8h}$, µg/mL | 10.2 (3.0) [135.8] | 9.7 (2.7) [138.8] |
| $AUC_{0 inf}$, µg h/mL | 282.7 (30.2) [52.2] | 273.3 (27.8) [50.8] |
| $AUC_{0 t}$, µg h/mL | 274.9 (29.8) [54.2] | 272.7 (27.8) [51.0] |
| $t_{1/2}$, h | 0.66 (0.04) [26.7] | 0.70 (0.06) [44.6] |
| $t_{max}$, h | 1.5 (0.5  2.5) | 4.5 (0.5  5.5)[b] |
| $t_{max}$ dose 1, h | N/A | 0.51 (0.3  2.0) |
| $t_{max}$ dose 2, h | N/A | 5.0 (4.5  6.1) |

$AUC_{0 t}$, area under the concentration-time curve from time 0 to the time of the last observed/measured non-zero concentration; $AUC_{0 inf}$, area under the concentration-time curve from time 0 extrapolated to infinity; $C_{8h}$, plasma concentration 8 h after dosing; $C_{max}$, maximum plasma concentration; %CV, percent coefficient of variation; GHB, γ–hydroxybutyrate; N/A, not applicable; ON-SXB, once-nightly sodium oxybate; PK, pharmacokinetics; SXB, sodium oxybate; $t_{1/2}$, apparent terminal elimination half-life; $t_{max}$, time to $C_{max}$.
  [a] All data are arithmetic mean (SEM) [%CV] except $t_{max}$, which is median (range).
  [b] After first dose.



**Fig. 1.** Mean plasma concentrations of GHB following oral administration of ON-SXB or twice-nightly SXB over time (PK population). Error bars indicate standard error. GHB, γ-hydroxybutyrate; ON-SXB, once-nightly sodium oxybate; PK, pharmacokinetic; SXB, sodium oxybate.

ON SXB has demonstrated a linear increase in $C_{max}$ as the dose doubled from 4.5 to 9 g, and a slightly more than dose proportional increase (2.3) in the AUC [16]. Twice nightly SXB has nonlinear

pharmacokinetics, with a 3.7 fold increase in systemic drug expo sure as the total dose was doubled from 4.5 to 9 g [13]. Moreover, because of the twice nightly dosing of conventional oxybates, the second dose requires interruption of nocturnal sleep for patients and bed partners. Theoretically, the PK profile of ON SXB may produce a more "normal" physiological sleep pattern in patients with narcolepsy who typically experience irregular sleep patterns and fragmented nighttime sleep [18,19]. The single maximum GHB concentration early in the nocturnal sleep period may facilitate more slow wave sleep during the first half of the night [19], although the slow waves induced by SXB may differ from normal physiological deep sleep in healthy volunteers [20].

Both ON SXB and twice nightly SXB were generally well toler ated in this study, with similar safety profiles, and no new safety signals were observed. Only 3 participants experienced an AESI (sleep apnea [n   2, 1 each with ON SXB and twice nightly SXB] and respiratory depression [n   1, ON SXB]), all of which were mild in severity and resolved. A limitation of this phase 1 study in healthy participants is that reports of sleep apnea were solely based upon the investigators' clinical observation of irregular sleep related respiration and were not further characterized or evalu ated using polysomnography, as is typically required to diagnose sleep apnea. Rates of treatment related AEs with ON SXB were greater than those reported in the phase 3 REST ON clinical trial of ON SXB in individuals with narcolepsy [19]. This is likely owing to the lack of dose titration up to the 6 g dose in healthy volunteers. In contrast, participants in REST ON had doses titrated slowly from a 4.5 g dose to a 9 g dose; rates of AEs associated with ON SXB in

FDA-Jazz-001286

R. Bogan, M.J. Thorpy, J.W. Winkelman et al.

Sleep Medicine 100 (2022) 442–447

**Table 3**
Summary of relative bioavailability (PK-evaluable population, n = 23).

| Parameter | Geometric Least Squares Means | | | | Geometric Mean Ratio | 90% CI | Intrasubject %CV |
|---|---|---|---|---|---|---|---|
| | n | ON-SXB (One 6-g Dose) | n | Twice-Nightly SXB (Two 3-g Doses) | | | |
| $AUC_{0-t}$ (μg h/mL) | 23 | 241.1 | 23 | 234.4 | 102.9 | 98.0, 108.0 | 9.58 |
| $AUC_{0-inf}$ (μg h/mL) | 23 | 241.8 | 23 | 235.1 | 102.9 | 98.0, 108.0 | 9.57 |
| $C_{max}$ (μg/mL) | 23 | 62.8 | 23 | 71.1 | 88.3 | 80.5, 97.0 | 18.4 |
| $C_{8h}$ (μg/mL) | 20[a] | 2.26 | 23 | 3.67 | 61.7 | 45.8, 83.0 | 58.2 |

%CV, percent coefficient of variation; ANOVA, analysis of variance; $AUC_{0-t}$, area under the concentration-time curve from time 0 to the time of the last observed/measured non-zero concentration; $AUC_{0-inf}$, area under the concentration-time curve from time 0 extrapolated to infinity; $C_{8h}$, plasma concentration 8 h after dosing; $C_{max}$, maximum plasma concentration; ON-SXB, once-nightly sodium oxybate; PK, pharmacokinetics; SXB, sodium oxybate.

[a] 3 participants had plasma GHB concentrations at 8 h that were below the limit of quantitation and were excluded from the analysis.

**Table 4**
Summary of AEs (safety population).

| n (%) | ON-SXB 6.0 g (n = 28) | Twice-Nightly SXB 6.0 g (n = 28) |
|---|---|---|
| Any AE | 11 (39) | 13 (46) |
| Serious AEs | 0 | 0 |
| Withdrawal due to AEs | 0 | 0 |
| Treatment-related AEs | 10 (36) | 13 (46) |
| AEs reported by ≥ 1 participant by preferred term | | |
| Nausea | 8 (29) | 3 (11) |
| Dizziness | 7 (25) | 7 (25) |
| Somnolence | 3 (11) | 4 (14) |
| Vomiting | 3 (11) | 3 (11) |
| Headache | 2 (7) | 2 (7) |
| Vertigo | 1 (4) | 1 (4) |
| Feeling hot | 1 (4) | 1 (4) |
| Dysarthria | 1 (4) | 1 (4) |
| Lethargy | 1 (4) | 1 (4) |
| Apnea | 1 (4) | 1 (4) |
| Asthenopia | 1 (4) | 0 |
| Constipation | 0 | 1 (4) |
| Dry mouth | 0 | 1 (4) |
| Chills | 0 | 1 (4) |
| Feeling cold | 1 (4) | 0 |
| Hypopnea | 1 (4) | 0 |
| Hyperhidrosis | 0 | 1 (4) |
| Rash | 1 (4) | 0 |
| Peripheral coldness | 0 | 1 (4) |

AE, adverse event; ON-SXB, once-nightly sodium oxybate; SXB, sodium oxybate.

REST ON, particularly nausea and vomiting, were generally highest at the beginning of a new dosing period and tended to taper off as the period progressed [19].

Arousability with SXB use, particularly at higher doses, may be a concern for some individual patients, caregivers, and clinicians. Although SXB is a strong CNS depressant and care should be given when prescribed, the unfortunate and highly publicized illicit use of GHB – often in combination with alcohol and other drugs – may perpetuate an exaggerated stigma around the arousability of individuals taking SXB when it is prescribed at therapeutic doses to treat narcolepsy. The sleep medicine literature contains numerous publications about SXB for narcolepsy, but none have been identified that assess a drug concentration from which a patient could not be roused from sleep. In a study that measured plasma GHB concentrations after intravenous administration for anesthesia and identified concentration thresholds at which individuals who received GHB experienced impairment, deep sleep (ie, no response to voice, touch, pin prick, deep pressure, and the absence of reflexes such as laryngeal reflex) was reported with a mean plasma GHB concentration of 311 (range, 244–395) μg/mL [21,22]. Thus, the therapeutic plasma GHB concentrations with a total dose of 6 g ON SXB (mean $C_{max}$, 65.8 μg/mL) and twice nightly SXB (mean $C_{max}$, 77.1 μg/mL) were more than 4 times lower than the nonresponse to stimuli level identified in that report. Although this

bioavailability study was not designed to assess arousability, the concentrations of either SXB medication in the context of these data may be relevant to consider, given the perceptions about GHB. It should be recognized that these data are based on a 6 g dose, while the approved dosing regimens allow for a total nightly dose of up to 9 g, which may warrant more concern.

## 5. Conclusions

GHB exposure and $C_{max}$ with one 6 g dose of ON SXB were bioequivalent to those observed with two 3 g doses of twice nightly SXB. Eliminating the middle of the night dose may represent an improvement for individuals with narcolepsy who typically experience a frequent number of nocturnal arousals or awakenings. ON SXB was generally well tolerated in healthy volunteers. If approved, ON SXB will offer the option of a single bedtime oxybate dose for the treatment of adults with narcolepsy.

## Funding

This study was funded by Avadel Ireland. Avadel was involved in the study design; in the collection, analysis, and interpretation of data; in the writing of the report; and in the decision to submit the article for publication.

## CRediT authorship contribution statement

**Richard Bogan:** Writing – review & editing, Formal analysis.
**Michael J. Thorpy:** Writing – review & editing, Formal analysis.
**John W. Winkelman:** Writing – review & editing, Formal analysis.
**Jordan Dubow:** Writing – review & editing, Formal analysis.
**Jennifer Gudeman:** Writing – review & editing, Formal analysis.
**David Seiden:** Writing – review & editing, Formal analysis.

## Declaration of competing interest

RB is a shareholder in WaterMark Medical and Healthy Humming, LLC; serves on the board of directors for the National Sleep Foundation and WaterMark Medical; is a consultant for Jazz Pharmaceuticals, Takeda Pharmaceutical Co., Avadel Pharmaceuticals, and Oventus; has received industry funded research grants from Avadel Pharmaceuticals, BrescoTec, Bayer, Idorsia, Suven Life Sciences Ltd, Jazz Pharmaceuticals, Balance, Vanda, Merck & Co., Eisai, Philips, FRESCA Medical, Takeda Pharmaceutical Co., LivaNova, Roche, and Sommetrics; and has served on speakers bureaus for Jazz Pharmaceuticals, Eisai, and Harmony Biosciences.

MJT has served as a consultant or on advisory boards for Axsome Therapeutics, Balance Therapeutics, Eisai, Avadel Pharmaceuticals, Harmony Biosciences, Jazz Pharmaceuticals, NLS Pharmaceutics, Suven Life Sciences Ltd, and Takeda Pharmaceutical Co.

JWW receives consultation fees from Avadel Pharmaceuticals,

FDA-Jazz-001287

R. Bogan, M.J. Thorpy, J.W. Winkelman et al.    Sleep Medicine 100 (2022) 442 447

Emalex Biosciences, Noctrix Health, Disc Medicine, and Idorsia Pharmaceuticals; and research support from Merck Pharmaceuticals, American Regent, National Institute on Drug Abuse (NIDA), the RLS Foundation, and the Baszucki Brain Research Fund.

JD and DS were employees of Avadel Pharmaceuticals at the time of the study.

JG is an employee of Avadel Pharmaceuticals.

## Acknowledgments

The authors thank the study participants. Statistical review of the manuscript was provided by Kaiyan Jing, Premier Research (Morrisville, NC, USA), with funding from Avadel Pharmaceuticals (Chesterfield, MO, USA). Medical writing support was provided by The Curry Rockefeller Group, LLC (Tarrytown, NY, USA), and was funded by Avadel Pharmaceuticals (Chesterfield, MO, USA).

## References

[1] Dauvilliers Y, Arnulf I, Mignot E. Narcolepsy with cataplexy. Lancet 2007;369(9560):499 511. https://doi.org/10.1016/S0140-6736(07)60237-2.

[2] Kornum BR, Knudsen S, Ollila HM, et al. Narcolepsy. Nat Rev Dis Primers 2017;3(1):16100. https://doi.org/10.1038/nrdp.2016.100.

[3] Longstreth Jr WT, Koepsell TD, Ton TG, Hendrickson AF, van Belle G. The epidemiology of narcolepsy. Sleep 2007;30(1):13 26. https://doi.org/10.1093/sleep/30.1.13.

[4] Scammell TE. Narcolepsy. N Engl J Med 2015;373(27):2654 62. https://doi.org/10.1056/NEJMra1500587.

[5] Daniels E, King MA, Smith IE, Shneerson JM. Health-related quality of life in narcolepsy. J Sleep Res 2001;10(1):75 81. https://doi.org/10.1046/j.1365-2869.2001.00234.x.

[6] Weaver TE, Mathias SD, Crosby RD, et al. Relationship between sleep efficacy endpoints and measures of functional status and health-related quality of life in participants with narcolepsy or obstructive sleep apnea treated for excessive daytime sleepiness. J Sleep Res 2021;30(3):e13210. https://doi.org/10.1111/jsr.13210.

[7] Ingravallo F, Gnucci V, Pizza F, et al. The burden of narcolepsy with cataplexy: how disease history and clinical features influence socio-economic outcomes. Sleep Med 2012;13(10):1293 300. https://doi.org/10.1016/j.sleep.2012.08.002.

[8] Dauvilliers Y, Paquereau J, Bastuji H, Drouot X, Weil JS, Viot-Blanc V. Psychological health in central hypersomnias: the French Harmony study.

[9] J Neurol Neurosurg Psychiatry 2009;80(6):636 41. https://doi.org/10.1136/jnnp.2008.161588.

[9] Maski K, Trotti LM, Kotagal S, et al. Treatment of central disorders of hypersomnolence: an American Academy of Sleep Medicine clinical practice guideline. J Clin Sleep Med 2021;17(9):1881 93. https://doi.org/10.5664/jcsm.9328.

[10] Gowda CR, Lundt LP. Mechanism of action of narcolepsy medications. CNS Spectr 2014;19(suppl 1):25 33. https://doi.org/10.1017/s1092852914000583. quiz 25-7, 34.

[11] Thorpy MJ. Sodium oxybate for the treatment of narcolepsy. Expet Opin Pharmacother 2005;6(2):329 35. https://doi.org/10.1517/14656566.6.2.329.

[12] Madden TE, Johnson SW. Gamma-hydroxybutyrate is a GABA_B receptor agonist that increases a potassium conductance in rat ventral tegmental dopamine neurons. J Pharmacol Exp Therapeut 1998;287(1):261 5.

[13] Jazz Pharmaceuticals. XYREM (sodium oxybate oral solution, CIII). Full Prescribing Information. Palo Alto, CA: Jazz Pharmaceuticals; 2020.

[14] Jazz Pharmaceuticals. XYWAV (calcium, magnesium, potassium, and sodium oxybates). Palo Alto, CA, USA: Jazz Pharmaceuticals: Full Prescribing Information.; 2021.

[15] Avadel Pharmaceuticals. Avadel Pharmaceuticals announces FDA acceptance of new drug application for FT218 in adults with narcolepsy for the treatment of excessive daytime sleepiness and cataplexy. 2021 [cited 2021 April 21]; Available from: https://investors.avadel.com/news-releases/news-release-details/avadel-pharmaceuticals-announces-fda-acceptance-new-drug-0.

[16] Seiden D, Tyler C, Dubow J. Pharmacokinetics of FT218, a once-nightly sodium oxybate formulation in healthy adults. Clin Therapeut 2021;43(4):e1 14. https://doi.org/10.1016/j.clinthera.2021.01.017. 672.

[17] US Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research. Bioavailability studies submitted in NDAs or INDs general considerations. 2022.

[18] Rogers AE, Aldrich MS, Caruso CC. Patterns of sleep and wakefulness in treated narcoleptic subjects. Sleep 1994;17(7):590 7. https://doi.org/10.1093/sleep/17.7.590.

[19] Kushida CA, Shapiro CM, Roth T, et al. Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy. Sleep 2022;45(6):zsab200. https://doi.org/10.1093/sleep/zsab200.

[20] Vienne J, Lecciso G, Constantinescu I, et al. Differential effects of sodium oxybate and baclofen on EEG, sleep, neurobehavioral performance, and memory. Sleep 2012;35(8):1071 83. https://doi.org/10.5665/sleep.1992.

[21] Busardò FP, Jones AW. GHB pharmacology and toxicology: acute intoxication, concentrations in blood and urine in forensic cases and treatment of the withdrawal syndrome. Curr Neuropharmacol 2015;13(1):47 70. https://doi.org/10.2174/1570159x13666141210215423.

[22] Helrich M, McAslan TC, Skolnik S, Bessman SP. Correlation of blood levels of 4-hydroxybutyrate with state of consciousness. Anesthesiology 1964;25:771 5. https://doi.org/10.1097/00000542-196411000-00007.

FDA-Jazz-001288

# EXHIBIT 2



UNITED STATES OF AMERICA

Federal Trade Commission

WASHINGTON, D.C. 20580

Office of the Chair

### Statement of Chair Lina M. Khan at the
### September Open Commission Meeting on
### Brand Drug Manufacturers' Improper Listing of Patents in the Orange Book
### Commission File No. P233900

### September 14, 2023

Drug prices are sky high. Americans pay more for medicines that any other country in the world. A striking number of people now report having to ration their medicines or skip them altogether because they are too expensive.[1] Many factors contribute to this unaffordability crisis—including unlawful business practices. We at the FTC are committed to using all of our tools to combat corporate conduct that unlawfully inflates drug prices.

That is why the Commission today is considering a policy statement on how the FTC will scrutinize improper "Orange Book" patent listings. The Orange Book is where brand manufacturers list their patents for FDA-approved drug products. A brand pharmaceutical company can obtain a presumptive 30-month stay of the FDA approving competitors merely by listing a patent in the Orange Book and filing a lawsuit against a generic manufacturer, regardless of whether the patent it listed is actually valid or infringed by the competing generic product. In this way, a pharmaceutical company can weaponize the Orange Book to protect monopoly rights to a medical product—even if those monopoly rights are invalid. This practice can delay or block generic and innovative drugs from entering the market, keeping prices higher for American patients.

Experience shows that we have good reason to be concerned about improperly listed patents in the Orange Book. Last year the FTC filed an amicus brief in a lawsuit that highlighted the stakes.[2] Avadel, a specialty pharmaceutical company, had developed an extended-release version of a narcolepsy drug that allowed patients to avoid having to wake up in the middle of the night to take a second dose. The FDA tentatively approved Avadel's extended-release version in 2022, but by that time, Jazz, another pharma company, had sued Avadel for infringing

---

[1] MUNIRA Z. GUNJA, ET AL., U.S. HEALTH CARE FROM A GLOBAL PERSPECTIVE, 2022: ACCELERATING SPENDING, WORSENING OUTCOMES, THE COMMONWEALTH FUND (2023), https://www.commonwealthfund.org/publications/issue-briefs/2023/jan/us-health-care-global-perspective-2022; Katie Adams, *Rising Costs Force 39% of Americans to Skip Ration Meds, Survey Says*, BECKER'S HOSP. REV. (Mar. 22, 2021), https://www.beckershospitalreview.com/pharmacy/rising-costs-force-39-of-americans-to-skip-ration-meds-survey-says.html; Dan Witters, *In U.S., An Estimated 18 Million Can't Pay for Needed Drugs*, GALLUP (Sept. 21, 2021), https://news.gallup.com/poll/354833/estimated-million-pay-needed-drugs.aspx; Ken Alltucker, *More than 1.3M Americans Ration Life-Saving Insulin Due to Cost. That's 'Very Worrisome' to Doctors.*, USA TODAY (Oct. 17, 2022), https://www.usatoday.com/story/news/health/2022/10/17/high-cost-insulin-prompts-1-3-million-americans-ration-drug/10498626002/.

[2] Fed. Trade Comm'n's Brief as Amicus Curiae, *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, C.A. No. 21-691-GBW (D. Del. Nov. 10, 2022).

Jazz's "Risk Evaluation and Mitigation Strategies" ("REMS") patent—a patent that had nothing to do with the drug itself or an approved method of using the drug. Jazz cited the Orange Book to automatically trigger the 30-month stay, blocking Avadel from the market. The Federal Circuit court eventually held that the patent was improperly listed in the Orange Book and ordered it to be delisted.[3] Following this order, the FDA granted final approval of Avadel's new drug—nearly ten months after the original tentative approval. In that intervening period, Jazz continued to rake in monopoly profits and patients were deprived of a potentially superior formulation of a critical narcolepsy drug.[4]

Concerns over improper Orange Book listings have also been raised in the context of device patents. For example, in late 2016 direct purchasers of the insulin Lantus brought an antitrust lawsuit claiming that certain device patents were improperly listed in the Orange Book, resulting in delay of entry of competing insulin products. That case made its way to the First Circuit, which agreed with the plaintiffs that device patents that do not claim the drug itself are not properly listed in the Orange Book as a matter of law.[5] The same concern has been raised with regard to brand inhalers for asthma and chronic obstructive pulmonary disease. Even though inhalers have been on the market for decades, they have faced relatively limited generic competition in recent years.[6]

Our laws—and even the Constitution[7]—enshrine an important role for patents in promoting innovation and creativity. But abuse of patent rights can deprive Americans of access to more affordable drugs and medical products, and the FTC has a long history of challenging these practices when they violate the antitrust laws.[8]

The policy statement we're considering today builds on this important work. This statement explains that patents that are improperly listed in the Orange Book can unlawfully harm patients, competition, and innovation, and notes that these practices may be an unfair method of competition and violate the FTC Act.

The soaring price of drugs, including essential life-saving medicines, is a real crisis in our country, and we at the FTC have an obligation to use all our tools and authorities to combat any illegal business practices that may be contributing to the crisis.

---

[3] *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373, 1380 (Fed. Cir. 2023).
[4] *See* Rebecca Robbins, *A Drug Company Exploited a Safety Requirement to Make Money*, N.Y. TIMES (Feb. 28, 2023), https://www.nytimes.com/2023/02/28/business/jazz-narcolepsy-avadel-patents.html (noting that Jazz's narcolepsy drug "generat[ed] more than $13 billion in revenue since Jazz acquired it in 2005").
[5] *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1 (1st Cir. 2020).
[6] *See* Brandon J. Demkowicz, et al., *Patenting Strategies on Inhaler Delivery Devices*, 164 CHEST 450 (2023); William B. Feldman, et al., *Manufacturer Revenue on Inhalers After Expiration of Primary Patents, 2000-2021*, 329 JAMA 87 (2023).
[7] U.S. CONST. art. I, § 8, cl. 8.
[8] *See, e.g.*, FED. TRADE COMM'N, OVERVIEW OF FTC ACTIONS IN PHARMACEUTICAL PRODUCTS AND DISTRIBUTION (2022); *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) (holding that pay-for-delay settlements can violate antitrust laws); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 590 (S.D.N.Y. 2022) (banning Martin Shkreli from the pharmaceutical industry); *In re Bristol-Myers Squibb Co.*, FTC File No. 0110046 (May 25, 2004) (settling charges that, among other things, respondent purposely made wrongful listings in the Orange Book); *Biovail Corp.*, FTC File No. 0110094 (Oct. 2, 2002) (same).

I am eager for us to continue approaching this work with the enormous urgency that it deserves, and I am grateful to the FTC teams whose talent and commitment will allow us to do so. Many thanks to the Office of Policy Planning for giving us the opportunity to consider this policy statement, including Hillary Green, Sarah Mackey, Anu Sawkar, Marc Lanoue, David Barclay, and Brad Vettraino.

***

3

# EXHIBIT 3

# FULLY REDACTED

# EXHIBIT 4

# FULLY REDACTED

# EXHIBIT 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-K

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2008

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-33500

# JAZZ PHARMACEUTICALS, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **05-0563787** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3180 Porter Drive**
**Palo Alto, CA 94304**
**(650) 496-3777**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, par value $.0001 per share** | **The NASDAQ Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant as of June 30, 2008, based upon the last sale price reported for such date on the NASDAQ Global Market, was $70,678,403. The calculation of the aggregate market value of voting and non-voting stock excludes 15,360,755 shares of the registrant's common stock held by current executive officers, directors, and stockholders that the registrant has concluded are affiliates of the registrant. Exclusion of such shares should not be construed to indicate that any such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the registrant or that such person is controlled by or under common control with the registrant.

As of March 20, 2009, a total of 28,925,352 shares of the registrant's Common Stock, $.0001 par value, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for the 2009 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A not later than 120 days after the end of the fiscal year covered by this Form 10-K are incorporated by reference in Part III, Items 10-14 of this Form 10-K.

Table of Contents

*Attributes of Xyrem*

Xyrem is the only product approved by the FDA to treat both excessive daytime sleepiness and cataplexy in patients with narcolepsy. Xyrem is administered at night in two equal doses and quickly metabolized so that during the daytime, very little of the active drug is present in the patient. Xyrem has a well established safety profile. In the Journal *SLEEP* in December 2007, the American Academy of Sleep Medicine recommended Xyrem as a standard of care for the treatment of both excessive daytime sleepiness and cataplexy associated with narcolepsy.

*Commercialization*

We promote Xyrem in the U.S. through our approximately 120 person specialty sales force. Pursuant to an agreement originally executed in 2003 and subsequently amended, we have licensed to UCB the exclusive right to register and market Xyrem for the treatment of narcolepsy in 54 countries throughout Europe, South America, the Middle East and Asia in exchange for milestone and royalty payments to us. UCB currently markets the product in 13 countries. We are entitled to additional commercial milestone payments of up to $6.0 million specifically associated with the sale of Xyrem for the treatment of narcolepsy and royalties on all commercial sales of Xyrem by UCB. In October 2005, the European Agency for the Evaluation of Medical Products, or EMEA, approved Xyrem for the treatment of cataplexy in adult patients with narcolepsy, and in March 2007, the EMEA approved the product for the treatment of narcolepsy with cataplexy in adult patients. In December 2006, we licensed to Valeant the Canadian marketing rights to Xyrem for the treatment of narcolepsy, subject to our right to later reacquire these rights. Valeant began marketing the product in Canada in 2007.

The term of our agreement with UCB, as it applies to Xyrem for the treatment of narcolepsy, extends to the later of the expiration of our associated patent rights in the territories covered by the agreement or ten years from the date of EMEA approval to commercially promote and distribute Xyrem for the treatment of narcolepsy, subject to automatic extension unless and until UCB terminates the agreement upon not less than 12 months' notice. Under the terms of an amendment to our license and distribution agreement with UCB entered in July 2008, UCB may terminate our agreement for any reason upon 12 months' notice. We are responsible for supplying Xyrem to UCB in exchange for supply price payments. If we are materially unable to comply with our obligations to supply Xyrem to UCB, UCB has the right under certain circumstances to terminate our agreement upon nine months' notice or assume manufacturing responsibility for Xyrem in their territory.

The FDA has granted Xyrem orphan drug exclusivity in the U.S. for both excessive daytime sleepiness and cataplexy in patients with narcolepsy. This provides marketing exclusivity in the U.S. until July 2009 for the cataplexy indication and November 2012 for the excessive daytime sleepiness indication. In addition to orphan drug exclusivity, Xyrem is covered by two formulation patents that are listed in the FDA's approved drug products with therapeutic equivalence evaluation document, or Orange Book. The patents will expire in 2020. An additional process patent that covers the product is not listed in the Orange Book and expires in 2019. The Orange Book, among other things, lists drug products approved by the FDA and identifies applicable patent and non-patent marketing exclusivities. The listing of our formulation patents in the Orange Book requires potential competitors to certify as to non-infringement or invalidity of the patent prior to FDA approval of their product candidates unless they are willing to postpone market entry until patent expiry. Patent applications covering Xyrem's distribution system are currently pending, and the patents, if issued, would expire in 2022. In addition, we believe that the strict manufacturing and distribution controls on sodium oxybate and Xyrem, and the complicated risk management procedures required to market and sell the product, may make it difficult for other companies to manufacture and market generic formulations of Xyrem.

Our marketing, sale and distribution of Xyrem are subject to a Risk Evaluation and Mitigation Strategy program, or REMS, required in conjunction with Xyrem's approval by the FDA. Under the Xyrem REMS, Xyrem must be distributed through a single central pharmacy. The central pharmacy we use is Express Scripts Specialty Distribution Services, or Express Scripts, with whom we have an exclusive relationship. The central pharmacy must maintain physician and patient registries, and the product may not be stocked in retail pharmacies. Each physician and patient must be educated about the risks and benefits of the product before the physician can prescribe, or a patient can receive, Xyrem. Whenever a prescription is received by the central pharmacy, the central pharmacy must verify the prescription and obtain additional information by contacting the patient's insurance company. The central pharmacy must also speak with the patient before it can ship any Xyrem to the patient. The central pharmacy must ship the product directly to the patient by a courier service, and the patient or his/her designee must sign for the package. The initial shipment may only be for a one-month supply and physicians may only prescribe up to six months of supply of Xyrem at one time.

Pursuant to our exclusive agreement with Express Scripts and Curascript, Inc., or Curascript, an affiliate of Express Scripts, Express Scripts provides distribution and Express Scripts and Curascript provide other customer support services to us related to the sale and marketing of Xyrem in the U.S. We are billed monthly for the services performed by Express Scripts and Curascript. Our agreement with Express Scripts and Curascript expires on December 31, 2010, subject to automatic one-year extensions thereafter until either party provides notice to the other of its intent to terminate the agreement at least 120 days prior to the end of the term. We may terminate the agreement with Express Scripts and Curascript upon five days' notice if Express Scripts or Curascript is not in compliance with applicable regulatory requirements.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Jazz Pharmaceuticals, Inc.**
(Registrant)

Date: March 26, 2009

/s/   SAMUEL R. SAKS, M.D.

**Samuel R. Saks, M.D.**
**Chief Executive Officer and Director**
**(Principal Executive Officer)**

78

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Samuel R. Saks, M.D. and Carol A. Gamble, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution for him, and in his name in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and any of them, his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, the following persons on behalf of the registrant and in the capacities and on the dates indicated have signed this report below:

| Signature | Title | Date |
|---|---|---|
| /s/   SAMUEL R. SAKS, M.D.<br>Samuel R. Saks, M.D. | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | March 26, 2009 |
| /s/   JOAN E. COLLIGAN<br>Joan E. Colligan | Controller<br>*(Principal Accounting Officer and Acting Principal Financial Officer)* | March 26, 2009 |
| /s/   E. ALEXANDER ALBERT<br>E. Alexander Albert | Director | March 26, 2009 |
| /s/   SAMUEL D. COLELLA<br>Samuel D. Colella | Director | March 26, 2009 |
| /s/   BRUCE C. COZADD<br>Bruce C. Cozadd | Director | March 26, 2009 |
| /s/   BRYAN C. CRESSEY<br>Bryan C. Cressey | Director | March 26, 2009 |
| /s/   MICHAEL W. MICHELSON<br>Michael W. Michelson | Director | March 26, 2009 |
| /s/   JAMES C. MOMTAZEE<br>James C. Momtazee | Director | March 26, 2009 |
| /s/   KENNETH W. O'KEEFE<br>Kenneth W. O'Keefe | Director | March 26, 2009 |
| /s/   ALAN M. SEBULSKY<br>Alan M. Sebulsky | Director | March 26, 2009 |
| /s/   JAMES B. TANANBAUM, M.D.<br>James B. Tananbaum, M.D. | Director | March 26, 2009 |
| /s/   NATHANIEL M. ZILKHA<br>Nathaniel M. Zilkha | Director | March 26, 2009 |

# EXHIBIT 6

# FULLY REDACTED

# EXHIBIT 7

# FULLY REDACTED

# EXHIBIT 8

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**
**or**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**
**Commission File Number: 001-33500**

# JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Ireland** | **98-1032470** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**Fifth Floor, Waterloo Exchange**
**Waterloo Road, Dublin 4, Ireland D04 E5W7**
**011-353-1-634-7800**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, nominal value $0.0001 per share | JAZZ | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, as of June 30, 2021, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $10,591,497,500 based upon the last sale price reported for the registrant's ordinary shares on such date on The Nasdaq Global Select Market. The calculation of the aggregate market value of voting and non-voting common equity excludes 1,490,584 ordinary shares of the registrant held by executive officers, directors and shareholders that the registrant concluded were affiliates of the registrant on that date. Exclusion of such shares should not be construed to indicate that any such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the registrant or that such person is controlled by or under common control with the registrant.

As of February 22, 2022, a total of 61,738,841 ordinary shares, nominal value $0.0001 per share, of the registrant were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III, Items 10-14 of this Form 10-K is incorporated by reference to the registrant's definitive Proxy Statement for the 2022 Annual General Meeting of Shareholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A. If such Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Form 10-K, such information will be included in an amendment to this Form 10-K to be filed within such 120-day period.

consumption, which is a modifiable risk factor, is associated with clinically meaningful reductions in blood pressure and cardiovascular disease risk. Therefore, we believe that reducing sodium intake compared to the standard of care by 92% each and every day is a significant advancement for these patients. The 92% reduction of sodium translates into a reduction of approximately 1,000 to 1,500 milligrams per day for a patient prescribed Xyrem, depending on the dose. When patients transition from Xyrem to Xywav, Xywav treatment is initiated at the same dose and regimen (gram for gram) and titrated as needed based on efficacy and tolerability. The label for Xywav, unlike Xyrem, does not include a warning to prescribers to monitor patients sensitive to sodium intake, including patients with heart failure, hypertension or renal impairment.

Our internal market research finds that health care providers and patients who understand the increased risk of cardiovascular disease faced by narcolepsy patients and who have been educated on the meaningful reduction in sodium from Xyrem to Xywav cite that meaningful reduction as a key reason for prescribing or starting on Xywav. In June 2021, FDA recognized seven years of Orphan Drug Exclusivity, or ODE, for Xywav in narcolepsy through July 21, 2027, stating that Xywav is clinically superior to Xyrem by means of greater safety due to reduced chronic sodium burden.

In approving Xywav, FDA approved a REMS to cover both Xywav and Xyrem. The Xywav and Xyrem REMS has the same requirements for both products and both products are also distributed by the central pharmacy through exclusive agreements described more fully below.

On August 12, 2021, FDA approved Xywav for the treatment of IH in adults. Xywav is the first and only FDA-approved therapy to treat IH. We initiated the U.S. commercial launch of Xywav for the treatment of IH in adults on November 1, 2021. IH is a debilitating neurologic sleep disorder characterized by chronic EDS (the inability to stay awake and alert during the day resulting in the irrepressible need to sleep or unplanned lapses into sleep or drowsiness), severe sleep inertia, and prolonged and non-restorative nighttime sleep. Although there are overlapping clinical features with other conditions, including narcolepsy, IH has its own specific diagnostic criteria. IH can significantly affect social, educational and occupational functioning. An estimated 37,000 people in the U.S. have been diagnosed with IH and are actively seeking healthcare. In January 2022, FDA recognized seven years of ODE for Xywav in IH through August 12, 2028.

In 2021, net product sales of Xywav were $535.3 million, which represented 17% of our total net product sales. There were approximately 6,900 active patients on Xywav exiting the fourth quarter of 2021, including approximately 6,650 active patients with narcolepsy and approximately 250 active patients with IH. With respect to Xywav and Xyrem in the aggregate, the average number of active oxybate patients on therapy was approximately 16,200 in the fourth quarter of 2021.

*Xyrem.* Xyrem is a product approved by FDA and distributed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy. Sodium oxybate, the active pharmaceutical ingredient, or API, in Xyrem, is a formulation of the sodium salt of gamma-hydroxybutyrate, an endogenous neurotransmitter and metabolite of gamma-aminobutyric acid.

Xyrem was approved in the U.S. for the treatment of cataplexy in adult patients with narcolepsy in 2002 and was approved for EDS in adult patients with narcolepsy in 2005. In October 2018, Xyrem was also approved in the U.S. for the treatment of cataplexy or EDS in pediatric narcolepsy patients ages seven and older. In its updated 2021 treatment guidelines, the American Academy of Sleep Medicine gives sodium oxybate a strong recommendation for the treatment of narcolepsy in adults. To support the development and commercialization of Xyrem internationally, we have license and distribution agreement with UCB Pharma Limited, or UCB, across other countries. This agreement provides UCB and its affiliates with the sole right to commercialize Xyrem in exclusive territories for all indications.

In 2021, net product sales of Xyrem were $1.3 billion, which represented 41% of our total net product sales.

*Xywav and Xyrem REMS.* Our marketing, sales and distribution of Xywav and Xyrem in the U.S. are subject to a REMS, which is required by FDA to mitigate the risks of serious adverse outcomes resulting from inappropriate prescribing, abuse, misuse and diversion of Xywav and Xyrem. Under this REMS, all of the Xywav and Xyrem sold in the U.S. must be dispensed and shipped directly to patients or caregivers through a central pharmacy. Xywav and Xyrem may not be stocked in retail pharmacies. Physicians and patients must complete an enrollment process prior to fulfillment of Xywav and Xyrem prescriptions, and each physician and patient must receive materials concerning the serious risks associated with Xywav and Xyrem before the physician can prescribe, or a patient can receive, the product. The central certified pharmacy must monitor and report instances of patient or prescriber behavior giving rise to a reasonable suspicion of abuse, misuse or diversion of Xywav and Xyrem, and maintains enrollment and prescription monitoring information in a central database. The central pharmacy ships the product directly to the patient (or caregiver) by a courier service.

We have had exclusive agreements with Express Scripts Specialty Distribution Services, Inc., or ESSDS, the central pharmacy for Xywav and Xyrem, to distribute Xywav and Xyrem in the U.S. and provide patient support services related to Xyrem since 2002. In July 2020, upon expiration of the existing exclusive agreements with ESSDS, we entered into new agreements with ESSDS with a two-year term. Our current agreements with ESSDS, which expire on July 1, 2022, may be terminated by either party at any time without cause on 180 days' prior written notice to the other party.

**Risks Related to Our Lead Products and Product Candidates**

***Our inability to maintain or increase sales from our oxybate franchise would have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

Our business has been substantially dependent on Xyrem® (sodium oxybate) oral solution, and our financial results have been significantly influenced by sales of Xyrem. Our future plans assume that Xywav®, our oxybate product launched in November 2020 with 92%, or approximately 1,000 to 1,500 milligrams per day, less sodium than Xyrem, depending on the dose, absence of a sodium warning and dosing titration option, will become the treatment of choice for patients who can benefit from oxybate treatment, current Xyrem patients, and patients who previously were not prescribed Xyrem, including those patients for whom sodium content is a concern. In June 2021, U.S. Food and Drug Administration, or FDA, recognized seven years of Orphan Drug Exclusivity through July 21, 2027 for Xywav in narcolepsy stating that Xywav is clinically superior to Xyrem by means of greater safety due to reduced chronic sodium burden. Our ability to successfully commercialize Xywav will depend on, among other things, our ability to maintain adequate coverage and reimbursement for Xywav and acceptance of Xywav by payors, physicians and patients.

Our ability to maintain or increase oxybate product sales and realize the anticipated benefits from our investment in Xywav is subject to a number of additional risks and uncertainties as discussed in greater detail below, including those related to the near-term introduction of authorized generic and generic versions of sodium oxybate and new products for treatment of cataplexy and/or excessive daytime sleepiness, or EDS, in narcolepsy in the U.S. market; the current and potential impacts of the COVID-19 pandemic, including the current and expected future negative impact on demand for our products and the uncertainty with respect to our ability to meet commercial demand in the future; increased pricing pressure from, changes in policies by, or restrictions on reimbursement imposed by, third party payors, including our ability to maintain adequate coverage and reimbursement for Xywav; and challenges to our intellectual property around Xyrem and/or Xywav. While we expect that our business will continue to be substantially dependent on oxybate product sales, there is no guarantee that we can maintain oxybate sales at or near historical levels, or that oxybate sales will continue to grow. A significant decline in oxybate sales could cause us to reduce our operating expenses or seek to raise additional funds, which would have a material adverse effect on our business, financial condition, results of operations and growth prospects, including on our ability to acquire, in-license or develop new products to grow our business.

***The introduction of new products in the U.S. market that compete with, or otherwise disrupt the market for, our oxybate products and product candidates would adversely affect sales of our oxybate products and product candidates.***

While Xywav and Xyrem are currently the only products approved by FDA and marketed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy, new treatment options for cataplexy and EDS in narcolepsy have launched, and in the future, other products may be launched that are competitive with or disrupt the market for our oxybate products.

For example, in the future, we expect Xywav and Xyrem to face competition from authorized generic and generic versions of sodium oxybate. Nine companies have sent us notices that they had filed abbreviated new drug applications, or ANDAs, seeking approval to market a generic version of Xyrem, and we have filed and settled patent lawsuits with all nine companies. To date, FDA has approved or tentatively approved four of these ANDAs, and we believe that it is likely that FDA will approve or tentatively approve some or all of the others. In our patent litigation settlement with the first filer, West-Ward Pharmaceuticals Corp. (a wholly owned subsidiary of Hikma Pharmaceuticals PLC and now known as Hikma in the U.S.), or Hikma, we granted Hikma the right to sell an authorized generic product, or AG Product, with royalties back to us, in the U.S. beginning on January 1, 2023, or earlier under certain circumstances. Hikma has a right to elect to continue to sell the Hikma AG Product for a total of up to five years. We also granted Hikma a license to launch its own generic sodium oxybate product as early as six months after it has the right to sell the Hikma AG Product, but if it elects to launch its own generic product, Hikma will no longer have the right to sell the Hikma AG Product. In our settlements with Amneal Pharmaceuticals LLC, or Amneal, Lupin Inc., or Lupin, and Par Pharmaceutical, Inc., or Par, we granted each party the right to sell a limited volume of an AG Product in the U.S. beginning on July 1, 2023, or earlier under certain circumstances, and ending on December 31, 2025, with royalties back to us. AG Products will be distributed through the same risk evaluation and mitigation strategy, or REMS, as Xywav and Xyrem. We also granted each of Amneal, Lupin and Par a license to launch its own generic sodium oxybate product under its ANDA on or after December 31, 2025, or earlier under certain circumstances, including the circumstance where Hikma elects to launch its own generic product. If Amneal, Lupin or Par elects to launch its own generic product under such circumstance, it will no longer have the right to sell an AG Product. In our settlements with each of the other five ANDA filers, we granted each a license to launch its own generic sodium oxybate product under its ANDA on or after December 31, 2025, or earlier under certain circumstances, including circumstances where Hikma launches its own generic sodium oxybate product. The actual timing of the launch of an AG Product or generic sodium oxybate product is uncertain because the launch dates of the AG Products and generic sodium oxybate products under our settlement agreements are subject to acceleration under certain circumstances. It is possible that additional companies may file ANDAs seeking to market a generic version of Xyrem which could lead to additional patent litigation or challenges with respect to Xyrem.

36

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: March 1, 2022

**Jazz Pharmaceuticals public limited company**
(Registrant)

/s/   BRUCE C. COZADD
Bruce C. Cozadd
Chairman and Chief Executive Officer and Director
(Principal Executive Officer)

/s/   RENÉE GALÁ
Renée Galá
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

/s/   PATRICIA CARR
Patricia Carr
Senior Vice President, Chief Accounting Officer
(Principal Accounting Officer)

113

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Bruce C. Cozadd, Renée Galá, Neena M. Patil and Patricia Carr, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution for him or her, and in his or her name in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and any of them, his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, the following persons on behalf of the registrant and in the capacities and on the dates indicated have signed this report below:

| Signature | Title | Date |
|---|---|---|
| /s/   BRUCE C. COZADD<br>Bruce C. Cozadd | Chairman, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | March 1, 2022 |
| /s/   RENÉE GALÁ<br>Renée Galá | Executive Vice President and Chief Financial Officer<br>*(Principal Financial Officer)* | March 1, 2022 |
| /s/   PATRICIA CARR<br>Patricia Carr | Senior Vice President, Chief Accounting Officer<br>*(Principal Accounting Officer)* | March 1, 2022 |
| /s/   JENNIFER E. COOK<br>Jennifer E. Cook | Director | March 1, 2022 |
| /s/   PATRICK G. ENRIGHT<br>Patrick G. Enright | Director | March 1, 2022 |
| /s/   PETER GRAY<br>Peter Gray | Director | March 1, 2022 |
| /s/   HEATHER ANN MCSHARRY<br>Heather Ann McSharry | Director | March 1, 2022 |
| /s/   SEAMUS C. MULLIGAN<br>Seamus C. Mulligan | Director | March 1, 2022 |
| /s/   KENNETH W. O'KEEFE<br>Kenneth W. O'Keefe | Director | March 1, 2022 |
| /s/   ANNE O'RIORDAN<br>Anne O'Riordan | Director | March 1, 2022 |
| /s/   NORBERT G. RIEDEL, PH.D.<br>Norbert G. Riedel, Ph.D. | Director | March 1, 2022 |
| /s/   MARK D. SMITH, M.D.<br>Mark D. Smith, M.D. | Director | March 1, 2022 |
| /s/   CATHERINE A. SOHN, PHARM.D.<br>Catherine A. Sohn, Pharm.D. | Director | March 1, 2022 |
| /s/   RICK E WINNINGHAM<br>Rick E Winningham | Director | March 1, 2022 |

# EXHIBIT 9



**Avadel Pharmaceuticals Provides Corporate Update and Reports Second Quarter 2024 Financial Results**

August 8, 2024 at 7:00 AM EDT

*-- Generated $41.5 million in net revenue from sales of LUMRYZ™ --*

*-- More than 1,900 patients on LUMRYZ as of June 30th --*

*-- First patient dosed in Phase 3 trial evaluating LUMRYZ in idiopathic hypersomnia --*

*-- FDA target action date of September 7, 2024 for sNDA for LUMRYZ in pediatric narcolepsy --*

*-- Management to host a conference call today at 8:30 a.m. ET --*

DUBLIN, Aug. 08, 2024 (GLOBE NEWSWIRE) -- Avadel Pharmaceuticals plc (Nasdaq: AVDL), a biopharmaceutical company focused on transforming medicines to transform lives, today provided a corporate update and announced its financial results for the quarter ended June 30, 2024.

"The continued strong quarter over quarter growth in patient demand is a testimonial to the reception LUMRYZ has received from the narcolepsy community since its launch last year. Alongside our focus on maximizing the launch of LUMRYZ for the treatment of narcolepsy, creating further sustainable value through indication expansion is a priority," said Greg Divis, Chief Executive Officer of Avadel Pharmaceuticals. "We are driven by our commitment to provide patients suffering from sleep disorders with transformative treatment options, and we are well positioned to continue executing on our mission to transform the sleep disorder treatment landscape. Last week, we dosed the first patient in the Phase 3 trial in idiopathic hypersomnia, and a potential FDA approval for the pediatric narcolepsy population is expected in September. We look forward to potentially extending LUMRYZ as a treatment option to both of these patient populations."

**Second Quarter and Recent Company Highlights**

**LUMRYZ Commercial Updates:**

- Generated $41.5 million of net product revenue from sales of LUMRYZ in the second quarter of 2024.
- As of June 30, there were more than 1,900 patients on LUMRYZ compared to more than 1,400 as of March 31 and more than 900 as of December 31, 2023.
  - From launch through June 30, approximately 3,800 patients had enrolled in Avadel's RYZUP™ patient support services and greater than 2,400 patients had initiated therapy.

**Pipeline and Corporate Updates:**

- Dosed the first patient in REVITALYZ™, a Phase 3 double-blind, placebo-controlled, randomized withdrawal, multicenter study designed to evaluate the efficacy and safety of LUMRYZ in idiopathic hypersomnia (IH). Enrollment is open to patients who are currently being treated with a twice-nightly oxybate and those not taking oxybates. The study is expected to enroll approximately 150 adults with IH and includes an open label extension portion.
- Supplemental New Drug Application (sNDA) for LUMRYZ for treatment of cataplexy or EDS in the pediatric narcolepsy population is under review with the U.S. Food and Drug Administration (FDA), with an assigned target action date of September 7, 2024.
  - With potential approval in the pediatric population, LUMRYZ could alleviate the burden placed on families and caregivers of children with narcolepsy who are responsible for waking up in the middle of the night to administer a second dose.
  - Pediatric patients currently represent approximately 5% of all oxybate treated narcolepsy patients.
- On July 1, joined the Russell 3000® Index.

**Overview of Second Quarter Financial Results**

Recognized $41.5 million in net product revenue for the second quarter 2024 compared to $1.5 million in the same period in 2023. Net product revenue consists of LUMRYZ product sales, which was launched in the U.S. on June 5, 2023.

Gross profit for the second quarter 2024 was $38.7 million compared to $1.5 million in the same period in 2023.

Selling, general and administrative (SG&A) expenses were $47.4 million in the quarter ended June 30, 2024, compared to $46.8 million for the same period in 2023. SG&A expenses in the current period include $5.0 million of non-recurring costs related to the mandatory exchange of the Company's American Depositary Shares (ADSs) for the underlying ordinary shares and the termination of its American Depository Receipt program (ADR Program).

Research and development (R&D) expenses were $4.1 million in the quarter ended June 30, 2024, compared to $4.2 million for the same period in 2023. R&D expenses in the current period include clinical study costs related to the Phase 3 pivotal trial in IH.

Net loss for the quarter ended June 30, 2024, was $13.8 million, or ($0.14) per diluted share, compared to net loss of $64.4 million, or ($0.83) per diluted share, for the same period in 2023.

Cash, cash equivalents and marketable securities were $71.4 million as of June 30, 2024. Cash used during the quarter ended June 30, 2024, included $5.0 million of non-recurring costs related to the mandatory exchange of the Company's ADSs for the underlying ordinary shares and the termination of its ADR Program.

**Conference Call Details:**

A live audio webcast of the call can be accessed by visiting the investor relations section of the Company's website, www.avadel.com. A replay of the webcast will be archived on Avadel's website for 90 days following the event. Participants may register for the conference call here and are advised to do so at least 10 minutes prior to joining the call.

**About LUMRYZ ™(sodium oxybate) for extended-release oral suspension**

LUMRYZ, is an extended-release sodium oxybate medication approved by the FDA on May 1, 2023, as the first and only once-at-bedtime treatment for cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy.

The FDA approval of LUMRYZ was supported by results from REST-ON, a randomized, double-blind, placebo-controlled, pivotal Phase 3 trial in adults with narcolepsy. LUMRYZ demonstrated statistically significant and clinically meaningful improvements in the three co-primary endpoints: EDS, clinicians' overall assessment of patients' functioning (CGI-I) and cataplexy attacks, for all three evaluated doses when compared to placebo.

With its approval, the FDA also granted seven years of Orphan Drug Exclusivity to LUMRYZ for the treatment of cataplexy or EDS in adults with narcolepsy due to a finding of clinical superiority of LUMRYZ relative to currently available oxybate treatments. In particular, the FDA found that LUMRYZ makes a major contribution to patient care over currently available, twice-nightly oxybate products by providing a once-nightly dosing regimen that avoids nocturnal arousal to take a second dose.

**About Avadel Pharmaceuticals plc**

Avadel Pharmaceuticals plc (Nasdaq: AVDL) is a biopharmaceutical company focused on transforming medicines to transform lives. Our approach includes applying innovative solutions to the development of medications that address the challenges patients face with current treatment options. Avadel's commercial product, LUMRYZ, was approved by the  U.S. Food & Drug Administration (FDA) as the first and only once-at-bedtime oxybate for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy. For more information, please visit www.avadel.com.

**IMPORTANT SAFETY INFORMATION**

> **WARNING: Taking LUMRYZ™ (sodium oxybate) with other central nervous system (CNS) depressants, such as medicines used to make you fall asleep, including opioid analgesics, benzodiazepines, sedating antidepressants, antipsychotics, sedating anti-epileptic medicines, general anesthetics, muscle relaxants, alcohol or street drugs, may cause serious medical problems, including trouble breathing (respiratory depression), low blood pressure (hypotension), changes in alertness (drowsiness), fainting (syncope) and death.**
>
> **The active ingredient in LUMRYZ (sodium oxybate) is a form of gamma hydroxybutyrate (GHB), a controlled substance. Abuse or misuse of illegal GHB alone or with other CNS depressants (drugs that cause changes in alertness or consciousness) have caused serious side effects. These effects include seizures, trouble breathing (respiratory depression), changes in alertness (drowsiness), coma and death. Call your doctor right away if you have any of these serious side effects.**
>
> **Because of these risks, LUMRYZ is available only by prescription and filled through certified pharmacies in the LUMRYZ REMS. You must be enrolled in the LUMRYZ REMS to receive LUMRYZ. Further information is available at www.LUMRYZREMS.com or by calling 1-877-453-1029.**

**INDICATIONS**

LUMRYZ (sodium oxybate) for extended-release oral suspension is a prescription medicine used to treat the following symptoms in adults with narcolepsy:

- sudden onset of weak or paralyzed muscles (cataplexy)
- excessive daytime sleepiness (EDS)

It is not known if LUMRYZ is safe and effective in people less than 18 years of age.

**Do not take LUMRYZ if you take** other sleep medicines or sedatives (medicines that cause sleepiness), drink alcohol or have a rare problem called succinic semialdehyde dehydrogenase deficiency. Keep LUMRYZ in a safe place to prevent abuse and misuse. Selling or giving away LUMRYZ may harm others and is against the law. Tell your doctor if you have ever abused or been dependent on alcohol, prescription medicines or street drugs.

Anyone who takes LUMRYZ should not do anything that requires them to be fully awake or is dangerous, including driving a car, using heavy machinery or flying an airplane, for at least six (6) hours after taking LUMRYZ. Those activities should not be done until you know how LUMRYZ affects you.

Falling asleep quickly, including while standing or while getting up from the bed, has led to falls with injuries that have required some people to be hospitalized.

**LUMRYZ can cause serious side effects, including the following:**

- **Breathing problems, including** slower breathing, trouble breathing and/or short periods of not breathing while sleeping (e.g., sleep apnea). People who already have breathing or lung problems have a higher chance of having breathing problems when they take LUMRYZ.
- **Mental health problems,** including confusion, seeing or hearing things that are not real (hallucinations), unusual or disturbing thoughts (abnormal thinking), feeling anxious or upset, depression, thoughts of killing yourself or trying to kill yourself, increased tiredness, feelings of guilt or worthlessness and difficulty concentrating. Tell your doctor if you have or had depression or have tried to harm yourself. **Call your doctor right away if you have symptoms of mental health problems or a change in weight or appetite.**
- **Sleepwalking.** Sleepwalking can cause injuries. Call your doctor if you start sleepwalking.

Tell your doctor if you are on a salt-restricted diet or if you have high blood pressure, heart failure or kidney problems. LUMRYZ contains a lot of sodium (salt) and may not be right for you.

The most common side effects of LUMRYZ in adults include nausea, dizziness, bedwetting, headache and vomiting. Your side effects may increase when you take higher doses of LUMRYZ. LUMRYZ can cause physical dependence and craving for the medicine when it is not taken as directed. These are not all the possible side effects of LUMRYZ.

**For more information, ask your doctor or pharmacist. Call your doctor for medical advice about side effects.**

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit www.fda.gov/medwatch, or call 1-800-FDA-1088.

**Please see full Prescribing Information, including BOXED Warning.**

**Cautionary Disclosure Regarding Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects or other events. Such forward-looking statements include, but are not limited to, expectations regarding the potential therapeutic benefit of LUMRYZ; the success of the commercialization of LUMRYZ; the anticipated market demand and sales opportunity of LUMRYZ; the FDA's review of the sNDA for LUMRYZ in the pediatric narcolepsy population and timing related thereto; the Company's idiopathic hypersomnia clinical study for LUMRYZ, including enrollment and timing related thereto; the Company's anticipated financial condition, expenses, uses of capital and other future financial results. In some cases, forward-looking statements can be identified by use of words such as "will," "may," "could," "believe," "expect," "look forward," "on track," "guidance," "anticipate," "estimate," "project," "next steps" and similar expressions and the negatives thereof (if applicable).

The Company's forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, the Company's business and operations are subject to significant risks and, as a result, there can be no assurance that actual results and the results of the company's business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in the Company's forward-looking statements include the risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of the Company's most recent Annual Report on Form 10-K and subsequent filings with the Securities and Exchange Commission.

Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. The Company does not undertake any obligation to publicly update or revise our forward-looking statements, except as required by law.

**Investor Contact:**
Courtney Mogerley
Precision AQ
Courtney.Mogerley@precisionAQ.com
(212) 698-8687

**Media Contact:**
Lesley Stanley
Real Chemistry
lestanley@realchemistry.com
(609) 273-3162

**AVADEL PHARMACEUTICALS PLC
CONDENSED CONSOLIDATED STATEMENTS OF LOSS**
*(In thousands, except per share data)*
*(Unaudited)*

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | **2024** | **2023** | **2024** | **2023** |
| Net product revenue | $ 41,504 | $ 1,496 | $ 68,682 | $ 1,496 |
| Cost of products sold | 2,788 | 36 | 4,310 | 36 |
| Gross profit | 38,716 | 1,460 | 64,372 | 1,460 |
| Operating expenses: | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Research and development expenses | | 4,051 | | 4,223 | | 7,119 | | 8,053 |
| Selling, general and administrative expenses | | 47,406 | | 46,778 | | 96,029 | | 71,246 |
| Total operating expense | | 51,457 | | 51,001 | | 103,148 | | 79,299 |
| Operating loss | | (12,741) | | (49,541) | | (38,776) | | (77,839) |
| Investment and other income, net | | 1,126 | | 623 | | 2,504 | | 816 |
| Interest expense | | (2,716) | | (2,295) | | (5,308) | | (5,554) |
| Loss on extinguishment of debt | | — | | (13,129) | | — | | (13,129) |
| Loss before income taxes | | (14,331) | | (64,342) | | (41,580) | | (95,706) |
| Income tax (benefit) provision | | (509) | | 90 | | (416) | | (490) |
| Net loss | $ | (13,822) | $ | (64,432) | $ | (41,164) | $ | (95,216) |
| | | | | | | | | |
| Net loss per share - basic | $ | (0.14) | $ | (0.83) | $ | (0.44) | $ | (1.35) |
| Net loss per share - diluted | $ | (0.14) | $ | (0.83) | $ | (0.44) | $ | (1.35) |
| | | | | | | | | |
| Weighted average number of shares outstanding - basic | | 96,151 | | 77,246 | | 93,922 | | 70,603 |
| Weighted average number of shares outstanding - diluted | | 96,151 | | 77,246 | | 93,922 | | 70,603 |

**AVADEL PHARMACEUTICALS PLC**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
*(In thousands, except per share data)*

| | | June 30, 2024 | | December 31, 2023 |
|---|---|---|---|---|
| | | *(Unaudited)* | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 28,847 | $ | 31,167 |
| Marketable securities | | 42,535 | | 73,944 |
| Accounts receivable, net | | 33,377 | | 12,103 |
| Inventories | | 13,313 | | 10,380 |
| Research and development tax credit receivable | | 927 | | 1,322 |
| Prepaid expenses and other current assets | | 6,781 | | 5,286 |
| Total current assets | | 125,780 | | 134,202 |
| Property and equipment, net | | 484 | | 585 |
| Operating lease right-of-use assets | | 2,154 | | 2,591 |
| Goodwill | | 16,836 | | 16,836 |
| Research and development tax credit receivable | | 252 | | 332 |
| Other non-current assets | | 12,015 | | 10,152 |
| Total assets | $ | 157,521 | $ | 164,698 |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Current portion of operating lease liability | $ | 866 | $ | 934 |
| Accounts payable | | 9,794 | | 11,433 |
| Accrued expenses | | 33,711 | | 24,227 |
| Other current liabilities | | 242 | | 261 |
| Total current liabilities | | 44,613 | | 36,855 |
| Long-term operating lease liability | | 1,308 | | 1,690 |
| Royalty financing obligation | | 35,493 | | 32,760 |
| Other non-current liabilities | | 5,819 | | 5,654 |
| Total liabilities | | 87,233 | | 76,959 |
| | | | | |
| Shareholders' equity: | | | | |
| Preferred shares, nominal value of $0.01 per share; 50,000 shares authorized; zero issued and outstanding at June 30, 2024 and 5,194 issued and outstanding at December 31, 2023 | | — | | 52 |
| Ordinary shares, nominal value of $0.01 per share; 500,000 shares authorized; 96,204 issued and outstanding at June 30, 2024 and 89,825 issued and outstanding at December 31, 2023 | | 961 | | 898 |
| Additional paid-in capital | | 880,202 | | 855,452 |

| | | | |
|---|---|---:|---:|
| Accumulated deficit | | (786,660) | (745,496) |
| Accumulated other comprehensive loss | | (24,215) | (23,167) |
| Total shareholders' equity | | 70,288 | 87,739 |
| Total liabilities and shareholders' equity | $ | 157,521 | $ 164,698 |

**AVADEL PHARMACEUTICALS PLC**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In thousands)*
*(Unaudited)*

| | | Six Months Ended June 30, | |
|---|---|---:|---:|
| | | **2024** | **2023** |
| **Cash flows from operating activities:** | | | |
| Net loss | $ | (41,164) | $ (95,216) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | | 978 | 1,189 |
| Amortization of debt discount and debt issuance costs | | — | 2,460 |
| Share-based compensation expense | | 10,851 | 9,166 |
| Loss on extinguishment of debt | | — | 13,129 |
| Other adjustments | | (1,208) | 42 |
| Net changes in assets and liabilities | | | |
| Accounts receivable | | (21,274) | (1,775) |
| Inventories | | (2,264) | (1,439) |
| Prepaid expenses and other current assets | | (1,557) | (4,400) |
| Research and development tax credit receivable | | 451 | 2,127 |
| Accounts payable & other current liabilities | | (1,638) | 2,470 |
| Accrued expenses | | 9,484 | 10,246 |
| Other assets and liabilities | | (549) | (255) |
| Net cash used in operating activities | | (47,890) | (62,256) |
| | | | |
| **Cash flows from investing activities:** | | | |
| Proceeds from sales of marketable securities | | 207,835 | 25,618 |
| Purchases of marketable securities | | (175,898) | (113,460) |
| Net cash provided by (used in) investing activities | | 31,937 | (87,842) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Proceeds from April 2023 public offering, net of issuance costs | | — | 134,151 |
| Payments for February 2023 Notes | | — | (17,500) |
| Payments for debt issuance costs | | — | (4,357) |
| Proceeds from issuance of shares off the at-the-market offering program | | 9,250 | 11,913 |
| Proceeds from stock option exercises and employee share purchase plan | | 4,663 | 1,779 |
| Net cash provided by financing activities | | 13,913 | 125,986 |
| | | | |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | | (280) | 116 |
| | | | |
| Net change in cash and cash equivalents | | (2,320) | (23,996) |
| Cash and cash equivalents at January 1, | | 31,167 | 73,981 |
| Cash and cash equivalents at June 30, | $ | 28,847 | $ 49,985 |



# EXHIBIT 10

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or Section 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported)**: March 30, 2023

# AVADEL PHARMACEUTICALS PLC
(Exact name of registrant as specified in its charter)

| Ireland | 001-37977 | 98-1341933 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **10 Earlsfort Terrace** | |
|---|---|
| **Dublin 2, Ireland, D02 T380** | **Not Applicable** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: +353 1 920 1000**

**Not applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation to the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| American Depositary Shares* Ordinary Shares, nominal value $0.01 per share** | AVDL N/A | The Nasdaq Global Market |

*American Depositary Shares may be evidenced by American Depositary Receipts. Each American Depositary Share represents one (1) Ordinary Share.

** Not for trading, but only in connection with the listing of American Depositary Shares on The Nasdaq Global Market.

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02**    **Results of Operations and Financial Condition**

On March 30, 2023, Avadel Pharmaceuticals plc (the "Company") announced its financial results for the quarter and full year ended December 31, 2022. A copy of the press release is being furnished as Exhibit 99.1 to this Report on Form 8-K.

The information in this Report on Form 8-K and Exhibit 99.1 attached hereto is intended to be furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as expressly set forth by specific reference in such filing.

**Item 8.01**    **Other Events**

As previously announced, on March 29, 2023, Avadel Finance Cayman Limited, a Cayman Islands exempted company (the "Issuer") and an indirect wholly-owned subsidiary of the Company, and the Company entered into separate, privately negotiated exchange agreements (the "Exchange Agreements") with certain holders of its outstanding 4.50% exchangeable senior notes due October 2, 2023 and issued on April 4, 2022 (the "2023 Notes"). Pursuant to the terms of the Exchange Agreements, the Issuer will exchange approximately $96.2 million in aggregate principal amount of the 2023 Notes for approximately $106.3 million in aggregate principal amount of new 6.00% exchangeable senior notes due April 1, 2027 (the "2027 Notes"), in each case, pursuant to the exemption from registration provided by Section 4(a)(2) under the Securities Act (the "Exchange Transactions"). Following the closing of the Exchange Transactions, approximately $21.2 million in aggregate principal amount of the 2023 Notes will remain outstanding with terms unchanged. The initial exchange rate for the 2027 Notes will be 102.3018 ADSs per $1,000 principal amount of 2027 Notes, subject to adjustment in accordance with terms of the Indenture that will govern the 2027 Notes. Reference is made to the Company's Current Report on Form 8-K, field with the SEC on March 28, 2023, for additional information related to the Exchange Agreements and the 2027 Notes.

**Item 9.01.**                                                              **Exhibits**

(d) Exhibits

99.1     Press release issued by Avadel Pharmaceuticals plc on March 30, 2023, furnished herewith.

104     Cover Page Interactive Data File (embedded within the Inline XBRL document).

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 30, 2023                    **AVADEL PHARMACEUTICALS PLC**

                                        By:    /s/ Jerad G. Seurer
                                               Name: Jerad G. Seurer
                                               Title: General Counsel & Corporate Secretary

**Exhibit 99.1**

### Avadel Pharmaceuticals Provides Corporate Update and Reports Fourth Quarter and Full Year 2022 Financial Results

·      *LUMRYZ™ NDA amendment filed March 1 requesting FDA final approval*

·      *Received FDA authorization to import LUMRYZ in advance of final approval decision; shortens timeline between potential approval and product availability*

·      *Secured $200 million of capital to fund the launch of LUMRYZ and extended the maturity of $96.2 million of the convertible notes to 2027*

·      *Launch preparations on track to support U.S. commercial launch of LUMRYZ*

·      *Management to host a conference call today at 8:30 a.m. ET*

DUBLIN, Ireland, March 30, 2023 - Avadel Pharmaceuticals plc (Nasdaq: AVDL), a biopharmaceutical company focused on transforming medicines to transform lives, today provided a corporate update and announced its financial results for the fourth quarter ended December 31, 2022.

"2023 is shaping up to be a significant year for Avadel. I am proud of all that our team has recently accomplished, including submitting an amendment to the FDA requesting final approval for LUMRYZ and securing the FDA's approval of our PLAIR request, which has allowed us to import product into the U.S. ahead of a final approval decision. Collectively, these milestones move us closer to the potential commercialization of LUMRYZ," said Greg Divis, Chief Executive Officer of Avadel Pharmaceuticals. "In parallel, the completion of multiple strategic financings in the current market environment reinforces the potential of LUMRYZ and positions us for long-term success as we enter a pivotal stage of growth for the company. I want to thank all stakeholders including patients, healthcare practitioners, and our investors for their strong support during this process. We look forward to our continued progress as we execute on our strategic plan to bring LUMRYZ to the $3 billion plus once-at-bedtime oxybate market."

**Fourth Quarter and Recent Company Highlights**

·      Recently, Avadel made significant progress advancing LUMRYZ toward a final approval decision and preparing for U.S. commercial launch.
   o   On March 1st, the company submitted a minor amendment to the U.S. Food and Drug Administration ("FDA") requesting final approval of LUMRYZ for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy.
      ▪   The Company filed the amendment shortly after Jazz Pharmaceuticals filed a submission with the FDA requesting the delisting of the REMS Patent from FDA's Orange Book in response to the unanimous 3-0 panel decision of the United States Court of Appeals for the Federal Circuit on February 24, affirming the previous ruling from the U.S. District Court for the Federal District of Delaware.
   o   The FDA approved Avadel's Pre-Launch Activities Important Requests (PLAIR) for LUMRYZ. Through PLAIR, Avadel is able to import tentatively approved LUMRYZ to the U.S. ahead of a final approval decision.

- ▪ Importation of LUMRYZ, prior to a potential final approval, enables Avadel to shorten the duration of time between a final FDA approval and commercial availability for people with narcolepsy.
  - o Advancements in commercial preparations ahead of potential U.S. launch of LUMRYZ, including finalization of specialty pharmacy network, patient services center and the LUMRYZ REMS program.
  - o Continued engagement with key stakeholders including sleep specialists and payers while expanding our customer facing teams including medical science liaisons, sales leadership, territory business managers, and field reimbursement specialists.
- · Successfully executed multiple strategic financing activities and secured $200 million of capital to fund the launch of LUMRYZ.
  - o Entered into a royalty agreement with RTW Investments (RTW) for up to $75 million to support the potential commercialization of LUMRYZ.
    - ▪ Under the terms of the royalty agreement, RTW will provide up to $75 million non-dilutive synthetic royalty financing commitment to Avadel in return for tiered rate, cash royalty payments based on net sales of LUMRYZ in the U.S.
  - o Completed an equity offering with gross proceeds of $125 million, before deducting underwriting discounts, commissions and estimated offering expenses.
  - o Exchanged $96.2 million of convertible notes with a new maturity date of April 3, 2027.
- · Announced multiple data sets supporting the LUMRYZ product profile, including:
  - o The publication of real-world data describing the risk of accidental dosing errors with immediate-release twice-nightly oxybate, including an analysis on post-marketing safety surveillance data from the FDA Adverse Event Reporting System (FAERS).
  - o Multiple presentations at the American Neurological Association (ANA) annual meeting in October describing demographic characteristics and comorbidities of patients with narcolepsy and reinforcing positive data from completed Phase 3 REST-ON trial and patient and clinician preference for once-nightly over twice-nightly dosing.
  - o Posters at the American College of Chest Physicians (CHEST) meeting in October featuring updated results from patient preference and nocturnal adverse event questionnaires from the RESTORE study with 94% of patients who switched from twice-nightly oxybates stating preference for the once-at-bedtime dosing regime, as well as confirming challenges related to the middle-of-the-night dose.
- · Expanded patent exclusivity for LUMRYZ with 5 additional U.S. patents for a current total of 13 patents, providing Orange Book-listable patent protection into early 2042.

**Overview of Fourth Quarter Results**

R&D expenses were $6.2 million in the quarter ended December 31, 2022, compared to $2.1 million for the same period in 2021. The period-over-period increase was primarily attributed to an increase in purchases of the active pharmaceutical ingredient used in the manufacture of LUMRYZ.

SG&A expenses were $17.0 million in the quarter ended December 31, 2022, compared to $21.0 million for the same period in 2021. The period-over-period decrease is the result of a number of factors including lower marketing and commercial spend. These decreases were partially offset by higher legal costs.

Net loss for the quarter ended December 31, 2022, was $27.5 million, or ($0.44) per diluted share, compared to net loss of $22.3 million, or ($0.38) per diluted share, for the same period in 2021.

Cash, cash equivalents and marketable securities were $96.5 million as of December 31, 2022. The Company extended the maturity of $96.2 million of its convertible notes to April 2027 and $21.2 million will mature in October 2023.

**Conference Call**

Avadel will host a conference all and live audio webcast to discuss its fourth quarter and full year quarter 2022 financial results and provide a corporate update today at 8:30 a.m. ET. To access the live conference call, please register here. A live audio webcast of the call and accompanying slide presentation will also be available in the investor relations section of the Company's website, www.avadel.com. A replay of the webcast will be archived on Avadel's website for 90 days following the event.

**About LUMRYZ**

LUMRYZ is an investigational formulation of sodium oxybate leveraging our proprietary drug delivery technology and designed to be taken once at bedtime for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy.

In March 2020, Avadel completed the REST-ON study, a randomized, double-blind, placebo-controlled, pivotal Phase 3 trial, to assess the efficacy and safety of LUMRYZ in patients with narcolepsy. Among the three co-primary endpoints, LUMRYZ demonstrated statistically significant and clinically meaningful results in EDS, the clinician's overall assessment of the patient's functioning, and reduction in cataplexy attacks, for all three evaluated does when compared to placebo.

In January 2018, the U.S. Food and Drug Administration (FDA) granted LUMRYZ Orphan Drug Designation for the treatment of narcolepsy based on the plausible hypothesis that LUMRYZ may be safer than the twice-nightly formulation of sodium oxybate already approved by the FDA due to the ramifications associated with dosing regimen of that product. LUMRYZ is currently under review by the FDA.

On July 18, 2022, the FDA tentatively approved the LUMRYZ NDA for the treatment of cataplexy or EDS in adults with narcolepsy. Avadel submitted a minor amendment to the FDA on March 1, 2023, requesting final approval of LUMRYZ. This minor amendment submission occurred shortly after the delisting of the REMS Patent from FDA's Orange Book by Jazz Pharmaceuticals in response to the unanimous 3-0 panel decision by the United States Court of Appeals for the Federal Circuit on February 24, affirming the previous ruling from the United States District Court for the Federal District of Delaware, ordering Jazz to do so.

Avadel is currently evaluating the long-term safety and tolerability of LUMRYZ in the open-label RESTORE clinical study. For more information, visit: www.restore-narcolepsy-study.com.

**About Avadel Pharmaceuticals plc**

Avadel Pharmaceuticals plc (Nasdaq: AVDL) is a biopharmaceutical company focused on transforming medicines to transform lives. Our approach includes applying innovative solutions to the development of medications that address the challenges patients face with current treatment options. Our current lead drug candidate, LUMRYZ, is an investigational formulation of sodium oxybate leveraging our proprietary drug delivery technology and designed to be taken once at bedtime for the treatment of cataplexy or EDS in adults with narcolepsy. For more information, please visit www.avadel.com.

**Cautionary Disclosure Regarding Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects, or other events. Such forward-looking statements include, but are not limited to, expectations regarding the FDA's potential final approval of LUMRYZ, including the timing thereof, the Company's preparation for launch of LUMRYZ, the potential time savings between a potential final FDA approval and commercial launch of LUMRYZ attributable to the FDA's approval of the PLAIR; the market acceptance of LUMRYZ (if approved), the total addressable market size for sodium oxybate, the Company's anticipated uses of capital, including the proceeds from the recent financing; the expected maturity of the Company's convertible notes; and the anticipated duration and scope of patent exclusivity for LUMRYZ. In some cases, forward-looking statements can be identified by the use of words such as "will," "may," "could," "believe," "potential," "can," "would," "seek," "expect," "look forward," "on track," "guidance," "anticipate," "estimate," "project," "investigational," "pipeline," "launch," "next steps" and similar expressions, and the negatives thereof (if applicable).

The Company's forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, the Company's business and operations are subject to significant risks, and, as a result, there can be no assurance that actual results and the results of the company's business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in the Company's forward-looking statements include the risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, which was filed with the Securities and Exchange Commission (SEC) on March 29, 2023, and subsequent SEC filings.

Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. The Company does not undertake any obligation to publicly update or revise our forward-looking statements, except as required by law.

**Investor Contact:**
Courtney Turiano
Stern Investor Relations, Inc.
Courtney.Turiano@sternir.com
(212) 698-8687

**Media Contact:**
Gabriella Greig
Real Chemistry
ggreig@realchemistry.com
(203) 249-2688

**AVADEL PHARMACEUTICALS PLC**
**CONDENSED CONSOLIDATED STATEMENTS OF LOSS**
*(In thousands, except per share data)*

|  | *(Unaudited)* | | | |
|---|---|---|---|---|
|  | **Three Months Ended December 31,** | | **Twelve Months Ended December 31,** | |
|  | **2022** | **2021** | **2022** | **2021** |
| Operating expenses: | | | | |
| Research and development expenses | $ 6,235 | $ 2,110 | $ 20,700 | $ 17,104 |
| Selling, general and administrative expenses | 16,981 | 21,026 | 74,516 | 68,495 |
| Restructuring (income) expense | (178) | — | 3,345 | (53) |
| Total operating expenses | 23,038 | 23,136 | 98,561 | 85,546 |
| Operating loss | (23,038) | (23,136) | (98,561) | (85,546) |
| Investment and other (expense) income, net | (1,072) | 646 | (536) | 2,343 |
| Interest expense | (3,255) | (4,154) | (12,342) | (9,942) |
| Loss before income taxes | (27,365) | (26,644) | (111,439) | (93,145) |
| Income tax provision (benefit) | 85 | (4,343) | 26,025 | (15,816) |
| Net loss | $ (27,450) | $ (22,301) | $ (137,464) | $ (77,329) |
| | | | | |
| Net loss per share - basic | $ (0.44) | $ (0.38) | $ (2.29) | $ (1.32) |
| Net loss per share - diluted | (0.44) | (0.38) | (2.29) | (1.32) |
| | | | | |
| Weighted average number of shares outstanding - basic | 62,276 | 58,620 | 60,094 | 58,535 |
| Weighted average number of shares outstanding - diluted | 62,276 | 58,620 | 60,094 | 58,535 |



**AVADEL PHARMACEUTICALS PLC**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
*(In thousands, except per share data)*

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 73,981 | $ 50,708 |
| Marketable securities | 22,518 | 106,513 |
| Research and development tax credit receivable | 2,248 | 2,443 |
| Prepaid expenses and other current assets | 2,096 | 32,826 |
| Total current assets | 100,843 | 192,490 |
| Property and equipment, net | 839 | 285 |
| Operating lease right-of-use assets | 1,713 | 2,652 |
| Goodwill | 16,836 | 16,836 |
| Research and development tax credit receivable | 1,232 | 1,225 |
| Other non-current assets | 11,322 | 33,777 |
| Total assets | $ 132,785 | $ 247,265 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of long-term debt | $ 37,668 | $ — |
| Current portion of operating lease liability | 960 | 900 |
| Accounts payable | 7,890 | 7,679 |
| Accrued expenses | 7,334 | 7,151 |
| Other current liabilities | 1,941 | 5,270 |
| Total current liabilities | 55,793 | 21,000 |
| Long-term debt | 91,614 | 142,397 |
| Long-term operating lease liability | 780 | 1,707 |
| Other non-current liabilities | 5,743 | 3,917 |
| Total liabilities | 153,930 | 169,021 |
| | | |
| Shareholders' (deficit) equity: | | |
| Preferred shares, nominal value of $0.01 per share; 50,000 shares authorized; 488 issued and outstanding at December 31, 2022 and 2021, respectively | 5 | 5 |
| Ordinary shares, nominal value of $0.01 per share; 500,000 shares authorized; 62,878 and 58,620 issued and outstanding at December 31, 2022 and 2021, respectively | 628 | 586 |
| Additional paid-in capital | 589,783 | 549,349 |
| Accumulated deficit | (585,220) | (447,756) |
| Accumulated other comprehensive loss | (26,341) | (23,940) |
| Total shareholders' (deficit) equity | (21,145) | 78,244 |
| Total liabilities and shareholders' (deficit) equity | $ 132,785 | $ 247,265 |



**AVADEL PHARMACEUTICALS PLC**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In thousands)*

| | Twelve Months Ended December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| **Cash flows from operating activities:** | | |
| Net loss | $ (137,464) | $ (77,329) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 1,493 | 815 |
| Amortization of debt discount and debt issuance costs | 6,052 | 1,248 |
| Changes in deferred tax | 26,025 | (15,666) |
| Share-based compensation expense | 7,013 | 8,872 |
| Other adjustments | 2,042 | 1,055 |
| Net changes in assets and liabilities | | |
| Prepaid expenses and other current assets | 30,815 | (439) |
| Research and development tax credit receivable | 30 | 2,796 |
| Accounts payable & other current liabilities | (3,108) | 4,232 |
| Accrued expenses | 227 | 895 |
| Other assets and liabilities | (3,429) | (3,789) |
| Net cash used in operating activities | (70,304) | (77,310) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (716) | (26) |
| Proceeds from the disposition of the Hospital Products | — | 16,500 |
| Proceeds from sales of marketable securities | 83,828 | 102,224 |
| Purchases of marketable securities | (3,414) | (61,769) |
| Net cash provided by investing activities | 79,698 | 56,929 |
| | | |
| **Cash flows from financing activities:** | | |
| Payments for debt issuance costs | (4,804) | — |
| Payments for extinguishment of February 2023 Notes | (8,653) | — |
| Proceeds from stock option exercises and employee share purchase plan | 2,682 | 263 |
| Proceeds from issuance of shares off the at-the-market offering program | 25,318 | — |
| Net cash provided by financing activities | 14,543 | 263 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (664) | (896) |
| Net change in cash and cash equivalents | 23,273 | (21,014) |
| Cash and cash equivalents at January 1 | 50,708 | 71,722 |
| Cash and cash equivalents at December 31 | $ 73,981 | $ 50,708 |

# EXHIBIT 11

# FULLY REDACTED