IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAZZ PHARMACEUTICALS, INC.,     )
               )
      Counterclaim-Defendant,)
               )
      v.             )      C.A. No. 22-941 (GBW)
               )
AVADEL CNS PHARMACEUTICALS LLC, )    **PUBLIC VERSION**
               )
      Counterclaim-Plaintiff.  )

## JAZZ'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Counterclaim-Defendant*
*Jazz Pharmaceuticals, Inc.*

OF COUNSEL:

F. Dominic Cerrito
Steig D. Olson
Gabriel P. Brier
Frank C. Calvosa
Nicolas Siebert
Maxwell Hawley
Kevin Adams
John P. Galanek
Habib-Emmanuel Abraham
Sami H. Rashid
Elizabeth J. Murphy
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 5th Avenue
New York, NY  10016
(212) 849-7000

William R. Sears
Lynette Lim
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

**Confidential Version Filed: April 25, 2025**
**Public Version Filed: May 9, 2025**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   FACTUAL BACKGROUND ..................................................................................4

    A.    Jazz's Innovative Investments In Treating Narcolepsy Patients............................4

    B.    Avadel's Efforts to Secure Approval for Lumryz....................................................7

        1.    Avadel Begins FDA Submissions And Its Early Requests To The FDA Are Denied ..............................................................................7

        2.    Avadel Seeks To Break Xywav's ODE And Avoid Certifying To Jazz's DDI Patents In Order To Accelerate Approval ...............................8

        3.    The FDA Continues Reviewing Avadel's NDA After The Goal Date ..................................................................................................10

    C.    The Parties' Disputes ..........................................................................................14

III.  LEGAL STANDARD ..........................................................................................15

IV.   MOTION 1 – AVADEL LACKS ANTITRUST STANDING ........................................16

    A.    Avadel Lacks Antitrust Standing Because It Cannot Show The FDA Would Have Approved Lumryz By October 15, 2021 .....................................................16

        1.    There Is No Genuine Dispute Avadel Needed The FDA To Find Clinical Superiority To Overcome Jazz's ODE And That The FDA's Clinical Superiority Review Continued Long Past October 15, 2021 ..........................................................................................17

        2.    There Is No Genuine Dispute Avadel's Clinical Superiority Timeline Would Have Been Unprecedented ...............................................19

        3.    All Of Avadel's Purported Evidence Of A Faster Clinical Superiority Decision Is Pure Speculation ...................................................20

        4.    There Is No Genuine Dispute Jazz's DDI Patents Also Barred Approval As Of October 15, 2021 ..........................................................23

    B.    There Is No Genuine Dispute Avadel Lacks Antitrust Standing Because Lumryz's Earlier Launch Would Have Infringed Jazz's Valid '782 Patent ..........24

        1.    Avadel Cannot Show Its Earlier Launch Would Have Been Legal ..........24

        2.    The Undisputed Evidence Shows Avadel Would Have Been Enjoined .....................................................................................26

        3.    There Is No Genuine Dispute Avadel Would Not Have Obtained A Voluntary License .............................................................................27

V.    MOTION 2: AVADEL CANNOT SHOW ANTITRUST LIABILITY............................28

    A.    There Is No Genuine Dispute That Jazz Did Not Engage In *Walker Process* Fraud ...................................................................................................................28

    B.    There Is No Genuine Dispute Regarding Jazz's Regulatory Compliance ............33

VI.    CONCLUSION.................................................................................................................34

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Alberici v. Recro Pharma, Inc.*,
    2020 WL 806719 (E.D. Pa. Feb. 14, 2020) ................................................................33

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................................15, 16

*In re Androgel Antitrust Litig. (No. II)*,
    2018 WL 2984873 (N.D. Ga. June 14, 2018) .....................................................24, 25

*Avaya Inc., RP v. Telecom Labs, Inc.*,
    838 F.3d 354 (3d Cir. 2016) .........................................................................16, 23, 28

*In re Canadian Import Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006) ...............................................................................16

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) ........................................................1, 16, 20, 23, 24

*DeCurtis LLC v. Carnival Corp.*,
    2023 WL 2071915 (S.D. Fla. Feb. 8, 2023) ...........................................................32

*Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*,
    841 F. App'x 399 (3d Cir. 2021) ...........................................................................24

*In re GeoPharma, Inc. Sec. Litig.*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005) .............................................................32, 33

*Gillispie v. RegionalCare Hosp. Partners Inc.*,
    892 F.3d 585 (3d Cir. 2018) ...................................................................................21

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) ..................................................................................16

*Inline Packaging, LLC v. Graphic Packaging Int'l*,
    351 F. Supp. 3d 1187 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020) ...................4, 29

*Kroger Co. v. Sanofi-Aventis*,
    701 F. Supp. 2d 938 (S.D. Ohio 2010) ..................................................................27

*In re Lipitor Antitrust Litig.*,
    2024 WL 2866654 (D.N.J. June 6, 2024) ..................................................2, 19, 21

*Lyda v. CBS Corp.*,
    838 F.3d 1331 (Fed. Cir. 2016)........................................................................................31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................16, 19

*Meijer, Inc. v. Biovail Corp.*,
    533 F.3d 857 (D.C. Cir. 2008)..........................................................................................21

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    42 F. Supp. 3d 231 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016)..............................24

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    842 F.3d 34 (1st Cir. 2016).........................................................................................3, 24

*Paxton v. Provention Bio, Inc.*,
    2022 WL 3098236 (D.N.J. Aug. 4, 2022) ............................................................................33

*Pharm. Corp. of Am. v. Askari*,
    2022 WL 3697342 (3d Cir. Aug. 26, 2022)..........................................................................27

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)..............................................................................................15

*Robertson v. Allied Signal, Inc.*,
    914 F.2d 360 (3d Cir. 1990)............................................................................................16

*RSA Media, Inc. v. AK Media Grp.*,
    260 F.3d 10 (1st Cir. 2001)............................................................................................16

*SodexoMAGIC, LLC v. Drexel Univ.*,
    24 F.4th 183 (3d Cir. 2022) ...........................................................................................16

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    2018 WL 563144 (D. Mass. Jan. 25, 2018) .........................................................................25

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*,
    490 Fed. Appx. 492 (3d Cir. 2012) ...................................................................................16

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011).....................................................................................4, 29

*Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*,
    2005 WL 3675999 (D.D.C. Mar. 31, 2005)..........................................................................23

*United Mag. Co. v. Murdoch Mags. Distr., Inc.*,
    393 F. Supp. 2d 199 (S.D.N.Y. 2005).................................................................................24

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965) ............................................................................29

*In re Wellbutrin XL Antitrust Litig.*,
    133 F. Supp. 3d 734 (E.D. Pa. 2015) ...............................................2, 3

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017).................2, 3, 16, 20, 22, 24, 25, 26, 27, 28

## **Statutes**

21 U.S.C. § 355(b)(2)(A) ............................................................................8

21 U.S.C. § 355(c)(3)(C) ............................................................................8

21 U.S.C. § 360bb(a)(2) .............................................................................5

21 U.S.C. § 360cc(a) ..................................................................................5

35 U.S.C. § 271(e)(2)(A) ...........................................................................8

## **Other Authorities**

21 C.F.R. § 314.50(i)(1)(i)(A)(4) ..............................................................8

21 C.F.R. § 316.3(b)(3) ...................................................................9, 17, 18

21 C.F.R. § 316.3(b)(14) .............................................................................9

21 C.F.R. § 316.20(a) .................................................................................5

21 C.F.R. § 316.31(a) .................................................................................9

Federal Rule of Civil Procedure 12(c) .....................................................31

Federal Rule of Civil Procedure 30(b)(6) ................................................30

# I.     PRELIMINARY STATEMENT

Summary judgment is warranted against Avadel's antitrust claims—which allege that Jazz's listing of a single patent in the FDA's Orange Book violated the antitrust laws by delaying the approval and lawful marketing of Lumryz—for two independent reasons.

*First*, Avadel lacks antitrust standing because Jazz's regulatory exclusivity and intellectual property barred Lumryz's FDA approval and its lawful market entry at all relevant times.

To begin, Avadel cannot carry its burden of proving that the alleged delay in the FDA's approval of Lumryz flowed from Jazz's patent listing rather than "from the realities of the regulated environment"—especially, the Orphan Drug Exclusivity ("ODE") that the FDA awarded to Jazz under the Orphan Drug Act for its low-sodium oxybate product, Xywav. *See City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998) (affirming dismissal for lack of standing where regulations independently blocked market entry). Xywav's ODE blocked the FDA from approving Lumryz until May 1, 2023, when the FDA's Office of Orphan Products Development ("OOPD") issued a 42-page decision detailing its legal, regulatory, and scientific reasoning for breaking Xywav's ODE based on its decision that Lumryz was clinically superior.

According to Avadel, absent Jazz's patent listing, the FDA would have done this same analysis, reached the same conclusion, and approved Lumryz by October 15, 2021, which is the default 10-month goal date assigned to New Drug Applications ("NDAs"). This is implausible. In fact, there is no evidence of the FDA *ever* resolving clinical superiority on a 10-month timeline, or anything close to it. Quite to the contrary, the FDA resolved clinical superiority (and other ODE issues) for Xywav substantially after the goal date. Avadel has no basis other than speculation, and the jury would have no non-speculative basis to conclude, that the FDA would have resolved all of the clinical superiority issues here in 10 months for the first time in history.

1

The District of New Jersey recently rejected such a speculative causation theory under similar facts. *In re Lipitor Antitrust Litig.*, 2024 WL 2866654, at *21 (D.N.J. June 6, 2024). As the court in *Lipitor* held, "FDA is not glued to meeting earliest possible entry dates and will not achieve an earlier entry-date merely to achieve a target," and thus where, as here, a causation theory depends on speculating that the FDA will necessarily meet a target date "there is no genuine issue of material fact, and summary judgment is appropriate." *Id.* at *28-30.

Avadel cannot identify any disputed material fact sufficient to prove its theory that the FDA would have resolved all the issues necessary to break the ODE previously awarded to Xywav and give it to Lumryz by the October 15, 2021 target date. Rather, the record establishes that the FDA designates ODE issues involving clinical superiority as "complex," and recognizes they may take additional time to resolve because of the various "complex exclusivity determination activities" they require. As of October 15, 2021 (and beyond), the FDA in fact consistently reported to Avadel that its work on clinical superiority was ongoing and involved issues having nothing to do with the '963 patent. Consequently, as in *Lipitor*, all Avadel can muster is "pure speculation" in the form of expert opinion that things may have happened differently if the '963 patent had not been listed. This is inadequate to survive summary judgment. *Id.*

But to make its claims even more untenable, Avadel faces an additional antitrust standing problem beyond that in *Lipitor*: Avadel cannot provide "specific or concrete evidence" that it could have launched Lumryz legally in April 2022 (*i.e.*, its but-for launch date) because Lumryz infringes Jazz's valid '782 patent. That independently means Avadel cannot establish antitrust standing, as "a valid patent independently precludes competition apart from any agreement and an 'at risk' launch is unlawful absent a later finding of patent invalidity or non-infringement." *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 764 (E.D. Pa. 2015), *aff'd sub nom. In re Wellbutrin XL*

2

*Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132 (3d Cir. 2017) (affirming summary judgment)[1]; *accord In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63 (1st Cir. 2016) ("The district court thus did not err by requiring some evidence of the patents' invalidity or noninfringement before allowing the plaintiffs to pursue an at-risk launch theory.").

Avadel attempts to evade *Wellbutrin* by incorrectly arguing that Jazz has the burden of showing it would have obtained an injunction to block Lumryz's launch before it could occur in 2022. Not so. The Third Circuit rejected that argument in *Wellbutrin*, requiring instead that ***the plaintiff*** must show the alleged earlier launch would have been legal. Here, it is Avadel's burden to prove antitrust standing, and so Avadel must prove it could have launched legally (*i.e.*, without violating Jazz's patent) in 2022. Avadel cannot meet that burden. And even if the Court were to consider Jazz's hypothetical prospect of securing an injunction barring Lumryz's market entry in 2022, undisputed evidence shows Jazz would have done so, just as it obtained an injunction barring Lumryz from the idiopathic hypersomnia ("IH") market in the actual world.

To get around this problem, Avadel has gestured at a new theory—that Jazz would have voluntarily licensed the '782 patent for Avadel to launch Lumryz in the but-for world. But this implausible theory appears nowhere in Avadel's pleadings (and is thus waived), and Avadel also lacks evidence to prove it. In *Wellbutrin*, the parties had actually engaged in extensive licensing negotiations, reaching agreement on all but one term. But the Third Circuit held even those facts were insufficient to support antitrust standing, because it was speculative to assume the deal would have been consummated. Here, Avadel has no evidence it ***even discussed*** licensing the '782 patent with Jazz, much less that it reached agreement on any terms. Once again, Avadel tries to make up for its lack of evidence by offering pure speculation, this time with its purported expert opining

---

[1]  All emphasis added and internal citations and quotations omitted unless otherwise specified.

that a hypothetical company in Jazz's position acting "without monopolistic intent" (whatever that means) *might* have licensed the '782 patent to Avadel, with unspecified terms, on an unspecified timeframe, if it had not considered other plausible options, like litigating against Avadel. That testimony is woefully insufficient; it clearly does not establish, as *Wellbutrin* requires, that Avadel would have actually obtained a license from Jazz. Thus, Avadel's claims here have two different but related flaws, each of which was independently found to warrant summary judgment on its own in *Lipitor* and *Wellbutrin*.

*Second*, Avadel's claims independently fail because Avadel lacks evidence sufficient to prove liability under antitrust standards. As the Court ruled at the motion to dismiss stage, to prove liability Avadel must prove that Jazz's suit against Avadel is not protected by *Noerr-Pennington* immunity because Jazz's listing of the '963 patent meets the standard for *Walker Process* fraud. D.I. 94 at 11-12. Avadel must therefore offer evidence "sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (emphasis in original). "[W]here multiple reasonable inferences may be drawn, intent to deceive cannot be found" and summary judgment is appropriate. *Inline Packaging, LLC v. Graphic Packaging Int'l*, 351 F. Supp. 3d 1187, 1203 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020) (granting summary judgment on *Walker Process* claim). As explained below, Avadel lacks evidence sufficient to require a finding of deceitful intent by Jazz, and thus its case is insufficient to proceed to a jury. And even if Avadel argues *Noerr-Pennington* does not apply, Jazz has proven its regulatory compliance eliminates any alleged liability.

## II.    FACTUAL BACKGROUND

### A.    Jazz's Innovative Investments In Treating Narcolepsy Patients

For decades, narcolepsy was misunderstood and underdiagnosed. A1431 at 46:8-22. Narcolepsy is an orphan disease—one affecting a relatively small population of underserved

patients (fewer than 200,000 in the U.S.) who have been "orphaned" because development of treatments is too expensive relative to the expected return. 21 U.S.C. § 360bb(a)(2); A3318.

Sodium oxybate, also known as GHB or oxybate, is an effective treatment for narcolepsy, because it acts as a central nervous system depressant and facilitates nighttime sleep, reducing excessive daytime sleepiness as well as cataplexy. A3895-99. Although scientists have long known about sodium oxybate, it was not until the mid-1990s that the National Organization of Rare Disorders and FDA Orphan Products Development Division approached Jazz's predecessor, Orphan Medical, suggesting the exploration of its use as a narcolepsy treatment. A3490. However, GHB was known "as a 'club drug' used at 'raves'" and was "implicated in a number of sexual assault cases," leading to its reputation as a "date-rape" drug. A3477. Any company seeking to market oxybate had to develop a way for patients to use it safely, mitigating to the greatest degree risks of abuse, misuse, or diversion. Orphan Medical was the first company to do so. It launched Xyrem, the first FDA-approved oxybate treatment in 2002. A3264-68.

Orphan Drug Exclusivity (or "ODE")—created by Congress by the 1983 Orphan Drug Act—is an important incentive for companies to invest in developing treatments like Xyrem. *See* A3307. The first step to getting ODE is applying for Orphan Drug Designation ("ODD"); if the same drug has already been approved for this designation, the applicant must provide a "medically plausible hypothesis" the drug is clinically superior to the approved drug used to treat the same disease. 21 C.F.R. § 316.20(a). ODE is harder to obtain than ODD and provides a far greater incentive: if a drug obtains ODE, the FDA generally may not approve another treatment using the "same drug for the same disease or condition" for seven years. 21 U.S.C. § 360cc(a). After the FDA approved Xyrem in 2002, it recognized that Jazz was entitled to ODE for treating cataplexy associated with narcolepsy. Statement of Facts for Motion No. 1 ("SOF1") ¶2; A4176.

Jazz acquired Orphan and Xyrem in April 2005. SOF1 ¶1. The use of Xyrem is conditioned on a Risk Evaluation and Mitigation Strategy ("REMS") to protect from risks of misuse, abuse, and diversion. SOF1 ¶3. Jazz developed the REMS for Xyrem, and has proven it to be effective; today, it is used as the template for other oxybate drugs. SOF1 ¶4; A3575-88. Jazz earned patents in connection with its work on its REMS, including the '963 patent. SOF1 ¶4; D.I. 22 at 7.

While Xyrem was a major step forward for narcolepsy patients, its sodium content at the highest dose is 1600 mg, the equivalent of four large orders of McDonald's French fries, and nearly two-thirds of the recommended daily limit of sodium for adults. SOF1 ¶5; A2921; A4056. Recognizing this, Jazz spent nearly a decade developing a lower-sodium oxybate, Xywav. Xywav has 92% less sodium than Xyrem, and is a safer option for narcolepsy patients, especially those suffering from comorbidities exacerbated by heightened sodium intake, like cardiovascular disease. *See* SOF1 ¶5; A2891. The FDA approved Xywav in July 2020. SOF1 ¶5; A4178. While discussing Xywav's approval, ███████████████████████████████████████ ████████████████████████████████████████████████. On June 24, 2021, the "FDA found Xywav to be clinically superior to Xyrem," and thus recognized Xywav's ODE, with an ODE period running from July 21, 2020 to July 21, 2027. SOF1 ¶6; A4178.

Jazz's groundbreaking research also uncovered potential drug-drug interactions ("DDI") between oxybate and divalproex sodium. *Cf.* SOF1 ¶8; A3601-779. As both are central nervous system depressants, patients who take them concomitantly risk serious adverse events, including death. *See* SOF1 ¶8; A3565-69. To mitigate this risk, Xyrem and Xywav's labels include a "Drug Interaction" for the "[c]oncomitant use with divalproex sodium" and recommend "[a]n initial reduction in [Xyrem or XYWAV] dose of at least 20%." *See* SOF1 ¶8; A3406-40; A3441-71. For

its innovations, Jazz was granted six patents covering the dosing method requirements that must be included on Xyrem's and Xywav's labels. *See* SOF1 ¶8; A3406-40; A3441-71.

On October 19, 2021, as part of its continued research efforts, Jazz also obtained the '782 patent, covering dosage forms of modified release oxybate. SOF1 ¶35; A3875.

### B.     Avadel's Efforts to Secure Approval for Lumryz

#### 1.     Avadel Begins FDA Submissions And Its Early Requests To The FDA Are Denied

On March 29, 2016, Avadel submitted an Investigational New Drug Application for FT-218 (Lumryz), a high-sodium, fixed-dose oxybate. SOF1 ¶9; A2571. "On April 20, 2016, Avadel requested ODD for oxybate for the treatment of narcolepsy." SOF1 ¶9; A4179. The FDA initially denied Avadel's request, because Avadel did not provide a "plausible hypothesis" that Lumryz was clinically superior to the oxybate marketed at the time, Xyrem. *See* SOF1 ¶9; A2229; *see also* A3280-85. Avadel amended its request 18 months later. SOF1 ¶9; A4179. The FDA granted Avadel ODD on January 8, 2018—more than 21 months after first requested. SOF1 ¶9; A4180.

In June 2020, Avadel sought expanded access—which allows patients to gain access to an investigational product outside of clinical trials where there is no alternative therapeutic option—for Lumryz. SOF1 ¶10; A4272. The FDA denied this request, finding Xyrem "is a generally comparable and satisfactory alternative therapy to FT218." SOF1 ¶10; A4272. ████████

████████████████████████████████████████

████████████████████

Avadel submitted its NDA on December 15, 2020, and asked the FDA to grant it priority (expedited) review. SOF1 ¶11; A4180. The FDA denied that too. On February 26, 2021, the FDA accepted Avadel's NDA without granting priority review. SOF1 ¶11; A4241.

The FDA assigned Avadel's NDA a Prescription Drug User Fee Act ("PDUFA") goal date

of October 15, 2021. SOF1 ¶11; A2658. PDUFA goal dates are automatically the date 10 months after NDA acceptance, for non-priority review. *See* SOF1 ¶7; A3873. The FDA states "the timeline does not force the FDA to decide on a product application before the agency's work is complete" and applicants should "not count on meeting the timeline 100% of the time." SOF1 ¶7; A4218.

Avadel's NDA sought approval for Lumryz via the 505(b)(2) pathway. SOF1 ¶11. Under the Hatch-Waxman Act, a "505(b)(2) NDA applicant" can rely on safety and efficacy studies conducted by another drug sponsor. 505(b)(2) NDA applicants are required to certify how their proposed new drugs implicate patents listed in the FDA's Orange Book. 21 U.S.C. § 355(b)(2)(A). Applicants have four options: (1) certify that no listed patent is implicated; (2) certify that any implicated patent has expired, (3) certify not to launch until after the date(s) any implicated patent(s) will expire, or (4) certify that any implicated patent(s) are invalid or not infringed. *Id.* The last option is known as a "Paragraph IV certification." 21 C.F.R. § 314.50(i)(1)(i)(A)(4). A Paragraph IV certification is considered a statutory act of infringement. 35 U.S.C. § 271(e)(2)(A). If the patent holder files an infringement suit against the applicant within 45 days, the FDA will not grant final approval for the lesser of thirty months, until a court rules the applicant non-infringing or the patent invalid, or the patent expires. *See* 21 U.S.C. § 355(c)(3)(C).

### 2.    Avadel Seeks To Break Xywav's ODE And Avoid Certifying To Jazz's DDI Patents In Order To Accelerate Approval

With its NDA, Avadel also submitted a request to the OOPD, which reviews ODE requests, for ODE based on claims of clinical superiority over Xyrem and Xywav. SOF1 ¶12; A4234-44. Avadel needed to have this request granted to receive marketing approval prior to the expiration of Xywav's ODE in July 2027. Because the FDA had recognized ODE for Xywav, Avadel had to convince the OOPD to "break" Jazz's ODE before approving Lumryz.

The FDA has asserted the power to "break" ODE earned by one sponsor (here Jazz) in

favor of a later sponsor (here Avadel) if the later sponsor can demonstrate its formulation of the same drug is clinically superior. 21 C.F.R. §§ 316.31(a), 316.3(b)(14). As the FDA construes its regulations, a company can overcome a prior ODE only by showing its new drug: (i) has greater effectiveness; (ii) has greater safety; or (iii) in "unusual cases, where neither greater safety nor greater effectiveness has been shown … makes a major contribution to patient care" ("MCTPC"). 21 C.F.R. § 316.3(b)(3). (The D.C. Circuit will soon decide whether Congress has actually authorized any of this. *See Jazz Pharms., Inc. v. Kennedy*, No. 24-5262 (D.C. Cir.).)

The OOPD's Standard Operating Procedures and Policies ("SOPP") govern how the FDA makes ODE determinations. A4207-15. Due to the variety of orphan drugs and their indications, the OOPD will consult with divisions that have expertise in the relevant subject matter for a particular disease. SOF1 ¶14; A4208-10. The SOPP expressly states: "In complex cases, such as those involving clinical superiority, the exclusivity review may take more time to allow appropriate coordination" for the consult. SOF1 ¶14; A4208. For sodium oxybate, the OOPD consults Division of Neurology I ("DN1"), the division responsible for reviewing applications for the treatment of neurodegenerative disorders, including narcolepsy. SOF1 ¶13; A3277; A3590. As it did here, the OOPD may consult other divisions as well. A1853 at 193:18-20.

The OOPD's review of Avadel's request to break Xywav's ODE in favor of Lumryz took about 22 months. That is about the same amount of time for the FDA's review of Avadel's request for ODD over Xyrem, which Avadel does not allege was affected by the '963 patent listing. SOF1 ¶9. The FDA communicated with Avadel throughout this process and generated internal memoranda regarding its evaluation of Avadel's request, which are part of the record here. For example, as contemplated by the SOPP, on July 6, 2021, the OOPD submitted a consult request to DN1. SOF1 ¶13; A4234. The OOPD stated that the "most persuasive" of Avadel's arguments for

clinical superiority was Avadel's claim that Lumryz offered greater safety than Xywav based on a reduced risk of nighttime falls and asked whether DN1 agreed. SOF1 ¶13; A4238. While the consult request was pending, on July 14, 2021, Avadel submitted supplemental information to the OOPD regarding Lumryz's alleged clinical superiority. SOF1 ¶13; A2413-23. On July 21, 2021, Avadel wrote to the OOPD and FDA's Office of Chief Counsel to make its case for why Lumryz should be eligible for approval despite Xywav's ODE. SOF1 ¶16.

But DN1 did not agree. On August 30, 2021, DN1 responded to the OOPD's consult request. SOF1 ¶17; A4233-44. DN1 found "[t]he available data do not indicate that Lumryz™ provides greater safety… than Xyrem® or Xywav™, despite [Avadel's] arguments." SOF1 ¶17; A4242. DN1 also found that "[t]here is no evidence suggesting that the efficacy of Lumryz™ is substantially different from that of Xyrem® or Xywav™" and that "the once-nightly regimen of Lumryz™ … cannot be considered a major contribution to patient care." SOF1 ¶17; A4241-42. In sum, DN1 stated "no evidence has been provided by the applicant that Lumryz™ is clinically superior to Xyrem® or Xywav™ as defined in the orphan drug regulations[.]" A4244.

On September 23, 2021, the FDA separately expressed concern about a potential pharmacodynamic interaction between Lumryz and divalproex sodium, similar to that addressed by the prescribing information of Xyrem and Xywav. SOF1 ¶18; A2666; A4260-61. On September 28, 2021, Avadel proposed a revision to Lumryz's prescribing information in an effort to address these concerns. SOF1 ¶18; A2679-709.

### 3.     The FDA Continues Reviewing Avadel's NDA After The Goal Date

On October 13, 2021, with both the ODE and DDI issues unresolved and under review, the FDA notified Avadel that its review of the Lumryz NDA would extend beyond October 15, 2021. SOF1 ¶20; A2225.

10

Avadel's theory is that the FDA had not completed its review of all of the issues by this date solely because of the '963 patent listing. But the discovery record shows otherwise. On October 18, 2021, for example, Avadel met by teleconference with the FDA. SOF1 ¶20; A1847-48 at 169:7-170:1. ██████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████. On October 25, Avadel sent a letter to the FDA's Office of Chief Counsel about Lumryz's approvability. SOF1 ¶20; A2663-773. On December 14, 2021, Avadel CEO Greg Divis reported to an investor that "[the FDA] haven't stopped doing their work so they are active and engaged." SOF1 ¶21. On January 10, 2022, the FDA again informed Avadel its "review for the determination *for orphan-drug exclusivity continues*." SOF1 ¶22; A4443.

On January 13, 2022, the Director of the Office of Neuroscience (which encompasses DN1) responded to an email from Avadel, explaining that the FDA was "attend[ing] to internal issues that must be addressed prior to taking action on [Avadel's] application." SOF1 ¶22; A4224-25. On January 21, 2022, the FDA stated the "application remains under review and the Agency is *actively considering* the regulatory issues related to the potential approvability of the application." SOF1 ¶22; A4223. ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



. On May 24, 2022, the FDA sent a letter requiring Avadel to certify against the '963 patent. SOF1 ¶26. This was the first communication from the FDA to Avadel regarding the '963 patent since September 10, 2021. *See* A2310. On May 25, 2022, the FDA finally resolved Avadel's DDI labeling issues after several months of review. SOF1 ¶27. For the first time, after five months of discussion, the FDA stated: "The draft labeling reflects the Agency's determination of scientifically appropriate labeling and would permit 505(b)(2)(B) statements regarding DDI patents consistent with that labeling." *Id.*

The FDA's review of the ODE issues continued. After the August 2021 DN1 Consult, the OOPD continued to discuss the clinical superiority issues with DN1 and separately requested a consult from a group of board-certified sleep specialists (the "Sleep Team") within another division, the Center for Devices and Radiological Health ("CDER"). SOF1 ¶28. On July 8, 2022, DN1 noted in a follow-up consult memo that, since its August 2021 consult, the OOPD had "identified additional information for DN1's further consideration" and so "the orphan-drug exclusivity issues associated with this application ***remain under review***." SOF1 ¶29.

---

[2] The SOPP provides that the Office of Chief Counsel and regulatory counsel will be involved in reviewing complex ODE issues involving clinical superiority. A4209.

The FDA granted Lumryz tentative approval on July 18, 2022. The tentative approval letter stated it "d[id] not address whether any orphan drug exclusivity (ODE) recognized for Xyrem […] or for Xywav […] affects the approvability of Avadel's application." SOF1 ¶30.

With ODE unresolved, Avadel continued to submit more information and argument to the FDA. On August 30, 2022, Avadel sent the FDA data and analysis in support of its safety-related clinical superiority arguments, purporting to show risks associated with the "inappropriate schedule of dosing administration" of Xyrem and Xywav. SOF1 ¶31; A2776-80. In November 2022, Avadel facilitated a letter from a patient advocacy group to the OOPD. SOF1 ¶28; A2848. Avadel facilitated a letter from a clinician to the OOPD on January 2, 2023. SOF1 ¶28; A2848.

On April 29, 2023, the Sleep Team provided the results of its consult to OOPD and DN1, laying out its view that "Lumryz provides a MCTPC over Xyrem and Xywav due to its once nightly dosing." SOF1 ¶32. The Sleep Team's discussion of the scientific literature cited multiple sources published in 2022, after the goal date, as relevant to its MCTPC determination. *Id.*

On May 1, 2023, citing the Sleep Team review as a crucial input into its decision-making, DN1 agreed that Lumryz was clinically superior to Xyrem and Xywav on the basis of a MCTPC. SOF1 ¶33; A4452-53. DN1 stated it had moved from its prior view that Lumryz did not constitute a MCTPC because of "scientific, legal, and regulatory considerations raised by OOPD and the expert opinion of FDA's sleep team" that were not considered in its August 2021 consult. SOF1 ¶33; A4452. Also on May 1, 2023, the OOPD in a 42-page memo laid out its analysis of the various issues relating to its determination that Lumryz was clinically superior to Xywav because it provided a MCTPC, with that memo acknowledging, consistent with DN1's first consult, the OOPD's finding was "not based on Lumryz providing greater safety than Xyrem and Xywav."

13

SOF1 ¶33; A2615. As the clinical superiority finding was necessary for the FDA's approval of Avadel's NDA, the FDA granted approval to Lumryz the same day. A3781-99.

### C.    The Parties' Disputes

Jazz filed multiple suits against Avadel for infringement of its patents. C.A. No. 21-691, D.I. 1; C.A. No. 21-1138, D.I. 1; C.A. No. 21-1594, D.I. 1. Avadel stipulated to infringement of claim 24 of Jazz's '782 patent; at trial, the Court granted Jazz's motion for judgment as a matter of law that Avadel infringes that claim. C.A. No. 21-691, D.I. 550. At trial, the jury rejected Avadel's argument that the '782 patent was invalid and found Avadel owed Jazz a 3.5% royalty rate for past damages. C.A. No. 21-691, D.I. 579. Following trial, the Court held Avadel owes Jazz ongoing royalties, though it has yet to rule on the precise rate. C.A. No. 21-691, D.I. 665, 666. The Court also granted Jazz's request for a limited permanent injunction prohibiting Avadel from seeking FDA approval and making, using, or selling Lumryz for the treatment of conditions other than narcolepsy, including IH. *Id.* It denied Jazz's request to enjoin Avadel from continuing to make, use, or sell its infringing product to treat narcolepsy. *Id.*

This suit was filed on July 15, 2022, D.I. 1, following Avadel's Paragraph IV certification on June 6, 2022, A2297-99. On October 14, 2022, Avadel filed its antitrust counterclaims against Jazz, alleging the listing of the '963 patent and initiation of this lawsuit (and attendant 30-month stay) caused Avadel antitrust injury by delaying the launch of Lumryz. D.I. 14. Following its claim construction decision that the '963 patent does not claim a method (C.A. 21-691, D.I. 229 at 14-17), the Court ordered Jazz to request delisting of the '963 patent from the Orange Book on November 18, 2022 (C.A. 21-691, D.I. 231 at 6). The Court did not take a position as to whether the initial listing decision was proper, *id.* at 7, but later noted Jazz could not be expected to "divine the outcome" of the claim construction dispute, D.I. 94 at 12. Jazz appealed the delisting order (C.A. 23-1186, D.I. 1). After first granting a stay pending appeal (C.A. 23-1186, D.I. 10), the

14

Federal Circuit ultimately affirmed (C.A. 23-1186, D.I. 59). Jazz complied with the court's ruling and requested the FDA delist the patent.

Jazz filed a motion to dismiss Avadel's counterclaims, arguing it had a reasonable basis for listing the '963 patent on December 9, 2022. D.I. 21. Based on newly released FDA documents, Jazz supplemented its motion, arguing Avadel lacked antitrust standing, D.I. 48-1, and moved to stay the case, D.I. 49. Following the jury's verdict finding the '782 patent valid, Jazz supplemented its previous motion to stay the case on March 13, 2024. D.I. 80. This Court denied Jazz's motion to dismiss and deferred ruling on Jazz's supplemental motion to stay. D.I. 94. Jazz subsequently filed a motion for reconsideration or interlocutory appeal in light of authoritative case law supporting Jazz's position that Avadel lacks antitrust standing because of its failure to show that its alleged earlier launch of Lumryz would have been legal. D.I. 100. Jazz's motion for reconsideration and supplemental motion to stay remain pending.

## III.    LEGAL STANDARD

"[S]ummary judgment is not disfavored in the antitrust context. The entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010). "[T]he plaintiff in an antitrust case responding to a summary judgment motion must overcome a higher threshold, which is imposed in order to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *Id.*

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome

15

of the suit." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022). An "inference based upon a speculation or conjecture does not create a material factual dispute." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). For a dispute to be genuine, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" but must instead "come forward with specific facts showing that there is a *genuine issue for trial*." *Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 490 Fed. Appx. 492, 496-97 (3d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). "'[T]he mere existence of a scintilla of evidence' favoring the non-moving party will not prevent summary judgment." *SodexoMAGIC*, 24 F.4th at 203 (quoting *Anderson*, 477 U.S. at 252). Expert testimony without a "factual foundation" cannot defeat summary judgment. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 412 (3d Cir. 2016).

## IV.    MOTION 1 – AVADEL LACKS ANTITRUST STANDING

### A.    Avadel Lacks Antitrust Standing Because It Cannot Show The FDA Would Have Approved Lumryz By October 15, 2021

It is "beyond fair dispute" that a "regulatory or legislative bar," such as Jazz's ODE, can "break the chain of causation in an antitrust case." *Wellbutrin*, 868 F.3d at 165. In such cases, the plaintiff lacks standing because the alleged injury does "not flow from the defendants' conduct, but, rather, from the realities of the regulated environment." *City of Pittsburgh*, 147 F.3d at 265. Here, Avadel lacks evidence that "'but for' the alleged antitrust violation, [it] would not have suffered the [delay] of which they complain." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 404 (7th Cir. 1993); *see also In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791-92 (8th Cir. 2006) (no standing where injury was "caused by the federal statutory and regulatory scheme," not "the alleged conduct of the defendants"); *RSA Media, Inc. v. AK Media Grp.*, 260 F.3d 10, 15 (1st Cir. 2001) (no standing where regulatory scheme excluded plaintiff).

**1.    There Is No Genuine Dispute Avadel Needed The FDA To Find Clinical Superiority To Overcome Jazz's ODE And That The FDA's Clinical Superiority Review Continued Long Past October 15, 2021**

Given Xywav's ODE, the only way for Avadel to secure approval before July 2027 was to convince the FDA that Lumryz was clinically superior to Xywav. That required the FDA (specifically, the OOPD) to work through a complex set of scientific, legal, and regulatory issues. Here, undisputed evidence shows it took long after the goal date to resolve all of the issues implicated by Avadel's effort to break the ODE awarded to Jazz for Xywav. *Supra* § II.B.

PDUFA goal dates are assigned automatically *without* regard to the complexity of the issues implicated by the NDA. SOF1 ¶7. In particular, PDUFA goal dates do not take into account whether (as here) the NDA approval requires working through ODE issues involving clinical superiority. *Id.*; *see also* A1762 at 89:14-17; A1388 at 73:7-11. But those issues indisputably can affect the complexity and timeline for the review. Indeed, the OOPD designates ODE issues involving clinical superiority as "complex" ones that trigger a series of "complex exclusivity determination activities" involving different personnel, multiple levels of review, including by regulatory counsel and the Office of Chief Counsel, and consultation with other divisions. SOF1 ¶14; A4208-11. The SOPP expressly recognizes that: "In complex cases, *such as those involving clinical superiority*, *the exclusivity review may take more time* to allow appropriate coordination with the Review Division(s) within the Centers." SOF1 ¶14; A4208.

Here, Avadel's clinical superiority showing was even more complex than most. To break Xywav's ODE, Avadel had to show greater efficacy, greater safety or, failing either of those, a MCTPC over Xywav. 21 C.F.R. § 316.3(b)(3). Avadel could not show greater efficacy, because Lumryz had the same efficacy as Jazz's products. A4190. Avadel initially argued for greater safety and MCTPC. A4236-37. But after Xywav—with its much lower chronic sodium burden—got ODE on the basis of greater safety, Avadel's greater safety argument became more difficult,

because Xywav has much lower sodium than Lumryz. ██████████████████

████████████████████████████████████████████

██████████ Confirming as much, when the OOPD asked the subject matter experts at DN1 whether they agreed that Avadel's greater-safety argument was its "most persuasive" path to approval in July 2021, DN1 **disagreed**. A4242. Instead, on August 30, 2021, just six weeks before the goal date, DN1 stated that Avadel had ***not*** shown greater safety and had not provided sufficient evidence to support any of its arguments for clinical superiority. SOF1 ¶17; A4241-43.

The OOPD eventually came around to DN1's view that Avadel could not establish greater safety. That left Avadel with only one potential option—establishing a MCTPC. But the MCTPC pathway is available only in "unusual cases," 21 C.F.R. § 316.3(b)(3), where greater efficacy and greater safety cannot be shown. Because MCTPC cannot be worked through until greater efficacy and safety are addressed, it is necessarily complex. The FDA expressly recognizes MCTPC determinations "can be complex and encompass consideration of a number of factors that potentially implicate safety and effectiveness." SOF1 ¶15.

Here, DN1 concluded in August 2021 that once-nightly dosing "cannot be considered a major contribution to patient care." SOF1 ¶17; A4242. So just six weeks before the goal date, which Avadel's theory of antitrust injury assumes the FDA was ready and able to meet absent the '963 patent listing, the undisputed evidence shows Avadel had no viable pathway to overcoming Xywav's ODE and obtaining approval for Lumryz. Nor was this the first time Avadel failed to convince the FDA to adopt its arguments on the timeline that Avadel preferred. The FDA had first rejected them when Avadel initially sought ODD, then again when Avadel sought expanded access, and yet again when Avadel sought priority review. *Supra* § II.B.

18

Against this backdrop, Avadel points to "nothing in the record aside from speculation," that, absent the '963 patent listing, the OOPD would have worked through all of the necessary issues, aligned with DN1 on whether or not Lumryz provided greater efficacy or safety, jointly worked through the complex and unusual MCTPC pathway, consulted with the Sleep Team from CDER, and issued a clinical superiority determination on the goal date. *Lipitor*, 2024 WL 2866654, at *26. Avadel has thus "failed to show that FDA would have reviewed" its "application on a different timeline given the incredibly unusual circumstances of this case." *Id.* at *29. Avadel has "failed to create a genuine issue of material fact that it was more likely than not that FDA would have completed its review any sooner." *Id.* at *1.

*Lipitor* is on point. 2024 WL 2866654. Like Avadel, the plaintiff simplistically claimed that, but-for the challenged conduct, the FDA would have approved on the target date. *Id.* at *27. The court rejected that claim: "the November 30, 2011 date was merely a target for the FDA. Even had that 'target' been earlier, there is no evidence to suggest that the FDA's review process would have been faster." *Id.* at 28. Just like Avadel, "Plaintiffs rel[ied] on the actual approval date as proof of that FDA could have moved faster. Such arguments are appeals to 'metaphysical doubt[s] as to material facts.'" *Id.* at *29 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586). Summary judgment is warranted here for the same reason.

### 2. There Is No Genuine Dispute Avadel's Clinical Superiority Timeline Would Have Been Unprecedented

Avadel's theory is not just implausible and speculative—it is, by Avadel's own admission, unprecedented. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████. Moreover, Avadel's theory is not just that the FDA would have worked through complex ODE clinical superiority issues at record speed, but the FDA would

have taken away the Xywav ODE only four months after recognizing that Jazz had earned it.

██████████████████████████████████████████████████████████.

The reality is the FDA has a track record of not resolving by the goal date even much simpler ODE issues for oxybates (*i.e.*, ones do not implicate clinical superiority at all, much less the MCTPC pathway). Jazz's expert, Mr. Troy, pointed this out, and Avadel had no response. A743-46 ¶166. Consider when Jazz sought ODE for Xywav, which, relative to Avadel's application for Lumryz, was a simpler case for clinical superiority and ODE. Xyrem and Xywav are the same except for Xywav's 92% reduction in sodium, so Xywav was plainly safer. Even then, resolution of the ODE issue took ***17 months***, extending ***nearly a year after Xywav's PDUFA goal date***. SOF1 ¶6; A4177-78. More recently, consider Lumryz's application for pediatric exclusivity, which had a goal date of September 2024—months after the '963 patent was delisted—and relied on essentially the same arguments the FDA had credited in granting Lumryz ODE. The FDA did not resolve that ODE issue by the goal date either. SOF1 ¶34.

Yet here, Avadel's theory for antitrust standing rests on the FDA sorting through the most complex ODE issues of all at record speed. "A plaintiff cannot satisfy the summary judgment burden based on speculation alone," and that is all Avadel can offer. *Wellbutrin*, 868 F.3d at 167; *see also City of Pittsburgh*, 147 F.3d at 267 ("[Plaintiff] cannot foist [its] version of what might have been on the court under the rubric of antitrust injury.").

### 3.    All Of Avadel's Purported Evidence Of A Faster Clinical Superiority Decision Is Pure Speculation

In contrast to the undisputed evidence that Avadel's theory of injury is speculative and implausible, Avadel has no evidence to the contrary. All Avadel has is the goal date, but the goal date is not a deadline, and the FDA itself says companies should "not count on meeting the timeline 100% of the time." *See* SOF1 ¶7; A4218. Avadel's unsupported hope that, despite the FDA's clear

disclaimer, Avadel could "count on" it "meeting the timeline" is not sufficient to defeat summary judgment. *Lipitor*, 2024 WL 2866654, at *21 (granting summary judgment where there was "no evidence" supporting plaintiff's theory); *see also Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 598 (3d Cir. 2018) (affirming summary judgment where plaintiff "does not cite to anything in the record in making [her] argument"); *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 865 (D.C. Cir. 2008) (affirming summary judgment where no "evidence sufficient for a reasonable juror to find the FDA would have approved [the generic's] ANDA in February 2001").

Avadel has argued that, because the FDA approved Lumryz about eight weeks after Jazz delisted the '963 patent in the actual world, the FDA's resolution of the clinical superiority issue would have only taken eight weeks back in 2021. But this is yet more speculation, which rests on the baseless conjecture that the FDA had stopped work on both Avadel's NDA and the ODE question in 2021, and then returned to both tasks only after the '963 patent was delisted. There is no evidence of this either.

To the contrary, the indisputable record evidence shows the FDA continued working through the complex ODE issues after the goal date, as it repeatedly informed Avadel. *See supra* §II.B. ███████████████████████████████████████████████████████

███████████████████████████████████████████████. ██████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████. ***Avadel itself*** told an investor in December 2021 that the FDA "haven't stopped doing their work so they are active and engaged." SOF1 ¶21. Nor did the FDA ever tell Avadel that Jazz's patent listing was the reason for the delay, or that the FDA had stopped its work on the ODE issues because of that listing. *Id.*; ████████████████████████████████



Yet that speculation is now the only thing underlying Avadel's claims.

Avadel has suggested that two footnotes, in two FDA letters (one noting the patent listing issue in May 2022, and one granting Lumryz tentative approval in July 2022) somehow prove that the FDA stopped or slowed down its work on the ODE issue because of Jazz's patent listing. Neither letter says that. To the contrary, both acknowledge the ODE issue remained outstanding.[3] Avadel cannot bootstrap a disputed material fact out of two letters that, if anything, confirm that the FDA continued to review the ODE issue. *Wellbutrin*, 868 F.3d at 167 ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat [entry of] summary judgment.")

Nor can Avadel rely on its two experts (Flanagan and Unger) to patch this hole in its case, as they engaged in admitted speculation while purposefully ignoring the relevant facts. Their

---

[3] The first document (A2238) simply refers to the "FDA's general practice" not to announce the outcome of ODE determinations while other issues are outstanding, but does not say the FDA had stopped working on or finished working through the ODE clinical superiority issues applicable here. The second document (SOF1 ¶30) simply notes that the letter did not address ODE at all.

testimony should be excluded, as set forth in Jazz's *Daubert* motions, which would independently warrant summary judgment. *See Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*, 2005 WL 3675999, at *6 (D.D.C. Mar. 31, 2005) (granting summary judgment after excluding plaintiff's two causation experts). Even if the Court were to consider their testimony (the Court should not), ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████. Expert speculation—especially speculation that ignores and contradicts undisputed facts—cannot create a material factual dispute. *Avaya*, 838 F.3d at 412.

### 4.    There Is No Genuine Dispute Jazz's DDI Patents Also Barred Approval As Of October 15, 2021

Jazz's DDI patents were an additional regulatory barrier that existed as of October 15, 2021. The FDA could not approve Lumryz without resolving that issue, because it affected what Avadel had to put in Lumryz's label, and the FDA would not approve Lumryz without a finalized label. SOF1 ¶19. The FDA did not resolve that issue, by determining Avadel could avoid certifying against Jazz's separate DDI patents, which Avadel has never pled were invalid or otherwise improper, until May 2022, six months after the goal date. SOF1 ¶27. This further demonstrates that, just as the FDA told Avadel, "a number of complicated regulatory issues" affected the timing of approval, separate and apart from Jazz's patent listing. *City of Pittsburgh*, 147 F.3d at 269

---

[4] ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

(dismissing claims with implausible regulatory causation story); *see also United Mag. Co. v. Murdoch Mags. Distr., Inc.*, 393 F. Supp. 2d 199, 212-13 (S.D.N.Y. 2005) (no standing where plaintiffs' alleged injury "failed to account for [] other causes."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 266 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016) (no standing where plaintiffs "offered little evidence in support of their complicated, multi-step proposition that the FDA would have approved … Nexium any earlier than May 2014").

### B.    There Is No Genuine Dispute Avadel Lacks Antitrust Standing Because Lumryz's Earlier Launch Would Have Infringed Jazz's Valid '782 Patent

Avadel's claims also fail under *Wellbutrin*. Jazz previously argued this case should be stayed, pending resolution of post-trial and appellate briefing in the patent case, because the jury's finding in the parties' patent case deprives Avadel of antitrust standing under Third Circuit precedent. D.I. 49, 50, 57, 80; *Wellbutrin*, 868 F.3d at 165-66; *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 841 F. App'x 399, 403 (3d Cir. 2021). The Court deferred ruling on Jazz's motion to stay, indicating Avadel could develop evidence to prove its standing consistent with *Wellbutrin*. Summary judgment is warranted because that effort has failed.

### 1.    Avadel Cannot Show Its Earlier Launch Would Have Been Legal

Under Third Circuit precedent, Avadel must do more than show it wanted to launch earlier; it "must also show that the launch would have been ***legal***." *Wellbutrin*, 868 F.3d at 165. A launch that infringes a defendant's patent is not legal. *Id.* Thus, there can be no delayed entry antitrust claim where, as here, the earlier entry would have infringed the defendant's valid patent. Prior to the motion to dismiss ruling, every court to apply *Wellbutrin* has agreed. *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63 (1st Cir. 2016) ("The district court thus did not err by requiring some evidence of the patents' invalidity or noninfringement before allowing the plaintiffs to pursue an at-risk launch theory."); *In re Androgel Antitrust Litig. (No. II)*, 2018 WL

24

2984873, at *13 (N.D. Ga. June 14, 2018) ("[I]f the patent was valid, any at-risk launch would have been unlawful if it infringed on the patent[.]") (collecting cases); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *13 (D. Mass. Jan. 25, 2018) ("To succeed on an at-risk launch theory, Plaintiffs must show that Impax could have launched at-risk lawfully, i.e., without infringing any lawful patent.").

This Court stated that the Third Circuit in *Wellbutrin* "did not have the opportunity to address" whether a plaintiff could show that a valid and infringed patent does not preclude antitrust standing by demonstrating that the patentholder would not have obtained an injunction completely blocking the launch of the infringing product. D.I. 94 at 19. As discussed in Jazz's motion for re-argument, the *Wellbutrin* court was presented with that argument, and ***rejected it***. D.I. 100 at 4-7. Indeed, the district court in *Wellbutrin* found there was a question of fact whether the alleged delayed entrant would have entered earlier. 868 F.3d at 165. Nonetheless, that dispute was irrelevant because the entrant could not "show that the launch would have been legal." *Id.* In other words, it does not matter if the alleged entrant would have found a way to enter without being blocked. What matters instead under *Wellbutrin* is whether ***Avadel*** can prove that it actually could have launched earlier without violating patent law.

That dooms Avadel's claims, because Avadel lacks "specific or concrete evidence" it would have obtained a compulsory, court-ordered license in time to launch by April 2022. *Wellbutrin*, 868 F.3d at 166-67. Even assuming Jazz sued for infringement the moment the '782 patent issued, on October 19, 2021, that would leave only six months for resolution of the entire suit. In the actual infringement action, the jury returned a verdict on March 4, 2024, C.A. No. 21-1594, D.I. 462, approximately 28 months after Jazz filed suit on November 10, 2021, C.A. No. 21-1594, D.I. 1. And it was not until August 27, 2024 that the Court clarified that Avadel would not

be permanently enjoined from selling Lumryz in the narcolepsy market. C.A. No. 21-1594, D.I. 541. "On this record, then, no reasonable jury could conclude that" Avadel could have secured a ruling allowing it to sell Lumryz with a court-ordered royalty by April 2022, its but-for entry date. *Wellbutrin*, 868 F.3d at 169.

### 2.    The Undisputed Evidence Shows Avadel Would Have Been Enjoined

Timing aside, Avadel also cannot show that "an injunction would not have issued had Jazz sought an injunction on or near" April 2022. D.I. 94 at 20. To be clear, Jazz respectfully maintains this is not the right inquiry because *Wellbutrin* rejected such a requirement, and courts applying *Wellbutrin* have not required such a showing. *Supra* § IV.B.1. But even if the prospect of an injunction were considered, Avadel would bear the burden of showing it would have defeated an injunction in April 2022, and there is no non-speculative evidence it would have done so.

The Court enjoined Avadel from entering any market other than the narcolepsy market, noting Lumryz had not yet been approved beyond narcolepsy, C.A. No. 21-1594, D.I. 540 at 25, and its ODE did not extend to other conditions, *id.* at 28. Similarly, as of April 2022, Lumryz lacked both FDA approval and ODE for narcolepsy. The only party with ODE in 2022 was *Jazz*. Given the similarity to the circumstances the Court relied upon in its injunction decision, a court would have enjoined Lumryz from the narcolepsy market around or before April 2022. D.I. 50 at 7, 9 (highlighting that Lumryz was not approvable due to Xywav's ODE).

Avadel's evidence it would not have been enjoined in April 2022 is its expert William Charman. *See* A381 ¶¶20-21. But even assuming that testimony is admissible, *see* Daubert Mot. at § II.D, ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████. Thus, Avadel's position that Avadel would have defeated an injunction prior to April 2022 is not only highly speculative; it is contradictory to the undisputed facts.

### 3. There Is No Genuine Dispute Avadel Would Not Have Obtained A Voluntary License

Attempting to get around *Wellbutrin*, Avadel said in a letter to Jazz at the end of fact discovery it intends to prove "Jazz and Avadel would likely have entered into a voluntary license for the '782 patent." A3571. This theory appears nowhere in Avadel's counterclaims and thus is waived. *See Pharm. Corp. of Am. v. Askari*, 2022 WL 3697342, at *4-5 (3d Cir. Aug. 26, 2022) (affirming exclusion of new theories not alleged in complaint). It is also unsupported by any facts, as Avadel has no evidence that Jazz would have voluntarily licensed the '782 patent to Avadel.

In *Wellbutrin*, the parties were actually negotiating a license agreement "and had agreed on all but one term." *Wellbutrin*, 868 F.3d at 167. The Third Circuit still held it was "completely speculative" the parties would have completed the deal, because "[m]any a contract has foundered on a single deal-breaker point." *Wellbutrin*, 868 F.3d at 167. Avadel has nothing even close to this. There were no negotiations about licensing the '782 patent. SOF1 ¶37. What limited talks did occur, for a potential collaboration on developing once-nightly oxybate, fell apart first in 2015, *see* C.A. No. 22-487, D.I. 18 at 28-29, and then again in the beginning of 2019, A3262. "Without more specific or concrete evidence, the jury in this case would be left with nothing on which it could rely to reach a conclusion" that Jazz would have voluntarily licensed the '782 patent; the only evidence suggests the opposite. *Wellbutrin*, 868 F.3d at 167; *see also Kroger Co. v. Sanofi-Aventis*, 701 F. Supp. 2d 938, 957 (S.D. Ohio 2010) (a "claim for an injury deriving from the failure to reach a hypothetical procompetitive agreement is nothing but speculation").

Attempting to get around this absence of evidence, Avadel put forth Dr. E. Fintan Walton, who opines that a reasonable company in Jazz's position not acting with "monopolistic intent"

27

would have voluntarily licensed the '782 patent to Avadel at a 3.5% royalty rate on or before April 2022. A7 ¶ 23; A8-9 ¶¶26-28. As discussed in Jazz's Daubert motion, Walton's opinion amounts to nothing more than baseless speculation, relying on a nonsensical concept he admittedly invented for this case ("acting without 'monopolistic intent'"). *See* Daubert Mot. at § II.C. But even if it is admissible, that opinion cannot save Avadel from summary judgment. *See Avaya*, 838 F.3d at 412. Walton's opinion does not concern Jazz the actual company or an actual license. A1296 at 15:20-16:17. Instead, it concerns a hypothetical license ██████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████ "In order to withstand summary judgment, [Avadel] must produce evidence from which a reasonable jury could conclude that it is more likely than not that [Avadel] would have obtained a license. Evidence showing that [Avadel] may have been able to obtain a license does not meet that standard." *Wellbutrin*, 868 F.3d at 167. Avadel has none of the evidence it needs.

## V.    MOTION 2: AVADEL CANNOT SHOW ANTITRUST LIABILITY

### A.    There Is No Genuine Dispute That Jazz Did Not Engage In *Walker Process* Fraud

Avadel alleges that Jazz delayed Avadel's launch of Lumryz by filing a lawsuit, thereby "triggering an automatic stay on the FDA's ability to issue final approval." *See* D.I. 14 at ¶¶86, 95-101. "A plaintiff claiming that a lawsuit is, by its very existence, anticompetitive and unlawful faces an uphill battle." *Wellbutrin*, 868 F.3d at 147. "It is well-established that the First Amendment protects the right to petition the government and to have access to the courts." *Id.* This right to petition the federal courts is the basis of the *Noerr-Pennington* doctrine, which holds that "[t]hose who petition [the] government for redress are generally immune from antitrust liability." *Id.* at 147-48. However, under the *Walker Process* doctrine, a patentee may lose antitrust

immunity where it "obtained the [asserted] patent by knowingly and willfully misrepresenting facts to the Patent Office." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). The *Walker Process* claimant must prove that the patentee had an "intent to deceive" by "clear and convincing evidence." *Therasense*, 649 F.3d at 1290. And "to meet the clear and convincing evidence standard, the specific intent to deceive must be '***the single most reasonable*** inference able to be drawn from the evidence.' Indeed, the evidence 'must be sufficient to require a finding of deceitful intent in the light of all the circumstances.' Hence, when there are ***multiple reasonable inferences that may be drawn, intent to deceive cannot be found***." *Id.* at 1290-91; *see also Inline Packaging, LLC v. Graphic Packaging Int'l*, 351 F. Supp. 3d 1187, 1203 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020) (granting summary judgment).

This Court has already held that Jazz's "patent litigation suit is protected under *Noerr-Pennington* unless an exception applies." D.I. 94 at 11. Jazz can only be liable if it is stripped of its *Noerr-Pennington* immunity upon a finding of sham litigation or *Walker Process* fraud. *Id.* at 11-12. This Court has also already held that Jazz's initiation of the instant suit was not a sham. D.I. 94 at 11-12. Thus, as the Court held, Avadel's only potential basis for any antitrust recovery is by proving that Jazz engaged in *Walker Process* fraud by knowingly improperly listing the '963 patent in the Orange Book. *See id.* at 12-14. But to survive summary judgment, Avadel must do more than satisfy the pleading standard. Avadel must offer evidence that gives rise to a single most reasonable inference of that alleged fraud. Avadel cannot meet that standard.

None of Jazz's witnesses testified that Jazz acted in bad faith or with intent to mislead the FDA when Jazz listed the '963 patent. Nor could such intent be inferred from Jazz's testimony or documents, let alone as the only possible inference from such evidence. Unable to prove the lone allegation that prevented this case from being dismissed, Avadel submitted twenty-two reports

from ten experts, many of which rely on nothing more than legal conclusions and *ipse dixit* that should be excluded for the reasons set forth in Jazz's *Daubert* motions. Nestled among its hundreds of pages of purported expert opinion is a discussion of three documents that, according to one of Avadel's experts, are "smoking guns." *See* A1147 ¶21. But even viewing these documents in the light most favorable to Avadel, they cannot lead to the requisite "***single*** most reasonable inference" that Jazz had any intent to deceive—a necessary element of the *Walker Process* fraud exception.

Avadel claims these documents—all of which are public-facing documents providing updates to investors—are "smoking guns" because they describe the '963 patent as a "Distribution system" patent or as a "restricted distribution system patent," and not as a "method patent." *See* Statement of Facts for Motion No. 2 ("SOF2") ¶1; A4406; A4438; A4115. That is, according to Avadel, these three documents purportedly show that Jazz intentionally misled the FDA when it listed the '963 patent, because these documents allegedly show that Jazz knew the patent was directed to a distribution system rather than a method of treatment and therefore should not have been listed. But even viewing these documents in the light most favorable to Avadel, the evidence gives rise to another explanation for Jazz's statements that is as reasonable (if not more so).

As Jazz's Rule 30(b)(6) witness explained, Jazz's investor relations team used "distribution system" in these public-facing materials as shorthand. SOF2 ¶2. Indeed, Avadel's own purported experts acknowledge that Jazz had twice previously defined its "method of use" patents to the investment community as including its "distribution" system patents. SOF2 ¶3; A1921 at 148:5-25; A4060; A2898. It is reasonable to infer from Jazz's repeated public disclosure of the '963 patent as a "distribution system" that Jazz legitimately believed—consistent with its claim construction arguments—that the "system claims" of the '963 patent "are, in fact, method claims

because the body of the claims require the performance of particular method steps." *See* C.A. No. 21-691, D.I. 132 at 47-48 (citing *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016)).

There is no dispute that Jazz consistently maintained, from the moment it listed the patent until the Federal's Circuit's affirmance of this Court's *Markman* ruling, that the '963 patent claims were directed to methods of using Xyrem. SOF2 ¶5. There is also no dispute that, even before Avadel filed its 505(b)(2) application for Lumryz in December 2020 and any alleged harm to Avadel could possibly occur, Jazz maintained that Avadel's delisting position was a matter of disputed claim construction. In fact,

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████." SOF2 ¶6.[5]

There is also no record evidence that Jazz's claim construction position was unreasonable, let alone fraudulent. To the contrary, this Court has already ruled that Jazz's claim construction position was ***not*** objectively unreasonable. D.I. 94 at 11-12 (and further noting that the Court did not issue its *Markman* Order until November 11, 2022 and that "it would be unfair to require parties to divine the outcome of claim construction"). As Avadel's purported antitrust law expert conceded, this means that a reasonable litigant could have expected success on the merits of that dispute. SOF2 ¶7; *see also* D.I. 94 at 11. Moreover, not even Avadel's patent law expert opined that Jazz's claim construction position was an unreasonable one. SOF2 ¶8. Thus, the evidentiary record (and the Court's previous ruling) further support the reasonable inference that Jazz did not knowingly enforce a patent listed in the Orange Book through fraud on the FDA, but instead

---

[5] Jazz also advanced this argument in response to Avadel's original Rule 12(c) motion. *See, e.g.*, C.A. 22-691, D.I. 43 at 2, 9-14. There is no dispute that the Court denied that motion, in part, based on claim construction. C.A. 22-691, D.I. 55 at 5-6; A1987 at 160:9-161:22. There is also no dispute that the Court applied the applicable law in denying that motion. A1988 at 163:5-17.

consistently and reasonably listed (and then asserted) the '963 patent in good faith.

In fact, the undisputed record further reveals that third-party generic drug companies accused of infringing the '963 patent determined (and argued before the District of New Jersey and before the Patent Office) that the claims were directed to methods and series of steps. SOF2 ¶¶10, 12. And a person of skill in the art hired by two of those third-party companies to opine on the validity of the '963 patent likewise determined that its claims were directed to methods. SOF2 ¶11. There is also no dispute that, if the '963 patent were construed to claim methods, then Jazz was required to list the patent. A2015 at 272:19-273:18.

Given all this, there is no genuine dispute that Jazz's listing was objectively reasonable, and thus a reasonable inference can be drawn that Jazz's public disclosures are consistent with its claim construction position—not any fraudulent intent. Avadel thus cannot "show that the intent to deceive is the single most reasonable inference to be drawn from the record" and summary judgment is appropriate. *DeCurtis LLC v. Carnival Corp.*, 2023 WL 2071915, at *8 (S.D. Fla. Feb. 8, 2023) (granting motion for summary judgment).

Moreover, if Jazz truly had an intent to deceive the FDA in mid-2014 by mischaracterizing the nature of the '963 patent and listing a patent it knew to be ineligible, it makes little sense to conclude, let alone as the single most reasonable inference, that Jazz would turn around and publicly characterize the '963 patent in a manner that evidences its own fraudulent intent. Numerous courts have held that where, like here, a party accused of fraud is said to have publicly contradicted its alleged misrepresentation, that public disclosure gives rise to an inference that the accused had **no** intent to deceive. *See, e.g.*, *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005) ("Plaintiffs have cited no case, and I am aware of none, where a plaintiff adequately pled scienter based solely on the contradiction between public information and the

32

company's public statements."); *Paxton v. Prevention Bio, Inc.*, 2022 WL 3098236, at *17 (D.N.J. Aug. 4, 2022) (if "Defendants intended to hide purported risks to FDA approval so as to raise additional funds, they would presumably not have disclosed in the document underlying the fundraising the purported shortcoming."). Put simply, the evidence on which Avadel relies cannot give rise to the single, reasonable inference that Jazz's employees responsible for Orange Book listing had an "intent to defraud …, because if they had, they would not have disclosed the [information]" that Avadel relies upon. *Alberici v. Recro Pharma, Inc.*, 2020 WL 806719, at *18 (E.D. Pa. Feb. 14, 2020). Thus, because Avadel cannot establish scienter by clear and convincing evidence, a necessary element of the *Walker Process* fraud exception, and its counterclaims cannot survive.

### B.   There Is No Genuine Dispute Regarding Jazz's Regulatory Compliance

As stated above, Avadel's antitrust claims fail because, *inter alia*, Avadel cannot pierce Jazz's *Noerr-Pennington* immunity. However, even if Jazz is required to show that its listing was objectively reasonable and in good faith based on established regulatory compliance, Jazz has done so.[6]

*First*, there is no material dispute regarding the reasonableness of Jazz's listing of the '963 patent. As explained above, the Court has already determined Jazz's claim construction position was reasonable. *See supra* § V.A.

---

[6] At the pleading stage, Jazz argued Avadel has the burden to show Jazz's listing of the '963 patent was objectively unreasonable, whereas Avadel argued "that (1) Jazz's defense is an affirmative defense that Avadel is not required to address at this stage, and (2) Jazz's defense requires it to show that its listing of the '963 patent in the Orange Book was both 'reasonable' and 'in good faith.'" *See* D.I. 94 at 5. While Jazz maintains its position, assuming *arguendo* that regulatory compliance is an affirmative defense, Jazz still is entitled to summary judgment.

*Second*, the undisputed factual record shows that Jazz acted in good faith. It has consistently been Jazz's position that the question of the '963 patent's listability turned on, at least, a good-faith claim construction dispute. When Avadel sought delisting of the '963 patent at the FDA in 2019, Jazz stated that "[t]he argument put forward against the '963 patent's listing appears to be based upon an incorrect claim construction that has not been presented or adjudicated." SOF2 ¶6. Then, when Avadel moved to delist the '963 patent in 2021, Jazz argued "Avadel's motion is premised entirely on a proposed claim construction that cannot be resolved on the pleadings" (No. 21-691, D.I. 43 at 2), Judge Noreika found that "[t]he Court agrees…and will decline to engage in claim construction at this early stage of the case" (No. 21-691, D.I. 55 at 6), and denied Avadel's motion (No. 21-691, D.I. 56). When Avadel re-raised its delisting motion in 2022, Jazz again argued that Avadel's motion depended on a "mischaracteriz[ation]" of Jazz's proposed claim construction. No. 21-691, D.I. 153 at 11. When the Federal Circuit affirmed this Court's claim construction and delisting orders, Jazz promptly requested delisting. *See* No. 21-691, D.I. 299. Thus, throughout the time—from 2019 to 2023—that the parties were disputing the listability of the '963 patent, it was Jazz's position that the issue turned on, at least, a good-faith dispute regarding the construction of the '963 patent's claims. This is a dispute that this Court has already found to be reasonable (*see* D.I. 94 at 11-12) and for which Avadel has no evidence that Jazz pursued in bad faith. Accordingly, there is no material dispute as to whether Jazz's listing of the '963 patent was based on a reasonable claim construction dispute that was made in good faith.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Jazz's motion for summary judgment as to Counts IV and V of Avadel's counterclaims. D.I. 14 at ¶¶134-153.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Jeremy A. Tigan*

F. Dominic Cerrito
Steig D. Olson
Gabriel P. Brier
Frank C. Calvosa
Nicolas Siebert
Maxwell Hawley
Kevin Adams
John P. Galanek
Habib-Emmanuel Abraham
Sami H. Rashid
Elizabeth J. Murphy
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
295 5th Avenue
New York, NY  10016
(212) 849-7000

William R. Sears
Lynette Lim
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

April 25, 2025

Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Counterclaim-Defendant*
*Jazz Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 25, 2025, upon the following in the manner indicated:

Daniel M. Silver, Esquire                                   *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Kenneth G. Schuler, Esquire                                 *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
Sarah W. Wang, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Herman H. Yue, Esquire                                      *VIA ELECTRONIC MAIL*
Franco W. Benyamin, Esquire
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

David F. Kowalski, Esquire                                  *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA  92130
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Alan J. Devlin, Esquire                                                  *VIA ELECTRONIC MAIL*
Ian R. Conner, Esquire
Anna M. Rathbun, Esquire
Christopher J. Brown, Esquire
Kimon K. Triantafyllou, Esquire
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Alfred C. Pfeiffer, Esquire                                              *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Daralyn J. Durie, Esquire                                               *VIA ELECTRONIC MAIL*
Tannyr Pasvantis, Esquire
Eliot A. Adelson, Esquire
Helen He, Esquire
Margaret A. Webb, Esquire
Adam R. Brausa, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Rose S. Lee, Esquire                                                    *VIA ELECTRONIC MAIL*
Kira A. Davis, Esquire
W. Henry Huttinger, Esquire
Katherine E. McNutt, Esquire
Rebecca E. Weires, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

David F. McGowan, Esquire                                               *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA  92130
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Andrew T. Jones, Esquire                                    *VIA ELECTRONIC MAIL*
Haydn Forrest, Esquire
Alexander Okuliar, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


Matthew C. Hans, Esquire                                    *VIA ELECTRONIC MAIL*
POLSINELLI PC
7676 Forsyth Boulevard, Suite 800
St. Louis, MO  63105
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)