IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-941 (GBW) |
| | ) | |
| AVADEL CNS PHARMACEUTICALS LLC, | ) | **PUBLIC VERSION** |
| | ) | |
| Counterclaim-Plaintiff. | ) | |

**JAZZ'S BRIEF IN OPPOSITION TO AVADEL'S
MOTIONS FOR SUMMARY JUDGMENT AND *DAUBERT***

OF COUNSEL:

F. Dominic Cerrito
Steig D. Olson
Gabriel P. Brier
Frank C. Calvosa
Sami H. Rashid
Elizabeth J. Murphy
John P. Galanek
Nicolas Siebert
Maxwell Hawley
Kevin Adams
Habib-Emmanuel Abraham
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

William R. Sears
Lynette Lim
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Counterclaim-Defendant
Jazz Pharmaceuticals, Inc.*

Confidential Version Filed: May 23, 2025
Public Version Filed: June 6, 2025

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .................................................................................1

II.   JAZZ'S OPPOSITION TO AVADEL'S SUMMARY JUDGMENT MOTIONS..............4

     A.     Legal Standard ........................................................................................4

     B.     Opposition To Motion No. 1: Avadel's Motion On Jazz's Seventh Affirmative Defense Should Be Denied ................................................4

         1.     Jazz Has Sufficient Evidence Of Its Good Faith ........................5

         2.     Jazz Need Not Waive Privilege Nor Rely On Advice Of Counsel............10

     C.     Opposition To Motion No. 2: Avadel's Motion On Exclusionary Conduct Should Be Denied ........................................................................11

         1.     Avadel Cannot Show The Challenged Conduct Indisputably Caused The Alleged Exclusion................................................12

         2.     Avadel Also Cannot Show The Challenged Conduct Created Or Maintained Any Monopoly for Jazz ........................................16

III.   JAZZ'S OPPOSITION TO AVADEL'S DAUBERT MOTIONS ...................................23

     A.     Legal Standard ......................................................................................23

     B.     Dr. Anupam Jena's Testimony Is Admissible ........................................24

         1.     Jena's opinions on innovation are relevant................................26

         2.     Jena's analysis of Jazz's investments "fits" the case ................29

         3.     Jena's analysis of Xyrem and its REMS' development is relevant ..........30

     C.     Dr. Iain Cockburn's Testimony Is Admissible ......................................31

         1.     Cockburn's opinions are relevant ............................................33

         2.     Cockburn's opinions are reliable ............................................33

     D.     Mr. Jonathan Singer's Testimony Is Admissible ...................................36

         1.     Singer's opinions are not "unreliable" or "incorrect as a matter of law".....................................................................................36

         2.     Singer does not offer opinions on Jazz's "state of mind".........37

         3.     Whether Singer's opinions are legal opinions ..........................39

     E.     Mr. Daniel Troy's Testimony Is Admissible ........................................39

IV.   CONCLUSION.........................................................................................................44

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*1st Source Bank v. First Res. Fed. Credit Union,*
    167 F.R.D. 61 (N.D. Ind. 1996) ................................................................................34

*In re Actos Antitrust Litig.,*
    2025 WL 1001259 (S.D.N.Y. Mar. 31, 2025) ....................................13, 14, 23, 28, 31, 33, 35

*In re Actos End-Payor Antitrust Litig.,*
    848 F.3d 89 (2d Cir. 2017)..............................................................................................13, 14

*AFMS LLC v. United Parcel Serv. Co.,*
    2014 WL 12515335 (C.D. Cal. Feb. 5, 2014)......................................................................36

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours & Co.,*
    826 F.2d 1235, 1244 (3d Cir. 1987)...................................................................................21

*Align Tech., Inc. v. 3Shape A/S,*
    2020 WL 4926164 (D. Del. Aug. 14, 2020) .......................................................................34

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Pubs.,
Inc.,*
    108 F.3d 1147 (9th Cir. 1997) ...........................................................................................21

*Amphastar Pharms., Inc. v. Momenta Pharms., Inc.,*
    297 F. Supp. 3d 222 (D. Mass. 2018) ................................................................................14

*Argus Inc. v. Eastman Kodak Co.,*
    801 F.2d 38 (2d Cir. 1986).................................................................................................14

*Bacchi v. Massachusetts Mut. Life Ins. Co.,*
    110 F. Supp. 3d 270 (D. Mass. 2015) ................................................................................11

*Bhan v. NME Hosps., Inc.,*
    929 F.2d 1404 (9th Cir. 1991) ...........................................................................................21

*Complaint of Borghese Lane, LLC,*
    2023 WL 3114851 (W.D. Pa. Apr. 27, 2023)......................................................................24

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007)..........................................................................................20, 21

*CAE Inc. v. Gulfstream Aerospace Corp.,*
    203 F. Supp. 3d 447 (D. Del. 2016)...................................................................................21

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
  2009 WL 1649773 (D. Kan. June 9, 2009) ........................................................34

*Chandler v. Phoenix Servs., L.L.C.*,
  45 F.4th 807 (5th Cir. 2022) ........................................................14

*Cohen v. Cohen*,
  125 F.4th 454 (3d Cir. 2025) ........................................................36

*Collick v. William Paterson Univ.*,
  2022 WL 14002177 (3d Cir. Oct. 24, 2022) ........................................................4

*Coquina Invs. v. Rothstein*,
  2011 WL 4949191 (S.D. Fla. Oct. 18, 2011) ........................................................34

*Ebbert v. DaimlerChrysler Corp.*,
  319 F.3d 103 (3d Cir. 2003) ........................................................9

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
  2014 WL 1343254 (D.N.J. Mar. 28, 2014) ........................................................11

*El v. Se. Pa. Transp. Auth.*,
  479 F.3d 232 (3d Cir. 2007) ........................................................4

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000) ........................................................36

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  2021 WL 2577490 (D. Kan. June 23, 2021) ........................................................42

*Freedom Card, Inc. v. JP Morgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005) ........................................................11

*French v. Squire-Tibbs*,
  2013 WL 3283869 (D.N.J. June 26, 2013) ........................................................5

*FTC v. Tate's Auto Center of Winslow Incorporation*,
  2021 WL 410857 (D. Ariz. Feb. 5, 2021) ........................................................42

*FTC v. Vyera Pharms., LLC*,
  2021 WL 5279465 (S.D.N.Y. Nov. 12, 2021) ........................................................31

*In re Generic Pharms. Pricing Antitrust Litig.*,
  2024 WL 4980784 (E.D. Pa. Dec. 3, 2024) ........................................................33

*Gordon v. Lewistown Hosp.*,
  2001 WL 34373013 (M.D. Pa. May 21, 2001), *aff'd*, 423 F.3d 184 (3d Cir. 2005) ........................................................18

*Hicks v. T.L. Cannon Mgmt. Corp.*,
  2015 WL 5167225 (W.D.N.Y. Sept. 3, 2015) ....................................................................10

*In re Intuniv Antitrust Litig.*,
  2021 WL 10362709 (D. Mass. Mar. 3, 2021) ....................................................................11

*Jame Fine Chems., Inc. v. Hi-Tech Pharm. Co., Inc.*,
  2007 WL 927976 (D.N.J. Mar. 27, 2007) .........................................................................21

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods.*
  *Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) .......................................................................30

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  2016 WL 278054 (E.D. Pa. Jan. 22, 2016) .......................................................................11

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
  863 F.2d 867 (Fed. Cir. 1988) .............................................................................................9

*Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*,
  232 F. Supp. 3d 632 (D. Del. 2017) ..................................................................................34

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
  22 F.4th 1369 (Fed. Cir. 2022) ..........................................................................................37

*Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*,
  757 F. Supp. 2d 431 (D. Del. 2010) ..................................................................................41

*In re Lantus Direct Purchaser Antitrust Litig.*,
  950 F.3d 1 (1st Cir. 2020) ...........................................................................................14, 22

*Lontex Corp. v. Nike, Inc.*,
  107 F.4th 139 (3d Cir. 2024) ...............................................................................................5

*McKee v. PetSmart, Inc.*,
  71 F. Supp. 3d 439 (D. Del. 2014) ...............................................................................10, 11

*In re Montage Technology Group Ltd. Securities Litigation*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ...................................................................42

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016)..........................................................................................17, 18

*In re Neurontin Antitrust Litig.*,
  2013 WL 4042460 (D.N.J. Aug. 8, 2013) .........................................................................20

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)...............................................................................................23

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)........................................................................................18, 20

*Orthofix Inc. v. Gordon*,
    2016 WL 1273160 (C.D. Ill. Mar. 1, 2016) .....................................................40

*In re Outpatient Medical Center Emp. Antitrust Litig.*,
    630 F. Supp. 3d 968 (N.D. Ill. 2022) ...............................................................14

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
    2011 WL 2295269 (S.D. Fla. June 8, 2011) ....................................................34

*Paxton v. Provention Bio, Inc.*,
    2022 WL 3098236 (D.N.J. Aug. 4, 2022) ..........................................................6

*Persawvere, Inc. v. Milwaukee Elec. Tool Corp.*,
    2023 WL 8019085 (D. Del. Nov. 20, 2023) .....................................................38

*Philadelphia Taxi Ass'n v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018)..............................................................................21

*In re Processed Egg Prods. Antitrust Litig.*,
    2014 WL 6388436 (E.D. Pa. Nov. 17, 2014) ...................................................10

*In re Processed Egg Prods. Antitrust Litig.*,
    392 F. Supp. 3d 498 (E.D. Pa. 2019) ...............................................................14

*Radecki v. Amoco Oil Co.*,
    634 F. Supp. 1393 (D. Minn. 1986)................................................................5, 7

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
    32 F.3d 851 (3d Cir. 1994)................................................................................10

*Ryanair DAC v. Booking Holdings Inc.*,
    2024 WL 3732498 (D. Del. June 17, 2024)........................................23, 24, 35

*Shaver v. Libbey Glass LLC*,
    2024 WL 3050719 (C.D. Cal. Apr. 12, 2024) ..................................................24

*SmithKline Beecham Corp. v. Apotex Corp.*,
    2005 WL 2436662 (E.D. Pa. Sept. 28, 2005) ..................................................10

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    622 F. Supp. 3d 22 (E.D. Pa. 2022) ...........................................................27, 33

*In re TMI Litig.*,
    193 F.3d 613 ............................................................................................28, 29, 36

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co.*,
    11 F.4th 118 (2d Cir. 2021) ..................................................................................14, 22

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..........................................................................................23, 27

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017) ....................................................................................12

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
    2021 WL 2352016 (E.D. Pa. June 9, 2021) .............................................................34

*ZF Meritor LLC v. Eaton Corp.*,
    2013 WL 6729509 (D. Del. Dec. 20, 2013)..............................................................42

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)....................................................................................17

*Ziparo v. CSX Transp., Inc.*,
    15 F.4th 153 (2d Cir. 2021) ......................................................................................5

## Statutes

21 C.F.R. § 314.53(d)(3)..................................................................................................6

21 U.S.C. § 355(c)(2) ......................................................................................................6

21 U.S.C. § 355(j)(5)(B)(iii) ...........................................................................................7

## Other Authorities

Fed. R. Civ. P. 26(a)(2)(D)(ii) ......................................................................................23

Hovenkamp, Herbert and Areeda, Phillip E., "Antitrust Law: An Analysis of Antitrust Principles and Their Application" (2022).................................11, 12, 14

Local Rule 7.1.3(c)(2).....................................................................................................41

## I.    PRELIMINARY STATEMENT

Avadel claims that "Jazz unlawfully protected its monopoly from competition" by listing a single patent (the "'963 patent") in the FDA's Orange Book. Specifically, Avadel claims that the listing prevented the FDA from approving Avadel's narcolepsy drug, Lumryz, by October 15, 2021—even though the FDA had previously recognized that Jazz's own narcolepsy drug, Xywav, was entitled to Orphan Drug Exclusivity ("ODE") as of that date, which was an independent regulatory bar to Lumryz's approval. Avadel also claims that, by purportedly delaying the October 2021 approval, the patent listing delayed Avadel's desired launch of Lumryz in April 2022—even though that launch would have not have been legal, as it indisputably would have infringed another Jazz patent (the "'782 patent"), which a jury in this Court found was valid.

Ignoring these fatal defects, Avadel now moves for summary judgment on two grounds. *First*, Avadel seeks partial summary judgment on Jazz's Seventh Affirmative Defense, which pleads that Jazz acted reasonably in listing the '963 patent. Avadel argues that Jazz has no evidence it listed the patent in good faith. Avadel is wrong. As set forth below, Jazz has ample evidence to support a jury finding on the good faith element. Moreover, Avadel's argument that Jazz cannot advance this defense without waiving privilege is mistaken. The law in the Third Circuit is clear that a defendant does not have to waive privilege to defend against claims like Avadel's.

*Second*, Avadel seeks partial summary judgment that "Jazz's listing and refusal to delist the '963 patent were exclusionary conduct" based solely on the fact that, after construing the claims of the '963 patent to cover a system and not a method, the Court ordered Jazz to delist it. This argument is also baseless. Not every patent listing later determined to be incorrect is "exclusionary" under the antitrust laws. Rather, to prove the listing was exclusionary, Avadel must show the listing caused Lumryz to be *excluded* from a relevant antitrust market. And to secure summary judgment on this element, Avadel must make that showing based on undisputed facts.

1

But Avadel does not even argue it can prove the listing indisputably caused an exclusion and instead argues it need not address whether other factors, independent of the '963 patent, excluded Lumryz independently for this element at all. Avadel is wrong again. The law is clear that, to prove exclusion, Avadel must establish the challenged conduct caused an exclusion, and thus Avadel is not entitled to summary judgment on this element of its claim.

To the contrary, as Jazz has shown in its own summary judgment motion, Avadel indisputably cannot prove causation because Jazz's lawful ODE (and other factors) were independent bars to Lumryz being approved as of October 15, 2021 (Avadel's alleged but-for approval date) and Jazz's '782 patent was an independent bar to Avadel selling Lumryz legally in April 2022 (Avadel's alleged but-for launch date). Moreover, beyond those undisputed facts, the evidence also shows that Avadel could not have sold Lumryz in April 2022 at all, ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ .

Even if Avadel could prove the listing caused an exclusion (which it cannot), to secure summary judgment that the listing was "exclusionary," it would also need to prove that the exclusion indisputably protected a "monopoly from competition." Mot. at 1. But Avadel has not even argued that Jazz indisputably had a monopoly in any defined relevant market, nor shown that the listing maintained any such monopoly. Avadel's motion must be denied for this independent reason too. Avadel cannot obtain summary adjudication that any hypothetical exclusion caused by Jazz's patent listing "unlawfully maintained a monopoly" when it is disputed whether Jazz ever had a monopoly and, even if it did, whether the patent listing did anything to "maintain" it.

Turning to Avadel's *Daubert* motions, its first two motions claim that certain rebuttal opinions by Jazz's economists (Dr. Anupam Jena and Dr. Iain Cockburn) are irrelevant. In fact,

the opinions challenged by Avadel go directly to the core disputed economic issues in the case—whether Jazz is a monopolist that has stifled competition in a relevant market or not. In the opinions Avadel seeks to exclude, these economists explain that Avadel's own affirmative economic expert (Mr. Jonathan Orszag) wrongly concluded that Jazz is a monopolist that controlled a non-competitive market. Jazz's experts explain that while Orszag, in his non-litigation work, has stressed the importance of analyzing the innovation that has occurred in pharmaceutical markets to determine whether the markets are competitive, his analyses for this litigation ignored the continuous innovations that have occurred in the narcolepsy market that Avadel claims Jazz has monopolized. In fact, as Jazz's experts explain, the sustained record of innovation in the allegedly monopolized market is consistent with a competitive market, not a monopolized one. In large part owing to Jazz's own efforts, narcolepsy patients have been part of a market that is steadily expanding, with more treatment options becoming continuously available. These economic realities are the exact opposite of what would occur in a monopolized market. Avadel is free to disagree, but there can be no doubt that the opinions of Jazz's economists on these topics are directly relevant to the case, and thus Avadel's *Daubert* motions must be denied.

Avadel's *Daubert* motions against Jonathan Singer and Daniel Troy should also be denied. The testimony Avadel seeks to exclude addresses Jazz's Orange Book listing **before** the Federal Circuit delisting decision and therefore does not, as Avadel wrongly contends, offer any opinions that contradict that decision. Nor does either expert improperly opine about Jazz's state of mind—*e.g.*, what Jazz was thinking at any time from the '963 patent's listing up until its delisting. Finally, Troy's opinions are not circular, nor do they offer any impermissible legal conclusions. Thus, all of Avadel's motions lack merit and should be denied in full.

## II.    JAZZ'S OPPOSITION TO AVADEL'S SUMMARY JUDGMENT MOTIONS

### A.    Legal Standard

"[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law. … [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).[1] "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will "defeat a motion for summary judgment." *Id*. Summary judgment is appropriate only when no "reasonable jury could return a verdict for the nonmoving party." *Collick v. William Paterson Univ.*, 2022 WL 14002177, at *3 (3d Cir. Oct. 24, 2022).

### B.    <u>Opposition To Motion No. 1</u>: Avadel's Motion On Jazz's Seventh Affirmative Defense Should Be Denied

Avadel seeks summary judgment on Jazz's Seventh Affirmative Defense, which pleads Jazz "acted reasonably in listing the '963 patent in the Orange Book and maintaining that listing until March 2023." Mot. at 8 (quoting D.I. 99 at 63). According to Avadel, the defense requires proving objective and subjective reasonableness and Jazz has "no evidence to create a dispute as to a material fact about" about subjective reasonableness—*i.e.*, "whether Jazz had subjective good faith in making its decisions to list and maintain the '963 patent listing." *Id.* at 10.

Avadel is wrong. Jazz has ample evidence from which a reasonable juror could find Jazz listed the '963 patent in the Orange Book because it believed in good faith that it covered a method

---

[1] All citation and quotation omitted, and emphasis added, unless specified.

of using Xyrem. Avadel's argument that, to advance this defense, Jazz must waive privilege over the confidential legal advice it received is wrong.

### 1.    Jazz Has Sufficient Evidence Of Its Good Faith

As the Third Circuit has instructed, "[a] defendant's subjective belief is often discerned through circumstantial, rather than direct, evidence." *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 152 (3d Cir. 2024); *see also Ziparo v. CSX Transp., Inc.*, 15 F.4th 153, 163 (2d Cir. 2021) ("Since factfinders have no direct access to the subjective motivations of parties, good faith, like other states of mind, must often be determined through circumstantial evidence"); *French v. Squire-Tibbs*, 2013 WL 3283869, at *54 (D.N.J. June 26, 2013) ("The question of subjective good faith … must be sensitively treated in light of all the attendant facts and circumstances"); *Radecki v. Amoco Oil Co.*, 634 F. Supp. 1393, 1402 (D. Minn. 1986) (noting that "subjective good faith need not be proved or refuted with direct evidence of an actual state of mind," but rather "is usually a matter of inference to be derived from all of the objective facts and evidence").

Moreover, because the circumstantial evidence of subjective intent is often open to multiple interpretations, issues regarding good faith are "best left to the trier of fact after a trial on the merits." *Radecki*, 634 F. Supp. at 1402 (denying summary judgment); *see also Ziparo*, 15 F.4th at 163, 166 (reversing summary judgment); *Squire-Tibbs*, 2013 WL 3283869, at *4-5 (denying summary judgment because "subjective good faith … appears to call for a decidedly fact intensive inquiry").

Here, there is ample evidence of Jazz's good faith to support its Seventh Affirmative Defense. ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ This testimony alone is sufficient for a reasonable juror to find in Jazz's favor on the Seventh Affirmative Defense.

Jazz's contemporaneous public statements provide yet more evidence from which a reasonable jury could find Jazz's subjective good faith. *See Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *17 (D.N.J. Aug. 4, 2022) (holding public statements evidenced subjective intent). Jazz consistently stated that it believed its REMS patents qualified for listing as method-of-use patents. SOF2 ¶3; A1921 at 148:5-25; A4060; A2898. And Jazz expressed the view, from the moment it listed '963 patent until the Federal Circuit's affirmance of this Court's *Markman* ruling, that the '963 patent claims were directed to methods of using Xyrem. SOF2 ¶5.

Additional evidence regarding the circumstances of Jazz's listing provides further support. The law required Jazz to list all patents it believed eligible for listing in the Orange Book within 30 days of issuance. 21 U.S.C. § 355(c)(2); *see also* 21 C.F.R. § 314.53(d)(3). As of May 30, 2014, when Jazz submitted the '963 patent for listing, there is no evidence that Jazz knew it would provide any bar to any drug approval or any other alleged competitive advantage. In fact, at that time, there were already eleven patents listed in the Orange Book for Xyrem. Three of those patents

6

were set to expire more than 18 months *after* the '963 patent, and three other patents had the same expiration date as the '963 patent. CSOF ¶1; A5584. A jury could find that this evidence supports a finding that Jazz listed the patent for regulatory compliance reasons, as opposed to commercial reasons, because the '963 patent listing had no independent ability to exclude competitive entry at the time it was listed. *See Radecki*, 634 F. Supp. at 1402 (factfinder can look to "objective evidence, such as inter-office memoranda or documents … and the manner in which the changes and additions to the provisions of the franchise were promulgated or presented" to ascertain subjective intent). In fact, the same day Jazz submitted the '963 patent for listing, Jazz paid the issue fee for a twelfth patent (the '306 patent), which Avadel has not alleged was improperly listed, and which had an expiration date over 10 years after the '963 patent. CSOF ¶2; A5575; A5464.

There is still more evidence that supports a finding of good faith. At the time the '963 patent was listed, Jazz had already sued Roxane, Par, and Amneal for patent infringement regarding their ANDA submissions, which had already triggered a 30-month stay of their approval. *See Jazz Pharms., Inc. v. Roxane Labs., Inc.*, C.A. No. 10-6108 (D.N.J.) (filed Nov. 22, 2010); *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, C.A. No. 13-0391 (D.N.J.) (filed Jan. 18, 2013); *Jazz Pharms., Inc. v. Par Pharms., Inc.*, C.A. No. 13-7884 (D.N.J.) (filed Dec. 27, 2013). By law, listing the '963 patent in the Orange Book would not trigger any additional 30-month stay against those ANDA filers. 21 U.S.C. §§ 355(j)(5)(B)(iii). And Avadel has identified no evidence that, at that time of listing, Jazz knew there would necessarily be any additional ANDA or 505(b)(2) filers at all. Thus, in 2014, the '963 patent had no impact on FDA approval of any ANDA or 505(b)(2) products, and there was no apparent reason for Jazz to list the '963 patent other than as part of a good-faith effort to comply with the listing statute.

Finally, Jazz consistently took the position both before and during the patent litigation that the '963 patent's claims covered a method of using Xyrem. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ SOF2 ¶6. That was before Avadel had filed its 505(b)(2) NDA. Judge Noreika then found that "[t]he Court agrees … and will decline to engage in claim construction at this early stage of the case" (No. 21-691, D.I. 55 at 6), and denied Avadel's original delisting motion (No. 21-691, D.I. 56). When Avadel re-raised its delisting motion in 2022, Jazz again argued that Avadel's motion depended on a "mischaracteriz[ation]" of Jazz's proposed claim construction. No. 21-691, D.I. 153 at 11. And notably, this Court has itself observed that the parties' claim construction dispute was reasonable. D.I. 94 at 11-12. This evidence too would support a jury finding of good faith.[2]

A reasonable juror could easily rely on this substantial body of evidence to find that Jazz's listing of the '963 patent was consistent with a good-faith effort to comply with the regulatory requirements. That is especially so because Orange Book listing requirements are complex and opaque and were unsettled as they apply to REMS patents. As Jazz's regulatory expert, Dan Troy, has explained, the question of whether REMS patents should be listed in the Orange Book was a complex one from a regulatory perspective in 2014, and one the FDA itself has wrestled with without resolving to this day. A0397 ¶22; A0417-22 ¶¶51-56; A0441-48 ¶¶79-88. The industry practice at the time also supported listing. Even Avadel's own expert, Prof. Michael Carrier, noted

---

[2] Avadel has suggested that Jazz engaged in bad faith by appealing this Court's delisting decision to the Federal Circuit, but parties are entitled to appeal trial court rulings, and the Federal Circuit stayed this Court's delisting order pending appeal. *See* No. 21-691, D.I. 250. When the Federal Circuit affirmed this Court's claim construction and delisting orders, Jazz promptly requested delisting. *See* No. 21-691, D.I. 299.

in a 2017 article that "the current practice is to list REMS patents in the Orange Book" and advocated that "the FDA supplement its regulatory efforts by providing additional detail on the patents that can be listed in the Orange Book." A0651-52 ¶13; A0685 ¶81. Here, Jazz had to make its listing decisions about its REMS patents quickly, without guidance from the FDA, before claim construction was resolved, and without the benefit of hindsight.

Avadel cannot dispute the lack of regulatory clarity about the listing of REMS patents that existed in 2014, or the industry practice of listing the patents. ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ Mot. at 7. But patents by their nature present hurdles to competitors who might infringe them, and there is nothing "improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988). Indeed, Avadel has run head-long into one of those hurdles, infringing Jazz's '782 patent. *See* D.I. 247, §IV.B.

Thus, at a minimum, the evidence of Jazz's subjective intent gives rise to multiple reasonable inferences, and therefore Avadel's motion cannot be granted, as "genuinely disputed facts cannot be the basis of summary judgment." *Ebbert v. DaimlerChrysler Corp.*, 319 F.3d 103, 117 (3d Cir. 2003).[3] Avadel's motion should, therefore, be denied.

---

[3] Avadel's argument that "there is a complete absence of evidence regarding subjective intent," Mot. at 10, is wrong when it comes to Jazz's evidence, but it highlights the absence of evidence that **Avadel** can present to meet its burden for its own claims. In fact, the existence of disputed inferences arising from Jazz's evidence supports granting summary judgment in Jazz's favor on Avadel's affirmative claims, because Avadel cannot carry its burden of establishing *Walker Process* fraud by clear and convincing evidence, as it must. *See* D.I. 247 §V.A.

## 2.    Jazz Need Not Waive Privilege Nor Rely On Advice Of Counsel

Avadel has argued that the only way for Jazz to show good faith would be to waive privilege over the confidential legal advice it received from its attorneys. *See* Mot. at 10. Avadel is wrong. The evidence summarized above is sufficient to prove this element. *McKee v. PetSmart, Inc.*, 71 F. Supp. 3d 439, 443 (D. Del. 2014) (holding that "privileged communications are not the only evidence of defendant's state of mind"). And there is no requirement in the Third Circuit that Jazz waive privilege to defend itself. In the Third Circuit, "[a] party does not lose the privilege to protect attorney client communications from disclosure in discovery when his or her state of mind is put in issue in the action." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994). Thus, courts have repeatedly rejected the argument Avadel advances—*i.e.*, that a party "cannot inquire into how defendant's state of mind was formed without access to privileged testimony and documents." *McKee*, 71 F. Supp. 3d at 441; *see also SmithKline Beecham Corp. v. Apotex Corp.*, 2005 WL 2436662, at *4-5 (E.D. Pa. Sept. 28, 2005) (permitting antitrust defendant to assert good-faith defense without relying on advice of counsel); *In re Processed Egg Prods. Antitrust Litig.*, 2014 WL 6388436, at *8-9 (E.D. Pa. Nov. 17, 2014) (same).

Avadel's claim (Mot. at 11) that there is a "stark contrast" between Jazz's maintenance of privilege and the choice of defendants in other cases to waive privilege (*Actos* and *Lantus*) is baseless. *Actos* is in the Second Circuit where, unlike in the Third Circuit, a defendant is ***required*** to waive privilege when asserting a good-faith defense. *See Hicks v. T.L. Cannon Mgmt. Corp.*, 2015 WL 5167225, at *5 (W.D.N.Y. Sept. 3, 2015) (explaining that, unlike the Third Circuit, the Second Circuit requires the "waiver of the privilege to cases in which the client's state of mind may be in issue in the litigation"). As noted, in this Circuit, in contrast, defendants are not required to waive privilege and courts recognize that "privileged communications are not the only evidence of defendant's state of mind." *McKee*, 71 F. Supp. 3d at 443.

10

In *Lantus*, the defendant chose to waive privilege. But other defendants in other cases from that district made different choices, as Jazz was free to do here. *See Bacchi v. Mass. Mut. Life Ins. Co.*, 110 F. Supp. 3d 270, 277 (D. Mass. 2015) ("[T]he bank's argument was not that it had relied in good faith on its attorneys, but rather that the objective facts regarding the steps it took to obtain regulatory approval would demonstrate that it acted in good faith"); *In re Intuniv Antitrust Litig.*, 2021 WL 10362709, at *9 (D. Mass. Mar. 3, 2021) (permitting at trial "evidence of *actions*" the defendant took as evidence of its subjective good faith without privilege waiver) (emphasis in original).

Jazz's decision to maintain privilege simply has no relevance to the merits of its defense at all. *McKee*, 71 F. Supp. at 442. Indeed, "it would be 'improper to draw an inference of bad faith from the assertion of the attorney-client privilege.'" *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2016 WL 278054, at *2 (E.D. Pa. Jan. 22, 2016) (quoting *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 479-80 n.25 (3d Cir. 2005)). Avadel's motion should be denied.

### C.   Opposition To Motion No. 2: Avadel's Motion On Exclusionary Conduct Should Be Denied

Avadel next argues that the Court should grant partial summary judgment on the "exclusionary conduct" prong of its monopoly maintenance and attempt-to-monopolize claims. Mot. at 12-14. But Avadel does not come close to meeting its burden of showing that the material facts relevant to this element are undisputed. Conduct is only "exclusionary" in the antitrust sense if it ***caused an exclusion***, which Avadel cannot prove at all, and certainly cannot prove on undisputed facts. *See Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *32 (D.N.J. Mar. 28, 2014) (finding there was no exclusion where the court was not persuaded that the conduct at issue actually excluded the plaintiff "as opposed to a multitude of other factors"); *see also* Hovenkamp, Herbert and Areeda, Phillip E., "Antitrust Law: An Analysis of Antitrust Principles

11

and Their Application" (2022) ("Areeda & Hovenkamp"), A5565-66 ¶657a ("[I]t [is] important that treble damages remedies be limited to those aspects of a plaintiff's injury that were in fact caused by an unlawful exploitation of market power[.]"). Relatedly, conduct is also only "exclusionary" under the antitrust laws when it creates or maintains **monopoly power**, and Avadel cannot prove that on undisputed facts either. For each of these reasons, Avadel is not entitled to summary judgment on this element of its claims.

### 1.    Avadel Cannot Show The Challenged Conduct Indisputably Caused The Alleged Exclusion

Avadel cannot show that the '963 patent listing indisputably caused the alleged exclusion. To the contrary, Jazz has shown that Avadel **lacks** sufficient evidence to prove causation, and thus the Court should enter summary judgment for Jazz. Independent "regulatory and legislative bar[s]"—including ODE, DDI issues, and the '782 patent—prevented the approval and lawful sale of Lumryz on the speculative timeline Avadel has alleged, which warrants summary judgment in Jazz's favor. D.I. 247 at 16-28 (quoting *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017)).

The main case on which Avadel relies (*In re Actos*) demonstrates why Avadel cannot obtain summary judgment. Avadel argues: "The court in *Actos* has held that partial summary judgment on exclusionary conduct is appropriate where, as here, the court has already determined that a patent was improperly listed in the Orange Book." Mot. at 13. But the *Actos* court did not hold that an improper patent listing **alone** was sufficient to enter summary judgment. Rather, it analyzed whether the listing **caused** an exclusion—the element Avadel ignores here. And the *Actos* court granted summary judgment for the plaintiff only where causation was undisputed.

Specifically, the court granted summary judgment only about Takeda's improper patent listings in January and May 2010 because it found that conduct indisputably delayed generic entry.

12

*In re Actos Antitrust Litig.*, 2025 WL 1001259, at *15-20 (S.D.N.Y. Mar. 31, 2025) ("*Actos II*"). However, the court **rejected** the plaintiffs' claims about other alleged misstatements that **lacked** the same "causal foundation"—because they could not be causally tied to an actual, non-speculative delay. *Id*. at *14-15. As *Actos II* explains: "Plaintiffs may not seek liability on the theory that its descriptions of the Patents in 1999 and 2002 delayed entry of generics writ large. … Because the generics did not know about those statements, there was no basis to say that they **caused** the generics to file Paragraph IV certifications." *Actos II*, 2025 WL 1001259, at *14. In fact, in a prior decision in that case, the Second Circuit had dismissed at the pleading stage certain of the plaintiffs' patent misstatement claims because the plaintiffs' "theory of causation" about those misstatements relied on "wishful thinking" and speculation rather than actual facts or evidence. *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 99 (2d Cir. 2017) ("*Actos I*").

That holding from *Actos I*, which Avadel ignores, is the one that is the most salient here. Here too, Avadel's causation theory necessarily depends on wishful thinking and speculation rather than actual, undisputed facts. Avadel's theory comes down to pure speculation that the FDA would have resolved all of the complex ODE and other regulatory issues necessary to approve Lumryz by October 15, 2021, simply because that was the 10-month PDUFA date automatically assigned as a target date for action on the Lumryz application without regard to the many complex issues that is raised. As Jazz has shown in its own motion, Avadel has no evidence to support that theory. Indeed, Avadel's purported experts could not identify a single time the FDA has ever resolved similarly complex ODE issues within 10 months. D.I. 247 at 19. Avadel's causation theory, in other words, is not just speculative; it is fantastical.

*Actos I* and *Actos II* thus make clear that Avadel cannot obtain summary judgment that the patent listing was exclusionary without proving that it indisputably caused an exclusion. None of

the cases Avadel cites say otherwise. *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co.* states clearly that an improper listing claim requires: (1) market power, (2) an incorrect listing, and (3) that proof that this incorrect listing "***caused*** [Plaintiffs'] antitrust injuries." 11 F.4th 118, 139 (2d Cir. 2021). *In re Lantus Direct Purchaser Antitrust Litigation* likewise required causation. 950 F.3d 1, 14-15 (1st Cir. 2020). Avadel does not cite a single antitrust case where a court evaluated the alleged exclusionary conduct in a vacuum separate from causation.

This is because causation is not only considered as part of the analysis of whether a plaintiff has antitrust standing, as Avadel insists, but is also, as *Actos I* recognized, a "necessary element of any claim for relief." *Actos I*, 848 F.3d at 97 (quoting *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986)); *see also Actos II*, 2025 WL 1001259, at *14-15 (denying summary judgment on anticompetitive conduct where causation lacked any plausible basis). It is axiomatic that antitrust plaintiffs "must prove a causal connection between the [alleged antitrust violation] and actual damage suffered." *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 506 (E.D. Pa. 2019); *see also* Areeda & Hovenkamp, A5551-52 ¶338 ("Every private plaintiff in a civil case must show that its injuries were 'caused' by the defendant's illegal conduct.").[4]

Here, as noted, there is ample undisputed evidence that ODE and DDI issues prevented the FDA from approving Lumryz by October 15, 2021 (Avadel's alleged but-for approval date). There

---

[4] *See also Amphastar Pharms., Inc. v. Momenta Pharms., Inc.*, 297 F. Supp. 3d 222, 228 (D. Mass. 2018) ("A plaintiff in an antitrust case must demonstrate that there is a causal connection between the defendant's illegal practice and the antitrust injury."); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 982 (N.D. Ill. 2022) ("[A] plaintiff must demonstrate a direct link between the antitrust violation and the antitrust injury.") (cleaned up); *Chandler v. Phoenix Servs., L.L.C.*, 45 F.4th 807, 814 (5th Cir. 2022) ("That [causation] showing may not be based on speculation. Rather, the required causal link must be proved as a matter of fact and with a fair degree of certainty.").

is also ample undisputed evidence that the '782 patent prevented Avadel from legally selling Lumryz in April 2022 (Avadel's alleged but-for launch date). This alone is more than enough to deny Avadel's summary judgment motion. That there is not a material dispute about these issues also warrants granting Jazz's summary judgment motion.

But, for the sake of completeness, Jazz notes that even beyond these undisputed issues, there is a wealth of other evidence—which Avadel may or may not dispute—that a jury could also easily rely on to find that Avadel was in no position to start selling Lumryz on the timeline it has alleged. Of course, the Court need not resolve any factual disputes arising from these events; they just further demonstrate the inability of Avadel to prove its entitlement to summary judgment.

Specifically, the evidence shows that Avadel had major problems with its manufacturing and supply of Lumryz that, on their own, meant it could not have met the speculative timeline it posits. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████. Plainly, the FDA would not have approved the sale of Lumryz under these circumstances. █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



. And these self-inflicted delays continued long after April 2022.

. Even that was unrealistic. Again, these facts underscore that—even putting aside the more fundamental and undisputed issues such as ODE, DDI, and the '782 patent—Avadel cannot possibly show with undisputed facts that the '963 patent listing caused the exclusion it alleges. Avadel's summary judgment motion should be denied.

> ### 2. Avadel Also Cannot Show The Challenged Conduct Created Or Maintained Any Monopoly for Jazz

Avadel's motion fails for another, independent reason: even if Avadel could prove that the '963 patent listing caused the exclusion it alleges (which it cannot), there is a material dispute

about whether that hypothetical exclusion created or maintained any monopoly for Jazz. Avadel ignores this requirement, even as it acknowledges that for conduct to be exclusionary it must lead to the "'willful acquisition or maintenance' of monopoly power," Mot. at 12 n.2. Here, Avadel cannot prove that the patent listing indisputably led to the acquisition or maintenance of monopoly power, which is another reason why summary judgment for Avadel on this element is improper.

As discussed further below in the context of Avadel's *Daubert* motions, Jazz's two economic experts (Jena and Cockburn) have each explained why the economic facts show that Jazz is not a monopolist and, to the contrary, has been vital in building a vibrant and competitive narcolepsy market that is characterized by ongoing innovation and growth. During the very period in which Avadel alleges that Jazz dominated a non-competitive market, that market actually expanded both in overall numbers (*e.g.*, patients and prescriptions) and in the variety of treatment options available to narcolepsy patients (brand and generic). Indeed, the evidence shows that narcolepsy patients had been largely ignored by the pharmaceutical industry until Jazz and its predecessor, Orphan Medical, invested in bringing Xyrem to this orphan market, with Jazz then spending years to demonstrate that sodium oxybate could be safely distributed and used under a REMS, thus providing a template for Avadel and others (including generic competitors) to follow. Multiple new treatment options have followed, nearly all of them in some way piggybacking off of Jazz's investments. As a result, the market has steadily grown and expanded over the exact time that Avadel wrongly alleges it was stifled and controlled. These facts affirmatively disprove Avadel's simplistic allegations of monopolization. *See* D.I. 268, Ex. 30 ¶¶86-95.

Avadel alleges claims under Section 2 of the Sherman Act, D.I. 14 ¶¶134-154, which are analyzed in the Third Circuit under the Rule of Reason. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 438

(3d Cir. 2016). As the Supreme Court has made clear, "[t]he rule of reason requires courts to conduct a fact-specific assessment of market power and market structure... to assess the [restraint]'s actual effect" on competition (e.g., whether it was exclusionary). *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*"). Only after addressing market definition and power do courts apply the Rule of Reason's "three-step, burden-shifting framework" to analyze competitive effects. *See id.* at 541-42 (describing the framework). To win its motion, Avadel must show there is no material dispute of fact on ***any*** part of the analysis, including market definition, monopoly power, and competitive effects. It fails on each.

*First*, Avadel does not even address market definition in its motion. "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Amex*, 585 U.S. at 543. "[T]he relevant market is defined as the area of effective competition." *Id.* Here, market definition is contested, which precludes entry of summary judgment. Because competitive effects can only be assessed by reference to a well-defined antitrust market, *Amex*, 585 U.S. at 543, and Avadel cannot show and has not shown there is an absence of any factual dispute as to market definition, Avadel's motion on "exclusionary conduct" must fail. *See Gordon v. Lewistown Hosp.*, 2001 WL 34373013, at *23-24 (M.D. Pa. May 21, 2001), *aff'd*, 423 F.3d 184 (3d Cir. 2005) (denying summary judgment on competitive effects where a "genuine issue of fact regarding the relevant geographic market" exists).

Although unaddressed in its motion, Avadel has alleged that Jazz unlawfully maintained its monopoly power in the relevant market for "(a) FDA approved oxybate-based drugs for treatment of narcolepsy [i.e. Lumryz, Xywav, Xyrem, and Xyrem's authorized generics] and/or (b) FDA-approved drugs to treat patients with narcolepsy with cataplexy in the United States [i.e. oxybates plus pitolisant]." D.I. 14 ¶¶135, 140. Its primary support for this is the testimony of

18

Orszag. A0526-69 ¶¶65-180. But Jazz's rebuttal expert Jena, an economist and physician, explains that Orszag's analysis is flawed for numerous reasons, resulting in an overly narrow market definition. D.I. 268, Ex. 30 ¶127.

Jena explains, for example, that numerous other treatments for narcolepsy exist today (and existed throughout the period when Jazz allegedly monopolized the market), including SSRIs, stimulants, and wake-promoting agents such as Provigil, Nuvigil, and Wakix (and generic versions of certain stimulants). *See* CSOF ¶¶15-16; D.I. 268, Ex. 30 ¶¶149-151. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

In addition, Jena explains that Jazz has faced price competition from more than just other oxybate products. D.I. 268, Ex. 30 ¶¶180-187. Health plans place drugs on "formularies," which tier products based on numerous factors, including price. D.I. 268, Ex. 30 ¶¶187-195. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████ In short, the element of market definition is hotly disputed here, precluding summary judgment.

*Second*, even if market definition were undisputed, Avadel similarly fails to establish there is no material dispute as to monopoly power. "[M]onopoly power may be proven through direct

evidence of supracompetitive prices and restricted output," or "indirect evidence" of "market share and barriers to entry." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007). Courts have recognized that, following the Third Circuit's decision in *Broadcom*, "Plaintiffs must define, at least with a degree of approximation, the relevant market in their analysis [even] under the direct evidence method." *In re Neurontin Antitrust Litig.*, 2013 WL 4042460, at *3 (D.N.J. Aug. 8, 2013).

Avadel cannot prove monopoly power because it failed to define the relevant market. *Broadcom*, 501 F.3d at 307 n.3. Avadel has not even attempted to show it can prove monopoly power directly through supracompetitive prices or restricted output. ███████████████████████
███████████████████████████████████████████████████
████████████████████████████ *See* D.I. 268, Ex. 30 ¶108 & Figure 5. Accordingly, "the natural inference is that Jazz's price has been, and continues to be, a competitive price." D.I. 268, Ex. 30 ¶108. Moreover, output has steadily increased throughout the period Avadel claims Jazz was a monopolist, D.I. 268, Ex. 30 ¶¶91-95, which contradicts Avadel's allegation that Jazz has monopoly power. *Amex*, 585 U.S. at 549-52 (plaintiff failed under the Rule of Reason where, as here, output increased over the relevant timeframe). ██████████████████
████████████████████████████████████████████████████
██████████████████████████████████

*Third*, even assuming for sake of argument that causation, market definition, and monopoly power were undisputed, Avadel would ***still*** be unable to prove harm to competition. As discussed above, Avadel has not and cannot show that Jazz's patent listing actually caused the alleged exclusion of Lumryz. But even if it did, Avadel cannot show that the alleged exclusion harmed overall competition itself, as opposed to just causing the short-term delay of one competitor.

"Conduct that merely harms competitors … while not harming the competitive process itself, is not anticompetitive." *Broadcom Corp.*, 501 F.3d at 308.[5]

Confirming this, many courts have held that a short-term, temporary exclusion of a single competitor—*i.e.*, what Avadel alleges here—is insufficient to show overall harm to competition. *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Pubs., Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) ("We therefore insist on a preliminary showing of significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer) before these practices can rise to the level of exclusionary conduct."); *Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("Clearly, de minimis foreclosure of a market is not an antitrust dereliction in itself"); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (holding the plaintiff must show competition that is "of significant magnitude"). Indeed, the short-term, temporary delay of even generic competition has been held insufficient to prove foreclosure of the relevant market. *See Jame Fine Chems., Inc. v. Hi-Tech Pharm. Co., Inc.*, 2007 WL 927976, at *5 (D.N.J. Mar. 27, 2007) (delay of five to nine months insufficient).

Here, there is ample evidence that the alleged short-term, temporary delay in the regulatory approval of one additional competitor (Lumryz) did not amount to overall competitive harm. As noted, Avadel ignores that product variety and consumer choice actually expanded over the very period it claims that competition was foreclosed. *See* D.I. 268, Ex. 30 ¶¶86-90. After Jazz's listing of the '963 patent, four new brand drugs came to market to treat narcolepsy (Sunosi, Wakix,

---

[5] Avadel's own case law confirms that merely showing harm to a competitor is insufficient. *See Philadelphia Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018) (dismissing claims for failure to allege harm to competition); *CAE Inc. v. Gulfstream Aerospace Corp.*, 203 F. Supp. 3d 447, 454-56 (D. Del. 2016) (same).

Xywav, and Lumryz). *See* CSOF ¶15; D.I. 268, Ex. 30 Table 1. Jazz itself, the supposed monopolist, invested in developing two of these new brand products (Sunosi and Xywav). Jazz invested to develop Xywav, which has 92% less sodium than Xyrem and Lumryz, and is thus a safer treatment option for narcolepsy patients. SOF1 ¶5; A2891. Generic Nuvigil and generic Xyrem also became available to narcolepsy patients. CSOF ¶16; *See* D.I. 268, Ex. 30 ¶88. Given this steady and ongoing expansion of competitive options, a jury could easily find that a short-term delay in the regulatory approval of just one competitor does not amount to the type of exclusion covered by the antitrust laws. Avadel's motion should be denied for this reason as well.

Avadel fails to engage with any of these legal requirements. Instead, it asserts (Mot. at 13) it is entitled to summary judgment on the exclusionary conduct element simply because "the court has already determined that a patent was improperly listed," citing to three cases, none of which support its argument. *United Food* and *Lantus* merely discuss the pleading standard for exclusionary conduct. *See United Food*, 11 F.4th at 137-38 (holding that plaintiffs "need only have plausibly alleged that Takeda had market power and that it incorrectly listed its combination patents as claiming ACTOS, causing their antitrust injuries"); *Lantus*, 950 F.3d at 14-15("[N]othing in the operative complaint requires us to conclude that the automatic thirty-month freeze on FDA approval of the other companies' products had no plausible effect on the course of the underlying litigation."). These courts do not hold that a plaintiff can secure summary judgment on this element while ignoring the required elements of causation, market definition, market power, and competitive harm.

By ignoring causation, market definition, monopoly power, and competitive effects, Avadel suggests that Jazz's conduct is *per se* unlawful, rather than conduct that must be analyzed under the Rule of Reason. But that is contrary to law, and no court has applied the *per se* framework

in the Section 2 context. *Cf. Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) ("The cost of false positive counsels against an undue expansion of §2 liability.").

The closest Avadel has come to identifying any legal support for its position is *Actos II*, which granted summary judgment on the "willful maintenance" prong after finding that monopoly power was in dispute. While that aspect of the ruling is questionable, given all of the foregoing legal principles, *Actos II* is also easily distinguishable. In *Actos II*, the court found "the price of pioglitazone plummeted when the first-filing generics entered the market." *Actos II*, 2025 WL 1001259, at *8. That is consistent with Avadel's other case, *New York ex rel. Schneiderman v. Actavis PLC*, which found that "[p]rice competition at the pharmacy, facilitated by state substitution laws, is the principal means by which generics are able to compete in the United States." 787 F.3d 638, 655 (2d Cir. 2015). But here, there is no automatic substitution of Lumryz for any other drug; and the effects of Lumryz's entry on price and competition (and the length of time it was delayed, if any) are very much in dispute. Indeed, rather than immediately causing prices to plummet for narcolepsy patients, Avadel first launched Lumryz at the same price as Jazz's Xywav, and then raised the price later above that. A5418 at 57:7-22.

Thus, for all of these reasons, Avadel's motion for summary judgment related to exclusionary conduct should be denied.

## III.    JAZZ'S OPPOSITION TO AVADEL'S DAUBERT MOTIONS

### A.    Legal Standard

All of the expert testimony that Avadel seeks to exclude is rebuttal testimony. Federal Rule of Civil Procedure 26(a)(2)(D)(ii) expressly permits expert testimony "solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Accordingly, courts permit rebuttal experts to critique opposing experts' methodologies without offering an affirmative methodology of their own. *Ryanair DAC v. Booking Holdings Inc.*, 2024

23

WL 3732498, at *40 (D. Del. June 17, 2024) ("Courts have held that it is the proper role of rebuttal experts to critique [an] expert's methodologies and point out potential flaws in the ... experts' reports.") (quoting *Complaint of Borghese Lane, LLC*, 2023 WL 3114851, at *3 (W.D. Pa. Apr. 27, 2023)). Simply put, "a rebuttal expert is permitted to discuss overlooked evidence and perceived flaws in the methodology of the original expert's testimony." *Shaver v. Libbey Glass LLC*, 2024 WL 3050719, at *3 (C.D. Cal. Apr. 12, 2024). Avadel does not acknowledge these principles about the permissible scope of rebuttal opinions and several of Avadel's arguments fail for this reason alone. None of Avadel's remaining arguments warrant exclusion under *Daubert*.

### B.    Dr. Anupam Jena's Testimony Is Admissible

Dr. Jena is an economist and physician who responds to Orszag, an economic consultant hired by Avadel who opines, among other things, that ███████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ Jena is a rebuttal expert addressing these and other points.

Avadel does not challenge Jena's qualifications to give the challenged opinions, *see generally* Mot. at 15-16, and for good reason. Jena is a Professor of Health Care Policy and Medicine at Harvard Medical School and an Internal Medicine Specialist at Massachusetts General Hospital, the largest affiliated teaching hospital of Harvard Medical School. D.I. 268, Ex. 30 ¶1. He earned a Ph.D. in economics and an M.D. from the University of Chicago. *Id*. Jena specializes in the economics of physician behavior, the economics of health care productivity, the economics of medical innovation and biopharmaceutical markets, and the use of large-scale data and natural experiments to study questions at the intersection of health and economics. D.I. 268, Ex. 30 ¶3. As a physician, Jena treats a variety of conditions, often in conjunction with neurologists. D.I. 268, Ex. 30 ¶2. He has authored three books and co-authored over 200 peer-reviewed articles in leading medical and economics journals. D.I. 268, Ex. 30 ¶3.

As relevant here, Jena explains that "Orszag's analysis of market power, as well as his analysis of competitive effects, are flawed and fail to account for Jazz's, and other manufacturers' efforts to innovate and compete in a marketplace for patients suffering from a rare disease." D.I. 268, Ex. 30 ¶18. As Jena explains: "I find extensive economic evidence that, contrary to Orszag's conclusions, Jazz competes in a marketplace that is characterized by growth and innovation. By way of this competition, Jazz has played an important role in expanding treatment options for patients suffering from narcolepsy…This economic evidence is inconsistent with a monopolized market that was substantially foreclosed by the listing of a REMS patent in the Orange Book." D.I. 268, Ex. 30 ¶20.

To support these opinions, Jena's report first provides background on narcolepsy and the economics of pharmaceutical innovation. D.I. 268, Ex. 30 ¶¶23-44. He then analyzes whether Jazz's investments and innovations in narcolepsy treatments are consistent with a marketplace that was monopolized and foreclosed from competition, as Orszag contends, finding instead that Jazz's actions benefited competition and expanded the options available to narcolepsy patients that had long been ignored by the industry. D.I. 268, Ex. 30 ¶¶45-84. Jena specifically responds to Orszag's opinions ██ ███ ███ ███ ███ ███ ██ ███ ███ ██ ██

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████.

Avadel does not seek to exclude Jena's testimony about market definition, Jazz's alleged monopoly power, or the alleged anticompetitive effects of Jazz's conduct. Avadel only seeks to exclude Jena's opinion about Jazz's innovations relating to narcolepsy treatments. Avadel claims

these opinions are "abstract," irrelevant, and improperly designed to paint Jazz "in a positive light." Mot. at 15. Avadel's arguments are meritless. These opinions go to a core disputed issue, as Jena explains exactly why Avadel and its expert are wrong to allege that Jazz was a monopolist that controlled a market devoid of competition and innovation. Mot. at 15-16; *see* D.I. 268, Ex. 30 ¶¶28-44, 49-84. Jena's rebuttal opinions are plainly relevant, helpful to the trier of fact, and fall squarely within appropriate rebuttal testimony.

### 1.    Jena's opinions on innovation are relevant

Avadel asserts that "pharmaceutical innovation in the abstract has no bearing on any disputed facts." Mot. at 15. But Jena does not evaluate innovation "in the abstract." He applies these concepts to a central disputed issue in the case—whether Jazz's alleged conduct harmed competition in a monopolized market or not.

Avadel's expert, Orszag, opines that ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████ In a background section of his report, Jena first explains that understanding the "economics of pharmaceutical innovation, particularly as it relates to treatments for rare diseases, such as narcolepsy" which he covers in Section IV of his report, is needed before examining how such innovation "intersects with the economic issues of market power and competitive effects." D.I. 268, Ex. 30 ¶28. This opinion is not "abstract" but necessary since, as Jena explains, Orszag fails to account for this important competitive dynamic. *Id.* ¶¶45-46.

Avadel's bid to exclude what is essentially the background section of Jena's report should be rejected. It is common for an expert to have a background section, and virtually every one of Avadel's experts (including Orszag) includes one that sets the table for their opinions. *See, e.g.*,

A0511-12 ¶¶18-20; A0516-20 ¶¶35-45 (providing background on narcolepsy industry and FDA approval of oxybate products). It is entirely appropriate for Jena likewise to give background regarding the importance of innovation in the pharmaceutical industry, including in rare disease spaces like narcolepsy, before applying those concepts to the specific issues in this case, especially because "[a]ntitrust analysis must always be attuned to the particular structure and circumstance of the industry at issue." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 70 (E.D. Pa. 2022) (quoting *Trinko*, 540 U.S. at 411).

Avadel's effort to exclude Jena's opinions as to the specifics of the innovation and competition that have occurred in the narcolepsy market fare no better. These are obviously relevant concepts to assessing Avadel's monopolization claims. As Jena explains, "my economic analysis examines whether Jazz's oxybate products were sold into a marketplace characterized by monopolization, and substantial foreclosure by a participant, or not. This is a critical analysis for assessing whether the conduct at issue (i.e., the listing of a REMS patent in the Orange Book) negatively impacted competition[.]" *See* D.I. 268, Ex. 30 ¶47; *see also id.* ¶¶28-34. And as Jena further explains, by ignoring the record of ongoing innovation that has steadily benefited narcolepsy patients, much of it led by Jazz, Orszag's simplistic analysis of Jazz's supposed monopolization is incomplete and incorrect. *See, e.g.*, D.I. 268, Ex. 30 ¶¶209-225. Jena's analyses of pharmaceutical innovation for rare diseases in general and in the narcolepsy space specifically are plainly admissible as they respond to Orszag and bear directly on core issues in this case— whether Jazz has monopoly power and whether it harmed competition in a relevant market.

Ironically, while Avadel asserts that the record of ongoing innovation in the narcolepsy space is irrelevant, *see, e.g.*, Mot. at 15 (stating that "pharmaceutical innovation in the abstract has no bearing on any disputed facts"), ***its own expert***, Orszag, admits that "innovation is an important

channel through which companies, especially pharmaceutical companies, deliver benefits to consumers," A0990-91 ¶67. In fact, Orszag has written about the value of pharmaceutical innovation, describing it as "the lifeblood of the pharmaceutical industry." CSOF ¶23; A5517. █

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████. Jena explains that focusing on both is critical for assessing whether a pharmaceutical market has been monopolized, yet █████████████████████████

██████████████████████████████. Jena's opinions are undeniably relevant, not least because they show that ██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████.

Notably, Jena recently offered similar opinions in *Actos II*, a case that Avadel repeatedly relies upon here. There, the court credited Jena's opinions in denying summary judgment. *Actos II*, 2025 WL 1001259, at *11-13. There, like here, Jena explained how the alleged monopolist engaged in research and development, the key ingredient in furtherance of innovation, which was ultimately a factor in deciding whether pricing was supracompetitive in the allegedly monopolized market. *Id.* at *12. The Court found that testimony relevant to assessing monopoly power, rejecting the plaintiffs' bid for summary judgment on that issue. *Id.* at *12-13. Here, as in *Actos II*, Jena's testimony about innovation is germane and clearly "fits" the case.

Avadel's authorities are inapposite. In *In re TMI Litigation*, the experts admitted there was ***no*** connection between the studies or analyses performed and the issues in the case. 193 F.3d 613, 710-11 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ("Wing's admission that his study

was a mortality study only, and not an analysis of an association between dose and mortality, combined with his admission that he was unable to conclude that the elevated mortality was due to radiation exposure clearly demonstrates a lack of 'fit.'"). That is not the case here. Jena has explained why it is critical to assess all of the innovations that have occurred in the narcolepsy market in order to assess (and ultimately reject) Avadel's allegation that the market was controlled and monopolized. A4809 at 102:3-16.

### 2. Jena's analysis of Jazz's investments "fits" the case

Avadel also argues that Jena's opinions about Jazz's specific investments in narcolepsy patients, education, and treatment are irrelevant because they "do not flow from the challenged conduct in this case"—*i.e.*, Jazz's Orange Book listing. Mot. at 15-16. But this framing mischaracterizes Jena's testimony, which is not just about whether Jazz's various investments were procompetitive (they were), but, again, "whether Jazz's oxybate products were sold into a marketplace characterized by monopolization, and substantial foreclosure by a participant, or not." D.I. 268, Ex. 30 ¶47. The investments by Jazz that Jena discusses are indisputably relevant to rebutting Avadel's and its experts' allegations that the narcolepsy market was characterized by monopolization and foreclosed competition. They show, instead, that the market has been expanding and growing. *See supra* §II.C.2.

In fact, the opinions about Jazz's investments that Avadel seeks to exclude directly respond to incomplete and misleading opinions by Avadel's expert. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████. These are all appropriate rebuttal opinions. Having put these developments at issue, Avadel can hardly complain that Jena rebutted Orszag's misleading and incomplete opinions about them.

Avadel argues that "Jena's opinions serve only to portray Jazz in a false positive light[.]" Mot. at 15. But Avadel has not shown that anything Jena says is false; it just disagrees with his opinions. That is not a basis for exclusion. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 192 (D.N.J. 2020) ("The parties fundamentally disagree as to which experts' opinion and interpretation is best and, further, which experts reached the correct conclusions. … [I]t is up to the jury to decide whether the expert used the best or most reliable methodology[.]").

### 3. Jena's analysis of Xyrem and its REMS' development is relevant

Avadel argues that Jena's opinions about the investments Jazz made in Xyrem and its REMS program should be excluded because, in Avadel's view, Jazz did not make any such

investments. Mot. at 16. Avadel is wrong. While Orphan Medical developed the initial risk management program for Xyrem, Jazz acquired Xyrem at substantial cost and thereafter took responsibility for ensuring the safe distribution and use of Xyrem for the years to come, which involved, among other things, gaining FDA approval for converting the initial risk management program into a full-fledged REMS, which the FDA approved in 2015. CSOF ¶18; D.I. 268, Ex. 30 ¶¶58-61. After getting the REMS approved, Jazz then expended considerable resources over the years not only to operate its REMS but to improve the program to ensure that patients can access and use oxybate while preventing abuse, misuse, or diversion, and also providing an established REMS model that Avadel and others have used as a framework to gain FDA approval for subsequent oxybate products. D.I. 268, Ex. 30 ¶¶59-65. Jazz continues to operate Xyrem (and now Xywav's) REMS today. D.I. 268, Ex. 30 ¶¶59-64. *Actos II* confirms that these types of expenditures are relevant to assessing the full picture of whether a defendant has monopoly power. *Actos II*, 2025 WL 1001259, at *12.

Avadel's citation to *FTC v. Vyera Pharms., LLC*, 2021 WL 5279465 (S.D.N.Y. Nov. 12, 2021) is inapposite. There, the pharmaceutical manufacturer made ***no*** investment in the products at issue. *Id*. at *7. No one could seriously say that about Jazz.

### C.    Dr. Iain Cockburn's Testimony Is Admissible

As another rebuttal to Orszag, Dr. Cockburn discusses the appropriate economic framework for evaluating competitive effects in the pharmaceutical industry, D.I. 268, Ex. 32 ¶¶12-64, explaining that any evaluation of competitive effects in pharmaceutical markets must account for dynamic competition, which Orszag ignores. D.I. 268, Ex. 32 ¶¶17-18. Avadel does not challenge Cockburn's qualifications to give these opinions. *See generally* Mot. at 16-19. Cockburn is a Professor in Strategy and Innovation at Boston University's Questrom School of Business. D.I. 268, Ex. 32 ¶1. He received his Ph.D. in economics from Harvard. D.I. 268, Ex. 32

¶2. Cockburn has published nearly four dozen articles in leading academic journals on various topics including the economics of innovation, and downloads of his publications ranked him among the Top 10% of authors by all-time downloads by the Social Science Research Network (SSRN). D.I. 268, Ex. 32 ¶4. Some of Cockburn's most highly cited articles concern his economic research in the pharmaceutical industry specifically. D.I. 268, Ex. 32 ¶5.

As Cockburn explains, dynamic competition spurs innovation, which substantially increases consumer welfare and therefore reflects competitive benefit. D.I. 268, Ex. 32 ¶¶21-25. But innovation is costly and risky. D.I. 268, Ex. 32 ¶¶26-44. Accordingly, economists and Congress have recognized that pharmaceutical innovation will only occur when pharmaceutical companies are given incentives to innovate, such as strong patent rights and regulatory protections including ODE. D.I. 268, Ex. 32 ¶¶45-64; CSOF ¶22; A5466. . Cockburn explains that any reliable economic analysis of competitive effects requires assessing the value of innovations made. D.I. 268, Ex. 32 ¶17.

Having established the appropriate framework, Cockburn then shows that Orszag has failed to adhere to it. He evaluates Jazz's innovations and the benefits that patients received as a result of those innovations, D.I. 268, Ex. 32 ¶¶65-124, concluding that "Jazz undertook significant risks and costs associated with treating underserved narcolepsy patients, that Jazz's efforts led to significant procompetitive innovations that benefitted this underserved patient population, and that these procompetitive benefits were being realized throughout the time period in which Avadel alleges competitive harm." D.I. 268, Ex. 32 ¶67. Cockburn discusses many of the risks and investments that Jazz took, including (1) the risk of acquiring Orphan Medical, D.I. 268, Ex. 32 ¶¶75-84, (2) development and maintenance of the REMS program, D.I. 268, Ex. 32 ¶¶85-93, (3) efforts to expand output by educating physicians and patients on oxybate and narcolepsy, D.I.

268, Ex. 32 ¶¶94-106, and (4) significant research and development expenditures, D.I. 268, Ex. 32 ¶¶107-124.

Avadel argues that Cockburn's analysis should be excluded as (1) irrelevant and (2) unreliable. Mot. 16-19. Neither is true. As with Jena, Cockburn's opinions go to core disputed issues in the case, and Avadel merely disagrees with them.

### 1.    Cockburn's opinions are relevant

As with Jena, Avadel argues that Cockburn's analyses of Jazz's innovations and investments are irrelevant because "Avadel does not challenge any of that conduct." Mot. at 16-17. But Avadel's experts do in fact discuss that conduct at length throughout their reports. *See supra* §III.B. Even if they had not, Cockburn's analyses would "fit" the case because it "explain[s] economic conditions at the time of the challenged [conduct]" and will therefore "be relevant to help the trier of fact [understand] industry dynamics that will bear on their understanding of key issues." *See In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784, at *32-33 (E.D. Pa. Dec. 3, 2024); *see, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 50 (E.D. Pa. 2022) (weighing expert testimony about the procompetitive benefits of the defendant's conduct against the plaintiffs' allegations of anticompetitive conduct).

As with Jena, whether Avadel wants to discuss it or not, this conduct is undeniably relevant because it rebuts Avadel's claim that the narcolepsy market was monopolized by Jazz. Cockburn's analysis is also fully consistent with *Actos II*, which similarly considered expert testimony on the alleged monopolist's expenditures in innovation. *Actos II*, 2025 WL 1001259, at *12.

### 2.    Cockburn's opinions are reliable

Avadel argues that "Cockburn does not provide any analysis of his own." Mot. at 17-18. But Cockburn is a rebuttal expert, who draws upon his substantial expertise in the field of pharmaceutical innovation to explain the flaws with Orszag's opinions. *See generally* D.I. 268,

Ex. 32 §II. Courts routinely recognize that rebuttal experts need not offer their own affirmative methodology. *See Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 636 (D. Del. 2017) (holding, where rebuttal expert's report "center[ed] on [the plaintiff's expert's] methodology and whether [the plaintiff's expert's] conclusions deserve any weight[,]" that it was "not necessary that [the rebuttal expert] provide an alternative market analysis of his own"). Courts routinely recognize this principle.[6]

Moreover, Cockburn does offer his own analysis. As Cockburn shows, Orszag ignored important factors that, "[a]t a minimum, a complete evaluation of the nature of the competitive process in the narcolepsy drug marketplace, and the potential for harm to competition from the challenged conduct, would need to take into account." D.I. 268, Ex. 32 ¶17. Those include factors "such as R&D investment, introduction of new products or improvements to existing products, and development of new market segments[,]" with indicia of these factors including "R&D expenditure, transactions in the market for technology such as licensing and acquisitions, patent

---

[6] *See e.g.*, *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 2352016, at *14 (E.D. Pa. June 9, 2021) (admitting rebuttal expert criticisms of plaintiff's expert's model, and explaining that it is proper for a rebuttal expert to "point out potential flaws in the plaintiff's experts' reports"); *Coquina Invs. v. Rothstein*, 2011 WL 4949191, at *3 (S.D. Fla. Oct. 18, 2011) ("A rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report that implicitly assumes or ignores certain facts."); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *6 (S.D. Fla. June 8, 2011) (admitting a rebuttal expert who "merely provides other factors that [the plaintiff's expert] should have considered in his report, based on her economics expertise," explaining that "[h]ighlighting such factors will be helpful for the jury"); *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009) (admitting rebuttal experts who "primarily critique[d] [plaintiffs' experts'] methodology" and stating that "[s]uch evidence, which attacks the opposing expert's substantive testimony, is proper rebuttal"); *1st Source Bank v. First Res. Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) (allowing a rebuttal expert witness to criticize the plaintiff's "damages theories and calculations without offering alternatives"); *see also Align Tech., Inc. v. 3Shape A/S*, 2020 WL 4926164, at *8-9 (D. Del. Aug. 14, 2020) (allowing a rebuttal expert's opinion where "the intent of the report is solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report" even though the rebuttal expert did not conduct an alternative analysis).

34

filings, clinical trials, applications for new drugs, new product launches, addition of new approved indications, innovative efforts to inform patients and prescribers, and so on." D.I. 268, Ex. 32 ¶17. Cockburn's report discusses these indicia at length.

Cockburn thus offered an analysis like any sound rebuttal expert would: he identified factors that Orszag failed to consider. He could have stopped there, but did not, and considered those factors himself. Nothing more is required. *See Ryanair*, 2024 WL 3732498, at *40. Avadel's critique appears to be that Cockburn does not offer his own "economic model." *See* Mot. at 17-18. But neither does Orszag. ██████████████████████████████████████ ████████████████████████████████████.

Avadel claims that Cockburn could not provide a reliable contrary methodology to Orszag's "because no such peer-reviewed, generally accepted methodology exists." Mot. at 18-19. Avadel is mistaken. Cockburn explained at deposition that his report laid out "how one could assess whether a market was dynamically competitive" and there are "well-established methodologies in economics for evaluating economic welfare, gains and losses driven by innovation or by potentially anticompetitive conduct." A4977-78 at 45:20-46:15. Further, as he explained at his deposition, "there's an entire branch of health economics called 'outcomes research'" that allows economists to test the economic benefits of taking a drug, something Cockburn criticizes Orszag for failing to do. A4979 at 52:14-53:12. That Orszag failed to apply any of those the well-established methodologies available to him is an indictment of ***Orszag's*** opinions, not a reason to exclude Cockburn's rebuttal. Finally, as outlined above, "methodology" or not, even Avadel's primary case (*Actos II*) recognizes that expert testimony concerning innovation (which a leading indicator of dynamic competition) is highly relevant to assessing whether a market has been monopolized. *Actos II*, 2025 WL 1001259, at *11-13.

Avadel's cases are far afield. Avadel cites *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000), but that case involved an affirmative expert, not a rebuttal expert. *Id.* at 740. Avadel's other cases likewise involved affirmative experts or extreme facts unlike those at issue here. *AFMS LLC v. United Parcel Serv. Co.* involved experts who either provided expert testimony on an "obvious conclusion" rendering the opinion unhelpful to the jury or a subject, economics, over which the expert had no "expertise or training." 2014 WL 12515335, at *4-6 (C.D. Cal. Feb. 5, 2014). *TMI* involved an affirmative expert, not a rebuttal expert, who "discarded standard and generally accepted computer models" instead relying on numerical models with no evidence of general acceptance, could not explain the differences in his model from another, recanted expert testimony in the case, and produced a "movie" based on "pure speculation." *In re TMI Litig.*, 193 F.3d at 668-69, 671. Cockburn did none of that. Finally, *Cohen v. Cohen*, 125 F.4th 454 (3d Cir. 2025) involved an expert whose opinion was unsupported by "good grounds" because the expert cited statistics not "substantially supported by the research," *id.* at 462-64, and also did not "fit the facts" of the case, *id.* at 464, criticisms which are inapplicable to Cockburn's opinions.

**D.    Mr. Jonathan Singer's Testimony Is Admissible**

Singer is also a Jazz rebuttal expert witness. Singer responds to several Avadel experts who purport to opine on the objective reasonableness of Jazz's Orange Book '963 patent listing and maintenance of that listing until the Federal Circuit's delisting decision. Avadel's arguments for exclusion lack merit. Singer is well-equipped to offer these opinions, as he has more than 30 years of pharmaceutical patent litigation experience and has advised more than 20 pharmaceutical companies regarding Orange Book listings. D.I. 268, Ex. 35 at ¶¶7-8; A1687 at 31:20-32:3.

**1.    Singer's opinions are not "unreliable" or "incorrect as a matter of law"**

Avadel argues Singer's opinions are "unreliable" and "incorrect as a matter of law" because they purportedly "contradict[] the Federal Circuit's holding in its decision affirming this Court's

36

order to delist the '963 patent from the Orange Book." Mot. at 19. Not so. Avadel makes it seem as if Singer is disagreeing with the Federal Circuit's delisting decision and opining that Jazz had an objectively reasonable basis for listing the '963 patent *after* that decision. That is not Singer's opinion. Rather, Singer addresses whether it would have been objectively reasonable to list and maintain the '963 patent listing *before* the Federal Circuit's delisting decision.

Singer made clear at deposition that he was not disagreeing with the Federal Circuit decision. *See, e.g.*, A1691 at 47:13-20 ("I'm not articulating how [the patent] should be construed because that matter has already been decided."); A1704 at 100:6-12 ("In my view, the Federal Circuit decided the decision, and . . . that's what I utilized"). Instead, his opinion is that, "*[i]n 2014*, it would have been reasonable for an attorney to advise a company in Jazz's position that the law required the listing of the '963 patent in the Orange Book." D.I. 268, Ex. 35 ¶3. Similarly, Singer opined that "[i]t would have been reasonable for an attorney to advise a company in Jazz's position to maintain the listing of the '963 patent in the Orange Book *up to and until at least the Federal Circuit's ruling*[.]" *Id*. Avadel cannot explain how Singer's opinions contradict a decision that did not exist until after the time period he addresses.[7]

### 2. Singer does not offer opinions on Jazz's "state of mind"

Avadel also argues that "Singer offers improper state of mind opinions—including the state of mind of Jazz when it listed the '963 patent in the Orange Book." Mot. at 20. Avadel focuses on

---

[7] Avadel also states that Singer did not engage in any analysis of the '963 patent claims, but rather relied on Jazz's expert Dr. Edward Sellers' opinion that the '963 patent claims cover the Xyrem/Xywav REMS. Mot. at 19. But courts routinely rely on the testimony of experts and persons of ordinary skill in the art ("POSA") to evaluate whether patent claims cover a product or method. *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1377 (Fed. Cir. 2022). Avadel does not dispute that Sellers is a POSA, nor did it move to exclude his opinions. Avadel further fails to mention that Singer also relied on Avadel's expert's, Dr. Gudin's, opinions regarding whether the '963 patent claims are practiced by the XYREM REMS. D.I. 268, Ex. 35 ¶95. Thus, the import of Avadel's statement is unclear.

one sentence from Singer's report for this argument: "It was certainly reasonable for Jazz to assert that, regardless of the fact that the '963 patent claims a 'system,' utilizing that system – i.e., performing the XYREM REMS method – was still a required 'condition of use' for XYREM." *Id.*

That opinion is not about Jazz's state of mind. State of mind testimony would be testimony about what Jazz was thinking at the time of listing. That is not what Singer addresses, as Singer repeatedly explained at deposition. *See, e.g.*, A1707 at 111:4-7, 112:1-7; A1710 at 122:18-20; A1715 at 143:17-20; A1734 at 218:14-17. Instead. Singer's opinions address what was objectively reasonable before the Federal Circuit's delisting decision. Singer clearly states "[s]ince it would have been reasonable for a patent attorney to conclude that (1) the '963 patent covers the XYREM REMS and (2) the XYREM REMS is a condition of using XYREM approved by FDA, it is my opinion that it would have been reasonable for a patent attorney to advise a company in Jazz's position that the '963 patent must be listed in the Orange Book under the FDA's regulations." D.I. 268, Ex. 35 at ¶103.

Rather than supporting Avadel's argument, the citation to *Persawvere* confirms that Singer's testimony is proper. There, the court excluded only a portion of the expert's testimony regarding what a Patent Office declarant allegedly knew about the veracity of his declaration. *Persawvere, Inc. v. Milwaukee Elec. Tool Corp.*, 2023 WL 8019085, at *14 (D. Del. Nov. 20, 2023). That is state-of-mind testimony unlike the testimony Singer offers here. On the other hand, *Persawvere* permitted the expert to testify on other issues because "he has specialized knowledge regarding the patent application process as well as the policies, practices, and procedures of the PTO." *Id.* Likewise here, Singer can address the objective reasonableness of Orange Book listings based on his 30 years as a pharmaceutical patent litigator, advising more than 20 pharmaceutical companies regarding Orange Book listings.

### 3.    Whether Singer's opinions are legal opinions

Avadel argues that, if "the Court determines that it should exclude expert testimony relating to whether Jazz's listing decisions were objectively reasonable on the basis that such testimony involves an impermissible legal opinion, then the Court should exclude the opinions and testimony of Singer that it was reasonable for Jazz to list the '963 patent in the Orange Book." Mot at 21. Jazz agrees. Singer is a rebuttal expert and Jazz has moved to exclude the testimony of Avadel's experts on objective reasonableness. Should any portion of Avadel's expert testimony be permitted, however, then Singer should likewise be permitted to testify to the same subject matter.

### E.    Mr. Daniel Troy's Testimony Is Admissible

Daniel Troy is the former Chief Counsel of the FDA and a senior executive and general counsel of several pharmaceutical companies, including GlaxoSmithKline. A0389-90 ¶¶2-6. Troy draws on this experience in his opening report, which addressed the regulatory guidance and industry practice that applied to the listing of REMS-related patents as of 2014, when Jazz was required to make its listing decision. In his opening report, Troy explains that regulatory guidance as to the listing of REMS patents was ambiguous at best, and that absent contrary guidance from FDA, he would expect Jazz and other pharmaceutical manufacturers to list REMS patents at the time Jazz did so. A0440-70 §V. Troy also issued a rebuttal report, which, among other things, explained the flaws in the opinions of Avadel's causation experts (Flanagan and Unger), who opined that the FDA would have resolved all the complex ODE issues necessary to approve Lumryz by October 15, 2021. A0689-775 §IV. Avadel does not challenge any of those opinions.

Rather, Avadel challenges only the portion of Troy's rebuttal opinion where, like Singer, he responds to specific arguments made by Avadel's experts about why a reasonable company would not have listed the '963 patent or maintained the listing after Avadel challenged it. *See* Mot. at 21 (moving to "exclude the testimony and opinions of Jazz's expert Mr. Daniel Troy regarding

39

whether it was reasonable for a company like Jazz to list and maintain the '963 patent in the Orange Book."). As noted above, *supra* §III.D, Jazz has moved to exclude the testimony of Avadel's experts and, if that motion is granted, Troy's rebuttal opinion on that topic (like Singer's) becomes moot. But if that motion is denied, Troy (like Singer) should be permitted to respond, and Avadel's arguments for exclusion lack merit.

*First*, seizing on testimony from his deposition where Troy said he had assumed the '963 patent claimed a method of use, without evaluating claim construction himself, Avadel claims that Troy's rebuttal opinions are circular. Troy's opinions are not circular because he is not offering any opinions about patent law. In fact, Troy clarified that he had assumed only that "***Jazz decided*** that this was a method of us[e] patent and then [Troy] assessed whether or not it was reasonable for that REMS-related patent to be listed in the Orange Book, a controversy that existed for twenty years." A4883 at 60:18-61:8; *See also id.* at 61:10-15 ("The assumption is that ***Jazz decided*** it was a patent that – yes, that it was a method of use."). That assumption did not render Troy's opinions circular; it simply helped to keep Troy's opinions within the scope of his regulatory and industry expertise by taking the issue of Jazz's state of mind and claim construction off the table. This is similar to how damages experts sometimes assume liability without rendering an opinion on it— Troy was putting the claim construction issue to the side, so he could apply his undisputed expertise to the regulatory and industry practice issues he actually did opine on. *See Orthofix Inc. v. Gordon*, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 1, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion. To hold otherwise would be illogical.").

To be clear, Troy did not opine that it was "reasonable" for Jazz to list and maintain the '963 patent in his opening report—and thus Avadel's *Daubert* motion does not appear to address

his opening opinions. Troy's opening report addresses a different issue: he explains that listing decisions regarding REMS-related patents generally, not the '963 patent specifically, were "complex and unsettled" as of 2014 because of the lack of regulatory guidance provided by the FDA. A0397 ¶22. He further explains that the industry practice at the time was to list such patents. A0398-99 ¶¶26-28. In other words, Troy's affirmative opinions apply his expertise to address regulatory guidance and industry practice about REMS patents—a category into which the '963 patent falls. Avadel's motion appears limited to Troy's rebuttal report and specifically his opinions there "regarding whether it was reasonable for a company like Jazz to list and maintain the '963 patent in the Orange Book." Mot. at 21.[8]

In his rebuttal report, Troy offers *rebuttal* opinions criticizing specific claims by Avadel's affirmative experts about why the listing of a REMS patent was purportedly unreasonable. There again, Troy's criticisms apply his expertise in regulatory guidance and industry practice, not patent law. Troy's rebuttal report makes this clear. For example, Troy explains that even though Avadel's expert, Carrier, *now* opines that ██████████████████████████████████████ ██████████, Carrier previously authored an article acknowledging "the need for additional regulatory revisions to clarify whether REMS-related patents should or should not be listed in the Orange Book," given the substantial uncertainty around this issue. A0651-52 ¶13. Similarly, Troy

---

[8] The word "reasonable" appears only once in Troy's opening report, and not in the context of his substantive opinions. A0397 ¶21. To the extent Avadel argues for the first time in reply that any portion of Troy's opening report should be excluded as well, that argument should be rejected as improper. *Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 437 (D. Del. 2010) (precluding argument made for first time in reply because Local Rule 7.1.3(c)(2) demands that the "party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."). Any such argument would also fail on its merits, as any assumption about what Jazz may have concluded about the scope of the '963 patent claims does not impact Troy's opinions that listing decisions regarding REMS-related patents were "complex and unsettled" as of 2014. A0397 ¶22.

responds to the opinion of Carrier and Waibel that there was ███████████████ ████████████████ about the propriety of listing REMS-related patents in the Orange Book by highlighting the significant ambiguity that existed about this issue, even within the FDA. A0652-53 ¶14. And as noted, he points out that Carrier himself previously admitted that "the current practice is to list REMS patents in the Orange Book." A0685 ¶81.

This is all appropriate rebuttal opinion. It is within the scope of Troy's expertise; none of it depends on whether the '963 patent claims a system or a method as a matter of patent law; and none of it is circular. At most, Avadel's belief that it has found a logical flaw in Troy's "underlying assumptions" provides "fodder for cross-examination at trial," not grounds for exclusion. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490 (D. Kan. June 23, 2021) (quoting *ZF Meritor LLC v. Eaton Corp.*, 2013 WL 6729509, at *5 (D. Del. Dec. 20, 2013)).

Avadel's cases are inapposite. In *In re Montage Technology Group Ltd. Securities Litigation*, the expert's methodology assumed the very thing it intended to prove, whereas Troy did not opine on claim construction or Jazz's state of mind at all. 2016 WL 1598666, at *11 (N.D. Cal. Apr. 21, 2016). Similarly, the court in *FTC v. Tate's Auto Center of Winslow Inc.* did not allow an expert to opine that the defendant had "no ill-gotten monies" based on an "assumption that there are no ill-gotten monies." 2021 WL 410857, at *8 (D. Ariz. Feb. 5, 2021). But here, Troy is not opining that it was reasonable to list the '963 patent based on an assumption that it was reasonable to list the '963 patent. Instead, in the challenged opinions, Troy is identifying specific flaws in the opinions of Avadel's experts that Jazz should have known that it was unreasonable to list a REMS-related patent in the Orange Book.

*Second*, Avadel argues that, because Troy is not a patent expert, he could not perform the legal analysis of the '963 patent's claim construction that the Federal Circuit said was required to determine whether the patent should be listed, and thus his rebuttal opinions criticizing Avadel's expert's opinions that it was unreasonable to list the patent "implicate a legal error." Mot. at 22-23. This argument is equally meritless. Again, Troy's rebuttal opinions were not intended to construe the claims of the '963 patent or address the legal question of whether the specific patent was listable. His rebuttal opinions instead explain why he disagrees with Avadel's experts that it would have been apparent to any reasonable company ***before claim construction*** that the claims of a REMS-related patent were not listable. A4880-81 at 49:21-50:9; A4890 at 87:17-89:5. By pointing out that there was ambiguity within the regulatory landscape about whether to list REMS patents, Troy has not committed any legal error. Rather, Troy is simply stating a fact that is consistent with this Court's own recognition that Jazz had to make the listing decision before it could have known how the specific claim construction disputes would be resolved. *See* D.I. 94 at 11-12 ("While it is no doubt important to think about possible construction for patent claims before filing a case, it would be unfair to require parties to divine the outcome of claim construction before filing"). Avadel's related argument that Troy's rebuttal opinions somehow violate the "law of the case" about claim construction also fails. Mot. at 23. Troy is not offering any legal opinions at all, much less that the '963 patent should remain listed in defiance of the Court's order.

*Finally*, Avadel's argument that Troy's opinions "about what Jazz ostensibly could or could not have known is an improper effort to suggest Jazz's actual state of mind" (Mot. at 24) misconstrues Troy's actual rebuttal opinion. Troy did ***not*** opine about Jazz's state of mind. In fact, that is why Troy assumed Jazz's views—because he was not offering expert opinion about them. Rather, again, Troy was responding to specific arguments by Avadel's experts that certain events

43

would have demonstrated to a reasonable company that the listing was wrong or could not be maintained. Troy's disagreement with those opinions is appropriately based on his expertise in light of the substantial regulatory uncertainty at the time about REMS patents, and do not address Jazz's state of mind.

Accordingly, Avadel's *Daubert* regarding Troy's "reasonableness" opinion should be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Avadel's motions for summary judgment and Daubert.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

F. Dominic Cerrito
Steig D. Olson
Gabriel P. Brier
Frank C. Calvosa
Sami H. Rashid
Elizabeth J. Murphy
John P. Galanek
Nicolas Siebert
Maxwell Hawley
Kevin Adams
Habib-Emmanuel Abraham
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
295 5th Avenue
New York, NY 10016
(212) 849-7000

William R. Sears
Lynette Lim
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

May 23, 2025

Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Counterclaim-Defendant*
*Jazz Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 23, 2025, upon the following in the manner indicated:

Daniel M. Silver, Esquire                               *VIA ELECTRONIC MAIL*
Alexandra M. Joyce, Esquire
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


Kenneth G. Schuler, Esquire                             *VIA ELECTRONIC MAIL*
Marc N. Zubick, Esquire
Alex Grabowski, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


Herman H. Yue, Esquire                                  *VIA ELECTRONIC MAIL*
Franco W. Benyamin, Esquire
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


David F. Kowalski, Esquire                              *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA  92130
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Alan J. Devlin, Esquire                                          *VIA ELECTRONIC MAIL*
Ian R. Conner, Esquire
Anna M. Rathbun, Esquire
Christopher J. Brown, Esquire
Kimon K. Triantafyllou, Esquire
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


Alfred C. Pfeiffer, Esquire                                      *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


Daralyn J. Durie, Esquire                                        *VIA ELECTRONIC MAIL*
Tannyr Pasvantis, Esquire
Eliot A. Adelson, Esquire
Helen He, Esquire
Margaret A. Webb, Esquire
Adam R. Brausa, Esquire
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


Rose S. Lee, Esquire                                             *VIA ELECTRONIC MAIL*
Kira A. Davis, Esquire
W. Henry Huttinger, Esquire
Katherine E. McNutt, Esquire
Rebecca E. Weires, Esquire
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA  90017
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*


David F. McGowan, Esquire                                        *VIA ELECTRONIC MAIL*
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA  92130
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Andrew T. Jones, Esquire                          *VIA ELECTRONIC MAIL*
Haydn Forrest, Esquire
Alexander Okuliar, Esquire
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C.  20037
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

Matthew C. Hans, Esquire                          *VIA ELECTRONIC MAIL*
POLSINELLI PC
7676 Forsyth Boulevard, Suite 800
St. Louis, MO  63105
*Attorneys for Counterclaim-Plaintiff*
*Avadel CNS Pharmaceuticals, LLC*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)