**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

JAZZ PHARMACEUTICALS, INC.,

        Plaintiff and Counter-Defendant,

    v.

AVADEL CNS PHARMACEUTICALS, LLC,

        Defendant and Counter-Plaintiff

C.A. No. 22-941-GBW



REDACTED PUBLIC VERSION
FILED JUNE 6, 2025

## AVADEL'S OPPOSITION TO JAZZ'S MOTIONS FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ..................................................................................................................1

II. LEGAL STANDARD ...........................................................................................................2

III. THE COURT SHOULD DENY JAZZ'S MOTION FOR SUMMARY JUDGMENT NO. 1 REGARDING ANTITRUST STANDING ........................................2

    A. Jazz Is Not Entitled to Summary Judgment Based on ODE ...................................3

        1. Three facts require denial of Jazz's motion. ...............................................3

        2. Additional evidence supports a jury question on ODE timing. ..................7

        3. Jazz's remaining arguments as to ODE lack merit. ....................................8

    B. Jazz Is Not Entitled to Summary Judgment Based on its DDI Patents.................11

    C. Jazz Is Not Entitled to Summary Judgment Based on the '782 Patent .................12

        1. The '782 patent has not allowed Jazz to exclude competition from LUMRYZ in the actual world...................................................................13

        2. The '782 patent would not have stopped the launch of LUMRYZ. .........14

        3. The Court's rulings are consistent with *Wellbutrin.* .................................16

        4. Jazz seeks an unprecedented ruling that would allow patentees to eliminate competition beyond the lawful scope of their patents...............18

        5. The Court's decision to deny an injunction and the jury's reasonable royalty award licensed Avadel's competition under *Wellbutrin.* ..................................................................................................19

        6. Whether Avadel would have obtained a voluntary license to the '782 patent in the but-for world is a fact question for the jury..................19

IV. THE COURT SHOULD DENY JAZZ'S MOTION FOR SUMMARY JUDGMENT NO. 2 REGARDING ANTITRUST LIABILITY.......................................22

    *A.* *Noerr-Pennington* Does Not Shield Jazz's Anticompetitive Conduct .................22

        1. The *Noerr-Pennington* doctrine has no bearing on this case....................23

        2. Avadel is entitled to damages stemming from the lawsuit. ......................24

        3. There is a factual dispute as to *Walker Process* fraud ..............................25

    B. Jazz Cannot Prevail on Its Regulatory Compliance Defense................................30

V. CONCLUSION...................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*10x Genomics, Inc. v. Vizgen, Inc.*,
    681 F. Supp. 3d 252 (D. Del. 2023)......................................................................24

*Alcon Rsch., Ltd. v. Apotex, Inc.*,
    2013 WL 2244338 (S.D. Ind. May 21, 2013).........................................................26

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
    850 F.3d 52 (1st Cir. 2017)....................................................................................24

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
    2012 WL 2571719 (N.D. Cal. June 30, 2012)........................................................25

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
    2018 WL 11230167 (N.D. Cal. May 21, 2018)......................................................25

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
    2018 WL 11606358 (N.D. Cal. Feb. 14, 2018) .....................................................18

*Bletz v. Corrie*,
    974 F.3d 306 (3d Cir. 2020).....................................................................................2

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)...............................................................................................18

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)...................................................................................21

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999)................................................................................3, 4

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)...............................................................................................18

*DeCurtis LLC v. Carnival Corp.*,
    2023 WL 2071915 (S.D. Fla. Feb. 8, 2023) .........................................................26

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...............................................................................................18

*Freed v. St. Jude Med., Inc.*,
    2017 WL 4102583 (D. Del. Sept. 15, 2017)...........................................................9

*Funai Elec. Co. v. LSI Corp.*,
2017 WL 1133513 (N.D. Cal. Mar. 27, 2017).........................................................25

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) ................................................................25

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
527 F. Supp. 2d 1084 (N.D. Cal. 2007) ...........................................................24, 25

*In re Actos Antitrust Litig.*,
2025 WL 1001259 (S.D.N.Y. Mar. 31, 2025) ...................................................31, 32

*In re Actos Antitrust Litig.*,
628 F. Supp. 3d 524 (S.D.N.Y. 2022) ....................................................................30

*In re Buspirone Pat. Litig.*,
185 F. Supp. 2d 363 (S.D.N.Y. 2002) ....................................................................25

*In re Diet Drugs*,
2001 WL 454586 (E.D. Pa. Feb. 1, 2001) ................................................................7

*In re EpiPen Antitrust Litig.*,
545 F. Supp. 3d 922 (D. Kan. 2021) ......................................................................11

*In re Flonase Antitrust Litig.*,
798 F. Supp. 2d 619 (E.D. Pa. 2011) ...................................................................2, 3

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012).................................................................................4, 6

*In re K-Dur*,
2008 WL 2660776 (D.N.J. Feb. 21, 2008) .............................................................11

*In re La. Real Est. Appraisers Bd.*,
2019 WL 2118885 (F.T.C. May 6, 2019) ...............................................................32

*In re Lantus*,
950 F.3d 1 (1st Cir. 2020)...............................................................................22, 30

*In re Lipitor Antitrust Litig.*,
2024 WL 2866654 (D.N.J. June 6, 2024) .............................................................9, 10

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
2022 WL 14865281 (E.D.N.Y. Oct. 26, 2022).......................................................21

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd,* 934 F.3d 619 (D.C. Cir. 2019).............21

*In re Seroquel XR Antitrust Litig.*,
   2025 WL 992004 (D. Del. Apr. 2, 2025)...........................................................4, 6, 14

*In re Suboxone Antitrust Litig.*,
   2017 WL 4910673 (E.D. Pa. Oct. 30, 2017)...........................................................2

*In re Terazosin Hydrochloride Antitrust Litig.*,
   2005 WL 5955705 (S.D. Fla. Feb. 1, 2005) ........................................................6, 7

*In re Wellbutrin XL Antitrust Litig.*,
   868 F.3d 132 (3d Cir. 2017) ...........................................................................*passim*

*Intel Corp. v. Fortress Inv. Grp. LLC*,
   2020 WL 6390499 (N.D. Cal. July 15, 2020).........................................................25

*Itron, Inc. v. Benghiat*,
   2003 WL 22037710 (D. Minn. Aug. 29, 2003) ......................................................19

*Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*,
   2025 WL 1298920 (Fed. Cir. May 6, 2025) ......................................................13, 14

*Jazz Pharms., Inc. v. Becerra*,
   2024 WL 4625731 (D.D.C. Oct. 30, 2024) ..............................................................8

*King Instrument Corp. v. Otari Corp.*,
   814 F.2d 1560 (Fed. Cir. 1987)..............................................................................19

*LEGO A/S v. ZURU Inc.*,
   799 F. App'x 823 (Fed. Cir. 2020) ........................................................................19

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) ....................................................................................2

*Microsoft Mobile Inc. v. InterDigital, Inc.*,
   2016 WL 1464545 (D. Del. Apr. 13, 2016).............................................................24

*Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*,
   615 F.2d 1372 (5th Cir. 1980) ...............................................................................32

*Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*,
   979 F.2d 1579 (3d Cir. 1992)..................................................................................31

*No Spill LLC v. Scepter Can., Inc.*,
   2022 WL 1078435 (D. Kan. Apr. 6, 2022)..............................................................25

*Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*,
   688 F.3d 766 (Fed. Cir. 2012)................................................................................28

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)................................................................................9

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007)........................................................................19

*Peckham v. Cont'l Cas. Ins. Co.*,
895 F.2d 830 (1st Cir. 1990)..............................................................................3

*Perma Life Mufflers v. Int'l Parts Corp.*,
392 U.S. 134 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ...............................................................18

*Pharm. Corp. of Am. v. Askari*,
2022 WL 3697342 (3d Cir. Aug. 26, 2022)......................................................19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)....................................................................................26, 27

*Rochester Drug Co-op., Inc. v. Braintree Lab'ys*,
712 F. Supp. 2d 308 (D. Del. 2010)..................................................................23

*Rossi v. Standard Roofing, Inc.*,
156 F.3d 452 (3d Cir. 1998)................................................................................4

*Safeway Inc. v. Abbott Lab'ys*,
761 F. Supp. 2d 874 (N.D. Cal. 2011) ..............................................................20

*Shuffle Tech. Int'l LLC v. Sci. Games Corp.*,
2017 WL 3838096 (N.D. Ill. Sept. 1, 2017) .....................................................26

*Staley v. Gilead Scis., Inc.*,
2020 WL 5507555 (N.D. Cal. July 29, 2020)...................................................25

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)............................................................................................3

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011).........................................................................26

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
2021 WL 1907501 (E.D. Pa. May 12, 2021).....................................................20

*Zenith Elecs., LLC v. Sceptre, Inc.*,
2015 WL 12765633 (C.D. Cal. Feb. 5, 2015)....................................................25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969)............................................................................................4

**STATUTES**

35 U.S.C. § 284 ............................................................................................................19

**RULES**

Fed. R. Civ. P. 8(a)(2) ................................................................................................20

## I.    INTRODUCTION

Discovery unearthed compelling evidence that supports every element of Avadel's antitrust counterclaims. Jazz knew that its U.S. Patent No. 8,731,963 ("'963 patent") should never have been listed in the Orange Book. *Infra* at 23, 25-30. But it did so anyway—despite having warned investors that its REMS practices may be found anticompetitive by the FTC and despite having been previously accused of wrongfully listing REMS patents to block competitors. *Id.* Jazz maintained that listing for as long as possible, knowing that it was impeding FDA approval, all in an effort to delay competition from Avadel. The effort worked. Narcolepsy patients were denied a clinically superior drug for well over a year, while Jazz enjoyed monopoly profits.

The fact that Jazz engaged in exclusionary conduct by listing the '963 patent has already been established. D.I. 267 at 12-13. At trial, Avadel will show that Jazz had monopoly power in a well-defined relevant market. Avadel will also introduce evidence that it would have been ready and able to launch LUMRYZ in April 2022 were it not for the delay in FDA approval caused by the '963 patent. Jazz does not move for summary judgment on any of these grounds.

Instead, Jazz seeks to avoid trial on the flimsiest of grounds. It rehashes arguments that orphan drug exclusivity ("ODE") and U.S. Patent No. 11,147,782 ("the '782 patent") mean that Avadel could not have entered the market any sooner than it did in the real world. These arguments run head on into genuine disputes of material fact and are based on incorrect legal positions that the Court has properly rejected. Jazz musters an argument that its drug-drug interaction ("DDI") patents also deprive Avadel of standing, but it concedes that FDA had resolved any DDI-related issues a year before the agency approved LUMRYZ in the real world. Hence, they could not possibly be an independent bar.

All that remains are Jazz's efforts to stretch the *Noerr-Pennington* doctrine to cover the anticompetitive consequences of its unlawful patent listing—which it concedes is beyond *Noerr*

1

immunity—and to flip the burden on its deficient affirmative defense that its wrongful listing was somehow both objectively reasonable and motivated by a good faith effort to comply with the law. There is a complete failure of proof in support of Jazz's defense, while *Noerr* has no bearing on the anticompetitive actions challenged in this case. Jazz's motions should be denied.

## II.    LEGAL STANDARD

Summary judgment should be denied when disputed facts "could lead a reasonable jury to find in favor of the nonmoving party."[1] *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). As the movant, Jazz is entitled neither to inferences drawn in its favor nor to ask the Court to weigh evidence. *Id.* All reasonable inferences must be drawn in Avadel's favor. *Id.*

## III.   THE COURT SHOULD DENY JAZZ'S MOTION FOR SUMMARY JUDGMENT NO. 1 REGARDING ANTITRUST STANDING

Antitrust standing requires plaintiffs to "show that they have suffered an antitrust injury and that they are the proper parties to bring suit." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co*., 29 F.4th 337, 347 (7th Cir. 2022). Jazz does not contest Avadel's antitrust standing on the latter ground. Nor does Jazz dispute that improperly listing and maintaining a patent in the Orange Book to "delay FDA approval" of a competitor "creates the anticompetitive effect that the antitrust laws were designed to prevent, and therefore constitutes antitrust injury." *In re Suboxone Antitrust Litig*., 2017 WL 4910673, at *13 (E.D. Pa. Oct. 30, 2017).

Jazz's motion is directed to causation—the requirement that a plaintiff show "the defendant's antitrust violation was a 'material cause' of the plaintiff's injury." *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 627 (E.D. Pa. 2011). Jazz asks the Court to find, as a matter of law, that its listing and refusal to delist the '963 patent—which resulted in an automatic stay of

---

[1] Unless otherwise noted, all quoted material is cleaned up.

FDA approval—did not harm Avadel at all. It asks the Court to find that Jazz's unlawful patent listing did not delay FDA approval of LUMRYZ by even a single day on the theory that Jazz's ODE, its DDI patents, and the '782 patent are fully independent causes of Avadel's injury.

Causation, however, is an intensely factual issue "best left to the jury." *Flonase*, 798 F. Supp. 2d at 627 (quoting *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 257 (3d Cir. 1999)); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566 (1931) (causation is "for the jury to be determined as a fact"); *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) ("[c]ausation questions [are] normally grist for the jury's mill"). Jazz does not come close to establishing the absence of a genuine dispute of fact on causation.

### A. Jazz Is Not Entitled to Summary Judgment Based on ODE

Jazz leads its motion by presenting exactly the same argument that it raised unsuccessfully two years ago. *See* D.I. 247 at 16-19. The Court should deny Jazz's motion for at least the same three reasons as before: (1) FDA took only eight weeks to grant ODE after Jazz was forced to delist the '963 patent; (2) FDA does not decide ODE, as a matter of policy, until an NDA is otherwise finally approvable; and (3) FDA's decision to grant ODE to LUMRYZ was based on evidence submitted to the agency before the PDUFA date. D.I. 94 at 16. As the Court properly held, these three "disputed issues are sufficient to establish that there is a genuine dispute of material fact regarding when FDA would have approved Avadel's NDA for LUMRYZ but for Jazz's listing of the '963 patent." *Id.* at 17. Discovery has not resolved these disputes in Jazz's favor.

### 1.    Three facts require denial of Jazz's motion.

Genuine disputes of material fact surround Jazz's extreme position that the '963 patent listing "did not plausibly delay" LUMRYZ's approval "***by a single day***." D.I. 48-1 at 3. Jazz's

motion fails because, drawing all reasonable inferences in Avadel's favor, a jury could reasonably find that FDA would have granted ODE to LUMRYZ before May 1, 2023 but for Jazz's illegal patent listing. Three facts require denial of Jazz's summary judgment motion.

First, OOPD granted ODE to LUMRYZ within just eight weeks of Jazz's delisting action. Counter Statement of Facts in Opp'n to Jazz Mot. No. 1 ("CSOF 1") ¶¶ 8, 12. That fact alone creates a powerful inference that the improper listing delayed FDA approval. *See* D.I. 14 ¶¶ 96-97; *In re Seroquel XR Antitrust Litig.*, 2025 WL 992004, at *3 (D. Del. Apr. 2, 2025) ("In an antitrust case, a party's conduct in the real world constitutes evidence from which the jury can infer that the party would have engaged in the same conduct in the but-for world."); *see also In re K-Dur Antitrust Litig.*, 686 F.3d 197, 222 (3d Cir. 2012) (agreeing that real-world conduct "gives rise to the inference" of the same conduct in the but-for world).

Jazz suggests that FDA would have needed more time beyond the PDUFA date of October 15, 2021, to decide ODE. But that argument goes to the damages period, not to liability, and thus provides no basis for granting summary judgment on antitrust standing. *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir. 1998) ("[Plaintiff's] burden of proving the fact of damage . . . is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages." (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n. 9 (1969))); *see also Callahan*, 182 F.3d at 247 ("[A]t the summary judgment stage, the court's main concern should be with determining loss and causation in general, rather than proof of specific amounts of damages").

Second, OOPD does not decide ODE until an NDA is otherwise finally approvable. CSOF 1 ¶ 7. This is FDA's policy for good reason. As FDA explained to Avadel in May 2022:

█████████████████████████████████████

[REDACTED]

Ex. 41,[2] at -513. Hence, OOPD did not—and could not—decide ODE while the Office of Chief Counsel was assessing between October 15, 2021, and May 24, 2022, whether Avadel had to certify to the '963 patent. *See id.*; *see also* A3912 (in its July 18, 2022, decision tentatively approving LUMRYZ, [REDACTED]

[REDACTED]

[REDACTED] ). And the same is true during the automatic stay of FDA approval from July 15, 2022, until it ended with the delisting in late February 2023. For these reasons, a jury could readily determine that Jazz's '963 patent listing did indeed delay OOPD's ODE decision point as to LUMRYZ.

Third, and contrary to Jazz's suggestion, FDA did ***not*** rely on any post-PDUFA date evidence to justify its decision to grant ODE to LUMRYZ on May 1, 2023 (the "May 2023 Decision"). Instead, the May 2023 Decision was based on materials that were available to the agency as of the PDUFA date and would have readily enabled FDA to reach the same conclusion at that earlier time. The rationale relied upon by OOPD was straightforward: "waking up to take a second dose of Xyrem and Xywav is antithetical to the goal of improving sleep." A4190-91.[3] [REDACTED]

[REDACTED]

[REDACTED] . In its May 2023 Decision, FDA mentioned materials postdating October 2021 only

---

[2] Unless otherwise noted, all exhibits cited herein are to the concurrently filed Declaration of Daniel M. Silver, Esq in Support of Avadel's Opposition to Jazz's Motions for Summary Judgment and *Daubert* Motions.

[3] All citations marked "A__" are from Jazz's Appendix of Exhibits in Support of Jazz's Motions for Summary Judgment and Omnibus Daubert Motion, D.I. 260-65.

in non-substantive citations in the "Introduction" and "Factual Background" sections. *See* A4164-76. Based on that evidence, a rational jury could conclude that OOPD would have reached the same conclusion, only sooner, but for the impediment created by the '963 patent listing. *See Seroquel*, 2025 WL 992004, at *3; *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 5955705, at *4 (S.D. Fla. Feb. 1, 2005); *see also K-Dur*, 686 F.3d at 222.

Jazz argues that FDA cited an April 29, 2023, memorandum from sleep experts from FDA's Center for Devices and Radiological Health (the "Sleep Team Consult") in the May 2023 Decision, which in turn "cited multiple sources published in 2022, after the [PDUFA] date." D.I. 247 at 13. But the Sleep Team Consult and May 2023 Decision cite post-October 2021 sources only to support basic facts about sleep that were well known to FDA—and, indeed, to the public—in October 2021. For example, they cite documents from 2022 to support the following propositions: "[a]dequate sleep is essential for humans as it physically and psychologically restores bodily functions"[4]; "[w]ithout adequate sleep, humans function poorly and may die prematurely"[5]; and "[n]arcolepsy is a disorder of REM intrusion into wakefulness."[6] The notion that FDA did not know those facts before May 1, 2023—or could not have cited literature to support those facts as of the PDUFA date—is absurd. And a jury likewise could conclude in any event that absent the '963 patent barrier, those consults would have occurred in Fall 2021 and approval would have promptly followed. *See, e.g.*, A0043-48; A0084-85; A1525-26.

As this Court has correctly assessed, these three facts—which at the time were alleged and now are firmly established by the record—"raise[] a genuine issue of material fact." D.I. 94 at 16.

---

[4] A2592 & n.45;.A2647 & n.6.

[5] A2592 & n.46; A2647 & n.7.

[6] A2594 & n.67; A2651 & n.31.

### 2.    Additional evidence supports a jury question on ODE timing.

This Court need not proceed any further to deny Jazz's motion. But Avadel has amassed substantially more evidence that OOPD would have granted ODE to LUMRYZ sooner than it did.

For example, Avadel will introduce supportive testimony from three experts—one of whom, Marla Scarola, Jazz does not challenge. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

Beyond expert testimony, there are probative statistics. For LUMRYZ's PDUFA VI submission cohort (i.e., Original Standard Non-NME NDAs submitted in Fiscal Year 2021), FDA took action on or before the Goal Date **93%** of the time. CSOF 1 ¶ 2; A0090 ¶ 39. Avadel's burden at trial is merely to show, by a preponderance of the evidence, that FDA would have approved LUMRYZ (which would have required granting it ODE) earlier in the but-for world. Indeed, Jazz's

---

[7] Courts regularly permit qualified experts to testify "as to what reasonable FDA officials... would have done" in the but-for world. *In re Diet Drugs*, 2001 WL 454586, at *19 (E.D. Pa. Feb. 1, 2001). Such testimony is not "speculative"—especially when, as here, an expert simply predicts that FDA would have "earlier" made "the exact same [decision] in the 'but for' world that it eventually [made] in the real world." *Terazosin*, 2005 WL 5955705, at *4 .

██████████████████████████████████████████████████

███████████████ CSOF 1 ¶ 10—a jury is entitled to conclude that Jazz itself recognized that the '963 patent was the critical impediment to prompt approval of LUMRYZ.

This mountain of evidence is more than sufficient to create a fact question for the jury.

### 3.    Jazz's remaining arguments as to ODE lack merit.

First, Jazz argues that the LUMRYZ NDA raised a "complex" ODE issue that delayed FDA's review—namely, whether LUMRYZ was clinically superior to Xyrem and Xywav on the basis of major contribution to patient care ("MCTPC"). *See* D.I. 247 at 17-18. However, in support of this contention, Jazz solely relies on an FDA policy—OOPD's Standard Operating Procedures and Policies ("SOPP")—stating that review of an NDA is ***automatically*** "considered complex" when "[t]he same drug has previously been approved for the same use or indication." A4211. The term "complex," as used in the SOPP, is not coextensive with "time-consuming"; it simply means that some NDAs designated as "complex" might trigger additional discretionary layers of review that are not usually necessary in non-complex NDAs.[8] *See*  A4211-13; *Jazz Pharms., Inc. v. Becerra*, 2024 WL 4625731, at *23 (D.D.C. Oct. 30, 2024) (upholding FDA approval of LUMRYZ and noting that the SOPP "indicate[s] some degree of discretion"). Thus, whether OOPD internally designated the LUMRYZ NDA as "complex" has little or no bearing on whether OOPD could have decided ODE by the PDUFA date—particularly where, as here, the benefits of

---

[8] Jazz notes that, according to the SOPP, ODE review "***may*** take more time to allow appropriate coordination with the Review Division(s) within the Centers." *See* D.I. 247 at 17 (emphasis modified) (quoting A4208. That language is plainly discretionary, and there is no evidence that OOPD ever invoked the SOPP with respect to the LUMRYZ NDA—and certainly not to justify delaying LUMRYZ's approval and grant of ODE 18.5 months past the PDUFA date.

once-nightly dosing to patients suffering from narcolepsy are straightforward.[9]

Second, Jazz argues that a 10-month timeline for resolution of an ODE clinical superiority issue would have been unprecedented. *See* D.I. 247 at 19-20. That claim is incorrect—FDA has previously resolved clinical superiority in less than six months.[10] ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Moreover, Jazz's argument ignores that FDA commits to meeting PDUFA dates in 90% of NDA reviews—a target that the agency *exceeded* in 2021. *See* A1392-93 at 89:21-90:3; A0090 ⁋ 39. And even if Jazz were correct that a 10-month timeline was unprecedented, it would merely suggest that FDA needed *some* amount of time beyond the PDUFA date to decide ODE. That argument goes to damages, not liability.

Third, Jazz invokes *In re Lipitor Antitrust Litig.*, 2024 WL 2866654 (D.N.J. June 6, 2024). But that case has no bearing on the question here. *Lipitor* did not involve ODE at all, much less a

---

[9] As OOPD determined, Avadel's experts will explain, and common sense dictates, LUMRYZ offers a compelling benefit over other oxybate drugs for narcolepsy patients (who suffer from fragmented sleep) because "waking up to take a second dose of Xyrem and Xywav is antithetical to the goal of improving sleep." A4190-91. Indeed, DN1 recognized as early as November 2017 that a once-nightly drug would "clearly" provide a MCTPC compared to Jazz's twice-nightly drugs." A2577-78. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████

[10] *See* CSOF 1 ¶ 3. The court can take judicial notice of the timelines of these official FDA actions, which are publicly available on FDA's website and through SEC filings. *See Freed v. St. Jude Med., Inc.*, 2017 WL 4102583, at *2 n.13 (D. Del. Sept. 15, 2017) ("Courts in this District regularly take judicial notice of FDA records," including "FDA's published reports posted on FDA's website"); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (a court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC").

patent listing (or any form of challenged conduct) that prevented FDA from making a timely ODE decision. Here, Jazz's listing delayed the ODE determination, and FDA quickly granted ODE on grounds that were equally available to the agency as of the PDUFA date once that obstacle to approval was removed.

Jazz attempts to stretch *Lipitor* to support its meritless position that, if OOPD would not have granted ODE to LUMRYZ by the PDUFA date, it would not have done so at any point before May 1, 2023. *See* D.I. 247 at 19. That is, of course, wrong. Jazz cannot point to approval by the PDUFA date as an "all or nothing" proposition. Moreover, in *Lipitor*, FDA had set an informal "target date," which the agency actually met. *See id.* at *27. The *Lipitor* plaintiffs argued that FDA would have granted the relevant NDA ***sooner*** than that target date, notwithstanding that the NDA sponsor faced numerous obstacles to securing approval, including a criminal investigation, multiple amendments to the NDA that forced FDA to restart its review, and FDA's determination that the sponsor had engaged in "a pattern and practice of submitting untrue statements of material fact" requiring FDA to "delay[ ]" acting on the NDA for about two years. *See id.* at *2, 8, 13, 21, 17-18. Even putting those crucial differences aside, the "target date" at issue in *Lipitor* was ***not*** a PDUFA date, but a purely informal target. *See id.* at *29. By contrast, PDUFA dates are set pursuant to a statutory regime that requires FDA to report compliance rates to Congress. COSF 1 ¶¶ 1-2, 4. Notably, FDA met its PDUFA targets for over 90% of NDAs in the same category as LUMRYZ in 2021. COSF 1 ¶¶ 3-4.

In short, the evidentiary record requires denial of Jazz's motion. As this Court has already held, Jazz's ODE-related causation argument raises disputed questions of fact. That ruling applies *a fortiori* now, given the additional evidence—including the expert testimony of former senior FDA officials—that discovery has yielded in support of Avadel's claims.

### B.  Jazz Is Not Entitled to Summary Judgment Based on its DDI Patents

Jazz improperly argues that its DDI patents operated as a regulatory barrier that completely bars Avadel's antitrust counterclaims. D.I. 247 at 1, 23-24. But Jazz concedes that "FDA did . . . resolve that [DDI labeling] issue . . . [by] May 2022, six months after the goal date." *Id.* at 23. Hence, Jazz cannot show that DDI patents "barred Lumryz's FDA approval and its lawful market entry at all relevant times." *Id.* at 1.

To establish antitrust standing, Avadel need merely show by a preponderance of the evidence that, but for Jazz's unlawful patent listing, LUMRYZ would have entered the market earlier than June 5, 2023. *See In re K-Dur*, 2008 WL 2660776, at *4 (D.N.J. Feb. 21, 2008) ("Injury-in-fact is not Mount Everest. . . . A plaintiff's burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful act; inquiry beyond this minimum point goes only to the amount and not the fact of damages."). Whether LUMRYZ would have been approved on the PDUFA date or at some other date before May 1, 2023, only impacts the extent of Avadel's damages—and the damages period is ***not*** an issue on which Jazz has moved for summary judgment. *See, e.g., In re EpiPen Antitrust Litig*., 545 F. Supp. 3d 922, 1019-20 (D. Kan. 2021) (defining the relevant "delay damages" period as being *between* the alleged "but for" entry date and the date the generic was ultimately launched in a case involving the delayed entry of generic EpiPen).

Jazz concedes that FDA informed Avadel that the LUMRYZ labeling was acceptable in May 2022.[11] D.I. 247 at 23. That was nine months before Jazz delisted the '963 patent and almost an entire year before FDA finally approved LUMRYZ. Thus, even if the but-for approval date

---

[11] The review package published by FDA following the approval of LUMRYZ in fact shows that the labeling was deemed acceptable in October 2021. *See* Ex. 93, FDA-Jazz-000084.

were May 2022, it would mean that Jazz's improper patent listing delayed Avadel's launch of LUMRYZ by a year. Avadel would still have suffered antitrust injury and, therefore, summary judgment must be denied.

Further, ample evidence would support a jury finding that FDA would have approved the label for LUMRYZ in time for an April 2022 launch, were it not for the '963 patent listing. Discovery has revealed that FDA had completed its substantive evaluation of the labeling for LUMRYZ—with respect to DDI-related carve-out issues—*before* the PDUFA date. FDA completed an analysis of the DDI issues by October 14, 2021. *See* Ex. 93, FDA-Jazz-000084.

████████████████████████████████████████████████████████████

████████████████████████[12]

Construed in the light most favorable to Avadel, the record would clearly permit the jury to find that the label for LUMRYZ was not a source of delay independent of the '963 patent listing.

### C.  Jazz Is Not Entitled to Summary Judgment Based on the '782 Patent

This Court has correctly held that "a plaintiff advancing a delayed market-entry theory under Section 2 of the Sherman Act may be able to show that a valid and infringed blocking patent does not break the causal chain between the plaintiff's injury and the defendant's allegedly anticompetitive conduct by showing that the plaintiff's infringing product would have entered the relevant market notwithstanding the defendant's patent." D.I. 94 at 21.  As detailed below, the evidence on which the Court denied Jazz's narcolepsy injunction motion alone establishes that Jazz would not have "obtained an injunction blocking Avadel's launch of LUMRYZ in

---

[12] Jazz cannot seriously contest this critical fact—its ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

April 2022." D.I. 182. Should the Court conclude that whether Jazz would have obtained an injunction in the but-for world entails a factual question, however, then Avadel has adduced more than sufficient evidence to create an issue for the jury.

**1.   The '782 patent has not allowed Jazz to exclude competition from LUMRYZ in the actual world.**

The '782 patent claims a formulation of sodium oxybate that includes a modified release portion in a sachet. It was issued on October 19, 2024, four days after FDA's target action for LUMRYZ, and was thus unknown to Avadel during FDA's regular review period. The '782 patent has not excluded competition from LUMRYZ, which is a branded, clinically superior drug—not a generic. This is not surprising. Expert discovery revealed that no U.S. court has *ever* enjoined a drug that FDA determined to be clinically superior, least of all where the patentee does not practice the claimed invention. Ex. 45, at 7; A0168-70.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ "Instead, the court determined that Jazz is entitled to a reasonable royalty for Avadel's ongoing sales of Lumryz for narcolepsy." *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 2025 WL 1298920, at *3 n.5 (Fed. Cir. May 6, 2025). Jazz did not appeal the Court's denial of its injunction request for narcolepsy. *Id*.

LUMRYZ brought much-needed competition, offering narcolepsy patients the first-ever oxybate drug that allows for an undisturbed night's sleep ██████████████████████

██████████████████████████████. A2058-59 at 77:22-78:5; A2060 at 82:12-83:3, 85:3-13. Jazz now moves for summary judgment, claiming that this competition has no value within the meaning of the antitrust laws because of its '782 patent. D.I. 247. It asserts that any "launch that infringes a defendant's patent is not legal," D.I. 247 at 24, ignoring that the Court

declined to enjoin the sale of LUMRYZ to narcolepsy patients and that a jury awarded a reasonable royalty of 3.5% to compensate Jazz for past sales of the formulation claimed by that patent.

### 2.    The '782 patent would not have stopped the launch of LUMRYZ.

The Court's analysis of *Wellbutrin* remains correct in all respects. D.I. 94 at 17-22. Sufficient facts exist to show that "an injunction would not have issued against the plaintiff's infringement, and [that] the plaintiff would have entered the relevant market even if it had to pay a hypothetical damages award for its infringement." *Id.* at 21. Jazz's recurring argument that the '782 patent deprives Avadel of antitrust standing is wrong for multiple reasons.

Jazz cannot get summary judgment because real-world events show that "an injunction would not have issued against [Avadel's alleged] infringement" in a world in which the '963 patent had never been listed or had been timely delisted. D.I. 94 at 21; D.I. 189 at 6-9.

███████████████████████████████████████████████████████████

And even if Jazz had pointed to evidence that it would have made a different choice in the but-for world (which it has not), its real-world decision not to seek an injunction to stop the launch itself creates a fact question for the jury. *See, e.g.*, *Seroquel*, 2025 WL 992004, at *3 ("[A] party's conduct in the real world constitutes evidence from which [a] jury can infer that the party would have engaged in the same conduct in the but-for world.").

███████████████████████████████████████████████████████████

████████████████████████████████████████████████ As to the first, expert testimony supports a finding that there would have been a substantial question as to validity. A0381 ¶ 20; A0382 ¶¶ 22-23; A0383 ¶ 28. As to the second, LUMRYZ was only eligible to be approved with ODE, *see infra* at 17, and thus, in the but-for world, its clinical superiority alone would have been sufficient to preclude an injunction of either sort as the public interest would be disserved by denying those patients access to a clinically superior drug. Ex. 44, at 3. At

a minimum, this evidence creates a fact question regarding whether Jazz could have stopped the launch of LUMRYZ, thus requiring denial of Jazz's motion. ███████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████

      █████████████████████████████████

██████████████████████████████████████

██████ D.I. 247; D.I. 184. But no amount of contortion allows Jazz to frame its *failure* to get an injunction preventing competition from LUMRYZ as evidence (let alone dispositive evidence) that it would have received an injunction that "prevented market entry" in the but-for world. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 165 (3d Cir. 2017). The evidence shows otherwise. *See* A0166-170; D.I. 189 at 4-9.

The rationale of the Court's injunction order clearly shows that LUMRYZ would not have been enjoined in the but-for world. *See* A0166-170; Ex. 45, at 16-21. To try to get around this, Jazz pretends that, in the but-for world, LUMRYZ would not have gotten ODE in time for an earlier launch. D.I. 247 at 26-27. This makes no sense. As explained above, there is a genuine dispute of material fact regarding ODE. *See supra* at 3-11. Jazz cannot get summary judgment by assuming away a question of fact for the jury (i.e., the ODE grant date in the but-for world) to concoct a world in which it may have gotten an injunction. Jazz's assumption would mean that FDA would not have approved LUMRYZ any sooner in the but-for world, such that there would have been no earlier launch for Jazz to try to enjoin—rendering Jazz's assertion entirely circular.

Indeed, the evidence shows that the FDA only granted approval to LUMRYZ because it qualified for ODE. *See* A2583-84; A1845-46 at 161:12-162:3. Again, the FDA's actions in the

real world are sufficient evidence of what would have occurred in the but-for world, and a jury can (and surely will) reasonably conclude that the FDA would have approved LUMRYZ by granting it ODE prior to the real-world approval date of May 1, 2023.

### 3. The Court's rulings are consistent with *Wellbutrin*.

Rather than accept the Court's reading of *Wellbutrin*, Jazz seeks immunity from antitrust liability based on a patent that may have granted it the right to a reasonable royalty—but ***not*** the right to exclude competition from a clinically superior drug. This is a critical distinction, which the Court correctly recognized. D.I. 94 at 20.

First, contrary to Jazz's suggestion that the Third Circuit was somehow "presented with [the same] argument [that Avadel raises here,]" D.I. 247 at 25, the Court was right to observe that the Third Circuit in *Wellbutrin* faced neither the factual scenario nor the legal question presented in this case. There was no argument—let alone showing—separate from infringement and validity that the courts would have denied the patentee, Andrx, its requested injunction against the generic drugs in that case, thus allowing them to compete on payment of reasonable royalty. D.I. 108 at 6-9. The Third Circuit observed that, beyond infringement and validity, "[n]either the Appellants nor GSK identify any other evidence in the record that speaks to the possible outcomes of the Anchen-Andrx litigation." *Wellbutrin*, 868 F.3d at 169. Here, we know key outcomes of the patent litigation—████████████████████████ its request to permanently enjoin Avadel's clinically superior drug was denied. And the evidence supports a jury finding that Avadel would have entered, and competed in the market sooner, but for Jazz's unlawful patent listing. *See, e.g.*, A0007-08 ¶¶ 23-25; A0024 ¶ 91; A1327 at 139:2-4, 140:5-9; A1329 at 149:12-20; A1451-52 at 129:19-130:3; A1487 at 272:25-273:7.

Jazz observes that "the district court in *Wellbutrin* found there was a question of fact whether the alleged delayed entrant would have entered earlier." D.I. 247 at 25 (citing 868 F.3d at

165). But in observing that factual question, the Third Circuit pointed out that "want[ing] to launch" does not mean actually launching, and it made clear that the inquiry involves whether or not "the launch were stopped" due to patent law. *Wellbutrin*, 868 F.3d at 165. Thus, this Court's prior ruling is entirely consistent with *Wellbutrin*, as the facts here are sufficient to conclude that the launch was not stopped—and would not have been stopped in the but-for world.

Obviously, the only way a patentee could "stop[]" a launch and "prevent[] market entry" is by obtaining an injunction. *Id.* And that is what Andrx had sought to achieve in the real world. As the Third Circuit observed, the patentee had requested "an injunction against the sale of infringing products." *Wellbutrin*, 868 F.3d at 146, 165. If one reads the pursuit of an injunction out of the case, as Jazz does, then the holding would make no sense. The Third Circuit analogized the '708 patent in that case to absolute prohibitions on market activity, such as an FDA prohibition on importation of cheaper Canadian drugs and a Massachusetts regulatory prohibition of outdoor billboards. *Id.* at 165. As this Court pointed out, the patent-law analogue to such a categorical legal bar on sales is a court-ordered injunction. D.I. 94 at 20-21.

Notably, the Third Circuit had reason to presume the availability of injunctive relief in the event of a valid, infringed patent based on the factual record before it. Not only had the plaintiff made no factual showing independent of validity and infringement that an injunction would have been denied, thus allowing it to compete, but the allegedly delayed drugs in that litigation were generic copies of the branded drug, *Wellbutrin*, 868 F.3d at 142, and thus far more likely to be enjoined than LUMRYZ: a new, branded drug that FDA has deemed to be clinically superior.

For these reasons, this Court was entirely correct in its interpretation of *Wellbutrin* and to ask "whether Jazz would have been entitled to such an injunction at or near the Alleged Launch Date." D.I. 94 at 22. As explained above, the answer is no.

17

### 4. Jazz seeks an unprecedented ruling that would allow patentees to eliminate competition beyond the lawful scope of their patents.

No court—including *Wellbutrin*—has *ever* adopted Jazz's extreme view. As this Court has pointed out, patents do not always allow their owners to exclude competition. *Id.* at 21 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)). According to Jazz, however, a patentee that is denied an injunction could resort to any other means to exclude its competitor without fear of antitrust liability. For example, on its theory, *after* losing a motion for a preliminary injunction, Jazz could have conspired with specialty pharmacies not to distribute LUMRYZ or taken any number of *per se* unlawful actions to preserve its monopoly—and Avadel somehow would lack antitrust injury.

This position, if adopted, would be unprecedented and turn long-standing principles of antitrust standing on their head. *See, e.g.*, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) ("The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices."); *Arista Networks, Inc. v. Cisco Sys.*, *Inc.*, 2018 WL 11606358, at *7 (N.D. Cal. Feb. 14, 2018) ("[A] patent infringer may participate in the market so long as it pays damages assessed and future license fees and it is not subject to an injunction.").

Indeed, the Supreme Court has long held that wrongdoing by an antitrust plaintiff is "not to be recognized as a defense[.]" *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139–40 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). The Third Circuit itself has made clear that "an antitrust plaintiff's improper conduct d[oes] not preclude that plaintiff from asserting an antitrust claim unrelated to the improper conduct." *Wellbutrin*, 868 F.3d at 166. Here, any alleged infringement of the '782 patent is unrelated to Jazz's improper listing of the '963 patent. Moreover, a monopolist may not use its patents, as Jazz did, to unlawfully exclude competition and seek shelter behind its patent portfolio by insisting that it is

18

entitled to injunctive relief. In such circumstances, courts are particularly likely to deny an injunction, thus awarding a court-ordered license that allows for competition. *See, e.g.*, *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007).

5.    **The Court's decision to deny an injunction and the jury's reasonable royalty award licensed Avadel's competition under *Wellbutrin*.**

Jazz's argument for antitrust immunity is foreclosed by *Wellbutrin* itself on yet additional grounds. An antitrust plaintiff can demonstrate antitrust injury by showing that it "would have obtained a license" to compete in the market. *Wellbutrin*, 868 F.3d at 166. A court's decision to deny an injunction and allow competition subject to payment of a reasonable royalty *itself* operates as a license. *See, e.g.*, *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 834 (Fed. Cir. 2020). Here, the Court denied Jazz's requested injunction as to narcolepsy, and the jury awarded Jazz a 3.5% royalty "adequate to compensate" it for any past infringement. CSOF 1 ¶ 26; 35 U.S.C. § 284; *see also King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560, 1564 (Fed. Cir. 1987); *Itron, Inc. v. Benghiat*, 2003 WL 22037710, at *14 (D. Minn. Aug. 29, 2003) (paying damages results in "an implied license on its past infringing sales.").

6.    **Whether Avadel would have obtained a voluntary license to the '782 patent in the but-for world is a fact question for the jury.**

Although the Court need not address this question, as there is clearly sufficient evidence that Avadel suffered antitrust injury, a plaintiff can also show that it would have obtained a voluntary license to the allegedly blocking patent. *Wellbutrin*, 868 F.3d at 166-67.

Jazz tries to head off this additional path by claiming that it was waived because it was not expressly pleaded in Avadel's counterclaims. D.I. 247 at 27 (citing *Pharm. Corp. of Am. v. Askari*, 2022 WL 3697342, at *4-5 (3d Cir. Aug. 26, 2022)). That is incorrect. The Federal Rules merely require "a short and plain statement of *the claim* showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Voluntary licensing raises no new claim for relief—Avadel's

19

counterclaims remain monopolization and attempted monopolization. Thus, unlike in *Askari*, Avadel did not add any new claim for relief or any unpleaded theory of liability. If Jazz's position were correct, plaintiffs would have to amend their pleadings every time a development in a case introduced a new argument (as distinct from a new claim for relief). The Federal Rules do not require an amended pleading in these circumstances. *See, e.g., Safeway Inc. v. Abbott Lab'ys*, 761 F. Supp. 2d 874, 890 (N.D. Cal. 2011) ("Although GSK must plead every claim for which it seeks relief, ***it need not plead the legal theories that support liability***." (emphasis added)).

Moreover, the Federal Rules are based on notice-pleading. Jazz cannot claim any lack of notice. Jazz ***itself*** raised voluntary licensing as a means around its *Wellbutrin* argument in the first instance, and on the same day it filed its answer. D.I. 100 at 8. As of June 28, 2024, Jazz had express notice of Avadel's intent "to take discovery on" the issue of whether "Jazz and Avadel would have negotiated a voluntary license in the but-for world." D.I. 108 at 2. That preceded any depositions in this case and was months before fact discovery closed. Unsurprisingly, Jazz does not claim that it lacked any opportunity to take discovery of this issue. Thus, Jazz's claim of waiver is incorrect. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 1907501, at *13 (E.D. Pa. May 12, 2021); *Safeway*, 761 F. Supp. 2d at 891.

On the merits, Jazz argues that "Avadel has no evidence that Jazz would have voluntarily licensed the '782 patent to Avadel." D.I. 247 at 27. This is the wrong question because, unlike Andrx in *Wellbutrin*, in this case the patentee is the antitrust violator. At trial, Avadel will show that Jazz acted with monopolistic intent, pursuing every conceivable avenue to prevent competition—from listing the '963 patent to suing FDA to challenge its approval of LUMRYZ.

In analyzing the but-for world, however, the jury must assume away the antitrust violation. *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2022 WL 14865281, at

*5 n.7 (E.D.N.Y. Oct. 26, 2022); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 56 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019). Far from "a nonsensical concept," as Jazz claims, D.I. 247 at 28, monopolistic intent is an element of Avadel's counterclaims.[13] Hence, the relevant factual question for the jury is whether a reasonable company in Jazz's position, ***not*** acting with monopolistic intent, ("RCIJP") would have likely licensed the '782 patent to Avadel.

In support of that showing, Avadel will introduce testimony of Dr. Fintan Walton, an expert with decades of experience in patent-licensing deals in the pharmaceuticals industry.  A0007 ¶ 23; A0930 ¶¶ 53-54; A0935 ¶¶ 70-71. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████.

---

[13] In particular, 'specific intent to monopolize' is an element of an attempted monopolization claim under Section 2 of the Sherman Act. *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007); *see also id.* at 308.

A jury has already decided that Jazz and Avadel would have negotiated a 3.5% royalty on the eve of infringement. Absent an injunction, which was not a realistic outcome—*see* A0166-70 ¶¶ 107-16; A1083-99 ¶¶ 41-52—a RCIJP would have rationally negotiated a reasonable royalty upfront rather than litigating for years to get to the same outcome. A0942-43 ¶ 93. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. The jury could reasonably conclude, based on this evidence and testimony, that a RCIJP would have licensed the '782 patent to Avadel.

## IV.    THE COURT SHOULD DENY JAZZ'S MOTION FOR SUMMARY JUDGMENT NO. 2 REGARDING ANTITRUST LIABILITY

Jazz's second summary judgment motion—styled as being directed to "antitrust liability" —is, in fact, two motions based on two different affirmative defenses: *Noerr-Pennington* immunity and the regulatory compliance defense. *See* D.I. 99 at 63, 65. Neither has merit.

### A.   *Noerr-Pennington* Does Not Shield Jazz's Anticompetitive Conduct

The anticompetitive conduct at issue here is Jazz's decision to list, and refusal to delist, the '963 patent. None of those actions involved petitioning the government. The fact that Jazz filed this lawsuit to trigger an automatic stay is not relevant to this issue. The delay stems from the improper listing—without it, the filing of this case by Jazz would have had no effect. *See In re Lantus*, 950 F.3d 1, 14 (1st Cir. 2020) (an "improper Orange Book listing" could be a "material or substantial cause of [antitrust] injury"). Absent the listing, there would have been no certification to the '963 patent and FDA's Office of Chief Counsel would not have had to delay the agency's review by over half a year analyzing whether to require Avadel to certify, taking Jazz's incorrect use code at face value.

A jury will surely conclude that the '963 patent listing impeded timely approval. In fact, Jazz knew that the patent listing was the source of delay. 

Counter Statement of Facts in Opp'n to Jazz Mot. No. 2 ("CSOF 2") ¶ 1.

CSOF 2 ¶ 2.

In short, the improper listing was exclusionary conduct and the root cause of LUMRYZ's delayed launch. Jazz's effort to stretch *Noerr* to immunize wrongful patent listings would render antitrust a dead letter, and is not supported by law. Even if *Noerr* had some potential application here, ample evidence would support a finding that Jazz listed its patent fraudulently.

### 1.    The *Noerr-Pennington* doctrine has no bearing on this case.

*Noerr* provides no protection for Jazz's improper listing. As this Court already held, "a defendant's decision to list its patent in the Orange Book is not 'petitioning activity' entitled to *Noerr-Pennington* immunity." D.I. 94 at 7; *see also Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 321 n.14 (D. Del. 2010). Indeed, Jazz did not deny this at the motion to dismiss stage. *See* D.I. 28 at 8.

Jazz resorts to mischaracterizing Avadel's counterclaims as challenging merely the lawsuit that triggered the automatic stay of FDA approval. D.I. 247 at 28. But Avadel's pleading is clear that "Jazz's listing and maintenance of the '963 patent in the Orange Book have delayed the FDA's final decision on approval of Avadel's NDA for LUMRYZ by over a year, already." D.I. 14 ¶ 55; *see also id.* ¶¶ 95, 97-99, 117, 137. Indeed, Avadel alleged that, "even before it filed this lawsuit, Jazz wrongly delayed the launch of LUMRYZ by listing the '963 patent and then maintaining that listing." *Id.* ¶ 93.

The lawsuit merely gave Jazz the automatic stay that its improper listing made possible.

*Id.* ¶ 44. Indeed, filing that complaint served no other purpose: Jazz had already filed a separate lawsuit alleging that Avadel infringed the '963 patent, and Jazz waited over two months before even serving the complaint that triggered the automatic stay. *Id.* ¶ 94. The lawsuit itself falls within an exception to *Noerr*—both because it derived from a fraudulent patent listing and it formed part of a larger anticompetitive scheme—but that does not change the fact that the delisting and refusal to delist were independently unlawful and harmed competition. The Court should deny Jazz's motion on that ground alone. *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017) ("The mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct."); Ex. 43, *Intell. Ventures I LLC v. Capital One Fin. Corp.*, No. 18-1367 (Fed. Cir.) (Docket No. 41) (FTC/DOJ Amicus Br. at 20) (*Noerr-Pennington* does not protect anticompetitive patent-related conduct "from antitrust liability simply because the patent holder subsequently engages in protected litigation activity.").

### 2.    Avadel is entitled to damages stemming from the lawsuit.

*Noerr* also does not prevent Avadel from recovering damages from **both** Jazz's improper patent listing and the stay-triggering lawsuit (even if *Noerr*-protected). Most courts, including in this District, allow damages stemming from a lawsuit that was filed further to an anticompetitive scheme. *See Hynix Semiconductor Inc. v. Rambus, Inc*., 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007); *see also Microsoft Mobile Inc. v. InterDigital, Inc*., 2016 WL 1464545, at *3 (D. Del. Apr. 13, 2016) ("find[ing] the reasoning in *Hynix* persuasive"); *10x Genomics, Inc. v. Vizgen, Inc.*, 681 F. Supp. 3d 252, 269 (D. Del. 2023) (applying *Hynix*).[14] Here, there is (1) "an explicit linkage

---

[14] *See also No Spill LLC v. Scepter Can., Inc.*, 2022 WL 1078435, at *6 (D. Kan. Apr. 6, 2022); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1145-46 (N.D. Cal. 2020); *Intel Corp. v. Fortress Inv. Grp. LLC*, 2020 WL 6390499, at *15-16 (N.D. Cal. July 15, 2020); *Arista Networks, Inc. v. Cisco Sys., Inc*., 2018 WL 11230167, at *9 (N.D. Cal. May 21, 2018); *Funai Elec. Co. v.*

between [the] antitrust violation and the litigation"—i.e., the most obvious of causal connections between Jazz's unlawful patent listing and stay-triggering lawsuit—and (2), at a minimum, a genuine factual dispute regarding whether the patent listing "independently produce[d] anticompetitive harm[.]" *See Hynix*, 527 F. Supp. 2d at 1095, 1097. Accordingly, Avadel is entitled to receive all damages caused by both Jazz's improper listing and the stay-triggering lawsuit.[15]

### 3.    There is a factual dispute as to *Walker Process* fraud

Jazz's motion also should be denied because of a genuine factual dispute regarding the *Walker Process* exception to *Noerr*. It applies where "a party with intimate legal knowledge about a patent has made knowingly false statements about its scope to" the FDA. *In re Buspirone Pat. Litig.*, 185 F. Supp. 2d 363, 374 (S.D.N.Y. 2002); D.I. 94 at 6.

Jazz all but concedes that discovery unearthed "smoking gun" evidence that ***Jazz knew the '963 patent claims a distribution system, not a method of using Xyrem***. *See* D.I. 247 at 30. Jazz insists that its public position has consistently been that the '963 patent claims a method of use (as if the gulf between Jazz's internal and external views were anything other than inculpatory). But that effort reveals yet further contradictions, making the inference of fraud all the more compelling. Viewed in the light most favorable to Avadel, the record supports a finding that Jazz knowingly

---

*LSI Corp.*, 2017 WL 1133513, at *6 (N.D. Cal. Mar. 27, 2017); *Zenith Elecs., LLC v. Sceptre, Inc.*, 2015 WL 12765633, at *6 n.2 (C.D. Cal. Feb. 5, 2015); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012).

[15] Judge Chen's opinion in *Staley*, previously referenced by the Court when it declined to reach this issue, D.I. 94 at 14, does not counsel against applying *Hynix*. There, the court found *Hynix* inapplicable to a petition to FDA for a patent term extension (PTE) because there was no "exercise of market power through litigation – e.g., relying on a patent to bring patent infringement cases." *Staley v. Gilead Scis., Inc.*, 2020 WL 5507555, at *19 (N.D. Cal. July 29, 2020). In *Staley*, there was no lawsuit at all—the alleged scheme consisted of the PTE and the defendant's "intentional delay" in developing a new drug. *Id.* at *12-13. But here Jazz's maintenance of monopoly power through a wrongful listing and subsequent stay-triggering lawsuit is exactly the issue for which it claims immunity.

and falsely stated to FDA that the '963 patent claims a method of use and that Jazz knew its use code submission was false.[16]

### a.  Jazz knew that the '963 patent claims a distribution system

Seeking to avoid *Walker Process,* Jazz asserts as an undisputed fact that it "***consistently maintained***, from the moment that it listed the patent until the Federal Circuit's affirmance of this Court's *Markman* ruling, that the '963 patent claims were directed to methods of using Xyrem." D.I. 247 at 31. This is demonstrably incorrect.

Putting aside that Jazz's internal documents identify the '963 patent as a "distribution system" patent, *see* CSOF 2 ¶¶ 3-4, Jazz's CEO and even its attorneys themselves have previously acknowledged the obvious—the '963 patent claims a distribution system, not a method of use— including during calls with investors and before the PTAB. Mr. Cozadd, for example, told investors in 2016 (two years after the '963 patent listing) that Jazz had "initiated litigation against Roxane on our '963 patent, a ***restricted distribution system patent.***" CSOF 2 ¶ 5. Referring to an IPR filed by generic competitors, Mr. Cozadd stated that the '963 patent is "***directed to the***

---

[16] Jazz relies on *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011), claiming that intent to deceive must be "the single most reasonable inference" from the evidence. Not only is the record here clear that Jazz intended to deceive, but *Therasense* did not involve summary judgment on a *Walker Process* claim. Rather, it "was an appeal from a bench trial" setting "forth the standard for proving inequitable conduct at trial." *Alcon Rsch., Ltd. v. Apotex, Inc.*, 2013 WL 2244338, at *8 (S.D. Ind. May 21, 2013); *see also Shuffle Tech. Int'l LLC v. Sci. Games Corp.*, 2017 WL 3838096, at *11 (N.D. Ill. Sept. 1, 2017) (noting that "Federal Circuit decisions addressing *Walker Process* claims in the wake of *Therasense* do not cite to that decision" and "omit the requirement that fraudulent intent must be the 'single most reasonable inference' that can be drawn from the evidence."). Applying the single-most-reasonable-inference standard at summary judgment would be inconsistent with the requirement to "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But, even if the Court applied *Therasense*, Jazz's authority provides that the standard is whether "the evidence, viewed in the light most favorable to [Avadel], must show that no reasonable trier of fact could find that 'the specific intent to deceive is the single most reasonable inference able to be drawn.'" *DeCurtis LLC v. Carnival Corp.*, 2023 WL 2071915, at *7 (S.D. Fla. Feb. 8, 2023). Jazz cannot satisfy this standard.

*restricted distribution system for Xyrem*" CSOF 2 ¶ 6; *see id.* ¶¶ 7–8. In those proceedings, Jazz's attorneys stated that "Claims 24, 26, and 27 of the '963 patent claim ***computer-implemented systems*** for treating a narcoleptic patient with a prescription drug that has a potential for misuse, abuse, or diversion." CSOF 2 ¶ 9. Only subsequently did Jazz and its attorneys realize the litigation benefits of adhering to the fiction that a patent that expressly claims a "computer-implemented system" and does not contain a single claim with the word "method" or that recites any step is actually directed to a method of using Xyrem.

Stretching credibility, Jazz claims that it used the terms "distribution system" and "method of use" interchangeably. Jazz's internal documents—and its CEO's remarks on earnings calls—belie that expedient claim. Jazz repeatedly distinguished between method-of-use patents and distribution system patents, including in the context of the '963 patent. *See* CSOF 2 ¶¶ 3–4, 8. The inference that Jazz seeks in its favor is extraordinarily generous, and is clearly improper when it is the party moving for summary judgment. *See Reeves*, 530 U.S. at 150, 152 (district court erred by "fail[ing] to draw all reasonable inferences in favor of" the non-moving party).

Ultimately, Jazz has provided ***no evidence*** that it decided to list the '963 patent because it believed the patent claimed a method of use. Jazz instead asserted privilege and blocked all discovery into its decision-making. Indeed, the evidence allows a jury to conclude that Jazz knew that its misdescription of the '963 patent claims was likely to fail—███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████. CSOF 2 ¶ 2.

**b.  Jazz knew that its use code for the '963 patent was false.**

A reasonable jury also could conclude that Jazz knowingly submitted a false use code.

The '963 patent claims a "***computer-implemented system***" comprising "one or more computer memories" and a "data processor." D.I. 269 ¶ A-4. But the use code Jazz submitted describes the patent as claiming a "***method of treating a patient*** with a prescription drug using a computer database in a computer system for distribution." D.I. 269 ¶ A-7. ██████████████

████████████████████████████████████████████████████████████

████████████████████████████; *see also Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 688 F.3d 766, 768 (Fed. Cir. 2012). Obviously, the use code here is not "the same as the claim language" and does not accurately describe any method-of-use claim.

Jazz recycled this false use code from the '730 patent, the parent patent of the '963 patent. It was the second use code submitted for the '730 patent after Roxane, the first ANDA filer for Xyrem, alleged that the patent was improperly listed. *See* D.I. 269 ¶ A-5. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ *with id.* ¶ 11 (Claim 1 reciting "[a] computerized method of distributing a prescription drug under exclusive control of an exclusive central pharmacy"). ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. 

In the intervening 11 months, nothing in the claim language of the '730 patent or the Xyrem label changed that could conceivably justify changing the use code. What changed is that Roxane

asserted a delisting counterclaim alleging that Jazz had improperly listed the '730 patent. *See* D.I. 269 ¶ A-5. Although Jazz has asserted that the reasons for this use code change are privileged, *see* CSOF 2 ¶ 14, at this stage of the proceedings, Avadel is entitled to the reasonable inference that Jazz changed the use code in response to Roxane's claim that the patent was improperly listed.

### c.   Jazz listed the '963 patent to harm competition

A reasonable jury could also conclude that Jazz listed the '963 patent not because it genuinely believed it was required to do so by law, but rather to exclude competitors. In February 2014, three months before listing the '963 patent, Jazz disclosed in its SEC filings that the "FTC has been paying increasing attention to the use of REMS by companies selling branded products" and the possibility that "the FTC or others could claim that our REMS or other practices are being used in an anticompetitive manner." Jazz noted that the REMS statute "states that a REMS shall not be used by an NDA holder to block or delay generic drugs from entering the market. Two of the ANDA applicants have asserted that our patents covering the distribution system for Xyrem should not have been listed in the Orange Book, and that the Xyrem REMS is blocking competition." D.I. 269 ¶ A-6.

Why would Jazz list and maintain the '963 patent under these circumstances? ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. Maintaining exclusivity was paramount. ██████████

████████████████████████████████████████████████████████████

████████████████████. CSOF 2 ¶ 17.



D.I. 269 ¶ A-11.

Viewing all of this evidence in the light most favorable to Avadel, a reasonable jury could conclude—including under the *Therasense* standard—that Jazz knowingly and falsely described the '963 patent as claiming a method of use. There is a genuine dispute of material fact regarding the *Walker Process* exception and summary judgment must be denied.

### B.   Jazz Cannot Prevail on Its Regulatory Compliance Defense

Jazz provides no support for its position that it is Avadel's burden to prove that listing the '963 patent was not merely wrongful, but also objectively unreasonable. *See* D.I. 247 at 33 n.6. Nor could it. D.I. 267 at 12-14. The reasonableness inquiry is part of Jazz's regulatory compliance defense, which puts the burden on Jazz to prove that "(1) [it] objectively 'had a reasonable basis in regulatory policy to conclude' that its actions were required by regulation, and (2) [it] subjectively 'in good faith concluded' that its actions were required by regulation.'" *In re Actos Antitrust Litig.*, 628 F. Supp. 3d 524, 534 (S.D.N.Y. 2022); *see also Lantus*, 950 F.3d at 13. In moving for summary judgment on its own affirmative defense, Jazz must "establish the absence of a genuine factual issue." *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1582 (3d Cir. 1992). It cannot do so for either element of this defense.

### 1.   There is a genuine factual dispute regarding objective reasonableness.

Jazz provides no reason why this Court should reconsider its holding that there is "a genuine dispute of material fact regarding whether Jazz had a reasonable basis to conclude that it was required to list the '963 patent." D.I. 94 at 9. Jazz contends the Court "already determined that Jazz's claim construction position was reasonable." D.I. 247 at 33. Jazz misreads the Court's opinion. The Court considered Jazz's decision to file the instant action in the context of the sham litigation exception to *Noerr*, which concerns whether a "reasonable litigant could realistically expect success on the merits." D.I. 94 at 11-12. Whether Jazz could succeed on the merits of its patent claim depends on infringement and validity, not whether the '963 patent was properly listed.

With respect to the reasonableness of *listing* the '963 patent, the Court noted that it "is not convinced that Jazz's incorrect interpretation of Section 314.53 was 'objectively reasonable.'" D.I. 94 at 10. Indeed, the Court found that the claims of the '963 patent, "on their face, do not recite any method steps." Ex. 47, at 7. Moreover, to determine whether a patent listing is objectively reasonable courts look to a variety of factors including (1) whether a defendant's misinterpretation is of an ambiguous regulation is plausible, (2) whether that misreading is "consistent with the 'regulatory policy' underlying those provisions", (3) "whether others in the industry had adopted the same misinterpretation, as evidenced by 'custom and practice'" and (4) "whether 'any legal opinions' supported the defendant's misinterpretation." *In re Actos Antitrust Litig.*, 2025 WL 1001259, at *20 (S.D.N.Y. Mar. 31, 2025). Jazz has not addressed any of these factors despite having the burden to show the absence of any genuine fact issue. *See Nat'l State Bank*, 979 F.2d at 1582. That alone is reason to deny Jazz's motion.

At a minimum, there is a genuine factual dispute regarding "custom and practice" in the industry. ███████████████████████████████████████

███████████████████████████████████████

31

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████. *See Actos*, 2025 WL 1001259,

at *25 (denying summary judgment due to fact disputes regarding industry practice).

### 2. Jazz has not proved, and cannot prove, subjective good faith.

Jazz now concedes that its regulatory compliance defense requires proof of subjective good faith. *See* D.I. 247 at 34. This element "requires examining whether a defendant acted out of a subjective belief that its conduct was required by regulatory law, as opposed to for 'competitive' reasons." *Actos*, 2025 WL 1001259, at *20; *see also In re La. Real Est. Appraisers Bd.*, 2019 WL 2118885, at *5 (F.T.C. May 6, 2019). Jazz therefore has the burden to prove that, when it listed the patent in 2014 and when it decided to maintain that patent listing, it did so because it believed in good faith that its actions were compelled by law, rather than because of competitive reasons or business considerations. *Id.* at *5.

There is simply no evidence in the record to satisfy the subjective good-faith element. Jazz points solely to attorney statements prepared in response to Avadel's patent listing dispute before FDA in 2019 and in pleadings opposing Avadel's delisting motions. *See* D.I. 247 at 34. Jazz's reliance on self-serving statements made in litigation nearly a decade after it decided to list the '963 patent cannot satisfy its burden. This is precisely the type of *post hoc* rationalization that the subjective, good-faith element is designed to prevent. *See Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1380-81 (5th Cir. 1980) (requiring proof of subjective good faith and an "assessment of [the defendant's] alleged monopolistic purpose or intent" because "it may also be possible to rationalize a decision whose purpose is anticompetitive."). Allowing Jazz to argue good faith based solely on its public-facing litigation position—where Jazz has blocked

discovery into its listing decisions and discovery has revealed that Jazz has both internally and externally contradicted its current public position—would eviscerate the good-faith element.

Rather than produce any evidence of what actually motivated its listing and refusal-to-delist decisions, Jazz closed the door to any discovery of that issue. ████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ Jazz's absolute failure of proof defeats Jazz's motion for summary judgment, and requires the Court to grant Avadel's cross-motion for summary judgment on the subjective good-faith element of Jazz's defense. And the wealth of statements made by Jazz describing the '963 patent as claiming a system at worst create an issue of fact on that score. *See supra* at 26–29.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Jazz's motions for summary judgment.


                                                Respectfully submitted,

Dated: May 23, 2025                             MCCARTER & ENGLISH, LLP

                                                /s/ *Daniel M. Silver*
OF COUNSEL:                                        Daniel M. Silver (#4758)
                                                   Alexandra M. Joyce (#6423)
Kenneth G. Schuler                                 Renaissance Centre
Marc N. Zubick                                     405 North King Street, 8th Floor
Alex Grabowski                                     Wilmington, DE 19801
Sarah W. Wang                                      (302) 984-6300
LATHAM & WATKINS LLP                               dsilver@mccarter.com
330 North Wabash Avenue, Suite 2800                ajoyce@mccarter.com
Chicago, IL 60611
(312) 876-7700                                     *Attorneys for Defendant*
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

Ian R. Conner

Alan J. Devlin
Anna Rathbun
Christopher J. Brown
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, D.C. 20004
(202) 637-2200
ian.conner@lw.com
alan.devlin@lw.com
anna.rathbun@lw.com
christopher.brown@lw.com

Herman Yue
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
herman.yue@lw.com

Alfred C. Pfeiffer
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 395-8898
al.pfeiffer@lw.com

Daralyn J. Durie
Rebecca E. Weires
Tannyr Pasvantis
Eliot A. Adelson
Margaret A. Webb
Helen He
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6055
ddurie@mofo.com
rweires@mofo.com
tpasvantis@mofo.com
eadelson@mofo.com
mwebb@mofo.com
hhe@mofo.com

Kira A. Davis
Henry Huttinger
Katherine E. McNutt

MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5200
kiradavis@mofo.com
hhuttinger@mofo.com
kmcnutt@mofo.com

Alexander Okuliar
Haydn Forrest
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037, USA
(202) 887-1500
aokuliar@mofo.com
hforrest@mofo.com

Matthew C. Has
POLSINELLI
100 South Fourth Street, Suite 1000
St. Louis, MO 63102
mhans@polsinelli.com