# EXHIBIT 50

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

# Summary Memorandum

| Date | May 22, 2019 |
|---|---|
| From | Philip H. Sheridan, MD<br>Nick Kozauer, MD<br>Eric Bastings, MD |
| Subject | Summary Memorandum |
| NDA/BLA # Supplement# | 21446 (S-036)<br>22488 (S-014) |
| Applicant | Pfizer Inc. |
| Date of Submission | August 27, 2018 (Major Amendment December 3, 2018) |
| PDUFA Goal Date | May 29, 2019 |
| Proprietary Name / Non-Proprietary Name | Lyrica (pregabalin) |
| Dosage form(s) / Strength(s) | Capsules: 25 mg, 50 mg, 75 mg, 100 mg, 150 mg, 200 mg, 225 mg, 300 mg; Oral solution: 20 mg/mL |
| Applicant Proposed Indication(s)/Population(s) | Treatment of partial-onset seizures as adjunctive therapy for patients 1 month of age and older |
| Recommendation on Regulatory Action | Approval |

Reference ID: 4437434

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

# 1.    Background

Lyrica (pregabalin) was approved for adjunctive therapy in the treatment of partial-onset seizures in adult patients with epilepsy aged 17 years and older in June 2005. Lyrica was subsequently approved for the same indication in patients 4 years of age and older in 2018. The anticonvulsant mechanism of action for pregabalin may be related to its high affinity binding to the alpha2-delta site (an auxiliary subunit of voltage-gated calcium channels).

These supplemental applications seek to extend the current indication for both the capsule and oral solution formulations of pregabalin for the adjunctive treatment of partial-onset seizures (POS) to include pediatric patients down to 1 month of age based on a randomized, double-blind, placebo-controlled pediatric clinical trial  (Study A0081042). These supplemental applications, along with the supplements previously approved in 2018 (for the adjunctive treatment of partial-onset seizures (POS) to include pediatric patients down to 4 years of age), also fulfill a pediatric Written Request and Pediatric Research Equity Act (PREA) postmarketing requirements as discussed in Section 9 of this memo.

In a Type C Meeting in October 2017, the applicant asked to split this supplement into two parts, 2a and 2b. The applicant proposed to submit (as part 2a) sufficient information to fulfill their Pediatric Written Request (PWR) and PREA requirements prior to the PWR deadline of September 28, 2018, and prior to patent expiration in December 2018. The applicant proposed to submit (as part 2b) the remainder of the application necessary to allow for a new pediatric indication in patients 1 month to < 4 years of age, pending final data analysis from the conclusion of Study A0081042. The Agency agreed to this proposed plan and part 2a was submitted on August 27, 2018. At the time Part 2a application was filed, it was determined that the applicant did fulfill their PWR.  On December 3, 2018, the applicant submitted Part 2b as a Major Amendment to extend the pediatric treatment indication down to 1 month of age, thus extending the PDUFA deadline by 3 months, to May 29, 2019.

# 2.    Product Quality

The primary CMC reviewer was Dr. Richard Matsuoka.

No new product quality information was submitted.

Since this submission had no updates/changes to the approved product quality information for pregabalin (NDA 21446 and NDA 22488), this submission is adequate from a product quality perspective.

# 3.    Nonclinical Pharmacology/Toxicology

No new data submitted or required.

2

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

# 4.    Clinical Pharmacology

The Office of Clinical Pharmacology (OCP) review was performed by reviewers Dr. Michael Bewernitz and Dr. Dawei Li, with Dr. Kevin Krudys and Dr. Angela Men as Team Leaders.

The OCP review evaluated the acceptability of the proposed dose in patients from 1 month to < 4 years of age. Although the pharmacokinetic (PK) study (A0081074) and efficacy trial (A0081042) were open to enrollment of patients in this entire age range, the applicant was only able to enroll two patients toward the lower end of the age range (3.29 months of age in placebo arm, 3.84 months of age in the 14 mg/kg/day arm). Therefore, PK simulations were used to support dosing in this age range.

The OCP review concluded that the proposed maintenance dose (maximum of 14 mg/kg/day divided evenly and administered three times daily [TID]) is acceptable in patients 1 month to < 4 years of age based on the following considerations:

- Using different models of renal maturation, simulated exposures for the highest proposed dose level of 14 mg/kg/day TID in the subpopulation of patients age 1 to < 4 months are expected to be less than or within the range of exposures already demonstrated to be safe and effective in the older pediatric population and adults.

- Dosing begins at a low dose (3.5 mg/kg/day) and titration to the maximum dose (14 mg/kg/day) is likely to occur over a duration of several weeks. Titration based on tolerability and efficacy is expected to provide appropriate individualization for these patients. The most common adverse reaction during titration is somnolence, which is monitorable. Furthermore, titration in a patient 1-month of age can occur over a period of 6 weeks, during which time further renal maturation will proceed. The patient will be nearly 3 months of age once titration is complete, and thus nearly the age of the youngest patients in Trial A0081042.

- The total daily dose was administered TID for all patients in Trial A0081042.

The OCP review concluded that the applicant's proposed dosing regimen (as presented in Table 1 below) is acceptable.

**Table 1: Proposed Lyrica Dosage Schedule for Pediatric Patients Age 1 Month to < 4 Years Old for POS**

| Age and Body Weight | Recommended Initial Dosage | Recommended Maximum Dosage | Frequency of Administration |
|---|---|---|---|
| Adults (17 years and older) | 150 mg/day | 600 mg/day | 2 or 3 divided doses |
| Pediatric patients (b) (4) <br><br> Weighing *30 kg or more* | 2.5 mg/kg/day | 10 mg/kg/day (not to exceed 600 mg/day) | 2 or 3 divided doses |

3

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

| Age and Body Weight | Recommended Initial Dosage | Recommended Maximum Dosage | Frequency of Administration |
|---|---|---|---|
| Pediatric patients 4 years to younger than 17 years of age Weighing *less than 30 kg* | 3.5 mg/kg/day | 14 mg/kg/day | 2 or 3 divided doses |
| Pediatric patients 1 month to younger than 4 years of age | 3.5 mg/kg/day | 14 mg/kg/day | 3 divided doses |

*During titration period, increase approximately weekly based on response and tolerability.*

The OCP review recommends approval and agrees with the applicant's proposed weight-based dosing for pediatric patients ages 1 month to < 4 years. I concur.

# 5.    Clinical Microbiology

No new data submitted or required.

# 6.    Clinical / Statistical - Efficacy

A single placebo-controlled clinical trial, Study A0081042, was submitted with the application, and intended to support the efficacy of the product for the adjunctive treatment of POS in patients 1 month to less than 4 years of age.

**Controlled Study A0081042**

The efficacy data from controlled trial A0081042 were reviewed by the statistical reviewers, Dr. Xiangmin Zhang, Dr. Kun Jin (Biometrics team lead), and Dr. Helen Ming Hung. Dr. Emily Freilich conducted the clinical efficacy review.

**Study Design**

Study A0081042 was a multi-center randomized, double-blind, placebo-controlled, parallel-group, 3-arm clinical study to evaluate the efficacy, safety, and tolerability of pregabalin in patients 1 month through < 4 years of age. Accounting for an approximately 10% discontinuation rate, approximately 123 patients were originally planned to be randomized in a 2:2:1 ratio to a placebo group, a 7 mg/kg/day pregabalin group, or a 14 mg/kg/day pregabalin group.

The study consisted of a five-day double-blind dose escalation period, a nine-day double-blind fixed dose treatment period, and a seven-day double-blind taper period. The total duration of the double-blind treatment phase was 21 days.

During the study, two 48-hour Video-Electroencephalogram (EEG) evaluations were performed: one at the baseline and the other at the end of the fixed-dose treatment period. One of the inclusion criteria of Study 1042 was that patients must have at least two partial

4

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

onset seizures, as determined by the investigator or designee during the 48-hour Video-EEG at baseline. Patients that were randomized but subsequently determined by the central reader to have less than two partial-onset seizures were allowed to continue the study. However, a central reader evaluated the Video-EEG data to determine the number of seizures for efficacy evaluation.

The primary efficacy endpoint was the change from baseline to Visit 6 in the 24-hour EEG seizure rate, as determined by the central reader. The 24-hour EEG seizure rate was defined as the number of seizures during the 48-hour EEG divided by the number of hours of Video-EEG monitoring then multiplied by 24 hours.

**Statistical Methods**

The efficacy analysis population was the modified intent-to-treat (mITT) population, defined as all randomized patients who took at least one dose of study drug during the double-blind treatment period, have a baseline with at least one partial onset seizure identified by Video-EEG, and a follow-up Video-EEG.

The primary endpoint of 24-hour EEG seizure rate was transformed on a logarithmic scale after adding a value of 1. Log(24-hour EEG seizure rate + 1) was analyzed using a linear model that included log(24-hour EEG seizure rate + 1) at baseline as the covariate and treatment, age at randomization (< 1 years, 1-2 years of age, > 2 years of age), and geographic region (North America + Europe + Middle East, Asia Pacific, Rest of the World) as effects.

In order to control the overall type I error, tests of the two doses were planned in the following order, each step at the two-sided significance level of 0.05:

Step 1. Test equal treatment of pregabalin 14 mg/kg/day vs placebo.
Step 2. Test equal treatment of pregabalin 7 mg/kg/day vs placebo.

A blinded sample size re-estimation using the method described in Keiser and Friede (2011) [1] was planned to be conducted when approximately two thirds of the patients had completed the study.


**Results**

Demographic characteristics of the enrolled patients indicated that the treatment groups appeared similar in terms of age, sex, and race. The average age of the enrolled patients was 28.2 months (standard deviation (SD) = 12.6 months). Overall, there were more male patients in the study (59%). The majority of the enrolled patients were white (68.6%).

The total number of patients randomized were 175 and the total number of patients in the mITT efficacy analysis population was 140.

5

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

Table 2, reproduced from the Biometrics review, summarizes the results of the primary efficacy analysis:

**Table 2: Primary Efficacy Results from Study A0081042 (mITT population)**

| Visit | | Pregabalin 7 mg/kg/day (N=59) | Pregabalin 14 mg/kg/day (N=28) | Placebo (N=53) |
|---|---|---|---|---|
| Baseline | n | 59 | 28 | 53 |
| | Min | 0.5 | 0.3 | 0.3 |
| | Median | 1.73 | 1.86 | 1.37 |
| | Max | 5.5 | 3.8 | 4.0 |
| | Mean | 2.03 | 1.86 | 1.66 |
| | 95% CI of Mean | (1.73, 2.33) | (1.49, 2.23) | (1.40, 1.91) |
| | SD | 1.157 | 0.945 | 0.920 |
| | | | | |
| DB Phase | n | 59 | 28 | 53 |
| | Min | 0.0 | 0.0 | 0.0 |
| | Median | 1.57 | 0.87 | 1.19 |
| | Max | 5.7 | 3.5 | 4.5 |
| | Mean | 1.81 | 1.10 | 1.36 |
| | 95% CI of Mean | (1.49, 2.12) | (0.69, 1.51) | (1.03, 1.69) |
| | SD | 1.219 | 1.065 | 1.193 |
| | LS Mean | 1.69 | 1.15 | 1.58 |
| | 95% CI of LS Mean | (1.46, 1.92) | (0.83, 1.47) | (1.32, 1.83) |
| | Standard error | 0.115 | 0.163 | 0.129 |
| | | | | |
| | Versus Placebo (log) | | | |
| | LS Mean Difference | 0.11 | -0.43 | |
| | 95% CI of LS Mean Difference | (-0.19, 0.42) | (-0.80, -0.06) | |
| | Standard error | 0.153 | 0.185 | |
| | p-value | 0.4606 | 0.0223 | |

Source: Table 13 in the clinical study report body

As depicted in the table, the Biometrics review confirms that patients treated with pregabalin 14 mg/kg/day had, on average, a 43.9% greater reduction in the rate of partial-onset seizures than patients treated with placebo (p=0.02).

For the key secondary endpoint, pediatric patients treated with pregabalin 14 mg/kg/day showed a numerical (but not statistically significant) improvement in responder rates (≥50% reduction in partial-onset seizure frequency) compared with placebo (53.6% versus 41.5%).

Patients treated with pregabalin 7 mg/kg/day did not show improvement relative to placebo for either endpoint.

The Biometrics review observes that the efficacy results appeared to be disproportionally affected by the results in three foreign study centers. The biometrics review further notes that after removing data from any one of the three centers, the pregabalin-placebo comparisons no longer reached statistical significance. However, the review finds that removing data from any one of the three centers would reassuringly still provide results favoring the pregabalin 14 mg/kg/day group. For example, the overall percentage of seizure rate reduction relative to placebo was 43.9%. This percentage would change to 41%, 40%, or 36.5%, if Center 1069, Center 1084, or Center 1209, respectively, was removed. A data audit of one of these sites (Dr. Yulia Karakulova, M.D., Ph.D.) by the

6

Reference ID: 4437434

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

Office of Scientific Investigation did not identify any concerns that would impact the interpretability of the results from that site.

The statistical reviewers, Dr. Xiangmin Zhang and Dr. Kun Jin, concluded, "Based on the statistical evidence from Study A0081042, pregabalin appears effective as adjunctive therapy for children 1 month through < 4 years of age with partial onset seizures." Dr. Freilich similarly concludes that the efficacy data provided in the application support approval.

I agree with the statistical and clinical reviewers' conclusion. Additionally, a single positive efficacy study is sufficient to support approval for children 1 month through < 4 years of age as the already established efficacy of pregabalin for the adjunctive treatment of POS in patients 4 years of age and older provides confirmatory evidence.

# 7. Safety

The safety data in this submission were reviewed by Dr. Emily Freilich, clinical reviewer.

The primary sources of safety data were the following:

- Study A0081042: A double-blind, placebo-controlled, parallel-group, multicenter study of the efficacy and short-term safety of pregabalin as adjunctive therapy in children 1 month to <4 years of age with POS.

- Study A0081075: A 12-month, open-label extension study evaluating the safety and tolerability of flexible doses of pregabalin in pediatric patients with POS who had previously participated in pharmacokinetic study A0081074.

- Study A0081106: A 12-month, open-label extension study evaluating the safety and tolerability of pregabalin as adjunctive therapy in pediatric patients 1 month to 16 years of age with POS and pediatric and adult patients 5 to 65 years of age with primarily generalized tonic-clonic (PGTC) seizures.

Dr. Freilich's review comments that, because there was a single placebo-controlled study (Study 1042) and two open-label extension studies (Studies 1075 and 1106) which lacked comparators, the data from all 3 studies were not pooled for the majority of the analyses. The three safety populations (including patients age 3 months to < 4 years) analyzed were controlled data from Study 1042 (n = 175), controlled/uncontrolled data from the safety pool of all three studies 1042, 1075, and 1106 (n = 182), and safety data from Phase 1 PK study 1074 (n = 26).

7

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

## 7.1. Deaths

There were no deaths in Study 1042.

Four patients died during the long-term extension studies (Studies 1075 and 1106). None of the deaths were assessed by the investigators, applicant, or Dr. Freilich as causally related to pregabalin.

## 7.2. Nonfatal Serious Adverse Events

There were 5 serious adverse events (SAEs) during Study 1042, as noted in Table 3 below from Dr. Freilich's review, with only one of these events in a patient on pregabalin (a case of pneumonia in a patient on 14 mg/kg/day).

**Table 3: Treatment-Emergent Adverse Events - Safety Analysis Set**

|  | Pregabalin 7 mg/kg N = 71 n (%) | Pregabalin 14 mg/kg N = 34 n (%) | Placebo N = 70 n (%) | Total N = 175 n (%) |
|---|---|---|---|---|
| TEAEs | 32 (45.1) | 17 (50.0) | 38 (54.3) | 87 (49.7) |
| SAEs | 0 | 1 (2.9) | 4 (5.7) | 5 (2.9) |
| Severe AEs | 0 | 0 | 0 | 0 |
| Discontinued due to AEs | 0 | 0 | 1 (1.4) | 1 (0.6) |

*Source: Adapted from Study 1042 CSR Table 17, clinical reviewer- verified*

None of the SAEs led to discontinuation from the study. The SAEs are briefly described below, including one patient who was randomized to pregabalin 14 mg/kg/day and 4 patients who were randomized to placebo.

In the long-term extension studies, there were 33 patients who had SAEs. The only SAEs that occurred in more than one patient were pneumonia, seizure, asthma, and status epilepticus. Three of these patients, with SAEs of status epilepticus, seizures, and thrombocytopenia, were permanently discontinued from the studies. The case of thrombocytopenia was subsequently determined to be a laboratory error.

The incidence and character of the SAEs did not appear to be substantially different from what has been previously reported in the adult clinical trials. No new safety signals were identified.

## 7.3. Dropouts and Discontinuations

No patients in either pregabalin group discontinued treatment due to TEAEs. There was one patient in the placebo group who discontinued treatment after a TEAE of vomiting.

8

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

In the long-term open-label extensions, three patients discontinued due to SAEs.

No new safety signals were identified by the applicant or by Dr. Freilich.

## 7.4. Common Adverse Events

Table 4 below lists all dose-related adverse reactions occurring in at least 2% of all pregabalin-treated patients. Dose-relatedness was defined as an incidence of the adverse event in the 14 mg/kg/day group that was at least 2% greater than the rate in both the placebo and 7 mg/kg/day groups. In this study, 105 patients received pregabalin and 70 patients received placebo for up to 14 days.

**Table 4. Dose-related Adverse Reaction Incidence in a Controlled Trial in Adjunctive Therapy for Partial-Onset Seizures in Patients 1 Month to Less Than 4 Years of Age**

| Body System Preferred Term | 7 mg/kg/day [N=71] % | 14 mg/kg/day [N=34] % | All PGB [N=105] % | Placebo [N=70] % |
|---|---|---|---|---|
| **Nervous system disorders** | | | | |
| Somnolence* | 13 | 21 | 15 | 9 |
| **Infections and infestations** | | | | |
| Pneumonia | 1 | 9 | 4 | 0 |
| Viral infection | 3 | 6 | 4 | 3 |

Abbreviations: N=number of patients; PGB=pregabalin.
*    includes related terms including lethargy, sluggishness, and hypersomnia.

The types of TEAEs were similar to those reported in the adult clinical trials. Although incidence rates cannot be directly compared between the short-term controlled adult studies and the long-term open-label pediatric studies, there did not appear to be a substantial difference in rates of reported events to raise a concern for a new or unique safety signal in the pediatric population.

## 7.5. Adverse Events of Interest

The following adverse events were prospectively identified to be of interest for pregabalin and the pediatric patient population.

- Dizziness
- Somnolence
- Edema
- Weight gain
- Vision-related events
- Ataxia
- Tremor

9

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

- Cognitive/neuropsychiatric events including behavioral effects (behavior/aggression, concentration/personality changes, or hyperkinesia)
- Euphoric effects
- Suicidal ideation and behavior

Dr. Freilich did not identify and new safety signals with respect to the preceding list of AEs.

## 7.6. Laboratory Findings/Vitals/ECG

No clinically meaningful changes in laboratory assessments, vital signs, weight, or ECGs were identified by Dr. Freilich.

## 7.7. Safety by Age Group

Dr. Freilich did not identify any significant differences in the incidence or quality of TEAEs across the age groups.

With regard to age representation in the pivotal controlled trial (Study 1042), Dr. Freilich discussed in her review that there are no patients under 4 months of age who received pregabalin during the double-blind treatment phase. There were only a few patients under 1 year of age in all treatment arms of the study. The applicant is proposing an indication down to 1 month of age. Although there is decreased renal clearance in patients 1 to 3 months of age, the clinical pharmacology reviewer has addressed the safety of the starting dose based on the PK simulations provided by the applicant for this age group (discussed above). Furthermore, from a clinical perspective, there are no safety concerns that would preclude using the drug in patients age 1 month to less than 4 months of age, given the conservative approach in labeling to dosing (starting at a low dose and titrating up to a maximum dose based on tolerability and clinical response). The most common adverse event is dose-dependent somnolence, which would be able to be monitored for, and, given the dose titration schedule, even the youngest patients at 1 month of age would be closer to 3 months of age by the time they reached the maximum dose. The conservative dosing regimen in labeling also accommodates interpatient variability. Therefore, there are no safety concerns to expanding the indication down to the youngest age at which POS can be diagnosed, i.e., 1 month.

## 7.8. Postmarketing Experience

Based on the available postmarketing reports from limited use in pediatric patients less than 4 years of age, there were no new safety signals identified.

Reference ID: 4437434

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

### 7.9 Overall Safety Conclusion by the Clinical Reviewer

I agree with Dr. Freilich's conclusion that there are no new safety concerns identified with the use of pregabalin in the pediatric population and that the safety data from the current application support an approval for the adjunctive treatment of POS in patients 1 month to less than 4 years of age.

# 8. Advisory Committee Meeting

This application was not referred for review to an advisory committee because the clinical trial design was acceptable, the efficacy findings were clear, and the safety profile of pregabalin is acceptable for the proposed indication.

# 9.  Pediatrics

The submission was discussed with the Pediatric Review Committee (PeRC) on May 1, 2019.

The January 4, 2010, approval letter for Lyrica Oral Solution (NDA 22488) includes the following deferred PREA postmarketing requirements:

1576-2    Deferred pediatric study under PREA, a randomized, double-blind, placebo-controlled study to evaluate the efficacy, pharmacokinetics, and safety of pregabalin in pediatric patients with partial onset seizures ages 1 month through 3 years of age, inclusive.

Upon review of the current application, the above requirement has been fulfilled.

The June 10, 2005, approval letter for Lyrica capsules (NDA 21724) and the January 4, 2010, approval letter for Lyrica Oral Solution (NDA 22488) include the following deferred PREA postmarketing requirements:

1359-4:   Deferred pediatric study under PREA for the treatment of partial onset seizures in pediatric patients ages 1 month [44 weeks gestational age] to 16 years.

1576-4:   Deferred pediatric study under PREA, a 12-month open label extension study to evaluate the safety of pregabalin in pediatric patients with partial onset seizures ages 1 month through 16 years, inclusive.

Upon review of the current application (combined with the previous supplemental applications approved in 2018 for pediatric 4 to 16 years of age), these deferred PREA postmarketing requirements for studies conducted in the age group of 4 to 16 years have been fulfilled.

Reference ID: 4437434

Summary Memorandum
Lyrica (pregabalin) NDA 21446 (S-036) and NDA 22488 (S-014)

**Pediatric Written Request**

A pediatric Written Request (WR) was originally issued on June 8, 2005, and amended on October 17, 2006, July 30, 2010, September 26, 2013, and March 23, 2017. These supplemental applications (combined with the previous supplemental applications approved in 2018 for pediatric 4 to 16 years of age) fulfill the requirements of this amended WR for studies conducted in the age group of 1 month to 16 years.

# 10.  Labeling

See the final negotiated product label.  Labeling negotiations with the applicant have been completed and the applicant has accepted all recommended changes.

# 11.  Postmarketing

The approval letter will reiterate that there is a postmarketing requirement listed in the December 30, 2004 (NDA 21446), June 10, 2005 (NDA 21724), and January 4, 2010 (NDA 22488), approval letters that remains open:

1118-1 & 1359-1: Complete an adequate and well-controlled clinical study or studies to better assess the ophthalmologic effects of pregabalin.

# 12.  Recommendations/Risk Benefit Assessment

The applicant has provided substantial evidence of effectiveness for the adjunctive use of pregabalin capsules and oral suspension in pediatric patients aged 1 month to less than 4 years with POS, based on a randomized, double-blind, placebo-controlled pediatric clinical trial (Study A0081042).

Safety for the pediatric population was analyzed in a total of 182 patients 3 months to 3 years of age with POS that were treated with pregabalin in controlled Study A0081042 or open-label extension Studies A0081075 and A0081106. There are no new safety concerns identified with the use of pregabalin in the proposed pediatric population.  There are no outstanding unresolved issues.

The risk-benefit profile of pregabalin for the proposed indication in the proposed population is acceptable and supports the approval of the application.

Reference ID: 4437434

----------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

----------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

PHILIP H SHERIDAN
05/22/2019 05:23:19 PM

NICHOLAS A KOZAUER
05/22/2019 05:24:19 PM

ERIC P BASTINGS
05/22/2019 05:38:42 PM
I concur.

# EXHIBIT 51

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

**(Mark One)**

☒    **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

### For the quarterly period ended June 30, 2010

or

☐    **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

### For the transition period from          to

### Commission File Number: 001-33500

# JAZZ PHARMACEUTICALS, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **05-0563787** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3180 Porter Drive**
**Palo Alto, CA 94304**
**(650) 496-3777**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☐    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of August 2, 2010, 38,855,779 shares of the registrant's Common Stock, $.0001 par value, were outstanding.

Table of Contents

**JAZZ PHARMACEUTICALS, INC.**
**QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2010**
**INDEX**

| | | **Page** |
|---|---|---|
| **PART I – FINANCIAL INFORMATION** | | 3 |
| Item 1. | Financial Statements | 3 |
| | Condensed Consolidated Balance Sheets – June 30, 2010 and December 31, 2009 | 3 |
| | Condensed Consolidated Statements of Operations – Three and Six Months Ended June 30, 2010 and 2009 | 4 |
| | Condensed Consolidated Statements of Cash Flows – Six Months Ended June 30, 2010 and 2009 | 5 |
| | Notes to Condensed Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 4. | Controls and Procedures | 24 |
| **PART II – OTHER INFORMATION** | | 25 |
| Item 1A. | Risk Factors | 25 |
| Item 6. | Exhibits | 46 |

In this report, "Jazz Pharmaceuticals," "we," "us," and "our" refer to Jazz Pharmaceuticals, Inc. and its consolidated subsidiaries.

We own or have rights to various copyrights, trademarks, and trade names used in our business, including the following: Xyrem® (sodium oxybate) oral solution; Luvox CR® (fluvoxamine maleate) Extended-Release Capsules; and Luvox® (fluvoxamine). This report also includes other trademarks, service marks, and trade names of other companies.

**PART I – FINANCIAL INFORMATION**

Item 1.        **Financial Statements.**

**JAZZ PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In thousands)**
**(Unaudited)**

| | June 30, 2010 | December 31, 2009 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 9,574 | $ 15,595 |
| Restricted cash | 910 | 2,988 |
| Accounts receivable, net of allowances of $317 and $288 at June 30, 2010 and December 31, 2009, respectively | 14,095 | 12,313 |
| Inventories | 4,429 | 3,426 |
| Prepaid expenses | 2,287 | 1,653 |
| Other current assets | 788 | 979 |
| Total current assets | 32,083 | 36,954 |
| Property and equipment, net | 901 | 1,124 |
| Intangible assets, net | 25,757 | 29,858 |
| Goodwill | 38,213 | 38,213 |
| Other long-term assets | 310 | 1,247 |
| Total assets | $ 97,264 | $ 107,396 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Revolving credit facility | $ 7,350 | $ 9,399 |
| Accounts payable | 6,403 | 2,158 |
| Accrued liabilities | 16,217 | 14,296 |
| Current portion of long-term debt (including $1,355 pertaining to a related party at December 31, 2009) | 15,925 | 23,759 |
| Purchased product rights liability | 4,250 | 4,000 |
| Liability under government settlement | 2,715 | 2,954 |
| Deferred revenue | 3,424 | 2,675 |
| Total current liabilities | 56,284 | 59,241 |
| Deferred rent | 73 | 29 |
| Deferred revenue, non-current | 9,622 | 10,191 |
| Purchased product rights liability, non-current | 6,750 | 9,000 |
| Liability under government settlement, non-current | 8,142 | 10,658 |
| Long-term debt, less current portion (including $5,196 pertaining to a related party at December 31, 2009) | 32,694 | 91,107 |
| Commitments and contingencies (Note 12) | | |
| Stockholders' deficit: | | |
| Common stock | 4 | 3 |
| Additional paid-in capital | 496,263 | 434,811 |
| Accumulated deficit | (512,568) | (507,644) |
| Total stockholders' deficit | (16,301) | (72,830) |
| Total liabilities and stockholders' deficit | $ 97,264 | $ 107,396 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

3

**JAZZ PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share amounts)**
**(Unaudited)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2010 | 2009 | 2010 | 2009 |
| Revenues: |  |  |  |  |
| Product sales, net | $ 39,528 | $ 26,478 | $ 73,811 | $ 47,797 |
| Royalties | 674 | 518 | 1,279 | 990 |
| Contract revenues | 284 | 10,284 | 569 | 10,569 |
| Total revenues | 40,486 | 37,280 | 75,659 | 59,356 |
| Operating expenses: |  |  |  |  |
| Cost of product sales (excluding amortization of acquired developed technology) | 2,802 | 2,575 | 5,684 | 4,518 |
| Research and development | 7,962 | 11,192 | 14,177 | 22,600 |
| Selling, general and administrative | 17,096 | 13,657 | 33,886 | 27,873 |
| Intangible asset amortization | 2,044 | 1,822 | 4,101 | 3,554 |
| Total operating expenses | 29,904 | 29,246 | 57,848 | 58,545 |
| Income from operations | 10,582 | 8,034 | 17,811 | 811 |
| Interest income | 2 | 6 | 4 | 27 |
| Interest expense (including $255 and $325 for the three months ended June 30, 2010 and 2009, respectively, and $570 and $645 for the six months ended June 30, 2010 and 2009, respectively, pertaining to a related party) | (4,687) | (5,856) | (10,454) | (11,650) |
| Other income (expense) | 2 | (13) | 2 | (5) |
| Loss on extinguishment of debt | (12,287) | — | (12,287) | — |
| Net income (loss) | $ (6,388) | $ 2,171 | $ (4,924) | $ (10,817) |
| Net income (loss) per share: |  |  |  |  |
| Basic | $ (0.18) | $ 0.07 | $ (0.15) | $ (0.37) |
| Diluted | $ (0.18) | $ 0.07 | $ (0.15) | $ (0.37) |
| Weighted-average common shares used in computing net income (loss) per share: |  |  |  |  |
| Basic | 35,423 | 29,021 | 33,428 | 28,995 |
| Diluted | 35,423 | 29,023 | 33,428 | 28,995 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

**JAZZ PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**
**(Unaudited)**

| | Six Months Ended June 30, | |
| | 2010 | 2009 |
|---|---|---|
| **Operating activities** | | |
| Net loss | $ (4,924) | $ (10,817) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation | 525 | 739 |
| Amortization of intangible assets | 4,101 | 3,554 |
| Loss on disposal of property and equipment | — | 14 |
| Stock-based compensation expense | 3,792 | 2,196 |
| Senior secured notes, non-cash interest expense | 1,923 | 1,148 |
| Loss on extinguishment of debt, non-cash portion | 3,803 | — |
| Changes in assets and liabilities: | | |
| Accounts receivable | (1,782) | (2,554) |
| Inventories | (982) | 560 |
| Prepaid expenses and other current assets | (512) | 802 |
| Other assets | (159) | (521) |
| Accounts payable | 4,245 | (1,662) |
| Accrued liabilities | 1,608 | 507 |
| Senior secured notes, accrued and unpaid interest | — | 10,157 |
| Deferred revenue | 180 | (10,542) |
| Deferred rent | 44 | — |
| Liability under government settlement | (2,755) | 211 |
| Net cash provided by (used in) operating activities | 9,107 | (6,208) |
| **Investing activities** | | |
| Purchases of property and equipment | (302) | (17) |
| Purchase of product rights | (2,000) | (1,000) |
| Decrease in restricted cash and investments | 2,078 | 838 |
| Proceeds from maturities of marketable securities | — | 1,004 |
| Net cash (used in) provided by investing activities | (224) | 825 |
| **Financing activities** | | |
| Repayment of senior secured notes (including $6,816 paid to a related party) | (119,496) | — |
| Proceeds from offering of common stock, net of issuance costs | 57,119 | — |
| Proceeds from term loan, net | 48,688 | — |
| Proceeds from employee stock purchases and exercise of stock options | 834 | 127 |
| Net repayment of revolving credit facilities | (2,049) | (3,875) |
| Net cash used in financing activities | (14,904) | (3,748) |
| Net decrease in cash and cash equivalents | (6,021) | (9,131) |
| Cash and cash equivalents, at beginning of period | 15,595 | 24,903 |
| Cash and cash equivalents, at end of period | $ 9,574 | $ 15,772 |
| Supplemental disclosure of non-cash investing and financing activities: | | |
| Liability for purchase of product rights | $ — | $ 5,000 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

5

**JAZZ PHARMACEUTICALS, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1. Summary of Significant Accounting Policies

*Basis of Presentation*

These unaudited condensed consolidated financial statements have been prepared following the requirements of the Securities and Exchange Commission, or SEC, for interim reporting. As permitted under those rules, certain footnotes and other financial information that are normally required by U.S. generally accepted accounting principles, or GAAP, can be condensed or omitted. The information included in this Quarterly Report on Form 10–Q should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2009. In the opinion of management, these condensed consolidated financial statements have been prepared on the same basis as the annual consolidated financial statements and include all adjustments, consisting only of normal recurring adjustments, considered necessary for the fair presentation of our financial position and operating results. Certain amounts related to deferred cost of goods sold in the condensed consolidated statements of cash flows for the six months ended June 30, 2009 have been reclassified to conform to the presentation for the six months ended June 30, 2010. The results for the three and six months ended June 30, 2010 are not necessarily indicative of the results to be expected for the year ending December 31, 2010 or for any other interim period or for any future period. The consolidated financial statements include the accounts of Jazz Pharmaceuticals, Inc. and our wholly-owned subsidiaries, Orphan Medical, LLC and JPI Commercial, LLC after elimination of intercompany transactions and balances.

*Significant Risks and Uncertainties*

We have incurred significant net losses since our inception in 2003, and although we reported income from operations and cash generated from operations in recent quarters, we reported net losses for the three and six months ended June 30, 2010 and we may incur net losses in the future. As of June 30, 2010, we had cash and cash equivalents of $9.6 million and our accumulated deficit was $512.6 million.

We believe our existing cash balances, cash we expect to generate from operations, and cash we expect to have available under our revolving credit facility will be sufficient to fund our operations and meet all of our existing obligations for the foreseeable future. The adequacy of our cash resources depends on many assumptions, including primarily our assumptions with respect to product sales and expenses. Our assumptions may prove to be wrong or other factors may adversely affect our business, and if that were to occur, we could exhaust our available cash resources or be forced to reduce our expenses, which could have a material adverse effect on our business.

We are subject to risks common to companies in the pharmaceutical industry with development and commercial operations including, but not limited to, risks and uncertainties related to commercial success and acceptance of our products by patients, physicians and payors, competition from branded and generic products, regulatory approvals, regulatory requirements, including those of the U.S. Food and Drug Administration, or FDA, and the U.S. Drug Enforcement Administration, or DEA, dependence on key customers and sole source suppliers and protection of intellectual property rights.

*Concentration of Credit Risks*

Financial instruments that potentially subject us to concentrations of credit risk consist of cash equivalents, restricted cash, marketable securities and accounts receivable. Our investment policy limits investments to certain types of debt securities issued by the U.S. government, its agencies and institutions with investment-grade credit ratings and places restrictions on maturities and concentration by type and issuer. We are exposed to credit risk in the event of a default by the financial institutions holding our cash and cash equivalents and issuers of investments to the extent recorded on the balance sheet.

We monitor our exposure within accounts receivable and record a reserve against uncollectible accounts receivable as necessary. We extend credit to pharmaceutical wholesale distributors and a specialty pharmaceutical distribution company, primarily in the United States, and to international distributors in the normal course of business. Customer creditworthiness is monitored and collateral is not normally required. Historically, we have not experienced significant credit losses on our accounts receivable. Our five largest customers accounted for an aggregate of approximately 97% and 99% of gross accounts receivable as of June 30, 2010 and December 31, 2009, respectively.

6

Table of Contents

*Concentration of Supply Risk*

We rely on certain sole suppliers for drug substance and certain sole manufacturing partners for each of our marketed products and certain of our product candidates. Earlier this year, Lonza, Inc., or Lonza, our current sole supplier of sodium oxybate, the active ingredient in both Xyrem and JZP-6, announced its intention to close the plant where it manufactures sodium oxybate and formally notified us in March 2010 that our agreement for the supply of sodium oxybate will terminate on December 31, 2011, at the end of its current term. Lonza is contractually obligated to supply our requirements of sodium oxybate through December 31, 2011. We have entered into an agreement with a new supplier, Siegfried (USA) Inc., or Siegfried, in order to help ensure that we have an uninterrupted supply of sodium oxybate. The FDA must approve Siegfried as a new supplier of sodium oxybate and Siegfried will need to obtain quota from the DEA in order to manufacture sodium oxybate for us. Lonza will also need to obtain additional DEA quota prior to closing its plant in order to manufacture additional sodium oxybate supplies for us for 2011. While we have been in active discussion with the DEA, no additional quota has yet been issued to Lonza, and quota has not yet been issued to Siegfried. Since the DEA typically grants quota on an annual basis and requires a detailed submission and justification for each request, obtaining a DEA quota is a difficult and time consuming process. If our suppliers cannot obtain as much quota as is needed on a timely basis, our business, financial condition, results of operations and growth prospects could be materially and adversely affected.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts and disclosures reported in the condensed consolidated financial statements and accompanying notes. On an ongoing basis, management evaluates its estimates, including those related to revenue recognition, intangible assets, inventory reserves, accrued expenses, and stock-based compensation. Management bases its estimates on historical experience and on assumptions believed to be reasonable under the circumstances. Actual results could differ materially from those estimates.

*Net Income (Loss) Per Common Share*

Basic and diluted net income (loss) per common share is computed using the weighted-average number of shares of common stock outstanding as follows (in thousands, except per share amounts):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Numerator: | | | | |
| Net income (loss) | $ (6,388) | $ 2,171 | $ (4,924) | $ (10,817) |
| Denominator: | | | | |
| Weighted-average common shares outstanding - basic | 35,423 | 29,021 | 33,428 | 28,995 |
| Dilutive effect of employee equity incentive and purchase plans | — | 2 | — | — |
| Weighted-average common shares outstanding - diluted | 35,423 | 29,023 | 33,428 | 28,995 |
| Net income (loss) per share: | | | | |
| Basic | $ (0.18) | $ 0.07 | $ (0.15) | $ (0.37) |
| Diluted | $ (0.18) | $ 0.07 | $ (0.15) | $ (0.37) |

Potentially dilutive common shares from employee stock plans and warrants are determined by applying the treasury stock method to the assumed exercise of warrants and stock options, the assumed vesting of outstanding restricted stock units, and the assumed issuance of common stock under our employee stock purchase plan. The following table represents the weighted-average shares of our common stock that were excluded from the computation of diluted net loss per share for the periods presented because including them would have an anti-dilutive effect (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Warrants to purchase common stock | 1,568 | 3,300 | — | 3,300 |
| Options to purchase common stock | 3,527 | 5,012 | 3,062 | 5,103 |
| Restricted stock units | — | 43 | — | 45 |
| Total | 5,095 | 8,355 | 3,062 | 8,448 |

*Recent Accounting Pronouncements*

In March 2010, the Financial Accounting Standards Board, or FASB, ratified authoritative guidance which amends the revenue recognition guidance related to milestone payments. The FASB concluded that the milestone method is a valid application of the proportional performance model when applied to research or development arrangements. Under the guidance, an entity can make an accounting policy election to recognize a payment that is contingent upon the achievement of a substantive milestone in its entirety in the period in which the milestone is achieved. The milestone method is not required and is not the only acceptable method of revenue recognition for milestone payments. This guidance will not have an impact on our results of operations and financial position as we have applied the milestone method to previously received milestone payments as this method is an acceptable alternative applied in practice.

In October 2009, the FASB issued authoritative guidance which amends the revenue recognition guidance to require companies to allocate revenue in multiple-element arrangements based on an element's estimated selling price if vendor-specific or other third-party evidence is not available. The guidance is effective beginning January 1, 2011. Earlier adoption is permitted. We are currently evaluating the effect that the adoption of this guidance will have on our results of operations and financial position, if any.

## 2. Inventories

The components of inventories were as follows (in thousands):

|  | June 30, 2010 | December 31, 2009 |
|---|---|---|
| Raw materials | $1,359 | $ 1,245 |
| Work in process | 944 | 676 |
| Finished goods | 2,126 | 1,505 |
| Total inventories | $4,429 | $ 3,426 |

## 3. Goodwill and Intangible Assets

The gross carrying amount of goodwill was $38.2 million at both June 30, 2010 and December 31, 2009. The gross carrying amounts and net book values of our intangible assets were as follows (in thousands):

|  | June 30, 2010 | | | December 31, 2009 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Book Value | Gross Carrying Amount | Accumulated Amortization | Net Book Value |
| Developed technology - Xyrem | $39,700 | $ (20,928) | $18,772 | $39,700 | $ (18,842) | $20,858 |
| Developed technology - Luvox CR | 9,700 | (3,944) | 5,756 | 9,700 | (2,443) | 7,257 |
| Agreements not to compete | — | — | — | 3,900 | (3,523) | 377 |
| Trademarks | 2,600 | (1,371) | 1,229 | 2,600 | (1,234) | 1,366 |
| Total | $52,000 | $ (26,243) | $25,757 | $55,900 | $ (26,042) | $29,858 |

Based on intangible assets recorded as of June 30, 2010, and assuming the underlying assets will not be impaired in the future and that we will not change the expected lives of the assets, future amortization costs per year for our existing intangible assets other than goodwill were estimated as follows (in thousands):

| Year Ending December 31, | Estimated Amortization Expense |
|---|---|
| 2010 (remaining portion) | $ 3,724 |
| 2011 | 7,448 |
| 2012 | 5,696 |
| 2013 | 4,445 |
| 2014 | 4,445 |

8

**4. Fair Value Measurement**

Available-for-sale investments consisted of the following as of June 30, 2010 and December 31, 2009 (in thousands):

| | June 30, 2010 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Money market funds | $ 46 | $ — | $ — | $ 46 |

| | June 30, 2010 |
| --- | --- |
| Available-for-sale investments | $ 46 |
| Cash | 9,528 |
| Restricted cash | 910 |
| Total | $ 10,484 |

| Reported as | June 30, 2010 |
| --- | --- |
| Amounts classified as cash and cash equivalents | $ 9,574 |
| Amounts classified as restricted cash | 910 |
| Total | $ 10,484 |

| | December 31, 2009 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Money market funds | $ 5,072 | $ — | $ — | $ 5,072 |

| | December 31, 2009 |
| --- | --- |
| Available-for-sale investments | $ 5,072 |
| Cash | 10,523 |
| Restricted cash | 2,988 |
| Total | $ 18,583 |

| Reported as | December 31, 2009 |
| --- | --- |
| Amounts classified as cash and cash equivalents | $ 15,595 |
| Amounts classified as restricted cash | 2,988 |
| Total | $ 18,583 |

Since inception, there have been no significant realized gains or losses on cash equivalents or marketable securities.

9

The following table summarizes, by major security type, our available-for-sale investments that are measured at fair value on a recurring basis and are categorized using the fair value hierarchy (in thousands):

| | June 30, 2010 | | December 31, 2009 | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Total Estimated Fair Value | Quoted Prices in Active Markets for Identical Assets (Level 1) | Total Estimated Fair Value |
| --- | --- | --- | --- | --- |
| Money market funds | $ 46 | $ 46 | $ 5,072 | $ 5,072 |

As of June 30, 2010, the carrying amount and estimated fair value of the $50.0 million principal amount of our long-term debt was $48.6 million. We believe the fair value was equal to the carrying value because the obligation was incurred on June 30, 2010. As of December 31, 2009, the carrying amount of the $119.5 million principal amount of senior secured notes then outstanding, which we prepaid in full as of June 30, 2010, was $114.9 million and the estimated fair value was $123.6 million, which was estimated using a discounted cash flow analysis based on our estimated incremental borrowing rates for similar types of borrowing arrangements.

## 5. Debt and Financing Obligations

### Retired Senior Secured Notes

In March, May and June 2010 we repaid $3.0 million, $53.0 million and $63.5 million principal amount of our senior secured notes, respectively. In addition to the principal repayments in May and June 2010, we paid prepayment penalties and fees totaling $8.5 million in accordance with our agreement with the holders of the senior secured notes, and recorded non-cash charges related to unamortized debt discount and debt issuance costs of $3.8 million during the three months ended June 30, 2010. As of June 30, 2010, the senior secured notes were repaid in full.

### New Term Loan and Revolving Credit Facility

In June 2010, we entered into a new credit agreement with a lender which provides for a term loan in an aggregate principal amount of $50.0 million and a $15.0 million revolving credit facility, both of which mature in June 2013. On June 30, 2010, we borrowed $57.4 million under the new credit agreement, consisting of the term loan of $50.0 million and $7.4 million under the revolving credit facility, and we used all of the borrowed funds, together with cash on hand, to repay all of the remaining outstanding senior secured notes, which otherwise had a final maturity of June 2011. We also terminated our previous revolving line of credit. Borrowings under the new term loan and revolving credit facility bear interest at a variable rate based on the higher of the prime rate or the federal funds rate plus 0.5% plus, in each case, a margin ranging from 1% to 2.5% or, at our option, the eurodollar rate plus a margin ranging from 3% to 5%. The revolving credit facility has a commitment fee payable on the undrawn amount ranging from 0.5% to 0.75% per annum and was initially set at 0.75%. The interest rate margins and the commitment fee will vary based on our consolidated leverage ratio, as defined in the credit agreement.

The borrowing availability under the revolving credit facility will vary according to the levels of our eligible accounts receivable and other terms and conditions described in the credit agreement and is limited to $8.0 million until January 1, 2011 and $15.0 million thereafter. Borrowings under the revolving credit facility and the term loan are secured by substantially all of our assets. The term loan is repayable in twelve equal quarterly installments of $4.2 million beginning on September 30, 2010. If we prepay the term loan (in whole or in part), or if we terminate or reduce the lender's commitments to make loans under the revolving credit facility, we must pay a prepayment fee equal to (a) 2% of the aggregate amount of the term loan prepaid or commitments terminated or reduced during the first year of the credit agreement, and (b) 1% of the aggregate amount of the term loan prepaid or commitments terminated or reduced during the second year of the credit agreement.

The credit agreement contains customary operating covenants, including covenants that restrict our ability to: incur indebtedness and liens; effect mergers, consolidations and other fundamental changes; dispose of significant assets or enter into sale-leaseback transactions; pay dividends or make other restricted payments; make loans, advances or certain investments; or enter into transactions with affiliates. The credit agreement also requires us to comply with financial covenants requiring us to maintain a minimum consolidated fixed charge coverage ratio, a maximum consolidated leverage ratio and minimum monthly liquidity, each as defined in the credit agreement. The minimum monthly liquidity covenant requires us to maintain cash and availability under the revolving line of credit of not less than $10.0 million from September 30, 2010 through March 31, 2011 and not less than $20.0 million thereafter.

10

The $50.0 million principal amount of the term loan was recorded net of a debt discount of $1.4 million related to fees paid to the lender under the credit agreement. As of June 30, 2010, the interest rate on the term loan was 5.75%. Interest expense associated with the term loan will be recorded using the interest method and will include non-cash interest related to the debt discount and debt issuance costs. The current portion of the carrying amount of the term loan was $15.9 million as of June 30, 2010. As of June 30, 2010, $7.4 million was outstanding under the revolving credit facility which bore interest at 5.75%. As of December 31, 2009, $9.4 million was outstanding under our previous revolving bank line of credit which bore interest at 6.5%. Our previous revolving bank line of credit was terminated effective June 30, 2010.

**6. Common Stock**

*Common Stock Offering*

In May 2010, we issued 7,000,000 shares of our common stock in an underwritten public offering for net proceeds of $57.1 million, after deducting underwriting discounts and commissions and offering expenses payable by us.

*Stock Option Exercises and Employee Stock Purchase Plan (ESPP)*

During the six months ended June 30, 2010, we issued 334,878 shares of common stock as a result of stock option exercises for proceeds of $579,000. In May 2010, we issued 259,906 shares of our common stock for proceeds of $255,000 under our ESPP.

**7. Comprehensive Income (Loss)**

Comprehensive income (loss) includes net income (loss) and all changes in stockholders' deficit during a period, except for those changes resulting from investments by stockholders or distributions to stockholders. During the three and six months ended June 30, 2010, comprehensive income (loss) was equal to net income (loss). During the three and six months ended June 30, 2009, the difference between comprehensive income (loss) and net income (loss) represented the change in unrealized gains/losses on available-for-sale securities and was not significant.

**8. Segment Information**

We have determined that we operate in one business segment, which is the development and commercialization of specialty pharmaceutical products.

The following table presents a summary of product sales, net (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Xyrem | $ 33,723 | $ 22,362 | $ 62,468 | $ 40,081 |
| Luvox CR | 5,805 | 4,116 | 11,343 | 7,716 |
| Total | $ 39,528 | $ 26,478 | $ 73,811 | $ 47,797 |

The following table presents a summary of total revenues including net product sales, royalties and contract revenues attributed to domestic and foreign sources (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| United States | $ 39,546 | $ 25,663 | $ 73,608 | $ 46,985 |
| Europe | 936 | 11,273 | 2,042 | 12,022 |
| All other | 4 | 344 | 9 | 349 |
| Total | $ 40,486 | $ 37,280 | $ 75,659 | $ 59,356 |

11

The following table presents a summary of total revenues from significant customers as a percentage of our total revenues:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Express Scripts | 83% | 58% | 82% | 66% |
| UCB Pharma Limited (1) | * | 30% | * | 20% |

(1)   In April 2009, we recognized as revenue a $10.0 million nonrefundable milestone payment received from UCB Pharma Limited, or UCB, in July 2008. See Note 9 for additional information.

*      Represented less than 10% of our total revenues.

## 9. Collaboration and License Agreements

Under the terms of our agreement with UCB, UCB has the right to market Xyrem for the treatment of narcolepsy and JZP-6 for the treatment of fibromyalgia in 54 countries outside of the United States. During the three months ended June 30, 2009, upon the completion of the last patient in our second Phase III pivotal clinical trial of sodium oxybate for the treatment of fibromyalgia, we recognized as revenue a $10.0 million nonrefundable milestone payment we received from UCB in July 2008 that was previously recorded as deferred revenue. In addition, we recognized contract revenues of $280,000 in each of the three months ended June 30, 2010 and 2009, and $560,000 in each of the six months ended June 30, 2010 and 2009 related to previously deferred upfront payments which are being recognized as contract revenue ratably through 2019, the expected performance period under the agreement.

## 10. Stock-Based Compensation

Stock-based compensation expense related to stock options, restricted stock units, shares of common stock credited to each director's phantom stock account under our directors deferred compensation plan, and stock awards under our employee stock purchase plan was as follows (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Selling, general and administrative | $ 1,344 | $ 774 | $ 2,665 | $ 1,506 |
| Research and development | 545 | 299 | 1,010 | 613 |
| Cost of product sales | 71 | 41 | 117 | 77 |
| Total | $ 1,960 | $ 1,114 | $ 3,792 | $ 2,196 |

Employee stock-based compensation costs of $67,000 and $46,000 as of June 30, 2010 and December 31, 2009, respectively, were capitalized as a component of inventories and included in the condensed consolidated balance sheets.

### Stock Options

During the three months ended June 30, 2010 and 2009, we granted options to employees to purchase 92,500 and 115,750 shares of common stock, respectively, with a weighted-average grant date fair value per share of $6.64 and $0.73, respectively. During the six months ended June 30, 2010 and 2009, we granted options to employees to purchase 1,351,000 and 2,569,000 shares of common stock, respectively, with a weighted-average grant date fair value per share of $8.17 and $0.94, respectively. The fair value of options granted was estimated at the grant date using the Black–Scholes option pricing model with the following assumptions:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Weighted-average volatility | 88% | 92% | 84% | 92% |
| Weighted-average expected term (years) | 5.9 | 6.1 | 6.1 | 6.1 |
| Range of risk-free rates | 2.3-3.1% | 2.2-2.8% | 2.3-3.1% | 1.8-2.8% |
| Expected dividend yield | 0.0% | 0.0% | 0.0% | 0.0% |

## 11. Income Tax Expense

During the three and six months ended June 30, 2010, our effective income tax rate was 0%. This rate was lower than the federal statutory rate of 35% due to our application of federal net operating loss carryforwards to offset both regular taxable income and alternative minimum taxable income and reflects our utilization of deferred state tax benefits.

**12. Commitments and Contingencies**

*Indemnification*

In the normal course of business, we enter into agreements that contain a variety of representations and warranties and provide for general indemnification, including indemnification associated with product liability or infringement of intellectual property rights. Our exposure under these agreements is unknown because it involves future claims that may be made but have not yet been made against us. To date, we have not paid any claims or been required to defend any action related to these indemnification obligations.

We have agreed to indemnify our officers, directors and certain other employees for losses and costs incurred in connection with certain events or occurrences, including advancing money to cover certain costs, subject to certain limitations. The maximum potential amount of future payments we could be required to make under the indemnification obligations is unlimited; however, we maintain insurance policies that may limit our exposure and may enable us to recover a portion of any future amounts paid. Assuming the applicability of coverage, the willingness of the insurer to assume coverage, and subject to certain retention, loss limits and other policy provisions, we believe the fair value of these indemnification obligations is not significant. Accordingly, we have not recognized any liabilities relating to these obligations as of June 30, 2010 and December 31, 2009. No assurances can be given that the covering insurers will not attempt to dispute the validity, applicability, or amount of coverage without expensive litigation against these insurers, in which case we may incur substantial liabilities as a result of these indemnification obligations.

*Legal Proceedings*

In August and September 2009, we received Paragraph IV Patent Certification notices from Actavis Elizabeth, LLC, or Actavis, and from Anchen Pharmaceuticals, Inc., or Anchen, advising that each has filed an ANDA with the FDA seeking approval to market a generic version of Luvox CR. We have not been informed as to the timing or status of the FDA's review of either party's filing, or whether either filer has complied with FDA requirements for proving bioequivalence, or which party was first to file its ANDA with the FDA. Actavis' Paragraph IV Certification alleges that U.S. Patent No. 7,465,462, or the 462 patent, which is owned by Elan Pharma International Limited, or Elan, and licensed to us, is invalid on the basis that the inventions claimed therein were obvious. Anchen's Paragraph IV Certification alleges that the 462 patent will not be infringed by Anchen's manufacture, use or sale of the generic product for which the ANDA was submitted and that the 462 patent is invalid on the basis that the inventions claimed therein were obvious. On October 6, 2009, we and Elan, as plaintiffs, filed a lawsuit against Actavis, Anchen, and Anchen Incorporated, the parent of Anchen, in the United States District Court for the District of Delaware claiming infringement of the 462 patent by the defendants in response to the Paragraph IV Certifications filed by Actavis and Anchen. We are seeking a permanent injunction against Actavis and Anchen from introducing a generic version of Luvox CR prior to the expiration of the 462 patent. On October 27, 2009, Anchen and Anchen Incorporated filed a motion to dismiss for lack of jurisdiction. On November 16, 2009, we and Elan filed our response. On January 14, 2010, we and Elan filed a motion to enjoin the later-filed duplicative proceeding in the United States District Court for the Central District of California referenced below. On February 1, 2010, Anchen and Anchen Incorporated responded. The court has not ruled on either motion and no hearing dates are scheduled. We cannot predict or determine the outcome of this matter.

On October 14, 2009, we and Elan, as plaintiffs, also filed a lawsuit in the United States District Court for the Central District of California against Anchen and Anchen Incorporated claiming infringement of the 462 patent based upon Anchen's Paragraph IV Certification. The plaintiffs are seeking a permanent injunction that prevents Anchen from introducing a generic version of Luvox CR prior to the expiration of the 462 patent. Since Anchen is incorporated in California, the additional protective lawsuit was filed in California in an effort to both ensure jurisdiction over Anchen in the event that the United States District Court for the District of Delaware finds that it does not have jurisdiction over Anchen in Delaware, and to prevent the FDA from approving the ANDA filed by Anchen until the earliest of 30 months following the filing of the lawsuit, expiration of the 462 patent, settlement of the lawsuit or a decision in the infringement case that is favorable to Anchen in California. On December 14, 2009, the court in the United States District Court for the Central District of California held a scheduling conference to discuss the status of the case and the Delaware case. Following the conference and submission of scheduling proposals by both parties, the court scheduled a patent claim construction or *Markman* hearing that was held on June 1, 2010. On July 16, 2010, Anchen filed a motion for summary judgment in the case and we and Elan filed our response on August 9, 2010. The court has scheduled a hearing on the motion for August 31, 2010 and a trial date of January 31, 2011. We cannot predict the outcome of this matter.

From time to time we are involved in legal proceedings arising in the ordinary course of business. We believe there is no other litigation pending that could have, individually or in the aggregate, a material adverse effect on our results of operations or financial condition.

13

***Phase IV Clinical Study Commitment***

The FDA approval of Luvox CR included a commitment for two Phase IV clinical studies, one in adolescent patients with social anxiety disorder, or SAD, and one a long-term duration of effect study in patients with SAD. If they were to be performed, the cost of these Phase IV studies would likely be significant. We have been in discussions with the FDA concerning our Phase IV clinical study commitment, and as a result of these discussions, in April 2010, we submitted a labeling supplement to the new drug application, or NDA, for Luvox CR to remove the SAD indication from the label. This supplement is under active review by the FDA. Based upon our discussions with the FDA, we believe that if the labeling supplement is approved by the FDA, we would then be released from the Phase IV clinical study commitment.

14

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with the condensed consolidated financial statements and notes to condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q. This discussion contains forward looking statements that involve risks and uncertainties. When reviewing the discussion below, you should keep in mind the substantial risks and uncertainties that characterize our business. In particular, we encourage you to review the risks and uncertainties described in Part II Item 1A "Risk Factors" included elsewhere in this report. These risks and uncertainties could cause actual results to differ materially from those projected in forward-looking statements contained in this report or implied by past results and trends. Forward-looking statements are statements that attempt to forecast or anticipate future developments in our business, financial condition or results of operations—see "Cautionary Note Regarding Forward-Looking Statements" that appears at the end of this discussion. These statements, like all statements in this report, speak only as of their date (unless another date is indicated), and we undertake no obligation to update or revise these statements in light of future developments.*

**Overview**

We are a specialty pharmaceutical company that, since our inception, has focused on the development and commercialization of pharmaceutical products to meet important unmet medical needs in neurology and psychiatry. With our JZP-6 product candidate for the treatment of fibromyalgia, for which our new drug application, or NDA, was filed by the U.S. Food and Drug Administration, or FDA, in February 2010, we expanded our development activities to include rheumatology and pain management. We currently market two products: Xyrem (sodium oxybate) oral solution and Luvox CR (fluvoxamine maleate) Extended-Release Capsules. We are building a portfolio of products through a combination of internal development, acquisition and in-licensing activities, and we utilize our specialty sales force to promote our products in our target markets. Since our inception in 2003, we have built a commercial operation and assembled a portfolio of products and product candidates that currently includes our two marketed products, Xyrem and Luvox CR, our late-stage JZP-6 product candidate, and additional product candidates in various stages of clinical development.

*Xyrem*

Xyrem is the only product approved by the FDA for the treatment of both excessive daytime sleepiness and cataplexy in patients with narcolepsy. We promote Xyrem in the United States for its FDA-approved indications to sleep specialists, neurologists, pulmonologists and psychiatrists through our specialty sales force. We have licensed the rights to commercialize Xyrem in 54 countries outside of the United States to UCB Pharma Limited, or UCB, and in Canada to Valeant Canada Limited, or Valeant. UCB currently markets Xyrem in 15 countries in Europe. We have three issued patents covering our formulation for Xyrem, one of which expires in 2019, and two of which expire in 2020, in the United States. We have three issued U.S. patents covering our distribution system for Xyrem, which expire in 2024. All of these patents, except the formulation patent that expires in 2019, are listed in the FDA's approved drug products with therapeutic equivalence evaluation documents, or Orange Book. In addition, we have orphan drug exclusivity for the excessive daytime sleepiness in narcolepsy indication for Xyrem until November 2012; all narcolepsy patients suffer from excessive daytime sleepiness.

*Luvox CR*

Luvox CR was approved by the FDA for the treatment of both obsessive compulsive disorder, or OCD, and social anxiety disorder, or SAD, in February 2008. We began promoting Luvox CR through our specialty sales force in April 2008. Luvox CR was developed by Solvay Pharmaceuticals, Inc., or Solvay, in collaboration with Elan Pharma International Limited, or Elan. We obtained the exclusive rights to market and distribute Luvox CR in the United States from Solvay in January 2007. Solvay retained the rights to market and distribute Luvox CR outside of the United States. Luvox CR is covered by a product-specific patent issued to Elan, which manufactures the product for us. We are currently involved in litigation relating to abbreviated new drug applications filed by two companies seeking to market generic versions of Luvox CR. If generic products were to be introduced, our revenue from Luvox CR product sales would decline.

*JZP-6*

We are developing and seeking FDA approval for sodium oxybate, the active pharmaceutical ingredient in Xyrem, for the treatment of fibromyalgia. Our development program includes two completed Phase III pivotal clinical trials and a long-term safety trial that is expected to be completed in 2010. In November 2008 and June 2009, we announced positive top-line results from our first and second Phase III pivotal clinical trials, respectively. The two randomized, double-blind, placebo-controlled studies demonstrated that sodium oxybate significantly decreased pain and fatigue, and improved daily function and patient global impression of change, in patients with fibromyalgia. We submitted an NDA for JZP-6 in December 2009 and the NDA was filed by the FDA in February 2010 with a Prescription Drug User Fee Act action date of October 11, 2010. The FDA's Arthritis Advisory Committee and Drug Safety and Risk Management Advisory Committee are scheduled to review JZP-6 at a joint meeting on August 20, 2010 and to provide a

15

recommendation to the FDA. If our NDA is approved by the FDA, we expect to market JZP-6 in the United States to physicians who treat fibromyalgia patients, through an expanded specialty sales force. At some time after launch, we may consider a partnership with a third party to promote the product to a broader audience. We have licensed to UCB the commercialization rights to JZP-6 in 54 countries outside of the United States in exchange for development funding, commercial milestones and royalties. Our JZP-6 product candidate is covered by one of the formulation patents covering Xyrem, and we expect that its distribution system will be covered by one or more of our distribution system patents that expire in 2024. JZP-6 is also covered by a patent covering the use of sodium oxybate to treat fibromyalgia expiring in 2017.

### Other Product Candidates

Our other product candidates in clinical development are oral tablet forms of sodium oxybate and JZP-8 (intranasal clonazepam), being developed for the treatment of recurrent acute repetitive seizures in epilepsy patients who continue to have seizures while on stable anti-epileptic regimens. We are seeking a partner to continue development of JZP-4 (elpetrigine), our product candidate for the treatment of epilepsy and bipolar disorder. We have recently terminated the development of our JZP-7 (ropinirole gel) product candidate for the treatment of restless legs syndrome.

### Recent Developments

Although we have incurred significant cumulative net losses since our inception, we reported income from operations in our most recent quarters. This improvement in our operating performance was due to a significant increase in revenue from product sales. The improvement in our operating performance has allowed us to strengthen our balance sheet by raising $57.1 million in net proceeds through a public offering of shares of our common stock in May 2010 and by reducing and refinancing our debt, thereby lowering our ongoing debt service obligations. During the first half of 2010, we reduced our long-term debt from $119.5 million to $50.0 million and reduced the interest rate on our long-term debt beginning July 1, 2010 from 15% to a variable rate which was 5.75% at June 30, 2010.

We believe our existing cash balances, cash we expect to generate from operations, and cash we expect to have available under our revolving credit facility will be sufficient to fund our operations and meet all of our existing obligations for the foreseeable future. The adequacy of our cash resources depends on many assumptions, including primarily our assumptions with respect to product sales and expenses as well as other factors set forth in Part II Item 1A of this Quarterly Report on Form 10-Q under the heading "*We have a history of net losses, and, if we are to grow our business in the future, we will need to commit substantial resources, which could result in future losses*". Our assumptions may prove to be wrong or other factors may adversely affect our business, in which case we could exhaust our available cash resources or be forced to raise additional funds and/or reduce our expenses, which could have a material adverse effect on our business.

Lonza, Inc., or Lonza, our current sole supplier of sodium oxybate, the active ingredient in both Xyrem and JZP-6, formally notified us in March 2010 that our agreement for the supply of sodium oxybate will terminate on December 31, 2011, at the end of its current term, and that Lonza's plan is to close the plant in which sodium oxybate is currently produced by the end of 2010. In April 2010, we entered into an agreement with a new supplier, Siegfried (USA) Inc., or Siegfried, in order to help ensure that we have an uninterrupted supply of sodium oxybate. However, the FDA must approve Siegfried as a new supplier of sodium oxybate and Siegfried will need to obtain quota from the U.S. Drug Enforcement Administration, or DEA, in order to manufacture sodium oxybate for us. Lonza will also need to obtain additional DEA quota prior to closing its plant in order to manufacture sodium oxybate supplies for us for 2011. While we have been in active discussion with the DEA, no additional quota has yet been issued to Lonza, and quota has not yet been issued to Siegfried. Since the DEA typically grants quota on an annual basis and requires a detailed submission and justification for each request, obtaining a DEA quota is a difficult and time consuming process.

On March 23, 2010, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act, or collectively, the Healthcare Reform Act, was signed into law. As a result of this new law, we expect to incur less than $1.0 million of additional rebates for Medicare and Medicaid patients for the remainder of 2010 which will reduce our net product sales in 2010. The Healthcare Reform Act contains a number of additional provisions that are expected to impact our business and operations. In general, it is too early to predict specifically all of the effects this recently enacted Health Reform Act and its implementation will have on our business. We will continue to evaluate the effect of this new law on our business and operations.

In July 2010 we received a warning letter from the FDA concerning our promotional materials for Luvox CR. We are in discussions with the FDA and have taken some actions to address the FDA's concerns. We intend to complete our response to the FDA through appropriate actions promptly and after further consultation with the FDA.

Table of Contents

**Critical Accounting Policies and Significant Estimates**

To understand our financial statements, it is important to understand our critical accounting policies and estimates. The preparation of our financial statements in conformity with United States generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates and assumptions are required in the determination of revenue recognition, in particular related to our agreement with UCB, sales deductions for estimated specialty distributor and wholesaler fees, prompt payment discounts, Medicaid and TRICARE rebates, chargebacks, customer rebates, and royalties. Significant estimates and assumptions are also required to determine whether to capitalize intangible assets, the amortization periods for identifiable intangible assets, the potential impairment of goodwill and other intangible assets, the determination of excess and obsolete inventory reserves, stock-based compensation and accrued expenses. Some of these judgments can be subjective and complex, and, consequently, actual results may differ from these estimates. For any given individual estimate or assumption we make, there may also be other estimates or assumptions that are reasonable. Although we believe our estimates and assumptions are reasonable, they are based upon information available at the time the estimates and assumptions were made.

Our critical accounting policies and significant estimates are detailed in our Annual Report on Form 10-K for the year ended December 31, 2009. Our critical accounting policies and significant estimates have not changed substantially from those previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2009.

17

**Results of Operations**

*Comparison of Three and Six Months Ended June 30, 2010 and 2009*

| | Three Months Ended June 30, | | Increase/ (Decrease) | Increase/ (Decrease) | Six Months Ended June 30, | | Increase/ (Decrease) | Increase/ (Decrease) |
|---|---|---|---|---|---|---|---|---|
| | 2010 | 2009 | | | 2010 | 2009 | | |
| | | (In thousands) | | | | (In thousands) | | |
| Product sales, net | $39,528 | $26,478 | $ 13,050 | 49% | $73,811 | $47,797 | $ 26,014 | 54% |
|    Xyrem | 33,723 | 22,362 | 11,361 | 51% | 62,468 | 40,081 | 22,387 | 56% |
|    Luvox CR | 5,805 | 4,116 | 1,689 | 41% | 11,343 | 7,716 | 3,627 | 47% |
| Royalties, net | 674 | 518 | 156 | 30% | 1,279 | 990 | 289 | 29% |
| Contract revenues | 284 | 10,284 | (10,000) | N/A (1) | 569 | 10,569 | (10,000) | N/A (1) |
| Cost of product sales (excluding amortization of acquired developed technology) | 2,802 | 2,575 | 227 | 9% | 5,684 | 4,518 | 1,166 | 26% |
| Research and development | 7,962 | 11,192 | (3,230) | (29%) | 14,177 | 22,600 | (8,423) | (37%) |
| Selling, general and administrative | 17,096 | 13,657 | 3,439 | 25% | 33,886 | 27,873 | 6,013 | 22% |
| Amortization of intangible assets | 2,044 | 1,822 | 222 | 12% | 4,101 | 3,554 | 547 | 15% |
| Interest income | 2 | 6 | (4) | (67%) | 4 | 27 | (23) | (85%) |
| Interest expense | 4,687 | 5,856 | (1,169) | (20%) | 10,454 | 11,650 | (1,196) | (10%) |
| Other income (expense) | 2 | (13) | 15 | N/A (1) | 2 | (5) | 7 | N/A (1) |
| Loss on extinguishment of debt | 12,287 | — | 12,287 | N/A (1) | 12,287 | — | 12,287 | N/A (1) |

(1)    Comparison to prior period is not meaningful.

*Product Sales, Net*

    The increase in Xyrem product sales in the three and six months ended June 30, 2010 compared to the same periods in 2009 was primarily due to the impact of price increases taken in 2009 and 2010 and, to a lesser extent, increases in volume of approximately 6% and 5%, respectively, on domestic sales of Xyrem. We expect Xyrem product sales in 2010 to be higher than in 2009, due primarily to the impact of past price increases. Total Xyrem volume growth in 2009 compared to 2008 was 10%, and we expect to see continued volume growth in 2010 compared to 2009, though at a single digit rate.

    The increase in Luvox CR product sales in the three and six months ended June 30, 2010 compared to the same periods in 2009 was primarily due to increases in volume and, to a lesser extent, due to price increases. We market Luvox CR for the treatment of both OCD and SAD. In April 2010, we submitted to the FDA a labeling supplement to the NDA for Luvox CR to remove the SAD indication from the Luvox CR label. We believe that the removal of the SAD indication from the label, if it occurs, will not have a significant negative impact on our Luvox CR product sales. We expect Luvox CR product sales in 2010 to be higher than in 2009, due primarily to increases in volume.

*Royalties*

    The increase in royalties in the three and six months ended June 30, 2010 compared to the same period in 2009 was entirely due to the increase in royalties we received under our agreement with UCB related to UCB's sales of Xyrem in territories outside of North America. We expect modest growth in royalty income in 2010 as compared with 2009.

*Contract Revenues*

    Except for a $10.0 million milestone payment which we recognized as revenue in the three months ended June 30, 2009, contract revenues consists primarily of previously deferred upfront payments under our agreement with UCB, which are being recognized as contract revenues ratably through 2019, the expected performance period under our agreement with UCB.

*Cost of Product Sales*

    The increase in cost of product sales in the three and six months ended June 30, 2010 compared to the same periods in 2009 was primarily due to our increased sales and sales volumes. As a percentage of product sales, costs were 7.1% and 7.7% in the three and six months ended June 30, 2010, respectively, compared to 9.7% and 9.5%, respectively, for the same periods in 2009. This improvement in cost of product sales as a percentage of product sales was primarily due to price increases taken in 2009 and 2010.

Table of Contents

*Research and Development Expenses*

Research and development costs were lower in the three and six months ended June 30, 2010 compared to the same periods in 2009 primarily due to lower spending on JZP-6 as we focused on the prosecution of our NDA for our JZP-6 product candidate and our ongoing safety study for JZP-6, which we expect to complete in 2010, partially offset by higher spending as a result of development work on oral tablet forms of sodium oxybate, the active pharmaceutical ingredient in both Xyrem and JZP-6. As a result, our direct development costs decreased $4.1 million and $10.1 million in the three and six months ended June 30, 2010, respectively compared to the same periods in 2009, when we were actively conducting our second JZP-6 Phase III clinical trial and enrolling patients in the long-term safety study. Our direct development costs consisted primarily of out-sourced study costs, including investigator payments and consulting fees, and do not include salaries and benefits or general administrative costs related to maintaining a research and development organization. Salaries and benefits expenses including stock-based compensation and accrued incentive compensation incurred in the research and development organization increased $890,000 and $1.7 million in the three and six months ended June 30, 2010, respectively, compared to the same periods in 2009. We expect research and development spending in 2010 to be lower than 2009 and to continue to be focused primarily on prosecution of the JZP-6 NDA, completion of the JZP-6 safety study, development work on oral tablet forms of sodium oxybate and JZP-8 activities.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses were higher in the three and six months ended June 30, 2010 compared to the same periods in 2009, due primarily to pre-launch planning and preparation activities in the 2010 periods related to our JZP-6 product candidate and to increases in salaries and benefits expenses including stock-based compensation and incentive compensation. We expect that selling, general and administrative expenses will be higher in 2010 than in 2009, primarily due to pre-launch planning and preparation activities related to our JZP-6 product candidate.

*Amortization of Intangible Assets*

Our intangible assets consist primarily of developed technology related to Xyrem and Luvox CR which are amortized on a straight-line basis over their estimated useful lives. Amortization costs in the three and six months ended June 30, 2010 were higher compared to the same periods in 2009, primarily due to our reduction in the estimated useful life of the Luvox CR intangible asset in response to the filings in the third quarter of 2009 of two abbreviated new drug applications with the FDA by third parties seeking to market generic versions of Luvox CR.

*Interest Income*

Interest income was not significant in the three and six months ended June 30, 2010 and 2009.

*Interest Expense*

Interest expense in the three and six months ended June 30, 2010 and 2009 relates primarily to interest on our $119.5 million of senior secured notes, which we repaid in part in March and May 2010 and the remainder in full in June 2010 and, to a small extent, interest on our liability under a government settlement. Interest on the senior secured notes was comprised of quarterly cash payments for interest, amortization of a debt discount related to warrants that were issued in conjunction with the senior secured notes and amortization of debt issuance costs. We expect a net decrease in interest expense in 2010 compared to 2009, due to the repayment in full of the senior secured notes, which bore interest at a fixed rate of 15%, partially offset by interest due on the $50.0 million principal amount of the term loan under our new credit agreement, which bore interest at a variable rate that was 5.75% as of June 30, 2010.

*Loss on Extinguishment of Debt*

The loss on extinguishment of debt relates to the repayment of our senior secured notes in May and June 2010 and is comprised of $8.5 million of prepayment premiums and fees, and $3.8 million of non-cash expense related to the write-off of unamortized debt discount and debt issuance costs.

**Non-GAAP Financial Measures**

To supplement our financial results and financial guidance presented on a GAAP basis, we use the non-GAAP measures adjusted net income (loss) and adjusted net income (loss) per diluted share as shown in the table below. These measures exclude (1) revenue related to upfront and milestone payments, and (2) certain expenses comprised of loss on extinguishment of debt, amortization and impairment of intangible assets, stock-based compensation and non-cash interest expense associated with debt discount and debt issuance costs. We believe these non-GAAP financial measures are helpful in understanding our past financial performance and our future results, are not meant to be considered in isolation or as a substitute for comparable GAAP measures, and should be read in

conjunction with our consolidated financial statements prepared in accordance with GAAP. Our management regularly uses these supplemental non-GAAP financial measures internally to understand, manage and evaluate our business and make operating decisions. Compensation of our executives is based in part on the performance of our business based on these non-GAAP measures. In addition, we believe that the use of these non-GAAP measures enhances the ability of investors to compare our results both from period to period and with those of other companies. Adjusted net income (loss) and adjusted net income (loss) per diluted share, as used by us, may be calculated differently from, and therefore may not be directly comparable to, similarly titled measures used by our competitors and other companies.

A reconciliation of GAAP net income (loss) to adjusted net income (loss), a non-GAAP financial measure, and related per share amounts follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2010 | 2009 | 2010 | 2009 |
|---|---|---|---|---|
| GAAP net income (loss) | $ (6,388) | $ 2,171 | $ (4,924) | $ (10,817) |
| Add: | | | | |
| Intangible asset amortization | 2,044 | 1,822 | 4,101 | 3,554 |
| Stock-based compensation expense | 1,960 | 1,114 | 3,792 | 2,196 |
| Non-cash interest expense | 873 | 613 | 1,923 | 1,148 |
| Loss on extinguishment of debt | 12,287 | — | 12,287 | — |
| Deduct: | | | | |
| Contract revenues | (284) | (10,284) | (569) | (10,569) |
| Adjusted net income (loss) | $ 10,492 | $ (4,564) | $ 16,610 | $ (14,488) |
| | | | | |
| GAAP net income (loss) per diluted share | $ (0.18) | $ 0.07 | $ (0.15) | $ (0.37) |
| Adjusted net income (loss) per diluted share | $ 0.28 | $ (0.16) | $ 0.46 | $ (0.50) |
| | | | | |
| Shares used in computing GAAP net income (loss) per diluted share (1) | 35,423 | 29,023 | 33,428 | 28,995 |
| Shares used in computing adjusted net income (loss) per diluted share (1) | 38,142 | 29,021 | 36,447 | 28,995 |

(1)    Shares used in computing GAAP or adjusted net income per diluted share are greater than shares used in computing GAAP or adjusted net loss per diluted share due to the potentially dilutive effect of common shares from employee stock plans and warrants.

**Liquidity and Capital Resources**

During the first half of 2010, we reduced our long-term debt outstanding from $119.5 million to $50.0 million, extended the final maturity date of our long-term debt from June 2011 to June 2013 by repaying our senior secured notes in full and entering into a new credit agreement. As a result of this repayment and new financing we reduced the interest rate on our long-term debt from a fixed rate of 15% to a variable rate that was 5.75% as of June 30, 2010. We believe that our existing cash balances, together with cash we expect to generate from operations and borrowings we expect to be available under our new revolving credit facility, will be sufficient to fund our operations and to meet our existing obligations for the foreseeable future. The adequacy of our cash resources depends on many assumptions, including primarily our assumptions with respect to product sales and expenses as well as the other factors set forth in Part II Item 1A of this Quarterly Report on Form 10-Q under the heading "*We have a history of net losses, and, if we are to grow our business in the future, we will need to commit substantial resources, which could result in future losses*". Our assumptions may prove to be wrong or other factors may adversely affect our business, and as a result we could exhaust our available cash resources or be forced to raise additional funds and/or reduce our expenses, which could have a material adverse effect on our business. As of June 30, 2010, we had cash and cash equivalents of $9.6 million.

In May 2010, we issued 7,000,000 shares of our common stock in an underwritten public offering for net proceeds of $57.1 million. With the proceeds of this offering we prepaid $53.0 million principal amount of our then existing senior secured notes. In June 2010, we entered into a new credit agreement which provides for a term loan in an aggregate principal amount of $50.0 million and a $15.0 million secured revolving credit facility, both of which mature in June 2013. On June 30, 2010, we borrowed $57.4 million under the new credit agreement, consisting of a term loan of $50.0 million and $7.4 million under the revolving credit facility, and we used all of the borrowed funds, together with cash on hand, to prepay in full all of the remaining outstanding senior secured notes. We also terminated our previous revolving line of credit. Borrowings under the new term loan and revolving credit facility bear interest at a variable rate based on the higher of the prime rate or the federal funds rate plus 0.5% plus, in each case, a margin ranging from 1% to 2.5% or, at our option, the eurodollar rate plus a margin ranging from 3% to 5%. The interest rate was 5.75% at June 30, 2010. The revolving credit facility has a commitment fee payable on the undrawn amount ranging from 0.5% to 0.75% per annum and was initially set at 0.75%. The interest rate margins and the commitment fee will vary based on our consolidated leverage ratio, as defined in the credit agreement.

Table of Contents

The borrowing availability under the revolving credit facility will vary according to the levels of our eligible accounts receivable and other terms and conditions described in the credit agreement and is limited to $8.0 million until January 1, 2011 and $15.0 million thereafter. Borrowings under the revolving credit facility and the term loan are secured by substantially all of our assets. At such times as our cash, cash equivalents and amounts available under the revolving credit facility, in total, are less than $25.0 million, our borrowings under the revolving credit facility are automatically paid with our cash receipts, although we are able to reborrow based on our eligible accounts receivable and other terms and conditions described in the credit agreements. The term loan is repayable in twelve equal quarterly installments of $4.2 million beginning on September 30, 2010. If we prepay the term loan (in whole or in part) or if we terminate or reduce the lender's commitments to make loans under the revolving credit facility we must pay a prepayment fee equal to (a) 2% of the aggregate amount of the term loan prepaid or commitments terminated or reduced during the first year of the credit agreement, and (b) 1% of the aggregate amount of the term loan prepaid or commitments terminated or reduced during the second year of the credit agreement.

The credit agreement contains customary operating covenants, including covenants that restrict our ability to: incur indebtedness and liens; effect mergers, consolidations and other fundamental changes; dispose of significant assets or enter into sale-leaseback transactions; pay dividends or make other restricted payments; make loans, advances or certain investments; or enter into transactions with affiliates. The credit agreement also requires us to comply with financial covenants requiring us to maintain a minimum consolidated fixed charge coverage ratio, a maximum consolidated leverage ratio and minimum monthly liquidity, each as defined in the credit agreement. The minimum monthly liquidity covenant requires us to maintain at any time during any month daily cash balances of not less than $10.0 million from September 30, 2010 through to March 31, 2011 and not less than $20.0 million thereafter. Our failure to comply with any of the operating and financial covenants contained in the credit agreement would constitute an event of default under the credit agreement. The credit agreement contains other customary events of default. Upon the occurrence of one or more events of default, including our failure to comply with all operating and financial covenants, all or part of the obligations under the credit agreement may be declared immediately due and payable and borrowings under the credit agreement may be stopped. We do not currently have the cash resources necessary to satisfy our obligations under the credit agreement in full if our obligations were accelerated.

To grow our business in the future, we will need to commit substantial resources to costly and time-consuming product development and clinical trials of our product candidates and significant funds to our commercial operations. We may seek to raise additional funds for general corporate purposes, including licensing or acquiring additional products, product candidates or companies. Raising additional capital may be accomplished through one or more public or private debt or equity financings, collaborations, partnering arrangements or development financings or a draw down of funds under our committed equity financing facility, or CEFF, with Kingsbridge Capital Limited. Under the CEFF, we have the ability to draw down amounts up to $75.0 million, subject to certain conditions. The CEFF expires in December 2012. Any equity financing would be dilutive to our stockholders, and a debt issuance could be prohibited or difficult, or the consent of the lender under our new credit agreement could be required.

The following table shows a summary of our cash flows for the periods indicated:

| | Six Months Ended June 30, | |
| | 2010 | 2009 |
| | (In thousands) | |
| Net cash provided by (used in) operating activities | $    9,107 | $   (6,208) |
| Net cash (used in) provided by investing activities | (224) | 825 |
| Net cash used in financing activities | (14,904) | (3,748) |
| Net decrease in cash and cash equivalents | $   (6,021) | $   (9,131) |

Net cash provided by (used in) operating activities during the six months ended June 30, 2010 and 2009, primarily reflected the net loss, adjusted for non-cash items including depreciation and amortization, stock-based compensation expense and a portion of the loss on the extinguishment of the senior secured notes in addition to the change in working capital. Net cash used in investing activities during the six months ended June 30, 2010 primarily related to two payments for the purchase of rights to Luvox CR and purchases of property, plant and equipment partially offset by the release of restricted cash. Net cash provided by investing activities during the six months ended June 30, 2009 primarily related to the release of restricted cash and the maturity of an investment in a marketable security, partially offset by a payment for the purchase of rights to Luvox CR. Net cash used in financing activities during the six months ended June 30, 2010 was attributable to the repayment of $119.5 million principal amount of senior secured notes and a repayment of our previous revolving bank line of credit of $9.4 million, offset by proceeds of $57.1 million from an underwritten public offering of shares of our common stock and borrowings of $48.7 million under our new term loan and $7.4 million under our new revolving credit facility. Net cash used in financing activities during the six months ended June 30, 2009 was attributable to the repayment of our previous revolving bank line of credit.

21

**Contractual Obligations**

In addition to our contractual obligations set forth in our Annual Report on Form 10-K for the year ended December 31, 2009, the following table reflects a summary of material contractual obligations that have been modified or have been incurred during the first six months of 2010 and remain outstanding as of June 30, 2010:

| Contractual Obligations | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 years |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Term loan - principal (1) | $50,000 | $16,664 | $ 33,336 | $— | $ — |
| Term loan - interest (2) | 4,681 | 2,517 | 2,164 | — | — |
| Revolving credit facility (1) | 7,350 | 7,350 | — | — | — |
| Total | $62,031 | $26,531 | $ 35,500 | $— | $ — |

(1)   In June 2010, we entered into a new credit agreement which provides for a term loan in an aggregate principal amount of $50.0 million and a $15.0 million revolving credit facility both of which mature in June 2013. On June 30, 2010, we borrowed $57.4 million under the new credit agreement, consisting of a term loan of $50.0 million and $7.4 million under the revolving credit facility. Borrowings under the term loan and revolving credit facility bear interest at a variable rate based on the higher of the prime rate or the federal funds rate plus 0.5% plus, in each case, a margin ranging from 1% to 2.5% or, at our option, the eurodollar rate plus a margin ranging from 3% to 5%. The interest rate was 5.75% at June 30, 2010. The revolving credit facility has a commitment fee payable on the undrawn amount ranging from 0.5% to 0.75% per annum and was initially set at 0.75%. The interest rate margins and the commitment fee will vary based on our consolidated leverage ratio, as defined in the credit agreement. The borrowing availability under the revolving credit facility will vary according to the levels of our eligible accounts receivable and other terms and conditions described in the credit agreement and is limited to $8.0 million until January 1, 2011 and $15.0 million thereafter. Borrowings under the revolving credit facility and the term loan are secured by substantially all of our assets. The $50.0 million term loan is repayable in twelve equal quarterly installments of $4.2 million beginning on September 30, 2010.

(2)   Borrowings under the term loan bear interest at a variable rate which was 5.75% at June 30, 2010. We estimated future interest payments by applying the currently applicable interest rate, which may not represent actual interest payments made.

The FDA approval of Luvox CR included a commitment for two Phase IV clinical studies, one in adolescent patients with SAD and one a long-term duration of effect study in patients with SAD. If they were to be performed, the cost of the Phase IV studies would likely be significant. The cost of the Phase IV studies is not included in the table above and it was not included in our contractual obligations table as set forth in our Annual Report on Form 10-K for the year ended December 31, 2009. We have been in discussions with the FDA concerning our Phase IV clinical study commitment, and as a result of these discussions, in April 2010, we submitted a labeling supplement to the new drug application, or NDA, for Luvox CR to remove the SAD indication from the label. This supplement is under active review by the FDA. Based upon our discussions with the FDA, we believe that if the labeling supplement is approved by the FDA, we would then be released from the Phase IV clinical study commitment.

**Related Party**

As of December 31, 2009, an entity affiliated with Kohlberg, Kravis & Roberts & Co. L.P., or KKR, a significant stockholder, held senior secured notes with an aggregate principal amount of $6.8 million and warrants to purchase 70,156 shares of our common stock exercisable at $9.34 per share. During the six months ended June 30, 2010, we repaid the entire principal balance of all of our senior secured notes, including the $6.8 million of the senior secured notes held by the entity affiliated with KKR. During the six months ended June 30, 2010, cash paid for interest and prepayment penalties with respect to those senior secured notes held by the entity affiliated with KKR was $461,000 and $484,000, respectively.

**Off-Balance Sheet Arrangements**

Since our inception, except for standard operating leases, we have not engaged in any off-balance sheet arrangements, including the use of structured finance, special purpose entities or variable interest entities.

**Cautionary Note Regarding Forward-Looking Statements**

This Quarterly Report on Form 10-Q (including documents incorporated by reference) and other written and oral statements we make from time to time contain certain "forward-looking" statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. You can identify these forward-looking statements by the fact they use

22

words such as "should", "expect", "anticipate", "estimate", "target", "may", "project", "guidance", "intend", "plan", "believe" and other words and terms of similar meaning and expression in connection with any discussion of future operating or financial performance. You can also identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. Such forward-looking statements are based on current expectations and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause actual outcomes to differ materially from current expectations. These statements are likely to relate to, among other things, our goals, plans and projections regarding our financial position, results of operations, cash flows, market position, product development, clinical trials, product approvals, sales efforts, expenses, performance or results of current and anticipated products, the outcome of contingencies such as legal proceedings, and financial results, all of which are based on current expectations that involve inherent risks and uncertainties, including internal or external factors that could delay, divert or change any of them from time to time. We have included important factors in the cautionary statements included in this report, particularly under Part II Item 1A "Risk Factors", that we believe could cause actual results to differ materially from any forward-looking statement.

Although we believe we have been prudent in our plans and assumptions, no assurance can be given that any goal or plan set forth in forward-looking statements can be achieved, and you are cautioned not to place undue reliance on such statements, which speak only as of the date made. We undertake no obligation to release publicly any revisions to forward-looking statements as a result of new information, future events or otherwise.

<div align="center">23</div>

Table of Contents

**Item 3.        Quantitative and Qualitative Disclosures About Market Risk.**

In addition to the market risk disclosures set forth in "Item 7A. Quantitative and Qualitative Disclosures About Market Risk" in our Annual Report on Form 10-K for the year ended December 31, 2009, effective June 30, 2010, we are exposed to risks associated with changes in interest rates as a result of borrowings under our new term loan. As of June 30, 2010 the principal amount due under the term loan was $50.0 million, which bore interest at a variable rate that was 5.75%. We are required to make quarterly principal payments of $4.2 million on the term loan over the next three years and therefore our exposure to risks associated with changes in interest rates will decrease over time. If market interest rates were to change by 1% our interest expense would change by a total of $814,000 over the remaining term of the term loan. Actual interest expense in the future may differ materially.

**Item 4.        Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures.* We have carried out an evaluation, under the supervision, and with the participation of, management including our principal executive officer and principal financial officer, of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this quarterly report on Form 10-Q. Based on their evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of June 30, 2010.

*Limitations on the Effectiveness of Controls.* A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within an organization have been detected. Accordingly, our disclosure controls and procedures are designed to provide reasonable, not absolute, assurance that the objectives of our disclosure control system are met and, as set forth above, our principal executive officer and principal financial officer have concluded, based on their evaluation as of the end of the period covered by this report, that our disclosure controls and procedures were effective to provide reasonable assurance that the objectives of our disclosure control system were met.

*Changes in Internal Control over Financial Reporting.* No changes in our internal control over financial reporting occurred during the six months ended June 30, 2010 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II – OTHER INFORMATION**

**Item 1A.        Risk Factors.**

*We have identified the following risks and uncertainties that may have a material adverse effect on our business, financial condition or results of operations. The risks described below are not the only ones we face. Additional risks not presently known to us or that we currently believe are immaterial may also significantly impair our business operations. Our business could be harmed by any of these risks. The trading price of our common stock could decline due to any of these risks, and you may lose all or part of your investment. In assessing these risks, you should also refer to the other information contained in this Quarterly Report on Form 10-Q, including our condensed consolidated financial statements and related notes.*

*We have marked with an asterisk (\*) those risks described below that reflect substantive changes from, or additions to, the risks described in our Annual Report on Form 10-K for the year ended December 31, 2009.*

**Risks Relating to Our Business**

***We depend on sales of Xyrem and Luvox CR to generate the cash necessary to operate our business and to meet our ongoing financial obligations, and, if we are not able to maintain or increase sales of our products, it would have a material adverse effect on our business, financial condition, results of operations and growth prospects.\****

We depend on sales of Xyrem and Luvox CR to generate the cash necessary to operate our business and to meet our ongoing financial obligations, and our future plans assume that sales of our products will increase. While Xyrem product sales increased in the three and six months ended June 30, 2010 compared to the same periods in 2009, the rates of increase were lower than the rates of increase in the 2009 periods. Although we expect modest Xyrem sales volume growth in 2010, we cannot assure you that Xyrem sales volume will grow. We increased the price of Xyrem during 2009 and in May 2010. We cannot assure you that these or future price increases have not affected or will not negatively affect Xyrem sales volumes.

If sales of Luvox CR do not continue as expected, they may not cover the payments due to Solvay under our license agreement for Luvox CR plus the cost to manufacture, market and sell the product. While we have been in discussions with the U.S. Food and Drug Administration, or FDA, concerning our Phase IV clinical study commitment related to social anxiety disorder, or SAD, and as a result of these discussions, in April 2010 we submitted a labeling supplement to the new drug application, or NDA, for Luvox CR to remove the SAD indication from the label, we cannot assure you that if the labeling supplement is approved by the FDA, we would be released from the Phase IV clinical study commitment. If performed, the cost of the Phase IV studies would likely be significant. In addition, while we believe that the removal of the SAD indication from the Luvox CR label, if it occurs, will not have a significant negative impact on our Luvox CR product sales, our belief could be incorrect and sales of Luvox CR could decrease.

We recently received a warning letter from the FDA concerning our promotional materials for Luvox CR. We are in discussions with the FDA and have taken some actions to address the FDA's concerns. We intend to complete our response to the FDA through appropriate actions promptly and to continue to emphasize compliance in our promotion of Luvox CR and all of our products. We cannot assure you that any actions we have taken and may take in response to the FDA warning letter will not have a negative effect on Luvox CR sales.

If prescriptions and revenue from sales of Xyrem and Luvox CR do not continue as expected, we may be required to reduce our operating expenses, decrease our efforts in support of our products or seek to raise additional funds, all of which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***If generic products that compete with any of our products are approved, sales of our products may be adversely affected.***

Our products are or may become subject to competition from generic equivalents if there is no proprietary protection for some of our products or because our protection has expired or is not sufficiently broad. Although Xyrem is covered by three issued patents covering its formulation expiring in 2019 and 2020, and three U.S. patents covering its distribution system expiring in 2024, we cannot assure you that third parties will not attempt to invalidate or design around the patents, or assert that they are invalid or otherwise unenforceable and introduce generic equivalents of Xyrem. Once orphan drug exclusivity for Xyrem in the United States for the treatment of excessive daytime sleepiness in patients with narcolepsy expires in November 2012, other companies could possibly introduce generic equivalents of Xyrem if they do not infringe our existing patents covering for Xyrem. If a generic product were approved by the FDA for excessive daytime sleepiness or cataplexy in narcolepsy patients, or both, it is possible that prescriptions for other indications, such as fibromyalgia, if our JZP-6 product candidate is approved by the FDA, could be filled with a generic equivalent approved only for cataplexy or excessive daytime sleepiness, even if the patient is diagnosed with fibromyalgia.

Although Luvox CR is covered by a product-specific patent issued to Elan Pharma International Limited, or Elan, expiring in 2020, other companies could manufacture and sell generic equivalents of Luvox CR in ways that are not covered by the claims of the patent after the expiration of three years of marketing exclusivity, which ends on February 28, 2011. In August 2009, we received a

Table of Contents

Paragraph IV Patent Certification notice from Actavis Elizabeth, LLC, or Actavis, advising that Actavis has filed an abbreviated new drug application, or ANDA, with the FDA seeking approval to market a generic version of Luvox CR. In September 2009, we received an additional Paragraph IV Patent Certification notice from Anchen Pharmaceuticals, Inc., or Anchen, advising that Anchen has filed an ANDA with the FDA for a generic version of Luvox CR. While we and Elan have filed and are prosecuting lawsuits in response to the Paragraph IV certifications, we cannot assure you that these lawsuits will prevent the introduction of generic products for any particular length of time, or at all.

Although our JZP-6 product candidate is covered by one of the formulation patents and a patent covering the use of sodium oxybate to treat fibromyalgia expiring in 2017, and we expect that JZP-6 will also be covered by one or more of our distribution system patents expiring in 2024, we cannot assure you that this will prevent generic competition for JZP-6, if it is approved by the FDA and commercially launched.

After the introduction of a generic competitor, a significant percentage of the prescriptions written for a product generally may be filled with the generic version at the pharmacy, resulting in a loss in sales of the branded product, including for indications for which the generic version has not been approved for marketing by the FDA. Generic competition often results in decreases in the prices at which branded products can be sold. In addition, legislation enacted in the United States allows for, and in a few instances in the absence of specific instructions from the prescribing physician mandates, the dispensing of generic products rather than branded products where a generic equivalent is available. Generic competition for our products earlier than expected, including as a result of FDA approval of ANDAs for generic versions of our products, could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***Our only product candidate currently in late-stage development is JZP-6 for the treatment of fibromyalgia, for which we submitted an NDA to the FDA in December 2009, and for which an FDA Advisory Committee meeting is scheduled for August 20, 2010. Although we believe our completed Phase III pivotal clinical trials have shown JZP-6 to be safe and effective for the treatment of fibromyalgia, the FDA may not approve JZP-6 for marketing or may approve it with restrictions on the label, which could have a material adverse effect on our growth prospects.****

We are currently seeking approval from the FDA for JZP-6 for the treatment of fibromyalgia. Our development program for JZP-6 includes two completed Phase III pivotal clinical trials and a long-term safety trial that is expected to be completed in 2010. Although we received statistically significant positive results from both of our Phase III pivotal clinical trials and believe the results show JZP-6 to be safe and effective for the treatment of fibromyalgia, we do not know if the FDA will agree with our interpretation of the results of these trials or whether the FDA and other regulatory authorities will approve JZP-6 for the treatment of fibromyalgia. The FDA's Arthritis Committee and Drug Safety and Risk Management Advisory Committee, or the Advisory Committees, are scheduled to review JZP-6 at a joint meeting on August 20, 2010 and to provide a recommendation to the FDA on whether or not to approve JZP-6. A negative recommendation by the Advisory Committees will make it less likely that the FDA will approve JZP-6 for the treatment of fibromyalgia. Even if the Advisory Committees recommend approval, the FDA is not required to follow the recommendation. Although JZP-6 has the same active pharmaceutical ingredient as Xyrem, which has been approved by the FDA for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy, this does not assure approval by the FDA, or any other regulatory authorities, of this active pharmaceutical ingredient for the treatment of fibromyalgia. Lyrica (pregabalin), marketed by Pfizer, Cymbalta (duloxetine), marketed by Eli Lilly, and Savella (milnacipran), marketed by Forest Laboratories, were approved by the FDA in June 2007, June 2008, and January 2009, respectively, for the treatment of fibromyalgia. With treatments for fibromyalgia already approved, the FDA may be less willing to approve JZP-6 for the treatment of fibromyalgia. None of these products has been approved by the European Medicines Agency, or EMA, for the treatment of fibromyalgia. A failure to obtain FDA or other regulatory approval of JZP-6 for fibromyalgia patients could have a material adverse effect on our growth prospects.

Even if the FDA approves JZP-6 for the treatment of fibromyalgia, the FDA will likely require us to have a Risk Evaluation and Mitigation Strategy program, or REMS, which may be similar to the one we use for Xyrem. The Xyrem REMS is labor intensive, complex and expensive to operate. Since Xyrem is currently prescribed for a relatively small number of patients, the Xyrem REMS does not prevent us from effectively supplying Xyrem to narcolepsy patients. However, significantly more patients are diagnosed with fibromyalgia, and if the same or a similar REMS is required for JZP-6, scale-up of the REMS could make it difficult for us to timely supply all of the patients who may be prescribed JZP-6 for the treatment of fibromyalgia. This could make JZP-6 less attractive to physicians and patients than other products that are currently, or that in the future may be, approved for the treatment of fibromyalgia, which could limit potential sales of JZP-6.

***We depend on one central pharmacy distributor for Xyrem sales in the United States, and the loss of that distributor or its failure to distribute Xyrem effectively would adversely affect sales of Xyrem.***

As a condition of approval of Xyrem, the FDA mandated that we maintain a REMS for Xyrem under which all Xyrem that we sell in the United States must be shipped directly to patients through a single central pharmacy. The process under which patients receive Xyrem under the Xyrem REMS is cumbersome. While we have an agreement with the central pharmacy for Xyrem, Express

26

Table of Contents

Scripts Specialty Distribution Services, or Express Scripts, if the central pharmacy does not fulfill its contractual obligations to us, or refuses or fails to adequately serve patients, shipments of Xyrem, and our sales, would be adversely affected. Changing central pharmacy distributors could raise a significant amount of time. In addition, sodium oxybate, the active pharmaceutical ingredient in Xyrem, is regulated by the U.S. Drug Enforcement Administration, or DEA, as a controlled substance. Any new central pharmacy would need to be registered with the DEA and would also need to develop the particular processes, procedures and activities necessary to distribute Xyrem under the REMS approved by the FDA. If we change central pharmacies, new contracts might also be required with government and other insurers who pay for Xyrem. Transitioning to a new central pharmacy could result in product shortages, which would adversely affect sales of Xyrem in the United States, and/or result in additional costs and expenses for us, any of which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

### Our current and new suppliers of sodium oxybate and our product manufacturer for Xyrem and JZP-6 must obtain DEA quotas in order to supply us with Xyrem, JZP-6 and sodium oxybate, and these quotas may not be sufficient to satisfy our clinical and commercial needs.*

The DEA limits the quantity of certain Schedule I controlled substances that may be produced in the United States in any given calendar year through a quota system. Because the active pharmaceutical ingredient of Xyrem and JZP-6, sodium oxybate, is a Schedule I controlled substance, our current and new suppliers of sodium oxybate and our product manufacturer must obtain DEA quotas in order to supply us with sodium oxybate, Xyrem and JZP-6. Since the DEA typically grants quotas on an annual basis and requires a detailed submission and justification for each request, obtaining a DEA quota is a difficult and time consuming process. If our commercial or clinical requirements for sodium oxybate, Xyrem or JZP-6 exceed our suppliers' and product manufacturer's DEA quotas, our suppliers and product manufacturer would need quota increases from the DEA, which could be difficult and time consuming to obtain and might not ultimately be obtained on a timely basis, or at all. The DEA issued an overall sodium oxybate quota for 2010 that was substantially the same as that issued for 2009, and the DEA recently published a proposed increase in that overall quota. However, the new proposed quota is less than the quota that we believe we will need to provide commercial supplies of Xyrem, support our development needs and prepare for the potential commercial launch of JZP-6. We and our suppliers have requested additional quota from the DEA for 2010, which, if it is not granted in a timely manner, could delay the potential commercial launch of JZP-6.

Lonza, Inc., or Lonza, currently our sole supplier of sodium oxybate, announced earlier this year that it intends to close its U.S. facility where it manufactures sodium oxybate, and Lonza formally notified us in March 2010 that our agreement for the supply of sodium oxybate will terminate on December 31, 2011, at the end of its current term. As a result, we recently entered into an agreement with a new supplier, Siegfried (USA) Inc., or Siegfried, in order to help ensure that we have an uninterrupted supply of sodium oxybate. However, the FDA must approve Siegfried as a new supplier of sodium oxybate and Siegfried will need quota from the DEA in order to manufacture sodium oxybate. Lonza will also need to obtain additional DEA quota prior to closing its plant in order to manufacture sodium oxybate supplies for us for 2011. If we and our suppliers cannot obtain as much quota as is needed on a timely basis, our business, financial condition, results of operations and growth prospects could be materially and adversely affected.

### We depend on single source suppliers and manufacturers for each of our products and product candidates. The loss of any of these suppliers or manufacturers, or delays or problems in the supply or manufacture of our products for commercial sale or our product candidates for use in our clinical trials, could materially and adversely affect our business, financial condition, results of operations and growth prospects.*

We do not have, and do not intend to establish in the near term, our own manufacturing or packaging capability for our products or product candidates, or their active pharmaceutical ingredients. Accordingly, we have entered into manufacturing and supply agreements with single source suppliers and manufacturers for our commercialized products and product candidates. The recent deterioration in worldwide economic conditions and the disruption to the credit and financial markets in the United States and worldwide may materially and adversely impact the financial position of our single source suppliers and manufacturers. If our suppliers and contract manufacturers are unable to obtain the necessary capital to operate their respective businesses or for other reasons, our suppliers and contract manufacturers may not be able to manufacture our products or product candidates without interruption, or may not comply with their obligations to us under our supply and manufacturing arrangements. We may not have adequate remedies for any breach, and their failure to supply us could result in a shortage of our products or product candidates.

The availability of our products for commercial sale depends upon our ability to procure the ingredients, packaging materials and finished products we need. If one of our suppliers or product manufacturers fails or refuses to supply us for any reason, it would take a significant amount of time and expense to qualify a new supplier or manufacturer. The loss of one of our suppliers or product manufacturers could require us to obtain regulatory clearance in the form of a "prior approval supplement" and to incur validation and other costs associated with the transfer of the active pharmaceutical ingredient or product manufacturing process. We believe that it could take as long as two years to qualify a new supplier or manufacturer, and we may not be able to obtain active pharmaceutical ingredients, packaging materials or finished products from new suppliers or manufacturers on acceptable terms and at reasonable prices, or at all. Should we lose either an active pharmaceutical ingredient supplier or a product manufacturer, we could run out of salable product to meet market demands or investigational product for use in clinical trials while we wait for FDA approval of a new

Table of Contents

active pharmaceutical ingredient supplier or product manufacturer. For Xyrem, JZP-6 or sodium oxybate, any new supplier or manufacturer would also need to be registered with the DEA and obtain a DEA quota. In addition, the FDA must approve suppliers of the active and inactive pharmaceutical ingredients and certain packaging materials used in our products, as well as suppliers of finished products. The qualification of new suppliers and manufacturers could potentially delay the manufacture of our products and product candidates and result in shortages in the marketplace or for our clinical trials, or both, particularly since we do not have secondary sources of supply of the active pharmaceutical ingredient or backup manufacturers for our products and product candidates. If there are delays in qualifying the new manufacturer or the new manufacturer is unable to obtain a sufficient quota from the DEA, there could be a shortage of Xyrem, sodium oxybate or, if approved, JZP-6 for the marketplace or for use in our clinical studies, or both.

Lonza is currently our sole supplier of sodium oxybate, the active pharmaceutical ingredient in Xyrem and, through Solvay Pharmaceuticals, Inc., or Solvay, our sole supplier of fluvoxamine maleate, the active pharmaceutical ingredient in Luvox CR. We will need Lonza to build significant additional supplies of sodium oxybate before Lonza closes its plant, and, even if Lonza is able to obtain sufficient and timely DEA quota to manufacture additional inventory, we cannot assure you that Lonza will have the capacity to timely meet our requirements. We cannot assure you that we and any new suppliers or manufacturers, including our new supplier for sodium oxybate, will be able to complete all of the necessary validation and other activities prior to the time at which Lonza ceases manufacturing sodium oxybate for us or we run out of inventory. Any failure to obtain sufficient commercial and clinical quantities of sodium oxybate could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Elan has the right and obligation to manufacture the worldwide commercial requirements of Luvox CR. In June 2001, Solvay's NDA for Luvox CR was withdrawn due to manufacturing difficulties. We cannot assure you that Elan will be able to continue to supply in a timely manner or at all our ongoing commercial needs of Luvox CR. Any failure of Elan to supply necessary quantities of Luvox CR could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Failure by our third party manufacturers to comply with regulatory requirements could adversely affect their ability to supply products to us. All facilities and manufacturing techniques used for the manufacture of pharmaceutical products must be operated in conformity with the FDA's current Good Manufacturing Practices, or cGMP, requirements. In complying with cGMP requirements, our suppliers must continually expend time, money and effort in production, record-keeping and quality assurance and control to ensure that our products and product candidates meet applicable specifications and other requirements for product safety, efficacy and quality. DEA regulations also govern facilities where controlled substances such as sodium oxybate are manufactured. Manufacturing facilities are subject to periodic unannounced inspection by the FDA, the DEA and other regulatory authorities, including state authorities. Failure to comply with applicable legal requirements subjects the suppliers to possible legal or regulatory action, including shutdown, which may adversely affect their ability to supply us with the ingredients or finished products we need.

Due to FDA-mandated dating requirements, the limited market size for our approved products and DEA quotas relating to sodium oxybate, Xyrem and JZP-6, we are subject to complex manufacturing logistics and minimum order quantities that could result in excess inventory as determined under our accounting policy, unsalable inventory as a result of product expiring prior to use, and competition with others for manufacturing services when needed or expected. We have adopted a production planning program to assess and manage manufacturing logistics among the vendors supplying our requirements of active pharmaceutical ingredient, drug product and packaging; however, unexpected market requirements or problems with vendors' facilities, among other things, could result in shortages of one or more of our products for the marketplace or product candidates for use in our clinical studies, or both.

Any delay in supplying, or failure to supply, products by any of our suppliers could result in our inability to meet the commercial demand for our products or our needs for use in clinical trials, and could adversely affect our business, financial condition, results of operations and growth prospects. In addition, under our agreement with UCB Pharma Limited, or UCB, we are responsible for the supply of Xyrem and, if approved, JZP-6 to UCB. Our failure to meet our contractual obligations to supply UCB with adequate quantities of Xyrem and JZP-6 would result in lost revenues to us and, if material, could result in termination of our agreements by UCB.

***We depend upon UCB to market and promote Xyrem outside the United States, and we are dependent upon our collaboration with UCB for the development and potential commercialization of JZP-6 for the treatment of fibromyalgia in major markets outside of the United States.****

We have exclusively licensed to UCB the rights to market and promote Xyrem in 54 countries outside of the United States. If UCB does not obtain regulatory approvals for and launch Xyrem in its licensed countries in the time frames we expect, or at all, our revenues would be adversely affected. In addition, under the terms of our collaboration with UCB, we granted UCB the exclusive right to commercialize JZP-6 for the treatment of fibromyalgia in the same territories in which UCB has the right to market and promote Xyrem for patients with narcolepsy. UCB recently announced that it has filed for EMA approval of Xyrem for fibromyalgia. However, there are currently no approved fibromyalgia treatments in the European Union, and we cannot assure you that the EMA will approve any treatment, or JZP-6 in particular, for fibromyalgia. For example, in October 2008, April 2009 and July 2009 panels of European regulators recommended against approving Cymbalta, Lyrica and Savella, respectively, as treatments for fibromyalgia.

28

UCB has the right to terminate our collaboration on 12-months' notice (or less in certain circumstances), and UCB may terminate its rights to JZP-6 for the fibromyalgia indication on six-months' notice at any time prior to the receipt of marketing approval of JZP-6 for fibromyalgia in the European Union. If UCB terminates our collaboration or terminates its rights to JZP-6 for the fibromyalgia indication, we would need to find another party or parties to commercialize Xyrem and JZP-6 in UCB's territories. We may be unable to do this on acceptable terms, or at all, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***The commercial success of our products depends upon attaining market acceptance by physicians, patients, third party payors and the medical community.***

Even if our product candidates are approved for sale by the appropriate regulatory authorities, physicians may not prescribe our products, in which case we would not generate the revenues we anticipate. Market acceptance of any of our products by physicians, patients, third party payors and the medical community depends on:

- the clinical indications for which a product is approved, including any potential additional restrictions placed upon the product in connection with its approval;

- prevalence of the disease or condition for which the product is approved and the severity of side effects;

- acceptance by physicians and patients of each product as a safe and effective treatment;

- perceived advantages over alternative treatments;

- relative convenience and ease of administration;

- the cost of treatment in relation to alternative treatments, including generic products;

- the extent to which the product is approved for inclusion on formularies of hospitals and managed care organizations; and

- the availability of adequate reimbursement by third parties.

***A failure to prove that our product candidates are safe and effective in clinical trials would require us to discontinue their development, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.***

Significant additional research and development, financial resources and additional personnel will be required to obtain necessary regulatory approvals for our current and any future product candidates and to develop them into commercially viable products. As a condition to regulatory approval, each product candidate must undergo extensive clinical trials to demonstrate to a statistically significant degree that the product candidate is safe and effective. The clinical trials for a product candidate can cost between $40 million and $100 million, and potentially even more. If a product candidate fails at any stage of development, we will not be able to commercialize it and we will not receive any return on our investment from that product candidate.

Clinical testing can take many years to complete, and failure can occur any time during the clinical trial process. In addition, the results from early clinical trials may not be predictive of results obtained in later and larger clinical trials, and product candidates in later clinical trials may fail to show the desired safety and efficacy despite having progressed successfully through initial clinical testing. A number of companies in the pharmaceutical industry, including us, have suffered significant setbacks in clinical trials, even in advanced clinical trials after showing positive results in earlier clinical trials. The completion of clinical trials for our product candidates may be delayed or halted for many reasons, including:

- delays in patient enrollment, and variability in the number and types of patients available for clinical trials;

- regulators or institutional review boards may not authorize us to commence or continue a clinical trial;

- our inability, or the inability of our partners, to manufacture or obtain from third parties materials sufficient to complete our clinical trials;

- delays or failure in reaching agreement on acceptable clinical trial contracts or clinical trial protocols with prospective sites;

- risks associated with trial design, which may result in a failure of the trial to show statistically significant results even if the product candidate is effective;

- difficulty in maintaining contact with patients after treatment commences, resulting in incomplete data;

- poor effectiveness of product candidates during clinical trials;

- safety issues, including adverse events associated with product candidates;

29

Table of Contents

- the failure of patients to complete clinical trials due to adverse side effects, dissatisfaction with the product candidate, or other reasons;

- governmental or regulatory delays or changes in regulatory requirements, policies and guidelines;

- varying interpretation of data by the FDA or foreign regulatory agencies; and

- insufficient funds to complete the trials.

In addition, our product candidates are subject to competition for clinical study sites and patients from other therapies under development that may delay the enrollment in or initiation of our clinical trials. Many of these companies have far greater financial and human resources than we do.

The FDA or foreign regulatory authorities may require us to conduct unanticipated additional clinical trials, which could result in additional expense and delays in bringing our product candidates to market. Any failure or delay in completing clinical trials for our product candidates would prevent or delay the commercialization of our product candidates, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***We rely on third parties to conduct clinical trials for our product candidates, and if they do not properly and successfully perform their legal and regulatory obligations, as well as their contractual obligations to us, we may not be able to obtain regulatory approvals for our product candidates.***

We design the clinical trials for our product candidates, but rely on contract research organizations and other third parties to assist us in managing, monitoring and otherwise carrying out these trials, including with respect to site selection, contract negotiation and data management. We do not control these third parties and, as a result, they may not treat our clinical studies as their highest priority, or in the manner in which we would prefer, which could result in delays.

Although we rely on third parties to conduct our clinical trials, we are responsible for confirming that each of our clinical trials is conducted in accordance with its general investigational plan and protocol. Moreover, the FDA and foreign regulatory agencies require us to comply with regulations and standards, commonly referred to as good clinical practices, for conducting, recording and reporting the results of clinical trials to ensure that the data and results are credible and accurate and that the trial participants are adequately protected. Our reliance on third parties does not relieve us of these responsibilities and requirements. The FDA enforces good clinical practices through periodic inspections of trial sponsors, principal investigators and trial sites. If we, our contract research organizations or our study sites fail to comply with applicable good clinical practices, the clinical data generated in our clinical trials may be deemed unreliable and the FDA may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that, upon inspection, the FDA will determine that any of our clinical trials comply with good clinical practices. In addition, our clinical trials must be conducted with product produced under the FDA's cGMP regulations. Our failure, or the failure of our contract manufacturers, to comply with these regulations may require us to repeat or redesign clinical trials, which would delay the regulatory approval process.

If third parties do not successfully carry out their duties under their agreements with us, if the quality or accuracy of the data they obtain is compromised due to failure to adhere to our clinical protocols or regulatory requirements, or if they otherwise fail to comply with clinical trial protocols or meet expected deadlines, our clinical trials may not meet regulatory requirements. If our clinical trials do not meet regulatory requirements or if these third parties need to be replaced, our clinical trials may be extended, delayed, suspended or terminated. If any of these events occur, we may not be able to obtain regulatory approval of our product candidates.

***We could be materially adversely affected if we or our products are subject to negative publicity. For example, sodium oxybate, the active pharmaceutical ingredient in Xyrem and JZP-6, is a derivative of gamma hydroxybutyrate, or GHB, which has been a drug of abuse and may not be sold legally in the United States. If physicians and patients perceive Xyrem and JZP-6 to be the same as or similar to GHB, or if adverse effects become associated with our products, sales of our products could be adversely affected.***

From time to time, there is negative publicity about illicit GHB and its effects, including with respect to illegal use, overdoses, serious injury and death. Because sodium oxybate, the active pharmaceutical ingredient in Xyrem and JZP-6, is a derivative of GHB, Xyrem sometimes also receives (and it can be expected that JZP-6, if approved, could receive) negative mention in publicity relating to GHB. For the same reason, patients, physicians and regulators may view Xyrem and JZP-6 as the same as or similar to illicit GHB. In addition, there are regulators and some law enforcement agencies that oppose the prescription and use of Xyrem generally (and may oppose the prescription and use of JZP-6) because of its connection to GHB. Xyrem's label includes information about adverse events from GHB, and we anticipate that if JZP-6 is approved, its label will include similar information. We could also be adversely affected if any of our products or any similar products distributed by other companies prove to be, or are asserted to be, harmful to consumers. Because of our dependence upon patient and physician perceptions, any adverse publicity associated with illness or other adverse effects resulting from the use or misuse of our products or any similar products distributed by other companies could materially and adversely affect our business, financial condition, results of operations and growth prospects.

Table of Contents

***The investigation by the U.S. Attorney's Office for the Eastern District of New York concerning the sales and marketing of Xyrem creates additional compliance-related operating costs and could result in additional fines, penalties or other adverse consequences.***

In April 2006, we and our subsidiary, Orphan Medical, LLC, or Orphan Medical, received subpoenas from the U.S. Department of Justice, acting through the U.S. Attorney for the Eastern District of New York, in connection with the sale and marketing of Xyrem. We and Orphan Medical have settled this matter with the United States, acting through the Department of Justice, the U.S. Attorney's Office for the Eastern District of New York and other federal agencies, including the Office of Inspector General, U.S. Department of Health and Human Services. Orphan Medical pled guilty to one felony count of introducing a misbranded drug into interstate commerce. A total of approximately $20 million in civil and criminal payments is required to be paid in connection with this matter, of which $1 million was paid in July 2007, $2 million was paid in January 2008, $2.5 million was paid in October 2009, and $3 million was paid in January 2010; the remaining amount will be due over the next two years.

While we were not prosecuted, as part of the settlement, we entered into a corporate integrity agreement with the Office of Inspector General, U.S. Department of Health and Human Services. That agreement requires us to maintain a comprehensive compliance program, and we will have additional ongoing compliance-related operating costs related to this compliance program and the corporate integrity agreement. In the event of an uncured material breach or deliberate violation, as the case may be, of the corporate integrity agreement or the other definitive settlement agreements we entered into, we could be excluded from participation in Federal healthcare programs and/or subject to prosecution.

In addition, there is no assurance that we will not be subject to future investigations. Many pharmaceutical companies have announced government investigations of their sales and marketing practices for many of their products. Even with compliance training and a company culture of compliance, our current or future practices may nonetheless become the subject of an investigation. A number of laws, often referred to as "whistleblower" statutes, provide for financial rewards to employees and others for bringing to the attention of the government sales and marketing practices that the government views as illegal or fraudulent. The costs of investigating any claims, responding to subpoenas of investigators, and any resulting fines, can be significant and could divert the attention of our management from operating our business.

***We face substantial competition from companies with greater resources than we have.***

With respect to all of our existing and future products, we may compete with companies selling or working to develop products that may be more effective, safer or less costly than our products. The markets for which we are developing products are competitive and include generic and branded products, some of which are marketed by major pharmaceutical companies that have significantly greater financial resources and expertise in research and development, preclinical testing, conducting clinical trials, obtaining regulatory approvals, manufacturing and marketing and selling approved products than we do. While Xyrem is the only product approved by the FDA for the treatment of both excessive daytime sleepiness and cataplexy in patients with narcolepsy, cataplexy is often treated with tricyclic antidepressants and selective serotonin reuptake inhibitors, or SSRIs, although none of these compounds has been approved by the FDA for the treatment of cataplexy. Other treatments for excessive daytime sleepiness in patients with narcolepsy consist primarily of stimulants and wakefulness promoting agents, including Provigil and Nuvigil, the only other FDA-approved products for the treatment of excessive daytime sleepiness in patients with narcolepsy.

Luvox CR is an SSRI, and. SSRIs are the standard treatment for anxiety disorders, including obsessive compulsive disorder and social anxiety disorder. Six other branded products are currently approved by the FDA for the treatment of obsessive compulsive disorder, and most of these products have generic equivalents. Generic products are generally sold at significantly lower prices than non-generic branded products, tending to both take market share away from branded products and put downward pricing pressure on branded products. Four other products are currently approved by the FDA for the treatment of social anxiety disorder, and each of these products has generic equivalents.

We are seeking FDA approval of JZP-6 for the treatment of fibromyalgia. The FDA has approved Lyrica, marketed by Pfizer, Cymbalta, marketed by Eli Lilly, and Savella, marketed by Forest Laboratories, for the treatment of fibromyalgia. In clinical practice, a variety of other drugs are often prescribed to address individual symptoms of fibromyalgia, including antidepressants, pain medications, muscle relaxants, hypnotics and anticonvulsants, even though those products are not specifically approved by the FDA for the treatment of fibromyalgia. These treatments, as well as other product candidates that may be approved for the treatment of fibromyalgia may be better accepted by physicians and patients. Thus, even if we are able to obtain and maintain FDA approval of JZP-6 for the treatment of fibromyalgia, JZP-6 may not result in significant commercial revenues for us.

JZP-6 contains the same active pharmaceutical ingredient as Xyrem. While we have not established the price we will charge for JZP-6 if it is approved by the FDA and launched, Xyrem is substantially more expensive than the products currently approved by the FDA for the treatment of fibromyalgia. If the price we charge for JZP-6 is substantially higher than the price of other products that are now or that may in the future be approved for the treatment of fibromyalgia, we cannot assure you that JZP-6 will be included on formularies, or at what level it might be included on formularies, or that there will not be managed care, government or insurance restrictions on its use. Any such restrictions could negatively affect the commercial potential of JZP-6.

31

Table of Contents

Smaller or earlier stage companies may also prove to be significant competitors, particularly through collaborative arrangements with other large, established companies. Our commercial opportunities may be reduced or eliminated if our competitors develop and commercialize generic or branded products that are safer or more effective, have fewer side effects or are less expensive than our products.

Many of our competitors have far greater financial resources and a larger number of personnel to market and sell their products than we do. Our competitors may obtain FDA or other regulatory approvals for their product candidates more rapidly than we may and may market their products more effectively than we do. If we are unable to demonstrate to physicians that, based on experience, clinical data, side-effect profiles and other factors, our products are preferable to other therapies, we may not generate meaningful revenues from the sales of our products.

***Xyrem cannot be advertised in the same manner as competing products, which could limit sales.***

The FDA has required that Xyrem's label include a boxed warning regarding the risk of abuse. A boxed warning is the strongest type of warning that the FDA can require for a drug product and warns prescribers that the drug carries a significant risk of serious or even life-threatening adverse effects. A boxed warning also means, among other things, that the product cannot be advertised through reminder ads, ads which mention the pharmaceutical brand name but not the indication or medical condition it treats. Provigil (modafinil) and Nuvigil (armodafinil), the only other products approved by the FDA specifically for the treatment of excessive daytime sleepiness in patients with narcolepsy, do not have a boxed warning and can be advertised with reminder ads. In addition, Xyrem's FDA approval under the FDA's Subpart H regulations requires that all of the promotional materials for Xyrem be provided to the FDA for review at least 30 days prior to the intended time of first use. Unlike Xyrem, Provigil and Nuvigil were not approved under the FDA's Subpart H regulations and are not subject to the pre-review requirements. Accordingly, promotional materials for Provigil and Nuvigil are not subject to the same delays that we experience with respect to new promotional materials for Xyrem.

Because JZP-6 contains the same active pharmaceutical ingredient as Xyrem, we anticipate that the label for JZP-6, if approved by the FDA, will also include a boxed warning. One of the products already approved by the FDA for the treatment of fibromyalgia is not, and future competing products may not be, subject to this restriction, and the boxed warning may negatively affect potential JZP-6 sales if competing products can be advertised directly to consumers.

***We may not be able to successfully acquire, in-license or develop additional products or product candidates to grow our business.***

Because we do not perform discovery research, we intend to grow our business by acquiring or in-licensing additional products and product candidates that we believe have significant commercial potential. Any growth through acquisitions or in-licensing will depend upon the continued availability of suitable acquisition or in-license products and product candidates at favorable prices and upon advantageous terms and conditions, and any growth through development will depend upon our obtaining product candidates, our ability to develop those product candidates and the availability of funding to complete the development, obtain regulatory approval of and commercialize these product candidates. Even if such opportunities are present, we may not be able to successfully identify products or product candidates suitable for potential acquisition, in-licensing or development, or we may not have the financial resources necessary to pursue opportunities. Other companies, many of which may have substantially greater financial, marketing and sales resources, compete with us for the right to acquire and in-license such products or product candidates.

***We currently have a relatively small sales organization compared with most other pharmaceutical companies with marketed products. If our specialty sales force and sales organization is not appropriately sized to adequately promote our current and potential future products, the commercial opportunity for our products may be diminished.***

We have a relatively small number of sales representatives compared with the number of sales representatives of most other pharmaceutical companies with marketed products. Each of our sales representatives is responsible for a territory of significant size. Our potential future commercial products, including JZP-6, may require expansion of our sales force and sales support organization, and we will need to commit significant additional funds, management and other resources to the growth of our sales organization before the commercial launch of those product candidates. We may not be able to achieve the necessary growth in a cost-effective manner or realize a positive return on our investment, and we may not have the financial resources to achieve the necessary growth in a timely manner or at all. We also have to compete with other pharmaceutical and life sciences companies to recruit, hire, train and retain sales and marketing personnel.

Turnover in our sales force could also negatively affect sales of our products. If we elect to rely on third parties to sell our products in the United States, we may receive less revenue or incur more expense than if we sold our products directly. In addition, we may have little or no control over the sales efforts of those third parties. If we are unable to appropriately size our sales force or collaborate with third parties to sell our products, our ability to generate revenues would be adversely affected.

***We are a small company and our employees must work on many important and diverse matters at the same time. If we fail to retain key personnel, or to retain our executive management team, or if we cannot provide additional resources to perform important tasks, we may be unable to successfully sustain our business.\****

Our success and our ability to grow depend in part on our continued ability to retain and motivate highly qualified personnel and on our ability to develop and maintain important relationships with leading academic institutions, clinicians and scientists. As a small company, we are highly dependent upon our executive management team and other key personnel, all of whom work on many complex matters that are critical to our success. The loss of services of any one or more members of our executive management team or other key personnel could delay or prevent the successful completion of some of our key activities. We do not carry "key person" insurance. Any member of our executive management team and any other key employees may terminate his or her employment at any time without notice and without cause or good reason.

To grow our company we will need additional personnel. Competition for qualified personnel in the life sciences industry has historically been intense. If we cannot timely attract and retain quality personnel on acceptable terms, our failure to do so could adversely affect our business, financial condition, results of operations and growth prospects.

***Our offices are located near known earthquake fault zones, and the occurrence of an earthquake or other catastrophic disaster could damage our facilities, which could adversely affect our operations.***

Our offices are located in the San Francisco Bay Area, near known earthquake fault zones and are therefore vulnerable to damage from earthquake. In October 1989, a major earthquake in our area caused significant property damage and a number of fatalities. We are also vulnerable to damage from other disasters such as power loss, fire, floods and similar events. If a significant disaster occurs, our ability to continue our operations could be seriously impaired and we may not have adequate insurance to cover any resulting losses. Any significant unrecoverable losses could seriously impair our operations and financial conditions.

**Risks Related to Our Intellectual Property**

***It is difficult and costly to protect our proprietary rights, and we may not be able to ensure their protection.***

Our commercial success will depend in part on obtaining and maintaining patent protection and trade secret protection of our products and product candidates, their use and the methods used to manufacture and, in some cases, distribute them, as well as successfully defending these patents against third party challenges. Our ability to protect our products and product candidates from unauthorized making, using, selling, offering to sell or importation by third parties depends on the extent to which we have rights under valid and enforceable patents, or have trade secrets that cover these activities.

The patent position of pharmaceutical companies can be highly uncertain and involve complex legal and factual questions for which important legal principles remain unresolved. Changes in either the patent laws or in interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property. Even if we are able to obtain patents covering our products and product candidates, any patent may be challenged, invalidated, held unenforceable or circumvented. In the case of Luvox CR, for example, Actavis' Paragraph IV Certification alleges that Elan's U.S. Patent No. 7,465,462, listed in the Orange Book, is invalid on the basis that the inventions claimed therein were obvious; Anchen's Paragraph IV Certification alleges that Elan's U.S. Patent No. 7,465,462, listed in the Orange Book, will not be infringed by Anchen's manufacture, use or sale of the generic product for which the ANDA was submitted and that the patent is invalid on the basis that the inventions claimed therein were obvious. The expiration date for the patent at issue is May 10, 2020. The existence of a patent will not necessarily prevent other companies from developing similar or therapeutically equivalent products or protect us from claims of third parties that our products infringe their issued patents, which may require licensing and the payment of significant fees or royalties. Competitors may successfully challenge our patents, produce similar products that do not infringe our patents, or manufacture products in countries where we have not applied for patent protection or that do not respect our patents. Accordingly, we cannot predict the breadth of claims that may be allowed or enforced in our patents, our licensed patents or in third party patents.

The degree of future protection to be afforded by our proprietary rights is uncertain because legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep our competitive advantage. For example:

- others may be able to make products that are similar to our product candidates but that are not covered by the claims of our patents, or for which we are not licensed under our license agreements;

- we or our licensors or partners might not have been the first to make the inventions covered by our issued patents or pending patent applications or the pending patent applications or issued patents of our licensors or partners;

- we or our licensors or partners might not have been the first to file patent applications for these inventions;

- others may independently develop similar or alternative products without infringing our intellectual property rights;

- our pending patent applications may not result in issued patents;

33

Table of Contents

- our issued patents and the issued patents of our licensors or partners may not provide us with any competitive advantages, or may be held invalid or unenforceable as a result of legal challenges by third parties;

- we may not develop additional proprietary products that are patentable; or

- the patents of others may have an adverse effect on our business.

We also may rely on trade secrets and other unpatented proprietary information to protect our technology, especially where we do not believe patent protection is appropriate or obtainable. However, trade secrets are difficult to protect. Although we use reasonable efforts to protect our trade secrets and other unpatented proprietary information, our employees, consultants, advisors and partners may unintentionally or willfully disclose our proprietary information to competitors, and we may not have adequate remedies for such disclosures. If our employees, consultants, advisors and partners develop inventions or processes independently, or jointly with us, that may be applicable to our products under development, disputes may arise about ownership or proprietary rights to those inventions and processes. Enforcing a claim that a third party illegally obtained and is using any of our inventions or trade secrets is expensive and time consuming, and the outcome is unpredictable. In addition, courts outside of the United States are sometimes less willing to protect trade secrets. Moreover, our competitors may independently develop equivalent knowledge, methods and know-how.

Our research and development collaborators may have rights to publish data and other information to which we have rights. In addition, we sometimes engage individuals or entities to conduct research that may be relevant to our business. While the ability of these individuals or entities to publish or otherwise publicly disclose data and other information generated during the course of their research is subject to contractual limitations, these contractual provisions may be insufficient or inadequate to protect our trade secrets and may impair our patent rights. If we do not apply for patent protection prior to such publication, or if we cannot otherwise maintain the confidentiality of our innovations and other confidential information, then our ability to obtain patent protection or protect our proprietary information may be jeopardized. Moreover, a dispute may arise with our research and development collaborators over the ownership of rights to jointly developed intellectual property. Such disputes, if not successfully resolved, could lead to a loss of rights and possibly prevent us from pursuing certain new products or product candidates.

***We may incur substantial costs as a result of litigation or other proceedings relating to patent and other intellectual property rights and we may be unable to protect our rights to, or commercialize, our products.***

Our ability, and that of our partners, to commercialize any approved products will depend, in part, on our ability to obtain patents, enforce those patents and operate without infringing the proprietary rights of third parties. The patent positions of pharmaceutical companies can be highly uncertain and involve complex legal and factual questions. We have filed multiple U.S. patent applications and foreign counterparts, and may file additional U.S. and foreign patent applications related thereto. There can be no assurance that any issued patents we own or control will provide sufficient protection to conduct our business as presently conducted or as proposed to be conducted. Moreover, in part because of prior research performed and patent applications submitted in the same manner or similar fields, there can be no assurance that any patents will issue from the patent applications owned by us, or that we will remain free from infringement claims by third parties.

If we choose to go to court to stop someone else from pursuing the inventions claimed in our patents or in or our licensed patents or those of our partners, that individual or company has the right to ask the court to rule that these patents are invalid and/or should not be enforced against that third party. These lawsuits are expensive and would consume time and other resources, even if we were successful in stopping the infringement of these patents. In addition, there is a risk that the court will decide that these patents are not valid and that we do not have the right to stop the other party from using the inventions. There is also the risk that, even if the validity of these patents is upheld, the court will refuse to stop the other party on the ground that the other party's activities do not infringe our rights to these patents or that it is in the public interest to permit the infringing activity. We and Elan have filed and are prosecuting lawsuits in response to the Paragraph IV certifications that we received from Actavis and Anchen. We cannot assure you that these lawsuits will be successful in stopping the infringement of our related patents, that the litigation will be cost effective, or that the litigation will have a satisfactory result for us.

A third party may claim that we or our manufacturing or commercialization partners are using inventions covered by the third party's patent rights and may go to court to stop us from engaging in our normal operations and activities, including making or selling our products. Patent infringement lawsuits are costly and could affect our results of operations and divert the attention of management and development personnel. There is a risk that a court could decide that we or our partners are infringing third party patent rights. In the event that we or our partners are found to infringe any valid claim of a patent held by a third party, we may, among other things, be required to:

- pay damages, including up to treble damages and the other party's attorneys' fees, which may be substantial;

- cease the development, manufacture, use and sale of our products that infringe the patent rights of others through a court-imposed sanction such as an injunction;

34

Table of Contents

- expend significant resources to redesign our products so they do not infringe others' patent rights, which may not be possible;

- discontinue manufacturing or other processes incorporating infringing technology; or

- obtain licenses to the infringed intellectual property, which may not be available to us on acceptable terms, or at all.

The pharmaceutical and life sciences industry has produced a proliferation of patents, and it is not always clear to industry participants, including us, which patents cover various types of products or methods. The coverage of patents is subject to interpretation by the courts, and the interpretation is not always uniform. If we are sued for patent infringement, we would need to demonstrate that our products or methods do not infringe the patent claims of the relevant patent and/or that the patent claims are invalid or unenforceable, and we may not be able to do this. Proving invalidity, in particular, is difficult since it requires a showing of clear and convincing evidence to overcome the presumption of validity enjoyed by issued patents in the United States.

Because some patent applications in the United States may be maintained in secrecy until the patents are issued, because patent applications in the United States and many foreign jurisdictions are typically not published until 18 months after filing, and because publications in the scientific literature often lag behind actual discoveries, we cannot be certain that others have not filed patent applications for inventions covered by our licensors' or our issued patents or pending applications, or that we or our licensors were the first inventors. Our competitors may have filed, and may in the future file, patent applications covering subject matter similar to ours. Any such patent application may have priority over our or our licensors' patents or applications and could further require us to obtain rights to issued patents covering such subject matter. If another party has filed a U.S. patent application on inventions similar to ours, we may have to participate in an interference proceeding declared by the U.S. Patent and Trademark Office to determine priority of invention in the United States. The costs of these proceedings could be substantial, and it is possible that such efforts would be unsuccessful, resulting in a loss of our U.S. patent position with respect to such inventions.

Some of our competitors may be able to sustain the costs of complex patent litigation more effectively than we can because they have substantially greater resources. In addition, any uncertainties resulting from the initiation and continuation of any litigation could have a material adverse effect on our ability to raise the funds necessary to continue our operations.

**Risks Related to Our Industry**

***The regulatory approval process is expensive, time consuming and uncertain and may prevent us or our partners from obtaining approvals for the commercialization of some or all of our product candidates.***

The research, testing, manufacturing, selling and marketing of pharmaceutical products are subject to extensive regulation by FDA and other regulatory authorities in the United States and other countries, and regulations differ from country to country. Approval in the United States, or in any jurisdiction, does not ensure approval in other jurisdictions. The regulatory approval process is lengthy, expensive and uncertain, and we may be unable to obtain approval for our product candidates. We are not permitted to market our product candidates in the United States until we receive approval from the FDA, generally of an NDA. An NDA must contain, among other things, data to demonstrate that the drug is safe and effective for its intended uses and that it will be manufactured to appropriate quality standards. Obtaining approval of an NDA can be a lengthy, expensive and uncertain process, and the FDA has substantial discretion in the approval process. In addition, failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject our company to administrative or judicially imposed sanctions, including warning letters, untitled letters, civil and criminal penalties, injunctions, product seizure or detention, product recalls, total or partial suspension of production and refusal to approve pending NDAs or supplements to approved NDAs. If we are unable to obtain regulatory approval of our product candidates, we will not be able to commercialize them and recoup our research and development costs.

In 2008, the FDA announced that, in light of staffing issues, it has given its managers discretion to miss Prescription Drug User Fee Act, or PDUFA, deadlines for completing reviews of NDAs. Although the FDA has since publicly expressed a recommitment to meeting PDUFA deadlines, it remains unclear whether and to what extent the FDA will adhere to PDUFA deadlines in the future. If the FDA were to miss a PDUFA deadline for JZP-6 or one of our other product candidates, delaying the approval and launch, the delay could have a material adverse effect on our business.

***Healthcare law and policy changes, including those based on recently enacted legislation, may impact our business in ways that we cannot currently predict and these changes could have a material adverse effect on our business and financial condition.****

In March 2010, the President signed the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act, or the "Healthcare Reform Act. This law substantially changes the way health care is financed by both governmental and private insurers, and significantly impacts the pharmaceutical industry. The Healthcare Reform Act contains a number of provisions that are expected to impact our business and operations, in some cases in ways we cannot currently predict. Changes that may affect our business include those governing enrollment in federal healthcare programs, reimbursement changes and fraud and abuse, enforcement. These changes will impact existing government healthcare programs and

35

will result in the development of new programs, including Medicare payment for performance initiatives and improvements to the physician quality reporting system and feedback program.

Additional provisions of the Healthcare Reform Act, some of which become effective in 2011, may negatively affect our revenues and prospects for continued profitability in the future. For example, the Healthcare Reform Act imposes a non-deductible excise tax on pharmaceutical manufacturers or importers that sell branded prescription drugs to U.S. government programs that we believe will impact our revenues from our products. In addition, as part of the Healthcare Reform Act's provisions closing a funding gap that currently exists in the Medicare Part D prescription drug program (commonly known as the "donut hole"), we will also be required to provide a 50% discount on branded prescription drugs dispensed to beneficiaries within this donut hole. We expect that the Healthcare Reform Act and other healthcare reform measures that may be adopted in the future could have a material adverse effect on our industry generally and on our ability to maintain or increase our product sales or successfully commercialize our product candidates, including JZP-6, or could limit or eliminate our future spending on development projects.

In addition to the Healthcare Reform Act, there will continue to be proposals by legislators at both the federal and state levels, regulators and third-party payors to keep healthcare costs down while expanding individual healthcare benefits. Certain of these changes could impose limitations on the prices we will be able to charge for our products and any approved product candidates or the amounts of reimbursement available for these products from governmental agencies or third-party payors, or may increase the tax obligations on pharmaceutical companies such as ours. The enactment and implementation of any future healthcare reform legislation or policies could have a material adverse effect on our business and financial condition.

*We are subject to significant ongoing regulatory obligations and oversight, which may result in significant additional expense and limit our ability to commercialize our products.*

We are subject to significant ongoing regulatory obligations, such as safety reporting requirements and additional post-marketing obligations, including regulatory oversight of the promotion and marketing of our products. In addition, the labeling, packaging, adverse event reporting, storage, advertising, promotion and recordkeeping for our products are, and any of our product candidates that may be approved by the FDA will be, subject to extensive and ongoing regulatory requirements. If we receive regulatory approvals to sell our products, the FDA and foreign regulatory authorities may impose significant restrictions on the indicated uses or marketing of our products, or impose requirements for burdensome post-approval study commitments. The terms of any product approval, including labeling, may be more restrictive than we desire and could affect the commercial potential of the product. If we become aware of previously unknown problems with any of our products in the United States or overseas or at our contract manufacturers' facilities, a regulatory agency may impose restrictions on our products, our contract manufacturers or on us, including requiring us to reformulate our products, conduct additional clinical trials, make changes in the labeling of our products, implement changes to, or obtain re-approvals of, our contract manufacturers' facilities, or withdraw the product from the market. In addition, we may experience a significant drop in the sales of the affected products, our product revenues and reputation in the marketplace may suffer, and we could become the target of lawsuits, including class action suits. The FDA and other governmental authorities also actively enforce regulations prohibiting promotion of off-label uses and the promotion of products for which marketing approval has not been obtained. The federal government has levied large civil and criminal fines against companies for alleged improper promotion and has enjoined several companies from engaging in off-label promotion. The FDA has also requested that companies enter into consent decrees or permanent injunctions under which specified promotional conduct is changed or curtailed.

We are also subject to regulation by regional, national, state and local agencies, including the DEA, the Department of Justice, the Federal Trade Commission, the Office of Inspector General of the U.S. Department of Health and Human Services and other regulatory bodies, as well as governmental authorities in those foreign countries in which we commercialize our products. The Federal Food, Drug, and Cosmetic Act, the Public Health Service Act and other federal and state statutes and regulations govern to varying degrees the research, development, manufacturing and commercial activities relating to prescription pharmaceutical products, including preclinical testing, approval, production, labeling, sale, distribution, import, export, post-market surveillance, advertising, dissemination of information, promotion, marketing, and pricing to government purchasers and government health care programs. Our manufacturing partners are subject to many of the same requirements, which include obtaining sufficient quota from the DEA each year to manufacture sodium oxybate, Xyrem and JZP-6. These statutes and regulations include anti-kickback statutes and false claims statutes.

The federal health care program anti-kickback statute prohibits, among other things, knowingly and willfully offering, paying, soliciting, or receiving remuneration to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any health care item or service reimbursable under Medicare, Medicaid or other federally financed healthcare programs. This statute has been interpreted to apply to arrangements between pharmaceutical companies on one hand and prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exemptions and regulatory safe harbors protecting certain common manufacturer business arrangements and activities from prosecution, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration intended to induce prescribing, purchases or recommendations of our products may be subject to scrutiny if they do not qualify for an exemption or safe harbor. We seek to comply with the exemptions and safe harbors whenever possible, but our practices may not in all cases meet all of the criteria for safe harbor protection from anti-kickback liability.

36

Table of Contents

The Federal False Claims Act prohibits any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.

Many pharmaceutical and other health care companies have been investigated and have reached substantial financial settlements with the federal government under these laws for a variety of alleged marketing activities, including providing free product to customers with the expectation that the customers would bill federal programs for the product; providing consulting fees, grants, free travel, and other benefits to physicians to induce them to prescribe the company's products; and inflating prices reported to private price publication services, which are used to set drug payment rates under government health care programs. Other companies have been prosecuted for causing false claims to be submitted because of the marketing of their products for unapproved, and thus non-reimbursable, uses. Pharmaceutical and other health care companies have also been prosecuted on other legal theories of Medicare and Medicaid fraud.

The majority of states also have statutes or regulations similar to the federal anti-kickback law and false claims laws, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Several states now require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and to report gifts and payments to individual physicians in the states. Other states prohibit providing meals to prescribers or other marketing related activities. Still other states require the posting of information relating to clinical studies and their outcomes. In addition, California, Nevada, and Massachusetts require pharmaceutical companies to implement compliance programs or marketing codes. Currently, several additional states are considering similar proposals.

Compliance with various federal and state laws is difficult and time consuming, and companies that violate them may face substantial penalties. The potential sanctions include civil monetary penalties, exclusion of a company's products from reimbursement under government programs, criminal fines and imprisonment. Because of the breadth of these laws and the lack of extensive legal guidance in the form of regulations or court decisions, it is possible that some of our business activities could be subject to challenge under one or more of these laws. Such a challenge could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

The number and complexity of both federal and state laws continues to increase, and additional governmental resources are being added to enforce these laws and to prosecute companies and individuals who are believed to be violating them. In particular, the Healthcare Reform Act includes a number of provisions aimed at strengthening the government's ability to pursue anti-kickback and false claims cases against pharmaceutical manufacturers and other healthcare entities, including substantially increased funding for healthcare fraud enforcement activities, enhanced investigative powers, amendments to the False Claims Act that make it easier for the government and whistleblowers to pursue cases for alleged kickback and false claim violations and, beginning in March 2013 for payments made in 2012, public reporting of payments by pharmaceutical manufacturers to physicians and teaching hospitals nationwide. While it is too early to predict what effect these changes will have on our business, we anticipate that government scrutiny of pharmaceutical sales and marketing practices will continue for the foreseeable future and subject us to the risk of government investigations and enforcement actions. Responding to a government investigation or enforcement action would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

If we or any of our partners fail to comply with applicable regulatory requirements, we or they could be subject to a range of regulatory actions that could affect our or our partners' ability to commercialize our products and could harm or prevent sales of the affected products, or could substantially increase the costs and expenses of commercializing and marketing our products. Any threatened or actual government enforcement action could also generate adverse publicity and require that we devote substantial resources that could otherwise be used in other aspects of our business.

***If we fail to comply with our reporting and payment obligations under the Medicaid rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.****

We participate in the federal Medicaid rebate program established by the Omnibus Budget Reconciliation Act of 1990, as well as several state supplemental rebate programs. Under the Medicaid rebate program, we pay a rebate to each state Medicaid program for our covered outpatient drugs that are dispensed to Medicaid beneficiaries and paid for by a state Medicaid program under a fee-for-service arrangement, as a condition of having federal funds being made available to the states for our drugs under Medicaid and Medicare Part B. Those rebates are based on pricing data reported by us on a monthly and quarterly basis to the Centers for Medicare and Medicaid Services (CMS), the federal agency which administers the Medicaid drug rebate program. These data include the average manufacturer price (AMP), and in the case of innovator products, the best price for each drug. As a result of the enactment of the Healthcare Reform Act, rebates now also will be due on the utilization of Medicaid managed care organizations, effective March 23, 2010.

Table of Contents

Pursuant to the Healthcare Reform Act, and effective for rebate periods beginning the first quarter 2010, the minimum amount of the Medicaid rebate for each unit of a drug has been increased. For innovator products, in general a drug marketed under a New Drug Application, or NDA, the minimum rebate has been increased from 15.1% to 23.1% of the AMP for that product, or if it is greater, the difference between the AMP and the best price for the product. The 23.1% rebate amount is lowered to 17.1% for certain clotting factor and pediatric drug products. For noninnovator products, in general a drug marketed under an Abbreviated New Drug Application, or ANDA, the rebate amount has been increased from 11% to 13.1% of the AMP for drug. The Medicaid rebate for innovator products also includes an additional rebate amount if price increases for the drug exceed the rate of inflation since the product's launch. The Healthcare Reform Act changes this additional rebate formula for certain products that qualify as line extensions of existing drugs, effective for rebate periods beginning with drugs paid for by a state as of the first quarter 2010, so that the rebate for these products can be increased and based on the additional rebate for the original drug. It also caps the total rebate amount for innovator drugs at 100% of the AMP for the drug. In addition, the Healthcare Reform Act changes the definition of AMP, effective for AMP prices reported for the fourth quarter of 2010, and additional legislation is currently pending that would further amend the AMP definition. CMS has yet to issue regulations to implement any of the enacted statutory changes.

We cannot assure that there will not be additional increases in rebates or other costs and charges from government agencies. Regulations continue to be issued and coverage expanded by various governmental agencies relating to these programs, increasing the cost and complexity of compliance.

Pricing and rebate calculations vary among products and programs. The calculations are complex and are often subject to interpretation by us, governmental or regulatory agencies and the courts. The Medicaid rebate amount is computed each quarter based on our submission to CMS our current AMP and best prices for the quarter. If we become aware that our reporting for prior quarters was incorrect, or has changed as a result of recalculation of the pricing data, we are obligated to resubmit the corrected AMP or best price for that quarter. Any corrections to our rebate calculations could result in an overage or underage in our rebate liability for past quarters, depending on the nature of the correction as well as changes in the 340B ceiling prices based on those rebate calculations, as discussed below, such that refunds to covered entities that purchased at the earlier prices may be due. In addition to retroactive rebates and the potential for 340B ceiling price refunds, if we are found to have knowingly submitted false average manufacturer price or best price information to the government, we may be liable for civil monetary penalties in the amount of $100,000 per item of false information. Governmental agencies may also make changes in program interpretations, requirements or conditions of participation, some of which may have implications for amounts previously estimated or paid.

Federal law requires that any company that participates in the Medicaid rebate program also participate in the Public Health Service's 340B pharmaceutical pricing program in order for federal funds to be available for the manufacturer's drugs under Medicaid and Medicare Part B. The 340B pricing program requires participating manufacturers to agree to charge statutorily-defined covered entities no more than the 340B ceiling price for the manufacturer's covered outpatient drugs. These covered entities include a variety of community health clinics and other entities that receive health services grants from the Public Health Service, as well as hospitals that serve a disproportionate share of poor patients and children. The 340B ceiling price is calculated using a statutory formula which is based on the AMP and rebate amount for the covered outpatient drug as calculated under the Medicaid drug rebate program. This means that to the extent the Healthcare Reform Act, as discussed above, changes the statutory and regulatory definitions of AMP and the Medicaid rebate amount, these changes also will affect the 340B ceiling price. The Healthcare Reform Act expands the 340B drug pricing program to include new covered entity types, effective for drugs purchased on or after January 1, 2010, although drugs that have received an orphan drug designation under section 526 of the Federal Food Drug and Cosmetic Act are exempt from the ceiling price requirement for the new categories of covered entities. The Healthcare Reform Act also obligates the Secretary to create regulations and processes to improve the integrity of the program and to update the agreement that manufacturers must sign to participate in the program to obligate manufacturers to sell to covered entities if they sell to any other purchaser and to report to the government the ceiling prices for its drugs. In addition, Congress is currently considering legislation that, if passed, would further expand the 340B program to require participating manufacturers to agree to provide 340B discounted pricing on drugs used in the inpatient setting by certain covered entity hospitals, where those drugs are used for the covered entity's uninsured inpatients.

***Reimbursement may not be available for our products, which could diminish our sales or affect our ability to sell our products profitably.***

In both U.S. and foreign markets, our ability to commercialize our products successfully, and to attract strategic partners for our products, depends in significant part on the availability of adequate financial coverage and reimbursement from third party payors, including, in the United States, governmental payors such as the Medicare and Medicaid programs, managed care organizations and private health insurers. Third party payors decide which drugs they will pay for and establish reimbursement and co-pay levels. Third party payors are increasingly challenging the prices charged for medical products and services and examining their cost effectiveness, in addition to their safety and efficacy. In some cases, for example, third party payors try to encourage the use of less expensive generic products through their prescription benefits coverage and reimbursement and co-pay policies. We may need to conduct expensive pharmacoeconomic studies in order to demonstrate the cost-effectiveness of our products. Even with studies, our products may be considered less safe, less effective or less cost-effective than existing products, and third party payors may not provide

38

Table of Contents

coverage and reimbursement for our products, in whole or in part. We cannot predict actions third party payors may take, or whether they will limit the coverage and level of reimbursement for our products or refuse to provide any coverage at all. For example, because Luvox CR is competing in a market with both branded and generic products, reimbursement by government and private payors may be more challenging than for new chemical entities. We cannot be sure that reimbursement amounts, or the lack of reimbursement, will not reduce the demand for, or the price of, our products. If reimbursement is not available or is available only to limited levels, we may not be able to effectively commercialize our products.

In recent years, there have been a number of legislative and regulatory changes in and proposals to change the healthcare system in ways that could impact our ability to sell our products profitably. These changes and proposals include measures that would limit or prohibit payments for some medical treatments or subject the pricing of drugs to government control and regulations changing the rebates we are required to provide. For example, a final rule published by the Department of Defense, or DoD, in March 2009, implementing the terms of the National Defense Authorization Act of 2008, established a program under which DoD expects rebates from pharmaceutical manufacturers on all prescriptions of "covered" prescription drugs (including innovator drugs and biologics) filled under the TRICARE retail pharmacy program from January 28, 2008 forward, unless DoD agrees to a waiver or compromise of amounts due. Additionally, under the final rule, to remain eligible for inclusion on the DoD Uniform Formulary, a pharmaceutical manufacturer must enter into a pricing agreement under which it agrees to pay rebates to DoD on TRICARE retail pharmacy utilization on a prospective basis. These rebates are meant to enable DoD to access pricing that is either close to or equal to "Federal Ceiling Prices," defined under the Veterans Health Care Act of 1992. Per the process set forth in this rule, we entered into a retail rebate agreement with DoD in July 2009. These legislative and regulatory changes, including our entering into the retail rebate agreement with DoD, could impact our ability to maximize revenues in the Federal marketplace. As discussed above, recent legislative changes to the 340B drug pricing program, the Medicaid drug rebate program, and the Medicare Part D prescription drug benefit also could impact our revenues.

We expect to experience pricing pressures in connection with the sale of our products due to the trend toward managed health care, the increasing influence of health maintenance organizations and additional legislative proposals. If we fail to successfully secure and maintain reimbursement coverage for our products or are significantly delayed in doing so, we will have difficulty achieving market acceptance of our products and our business will be harmed.

***Prescription drug importation from Canada and other countries could increase pricing pressure on our products and could decrease our revenues and profit margins.***

Under current U.S. law, there is a general prohibition on imports of unapproved drug products. The FDA has published internal guidance that sets forth the agency's enforcement priorities for imported drugs. Under this policy, the FDA allows its personnel to use their discretion in permitting entry into the United States of personal use quantities of FDA-regulated products in personal baggage and mail when the product does not present an unreasonable risk to the user. Thus, individuals may import prescription drugs that are unavailable in the United States from Canada and other countries for their personal use under specified circumstances. Other imports, although illegal under U.S. law, also enter the country as a result of the resource constraints and enforcement priorities of the FDA and the U.S. Customs Services. In addition, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 permits pharmacists and wholesalers to import prescription drugs into the United States from Canada under specified circumstances. These additional import provisions will not take effect until the Secretary of Health and Human Services makes a required certification regarding the safety and cost savings of imported drugs and the FDA has promulgated regulations setting forth parameters for importation. These conditions have not been met to date and the law has therefore not taken effect. However, legislative proposals have been introduced to remove these conditions and implement changes to the current import laws, or to create other changes that would allow foreign versions of our products priced at lower levels than in the United States to be imported or reimported to the United States from Canada, Europe and other countries. In addition, there have been indications that the current presidential administration is considering changing certain rules to make it easier to import drugs from other countries, and we cannot predict what, if any changes will happen. If these provisions or changes in the rules take effect, the volume of prescription drug imports from Canada and elsewhere could increase significantly and our products could face competition from lower priced imports.

Even if these provisions do not take effect and alter current law, the volume of prescription drug imports from Canada and elsewhere could increase due to a variety of factors, including the further spread of internet pharmacies and actions by a number of state and local governments to facilitate Canadian and other imports. These imports may harm our business.

***Product liability and product recalls could harm our business.****

The development, manufacture, testing, marketing and sale of pharmaceutical products entail significant risk of product liability claims or recalls. Side effects of, or manufacturing defects in, the products sold by us could result in exacerbation of a patient's condition, serious injury or impairments or even death. This could result in product liability claims and/or recalls of one or more of our products. For example, studies and publications suggest that SSRIs, including the active pharmaceutical ingredient in Luvox CR and its immediate release formulation Luvox, may increase the risk of suicidal behavior in adults and adolescents. In addition, the current SSRI products used to treat obsessive compulsive disorder and social anxiety disorder, particularly those formulated for

39

Table of Contents

immediate release, all have significant adverse side effects. Side effects associated with SSRIs include sexual dysfunction, adverse drug interaction and risk of hypertension. Xyrem is contraindicated in patients being treated with sedative hypnotic agents and in patients with succinic semialdehyde dehydrogenase deficiency. It should not be used with alcohol or other CNS depressants. Its label includes many adverse events associated with illicit GHB and with the use of sodium oxybate. In addition, both Xyrem and Luvox CR have boxed warnings in their labels. We expect that the label for JZP-6, if it is approved by the FDA, will also have a boxed warning, and will include adverse events seen in narcolepsy and fibromyalgia trials, as well as post-marketing safety information.

Product liability claims may be brought by individuals seeking relief for themselves or by groups seeking to represent a class. While we have not had to defend against any product liability claims to date, as sales of our products increase, we believe it is likely product liability claims will be made against us. If our JZP-6 product candidate is approved by the FDA, sales of that product could be significantly higher than those of Xyrem or Luvox CR, or both, which makes product liability claims more likely. We cannot predict the frequency, outcome or cost to defend any such claims.

Product liability insurance coverage is expensive, can be difficult to obtain and may not be available in the future on acceptable terms, if at all. Partly as a result of product liability lawsuits related to pharmaceutical products, product liability and other types of insurance have become more difficult and costly for pharmaceutical companies to obtain. Our product liability insurance may not cover all of the future liabilities we might incur in connection with the development, manufacture or sale of our products. In addition, we may not continue to be able to obtain insurance on satisfactory terms or in adequate amounts.

A successful claim or claims brought against us in excess of available insurance coverage could subject us to significant liabilities and could have a material adverse effect on our business, financial condition, results of operations and growth prospects. Such claims could also harm our reputation and the reputation of our products, adversely affecting our ability to market our products successfully. In addition, defending a product liability lawsuit is expensive and can divert the attention of key employees from operating our business.

Product recalls may be issued at our discretion or at the discretion of our suppliers, government agencies and other entities that have regulatory authority for pharmaceutical sales. Any recall of our products could materially adversely affect our business by rendering us unable to sell that product for some time and by adversely affecting our reputation.

**Risks Relating to Our Financial Condition**

***We have a history of net losses, and, if we are to grow our business in the future, we will need to commit substantial resources, which could result in future losses.***

We have incurred significant net losses since our inception in 2003, and although we reported both operating income and cash generated from operations in recent quarters, we reported net losses for the three and six months ended June 30, 2010 and we may incur net losses in the future. To grow our business in the future, we will need to commit substantial resources to costly and time-consuming product development and clinical trials of our product candidates and significant funds to our commercial operations. Our future capital requirements will depend on many factors, including:

- the amount of sales and other revenues from our commercial products, including selling prices for products that we may begin selling and price increases for our current products, and whether or not there is generic competition;

- market acceptance of and the number of prescriptions written for our products and competition;

- selling and marketing costs associated with our products in the United States;

- the timing of potential receipt of FDA approval of JZP-6 and its potential commercialization;

- revenues from current and potential future development and/or commercial collaboration partners, in particular our current partnership with UCB;

- the scope, rate of progress, results and costs of our preclinical studies and clinical trials, including our Phase IV clinical trial commitment to the FDA for Luvox CR (if we are not released by the FDA from that commitment), and other research and development activities;

- the number and characteristics of product candidates that we pursue;

- the cost and timing of establishing and maintaining clinical and commercial supplies of our product candidates and products and our reliance on sole source suppliers;

- the cost and timing of obtaining regulatory approvals and of compliance with laws and regulations;

- payments of milestones to third parties;

- increased expenses associated with our current employees and new employees hired to support our continued growth;

40

Table of Contents

- the cost of investigations, litigation and/or settlements related to regulatory activities;

- the cost of preparing, filing, prosecuting, defending and enforcing patent claims and other intellectual property rights;

- the extent to which we acquire, in-license or invest in new businesses, products or product candidates;

- changes in laws and regulations, including, for example, the recently enacted comprehensive health care reform legislation; and

- our ability to utilize our net operating loss carryforwards to offset potential future taxable income and related income taxes.

***Our operations have, until very recently, generated negative cash flows, and, if our cash flow estimates are incorrect, we may be required to secure additional funding, scale back our operations, reduce our headcount, and/or discontinue some of our activities, which could negatively affect our business and prospects.\****

Although we have generated cash from our operations in recent quarters, we may not be able to sustain or increase our cash from operations on a quarterly or annual basis. While we believe that our existing cash balances, cash we expect to generate from operations, and cash we expect to have under our revolving credit facility will be sufficient to fund our operations and meet all of our existing obligations for the foreseeable future, we cannot assure you that this belief is correct. The adequacy of our cash resources depends on many assumptions, including primarily our assumptions with respect to product sales and expenses. We cannot predict with certainty the level of our product sales. Our assumptions may prove to be wrong or other factors may adversely affect our business, and in that case we could exhaust or significantly limit our available cash resources which could, among other things, force us to raise additional funds and/or force us to reduce our expenses, either of which could have a material adverse effect on our business.

Our ability to raise additional funds will depend, among other things, on the capital markets and our financial condition at such time. Any additional funds we may raise could be on terms that are not favorable to us and may be dilutive to existing stockholders. If product sales do not meet our expectations and we cannot raise additional funds, we may need to reduce our expenditures, which could negatively affect our business and prospects.

***The terms of our new credit facility could restrict our operations, particularly our ability to respond to changes in our business or to take specified actions.\****

The terms of our new credit agreement include, and any future indebtedness may include, a number of restrictive covenants that impose significant operating and financial restrictions on us, including restrictions on our ability to take actions that may be in our best interests. The terms of the new credit agreement include operating covenants restricting, among other things, our ability to:

- incur additional indebtedness and liens;

- effect mergers, consolidations and other fundamental changes

- dispose of significant assets or enter into sale-leaseback transactions;

- pay dividends or make other restricted payments;

- make loans advance or other investments; and

- enter into transactions with affiliates.

In addition, the terms of the credit agreement include financial covenants requiring us, among other things, to

- maintain a certain consolidated fixed charge coverage ratio;

- maintain a certain leverage ratio; and

- maintain, as at the end of each month, beginning with the month ended September 30, 2010 through March 31, 2011, certain liquidity.

Our failure to comply with any of these covenants could result in a default under the terms of the credit agreement, which could permit the lenders to declare all or part of the outstanding borrowings to be immediately due and payable. If our outstanding borrowings were to be accelerated, we may not have sufficient funds to repay those borrowings, and any such acceleration would have a material adverse effect on our business, financial condition and results of operations.

41

Table of Contents

*We have a substantial amount of secured debt, which matures in June 2013.\**

Although we have significantly reduced the total amount of our outstanding debt through the repayment of our senior secured notes and the execution of our new credit agreement, as of June 30, 2010, we had borrowed $57.4 million under our new credit agreement, all of which is secured by a first lien and security interest in substantially all of our assets. These borrowings, combined with our other financial obligations and contractual commitments, could have important consequences. For example, it could:

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flows to fund working capital, capital expenditures and acquisitions;

- make us more vulnerable to adverse changes in general U.S. and worldwide economic, industry and competitive conditions and adverse changes in government regulation;

- limit our flexibility in planning for, or reacting to, changes in our business and our industry;

- place us at a competitive disadvantage compared to our competitors who have less debt; and

- limit our ability to borrow additional amounts for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy or other purposes.

Any of these factors could materially adversely affect our business, financial condition, results of operations and growth prospects.

***Our ability to use our net operating losses to offset potential future taxable income and related income taxes that would otherwise be due could be limited or lost entirely, which could materially and adversely affect our business, financial condition, and results of operations, if we do not generate taxable income in a timely manner or if an "ownership change" pursuant to Section 382 of the Internal Revenue Code is triggered.***

We have significant net operating loss carryforwards, or NOLs. Our ability to use our NOLs to offset potential future taxable income and related income taxes that would otherwise be due is dependent upon our generation of future taxable income before the expiration dates of the NOLs, and we cannot predict with certainty whether or when, we will generate sufficient taxable income to use our NOLs. In addition, even if we generate taxable income, realization of our NOLs to offset potential future taxable income and related income taxes that would otherwise be due could be restricted by annual limitations on use of NOLs triggered by an "ownership change" under Section 382 of the Internal Revenue Code and similar state provisions. An "ownership change" may occur if, during a three-year period, the percentage ownership of our company by 5% shareholders or shareholder groups, as defined in the Code, increases by 50% or more. If we generate taxable income, the loss of some or all of our NOLs could materially and adversely affect our business, financial condition, results of operations and growth prospects.

Effective July 7, 2009, we entered into an NOL preservation lock-up agreement with most of our significant stockholders that restricts transferability of all of the shares of our common stock held by the stockholders who entered into the agreement until June 2011, unless terminated earlier under certain circumstances, in order to reduce the risk that we will undergo an "ownership change" within the meaning of Section 382(g) of the Internal Revenue Code prior to that time. Section 382 of the Internal Revenue Code is an extremely complex provision with respect to which there are many uncertainties. Although the NOL preservation lock-up agreement and 5% shareholder limitation are intended to reduce the risk of such an "ownership change," we cannot assure you that such an ownership change will not occur. In addition, we have not requested a ruling from the Internal Revenue Service, or IRS, regarding whether we have not experienced an "ownership change" since 2005, and, therefore, we have not established whether the IRS agrees with us that our NOLs have been effectively preserved for purposes of Section 382 of the Internal Revenue Code.

**Risks Relating to Our Common Stock**

***The market price of our common stock may be volatile, and the value of your investment could decline significantly.\****

Investors who purchase our common stock may not be able to sell their shares at or above the purchase price. Our common stock has historically had a very low average trading volume, and our stockholders may not be able to sell any or all of their holdings quickly or at all. The price of our stock has also fluctuated significantly since the beginning of 2009, and we cannot predict if it will continue to do so. In addition, the stock market in general, including the market for life sciences companies, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may seriously harm the market price of our common stock, regardless of our operating performance. In the past, following periods of volatility in the market, securities class-action litigation has often been instituted against companies. Such litigation, if instituted against us, could result in substantial costs and diversion of management's attention and resources, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

Table of Contents

The following factors, in addition to other risks described herein, may have a significant effect on our common stock market price:

- the level of Xyrem and Luvox CR sales in the United States;

- conditions or trends in the pharmaceutical industry, the credit and financial markets or the United States and worldwide economy in general;

- the failure or delay by the DEA in providing sufficient quotas for sodium oxybate, Xyrem or JZP-6;

- the success of our development efforts and clinical trials;

- announcement of FDA approval or non-approval of our product candidates, including JZP-6, or specific label indications for their use, or delays in the FDA review process, or a negative outcome of our upcoming FDA Advisory Committee meeting;

- the review, evaluation and recommendations of any FDA advisory committee regarding the potential approval of JZP-6;

- our ability to successfully market JZP-6 in the United States if approved by the FDA for the treatment of fibromyalgia, or any delays in the potential commercial launch of JZP-6;

- our ability to obtain adequate clinical and commercial supplies of our product candidates and products from our single source suppliers and manufacturers, including our ability to effectively transition to our new supplier of sodium oxybate;

- the ability of Elan to provide us with sufficient commercial supply of Luvox CR;

- our financial situation, including our ability or inability to raise additional capital when needed and the terms on which we raise it;

- actual or expected fluctuations in our operating results, including as a result of fluctuating demand for our commercial products as a result of purchases by wholesalers in connection with product launches, stockpiling or inventory drawdowns by our customers, or otherwise;

- hedging or arbitrage trading activity that may develop involving our common stock;

- changes in the prices for our products;

- the success of our efforts to acquire or in-license additional products or product candidates;

- introductions and announcements of new products by us, our commercialization partners, or our competitors, and the timing of these introductions or announcements;

- the filing of, and thereafter the possible FDA approval of, ANDAs for generic forms of Xyrem, Luvox CR and, if approved by the FDA, JZP-6;

- announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

- announcements of product innovations by us, our partners or our competitors;

- changes in laws or regulations applicable to our products, including but not limited to clinical trial requirements and changes as a result of the recently enacted comprehensive healthcare reform legislation;

- actions taken by regulatory agencies with respect to our products, clinical trials, manufacturing process or sales and marketing terms;

- developments concerning our collaborations, including but not limited to those with our sources of manufacturing supply and our commercialization partners;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our products;

- actual or anticipated changes in earnings estimates or changes in stock market analyst recommendations regarding our common stock, other comparable companies or our industry generally;

- actual or expected changes in our growth rates or our competitors' growth rates;

- changes in the market valuation of similar companies;

- trading volume of our common stock; and

- sales of our common stock by us or our stockholders.

43

Table of Contents

***Future sales of our common stock in the public market could cause our stock price to fall.*** *

Sales of a substantial number of shares of our common stock in the public market or the perception that these sales might occur, could depress the market price of our common stock, and could impair our ability to raise capital through the sale of additional equity securities. As of August 2, 2010, we had 38,855,799 shares of common stock outstanding, all of which shares are eligible for sale in the public market, subject in some cases to the volume limitations and manner of sale and other requirements under Rule 144, the restrictions under our NOL preservation lock-up agreement, and the restrictions in the lock-up agreements entered into with the underwriter of our May 2010 public offering which expire on August 28, 2010.

As of August 2, 2010, the holders of up to approximately 18,312,159 shares of common stock, based on shares outstanding as of that date, including 785,728 shares underlying outstanding warrants, were entitled to certain rights with respect to the registration of such shares under the Securities Act of 1933, as amended, under an amended and restated investor rights agreement that we entered into with these holders in June 2007. In addition, upon exercise of outstanding options by our executive officers, our executive officers will be entitled to rights under the amended and restated investor rights agreement with respect to registration of the shares of common stock acquired on exercise. If such holders, by exercising their registration rights, sell a large number of shares, they could adversely affect the market price for our common stock. If in the future we file a registration statement and include shares held by these holders pursuant to the exercise of their registration rights, these sales may impair our ability to raise capital. We also entered into a registration rights agreement pursuant to which we filed a registration statement covering the resale of the 562,192 shares underlying the warrants that we issued in connection with the issuance of senior secured notes that were repaid in June 2010. In addition, we have filed registration statements on Form S-8 under the Securities Act to register the shares of our common stock reserved for issuance under our stock option and employee stock purchase plans, and intend to file additional registration statements on Form S-8 to register the shares automatically added each year to the share reserves under these plans.

We entered into a committed equity financing facility, or CEFF, in May 2008 with Kingsbridge Capital Limited, or Kingsbridge, which we amended in November 2009. The perceived risk of dilution from sales of our common stock to or by Kingsbridge in connection with the CEFF in the future may cause holders of our common stock to sell their shares, or it may encourage short selling by market participants, which could contribute to a decline in our stock price. We have not drawn down funds and have not issued shares of our common stock under the CEFF with Kingsbridge. Because our ability to draw down amounts under the CEFF is subject to a number of conditions, there is no guarantee that we will be able to draw down any portion or all of the $75 million available to us under the CEFF. In addition, although the CEFF provides for our ability to draw down amounts of up to $75 million, there is a limit on the maximum number of shares of common stock we can issue to Kingsbridge. Since we would issue shares of our common stock at a discount of up to 9.5% from the then average price of our common stock if we were to draw down amounts under the CEFF, even if we were able to issue the maximum number of shares provided for under the CEFF to Kingsbridge, the aggregate proceeds to us could be substantially less than $75 million. If we were to draw down funds under the CEFF and Kingsbridge acquires shares in connection with a drawdown, there are no restrictions on its ability to sell those shares or engage in other transactions that could put downward pressure on the price of our common stock. If we sell shares to Kingsbridge under the CEFF, they will be issued at a discount from the average price of our common stock. This will have a dilutive effect on the holdings of our current stockholders, and may result in downward pressure on the price of our common stock. If we draw down amounts under the CEFF when our share price is decreasing, we will need to issue more shares to raise the same amount than if our share price was higher. Issuances in the face of a declining share price will have an even greater dilutive effect than if our share price were stable or increasing, and could further decrease our share price. The CEFF expires in December 2012.

Pursuant to the terms of an investor rights agreement dated July 7, 2009 we entered into in connection with a private placement completed on July 7, 2009, we filed a registration statement under the Securities Act registering the resale of the 1,895,734 shares of common stock we issued to the investors pursuant to a securities purchase agreement we entered into with the investors on July 6, 2009, as well as the 947,867 shares of common stock underlying the warrants we issued to the investors pursuant to the securities purchase agreement. In addition, if we propose to register any of our securities under the Securities Act, either for our own account or for the account of others, the investors are entitled to notice of the registration and are entitled to include, at our expense, their shares of common stock in the registration and any related underwriting, provided, among other conditions, that the underwriters may limit the number of shares to be included in the registration.

***Our executive officers and directors, together with their respective affiliates, own a significant percentage of our stock and will be able to exercise significant influence over matters subject to stockholder approval.***

As of August 2, 2010, our executive officers and directors, together with the stockholders with which our executive officers and directors are affiliated or associated, beneficially owned approximately 56.0% of our capital stock, of which approximately 4.6% was beneficially owned by our executive officers. Accordingly, our executive officers and directors, together with their respective affiliates or associates, are able to determine the composition of our board of directors, retain the voting power to approve all matters requiring stockholder approval, including mergers and other business combinations, and continue to have significant influence over our operations. This concentration of ownership could have the effect of delaying or preventing a change in our control or otherwise

44

discouraging a potential acquirer from attempting to obtain control of us, which in turn could have a material adverse effect on the market value of our common stock, and may prevent attempts by our stockholders to replace or remove our board of directors or management.

***We incur significant increased costs as a result of operating as a public company, and our management devotes substantial time to new compliance initiatives.\****

As a public company, we incur significant legal, accounting and other expenses. In addition, the Sarbanes-Oxley Act of 2002 and rules of the Securities and Exchange Commission and The NASDAQ Stock Market LLC have imposed various requirements on public companies including requiring establishment and maintenance of effective disclosure and financial controls. Our management and other personnel devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased and will continue to increase our legal and financial compliance costs and will make some activities more time-consuming and costly.

The Sarbanes-Oxley Act of 2002 requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. For example, we are required to perform system and process evaluation and testing of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, and, beginning with our annual report on Form10-K for the fiscal year ending December 31, 2010, to allow our independent registered public accounting firm to issue a report on the effectiveness of our internal control over financial reporting. Our compliance with Section 404 of the Sarbanes-Oxley Act requires that we incur substantial accounting expense and expend significant management efforts. Our ability to successfully implement our business plan and comply with Section 404 requires us to be able to prepare timely and accurate financial statements. We expect that we will need to continue to improve existing, and implement new, operational and financial systems, procedures and controls to manage our business effectively.

***Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders, and may prevent attempts by our stockholders to replace or remove our current management.***

Provisions in our certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us, or for a change in the composition of our board of directors or management to occur, even if doing so would benefit our stockholders. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- dividing our board of directors into three classes;

- limiting the removal of directors by the stockholders;

- eliminating cumulative voting rights and therefore allowing the holders of a majority of the shares of our common stock to elect all of the directors standing for election, if they should so choose;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless, among other exceptions, such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, because some corporate takeovers occur through an acquirer's purchase, in the public market or otherwise, of sufficient stock to give it control of a company, the NOL preservation lock-up agreement, which restricts the transferability of our securities, could have the effect of delaying or discouraging such a takeover of us.

***We have never declared or paid dividends on our capital stock and we do not anticipate paying dividends in the foreseeable future.\****

We do not anticipate paying any cash dividends on our common stock in the foreseeable future. We currently plan to invest all available funds and future earnings in the development and growth of our business and in the payment of our obligations. As a result, capital appreciation, if any, of our common stock will be your sole source of potential gain for the foreseeable future.

Table of Contents

**Item 6.      Exhibits.**

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of the Registrant (incorporated herein by reference to exhibit 3.1 in the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007). |
| 3.2 | Amended and Restated Bylaws (incorporated herein by reference to exhibit 3.4 in the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007) |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. |
| 4.2 | Specimen Common Stock Certificate (incorporated herein by reference to exhibit 4.2 in the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007) |
| 4.3A | Third Amended and Restated Investor Rights Agreement, made effective as of June 6, 2007, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3A in the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007) |
| 4.3B | Waiver and Amendment Agreement, dated as of March 12, 2008, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3B in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.3C | Waiver and Amendment Agreement, dated as of May 7, 2008, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3C in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008) |
| 4.3D | Waiver and Amendment Agreement, dated as of July 6, 2009 by and between the Registrant and the other parties named therein (incorporated by reference to exhibit 4.3D in the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2009, as filed with the SEC on August 14, 2009) |
| 4.4A | Form of Series BB Preferred Stock Warrant of the Registrant (incorporated by reference to exhibit 4.6 to the Registrant's registration statement on Form S-1 (File No. 333-141164), as filed with the SEC on March 9, 2007) |
| 4.4B | Form of Series BB Preferred Stock Warrant of the Registrant, as amended (incorporated herein by reference to exhibit 4.4B in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.5A | Form of Common Stock Warrant of the Registrant (incorporated herein by reference to exhibit 4.5D in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.5B† | Registration Rights Agreement, dated as of March 17, 2008, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.5E in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.5C | Amendment and Waiver Agreement, dated as of November 10, 2009, by and among the Registrant, JPI Commercial, LLC and the other parties named therein (incorporated by reference to exhibit 4.5F in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on November 10, 2009) |
| 4.6A | Warrant issued to Kingsbridge Capital Limited, dated May 7, 2008 (incorporated herein by reference to exhibit 4.6A in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008) |
| 4.6B | Registration Rights Agreement, dated as of May 7, 2008, by and between the Registrant and Kingsbridge Capital Limited (incorporated herein by reference to exhibit 4.6B in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008) |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 4.6C | Amendment Agreement No. 1, dated as of November 20, 2009, by and between the Registrant and Kingsbridge Capital Limited (incorporated by reference to exhibit 4.6C in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on November 23, 2009) |
| 4.7 | Form of Registered Direct Common Stock Warrant (incorporated herein by reference to exhibit 4.7 in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 16, 2008) |
| 4.8 | NOL Preservation Lock-Up Agreement, effective as of July 7, 2009, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.8 in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009) |
| 4.9A | Form of Common Stock Warrant (incorporated herein by reference to exhibit 4.9A in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009) |
| 4.9B | Investor Rights Agreement, dated July 7, 2009 by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.9B in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009) |
| 10.54† | Supply Agreement, dated as of April 1, 2010, by and between the Registrant and Siegfried (USA) Inc. (incorporated herein by reference to exhibit 10.54 in the Registrant's quarterly report on Form 10-Q (File No. 001-33500), as filed with the SEC on May 6, 2010) |
| 10.56 | Senior Secured Credit Facilities Credit Agreement, dated as of June 28, 2010, among the Registrant, JPI Commercial, LLC, the several lenders from time to time parties thereto and Silicon Valley Bank, as Administrative Agent (incorporated herein by reference to exhibit 10.56 in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 1, 2010) |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

\*      The certifications attached as Exhibit 32.1 accompany this Quarterly Report on Form 10-Q pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

†      Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: August 11, 2010

**Jazz Pharmaceuticals, Inc.**
(Registrant)

/s/   Bruce C. Cozadd
Bruce C. Cozadd
*Chairman and Chief Executive Officer and Director*
*(Principal Executive Officer)*

/s/   Kathryn E. Falberg
Kathryn E. Falberg
*Senior Vice President and Chief Financial Officer*
*(Principal Financial Officer)*

48

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of the Registrant (incorporated herein by reference to exhibit 3.1 in the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007). |
| 3.2 | Amended and Restated Bylaws (incorporated herein by reference to exhibit 3.4 in the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007) |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. |
| 4.2 | Specimen Common Stock Certificate (incorporated herein by reference to exhibit 4.2 in the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007) |
| 4.3A | Third Amended and Restated Investor Rights Agreement, made effective as of June 6, 2007, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3A in the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007) |
| 4.3B | Waiver and Amendment Agreement, dated as of March 12, 2008, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3B in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.3C | Waiver and Amendment Agreement, dated as of May 7, 2008, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3C in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008) |
| 4.3D | Waiver and Amendment Agreement, dated as of July 6, 2009 by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.3D in the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2009, as filed with the SEC on August 14, 2009) |
| 4.4A | Form of Series BB Preferred Stock Warrant of the Registrant (incorporated by reference to exhibit 4.6 to the Registrant's registration statement on Form S-1 (File No. 333-141164), as filed with the SEC on March 9, 2007) |
| 4.4B | Form of Series BB Preferred Stock Warrant of the Registrant, as amended (incorporated herein by reference to exhibit 4.4B in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.5A | Form of Common Stock Warrant of the Registrant (incorporated herein by reference to exhibit 4.5A in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.5B† | Registration Rights Agreement, dated as of March 17, 2008, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.5E in the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008) |
| 4.5C | Amendment and Waiver Agreement, dated as of November 10, 2009, by and among the Registrant, JPI Commercial, LLC and the other parties named therein (incorporated by reference to exhibit 4.5F in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on November 10, 2009) |
| 4.6A | Warrant issued to Kingsbridge Capital Limited, dated May 7, 2008 (incorporated herein by reference to exhibit 4.6A in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008) |
| 4.6B | Registration Rights Agreement, dated as of May 7, 2008, by and between the Registrant and Kingsbridge Capital Limited (incorporated herein by reference to exhibit 4.6B in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008) |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 4.6C | Amendment Agreement No. 1, dated as of November 20, 2009, by and between the Registrant and Kingsbridge Capital Limited (incorporated by reference to exhibit 4.6C in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on November 23, 2009) |
| 4.7 | Form of Registered Direct Common Stock Warrant (incorporated herein by reference to exhibit 4.7 in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 16, 2008) |
| 4.8 | NOL Preservation Lock-Up Agreement, effective as of July 7, 2009, by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.8 in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009) |
| 4.9A | Form of Common Stock Warrant of the Registrant issued on July 7, 2009 (incorporated herein by reference to exhibit 4.9A in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009) |
| 4.9B | Investor Rights Agreement, dated July 7, 2009 by and between the Registrant and the other parties named therein (incorporated herein by reference to exhibit 4.9B in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009) |
| 10.54† | Supply Agreement, dated as of April 1, 2010, by and between the Registrant and Siegfried (USA) Inc. (incorporated herein by reference to exhibit 10.54 in the Registrant's quarterly report on Form 10-Q (File No. 001-33500), as filed with the SEC on May 6, 2010) |
| 10.56 | Senior Secured Credit Facilities Credit Agreement, dated as of June 28, 2010, among the Registrant, JPI Commercial, LLC, the several lenders from time to time parties thereto and Silicon Valley Bank, as Administrative Agent (incorporated herein by reference to exhibit 10.56 in the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 1, 2010) |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

\*    The certifications attached as Exhibit 32.1 accompany this Quarterly Report on Form 10-Q pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

†    Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

Exhibit 31.1

**CERTIFICATION**

I, Bruce C. Cozadd, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 11, 2010

By: _____ /s/ Bruce C. Cozadd
                    **Bruce C. Cozadd**
       **Chairman and Chief Executive Officer**

**Exhibit 31.2**

**CERTIFICATION**

I, Kathryn E. Falberg, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 11, 2010

By: _____/s/   Kathryn E. Falberg_____

                                    **Kathryn E. Falberg**
                    **Senior Vice President and Chief Financial Officer**

Exhibit 32.1

CERTIFICATION (1)

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. Section 1350), Bruce C. Cozadd, Chief Executive Officer of Jazz Pharmaceuticals, Inc. (the "Company"), and Kathryn E. Falberg, Senior Vice President and Chief Financial Officer of the Company, each hereby certifies that, to the best of his or her knowledge:

1. The Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, and

2. The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

In Witness Whereof, the undersigned have set their hands hereto as of August 11, 2010.

/s/  Bruce C. Cozadd
_____
**Bruce C. Cozadd**
**Chairman and Chief Executive Officer**

/s/  Kathryn E. Falberg
_____
**Kathryn E. Falberg**
**Senior Vice President and Chief Financial Officer**

_____

(1) This certification accompanies the Quarterly Report on Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Jazz Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing. A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Jazz Pharmaceuticals, Inc. and will be retained by Jazz Pharmaceuticals, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT 52

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

---

# FORM 10-Q

---

☒    **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the quarterly period ended September 30, 2008

or

☐    **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the transition period from _____ to _____

Commission File Number: 001-33500

---

# JAZZ PHARMACEUTICALS, INC.

**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **05-0563787** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3180 Porter Drive**
**Palo Alto, CA 94304**
**(650) 496-3777**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

---

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of October 31, 2008, 28,775,217 shares of the registrant's Common Stock, $.0001 par value, were outstanding.

Table of Contents

**JAZZ PHARMACEUTICALS, INC.**
**QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2008**
**INDEX**

|  |  | **Page** |
|---|---|---|
| **PART I – FINANCIAL INFORMATION** | | 3 |
| Item 1. | Financial Statements | 3 |
| | Condensed Consolidated Balance Sheets – September 30, 2008 and December 31, 2007 | 3 |
| | Condensed Consolidated Statements of Operations – Three and Nine Months Ended September 30, 2008 and 2007 | 4 |
| | Condensed Consolidated Statements of Cash Flows – Nine Months Ended September 30, 2008 and 2007 | 5 |
| | Notes to Condensed Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 4T. | Controls and Procedures | 29 |
| **PART II – OTHER INFORMATION** | | 30 |
| Item 1. | Legal Proceedings | 30 |
| Item 1A. | Risk Factors | 30 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 50 |
| Item 5. | Other Information | 50 |
| Item 6. | Exhibits | 51 |
| Signatures | | 53 |
| Exhibit Index | | 54 |

PART I – FINANCIAL INFORMATION

Item 1.    Financial Statements.

JAZZ PHARMACEUTICALS, INC.
CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands)
(Unaudited)

| | September 30, 2008 | December 31, 2007 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 49,907 | $ 102,945 |
| Restricted cash | 1,998 | 1,939 |
| Marketable securities | 999 | — |
| Accounts receivable, net of allowances of $173 and $218 at September 30, 2008 and December 31, 2007, respectively | 6,686 | 5,389 |
| Inventories | 6,264 | 2,213 |
| Prepaid expenses | 3,114 | 3,224 |
| Other current assets | 736 | 381 |
| Total current assets | 69,704 | 116,091 |
| Property and equipment, net | 3,708 | 3,941 |
| Intangible assets, net | 65,663 | 36,040 |
| Goodwill | 38,213 | 38,213 |
| Long-term restricted cash and investments | — | 12,000 |
| Other long-term assets | 2,505 | 1,269 |
| Total assets | $ 179,793 | $ 207,554 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Line of credit | $ 3,265 | $ 3,459 |
| Accounts payable | 6,614 | 2,856 |
| Accrued liabilities | 23,161 | 29,047 |
| Purchased product rights liability | 21,000 | — |
| Deferred revenue | 12,400 | 1,494 |
| Total current liabilities | 66,440 | 36,856 |
| Non-current portion of deferred revenue | 11,614 | 12,468 |
| Liability under government settlement | 13,063 | 14,881 |
| Senior secured notes (including $91,583 and $52,581 as of September 30, 2008 and December 31, 2007, respectively, held by related parties) | 113,614 | 75,116 |
| Common stock subject to repurchase | 13,241 | 13,241 |
| Commitments and contingencies (Note 15) | | |
| Stockholders' equity (deficit): | | |
| Common stock | 3 | 2 |
| Additional paid-in capital | 405,689 | 371,440 |
| Accumulated other comprehensive income (loss) | (3) | 19 |
| Accumulated deficit | (443,868) | (316,469) |
| Total stockholders' equity (deficit) | (38,179) | 54,992 |
| Total liabilities and stockholders' equity (deficit) | $ 179,793 | $ 207,554 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

3

**JAZZ PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share amounts)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Revenues: | | | | |
|     Product sales, net | $ 17,022 | $ 13,436 | $ 45,757 | $ 38,676 |
|     Royalties, net | 440 | 253 | 1,308 | 824 |
|     Contract revenues | 284 | 7,785 | 854 | 10,326 |
|         Total revenues | 17,746 | 21,474 | 47,919 | 49,826 |
| Operating expenses: | | | | |
|     Cost of product sales (excluding amortization of acquired developed technology) | 5,525 | 1,938 | 10,619 | 5,620 |
|     Research and development | 12,149 | 16,978 | 55,274 | 49,252 |
|     Selling, general and administrative | 24,329 | 18,069 | 91,218 | 50,583 |
|     Amortization of intangible assets | 3,487 | 2,287 | 9,454 | 6,936 |
|     Provision for government settlement | — | — | — | 17,469 |
|         Total operating expenses | 45,490 | 39,272 | 166,565 | 129,860 |
| Loss from operations | (27,744) | (17,798) | (118,646) | (80,034) |
|     Interest income | 353 | 1,969 | 1,700 | 4,360 |
|     Interest expense (including $4,096 and $2,321 for the three months ended September 30, 2008 and 2007, respectively, and $10,960 and $6,862 for the nine months ended September 30, 2008 and 2007, respectively, pertaining to related parties) | (5,355) | (3,511) | (14,377) | (10,093) |
|     Other income (expense), net | 19 | (19) | 6 | 1,816 |
|     Gain on sale of product rights | 3,918 | — | 3,918 | 5,145 |
| Net loss | $(28,809) | $(19,359) | $(127,399) | $ (78,806) |
| Net loss per share, basic and diluted | $   (1.07) | $   (0.82) | $   (5.12) | $   (7.50) |
| Weighted-average common shares used in computing net loss per share, basic and diluted | 26,994 | 23,671 | 24,873 | 10,505 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

**JAZZ PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**
**(Unaudited)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2008 | 2007 |
| **Operating activities** | | |
| Net loss | $(127,399) | $ (78,806) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 1,760 | 921 |
| Amortization of intangible assets | 9,454 | 6,937 |
| Loss on disposal of property and equipment | 138 | 6 |
| Fair value adjustment to acquired finished goods | — | 54 |
| Stock-based compensation expense | 5,790 | 3,773 |
| Non-cash interest expense | 1,435 | 802 |
| Revaluation of preferred stock warrant liability | — | (1,846) |
| Gain on sale of product rights | (3,918) | (5,145) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (1,297) | (1,177) |
| Inventories | (4,084) | (567) |
| Prepaid expenses and other current assets | (258) | (32) |
| Other assets | (341) | (318) |
| Accounts payable | 3,758 | (2,571) |
| Accrued liabilities | (4,718) | 10,342 |
| Deferred revenue | 10,052 | (166) |
| Deferred rent | — | (118) |
| Liability under government settlement | (1,818) | 14,881 |
| Net cash used in operating activities | (111,446) | (53,030) |
| **Investing activities** | | |
| Purchases of property and equipment | (1,665) | (2,106) |
| Transfer of long-term restricted investments to marketable securities | (4,410) | (10,848) |
| Proceeds from maturities of marketable securities | 3,411 | — |
| Decrease (increase) in restricted cash and investments | 11,941 | (114) |
| Proceeds from sale of product rights | 5,775 | 9,000 |
| Purchase of product rights | (20,000) | — |
| Net cash used in investing activities | (4,948) | (4,068) |
| **Financing activities** | | |
| Proceeds from employee stock purchases and exercise of stock options | 976 | 76 |
| Proceeds from sale of common stock in initial public offering, net of issuance costs | — | 97,640 |
| Net (repayments under) proceeds from line of credit | (194) | 406 |
| Proceeds from sale of senior secured notes and warrants, net of issuance costs | 38,566 | — |
| Repayment of senior secured notes | (504) | — |
| Proceeds from sale of common stock in registered direct public offering, net of issuance costs | 24,512 | — |
| Net cash provided by financing activities | 63,356 | 98,122 |
| Net increase (decrease) in cash and cash equivalents | (53,038) | 41,024 |
| Cash and cash equivalents, at beginning of period | 102,945 | 78,948 |
| Cash and cash equivalents, at end of period | $  49,907 | $119,972 |
| Supplemental disclosure of non-cash financing and investing activities: | | |
| Conversion of preferred stock warrant liability to stockholders' equity | $      — | $   6,675 |
| Purchased product rights liability | 21,000 | — |
| Warrants to purchase common stock issued in conjunction with registered direct public offering | 6,400 | — |
| Warrants to purchase common stock issued in conjunction with senior secured notes | 2,000 | — |
| Warrants to purchase common stock issued in conjunction with equity financing facility | 850 | — |
| Common stock issued as employee bonuses | 999 | — |

The accompanying notes are an integral part of these condensed consolidated financial statements.

5

**JAZZ PHARMACEUTICALS, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**1.    Summary of Significant Accounting Policies**

*Basis of Presentation*

These unaudited condensed consolidated financial statements have been prepared following the requirements of the Securities and Exchange Commission ("SEC") for interim reporting. As permitted under those rules, certain footnotes and other financial information that are normally required by U.S. generally accepted accounting principles ("GAAP") can be condensed or omitted. The information included in this Quarterly Report on Form 10–Q should be read in conjunction with the consolidated financial statements and accompanying notes included in the Annual Report on Form 10-K for the year ended December 31, 2007 of Jazz Pharmaceuticals, Inc. (the "Company" or "Jazz Pharmaceuticals"). In the opinion of management, these condensed consolidated financial statements have been prepared on the same basis as the annual consolidated financial statements and include all adjustments, consisting only of normal recurring adjustments, considered necessary for the fair presentation of the Company's financial position and operating results. The results for the three and nine months ended September 30, 2008 are not necessarily indicative of the results to be expected for the year ending December 31, 2008 or for any other interim period or for any future year. The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Orphan Medical, LLC ("Orphan Medical") and JPI Commercial, LLC ("JPIC"), after elimination of intercompany transactions and balances.

*Significant Risks and Uncertainties*

The Company has incurred significant losses from operations since its inception and may continue to incur losses for the next few years. In June 2008, as part of a strategic decision to reduce its emphasis on early-stage research and development activities, reduce research and development commitments and streamline administrative operations, the Company completed a workforce reduction of 33 employees. In November 2008, in large part as a reaction to the lower than anticipated demand to date for Luvox CR® (fluvoxamine maleate) Extended-Release Capsules which the Company launched earlier this year, the Company implemented a workforce reduction of 67 employees, including 62 in the field sales force. In addition, the Company determined not to fill a number of currently open positions in the field and in the home office. The Company cannot predict with certainty the level of future sales of its products and the Company's future sales may not reach the levels the Company currently expects. Accordingly, in order to preserve its cash resources, the Company expects to continue to take actions designed to reduce its expenses. The cost-cutting measures the Company has taken and may take in the future may not be sufficient to enable the Company to meet its cash requirements or for the Company to reach profitability.

In addition to expense reduction initiatives, the Company will need to raise additional funds by early 2009 to support its operations, and such funding may not be available to it on acceptable terms, or at all. Other than the committed equity financing facility ("CEFF"), which the Company is currently not able to access due to the trading price of the Company's common stock, (discussed in Note 7) and the Company's existing line of credit (discussed in Note 5), the Company does not have any commitments or arrangements for financing. The Company is seeking additional sources of financing through collaborations, partnering arrangements, development financings, or public or private debt or equity financings. The Company expects that its ability to obtain sufficient additional funding by early 2009 may depend significantly on the preliminary data from the first Phase III pivotal clinical trial of JZP-6 (sodium oxybate) for the treatment of fibromyalgia, data which the Company expects to have in the fourth quarter of 2008. If the Company is unable to raise sufficient additional funds by early 2009 as a result of unfavorable results from the first JZP-6 Phase III pivotal clinical trial or other factors, including effects of the recent disruptions to the credit and financial markets in the United States and worldwide, the Company will be required to significantly scale back its operations, significantly reduce its headcount, and/or discontinue many of its activities.

To build a successful business, the Company must successfully identify, develop and commercialize its products, which require significant amounts of cash. Products developed by the Company will require approval of the U.S. Food and Drug Administration ("FDA") and/or a foreign regulatory authority prior to commercial sales. The regulatory approval process is expensive, time consuming and uncertain, and any denial or delay of approval could have a material adverse effect on the Company. Even if approved, the Company's products may not achieve market acceptance and will face competition from both generic and branded pharmaceutical products.

*Concentration of Credit Risks*

The Company monitors its exposure within accounts receivable and records a reserve against uncollectible accounts receivable as necessary. The Company extends credit to pharmaceutical companies, pharmaceutical wholesale distributors and a specialty pharmaceutical distribution company, primarily in the United States, in the normal course of business. Customer creditworthiness is monitored and collateral is not normally required. Historically, the Company has not experienced significant credit losses on its accounts receivable. The Company's five largest customers accounted for an aggregate of approximately 96% and 93% of gross accounts receivable as of September 30, 2008 and December 31, 2007, respectively.

Table of Contents

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts and disclosures reported in the consolidated financial statements and accompanying notes. Management bases its estimates on historical experience and on assumptions believed to be reasonable under the circumstances. Actual results could differ materially from those estimates.

*Revenue Recognition*

Revenues are recognized when there is persuasive evidence that an arrangement exists, delivery has occurred, the price is fixed and determinable, and collection is reasonably assured. Revenues from sales of Xyrem® (sodium oxybate) oral solution within the U.S. are recognized upon transfer of title, which occurs when the Company's specialty pharmaceutical distributor removes product from the Company's consigned inventory location at its facility for shipment to a patient. Prior to the Company's sale of the Company's rights to Antizol® (fomepizole), Antizol-Vet®, and Cystadane® (betaine anhydrous), Antizol, Antizol-Vet and Cystadane were shipped to the Company's wholesaler customers in the U.S. with free on board destination shipping terms, and the Company recognized revenues when delivery occurred. The Company's international sales often have customer acceptance clauses and therefore the Company recognizes revenues when it is notified of acceptance or when the time to inspect and reject a shipment has lapsed. When sales to international customers do not have acceptance clauses, the Company recognizes revenues when title transfers, which is generally when the product leaves the Company's logistics provider's facilities.

Luvox CR was approved by the FDA for the treatment of obsessive compulsive disorder and social anxiety disorder in February 2008 and the Company shipped initial stocking orders to its wholesaler customers in the first quarter of 2008. Luvox CR is subject to rights of return within six months prior to and up to twelve months after product expiration. Given the Company's limited history of selling Luvox CR, the Company currently cannot reliably estimate expected returns of Luvox CR at the time of shipment. Accordingly, the Company defers recognition of revenue on product shipments of Luvox CR and instead recognizes revenue on a "sell-through" basis using dispensing data generated by an independent prescription tracking service. Units dispensed through prescriptions are not subject to return. When trade channel inventories are reduced to targeted stocking levels and the Company has sufficient data to determine product acceptance in the marketplace the Company will recognize revenue on sales of Luvox CR at the time title passes to its customers, or on a "sell-in" basis, and provide for an estimate of future product returns. Through September 30, 2008, the Company has billed its wholesaler customers, who have certain industry standard rights of return, an aggregate of $4.7 million. The Company recorded revenue of $1.8 million and $2.4 million for the three and nine months ended September 30, 2008, respectively, on a sell-through basis, net of estimated wholesaler fees, discounts, chargebacks and rebates. As of September 30, 2008, the Company had recorded a liability of $1.3 million, which represented amounts paid by wholesaler customers in excess of revenue recognized, net of estimated wholesaler fees, discounts, chargebacks and certain rebates, and is included under the caption "Deferred Revenue" on the condensed consolidated balance sheet. Luvox CR cost of product sales of approximately $162,000 related to shipments for which revenue has not been recognized is included under the caption "Inventories" on the condensed consolidated balance sheet.

Under the Company's contractual relationships, nonrefundable fees where the Company has no continuing performance obligations are recognized as revenues when collection is reasonably assured. In situations where the Company has continuing performance obligations, nonrefundable fees are deferred and are recognized ratably over the Company's projected performance period. The Company recognizes at-risk milestone payments, which are typically related to regulatory, commercial or other achievements by the Company or its licensees and distributors, as revenues when the milestone is accomplished and collection is reasonably assured. Refundable fees are deferred and recognized as revenues upon the later of when they become nonrefundable or when the Company's performance obligations are completed. The Company and UCB Pharma Limited ("UCB") amended their license and distribution agreement in July 2008. Pursuant to this amendment, UCB made a nonrefundable payment of $10.0 million to the Company in July 2008 in lieu of a $7.5 million milestone payment which would have been due after the last patient completed or had withdrawn from the Company's second Phase III trial of sodium oxybate for the treatment of fibromyalgia which is ongoing. In consideration for the acceleration of the payment and for the additional $2.5 million, the Company agreed, among other things, to use commercially reasonable efforts to enroll at least 185 patients in the clinical trial from countries within the European Union. UCB would be entitled to a credit of $2.5 million against future royalties otherwise due under the license and distribution agreement if sodium oxybate for the treatment of fibromyalgia does not receive marketing authorization in the European Union because the clinical trials within the European Union did not include a sufficient number of patients and the Company did not enroll at least 185 patients in the clinical trials within the European Union. As of September 30, 2008, the Company recorded a liability of $10.0 million under the caption "Deferred Revenue" on the condensed consolidated balance sheet because the Company had not yet met the performance obligations under the amended license and distribution agreement. See Note 11 for additional information related to the amendment to the Company's license and distribution agreement with UCB.

7

*Net Loss Per Common Share*

Basic and diluted net loss per common share is computed using the weighted-average number of shares of common stock outstanding as follows (in thousands, except per share amounts):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Numerator: | | | | |
| Net loss | $(28,809) | $(19,359) | $(127,399) | $(78,806) |
| Denominator: | | | | |
| Weighted-average common shares outstanding | 27,871 | 24,551 | 25,751 | 11,231 |
| Less: weighted-average common shares outstanding subject to repurchase | (877) | (880) | (878) | (726) |
| Weighted-average common shares used in computing net loss per share, basic and diluted | 26,994 | 23,671 | 24,873 | 10,505 |
| Net loss per share, basic and diluted | $ (1.07) | $ (0.82) | $ (5.12) | $ (7.50) |

The following securities were excluded from the computation of diluted net loss per share for the periods presented because including them would have an anti-dilutive effect (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Warrants to purchase common stock | 2,904 | 786 | 1,756 | 396 |
| Options to purchase common stock | 3,855 | 2,489 | 3,662 | 1,359 |
| Common stock subject to repurchase | 877 | 880 | 878 | 726 |
| Restricted stock units | 84 | — | 104 | — |

*Recently Adopted Accounting Standards*

Effective January 1, 2008, the Company adopted Emerging Issues Task Force ("EITF") Issue No. 07-3, *Accounting for Nonrefundable Advance Payments for Goods or Services Received for Use in Future Research and Development Activities* ("EITF 07-3"). Under EITF 07-3, nonrefundable advance payments for goods or services that will be used or rendered for future research and development activities are deferred and capitalized and recognized as an expense as the related goods are delivered or the services are performed, or when the goods or services are no longer expected to be provided. The Company's adoption of EITF 07-3 did not have a material effect on the Company's consolidated results of operations and financial position.

Effective January 1, 2008, the Company adopted Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities, including an amendment of FASB Statement No. 115, Accounting for Certain Investments in Debt and Equity Securities* ("SFAS 159"), which provides companies with an option to report selected financial assets and liabilities at fair value. The objective of SFAS 159 is to reduce both complexity in accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. Most of the provisions in SFAS 159 are elective; however, the amendment to SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities* ("SFAS 115"), applies to all entities with available-for-sale and trading securities. Under SFAS 159, entities that elect the fair value option (by instrument) will report unrealized gains and losses in earnings at each subsequent reporting date. The fair value option election is irrevocable, unless a new election date occurs. SFAS 159 establishes presentation and disclosure requirements to help financial statement users understand the effect of the entity's election on its earnings, but does not eliminate disclosure requirements of other accounting standards. Assets and liabilities that are measured at fair value must be displayed on the face of the balance sheet. The Company chose not to elect the fair value option for its financial assets and liabilities existing at January 1, 2008, and did not elect the fair value option on financial assets and liabilities transacted in the three and nine months ended September 30, 2008. Therefore, the adoption of SFAS 159 had no impact on the Company's consolidated results of operations and financial position.

Effective January 1, 2008, the Company adopted SFAS No. 157, *Fair Value Measurements* ("SFAS 157"), for financial assets and liabilities and any other assets and liabilities carried at fair value. This pronouncement defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. On November 14, 2007, the FASB agreed to a one-year deferral for the implementation of SFAS 157 for nonfinancial assets and nonfinancial liabilities. The Company's adoption of SFAS 157 for financial assets and liabilities and any other assets and liabilities carried at fair value did not have a material effect on the Company's consolidated results of operations and financial position. The Company is currently evaluating the effect that the adoption of SFAS 157 for nonfinancial assets and liabilities will have on its consolidated results of operations and financial condition.

**2.    Inventories**

The components of inventories were as follows (in thousands):

| | September 30, 2008 | | December 31, 2007 | |
|---|---|---|---|---|
| Raw materials | $ | 3,835 | $ | 500 |
| Finished goods (1) | | 2,429 | | 1,713 |
| Total inventories | $ | 6,264 | $ | 2,213 |

(1)    Includes, at September 30, 2008, deferred cost of sales of $220,000 for which the related revenue has been deferred.

Based on an analysis performed during the third quarter of 2008, the Company recorded a charge to cost of product sales of $3.0 million for the three and nine months ended September 30, 2008, respectively. The charge consists of a reserve for inventory that the Company judged to be in excess of expected requirements in the amount of $2.4 million and a $552,000 liability to a contract manufacturer for cancelled production orders.

**3.    Goodwill and Intangible Assets**

The gross carrying amount of goodwill was $38.2 million at September 30, 2008 and December 31, 2007. The gross carrying amounts and net book values of the Company's intangible assets were as follows (in thousands):

| | September 30, 2008 | | | | | | December 31, 2007 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gross Carrying Amount | | Accumulated Amortization | | Net Book Value | | Gross Carrying Amount | | Accumulated Amortization | | Net Book Value | |
| Developed technology - Xyrem | $ | 39,700 | $ | 13,627 | $ | 26,073 | $ | 39,700 | $ | 10,499 | $ | 29,201 |
| Developed technology - Antizol | | — | | — | | — | | 2,715 | | — | | 2,715 |
| Developed technology - Luvox CR | | 41,000 | | 4,469 | | 36,531 | | — | | — | | — |
| Agreements not to compete | | 5,600 | | 4,248 | | 1,352 | | 5,600 | | 3,389 | | 2,211 |
| Trademarks | | 2,600 | | 893 | | 1,707 | | 2,600 | | 687 | | 1,913 |
| Total | $ | 88,900 | $ | 23,237 | $ | 65,663 | $ | 50,615 | $ | 14,575 | $ | 36,040 |

During the nine months ended September 30, 2008, the Company recorded an intangible asset of $41.0 million related to Luvox CR developed technology with an estimated useful life of approximately five years (see Note 10 for additional information). In August 2008, the Company sold its rights to Antizol to an unrelated third party (see Note 13 for additional information).

Future amortization costs per year for the Company's existing intangible assets other than goodwill as of September 30, 2008 were estimated as follows (in thousands):

| Year Ending December 31, | Estimated Amortization Expense | |
|---|---|---|
| 2008 (remaining portion) | $ | 3,374 |
| 2009 | | 13,496 |
| 2010 | | 13,093 |
| 2011 | | 12,716 |
| 2012 | | 12,716 |

**4.    Fair Value Measurement**

As stated in Note 1, on January 1, 2008, the Company adopted SFAS 157 as it applies to its financial assets and financial liabilities. SFAS 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. Fair value is defined as the estimated exit price received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date rather than on an entry price which represents the purchase price of an asset or liability. SFAS 157 establishes a fair value hierarchy that prioritizes observable and unobservable inputs used to measure fair value into three broad levels, which are described below:

Level 1: Quoted prices (unadjusted) in active markets that are accessible at the measurement date for assets or liabilities. The fair value hierarchy gives the highest priority to Level 1 inputs.

9

Level 2: Observable prices that are based on inputs not quoted on active markets, but corroborated by market data.

Level 3: Unobservable inputs (i.e. inputs that reflect the reporting entity's own assumptions about the assumptions that market participants would use in estimating the fair value of an asset or liability) are used when little or no market data is available. The fair value hierarchy gives the lowest priority to Level 3 inputs.

As of September 30, 2008, the Company measured its available-for-sale securities using significant observable prices that are based on inputs not quoted on active markets, but corroborated by market data, Level 2 in the fair value hierarchy, resulting in a fair value estimate of $52.9 million. No other financial assets and liabilities were carried at fair value as of September 30, 2008.

The Company chose not to elect the fair value option as prescribed by SFAS 159 for its financial assets and liabilities that had not been previously carried at fair value. Therefore, material financial assets and liabilities not carried at fair value, such as the Company's short- and long-term debt obligations and trade accounts receivable and payable, are still reported at their carrying values.

## 5.    Debt Obligations

### *Line of Credit*

In May 2008, the Company amended its existing line of credit so that the Company may borrow up to 75% of eligible accounts receivable up to a maximum of $15.0 million in borrowings subject to certain other limitations. As of September 30, 2008, the Company owed $3.3 million, the maximum amount currently available for borrowing under the line of credit. Upon the occurrence of certain events, including the effects of conditions or events that are generally applicable to the capital, financial, banking or currency markets, difficulties in generating product sales, or changes in the market price of the Company's common stock, the lender has the right to stop advancing the Company money pursuant to the line of credit and to declare all amounts outstanding under the line of credit due and payable.

### *Senior Secured Notes and Warrants*

On March 17, 2008, JPIC, a wholly-owned subsidiary of the Company, sold $40.0 million aggregate principal amount of senior secured notes pursuant to a new debt arrangement. As part of the transaction, the Company issued to the purchasers of these notes warrants to purchase a total of 562,192 shares of its common stock exercisable at an exercise price of $14.23 per share at any time until March 17, 2013. The Company paid an arrangement fee of $800,000 and incurred issuance costs of $634,000 in connection with the transaction. The warrants were recorded as a debt discount at an estimated fair value of $2.0 million and were recorded, net of issuance costs, in stockholders' equity (deficit). The fair value of the warrants was estimated using the Black-Scholes option pricing model with the following assumptions: a volatility of 51%, a term of 5.0 years, a risk-free rate of 2.2% and an expected dividend yield of 0%. The recorded debt is accreted by the amount of the debt discount over the terms of the notes, and the issuance costs, which are recorded in other long-term assets, are amortized over the term of the notes using the effective interest method. The notes bear interest at 15% per annum, payable quarterly in arrears, and are due on June 24, 2011. In addition, on March 17, 2008, a total of $80.0 million aggregate principal amount of senior secured notes of Orphan Medical were exchanged for the same principal amount of new senior secured notes issued by JPIC pursuant to the debt arrangement described above at the same interest rate. In the transactions, the Company guaranteed the repayment obligations of JPIC and granted the note holders a security interest in all of the Company's assets and those of the Company's wholly-owned subsidiaries. The Company has also agreed to restrictions on working capital borrowings, dividends and certain other payments. Under the debt agreement, the Company may borrow from other sources up to $15.0 million secured by its accounts receivable and inventory. JPIC may be required to redeem up to $30.0 million of the outstanding principal amount of senior secured notes if the Company's annualized net product sales are less than $100 million and a generic version of Xyrem has been approved in the United States. JPIC may, at its option, prepay some or all of the notes subject to a repayment premium. The repayment premium on the first $40.0 million principal amount is 10% of the principal repayment. The repayment premium on any additional principal repayment was 18.3% of the principal repayment at September 30, 2008, and reduces ratably to zero on June 24, 2011. If there is an event of default under the terms of the notes, JPIC may be required to prepay some or all of the notes, including a repayment premium. The repayment premium for an event of default was 18.3% of the principal amount of the notes as of September 30, 2008 and will be reduced to zero ratably over the term of the notes.

Pursuant to the debt arrangement described above, the Company has the option, prior to January 31, 2009, to have JPIC sell to the purchasers of the $40.0 million of senior secured notes up to $30.0 million aggregate principal amount of senior secured notes and warrants to purchase shares of the Company's common stock at an exercise price based upon the closing stock price for a specified period prior to the sale of the notes and warrants. This option can only be exercised if certain conditions, including a condition relating to the Company's net product sales, are met. The Company does not expect to satisfy the net sales condition and, therefore, does not expect to sell any additional senior secured notes pursuant to the terms of the debt arrangement described above.

The Company is not currently required to maintain a restricted cash balance under the debt arrangement described above. However, if at any time after the quarter ending March 31, 2009, the Company's annualized product sales are not at least $100 million, JPIC would be required to maintain a restricted cash balance equal to 15% of the then outstanding principal amount of notes. Under a terminated agreement pursuant to which $80.0 million of senior secured notes were issued in 2005 (and later exchanged for new notes as described above), the Company was required to maintain a restricted cash balance of $12.0 million as of December 31, 2007.

Prior to the issuance of the $40.0 million senior secured notes on March 17, 2008, LB I Group Inc., a related party and an entity affiliated with Lehman Brothers Holdings Inc., purchased certain senior notes and warrants then outstanding, including certain senior notes and warrants held by an affiliate of Kohlberg Kravis Roberts & Co. L.P., a significant stockholder and a related party. Subsequent to this purchase and the issuance of the $40.0 million senior secured notes on March 17, 2008, entities affiliated with Kohlberg Kravis Roberts & Co. L.P. held notes with an aggregate principal amount of $7.1 million and warrants to purchase 70,156 shares of common stock exercisable at $20.36 per share. Subsequent to the issuance of the $40.0 million senior secured notes on March 17, 2008, LB I Group Inc. held notes with an aggregate principal amount of $89.5 million, warrants to purchase 479,853 shares of common stock exercisable at $20.36 per share and warrants to purchase 470,836 shares of common stock exercisable at $14.23 per share. The Company paid LB I Group Inc. the arrangement fee of $800,000 described above in connection with the issuance of the $40.0 million senior secured notes.

Pursuant to the terms of the senior secured notes described above, the holders of the senior secured notes had the right to receive, as partial prepayment of the outstanding principal of the senior secured notes, the $5.5 million proceeds from the Company's sale of its rights to Antizol and Antizol-Vet and, so long as the senior secured notes are outstanding, have the right to receive any additional future payments the Company may receive if sales of Antizol and Antizol-Vet reach certain thresholds. The holders of a majority of the senior secured notes waived these rights. During the three months ended September 30, 2008, the Company paid the holders of the senior secured notes that did not waive these rights an aggregate of $504,000 as their pro rata share of the proceeds from the Company's sale of its rights to Antizol and Antizol-Vet, including $327,000 to an entity affiliated with Kohlberg Kravis Roberts & Co. L.P., as partial prepayment of the outstanding principal of the senior secured notes. So long as the senior secured notes are outstanding, the holders that did not waive these rights are entitled to their pro rata share of any future payments the Company receives related to the sale of Antizol and Antizol-Vet, as partial prepayment of the outstanding principal of the senior secured notes. See Note 13 for additional information on the Company's sale of its rights to Antizol and Antizol-Vet.

**6.    Convertible Preferred Stock and Preferred Stock Warrant Liability**

In connection with the Company's initial public offering, on June 6, 2007, all shares of convertible preferred stock were converted to common stock and all outstanding warrants exercisable for convertible preferred stock became exercisable for common stock. The related preferred stock warrant liability was reclassified to stockholders' equity at its then fair value of $6.7 million. The Company recorded a benefit of $1.8 million, in other income, during the nine months ended September 30, 2007 to reflect decreases in the fair value of the preferred stock warrant liability.

**7.    Common Stock**

*Registered Direct Public Offering*

On July 21, 2008, the Company completed a registered direct public offering of units consisting of an aggregate of 3,848,289 shares of common stock and warrants to purchase an aggregate of 1,731,724 shares of common stock at a public offering price of $6.75625 per unit. Net proceeds from this offering were $24.5 million after deducting the placement agents' fees and other offering expenses payable by the Company. The warrants are exercisable for $7.37 per share of common stock at any time on or after January 21, 2009 and prior to July 21, 2014. The fair value of the warrants was estimated using the Black-Scholes option pricing model with the following assumptions: a risk free rate of 3.62%, volatility of 58%, an expected term of 6.5 years and an expected dividend yield of 0%. The estimated fair value of the warrants of $6.4 million was recorded in stockholders' equity (deficit).

A total of 60% of the investment in the registered direct public offering was made by certain of the Company's existing stockholders with which certain members of the Company's board of directors are affiliated and/or associated; the remaining units were purchased by third party institutional investors on the same terms and conditions.

*Committed Equity Financing Facility*

In May 2008, the Company entered into a committed equity financing facility ("CEFF") with Kingsbridge Capital Limited ("Kingsbridge"), that entitles the Company to sell and obligates Kingsbridge to purchase up to the lesser of $75.0 million of the Company's common stock or 4,922,064 shares over a three-year period, subject to early termination in certain circumstances. In connection with the CEFF, the Company issued a warrant to Kingsbridge to purchase up to 220,000 shares of the Company's common stock with an exercise price of $11.20 per share. The warrant is exercisable for a period of five years beginning six months after the date of issuance. The fair value of the warrant was estimated using the Black-Scholes option pricing model with the following assumptions: a risk free rate of 3.18%, volatility of 52%, an expected term of 5.5 years and an expected dividend yield of 0%. The estimated fair value of the warrant of $850,000 was recorded in stockholders' equity (deficit).

11

Subject to certain conditions and limitations, from time to time under the CEFF, the Company may require Kingsbridge to purchase shares of its common stock at a price that is between 90% and 94% of the volume weighted average price on each trading day during an eight day pricing period. The maximum number of shares the Company may require Kingsbridge to purchase in any pricing period is, the greater of (i) 1.5% of the Company's market capitalization at the time of the commencement of the pricing period or (ii) the lesser of (A) 3.0% of the Company's market capitalization at the time of the commencement of the pricing period or (B) a number of shares determined by a formula based in part on the average trading volume and trading price of the Company's common stock prior to the date of the draw down notice issued by the Company with respect to that pricing period; provided, however, that the shares the Company can require Kingsbridge to purchase in any pricing period cannot exceed an aggregate purchase price of $25 million. If the average price of the Company's common stock is lower than $4.50 or declines more than 10% from the closing price on the trading day immediately prior to the start of a pricing period, the Company cannot draw under the CEFF during that pricing period for so long as the price remains below either of these thresholds. To date, no shares have been issued under the CEFF, and for so long as the average price of the Company's common stock remains lower than $4.50, which the Company's common stock has recently been trading well below, the Company will not be able to sell any shares under the CEFF.

*Stock Bonus*

In May 2008, the Company issued 125,532 shares of common stock with a fair value of $999,000 to employees as settlement of a liability under the Company's employee bonus plan.

*ESPP, Stock Option Exercises and Vested Restricted Stock Units*

In May 2008, the Company issued 149,856 shares of its common stock for proceeds of $974,000 under its employee stock purchase plan. The Company issued 26,228 shares of common stock as a result of stock option exercises and the vesting of restricted stock units during the nine months ended September 30, 2008 for proceeds of $2,000.

*Initial Public Offering*

On June 6, 2007, the Company completed its initial public offering of 6,000,000 shares of its common stock at a public offering price of $18.00 per share. Net cash proceeds from the initial public offering were $97.5 million, after deducting underwriting discounts and commissions and offering expenses.

**8.    Comprehensive Income (Loss)**

Comprehensive loss includes net loss and all changes in stockholders' equity (deficit) during a period, except for those changes resulting from investments by stockholders or distributions to stockholders. For the nine months ended September 30, 2008 and 2007, the difference between comprehensive loss and net loss represented the change in unrealized gains/losses on available-for-sale securities and was not material.

**9.    Segment Information**

Management has determined that the Company operates in one business segment, which is the development and commercialization of pharmaceutical products.

The following table presents a summary of product sales, net (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|
| Xyrem | $14,234 | $ 9,646 | $37,980 | $27,898 |
| Antizol (1) | 831 | 3,790 | 5,106 | 10,413 |
| Luvox CR (2) | 1,957 | — | 2,671 | — |
| Cystadane (3) | — | — | — | 365 |
| Total | $17,022 | $13,436 | $45,757 | $38,676 |

(1)    Includes sales of Antizol-Vet, which were $15,000 and $48,000 in the three months ended September 30, 2008 and 2007, respectively, and $163,000 and $179,000 in the nine months ended September 30, 2008 and 2007, respectively. The Company sold its rights to Antizol and Antizol-Vet to an unrelated third party in August 2008.

(2)    Includes sales of the active pharmaceutical ingredient in Luvox CR of $126,000 and $253,000 in the three and nine months ended September 30, 2008, respectively.

(3)    The Company sold its rights to Cystadane to a third party in March 2007.

12

The following table presents a summary of total revenues attributed to domestic and foreign sources (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2008 | 2007 | 2008 | 2007 |
| United States | $16,401 | $13,416 | $44,286 | $38,550 |
| Europe | 720 | 7,675 | 2,148 | 10,752 |
| All other | 625 | 383 | 1,485 | 524 |
| Total | $17,746 | $21,474 | $47,919 | $49,826 |

The following table presents a summary of total revenues from significant customers as a percentage of the Company's total revenues:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2008 | 2007 | 2008 | 2007 |
| Express Scripts | 79% | 46% | 78% | 56% |
| UCB Pharma Limited | * | 36% | * | 21% |

---

\* Represented less than 10% of the Company's total revenues.

## 10. Product License

In January 2007, the Company entered into a product license agreement with Solvay Pharmaceuticals, Inc. ("Solvay") for the rights to market Luvox CR and Luvox in the United States, which product license agreement was subsequently assigned to JPIC. The Company made a $2.0 million payment upon execution of the agreement which was recorded as research and development expense in the nine months ended September 30, 2007. As a result of approval by the FDA and the first commercial sale of Luvox CR, both of which occurred during the three months ended March 31, 2008, JPIC is obligated to make payments under this agreement totaling $41.0 million, of which $10.0 million was paid by the Company on March 28, 2008 and $10.0 million was paid by the Company on April 7, 2008 and $21.0 million remained recorded as a current liability at September 30, 2008. In October 2008, JPIC entered into a second amendment to its product license agreement with Solvay with respect to $21.0 million of payments to Solvay under the product license agreement. Prior to the second amendment, $10.5 million would have been payable on September 30, 2008 and $10.5 million would have been payable on December 31, 2008. Pursuant to the second amendment, these payments will be due to Solvay in accordance with the schedule described in Note 16. JPIC is obligated under the product license agreement to pay Solvay up to an additional $95.0 million in commercial milestone payments associated with Luvox CR, as well as royalties on net product sales at specified rates. Luvox CR's FDA approval included a commitment for two Phase IV clinical trials, one in adolescent patients with social anxiety disorder ("SAD") and the other a duration of effect study in patients with SAD. Solvay is required to reimburse the Company for fifty percent of the costs to be incurred in connection with these clinical trials up to $1.0 million.

## 11. Collaboration and License Agreements

Under the terms of an agreement with UCB, UCB has the right to market Xyrem for the treatment of narcolepsy and JZP-6 (sodium oxybate) for the treatment of fibromyalgia in 54 countries outside of the United States. UCB made a nonrefundable milestone payment to the Company of $2.0 million in March 2007, which was recorded as contract revenue in the nine months ended September 30, 2007. The Company recognized contract revenues of $280,000 during each of the three months ended September 30, 2008 and 2007, and $840,000 and $813,000 during the nine months ended September 30, 2008 and 2007, respectively, related to previously deferred upfront payments which are being recognized as contract revenue ratably through 2019, the expected performance period under the agreement.

In July 2008, the Company entered into a second amendment to its license and distribution agreement with UCB. Pursuant to the second amendment, the timing and size of a certain milestone payment were adjusted and UCB's ability to terminate the license and distribution agreement in whole or in part was revised. Prior to the second amendment, UCB was required to pay $7.5 million to the Company within 30 days after the last patient completed or had withdrawn from the Company's second Phase III trial of sodium oxybate for the treatment of fibromyalgia. Pursuant to the second amendment, a nonrefundable $10.0 million payment was made to the Company in July 2008 in lieu of the $7.5 million milestone payment. UCB would be entitled to a credit of $2.5 million against future royalties otherwise due under the license and distribution agreement if sodium oxybate for the treatment of fibromyalgia does not receive marketing authorization in the European Union because the clinical trials within the European Union did not include a sufficient number of patients and the Company did not enroll at least 185 patients in the clinical trials within the European Union. The Company has agreed to use commercially reasonable efforts to enroll at least 185 patients in the clinical trial from countries within the European Union. In addition, under the terms of the second amendment, the notice period for UCB's right to terminate the entire license and distribution agreement without cause was reduced from 18 months to 12 months, and a provision was added permitting

13

UCB to terminate its rights to sodium oxybate for the fibromyalgia indication on six months' notice at any time prior to the receipt of marketing approval of sodium oxybate for fibromyalgia in the European Union. As of September 30, 2008, the Company recorded a deferred revenue liability of $10.0 million because the Company had not yet met the performance obligations under the amended license and distribution agreement.

**12.    Stock-Based Compensation**

The Company accounts for employee stock-based compensation under SFAS No. 123(R), *Share-Based Payment* ("SFAS 123R"), which requires compensation expense related to share-based transactions, including employee stock options, to be measured and recognized in the financial statements based on fair value. Employee stock-based compensation expense recognized in the three and nine months ended September 30, 2008 and 2007 was calculated based on awards ultimately expected to vest, and has been reduced for estimated forfeitures. SFAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates.

Stock–based compensation expense recognized under SFAS 123R related to stock options, restricted stock units, phantom shares and awards under the Company's employee stock purchase plan was as follows (in thousands):

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| Cost of product sales | $    11 | $     6 | $  114 | $    22 |
| Research and development | 393 | 426 | 1,440 | 846 |
| Selling, general and administrative | 1,284 | 1,150 | 4,236 | 2,694 |
| Total stock-based compensation expense | $ 1,688 | $ 1,582 | $5,790 | $ 3,562 |

Employee stock-based compensation expenses of $57,000 and $43,000 as of September 30, 2008 and December 31, 2007, respectively, were capitalized as a component of inventories and included in the condensed consolidated balance sheets.

*Stock Options*

During the three and nine months ended September 30, 2008, the Company granted stock options to purchase 134,100 and 927,025 shares of common stock, respectively. The weighted-average grant-date fair value per share of the stock options granted during the three and nine months ended September 30, 2008 was $4.48 and $4.94, respectively. The fair value of these stock option grants was estimated at the grant date using the Black–Scholes option pricing model with the following weighted-average assumptions:

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| Weighted-average volatility | 60% | 55% | 59% | 56% |
| Weighted-average expected term | 5.9 | 6.1 | 6.1 | 6.1 |
| Range of risk-free rates | 3.0-3.4% | 4.3-4.9% | 2.7-3.4% | 4.3-4.9% |
| Expected dividend yield | 0.0% | 0.0% | 0.0% | 0.0% |

*Phantom Shares*

In August 2008, certain directors elected to defer receipt of their annual retainer fees to be paid in Company common stock and the Company recorded phantom shares equivalent to 26,783 shares of the Company's common stock with a market value per share of $7.84. Total compensation cost related to phantom shares of common stock granted under the Directors Deferred Compensation Plan was approximately $210,000 and $211,000 for both the three and nine months ended September 30, 2008 and 2007, respectively.

**13.    Sale of Product Rights**

In August 2008, the Company sold its rights to and interests in Antizol and Antizol-Vet for cash consideration of $5.5 million and existing inventory, raw materials and work in process for cash consideration of $275,000. In connection with this transaction, the Company recognized a gain on sale of product rights of $3.9 million. In addition, for the next three years, the Company is entitled to receive annual product payments equal to a specified percentage of net sales of Antizol and Antizol-Vet if sales reach certain thresholds, a portion of which would be payable to certain holders of JPIC's senior secured notes as discussed in Note 5 above as partial prepayment of the outstanding principal of the senior secured notes.

In March 2007, the Company sold its rights to Cystadane, associated product registrations, commercial inventory and trademarks for cash consideration of $9.0 million and recorded a gain on sale of product rights of $5.1 million.

14

Table of Contents

**14.    Workforce Reductions**

In June 2008, as part of a strategic decision to reduce its emphasis on early-stage research and development activities, reduce research and development commitments and streamline administrative operations, the Company completed a workforce reduction of 33 employees and recorded a charge of $439,000 in the nine months ended September 30, 2008, of which $220,000 was recorded in research and development expense and the remainder in selling, general and administrative expense. Approximately $426,000 of the charge relates to severance, health insurance premium and outplacement assistance payments, and no amounts were unpaid as of September 30, 2008. The remaining $13,000 relates to the accelerated vesting of restricted stock units for terminated employees.

In November 2008, the Company implemented a workforce reduction of 67 employees. See Note 16 for additional information.

**15.    Commitments and Contingencies**

*Indemnification*

In the normal course of business, the Company enters into contracts and agreements that contain a variety of representations and warranties and provide for general indemnification, including indemnification associated with product liability or infringement of intellectual property rights. The Company's exposure under these agreements is unknown because it involves future claims that may be made against the Company that have not yet been made. To date, the Company has not paid any claims or been required to defend any action related to these indemnification obligations except as disclosed in the Company's prior public filings.

The Company has agreed to indemnify its officers and directors, and the officers and directors of Orphan Medical and JPIC, for losses and costs incurred in connection with certain events or occurrences, including advancing money to cover certain costs, subject to certain limitations. The maximum potential amount of future payments the Company could be required to make under this indemnification is unlimited; however, the Company maintains insurance policies that may limit its exposure and may enable it to recover a portion of any future amounts paid. Assuming the applicability of coverage, the willingness of the insurer to assume coverage, and subject to certain retention, loss limits and other policy provisions, the Company believes that the fair value of these indemnification obligations is not material. Accordingly, the Company has not recognized any liabilities relating to these obligations as of September 30, 2008 and December 31, 2007. No assurances can be given that the covering insurers will not attempt to dispute the validity, applicability, or amount of coverage without expensive litigation against these insurers, in which case the Company may incur substantial liabilities as a result of these indemnification obligations.

*Legal Proceedings*

In April 2006, the Company and Orphan Medical received subpoenas from the United States Department of Justice in connection with the sale and marketing of Xyrem. In July 2007, the Company reached a comprehensive settlement with the government in connection with this matter and agreed to make payments totaling approximately $20.0 million over the next several years of which the Company has paid $3.0 million as of September 30, 2008. The Company recorded a charge of $17.5 million in the nine months ended September 30, 2007, which represents the present value of these payments discounted at an interest rate of 4.6%. As of September 30, 2008, the non-current portion of this provision was $13.1 million and the current portion, which is included in accrued liabilities, was $2.3 million.

On April 10, 2006, Little Gem Life Sciences LLC, individually and purportedly on behalf of a class of persons similarly situated, filed a complaint against Orphan Medical and former officers of Orphan Medical in the United States District Court for the District of Minnesota. The complaint alleges that the defendants made false and misleading statements in the proxy statement prepared by Orphan Medical in connection with the solicitation of proxies to be voted at the special meeting of Orphan Medical stockholders held on June 22, 2005. The purpose of the special meeting was to consider and vote upon a proposal to adopt the definitive merger agreement pursuant to which the Company acquired Orphan Medical. The plaintiff seeks damages for itself and the putative class, in an unspecified amount, together with interest, litigation costs and expenses, and its attorneys' fees and other disbursements, as well as unspecified other and further relief. On October 25, 2006, the defendants filed a motion to dismiss the complaint and oral argument on the motion was heard by the United States District Court for the District of Minnesota. On February 16, 2007, the United States District Court for the District of Minnesota granted the defendants' motion to dismiss the complaint, with leave to amend. On March 14, 2007, the plaintiff filed an amended complaint, and the defendants responded with a motion to dismiss on March 16, 2007. Oral argument on the motion was heard on June 8, 2007. On September 13, 2007, the United States District Court for the District of Minnesota granted the defendants' motion to dismiss the complaint with prejudice. On September 28, 2007, the plaintiff filed a Notice of Appeal to the United States Court of Appeals for the Eighth Circuit. On November 21, 2007, the plaintiff filed its brief with the United States Court of Appeals for the Eighth Circuit. On December 21, 2007, the defendants filed their brief with the United States Court of Appeals for the Eighth Circuit. On January 8, 2008, the plaintiff filed a reply brief. Oral arguments were heard on May 15, 2008. On August 11, 2008, the United States Court of Appeals for the Eighth Circuit affirmed the judgment of the United States District Court for the District of Minnesota in favor of the defendant. The time to appeal this decision has elapsed.

From time to time the Company is involved in legal proceedings arising in the ordinary course of business. The Company believes there is no other litigation pending that could have, individually or in the aggregate, a material adverse effect on results of operations or financial condition.

15

Table of Contents

**16.    Subsequent Events**

*Amendment to Solvay Agreement*

    In October 2008, JPIC amended its product license agreement with Solvay to modify the terms for $21.0 million of payments under the agreement. Prior to the amendment, $10.5 million would have been payable on September 30, 2008 and $10.5 million would have been payable on December 31, 2008. Pursuant to the terms of the amendment, a payment of $3.5 million was paid in October 2008, a payment of $3.5 million will be due on each of November 15, 2008 and on December 15, 2008 and the remaining $10.5 million will be due in nine equal monthly payments beginning January 15, 2009 and ending September 15, 2009. In addition, pursuant to this amendment, Solvay may terminate the license agreement if any of these payments is not made within fifteen days after it is due.

*Workforce Reduction*

    In November 2008, in large part as a reaction to the lower than anticipated demand to date for Luvox CR, the Company implemented a workforce reduction of 67 employees, largely from its commercial organization. The Company expects to record a charge in selling, general and administrative expense of approximately $1.6 million in the three months and year ending December 31, 2008. The Company expects approximately $742,000 of the charge to relate to severance and health insurance premium payments, most of which is expected to be paid by February 28, 2009.

<div align="center">16</div>

Item 2.        **Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with the condensed consolidated financial statements and notes to condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q. This discussion contains forward looking statements that involve risks and uncertainties. When reviewing the discussion below, you should keep in mind the substantial risks and uncertainties that characterize our business. In particular, we encourage you to review the risks and uncertainties described in Part II Item 1A "Risk Factors" included elsewhere in this report. These risks and uncertainties could cause actual results to differ materially from those projected in forward-looking statements contained in this report or implied by past results and trends. Forward-looking statements are statements that attempt to forecast or anticipate future developments in our business and we encourage you to review the examples of our forward-looking statements under the heading "Cautionary Note Regarding Forward-Looking Statements" that appears at the end of this discussion. These statements, like all statements in this report, speak only as of their date (unless another date is indicated), and we undertake no obligation to update or revise these statements in light of future developments.*

**Overview**

      We are a specialty pharmaceutical company focused on identifying, developing and commercializing innovative products to meet unmet medical needs in neurology and psychiatry. Our goal is to build a broad portfolio of products through a combination of internal development and acquisition and in-licensing activities, and to utilize our specialty sales force to promote our products in our target markets. We apply novel formulations and drug delivery technologies to known drug compounds, and to compounds with the same mechanism of action or similar chemical structure as marketed products, to improve patient care by, among other things, improving efficacy, reducing adverse side effects or increasing patient compliance relative to existing therapies. By working with these drug compounds, we believe that we can substantially mitigate the risks and reduce the costs and time associated with product development and commercialization of new therapies with significant market opportunities. Through the application of novel formulations and drug delivery technologies, we also explore potential new indications for known drug compounds. Since our inception in 2003, we have built a commercial operation and assembled a portfolio of products and product candidates that currently includes two marketed products and four product candidates in various stages of clinical development. We have additional product candidates in earlier stages of development.

      Our marketed products are:

- *Xyrem® (sodium oxybate) oral solution.* Xyrem is the only product approved by the U.S. Food and Drug Administration, or FDA, for the treatment of both cataplexy and excessive daytime sleepiness in patients with narcolepsy. Narcolepsy is a chronic neurologic disorder caused by the brain's inability to regulate sleep-wake cycles. According to the National Institutes of Health, 150,000 or more individuals in the United States are affected by narcolepsy. We promote Xyrem in the United States to neurologists, psychiatrists, pulmonologists and sleep specialists through our specialty sales force. We have significantly increased U.S. sales of Xyrem since acquiring rights to Xyrem in June 2005. We have licensed the rights to commercialize Xyrem in 54 countries outside of the United States to UCB Pharma Limited, or UCB, and in Canada to Valeant Canada Limited, or Valeant. UCB currently markets Xyrem in 13 countries.

- *Luvox CR® (fluvoxamine maleate) extended release capsules.* Once-daily Luvox CR was approved by the FDA for the treatment of both obsessive compulsive disorder and social anxiety disorder on February 28, 2008. We shipped initial stocking orders of Luvox CR to our wholesaler customers in March 2008 and began promoting the product through our specialty sales force in April 2008. Luvox CR is a once-daily extended release formulation of fluvoxamine, a selective serotonin reuptake inhibitor. Selective serotonin reuptake inhibitors are used in the treatment of depression, anxiety disorders and some personality disorders. According to the National Institute of Mental Health, obsessive compulsive disorder and social anxiety disorder affect approximately 2.2 million and 15 million adults in the United States, respectively. Luvox CR was developed by Solvay Pharmaceuticals, Inc., or Solvay, in collaboration with Elan Pharma International Limited, or Elan. We obtained the exclusive rights to market and distribute Luvox CR in the United States from Solvay in January 2007. Solvay retains the rights to market and distribute Luvox CR outside of the United States.

      Our clinical development pipeline consists of the following product candidates:

- *JZP-6 (sodium oxybate).* We are developing sodium oxybate, the active pharmaceutical ingredient in Xyrem, for the treatment of fibromyalgia. According to the American College of Rheumatology, between two and four percent of the U.S. population suffers from fibromyalgia. We have successfully completed a Phase II clinical trial of this product candidate for the treatment of fibromyalgia. The Phase III clinical trial program includes two pivotal clinical trials. We expect preliminary data from the first Phase III pivotal clinical trial, for which all patients have completed their participation, in the fourth quarter of 2008. In Phase II clinical trials, JZP-6 achieved a statistically significant improvement compared to placebo in pain based on the pain visual analog scale, which the FDA and the European Agency for the Evaluation of Medicinal Products have indicated is the appropriate primary endpoint for our Phase III pivotal clinical trials. Subject to successful completion of the Phase III clinical trials, we plan to submit a new drug application, or NDA, for JZP-6 in the fourth quarter of 2009. If our NDA is approved by the FDA, we expect to market JZP-6 in the United States to specialists who treat fibromyalgia patients, through an expanded specialty sales force or in partnerships with third parties. We have granted UCB the commercialization rights to JZP-6 in 54 countries outside of the United States.

17

Table of Contents

- *JZP-8 (intranasal clonazepam)*. JZP-8, an intranasal formulation of clonazepam, is being developed for the treatment of recurrent acute repetitive seizures in epilepsy patients who continue to have seizures while on stable anti-epileptic regimens. Recurrent acute repetitive seizures are bouts of multiple seizures occurring over a short period of time. According to an article published in the *New England Journal of Medicine*, approximately 30% of epilepsy patients are unresponsive, or refractory, to treatment despite being on an effective dose of an antiepilepsy regimen, and a subset of these refractory patients experience recurrent acute repetitive seizures. We have received orphan drug designation from the FDA for this product candidate for the treatment of recurrent acute repetitive seizures. We are currently conducting a Phase II clinical trial of JZP-8 to evaluate the effectiveness and safety of several dosage strengths for the treatment of recurrent acute repetitive seizures in patients with epilepsy who have seizures while on stable anti-epileptic regimens. We expect to complete enrollment in this trial by early 2009.

- *JZP-4 (sodium channel antagonist)*. JZP-4, a controlled release formulation of an anticonvulsant that is believed to work through a similar mechanism of action as Lamictal® (lamotrigine), an antiepileptic drug marketed by GlaxoSmithKline for the treatment of epilepsy and bipolar disorder. According to the Epilepsy Foundation, approximately 2.7 million people in the United States suffer from epilepsy, and according to the National Institute of Mental Health, approximately 5.7 million people in the United States are affected by bipolar disorder. We are currently conducting product formulation activities in preparation for the potential initiation of a Phase II clinical program for JZP-4 in 2009, assuming we are able to partner or otherwise secure funding for this program.

- *JZP-7 (ropinirole gel)*. JZP-7, a transdermal gel formulation of ropinirole, is being developed for the treatment of restless legs syndrome. Dopamine is naturally produced by the human body, and in the brain, dopamine functions to help nerve cells communicate. A dopamine agonist is a drug compound that mimics the effects of dopamine. According to the Restless Legs Syndrome Foundation, up to 10% of the U.S. population suffers from restless legs syndrome. We are currently conducting certain pre-clinical activities in preparation for the potential initiation of a Phase III clinical program for JZP-7 in 2009, assuming we are able to partner or otherwise secure funding for this program.

In March 2008, JPI Commercial, LLC, or JPIC, a wholly-owned subsidiary, sold $40.0 million aggregate principal amount of senior secured notes. As part of the transaction, we issued to the purchasers of these notes warrants to purchase a total of 562,192 shares of our common stock exercisable at an exercise price of $14.23 per share at any time until March 17, 2013. We paid an arrangement fee of $800,000 and incurred other issuance costs of $634,000 in connection with the transaction. We are using the net proceeds to fund a portion of milestone payments due under JPIC's license agreement with Solvay, to fund Luvox CR launch expenses and for general corporate purposes. The notes bear interest at 15% per annum, payable quarterly in arrears, and are due on June 24, 2011. In addition, on March 17, 2008, a total of $80.0 million aggregate principal amount of senior secured notes of Orphan Medical, LLC, or Orphan Medical, a wholly-owned subsidiary, were exchanged for the same principal amount of new senior secured notes issued by JPIC at the same interest rate. For additional information see "Liquidity and Capital Resources" below.

In May 2008, we entered into a committed equity financing facility, or CEFF, with Kingsbridge Capital Limited, or Kingsbridge, that entitles us to sell and obligates Kingsbridge to purchase up to the lesser of $75.0 million of our common stock or 4,922,064 shares over a three-year period, subject to certain conditions and restrictions. For additional information see "Liquidity and Capital Resources" below.

In June 2008, as part of a strategic decision to reduce our emphasis on early-stage research and development activities, reduce research and development commitments and streamline administrative operations we completed a workforce reduction of 33 employees and recorded a charge of $439,000 in the nine months ended September 30, 2008. At the same time, we determined that we would initiate the Phase II clinical program for JZP-4 and the Phase III clinical program for JZP-7 if and when we are able to partner or otherwise secure additional sources of funding for these programs.

In July 2008, we completed a registered direct public offering of units consisting of an aggregate of 3,848,289 shares of common stock and warrants to purchase an aggregate of 1,731,724 shares of common stock at a public offering price of $6.75625 per unit for net proceeds of $24.5 million after deducting the placement agents' fees and other offering expenses payable by us. We are using the net proceeds primarily to fund our commercial activities in support of the launch of Luvox CR, including payment of a portion of the milestone payments due to Solvay, to complete the Phase III clinical studies of JZP-6, and for general corporate purposes. The warrants are exercisable for $7.37 per share of common stock at any time on or after January 21, 2009 and prior to July 21, 2014.

In July 2008, we amended the terms of our license agreement with UCB and received a milestone payment of $10.0 million in July 2008. For additional information see "Liquidity and Capital Resources" below.

In August 2008, we sold our rights to and interests in Antizol and Antizol-Vet for cash consideration of $5.5 million and we sold existing inventory, raw materials and work in process for cash consideration of $275,000. In connection with this transaction, we recognized a gain of $3.9 million.

18

In October 2008, JPIC amended its product license agreement with Solvay to modify the payment terms for $21.0 million of payments under the agreement. Prior to the amendment, $10.5 million would have been payable on September 30, 2008 and $10.5 million would have been payable on December 31, 2008. Pursuant to the terms of the amendment, a payment of $3.5 million was paid in October 2008, a payment of $3.5 million will be due on each of November 15, 2008 and on December 15, 2008 and the remaining $10.5 million will be due in nine equal monthly payments beginning January 15, 2009 and ending September 15, 2009. In addition, Solvay may terminate the license agreement if any of these payments is not made within fifteen days after it is due.

Since our inception, we have incurred significant net losses, and we may continue to incur net losses for the next few years. In June 2008, as part of a strategic decision to reduce our emphasis on early-stage research and development activities, reduce research and development commitments and streamline administrative operations, we completed a workforce reduction of 33 employees. In November 2008, in large part as a reaction to the lower than anticipated demand to date for Luvox CR, we implemented a workforce reduction of 67 employees, including 62 in the field sales force. We cannot predict with certainty the level of future sales of our products and our future product sales may not reach the levels we currently expect. Accordingly, in order to preserve our cash resources, we expect to continue to take actions designed to reduce our expenses. The cost-cutting measures we have taken and may take in the future may not be sufficient to enable us to meet our cash requirements or for us to reach profitability. In addition to expense reduction initiatives, we will need to raise additional funds by early 2009 to support our operations. Such funding may not be available to us on acceptable terms, or at all. If we are unable to raise additional funds by early 2009, we will be required to significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities.

*Revenues*

*Product Sales, Net*

The following is a summary of our product sales, net for the three and nine months ended September 30, 2008 and 2007:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | (In thousands) | | | |
| Xyrem | $14,234 | $ 9,646 | $37,980 | $27,898 |
| Antizol (1) | 831 | 3,790 | 5,106 | 10,413 |
| Luvox CR (2) | 1,957 | — | 2,671 | — |
| Cystadane (3) | — | — | — | 365 |
| Total | $17,022 | $13,436 | $45,757 | $38,676 |

(1)    Includes sales of Antizol-Vet, which were $15,000 and $48,000 in the three months ended September 30, 2008 and 2007, respectively, and $163,000 and $179,000 in the nine months ended September 30, 2008 and 2007, respectively. We sold our rights to Antizol and Antizol-Vet to an unrelated third party in August 2008.

(2)    Includes sales of the active pharmaceutical ingredient in Luvox CR of $126,000 and $253,000 in the three and nine months ended September 30, 2008, respectively.

(3)    We sold our rights to Cystadane to an unrelated third party in March 2007.

*Xyrem (sodium oxybate) oral solution*. Revenues from sales of Xyrem primarily represented sales in the United States to Express Scripts Specialty Distribution Services, Inc. Revenues from sales of Xyrem under our agreements with UCB and Valeant have not been material. Orphan drug exclusivity for Xyrem in the United States expires in 2009 for the treatment of cataplexy in patients with narcolepsy, and in 2012 for the treatment of excessive daytime sleepiness in patients with narcolepsy.

*Luvox CR (fluvoxamine maleate) extended release capsules*. Revenues from sales of Luvox CR primarily represented sales in the United States to patients based on units dispensed through prescriptions as of September 30, 2008. Marketing exclusivity for Luvox CR under the provisions of the Hatch-Waxman Act in the United States will expire in February 2011.

*Royalties, Net*

We receive royalties primarily from international distributors of our products, typically based on their net sales of our products. Royalty income was $440,000 and $253,000 in the three months ended September 30, 2008 and 2007, respectively, and $1.3 million and $824,000 in the nine months ended September 30, 2008 and 2007, respectively. Although we do not expect royalty revenues to comprise a substantial portion of our revenues in the near future, we expect royalty revenues to increase as sales of Xyrem by UCB and Valeant increase.

*Contract Revenues*

Almost all of our contract revenues consist of upfront or milestone payments received from UCB. UCB made a nonrefundable commercial milestone payment of $2.0 million in March 2007, which we recognized upon achievement of the milestone. In connection with the expansion of our agreement with UCB in 2006, UCB made an upfront payment of $5.0 million and subsequently an additional payment of $10.0 million in September 2006 upon exercise of its rights to develop and commercialize JZP-6 for the treatment of fibromyalgia syndrome. These payments are being recognized as revenue through 2019, the estimated performance period of the contract. This amortization resulted in contract revenues of $280,000 during each of the three months ended September 30, 2008 and 2007, and $840,000 and $813,000 in nine months ended September 30, 2008 and 2007, respectively.

*Research and Development Expenses*

Our research and development expenses consisted of expenses incurred in identifying, developing and testing our product candidates. These expenses consisted primarily of fees paid to contract research organizations and other third parties to assist us in managing, monitoring and analyzing our clinical trials, clinical trial costs paid to sites and investigators' salaries, costs of non-clinical studies, including toxicity studies in animals, costs of contract manufacturing services, costs of materials used in clinical trials and non-clinical studies, fees paid to third parties for development candidates or drug delivery or formulation technologies that we have licensed, allocated expenses, such as facilities and information technology that support our research and development activities, and related personnel expenses, including stock-based compensation. Research and development costs are expensed as incurred, including payments made under our license agreements for product candidates in development.

Conducting a significant amount of research and development has been central to our business model. Since our formation in 2003 through September 30, 2008, we incurred approximately $243.8 million in research and development expenses. To continue the development of our product candidates, we will need to make significant investments in research and development, including, for example, in connection with the JZP-6 Phase III clinical trials and a related open label safety study currently underway. Until we obtain sufficient additional financing, which we may not be able to do, we will need to focus our research and development efforts almost exclusively on JZP-6 in order to conserve cash. Product candidates in later-stage clinical development generally have higher development costs than those in earlier stages of development, primarily due to the significantly increased size and length of the clinical trials.

We designate development projects to which we have allocated significant research and development resources with the term "JZP" and a unique number. Earlier-stage development and product lifecycle extension projects are included in "Other projects" in the following table. Early product concept feasibility studies and other research activities are included in "R&D support" in the following table. The expenditures summarized in the following table reflect costs directly attributable to each development candidate and to our "Other projects." We do not allocate salaries, benefits or other indirect costs to our development candidates or "Other projects," but include these costs in "R&D support" in the following table. The following table summarizes our research and development expenses for the nine months ended September 30, 2008, and for JZP projects currently under development and Luvox CR, direct research and development expenses attributed to each project from its inception through September 30, 2008:

| | Nine Months Ended September 30, 2008 | | Project Inception to September 30, 2008 |
|---|---|---|---|
| | | (In thousands) | |
| JZP-6 | $ | 26,381 | $ | 65,047 |
| JZP-4 | | 2,138 | | 22,095 |
| Luvox CR (1) | | 1,242 | | 9,676 |
| JZP-7 | | 3,669 | | 7,106 |
| JZP-8 | | 2,602 | | 5,717 |
| Terminated projects (2) | | (125) | | |
| Other projects | | 2,826 | | |
| R&D support | | 16,541 | | |
| Total | $ | 55,274 | | |

(1)    During the nine months ended September 30, 2008, our research and development expenses for Luvox CR primarily consisted of expenses in connection with the scale-up for commercial manufacturing of Luvox CR prior to FDA approval on February 28, 2008. Expenses subsequent to FDA approval were either expensed as part of cost of product sales as a period expense or capitalized in inventory.

(2)    Relates to a decrease in estimated expenses accrued for two terminated projects.

Table of Contents

**Critical Accounting Policies and Significant Estimates**

To understand our financial statements, it is important to understand our critical accounting policies and estimates. The preparation of our financial statements in conformity with United States generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates and assumptions are required in the determination of revenue recognition, in particular related to our agreement with UCB, sales deductions for estimated specialty distributor and wholesaler fees, prompt payment discounts, Medicaid rebates, chargebacks, customer rebates, and royalties. Significant estimates and assumptions are also required to determine whether to capitalize intangible assets, the amortization periods for identifiable intangible assets, the potential impairment of goodwill and other intangible assets, stock-based compensation and accrued expenses. Some of these judgments can be subjective and complex, and, consequently, actual results may differ from these estimates. For any given individual estimate or assumption we make, there may also be other estimates or assumptions that are reasonable. Although we believe our estimates and assumptions are reasonable, they are based upon information available at the time the estimates and assumptions were made.

Our critical accounting policies and significant estimates are detailed in our Annual Report on Form 10-K for the year ended December 31, 2007. Other than the policies and estimates listed below, our critical accounting policies and significant estimates have not changed substantially from those previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2007.

*Goodwill and Intangible Assets*

*Goodwill*

Goodwill represents the excess of the purchase price over the fair value of assets acquired and liabilities assumed. We have determined that we operate in a single segment and have a single reporting unit associated with the development and commercialization of pharmaceutical products. The annual test for goodwill impairment is a two-step process. The first step is a comparison of the fair value of the reporting unit with its carrying amount, including goodwill. If this step indicates impairment, then in the second step, the loss is measured as the excess of recorded goodwill over its implied fair value. Implied fair value is the excess of the fair value of the reporting unit over the fair value of all identified assets and liabilities. We test goodwill for impairment annually in October and concluded that no impairment existed as of October 1, 2008. We tested for impairment when events or changes in circumstances such as the recent decline in our stock price indicated that the carrying value may not be recoverable.

*Intangible Assets*

We believe we will receive substantially all of the cash flows from our $41.0 million investment in the Luvox CR developed technology intangible asset over a period of five years from the date Luvox CR was approved by the FDA. Accordingly, we have selected that period of time as the estimated useful life of the asset. The assumptions and forecasts used to estimate these cash flows are extremely subjective and require a high degree of judgment. The most significant assumption in these estimates is the extent to which competitive products could impact our net sales.

The method of amortization should reflect the pattern in which the economic benefits of the intangible asset are consumed. If that pattern cannot be reliably determined, a straight-line amortization method should be used. We do not believe we should pattern the amortization of the intangible asset using expected cash flows because they are inherently subjective and potentially unreliable and, in addition, cash flows are negative during the product launch period, which would result in periods where no amortization expense is recorded. We believe the rights we have purchased represent a consistent periodic economic benefit to us since we cannot use our right to sell Luvox CR more in one period than in any other and, accordingly, we will amortize the asset on a straight-line basis.

We evaluate our intangible assets for impairment whenever events or changes in circumstances indicate that the carrying value of the assets may not be recoverable. An impairment loss would be recognized when estimated undiscounted future cash flows expected to result from the use of the asset and its eventual disposition are less than its carrying amount. Because sales of Luvox CR at September 30, 2008 had not reached the levels we had expected, we updated our estimated undiscounted future cash flows for Luvox CR for the remaining life of the related intangible asset. We compared our estimated undiscounted future cash flows to the remaining carrying value of the Luvox CR intangible asset and found that the value of the intangible asset was recoverable and not impaired. The estimates and assumptions used in our analysis are very subjective. Changes in our estimates and assumptions could have a material adverse effect on our results of operations.

**Revenue Recognition**

Luvox CR was approved by the FDA for the treatment of obsessive compulsive disorder and social anxiety disorder and we shipped initial stocking orders to our wholesaler customers in the first quarter of 2008. Luvox CR is subject to rights of return within six months prior to and up to twelve months after product expiration. Given our limited history of selling Luvox CR, we currently cannot reliably estimate expected returns of Luvox CR at the time of shipment. Accordingly, we defer recognition of revenue on product shipments of Luvox CR and instead recognize revenue on a "sell-through" basis using dispensing data generated by an independent prescription tracking service. Units dispensed through prescriptions are generally not subject to return. When trade channel inventories are reduced to targeted stocking levels and we have sufficient data to determine product acceptance in the

21

Table of Contents

marketplace we will recognize revenue on sales of Luvox CR at the time title passes to our customers, or on a "sell-in" basis, and provide for an estimate of future product returns. Through September 30, 2008, we billed our wholesaler customers, who have certain industry standard rights of return, an aggregate of $4.7 million. We concluded, based on prescription data and the level of trade channel inventories, that we are unable to determine the extent of Luvox CR acceptance by the market and consequently we are unable to estimate the extent of product returns. On a sell-through basis, we recorded revenue of $1.8 million and $2.4 million for the three and nine months ended September 30, 2008, respectively, net of estimated wholesaler fees, discounts, chargebacks and rebates. As of September 30, 2008, we had recorded a deferred revenue liability of $1.3 million, which represents amounts paid by wholesaler customers in excess of revenue recognized, net of estimated wholesaler fees, discounts, chargebacks and certain rebates. As of September 30, 2008, we had included in our inventories Luvox CR cost of sales of approximately $162,000 related to shipments for which revenue has been deferred. We believe the independent prescription data we used to record revenue related to Luvox CR is accurate and reliable and not subject to subsequent adjustments. While we record Luvox CR revenue on a sell-through basis, we believe our estimated wholesaler fees, discounts, chargebacks and rebates are subject to minimal future adjustments. When we are able to record Luvox CR revenues on a sell-in basis our estimates related to product returns, indirect rebates payable to contracted managed care organizations and Medicaid supplemental rebates will be subject to variability and adjustment. As a result, when we do recognize revenue from sales of Luvox CR on a sell-in basis, it may be subject to greater period to period fluctuations than products with long established histories.

There have been no significant changes in the estimates and assumptions we used to record revenue from sales of Xyrem during the nine months ended September 30, 2008.

Under our contractual relationships, nonrefundable fees where we have no continuing performance obligations are recognized as revenues when collection is reasonably assured. In situations where we have continuing performance obligations, nonrefundable fees are deferred and recognized ratably over our projected performance period. We recognize at-risk milestone payments, which are typically related to regulatory, commercial or other achievements by us or our licensees and distributors, as revenues when the milestone is accomplished and collection is reasonably assured. Refundable fees are deferred and recognized as revenues upon the later of when they become nonrefundable or when our performance obligations are completed. Under an amendment to our license and distribution agreement with UCB, UCB paid $10.0 million to us in July 2008 in lieu of a $7.5 million milestone payment which would have been due after the last patient completed or had withdrawn from our second Phase III trial of sodium oxybate for the treatment of fibromyalgia which is ongoing. Under the amendment, we are obligated to use commercially reasonable efforts to enroll at least 185 patients in the clinical trial from countries within the European Union. As of September 30, 2008, we deferred recognition of revenue related to the nonrefundable $10.0 million payment because we had not yet met the performance obligations under the amended license and distribution agreement. We expect the last patient will have completed or will have withdrawn from our second Phase III trial of sodium oxybate for the treatment of fibromyalgia in mid 2009, at which point we expect to recognize at least $7.5 million of the $10.0 million payment received as revenue.

*Inventory Reserves*

Inventories are valued at the lower of cost or market. Cost is determined using the first-in, first-out method for all inventories. Our policy is to write down inventory that has become obsolete, inventory that has a cost basis in excess of its expected net realizable value and inventory in excess of expected requirements. Based on an analysis performed during the third quarter, we recorded a charge to cost of product sales of $3.0 million. This consists of a reserve for inventory we judged to be in excess of expected requirements in the amount of $2.4 million and a $552,000 liability to a contract manufacturer for cancelled production orders. The estimate of excess quantities is subjective and primarily dependent on our estimates of future demand for the product. If our estimate of future demand is too high we may have to increase the reserve for excess inventory and record a charge to cost of product sales.

**Results of Operations**

*Comparison of Three and Nine Months Ended September 30, 2008 and 2007*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | Change | Change | 2008 | 2007 | Change | Change |
| | | (In thousands) | | | | (In thousands) | | |
| Product sales, net | $17,022 | $13,436 | $ 3,586 | 27% | $ 45,757 | $ 38,676 | $  7,081 | 18% |
| Royalties, net | 440 | 253 | 187 | 74% | 1,308 | 824 | 484 | 59% |
| Contract revenues | 284 | 7,785 | (7,501) | (96%) | 854 | 10,326 | (9,472) | (92%) |
| Cost of product sales (excluding amortization of acquired developed technology) | 5,525 | 1,938 | 3,587 | 185% | 10,619 | 5,620 | 4,999 | 89% |
| Research and development | 12,149 | 16,978 | (4,829) | (28%) | 55,274 | 49,252 | 6,022 | 12% |
| Selling, general and administrative | 24,329 | 18,069 | 6,260 | 35% | 91,218 | 50,583 | 40,635 | 80% |
| Amortization of intangible assets | 3,487 | 2,287 | 1,200 | 52% | 9,454 | 6,936 | 2,518 | 36% |
| Provision for government settlement | — | — | — | N/A(1) | — | 17,469 | (17,469) | N/A(1) |
| Interest income | 353 | 1,969 | (1,616) | (82%) | 1,700 | 4,360 | (2,660) | (61%) |
| Interest expense | (5,355) | (3,511) | (1,844) | 53% | (14,377) | (10,093) | (4,284) | 42% |
| Other income (expense), net | 19 | (19) | 38 | (200%) | 6 | 1,816 | (1,810) | (100%) |
| Gain on sale of product rights | 3,918 | — | 3,918 | N/A(1) | 3,918 | 5,145 | (1,227) | (24%) |

(1)    No comparable data for prior period or comparison to prior period is not meaningful.

*Product Sales, Net*

The increase in product sales, net in the three and nine months ended September 30, 2008, as compared to the same periods in 2007, was primarily due to the growth of Xyrem sales, which increased by $4.6 million and $10.1 million, respectively. We believe the increase in Xyrem sales was primarily attributable to the expansion of our sales force and, to a lesser extent, increases in the price we charged our central pharmacy customer for Xyrem of 9.5% in July 2008, 7.0% in January 2008 and 9.0% in May 2007. In the three and nine months ended September 30, 2008, we recorded revenue on sales of Luvox CR of $1.8 million and $2.4 million, respectively, and on sales of the active pharmaceutical ingredient in Luvox CR of $126,000 and $253,000, respectively. Prior to the sale of our rights to Antizol and Antizol-Vet in August 2008, we recorded sales of Antizol of $831,000 and $5.1 million in the three and nine months ended September 30, 2008, respectively. Prior to the sale of our rights to Cystadane in March 2007, we recorded Cystadane sales of $365,000 in the nine months ended September 30, 2007. We expect product sales for the fourth quarter of 2008 to be higher than during the third quarter of 2008.

*Royalties, Net*

The increase in royalties, net in the three and nine months ended September 30, 2008, as compared to same periods in 2007, was entirely due to an increase in sales of Xyrem by UCB.

*Contract Revenues*

Contract revenues in both the three and nine months ended September 30, 2007 included a $7.5 million nonrefundable milestone payment received from UCB in August 2007. In addition, contract revenues in the nine months ended September 30, 2007 included a $2.0 million nonrefundable milestone payment received from UCB in March 2007. We recognized additional contract revenues of $284,000 and $285,000 in the three months ended September 30, 2008 and 2007, respectively, and $854,000 and $826,000 in the nine months ended September 30, 2008 and 2007, respectively, primarily related to previously deferred upfront payments which are being recognized as contract revenues ratably through 2019, the expected performance period under our agreement with UCB.

*Cost of Product Sales*

Cost of product sales as a percentage of product sales increased to 32.5% and 23.2% in the three and nine months ended September 30, 2008, respectively, compared to 14.4% and 14.5% in the three and nine months ended September 30, 2007, respectively. The increases for both periods were primarily due to a $3.0 million charge to cost of product sales recorded in the three and nine months ended September 30, 2008, respectively, which consists of a reserve for Luvox CR inventory we judged to be in excess of expected requirements in the amount of $2.4 million and a $552,00 liability to a contract manufacturer for cancelled production orders, and $754,000 and $2.1 million of manufacturing period costs related to Luvox CR in the three and nine months ended September 30, 2008, respectively. Cost of product sales as a percentage of product sales in the three and nine months ended September 30, 2007 benefited from higher sales of Antizol, which had comparatively lower cost of sales as a percentage of product sales. Xyrem cost of product sales as a percentage of Xyrem product sales ranged from 85.6% to 88.7% in the three and nine months ended September 30, 2007 and 2008, respectively.

23

*Research and Development Expenses*

Lower research and development expenses in the three months ended September 30, 2008, as compared to the same period in 2007, resulted from lower spending on JZP-4, scale-up and manufacturing costs for Luvox CR and personnel related costs. In addition, the three months ended September 30, 2008 includes the reversal of a $1.1 million over-accrual of expenses related to JZP-6 originally recorded in the three months ended June 30, 2008. Higher research and development expenses in the nine months ended September 30, 2008, as compared to the same period in 2007, resulted from increased spending on development projects, primarily for JZP-6 and, to a lesser extent, JZP-7 and JZP-8, offset in part by decreased spending on JZP-4 and scale-up and manufacturing costs prior to the approval of Luvox CR. In addition, during the three and nine months ended September 30, 2007, we recorded a benefit of $1.3 million as a result of an agreement with a former technology partner related to a project that was terminated in 2005. We expect the level of research and development expenses for the fourth quarter of 2008 to be higher than the level of research and development expenses during the third quarter of 2008 primarily due to JZP-6 clinical trials expenditures.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses were higher in the three and nine months ended September 30, 2008, as compared to the same periods in 2007, primarily due to growth in headcount and related expenses, in particular related to the expansion of our sales force, marketing expenditures related to the launch of Luvox CR, and higher expenses to support our sales force. Legal fees were lower in the three and nine months ended September 30, 2008, as compared to the same periods in 2007, primarily as a result of the costs in 2007 related to a government investigation. We expect selling, general and administrative expenses for the year ending December 31, 2008 to be higher than in the year ended December 31, 2007 primarily due to the expansion of the sales force prior to the launch of Luvox CR. We expect selling, general and administrative expenses to begin to decrease in the first quarter of 2009 as a result of the reduction in force in November 2008.

*Amortization of Intangible Assets*

Our intangible assets consist primarily of developed technology, agreements not to compete and trademarks, all of which are amortized on a straight-line basis over their estimated useful lives. Amortization costs in the three and nine months ended September 30, 2008 were higher as compared to the same periods in 2007, as a result of amortization costs associated with the Luvox CR intangibles, offset by lower amortization costs on the Antizol intangibles. We expect amortization costs for the year ending December 31, 2008 to be higher than in the year ended December 31, 2007.

*Provision for Government Settlement*

In April 2006, we and Orphan Medical received subpoenas from the United States Department of Justice in connection with the sale and marketing of Xyrem. In July 2007, we reached a comprehensive settlement with the government in connection with this matter and agreed to make payments totaling approximately $20.0 million, including interest, over the next several years. We recorded a charge of $17.5 million in the nine months ended September 30, 2007, which represented the present value of these payments discounted at an interest rate of 4.6%.

*Interest Income*

Interest income was lower in the three and nine months ended September 30, 2008, as compared to the same periods in 2007, due to lower average cash balances and to lower average interest rates.

*Interest Expense*

Interest expense in the three and nine months ended September 30, 2008, as compared to the same periods in 2007, increased primarily due to interest expense related to the settlement of a government investigation and interest expense recorded on the additional $40.0 million principal amount of senior secured notes we issued in March 2008. Interest on the notes is comprised of the accretion of a discount related to warrants that were issued in conjunction with the notes, amortization of debt issuance costs and quarterly cash payments for interest, and was calculated using the effective interest method.

*Other Income (Expense), Net*

We recorded a benefit of $1.8 million for the nine months ended September 30, 2007 to reflect a decrease in the fair value of the preferred stock warrant liability. Prior to our initial public offering the preferred stock warrant liability was revalued at the end of each reporting period to fair value using the Black-Scholes option pricing model. On June 6, 2007, upon completion of our initial public offering, the warrants became exercisable for common stock and the liability was reclassified to stockholders' equity at its then fair value.

24

Table of Contents

*Gain on Sale of Product Rights*

In August 2008, we entered into an agreement under which an unrelated third party purchased our rights to and interests in Antizol and Antizol-Vet with the associated product registrations and trademarks for cash consideration of $5.5 million and existing inventory, raw materials and work in process for cash consideration of $275,000. In connection with this transaction, we recorded a gain of $3.9 million in the three and nine months ended September 30, 2008.

In March 2007, we entered into an agreement under which an unrelated third party purchased our rights to Cystadane along with the associated product registrations, commercial inventory and trademarks, for cash consideration of $9.0 million. In connection with this transaction, we recorded a gain of $5.1 million in the nine months ended September 30, 2007.

**Liquidity and Capital Resources**

Since our inception, we have incurred significant net losses, and, as of September 30, 2008, we had an accumulated deficit of $443.9 million. As of September 30, 2008, we had $50.9 million in unrestricted cash, cash equivalents and marketable securities, held primarily in obligations of United States government agencies, corporate debt securities and money market funds.

We have not achieved profitability and to become profitable we must reduce expenses as we continue our efforts to increase revenues. In June 2008, as part of a strategic decision to reduce our emphasis on early-stage research and development activities, reduce research and development commitments and streamline administrative operations, we completed a workforce reduction of 33 employees. In November 2008, in large part as a reaction to the lower than anticipated demand to date for Luvox CR, we implemented a workforce reduction of 67 employees, including 62 in the field sales force. In addition, we determined not to fill a number of currently open positions in the field and in the home office. We cannot predict with certainty the level of future sales of our products and our future sales may not reach the levels we currently expect.

We are seeking ways to reduce our expenses further as we continue to focus almost exclusively on our commercial products and JZP-6. We will need to raise additional funds by early 2009 to support our operations and such funding may not be available to us on acceptable terms, or at all. Other than the CEFF and our line of credit, we do not have any commitments or arrangements for additional funding.

We are actively seeking additional sources of financing through collaborations, partnering arrangements, development financings, or public or private debt or equity financings. We expect that our ability to obtain sufficient additional funding by early 2009 may depend significantly on the preliminary data from the first JZP-6 Phase III pivotal clinical trial. If we are unable to raise sufficient additional funds by early 2009 as a result of unfavorable results from the first JZP-6 Phase III pivotal clinical trial or other factors, including effects of the recent disruptions to the credit and financial markets in the United States and worldwide, we will be required to significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities. If we are able to raise funds through collaborations or partnering arrangements, we may be required to relinquish, on terms that are not favorable to us, rights to some of our product candidates that we would otherwise seek to develop or commercialize ourselves or to sell the rights to one or more commercial products to third parties. If we are able to raise additional funds through the issuance of debt securities, these securities could have rights that are senior to holders of our common stock and could contain covenants that restrict our operations. Any additional equity financing may be dilutive to our stockholders. In addition, if we raise additional funds through the sale of equity securities, new investors could have rights superior to our existing stockholders. The terms of future financings may restrict our ability to raise additional capital, which could delay or prevent the further development of our product candidates or commercialization of our products. Our failure to raise capital when needed may harm our business and operating results. See Part II Item 1A—Risk Factors "Our operations have generated negative cash flows, and if we are unable to secure additional funding, we may be required to significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities." and other risk factors included in Part II Item 1A for a discussion of the factors that will influence our future capital requirements.

To date, our operations have been financed primarily through the sale of convertible preferred stock prior to our initial public offering, the sale of common stock in our initial public offering, the sale of senior secured notes and warrants, project development financing, short-term borrowings under a line of credit, milestone payments received from our collaboration with UCB and the sale of units consisting of common stock and warrants in our registered direct public offering completed in July 2008.

In May 2008, we amended our existing line of credit so that we may borrow up to 75% of eligible accounts receivable, up to a maximum of $15.0 million in borrowings, subject to certain other limitations. As of September 30, 2008, we owed $3.3 million, the maximum amount currently available for borrowing under the line of credit. Upon the occurrence of certain events, including the effects of conditions or events that are generally applicable to the capital, financial, banking or currency markets, difficulties in generating product sales, or changes in the market price of our common stock, the lender has the right to stop advancing us money pursuant to the line of credit and to declare all amounts outstanding under the line of credit due and payable.

On March 17, 2008, JPIC, a wholly-owned subsidiary, sold $40.0 million aggregate principal amount of senior secured notes pursuant to a new debt arrangement. As part of the transaction, we issued to the purchasers of these notes warrants to purchase a total of 562,192 shares of our common stock exercisable at an exercise price of $14.23 per share at any time until March 17, 2013. We paid

25

an arrangement fee of $800,000 and incurred other expenses in connection with the transaction. The notes bear interest at 15% per annum, payable quarterly in arrears, and are due on June 24, 2011. In addition, on March 17, 2008, a total of $80.0 million aggregate principal amount of senior secured notes of Orphan Medical were exchanged for the same principal amount of new senior secured notes issued by JPIC pursuant to the debt arrangement described above at the same interest rate. In these transactions, we guaranteed the repayment obligations of JPIC and granted the note holders a security interest in all of our assets and those of our wholly-owned subsidiaries. We have also agreed to restrictions on working capital borrowings, dividends and certain other payments. Under the debt agreement, we may borrow from other sources up to $15.0 million secured by our accounts receivable and inventory. JPIC may be required to redeem up to $30.0 million of the outstanding principal amount of senior secured notes if our annualized net product sales are less than $100.0 million and a generic version of Xyrem has been approved in the United States.

JPIC may, at its option, prepay some or all of the notes subject to a repayment premium. The repayment premium on the first $40.0 million principal amount is 10% of the principal repayment. The repayment premium on any additional principal repayment was 18.3% of the principal repayment at September 30, 2008, and reduces ratably to zero on June 24, 2011. If there is an event of default under the terms of the notes, JPIC may be required to prepay some or all of the notes, including a repayment premium. The repayment premium for an event of default was 18.3% of the principal amount of the notes as of September 30, 2008 and will be reduced to zero ratably over the term of the notes. We are not currently required to maintain a restricted cash balance under this arrangement. We expect, however, that JPIC will be required to maintain a restricted cash balance equal to 15% of the then outstanding principal amount of notes after the quarter ending March 31, 2009 which JPIC may not be able to do, particularly if we are unable to obtain sufficient additional funding. If we are not able to maintain any required restricted cash balance under the terms of the senior secured notes, the holders of the senior secured notes may exercise their rights and remedies under the notes, which may include the acceleration of the indebtedness under the senior secured notes.

Pursuant to the debt arrangement described above, we have the option, prior to January 31, 2009, to have JPIC sell to the purchasers of the $40.0 million of senior secured notes up to $30.0 million aggregate principal amount of senior secured notes and warrants to purchase shares of our common stock. This option can only be exercised if certain conditions, including a condition relating to our net product sales, are met. We do not expect to satisfy the net sales condition and, therefore, do not expect to sell any additional senior secured notes pursuant to the terms of the debt arrangement described above.

On May 7, 2008, we entered into the CEFF with Kingsbridge pursuant to which Kingsbridge committed to purchase, subject to certain conditions, up to $75.0 million of our common stock over a three year period starting June 19, 2008, subject to early termination in certain circumstances. In connection with the CEFF, we issued a warrant to Kingsbridge to purchase up to 220,000 shares of our common stock with an exercise price of $11.20 per share. The warrant is exercisable for a period of five years beginning six months after the date of issuance. Under the CEFF, the maximum number of shares that we may sell to Kingsbridge is 4,922,064 shares (exclusive of the shares underlying the warrant issued to Kingsbridge). Subject to certain conditions and limitations, from time to time under the CEFF, we may require Kingsbridge to purchase shares of our common stock at a price that is between 90% and 94% of the volume weighted average price on each trading day during an eight day pricing period. The maximum number of shares we may require Kingsbridge to purchase in any pricing period is, the greater of (i) 1.5% of our market capitalization at the time of the commencement of the pricing period or (ii) the lesser of (A) 3.0% of our market capitalization at the time of the commencement of the pricing period or (B) a number of shares determined by a formula based in part on the average trading volume and trading price of our common stock prior to the date of the draw down notice issued by us with respect to that pricing period; provided, however, that the shares that we can require Kingsbridge to purchase in any pricing period cannot exceed an aggregate purchase price of $25 million. If the average price of our common stock is lower than $4.50 or declines more than 10% from the closing price on the trading day immediately prior to the start of a pricing period, we cannot draw under the CEFF during that pricing period for so long as the price remains below either of these thresholds. We filed a registration statement which became effective as of June 19, 2008 with respect to the resale of shares issuable pursuant to the CEFF and underlying the warrant, and the registration rights agreement requires us to maintain the effectiveness of the registration statement for up to two years following the termination of the common stock purchase agreement. If we fail to maintain the effectiveness of the registration statement or if we suspend the use of the registration statement, under certain circumstances we may be required to pay certain amounts to Kingsbridge (or issue to Kingsbridge additional shares of common stock in lieu of cash payment) as liquidated damages. We are not obligated to sell any of the $75.0 million of common stock available under the CEFF and there are no minimum commitments or minimum use penalties. The CEFF does not contain any restrictions on our operating activities, automatic pricing resets or minimum market volume restrictions. We have not drawn down funds and have not issued shares of our common stock under the CEFF as of October 31, 2008, and, for so long as the average price of our common stock remains lower than $4.50, which our common stock has recently been trading well below, we will not be able to sell shares under the CEFF.

On July 21, 2008, we completed a registered direct public offering of units consisting of an aggregate of 3,848,289 shares of common stock and warrants to purchase an aggregate of 1,731,724 shares of common stock at a public offering price of $6.75625 per unit for net proceeds of $24.5 million after deducting the placement agents' fees and other estimated offering expenses payable by us. The warrants are exercisable for $7.37 per share of common stock at any time on or after January 21, 2009 and prior to July 21, 2014.

On July 23, 2008, we entered into an amendment to our license and distribution agreement with UCB. Under the terms of the amendment, the timing and size of a certain milestone payment were adjusted and UCB's ability to terminate the license and distribution agreement with UCB in whole or in part was revised. Under the terms of the original license and distribution agreement

26

with UCB, UCB was required to pay $7.5 million to us within 30 days after the last patient completed or had withdrawn from our second Phase III trial of sodium oxybate for the treatment of fibromyalgia which is ongoing. Under the terms of the amendment, a nonrefundable $10.0 million payment was made to us in July 2008 in lieu of the $7.5 million payment. UCB would be entitled to a credit of $2.5 million against future royalties otherwise due under our license and distribution agreement with UCB if sodium oxybate for the treatment of fibromyalgia does not receive marketing authorization in the European Union because the clinical trials within the European Union did not include a sufficient number of patients and the Company did not enroll at least 185 patients in the clinical trials within the European Union. In addition, under the terms of the amendment, the notice period for UCB's right to terminate the entire license and distribution agreement without cause has been reduced from 18 months to 12 months, and a provision has been added permitting UCB to terminate its rights to sodium oxybate for the fibromyalgia indication on six-months' notice at any time prior to the receipt of marketing approval of sodium oxybate for fibromyalgia in the European Union.

In October 2008, JPIC amended its product license agreement with Solvay to modify the payment terms for $21.0 million of payments under the agreement. Prior to the amendment, $10.5 million would have been payable on September 30, 2008 and $10.5 million would have been payable on December 31, 2008. Pursuant to the terms of the amendment, a payment of $3.5 million was paid in October 2008, a payment of $3.5 million will be due on each of November 15, 2008 and on December 15, 2008, and the remaining $10.5 million will be due in nine equal monthly payments beginning January 15, 2009 and ending September 15, 2009. In addition, pursuant to this amendment, Solvay may terminate the license agreement if any of these payments is not made within fifteen days after it is due.

The following table shows a summary of our cash flows for the periods indicated:

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
|  | (In thousands) | |
| Net cash used in operating activities | $(111,446) | $(53,030) |
| Net cash used in investing activities | (4,948) | (4,068) |
| Net cash provided by financing activities | 63,356 | 98,122 |
| Net (decrease) increase in cash and cash equivalents | $ (53,038) | $ 41,024 |

Net cash used in operating activities during the nine months ended September 30, 2008 primarily reflected the net loss, adjusted for non-cash items including depreciation and amortization, stock-based compensation expense and the gain on sale of our product rights to Antizol and Antizol-Vet, in addition to the change in working capital, offset in part by the $10.0 million milestone payment we received from UCB in July 2008. Net cash used in operating activities during the nine months ended September 30, 2007 primarily reflected the net loss, adjusted for non-cash items including depreciation and amortization, stock-based compensation expense, the gain on sale of our product rights to Cystadane and the change in the preferred stock warrant liability, offset in part by changes in working capital and the liability under the government settlement. Net cash used in investing activities during the nine months ended September 30, 2008 primarily related to two milestone payments for the purchase of rights to Luvox CR, offset in part by the release of cash restricted under our previous senior secured note agreement, and proceeds of $5.5 million from the sale of our product rights to Antizol and Antizol-Vet. Net cash used by investing activities during the nine months ended September 30, 2007 primarily related to the purchase of marketable securities offset by proceeds of $9.0 million from the sale of our rights to Cystadane. Net cash provided by financing activities during the nine months ended September 30, 2008 was primarily attributable to the issuance of senior secured notes in March 2008 and net proceeds from our registered direct public offering in July 2008. Net cash provided by financing activities during the nine months ended September 30, 2007 was primarily attributable to net proceeds from our initial public offering.

**Contractual Obligations**

In addition to our contractual obligations set forth in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007, the following table reflects a summary of material contractual obligations we have incurred during the first nine months of 2008 and remain outstanding as of September 30, 2008:

| Contractual Obligations | Total | Less than 1 Year | 1-3 Years (In thousands) | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Senior secured notes (1) | $56,400 | $ 6,000 | $50,400 | $ — | $ — |
| Milestone payments (2) | 21,000 | 21,000 | — | — | — |
| Operating lease obligation (3) | 748 | 748 | — | — | — |
| Total | $78,148 | $27,748 | $50,400 | $ — | $ — |

(1) Represents our remaining payment obligations on $40.0 million aggregate principal amount of notes issued on March 17, 2008 which are due in full on June 24, 2011. During the first nine months of 2008, we paid $3.2 million of this obligation which is reflected as a reduction in the total amount due in the table above. Pursuant to the terms of the senior secured notes, the holders of the senior secured notes have the right to receive, as partial prepayment of the outstanding principal of the senior secured notes, the $5.5 million proceeds from the sale of our rights to Antizol and Antizol-Vet and, and so long as the senior secured notes are outstanding, the right to receive any additional future payments we may receive if sales of Antizol and Antizol-Vet reach certain thresholds, as partial prepayment of the outstanding principal of the senior secured notes. The holders of a majority of the senior secured notes waived these rights. In August 2008, we paid the holders of the senior secured notes that did not waive these rights an aggregate of $504,000 as their pro rata share of the proceeds from the sale of our rights to Antizol and Antizol-Vet, which is not reflected as a reduction in the total amount due in the table above. Our payment obligations on the $80.0 million of new senior secured notes issued by JPIC in exchange for the same principal amount of senior secured notes issued by Orphan Medical, are not included in the table above since these payment obligations were included in our contractual obligations table in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007.

(2) Represents milestone payments due under JPIC's license agreement with Solvay as a result of the approval by the FDA and the first commercial sale of Luvox CR. During the first nine months of 2008, we paid $20.0 million of this obligation which is not included in the table above. Milestone payments and royalty payments under our license and collaboration agreements that we cannot, as of September 30, 2008, determine when or if the related milestones will be achieved or the events triggering the commencement of payment obligations will occur are not included in the table above. As a result, we have not included in the table above an additional $95.0 million in commercial milestone payments due under JPIC's agreement with Solvay associated with Luvox CR, as well as royalties on net product sales at specified rates. FDA approval for Luvox CR includes a post marketing commitment to conduct a safety and efficacy study in adolescent patients with social anxiety disorder and a long-term safety and efficacy study in patients with social anxiety disorder. Costs associated with these studies are also not included in the table above. Solvay is required to reimburse us a portion of these costs.

(3) In February 2008, we exercised our option to extend the lease on our corporate office building for one year beginning August 2008. In addition to these lease payments, we are obligated to pay for operating expenses for the leased property. Our payment obligations for the minimum rental payments for our corporate office building and two other office spaces in Palo Alto, California and automobile lease payments for our sales force are not included in the table above since these payment obligations were included in our contractual obligations table in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007.

**Related Parties**

Prior to the issuance of the $40.0 million senior secured notes on March 17, 2008, as described in "Liquidity and Capital Resources" above, LB I Group Inc., an entity affiliated with Lehman Brothers Holdings Inc., purchased certain senior notes and warrants then outstanding, including certain senior notes and warrants held by an affiliate of Kohlberg Kravis Roberts & Co. L.P., a significant stockholder. Subsequent to the issuance of the $40.0 million senior secured notes on March 17, 2008, LB I Group Inc. held notes with an aggregate principal amount of $89.5 million, warrants to purchase 479,853 shares of common stock exercisable at $20.36 per share and warrants to purchase 470,836 shares of common stock exercisable at $14.23 per share. We paid LB I Group Inc. an arrangement fee of $800,000 in connection with the issuance of the $40.0 million senior secured notes issued on March 17, 2008. Subsequent to the issuance of the $40.0 million senior secured notes on March 17, 2008, entities affiliated with Kohlberg Kravis Roberts & Co. L.P. held notes with an aggregate principal amount of $7.1 million and warrants to purchase 70,156 shares of common stock exercisable at $20.36 per share.

28

In connection with the sale of our rights to Antizol and Antizol-Vet to an unrelated third party and pursuant to the terms of the senior secured notes, we paid $327,000 to an entity affiliated with Kohlberg Kravis Roberts & Co. L.P. as partial prepayment of the outstanding principal of the senior secured note held by it. So long as the senior secured note is outstanding, an entity affiliated with Kohlberg Kravis Roberts & Co. L.P. is entitled to receive its pro rata share of any future payments we receive related to the sale of Antizol and Antizol-Vet, as partial prepayment of the outstanding principal of the senior secured notes.

In the registered direct public offering we completed in July 2008, a total of 60% of the investment was made by certain of our existing stockholders with which certain members of our board of directors are affiliated and/or associated; the remaining units were purchased by third party institutional investors on the same terms and conditions.

**Off-Balance Sheet Arrangements**

Since our inception, except for standard operating leases, we have not engaged in any off-balance sheet arrangements, including the use of structured finance, special purpose entities or variable interest entities.

**Cautionary Note Regarding Forward-Looking Statements**

This Quarterly Report on Form 10-Q (including documents incorporated by reference) and other written and oral statements we make from time to time contain certain "forward-looking" statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. You can identify these forward-looking statements by the fact they use words such as "should", "expect", "anticipate", "estimate", "target", "may", "project", "guidance", "intend", "plan", "believe" and other words and terms of similar meaning and expression in connection with any discussion of future operating or financial performance. You can also identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. Such forward-looking statements are based on current expectations and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause actual outcomes to differ materially from current expectations. These statements are likely to relate to, among other things, our goals, plans and projections regarding our financial position, results of operations, cash flows, market position, product development, clinical trials, product approvals, sales efforts, expenses, performance or results of current and anticipated products, the outcome of contingencies such as legal proceedings, and financial results, all of which are based on current expectations that involve inherent risks and uncertainties, including internal or external factors that could delay, divert or change any of them from time to time. We have included important factors in the cautionary statements included in this report, particularly under Part II Item 1A "Risk Factors", that we believe could cause actual results to differ materially from any forward-looking statement.

Although we believe we have been prudent in our plans and assumptions, no assurance can be given that any goal or plan set forth in forward-looking statements can be achieved, and you are cautioned not to place undue reliance on such statements, which speak only as of the date made. We undertake no obligation to release publicly any revisions to forward-looking statements as a result of new information, future events or otherwise.

**Item 3.        Quantitative and Qualitative Disclosures About Market Risk.**

During the nine months ended September 30, 2008, there were no material changes to our market risk disclosures as set forth in "Item 7A. Quantitative and Qualitative Disclosures About Market Risk" in our Annual Report on Form 10-K for the year ended December 31, 2007, filed with the SEC.

**Item 4T.        Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures.* We have carried out an evaluation, under the supervision, and with the participation of, management, including our principal executive officer and principal financial officer, of our disclosure controls and procedures (as defined in Exchange Act Rule 13a–15(e)) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their evaluation, our principal executive officer and principal financial officer concluded that, subject to the limitations described below, our disclosure controls and procedures were effective as of September 30, 2008.

*Limitations on the Effectiveness of Controls.* A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within an organization have been detected. Accordingly, our disclosure controls and procedures are designed to provide reasonable, not absolute, assurance that the objectives of our disclosure control system are met and, as set forth above, our principal executive officer and principal financial officer have concluded, based on their evaluation as of the end of the period covered by this report, that our disclosure controls and procedures were sufficiently effective to provide reasonable assurance that the objectives of our disclosure control system were met. We continue to implement and refine our disclosure controls and procedures and our internal control over financial reporting.

*Changes in Internal Control over Financial Reporting.* There were no changes in our internal control over financial reporting that occurred during our fiscal quarter ended September 30, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II – OTHER INFORMATION

**Item 1.        Legal Proceedings.**

On April 10, 2006, Little Gem Life Sciences LLC, individually and purportedly on behalf of a class of persons similarly situated, filed a complaint against Orphan Medical and former officers of Orphan Medical in the United States District Court for the District of Minnesota. The complaint alleges that the defendants made false and misleading statements in the proxy statement prepared by Orphan Medical in connection with the solicitation of proxies to be voted at the special meeting of Orphan Medical stockholders held on June 22, 2005. The purpose of the special meeting was to consider and vote upon a proposal to adopt the definitive merger agreement pursuant to which we acquired Orphan Medical. The plaintiff seeks damages for itself and the putative class, in an unspecified amount, together with interest, litigation costs and expenses, and its attorneys' fees and other disbursements, as well as unspecified other and further relief. On October 25, 2006, the defendants filed a motion to dismiss the complaint and oral argument on the motion was heard by the United States District Court for the District of Minnesota. On February 16, 2007, the United States District Court for the District of Minnesota granted the defendants' motion to dismiss the complaint, with leave to amend. On March 14, 2007, the plaintiff filed an amended complaint, and the defendants responded with a motion to dismiss on March 16, 2007. Oral argument on the motion was heard on June 8, 2007. On September 13, 2007, the United States District Court for the District of Minnesota granted the defendants' motion to dismiss the complaint with prejudice. On September 28, 2007, the plaintiff filed a Notice of Appeal to the United States Court of Appeals for the Eighth Circuit. On November 21, 2007, the plaintiff filed its brief with the United States Court of Appeals for the Eighth Circuit. On December 21, 2007, the defendants filed their brief with the United States Court of Appeals for the Eighth Circuit. On January 8, 2008, the plaintiff filed a reply brief. Oral arguments were heard on May 15, 2008. On August 11, 2008, the United States Court of Appeals for the Eighth Circuit affirmed the judgment of the United States District Court for the District of Minnesota. The time to appeal this decision has elapsed.

From time to time we are involved in legal proceedings arising in the ordinary course of business. We believe there is no other litigation pending that could have, individually or in the aggregate, a material adverse effect on our results of operations or financial condition.

**Item 1A.        Risk Factors.**

*We have identified the following risks and uncertainties that may have a material adverse effect on our business, financial condition or results of operations. The risks described below are not the only ones we face. Additional risks not presently known to us or that we currently believe are immaterial may also significantly impair our business operations. Our business could be harmed by any of these risks. The trading price of our common stock could decline due to any of these risks, and you may lose all or part of their investment. We have marked with an asterisk (\*) those risks described below that reflect substantive changes from, or additions to the risks described in our Annual Report on Form 10-K for the year ended December 31, 2007, filed with the SEC. In assessing these risks, you should also refer to the other information contained in this Quarterly Report on Form 10-Q, including our condensed consolidated financial statements and related notes.*

**Risks Related to Our Business**

***We may not be able to successfully market or supply Luvox CR in the United States, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.\****

On February 28, 2008, the FDA approved Luvox CR for the treatment of obsessive compulsive disorder and social anxiety disorder. Under the terms of our license agreement with Solvay, which we subsequently assigned to JPI Commercial, LLC, our wholly-owned subsidiary, or JPIC, we made an initial payment of $2.0 million, paid $10.0 million on March 28, 2008 and $10.0 million on April 7, 2008, $3.5 million on October 20, 2008 and a payment of $3.5 million will be due on each of November 15, 2008 and on December 15, 2008, and the remaining $10.5 million will be due in nine equal monthly payments beginning January 15, 2009 and ending September 15, 2009. Elan is manufacturing commercial launch quantities of Luvox CR for us. In anticipation of the commercial launch of Luvox CR, we significantly expanded our sales force, marketing and commercial operations departments and administrative staff in the fourth quarter of 2007. In addition, we engaged numerous third party vendors, such as advertising agencies, market research firms and other service providers, to assist in the launch of Luvox CR. These expenses are significant and were incurred prior to the commercial launch of Luvox CR in order for us to be prepared to launch the product as soon as possible following approval. Most of the costs cannot be recouped or applied to other products.

Sales and prescriptions of Luvox CR since its launch have been lower than anticipated. As a result, in November 2008, we reduced the size of our sales force and certain other support positions to reflect the lower than anticipated demand for Luvox CR. If sales of Luvox CR do not increase, the remaining carrying value of the Luvox CR intangible asset may not be recoverable and therefore may be impaired, we will be required to further reduce our operating expenses, and our ability to raise additional funds would likely be adversely affected.

For quantities of Luvox CR that were initially used for commercial launch, and for product that was used in clinical studies, Solvay manufactured the active pharmaceutical ingredient, fluvoxamine maleate. Solvay no longer manufactures the active pharmaceutical ingredient, and manufacturing has been transferred to Lonza, Inc., or Lonza, which we expect will continue to be our sole source of fluvoxamine maleate for the foreseeable future. We cannot assure you that Lonza can or will continue to supply, in the time we need, sufficient quantities of active pharmaceutical ingredient to enable Elan to manufacture the quantities of Luvox CR that we need.

30

Table of Contents

Elan has the right and obligation to manufacture the worldwide commercial requirements of Luvox CR. In June 2001, Solvay's NDA for Luvox CR was withdrawn due to manufacturing difficulties. We cannot assure you that Elan will be able to continue to supply in a timely manner or at all our ongoing commercial needs of Luvox CR. Any failure of Elan to supply necessary quantities of Luvox CR could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***Our only product candidate currently in Phase III clinical trials is JZP-6 for the treatment of fibromyalgia. The Phase III clinical trials may not show JZP-6 to be safe and effective for the treatment of fibromyalgia or the FDA or foreign regulatory authorities may not otherwise approve JZP-6 for marketing, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.****

We are currently developing JZP-6 for the treatment of fibromyalgia. Our Phase III clinical program for JZP-6 includes two pivotal clinical trials, both of which must have statistically significant positive results before we can submit an NDA to the FDA seeking approval of JZP-6 for the treatment of fibromyalgia. Our Phase III clinical program for JZP-6 is costly, and we do not expect to have preliminary results from our first Phase III study until the fourth quarter of 2008. We do not know if the Phase III pivotal clinical trials will show JZP-6 to be safe and effective for the treatment of fibromyalgia, or if the FDA or other regulatory authorities will approve JZP-6 for the treatment of fibromyalgia. Favorable results from our prior Phase II clinical trials with JZP-6 for the treatment of fibromyalgia may not be indicative of the clinical results from our Phase III pivotal clinical trials. Further, although JZP-6 has the same active pharmaceutical ingredient as Xyrem, which has been approved by the FDA for the treatment of cataplexy and excessive daytime sleepiness in patients with narcolepsy, this does not assure approval by the FDA, or any other regulatory authorities, of this active pharmaceutical ingredient for the treatment of fibromyalgia. Unsuccessful Phase III pivotal clinical trials or a failure to obtain FDA or other regulatory approval of JZP-6 for fibromyalgia could have a material adverse effect on our business, financial condition, results of operations and growth prospects, and our ability to obtain sufficient additional funding by early 2009 may depend significantly on the preliminary data from the first Phase III pivotal clinical trial of JZP-6.

Lyrica (pregabalin), a product marketed by Pfizer, and Cymbalta (duloxetine), a product marketed by Eli Lilly, were approved by the FDA in June 2007 and June 2008, respectively, for the treatment of fibromyalgia. Forest Laboratories (and Cypress Bioscience) filed an NDA for milnacipran in December 2007 seeking FDA approval for the treatment of fibromyalgia. With treatments for fibromyalgia already approved, and others that may be approved before JZP-6, and which the FDA may believe have a lower risk profile to the general public if marketed, the FDA may be less willing to approve JZP-6 for the treatment of fibromyalgia.

There are currently no approved fibromyalgia treatments in the European Union. We cannot be sure that the European Agency for the Evaluation of Medicinal Products will approve any treatment, or JZP-6 in particular, for fibromyalgia. For example, a panel of European regulators recently recommended against approving Cymbalta as a treatment for fibromyalgia.

Even if the FDA approves JZP-6 for the treatment of fibromyalgia, the FDA is likely to require us to have a risk management program similar to the one we use for Xyrem. Under the Xyrem risk management program, Xyrem must be distributed through a single central pharmacy. The central pharmacy must maintain physician and patient registries, and the product may not be stocked in retail pharmacies. Each physician and patient must be educated about the risks and benefits of the product before the physician can prescribe, or a patient can receive, Xyrem. Whenever a prescription is received by the central pharmacy, the central pharmacy must verify the prescription and obtain additional information by contacting the physician's office and the patient's insurance company. The central pharmacy must also speak with the patient before it can ship any Xyrem to the patient. The central pharmacy must ship the product directly to the patient by a courier service, and the patient or his/her designee must sign for the package. The initial shipment may only be for a one month supply, and patients may not receive more than a three month supply at any time.

The Xyrem risk management program is labor intensive, complex and expensive to operate. Since Xyrem is currently prescribed for a relatively small number of patients, the risk management program does not prevent us from effectively supplying Xyrem to narcolepsy patients. However, significantly more patients are diagnosed with fibromyalgia, and if the same or a similar risk management program is required for JZP-6, scale-up of the risk management program could make it difficult for us to timely supply all of the patients who may be prescribed JZP-6 for the treatment of fibromyalgia. This could make JZP-6 less attractive to physicians and patients than other products that may be approved for the treatment of fibromyalgia, which could limit potential sales of JZP-6.

***A failure to prove that our product candidates are safe and effective in clinical trials would require us to discontinue their development, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.****

Significant additional research and development, financial resources and additional personnel will be required to obtain necessary regulatory approvals for our product candidates and to develop them into commercially viable products. As a condition to regulatory approval, each product candidate must undergo extensive clinical trials to demonstrate to a statistically significant degree that the product candidate is safe and effective. The clinical trials for a product candidate can cost between $40 million and $100 million, and potentially even more. If a product candidate fails at any stage of development, we will not have the anticipated revenues from that product candidate to fund our operations, and we will not receive any return on our investment in that product candidate.

Table of Contents

Clinical testing can take many years to complete, and failure can occur any time during the clinical trial process. In addition, the results from early clinical trials may not be predictive of results obtained in later and larger clinical trials, and product candidates in later clinical trials may fail to show the desired safety and efficacy despite having progressed successfully through initial clinical testing. A number of companies in the pharmaceutical industry, including us, have suffered significant setbacks in clinical trials, even in advanced clinical trials after showing positive results in earlier clinical trials. The completion of clinical trials for our product candidates may be delayed or halted for many reasons, including:

- delays in patient enrollment, and variability in the number and types of patients available for clinical trials;

- regulators or institutional review boards may not authorize us to commence or continue a clinical trial;

- our inability, or the inability of our partners, to manufacture or obtain from third parties materials sufficient to complete our clinical trials;

- delays or failure in reaching agreement on acceptable clinical trial contracts or clinical trial protocols with prospective sites;

- risks associated with trial design, which may result in a failure of the trial to show statistically significant results even if the product candidate is effective;

- difficulty in maintaining contact with patients after treatment commences, resulting in incomplete data;

- poor effectiveness of product candidates during clinical trials;

- safety issues, including adverse events associated with product candidates;

- the failure of patients to complete clinical trials due to adverse side effects, dissatisfaction with the product candidate, or other reasons;

- governmental or regulatory delays or changes in regulatory requirements, policy and guidelines;

- varying interpretation of data by the FDA or foreign regulatory agencies; and

- insufficient funds to complete the trials.

In addition, our product candidates are subject to competition for clinical study sites and patients from other therapies under development that may delay the enrollment in or initiation of our clinical trials. Many of these companies have more significant financial and human resources than we do.

The FDA or foreign regulatory authorities may require us to conduct unanticipated additional clinical trials, which could result in additional expense and delays in bringing our product candidates to market. Any failure or delay in completing clinical trials for our product candidates would prevent or delay the commercialization of our product candidates, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***We rely on third parties to conduct clinical trials for our product candidates, and if they do not properly and successfully perform their legal and regulatory obligations, as well as their contractual obligations to us, we may not be able to obtain regulatory approvals for our product candidates.***

We design the clinical trials for our product candidates, but rely on contract research organizations and other third parties to assist us in managing, monitoring and otherwise carrying out these trials, including with respect to site selection, contract negotiation and data management. We do not control these third parties and, as a result, they may not treat our clinical studies as their highest priority, or in the manner in which we would prefer, which could result in delays.

Although we rely on third parties to conduct our clinical trials, we are responsible for confirming that each of our clinical trials is conducted in accordance with its general investigational plan and protocol. Moreover, the FDA and foreign regulatory agencies require us to comply with regulations and standards, commonly referred to as good clinical practices, for conducting, recording and reporting the results of clinical trials to ensure that the data and results are credible and accurate and that the trial participants are adequately protected. Our reliance on third parties does not relieve us of these responsibilities and requirements. The FDA enforces good clinical practices through periodic inspections of trial sponsors, principal investigators and trial sites. If we, our contract research organizations or our study sites fail to comply with applicable good clinical practices, the clinical data generated in our clinical trials may be deemed unreliable and the FDA may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that, upon inspection, the FDA will determine that any of our clinical trials comply with good clinical practices. In addition, our clinical trials must be conducted with product produced under the FDA's current Good Manufacturing Practices, or cGMP, regulations. Our failure, or the failure of our contract manufacturers, to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.

Table of Contents

If third parties do not successfully carry out their duties under their agreements with us, if the quality or accuracy of the data they obtain is compromised due to failure to adhere to our clinical protocols or regulatory requirements, or if they otherwise fail to comply with clinical trial protocols or meet expected deadlines, our clinical trials may not meet regulatory requirements. If our clinical trials do not meet regulatory requirements or if these third parties need to be replaced, our clinical trials may be extended, delayed, suspended or terminated. If any of these events occur, we may not be able to obtain regulatory approval of our product candidates.

***The commercial success of our products depends upon attaining market acceptance by physicians, patients, third party payors and the medical community.\****

Even if our product candidates are approved for sale by the appropriate regulatory authorities, physicians may not prescribe our products, in which case we would not generate the revenues we anticipate. Market acceptance of any of our products by physicians, patients, third party payors and the medical community depends on:

- the clinical indications for which a product is approved;

- prevalence of the disease or condition for which the product is approved and the severity of side effects;

- acceptance by physicians and patients of each product as a safe and effective treatment;

- perceived advantages over alternative treatments;

- relative convenience and ease of administration;

- the cost of treatment in relation to alternative treatments, including generic products;

- the extent to which the product is approved for inclusion on formularies of hospitals and managed care organizations; and

- the availability of adequate reimbursement by third parties.

As an example, sales of Luvox CR to date have been significantly less than we had anticipated at the time of the acquisition of the rights to this product and prior to its launch earlier this year.

***We depend upon UCB to market and promote Xyrem outside the United States, and we are dependent upon our collaboration with UCB for the development and potential commercialization of JZP-6 for the treatment of fibromyalgia in major markets outside of the United States.\****

We have exclusively licensed to UCB the rights to market and promote Xyrem in 54 countries outside of the United States. If UCB does not obtain regulatory approvals for and launch Xyrem in its licensed countries in the time frames we expect, or at all, our revenues would be adversely affected. If UCB terminates its relationship with us, we would need to find another party or parties to commercialize Xyrem in UCB's licensed territories. We may be unable to find another party or parties on acceptable terms, or at all, which could materially and adversely affect our business, financial condition, results of operations and growth prospects. In addition, under the terms of our collaboration with UCB, we granted UCB the exclusive right to commercialize JZP-6 for the treatment of fibromyalgia in the same territories that UCB has the right to market and promote Xyrem for patients with narcolepsy. We have relied in part on milestone payments from UCB to offset our development costs of JZP-6. UCB has the right to terminate our collaboration on 12-months' notice (or less in certain circumstances), and UCB may terminate its rights to JZP-6 for the fibromyalgia indication on six-months' notice at any time prior to the receipt of marketing approval of JZP-6 for fibromyalgia in the European Union. If UCB terminates our collaboration or terminates its rights to JZP-6 for the fibromyalgia indication, we would need to find another party or parties to commercialize JZP-6 in UCB's territories and may need to execute alternative financing plans to help fund our development of JZP-6. We may be unable to do either of these on acceptable terms, or at all. There are currently no approved fibromyalgia treatments in the European Union. We cannot be sure that the European Agency for the Evaluation of Medicinal Products will approve any treatment, or JZP-6 in particular, for fibromyalgia. For example, a panel of European regulators recently recommended against approving Cymbalta as a treatment for fibromyalgia.

***We depend on one central pharmacy distributor for Xyrem sales in the United States and the loss of that distributor or its failure to distribute Xyrem effectively would adversely affect sales of Xyrem.***

As a condition of approval of Xyrem, the FDA mandated that we maintain a risk management program for Xyrem under which all Xyrem that we sell in the United States must be shipped directly to patients through a central pharmacy. The process under which patients receive Xyrem under our risk management program is cumbersome. While we have an agreement with the central pharmacy for Xyrem, Express Scripts, if the central pharmacy does not fulfill its contractual obligations to us, or refuses or fails to adequately serve patients, shipments of Xyrem, and our sales, would be adversely affected. Changing central pharmacy distributors could take a significant amount of time. In addition, sodium oxybate, the active pharmaceutical ingredient in Xyrem, is regulated by the U.S. Drug Enforcement Administration, or DEA, as a controlled substance. The new distributor would need to be registered with the DEA and would also need to develop the particular processes, procedures and activities necessary to distribute Xyrem, including the risk management program approved by the FDA. If we change distributors, new contracts might also be required with government and other insurers who pay for Xyrem. Transitioning to a new distributor could result in product shortages, which would adversely affect sales of Xyrem in the United States.

Table of Contents

***Our supplier of the active pharmaceutical ingredient and our product manufacturer must obtain DEA quotas in order to supply us with Xyrem, JZP-6 and sodium oxybate, and these quotas may not be sufficient to satisfy our clinical and commercial needs.****

The DEA limits the quantity of certain Schedule I and II controlled substances that may be produced in the United States in any given calendar year through a quota system. Because the active pharmaceutical ingredient of Xyrem and JZP-6, sodium oxybate, is a Schedule I controlled substance, our supplier of the active pharmaceutical ingredient and our product manufacturers must obtain DEA quotas in order to supply us with sodium oxybate, Xyrem and JZP-6. Since the DEA typically grants quotas on an annual basis and requires a detailed submission and justification for each request, obtaining a DEA quota is a difficult and time consuming process. If our commercial or clinical requirements for sodium oxybate, Xyrem or JZP-6 exceed our supplier's and contract manufacturer's DEA quotas, our supplier and contract manufacturer would need quota increases from the DEA, which could be difficult and time consuming to obtain and might not ultimately be obtained on a timely basis, or at all. In cooperation with our manufacturing partners, we sought and received significant increases in their 2007 quotas from the DEA for sodium oxybate, Xyrem and JZP-6 to satisfy the forecasted demand for Xyrem and to conduct our clinical studies of JZP-6. We did not succeed in obtaining the entire quota we requested for 2007. The quota our suppliers received from the DEA for 2008 was greater than what was issued for 2007 but was less than what we requested for 2008. The DEA recently published an aggregate quota for 2009 that was less than our request for 2009 but more than the 2008 quota issued to our suppliers. In the future and in cooperation with our procurement and manufacturing partners, we will continue to seek increased quotas to satisfy our clinical and commercial needs. However, we may not be successful in obtaining increased quotas from the DEA, and without sufficient DEA quotas, there could be shortages of Xyrem for the marketplace or JZP-6 for use in our clinical studies, or both.

***We depend on single source suppliers and manufacturers for each of our products and product candidates. The loss of any of these suppliers or manufacturers, or delays or problems in the supply or manufacture of our products for commercial sale or our product candidates for use in our clinical trials, could materially and adversely affect our business, financial condition, results of operations and growth prospects.****

We do not have, and do not intend to establish in the near term, our own manufacturing or packaging capability for our products or product candidates, or their active pharmaceutical ingredients. Accordingly, we have entered into manufacturing and supply agreements with single source suppliers and manufacturers for our commercialized products and product candidates. The recent deterioration in worldwide economic conditions and the recent disruption to the credit and financial markets in the United States and worldwide may materially and adversely impact the financial position of our single source suppliers and manufacturers. If our suppliers and contract manufacturers are unable to obtain the necessary capital to operate their respective businesses or for other reasons, our suppliers and contract manufacturers may not be able to manufacture our products or product candidates without interruption, or may not comply with their obligations to us under our supply and manufacturing arrangements. We may not have adequate remedies for any breach and their failure to supply us could result in a shortage of our products or product candidates.

The availability of our products for commercial sale is dependent upon our ability to procure the ingredients, packaging materials and finished products we need. If one of our suppliers or product manufacturers fails or refuses to supply us for any reason, it would take a significant amount of time and expense to qualify a new supplier or manufacturer. The loss of one of our suppliers or product manufacturers could require us to obtain regulatory clearance in the form of a "prior approval supplement" and to incur validation and other costs associated with the transfer of the active pharmaceutical ingredient or product manufacturing process. We believe that it could take as long as two years to qualify a new supplier or manufacturer, and we may not be able to obtain active pharmaceutical ingredients, packaging materials or finished products from new suppliers or manufacturers on acceptable terms and at reasonable prices, or at all. Should we lose either an active pharmaceutical ingredient supplier or a product manufacturer, we could run out of salable product to meet market demands or investigational product for use in clinical trials while we wait for FDA approval of a new active pharmaceutical ingredient supplier or product manufacturer.

For Xyrem, JZP-6 or sodium oxybate, the new supplier or manufacturer would also need to be registered with the DEA and obtain a DEA quota. In addition, the FDA must approve suppliers of the active and inactive pharmaceutical ingredients and certain packaging materials used in our products, as well as suppliers of finished products. The qualification of new suppliers and manufacturers could potentially delay the manufacture of our products and product candidates and result in shortages in the marketplace or for our clinical trials, or both, particularly since we do not have secondary sources of supply of the active pharmaceutical ingredient or backup manufacturers for our products and product candidates. If there are delays in qualifying the new manufacturer or the new manufacturer is unable to obtain a sufficient quota from the DEA, there could be a shortage of Xyrem for the marketplace.

Due to FDA-mandated dating requirements, DEA quotas relating to Xyrem and JZP-6, and the limited market size for our approved products, we are subject to complex manufacturing logistics and minimum order quantities that could result in excess inventory as determined under our accounting policy, unsalable inventory as a result of product expiring prior to use, and competition with others for manufacturing services when needed or expected. We have adopted a production planning program to assess and

34

Table of Contents

manage manufacturing logistics among the vendors supplying our requirements of active pharmaceutical ingredient, drug product and packaging; however, unexpected market requirements or problems with vendors' facilities, among other things, could result in shortages of one or more of our products for the marketplace or product candidates for use in our clinical studies, or both.

Failure by our third party manufacturers to comply with regulatory requirements could adversely affect their ability to supply products to us. All facilities and manufacturing techniques used for the manufacture of pharmaceutical products must be operated in conformity with cGMP requirements. In complying with cGMP requirements, our suppliers must continually expend time, money and effort in production, record-keeping and quality assurance and control to ensure that our products and product candidates meet applicable specifications and other requirements for product safety, efficacy and quality. DEA regulations also govern facilities where controlled substances such as sodium oxybate are manufactured. Manufacturing facilities are subject to periodic unannounced inspection by the FDA, the DEA and other regulatory authorities, including state authorities. Failure to comply with applicable legal requirements subjects the suppliers to possible legal or regulatory action, including shutdown, which may adversely affect their ability to supply us with the ingredients or finished products we need.

Any delay in supplying, or failure to supply, products by any of our suppliers could result in our inability to meet the commercial demand for our products or our needs for use in clinical trials, and could adversely affect our business, financial condition, results of operations and growth prospects. For example, if Lonza is unable to timely provide fluvoxamine in the quantities we need there could be an interruption in the supply of Luvox CR to the market. In addition, under our agreement with UCB, we are responsible for the supply of Xyrem and JZP-6 to UCB. Our failure to meet our contractual obligations to supply UCB with adequate quantities of Xyrem and JZP-6 would result in lost revenues to us and, if material, could result in termination of our agreements by UCB.

***Our current product candidates have never been manufactured on a commercial scale and there are risks associated with scaling up manufacturing to commercial scale.\****

Our current product candidates have never been manufactured on a commercial scale and there are risks associated with scaling up manufacturing to commercial scale including, among others, cost overruns, potential problems with process scale-up, process reproducibility, stability issues, lot consistency and timely availability of raw materials. If our manufacturers are unable to produce sufficient quantities of our products for commercialization or at a cost that we expect, our commercialization efforts would be impaired, which would have an adverse effect on our business, financial condition, results of operations and growth prospects.

***We could be materially adversely affected if we or our products are subject to negative publicity. For example, sodium oxybate, the active pharmaceutical ingredient in Xyrem and JZP-6, is a derivative of gamma hydroxybutyrate, or GHB, which has been a drug of abuse and may not be sold legally in the United States. If physicians and patients perceive Xyrem and JZP-6 to be the same as or similar to GHB, sales of Xyrem and JZP-6 could be adversely affected.***

From time to time, there is negative publicity about GHB and its effects, including with respect to illegal use, overdoses, serious injury and death and because sodium oxybate, the active pharmaceutical ingredient in Xyrem, is a derivative of GHB, Xyrem sometimes also receives negative mention in publicity relating to GHB. Because sodium oxybate is a derivative of GHB, patients, physicians and regulators may view Xyrem as the same as or similar to GHB. In addition, there are regulators and some law enforcement agencies that oppose the prescription and use of Xyrem generally. Xyrem's label includes information about adverse events from GHB, and we anticipate that if JZP-6 is approved, its label will include similar information. We could also be adversely affected if any of our products or any similar products distributed by other companies prove to be, or are asserted to be, harmful to consumers. Because of our dependence upon patient and physician perceptions, any adverse publicity associated with illness or other adverse effects resulting from the use or misuse of our products or any similar products distributed by other companies could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***The investigation by the U.S. Attorney's Office for the Eastern District of New York concerning the sales and marketing of Xyrem creates additional compliance-related operating costs and could result in additional fines, penalties or other adverse consequences.\****

In April 2006, we and our subsidiary Orphan Medical received subpoenas from the U.S. Department of Justice, acting through the U.S. Attorney for the Eastern District of New York, in connection with the sale and marketing of Xyrem. In April 2006, a physician who was a speaker for Orphan Medical, and for a short time for us, was indicted by a federal grand jury in the U.S. District Court for the Eastern District of New York. The indictment includes allegations that the physician engaged in a scheme with Orphan Medical sales representatives and other Orphan Medical employees to promote and obtain reimbursement for Xyrem for medical uses not approved for marketing by the FDA. In August 2008, the physician pled guilty to a misdemeanor charge. In March 2007, in the same federal court, a former Orphan Medical regional sales manager, who also worked for a short time for us, pled guilty on similar allegations to introducing a misbranded drug into interstate commerce. In October 2008, in the same federal court, a jury entered a guilty plea for a former Orphan Medical sales representative, who also worked for a short time for us, of conspiracy to introduce a misbranded drug into interstate commerce.

Table of Contents

We and Orphan Medical have settled this matter with the United States, acting through the Department of Justice, the U.S. Attorney's Office for the Eastern District of New York and other federal agencies, including the Office of Inspector General, U.S. Department of Health and Human Services. Orphan Medical pled guilty to one felony count of introducing a misbranded drug into interstate commerce. A total of approximately $20.0 million in civil and criminal payments will be paid in connection with this matter, of which $1.0 million was paid in July 2007 and $2.0 million was paid in January 2008; the remaining will be due over the next four years. We agreed to guarantee payment of amounts payable by Orphan Medical.

While we were not prosecuted, as part of the settlement we entered into a corporate integrity agreement with the Office of Inspector General, U.S. Department of Health and Human Services. That agreement requires us to maintain a comprehensive compliance program, and we will have additional ongoing compliance-related operating costs related to this compliance program and the corporate integrity agreement. In the event of an uncured material breach or deliberate violation, as the case may be, of the corporate integrity agreement or the other definitive settlement agreements we entered into, we could be excluded from participation in Federal healthcare programs and/or subject to prosecution.

Even though we have executed definitive settlement agreements, we might still be subject to regulatory and/or enforcement action by federal agencies that are not parties to the settlement, private insurers and states' attorneys general with respect to the activities covered by the settlement. We cannot predict whether this additional action will occur, nor can we reasonably estimate the amount of any fines or penalties that might result from an adverse outcome.

In addition, there is no assurance that we will not be subject to future investigations. Many pharmaceutical companies have announced government investigations of their sales and marketing practices for many of their products. Even with compliance training and a company culture of compliance, our current or future practices may nonetheless become the subject of an investigation. A number of laws, often referred to as "whistleblower" statutes, provide for financial rewards to employees and others for bringing to the attention of the government sales and marketing practices that the government views as illegal or fraudulent. The costs of investigating any claims, responding to subpoenas of investigators, and any resulting fines, can be significant and could divert the attention of our management from operating our business.

### Xyrem cannot be advertised in the same manner as competing products, which could limit sales.*

The FDA has required that Xyrem's label include a box warning regarding the risk of abuse. A box warning is the strongest type of warning that the FDA can require for a drug product and warns prescribers that the drug carries a significant risk of serious or even life-threatening adverse effects. A box warning also means, among other things, that the product cannot be advertised through reminder ads, ads which mention the pharmaceutical brand name but not the indication or medical condition it treats. Provigil, the only other product approved by the FDA specifically for the treatment of excessive daytime sleepiness in patients with narcolepsy, does not have a box warning and can be advertised with reminder ads. In addition, Xyrem's type of FDA approval under the FDA's Subpart H regulations requires that all of the promotional materials for Xyrem be provided to the FDA for review at least 30 days prior to the intended time of first use. Unlike Xyrem, Provigil was not approved under the FDA's Subpart H regulations and is not subject to the pre-review requirements. Accordingly, promotional materials for Provigil are not subject to the same delays that we experience with respect to new promotional materials for Xyrem.

Since JZP-6 contains the same active pharmaceutical ingredient as Xyrem, we anticipate that the label for JZP-6, if approved by the FDA, will also include a box warning. The FDA has approved products for the treatment of fibromyalgia. These products are not, and future competing products may not be, subject to this restriction, and the box warning may negatively affect potential JZP-6 sales if competing products can be advertised directly to consumers.

### We face substantial competition from companies with greater resources than we have.*

With respect to all of our existing and future products, we may compete with companies selling or working to develop products that may be more effective, safer or less costly than our products. The markets for which we are developing products are competitive and include generic and branded products, some of which are marketed by major pharmaceutical companies that have significantly greater financial resources and expertise in research and development, preclinical testing, conducting clinical trials, obtaining regulatory approvals, manufacturing and marketing and selling approved products than we do. While Xyrem is the only product approved by the FDA for the treatment of both cataplexy and excessive daytime sleepiness in patients with narcolepsy, cataplexy is often treated with tricyclic antidepressants and selective serotonin reuptake inhibitors, although none of these compounds has been approved by the FDA for the treatment of cataplexy. Other treatments for excessive daytime sleepiness in patients with narcolepsy consist primarily of stimulants and wakefulness promoting agents, including Provigil (modafinil), the only other FDA-approved product for the treatment of excessive daytime sleepiness in patients with narcolepsy.

We are marketing Luvox CR in the United States for the treatment of obsessive compulsive disorder and social anxiety disorder. Selective serotonin reuptake inhibitors are the standard treatment for anxiety disorders, including obsessive compulsive disorder and social anxiety disorder. Five other branded products are currently approved by the FDA for the treatment of obsessive compulsive disorder, including four selective serotonin reuptake inhibitors: Paxil, which is marketed by GlaxoSmithKline, Zoloft, which is marketed by Pfizer, Prozac, which is marketed by Eli Lilly, and Luvox, which is not currently marketed. Anafranil, the other branded

Table of Contents

product approved by the FDA for the treatment of obsessive compulsive disorder, is a tricyclic antidepressant marketed by Mallinckrodt in the United States. Each of these products currently has generic equivalents. Generic products are generally sold at significantly lower prices than branded products, tending to both take market share away from branded products and put downward pricing pressure on branded products. Four other products are currently approved by the FDA for the treatment of social anxiety disorder, including three selective serotonin reuptake inhibitors: Zoloft, Paxil and Paxil CR, an extended release version of Paxil, and one serotonin-norepinephrine reuptake inhibitor, Effexor XR. Effexor XR, developed and sold by Wyeth, does not have direct generic competitors, whereas Paxil, Paxil CR and Zoloft have generic competitors.

We are developing JZP-6 for the treatment of fibromyalgia. In June 2007, the FDA approved Lyrica, an anticonvulsant marketed by Pfizer for the treatment of partial seizures, post herpetic neuralgia and diabetic peripheral neuropathy, for the treatment of fibromyalgia. In June 2008, the FDA approved Cymbalta, a selective serotonin and norepinephrine reuptake inhibitor marketed by Eli Lilly for the treatment of major depressive disorder and generalized anxiety disorder, and diabetic peripheral neuropathic pain, for the treatment of fibromyalgia. There are currently no other products approved by the FDA for the treatment of fibromyalgia. In clinical practice, a variety of drugs are often prescribed to address individual symptoms of fibromyalgia, including antidepressants, pain medications, muscle relaxants, hypnotics and anticonvulsants. Forest Laboratories (with Cypress Bioscience) filed an NDA for milnacipran in December 2007 seeking FDA approval for the treatment of fibromyalgia. These are large pharmaceutical companies with far greater resources than we have.

Smaller or earlier stage companies may also prove to be significant competitors, particularly through collaborative arrangements with other large, established companies. Our commercial opportunities may be reduced or eliminated if our competitors develop and commercialize generic or branded products that are safer or more effective, have fewer side effects or are less expensive than our products.

Our competitors may obtain FDA or other regulatory approvals for their product candidates more rapidly than we may. For example, other major pharmaceutical companies have completed Phase III clinical trials of product candidates for the treatment of fibromyalgia. Two of these product candidates have received FDA approval and have already reached the market. These treatments, as well as other product candidates that may reach the market before JZP-6, may be better accepted by physicians and patients. Thus, even if we successfully complete our Phase III clinical trials for JZP-6 for the treatment of fibromyalgia and achieve FDA approval, JZP-6 may not result in significant commercial revenues for us.

Our competitors may market their products more effectively than we do. If we are unable to demonstrate to physicians that, based on experience, clinical data, side-effect profiles and other factors, our products are preferable to other therapies, we may not generate meaningful revenues from the sales of our products.

***If generic products that compete with any of our products are approved, sales of our products may be adversely affected.****

Our products are or may become subject to competition from generic equivalents because there is no proprietary protection for some of our products or because our protection has expired or is not sufficiently broad. The FDA has granted orphan drug exclusivity for Xyrem until July 2009 for cataplexy in patients with narcolepsy, and until November 2012 for excessive daytime sleepiness in patients with narcolepsy. Once our orphan drug exclusivity periods for Xyrem expire, other companies could introduce generic equivalents of Xyrem if the generic equivalents do not infringe our existing patents covering Xyrem. Once our orphan drug exclusivity period for Xyrem for the treatment of cataplexy expires in July 2009, prescriptions for Xyrem, or if approved by the FDA, JZP-6, could possibly be filled with generic equivalents that have been approved for the treatment of cataplexy in patients with narcolepsy, even if the patient is diagnosed with excessive daytime sleepiness or fibromyalgia.

Patent protection is not available for the active pharmaceutical ingredient in most of our products and product candidates, including Xyrem, Luvox CR and JZP-6. Although Xyrem is covered by patents expiring in 2019 and 2020 with claims covering the formula and process for manufacturing our commercial formulation of Xyrem, it is possible that other companies could manufacture generic equivalents of Xyrem in ways that are not covered by the claims of these patents.

Part of our business strategy includes the ongoing development of proprietary product improvements to Xyrem, including new and enhanced dosage forms. However, we may not be successful in developing or obtaining FDA and other regulatory approvals of these improvements. Although the active pharmaceutical ingredient in Xyrem and JZP-6 is a DEA scheduled compound for which a quota is required and the FDA has required a risk management program for its distribution, and therefore generic competition may be more difficult and expensive than it might be for other products not requiring a risk management program for distribution, our competitors will not be prevented from introducing a generic equivalent. We have filed a patent application with claims covering the method for distributing sodium oxybate using a centralized distribution system, but we cannot assure you that this patent will issue or, if issued, whether it will provide any significant protection of Xyrem from generic competition.

Luvox CR is covered by a patent application filed by Elan with claims covering the orally administered extended release formulation of fluvoxamine. This patent may not issue, and even if this patent issues, it is possible that other companies could manufacture similar or therapeutically equivalent products in ways that are not covered by the claims of the patent. There may be other patents that we are not aware of that cover some aspect of the Luvox CR formulation and that would prevent us from continuing to commercialize Luvox CR or that would require us to pay royalties or other forms of consideration.

37

Table of Contents

After the introduction of a generic competitor, a significant percentage of the prescriptions written for a product generally may be filled with the generic version at the pharmacy, resulting in a loss in sales of the branded product, including for indications for which the generic version has not been approved for marketing by the FDA. Generic competition often results in decreases in the prices at which branded products can be sold. In addition, legislation enacted in the United States allows for, and in a few instances in the absence of specific instructions from the prescribing physician mandates, the use of generic products rather than branded products where a generic equivalent is available. Generic competition for our products earlier than expected could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***We may not be able to enter into acceptable agreements to commercialize our products in international markets.***

If appropriate regulatory approvals are obtained, we generally intend to commercialize our products in most markets outside of the United States through arrangements with third parties. If we decide to sell our products in markets outside of the United States, we may not be able to enter into any arrangements on acceptable terms, or at all. In addition, these arrangements could result in lower levels of income to us than if we promoted our products directly in international markets. If we choose to market our products directly in markets outside of the United States, we may not be able to develop an effective international sales force. If we fail to enter into marketing arrangements for our products and are unable to develop an effective international sales force, our ability to generate revenues outside of the United States would be limited. In either case, our marketing efforts (and those of our partners) outside of the United States may be subject to regulatory requirements and politico-economic climates that are dissimilar to those in the United States and which could impose unforeseen costs or restrictions on us or our partners.

***We may not be able to successfully acquire or in-license additional products or product candidates as part of growing our business.****

In order to grow our business, we intend to acquire or in-license additional products and product candidates that we believe have significant commercial potential. Any growth through acquisitions or in-licensing will be dependent upon the continued availability of suitable acquisition or in-license products and product candidates at favorable prices and upon advantageous terms and conditions. Even if such opportunities are present, we may not be able to successfully identify products or product candidates suitable for potential acquisition or in-licensing, or we may not have the financial resources necessary to pursue such opportunities. Other companies, many of which may have substantially greater financial, marketing and sales resources, compete with us for the right to acquire and in-license such products or product candidates.

***We currently have a relatively small sales organization compared with most other pharmaceutical companies with marketed products. If our specialty sales force and sales organization is not appropriately sized to adequately promote our current and potential future products, the commercial opportunity for our products may be diminished.****

In November 2008, we reduced the size of our sales force to reflect the lower than expected demand for Luvox CR. Each of our remaining sales representatives is now responsible for a larger territory than he or she was responsible for prior to the reduction in force. We cannot predict if the smaller sales force will be effective at promoting our commercial products or if having a smaller sales force will negatively affect sales.

Our potential future commercial products, including JZP-6, may require expansion of our sales force and sales support organization, and we will need to commit significant additional management and other resources to the growth of our sales organization before the commercial launch of those product candidates. We may not be able to achieve the necessary growth in a cost-effective manner or realize a positive return on our investment. We also have to compete with other pharmaceutical and life sciences companies to recruit, hire, train and retain sales and marketing personnel. If we elect to rely on third parties to sell our products in the United States, we may receive less revenue or incur more expense than if we sold our products directly. In addition, we may have little or no control over the sales efforts of those third parties. If we are unable to appropriately size our sales force or collaborate with third parties to sell our products, our ability to generate revenues would be adversely affected.

***If we fail to retain key personnel, or to retain our executive management team, we may be unable to successfully develop or commercialize our products.****

Our success depends in part on our continued ability to retain and motivate highly qualified personnel and on our ability to develop and maintain important relationships with leading academic institutions, clinicians and scientists. We are highly dependent upon our executive management team. The loss of services of any one or more members of our executive management team or other key personnel could delay or prevent the successful completion of some of our key activities. We do not carry "key person" insurance. Although the members of our executive management team have employment contracts with us until mid-February 2009, each member of our executive management team and each of our other key employees may terminate his or her employment at any time without notice and without cause or good reason.

Table of Contents

In June 2008, we reduced the number of non-sales employees in our company in connection with efforts to focus, in the near term, on our commercial products and later-stage product candidates. In November 2008, we reduced the number of sales representatives and further reduced the number of non-sales employees in our company. These reductions in force may negatively affect our ability to retain or attract talented employees. Competition for qualified personnel in the life sciences industry is intense, and it is particularly difficult to recruit new employees to the San Francisco Bay Area, where our offices are located, in large part due to high housing costs. If we need to hire additional personnel to expand our development, clinical and commercial activities, or to support those activities, we may not be able to attract and retain quality personnel on acceptable terms.

If we need to accelerate our activities or expand our business, and cannot recruit qualified employees when we need them, our key activities could be delayed. Our future financial performance and our ability to commercialize our products and to compete effectively will depend, in part, on our ability to manage our personnel resources effectively, and our failure to do so could adversely affect our business, financial condition, results of operations and growth prospects.

***Our offices are located near known earthquake fault zones, and the occurrence of an earthquake or other catastrophic disaster could damage our facilities, which could adversely affect our operations.***

Our offices are located in the San Francisco Bay Area, near known earthquake fault zones and are therefore vulnerable to damage from earthquake. In October 1989, a major earthquake in our area caused significant property damage and a number of fatalities. We are also vulnerable to damage from other disasters such as power loss, fire, floods and similar events. If a significant disaster occurs, our ability to continue our operations could be seriously impaired and we may not have adequate insurance to cover any resulting losses. Any significant unrecoverable losses could seriously impair our operations and financial conditions.

### Risks Related to Our Intellectual Property

***It is difficult and costly to protect our proprietary rights, and we may not be able to ensure their protection.***

Our commercial success will depend in part on obtaining and maintaining patent protection and trade secret protection of our product candidates, their use and the methods used to manufacture them, as well as successfully defending these patents against third party challenges. Our ability to protect our product candidates from unauthorized making, using, selling, offering to sell or importation by third parties is dependent upon the extent to which we have rights under valid and enforceable patents, or have trade secrets that cover these activities.

The patent position of pharmaceutical companies can be highly uncertain and involve complex legal and factual questions for which important legal principles remain unresolved. Changes in either the patent laws or in interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property. Even if we are able to obtain patents covering our products and product candidates, any patent may be challenged, invalidated, held unenforceable or circumvented. The existence of a patent will not necessarily prevent other companies from developing similar or therapeutically equivalent products or protect us from claims of third parties that our products infringe their issued patents, which may require licensing and the payment of significant fees or royalties. Competitors may successfully challenge our patents, produce similar products that do not infringe our patents, or manufacture products in countries where we have not applied for patent protection or that do not respect our patents. Accordingly, we cannot predict the breadth of claims that may be allowed or enforced in our patents, our licensed patents or in third party patents.

The degree of future protection to be afforded by our proprietary rights is uncertain because legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep our competitive advantage. For example:

- others may be able to make products that are similar to our product candidates but that are not covered by the claims of our patents, or for which we are not licensed under our license agreements;

- we or our licensors or partners might not have been the first to make the inventions covered by our issued patents or pending patent applications or the pending patent applications or issued patents of our licensors or partners;

- we or our licensors or partners might not have been the first to file patent applications for these inventions;

- others may independently develop similar or alternative products without infringing our intellectual property rights;

- our pending patent applications may not result in issued patents;

- our issued patents and the issued patents of our licensors or partners may not provide us with any competitive advantages, or may be held invalid or unenforceable as a result of legal challenges by third parties;

- we may not develop additional proprietary products that are patentable; or

- the patents of others may have an adverse effect on our business.

We also may rely on trade secrets and other unpatented proprietary information to protect our technology, especially where we do not believe patent protection is appropriate or obtainable. However, trade secrets are difficult to protect. Although we use reasonable efforts to protect our trade secrets and other unpatented proprietary information, our employees, consultants, advisors and partners may unintentionally or willfully disclose our proprietary information to competitors, and we may not have adequate remedies

Table of Contents

for such disclosures. If our employees, consultants, advisors and partners develop inventions or processes independently, or jointly with us, that may be applicable to our products under development, disputes may arise about ownership or proprietary rights to those inventions and processes. Enforcing a claim that a third party illegally obtained and is using any of our inventions or trade secrets is expensive and time consuming, and the outcome is unpredictable. In addition, courts outside of the United States are sometimes less willing to protect trade secrets. Moreover, our competitors may independently develop equivalent knowledge, methods and know-how.

Our research and development collaborators may have rights to publish data and other information to which we have rights. In addition, we sometimes engage individuals or entities to conduct research that may be relevant to our business. While the ability of these individuals or entities to publish or otherwise publicly disclose data and other information generated during the course of their research is subject to contractual limitations, these contractual provisions may be insufficient or inadequate to protect our trade secrets and may impair our patent rights. If we do not apply for patent protection prior to such publication, or if we cannot otherwise maintain the confidentiality of our innovations and other confidential information, then our ability to obtain patent protection or protect our proprietary information may be jeopardized. Moreover, a dispute may arise with our research and development collaborators over the ownership of rights to jointly developed intellectual property. Such disputes, if not successfully resolved, could lead to a loss of rights and possibly prevent us from pursuing certain new products or product candidates.

***We may incur substantial costs as a result of litigation or other proceedings relating to patent and other intellectual property rights and we may be unable to protect our rights to, or commercialize, our products.***

Our ability, and that of our partners, to commercialize any approved products will depend, in part, on our ability to obtain patents, enforce those patents and operate without infringing the proprietary rights of third parties. The patent positions of pharmaceutical companies can be highly uncertain and involve complex legal and factual questions. We have filed multiple U.S. patent applications and foreign counterparts, and may file additional U.S. and foreign patent applications related thereto. There can be no assurance that any issued patents we own or control will provide sufficient protection to conduct our business as presently conducted or as proposed to be conducted. Moreover, in part because of prior research performed and patent applications submitted in the same manner or similar fields, there can be no assurance that any patents will issue from the patent applications owned by us, or that we will remain free from infringement claims by third parties.

If we choose to go to court to stop someone else from pursuing the inventions claimed in our patents or in or our licensed patents or those of our partners, that individual or company has the right to ask the court to rule that these patents are invalid and/or should not be enforced against that third party. These lawsuits are expensive and would consume time and other resources even if we were successful in stopping the infringement of these patents. In addition, there is a risk that the court will decide that these patents are not valid and that we do not have the right to stop the other party from using the inventions. There is also the risk that, even if the validity of these patents is upheld, the court will refuse to stop the other party on the ground that the other party's activities do not infringe our rights to these patents or that it is in the public interest to permit the infringing activity.

A third party may claim that we or our manufacturing or commercialization partners are using inventions covered by the third party's patent rights and may go to court to stop us from engaging in our normal operations and activities, including making or selling our products. Patent infringement lawsuits are costly and could affect our results of operations and divert the attention of management and development personnel. There is a risk that a court could decide that we or our partners are infringing third party patent rights. In the event that we or our partners are found to infringe any valid claim of a patent held by a third party, we may, among other things, be required to:

- pay damages, including up to treble damages and the other party's attorneys' fees, which may be substantial;

- cease the development, manufacture, use and sale of our products that infringe the patent rights of others through a court-imposed sanction such as an injunction;

- expend significant resources to redesign our products so they do not infringe others' patent rights, which may not be possible;

- discontinue manufacturing or other processes incorporating infringing technology; or

- obtain licenses to the infringed intellectual property, which may not be available to us on acceptable terms, or at all.

The pharmaceutical and life sciences industry has produced a proliferation of patents, and it is not always clear to industry participants, including us, which patents cover various types of products or methods. The coverage of patents is subject to interpretation by the courts, and the interpretation is not always uniform. If we are sued for patent infringement, we would need to demonstrate that our products or methods do not infringe the patent claims of the relevant patent and/or that the patent claims are invalid or unenforceable and we may not be able to do this. Proving invalidity, in particular, is difficult since it requires a showing of clear and convincing evidence to overcome the presumption of validity enjoyed by issued patents in the United States.

Because some patent applications in the United States may be maintained in secrecy until the patents are issued, because patent applications in the United States and many foreign jurisdictions are typically not published until 18 months after filing, and because publications in the scientific literature often lag behind actual discoveries, we cannot be certain that others have not filed patent

Table of Contents

applications for inventions covered by our licensors' or our issued patents or pending applications, or that we or our licensors were the first inventors. Our competitors may have filed, and may in the future file, patent applications covering subject matter similar to ours. Any such patent application may have priority over our or our licensors' patents or applications and could further require us to obtain rights to issued patents covering such subject matter. If another party has filed a U.S. patent application on inventions similar to ours, we may have to participate in an interference proceeding declared by the U.S. Patent and Trademark Office to determine priority of invention in the United States. The costs of these proceedings could be substantial, and it is possible that such efforts would be unsuccessful, resulting in a loss of our U.S. patent position with respect to such inventions.

Some of our competitors may be able to sustain the costs of complex patent litigation more effectively than we can because they have substantially greater resources. In addition, any uncertainties resulting from the initiation and continuation of any litigation could have a material adverse effect on our ability to raise the funds necessary to continue our operations.

**Risks Related to Our Industry**

***The regulatory approval process is expensive, time consuming and uncertain and may prevent us or our partners from obtaining approvals for the commercialization of some or all of our product candidates.***

The research, testing, manufacturing, selling and marketing of pharmaceutical products are subject to extensive regulation by FDA and other regulatory authorities in the United States and other countries, and regulations differ from country to country. Approval in the United States, or in any jurisdiction, does not ensure approval in other jurisdictions. The regulatory approval process is lengthy, expensive and uncertain, and we may be unable to obtain approval for our products. We are not permitted to market our product candidates in the United States until we receive approval from the FDA, generally of an NDA. An NDA must contain, among other things, data to demonstrate that the drug is safe and effective for its intended uses and that it will be manufactured to appropriate quality standards. Obtaining approval of an NDA can be a lengthy, expensive and uncertain process, and the FDA has substantial discretion in the approval process. In addition, failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject our company to administrative or judicially imposed sanctions, including warning letters, untitled letters, civil and criminal penalties, injunctions, product seizure or detention, product recalls, total or partial suspension of production and refusal to approve pending NDAs or supplements to approved NDAs. If we are unable to obtain regulatory approval of our product candidates, we will not be able to commercialize them and recoup our research and development costs.

Earlier in 2008, the FDA announced that, in light of staffing issues, it has given its managers discretion to miss Prescription Drug User Fee Act, or PDUFA, deadlines for completing reviews of NDAs. If the FDA were to miss a PDUFA deadline for one of our products, delaying the approval and launch, the delay could have a material adverse effect on our business.

***Even if we receive regulatory approval for our product candidates, we will be subject to ongoing significant regulatory obligations and oversight, which may result in significant additional expense and limit our ability to commercialize our products.****

If we receive regulatory approvals to sell our products, the FDA and foreign regulatory authorities may impose significant restrictions on the indicated uses or marketing of our products, or impose requirements for burdensome post-approval study commitments. The terms of any product approval, including labeling, may be more restrictive than we desire and could affect the marketability of the product or otherwise reduce the size of the potential market for that product. Following any regulatory approval of our products, we will be subject to continuing regulatory obligations, such as safety reporting requirements and additional post-marketing obligations, including regulatory oversight of the promotion and marketing of our products. In addition, if the FDA approves any of our product candidates, the labeling, packaging, adverse event reporting, storage, advertising, promotion and recordkeeping for the product will be subject to extensive and ongoing regulatory requirements. If we become aware of previously unknown problems with any of our products in the United States or overseas or at our contract manufacturers' facilities, a regulatory agency may impose restrictions on our products, our contract manufacturers or on us, including requiring us to reformulate our products, conduct additional clinical trials, make changes in the labeling of our products, implement changes to, or obtain re-approvals of, our contract manufacturers' facilities, or withdraw the product from the market. In addition, we may experience a significant drop in the sales of the affected products and our product revenues and reputation in the marketplace may suffer, and we could become the target of lawsuits, including class action suits. The FDA and other governmental authorities also actively enforce regulations prohibiting promotion of off-label uses and the promotion of products for which marketing approval has not been obtained. The federal government has levied large civil and criminal fines against companies for alleged improper promotion and has enjoined several companies from engaging in off-label promotion. The FDA has also requested that companies enter into consent decrees or permanent injunctions under which specified promotional conduct is changed or curtailed.

We are also subject to regulation by regional, national, state and local agencies, including the DEA, the Department of Justice, the Federal Trade Commission, the Office of Inspector General of the U.S. Department of Health and Human Services and other regulatory bodies, as well as governmental authorities in those foreign countries in which we commercialize our products. The Federal Food, Drug, and Cosmetic Act, the Public Health Service Act and other federal and state statutes and regulations govern to varying degrees the research, development, manufacturing and commercial activities relating to prescription pharmaceutical products, including preclinical testing, approval, production, labeling, sale, distribution, import, export, post-market surveillance, advertising, dissemination of information and promotion. Our manufacturing partners are subject to the same requirements, which include obtaining sufficient quota from the DEA each year to manufacture sodium oxybate. These statutes and regulations include anti-kickback statutes and false claims statutes.

Table of Contents

The federal health care program anti-kickback statute prohibits, among other things, knowingly and willfully offering, paying, soliciting, or receiving remuneration to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any health care item or service reimbursable under Medicare, Medicaid or other federally financed healthcare programs. This statute has been interpreted to apply to arrangements between pharmaceutical companies on one hand and prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exemptions and regulatory safe harbors protecting identified common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration intended to induce prescribing, purchases or recommendations may be subject to scrutiny if they do not qualify for an exemption or safe harbor. Our practices may not in all cases meet all of the criteria for safe harbor protection from anti-kickback liability.

Federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.

Recently, several pharmaceutical and other health care companies have been prosecuted under these laws for allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product. Other companies have been prosecuted for causing false claims to be submitted because of the company's marketing of the product for unapproved, and thus non-reimbursable, uses. Pharmaceutical and other health care companies have also been prosecuted on other legal theories of Medicare fraud. The majority of states also have statutes or regulations similar to the federal anti-kickback law and false claims laws, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Sanctions under these federal and state laws may include civil monetary penalties, exclusion of a company's products from reimbursement under government programs, criminal fines and imprisonment. Several states now require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and the reporting of gifts to individual physicians in the states. Other states require the posting of information relating to clinical studies. In addition, California requires pharmaceutical companies to implement a comprehensive compliance program that includes a limit on expenditures for or payments to individual prescribers. Currently, several additional states are considering similar proposals. Compliance with these laws is difficult and time consuming and companies that do not comply with these state laws face civil penalties. Because of the breadth of these laws and the narrowness of the safe harbors, it is possible that some of our business activities could be subject to challenge under one or more of such laws. Such a challenge could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

If we or any of our partners fail to comply with applicable regulatory requirements, we or they could be subject to a range of regulatory actions that could affect our or our partners' ability to commercialize our products and could harm or prevent sales of the affected products, or could substantially increase the costs and expenses of commercializing and marketing our products. Any threatened or actual government enforcement action could also generate adverse publicity and require that we devote substantial resources that could otherwise be used in other aspects of our business.

***If we fail to comply with our reporting and payment obligations under the Medicaid rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

We participate in the federal Medicaid rebate program established by the Omnibus Budget Reconciliation Act of 1990, as well as several state supplemental rebate programs. Under the Medicaid rebate program, we pay a rebate to each state Medicaid program for our products that are reimbursed by those programs. The minimum amount of the rebate for each unit of product is set by law at 15.1% of the average manufacturing price of that product, or if it is greater, the difference between the average manufacturing price and the best price we make available to any customer. The rebate amount also includes an inflation adjustment, if necessary.

Pricing and rebate calculations vary among products and programs. The calculations are complex and are often subject to interpretation by us, governmental or regulatory agencies and the courts. The Medicaid rebate amount is computed each quarter based on our submission to the Centers for Medicare & Medicaid Services at the U.S. Department of Health and Human Services of our current average manufacturing price and best prices for the quarter. If we become aware that our reporting for prior quarters was incorrect, or changed as a result of recalculation of the pricing data, we are obligated to resubmit the corrected average manufacturing price or best price for that quarter. Any corrections to our rebate calculations could result in an overage or underage in our rebate liability for past quarters, depending on the nature of the correction. In addition to retroactive rebates (and interest, if any), if we are found to have knowingly submitted false information to the government, we may be liable for civil monetary penalties in the amount of $100,000 per item of false information. Governmental agencies may also make changes in program interpretations, requirements or conditions of participation, some of which may have implications for amounts previously estimated or paid.

Federal law requires that any company that participates in the Medicaid rebate program extend comparable discounts to qualified purchasers under the Public Health Services' pharmaceutical pricing program requiring us to sell our products at prices lower than we otherwise might be able to charge. The Public Health Services pricing program extends discounts comparable to the Medicaid rebates to a variety of community health clinics and other entities that receive health services grants from the Public Health Services, as well as hospitals that serve a disproportionate share of poor patients and children.

42

Table of Contents

***Reimbursement may not be available for our products, which could diminish our sales or affect our ability to sell our products profitably.\****

In both U.S. and foreign markets, our ability to commercialize our products successfully, and to attract strategic partners for our products, depends in significant part on the availability of adequate financial coverage and reimbursement from third party payors, including, in the United States, governmental payors such as the Medicare and Medicaid programs, managed care organizations and private health insurers. Third party payors decide which drugs they will pay for and establish reimbursement levels. Third party payors are increasingly challenging the prices charged for medical products and services and examining their cost effectiveness, in addition to their safety and efficacy. In some cases, for example, third party payors try to encourage the use of less expensive generic products through their prescription benefits coverage and reimbursement policies. We may need to conduct expensive pharmacoeconomic studies in order to demonstrate the cost-effectiveness of our products. Even with studies, our products may be considered less safe, less effective or less cost-effective than existing products, and third party payors may not provide coverage and reimbursement for our products, in whole or in part. We cannot predict actions third party payors may take, or whether they will limit the coverage and level of reimbursement for our products or refuse to provide any coverage at all. For example, because Luvox CR is competing in a market with both branded and generic products, reimbursement by government and private payors may be more challenging than for new chemical entities. We cannot be sure that reimbursement amounts will not reduce the demand for, or the price of, our products. If reimbursement is not available or is available only to limited levels, we may not be able to effectively commercialize our products.

There have been a number of legislative and regulatory proposals in recent years to change the healthcare system in ways that could impact our ability to sell our products profitably. These proposals include prescription drug benefit proposals for Medicare beneficiaries and measures that would limit or prohibit payments for some medical treatments or subject the pricing of drugs to government control. For example, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 provides a new Medicare prescription drug benefit that became effective in January 2006, and mandates other reforms. Although we cannot predict the full effect on our business of the implementation of this new legislation, it is possible that the new benefit, which is managed by private health insurers, pharmacy benefit managers and other managed care organizations, will result in decreased reimbursement for prescription drugs, which may further exacerbate industry-wide pressure to reduce the prices charged for prescription drugs. This could harm our ability to market our products and generate revenues. Currently, there are legislative proposals that would permit the U.S. Secretary of Health and Human Services to negotiate directly with pharmaceutical companies to obtain lower prices for drugs covered under Medicare Part D.

We expect to experience pricing pressures in connection with the sale of our products due to the trend toward managed health care, the increasing influence of health maintenance organizations and additional legislative proposals. If we fail to successfully secure and maintain reimbursement coverage for our products or are significantly delayed in doing so, we will have difficulty achieving market acceptance of our products and our business will be harmed. During the recent presidential election campaign, the candidates discussed healthcare reform proposals which, if enacted, could adversely affect the pharmaceutical industry as a whole, and therefore could have a material adverse effect on our business.

***Sales of our products in the United States may be adversely affected by consolidation among wholesale drug distributors and the growth of large retail drug store chains.\****

The market participants to whom we sell Luvox CR, and the market participants to whom we expect to sell most of our future products, have undergone significant consolidation, marked by mergers and acquisitions among wholesale distributors and the growth of large retail drugstore chains. As a result, a small number of large wholesale distributors control a significant share of the market, and the number of independent drug stores and small drugstore chains has decreased. In addition, excess inventory levels held by large distributors can lead to periodic and unanticipated reductions in our revenues and cash flows. Consolidation of drug wholesalers and retailers, as well as any increased pricing pressure that those entities face from their customers, including the U.S. government, may increase pricing pressure and place other competitive pressures on drug manufacturers, including us.

***Prescription drug importation from Canada and other countries could increase pricing pressure on our products and could decrease our revenues and profit margins.***

Under current U.S. law, there is a general prohibition on imports of unapproved products. The FDA has published internal guidance that sets forth the agency's enforcement priorities for imported drugs. Under this policy, the FDA allows its personnel to use their discretion in permitting entry into the United States of personal use quantities of FDA-regulated products in personal baggage and mail when the product does not present an unreasonable risk to the user. Thus, individuals may import prescription drugs that are unavailable in the United States from Canada and other countries for their personal use under specified circumstances. Other imports, although illegal under U.S. law, also enter the country as a result of the resource constraints and enforcement priorities of the FDA and the U.S. Customs Services. In addition, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 will permit

Table of Contents

pharmacists and wholesalers to import prescription drugs into the United States from Canada under specified circumstances. These additional import provisions will not take effect until the Secretary of Health and Human Services makes a required certification regarding the safety and cost savings of imported drugs and the FDA has promulgated regulations setting forth parameters for importation. These conditions have not been met to date and the law has therefore not taken effect. However, legislative proposals have been introduced to remove these conditions and implement changes to the current import laws, or to create other changes that would allow foreign versions of our products priced at lower levels than in the United States to be imported or reimported to the United States from Canada, Europe and other countries. If these provisions take effect, the volume of prescription drug imports from Canada and elsewhere could increase significantly and our products could face competition from lower priced imports.

Even if these provisions do not take effect and alter current law, the volume of prescription drug imports from Canada and elsewhere could increase due to a variety of factors, including the further spread of internet pharmacies and actions by a number of state and local governments to facilitate Canadian and other imports. These imports may harm our business.

We licensed Xyrem to Valeant to distribute in Canada. Due to government price regulation in Canada, products are generally sold in Canada for lower prices than in the United States. Due to the risk management program for Xyrem and our agreement with Valeant, we believe that it is unlikely that Xyrem will be imported from Canada to the United States. Luvox CR is not approved in Canada.

**Product liability and product recalls could harm our business.**

The development, manufacture, testing, marketing and sale of pharmaceutical products entail significant risk of product liability claims or recalls. Our products and product candidates are designed to affect important bodily functions and processes. Side effects of, or manufacturing defects in, the products sold by us could result in exacerbation of a patient's condition, further deterioration of a patient's condition or even death. This could result in product liability claims and/or recalls of one or more of our products. For example, studies and publications suggest that selective serotonin reuptake inhibitors, including the active pharmaceutical ingredient in Luvox CR and its immediate release formulation Luvox, may increase the risk of suicidal behavior in adults and adolescents. In addition, the current selective serotonin reuptake inhibitor products used to treat obsessive compulsive disorder and social anxiety disorder, particularly those formulated for immediate release, all have significant adverse side effects. Side effects associated with selective serotonin reuptake inhibitors include sexual dysfunction, adverse drug interaction and risk of hypertension. Claims may be brought by individuals seeking relief for themselves or by groups seeking to represent a class. While we have not had to defend against any product liability claims to date, as sales of our products increase, we believe it is likely product liability claims will be made against us. We cannot predict the frequency, outcome or cost to defend any such claims.

Product liability insurance coverage is expensive, can be difficult to obtain and may not be available in the future on acceptable terms, if at all. Partly as a result of product liability lawsuits related to pharmaceutical products, product liability and other types of insurance have become more difficult and costly for pharmaceutical companies to obtain. Our product liability insurance may not cover all of the future liabilities we might incur in connection with the development, manufacture or sale of our products. In addition, we may not continue to be able to obtain insurance on satisfactory terms or in adequate amounts.

A successful claim or claims brought against us in excess of available insurance coverage could subject us to significant liabilities and could have a material adverse effect on our business, financial condition, results of operations and growth prospects. Such claims could also harm our reputation and the reputation of our products, adversely affecting our ability to market our products successfully. In addition, defending a product liability lawsuit is expensive and can divert the attention of key employees from operating our business.

Product recalls may be issued at our discretion or at the discretion of our suppliers, government agencies and other entities that have regulatory authority for pharmaceutical sales. Any recall of our products could materially adversely affect our business by rendering us unable to sell that product for some time and by adversely affecting our reputation.

### Risks Relating to Our Financial Condition

**We have a history of net losses, which may continue for at least the next few years and, we are unable to predict the extent of any future losses or when, if ever, we will become profitable.\***

We have a limited operating history and have incurred significant net losses since our inception in 2003, and we may continue to incur net losses for the next few years. Our net loss for the nine months ended September 30, 2008 was $127.4 million and we had an accumulated deficit of $443.9 million at September 30, 2008. Our operations require significant cash and, in addition to expense reduction initiatives, we will need to raise additional funds by early 2009 to support our operations. If we do not significantly increase our revenues, or if we are not able to raise funds, we will be required to significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities and our ability to capture the market potential of our products and product candidates could be adversely affected, making it more difficult to achieve profitability. We are unable to predict the extent of any future losses or when we will become profitable, if at all.

44

Table of Contents

Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. If we are unable to achieve and sustain profitability, the market value of our common stock will likely decline.

***Our operations have generated negative cash flows, and if we are unable to secure additional funding, we may be required to significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities.***

As of September 30, 2008, we had approximately $50.9 million in unrestricted cash, cash equivalents and marketable securities. Our net cash used in operations for the three and nine months ended September 30, 2008 was approximately $28.7 million and $111.4 million, respectively. In June 2008, we reduced our activities to focus on our commercial products and later-stage product candidates, including a reduction in the size of our workforce. In November 2008, we implemented a workforce reduction of 67 employees, including 62 in the field sales force. We will continue in the foreseeable future to focus almost exclusively on our commercial products and JZP-6.

To grow our business, we must continue to commit substantial resources to costly and time-consuming product development and clinical trials of our product candidates and significant funds to our commercial operations. Our future capital requirements will depend on many factors, including:

- the amount of sales and other revenues from our commercial products, including selling prices for products that we may begin selling and price increases for our current products;

- market acceptance of and the number of prescriptions written for our products;

- selling and marketing costs associated with Luvox CR and Xyrem in the United States;

- revenues from current and potential future development and/or commercial collaboration partners;

- the scope, rate of progress, results and costs of our preclinical studies, clinical trials and other research and development activities;

- the number and characteristics of product candidates that we pursue;

- the cost and timing of establishing clinical and commercial supplies of our product candidates;

- the cost and timing of obtaining regulatory approval;

- payments of milestones to third parties;

- increased expenses associated with our current employees and new employees hired to support our continued growth;

- the cost of investigations, litigation and/or settlements related to regulatory activities;

- the cost of preparing, filing, prosecuting, defending and enforcing patent claims and other intellectual property rights; and

- the extent to which we acquire, in-license or invest in new businesses, products or product candidates.

Although we generate product revenues, since our inception in 2003, we have financed our operations primarily through the sale of convertible preferred stock, the issuance of senior secured notes and warrants, a line of credit, development financing related to one of our previous product candidates, our collaboration with UCB related to Xyrem and JZP-6, the sale of common stock in our initial public offering and the sale of units consisting of common stock and warrants in our registered direct public offering completed in July 2008.

We will need to raise additional funds by early 2009 to support our operations, and such funding may not be available to us on acceptable terms, or at all. The availability of funding may be limited by the recent illiquidity in the United States and worldwide credit markets and related crisis in the global financial system. We may face significant challenges in ways that we currently cannot predict if conditions in the credit and financial markets do not improve or conditions continue to worsen. In September 2008, Lehman Brothers Holdings, Inc., the indirect parent of LB I Group Inc., our largest creditor, filed for protection under Chapter 11 of the United States Bankruptcy Code.

If we are unable to raise sufficient additional funds by early 2009, we would be required, unless our sales increase significantly, to further reduce operating expenses, by, among other things, curtailing significantly or delaying or eliminating one or more product development programs or scaling back our commercial operations. We may also be required to license to third parties products and product candidates that we would prefer to develop and commercialize ourselves or to sell the rights to one or more commercial products to third parties. We may seek to raise additional funds through collaborations, partnering arrangements, development financings, or public or private debt or equity financings. We expect that our ability to obtain sufficient additional funding by early 2009 may depend significantly on the preliminary data from the first Phase III pivotal clinical trial of JZP-6, which we expect to have in the fourth quarter of 2008. If we exercise our right to draw down amounts under the committed equity financing facility, or CEFF, with Kingsbridge Capital Limited, or Kingsbridge, that we entered into on May 7, 2008, Kingsbridge will not be obligated to purchase shares of our common stock under the CEFF unless certain conditions are met. These conditions include a minimum trading price for our common stock, and our common stock has recently been trading well below that minimum. If we raise funds through

45

Table of Contents

collaborations or partnering arrangements, we may be required to relinquish, on terms that are not favorable to us, rights to some of our products or product candidates that we would otherwise seek to develop or commercialize ourselves. If we raise additional funds through the issuance of debt securities, these securities could have rights that are senior to holders of our common stock and could contain covenants that restrict our operations. Any additional equity financing may be substantially dilutive to our stockholders, particularly given the prices at which our common stock has been recently trading. In addition, if we raise additional funds through the sale of equity securities, new investors could have rights superior to our existing stockholders. The terms of future financings may restrict our ability to raise additional capital, which could delay or prevent the further development or commercialization or our products. Our failure to raise capital when needed may harm our business and operating results.

We cannot predict with certainty the level of our product sales. The current United States and worldwide economic crisis may lead to a reduced demand for our products. If product sales do not meet our expectations and we do not raise additional funds, we will need to further reduce our expenditures, perhaps significantly, to preserve our cash. In June 2008, we reduced our expenditures by focusing on our commercial products and later stage product candidates and eliminating some jobs. In November 2008, we further reduced expenditures by restructuring our commercial operations and reducing the size of our sales force. In addition to the June 2008 and November 2008 workforce reductions, we will continue to review our operations in order to identify additional measures to further reduce spending. The cost-cutting measures we have taken and may take in the future may not be sufficient to enable us to meet our cash requirements or for us to reach profitability.

***We have a substantial amount of debt, which may adversely affect our cash flows and our ability to operate our business.****

On March 17, 2008, we incurred $40.0 million of additional secured indebtedness in connection with the sale of senior secured notes and warrants and the exchange of existing senior debt which increased our aggregate senior debt to $120.0 million at face value. Our substantial debt combined with our other financial obligations and contractual commitments could have other important consequences. For example, it could:

- make us more vulnerable to adverse changes in general United States and worldwide economic, industry and competitive conditions and adverse changes in government regulation;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flows to fund working capital, capital expenditures, acquisitions and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and our industry;

- place us at a competitive disadvantage compared to our competitors who have less debt; and

- limit our ability to borrow additional amounts for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy or other purposes.

Any of these factors could materially adversely affect our business, financial condition, results of operations and growth prospects. In addition, under specified circumstances, our lenders could accelerate, or demand immediate repayment of, all or a portion of our debt, including if annualized net sales of our products fall below certain specified levels following the occurrence of certain events, or if we are unable to comply with certain of the other senior secured debt covenants, including the timely payment of quarterly interest installments. Any such acceleration would have a material adverse effect on our business, financial condition and results of operations. If we do not have sufficient funds to service our debt, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell securities, none of which we can assure you that we would be able to do in a timely manner or at all. In addition, our ability to refinance any amounts that may become accelerated or to secure waivers from the lenders with respect to compliance with the senior secured debt covenants may be adversely affected by the September 2008 filing by Lehman Brothers Holdings, Inc., the indirect parent of LB I Group Inc., the largest holder of our senior secured notes, for protection under Chapter 11 of the United States Bankruptcy Code.

***The terms of our debt could restrict our operations, particularly our ability to respond to changes in our business or to take specified actions.****

Our senior secured debt contains, and any future indebtedness would likely contain, a number of restrictive covenants that impose significant operating and financial restrictions on us, including restrictions on our ability to take actions that may be in our best interests. Our existing debt includes covenants, including requirements that we:

- generally not borrow additional amounts without the approval of our lenders;

- dispose of certain assets only in accordance with the terms of our existing senior secured debt;

- not impair our lenders' security interests in our assets; and

- repay a portion of the debt early under certain circumstances.

Table of Contents

In addition, we expect that, under the terms of the senior secured debt, JPIC will be required to maintain restricted cash balances equal to 15% of the then outstanding principal amount of senior secured notes after the quarter ending March 31, 2009 which JPIC may not be able to do, particularly if we are unable to obtain sufficient additional funding. If we are not able to maintain any required restricted cash balance under the terms of the senior secured notes, the holders of the senior secured notes may exercise their rights and remedies under the notes, which may include the acceleration of the indebtedness under the senior secured notes.

**Risks Relating to Ownership of Our Common Stock**

***The market price of our common stock may be volatile, and the value of your investment could decline significantly.\****

Investors who purchase our common stock may not be able to sell their shares at or above the purchase price. Security prices for companies similar to us experience significant price and volume fluctuations. The following factors, in addition to other risks described herein, may have a significant effect on our common stock market price:

- conditions or trends in the pharmaceutical industry, the credit and financial markets or the United States and worldwide economy in general;

- the success of Luvox CR in the United States;

- the success of our development efforts and clinical trials;

- negative publicity concerning one of our products or product candidates;

- announcement of FDA approval or non-approval of our product candidates, or specific label indications for their use, or delays in the FDA review process;

- the failure or delay by the DEA in providing sufficient quotas for sodium oxybate, Xyrem or JZP-6;

- actual or expected fluctuations in our operating results, including as a result of fluctuating demand for our commercial products as a result of purchases by wholesalers in connection with product launches, stockpiling or inventory drawdowns by our customers, or otherwise;

- changes in the market prices for our products;

- the success of our efforts to acquire or in-license additional products or product candidates;

- introductions and announcements of new products by us, our commercialization partners, or our competitors, and the timing of these introductions or announcements;

- announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

- announcements of product innovations by us, our partners or our competitors;

- changes in laws or regulations applicable to our products, including but not limited to clinical trial requirements;

- actions taken by regulatory agencies with respect to our products, clinical trials, manufacturing process or sales and marketing terms;

- developments concerning our collaborations, including but not limited to those with our sources of manufacturing supply and our commercialization partners;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our products;

- our ability or inability to raise additional capital by early 2009 and the terms on which we raise it;

- actual or anticipated changes in earnings estimates or changes in stock market analyst recommendations regarding our common stock, other comparable companies or our industry generally;

- actual or expected changes in our growth rates or our competitors' growth rates;

- changes in the market valuation of similar companies;

- trading volume of our common stock; and

- sales of our common stock by us or our stockholders.

In addition, the stock market in general and the market for life sciences companies in particular have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may seriously harm the market price of our common stock, regardless of our operating performance. In the past, following periods of volatility in the market, securities class-action litigation has often been instituted against companies. Such litigation, if instituted against us, could result in substantial costs and diversion of management's attention and resources, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

47

Table of Contents

*Future sales of our common stock in the public market could cause our stock price to fall.\**

Sales of a substantial number of shares of our common stock in the public market, or the perception that these sales might occur, including shares issued under the CEFF, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. In addition, the perceived risk of dilution from sales of our common stock to or by Kingsbridge in connection with the CEFF may cause holders of our common stock to sell their shares, or it may encourage short selling by market participants, which could contribute to a decline in our stock price. As of September 30, 2008, we had 28,775,217 shares of common stock outstanding, all of which shares, less shares subject to a repurchase option in our favor tied to the holders' continued service to us (which will be eligible for sale upon lapse of the repurchase option), were eligible for sale in the public market, subject in some cases to the volume limitations and manner of sale requirements under Rule 144.

As of October 31, 2008, the holders of up to approximately 19,306,128 shares of common stock, based on shares outstanding as of that date, including 785,728 shares underlying outstanding warrants, were entitled to certain rights with respect to the registration of such shares under the Securities Act of 1933, as amended, under an amended and restated investor rights agreement that we entered into with these holders. In addition, upon exercise of outstanding options by our executive officers, our executive officers will be entitled to rights under the amended and restated investor rights agreement with respect to registration of the shares of common stock acquired on exercise. If such holders, by exercising their registration rights, sell a large number of shares, they could adversely affect the market price for our common stock. If we file a registration statement and include shares held by these holders pursuant to the exercise of their registration rights, these sales may impair our ability to raise capital. On March 17, 2008, we entered into a registration rights agreement pursuant to which we agreed to file a registration statement covering the resale of the 562,192 shares underlying the warrants that we issued in connection with the expansion of our senior secured debt in March 2008. The registration rights agreement entered into in connection with the CEFF requires that we use commercially reasonable efforts to have the registration statement in connection with the CEFF declared effective and ensure that it remains effective for the term of such agreement. In addition, we have filed registration statements on Form S-8 under the Securities Act of 1933, as amended, to register the shares of our common stock reserved for issuance under our stock option and employee stock purchase plans, and intend to file additional registration statements on Form S-8 to register the shares automatically added each year to the share reserves under these plans.

*The CEFF may result in dilution to our stockholders.\**

Pursuant to the CEFF, Kingsbridge committed to purchase, subject to certain conditions, up to the lesser of $75.0 million of our common stock or 4,922,064 shares of our common stock over a three-year period. We are entitled in certain circumstances to deliver a "blackout" notice to Kingsbridge to suspend the use of the registration statement that we have filed with the SEC registering for resale the shares of common stock to be issued under the CEFF and the shares underlying the warrant we issued to Kingsbridge. If we deliver a blackout notice in the 15 trading days following a settlement of a draw down, then we must make a blackout payment to Kingsbridge, or issue Kingsbridge additional shares of our common stock in lieu of this payment. If we sell shares to Kingsbridge under the CEFF, or issue shares in lieu of any blackout payment, it will have a dilutive effect on the holdings of our current stockholders, and may result in downward pressure on the price of our common stock. Kingsbridge will not be obligated to purchase any shares of our common stock under the CEFF unless certain conditions are met, including a minimum trading price which our common stock has recently been trading well below. If we draw down amounts under the CEFF, we will issue shares to Kingsbridge at a discount of up to ten percent from the volume weighted average price of our common stock. If we draw down amounts under the CEFF when our share price is decreasing, we will need to issue more shares to raise the same amount than if our stock price was higher. Issuances in the face of a declining share price will have an even greater dilutive effect than if our share price were stable or increasing, and may further decrease our share price.

*Our executive officers and directors, together with their respective affiliates, own a significant percentage of our stock and will be able to exercise significant influence over matters subject to stockholder approval.\**

As of October 31, 2008, our executive officers and directors, together with their respective affiliates, beneficially owned 63.2% of our capital stock, of which 7.0% was beneficially owned by our executive officers. Accordingly, our executive officers and directors together with their respective affiliates are able to determine the composition of our board of directors, retain the voting power to approve all matters requiring stockholder approval, including mergers and other business combinations, and continue to have significant influence over our operations. This concentration of ownership could have the effect of delaying or preventing a change in our control or otherwise discouraging a potential acquirer from attempting to obtain control of us, which in turn could have a material adverse effect on the market value of our common stock, and may prevent attempts by our stockholders to replace or remove our board of directors or management.

*We incur significant increased costs as a result of operating as a public company, and our management will be required to devote substantial time to new compliance initiatives.\**

As a public company, we incur significant legal, accounting and other expenses that we did not incur as a private company. In addition, the Sarbanes-Oxley Act of 2002 and rules of the Securities and Exchange Commission and The NASDAQ Stock Market LLC have imposed various requirements on public companies including requiring establishment and maintenance of effective

Table of Contents

disclosure and financial controls. Our management and other personnel must continue to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased and will continue to increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, these rules and regulations may make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may incur substantial costs to maintain the same or similar coverage.

The Sarbanes-Oxley Act of 2002 requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. In particular, we must perform system and process evaluation and testing of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, beginning with our annual report on Form 10-K for the fiscal year ending December 31, 2008, and to allow our independent registered public accounting firm to issue a report on the effectiveness of our internal control over financial reporting beginning with our annual report on Form 10-K for the fiscal year ending December 31, 2009. Our compliance with Section 404 of the Sarbanes-Oxley Act requires that we incur substantial accounting expense and expend significant management efforts. We currently do not have an internal audit group, and we have hired and will need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by NASDAQ, the SEC or other regulatory authorities, which would require additional financial and management resources.

Our ability to successfully implement our business plan and comply with Section 404 requires us to be able to prepare timely and accurate financial statements. We expect that we will need to continue to improve existing, and implement new operational and financial systems, procedures and controls to manage our business effectively. Any delay in the implementation of, or disruption in the transition to, new or enhanced systems, procedures or controls, may cause our operations to suffer and we may be unable to conclude that our internal control over financial reporting is effective and to obtain an unqualified report on internal controls from our auditors as required under Section 404 of the Sarbanes-Oxley Act. This, in turn, could have an adverse impact on trading prices for our common stock, and could adversely affect our ability to access the capital markets.

***Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders, and may prevent attempts by our stockholders to replace or remove our current management.***

Provisions in our certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us, or for a change in the composition of our board of directors or management to occur, even if doing so would benefit our stockholders. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- dividing our board of directors into three classes;

- limiting the removal of directors by the stockholders;

- eliminating cumulative voting rights and therefore allowing the holders of a majority of the shares of our common stock to elect all of the directors standing for election, if they should so choose;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders.

***We have never declared or paid dividends on our capital stock and we do not anticipate paying dividends in the foreseeable future.***

Our business requires significant funding, and we currently invest more in product development than we earn from sales of our products. In addition, the agreements governing our debt restrict our ability to pay dividends on our common stock. Therefore, we do not anticipate paying any cash dividends on our common stock in the foreseeable future. We currently plan to invest all available funds and future earnings in the development and growth of our business. As a result, capital appreciation, if any, of our common stock will be your sole source of potential gain for the foreseeable future.

49

**Item 2.**        **Unregistered Sales of Equity Securities and Use of Proceeds.**

**Use of Proceeds**

On May 31, 2007, our registration statement on Form S-1/A (Registration No. 333-141164) was declared effective by the SEC for our initial public offering, pursuant to which we registered 6,000,000 shares of common stock to be sold by us. The stock was offered at a price to the public of $18.00 per share. Our common stock commenced trading on June 1, 2007. The offering closed on June 6, 2007 after the sale of 6,000,000 shares, and as a result, we received net proceeds of $97.5 million, after underwriters' discounts of $7.6 million and other expenses of $2.9 million. None of the net proceeds were used to make direct or indirect payments to directors, officers or persons owning ten percent or more of our common stock or to their associates, or to our affiliates, other than payments in the ordinary course of business to officers and to non-employee directors as compensation for their services. As of September 30, 2008, we have used all net proceeds from the offering to fund the U.S. launch and commercialization of Luvox CR, to fund our Phase III pivotal clinical trials of JZP-6 and to fund continued development of and feasibility activities for our portfolio of clinical and early-stage product candidates.

**Item 5.**        **Other Information.**

On November 12, 2008, we committed to a plan of termination that will result in a workforce reduction of 67 employees, including 62 in the field sales force. Affected employees will be eligible to receive severance payments and payment by us of each affected employee's COBRA premiums for up to three months. We had expanded the size of our sales force prior to the launch of Luvox CR in the first quarter of 2008. Sales and prescriptions of Luvox CR since launch have been significantly lower than what we expected and this workforce reduction was in large part undertaken to reflect the lower than anticipated demand to date for Luvox CR. We expect to complete the reduction in force by the end of the fourth quarter of 2008.

As a result of the reduction in force, we estimate that we will record a one-time severance-related charge in selling, general and administrative expense of approximately $1.6 million in the three months and year ending December 31, 2008. We expect approximately $742,000 of the charge to relate to severance and health insurance premium payments, most of which is scheduled to be paid by February 28, 2009.

This Item 5 contains forward-looking statements, including, but not limited to, statements related to the expected severance costs and related estimated severance-related charge, and the timing for completion of the reduction in force. These forward-looking statements are based on our current expectations and inherently involve significant risks and uncertainties. Our actual results and the timing of events could differ materially from those anticipated in such forward looking statements as a result of these risks and uncertainties. These and other risk factors are discussed in Part II Item 1A—Risk Factors. In addition, our costs in connection with the November 2008 workforce reduction may be greater than anticipated and such workforce reduction and any future workforce and expense reductions may have an adverse impact on our commercial and development activities.

**Item 6.**       **Exhibits.**

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of the Registrant.(1) |
| 3.2 | Amended and Restated Bylaws.(2) |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. |
| 4.2 | Specimen Common Stock Certificate.(3) |
| 4.3A | Third Amended and Restated Investor Rights Agreement, made effective as of June 6, 2007, by and between the Registrant and the other parties named therein.(4) |
| 4.3B | Waiver and Amendment Agreement, dated as of March 12, 2008, by and between the Registrant and the other parties named therein.(5) |
| 4.3C | Waiver and Amendment Agreement, dated as of May 7, 2008, by and between the Registrant and the other parties named therein.(6) |
| 4.4A | Form of Series BB Preferred Stock Warrant of the Registrant.(7) |
| 4.4B | Form of Series BB Preferred Stock Warrant of the Registrant, as amended.(5) |
| 4.5A# | Senior Secured Note and Warrant Purchase Agreement, dated as of March 14, 2008, by and among the Registrant, JPI Commercial, LLC and the Purchasers named therein.(5) |
| 4.5B | Form of Senior Secured Tranche A Note of JPI Commercial, LLC.(5) |
| 4.5C | Form of Senior Secured Tranche B Note of JPI Commercial, LLC.(5) |
| 4.5D | Form of Common Stock Warrant of the Registrant.(5) |
| 4.5E# | Registration Rights Agreement, dated as of March 17, 2008, by and between the Registrant and the other parties named therein.(5) |
| 4.6A | Warrant issued to Kingsbridge Capital Limited, dated May 7, 2008.(6) |
| 4.6B | Registration Rights Agreement, dated as of May 7, 2008, by and between the Registrant and Kingsbridge Capital Limited.(6) |
| 4.7 | Form of Registered Direct Common Warrant.(8) |
| 10.56 | Non-Employee Director Compensation Arrangements |
| 10.75 | Amendment No. 2 to Amended and Restated Xyrem License and Distribution Agreement, dated July 23, 2008, by and between the Registrant and UCB Pharma Limited.(9) |
| 10.76 | Antizol® Product Rights Acquisition Agreement, dated as of August 1, 2008, by and among the Registrant, JPI Commercial, LLC, Paladin Labs (Barbados) Inc., and Paladin Labs (USA) Inc.(10) |
| 10.77## | Amendment No. 2 to License Agreement, dated as of October 17, 2008, by and between JPI Commercial, LLC and Solvay Pharmaceuticals, Inc. |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

\#      Confidential treatment has been granted with respect to certain portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

\#\#      Confidential treatment has been requested with respect to certain portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

51

Table of Contents

(1) Incorporated herein by reference to the same numbered exhibit to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(2) Incorporated herein by reference to Exhibit 3.4 to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(3) Incorporated herein by reference to the same numbered exhibit to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(4) Incorporated herein by reference to Exhibit 4.3 to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(5) Incorporated herein by reference to the same numbered exhibit to the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008.

(6) Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008.

(7) Incorporated herein by reference to Exhibit 4.6 to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on March 9, 2007.

(8) Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 16, 2008.

(9) Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 24, 2008.

(10) Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on August 6, 2008.

* The certification attached as Exhibit 32.1 accompanies this Quarterly Report on Form 10-Q pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

Table of Contents

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: November 14, 2008

**Jazz Pharmaceuticals, Inc.**

/s/ Matthew K. Fust
_____

Matthew K. Fust
*Executive Vice President and Chief Financial Officer*
*(Duly Authorized and Principal Accounting and*
*Financial Officer)*

53

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of the Registrant.(1) |
| 3.2 | Amended and Restated Bylaws.(2) |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. |
| 4.2 | Specimen Common Stock Certificate.(3) |
| 4.3A | Third Amended and Restated Investor Rights Agreement, made effective as of June 6, 2007, by and between the Registrant and the other parties named therein.(4) |
| 4.3B | Waiver and Amendment Agreement, dated as of March 12, 2008, by and between the Registrant and the other parties named therein.(5) |
| 4.3C | Waiver and Amendment Agreement, dated as of May 7, 2008, by and between the Registrant and the other parties named therein.(6) |
| 4.4A | Form of Series BB Preferred Stock Warrant of the Registrant.(7) |
| 4.4B | Form of Series BB Preferred Stock Warrant of the Registrant, as amended.(5) |
| 4.5A# | Senior Secured Note and Warrant Purchase Agreement, dated as of March 14, 2008, by and among the Registrant, JPI Commercial, LLC and the Purchasers named therein.(5) |
| 4.5B | Form of Senior Secured Tranche A Note of JPI Commercial, LLC.(5) |
| 4.5C | Form of Senior Secured Tranche B Note of JPI Commercial, LLC.(5) |
| 4.5D | Form of Common Stock Warrant of the Registrant.(5) |
| 4.5E# | Registration Rights Agreement, dated as of March 17, 2008, by and between the Registrant and the other parties named therein.(5) |
| 4.6A | Warrant issued to Kingsbridge Capital Limited, dated May 7, 2008.(6) |
| 4.6B | Registration Rights Agreement, dated as of May 7, 2008, by and between the Registrant and Kingsbridge Capital Limited.(6) |
| 4.7 | Form of Registered Direct Common Warrant.(8) |
| 10.56 | Non-Employee Director Compensation Arrangements |
| 10.75 | Amendment No. 2 to Amended and Restated Xyrem License and Distribution Agreement, dated July 23, 2008, by and between the Registrant and UCB Pharma Limited.(9) |
| 10.76 | Antizol® Product Rights Acquisition Agreement, dated as of August 1, 2008, by and among the Registrant, JPI Commercial, LLC, Paladin Labs (Barbados) Inc., and Paladin Labs (USA) Inc.(10) |
| 10.77## | Amendment No. 2 to License Agreement, dated as of October 17, 2008, by and between JPI Commercial, LLC and Solvay Pharmaceuticals, Inc. |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

\#    Confidential treatment has been granted with respect to certain portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

\##    Confidential treatment has been requested with respect to certain portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

Table of Contents

(1)    Incorporated herein by reference to the same numbered exhibit to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(2)    Incorporated herein by reference to Exhibit 3.4 to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(3)    Incorporated herein by reference to the same numbered exhibit to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(4)    Incorporated herein by reference to Exhibit 4.3 to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(5)    Incorporated herein by reference to the same numbered exhibit to the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008.

(6)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008.

(7)    Incorporated herein by reference to Exhibit 4.6 to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on March 9, 2007.

(8)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 16, 2008.

(9)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 24, 2008.

(10)   Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on August 6, 2008.

*    The certification attached as Exhibit 32.1 accompanies this Quarterly Report on Form 10-Q pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

Exhibit 10.56

JAZZ PHARMACEUTICALS, INC.
NON-EMPLOYEE DIRECTOR
COMPENSATION ARRANGEMENTS
(as modified on August 14, 2008)

On May 1, 2007, the Board of Directors (the "Board") of Jazz Pharmaceuticals, Inc. (the "**Company**") adopted the following compensation program for non-employee directors of the Board to be effective upon the closing of the initial public offering of the Company's common stock (the "**Offering**"). Pursuant to this program, each member of the Board who is not an employee or an officer of the Company will receive the following cash compensation for Board services ("**Board Retainers**"), as applicable:

- a $30,000 annual retainer for service as a Board member;

- a $15,000 supplemental annual retainer for service as chair of the audit committee;

- a $10,000 supplemental annual retainer for service as chair of the compensation committee; and

- a $5,000 supplemental annual retainer for service as chair of each other committee of the Board.

The Company will continue to reimburse its non-employee directors for their reasonable expenses incurred in attending meetings of the Board and committees of the Board.

Additionally, members of the Board who are not employees or officers of the Company will receive non-statutory stock options under the Company's 2007 Non-Employee Directors Stock Option Plan which will become effective immediately upon the signing of the underwriting agreement for the Offering. Each non-employee director joining the Board after the closing of the Offering will automatically be granted a non-statutory stock option to purchase 30,000 shares of common stock with an exercise price equal to the then fair market value of the Company's common stock. On the first trading day on or after August 15 of each year, commencing on August 15, 2007, each non-employee director will automatically be granted a non-statutory stock option to purchase 10,000 shares of common stock on that date with an exercise price equal to the then fair market value of the Company's common stock. The initial grants will vest with respect to one-third of the shares on the first anniversary of the date of grant, and the balance in a series of 24 successive equal monthly installments thereafter. The annual grants will vest in a series of 12 successive equal monthly installments measured from the date of grant. All stock options granted under the Company's 2007 Non-Employee Directors Stock Option Plan will have a maximum term of ten years.

On July 18, 2007, the Board determined that the Board Retainers for the periods from (i) June 1, 2007 through August 14, 2007 (in an amount equal to 20.83% of the annual Board Retainer) and (ii) August 15, 2007 through August 14, 2008 shall be deemed earned and payable on August 15, 2007 and that commencing August 15, 2008, Board Retainers for each annual period from August 15 to the next subsequent August 14 shall be deemed earned and payable in advance on August 15. Payments of Board Retainers are subject to a non-employee's director's election pursuant to the Company's Directors Deferred Compensation Plan. Any amounts deferred under the Directors Deferred Compensation Plan are credited to a phantom stock account. On August 14, 2008, the Board determined that any distributions from a Board member's phantom stock account shall be in shares of the Company's common stock.

On December 18, 2007, the Board determined that for purposes of non-employee directors that are appointed or elected other than on August 15 of any given year, a pro-rata portion of all Board Retainers for the period from such non-employee director's appointment or election to the next subsequent August 15 shall be deemed earned and payable on the date of the first regularly scheduled meeting of the Board that takes place not less than 31 days following the date of such non-employee' director's appointment or election provided such date is in a "window period" (as such term is defined in the Company's *Policy Regarding Stock Trading By Officers, Directors and other Designated Employees*), or in the event such date is not in a window period, the next subsequent date which is in a window period.

**Exhibit 10.77**

AMENDMENT NO. 2 TO LICENSE AGREEMENT

This Amendment No. 2 to License Agreement (the "Amendment") is made and entered into as of the 17th day of October, 2008 ("Effective Date"), by and between SOLVAY PHARMACEUTICALS, INC., a Georgia corporation having its principal office at 901 Sawyer Road, Marietta, Georgia 30062 ("Solvay") and JPI COMMERCIAL, LLC, a Delaware limited liability corporation and wholly-owned subsidiary of Jazz Pharmaceuticals, Inc., a Delaware corporation ("Jazz Pharmaceuticals"), having its principal offices at 3180 Porter Drive, Palo Alto, California 94304 ("JPI"). Solvay and JPI are referred to herein on occasion separately as a "Party" or together as the "Parties". Capitalized terms used herein shall have their respective meanings set forth in the License Agreement, unless otherwise defined herein.

WHEREAS, Solvay and Jazz Pharmaceuticals entered into that certain License Agreement (the "Agreement") dated as of the 31st day of January, 2007, as amended on March 12, 2008;

WHEREAS, in accordance with Section 13.8 of the Agreement, Jazz Pharmaceuticals assigned the Agreement to JPI, it wholly-owned subsidiary, pursuant to that certain Assignment and Assumption Agreement dated March 17, 2008;

WHEREAS, Jazz Pharmaceuticals and JPI have entered into that certain LUVOX CR® License Agreement dated March 17, 2008 whereby Jazz Pharmaceuticals has the exclusive right to develop, make, have made, use and sell LUVOX CR in the Territory; and

WHEREAS, the Parties wish to amend the Agreement in accordance with Section 13.6 of the Agreement to change the times when certain payments are due from JPI to Solvay;

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment, the Parties agree as follows:

1. <u>Amendment of Definitions</u>.

(a) Section 1.11 of the Agreement is amended and replaced in its entirety with the following:

"1.11 <u>Milestones</u>" means the events identified in Sections 3.1 (b) through (l)."

(b) Section 1.12 of the Agreement is amended and replaced in its entirety with the following:

"1.12 "<u>Milestone Payments</u>" means the payments to be made by JPI to Solvay pursuant to Sections 3.1 (b) through (l)."

2. Amendment of Section 3.1. Section 3.1 of the Agreement is amended and replaced in its entirety with the following:

"3.1 Upfront Payment and Milestone Payments. As consideration for the license granted by Solvay to JPI hereunder, JPI will make the following upfront and milestone payments to Solvay:

(a) Two million ($2,000,000.00) dollars to be paid as a non-refundable payment at the Time of Closing (the "Upfront Payment");

(b) Two million ($2,000,000.00) dollars within fifteen (15) days of the First Commercial Sale of LUVOX-IR, supplied by or on behalf of Solvay, by Jazz Pharmaceuticals;

(c) Ten million dollars ($10,000,000.00) within thirty (30) days after receipt of FDA approval of the first indication for the LUVOX CR NDA;

(d) Ten million dollars ($10,000,000.00) within thirty-nine (39) days after receipt of FDA approval of the first indication for the LUVOX CR NDA;

(e) Three million five hundred thousand dollars ($3,500,000.00) on October 20, 2008;

(f) Three million five hundred thousand dollars ($3,500,000.00) on November 15, 2008;

(g) Three million five hundred thousand dollars ($3,500,000.00) on December 15, 2008;

(h) One million one hundred sixty-six thousand six hundred and sixty-seven dollars ($1,166,667.00) on the 15th day of each month starting on January 15, 2009 and ending on September 15, 2009;

(i) [ * ] dollars payable as set forth in Section 3.5 after twelve (12) months of uninterrupted supply of Jazz Pharmaceuticals' requirements of LUVOX CR by Elan to Jazz Pharmaceuticals in accordance with the terms and conditions of the Elan Agreement as measured from the date of the First Commercial Sale of LUVOX CR by Jazz Pharmaceuticals;

(j) [ * ] dollars payable as set forth in Section 3.5 when Net Sales of LUVOX CR first reach one hundred million ($100,000,000.00) dollars in a single twelve month period;

(k) [ * ] dollars payable as set forth in Section 3.5 when Net Sales of LUVOX CR first reach two hundred million ($200,000,000.00) dollars in a single twelve month period; and

[ * ] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24B-2 of the Securities Exchange Act of 1934, as amended.

(Calculated by you on Section 3.5 ... on 3.5 ... X CR ... ed date ... ed mi ... of ... of ... ale twelve month period.

Each Milestone Payment, other than those set forth in Section 3.1(h), shall be made only once, regardless of how many times each related Milestone is achieved. No payment shall be owed for a Milestone which is not reached.

3. <u>Amendment of Section 11.2</u>. Section 11.2 of the Agreement is amended and replaced in its entirety with the following:

"11.2 <u>Termination for Breach</u>. This Agreement may be terminated by either Party in the event the other Party breaches its obligation(s) under this Agreement and does not cure the same within sixty (60) days following written notice of such breach; provided, however, that if the breach is of such a nature that it cannot be cured within sixty (60) days, then the time to cure shall be extended until such breach can reasonably be cured. Notwithstanding the foregoing, Solvay may terminate this Agreement immediately if any Milestone Payment required pursuant to Sections 3.1(e) through (h) is not paid within fifteen (15) days after such Milestone Payment became due and payable."

4. <u>No Other Changes</u>. Except as set forth above, the Agreement remains in full force and effect as originally executed.

IN WITNESS WHEREOF, the Parties have caused this Amendment No. 2 to License Agreement to be executed by their duly authorized representatives as of the Effective Date.

**JPI COMMERCIAL, LLC**                                    **SOLVAY PHARMACEUTICALS, INC.**

By:          /s/ Robert Myers                              By:          /s/ Murray Kay
Print Name:  Robert Myers                                  Print Name:  Murray Kay
Title:       President                                     Title:       Vice President, Finance
Date:        10/17/08                                      Date:        10/13/08

[ * ] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24B-2 of the Securities Exchange Act of 1934, as amended.

EXHIBIT 31.1

**CERTIFICATION**

I, Samuel R. Saks, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2008                              By:   /s/ Samuel R. Saks
                                                          Samuel R. Saks, M.D.
                                                          Chief Executive Officer

EXHIBIT 31.2

CERTIFICATION

I, Matthew K. Fust, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2008                    By:    /s/ Matthew K. Fust
                                                  Matthew K. Fust
                                                  Executive Vice President and Chief Financial Officer

EXHIBIT 32.1

**CERTIFICATION (1)**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. Section 1350), Samuel R. Saks, Chief Executive Officer of Jazz Pharmaceuticals, Inc. (the "Company"), and Matthew K. Fust, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1. The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2. The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

In Witness Whereof, the undersigned have set their hands hereto as of November 14, 2008.

| /s/ SAMUEL R. SAKS |
| --- |
| **Samuel R. Saks** |
| **Chief Executive Officer** |

| /s/ MATTHEW K. FUST |
| --- |
| **Matthew K. Fust** |
| **Executive Vice President and Chief Financial Officer** |

(1) This certification accompanies the Quarterly Report on Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Jazz Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing. A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Jazz Pharmaceuticals, Inc. and will be retained by Jazz Pharmaceuticals, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT 53

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

**(Mark One)**

☒    **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the quarterly period ended September 30, 2009**

**or**

☐    **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from            to**

**Commission File Number: 001-33500**

# JAZZ PHARMACEUTICALS, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **05-0563787** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3180 Porter Drive**
**Palo Alto, CA 94304**
**(650) 496-3777**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☐    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☐ | |
| Non-accelerated filer ☒ (Do not check if a smaller reporting company) | | Smaller reporting company ☐ | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of October 30, 2009, 30,992,088 shares of the registrant's Common Stock, $.0001 par value, were outstanding.

**JAZZ PHARMACEUTICALS, INC.**

**QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2009**

**INDEX**

|  |  |  | **Page** |
|---|---|---|---|
| **PART I—FINANCIAL INFORMATION** | | | |
| Item 1. | Financial Statements | | |
| | Condensed Consolidated Balance Sheets—September 30, 2009 and December 31, 2008 | | 3 |
| | Condensed Consolidated Statements of Operations—Three and Nine Months Ended September 30, 2009 and 2008 | | 4 |
| | Condensed Consolidated Statements of Cash Flows—Nine Months Ended September 30, 2009 and 2008 | | 5 |
| | Notes to Condensed Consolidated Financial Statements | | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 17 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 26 |
| Item 4. | Controls and Procedures | | 26 |
| **PART II—OTHER INFORMATION** | | | |
| Item 1A. | Risk Factors | | 27 |
| Item 6. | Exhibits | | 47 |

In this report, "Jazz Pharmaceuticals," "we," "us," and "our" refer to Jazz Pharmaceuticals, Inc. and its consolidated subsidiaries.

We own or have rights to various copyrights, trademarks, and trade names used in our business, including the following: Xyrem® (sodium oxybate) oral solution; Luvox CR® (fluvoxamine maleate) Extended-Release Capsules; and Luvox® (fluvoxamine). This report also includes other trademarks, service marks, and trade names of other companies.

2

PART I—FINANCIAL INFORMATION

Item 1.      Financial Statements.

JAZZ PHARMACEUTICALS, INC.

CONDENSED CONSOLIDATED BALANCE SHEETS

(In thousands)

(Unaudited)

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 12,230 | $ 24,903 |
| Restricted cash | 950 | 1,913 |
| Marketable securities | — | 1,004 |
| Accounts receivable, net of allowances of $227 and $176 at September 30, 2009 and December 31, 2008, respectively | 9,202 | 6,643 |
| Inventories | 4,532 | 4,788 |
| Prepaid expenses | 1,969 | 2,366 |
| Other current assets | 261 | 2,382 |
| Total current assets | 29,144 | 43,999 |
| Property and equipment, net | 1,444 | 2,514 |
| Intangible assets, net | 31,915 | 32,526 |
| Goodwill | 38,213 | 38,213 |
| Other long-term assets | 1,456 | 246 |
| Total assets | $ 102,172 | $ 117,498 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Accounts payable | $ 5,240 | $ 5,736 |
| Accrued liabilities | 21,370 | 19,024 |
| Line of credit | 3,000 | 3,875 |
| Senior secured notes (including $6,747 pertaining to related parties at December 31, 2008) | — | 118,534 |
| Purchased product rights liability | 6,000 | 14,000 |
| Deferred revenue | 2,500 | 12,322 |
| Total current liabilities | 38,110 | 173,491 |
| Deferred rent | 7 | — |
| Purchased product rights liability, noncurrent | 10,000 | — |
| Deferred revenue, noncurrent | 10,476 | 11,330 |
| Liability under government settlement, noncurrent | 10,658 | 13,063 |
| Senior secured notes (including $6,571 pertaining to related parties at September 30, 2009) | 115,363 | — |
| Common stock subject to repurchase | — | 12,492 |
| Commitments and contingencies (Note 14) | | |
| Stockholders' deficit: | | |
| Common stock | 3 | 3 |
| Additional paid-in capital | 430,852 | 407,923 |
| Accumulated other comprehensive income | — | 4 |
| Accumulated deficit | (513,297) | (500,808) |
| Total stockholders' deficit | (82,442) | (92,878) |
| Total liabilities and stockholders' deficit | $ 102,172 | $ 117,498 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

3

**JAZZ PHARMACEUTICALS, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**

**(In thousands, except per share amounts)**

**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Revenues: | | | | |
| Product sales, net | $29,992 | $ 17,022 | $ 77,789 | $ 45,757 |
| Royalties, net | 532 | 440 | 1,522 | 1,308 |
| Contract revenues | 285 | 284 | 10,854 | 854 |
| Total revenues | 30,809 | 17,746 | 90,165 | 47,919 |
| Operating expenses: | | | | |
| Cost of product sales (excluding amortization of acquired developed technology) | 2,338 | 5,525 | 6,856 | 10,619 |
| Research and development | 7,644 | 12,149 | 30,244 | 55,274 |
| Selling, general and administrative | 15,061 | 24,329 | 42,934 | 91,218 |
| Amortization of intangible assets | 2,057 | 3,487 | 5,611 | 9,454 |
| Total operating expenses | 27,100 | 45,490 | 85,645 | 166,565 |
| Income (loss) from operations | 3,709 | (27,744) | 4,520 | (118,646) |
| Interest income | 2 | 353 | 29 | 1,700 |
| Interest expense (including $296 and $288 for the three months ended September 30, 2009 and 2008, respectively, and $937 and $880 for the nine months ended September 30, 2009 and 2008, respectively, pertaining to related parties) | (5,384) | (5,355) | (17,034) | (14,377) |
| Other income (expense), net | 1 | 19 | (4) | 6 |
| Gain on sale of product rights | — | 3,918 | — | 3,918 |
| Net loss | $ (1,672) | $(28,809) | $(12,489) | $(127,399) |
| Net loss per share: | | | | |
| Basic and diluted | $ (0.05) | $ (1.07) | $ (0.42) | $ (5.12) |
| Weighted-average common shares used in computing net loss per share: | | | | |
| Basic and diluted | 30,895 | 27,025 | 29,635 | 24,895 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

**JAZZ PHARMACEUTICALS, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(In thousands)**

**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2009 | 2008 |
| **Operating activities** | | |
| Net loss | $(12,489) | $(127,399) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 1,103 | 1,760 |
| Amortization of intangible assets | 5,611 | 9,454 |
| Loss on disposal of property and equipment | 14 | 138 |
| Senior secured notes, non-cash interest expense | 1,849 | 1,435 |
| Stock-based compensation expense | 3,509 | 5,790 |
| Gain on sale of product rights | — | (3,918) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (2,559) | (1,297) |
| Inventories | 252 | (4,084) |
| Prepaid expenses and other current assets | 1,039 | (258) |
| Other assets | (274) | (341) |
| Accounts payable | (496) | 3,758 |
| Accrued liabilities | (4,902) | (5,108) |
| Deferred revenue | (10,676) | 10,052 |
| Deferred rent | 7 | — |
| Liability under government settlement | 362 | (1,428) |
| Net cash used in operating activities | (17,650) | (111,446) |
| **Investing activities** | | |
| Purchases of property and equipment | (47) | (1,665) |
| Purchases of product rights | (3,000) | (20,000) |
| Proceeds from sale of product rights | — | 5,775 |
| Decrease in restricted cash and investments | 963 | 11,941 |
| Transfer of restricted cash to marketable securities | — | (4,410) |
| Proceeds from maturities of marketable securities | 1,004 | 3,411 |
| Net cash used in investing activities | (1,080) | (4,948) |
| **Financing activities** | | |
| Proceeds from employee stock purchases and exercise of stock options | 152 | 976 |
| Net repayments of line of credit | (875) | (194) |
| Proceeds from private offerings, net of issuance costs | 6,780 | — |
| Proceeds from sale of senior secured notes and warrants, net of issuance costs | — | 38,566 |
| Repayment of senior secured notes | — | (504) |
| Proceeds from public offerings, net of issuance costs | — | 24,512 |
| Net cash provided by financing activities | 6,057 | 63,356 |
| Net decrease in cash and cash equivalents | (12,673) | (53,038) |
| Cash and cash equivalents, at beginning of period | 24,903 | 102,945 |
| Cash and cash equivalents, at end of period | $ 12,230 | $ 49,907 |
| Supplemental disclosure of non-cash investing and financing activities: | | |
| Liability for purchase of product rights | $ 5,000 | $ 21,000 |
| Warrants to purchase common stock issued in conjunction with unregistered sales of equity securities | $ 2,700 | $ — |
| Warrants to purchase common stock issued in conjunction with registered direct public offering | $ — | $ 6,400 |
| Warrants to purchase common stock issued in conjunction with senior secured notes | $ — | $ 2,000 |
| Warrants to purchase common stock issued in conjunction with equity financing facility | $ — | $ 850 |
| Common stock issued as employee bonuses | $ — | $ 999 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Table of Contents

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

**(Unaudited)**

## 1. Summary of Significant Accounting Policies

### *Basis of Presentation*

These unaudited condensed consolidated financial statements have been prepared following the requirements of the Securities and Exchange Commission, or SEC, for interim reporting. As permitted under those rules, certain footnotes and other financial information that are normally required by U.S. generally accepted accounting principles, or GAAP, can be condensed or omitted. The information included in this Quarterly Report on Form 10-Q should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2008. In the opinion of management, these condensed consolidated financial statements have been prepared on the same basis as the annual consolidated financial statements and include all adjustments, consisting only of normal recurring adjustments, considered necessary for the fair presentation of our financial position and operating results. We have evaluated and disclosed all material subsequent events through the time of filing on November 6, 2009. Certain amounts in the condensed consolidated statement of cash flows for the nine months ended September 30, 2008 have been reclassified to conform to the presentation for the nine months ended September 30, 2009. The reclassified amounts reflect the combining of the current and noncurrent portions of the liability from government settlement. The results for the three and nine months ended September 30, 2009 are not necessarily indicative of the results to be expected for the year ending December 31, 2009 or for any other interim period or for any future year. The consolidated financial statements include the accounts of Jazz Pharmaceuticals, Inc. and our wholly-owned subsidiaries, Orphan Medical, LLC, or Orphan Medical, and JPI Commercial, LLC, or JPIC, after elimination of intercompany transactions and balances.

### *Significant Risks and Uncertainties*

We have incurred significant losses from operations since our inception and as of September 30, 2009, we had cash and cash equivalents of $12.2 million.

The sufficiency of our current cash resources and our potential need for additional capital and the timing thereof will depend on many factors, including primarily the amount of revenues that we receive from sales of Xyrem and Luvox CR and our ability to use our net operating losses to offset taxes that would otherwise be due. In July 2009, we raised net proceeds of $6.8 million through a private placement and in September 2009 we borrowed $3.0 million under our amended accounts receivable line of credit. In light of the cost reduction activities we have undertaken in the past year, and our increased cash flows from product sales, we believe we will be able to fund our operations and meet all of our ongoing current financial obligations for at least the next 12 months. We have based our projection on assumptions that may prove to be wrong, including assumptions with respect to the level of revenues from product sales, and we could exhaust our available financial resources. If our assumptions are incorrect, we may be required to further reduce our operating expenses or raise additional capital.

In the third quarter of 2009, we paid $14.6 million in accrued interest to the holders of the $119.5 million principal amount of senior secured notes, or Senior Notes, which satisfied quarterly interest payments that we had not previously made and we made our quarterly interest payment of $4.5 million due on September 30, 2009. We believe that we have cured all material defaults under the agreement with the holders of the Senior Notes, or Senior Note Agreement, and that the holders of our Senior Notes no longer have the right to accelerate the repayment of the Senior Notes; however, if the holders of our Senior Notes do not agree with us, they could attempt to accelerate our obligations under the Senior Notes at any time. The holders of our Senior Notes have a first priority security interest in all of our assets other than inventory and accounts receivable. If we were not able to prevent an acceleration of the Senior Notes, we would not have sufficient cash to pay the principal amount on the Senior Notes, including a prepayment premium and any accrued but unpaid interest.

In addition, we are subject to concentrations of credit risk and concentrations of supply risk discussed below, and risks and uncertainties that are inherent in our industry which includes regulatory risk and competition, including competition from generic pharmaceutical products.

We plan to submit a new drug application, or NDA, for our JZP-6 (sodium oxybate) product candidate by the end of 2009. The NDA will require approval of the U.S. Food and Drug Administration, or FDA, prior to commercial sales. The preparation of the NDA and the regulatory approval process is expensive, time consuming and uncertain, and any denial or delay of approval could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

### *Concentration of Credit Risks*

We monitor our exposure within accounts receivable and record a reserve against uncollectible accounts receivable as necessary. We extend credit to pharmaceutical wholesale distributors and a specialty pharmaceutical distribution company, primarily in the United States, and to international distributors in the normal course of business. Customer creditworthiness is monitored and collateral is not normally required. Historically, we have not experienced significant credit losses on our accounts receivable. Our five largest customers accounted for an aggregate of approximately 97% of gross accounts receivable as of both September 30, 2009 and December 31, 2008.

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

*Concentration of Supply Risk*

We rely on certain sole suppliers for drug substance and certain sole manufacturing partners for each of our marketed products and certain of our product candidates. Any failure of these suppliers or partners to supply necessary quantities of Xyrem or Luvox CR could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts and disclosures reported in the condensed consolidated financial statements and accompanying notes. On an ongoing basis, management evaluates its estimates, including those related to revenue recognition, intangible assets, inventory reserves, accrued expenses, and stock-based compensation. Management bases its estimates on historical experience and on assumptions believed to be reasonable under the circumstances. Actual results could differ materially from those estimates.

*Revenue Recognition*

Revenues are recognized when there is persuasive evidence that an arrangement exists, delivery has occurred, the price is fixed and determinable, and collection is reasonably assured. Revenues from sales of Xyrem within the United States are recognized upon transfer of title, which occurs when our specialty pharmaceutical distributor, Express Scripts Specialty Distribution Services, Inc., or Express Scripts, removes product from our consigned inventory location at their facility for shipment to a patient. Prior to the sale of our rights to Antizol® (fomepizole) and Antizol-Vet® in August 2008, Antizol and Antizol-Vet were shipped to our wholesaler customers in the U.S. with free on board destination shipping terms, and we recognized revenues when delivery occurred. All of our international sales have customer acceptance clauses and therefore we recognize revenues when we are notified of acceptance or when the time to inspect and reject a shipment has lapsed.

Luvox CR was approved by the U.S. Food and Drug Administration, or FDA, in the first quarter of 2008 for the treatment of obsessive compulsive disorder and social anxiety disorder and we shipped initial stocking orders of product with an October 2009 expiration date to our wholesaler customers. Luvox CR is subject to rights of return six months prior to and up to twelve months after product expiration. Given our limited history of selling Luvox CR and the lengthy return policy, we are not able to reliably estimate expected returns of Luvox CR at the time of shipment, and therefore we recognize revenue when units are dispensed through prescriptions, at which point, we believe, the product is not subject to return. In order to estimate units dispensed, we purchase dispensing data from an independent prescription tracking service. We believe this data to be accurate and reliable and not subject to material adjustments. We recorded a deferred revenue liability related to shipments of Luvox CR of $1.4 million and $944,000 as of September 30, 2009 and December 31, 2008, respectively, which represents amounts paid by wholesaler customers in excess of revenue recognized, net of estimated wholesaler fees, discounts, chargebacks and certain rebates.

In the nine months ended September 30, 2009, we had recorded, as a reduction of revenues, a reserve of $1.2 million as a result of a final rule issued by the Department of Defense in March 2009 for potential rebates due for drugs sold by retail pharmacies to TRICARE beneficiaries on or after January 28, 2008. We requested a waiver from the Department of Defense for approximately $988,000 of the $1.2 million amount reserved and have not yet received a response. Of the total amount requested in our waiver, $596,000 relates to net product sales for the year ended December 31, 2008.

7

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

### Net Loss Per Common Share

Basic and diluted net loss per common share is computed using the weighted-average number of shares of common stock outstanding as follows (in thousands, except per share amounts):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Numerator: | | | | |
| Net loss | $ (1,672) | $(28,809) | $(12,489) | $(127,399) |
| Denominator: | | | | |
| Weighted-average common shares outstanding | 30,895 | 27,902 | 29,635 | 25,773 |
| Less: weighted-average common shares outstanding subject to repurchase | — | (877) | — | (878) |
| Weighted-average common shares used in computing net loss per share, basic and diluted | 30,895 | 27,025 | 29,635 | 24,895 |
| Net loss per share, basic and diluted | $ (0.05) | $ (1.07) | $ (0.42) | $ (5.12) |

The following table represents the weighted-average shares of our common stock that were excluded from the computation of diluted net loss per share for the periods presented because including them would have an anti-dilutive effect (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Warrants to purchase common stock | 3,300 | 2,904 | 3,595 | 1,756 |
| Options to purchase common stock | 2,559 | 3,855 | 2,904 | 3,662 |
| Common stock subject to repurchase | — | 877 | — | 878 |
| Restricted stock units | 35 | 84 | 42 | 104 |

As of September 30, 2009, we had options to purchase 4,787,552 shares of common stock outstanding with a weighted average exercise price of $8.97 and a weighted average remaining contractual term of 8.0 years and 28,197 restricted stock units outstanding with a weighted average remaining contractual term of 1.4 years which had been granted to employees and members of our board of directors. As of September 30, 2009, we also had warrants outstanding as follows:

| Warrants issued in conjunction with | Shares | Expiration Date | Exercise Price |
|---|---|---|---|
| $80.0 million Senior Notes | 785,728 | June 2012 | $20.36 |
| $40.0 million Senior Notes | 562,192 | March 2013 | $14.23 |
| Equity financing facility | 220,000 | November 2013 | $11.20 |
| Public offering | 1,731,724 | July 2014 | $ 7.37 |
| Private offering | 947,867 | July 2016 | $ 4.00 |

### Recently Adopted Accounting Standards

In April 2009, the Financial Accounting Standards Board, or the FASB, issued authoritative guidance under which disclosures about fair value of financial instruments are required for interim reporting periods of publicly traded companies as well as in annual financial statements. The guidance require disclosures in summarized financial information at interim reporting periods and is effective for interim reporting periods ending after June 15, 2009. Our adoption of the guidance did not have an impact on our results of operations and financial position.

In April 2009, the FASB issued authoritative guidance which amends the other-than-temporary impairment guidance for debt securities by requiring an entity to evaluate whether it has the intent to sell the debt security or more likely than not will be required to sell the debt security before its anticipated recovery. If either of these conditions is met, the entity must recognize an other-than-temporary impairment. Additional disclosures are required for interim and annual periods about securities in unrealized loss positions for which an other-than-temporary impairment has or has not been recognized. The guidance is effective for interim reporting periods ending after June 15, 2009. Our adoption of the guidance did not have an impact on our results of operations and financial position.

In April 2009, the FASB issued additional authoritative guidance for estimating fair value when the volume and level of activity for the asset or liability have significantly decreased and for identifying circumstances that indicate a transaction is not orderly (i.e. distressed or forced). The guidance is effective for interim reporting periods ending after June 15, 2009. Our adoption of the guidance did not have an impact on our results of operations and financial position.

8

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

In May 2009, the FASB issued authoritative guidance that requires an entity to disclose the date through which the entity has evaluated subsequent events and whether that evaluation date is the date financial statements are issued (for public entities) or the date the financial statements were available to be issued (for nonpublic entities that do not widely distribute their financial statements). The guidance is effective for interim reporting periods ending after June 15, 2009. Our adoption of the guidance did not have an impact on our results of operations and financial position.

In October 2009, the FASB issued authoritative guidance which amends the revenue recognition guidance to require companies to allocate revenue in multiple-element arrangements based on an element's estimated selling price if vendor-specific or other third-party evidence is not available. The guidance is effective beginning January 1, 2011. Earlier adoption is permitted. We are currently evaluating the effect that the adoption of this guidance will have on our results of operations and financial position.

**2. Inventories**

The components of inventories were as follows (in thousands):

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Raw materials | $ 2,382 | $ 2,175 |
| Work in process | 662 | 156 |
| Finished goods(1) | 1,488 | 2,457 |
| Total | $ 4,532 | $ 4,788 |

(1) Includes deferred cost of sales of $375,000 and $495,000 at September 30, 2009 and at December 31, 2008, respectively, for which the related revenue has been deferred.

**3. Goodwill and Intangible Assets**

The gross carrying amount of goodwill was $38.2 million at both September 30, 2009 and December 31, 2008. The gross carrying amounts and net book values of our intangible assets were as follows (in thousands):

|  | September 30, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Book Value | Gross Carrying Amount | Accumulated Amortization | Net Book Value |
| Developed technology—Xyrem | $39,700 | $ (17,799) | $21,901 | $39,700 | $ (14,670) | $25,030 |
| Developed technology—Luvox CR | 9,700 | (1,692) | 8,008 | 4,700 | — | 4,700 |
| Agreements not to compete | 3,900 | (3,328) | 572 | 3,900 | (2,743) | 1,157 |
| Trademarks | 2,600 | (1,166) | 1,434 | 2,600 | (961) | 1,639 |
| Total | $55,900 | $ (23,985) | $31,915 | $50,900 | $ (18,374) | $32,526 |

During the nine months ended September 30, 2009, we recorded an addition of $5.0 million to the gross carrying amount of the intangible asset related to Luvox CR developed technology. See Note 9 for additional information regarding the increase in the intangible asset.

In response to a notice we received in August 2009 of the filing of an abbreviated new drug application with the FDA by a third party for a generic version of Luvox CR, we tested the intangible asset related to Luvox CR developed technology for impairment as of September 30, 2009. Based on the estimated undiscounted cash flows related to the asset, we determined that the asset was not impaired but that its remaining estimated useful life should be shortened. As of September 30, 2009, the carrying value of the asset is being amortized over its remaining estimated useful life of 2.7 years.

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

Future amortization costs per year for our existing intangible assets other than goodwill as of September 30, 2009 were estimated as follows (in thousands):

| Year Ending December 31, | Estimated Amortization Expense |
|---|---|
| 2009 (remaining portion) | $ 2,057 |
| 2010 | 7,825 |
| 2011 | 7,448 |
| 2012 | 5,696 |
| 2013 | 4,445 |

## 4. Fair Value Measurement

Cash, cash equivalents, restricted cash and marketable securities, all of which are considered available-for-sale, consisted of the following as of September 30, 2009 and December 31, 2008 (in thousands):

| | September 30, 2009 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| Cash | $ 8,108 | $ — | $ — | $ 8,108 |
| Money market funds | 5,072 | — | — | 5,072 |
| Total | $ 13,180 | $ — | $ — | $ 13,180 |

| | December 31, 2008 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| Cash | $ 1,161 | $ — | $ — | $ 1,161 |
| Obligations of U.S. government agencies | 1,000 | 4 | — | 1,004 |
| Other debt securities, primarily money market funds | 25,655 | — | — | 25,655 |
| Total | $ 27,816 | $ 4 | $ — | $ 27,820 |

Since inception, there have been no material realized gains or losses on cash equivalents or marketable securities.

All marketable securities, which consist of obligations of U.S. government agencies, held as of December 31, 2008, had contractual maturities of less than one year. The marketable securities held at December 31, 2008 had no unrealized losses.

The following tables summarize, by major security type, our financial assets that are measured at fair value on a recurring basis and are categorized using the fair value hierarchy (in thousands):

| | September 30, 2009 | | | |
|---|---|---|---|---|
| | Cash | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total Estimated Fair Value |
| Cash | $8,108 | $ — | $ — | $ 8,108 |
| Money market funds | — | 5,072 | — | 5,072 |
| Total | $8,108 | $ 5,072 | $ — | $ 13,180 |
| Amounts classified as cash and cash equivalents | | | | $ 12,230 |
| Amounts classified as restricted cash | | | | 950 |
| Total | | | | $ 13,180 |

10

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

|  | Cash | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total Estimated Fair Value |
|---|---|---|---|---|
|  | | December 31, 2008 | | |
| Cash | $1,161 | $ — | $ — | $ 1,161 |
| Obligations of U.S. government agencies | — | — | 1,004 | 1,004 |
| Money market funds | — | 25,655 | — | 25,655 |
| Total | $1,161 | $ 25,655 | $ 1,004 | $ 27,820 |
| Amounts classified as cash and cash equivalents | | | | $ 24,903 |
| Amounts classified as restricted cash | | | | 1,913 |
| Amounts classified as marketable securities | | | | 1,004 |
| Total | | | | $ 27,820 |

The fair value of our Senior Notes was estimated using a discounted cash flow analysis based on our estimated incremental borrowing rates for similar types of borrowing arrangements. As of September 30, 2009, the carrying amount of our Senior Notes was $115.4 million and the estimated fair value was $120.9 million. As of December 31, 2008, the carrying value of our Senior Notes was $118.5 million (including accrued interest). It was not practicable to estimate the fair value of our Senior Notes at December 31, 2008 because it was difficult to estimate the timing of cash flows under the Senior Notes and an appropriate discount rate due to the then existing default under the Senior Note Agreement.

## 5. Debt Obligations

### Senior Secured Notes

We did not timely make the quarterly interest payment of $4.5 million that was due on December 31, 2008 or the quarterly interest payments of $5.1 million due on each of June 30, 2009 and March 31, 2009 to the holders of the Senior Notes which constituted events of default under our Senior Note Agreement and permitted LB I Group Inc., as the holder of more than 50% of the principal amount outstanding, to accelerate payment of the Senior Notes. As a result of the defaults, interest on the Senior Notes accrued on the outstanding principal amount at an annual default rate of 17% (instead of 15%) effective January 1, 2009. On July 7, 2009, we paid $14.6 million to the holders of the Senior Notes which represented all of the accrued and unpaid interest as of June 30, 2009. In addition, we had an event of default related to a requirement under the Senior Notes to maintain a restricted cash balance. This requirement was suspended as of July 7, 2009 based on the level of our annualized net sales as of June 30, 2009. On September 29, 2009, we paid the quarterly interest payment of $4.5 million to the holders of the Senior Notes which represented interest calculated at the default rate of 17% for the period from July 1 to July 7, 2009, and at the non-default rate of 15% for the remainder of the quarter.

We believe that we have cured all material defaults under the Senior Note Agreement and that the holders of the Senior Notes no longer have the right to accelerate repayment of the Senior Notes; however, if the holders of our Senior Notes do not agree with us, they could attempt to accelerate our obligations under the Senior Notes at any time. The Senior Notes are due on June 24, 2011.

### Line of Credit

On September 30, 2009, we amended our existing accounts receivable line of credit agreement and borrowed $3.0 million. Pursuant to the terms of the amended agreement, we may borrow up to 75% of eligible accounts receivable up to a maximum of $3.0 million in borrowings subject to certain limitations. The maximum may be increased to $15.0 million at the lender's discretion. Borrowings under the line of credit are secured by a first priority security interest in our accounts receivable and inventory and bear interest at a variable rate which was 6.5% at September 30, 2009. In addition, a minimum monthly interest payment of $14,000 and a collateral monitoring fee up to 0.15% per month on the outstanding principal amount are payable. Borrowing under our line of credit had previously been suspended as a result of the events of default under our Senior Note Agreement.

## 6. Common Stock

### Common Stock Subject to Repurchase

In February 2004, each of our then executive officers entered into an employment agreement with us which permitted the executive officer or the officer's estate to require us to repurchase vested shares at fair market value upon termination of the executive officer's employment due to death or disability. The fair value of vested shares held by our executive officers as of the date of such agreements, or Agreement Date Fair Value, was recorded as common stock subject to repurchase and following the date of such

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

agreements, the Agreement Date Fair Value of shares held by our executive officers was recorded as common stock subject to repurchase as such shares vested. In February 2009, all outstanding employment agreements expired and as a result, we reclassified the balance of $12.5 million from common stock subject to repurchase to additional paid-in capital.

*Employee Stock Purchase Plan (ESPP), Stock Option Exercises and Vested Restricted Stock Units*

In May 2009, we issued 149,939 shares of our common stock for proceeds of $127,000 under our ESPP.

On September 30, 2009, the Compensation Committee of our Board of Directors approved an increase in the number of shares available for issuance under our ESPP during any six month purchase period. Prior to the change, the aggregate number of shares available for issuance was 150,000 in any six month purchase period. Beginning with the purchase period that began on June 1, 2009, and for the following three purchase periods, the aggregate number of shares available for issuance will be 260,000 for each of those six month purchase periods. Subsequently, the aggregate number of shares available for issuance in any six month purchase period will be 175,000.

We issued 17,237 shares of common stock as a result of stock option exercises and the vesting of restricted stock units during the nine months ended September 30, 2009 for proceeds of $25,000.

*Unregistered Sales of Equity Securities*

On July 7, 2009, we completed a private placement of units consisting of an aggregate of 1,895,734 shares of common stock and warrants to purchase an aggregate of 947,867 shares of our common stock at a price of $3.6925 per unit for net proceeds of $6.8 million. The warrants are exercisable for $4.00 per share of common stock at any time through July 6, 2016. However, under the terms of a net operating loss preservation lock-up agreement, or NOL Lock-Up Agreement, the holders of these warrants agreed to restrictions on their ability to exercise the warrants until the earlier of 1) June 24, 2011; 2) immediately prior to certain change in control transactions; or 3) the date on which all stockholders that are a party to the NOL Lock-Up Agreement or we terminate the NOL Lock-up Agreement. The fair value of the warrants was estimated using the Black-Scholes option pricing model with the following assumptions: a risk free rate of 3.12%, volatility of 92%, an expected term of 7.0 years and an expected dividend yield of 0%. The estimated fair value of the warrants of $2.7 million was recorded in stockholders' deficit. Pursuant to the terms of an investor rights agreement dated July 7, 2009 that we entered into with the investors in the private placement, we agreed to file a registration statement under the Securities Act registering the resale of all 2,843,601 shares held by or issuable to such investors. In the event that a registration statement registering the resale of such shares has not been declared effective by the SEC on or prior to November 15, 2009, we may be subject to the payment of liquidated damages to such investors. No underwriting discounts or commissions, placement agent fees or similar fees were payable in connection with the issuance.

**7. Comprehensive Income (Loss)**

Comprehensive income (loss) includes net income (loss) and all changes in stockholders' deficit during a period, except for those changes resulting from investments by stockholders or distributions to stockholders. The difference between comprehensive loss and net loss during both the nine months ended September 30, 2009 and 2008 represented the change in unrealized gains/losses on available-for-sale securities and was not significant.

**8. Segment Information**

We have determined that we operate in one business segment, which is the development and commercialization of pharmaceutical products.

The following table presents a summary of product sales, net (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2009** | **2008** | **2009** | **2008** |
| Xyrem | $25,038 | $14,234 | $65,119 | $37,980 |
| Luvox CR(1) | 4,954 | 1,957 | 12,670 | 2,671 |
| Antizol and Antizol-Vet(2) | — | 831 | — | 5,106 |
| Total | $29,992 | $17,022 | $77,789 | $45,757 |

(1)  Includes sales of the active pharmaceutical ingredient in Luvox CR of $126,000 and $253,000 in the three and nine months ended September 30, 2008, respectively.

(2)  We sold our rights to Antizol and Antizol-Vet in August 2008.

12

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

The following table presents a summary of total revenues including net product sales, royalties and contract revenues attributed to domestic and foreign sources (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| United States | $29,761 | $16,401 | $76,746 | $44,286 |
| Europe | 1,044 | 720 | 13,066 | 2,148 |
| All other | 4 | 625 | 353 | 1,485 |
| Total | $30,809 | $17,746 | $90,165 | $47,919 |

The following table presents a summary of total revenues from significant customers as a percentage of our total revenues:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Express Scripts | 81% | 79% | 71% | 78% |
| UCB Pharma Limited(1) | * | * | 14% | * |

(1)    During the nine months ended September 30, 2009, we recognized a $10.0 million nonrefundable milestone payment (received from UCB Pharma Limited, or UCB, in July 2008) as revenue. See Note 10 for additional information.

*    Represented less than 10% of our total revenues.

### 9. In-Licensing Agreement

In February 2009, we amended our product license agreement with Solvay relating to the rights to market Luvox CR and Luvox in the U.S. such that the then existing $14.0 million current payment obligation, a $5.0 million obligation related to a milestone of uninterrupted supply of Luvox CR and future royalty and other obligations were replaced with an obligation to pay a total of $19.0 million, of which $3.0 million has been paid ($1.0 million was paid in each of March, August and September 2009). As a result of the amendment, we recorded a $5.0 million liability and a corresponding increase in intangible assets in the nine months ended September 30, 2009 for our continuing right to market Luvox CR and Luvox in the U.S. In addition, we agreed to pay Solvay $5.0 million in 2015 if net sales of Luvox CR reach a cumulative amount of $100.0 million on or before December 31, 2014 and no AB-rated generic version of Luvox CR has been or is being sold in the U.S. as of December 31, 2014. We will recognize this obligation as if and when it is probable that these conditions will be met. Under the amendments, future cash payments are equal to the carrying value of our obligation and, as a result, we did not recognize a gain and we did not record any expense related to the amended agreement.

In June 2009, we amended our agreement with Solvay to defer payments due in 2009. The following table presents a summary of our obligations as of September 30, 2009 (in thousands):

| Amount Due | Due in |
|---|---|
| $    3,000 | 2009 |
| 4,000 | 2010 |
| 4,500 | 2011 |
| 4,500 | 2012(1) |
| $  16,000 | Total |

(1)    The $4.5 million amount due in 2012 assumes all previous payments are made when due. If payments are not made when due, the amount due in 2012 will be $5.0 million.

As of September 30, 2009, $6.0 million of the remaining amount due under the amended agreement was reported as a current liability and $10.0 million was reported as a noncurrent liability.

### 10. Collaboration and License Agreements

Under the terms of our agreement with UCB, UCB has the right to market Xyrem for the treatment of narcolepsy and JZP-6 for the treatment of fibromyalgia in 54 countries outside of the United States. During the nine months ended September 30, 2009, upon the completion of the last patient in our second Phase III pivotal clinical trial of sodium oxybate for the treatment of fibromyalgia, we

13

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

recognized as revenue a $10.0 million nonrefundable milestone payment we received from UCB in July 2008 that was previously recorded as deferred revenue. In addition, we recognized contract revenues of $280,000 in each of the three months ended September 30, 2009 and 2008 and $840,000 in each of the nine months ended September 30, 2009 and 2008 related to previously deferred upfront payments which are being recognized as contract revenue ratably through 2019, the expected performance period under the agreement.

**11. Stock-Based Compensation**

Stock-based compensation expense related to stock options, restricted stock units, phantom shares and awards under our ESPP was as follows (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Selling, general and administrative | $ 1,039 | $ 1,284 | $ 2,545 | $ 4,236 |
| Research and development | 262 | 393 | 875 | 1,440 |
| Cost of product sales | 12 | 11 | 89 | 114 |
| Total | $ 1,313 | $ 1,688 | $ 3,509 | $ 5,790 |

Employee stock-based compensation expenses of $27,000 and $31,000 as of September 30, 2009 and December 31, 2008, respectively, were capitalized as a component of inventories and included in the condensed consolidated balance sheets.

*Stock Options*

During the three and nine months ended September 30, 2009, we granted options to employees and to members of our board of directors to purchase 109,900 and 2,679,000 shares of common stock, respectively. The weighted-average grant date fair value per share of options granted during the three months ended September 30, 2009 and 2008 was $4.02 and $4.48, respectively, and $1.06 and $4.94 for options granted during the nine months ended September 30, 2009 and 2008, respectively. The fair value of options granted was estimated at the grant date using the Black-Scholes option pricing model with the following assumptions:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Weighted-average volatility | 85% | 60% | 92% | 59% |
| Weighted-average expected term (years) | 5.7 | 5.9 | 6.1 | 6.1 |
| Range of risk-free rates | 2.6-3.1% | 3.0-3.4% | 1.8-3.1% | 2.7-3.4% |
| Expected dividend yield | 0.0% | 0.0% | 0.0% | 0.0% |

*Phantom Shares*

In August 2009, certain directors elected to defer receipt of their annual retainer fees to be paid in our common stock under our Directors' Deferred Compensation Plan, and we recorded phantom shares equivalent to 38,432 shares of our common stock with a market value per share of $6.33. Total compensation cost related to phantom shares of common stock credited to the directors' phantom stock accounts was approximately $243,000 for the three and nine months ended September 30, 2009 and $210,000 for the three and nine months ended September 30, 2008.

*ESPP*

On September 30, 2009, the Compensation Committee of our Board of Directors approved an increase in the number of shares available for issuance under our ESPP for the current purchase period and for the next three six-month purchase periods. The total compensation cost related to the increase not yet recognized as of September 30, 2009, was $3.0 million and will be recognized over the next 1.7 years.

**12. Sale of Product Rights**

In August 2008, we sold our rights to and interests in Antizol and Antizol-Vet for cash consideration of $5.5 million and existing inventory, raw materials and work in process for cash consideration of $275,000. In connection with this transaction, we recognized a gain on sale of product rights of $3.9 million. In addition, for the next three years, we are entitled to receive annual product payments equal to a specified percentage of net sales of Antizol and Antizol-Vet if sales reach certain thresholds, a portion of which would be payable to certain holders of the Senior Notes as partial prepayment of the outstanding principal of the Senior Notes.

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

**13. Restructuring Expense**

As part of a strategic decision to focus on our commercial products, JZP-6, our late-stage product candidate, and lower operating expenses, we recorded restructuring charges in 2008 totaling $3.5 million of which $708,000 was recorded as part of research and development expense and the remainder included in selling, general and administrative expense.

The following table represents adjustments made to our restructuring charges (in thousands):

| | Employee Expenses(1) | Auto Lease Expenses(2) | Facility Expenses(3) | Total |
|---|---|---|---|---|
| Cumulative charge as of December 31, 2008 | $ 2,139 | $ 374 | $ 950 | $ 3,463 |
| Adjustment to charges incurred in prior periods | (75) | (57) | — | (132) |
| Cumulative charge as of March 31, 2009 | $ 2,064 | $ 317 | $ 950 | $ 3,331 |
| Adjustment to charges incurred in prior periods | (8) | (46) | — | (54) |
| Cumulative charge as of June 30, 2009 | $ 2,056 | $ 271 | $ 950 | $ 3,277 |

The following table represents activity in our restructuring accrual (in thousands):

| | Employee Expenses(1) | Auto Lease Expenses(2) | Facility Expenses(3) | Total |
|---|---|---|---|---|
| Accrual as of December 31, 2008 | $ 979 | $ 374 | $ 120 | $ 1,473 |
| Cash payments made during the three months ended March 31, 2009 | (885) | (271) | (70) | (1,226) |
| Adjustment to charges incurred in prior periods | (75) | (57) | — | (132) |
| Accrual as of March 31, 2009 | $ 19 | $ 46 | $ 50 | $ 115 |
| Cash payments made during the three months ended June 30, 2009 | (11) | — | (50) | (61) |
| Adjustment to charges incurred in prior periods | (8) | (46) | — | (54) |
| Accrual as of June 30, 2009 | $ — | $ — | $ — | $ — |

(1)  Includes employee severance, health insurance premium and outplacement assistance expenses.
(2)  Includes auto lease termination expenses.
(3)  Includes excess facilities, property and equipment expenses.

There was no restructuring accrual activity during the three months ended September 30, 2009.

**14. Commitments and Contingencies**

*Indemnification*

In the normal course of business, we enter into contracts and agreements that contain a variety of representations and warranties and provide for general indemnification, including indemnification associated with product liability or infringement of intellectual property rights. Our exposure under these agreements is unknown because it involves future claims that may be made against us that have not yet been made. To date, we have not paid any claims or been required to defend any action related to these indemnification obligations except as disclosed in our prior public filings.

We have agreed to indemnify our directors, executive officers and vice presidents for losses and costs incurred in connection with certain events or occurrences, including advancing money to cover certain costs, subject to certain limitations. The maximum potential amount of future payments we could be required to make under this indemnification is unlimited; however, we maintain insurance policies that may limit our exposure and may enable us to recover a portion of any future amounts paid. Assuming the applicability of coverage, the willingness of the insurer to assume coverage, and subject to certain retention, loss limits and other policy provisions, we believe that the fair value of these indemnification obligations is not material. Accordingly, we have not recognized any liabilities relating to these obligations as of September 30, 2009 and December 31, 2008. We cannot assure you that the covering insurers will not attempt to dispute the validity, applicability, or amount of coverage without expensive litigation against these insurers, in which case we may incur substantial liabilities as a result of these indemnification obligations.

*Amendment to Lease Agreement*

In June 2009, we amended the lease for our corporate office building located in Palo Alto, California. Under the amendment, which was effective September 1, 2009, the term of the lease has been extended by 36 months and the monthly base rent will change from its current rate of $67,964 per month to the following: $65,772 per month in the first twelve months, $74,542 per month in the second twelve months and $78,926 per month in the third twelve months. The lease is renewable through 2016, at our option. In addition to these lease payments, we are obligated to pay for operating expenses for the leased property.

15

Table of Contents

**JAZZ PHARMACEUTICALS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

*Legal Proceedings*

From time to time we are involved in legal proceedings arising in the ordinary course of business. We currently have no material ongoing litigation and are not aware of any claims that could lead to litigation that could have, individually or in the aggregate, a material adverse effect on our results of operations or financial condition.

16

Table of Contents

**Item 2.**    **Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read in conjunction with the condensed consolidated financial statements and notes to condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. This discussion contains forward looking statements that involve risks and uncertainties. When reviewing the discussion below, you should keep in mind the substantial risks and uncertainties that characterize our business. In particular, we encourage you to review the risks and uncertainties described in Part II Item 1A "Risk Factors" included elsewhere in this report. These risks and uncertainties could cause actual results to differ materially from those projected in forward-looking statements contained in this report or implied by past results and trends. Forward-looking statements are statements that attempt to forecast or anticipate future developments in our business and we encourage you to review the examples of our forward-looking statements under the heading "Cautionary Note Regarding Forward-Looking Statements" that appears at the end of this discussion. These statements, like all statements in this report, speak only as of their date (unless another date is indicated), and we undertake no obligation to update or revise these statements in light of future developments.*

**Overview**

We are a specialty pharmaceutical company focused on developing and commercializing innovative products to meet unmet medical needs in neurology and psychiatry. Our goal is to build a broad portfolio of products through a combination of internal development, acquisition and in-licensing activities, and to utilize our specialty sales force to promote our products in our target markets. We apply novel formulations and drug delivery technologies to known drug compounds, and to compounds with the same mechanism of action or similar chemical structure as marketed products, to improve patient care by, among other things, improving efficacy, reducing adverse side effects or increasing patient compliance relative to existing therapies. Since our inception in 2003, we have built a commercial operation and assembled a portfolio of products and product candidates that currently includes two marketed products, one product candidate in late Phase III clinical development and several product candidates in various stages of clinical development.

Our marketed products and late-stage product candidate are:

- *Xyrem (sodium oxybate) oral solution*. Xyrem is the only product approved by the U.S. Food and Drug Administration, or FDA, for the treatment of both excessive daytime sleepiness and cataplexy in patients with narcolepsy. Narcolepsy is a chronic neurologic disorder caused by the brain's inability to regulate sleep-wake cycles. According to the National Institutes of Health, 150,000 or more individuals in the U.S. are affected by narcolepsy. We promote Xyrem in the U.S. for its FDA-approved indications to sleep specialists, neurologists, pulmonologists and psychiatrists through our specialty sales force. We have significantly increased U.S. sales of Xyrem since acquiring the rights to Xyrem in June 2005. We have licensed the rights to commercialize Xyrem in 54 countries outside of the U.S. to UCB Pharma Limited, or UCB, and in Canada to Valeant Canada Limited, or Valeant. UCB currently markets Xyrem in 14 countries.

- *Luvox CR (fluvoxamine maleate) Extended-Release Capsules*. Once-Daily Luvox CR was approved by the FDA for the treatment of both obsessive compulsive disorder and social anxiety disorder on February 28, 2008. We began promoting Luvox CR through our specialty sales force in April 2008. Luvox CR is a once-daily extended-release formulation of fluvoxamine, a selective serotonin reuptake inhibitor, or SSRI. According to the National Institute of Mental Health, obsessive compulsive disorder and social anxiety disorder affect approximately 2.2 million and 15 million adults in the U.S., respectively. Luvox CR was developed by Solvay Pharmaceuticals, Inc., or Solvay, in collaboration with Elan Pharma International Limited, or Elan. We obtained the exclusive rights to market and distribute Luvox CR in the U.S. from Solvay in January 2007. Solvay retained the rights to market and distribute Luvox CR outside of the U.S.

- *JZP-6 (sodium oxybate)*. We are developing sodium oxybate, the active pharmaceutical ingredient in Xyrem, for the treatment of fibromyalgia. According to the American College of Rheumatology, between two and four percent of the U.S. population suffers from fibromyalgia. The program includes two Phase III pivotal clinical trials and a long term safety trial. In November 2008 and June 2009, we announced positive top-line results from our first and second Phase III pivotal clinical trials, respectively. The two randomized, double-blind, placebo-controlled studies demonstrated that sodium oxybate significantly decreased pain and fatigue and improved daily function and patient global impression of change, in patients with fibromyalgia. We plan to submit a new drug application, or NDA, for JZP-6 by the end of 2009. If our NDA is approved by the FDA, we expect to market JZP-6 in the U.S. to specialists who treat fibromyalgia patients, through an expanded specialty sales force and/or in partnerships with third parties. We have granted UCB the commercialization rights to JZP-6 in 54 countries outside of the U.S.

Our other product candidates in clinical development are JZP-8 (intranasal clonazepam), being developed for the treatment of recurrent acute repetitive seizures in epilepsy patients who continue to have seizures while on stable anti-epileptic regimens, JZP-4 (elpetrigine), being developed for the treatment of epilepsy and bipolar disorder, and JZP-7 (ropinirole gel), being developed for the treatment of restless legs syndrome. We do not anticipate significant additional development progress on JZP-8, JZP-4 or JZP-7 unless or until we partner a program or otherwise obtain additional funding that we believe is sufficient to continue a program's development.

17

Table of Contents

We did not timely make the quarterly interest payment of $4.5 million that was due on December 31, 2008 or the quarterly interest payments of $5.1 million due on each of June 30, 2009 and March 31, 2009 to the holders of the $119.5 million principal amount of senior secured notes, or the Senior Notes, which constituted events of default under our agreement with the holders of the Senior Notes, or Senior Note Agreement, and permitted LB I Group Inc., as the holder of more than 50% of the principal amount outstanding, to accelerate payment of the Senior Notes. As a result of the default, interest on the Senior Notes accrued on the outstanding principal amount at an annual default rate of 17% (instead of 15%) effective January 1, 2009. On July 7, 2009, we paid $14.6 million to the holders of the Senior Notes which represented all of the accrued and unpaid interest as of June 30, 2009. On September 29, 2009, we paid our quarterly interest payment of $4.5 million to the holders of the Senior Notes which represented interest calculated at the default rate of 17% for the period from July 1 to July 7, 2009, and at the non-default rate of 15% for the remainder of the quarter.

On July 7, 2009, we completed a private placement of units consisting of 1,895,734 shares of common stock and warrants to purchase 947,867 shares of our common stock at a price of $3.6925 per unit, for net proceeds of $6.8 million.

### Revenues

*Product Sales, Net*

The following is a summary of our product sales, net:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | (In thousands) | | | |
| Xyrem | $25,038 | $14,234 | $65,119 | $37,980 |
| Luvox CR(1) | 4,954 | 1,957 | 12,670 | 2,671 |
| Antizol and Antizol-Vet(2) | — | 831 | — | 5,106 |
| Total | $29,992 | $17,022 | $77,789 | $45,757 |

(1)   Includes sales of the active pharmaceutical ingredient in Luvox CR of $126,000 and $253,000 in the three and nine months ended September 30, 2008, respectively.

(2)   We sold our rights to Antizol® (fomepizole) and Antizol-Vet® in August 2008.

*Xyrem (sodium oxybate) oral solution.* Revenues from sales of Xyrem primarily represent sales in the U.S. to Express Scripts. Revenues from international sales of Xyrem under our agreements with UCB and Valeant have not been material. The FDA has granted Xyrem orphan drug exclusivity in the U.S. for both excessive daytime sleepiness and cataplexy in patients with narcolepsy. This provided marketing exclusivity in the U.S. until July 2009 for the cataplexy indication and provides marketing exclusivity in the U.S. until November 2012 for the excessive daytime sleepiness indication. In addition to orphan drug exclusivity, Xyrem is covered by two formulation patents that are listed in the FDA's approved drug products with therapeutic equivalence evaluation document, or Orange Book. The patents will expire in 2020. An additional process patent that covers the product is not listed in the Orange Book and expires in 2019.

*Luvox CR (fluvoxamine maleate) extended release capsules.* Revenues from sales of Luvox CR primarily represent product dispensed through prescriptions in the United States. Luvox CR has three years of marketing exclusivity beginning on February 28, 2008, the date the product was approved by the FDA. In addition, a U.S. patent covering the orally administered formulation of extended-release fluvoxamine, requiring the release of fluvoxamine over a period of not less than 12 hours, was issued to Elan and is listed in the FDA's Orange Book. The patent expires in 2020.

*Antizol (fomepizole).* Revenues from sales of Antizol in the U.S. primarily represent sales to pharmaceutical wholesalers. We sold our rights to and interests in Antizol and Antizol-Vet, along with the associated product registrations, commercial inventory and trademarks, for $5.8 million and recorded a gain of $3.9 million in the third quarter of 2008.

18

Table of Contents

*Royalties, Net*

We receive royalties primarily from international distributors of our products, typically based on their net sales of our products. Royalty income was $532,000 and $440,000 in the three months ended September 30, 2009 and 2008, respectively, and $1.5 million and $1.3 million in the nine months ended September 30, 2009 and 2008, respectively. Although we do not expect royalty revenues to comprise a substantial portion of our revenues, we expect royalty revenues to increase as sales of Xyrem by UCB increase.

*Contract Revenues*

Almost all of our contract revenues consist of upfront or milestone payments received from UCB. During the nine months ended September 30, 2009, upon the completion of the last patient in our second Phase III pivotal clinical trial of sodium oxybate for the treatment of fibromyalgia, we recognized as revenue a $10.0 million nonrefundable milestone payment we received from UCB in July 2008 that was previously recorded as deferred revenue. In addition, we recognized contract revenues of $280,000 in each of the three months ended September 30, 2009 and 2008 and $840,000 in each of the nine months ended September 30, 2009 and 2008 related to previously deferred upfront payments which are being recognized as contract revenue ratably through 2019, the expected performance period under the agreement.

*Research and Development Expenses*

Conducting a significant amount of research and development has been central to our business model. Since our formation in 2003 through September 30, 2009, we incurred approximately $288.8 million in research and development expenses. In the latter part of 2008, in order to preserve our cash resources, we significantly curtailed our investment in research and development programs other than JZP-6. Our ability to invest in research and development is dependent upon our obtaining additional cash resources.

Our research and development expenses consisted of expenses incurred in identifying, developing and testing our product candidates. These expenses consisted primarily of fees paid to contract research organizations and other third parties to assist us in managing, monitoring and analyzing our clinical trials, clinical trial costs paid to sites and investigators' fees, costs of non-clinical studies, including toxicity studies in animals, costs of contract manufacturing services, costs of materials used in clinical trials and non-clinical studies, fees paid to third parties for development candidates or drug delivery or formulation technologies that we have licensed, allocated expenses such as facilities and information technology that support our research and development activities, and related personnel expenses, including stock-based compensation. Research and development costs are expensed as incurred, including payments made under our license agreements for product candidates in development.

We designate development projects to which we have allocated significant research and development resources with the term "JZP" and a unique number. Earlier-stage development and product lifecycle extension projects are included in "Terminated and other projects" in the following table. Early product concept feasibility studies and other research activities are included in "R&D support" in the following table. The expenditures summarized in the following table reflect costs directly attributable to each development candidate and to our "Terminated and other projects." We do not allocate salaries, benefits or other indirect costs to our development candidates or "Terminated and other projects," but include these costs in "R&D support" in the following table. The following table summarizes our research and development expenses for the nine months ended September 30, 2009 and for JZP projects currently under development and Luvox CR from project inception through September 30, 2009 (in thousands):

| | Project Inception to September 30, 2009 | | Nine Months Ended September 30, 2009 | |
|---|---|---|---|---|
| JZP-6 | $ | 92,399 | $ | 19,975 |
| JZP-4 | | 22,189 | | 68 |
| Luvox CR(1) | | 9,676 | | — |
| JZP-7 | | 8,497 | | 694 |
| JZP-8 | | 6,634 | | 339 |
| Terminated and other projects | | | | 312 |
| R&D support | | | | 8,856 |
| Total | | | $ | 30,244 |

(1)   Our research and development expenses for Luvox CR consisted primarily of expenses in connection with the scale-up for commercial manufacturing of Luvox CR, including the cost of inventory manufactured prior to FDA approval on February 28, 2008. Expenses subsequent to FDA approval were either expensed as part of cost of product sales as a period expense or capitalized in inventory.

The process of developing and obtaining FDA approval of products is costly and time consuming. Development activities and clinical trials can take years to complete, and failure can occur any time during the clinical trial process. Although we design our development programs to mitigate risk, the successful development of our product candidates is highly uncertain. Development

19

timelines, probability of success and development costs vary widely among product candidates. As a result, we are unable to determine the time and completion costs related to the development of our product candidates or estimate when, or to what extent, we will generate revenues from the commercialization and sale of any of our product candidates.

**Critical Accounting Policies and Significant Estimates**

To understand our financial statements, it is important to understand our critical accounting policies and estimates. The preparation of our financial statements in conformity with United States generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates and assumptions are required in the determination of revenue recognition, in particular related to our agreement with UCB, sales deductions for estimated specialty distributor and wholesaler fees, prompt payment discounts, Medicaid and TRICARE rebates, chargebacks, customer rebates, and royalties. Significant estimates and assumptions are also required to determine whether to capitalize intangible assets, the amortization periods for identifiable intangible assets, the potential impairment of goodwill and other intangible assets, the determination of excess and obsolete inventory reserves, stock-based compensation and accrued expenses. Some of these judgments can be subjective and complex, and, consequently, actual results may differ from these estimates. For any given individual estimate or assumption we make, there may also be other estimates or assumptions that are reasonable. Although we believe our estimates and assumptions are reasonable, they are based upon information available at the time the estimates and assumptions were made.

Our critical accounting policies and significant estimates are detailed in our Annual Report on Form 10-K for the year ended December 31, 2008. Other than the estimates described below, our critical accounting policies and significant estimates have not changed substantially from those previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2008.

For information on additional significant estimates and assumptions please see the "Liquidity and Capital Resources" section below.

*Intangible Assets*

In February 2009, we amended our product license agreement with Solvay for the rights to market Luvox CR and Luvox in the U.S. such that the then existing $14.0 million current payment obligation, a $5.0 million obligation related to a milestone of uninterrupted supply of Luvox CR and future royalty and other obligations were replaced with an obligation to pay a total of $19.0 million. As a result we recorded an addition of $5.0 million to the gross carrying amount of the intangible asset related to Luvox CR developed technology during the nine months ended September 30, 2009.

In response to a notice we received in August 2009 of the filing of an abbreviated new drug application with the FDA by a third party for a generic version of Luvox CR, we tested the intangible asset related to Luvox CR developed technology for impairment as of September 30, 2009. Based on the estimated undiscounted cash flows related to the asset, we determined that the asset was not impaired but that its remaining estimated useful life should be shortened. As of September 30, 2009, the carrying value of the asset is being amortized over its remaining estimated useful life of 2.7 years.

*Stock-Based Compensation*

On September 30, 2009, the Compensation Committee of our Board of Directors approved an increase in the number of shares available for issuance under our ESPP for the current purchase period and for the next three six-month purchase periods. The total compensation cost related to the increase not yet recognized as of September 30, 2009, was $3.0 million and will be recognized over the next 1.7 years.

20

Table of Contents

**Results of Operations**

*Comparison of Three and Nine Months Ended September 30, 2009 and 2008*

| | Three Months Ended September 30, | | Increase/ (Decrease) | Increase/ (Decrease) | Nine Months Ended September 30, | | Increase/ (Decrease) | Increase/ (Decrease) |
|---|---|---|---|---|---|---|---|---|
| | 2009 | 2008 | | | 2009 | 2008 | | |
| | (In thousands) | | | | (In thousands) | | | |
| Product sales, net | $29,992 | $17,022 | $12,970 | 76% | $77,789 | $45,757 | $32,032 | 70% |
| Royalties, net | 532 | 440 | 92 | 21% | 1,522 | 1,308 | 214 | 16% |
| Contract revenues | 285 | 284 | 1 | 0% | 10,854 | 854 | 10,000 | N/A(1) |
| Cost of product sales (excluding amortization of acquired developed technology) | 2,338 | 5,525 | (3,187) | (58)% | 6,856 | 10,619 | (3,763) | (35)% |
| Research and development | 7,644 | 12,149 | (4,505) | (37)% | 30,244 | 55,274 | (25,030) | (45)% |
| Selling, general and administrative | 15,061 | 24,329 | (9,268) | (38)% | 42,934 | 91,218 | (48,284) | (53)% |
| Amortization of intangible assets | 2,057 | 3,487 | (1,430) | (41)% | 5,611 | 9,454 | (3,843) | (41)% |
| Interest income | 2 | 353 | (351) | (99)% | 29 | 1,700 | (1,671) | (98)% |
| Interest expense | 5,384 | 5,355 | 29 | 1% | 17,034 | 14,377 | 2,657 | 18% |
| Other income (expense), net | 1 | 19 | (18) | (95)% | (4) | 6 | (10) | (167)% |
| Gain on sale of product rights | — | 3,918 | (3,918) | N/A(1) | — | 3,918 | (3,918) | N/A(1) |

(1)    Comparison to prior period is not meaningful.

*Product Sales, Net*

The increase in product sales, net in the three and nine months ended September 30, 2009, as compared to the same periods in 2008, was primarily due to increases of $10.8 million and $27.1 million in Xyrem sales, respectively, and the launch of Luvox CR in March 2008, offset by decreases in Antizol sales as a result of the sale of our Antizol product rights in August 2008. The increase in Xyrem sales was substantially due to significant price increases in 2008 and a 27% price increase in May 2009, and to a lesser extent increases in sales volumes of 10% and 11% in the three and nine months ended September 30, 2009, respectively, as compared to the same periods in 2008.

*Royalties, Net*

The increase in royalties, net in the three and nine months ended September 30, 2009, as compared to the same periods in 2008, was entirely due to the increase in royalties we received under our agreement with UCB related to UCB's sales of Xyrem.

*Contract Revenues*

UCB made a nonrefundable milestone payment of $10.0 million in July 2008 which, upon the completion of the last patient in our second Phase III pivotal clinical trial of sodium oxybate for the treatment of fibromyalgia, was recorded as contract revenue in the nine months ended September 30, 2009 and was previously recorded as deferred revenue. In addition, we recognized contract revenues of $285,000 and $284,000 in the three months ended September 30, 2009 and 2008, respectively, and $854,000 in each of the nine months ended September 30, 2009 and 2008, primarily related to previously deferred upfront payments which are being recognized as contract revenues ratably through 2019, the expected performance period under our agreement with UCB.

*Cost of Product Sales*

The decrease in cost of product sales in the three and nine months ended September 30, 2009, as compared to the same periods in 2008, was due to:

• higher Antizol cost of product sales in the 2008 periods as a result of the sale of our Antizol product rights in 2008,

• higher Luvox CR cost of product sales in the 2008 periods related to excess inventory, and

• higher Luvox CR cost of product sales in the 2008 periods related to failed lots, partially offset by,

• higher material costs primarily related to the growth in our Luvox CR product sales in 2009.

*Research and Development Expenses*

Lower research and development expenses in the three and nine months ended September 30, 2009, as compared to the same periods in 2008, resulted from lower spending on all of our JZP and other projects and Luvox CR, for which we incurred research and development expenditures in the two months prior to approval of the product by the FDA in February 2008. Expenditures on JZP-6 are expected to comprise the majority of our research and development expenses in the remainder of 2009, unless or until we partner a program or otherwise obtain financing to fund our other programs. As a result, research and development expenses will be significantly lower in 2009 than in 2008.

Table of Contents

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses were lower in the three and nine months ended September 30, 2009, as compared to the same periods in 2008, primarily due to a reduction in the number of employees as a result of our three reductions in force in 2008 and to lower marketing expenses. Selling, general and administrative expenses will be significantly lower in 2009 than in 2008 as a result of the reductions in force and careful control of marketing expenses.

*Amortization of Intangible Assets*

Our intangible assets consist primarily of developed technology related to Xyrem and Luvox CR which are amortized on a straight-line basis over their estimated useful lives. Amortization costs in the three and nine months ended September 30, 2009 were lower as compared to the same periods in 2008, primarily due to the sale of our rights to and interests in Antizol and Antizol-Vet in August 2008 and a $29.8 million write down of the Luvox CR intangible asset in 2008. Amortization costs will be lower in 2009 than in 2008 primarily due to the write down of the Luvox CR intangible asset.

*Interest Income*

Interest income was lower in the three and nine months ended September 30, 2009, as compared to the same periods in 2008, due to lower average cash balances and to lower average interest rates.

*Interest Expense*

Interest expense relates primarily to interest on the Senior Notes, and, to a lesser extent, interest on our liability under a government settlement. The increase in interest expense in the nine months ended September 30, 2009, as compared to the same period in 2008, was primarily due to interest expense recorded on the additional $40.0 million principal amount of the Senior Notes we issued in March 2008 and the two percentage point increase in the annual interest rate on the principal amount of the Senior Notes from January 1, 2009 through to July 7, 2009 as a result of our defaults during that period. Interest on the Senior Notes is comprised of quarterly cash payments for interest, the accretion of the notes which were recorded at a discount related to warrants issued in conjunction with the issuance of the Senior Notes, and amortization of debt issuance costs.

*Gain on Sale of Product Rights*

In August 2008, we entered into an agreement under which an unrelated third party purchased our rights to and interests in Antizol and Antizol-Vet with the associated product registrations and trademarks for cash consideration of $5.5 million and existing inventory, raw materials and work in process for cash consideration of $275,000. In connection with this transaction, we recorded a gain of $3.9 million in the three and nine months ended September 30, 2008.

**Liquidity and Capital Resources**

Since our inception, we have incurred significant net losses and, as of September 30, 2009, we had cash and cash equivalents of $12.2 million.

On September 30, 2009, we amended our existing accounts receivable line of credit agreement and borrowed $3.0 million. Pursuant to the terms of the amended agreement, we may borrow up to 75% of eligible accounts receivable up to a maximum of $3.0 million in borrowings subject to certain limitations. The maximum may be increased to $15.0 million at the lender's discretion. Borrowings under the line of credit are secured by a first priority security interest in our accounts receivable and inventory and bear interest at a variable rate which was 6.5% at September 30, 2009. In addition, a minimum monthly interest payment of $14,000 and a collateral monitoring fee up to 0.15% per month on the outstanding principal amount are payable. Borrowing under our line of credit had previously been suspended as a result of the events of default under our Senior Note Agreement.

On September 29, 2009, we paid our quarterly interest payment of $4.5 million to the holders of the Senior Notes which represented interest calculated at the default rate of 17% for the period from July 1 to July 7, 2009, and at the non-default rate of 15% for the remainder of the quarter.

On July 7, 2009, we paid $14.6 million to the holders of the Senior Notes which represented all of the accrued and unpaid interest as of June 30, 2009. We did not make a timely quarterly interest payment of $4.5 million that was due on December 31, 2008 or timely quarterly interest payments of $5.1 million due on each of March 31, 2009 and June 30, 2009 to the holders of the Senior Notes, which constituted events of default under our Senior Note Agreement. As a result of the defaults, interest on the Senior Notes accrued on the outstanding principal amount at an annual default rate of 17% (instead of 15%) effective January 1, 2009 until July 7, 2009. In addition, we had an event of default related to a requirement under the Senior Notes to maintain a restricted cash balance. This requirement was suspended as of July 7, 2009 based on the level of our annualized net sales as of June 30, 2009.

On July 7, 2009, we completed a private placement of units consisting of 1,895,734 shares of common stock and warrants to purchase 947,867 shares of our common stock at a price of $3.6925 per unit, for net proceeds of $6.8 million.

In February 2009, we amended our product license agreement with Solvay to eliminate our obligation to make royalty payments on net sales of Luvox CR and to extend the time frame in which other obligations are due. In June 2009, we further amended our agreement with Solvay. Under the amendment, a $1.0 million payment that was due on June 15, 2009 was postponed until August 15, 2009 and a $2.0 million payment that was due on September 15, 2009 was divided into two payments of $1.0 million due on September 15, 2009 and October 15, 2009. We made each of these payments when due.

22

Table of Contents

In early 2009, we entered into arrangements with various government entities to postpone until October 2009 criminal and civil payments (totaling $2.5 million) that otherwise would have been due in January 2009. We made these payments totaling $2.5 million in October 2009.

Our ability to draw down funds and sell shares under a committed equity financing facility, or CEFF, with Kingsbridge Capital Limited, or Kingsbridge, requires the continued effectiveness of and ability to use the registration statement that we filed registering the resale of any shares issuable to Kingsbridge under the CEFF; however, we believe that the use of such registration statement may not be permitted under applicable SEC rules and guidance. Even if we are successful in taking the necessary steps to cause the resumption of the permitted use of such registration statement (as may be amended) in a timely manner, we are not be able to sell shares under the CEFF if the average price of our common stock is lower than $4.50 per share. We have not drawn down funds and have not issued shares of our common stock under the CEFF.

The financial statements included in this Quarterly Report on Form 10-Q have been prepared assuming that we will continue as a going concern, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from uncertainty related to our ability to continue as a going concern.

In light of the cost reduction activities we have undertaken in the past year, and our increased cash flows from product sales, we believe we will be able to fund our operations and meet all of our ongoing current financial obligations for at least the next 12 months. We have based our projection on assumptions that may prove to be wrong, including assumptions with respect to the level of revenues from product sales, and we could exhaust our available financial resources.

The sufficiency of our current cash resources will depend on many factors, including primarily the amount of revenues that we receive from sales of Xyrem and Luvox CR, our ability to use our net operating losses to offset taxes that would otherwise be due, as well as other factors set forth in Part II Item 1A of this Quarterly Report on Form 10-Q under the headings "*Our operations have generated negative cash flows, and, if our cash flow estimates are incorrect, we may be required to secure additional funding, significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities which could negatively affect our business and prospects*", "*We have a history of net losses, which may continue for the next few years and, if we are to grow our business in the future, we will need to commit substantial resources which, could increase the extent of any future losses*" and "*Our ability to use our net operating losses to offset taxes that would otherwise be due could be limited or lost entirely if we do not generate taxable income in a timely manner or if we trigger an "ownership change" pursuant to Section 382 of the Internal Revenue Code which, if we generate taxable income, could materially and adversely affect our business, financial condition, and results of operations*". We believe that we have cured all material defaults under the Senior Note Agreement, and that the holders of our Senior Notes no longer have the right to accelerate the repayment of the Senior Notes; however, if the holders of our Senior Notes do not agree with us, they could attempt to accelerate our obligations under the Senior Notes at any time. The holders of our Senior Notes have a first priority security interest in all of our assets other than inventory and accounts receivable. If we were not able to prevent an acceleration of the Senior Notes, we would not have sufficient cash to pay the principal amount on the Senior Notes, including a prepayment premium and any accrued but unpaid interest.

The following table shows a summary of our cash flows for the periods indicated:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| | (In thousands) | |
| Net cash used in operating activities | $(17,650) | $(111,446) |
| Net cash used in investing activities | (1,080) | (4,948) |
| Net cash provided by financing activities | 6,057 | 63,356 |
| Net decrease in cash and cash equivalents | $(12,673) | $ (53,038) |

Net cash used in operating activities during the nine months ended September 30, 2009 primarily reflected the net loss, adjusted for non-cash items including depreciation and amortization and stock-based compensation expense in addition to the change in working capital. Net cash used in operating activities during the nine months ended September 30, 2008 primarily reflected the net loss, adjusted for non-cash items including depreciation and amortization, stock-based compensation expense and the gain on sale of our product rights to Antizol and Antizol-Vet, in addition to the change in working capital, offset in part by the $10.0 million milestone payment we received from UCB in July 2008. Net cash used in investing activities during the nine months ended September 30, 2009 primarily related to three payments for the purchase of rights to Luvox CR partially offset by the release of restricted cash and the maturity of an investment in a marketable security. Net cash used in investing activities during the nine months

Table of Contents

ended September 30, 2008 primarily related to two milestone payments for the purchase of rights to Luvox CR, offset in part by the release of cash restricted under our previous senior secured note agreement, and proceeds of $5.5 million from the sale of our product rights to Antizol and Antizol-Vet. Net cash provided by financing activities during the nine months ended September 30, 2009 was primarily attributable to net proceeds of $6.8 million from our private placement in July 2009 offset by our net repayment of our line of credit. Net cash provided by financing activities during the nine months ended September 30, 2008 was primarily attributable to net proceeds from the $40.0 million principal amount of senior secured notes we issued in March 2008 and net proceeds from our registered direct public offering in July 2008.

**Contractual Obligations**

In addition to our contractual obligations set forth in our Annual Report on Form 10-K for the year ended December 31, 2008, the following table reflects a summary of material contractual obligations that have been modified or have been incurred during the first nine months of 2009 and remain outstanding as of September 30, 2009:

| Contractual Obligations | Total | Less than 1 Year | 1-3 Years (In thousands) | 3-5 Years | More than 5 years |
|---|---|---|---|---|---|
| Amounts due to Solvay(1) | $16,000 | $ 6,000 | $ 9,250 | $ 750 | $ — |
| Operating lease obligation(2) | 2,565 | 798 | 1,767 | — | |
| Total | $18,565 | $ 6,798 | $11,017 | $ 750 | $ — |

(1) In February 2009, we amended our product license agreement with Solvay as a result of which the then existing $14.0 million current payment obligation, a $5.0 million obligation related to a milestone of uninterrupted supply of Luvox CR as well as the future royalty and other obligations were replaced with an obligation to pay a total of $19.0 million, of which $3.0 million has been paid ($1.0 million was paid in each of March 2009, August 2009 and September 2009). In addition, we agreed to pay Solvay $5.0 million in 2015 if net sales of Luvox CR have reached a cumulative amount of $100.0 million on or before December 31, 2014 and no AB-rated generic version of Luvox CR has been or is being sold in the U.S. as of December 31, 2014. Since we cannot determine when or if this milestone will be achieved it is not included in the table above. In June 2009, we further amended our agreement with Solvay. Under the amendment, a $1.0 million payment that was due on June 15, 2009 was postponed until August 15, 2009 and a $2.0 million payment that was due on September 15, 2009 was divided into two payments of $1.0 million due on September 15, 2009 and October 15, 2009. In addition to the $1.0 million due in October 2009, $2.0 million is due in December 2009, $4.0 million is payable in 2010, $4.5 million is payable in 2011 and $4.5 million is payable in 2012. If payments are not made when due, the amount due in 2012 will be $5.0 million.

(2) In June 2009, we entered into an amendment of the operating lease for our corporate office building located in Palo Alto, California. Under the amendment, which was effective September 1, 2009, the term of the lease has been extended by 36 months and the monthly base rent will change from its current rate of $67,964 per month to the following: $65,772 per month in the first twelve months, $74,542 per month in the second twelve months and $78,926 per month in the third twelve months. The lease is renewable through 2016, at our option. In addition to these lease payments, we are obligated to pay for operating expenses for the leased property.

**Off-Balance Sheet Arrangements**

Since our inception, except for standard operating leases, we have not engaged in any off-balance sheet arrangements, including the use of structured finance, special purpose entities or variable interest entities.

**Cautionary Note Regarding Forward-Looking Statements**

This Quarterly Report on Form 10-Q (including documents incorporated by reference) and other written and oral statements we make from time to time contain certain "forward-looking" statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. You can identify these forward-looking statements by the fact they use words such as "should", "expect", "anticipate", "estimate", "target", "may", "project", "guidance", "intend", "plan", "believe" and other words and terms of similar meaning and expression in connection with any discussion of future operating or financial performance. You can also identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. Such forward-looking statements are based on current expectations and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause actual outcomes to differ materially from current expectations. These statements are likely to relate to, among other things, our goals, plans and projections regarding our financial position, results of operations, cash flows, market position, product development, clinical trials, product approvals, sales efforts, expenses, performance or results of current and anticipated products, the outcome of contingencies such as legal proceedings, and financial results, all of

24

Table of Contents

which are based on current expectations that involve inherent risks and uncertainties, including internal or external factors that could delay, divert or change any of them from time to time. We have included important factors in the cautionary statements included in this report, particularly under Part II Item 1A "Risk Factors", that we believe could cause actual results to differ materially from any forward-looking statement.

Although we believe we have been prudent in our plans and assumptions, no assurance can be given that any goal or plan set forth in forward-looking statements can be achieved, and you are cautioned not to place undue reliance on such statements, which speak only as of the date made. We undertake no obligation to release publicly any revisions to forward-looking statements as a result of new information, future events or otherwise.

25

Table of Contents

**Item 3.        Quantitative and Qualitative Disclosures About Market Risk.**

During the nine months ended September 30, 2009, there were no material changes to our market risk disclosures as set forth in "Item 7A. Quantitative and Qualitative Disclosures About Market Risk" in our Annual Report on Form 10-K for the year ended December 31, 2008.

**Item 4.        Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures.* We have carried out an evaluation, under the supervision of and with the participation of management, including our principal executive officer and acting principal financial officer, of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on their evaluation, our principal executive officer and acting principal financial officer concluded that our disclosure controls and procedures were effective as of September 30, 2009.

*Limitations on the Effectiveness of Controls.* A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within an organization have been detected. Accordingly, our disclosure controls and procedures are designed to provide reasonable, not absolute, assurance that the objectives of our disclosure control system are met and, as set forth above, our principal executive officer and acting principal financial officer have concluded, based on their evaluation as of the end of the period covered by this report, that our disclosure controls and procedures were effective to provide reasonable assurance that the objectives of our disclosure control system were met.

*Changes in Internal Control over Financial Reporting.* There were no changes in our internal control over financial reporting that occurred during the three months ended September 30, 2009 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

26

PART II—OTHER INFORMATION

**Item 1A.      Risk Factors.**

*We have identified the following risks and uncertainties that may have a material adverse effect on our business, financial condition or results of operations. The risks described below are not the only ones we face. Additional risks not presently known to us or that we currently believe are immaterial may also significantly impair our business operations. Our business could be harmed by any of these risks. The trading price of our common stock could decline due to any of these risks, and you may lose all or part of your investment. We have marked with an asterisk (\*) those risks described below that reflect substantive changes from, or additions to, the risks described in our Annual Report on Form 10-K for the year ended December 31, 2008, filed with the SEC. In assessing these risks, you should also refer to the other information contained in this Quarterly Report on Form 10-Q, including our condensed consolidated financial statements and related notes.*

**Risks Relating to Our Business**

***We are dependent on sales of Xyrem and Luvox CR to generate the cash necessary to operate our business, and, if we are not able to maintain or increase revenue from the sales of our products, it would have a material adverse effect on our business, financial condition, results of operation and growth prospects.\****

We are dependent on sales of Xyrem and Luvox CR to generate the cash necessary to operate our business and our future plans assume revenue from sales of our products will remain constant or increase. Sales and prescriptions of Xyrem increased in 2008 and during the first three quarters of 2009; however, cataplexy and excessive daytime sleepiness associated with narcolepsy are orphan conditions, which means that a relatively limited number of people suffer from those conditions. We significantly increased the price of Xyrem during the past year, including an approximately 20% increase in October 2009. While increased pricing does not appear to have negatively affected sales of the product, we cannot assure you that this or future price increases will not negatively affect sales of Xyrem. In July 2009, our orphan drug exclusivity for Xyrem for cataplexy in patients with narcolepsy expired and we cannot assure you that a generic equivalent will not be introduced for that indication in the future. If sales of Luvox CR do not increase as expected, they may not cover the payments due to Solvay under our license agreement for Luvox CR plus the cost to manufacture, market and sell the product and to fulfill our Phase IV clinical trial commitment to the FDA. If revenue from sales of Xyrem and Luvox CR do not maintain current levels or increase as expected, we may be required to further reduce our operating expenses, decrease our efforts in support of Luvox CR or seek to raise additional funds, all of which could have a material adverse effect on our business, financial condition, results of operation and growth prospects.

***Our only product candidate currently in Phase III clinical development is JZP-6 for the treatment of fibromyalgia. Although we believe the Phase III pivotal clinical trials have shown JZP-6 to be safe and effective for the treatment of fibromyalgia, the FDA may not approve JZP-6 for marketing or may approve it with restrictions on the label, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.\****

We are currently developing JZP-6 for the treatment of fibromyalgia. Our Phase III clinical program for JZP-6 includes two Phase III pivotal clinical trials. Although we received statistically significant positive results from both of our Phase III pivotal clinical trials and believe our results show JZP-6 to be safe and effective for the treatment of fibromyalgia, we do not know if the FDA will agree with our interpretation of the results or whether the U.S. Food and Drug Administration, or FDA, and other regulatory authorities will approve JZP-6 for the treatment of fibromyalgia. Even if the FDA or other regulatory authorities approve JZP-6 for the treatment of fibromyalgia, we cannot assure you that the approval will not include additional restrictions on the label that could make JZP-6 less attractive to physicians and patients than other products that may be approved for the treatment of fibromyalgia, which could limit potential sales of JZP-6. Further, although JZP-6 has the same active pharmaceutical ingredient as Xyrem, which has been approved by the FDA for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy, this does not assure approval by the FDA, or any other regulatory authorities, of this active pharmaceutical ingredient for the treatment of fibromyalgia. A failure to obtain FDA or other regulatory approval of JZP-6 for fibromyalgia patients could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Lyrica (pregabalin), marketed by Pfizer, Cymbalta (duloxetine), marketed by Eli Lilly, and Savella (milnacipran), marketed by Forest Laboratories, were approved by the FDA in June 2007, June 2008, and January 2009, respectively, for the treatment of fibromyalgia. With treatments for fibromyalgia already approved, the FDA may be less willing to approve JZP-6 for the treatment of fibromyalgia.

Even if the FDA approves JZP-6 for the treatment of fibromyalgia, the FDA will likely require us to have a Risk Evaluation and Mitigation Strategy program, or REMS, which may be similar to the one we use for Xyrem. Under the Xyrem REMS, Xyrem must be distributed through a single central pharmacy. The central pharmacy must maintain physician and patient registries, as the product may not be stocked in retail pharmacies. Each physician and patient must be educated about the risks and benefits of the product before the physician can prescribe, or a patient can receive, Xyrem. Whenever a prescription is received by the central pharmacy, the central pharmacy must verify the prescription and obtain additional information by contacting the patient's insurance company. The central pharmacy must also speak with the patient before it can ship any Xyrem to the patient. The central pharmacy must ship the product directly to the patient by a courier service, and the patient or his/her designee must sign for the package. The initial shipment may only be for a one month supply, and physicians may only prescribe up to six months of supply of Xyrem.

27

Table of Contents

The Xyrem REMS is labor intensive, complex and expensive to operate. Since Xyrem is currently prescribed for a relatively small number of patients, the Xyrem REMS does not prevent us from effectively supplying Xyrem to narcolepsy patients. However, significantly more patients are diagnosed with fibromyalgia, and if the same or a similar REMS is required for JZP-6, scale-up of the REMS could make it difficult for us to timely supply all of the patients who may be prescribed JZP-6 for the treatment of fibromyalgia. This potential supply issue and accessibility barrier could make JZP-6 less attractive to physicians and patients than other products that are currently, or that in the future may be, approved for the treatment of fibromyalgia, which could limit potential sales of JZP-6.

### We depend upon UCB to market and promote Xyrem outside the U.S., and we are dependent upon our collaboration with UCB for the development and potential commercialization of JZP-6 for the treatment of fibromyalgia in major markets outside of the U.S.*

We have exclusively licensed to UCB the rights to market and promote Xyrem in 54 countries outside of the U.S. If UCB does not obtain regulatory approvals for and launch Xyrem in its licensed countries in the time frames we expect, or at all, our revenues would be adversely affected. In addition, under the terms of our collaboration with UCB, we granted UCB the exclusive right to commercialize JZP-6 for the treatment of fibromyalgia in the same territories in which UCB has the right to market and promote Xyrem for patients with narcolepsy. There are currently no approved fibromyalgia treatments in the European Union. We cannot be sure that the European Medicines Agency, or EMEA, will approve any treatment, or JZP-6 in particular, for fibromyalgia. For example, in October 2008, April 2009 and July 2009 panels of European regulators recommended against approving Cymbalta, Lyrica and Savella, respectively, as treatments for fibromyalgia.

UCB has the right to terminate our collaboration on 12-months' notice (or less in certain circumstances), and UCB may terminate its rights to JZP-6 for the fibromyalgia indication on six-months' notice at any time prior to the receipt of marketing approval of JZP-6 for fibromyalgia in the European Union. If UCB terminates our collaboration or terminates its rights to JZP-6 for the fibromyalgia indication, we would need to find another party or parties to commercialize Xyrem and JZP-6 in UCB's territories. We may be unable to do this on acceptable terms, or at all, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

### We depend on one central pharmacy distributor for Xyrem sales in the U.S. and the loss of that distributor or its failure to distribute Xyrem effectively would adversely affect sales of Xyrem.

As a condition of approval of Xyrem, the FDA mandated that we maintain a risk management program for Xyrem under which all Xyrem that we sell in the U.S. must be shipped directly to patients through a central pharmacy. The process under which patients receive Xyrem under our Xyrem REMS is cumbersome. While we have an agreement with the central pharmacy for Xyrem, Express Scripts, if the central pharmacy does not fulfill its contractual obligations to us, or refuses or fails to adequately serve patients, shipments of Xyrem, and our sales, would be adversely affected. Changing central pharmacy distributors could take a significant amount of time. In addition, sodium oxybate, the active pharmaceutical ingredient in Xyrem, is regulated by the U.S. Drug Enforcement Administration, or DEA, as a controlled substance. The new central pharmacy would need to be registered with the DEA and would also need to develop the particular processes, procedures and activities necessary to distribute Xyrem, including the REMS approved by the FDA. If we change central pharmacies, new contracts might also be required with government and other insurers who pay for Xyrem. Transitioning to a new central pharmacy could result in product shortages, which would adversely affect sales of Xyrem in the U.S.

### Our supplier of the active pharmaceutical ingredient and our product manufacturer for Xyrem must obtain DEA quotas in order to supply us with Xyrem, JZP-6 and sodium oxybate, and these quotas may not be sufficient to satisfy our clinical and commercial needs.

The DEA limits the quantity of certain Schedule I controlled substances that may be produced in the U.S. in any given calendar year through a quota system. Because the active pharmaceutical ingredient of Xyrem and JZP-6, sodium oxybate, is a Schedule I controlled substance, our supplier of the active pharmaceutical ingredient and our product manufacturers must obtain DEA quotas in order to supply us with sodium oxybate, Xyrem and JZP-6. Since the DEA typically grants quotas on an annual basis and requires a detailed submission and justification for each request, obtaining a DEA quota is a difficult and time consuming process. If our commercial or clinical requirements for sodium oxybate, Xyrem or JZP-6 exceed our supplier's and contract manufacturer's DEA quotas, our supplier and contract manufacturer would need quota increases from the DEA, which could be difficult and time consuming to obtain and might not ultimately be obtained on a timely basis, or at all. We believe, although we cannot assure you, that our quota for 2009 will be sufficient to meet our commercial, clinical and development needs. The DEA has issued a preliminary quota for 2010 that is the same as that issued for 2009 but that is substantially less than the quota we believe we will need both to provide commercial supplies of Xyrem and to prepare for the commercial launch of JZP-6. We are in discussion with the DEA concerning the 2010 quota; however, if we are not successful in changing the quota before it becomes final we would have to petition

28

Table of Contents

for a change to the quota which could delay the potential commercial launch of JZP-6. In the future and in cooperation with our procurement and manufacturing partners, we will continue to seek increased quotas to satisfy our clinical and commercial needs. However, we may not be successful in obtaining increased quotas from the DEA, and without sufficient DEA quotas, there could be shortages of Xyrem, JZP-6 or sodium oxybate for the marketplace or for use in our clinical studies, or both.

***We depend on single source suppliers and manufacturers for each of our products and product candidates. The loss of any of these suppliers or manufacturers, or delays or problems in the supply or manufacture of our products for commercial sale or our product candidates for use in our clinical trials, could materially and adversely affect our business, financial condition, results of operations and growth prospects.***

We do not have, and do not intend to establish in the near term, our own manufacturing or packaging capability for our products or product candidates, or their active pharmaceutical ingredients. Accordingly, we have entered into manufacturing and supply agreements with single source suppliers and manufacturers for our commercialized products and product candidates. The recent deterioration in worldwide economic conditions and the recent disruption to the credit and financial markets in the U.S. and worldwide may materially and adversely impact the financial position of our single source suppliers and manufacturers. If our suppliers and contract manufacturers are unable to obtain the necessary capital to operate their respective businesses or for other reasons, our suppliers and contract manufacturers may not be able to manufacture our products or product candidates without interruption, or may not comply with their obligations to us under our supply and manufacturing arrangements. We may not have adequate remedies for any breach and their failure to supply us could result in a shortage of our products or product candidates.

The availability of our products for commercial sale is dependent upon our ability to procure the ingredients, packaging materials and finished products we need. If one of our suppliers or product manufacturers fails or refuses to supply us for any reason, it would take a significant amount of time and expense to qualify a new supplier or manufacturer. The loss of one of our suppliers or product manufacturers could require us to obtain regulatory clearance in the form of a "prior approval supplement" and to incur validation and other costs associated with the transfer of the active pharmaceutical ingredient or product manufacturing process. We believe that it could take as long as two years to qualify a new supplier or manufacturer, and we may not be able to obtain active pharmaceutical ingredients, packaging materials or finished products from new suppliers or manufacturers on acceptable terms and at reasonable prices, or at all. Should we lose either an active pharmaceutical ingredient supplier or a product manufacturer, we could run out of salable product to meet market demands or investigational product for use in clinical trials while we wait for FDA approval of a new active pharmaceutical ingredient supplier or product manufacturer.

For Xyrem, JZP-6 or sodium oxybate, the new supplier or manufacturer would also need to be registered with the DEA and obtain a DEA quota. In addition, the FDA must approve suppliers of the active and inactive pharmaceutical ingredients and certain packaging materials used in our products, as well as suppliers of finished products. The qualification of new suppliers and manufacturers could potentially delay the manufacture of our products and product candidates and result in shortages in the marketplace or for our clinical trials, or both, particularly since we do not have secondary sources of supply of the active pharmaceutical ingredient or backup manufacturers for our products and product candidates. If there are delays in qualifying the new manufacturer or the new manufacturer is unable to obtain a sufficient quota from the DEA, there could be a shortage of Xyrem for the marketplace.

Due to FDA-mandated dating requirements, the limited market size for our approved products and DEA quotas relating to sodium oxybate, Xyrem and JZP-6, we are subject to complex manufacturing logistics and minimum order quantities that could result in excess inventory as determined under our accounting policy, unsalable inventory as a result of product expiring prior to use, and competition with others for manufacturing services when needed or expected. We have adopted a production planning program to assess and manage manufacturing logistics among the vendors supplying our requirements of active pharmaceutical ingredient, drug product and packaging; however, unexpected market requirements or problems with vendors' facilities, among other things, could result in shortages of one or more of our products for the marketplace or product candidates for use in our clinical studies, or both.

Lonza, Inc., or Lonza, is our sole supplier of sodium oxybate, the active pharmaceutical ingredient in Xyrem and, through Solvay, for fluvoxamine maleate, the active pharmaceutical ingredient in Luvox CR. We expect Lonza will continue to be our sole supplier of sodium oxybate and fluvoxamine maleate for the foreseeable future. We cannot assure you that Lonza can or will continue to supply, in the time we need, sufficient quantities of active pharmaceutical ingredient to enable Elan and Patheon Pharmaceuticals to manufacture the quantities of Luvox CR and Xyrem, respectively, that we need.

Elan has the right and obligation to manufacture the worldwide commercial requirements of Luvox CR. In June 2001, Solvay's NDA for Luvox CR was withdrawn due to manufacturing difficulties. We cannot assure you that Elan will be able to continue to supply in a timely manner or at all our ongoing commercial needs of Luvox CR. Any failure of Elan to supply necessary quantities of Luvox CR could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

29

Table of Contents

Failure by our third party manufacturers to comply with regulatory requirements could adversely affect their ability to supply products to us. All facilities and manufacturing techniques used for the manufacture of pharmaceutical products must be operated in conformity with the FDA's current Good Manufacturing Practices, or cGMP, requirements. In complying with cGMP requirements, our suppliers must continually expend time, money and effort in production, record-keeping and quality assurance and control to ensure that our products and product candidates meet applicable specifications and other requirements for product safety, efficacy and quality. DEA regulations also govern facilities where controlled substances such as sodium oxybate are manufactured. Manufacturing facilities are subject to periodic unannounced inspection by the FDA, the DEA and other regulatory authorities, including state authorities. Failure to comply with applicable legal requirements subjects the suppliers to possible legal or regulatory action, including shutdown, which may adversely affect their ability to supply us with the ingredients or finished products we need.

Any delay in supplying, or failure to supply, products by any of our suppliers could result in our inability to meet the commercial demand for our products or our needs for use in clinical trials, and could adversely affect our business, financial condition, results of operations and growth prospects. For example, if Lonza is unable to timely provide fluvoxamine maleate in the quantities we need there could be an interruption in the supply of Luvox CR to the market. In addition, under our agreement with UCB, we are responsible for the supply of Xyrem and, if approved, JZP-6 to UCB. Our failure to meet our contractual obligations to supply UCB with adequate quantities of Xyrem and JZP-6 would result in lost revenues to us and, if material, could result in termination of our agreements by UCB.

***The commercial success of our products depends upon attaining market acceptance by physicians, patients, third party payors and the medical community.***

Even if our product candidates are approved for sale by the appropriate regulatory authorities, physicians may not prescribe our products, in which case we would not generate the revenues we anticipate. Market acceptance of any of our products by physicians, patients, third party payors and the medical community depends on:

- the clinical indications for which a product is approved, including any potential additional restrictions placed upon the product in connection with its approval;

- prevalence of the disease or condition for which the product is approved and the severity of side effects;

- acceptance by physicians and patients of each product as a safe and effective treatment;

- perceived advantages over alternative treatments;

- relative convenience and ease of administration;

- the cost of treatment in relation to alternative treatments, including generic products;

- the extent to which the product is approved for inclusion on formularies of hospitals and managed care organizations; and

- the availability of adequate reimbursement by third parties.

As an example, sales of Luvox CR have been significantly less than we had anticipated at the time of the acquisition of the rights to this product and prior to its launch in the first quarter of 2008.

***A failure to prove that our product candidates are safe and effective in clinical trials would require us to discontinue their development, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.***

Significant additional research and development, financial resources and additional personnel will be required to obtain necessary regulatory approvals for our product candidates and to develop them into commercially viable products. As a condition to regulatory approval, each product candidate must undergo extensive clinical trials to demonstrate to a statistically significant degree that the product candidate is safe and effective. The clinical trials for a product candidate can cost between $40 million and $100 million, and potentially even more. If a product candidate fails at any stage of development, we will not have the anticipated revenues from that product candidate to fund our operations, and we will not receive any return on our investment in that product candidate.

Clinical testing can take many years to complete, and failure can occur any time during the clinical trial process. In addition, the results from early clinical trials may not be predictive of results obtained in later and larger clinical trials, and product candidates in later clinical trials may fail to show the desired safety and efficacy despite having progressed successfully through initial clinical testing. A number of companies in the pharmaceutical industry, including us, have suffered significant setbacks in clinical trials, even in advanced clinical trials after showing positive results in earlier clinical trials. The completion of clinical trials for our product candidates may be delayed or halted for many reasons, including:

- delays in patient enrollment, and variability in the number and types of patients available for clinical trials;

- regulators or institutional review boards may not authorize us to commence or continue a clinical trial;

30

Table of Contents

- our inability, or the inability of our partners, to manufacture or obtain from third parties materials sufficient to complete our clinical trials;

- delays or failure in reaching agreement on acceptable clinical trial contracts or clinical trial protocols with prospective sites;

- risks associated with trial design, which may result in a failure of the trial to show statistically significant results even if the product candidate is effective;

- difficulty in maintaining contact with patients after treatment commences, resulting in incomplete data;

- poor effectiveness of product candidates during clinical trials;

- safety issues, including adverse events associated with product candidates;

- the failure of patients to complete clinical trials due to adverse side effects, dissatisfaction with the product candidate, or other reasons;

- governmental or regulatory delays or changes in regulatory requirements, policy and guidelines;

- varying interpretation of data by the FDA or foreign regulatory agencies; and

- insufficient funds to complete the trials.

In addition, our product candidates are subject to competition for clinical study sites and patients from other therapies under development that may delay the enrollment in or initiation of our clinical trials. Many of these companies have far greater financial and human resources than we do.

The FDA or foreign regulatory authorities may require us to conduct unanticipated additional clinical trials, which could result in additional expense and delays in bringing our product candidates to market. Any failure or delay in completing clinical trials for our product candidates would prevent or delay the commercialization of our product candidates, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***We rely on third parties to conduct clinical trials for our product candidates, and if they do not properly and successfully perform their legal and regulatory obligations, as well as their contractual obligations to us, we may not be able to obtain regulatory approvals for our product candidates.***

We design the clinical trials for our product candidates, but rely on contract research organizations and other third parties to assist us in managing, monitoring and otherwise carrying out these trials, including with respect to site selection, contract negotiation and data management. We do not control these third parties and, as a result, they may not treat our clinical studies as their highest priority, or in the manner in which we would prefer, which could result in delays.

Although we rely on third parties to conduct our clinical trials, we are responsible for confirming that each of our clinical trials is conducted in accordance with its general investigational plan and protocol. Moreover, the FDA and foreign regulatory agencies require us to comply with regulations and standards, commonly referred to as good clinical practices, for conducting, recording and reporting the results of clinical trials to ensure that the data and results are credible and accurate and that the trial participants are adequately protected. Our reliance on third parties does not relieve us of these responsibilities and requirements. The FDA enforces good clinical practices through periodic inspections of trial sponsors, principal investigators and trial sites. If we, our contract research organizations or our study sites fail to comply with applicable good clinical practices, the clinical data generated in our clinical trials may be deemed unreliable and the FDA may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that, upon inspection, the FDA will determine that any of our clinical trials comply with good clinical practices. In addition, our clinical trials must be conducted with product produced under the FDA's cGMP regulations. Our failure, or the failure of our contract manufacturers, to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.

If third parties do not successfully carry out their duties under their agreements with us, if the quality or accuracy of the data they obtain is compromised due to failure to adhere to our clinical protocols or regulatory requirements, or if they otherwise fail to comply with clinical trial protocols or meet expected deadlines, our clinical trials may not meet regulatory requirements. If our clinical trials do not meet regulatory requirements or if these third parties need to be replaced, our clinical trials may be extended, delayed, suspended or terminated. If any of these events occur, we may not be able to obtain regulatory approval of our product candidates.

31

Table of Contents

***We could be materially adversely affected if we or our products are subject to negative publicity. For example, sodium oxybate, the active pharmaceutical ingredient in Xyrem and JZP-6, is a derivative of gamma hydroxybutyrate, or GHB, which has been a drug of abuse and may not be sold legally in the U.S. If physicians and patients perceive Xyrem and JZP-6 to be the same as or similar to GHB or if adverse effects become associated with our products, sales of our products could be adversely affected.***

From time to time, there is negative publicity about illicit GHB and its effects, including with respect to illegal use, overdoses, serious injury and death and because sodium oxybate, the active pharmaceutical ingredient in Xyrem, is a derivative of GHB, Xyrem sometimes also receives negative mention in publicity relating to GHB. Because sodium oxybate is a derivative of GHB, patients, physicians and regulators may view Xyrem as the same as or similar to illicit GHB. In addition, there are regulators and some law enforcement agencies that oppose the prescription and use of Xyrem generally because of the connection to GHB. Xyrem's label includes information about adverse events from GHB, and we anticipate that if JZP-6 is approved, its label will include similar information. We could also be adversely affected if any of our products or any similar products distributed by other companies prove to be, or are asserted to be, harmful to consumers. Because of our dependence upon patient and physician perceptions, any adverse publicity associated with illness or other adverse effects resulting from the use or misuse of our products or any similar products distributed by other companies could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***The investigation by the U.S. Attorney's Office for the Eastern District of New York concerning the sales and marketing of Xyrem creates additional compliance-related operating costs and could result in additional fines, penalties or other adverse consequences.***

In April 2006, we and our subsidiary Orphan Medical received subpoenas from the U.S. Department of Justice, acting through the U.S. Attorney for the Eastern District of New York, in connection with the sale and marketing of Xyrem. We and Orphan Medical have settled this matter with the U.S., acting through the Department of Justice, the U.S. Attorney's Office for the Eastern District of New York and other federal agencies, including the Office of Inspector General, U.S. Department of Health and Human Services. Orphan Medical pled guilty to one felony count of introducing a misbranded drug into interstate commerce. A total of approximately $20.0 million in civil and criminal payments is required to be paid in connection with this matter, of which $1.0 million was paid in July 2007, $2.0 million was paid in January 2008, and $2.5 million was paid in October 2009; the remaining amount will be due over the next three years.

While we were not prosecuted, as part of the settlement we entered into a corporate integrity agreement with the Office of Inspector General, U.S. Department of Health and Human Services. That agreement requires us to maintain a comprehensive compliance program, and we will have additional ongoing compliance-related operating costs related to this compliance program and the corporate integrity agreement. In the event of an uncured material breach or deliberate violation, as the case may be, of the corporate integrity agreement or the other definitive settlement agreements we entered into, we could be excluded from participation in Federal healthcare programs and/or subject to prosecution.

In addition, there is no assurance that we will not be subject to future investigations. Many pharmaceutical companies have announced government investigations of their sales and marketing practices for many of their products. Even with compliance training and a company culture of compliance, our current or future practices may nonetheless become the subject of an investigation. A number of laws, often referred to as "whistleblower" statutes, provide for financial rewards to employees and others for bringing to the attention of the government sales and marketing practices that the government views as illegal or fraudulent. The costs of investigating any claims, responding to subpoenas of investigators, and any resulting fines, can be significant and could divert the attention of our management from operating our business.

***Xyrem cannot be advertised in the same manner as competing products, which could limit sales.***

The FDA has required that Xyrem's label include a box warning regarding the risk of abuse. A box warning is the strongest type of warning that the FDA can require for a drug product and warns prescribers that the drug carries a significant risk of serious or even life-threatening adverse effects. A box warning also means, among other things, that the product cannot be advertised through reminder ads, ads which mention the pharmaceutical brand name but not the indication or medical condition it treats. Provigil and Nuvigil, the only other products approved by the FDA specifically for the treatment of excessive daytime sleepiness in patients with narcolepsy, does not have a box warning and can be advertised with reminder ads. In addition, Xyrem's FDA approval under the FDA's Subpart H regulations requires that all of the promotional materials for Xyrem be provided to the FDA for review at least 30 days prior to the intended time of first use. Unlike Xyrem, Provigil and Nuvigil were not approved under the FDA's Subpart H regulations and are not subject to the pre-review requirements. Accordingly, promotional materials for Provigil and Nuvigil are not subject to the same delays that we experience with respect to new promotional materials for Xyrem.

Since JZP-6 contains the same active pharmaceutical ingredient as Xyrem, we anticipate that the label for JZP-6, if approved by the FDA, will also include a box warning. The FDA has approved products for the treatment of fibromyalgia. One of these products is not, and future competing products may not be, subject to this restriction, and the box warning may negatively affect potential JZP-6 sales if competing products can be advertised directly to consumers.

***We face substantial competition from companies with greater resources than we have.***

With respect to all of our existing and future products, we may compete with companies selling or working to develop products that may be more effective, safer or less costly than our products. The markets for which we are developing products are

Table of Contents

competitive and include generic and branded products, some of which are marketed by major pharmaceutical companies that have significantly greater financial resources and expertise in research and development, preclinical testing, conducting clinical trials, obtaining regulatory approvals, manufacturing and marketing and selling approved products than we do. While Xyrem is the only product approved by the FDA for the treatment of both excessive daytime sleepiness and cataplexy in patients with narcolepsy, cataplexy is often treated with tricyclic antidepressants and selective serotonin reuptake inhibitors, although none of these compounds has been approved by the FDA for the treatment of cataplexy. Other treatments for excessive daytime sleepiness in patients with narcolepsy consist primarily of stimulants and wakefulness promoting agents, including Provigil (modafinil) and Nuvigil (armodafinil), the only other FDA-approved products for the treatment of excessive daytime sleepiness in patients with narcolepsy.

We are marketing Luvox CR in the U.S. for the treatment of obsessive compulsive disorder and social anxiety disorder. Selective serotonin reuptake inhibitors are the standard treatment for anxiety disorders, including obsessive compulsive disorder and social anxiety disorder. Six other branded products are currently approved by the FDA for the treatment of obsessive compulsive disorder, including five selective serotonin reuptake inhibitors: Paxil, which is marketed by GlaxoSmithKline, Zoloft, which is marketed by Pfizer, Prozac, which is marketed by Eli Lilly, Pexeva, which is a branded generic marketed by Noven Therapeutics and Luvox, which is not currently marketed. Anafranil, the sixth other branded product approved by the FDA for the treatment of obsessive compulsive disorder, is a tricyclic antidepressant marketed by Mallinckrodt in the U.S. Each of these products currently has generic equivalents. Generic products are generally sold at significantly lower prices than non-generic branded products, tending to both take market share away from branded products and put downward pricing pressure on branded products. Four other products are currently approved by the FDA for the treatment of social anxiety disorder, including three selective serotonin reuptake inhibitors: Zoloft, Paxil and Paxil CR, an extended-release version of Paxil, and one serotonin-norepinephrine reuptake inhibitor, Effexor XR. Each of these products has generic competitors.

We are developing JZP-6 for the treatment of fibromyalgia. In June 2007, the FDA approved Lyrica, an anticonvulsant marketed by Pfizer for the treatment of partial seizures, post herpetic neuralgia and diabetic peripheral neuropathy, for the treatment of fibromyalgia. In June 2008, the FDA approved Cymbalta, a selective serotonin and norepinephrine reuptake inhibitor marketed by Eli Lilly for the treatment of major depressive disorder and generalized anxiety disorder, and diabetic peripheral neuropathic pain, for the treatment of fibromyalgia. In January 2009, the FDA approved Savella, a selective serotonin and norepinephrine reuptake inhibitor marketed by Forest Laboratories for the treatment of fibromyalgia. There are currently no other products approved by the FDA for the treatment of fibromyalgia. In clinical practice, a variety of drugs are often prescribed to address individual symptoms of fibromyalgia, including antidepressants, pain medications, muscle relaxants, hypnotics and anticonvulsants.

Smaller or earlier stage companies may also prove to be significant competitors, particularly through collaborative arrangements with other large, established companies. Our commercial opportunities may be reduced or eliminated if our competitors develop and commercialize generic or branded products that are safer or more effective, have fewer side effects or are less expensive than our products. In addition, we have undertaken several cost-cutting measures that may affect our ability to compete with other companies and due to our financial condition we may be required to take additional cost-cutting measures in the future.

Our competitors may obtain FDA or other regulatory approvals for their product candidates more rapidly than we may. For example, other major pharmaceutical companies have completed or we believe are close to completing Phase III clinical trials of product candidates for the treatment of fibromyalgia, and these are large pharmaceutical companies with far greater resources than we have. Three of these product candidates have received FDA approval and have already reached the market. These treatments, as well as other product candidates that may reach the market before JZP-6, may be better accepted by physicians and patients. Thus, even if we are able to obtain and maintain FDA approval of JZP-6 for the treatment of fibromyalgia, JZP-6 may not result in significant commercial revenues for us.

Our competitors may market their products more effectively than we do. If we are unable to demonstrate to physicians that, based on experience, clinical data, side-effect profiles and other factors, our products are preferable to other therapies, we may not generate meaningful revenues from the sales of our products.

***If generic products that compete with any of our products are approved, sales of our products may be adversely affected.***

Our products are or may become subject to competition from generic equivalents because there is no proprietary protection for some of our products or because our protection has expired or is not sufficiently broad. The FDA had previously granted orphan drug exclusivity in the U.S. for cataplexy in patients with narcolepsy, but this exclusivity expired in July 2009 and other companies could possibly introduce generic equivalents of Xyrem for the cataplexy indication if they do not infringe our existing patents covering Xyrem. Although the FDA has granted orphan drug exclusivity for Xyrem until November 2012 for excessive daytime sleepiness in patients with narcolepsy, prescriptions for Xyrem for the excessive daytime sleepiness in patients with narcolepsy indication, or if approved by the FDA, JZP-6, could possibly be filled with generic equivalents that are granted approval for the treatment of cataplexy in patients with narcolepsy, even if the patient is diagnosed with excessive daytime sleepiness or fibromyalgia.

33

Table of Contents

Patent protection is not available for the active pharmaceutical ingredient in most of our products and product candidates, including Xyrem, Luvox CR and JZP-6. Although Xyrem is covered by patents expiring in 2019 and 2020 with claims covering the formula and process for manufacturing our commercial formulation of Xyrem, JZP-6 is covered by a patent expiring in 2017 with claims covering the use of JZP-6 in patients with fibromyalgia, and Luvox CR is covered by a patent covering the orally administered formulation of extended-release fluvoxamine, it is possible that other companies could manufacture generic equivalents of Xyrem, JZP-6 and Luvox CR in ways that are not covered by the claims of these patents.

Part of our business strategy includes the ongoing development of proprietary product improvements to Xyrem, including new and enhanced dosage forms. However, we may not be successful in developing or obtaining FDA and other regulatory approvals of these improvements. Although the active pharmaceutical ingredient in Xyrem and JZP-6 is a DEA scheduled compound for which a quota is required and the FDA has required a REMS for its distribution, and therefore generic competition may be more difficult and expensive than it might be for other products not requiring a similar REMS for distribution, our competitors will not be prevented from introducing a generic equivalent. We have filed a patent application with claims covering the method for distributing sodium oxybate using a centralized distribution system, but we cannot assure you that this patent will issue or, if issued, whether it will provide any significant protection of Xyrem from generic competition.

Luvox CR is covered by a patent owned by Elan with claims covering the orally administered extended-release formulation of fluvoxamine. It is possible that other companies could manufacture similar or therapeutically equivalent products in ways that are not covered by the claims of the patent. In August 2009, we received a Paragraph IV Patent Certification notice from Actavis Elizabeth, LLC, or Actavis, advising that Actavis has filed an abbreviated New Drug Application, or ANDA, with the FDA for a generic version of Luvox CR. In September 2009, we received an additional Paragraph IV Patent Certification notice from Anchen Pharmaceuticals, Inc., or Anchen, advising that Anchen has filed an ANDA with the FDA for a generic version of Luvox CR. We have not been informed as to the timing or status of the FDA's review of either party's filing, or whether either filer has complied with FDA requirements for proving bioequivalence. Actavis' Paragraph IV Certification alleges that Elan's U.S. Patent No. 7,465,462, listed in the Orange Book, is invalid on the basis that the inventions claimed therein were obvious. Anchen's Paragraph IV Certification alleges that Elan's U.S. Patent No. 7,465,462, listed in the Orange Book, will not be infringed by Anchen's manufacture, use or sale of the generic product for which the ANDA was submitted. The expiration date for the patent at issue is May 10, 2020. We and Elan have filed lawsuits in response to the Paragraph IV certifications. We cannot assure you that these lawsuits will prevent introduction of generics for any particular length of time, or at all.

After the introduction of a generic competitor, a significant percentage of the prescriptions written for a product generally may be filled with the generic version at the pharmacy, resulting in a loss in sales of the branded product, including for indications for which the generic version has not been approved for marketing by the FDA. Generic competition often results in decreases in the prices at which branded products can be sold. In addition, legislation enacted in the U.S. allows for and, in a few instances in the absence of specific instructions from the prescribing physician, mandates the dispensing of generic products rather than branded products where a generic equivalent is available. Generic competition for our products earlier than expected, including as a result of FDA approval of ANDAs for generic versions of our products, could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***We may not be able to successfully acquire or in-license additional products or product candidates to grow our business.***

In order to grow our business, we will need to acquire or in-license additional products and product candidates that we believe have significant commercial potential. We do not believe we will be able to acquire or in-license additional products and product candidates until our financial condition improves. Any growth through acquisitions or in-licensing will be dependent upon the continued availability of suitable acquisition or in-license products and product candidates at favorable prices and upon advantageous terms and conditions. Even if such opportunities are present, we may not be able to successfully identify products or product candidates suitable for potential acquisition or in-licensing, or we may not have the financial resources necessary to pursue such opportunities. Other companies, many of which may have substantially greater financial, marketing and sales resources, compete with us for the right to acquire and in-license such products or product candidates.

***We currently have a relatively small sales organization compared with most other pharmaceutical companies with marketed products. If our specialty sales force and sales organization is not appropriately sized to adequately promote our current and potential future products, the commercial opportunity for our products may be diminished.***

In November 2008, we reduced the size of our sales force as a result of the lower than expected demand for Luvox CR. Each of our remaining sales representatives is now responsible for a larger territory than he or she was responsible for prior to the reduction in force. Our potential future commercial products, including JZP-6, may require expansion of our sales force and sales support organization, and we will need to commit significant additional funds, management and other resources to the growth of our sales organization before the commercial launch of those product candidates. We may not be able to achieve the necessary growth in a cost-effective manner or realize a positive return on our investment, and we may not have the financial resources to achieve the necessary growth in a timely manner or at all. We also have to compete with other pharmaceutical and life sciences companies to recruit, hire, train and retain sales and marketing personnel which our recent reduction in force of our sales force may make more difficult. Turnover in our sales force could negatively affect sales of our products.

Table of Contents

If we elect to rely on third parties to sell our products in the U.S., we may receive less revenue or incur more expense than if we sold our products directly. In addition, we may have little or no control over the sales efforts of those third parties. If we are unable to appropriately size our sales force or collaborate with third parties to sell our products, our ability to generate revenues would be adversely affected.

***If we fail to retain key personnel, or to retain our executive management team, we may be unable to successfully develop or commercialize our products.\****

Our success depends in part on our continued ability to retain and motivate highly qualified personnel and on our ability to develop and maintain important relationships with leading academic institutions, clinicians and scientists. We are highly dependent upon our executive management team. The loss of services of any one or more members of our executive management team or other key personnel could delay or prevent the successful completion of some of our key activities. We do not carry "key person" insurance. Any member of our executive management team and any other key employees may terminate his or her employment at any time without notice and without cause or good reason. In the last year, two of our senior executives have left the company.

In June 2008, we reduced the number of non-sales employees in our company in connection with efforts to focus, in the near term, on our commercial products and later-stage product candidates. In November 2008, we significantly reduced the number of sales representatives. In December 2008, we further reduced the number of non-sales employees in our company. These reductions in force may negatively affect our ability to retain or attract talented employees. Competition for qualified personnel in the life sciences industry has historically been intense. If we need to hire additional personnel to expand our development, clinical and commercial activities, or to support those activities, we may not be able to attract and retain quality personnel on acceptable terms.

If we need to accelerate our activities or expand our business, and cannot recruit qualified employees when we need them, our key activities could be delayed. Our future financial performance and our ability to commercialize our products and to compete effectively will depend, in part, on our ability to manage our personnel resources effectively, and our failure to do so could adversely affect our business, financial condition, results of operations and growth prospects.

***Our offices are located near known earthquake fault zones, and the occurrence of an earthquake or other catastrophic disaster could damage our facilities, which could adversely affect our operations.***

Our offices are located in the San Francisco Bay Area, near known earthquake fault zones and are therefore vulnerable to damage from earthquake. In October 1989, a major earthquake in our area caused significant property damage and a number of fatalities. We are also vulnerable to damage from other disasters such as power loss, fire, floods and similar events. If a significant disaster occurs, our ability to continue our operations could be seriously impaired and we may not have adequate insurance to cover any resulting losses. Any significant unrecoverable losses could seriously impair our operations and financial conditions.

## Risks Related to Our Intellectual Property

***It is difficult and costly to protect our proprietary rights, and we may not be able to ensure their protection.\****

Our commercial success will depend in part on obtaining and maintaining patent protection and trade secret protection of our product candidates, their use and the methods used to manufacture them, as well as successfully defending these patents against third party challenges. Our ability to protect our product candidates from unauthorized making, using, selling, offering to sell or importation by third parties is dependent upon the extent to which we have rights under valid and enforceable patents, or have trade secrets that cover these activities.

The patent position of pharmaceutical companies can be highly uncertain and involve complex legal and factual questions for which important legal principles remain unresolved. Changes in either the patent laws or in interpretations of patent laws in the U.S. and other countries may diminish the value of our intellectual property. Even if we are able to obtain patents covering our products and product candidates, any patent may be challenged, invalidated, held unenforceable or circumvented. In the case of Luvox CR, for example, Actavis' Paragraph IV Certification alleges that Elan's U.S. Patent No. 7,465,462, listed in the Orange Book, is invalid on the basis that the inventions claimed therein were obvious; Anchen's Paragraph IV Certification alleges that Elan's U.S. Patent No. 7,465,462, listed in the Orange Book, will not be infringed by Anchen's manufacture, use or sale of the generic product for which the ANDA was submitted. The existence of a patent will not necessarily prevent other companies from developing similar or therapeutically equivalent products or protect us from claims of third parties that our products infringe their issued patents, which may require licensing and the payment of significant fees or royalties. Competitors may successfully challenge our patents, produce similar products that do not infringe our patents, or manufacture products in countries where we have not applied for patent protection or that do not respect our patents. Accordingly, we cannot predict the breadth of claims that may be allowed or enforced in our patents, our licensed patents or in third party patents.

Table of Contents

The degree of future protection to be afforded by our proprietary rights is uncertain because legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep our competitive advantage. For example:

- others may be able to make products that are similar to our product candidates but that are not covered by the claims of our patents, or for which we are not licensed under our license agreements;

- we or our licensors or partners might not have been the first to make the inventions covered by our issued patents or pending patent applications or the pending patent applications or issued patents of our licensors or partners;

- we or our licensors or partners might not have been the first to file patent applications for these inventions;

- others may independently develop similar or alternative products without infringing our intellectual property rights;

- our pending patent applications may not result in issued patents;

- our issued patents and the issued patents of our licensors or partners may not provide us with any competitive advantages, or may be held invalid or unenforceable as a result of legal challenges by third parties;

- we may not develop additional proprietary products that are patentable; or

- the patents of others may have an adverse effect on our business.

We also may rely on trade secrets and other unpatented proprietary information to protect our technology, especially where we do not believe patent protection is appropriate or obtainable. However, trade secrets are difficult to protect. Although we use reasonable efforts to protect our trade secrets and other unpatented proprietary information, our employees, consultants, advisors and partners may unintentionally or willfully disclose our proprietary information to competitors, and we may not have adequate remedies for such disclosures. If our employees, consultants, advisors and partners develop inventions or processes independently, or jointly with us, that may be applicable to our products under development, disputes may arise about ownership or proprietary rights to those inventions and processes. Enforcing a claim that a third party illegally obtained and is using any of our inventions or trade secrets is expensive and time consuming, and the outcome is unpredictable. In addition, courts outside of the U.S. are sometimes less willing to protect trade secrets. Moreover, our competitors may independently develop equivalent knowledge, methods and know-how.

Our research and development collaborators may have rights to publish data and other information to which we have rights. In addition, we sometimes engage individuals or entities to conduct research that may be relevant to our business. While the ability of these individuals or entities to publish or otherwise publicly disclose data and other information generated during the course of their research is subject to contractual limitations, these contractual provisions may be insufficient or inadequate to protect our trade secrets and may impair our patent rights. If we do not apply for patent protection prior to such publication, or if we cannot otherwise maintain the confidentiality of our innovations and other confidential information, then our ability to obtain patent protection or protect our proprietary information may be jeopardized. Moreover, a dispute may arise with our research and development collaborators over the ownership of rights to jointly developed intellectual property. Such disputes, if not successfully resolved, could lead to a loss of rights and possibly prevent us from pursuing certain new products or product candidates.

***We may incur substantial costs as a result of litigation or other proceedings relating to patent and other intellectual property rights and we may be unable to protect our rights to, or commercialize, our products.***

Our ability, and that of our partners, to commercialize any approved products will depend, in part, on our ability to obtain patents, enforce those patents and operate without infringing the proprietary rights of third parties. The patent positions of pharmaceutical companies can be highly uncertain and involve complex legal and factual questions. We have filed multiple U.S. patent applications and foreign counterparts, and may file additional U.S. and foreign patent applications related thereto. There can be no assurance that any issued patents we own or control will provide sufficient protection to conduct our business as presently conducted or as proposed to be conducted. Moreover, in part because of prior research performed and patent applications submitted in the same manner or similar fields, there can be no assurance that any patents will issue from the patent applications owned by us, or that we will remain free from infringement claims by third parties.

If we choose to go to court to stop someone else from pursuing the inventions claimed in our patents or in or our licensed patents or those of our partners, that individual or company has the right to ask the court to rule that these patents are invalid and/or should not be enforced against that third party. These lawsuits are expensive and would consume time and other resources even if we were successful in stopping the infringement of these patents. In addition, there is a risk that the court will decide that these patents are not valid and that we do not have the right to stop the other party from using the inventions. There is also the risk that, even if the validity of these patents is upheld, the court will refuse to stop the other party on the ground that the other party's activities do not infringe our rights to these patents or that it is in the public interest to permit the infringing activity. In October 2009, we and Elan filed lawsuits in response to the Paragraph IV certifications that we received from Actavis and Anchen. We cannot assure you that these lawsuits will be successful in stopping the infringement of our related patents, that the litigation will be cost effective, or that the litigation will have a satisfactory result for us.

36

Table of Contents

A third party may claim that we or our manufacturing or commercialization partners are using inventions covered by the third party's patent rights and may go to court to stop us from engaging in our normal operations and activities, including making or selling our products. Patent infringement lawsuits are costly and could affect our results of operations and divert the attention of management and development personnel. There is a risk that a court could decide that we or our partners are infringing third party patent rights. In the event that we or our partners are found to infringe any valid claim of a patent held by a third party, we may, among other things, be required to:

- pay damages, including up to treble damages and the other party's attorneys' fees, which may be substantial;

- cease the development, manufacture, use and sale of our products that infringe the patent rights of others through a court-imposed sanction such as an injunction;

- expend significant resources to redesign our products so they do not infringe others' patent rights, which may not be possible;

- discontinue manufacturing or other processes incorporating infringing technology; or

- obtain licenses to the infringed intellectual property, which may not be available to us on acceptable terms, or at all.

The pharmaceutical and life sciences industry has produced a proliferation of patents, and it is not always clear to industry participants, including us, which patents cover various types of products or methods. The coverage of patents is subject to interpretation by the courts, and the interpretation is not always uniform. If we are sued for patent infringement, we would need to demonstrate that our products or methods do not infringe the patent claims of the relevant patent and/or that the patent claims are invalid or unenforceable and we may not be able to do this. Proving invalidity, in particular, is difficult since it requires a showing of clear and convincing evidence to overcome the presumption of validity enjoyed by issued patents in the U.S.

Because some patent applications in the U.S. may be maintained in secrecy until the patents are issued, because patent applications in the U.S. and many foreign jurisdictions are typically not published until 18 months after filing, and because publications in the scientific literature often lag behind actual discoveries, we cannot be certain that others have not filed patent applications for inventions covered by our licensors' or our issued patents or pending applications, or that we or our licensors were the first inventors. Our competitors may have filed, and may in the future file, patent applications covering subject matter similar to ours. Any such patent application may have priority over our or our licensors' patents or applications and could further require us to obtain rights to issued patents covering such subject matter. If another party has filed a U.S. patent application on inventions similar to ours, we may have to participate in an interference proceeding declared by the U.S. Patent and Trademark Office to determine priority of invention in the U.S. The costs of these proceedings could be substantial, and it is possible that such efforts would be unsuccessful, resulting in a loss of our U.S. patent position with respect to such inventions.

Some of our competitors may be able to sustain the costs of complex patent litigation more effectively than we can because they have substantially greater resources. In addition, any uncertainties resulting from the initiation and continuation of any litigation could have a material adverse effect on our ability to raise the funds necessary to continue our operations.

**Risks Related to Our Industry**

***The regulatory approval process is expensive, time consuming and uncertain and may prevent us or our partners from obtaining approvals for the commercialization of some or all of our product candidates.***

The research, testing, manufacturing, selling and marketing of pharmaceutical products are subject to extensive regulation by FDA and other regulatory authorities in the U.S. and other countries, and regulations differ from country to country. Approval in the U.S., or in any jurisdiction, does not ensure approval in other jurisdictions. The regulatory approval process is lengthy, expensive and uncertain, and we may be unable to obtain approval for our products. We are not permitted to market our product candidates in the U.S. until we receive approval from the FDA, generally of an NDA. An NDA must contain, among other things, data to demonstrate that the drug is safe and effective for its intended uses and that it will be manufactured to appropriate quality standards. Obtaining approval of an NDA can be a lengthy, expensive and uncertain process, and the FDA has substantial discretion in the approval process. In addition, failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject our company to administrative or judicially imposed sanctions, including warning letters, untitled letters, civil and criminal penalties, injunctions, product seizure or detention, product recalls, total or partial suspension of production and refusal to approve pending NDAs or supplements to approved NDAs. If we are unable to obtain regulatory approval of our product candidates, we will not be able to commercialize them and recoup our research and development costs.

In 2008, the FDA announced that, in light of staffing issues, it has given its managers discretion to miss Prescription Drug User Fee Act, or PDUFA, deadlines for completing reviews of NDAs. If the FDA were to miss a PDUFA deadline for JZP-6 or one of our other product candidates, delaying the approval and launch, the delay could have a material adverse effect on our business.

Table of Contents

***We are subject to ongoing significant regulatory obligations and oversight, which may result in significant additional expense and limit our ability to commercialize our products.***

If we receive regulatory approvals to sell our products, the FDA and foreign regulatory authorities may impose significant restrictions on the indicated uses or marketing of our products, or impose requirements for burdensome post-approval study commitments. The terms of any product approval, including labeling, may be more restrictive than we desire and could affect the marketability of the product or otherwise reduce the size of the potential market for that product. We are subject to continuing regulatory obligations, such as safety reporting requirements and additional post-marketing obligations, including regulatory oversight of the promotion and marketing of our products. In addition, the labeling, packaging, adverse event reporting, storage, advertising, promotion and recordkeeping for our products are, and any of our product candidates that may be approved by the FDA will be, subject to extensive and ongoing regulatory requirements. If we become aware of previously unknown problems with any of our products in the U.S. or overseas or at our contract manufacturers' facilities, a regulatory agency may impose restrictions on our products, our contract manufacturers or on us, including requiring us to reformulate our products, conduct additional clinical trials, make changes in the labeling of our products, implement changes to, or obtain re-approvals of, our contract manufacturers' facilities, or withdraw the product from the market. In addition, we may experience a significant drop in the sales of the affected products and our product revenues and reputation in the marketplace may suffer, and we could become the target of lawsuits, including class action suits. The FDA and other governmental authorities also actively enforce regulations prohibiting promotion of off-label uses and the promotion of products for which marketing approval has not been obtained. The federal government has levied large civil and criminal fines against companies for alleged improper promotion and has enjoined several companies from engaging in off-label promotion. The FDA has also requested that companies enter into consent decrees or permanent injunctions under which specified promotional conduct is changed or curtailed.

We are also subject to regulation by regional, national, state and local agencies, including the DEA, the Department of Justice, the Federal Trade Commission, the Office of Inspector General of the U.S. Department of Health and Human Services and other regulatory bodies, as well as governmental authorities in those foreign countries in which we commercialize our products. The Federal Food, Drug, and Cosmetic Act, the Public Health Service Act and other federal and state statutes and regulations govern to varying degrees the research, development, manufacturing and commercial activities relating to prescription pharmaceutical products, including preclinical testing, approval, production, labeling, sale, distribution, import, export, post-market surveillance, advertising, dissemination of information and promotion. Our manufacturing partners are subject to the same requirements, which include obtaining sufficient quota from the DEA each year to manufacture sodium oxybate Xyrem and JZP-6. These statutes and regulations include anti-kickback statutes and false claims statutes.

The federal health care program anti-kickback statute prohibits, among other things, knowingly and willfully offering, paying, soliciting, or receiving remuneration to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any health care item or service reimbursable under Medicare, Medicaid or other federally financed healthcare programs. This statute has been interpreted to apply to arrangements between pharmaceutical companies on one hand and prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exemptions and regulatory safe harbors protecting identified common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration intended to induce prescribing, purchases or recommendations may be subject to scrutiny if they do not qualify for an exemption or safe harbor. Our practices may not in all cases meet all of the criteria for safe harbor protection from anti-kickback liability.

Federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.

Recently, several pharmaceutical and other health care companies have been prosecuted under these laws for allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product. Other companies have been prosecuted for causing false claims to be submitted because of the company's marketing of the product for unapproved, and thus non-reimbursable, uses. Pharmaceutical and other health care companies have also been prosecuted on other legal theories of Medicare fraud. The majority of states also have statutes or regulations similar to the federal anti-kickback law and false claims laws, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Sanctions under these federal and state laws may include civil monetary penalties, exclusion of a company's products from reimbursement under government programs, criminal fines and imprisonment. Several states now require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and the reporting of gifts to individual physicians in the states. Other states require the posting of information relating to clinical studies. In addition, California requires pharmaceutical companies to implement a comprehensive compliance program that includes a limit on expenditures for or payments to individual prescribers. Currently, several additional states are considering similar proposals. Compliance with these laws is difficult and time consuming and companies that do not comply with these state laws face civil penalties. Because of the breadth of these laws and the narrowness of the safe harbors, it is possible that some of our business activities could be subject to challenge under one or more of such laws. Such a challenge could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

If we or any of our partners fail to comply with applicable regulatory requirements, we or they could be subject to a range of regulatory actions that could affect our or our partners' ability to commercialize our products and could harm or prevent sales of the affected products, or could substantially increase the costs and expenses of commercializing and marketing our products. Any threatened or actual government enforcement action could also generate adverse publicity and require that we devote substantial resources that could otherwise be used in other aspects of our business.

***If we fail to comply with our reporting and payment obligations under the Medicaid rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

We participate in the federal Medicaid rebate program established by the Omnibus Budget Reconciliation Act of 1990, as well as several state supplemental rebate programs. Under the Medicaid rebate program, we pay a rebate to each state Medicaid program for our products that are reimbursed by those programs. The minimum amount of the rebate for each unit of product is set by law at 15.1% of the average manufacturing price of that product, or if it is greater, the difference between the average manufacturing price and the best price we make available to any customer. The rebate amount also includes an inflation adjustment, if necessary.

Pricing and rebate calculations vary among products and programs. The calculations are complex and are often subject to interpretation by us, governmental or regulatory agencies and the courts. The Medicaid rebate amount is computed each quarter based on our submission to the Centers for Medicare & Medicaid Services at the U.S. Department of Health and Human Services of our current average manufacturing price and best prices for the quarter. If we become aware that our reporting for prior quarters was incorrect, or changed as a result of recalculation of the pricing data, we are obligated to resubmit the corrected average manufacturing price or best price for that quarter. Any corrections to our rebate calculations could result in an overage or underage in our rebate liability for past quarters, depending on the nature of the correction. In addition to retroactive rebates (and interest, if any), if we are found to have knowingly submitted false information to the government, we may be liable for civil monetary penalties in the amount of $100,000 per item of false information. Governmental agencies may also make changes in program interpretations, requirements or conditions of participation, some of which may have implications for amounts previously estimated or paid.

Federal law requires that any company that participates in the Medicaid rebate program extend comparable discounts to qualified purchasers under the Public Health Services' pharmaceutical pricing program requiring us to sell our products at prices lower than we otherwise might be able to charge. The Public Health Services pricing program extends discounts comparable to the Medicaid rebates to a variety of community health clinics and other entities that receive health services grants from the Public Health Services, as well as hospitals that serve a disproportionate share of poor patients and children.

***Reimbursement may not be available for our products, which could diminish our sales or affect our ability to sell our products profitably.\****

In both U.S. and foreign markets, our ability to commercialize our products successfully, and to attract strategic partners for our products, depends in significant part on the availability of adequate financial coverage and reimbursement from third party payors, including, in the U.S., governmental payors such as the Medicare and Medicaid programs, managed care organizations and private health insurers. Third party payors decide which drugs they will pay for and establish reimbursement levels. Third party payors are increasingly challenging the prices charged for medical products and services and examining their cost effectiveness, in addition to their safety and efficacy. In some cases, for example, third party payors try to encourage the use of less expensive generic products through their prescription benefits coverage and reimbursement policies. We may need to conduct expensive pharmacoeconomic studies in order to demonstrate the cost-effectiveness of our products. Even with studies, our products may be considered less safe, less effective or less cost-effective than existing products, and third party payors may not provide coverage and reimbursement for our products, in whole or in part. We cannot predict actions third party payors may take, or whether they will limit the coverage and level of reimbursement for our products or refuse to provide any coverage at all. For example, because Luvox CR is competing in a market with both branded and generic products, reimbursement by government and private payors may be more challenging than for new chemical entities. We cannot be sure that reimbursement amounts will not reduce the demand for, or the price of, our products. If reimbursement is not available or is available only to limited levels, we may not be able to effectively commercialize our products.

There have been a number of legislative and regulatory proposals in recent years to change the healthcare system in ways that could impact our ability to sell our products profitably. These proposals include measures that would limit or prohibit payments for some medical treatments or subject the pricing of drugs to government control and regulations changing the rebates we are required to provide. For example, a final rule published by the Department of Defense, or DoD, in March 2009 under the National Defense Authorization Act of 2008, establishes a program under which DoD will seek rebates from pharmaceutical manufacturers on all prescriptions of covered prescription drugs filled under the TRICARE retail pharmacy program from January 28, 2008 forward, unless DoD agrees to a waiver or compromise of amounts due. Additionally, under the final rule, to remain eligible for inclusion on the DoD Uniform Formulary, a pharmaceutical manufacturer must enter into a pricing agreement under which it agrees to pay rebates to DoD on TRICARE retail pharmacy utilization on a prospective basis. These changes could impact our ability to maximize revenues in the Federal marketplace. In addition, Congress currently is considering health care reform legislation that would affect the

Table of Contents

prices of our products under certain health care programs. These proposals include expanding the 340B drug pricing program to allow additional types of health care providers to purchase drugs at significant discounts and to require those discounts on inpatient drugs as well, increasing the minimum Medicaid drug rebate percentage, expanding Medicaid rebate liability to drugs purchased under Medicaid managed care contracts, increasing the Medicaid rebate on new formulations of existing drugs, and requiring Medicaid rebates to be paid on drugs provided to certain enrollees in the Medicare Part D prescription drug benefit.

We expect to experience pricing pressures in connection with the sale of our products due to the trend toward managed health care, the increasing influence of health maintenance organizations and additional legislative proposals. If we fail to successfully secure and maintain reimbursement coverage for our products or are significantly delayed in doing so, we will have difficulty achieving market acceptance of our products and our business will be harmed. Congress has recently been discussing and may be in the process of enacting healthcare reform, which, if enacted, could have a material adverse effect on the pharmaceutical industry as a whole, and therefore could have a material adverse effect on our business.

*Prescription drug importation from Canada and other countries could increase pricing pressure on our products and could decrease our revenues and profit margins.*

Under current U.S. law, there is a general prohibition on imports of unapproved drug products. The FDA has published internal guidance that sets forth the agency's enforcement priorities for imported drugs. Under this policy, the FDA allows its personnel to use their discretion in permitting entry into the U.S. of personal use quantities of FDA-regulated products in personal baggage and mail when the product does not present an unreasonable risk to the user. Thus, individuals may import prescription drugs that are unavailable in the U.S. from Canada and other countries for their personal use under specified circumstances. Other imports, although illegal under U.S. law, also enter the country as a result of the resource constraints and enforcement priorities of the FDA and the U.S. Customs Services. In addition, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 will permit pharmacists and wholesalers to import prescription drugs into the U.S. from Canada under specified circumstances. These additional import provisions will not take effect until the Secretary of Health and Human Services makes a required certification regarding the safety and cost savings of imported drugs and the FDA has promulgated regulations setting forth parameters for importation. These conditions have not been met to date and the law has therefore not taken effect. However, legislative proposals have been introduced to remove these conditions and implement changes to the current import laws, or to create other changes that would allow foreign versions of our products priced at lower levels than in the U.S. to be imported or reimported to the U.S. from Canada, Europe and other countries. In addition, there have been indications that the current presidential administration is considering changing certain rules to make it easier to import drugs from other countries, and we cannot predict what, if any changes will happen. If these provisions or changes in the rules take effect, the volume of prescription drug imports from Canada and elsewhere could increase significantly and our products could face competition from lower priced imports.

Even if these provisions do not take effect and alter current law, the volume of prescription drug imports from Canada and elsewhere could increase due to a variety of factors, including the further spread of internet pharmacies and actions by a number of state and local governments to facilitate Canadian and other imports. These imports may harm our business.

We licensed Xyrem to Valeant to distribute in Canada. Due to government price regulation in Canada, products are generally sold in Canada for lower prices than in the U.S. Due to the REMS for Xyrem and our agreement with Valeant, we believe that it is unlikely that Xyrem will be imported from Canada to the U.S. Luvox CR is not approved in Canada.

*Product liability and product recalls could harm our business.*

The development, manufacture, testing, marketing and sale of pharmaceutical products entail significant risk of product liability claims or recalls. Side effects of, or manufacturing defects in, the products sold by us could result in exacerbation of a patient's condition, serious injury or impairments or even death. This could result in product liability claims and/or recalls of one or more of our products. For example, studies and publications suggest that selective serotonin reuptake inhibitors, including the active pharmaceutical ingredient in Luvox CR and its immediate release formulation Luvox, may increase the risk of suicidal behavior in adults and adolescents. In addition, the current selective serotonin reuptake inhibitor products used to treat obsessive compulsive disorder and social anxiety disorder, particularly those formulated for immediate release, all have significant adverse side effects. Side effects associated with selective serotonin reuptake inhibitors include sexual dysfunction, adverse drug interaction and risk of hypertension. Claims may be brought by individuals seeking relief for themselves or by groups seeking to represent a class. While we have not had to defend against any product liability claims to date, as sales of our products increase, we believe it is likely product liability claims will be made against us. We cannot predict the frequency, outcome or cost to defend any such claims.

Product liability insurance coverage is expensive, can be difficult to obtain and may not be available in the future on acceptable terms, if at all. Partly as a result of product liability lawsuits related to pharmaceutical products, product liability and other types of insurance have become more difficult and costly for pharmaceutical companies to obtain. Our product liability insurance may not cover all of the future liabilities we might incur in connection with the development, manufacture or sale of our products. In addition, we may not continue to be able to obtain insurance on satisfactory terms or in adequate amounts.

A successful claim or claims brought against us in excess of available insurance coverage could subject us to significant liabilities and could have a material adverse effect on our business, financial condition, results of operations and growth prospects. Such claims could also harm our reputation and the reputation of our products, adversely affecting our ability to market our products successfully. In addition, defending a product liability lawsuit is expensive and can divert the attention of key employees from operating our business.

Product recalls may be issued at our discretion or at the discretion of our suppliers, government agencies and other entities that have regulatory authority for pharmaceutical sales. Any recall of our products could materially adversely affect our business by rendering us unable to sell that product for some time and by adversely affecting our reputation.

## Risks Relating to Our Financial Condition

### We believe that have cured all material defaults on our Senior Notes and that the holders of our Senior Notes no longer have the right to accelerate our obligations; however, if the holders of our Senior Notes do not agree with us, they could attempt to accelerate our obligations at any time.*

We did not timely make the quarterly interest payments on the $119.5 million principal amount of senior secured notes, or Senior Notes, due on December 31, 2008, March 31, 2009 and June 30, 2009. In addition, we failed to comply with a covenant to establish and maintain a minimum cash balance in an account pledged to the collateral agent for the Senior Notes, which became applicable in May 2009 because our annualized aggregate net product sales did not exceed $100.0 million for the three months ended March 31, 2009. The failure to make the quarterly interest payments when due and the failure to establish the required restricted cash balance account in May 2009 constituted events of default under the agreement with the holders of our Senior Notes, or Senior Note Agreement, that permitted the holders of more than 50% in principal amount of the Senior Notes, or the Majority Holders, to accelerate payment of the Senior Notes. On July 7, 2009, we paid $14.6 million to the holders of the Senior Notes which represented all of the accrued and unpaid interest as of June 30, 2009 and we delivered to the holders financial statements for the quarter ended June 30, 2009 that indicated that our annualized aggregate net product sales exceeded $100.0 million for the quarter ended June 30, 2009. As a result, the requirement to maintain a restricted cash balance was suspended. Accordingly, we believe that we have cured all material defaults under the Senior Note Agreement and that the holders of our Senior Notes no longer have the right to accelerate our obligations.

It is possible that the holders of our Senior Notes will not agree with us that all material defaults under the Senior Note Agreement have been cured and that they no longer have the right to accelerate our obligations. The Majority Holders may attempt to accelerate the Senior Notes and declare all of the Senior Notes to be immediately due and payable. The holders of our Senior Notes have a first priority security interest in all of our assets other than inventory and accounts receivable. We do not currently have sufficient cash resources to pay the amount that would become payable in the event of an acceleration of the Senior Notes, including a prepayment premium and any accrued but unpaid interest.

### We have a history of net losses, which may continue for the next few years and, if we are to grow our business in the future, we will need to commit substantial resources, which could increase the extent of any future losses.*

We have incurred significant net losses since our inception in 2003, and we may continue to incur net losses in the future. Our independent registered public accounting firm issued an opinion on our audited consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2008 that states that our recurring losses from operations and net capital deficiency raises substantial doubt about our ability to continue as a going concern.

To grow our business in the future, we will need to commit substantial resources to costly and time-consuming product development and clinical trials of our product candidates and significant funds to our commercial operations. Our future capital requirements will depend on many factors, including:

- the amount of sales and other revenues from our commercial products, including selling prices for products that we may begin selling and price increases for our current products;

- market acceptance of and the number of prescriptions written for our products;

- selling and marketing costs associated with Xyrem and Luvox CR in the U.S.;

- revenues from current and potential future development and/or commercial collaboration partners, in particular our current partnership with UCB;

- our ability to properly prepare and timely file our New Drug Application for JZP-6;

- the scope, rate of progress, results and costs of our preclinical studies, clinical trials, including our Phase IV clinical trial commitment to the FDA for Luvox CR, and other research and development activities;

- the number and characteristics of product candidates that we pursue;

41

- the cost and timing of establishing clinical and commercial supplies of our product candidates;

- the cost and timing of obtaining regulatory approval;

- payments of milestones to third parties;

- increased expenses associated with our current employees and new employees hired to support our continued growth;

- the cost of investigations, litigation and/or settlements related to regulatory activities;

- the cost of preparing, filing, prosecuting, defending and enforcing patent claims and other intellectual property rights; and

- the extent to which we acquire, in-license or invest in new businesses, products or product candidates.

Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. If we are unable to achieve and sustain profitability, the market value of our common stock will likely decline.

***Our operations have generated negative cash flows, and, if our cash flow estimates are incorrect, we may be required to secure additional funding, significantly scale back our operations, significantly reduce our headcount, and/or discontinue many of our activities which could negatively affect our business and prospects.****

While we believe we will be able to fund our operations and meet all of our ongoing current financial obligations for at least the next 12 months, we have based this estimate on assumptions that may prove to be wrong, including assumptions with respect to the level of revenues from product sales, and we could exhaust our available financial resources. The sufficiency of our current cash resources, and our potential need for additional capital and the timing thereof, will depend on many factors, including primarily the amount of revenues that we receive from sales of Xyrem and Luvox CR and our ability to use our net operating losses to offset taxes that would otherwise be due. If we are unable to raise sufficient additional funds when or if needed, we would be required to further reduce operating expenses. Furthermore, any additional funds we may raise could be on terms that are not favorable to us and may be dilutive to existing stockholders.

We have reduced the net cash used in our operations by implementing three reductions in force in 2008 and focusing our efforts on our commercial products and JZP-6. We cannot predict with certainty the level of our product sales. If product sales do not meet our expectations and/or we do not raise additional funds, we will need to further reduce our expenditures, perhaps significantly, to preserve our cash. The cost-cutting measures we have taken and may take in the future may not be sufficient to enable us to meet our cash requirements or for us to reach profitability, and they may negatively affect our business and prospects.

***We have a substantial amount of debt, which may adversely affect our cash flows and our ability to operate our business.****

There is currently outstanding $119.5 million principal amount of our senior secured notes, or the Senior Notes. Our substantial debt combined with our other financial obligations and contractual commitments could have important consequences. For example, it could:

- make us more vulnerable to adverse changes in general United States and worldwide economic, industry and competitive conditions and adverse changes in government regulation;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flows to fund working capital, capital expenditures and acquisitions;

- limit our flexibility in planning for, or reacting to, changes in our business and our industry;

- place us at a competitive disadvantage compared to our competitors who have less debt; and

- limit our ability to borrow additional amounts for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy or other purposes.

Any of these factors could materially adversely affect our business, financial condition, results of operations and growth prospects. In addition, in the event of a default under the agreement governing the Senior Notes, or the Senior Note Agreement, the holders of our Senior Notes could accelerate, or demand immediate repayment of, all or a portion of our indebtedness under the Senior Notes, including if annualized net sales of our products fall below certain specified levels following the occurrence of certain events, or if we are unable to comply with certain of the other Senior Notes covenants, including the timely payment of quarterly interest installments. Any such acceleration would have a material adverse effect on our business, financial condition and results of operations. If we do not have sufficient funds to service our debt, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell securities, none of which we can assure you that we would be able to do in a timely manner or at all. In addition, our ability to refinance any amounts that may become accelerated or to secure waivers from the holders of the Senior Notes with respect to compliance with the Senior Note Agreement covenants may be adversely affected by our prior defaults under the Senior Notes and the September 2008 filing by Lehman Brothers Holdings, Inc., the indirect parent of LB I Group Inc., the largest holder of our Senior Notes, for protection under Chapter 11 of the U.S. Bankruptcy Code. The holders of the Senior Notes have a first priority security interest in all of our assets other than inventory and accounts receivable and, in the event of an acceleration of our obligations under the Senior Notes and our failure to pay the amount that would then become due, the holders of the Senior Notes could seek to foreclose on our assets, as a result of which we would likely need to seek protection under the provisions of the U.S. Bankruptcy Code.

Table of Contents

***The terms of our Senior Notes could restrict our operations, particularly our ability to respond to changes in our business or to take specified actions.****

The terms of our Senior Notes currently contain, and any future indebtedness may contain, a number of restrictive covenants that impose significant operating and financial restrictions on us, including restrictions on our ability to take actions that may be in our best interests. The terms of the Senior Notes include covenants, including requirements that we:

- generally not borrow additional amounts without the approval of our lenders;

- dispose of certain assets only in accordance with the terms of our existing senior secured debt;

- not impair our lenders' security interests in our assets;

- repay an additional portion of the debt early under certain circumstances; and

- maintain restricted cash balances under certain circumstances.

***Our ability to use our net operating losses to offset taxes that would otherwise be due could be limited or lost entirely if we do not generate taxable income in a timely manner or if we trigger an "ownership change" pursuant to Section 382 of the Internal Revenue Code which, if we generate taxable income, could materially and adversely affect our business, financial condition, and results of operations.****

We have significant net operating loss carryforwards, or NOLs. Our ability to use our net operating losses to offset taxes that would otherwise be due is dependent upon our generation of future taxable income before the expiration dates of the NOLs, and we cannot predict with certainty when, if ever, we will be able to generate future taxable income. In addition, even if we generate taxable income, realization of our NOLs to offset taxes that would otherwise be due could be restricted by annual limitations on use of NOLs triggered by an "ownership change" under Section 382 of the Internal Revenue Code and similar state provisions. An "ownership change" may occur when there is a 50% or greater change in total ownership of our company by one or more 5% shareholders within a three-year period. If we generate taxable income, the loss of some or all of our NOLs could materially and adversely affect our business, financial condition, results of operations and growth prospects.

Effective July 7, 2009, we entered into a NOL preservation lock-up agreement with most of our significant stockholders that restricts transferability of shares of our common stock by the stockholders who entered into the agreement until June 2011, unless terminated earlier under certain circumstances, in order to minimize the risk that we will undergo an "ownership change" within the meaning of Section 382 of the Internal Revenue Code prior to that time. Section 382 of the Internal Revenue Code is an extremely complex provision with respect to which there are many uncertainties. Although the NOL Preservation Lock-up Agreement is intended to minimize the risk of such an "ownership change" we cannot assure you that such an ownership change will not occur. In addition, we have not requested a ruling from the Internal Revenue Service, or IRS, regarding whether we have effectively preserved our NOLs, and we cannot ensure that the IRS will agree that our NOLs have been effectively preserved for purposes of Section 382.

**Risks Relating to Ownership of Our Common Stock**

***The market price of our common stock may be volatile, and the value of your investment could decline significantly.****

Investors who purchase our common stock may not be able to sell their shares at or above the purchase price. Although recently the trading price and average volume of our common stock has increased, historically our common stock has had a very low average trading volume and our stockholders may not be able to sell any or all of their holdings quickly or at all. The price of our stock has also fluctuated significantly since the beginning of 2009 and we cannot predict if it will continue to do so. In addition, the stock market in general and the market for life sciences companies in particular have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may seriously harm the market price of our common stock, regardless of our operating performance. In the past, following periods of volatility in the market, securities class-action litigation has often been instituted against companies. Such litigation, if instituted against us, could result in substantial costs and diversion of management's attention and resources, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

The following factors, in addition to other risks described herein, may have a significant effect on our common stock market price:

- the success of Xyrem and Luvox CR in the U.S.;

- conditions or trends in the pharmaceutical industry, the credit and financial markets or the U.S. and worldwide economy in general;

Table of Contents

- our financial situation, including our ability or inability to raise additional capital if needed and the terms on which we raise it;

- the failure or delay by the DEA in providing sufficient quotas for sodium oxybate, Xyrem or JZP-6;

- the success of our development efforts and clinical trials;

- our ability to properly prepare and timely file our New Drug Application for JZP-6;

- announcement of FDA approval or non-approval of our product candidates, or specific label indications for their use, or delays in the FDA review process;

- the ability of Elan to provide us with sufficient commercial supply of Luvox CR;

- actual or expected fluctuations in our operating results, including as a result of fluctuating demand for our commercial products as a result of purchases by wholesalers in connection with product launches, stockpiling or inventory drawdowns by our customers, or otherwise;

- changes in the market prices for our products;

- the success of our efforts to acquire or in-license additional products or product candidates;

- introductions and announcements of new products by us, our commercialization partners, or our competitors, and the timing of these introductions or announcements;

- the filing of, and thereafter the possible FDA approval of, ANDAs for generic forms of Xyrem and Luvox CR;

- announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

- announcements of product innovations by us, our partners or our competitors;

- changes in laws or regulations applicable to our products, including but not limited to clinical trial requirements;

- actions taken by regulatory agencies with respect to our products, clinical trials, manufacturing process or sales and marketing terms;

- developments concerning our collaborations, including but not limited to those with our sources of manufacturing supply and our commercialization partners;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our products;

- actual or anticipated changes in earnings estimates or changes in stock market analyst recommendations regarding our common stock, other comparable companies or our industry generally;

- actual or expected changes in our growth rates or our competitors' growth rates;

- changes in the market valuation of similar companies;

- trading volume of our common stock; and

- sales of our common stock by us or our stockholders.

*Our common stock was recently at risk for delisting from The NASDAQ Global Market and may be again in the future. Delisting could adversely affect the liquidity of our common stock and the market price of our common stock could decrease.\**

Our common stock is currently listed on The NASDAQ Global Market. The NASDAQ Stock Market LLC, or NASDAQ, has minimum requirements that a company must meet in order to remain listed on The NASDAQ Global Market. These requirements include maintaining a minimum closing bid price of $1.00 per share. Although the trading price of our common stock is currently above $1.00 per share, the closing bid price of our common stock earlier in 2009 was well below $1.00. These requirements also include maintaining a minimum market value of publicly held shares, and, although as of October 30, 2009 we met this requirement, earlier in 2009 we did not. There can be no assurance that we will continue to meet these requirements in the future, and, if we do not, it is possible that NASDAQ may notify us that we have failed to meet the minimum listing requirements and initiate the delisting process. If our common stock were to be delisted, the liquidity of our common stock would be adversely affected and the market price of our common stock could decrease.

*Future sales of our common stock in the public market could cause our stock price to fall.\**

Sales of a substantial number of shares of our common stock in the public market, or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. As of October 30, 2009, we had 30,992,088 shares of common stock outstanding, all of which shares were eligible for sale in the public market, subject in some cases to the volume limitations and manner of sale requirements under Rule 144 and restrictions under our NOL Preservation Lock-up Agreement.

44

Table of Contents

As of October 30, 2009, the holders of up to approximately 18,312,159 shares of common stock, based on shares outstanding as of that date, including 785,728 shares underlying outstanding warrants, were entitled to certain rights with respect to the registration of such shares under the Securities Act of 1933, as amended, under an amended and restated investor rights agreement that we entered into with these holders. In addition, upon exercise of outstanding options by our executive officers, our executive officers will be entitled to rights under the amended and restated investor rights agreement with respect to registration of the shares of common stock acquired on exercise. If such holders, by exercising their registration rights, sell a large number of shares, they could adversely affect the market price for our common stock. If we file a registration statement and include shares held by these holders pursuant to the exercise of their registration rights, these sales may impair our ability to raise capital. On March 17, 2008, we entered into a registration rights agreement pursuant to which we agreed to file a registration statement covering the resale of the 562,192 shares underlying the warrants that we issued in connection with the issuance of the Senior Notes. In addition, we have filed registration statements on Form S-8 under the Securities Act of 1933, as amended, to register the shares of our common stock reserved for issuance under our stock option and employee stock purchase plans, and intend to file additional registration statements on Form S-8 to register the shares automatically added each year to the share reserves under these plans.

We entered into a committed equity financing facility, or CEFF, on May 7, 2008 with Kingsbridge Capital Limited, or Kingsbridge. The perceived risk of dilution from sales of our common stock to or by Kingsbridge in connection with the CEFF may cause holders of our common stock to sell their shares, or it may encourage short selling by market participants, which could contribute to a decline in our stock price. The registration rights agreement entered into in connection with the CEFF requires that we use commercially reasonable efforts to ensure that the registration statement in connection with the CEFF remains effective for the term of such agreement. We have not drawn down funds and have not issued shares of our common stock under our committed equity financing facility, or CEFF, with Kingsbridge Capital Limited, or Kingsbridge. Our ability to draw down funds and sell shares under the CEFF requires the continued effectiveness of and the ability to use the registration statement that we filed registering the resale of any shares issuable to Kingsbridge under the CEFF; however, we believe that the use of such registration statement may not be permitted under applicable SEC rules and guidance. Even if we are successful in taking the necessary steps to cause the resumption of the permitted use of such registration statement (as may be amended) in a timely manner, we are not able to sell shares under the CEFF if the average price of our common stock is lower than $4.50 per share.

Pursuant to the terms of an investor rights agreement dated July 7, 2009 we entered into in connection with the private placement completed on July 7, 2009, we filed a registration statement under the Securities Act registering the resale of the 1,895,734 shares of common stock we issued to the investors pursuant to a securities purchase agreement we entered into with the investors on July 6, 2009, as well as the 947,867 shares of common stock underlying the warrants we issued to the investors pursuant to the securities purchase agreement. In the event that a registration statement registering the resale of all of the 2,843,601 shares held by or issuable to the investors has not been declared effective by the SEC on or prior to November 15, 2009, we may be subject to the payment of liquidated damages to the investors. In addition, if we propose to register any of our securities under the Securities Act, either for our own account or for the account of others, the investors are entitled to notice of the registration and are entitled to include, at our expense, their shares of common stock in the registration and any related underwriting, provided, among other conditions, that the underwriters may limit the number of shares to be included in the registration.

### *Our executive officers and directors, together with their respective affiliates, own a significant percentage of our stock and will be able to exercise significant influence over matters subject to stockholder approval.\**

As of October 30, 2009, our executive officers and directors, together with their respective affiliates, beneficially owned approximately 65.7% of our capital stock, of which approximately 4.2% was beneficially owned by our executive officers. Accordingly, our executive officers and directors together with their respective affiliates are able to determine the composition of our board of directors, retain the voting power to approve all matters requiring stockholder approval, including mergers and other business combinations, and continue to have significant influence over our operations. This concentration of ownership could have the effect of delaying or preventing a change in our control or otherwise discouraging a potential acquirer from attempting to obtain control of us, which in turn could have a material adverse effect on the market value of our common stock, and may prevent attempts by our stockholders to replace or remove our board of directors or management.

### *We incur significant increased costs as a result of operating as a public company, and our management will be required to devote substantial time to new compliance initiatives.*

As a public company, we incur significant legal, accounting and other expenses that we did not incur as a private company. In addition, the Sarbanes-Oxley Act of 2002 and rules of the Securities and Exchange Commission and The NASDAQ Stock Market LLC have imposed various requirements on public companies including requiring establishment and maintenance of effective disclosure and financial controls. Our management and other personnel must continue to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased and will continue to increase our legal and financial

Table of Contents

compliance costs and will make some activities more time-consuming and costly. For example, these rules and regulations may make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may incur substantial costs to maintain the same or similar coverage.

The Sarbanes-Oxley Act of 2002 requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. For example, we were required to perform system and process evaluation and testing of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, beginning with our Annual Report on Form 10-K for the year ended December 31, 2008, and to allow our independent registered public accounting firm to issue a report on the effectiveness of our internal control over financial reporting beginning with our annual report on Form 10-K for the fiscal year ending December 31, 2010. Our compliance with Section 404 of the Sarbanes-Oxley Act requires that we incur substantial accounting expense and expend significant management efforts. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by NASDAQ, the SEC or other regulatory authorities, which would require additional financial and management resources.

Our ability to successfully implement our business plan and comply with Section 404 requires us to be able to prepare timely and accurate financial statements. We expect that we will need to continue to improve existing, and implement new, operational and financial systems, procedures and controls to manage our business effectively. Any delay in the implementation of, or disruption in the transition to, new or enhanced systems, procedures or controls, may cause our operations to suffer and we may be unable to conclude that our internal control over financial reporting is effective and to obtain an unqualified report on internal controls from our auditors as required under Section 404 of the Sarbanes-Oxley Act. This, in turn, could have an adverse impact on trading prices for our common stock, and could adversely affect our ability to access the capital markets.

***Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders, and may prevent attempts by our stockholders to replace or remove our current management.***

Provisions in our certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us, or for a change in the composition of our board of directors or management to occur, even if doing so would benefit our stockholders. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- dividing our board of directors into three classes;

- limiting the removal of directors by the stockholders;

- eliminating cumulative voting rights and therefore allowing the holders of a majority of the shares of our common stock to elect all of the directors standing for election, if they should so choose;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders.

***We have never declared or paid dividends on our capital stock and we do not anticipate paying dividends in the foreseeable future.***

Our business requires significant funding, and we currently invest more in product development than we earn from sales of our products. In addition, the agreements governing our debt restrict our ability to pay dividends on our common stock. Therefore, we do not anticipate paying any cash dividends on our common stock in the foreseeable future. We currently plan to invest all available funds and future earnings in the development and growth of our business and in the payment of our obligations. As a result, capital appreciation, if any, of our common stock will be your sole source of potential gain for the foreseeable future.

Table of Contents

**Item 6.    Exhibits.**

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of the Registrant.(1) |
| 3.2 | Amended and Restated Bylaws.(2) |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. |
| 4.2 | Specimen Common Stock Certificate.(3) |
| 4.3A | Third Amended and Restated Investor Rights Agreement, made effective as of June 6, 2007, by and between the Registrant and the other parties named therein.(4) |
| 4.3B | Waiver and Amendment Agreement, dated as of March 12, 2008, by and between the Registrant and the other parties named therein.(6) |
| 4.3C | Waiver and Amendment Agreement, dated as of May 7, 2008, by and between the Registrant and the other parties named therein.(7) |
| 4.3D | Waiver and Amendment Agreement, dated as of July 6, 2009 by and between the Registrant and the other parties named therein.(11) |
| 4.4A | Form of Series BB Preferred Stock Warrant of the Registrant.(5) |
| 4.4B | Form of Series BB Preferred Stock Warrant of the Registrant, as amended.(6) |
| 4.5A† | Senior Secured Note and Warrant Purchase Agreement, dated as of March 14, 2008, by and among the Registrant, JPI Commercial, LLC and the Purchasers named therein.(6) |
| 4.5B | Form of Senior Secured Tranche A Note of JPI Commercial, LLC.(6) |
| 4.5C | Form of Senior Secured Tranche B Note of JPI Commercial, LLC.(6) |
| 4.5D | Form of Common Stock Warrant of the Registrant.(6) |
| 4.5E† | Registration Rights Agreement, dated as of March 17, 2008, by and between the Registrant and the other parties named therein.(6) |
| 4.6A | Warrant issued to Kingsbridge Capital Limited, dated May 7, 2008.(7) |
| 4.6B | Registration Rights Agreement, dated as of May 7, 2008, by and between the Registrant and Kingsbridge Capital Limited.(7) |
| 4.7 | Form of Registered Direct Common Warrant.(8) |
| 4.8 | NOL Preservation Lock-Up Agreement, effective as of July 7, 2009, by and between the Registrant and the other parties named therein.(9) |
| 4.9A | Form of Common Stock Warrant of the Registrant issued on July 7, 2009.(9) |
| 4.9B | Investor Rights Agreement, dated July 7, 2009, by and between the Registrant and the other parties named therein.(10) |
| 10.91 | Amendment No. 5 to License Agreement, dated as of October 23, 2009, by and between the Registrant and Elan Pharma International Limited. |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Acting Principal Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of Chief Executive Officer and Acting Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

†    Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

(1)    Incorporated herein by reference to the same numbered exhibit to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(2)    Incorporated herein by reference to Exhibit 3.4 to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(3)    Incorporated herein by reference to the same numbered exhibit to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(4)    Incorporated herein by reference to Exhibit 4.3 to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(5)    Incorporated by reference to Exhibit 4.6 to the Registrant's registration statement on Form S-1 (File No. 333-141164), as filed with the SEC on March 9, 2007.

(6)    Incorporated herein by reference to the same numbered exhibit to the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008.

(7)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008.

(8)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 16, 2008.

(9)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009.

(10)    Incorporated herein by reference to Exhibit 10.88 to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009.

(11)    Incorporated herein by reference to the same numbered exhibit on the Registrant's quarterly report on Form 10-Q (File No. 001-33500), for the period ended June 30, 2009, as filed with the SEC on August 14, 2009.

*    The certifications attached as Exhibit 32.1 accompany this Quarterly Report on Form 10-Q pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: November 6, 2009

**JAZZ PHARMACEUTICALS, INC.**

| /s/   BRUCE C. COZADD |
| --- |
| **Bruce C. Cozadd** |
| *Chairman and Chief Executive Officer and Director* |
| *(Principal Executive Officer)* |

| /s/   JOAN E. COLLIGAN |
| --- |
| **Joan E. Colligan** |
| *Acting Principal Financial Officer* |
| *(Principal Financial Officer)* |

49

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Fourth Amended and Restated Certificate of Incorporation of the Registrant.(1) |
| 3.2 | Amended and Restated Bylaws.(2) |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. |
| 4.2 | Specimen Common Stock Certificate.(3) |
| 4.3A | Third Amended and Restated Investor Rights Agreement, made effective as of June 6, 2007, by and between the Registrant and the other parties named therein.(4) |
| 4.3B | Waiver and Amendment Agreement, dated as of March 12, 2008, by and between the Registrant and the other parties named therein.(6) |
| 4.3C | Waiver and Amendment Agreement, dated as of May 7, 2008, by and between the Registrant and the other parties named therein.(7) |
| 4.3D | Waiver and Amendment Agreement, dated as of July 6, 2009 by and between the Registrant and the other parties named therein.(11) |
| 4.4A | Form of Series BB Preferred Stock Warrant of the Registrant.(5) |
| 4.4B | Form of Series BB Preferred Stock Warrant of the Registrant, as amended.(6) |
| 4.5A† | Senior Secured Note and Warrant Purchase Agreement, dated as of March 14, 2008, by and among the Registrant, JPI Commercial, LLC and the Purchasers named therein.(6) |
| 4.5B | Form of Senior Secured Tranche A Note of JPI Commercial, LLC.(6) |
| 4.5C | Form of Senior Secured Tranche B Note of JPI Commercial, LLC.(6) |
| 4.5D | Form of Common Stock Warrant of the Registrant.(6) |
| 4.5E† | Registration Rights Agreement, dated as of March 17, 2008, by and between the Registrant and the other parties named therein.(6) |
| 4.6A | Warrant issued to Kingsbridge Capital Limited, dated May 7, 2008.(7) |
| 4.6B | Registration Rights Agreement, dated as of May 7, 2008, by and between the Registrant and Kingsbridge Capital Limited.(7) |
| 4.7 | Form of Registered Direct Common Warrant.(8) |
| 4.8 | NOL Preservation Lock-Up Agreement, effective as of July 7, 2009, by and between the Registrant and the other parties named therein.(9) |
| 4.9A | Form of Common Stock Warrant of the Registrant issued on July 7, 2009.(9) |
| 4.9B | Investor Rights Agreement, dated July 7, 2009, by and between the Registrant and the other parties named therein.(10) |
| 10.91 | Amendment No. 5 to License Agreement, dated as of October 23, 2009, by and between the Registrant and Elan Pharma International Limited. |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Acting Principal Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of Chief Executive Officer and Acting Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

†    Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

(1)    Incorporated herein by reference to the same numbered exhibit to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(2)    Incorporated herein by reference to Exhibit 3.4 to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(3)    Incorporated herein by reference to the same numbered exhibit to the Registrant's registration statement on Form S-1, as amended (File No. 333-141164), as filed with the SEC on May 17, 2007.

(4)    Incorporated herein by reference to Exhibit 4.3 to the Registrant's quarterly report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2007, as filed with the SEC on August 10, 2007.

(5)    Incorporated by reference to Exhibit 4.6 to the Registrant's registration statement on Form S-1 (File No. 333-141164), as filed with the SEC on March 9, 2007.

(6)    Incorporated herein by reference to the same numbered exhibit to the Registrant's annual report on Form 10-K (File No. 001-33500) for the period ended December 31, 2007, as filed with the SEC on March 31, 2008.

(7)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on May 9, 2008.

(8)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 16, 2008.

(9)    Incorporated herein by reference to the same numbered exhibit to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009.

(10)    Incorporated herein by reference to Exhibit 10.88 to the Registrant's current report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009.

(11)    Incorporated herein by reference to the same numbered exhibit on the Registrant's quarterly report on Form 10-Q (File No. 001-33500), for the period ended June 30, 2009, as filed with the SEC on August 14, 2009.

*    The certifications attached as Exhibit 32.1 accompany this Quarterly Report on Form 10-Q pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

Exhibit 10.91

OCTOBER 28 2009

# ELAN PHARMA INTERNATIONAL LIMITED

### AND

## JPI COMMERCIAL, LLC

### AMENDMENT NO. 5

## TO THE DEVELOPMENT, LICENSE AND SUPPLY AGREEMENT OF
## 22 DECEMBER 1997

Luvox CR® (fluvoxamine maleate)

Worldwide

**BETWEEN**:

(1)  **Elan Pharma International Limited**, a company incorporated under the laws of Ireland, and having its registered office at Monksland, Athlone, County Westmeath, Ireland ("**Elan**"); and

(2)  **JPI Commercial, LLC**, a Delaware limited liability company having a place of business at 3180 Porter Drive, Palo Alto, CA 94304, USA ("**JPI**").

**RECITALS**:

(A)  Elan Corporation plc., an Elan affiliate, and Solvay Pharmaceuticals, Inc. entered into an development, license and supply agreement dated 22 December 1997, which has been subsequently amended by Amendment No. 1 dated March 1, 1999, Amendment No. 2 dated 13 April 2000, Amendment No. 3 dated 7 November 2006 and Amendment No. 4 to the License Agreement dated 26 October 2007 (collectively the "**License Agreement**").

(B)  On 31 December 2006, Elan Corporation plc assigned all of its rights and obligations under the License Agreement to Elan, and Elan as assumed said rights and obligations.

(C)  On 31 January 2007, Solvay Pharmaceuticals, Inc. assigned all of its rights and obligations under the License Agreement to Jazz Pharmaceuticals, Inc., the parent company of JPI.

(D)  On 14 March 2008, Jazz Pharmaceuticals Inc. assigned all of its rights and obligations under the License Agreement to JPI, a wholly-owned subsidiary of Jazz Pharmaceuticals Inc., and JPI as assumed said rights and obligations. Jazz Pharmaceuticals Inc. and JPI confirm that (i) this assignment has had no withholding tax implications for Jazz Pharmaceuticals or JPI, (ii) no tax has been withheld by Jazz Pharmaceuticals or JPI to date as a result of this assignment, and (iii) JPI does not anticipate withholding tax in the future as a result of this assignment.

(E)  The Parties wish to enter into this Amendment No 5 to the License Agreement to further clarify and confirm the existing Elan Patent Rights that have been granted to JPI under the License Agreement.

All capitalized terms used in this Amendment Agreement shall have the same meaning as used in the License Agreement except as expressly provided to the contrary in this Amendment Agreement.

**NOW IT IS HEREBY AGREED AS FOLLOWS**:

1 <u>**Amendment to the License Agreement**</u>:

Elan and JPI hereby agree that the License Agreement shall be amended as follows:

a. by deletion of <u>Part I only of Appendix A</u> of the License Agreement and the substitution therefor of the following:

**PART 1**

**ELAN PATENT RIGHTS**

### United States of America Patent and Patent Application Numbers

**4,609,542**

**4,610,875**

**4,726, 951**

**4,769,236**

**5,051,262**

**7,465,462**

**2008/0206335**

**2.** Except as expressly modified herein, all other terms and conditions of the License Agreement remain unchanged and continue to be in full force and effect.

**3.** This Amendment No. 5 Agreement shall be governed by and construed in accordance with Georgia law, without regard to conflict of laws principles. Any disputes arising between the parties relating to this Amendment No. 5 Agreement shall be resolved and settled in accordance with the License Agreement.

*** *** ***

Executed by **JPI Commercial, LLC**

By: _____ /S/   BOB MYERS _____
Name: _____ Bob Myers _____
Title: _____ President _____

Executed by **Elan Pharma International Limited**

By: _____ /S/   WILLIAM DANIEL _____
Name: _____ William Daniel _____
Title: _____ Director _____

Exhibit 31.1

CERTIFICATION

I, Bruce C. Cozadd, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 6, 2009

By:    /s/   Bruce C. Cozadd
_____
Bruce C. Cozadd
Chief Executive Officer

Exhibit 31.2

**CERTIFICATION**

I, Joan E. Colligan, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 6, 2009

By:    /s/   Joan E. Colligan
       _____
       Joan E. Colligan
       Acting Principal Financial Officer

Exhibit 32.1

**CERTIFICATION(1)**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. Section 1350), Bruce C. Cozadd, Chief Executive Officer of Jazz Pharmaceuticals, Inc. (the "Company"), and Joan E. Colligan, Executive Director and Acting Principal Financial Officer of the Company, each hereby certifies that, to the best of his or her knowledge:

1. The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, and

2. The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

In Witness Whereof, the undersigned have set their hands hereto as of November 6, 2009.

/s/   BRUCE C. COZADD
_____
**Bruce C. Cozadd**
**Chief Executive Officer**

/s/   JOAN E. COLLIGAN
_____
**Joan E. Colligan**
**Acting Principal Financial Officer**

_____
(1) This certification accompanies the Quarterly Report on Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Jazz Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing. A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Jazz Pharmaceuticals, Inc. and will be retained by Jazz Pharmaceuticals, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT 54

**Avadel Pharmaceuticals Announces U.S. Commercial Launch of LUMRYZ™ (sodium oxybate) for the Treatment of Cataplexy or Excessive Daytime Sleepiness in Adults Living with Narcolepsy**

June 5, 2023

-LUMRYZ is the first and only once-at-bedtime oxybate for people living with narcolepsy

-Once-nightly dosing regimen of LUMRYZ has been found by FDA to provide a major contribution to patient care over all twice-nightly oxybates

DUBLIN, Ireland, June 05, 2023 (GLOBE NEWSWIRE) -- Avadel Pharmaceuticals plc (Nasdaq: AVDL), a biopharmaceutical company focused on transforming medicines to transform lives, announced today that LUMRYZ is now commercially available. LUMRYZ is an extended-release formulation of sodium oxybate indicated to be taken once at bedtime for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy.

"We are proud to announce that LUMRYZ is commercially available through both our RYZUP™ patient support program and our specialty pharmacy network for patients living with narcolepsy who have been waiting for over two decades for a single dose treatment option that provides the opportunity for an uninterrupted night sleep," said Greg Divis, Chief Executive Officer of Avadel. "LUMRYZ represents a new generation of oxybate treatment the FDA deemed clinically superior to all twice nightly oxybate treatments. The Avadel team is fully prepared to execute our commercial strategy and deliver LUMRYZ to the $3 billion plus once-at-bedtime oxybate market."

LUMRYZ is the first and only U.S. Food & Drug Administration (FDA) approved once-at-bedtime oxybate for people living with narcolepsy. The commercial strategy for LUMRYZ includes an extensive patient support program, RYZUP, which is designed to provide support and education to patients who have been prescribed LUMRYZ and to assist them in gaining access to their medication. More information about the RYZUP patient support program can be accessed at ryzupsupport.com.

LUMRYZ was granted FDA approval based on positive results from the pivotal Phase 3 REST-ON clinical study completed in March 2020. In the REST-ON Phase 3 trial, once-at-bedtime LUMRYZ demonstrated highly statistically significant (p<0.001) and clinically meaningful improvement compared to placebo across all three co-primary endpoints (Maintenance of Wakefulness Test, Clinical Global Impression-Improvement and mean weekly cataplexy attacks) for all three doses evaluated, 6, 7.5 and 9 grams.

LUMRYZ was approved by the FDA on May 1 and was granted a seven year period of Orphan Drug Exclusivity as a result of the FDA finding LUMRYZ to be clinically superior to all first generation oxybate products. In particular, FDA found that LUMRYZ makes a major contribution to patient care over currently available, twice-nightly oxybate products by providing a once-nightly dosing regimen that avoids nocturnal arousal to take a second dose.

**About Avadel Pharmaceuticals plc**

Avadel Pharmaceuticals plc (Nasdaq: AVDL) is a biopharmaceutical company focused on transforming medicines to transform lives. Our approach includes applying innovative solutions to the development of medications that address the challenges patients face with current treatment options. Avadel's commercial product, LUMRYZ, was approved by the U.S. Food & Drug Administration (FDA) as the first and only once-at-bedtime oxybate for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy. For more information, please visit www.avadel.com.

**IMPORTANT SAFETY INFORMATION**

> **WARNING: Taking LUMRYZ™ (sodium oxybate) with other central nervous system (CNS) depressants such as medicines used to make you fall asleep, including opioid analgesics, benzodiazepines, sedating antidepressants, antipsychotics, sedating anti-epileptic medicines, general anesthetics, muscle relaxants, alcohol, or street drugs, may cause serious medical problems, including trouble breathing (respiratory depression), low blood pressure (hypotension), changes in alertness (drowsiness), fainting (syncope), and death.**
>
> **The active ingredient of LUMRYZ (sodium oxybate) is a form of gamma hydroxybutyrate (GHB), a controlled substance. Abuse or misuse of illegal GHB alone or with other CNS depressants (drugs that cause changes in alertness or consciousness) have caused serious side effects. These effects include seizures, trouble breathing (respiratory depression), changes in alertness (drowsiness), coma, and death. Call your doctor right away if you have any of these serious side effects.**
>
> **Because of these risks, LUMRYZ is available only by prescription and filled through certified pharmacies in the LUMRYZ REMS program. You must be enrolled in the LUMRYZ REMS to receive LUMRYZ. Further information is available at www.LUMRYZREMS.com or by calling 1-877-453-1029.**

**INDICATIONS**

LUMRYZ (sodium oxybate) for extended-release oral suspension is a prescription medicine used to treat the following symptoms in adults with narcolepsy:

- sudden onset of weak or paralyzed muscles (cataplexy)
- excessive daytime sleepiness (EDS)

It is not known if LUMRYZ is safe and effective in people less than 18 years of age.

**Do not take LUMRYZ if you take** other sleep medicines or sedatives (medicines that cause sleepiness), drink alcohol, or have a rare problem called succinic semialdehyde dehydrogenase deficiency.

Keep LUMRYZ in a safe place to prevent abuse and misuse. Selling or giving away LUMRYZ may harm others and is against the law. Tell your doctor if you have ever abused or been dependent on alcohol, prescription medicines, or street drugs.

Anyone who takes LUMRYZ should not do anything that requires them to be fully awake or is dangerous, including driving a car, using heavy machinery, or flying an airplane, for at least six (6) hours after taking LUMRYZ. Those activities should not be done until you know how LUMRYZ affects you.

Falling asleep quickly, including while standing or while getting up from the bed, has led to falls with injuries that have required some people to be hospitalized.

**LUMRYZ can cause serious side effects, including the following:**

- **Breathing problems, including** slower breathing, trouble breathing, and/or short periods of not breathing while sleeping (e.g., sleep apnea). People who already have breathing or lung problems have a higher chance of having breathing problems when they take LUMRYZ.
- **Mental health problems, including** confusion, seeing or hearing things that are not real (hallucinations), unusual or disturbing thoughts (abnormal thinking), feeling anxious or upset, depression, thoughts of killing yourself or trying to kill yourself, increased tiredness, feelings of guilt or worthlessness, and difficulty concentrating. Tell your doctor if you have or had depression or have tried to harm yourself. **Call your doctor right away if you have symptoms of mental health problems or a change in weight or appetite.**
- **Sleepwalking.** Sleepwalking can cause injuries. Call your doctor if you start sleepwalking.

Tell your doctor if you are on a salt-restricted diet or if you have high blood pressure, heart failure, or kidney problems. LUMRYZ contains a lot of sodium (salt) and may not be right for you.

The most common side effects of LUMRYZ in adults include nausea, dizziness, bedwetting, headache, and vomiting. Your side effects may increase when you take higher doses of LUMRYZ. LUMRYZ can cause physical dependence and craving for the medicine when it is not taken as directed. These are not all the possible side effects of LUMRYZ.

**For more information, ask your doctor or pharmacist. Call your doctor for medical advice about side effects.**

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit www.fda.gov/medwatch, or call 1-800-FDA-1088.

**Please see full Prescribing Information, including BOXED Warning, and Medication Guide.**

**Cautionary Disclosure Regarding Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects, or other events. Such forward-looking statements include, but are not limited to, expectations regarding the potential therapeutic benefit of LUMRYZ; expectations regarding the commercial availability of LUMRYZ; expectations regarding the potential benefits of the RYZUP patient support program; and expectations regarding the potential market opportunity and market impact of LUMRYZ. In some cases, forward-looking statements can be identified by the use of words such as "will," "may," "could," "believe," "expect," "look forward," "on track," "guidance," "anticipate," "estimate," "project," "next steps" and similar expressions, and the negatives thereof (if applicable).

The Company's forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, the Company's business and operations are subject to significant risks, and, as a result, there can be no assurance that actual results and the results of the company's business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in the Company's forward-looking statements include the risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, which was filed with the Securities and Exchange Commission (SEC) on March 29, 2023, and subsequent SEC filings.

Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. The Company does not undertake any obligation to publicly update or revise our forward-looking statements, except as required by law.

**Investor Contact:**
Courtney Turiano
Stern Investor Relations, Inc.
Courtney.Turiano@sternir.com
(212) 698-8687

**Media Contact:**
Gabriella Greig
Real Chemistry
ggreig@realchemistry.com
(203) 249-2688



Source: Avadel Pharmaceuticals plc

# EXHIBIT 55

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 56

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 57

# FDA: User Fees Explained

## What are user fees?

The FDA collects fees from companies that produce certain products, such as drugs and medical devices, and from some other entities, such as certain accreditation and certification bodies. These fees are called "user fees." Federal law authorizes the FDA to collect user fees to supplement the annual funding that Congress provides for the agency. User fees help the FDA fulfill its mission of protecting the public health and also facilitate timely availability of innovative FDA-regulated products without compromising the agency's commitment to scientific integrity, public health, regulatory standards, patient safety, and transparency.

Congress determines the FDA's funding, including the amount of FDA user fees. There are separate user fee programs for many of the product types that the FDA regulates. Most user fee programs involve specific commitments made by the FDA and industry as part of a related agreement they develop, which is implemented when Congress authorizes the user fees. Such user fee program agreements, often called "commitment letters" or "goals letters," include goals such as timelines to evaluate applications to bring products to market or commitments for the FDA to publish guidance on topics of interest to industry.

While negotiations regarding these user fee program agreements involve the FDA and regulated industry, multiple stakeholders, including Congress and patient and consumer advocacy groups, have the opportunity to provide input on proposed user fee commitments. The user fee programs are examples of what the FDA, Congress, industry, and other stakeholders can achieve when they work together.

User fees are collected by the FDA through a central payment system and go into an FDA account in the Treasury, not to individuals at the FDA. User fees can only be spent by the FDA on the activities that Congress specifically allows. This means that user fees can be used only to support the FDA program the fees were collected for.

Importantly, the outcomes of decisions the FDA makes (such as whether to approve a product) do not depend on the agency's ability to collect user fees. The FDA's decisions are made based on science and are consistent with the legal/regulatory standards that govern the agency.

## Why are user fees important to funding the FDA?

To support its public health activities, the FDA relies on (1) annual funding that Congress provides for the agency, and (2) Congressionally-authorized user fees paid by industries that make and market FDA-regulated products, and paid by certain other entities.

User fees also help the FDA ensure predictable timelines for its review process by providing additional funding for needed staffing to review products more expeditiously without compromising the agency's commitment to scientific integrity, public health, regulatory standards, patient safety, and transparency. The fees also support other key activities, including helping ensure the safety of patients enrolled in clinical trials.

## Does the FDA retain all decision–making authority regarding the marketing authorization of medical products?

Yes. For products where premarket review is required, there are standards for FDA product review that are written into law and that the agency follows regardless of the source of funding. The FDA's work, high standards, and decisions are guided by science and focused on protecting and promoting the public health.

Importantly, there is no direct connection between a fee paid to submit an application and the review outcome for that application. The fees are not a "fee-for-service" payment.  Rather, the user fees, including application fees, are authorized by Congress to help the FDA fund payroll and related costs to deliver on program goals.

User fees provide the FDA with supplemental resources for reviewing product applications based on the scientific and clinical evidence, and for conducting related activities.

While the agency strives to meet the review timeline goals established as a part of the user fee program agreements, the timeline does not force the FDA to decide on a product application before the agency's work is complete. If additional work is necessary, the FDA continues working past the applicable goal date. The user fee performance goals anticipate this may happen and do not count on meeting the timeline 100% of the time.

## How have user fee programs benefitted the public?

User fees have helped make new human and animal drugs, generic human and animal drugs, medical devices, biologics, and biosimilar medications accessible to the public more quickly.

User fees have also supported programs to strengthen input from patients and enhance product safety. For example, the user-fee-supported patient science and engagement activities (/about-fda/center-devices-and-radiological-health/division-patient-centered-development) ensure that the FDA engages with patients to understand and integrate patient perspectives regarding medical devices into the regulatory process to help protect and promote public health. Patient

science and engagement activities are also focused on advancing patient-centered medical device development and evaluation. In addition, prescription drug user fees support a number of patient focused drug development (/drugs/development-approval-process-drugs/cder-patient-focused-drug-development) activities including the development of a guidance series related to patient experience data with the primary goal to ensure that patients' experiences, perspectives, needs, and priorities are captured and meaningfully incorporated into drug development and evaluation.

In addition, user fees help fund certain FDA inspections. These inspections include those that help ensure the rights, safety, and welfare of participants in clinical trials, as well as pre-approval inspections of manufacturing establishments to assess a manufacturer's ability to design and manufacture a product in accordance with the conditions specified in their marketing application and the requirements of the FDA's Current Good Manufacturing Practice regulations.

## What restrictions are there on how user fees may be spent by the FDA?

The FDA is required by law to spend user fee funds only on specified activities. For example, human prescription drug user fee funds can only be used for activities specified in the law, which include monitoring of research, review of human drug applications and post-market safety activities. Similarly, medical device user fee funds can only be used for activities specified in the law, which include monitoring of research, review of device applications, and a defined set of post-market activities.

## Learn more about specific user fee programs:

- Prescription Drug User Fee Act (PDUFA) (/industry/fda-user-fee-programs/prescription-drug-user-fee-amendments)

  PDUFA was created in 1992 and authorizes the FDA to collect fees from companies that produce certain human drug and biological products. Since the passage of PDUFA, user fees have played an important role in expediting the drug and biological product approval process. PDUFA, which must be reauthorized by Congress every five years, was renewed in 1997 (PDUFA II), 2002 (PDUFA III), 2007 (PDUFA IV), 2012 (PDUFA V), 2017 (PDUFA VI), and 2022 (PDUFA VII).

- Medical Device User Fee Amendments (MDUFA) (/industry/fda-user-fee-programs/medical-device-user-fee-amendments-mdufa)

  Medical device user fees were first established in 2002 in the Medical Device User Fee and Modernization Act (MDUFMA) and must be reauthorized by Congress every five years. These fees help the FDA increase the efficiency of regulatory processes, with the goals of increasing patient access to safe and effective medical devices in the U.S. and

advancing innovation. The medical device user fees were renewed in 2007 with the Medical Device User Fee Amendments (MDUFA II), 2012 (MDUFA III), 2017 (MDUFA IV), and 2022 (MDUFA V).

- Generic Drug User Fee Amendments (GDUFA) (/industry/fda-user-fee-programs/generic-drug-user-fee-amendments)

  GDUFA, the program authorizing collection of generic drug user fees, was signed into law in 2012. GDUFA is designed to facilitate the availability of safe and effective generic drugs to the public and enhance the predictability of the generic drug review process. GDUFA puts the FDA's generic drug program on a firm financial footing and helps to ensure timely access to safe, high-quality, affordable generic drugs. The program was renewed in 2017 (GDUFA II) and 2022 (GDUFA III) and must be reauthorized by Congress every five years.

- Biosimilar User Fee Act (BsUFA) (/industry/fda-user-fee-programs/biosimilar-user-fee-amendments)

  The biosimilar user fee program was established in 2012 and authorizes the FDA to assess and collect fees related to biosimilar and interchangeable biological products (biosimilars). BsUFA facilitates the development of safe and effective biosimilar products for the American public. Biosimilars provide public health benefit by offering additional treatment options, potentially increasing patient access and lowering costs through competition. The program was renewed in 2017 (BsUFA II) and 2022 (BsUFA III) and must be reauthorized by Congress every five years.

- Over-The-Counter Monograph Drug User Fee Program (OMUFA) (/industry/fda-user-fee-programs/over-counter-monograph-drug-user-fee-program-omufa)

  In 2020, Congress passed legislation which reformed and modernized the way certain nonprescription, over-the-counter (OTC) drugs (known as OTC monograph drugs) are regulated in the U.S. and also created a user fee program, known as OMUFA, which authorizes the FDA to assess and collect user fees to support the agency's OTC monograph drug activities.  By supporting such FDA work, OMUFA helps provide the public with access to innovative OTC monograph drugs. The program must be reauthorized by Congress every five years.

- Animal Drug User Fee Act (ADUFA) (/industry/fda-user-fee-programs/animal-drug-user-fee-act-adufa)

  ADUFA, which was originally signed into law in 2003, authorizes the FDA to assess and collect user fees to support the agency's responsibilities to ensure that new animal drugs are safe and effective for animals, as well as to ensure that food from treated animals is

safe for people to eat. The program was renewed in 2008 (ADUFA II), 2013 (ADUFA III), 2018 (ADUFA IV), and 2023 (ADUFA V) and reauthorizing legislation must be passed by Congress every five years.

- Animal Generic Drug User Fee Act (AGDUFA) (/industry/fda-user-fee-programs/animal-generic-drug-user-fee-act-agdufa)

  AGDUFA, which was originally signed into law in 2008, authorizes the FDA to assess and collect user fees to support the agency's responsibilities to ensure that generic new animal drugs are safe and effective for animals, as well as to ensure that food from treated animals is safe for people to eat. The program was renewed in 2013 (AGDUFA II), 2018 (AGDUFA III), and 2023 (AGDUFA IV) and reauthorizing legislation must be passed by Congress every five years.

- Tobacco User Fees (/tobacco-products/manufacturing/tobacco-user-fees)

  In 2009, the Tobacco Control Act (/tobacco-products/rules-regulations-and-guidance-related-tobacco-products/family-smoking-prevention-and-tobacco-control-act-overview) (TCA) amended the Federal Food, Drug, and Cosmetic (FD&C) Act to direct the FDA to assess and collect user fees on tobacco products (/tobacco-products/manufacturing/tobacco-user-fees) that fall within six classes:  cigars, pipe tobacco, cigarettes, snuff, chewing tobacco, and roll-your-own tobacco. At the time, the FDA did not regulate cigars and pipe tobacco, so the agency reallocated those fees to the other four classes (per the TCA). Cigars and pipe tobacco were added by regulation in 2016, and since then, the FDA has assessed all six classes. Tobacco user fees are calculated based, in part, on market share and are not assessed on product applications like the medical product user fees. Domestic manufacturers and importers are assessed user fees based on the amount of tobacco products they release into interstate commerce that are subject to excise taxes. The agency's tobacco program is entirely funded through these industry-paid user fees and tobacco regulation activities are the sole allowable use of these fees. Importantly, the annual amount of tobacco user fees is set in the statute and the tobacco user fee program does not have a sunset date, meaning it does not expire and does not require reauthorization. Tobacco user fees also fund FDA inspections of tobacco product manufacturing establishments and tobacco retailers to ensure compliance with laws and regulations. Although the FDA's tobacco regulation activities include the regulation of Electronic Nicotine Delivery Systems (ENDS), the FD&C Act does not currently allow the agency to assess and collect user fees for ENDS.

# EXHIBIT 58

# PDUFA VII: Fiscal Years 2023 – 2027

On September 30, 2022, the President signed into law the FDA User Fee Reauthorization Act of 2022. This new law includes the sixth reauthorization of the Prescription Drug User Fee Act (PDUFA) that provides FDA with the necessary resources to maintain a predictable and efficient review process for human drug and biologic products.

FDA developed the proposed enhancements for PDUFA VII in consultation with drug industry representatives, patient and consumer advocates, health care professionals, and other public stakeholders from September 2020 through February 2021. FDA transmitted these proposed enhancements to Congress in January 2022, which are referred to in Title 1 of the FDA User Fee Reauthorization Act.

The new law ensures that FDA will continue to receive a source of stable and consistent funding during fiscal years 2023-2027 that will allow the agency to fulfill its mission to protect and promote public health by helping to bring to market critical new medicines for patients. This page contains the relevant information related to PDUFA VII and FDA's implementation of the PDUFA VII enhancements. It also includes information related to the negotiations and consultations prior to the agreement.

## Implementation

- PDUFA VII Information Technology and Bioinformatics Goals and Progress (/industry/prescription-drug-user-fee-amendments/pdufa-vii-information-technology-and-bioinformatics-goals-and-progress)

- PDUFA and BsUFA Quarterly Hiring Updates (/industry/prescription-drug-user-fee-amendments/pdufa-and-bsufa-quarterly-hiring-updates)

- Completed PDUFA VII Deliverables (/industry/prescription-drug-user-fee-amendments/completed-pdufa-vii-deliverables)

## PDUFA VII Commitment Letter

- PDUFA VII Commitment Letter (/media/151712/download?attachment)

Top ()

## PDUFA VII Reauthorization Proposed Enhancements Public Meeting – September 28, 2021

The Food and Drug Administration (FDA or Agency) is announcing a virtual public meeting to discuss the proposed enhancements for the reauthorization of the Prescription Drug User Fee Act (PDUFA) for fiscal years (FYs) 2023 through 2027. Meeting Information (/drugs/news-events-human-drugs/public-meeting-recommendations-prescription-drug-user-fee-act-pdufa-reauthorization-september-28)

## PDUFA VII Reauthorization Kickoff Public Meeting – July 23, 2020

The Food and Drug Administration held a virtual public meeting on July 23, 2020 to kick off the process for reauthorization of the Prescription Drug User Fee Act (PDUFA) for fiscal years (FYs) 2023 through 2027. Meeting Information (/drugs/news-events-human-drugs/public-meeting-reauthorization-prescription-drug-user-fee-act-pdufa-07232020-07232020)

## Industry Discussions on Reauthorization

- February 12th, 2021: Steering Committee (/media/147048/download?attachment) (PDF - 155 KB)

- February 5th, 2021: Steering Committee (/media/147028/download?attachment) (PDF - 160 KB)

- February 3rd, 2021: Finance Subgroup (/media/147166/download?attachment) (PDF - 148 KB)

- February 3rd, 2021: Manufacturing and Inspections Subgroup (/media/146893/download?attachment) (PDF - 150 KB)

- February 2nd, 2021: Steering Committee (/media/147026/download?attachment) (PDF - 168 KB)

- February 1st, 2021: Digital Health and Informatics (/media/146780/download?attachment) (PDF - 122 KB)

- January 28th, 2021: Finance Subgroup (/media/147169/download?attachment) (PDF - 145 KB)

- January 27th, 2021: Postmarket Subgroup (/media/147345/download?attachment)(PDF - 181 KB)

- January 27th, 2021: Pre-Market Subgroup (/media/147552/download?attachment)(PDF - 187 KB)

- January 27th, 2021: Finance Subgroup (/media/147165/download?attachment) (PDF - 150 KB)

- January 27st, 2021: Manufacturing and Inspections Subgroup (/media/146892/download?attachment) (PDF - 145 KB)

- January 27th, 2021: Digital Health and Informatics (/media/146779/download?attachment) (PDF - 125 KB)

- January 26th, 2021: Steering Committee (/media/147021/download?attachment) (PDF - 188 KB)

- January 26th, 2021: CBER Breakout (/media/146793/download?attachment) (PDF - 98 KB)

- January 22nd, 2021: Digital Health and Informatics (/media/146778/download?attachment) (PDF - 97 KB)

- January 21st, 2021: Manufacturing and Inspections Subgroup (/media/146887/download?attachment) (PDF - 158 KB)

- January 21st, 2021: Postmarket Subgroup  (/media/147344/download?attachment)(PDF - 217 KB)

- January 21st, 2021: Pre-Market Subgroup (/media/147564/download?attachment) (PDF - 122 KB)

- January 19, 2021: Regulatory Decision Tools Subgroup (/media/147213/download?attachment) (PDF - 158 KB)

- January 19th, 2021: Steering Committee (/media/147012/download?attachment) (PDF - 158 KB)

- January 14th, 2021: Finance Subgroup (/media/147168/download?attachment) (PDF - 144 KB)

- January 13th, 2021: Finance Subgroup (/media/147164/download?attachment) (PDF - 147 KB)

- January 13th, 2021: Digital Health and Informatics (/media/146777/download?attachment) (PDF - 98 KB)

- January 13th, 2021: Manufacturing and Inspections Subgroup (/media/146889/download?attachment)  (PDF - 155 KB)

- January 13th, 2021: Postmarket Subgroup (/media/147343/download?attachment) (PDF - 187 KB)

Top ()

- January 12, 2021: Regulatory Decision Tools Subgroup (/media/147212/download?attachment) (PDF - 163 KB)

- January 12th, 2021: Steering Committee (/media/147011/download?attachment) (PDF - 208 KB)

- January 12th, 2021: CBER Breakout (/media/146794/download?attachment) (PDF - 145 KB)

- January 6th, 2021: Postmarket Subgroup (/media/147587/download?attachment) (PDF - 122 KB)

- January 6th, 2021: Finance Subgroup (/media/147167/download?attachment) (PDF - 148 KB)

- December 17th, 2020: Finance Subgroup (/media/146950/download?attachment) (PDF - 145KB)

- December 17th, 2020: CBER Breakout (/media/145580/download?attachment) (PDF - 148 KB)

- December 16th, 2020: Finance Subgroup (/media/146949/download?attachment) (PDF - 144KB)

- December 16th, 2020: Manufacturing and Inspections Subgroup (/media/146813/download?attachment) (PDF - 154KB)

- December 16th, 2020: Pre-Market Subgroup (/media/146127/download?attachment) (PDF - 145 KB)

- December 16th, 2020: Digital Health and Informatics (/media/146775/download?attachment) (PDF - 101KB)

- December 15th, 2020: Regulatory Decision Tools Subgroup (/media/146388/download?attachment) (PDF - 159 KB)

- December 15th, 2020: Steering Committee (/media/145840/download?attachment) (PDF - 160 KB)

- December 9th, 2020: Finance Subgroup (/media/146946/download?attachment) (PDF - 148KB)

- December 9th, 2020: Manufacturing and Inspections Subgroup (/media/146805/download?attachment) (PDF - 140KB)

- December 9th, 2020: Pre-Market Subgroup (/media/146126/download?attachment) (PDF - 145 KB)

Top ()

- December 9th, 2020: Digital Health and Informatics (/media/146036/download?attachment) (PDF - 104 KB)

- December 9th, 2020: Postmarket Subgroup (/media/145564/download?attachment#9 summary, december 9, 2020) (PDF - 78 KB)

- December 8th, 2020: Regulatory Decision Tools Subgroup (/media/146390/download?attachment) (PDF - 160 KB)

- December 8th, 2020: Steering Committee (/media/145841/download?attachment) (PDF - 164 KB)

- December 2nd, 2020: Finance Subgroup (/media/146948/download?attachment) (PDF - 154KB)

- December 2nd, 2020: Manufacturing and Inspections Subgroup (/media/146804/download?attachment) (PDF - 143 KB)

- December 2nd, 2020: Pre-Market Subgroup (/media/146125/download?attachment) (PDF - 138 KB)

- December 2nd, 2020: Digital Health and Informatics (/media/146033/download?attachment)(PDF - 164 KB)

- December 2nd, 2020: Postmarket Subgroup (/media/145562/download?attachment#8 summary, december 2, 2020) (PDF - 77 KB)

- December 1st, 2020: Regulatory Decision Tools Subgroup (/media/146389/download?attachment) (PDF - 161 KB)

- December 1st, 2020: Steering Committee (/media/145842/download?attachment) (PDF - 157KB)

- December 1st, 2020: CBER Breakout (/media/145578/download?attachment) (PDF - 148 KB)

- November 18th, 2020: Finance Subgroup (/media/146947/download?attachment) (PDF - 167KB)

- November 18th, 2020: Pre-Market Subgroup (/media/146117/download?attachment) (PDF - 141 KB)

- November 18th, 2020: Digital Health and Informatics (/media/146031/download?attachment) (PDF - 106 KB)

- November 18th, 2020: Manufacturing and Inspections Subgroup (/media/145368/download?attachment) (PDF - 157 KB)

⌃
Top ()

- November 18th, 2020: Postmarket Subgroup (/media/145170/download?attachment) (PDF - 130 KB)

- November 17th, 2020: CBER Breakout (/media/145581/download?attachment) (PDF - 148 KB)

- November 17th, 2020: Regulatory Decision Tools Subgroup (/media/145421/download?attachment) (PDF - 163 KB)

- November 17th, 2020: Steering Committee (/media/145289/download?attachment) (PDF - 156 KB)

- November 12th, 2020: Pre-Market Subgroup (/media/145383/download?attachment) (PDF - 136 KB)

- November 10th, 2020: CBER Breakout (/media/145588/download?attachment) (PDF - 158 KB)

- November 10th, 2020: Regulatory Decision Tools Subgroup (/media/145420/download?attachment) (PDF - 162 KB)

- November 10th, 2020: Steering Committee (/media/145093/download?attachment) (PDF - 155 KB)

- November 4th, 2020: Finance Subgroup (/media/146170/download?attachment) (PDF - 142 KB)

- November 4th, 2020: Digital Health and Informatics (/media/146030/download?attachment) (PDF - 105 KB)

- November 4th, 2020: Pre-Market Subgroup (/media/145378/download?attachment) (PDF - 142 KB)

- November 4th, 2020: Postmarket Subgroup (/media/145169/download?attachment) (PDF - 124 KB)

- November 4th, 2020: Manufacturing and Inspections Subgroup (/media/145065/download?attachment) (PDF - 138 KB)

- November 3rd, 2020: CBER Breakout (/media/145522/download?attachment) (PDF - 151 KB)

- October 28th, 2020: Digital Health and Informatics (/media/146029/download?attachment) (PDF - 107 KB)

- October 28th, 2020: Pre-Market Subgroup (/media/145384/download?attachment) (PDF - 133 KB)

Top ()

- October 28th, 2020: Finance Subgroup (/media/145042/download?attachment) (PDF - 153 KB)

- October 28th, 2020: Manufacturing and Inspections Subgroup (/media/144394/download?attachment) (PDF - 142 KB)

- October 28th, 2020: Postmarket Subgroup (/media/144386/download?attachment) (PDF - 30 KB)

- October 27th, 2020: Regulatory Decision Tools Subgroup (/media/145422/download?attachment) (PDF - 163 KB)

- October 27th, 2020: CBER Breakout (/media/144356/download?attachment) (PDF - 165 KB)

- October 27th, 2020: Steering Committee (/media/144075/download?attachment) (PDF - 157 KB)

- October 21st, 2020: Pre-Market Subgroup (/media/145387/download?attachment) (PDF - 128 KB)

- October 21st, 2020: Finance Subgroup (/media/145038/download?attachment) (PDF - 151 KB)

- October 21st, 2020: Manufacturing and Inspections Subgroup (/media/144393/download?attachment) (PDF - 140 KB)

- October 21st, 2020: Postmarket Subgroup (/media/144385/download?attachment) (PDF - 29 KB)

- October 21st, 2020: Digital Health and Informatics Subgroup (/media/144159/download?attachment) (PDF - 109 KB)

- October 20th 2020: Regulatory Decision Tools Subgroup (/media/145423/download?attachment) (PDF - 164 KB)

- October 20th, 2020: CBER Breakout (/media/144355/download?attachment) (PDF -153 KB)

- October 20th, 2020: Steering Committee (/media/144106/download?attachment) (PDF - 170 KB)

- October 14th, 2020: Pre-Market Subgroup (/media/145388/download?attachment) (PDF - 127 KB)

- October 14th, 2020: Finance Subgroup (/media/145025/download?attachment) (PDF - 167 KB)

Top ()

- October 14th, 2020: Postmarket Subgroup (/media/144383/download?attachment) (PDF - 31 KB)

- October 14th, 2020: Digital Health and Informatics Subgroup (/media/144160/download?attachment) (PDF - 106 KB)

- October 14th, 2020: Manufacturing and Inspections Subgroup (/media/144158/download?attachment) (PDF - 152 KB)

- October 13th, 2020: CBER Breakout (/media/144353/download?attachment) (PDF - 162 KB)

- October 13th 2020: Regulatory Decision Tools Subgroup (/media/144195/download?attachment) (PDF - 152 KB)

- October 13th, 2020: Steering Committee (/media/143843/download?attachment) (PDF - 148 KB)

- October 7th, 2020: Pre-Market Subgroup (/media/145377/download?attachment) (PDF - 167 KB)

- October 7th, 2020: Digital Health and Informatics Subgroup (/media/143859/download?attachment) (PDF - 100 KB)

- October 7th, 2020: Manufacturing and Inspections Subgroup (/media/143548/download?attachment) (PDF - 148 KB)

- October 7th, 2020: Post Market Subgroup (/media/143241/download?attachment)(PDF - 159 KB)

- October 7th, 2020: Finance Subgroup (/media/143355/download?attachment) (PDF - 158 KB)

- October 6th, 2020: CBER Breakout (/media/144352/download?attachment) (PDF - 165 KB)

- October 6th, 2020: Regulatory Decision Tools Subgroup (/media/144199/download?attachment) (PDF - 152 KB)

- October 6th, 2020: Steering Committee (/media/143841/download?attachment) (PDF - 157 KB)

- September 30th, 2020: Manufacturing and Inspections Subgroup (/media/143547/download?attachment) (PDF - 147 KB)

- September 30, 2020 Post Market Subgroup (/media/143240/download?attachment)(PDF -157 KB)

Top ()

- September 30th, 2020: Finance Subgroup (/media/143344/download?attachment) (PDF - 146 KB)

- September 30th, 2020: Pre-Market Subgroup (/media/143320/download?attachment) (PDF - 146 KB)

- September 30th, 2020: Digital Health and Informatics Subgroup (/media/143237/download?attachment) (PDF - 112 KB)

- September 29th, 2020: Regulatory Decison Tools Subgroup (/media/143288/download?attachment) (PDF - 158 KB)

- September 29th, 2020: CBER Breakout (/media/143233/download?attachment) (PDF - 124 KB)

- September 29th, 2020: Steering Committee (/media/143079/download?attachment) (PDF - 155 KB)

- September 22nd, 2020: Steering Committee (/media/142929/download?attachment) (PDF - 163 KB)

- September 15th, 2020: Steering Committee (/media/142512/download?attachment) (PDF - 150 KB)

## Stakeholder Discussions on PDUFA VII Reauthorization

- February 19, 2021 - Meeting Minutes (/media/146845/download?attachment) (PDF - 225KB)

- January 15, 2021 - Meeting Minutes (/media/146844/download?attachment) (PDF - 245KB)

- January 15, 2021 - Meeting Slides (/media/146843/download?attachment) (PDF - 2MB)

- December 11, 2020 - Meeting Minutes (/media/144836/download?attachment) (PDF - 153 KB)

- December 11, 2020 - Meeting Slides (/media/144835/download?attachment) (PDF - 2 MB)

- November 20, 2020 - Meeting Minutes (/media/144398/download?attachment) (PDF - 153 KB)

- November 20, 2020 - Meeting Slides (/media/144405/download?attachment) (PDF - 3 MB)

- October 30, 2020 - Meeting Minutes (/media/144314/download?attachment)(PDF - 209 KB)

- October 30, 2020 - Meeting Slides - Complex Innovative Designs for Clinical Trials (/media/144316/download?attachment) (PDF - 250 KB)

Top ()

- <u>October 30, 2020 - Meeting Slides - Model Informed Drug Development
  (/media/144317/download?attachment)</u> (PDF **-** 351 KB)

- <u>October 30, 2020 - Meeting Slides - Other Areas of Regulatory Science
  (/media/144318/download?attachment)</u> (PDF **-** 2 MB)

- <u>October 30, 2020 - Meeting Slides - Patient focused Drug Development
  (/media/144319/download?attachment)</u> (PDF **-** 503 KB)

- <u>September 25, 2020 - Meeting Minutes (/media/143296/download?attachment)</u> (PDF **-**
  215 KB)

- <u>September 25, 2020 - Meeting Slides (/media/144321/download?attachment)</u>(PDF **-** 715
  KB)

# EXHIBIT 59

**Performance Report to Congress**

# Prescription Drug User Fee Act

## FY 2022



# Executive Summary

The Prescription Drug User Fee Act (PDUFA) was enacted in 1992 and authorized the Food and Drug Administration (FDA or Agency) to collect user fees from pharmaceutical and biotechnology companies for the review of certain human drug and biological products. In return, FDA committed to certain review performance goals, procedural and processing goals, and other commitments that are part of the Agency's agreement with the regulated industry.

PDUFA has been reauthorized by Congress every 5 years. The fifth reauthorization (known as PDUFA VI) occurred on August 18, 2017, when the President signed into law the FDA Reauthorization Act of 2017. As directed by Congress, FDA developed proposed enhancements for PDUFA VI in consultation with drug industry representatives, patient and consumer advocates, health care professionals, and other public stakeholders. These discussions led to the current set of performance goals for the fiscal year (FY) 2018 to FY 2022 period, detailed in a document commonly known as the PDUFA VI Commitment Letter.[1]

This report summarizes FDA's performance results in meeting PDUFA goals and commitments for FY 2021 and FY 2022. Specifically, this report updates performance data for submissions received in FY 2021 (initially reported in the FY 2021 PDUFA Performance Report)[2] and presents preliminary data on FDA's progress in meeting FY 2022 goals. Updates on FDA's accomplishments related to additional PDUFA VI commitments for FY 2022 and historical review trend data are also included. Appendices include details of review cycle data on all original new drug applications (NDAs) and biologics license applications (BLAs) approved during FY 2022, the number and characteristics of applications filed by review division, and definitions of key terms used in this report. In addition, descriptions of the various submission types are included on page 4 of this report.

The estimated[3] median approval times for priority NDAs and BLAs received in FY 2021 remained approximately the same compared to the estimated median approval times for priority NDAs and BLAs received in FY 2020. The preliminary data show that the percentage of priority and standard applications filed in FY 2021 and approved during the first review cycle were 69 percent and 55 percent, respectively.

---

[1] http://www.fda.gov/media/99140/download.
[2] http://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.
[3] The median approval time is estimated because an application can receive an approval after multiple review cycles, thus impacting the median approval time for all applications in a given receipt cohort. Some applications may be approved several years after their original receipt.

## A.    Achievements in FY 2022

In FY 2022, although the Agency continued to appropriately allocate resources to work focused on the pandemic, according to preliminary data, FDA met or exceeded all 12 of its review performance goals.  For example, 100 percent of current performance goals were achieved for Original Priority new molecular entities (NMEs) and BLAs, Original Standard NMEs and BLAs, and Priority and Standard non-NME NDAs.

## B.    Review Performance Results

The FY 2021 cohort had a workload of 3,539 goal closing actions.  FDA met or exceeded the 90 percent performance level for 10 of the 12 review performance goals, and with submissions still pending within goal, FDA has the potential to meet or exceed 11 of the 12 review performance goals for FY 2021.

For the FY 2022 cohort, FDA had completed 1,755 actions as of September 30, 2022.  FDA is currently meeting or exceeding 12 of the 12 review performance goals for FY 2022.  With 1,372 submissions under review and still within the PDUFA goal date, FDA has the potential to meet or exceed 12 of the 12 review performance goals for FY 2022.

## C.    Procedural and Processing Performance Results

For the FY 2021 cohort, FDA's workload for activities related to procedural and processing goals and commitments (i.e., meeting management, procedural responses, and procedural notifications) totaled 11,392 actions.  FDA met or exceeded the performance level for 8 of the 20 procedural and processing goals for FY 2021.

For the FY 2022 cohort, FDA is currently meeting or exceeding 6 of the 20 procedural and processing goals.  With 1,275 submissions under review and still within the PDUFA goal date, FDA has the potential to meet or exceed 7 of the 20 procedural and processing goal commitments for FY 2022.

## D.    Additional PDUFA VI Commitments

During FY 2022, FDA made significant progress implementing all other remaining PDUFA VI commitments, including enhancing patient input and benefit-risk assessments in regulatory decision-making, enhancing regulatory science, enhancing regulatory decision tools to support drug development and review, enhancing and modernizing FDA's drug safety system, and enhancing transparency of FDA's electronic submission and data standards activities.  These achievements, as well as information about FDA's hiring and retention accomplishments, are detailed in this report.

To highlight just a few of these achievements, there were several important PDUFA commitments completed in FY 2022, including the following:

FDA's rare disease programs launched the Accelerating Rare disease Cures Program and engaged in numerous internal and external educational and collaborative activities to advance the development of medical products for rare diseases.

- Guidance documents were published on patient-oriented labeling and patient focused drug development.

- Public workshops or meetings were held on rare disease related topics, model-informed drug development, and patient-focused drug development.

- Enhancements were made to the Sentinel System that facilitated public and sponsor access to the system.

# Table of Contents

I.    **Introduction** ...................................................................................................... 1

  A.   *Information Presented in This Report* .............................................................. 1

II.   **PDUFA Review Goals** ...................................................................................... 5

  A.   *Review Workload:  FY 2017 to FY 2022* ........................................................ 5

  B.   *Final FY 2021 Review Goal Performance Results* ......................................... 6

  C.   *Final FY 2021 Review Goal Performance Details* .......................................... 7

  D.   *Preliminary FY 2022 Review Goal Performance Results* .............................. 8

  E.   *Preliminary FY 2022 Review Goal Performance Details* ............................... 9

III.  **PDUFA Procedural and Processing Goals and Commitments** ..................... 12

  A.   *Procedural and Processing Workload:  FY 2017 to FY 2022* ...................... 12

  B.   *Final FY 2021 Procedural and Processing Performance Results* ................. 13

  C.   *Final FY 2021 Procedural and Processing Performance Details* ................. 14

  D.   *Preliminary FY 2022 Procedural and Processing Performance Results* ..... 16

  E.   *Preliminary FY 2022 Procedural and Processing Performance Details* ...... 18

IV.   **PDUFA Trend Graphs** .................................................................................... 21

V.    **Additional PDUFA VI Commitments** ............................................................ 24

  A.   *Section I.I:  Enhancing Regulatory Science and Expediting Drug Development* ..... 25

  B.   *Section I.J:  Enhancing Regulatory Decision Tools to Support Drug Development and Review* ........................................................................ 30

  C.   *Section I.K:  Enhancement and Modernization of FDA's Drug Safety System* ........ 33

  D.   *Section II:  Enhancing the Management of User Fee Resources* .................. 36

E.    *Section III:  Improving FDA's Hiring and Retention of Review Staff* ...................... *36*

F.    *Section IV:  Information Technology Goals* ................................................. *37*

G.    *Additional PDUFA VI Review Program Reporting* ........................................ *38*

    1.    Hiring and Placement of New PDUFA VI Staff at FDA ................................. 38

**VI.    Rationale for PDUFA Program Changes** ..................................................... **39**

A.    *Changes in the number of FTEs hired as agreed in the PDUFA VI Commitment Letter and the number of FTEs funded by budget authority at FDA by division within CDER, CBER, ORA, and OC* ................................................................ *39*

    1.    Changes in the number of FTEs hired as agreed upon in the PDUFA VI Commitment Letter ......................................................................... 39

    2.    Changes in the number of FTEs funded by budget authority at FDA by division within CDER, CBER, ORA, and OC ................................................ 40

B.    *Changes in the fee revenue amounts and costs for the review process* ..................... *43*

C.    *Number of Employees for Whom Time Reporting Is Required* ............................... *44*

**Appendix A:  List of Approved Applications** ...................................................... **46**

**Appendix B:  Filed Application Numbers by Review Division** ................................. **56**

**Appendix C:  Analysis of Use of Funds** ........................................................... **61**

A.    *Original Application Approval Cycle Summary* ............................................. *61*

B.    *Performance Enhancement Goals* ............................................................ *62*

C.    *Common Causes and Trends Impacting Ability to Meet Goals* ............................. *66*

**Appendix D:  FY 2022 Corrective Action Report** ................................................ **68**

A.    *Executive Summary* ........................................................................... *69*

B.    *PDUFA Review Goals* ........................................................................ *72*

C.    *PDUFA Performance Enhancement Goals* ................................................. *75*

**Appendix E:  Definitions of Key Terms** ............................................................ **77**

# Acronym List

| | |
|---|---|
| **ARIA** | Active Risk Identification and Analysis |
| **BLA** | Biologics License Application |
| **BT** | Breakthrough Therapy |
| **CBER** | Center for Biologics Evaluation and Research |
| **CDER** | Center for Drug Evaluation and Research |
| **CDRH** | Center for Devices and Radiological Health |
| **CID** | Complex Innovative Design |
| **DRDMG** | Division of Rare Diseases and Medical Genetics |
| **EOP** | End of Phase |
| **ETASU** | Elements to Assure Safe Use |
| **FDA** | Food and Drug Administration |
| **FD&C Act** | Federal Food, Drug, and Cosmetic Act |
| **FDARA** | FDA Reauthorization Act of 2017 |
| **FTE** | Full-Time Equivalent |
| **FY** | Fiscal Year (October 1 to September 30) |
| **IND** | Investigational New Drug |
| **IT** | Information Technology |
| **NCATS** | National Center for Advancing Translational Sciences |
| **NDA** | New Drug Application |
| **NIH** | National Institutes of Health |
| **NME** | New Molecular Entity |
| **NORD** | National Organization for Rare Disorders |
| **NPC** | Niemann-Pick Type C |
| **OC** | Office of the Commissioner |
| **OCP** | Office of Combination Products |

| | |
|---|---|
| **OND** | Office of New Drugs |
| **ORA** | Office of Regulatory Affairs |
| **ORPURM** | Office of Rare Diseases, Pediatrics, Urologic and Reproductive Medicine |
| **OTS** | Office of Translational Sciences |
| **PDUFA** | Prescription Drug User Fee Act |
| **PFDD** | Patient-Focused Drug Development |
| **RDT** | Rare Diseases Team |
| **REMS** | Risk Evaluation and Mitigation Strategy |
| **WCF** | Working Capital Fund |

# I.    Introduction

On August 18, 2017, the President signed the FDA Reauthorization Act of 2017 (FDARA) into law, which included the fifth reauthorization of the Prescription Drug User Fee Act (PDUFA) for fiscal year (FY) 2018 through FY 2022, known as PDUFA VI.  PDUFA VI continued to provide the Food and Drug Administration (FDA or Agency) with a consistent source of funding to help maintain a predictable and efficient review process for human drugs and biological products.  In commitments tied to this funding, FDA agreed to certain review performance goals, such as reviewing and acting on new drug application (NDA) and biologics license application (BLA) submissions within predictable time frames.

Since the enactment of PDUFA I in 1992, FDA has used PDUFA resources to significantly reduce the time needed to evaluate new drugs and biological products without compromising its rigorous standards for a demonstration of safety, efficacy, and quality of these products before approval.  The efficiency gains under PDUFA have revolutionized the drug review process in the United States and enabled FDA to ensure more timely access to innovative and important new therapies for patients.

More information on the history of PDUFA is available on FDA's website.[1]

## A.    Information Presented in This Report

This report presents PDUFA performance and workload information for two different types of goals: (1) the review of applications and other submissions pertaining to human drugs and biological products and (2) meeting management and other procedural goals related to responses and notifications in the human drug review process.  PDUFA workload information for these goals is included in the tables that follow.  Significant components of the PDUFA workload (such as reviews of investigational new drug (IND) applications, labeling supplements, and annual reports, as well as the ongoing monitoring of drug safety in the postmarket setting) are not captured by PDUFA goals and are therefore not presented in this report.

PDUFA performance information related to achieving these two types of goals includes reviews of submissions pending from the previous fiscal year as well as reviews of submissions received during the current fiscal year.  This report presents the final performance results for the FY 2021 cohort of submissions based on actions completed in FY 2021 and FY 2022.  In addition, this report includes the preliminary performance results for the FY 2022 cohort of submissions that had actions completed or due for completion in FY 2022.  Final performance for the FY 2022 cohort will be presented in the FY 2023 PDUFA Performance Report and will include actions for

---

[1] http://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

submissions still pending within the PDUFA goal date as of September 30, 2022.

The following information refers to FDA's performance presented in this report.

- The following terminology is used throughout this document:
    - *Application* means a new, original application.
    - *Supplement* means a request to approve a change in an application that has been approved.
    - *Resubmission* means a resubmitted application or supplement in response to a complete response, approvable, not approvable, or tentative approval letter.
    - *New molecular entities (NMEs)* refer only to NMEs that are submitted for approval under NDAs (not BLAs).
    - *Submission* applies to all the above.
    - *Action* refers to an FDA decision on any of the above, including an approval, a tentative approval, a complete response, or withdrawal of the submission by the sponsor.

- Under PDUFA VI, the preliminary counts of NMEs in workload tables for the current fiscal year may not reflect the final determination of NME status for that fiscal year. FDA often receives multiple submissions for the same NME (e.g., different dosage forms). All such submissions are initially designated as NMEs, and once FDA approves the first of the multiple submissions, the other submissions will be designated as non-NMEs, and workload numbers will be appropriately updated in later years.

- The data presented in this report do not include biosimilar INDs or biosimilar BLAs. These data are presented in the annual Biosimilar User Fee Act (BsUFA) Performance Reports located on FDA's website.[2]

- FDA files applications only that are sufficiently complete to permit a substantive review. The Agency makes a filing decision within 60 days of an original application's receipt by FDA. FDA's review of an application begins once the application is received. For NME NDAs and original BLAs reviewed under the program (see the PDUFA VI Commitment Letter[3] for more information), the PDUFA clock begins after the conclusion of the 60-day filing period. For all other submissions, the PDUFA clock begins upon FDA's receipt of the application.

- FDA annually reports PDUFA performance data for each fiscal year receipt cohort (defined as submissions filed from October 1 to September 30 of the following year). In

[2] http://www.fda.gov/about-fda/user-fee-performance-reports/bsufa-performance-reports.
[3] http://www.fda.gov/media/99140/download.

each fiscal year, FDA receives submissions that will have associated goals due in the following fiscal year. For these submissions, FDA's performance data will be reported in subsequent fiscal years, either after the Agency takes an action or when the goal becomes overdue, whichever comes first.

- Submission types (e.g., responses to clinical holds) with shorter (e.g., 30-day) review time goals tend to have a larger percentage of reviews completed by the end of the fiscal year, and these submission types' preliminary performance data are a more reliable indicator of their final performance results. However, submission types (e.g., standard NME NDA/BLA) with longer (e.g., within 10 months of the 60-day filing date) review time goals tend to have a smaller percentage of reviews completed within the reporting period, and these submission types' preliminary performance data are a less reliable indicator of their final performance results.

- Final performance results for FY 2021 submissions are shown as the percentage of submissions that were reviewed within the specified goal timeline. Submission types with 90 percent or more submissions reviewed by the goal date are shown as having met the goal.

- Preliminary performance results for FY 2022 submissions are shown as the percentage of submissions reviewed on time as of September 30, 2022, excluding actions pending within the PDUFA goal date. Submission types with a current performance result of 90 percent or more reviewed by the goal date are shown as currently meeting the goal. The highest possible percent of reviews that may be completed on time (i.e., the highest possible performance results) if all non-overdue pending reviews are completed within the goal is also shown.

- Filed applications and supplements include submissions that have been filed or are in pending filing status. Data do not include submissions that are unacceptable for filing because of nonpayment of user fees, have been withdrawn within 60 days of receipt, or have been refused to file.

- FY 2022 workload and performance figures include applications that are identified as *undesignated*, which means they are still within the 60-day filing date and have not yet had a review designation, standard or priority, made.

- For resubmitted applications, the applicable performance goal is determined by the fiscal year in which the resubmission is received, rather than the year in which the original application was submitted.

- Unless otherwise noted, all performance data are as of September 30, 2022.

- Definitions of key terms used throughout this report can be found in Appendix E.

**Submission Types Included in This Report**

- **NDA** – When the sponsor of a new drug believes that enough evidence on the drug's safety and effectiveness has been obtained to meet FDA's requirements for marketing approval, the sponsor submits to FDA an NDA.  The application must contain data from specific technical viewpoints for review, including chemical, pharmacological, medical, biopharmaceutical, and statistical.  If the NDA is approved, the product may be marketed in the United States.

- **NME** – An NME is an active ingredient that contains no active moiety that has been previously approved by FDA in an application submitted under section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) or has been previously marketed as a drug in the United States.

- **BLA** – A BLA is a submission that contains specific information on the manufacturing processes, chemistry, pharmacology, clinical pharmacology, and the clinical effects of a biological product.  If the information provided meets FDA requirements, the application is approved, and a license is issued allowing the firm to market the product.

- **Resubmission** – A resubmitted original application or supplement is a complete response to an FDA action letter that addresses all identified deficiencies.

- **Supplement** – A supplement is an application to allow a company to make changes in a product that already has an approved NDA or to seek FDA approval for new uses of an approved drug.  The Center for Drug Evaluation and Research (CDER) must approve all major NDA changes (in packaging or ingredients, for instance) to ensure the conditions originally set for the product are still being met.

- **Source:**  http://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms

## II.    PDUFA Review Goals

### A.    Review Workload:  FY 2017 to FY 2022

In the table below, preliminary workload numbers from FY 2022 are compared to the previous 5-year averages for original NDAs and BLAs, resubmissions, and supplements, and the workload numbers for the previous 5 years are presented.  FDA saw an increase between FY 2021 and FY 2022 in the number of Class 1 and Class 2 resubmitted NDAs and BLAs.

Definitions of *Class 1* and *Class 2 resubmissions* and other terms are found in Appendix E.  The data presented in this section represent receipts by FDA of the submission types listed in the table.

### Table 1.  Workload for Applications and Submissions

| Submission Type | FY 17 | FY 18 | FY 19 | FY 20 | FY 21* | FY 22 | FY 17 to FY 21 5-Year Average | FY 22 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Original Priority NMEs and BLAs | 31 | 48 | 44 | 54 | 52 | 44** | 46 | -4% |
| Original Standard NMEs and BLAs | 22 | 22 | 35 | 29 | 29 | 29 | 27 | 7% |
| Original Priority Non-NME NDAs | 24 | 16 | 16 | 14 | 22 | 18** | 18 | 0% |
| Original Standard Non-NME NDAs | 81 | 69 | 68 | 59 | 72 | 43 | 70 | -39% |
| Class 1 Resubmitted NDAs and BLAs | 8 | 9 | 8 | 5 | 5 | 7 | 7 | 0% |
| Class 2 Resubmitted NDAs and BLAs | 49 | 50 | 41 | 57 | 51 | 60 | 50 | 20% |
| Priority NDA and BLA Efficacy Supplements | 78 | 97 | 81 | 112 | 100 | 84** | 94 | -11% |
| Standard NDA and BLA Efficacy Supplements | 173 | 177 | 197 | 195 | 173 | 159 | 183 | -13% |
| Class 1 Resubmitted NDA and BLA Efficacy Supplements | 3 | 3 | 4 | 3 | 3 | 1 | 3 | -67% |
| Class 2 Resubmitted NDA and BLA Efficacy Supplements | 11 | 11 | 2 | 20 | 10 | 8 | 11 | -27% |
| NDA and BLA Manufacturing Supplements Requiring Prior Approval | 968 | 992 | 973 | 1,168 | 1,243 | 1,233 | 1,069 | 15% |
| NDA and BLA Manufacturing Supplements Not Requiring Prior Approval | 1,540 | 1,610 | 1,450 | 1,717 | 1,779 | 1,441 | 1,619 | -11% |

\* FY 2021 numbers were changed to reflect updates to the data presented in the FY 2021 PDUFA Performance Report.

\*\* Some applications have not yet received a review priority designation.  There were 7 undesignated NMEs and BLAs counted as Priority NMEs and BLAs, 11 undesignated non-NME NDAs counted as Priority non-NME NDAs, and 15 undesignated efficacy supplements counted as Priority NDA and BLA Efficacy Supplements in the table above.  Performance results in all categories may change once designations are made for these applications, and the table will then be updated accordingly, as appropriate, in the FY 2023 PDUFA Performance Report.

## B.    Final FY 2021 Review Goal Performance Results

The final FY 2021 review goal performance results are presented in the table below.  The final performance results for submission types that met or exceeded the goal (i.e., 90 percent or more actions were completed by the goal date) are shown in bold text.  FDA met or exceeded the 90 percent performance level for 11 of the 12 review performance goals in FY 2021.

**Table 2.  FY 2021 Final Review Goal Performance Results**

| Submission Type | Goal:  Act on 90 Percent Within | Total | FY 2021 Performance |
|---|---|---|---|
| Original Priority NMEs and BLAs | 6 months of filing date | 51 of 52 on time | **98%** |
| Original Standard NMEs and BLAs | 10 months of filing date | 24 of 26 on time | **92%** |
| Original Priority Non-NME NDAs | 6 months | 20 of 22 on time | **91%** |
| Original Standard Non-NME NDAs | 10 months | 67 of 72 on time | **93%** |
| Class 1 Resubmitted NDAs and BLAs | 2 months | 4 of 5 on time | 80% |
| Class 2 Resubmitted NDAs and BLAs | 6 months | 48 of 51 on time | **94%** |
| Priority NDA and BLA Efficacy Supplements | 6 months | 90 of 100 on time | **90%** |
| Standard NDA and BLA Efficacy Supplements | 10 months | 160 of 172 on time | **93%** |
| Class 1 Resubmitted NDA and BLA Efficacy Supplements | 2 months | 3 of 3 on time | **100%** |
| Class 2 Resubmitted NDA and BLA Efficacy Supplements | 6 months | 10 of 10 on time | **100%** |
| NDA and BLA Manufacturing Supplements Requiring Prior Approval | 4 months | 1,189 of 1,243 on time | **96%** |
| NDA and BLA Manufacturing Supplements Not Requiring Prior Approval | 6 months | 1,706 of 1,779 on time | **96%** |

## C.    Final FY 2021 Review Goal Performance Details

The following tables detail the final performance data for the FY 2021 cohort of submissions. These data include the number of submissions reviewed *on time* (i.e., acted on by the PDUFA goal date) or *overdue* (i.e., acted on past the goal date or pending past the goal date) and the final *percent on time* (i.e., final performance with no actions pending within the PDUFA goal date). The performance data presented here have been updated from the preliminary performance information reported in the FY 2021 PDUFA Performance Report.

### Table 3.  FY 2021 Original Applications

| Original Application Type | Goal: Act on 90 Percent | Filed | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Priority NMEs & BLAs | 6 months of filing date | 52 | 51 | 1 | 98% |
| Standard NMEs & BLAs | 10 months of filing date | 29 | 24 | 2 | 92%[*] |
| Priority Non-NME NDAs | 6 months | 22 | 20 | 2 | 91% |
| Standard Non-NME NDAs | 10 months | 72 | 67 | 5 | 93% |

[*] Three standard NMEs and BLAs are pending within goal as of September 30, 2022.

### Table 4.  FY 2021 Resubmitted Original Applications

| Resubmitted Application Type | Goal: Act on 90 Percent Within | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Class 1 | 2 months | 5 | 4 | 1 | 80% |
| Class 2 | 6 months | 51 | 48 | 3 | 94% |

### Table 5.  FY 2021 Efficacy Supplements

| Efficacy Supplement Type | Goal: Act on 90 Percent Within | Filed | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Priority | 6 months | 100 | 90 | 10 | 90% |
| Standard | 10 months | 173 | 160 | 12 | 93%[*] |

[*] One standard efficacy supplement is pending within goal as of September 30, 2022.

**Table 6.  FY 2021 Resubmitted Efficacy Supplements**

| Resubmitted Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Class 1 | 2 months | 3 | 3 | 0 | 100% |
| Class 2 | 6 months | 10 | 10 | 0 | 100% |

**Table 7.  FY 2021 Manufacturing Supplements**

| Manufacturing Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Prior Approval Required | 4 months | 1,243 | 1,189 | 54 | 96% |
| Prior Approval Not Required | 6 months | 1,779 | 1,706 | 73 | 96% |

## D.    Preliminary FY 2022 Review Goal Performance Results

The preliminary FY 2022 review goal performance results are presented in the table below.

- The *progress* (i.e., the number of reviews completed) and the total number of submissions received for each submission type are shown in the second column.  *Current performance* includes submissions reviewed *on time* (i.e., acted on by the PDUFA goal date) or *overdue* (i.e., acted on past the goal date or pending past the goal date).  The current performance results for submission types with a greater proportion of reviews completed will be more representative of the final performance results.  The *highest possible final performance* is the best potential final performance result, which accounts for actions pending within the PDUFA goal date.

- The current performance results for submission types that are meeting the performance goal (i.e., 90 percent or more reviews were completed by the goal date) as of September 30, 2022, are shown in bold text.  FDA is currently meeting or exceeding the 90 percent performance level for 12 of the 12 performance goals.

- If all non-overdue pending submissions are reviewed on time, FDA will achieve the performance results presented in the Highest Possible Final Performance column.  FDA has the potential to meet or exceed the 90 percent performance level for 12 of the 12 review performance goals.

**Table 8. FY 2022 Preliminary Review Goal Performance Results**

| Submission Type | Progress* | Goal: Act on 90 Percent Within | FY 2022 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Original Priority NMEs and BLAs | 7 of 37 complete | 6 months of filing date | **100%** | 100% |
| Original Standard NMEs and BLAs | 0 of 29 complete | 10 months of filing date | **--** | 100% |
| Original Priority Non-NME NDAs | 4 of 7 complete | 6 months | **100%** | 100% |
| Original Standard Non-NME NDAs | 7 of 43 complete | 10 months | **100%** | 100% |
| Class 1 Resubmitted NDAs and BLAs | 7 of 7 complete | 2 months | **100%** | 100% |
| Class 2 Resubmitted NDAs and BLAs | 32 of 60 complete | 6 months | **100%** | 100% |
| Priority NDA and BLA Efficacy Supplements | 45 of 69 complete | 6 months | **98%** | 99% |
| Standard NDA and BLA Efficacy Supplements | 28 of 159 complete | 10 months | **96%** | 99% |
| Class 1 Resubmitted NDA and BLA Efficacy Supplements | 1 of 1 complete | 2 months | **100%** | 100% |
| Class 2 Resubmitted NDA and BLA Efficacy Supplements | 6 of 8 complete | 6 months | **100%** | 100% |
| NDA and BLA Manufacturing Supplements Requiring Prior Approval | 785 of 1,233 complete | 4 months | **96%** | 97% |
| NDA and BLA Manufacturing Supplements Not Requiring Prior Approval | 833 of 1,441 complete | 6 months | **98%** | 99% |

## E.    Preliminary FY 2022 Review Goal Performance Details

The following detailed performance information for the FY 2022 cohort submissions includes the number of submissions filed, reviewed on time (i.e., acted on by the PDUFA goal date), and overdue (i.e., acted on past the goal date or pending past the goal date). The number of submissions not yet acted on but still pending within the PDUFA goal date (pending within goal) is also provided, along with the highest possible percent of reviews that may be completed on time (highest possible percent on time).

**Table 9.  FY 2022 Original Applications**

| Original Application Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Priority NMEs & BLAs | 6 months of filing date | 37 | 7 | 0 | 30 | 100% | 100% |
| Standard NMEs & BLAs | 10 months of filing date | 29 | 0 | 0 | 29 | -- | 100% |
| Priority Non-NME NDAs | 6 months | 7 | 4 | 0 | 3 | 100% | 100% |
| Standard Non-NME NDAs | 10 months | 43 | 7 | 0 | 36 | 100% | 100% |
| Review Priority Undesignated* | N/A | 18 | -- | -- | 18 | -- | -- |
| Total | | 134 | 18 | 0 | 116 | -- | -- |

* These applications have not yet received a review priority designation.

**Table 10.  FY 2022 Resubmitted Original Applications**

| Resubmitted Application Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Class 1 | 2 months | 7 | 7 | 0 | 0 | 100% | 100% |
| Class 2 | 6 months | 60 | 32 | 0 | 28 | 100% | 100% |

**Table 11.  FY 2022 Efficacy Supplements**

| Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Priority | 6 months | 69 | 44 | 1 | 24 | 98% | 99% |
| Standard | 10 months | 159 | 27 | 1 | 131 | 96% | 99% |
| Review Priority Undesignated* | N/A | 15 | -- | -- | 15 | -- | -- |

* These applications have not yet received a review priority designation.

10

**Table 12.  FY 2022 Resubmitted Efficacy Supplements**

| Resubmitted Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Class 1 | 2 months | 1 | 1 | 0 | 0 | 100% | 100% |
| Class 2 | 6 months | 8 | 6 | 0 | 2 | 100% | 100% |

**Table 13.  FY 2022 Manufacturing Supplements**

| Manufacturing Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Prior Approval Required | 4 months | 1,233 | 750 | 35 | 448 | 96% | 97% |
| Prior Approval Not Required | 6 months | 1,441 | 820 | 13 | 608 | 98% | 99% |
| Review Priority Undesignated* | N/A | 0 | -- | -- | 0 | -- | -- |

\* These applications have not yet received a review priority designation.

# III.    PDUFA Procedural and Processing Goals and Commitments

## A.    Procedural and Processing Workload:  FY 2017 to FY 2022

The FY 2022 procedural and processing workload, which includes activities related to meeting management, procedural responses, and procedural notifications, is compared to the previous 5-year averages in the table below.  The upward trend of meeting management workload continued into FY 2022.

A new category of Type B meeting, Type B End of Phase (EOP),  was created under PDUFA VI; therefore, when comparing PDUFA VI (i.e., FY 2021 and FY 2022) data to previous years' data, it is important to combine both Type B meeting categories.  This new category also included a new meeting metric, Preliminary Response for Type B(EOP) Meetings.  Meeting type definitions and other terms can be found in Appendix E.  The table shows updated final FY 2021 performance and presents new reporting required under PDUFA VI.

Beginning in FY 2020, FDA committed to establish timelines for the review and comment on protocols for Human Factors studies of combination drug-device and biologic-device products. This additional goal is reflected in the number of procedural and processing goals reported.

**Table 14.  Meeting Management, Procedural Responses, and Procedural Notifications Workload**

| Submission/Request Type | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021* | FY 2022 | FY 2017 to FY 2021 5-Year Average | FY 2022 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Type A Meeting Requests | 175 | 146 | 153 | 182 | 178 | 284** | 167 | 70% |
| Type B Meeting Requests | 1,850 | 1,609 | 1,725 | 2,438 | 2,332 | 2,145 | 1,991 | 8% |
| Type B(EOP) Meeting Requests | -- | 343 | 343 | 350 | 347 | 307 | -- | -- |
| Type C Meeting Requests | 1,391 | 1,403 | 1,550 | 1,716 | 1,706 | 1,648 | 1,553 | 6% |
| Type A Meetings Scheduled | 159 | 127 | 130 | 147 | 143 | 231** | 141 | 64% |
| Type B Meetings Scheduled | 1,293 | 945 | 936 | 869 | 741 | 768 | 957 | -20% |
| Type B(EOP) Meetings Scheduled | -- | 324 | 325 | 322 | 282 | 261 | -- | -- |
| Type C Meetings Scheduled | 660 | 640 | 732 | 699 | 648 | 637 | 676 | -6% |
| Type A Written Response | -- | 6 | 6 | 13 | 11 | 18 | -- | -- |
| Type B Written Response | 482 | 578 | 719 | 1,430 | 1,451 | 1,281 | 932 | 37% |
| Type B(EOP) Written Response | -- | 14 | 11 | 23 | 49 | 36 | -- | -- |

| Submission/Request Type | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021* | FY 2022 | FY 2017 to FY 2021 5-Year Average | FY 2022 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Type C Written Response | 652 | 686 | 728 | 905 | 918 | 915 | 778 | 18% |
| Preliminary Response for Type B(EOP) Meetings | -- | 303 | 305 | 309 | 271 | 241 | -- | -- |
| Meeting Minutes | 1,679 | 1,541 | 1,638 | 1,515 | 1,363 | 1,305 | 1,547 | -16% |
| Responses to Clinical Holds | 193 | 199 | 197 | 261 | 275 | 344 | 225 | 53% |
| Major Dispute Resolutions | 20 | 23 | 28 | 35 | 14 | 13 | 24 | -46% |
| Special Protocol Assessments | 173 | 160 | 158 | 148 | 150 | 166 | 158 | 5% |
| Review of Proprietary Names Submitted During IND Phase | 176 | 159 | 212 | 224 | 211 | 191 | 196 | -3% |
| Review of Proprietary Names Submitted During NDA/BLA Phase | 255 | 228 | 230 | 255 | 223 | 208 | 238 | -13% |
| Human Factors Protocol Submissions | -- | -- | 70 | 79 | 79 | 59 | -- | -- |

* FY 2021 numbers were changed to reflect updates to the data presented in the FY 2021 PDUFA Performance Report.

** Some meeting requests and the subsequent scheduling of meetings are for requests where the type cannot be initially determined. There were 76 undesignated meetings counted as Type A meeting *requests* and *scheduled* in the table above. Performance in all categories will change once designations are made for these requests and scheduling and will be updated in the FY 2023 PDUFA Performance Report.

† Because of changing reporting requirements, no past average is presented for this area.

## B.     Final FY 2021 Procedural and Processing Performance Results

The table below presents the final performance results for FY 2021 submissions in meeting goals related to meeting management, procedural responses, and procedural notifications. The final performance results for submission types that met or exceeded the goal (e.g., 90 percent or more reviews were completed by the goal date) are shown in bold text. FDA exceeded the performance level for 8 of the 20 procedural and processing goals in FY 2021.

### Table 15.  FY 2021 Final Procedural and Processing Performance Results

| Submission/Request Type | Goal:  90 Percent | Total | FY 2021 Performance |
|---|---|---|---|
| Type A Meeting Requests | Respond within 14 days | 166 of 178 on time | **93%** |
| Type B Meeting Requests | Respond within 21 days | 2,089 of 2,332 on time | **90%** |
| Type B(EOP) Meeting Requests | Respond within 14 days | 296 of 347 on time | 85% |
| Type C Meeting Requests | Respond within 21 days | 1,551 of 1,706 on time | **91%** |

| Submission/Request Type | Goal: 90 Percent | Total | FY 2021 Performance |
|---|---|---|---|
| Type A Meetings Scheduled | Schedule within 30 days | 114 of 143 on time | 80% |
| Type B Meetings Scheduled | Schedule within 60 days | 595 of 741 on time | 80% |
| Type B(EOP) Meetings Scheduled | Schedule within 70 days | 228 of 282 on time | 81% |
| Type C Meetings Scheduled | Schedule within 75 days | 536 of 648 on time | 83% |
| Type A Written Response | Respond within 30 days | 9 of 11 on time | 82% |
| Type B Written Response | Respond within 60 days | 1,009 of 1,451 on time | 70% |
| Type B(EOP) Written Response | Respond within 70 days | 26 of 49 on time | 53% |
| Type C Written Response | Respond within 75 days | 692 of 918 on time | 75% |
| Preliminary Response for Type B(EOP) Meetings | Issue no later than 5 days prior to meeting date | 226 of 271 on time | 83% |
| Meeting Minutes | Issue within 30 days after meeting date | 1,264 of 1,363 on time | **93%** |
| Responses to Clinical Holds | Respond within 30 days | 257 of 275 on time | **93%** |
| Major Dispute Resolutions | Respond within 30 days | 12 of 14 on time | 86% |
| Special Protocol Assessments | Respond within 45 days | 144 of 150 on time | **96%** |
| Proprietary Name Submitted During IND Phase | Review and respond within 180 days | 202 of 211 on time | **96%** |
| Proprietary Name Submitted During NDA/BLA Phase | Review and respond within 90 days | 214 of 223 on time | **96%** |
| Human Factors Protocol Submissions | Respond within 60 days | 24 of 79 on time | 30% |

## C.    Final FY 2021 Procedural and Processing Performance Details

The following tables detail the final performance data for the FY 2021 cohort of submissions. These data include the number of submissions reviewed on time (i.e., acted on by the PDUFA goal date) or overdue (i.e., acted on past the goal date or pending past the goal date) and the final percent on time (i.e., final performance with no actions pending within the PDUFA goal date). The performance data presented here have been updated from the preliminary performance information reported in the FY 2021 PDUFA Performance Report.

## Table 16.  FY 2021 Meeting Management

| Type | Goal: 90 Percent | Received* | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Type A Meeting Requests | Respond within 14 days | 178 | 166 | 12 | 93% |
| Type B Meeting Requests | Respond within 21 days | 2,332 | 2,089 | 243 | 90% |
| Type B(EOP) Meeting Requests | Respond within 14 days | 347 | 296 | 51 | 85% |
| Type C Meeting Requests | Respond within 21 days | 1,706 | 1,551 | 155 | 91% |
| Type A Meetings Scheduled | Schedule within 30 days | 143 | 114 | 29 | 80% |
| Type B Meetings Scheduled | Schedule within 60 days | 741 | 595 | 146 | 80% |
| Type B(EOP) Meetings Scheduled | Schedule within 70 days | 282 | 228 | 54 | 81% |
| Type C Meetings Scheduled | Schedule within 75 days | 648 | 536 | 112 | 83% |
| Type A Written Response | Respond within 30 days | 11 | 9 | 2 | 82% |
| Type B Written Response | Respond within 60 days | 1,451 | 1,009 | 442 | 70% |
| Type B(EOP) Written Response | Respond within 70 days | 49 | 26 | 23 | 53% |
| Type C Written Response | Respond within 75 days | 918 | 692 | 226 | 75% |
| Preliminary Response for Type B(EOP) Meetings | Issue no later than 5 days prior to meeting date | 271 | 226 | 45 | 83% |
| Meeting Minutes | Issue within 30 days after meeting date | 1,363 | 1,264 | 99 | 93% |

* Not all meeting requests are granted; therefore, the number of meetings scheduled may differ from the number of meeting requests received.  Not all scheduled meetings are held; therefore, the number of meeting minutes may differ from the number of meetings scheduled.

## Table 17.  FY 2021 Responses to Clinical Holds

| Goal | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|
| Respond to 90 percent within 30 days | 275 | 257 | 18 | 93% |

**Table 18.  FY 2021 Major Dispute Resolutions**

| Goal | Responses* | On Time | Overdue | Percent on Time |
|---|---|---|---|---|
| Respond to 90 percent within 30 days | 14 | 12 | 2 | 86% |

\* This figure represents the number of FDA-generated 30-day responses to requests for review that have been received.  This figure is not representative of the number of unique appeals received that have been reviewed as there may be more than one response to an original appeal.

**Table 19.  FY 2021 Special Protocol Assessments**

| Goal | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|
| Respond to 90 percent within 45 days | 150 | 144 | 6 | 96% |

**Table 20.  FY 2021 Special Protocol Assessment Resubmissions**

| SPAs with Resubmissions | Applications with 1 Resubmission | Applications with 2 Resubmissions | Applications with 3 Resubmissions | Applications with 4 Resubmissions | Total Resubmissions |
|---|---|---|---|---|---|
| 19 | 16 | 2 | 1 | 0 | 23 |

**Table 21.  FY 2021 Drug/Biological Product Proprietary Names**

| Submission Type | Goal:  90 Percent | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Proprietary Name Submitted During IND Phase | Review and respond within 180 days | 211 | 202 | 9 | 96% |
| Proprietary Name Submitted During NDA/BLA Phase | Review and respond within 90 days | 223 | 214 | 9 | 96% |

**Table 22.  FY 2021 Human Factors Protocol Submissions**

| Submission Type | Goal: 90 Percent | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Human Factors Protocol Submissions | Respond within 60 days | 79 | 24 | 55 | 30% |

## D.    Preliminary FY 2022 Procedural and Processing Performance Results

The table below presents preliminary performance results for FY 2022 submissions in achieving goals related to meeting management, procedural responses, and procedural notifications as outlined under PDUFA VI.

- The *progress* (i.e., the number of review activities completed or pending overdue) and the

16

total number of submissions received for each submission type are shown in the second column. *Current performance* includes the number of submissions reviewed *on time* (i.e., acted on by the PDUFA goal date) or *overdue* (i.e., acted on past the goal date or pending past the goal date). *Highest possible final performance* is the best potential final performance result, which accounts for actions pending within the PDUFA goal date.

- The current performance results for submission types that are meeting the performance goal as of September 30, 2022, are shown in bold text. FDA is currently meeting or exceeding the performance level for 6 of the 20 procedural and processing goals. If all pending submissions are reviewed on time, FDA has the potential to meet 7 of the 20 goals, as seen in the Highest Possible Final Performance column.

**Table 23.  FY 2022 Preliminary Procedural and Processing Performance Results**

| Submission/Request Type | Progress | Goal:  90 Percent | FY 2022 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Type A Meeting Requests | 212 of 284 complete | Respond within 14 days | 89% | 92% |
| Type B Meeting Requests | 2101 of 2145 complete | Respond within 21 days | **90%** | 90% |
| Type B(EOP) Meeting Requests | 303 of 307 complete | Respond within 14 days | 89% | 89% |
| Type C Meeting Requests | 1608 of 1648 complete | Respond within 21 days | **90%** | 90% |
| Type A Meetings Scheduled | 154 of 231 complete | Schedule within 30 days | 71% | 81% |
| Type B Meetings Scheduled | 714 of 768 complete | Schedule within 60 days | 76% | 77% |
| Type B(EOP) Meetings Scheduled | 250 of 261 complete | Schedule within 70 days | 84% | 85% |
| Type C Meetings Scheduled | 607 of 637 complete | Schedule within 75 days | 82% | 83% |
| Type A Written Response | 17 of 18 complete | Respond within 30 days | 82% | 83% |
| Type B Written Response | 1084 of 1281 complete | Respond within 60 days | 66% | 71% |
| Type B(EOP) Written Response | 30 of 36 complete | Respond within 70 days | 67% | 72% |
| Type C Written Response | 748 of 915 complete | Respond within 75 days | 76% | 80% |
| Preliminary Response for Type B(EOP) Meetings | 192 of 241 complete | Issue no later than 5 days prior to meeting date | **90%** | 92% |
| Meeting Minutes | 959 of 1305 complete | Issue within 30 days after meeting date | **93%** | 95% |

| Submission/Request Type | Progress | Goal: 90 Percent | FY 2022 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Responses to Clinical Holds | 330 of 344 complete | Respond within 30 days | 88% | 89% |
| Major Dispute Resolutions | 10 of 13 complete | Respond within 30 days | 80% | 85% |
| Special Protocol Assessments | 149 of 166 complete | Respond within 45 days | **96%** | 96% |
| Proprietary Name Submitted During IND Phase | 103 of 191 complete | Review and respond within 180 days | 54% | 75% |
| Proprietary Name Submitted During NDA/BLA Phase | 161 of 208 complete | Review and respond within 90 days | **96%** | 97% |
| Human Factors Protocol Submissions | 51 of 59 complete | Respond within 60 days | 59% | 64% |

## E.    Preliminary FY 2022 Procedural and Processing Performance Details

The following detailed performance information for FY 2022 cohort submissions includes the number of submissions *received*, reviewed *on time* (i.e., acted on by the PDUFA goal date), and *overdue* (i.e., acted on past the goal date or pending past the goal date).  The number of submissions not yet acted on but still pending within the PDUFA goal date (*Pending Within Goal*) is also provided, along with the highest possible percent of reviews that may be completed on time (*Highest Possible Percent on Time*).

### Table 24.  FY 2022 Meeting Management

| Type | Goal: 90 Percent | Received* | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Type A Meeting Requests | Respond within 14 days | 284 | 188 | 24 | 72 | 89% | 92% |
| Type B Meeting Requests | Respond within 21 days | 2,145 | 1,893 | 208 | 44 | 90% | 90% |
| Type B(EOP) Meeting Requests | Respond within 14 days | 307 | 270 | 33 | 4 | 89% | 89% |
| Type C Meeting Requests | Respond within 21 days | 1,648 | 1,450 | 158 | 40 | 90% | 90% |
| Type A Meetings Scheduled | Schedule within 30 days | 231 | 110 | 44 | 77 | 71% | 81% |

18

| Type | Goal: 90 Percent | Received* | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Type B Meetings Scheduled | Schedule within 60 days | 768 | 540 | 174 | 54 | 76% | 77% |
| Type B(EOP) Meetings Scheduled | Schedule within 70 days | 261 | 210 | 40 | 11 | 84% | 85% |
| Type C Meetings Scheduled | Schedule within 75 days | 637 | 499 | 108 | 30 | 82% | 83% |
| Type A Written Response | Respond within 30 days | 18 | 14 | 3 | 1 | 82% | 83% |
| Type B Written Response | Respond within 60 days | 1,281 | 713 | 371 | 197 | 66% | 71% |
| Type B(EOP) Written Response | Respond within 70 days | 36 | 20 | 10 | 6 | 67% | 72% |
| Type C Written Response | Respond within 75 days | 915 | 568 | 180 | 167 | 76% | 80% |
| Preliminary Response for Type B(EOP) Meetings | Issue no later than 5 days prior to meeting date | 241 | 173 | 19 | 49 | 90% | 92% |
| Meeting Minutes | Issue within 30 days after meeting date | 1,305 | 896 | 63 | 346 | 93% | 95% |

* Not all meeting requests are granted; therefore, the number of meetings scheduled may differ from the number of meeting requests received.  Not all scheduled meetings are held; therefore, the number of meeting minutes may differ from the number of meetings scheduled.
† Some meeting requests and subsequent scheduling of meetings are for requests where the type cannot be initially determined.  There were 76 undesignated meetings counted as Type A meeting *requests* and *scheduled* in the table above.  Performance in all categories will change once designations are made for these requests and scheduling and will be updated in the FY 2023 PDUFA Performance Report.

## Table 25.  FY 2022 Responses to Clinical Holds

| Goal | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|
| Respond to 90 percent within 30 days | 344 | 291 | 39 | 14 | 88% | 89% |

**Table 26.  FY 2022 Major Dispute Resolutions**

| Goal | Responses* | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|------|------------|---------|---------|---------------------|-------------------------|----------------------------------|
| Respond to 90 percent within 30 days | 13 | 8 | 2 | 3 | 80% | 85% |

* This figure represents the number of FDA-generated 30-day responses to requests for review that have been received.  This figure is not representative of the number of unique appeals received that have been reviewed as there may be more than one response to an original appeal.

**Table 27.  FY 2022 Special Protocol Assessments**

| Goal | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|------|----------|---------|---------|---------------------|-------------------------|----------------------------------|
| Respond to 90 percent within 45 days | 166 | 143 | 6 | 17 | 96% | 96% |

**Table 28.  FY 2022 Special Protocol Assessments Resubmissions**

| SPAs with Resubmissions | Applications with 1 Resubmission | Applications with 2 Resubmissions | Applications with 3 Resubmissions | Applications with 4 Resubmissions | Total Resubmissions |
|-------------------------|----------------------------------|-----------------------------------|-----------------------------------|-----------------------------------|---------------------|
| 14 | 13 | 1 | 0 | 0 | 15 |

**Table 29.  FY 2022 Drug/Biological Product Proprietary Names**

| Submission Type | Goal: 90 Percent | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|-----------------|------------------|----------|---------|---------|---------------------|-------------------------|----------------------------------|
| Proprietary Name Submitted During IND Phase | Review and respond within 180 days | 191 | 56 | 47 | 88 | 54% | 75% |
| Proprietary Name Submitted During NDA/BLA Phase | Review and respond within 90 days | 208 | 154 | 7 | 47 | 96% | 97% |

**Table 30.  FY 2022 Human Factors Protocol Submissions**

| Submission Type | Goal: 90 Percent | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|-----------------|------------------|----------|---------|---------|---------------------|-------------------------|----------------------------------|
| Human Factors Protocol Submissions | Respond within 60 days | 59 | 30 | 21 | 8 | 59% | 64% |

# IV.    PDUFA Trend Graphs

The number of NDAs and BLAs filed from FY 2013 to FY 2022 is presented in the graph below. The total number of all original applications (NDAs and BLAs) filed in FY 2022 decreased from the number filed in FY 2021, and the total number of priority applications filed decreased in FY 2022.

## Figure 1.  Total NDAs and BLAs Filed



\* FY 2021 numbers were changed to reflect updates to the data presented in the FY 2021 PDUFA Performance Report.
\*\* Some applications filed in FY 2022 have not yet received a review priority designation.  The undesignated NDAs and BLAs are counted as Priority NDAs and BLAs.  In the FY 2023 PDUFA Performance Report, designations may change, and the table will be updated accordingly.

21

The median total times to approval for priority and standard applications received from FY 2012 through FY 2021 are presented in the graph below.[4]  The data represented in the graph are updated based on the approvals reported in Appendix A.  FY 2022 data are too preliminary to estimate the median approval time.

**Figure 2.  Median Time to Application Approval for All Filed NDAs and BLAs (Months)**



\* The median approval times for the 3 most recent years are estimated.
  The data represented in this graph are based on the approvals reported in Appendix A.

---

[4] The total time for applications that are approved in the first cycle includes only FDA's response times. Applications approved after multiple review cycles include both FDA's and sponsor's response times.  The *median total approval time* is the median of all application times for a given cohort, including applications with multiple review cycles.

The graph below depicts the percentages of priority and standard NDAs and BLAs approved in the first review cycle for the receipt cohorts from FY 2012 to FY 2021. These percentages are based on the approvals reported in Appendix A. The percentage of standard applications in first-cycle approvals decreased in FY 2021. For the FY 2021 cohort, which is still preliminary, 55 percent of standard applications were approved on the first cycle. First-cycle approvals for approved priority applications decreased in FY 2021, with 69 percent of approved priority applications being approved on the first cycle. The FY 2022 data are too preliminary to estimate the percent of first-cycle approvals.

**Figure 3. Percent of NDAs and BLAs Approved on the First Cycle**



* First-cycle approvals are still possible for FY 2021 priority and standard applications, so the data are preliminary. The data were changed to reflect updates to the data presented in the FY 2021 PDUFA Performance Report.
** The data represented in this graph are based on the approvals reported in Appendix A.

# V.    Additional PDUFA VI Commitments

Under Section VI of the PDUFA VI Commitment Letter, FDA committed to report its progress on the specific commitments identified in the following sections of the Commitment Letter:[5]

- Section I.I:   Enhancing Regulatory Science and Expediting Drug Development,

- Section I.J:   Enhancing Regulatory Decision Tools to Support Drug Development and Review,

- Section I.K:  Enhancement and Modernization of the FDA Drug Safety System,

- Section II:    Enhancing Management of User Fee Resources,

- Section III:   Improving FDA Hiring and Retention of Review Staff, and

- Section IV:  Information Technology Goals

Further, section 736B(a) of the FD&C Act, as amended by section 103 of FDARA, requires FDA to report on the Agency's performance under PDUFA VI.

FDA and industry designed these enhancements to improve the efficiency of drug development and the human drug review process.  The progress reports in this section detail the work FDA performed in FY 2021 on commitments in Sections I.I-K of the Commitment Letter.  In addition, this report includes updates on FDA's accomplishments under Section II:  Enhancing Management of User Fee Resources, Section III:  Improving FDA Hiring and Retention of Review Staff, and Section IV:  Information Technology Goals.  The Section II progress reports are duplicated in the FY 2022 PDUFA VI Financial Report.  Each accomplishment includes a reference to a specific section of the Commitment Letter.  External references are also provided to published guidance documents, meeting summaries, and other pertinent public information.

FDA is dedicated to the goals outlined in these sections of the Commitment Letter.  When applicable, for each section, additional information is included on other activities FDA has conducted that are not specifically required but further the goals outlined in the Commitment Letter.

---

[5] http://www.fda.gov/media/99140/download.

## A.  Section I.I:  Enhancing Regulatory Science and Expediting Drug Development

**Table 31.  Section I.I's FY 2022 Commitments and Accomplishments**

| Commitment Title | FY 2022 Accomplishments |
|---|---|
| I.I.1 Promoting Innovation Through Enhanced Communication Between FDA and Sponsors During Drug Development | • In FY 2022, there were no commitments due. |
| I.I.2 Ensuring Sustained Success of Breakthrough Therapy Program | • In FY 2022, there were no commitments due. |
| I.I.3 Early Consultation on the Use of New Surrogate Endpoints | • In FY 2022, there were no commitments due. |
| I.I.4 Advancing Drug Development of Drugs for Rare Diseases | **OVERALL**<br><br>• In FY 2022, CDER's Rare Diseases Team (RDT) engaged in critical rare disease drug development enhancement activities.  In May 2022, CDER launched the Accelerating Rare disease Cures Program.  This program was designed to accelerate and promote the development of effective and safe treatment options that address the unmet needs of patients with rare diseases.  It is managed by the RDT and governed by leadership in policy, review, and engagement from CDER's Office of the Center Director, Office of New Drugs (OND), and Office of Translational Sciences (OTS).<br><br>**EXPERTISE IN REVIEW**<br><br>• In FY 2022, the RDT continued to consult on or contribute to the approval of rare disease drug applications across the review divisions in OND regarding the design of trials, the assessment<br><br>• CBER ensured that its review offices considered flexible and feasible approaches in the review of biologics for rare diseases through the sharing of expert review practices and case study presentations during CBER Rare Disease Coordinating Committee meetings.<br><br>• CDER's Office of Rare Diseases, Pediatrics, Urologic and Reproductive Medicine (ORPURM), in conjunction with the RDT, continued to facilitate CDER's Rare Disease Drug Development Council meetings. Members of CDER's Division of Rare Diseases and Medical Genetics (DRDMG) and RDT serve on the council.  The council meetings are a forum (1) to discuss cross-cutting rare disease issues with leaders in rare disease drug development across OND and OTS and (2) to solicit input from OND and OTS on rare disease applications. |

25

- The RDT worked closely with other offices within CDER to continue to provide expertise for the rare disease pediatric voucher program.

- The RDT is the CDER program lead for the development and implementation of the PDUFA VII Rare Disease Endpoint Advancement Pilot Program. This joint CDER/CBER pilot program will support novel efficacy endpoint development for rare disease treatments.

**EDUCATION AND TRAINING**

- In FY 2022, the RDT and CBER continued to train CDER and CBER review staff, as well as other FDA staff, in areas of rare disease drug development.

- In September 2022, the RDT held a 2-day annual reviewer training event titled "Use of RWD/RWE in Rare Disease Medical Product Development." This training focused on collaborations across FDA's Centers and Offices (i.e., the Office of the Commissioner (OC), CDER, and CBER), which have impacted the development of medical products for rare diseases. Approximately 500 staff attended the program.

- The RDT holds a quarterly rare diseases seminar series. During these quarterly seminars, which are for FDA staff, topics pertaining to rare diseases are presented, including Bayesian statistical approaches, clinical outcome assessments as endpoints, transformative therapeutic clinical trial platforms (which was presented by the National Center for Advancing Translational Sciences (NCATS) at the National Institutes of Health (NIH) and use of CRISPR/CAS9 technology (in conjunction with CBER staff and Nobel Laureate Jennifer Doudna). CBER staff were integral contributors of topic ideas to this series.

- In September 2022, the RDT collaborated with CDER's Office of the Center Director and Office of Biostatistics to plan and conduct a Complex Innovative Design (CID) Seminar Series continuing education lecture titled "Small Sample SMART Design and Bayesian Methods to Determine the Effectiveness of a Drug." A University of Michigan expert presented research on rare disease clinical trial design that is being investigated under a Broad Agency Announcement contract with FDA.

- CDER's DRDMG and ORPURM distributed, in conjunction with the RDT, a bimonthly internal FDA rare disease newsletter, *Zebragram*. The newsletter to FDA staff provided not only news relating to rare disease science, regulations, and policies within OND, across the Agency, and with key stakeholder, but also information about rare disease drug and biological product applications from across CDER and CBER. CBER routinely contributed content to this newsletter on

26

CBER rare disease activities and ensured a wide distribution of it within its Center.

**EXTERNAL OUTREACH**

- In FY 2022, the RDT, in collaboration with CBER, continued its outreach activities with external stakeholders to advance rare disease drug development.

- The RDT—along with others in CDER, CBER, the Center for Devices and Radiological Health (CDRH), and OC—participated in the October 2021 National Organization for Rare Disorders (NORD) Summit by coordinating an FDA plenary session on FDA's patient engagement activities. The RDT also facilitated FDA participation in other sessions and presented posters at the summit.

- In May 2022, the RDT, along with others in CDER and the Division of Rare Diseases Research Innovation at NIH's NCATS co-sponsored a 2-day workshop on regulatory fitness in rare disease clinical trials (see https://www.fda.gov/drugs/news-events-human-drugs/fda-cder-nih-ncats-regulatory-fitness-rare-disease-clinical-trials-workshop-05162022). This workshop targeted academic investigators, patient groups, and small or emerging pharmaceutical or biotechnology companies that are often the sponsors for rare disease drug development but may lack regulatory experience. The workshop featured CDER's rare disease experts as speakers and case studies from the NCATS division's grantees.

- In July 2022, the RDT was a panelist in a NORD webinar titled "Drug Development for Rare Disease: A Community Conversation."

- The RDT led and facilitated the International Rare Diseases Cluster for FDA. In addition to including FDA, this cluster includes two other regulatory agencies—namely, the European Medicines Agency and Health Canada. In FY2022, Health Canada transitioned from being a participant to being a co-chair. CBER staff gave presentations at three of the fourteen Cluster meetings held with the European Medicines Agency and Health Canada.

- The RDT and CBER became members of the International Rare Diseases Research Consortium's new Regulatory Science Committee, which includes representation from regulatory bodies, patient groups, the biotech and pharmaceutical industries, public and not-for-profit organizations, clinicians, and scientists. The goal of the committee is to promote multi-stakeholder interaction to identify pathways for regulatory harmonization in consideration of global regulatory challenges surrounding therapeutic innovation in rare disease drug development.

|  | • The Duke-Margolis Center for Health Policy and the RDT, in conjunction with others at CDER, hosted a rare disease public workshop titled "Endpoint Considerations to Facilitate Drug Development for Niemann-Pick Type C (NPC)" in January 2022 (see https://www.fda.gov/drugs/news-events-human-drugs/endpoint-considerations-facilitate-drug-development-niemann-pick-type-c-npc-public-workshop-01242022). Presenters discussed clinical endpoints relevant to NPC clinical trials and innovative strategies to support therapeutic development for patients with NPC.  In August 2022, Duke-Margolis and the RDT hosted a follow-up webinar that provided key themes and shared future directions from the January 2022 workshop (see https://www.fda.gov/drugs/news-events-human-drugs/endpoint-considerations-facilitate-drug-development-niemann-pick-type-c-npc-key-themes-and-future).<br><br>• The RDT and CBER staff interacted with FDA's Office of Orphan Products Development, such as through contributing to the office's bimonthly meetings for planning and participating in the FDA Rare Disease Day 2022, a public meeting held on March 4, 2022 .<br><br>• DRDMG, the RDT, and CBER ensured the relevance of three draft guidance documents for industry for rare diseases.  Two of these draft guidances provided recommendations for real-world data and-real world evidence—one titled *Real-World Data:  Assessing Registries to Support Regulatory Decision-Making for Drug and Biological Products* (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/real-world-data-assessing-registries-support-regulatory-decision-making-drug-and-biological-products) and one titled *Considerations for the Use of Real-World Data and Real-World Evidence To Support Regulatory Decision-Making for Drug and Biological Products* (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/considerations-use-real-world-data-and-real-world-evidence-support-regulatory-decision-making-drug).  The third draft guidance document, titled *Benefit-Risk Assessment for New Drug and Biological Products* (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/benefit-risk-assessment-new-drug-and-biological-products), specifically included recommendations for rare diseases.<br><br>• ORPURM, DRDMG, and the RDT made over 30 presentations on various rare disease topics.<br><br>• CDER staff and reviewers in DRDMG published an FDA approval summary for a drug treatment, Nexviazyme for the rare late-onset Pompe disease. |
|---|---|

28

| | |
|---|---|
| | • In FY 2022, CBER staff participated in a minimum of 138 outreach activities intended to support the development of biological products for rare diseases. These activities included presentations (55%), publications (26%), and posters/abstracts (19%). <br><br> • The RDT and CBER staff attended multiple Patient-Focused Drug Development (PFDD) and Patient Listening Sessions for rare diseases. The PFDD meetings, some of which were hosted by patient organizations, provided a systematic approach to help ensure that patients' experiences, perspectives, needs, and priorities are captured and meaningfully incorporated into drug development and evaluation. The Patient Listening Sessions enabled FDA medical product centers to engage with patients and caregivers, which allowed the patient community to share with the Agency their experiences living with a disease/condition or other health-related matter. <br><br> • On November 16, 2021, and March 6, 2022, CBER held public RegenMedEd webinars on regenerative medicine. The goal of these webinars was to (1) bring together patients, caregivers, patient advocates, and FDA staff to discuss foundational information about regenerative medicine therapies, such as gene therapy and cell therapy, and (2) explore opportunities for stakeholders to engage with FDA to help advance drug development on November 16, 2021, and March 6, 2022. <br><br> • On May 24, 2022, CBER hosted a public workshop titled "Annual Patient Engagement & Regenerative Medicine Meeting 2022: An FDA CBER Workshop for Patient Advocates," which focused on the importance of natural history studies. <br><br> • On October 27, 2021, FDA CBER, NIH, and 10 pharmaceutical companies and five non-profit organizations established The Bespoke Gene Therapy Consortium, which was a partnership to accelerate the development of gene therapies with the goal of (1) leveraging and streamlining the gene therapy development process to help fill the unmet medical needs of people with rare diseases and (2) exploring methods to streamline regulatory requirements and processes for FDA's approval of safe and effective gene therapies. |
| I.I.5 Advancing Development of Drug-Device and Biologic-Device Combination Products Regulated by CBER and CDER | • In developing staff capacity for combination products, the Office of Combination Products (OCP) has hired several staff members over the last 5 years to support project management, policy development, scientific reviews, and IT initiatives. These additional hires have enabled OCP to continue to support all three medical product Centers in premarket review and postmarket regulations of combination products. <br><br> • Work on the final guidance document regarding bridging studies, including the bridging of data from combination |

| | |
|---|---|
| | products, has been delayed due to competing priorities with various public health emergencies.<br><br>• FDA published the patient-oriented labeling final guidance document *Instructions for Use – Patient Labeling for Human Prescription Drug and Biological Products – Content and Format*, in July 2022 (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/instructions-use-patient-labeling-human-prescription-drug-and-biological-products-content-and-format). |
| I.I.6 Enhancing Use of Real-World Evidence for Use in Regulatory Decision-Making | • In FY 2022, there were no commitments due. |

## B.    Section I.J:  Enhancing Regulatory Decision Tools to Support Drug Development and Review

### Table 32.  Section I.J's FY 2022 Commitments and Accomplishments

| Commitment Title | FY 2022 Accomplishments |
|---|---|
| I.J.1 Enhancing the Incorporation of the Patient's Voice in Drug Development and Decision-Making | • In June 2022, FDA published the draft guidance document *Patient-Focused Drug Development:  Selecting, Developing or Modifying Fit-For-Purpose Clinical Outcomes Assessments* (PFDD Guidance 3) (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/patient-focused-drug-development-selecting-developing-or-modifying-fit-purpose-clinical-outcome), thereby meeting this commitment. The public comment period for the guidance closed on September 28, 2022.  The comments will be reviewed and considered as part of the process to finalize this guidance document.<br><br>• In September 2022, FDA conducted a public webinar to provide an overview of the PFDD Guidance 3 and to answer stakeholder questions.<br><br>• In February 2022, FDA finalized the guidance document *Patient-Focused Drug Development:  Methods to Identify What Is Important to Patients* (PFDD Guidance 2) (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/patient-focused-drug-development-methods-identify-what-important-patients).<br><br>• FDA continued to strengthen its staff capacity to facilitate the development and use of patient-focused methods to inform drug development and regulatory decisions.  This strengthened staff were integrated across review divisions, frequently interacted with patient stakeholders, and provided |

|  | consultations to sponsors developing clinical outcome assessments that were to be used to collect patient and caregiver input.  These interactions included participating in at least 10 Patient Listening Sessions and 19 externally led PFDD meetings.  Staff also continued to support the Clinical Outcome Assessment qualification program. |
|---|---|
|  | • FDA continued the Standard Core Clinical Outcomes and Endpoints Grant Program that (1) funds the development of core outcome sets in a variety of clinical divisions and (2) increases the familiarity and understanding of the development of Clinical Outcome Assessments within review divisions and other areas. |
|  | • FDA maintained and enhanced its repository of publicly available tools and resources for stakeholders and, in August 2022, modified the repository to better meet the needs of stakeholders. |
|  | • FDA continued to hold monthly cross-disciplinary meetings to discuss reviews, guidance documents, and process changes. Staff provided presentations at several internal meetings and public meetings with a high attendance by FDA staff.  In addition, FDA staff and reviewers participated in multiple internal trainings to increase their familiarity and understanding of the role of patient preference studies in drug development. |
|  | • In June 2022, FDA conducted a public meeting titled "Using Methods from PFDD Guidance 1 and Guidance 2 as Tools for Including Patient Experience Data in Clinical Trials:  Who to Ask and How to Ask," which focused on the PFDD guidance series."  In July 022, FDA conducted a public meeting titled "Using Methods from PFDD Guidance 1 and Guidance 2 as Tools for Including Patient Experience Data in Clinical Trials:  Lessons Learned about Data Collection and Analysis," which provided an overview of the PFDD guidance documents and allowed FDA to hear from stakeholders about how they had utilized the guidance documents in their drug development programs. |
| I.J.2 Enhancing the Benefit-Risk Assessment in Regulatory Decision-Making | • FDA completed a third-party evaluation of the implementation of the benefit-risk framework in the human drug review program. |
|  | • FDA began work to develop a final guidance document on the benefit-risk assessment for new drugs and biologics at the close of the public comment period for the draft guidance. |
|  | • FDA continued to conduct trainings with review staff on the benefit-risk framework and related topics.  FDA continued to apply this framework in the review of new drugs and biologics and, in select cases, apply additional benefit-risk approaches to inform this framework.  FDA staff presented at conferences on |

| | |
|---|---|
| | topics relevant to benefit-risk assessment and continued participating in multi-stakeholder workgroups seeking to advance best practices in the benefit-risk assessment for drug development. |
| I.J.3 Advancing Model-Informed Drug Development | • FY 2022 model-informed drug development (MIDD) quarterly selections and meetings:<br><br>   ○ OCP granted 13 MIDD submissions and conducted 11 industry meetings (eight initial and three follow-up) from October 2021 to September 2022.<br>   ○ CBER granted one submission and conducted two industry meetings (one initial and one follow-up) from October 2021 to September 2022.<br><br>• Held the MIDD public workshop on disease progression model development titled, "Best Practices for Development and Application of Disease Progression Models" on November 19, 2021.  There were 1,052 attendees.<br><br>• Held the MIDD public workshop on immunogenicity and correlates of protection titled, "Model Informed Drug Development Approaches for Immunogenicity Assessments" on June 9, 2021, and reported in FY 2021.<br><br>• The publication of summary topics discussed in MIDD public workshop on disease progression model development is expected by December 2022.<br><br>• Published the summary topics discussed in MIDD public workshop on immunogenicity and correlates of protection in March 2022 in the *Clinical Pharmacology and Therapeutics* journal. |
| I.J.4 Enhancing Capacity to Review Complex Innovative Designs | • CID Pilot Program FY 2022 quarterly meetings:<br><br>   ○ FDA completed a paired meeting series for one proposed CID.<br>   ○ FDA denied three CID meeting requests.<br>   ○ FDA presented 14 CID-related presentations at professional meetings. |
| I.J.5 Enhancing Capacity to Support Analysis Data Standards for Product Development and Review | • FDA presented at external meetings sponsored by standards developing organizations. |
| I.J.6 Enhancing Drug Development Tools Qualification Pathway for Biomarkers | • FDA is currently working on a draft guidance document on the evidentiary framework for biomarker qualification and will continue to evaluate the potential need for a supplemental focused guidance document on evidentiary standards once the evidentiary framework guidance is published. |

## C.    Section I.K:  Enhancement and Modernization of FDA's Drug Safety System

### Table 33.  Section I.K's FY 2022 Commitments and Accomplishments

| Commitment Title | FY 2022 Accomplishments |
|---|---|
| I.K.1 Advancing Postmarketing Drug Safety Evaluation Through Expansion of the Sentinel System, and Integration into FDA Pharmacovigilance Activities | • FDA updated the Sentinel Common Data Model to version 8.0.0 and began implementation of version 8.1.0 (which was released to public Git6 on April 15, 2022).  This update allowed for increased data capture, improved data precision, and the opening of this data model to international and broader use of real-world data. <br><br>• FDA initiated a project funded by the Assistant Secretary for Planning and Evaluation to add Transformed Medicaid Statistical Information System data to Sentinel. <br><br>• FDA developed new analytic capabilities in Active Risk Identification and Analysis (ARIA)-distributed tools to enable verification that the Cox proportional hazards assumption was not violated using statistical tests adding the Cox Proportional Hazard Assumption Test and the Kaplan Meier curve estimation for Inverse Probability of Treatment Weighting, which is an analytic method that can reduce confounding bias in observational studies of medical treatments. <br><br>• FDA completed the TriNetX characterization to improve understanding of this electronic health record-based data sources. <br><br>• In FY 2022, the Innovation Center continued seven projects and initiated five new ones to advance a strategic goal of developing a new electronic health record-based distributed data network. <br><br>• FDA continued to post every analytic package and query result on the Sentinel website. <br><br>• FDA continued to notify sponsors about Sentinel analyses and results according to the policies and processes outlined in the Manual of Policies and Procedures 6701.4 (see www.fda.gov/media/141216/download). <br><br>• FDA made upgrades to distributed and local reporting tools used for ARIA analyses, including analytic programming code and comprehensive documentation, publicly available on the Sentinel website. |

---

[6] https://dev.sentinelsystem.org/repos?visibility=public.

- FDA conducted a public training on April 29, 2022, on Inverse Probability of Treatment Weighting.

- On January 19, 2022, the Sentinel Community Building and Outreach Center hosted a webinar on how health advocates can use publicly available resources on the Sentinel website.

- On September 14, Sentinel's Community Building and Outreach Center developed a webinar titled "An Overview of Sentinel's Publicly Available Analytics Tools" to increase stakeholder awareness and engagement with the Sentinel System.

- The Innovation in Medical Evidence Development and Surveillance is a program run by the Reagan-Udall Foundation for FDA that provides the private sector with access to a subset of FDA's Sentinel Network to conduct assessments of medical product safety and effectiveness. This program benefits from Sentinel's curated data and routine analytic toolset. From initiation through FY 2022, the Sentinel Operations Center supported seven program queries.

- FDA provided enhancements to the Sentinel website, which serves as a central hub for communications related to Sentinel. These enhancements included adding pages on pregnancy, pediatrics, and COVID-19.

- FDA continued to post a public quarterly newsletter to inform the Sentinel community of the work being done by Sentinel, upcoming events, and new publications.

- FDA created a new data visualization dashboard called Sentinel Views, a web-based data visualization platform, designed to increase access to study results from the Sentinel System. Sentinel Views was released to the public in April 2022. It can help internal and external users to visualize both descriptive and inferential results for eligible queries.

- Hosted the Sentinel annual public workshop on November 8, 2021, and November 9, 2021.

- FDA continued to notify sponsors on the sufficiency of FDA's ARIA system to evaluate serious safety concerns in the approval letter for original and supplemental drug and biological product applications.

- FDA developed and updated internal templates used in the ARIA process to improve the consistency of implementation.

- FDA continued a module-based online training program to provide FDA staff with a working knowledge of Sentinel and to enable staff to consistently use Sentinel to evaluate safety issues and address other regulatory questions.

| | |
|---|---|
| | • As part of the Sentinel website redesign, FDA created a downloadable table of drug assessments that provides a single view of analytic packages, results, and regulatory impacts of Sentinel analyses (see https://sentinelinitiative.org/assessments/drugs).<br><br>• FDA made updates to 12 drug assessments pages on the Sentinel website, which describe ongoing queries, completed queries, and regulatory impacts.<br><br>• FDA made ongoing updates to the "Assessing the ARIA System's Ability to Evaluate a Safety Concern" web page, which contains ARIA sufficiency memos (see https://sentinelinitiative.org/assessments/drugs/assessing-arias-ability-evaluate-safety-concern).<br><br>• FDA conducted an assessment of the Sentinel system that included analyzing and reporting on the impact of the Sentinel expansion and integration on FDA's use of Sentinel for regulatory purposes (e.g., in the contexts of labeling changes, post-marketing requirements, or post-marketing commitments). Assessment report available at: Assessment in Support of the Sentinel System (fda.gov) (see https://www.fda.gov/media/161944/download). |
| I.K.2 Timely and Effective Evaluation and Communication of Postmarketing Safety Findings Related to Human Drugs | • FDA contracted with a third party to assess how data systems and processes, as described in Manuals of Policies and Procedures and Standard Operating Policies and Procedures, support the review, oversight, and communication of postmarketing drug safety issues" in CDER and CBER. Results from this assessment were presented to an internal FDA audience in FY 2022, and a public summary outlining these results is being developed. Several recommendations from the assessment are being actively addressed by FDA. |

### D.    Section II:  Enhancing the Management of User Fee Resources

**Table 34.  Section II's FY 2022 Commitments and Accomplishments**

| Commitment Title | FY 2022 Accomplishments |
|---|---|
| II.A Resource Capacity Planning and Modernized Time Reporting | • In FY 2022, there were no commitments due. |
| II.B Financial Transparency and Efficiency | • The FY 2022 annual update to the 5-year financial plan was published on March 30, 2022 (see https://www.fda.gov/media/157297/download).<br><br>• The FY 2022 financial public meeting was held June 7, 2022 (see https://www.fda.gov/drugs/news-events-human-drugs/2022-financial-transparency-and-efficiency-prescription-drug-user-fee-act-biosimilar-user-fee-act#:~:text=This%20year%27s%20public%20meeting%20will,10%3A50%20AM%20Eastern%20Time). |

### E.    Section III:  Improving FDA's Hiring and Retention of Review Staff

**Table 35.  Section III's FY 2022 Commitments and Accomplishments**

| Commitment Title | FY 2022 Accomplishments |
|---|---|
| III.A Completion of Modernization of the Hiring System Infrastructure and Augmentation of System Capacity | • In FY 2022, there were no commitments due. |
| III.B Augmentation of Hiring Staff Capacity and Capability | • In FY 2022, there were no commitments due. |
| III.C Complete Establishment of a Dedicated Function to Ensure Needed Scientific Staffing for Human Drug Review Program | • In FY 2022, there were no commitments due. |
| III.D Set Clear Goals for Human Drug Review Program Hiring | • FDA's FY 2022 hiring goal was for nine full-time equivalents (FTEs), and five FTEs were onboarded (which is 56 percent of the FY 2022 hiring goal).<br><br>• FDA's hiring progress against this goal and the goals from previous years were posted on FDA's website (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data). |

36

| Commitment Title | FY 2022 Accomplishments |
|---|---|
| III.E Comprehensive and Continuous Assessment of Hiring and Retention | • The "FDA Final Hiring and Retention Assessment" report was completed on December 10, 2021 (see https://www.fda.gov/media/154873/download).<br><br>• A public meeting on the PDUFA hiring and retention final assessment was held on March 15, 2022 (see https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/fda-pdufa-hiring-and-retention-final-assessment-public-meeting-03152022). |

## F.    Section IV:  Information Technology Goals

**Table 36.  Section IV's FY 2022 Commitments and Accomplishments**

| Goal | FY 2022 Accomplishments |
|---|---|
| IV.B Improve the Predictability and Consistency of PDUFA Electronic Submission Processes | • In FY 2022, there were no commitments due. |
| IV.C Enhance Transparency and Accountability of FDA Electronic Submission and Data Standards Activities | • Four quarterly meetings with industry were held that focused on various topics including the Electronic Submissions Gateway, the electronic Common Technical Document, the identification of medicinal products, pharmaceutical quality data standards, IND safety reporting, and the technical rejection of study data.<br><br>• In early 2022, via a *Federal Register* notice, the FY 2022 annual public meeting for the IT strategic plan was announced.  The meeting was held on April 12, 2022.<br><br>• The Electronics Submission Gateway staff continues to collect and report submission statistics which can be found at: https://www.fda.gov/industry/electronic-submissions-gateway.<br><br>• The Office of Digital Technology has attended FDA-industry quarterly meetings to discuss both the data and technology modernization action plans.<br><br>• The Data Standards Action Plan, which is aligned with the CBER-CDER Data Standards Strategy document, continues to be updated and published quarterly. |

G.    **Additional PDUFA VI Review Program Reporting**

1.    *Hiring and Placement of New PDUFA VI Staff at FDA*

The hiring and placement of new staff at FDA under PDUFA VI are reported on a quarterly basis and posted on the FDARA hiring performance web page.[7]  FDA reports its progress in hiring new staff to support new initiatives in the annual PDUFA Financial Report, as per the PDUFA VI Commitment Letter.

---

[7] https://www.fda.gov/industry/prescription-drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data.

# VI.   Rationale for PDUFA Program Changes

FDARA amended the FD&C Act to require the reporting of certain information relating to PDUFA program changes in the annual performance report starting with FY 2020.

Specifically, section 903(a) of FDARA added section 736(b)(4) of the FD&C Act, which requires the annual PDUFA performance report to include the following:

(A)   data, analysis, and discussion of the changes in the number of FTEs hired as agreed upon in the letters described in section 101(b) of the Prescription Drug User Fee Amendments of 2017 and the number of FTEs funded by budget authority at FDA by each division within CDER, CBER, the Office of Regulatory Affairs (ORA), and OC;

(B)   data, analysis, and discussion of the changes in the fee revenue amounts and costs for the process for the review of human drugs, including identifying drivers of such changes; and

(C)   for each of the CDER, CBER, ORA, and OC, the number of employees for whom time reporting is required and the number of employees for whom time reporting is not required.

The information below fulfills these reporting requirements.

## A.   Changes in the number of FTEs hired as agreed in the PDUFA VI Commitment Letter and the number of FTEs funded by budget authority at FDA by division within CDER, CBER, ORA, and OC

This section addresses the requirement to provide data, an analysis, and a discussion of the changes in the number of FTEs hired as agreed upon in the letters described in section 101(b) of the Prescription Drug User Fee Amendments of 2017 and the number of FTEs funded by budget authority at the FDA by each division within CDER, CBER, ORA, and OC.

### 1.   Changes in the number of FTEs hired as agreed upon in the PDUFA VI Commitment Letter

FDA committed to hiring 230 FTEs from FY 2018 to FY 2022 as agreed upon in the PDUFA VI Commitment Letter.  FDA has successfully hired 223 FTEs of the 230 FTEs (97 percent) as of September 30, 2022.  The data in the following table show the total number of FTEs hired towards the FY 2021 and FY 2022 hiring targets as agreed upon in the PDUFA VI Commitment Letter and the change in the number of FTE hires from FY 2021 to FY 2022.

The hiring of FTEs decreased from FY 2021 to FY 2022 due to the hiring goal targets decreasing from 18 FTEs in FY 2021 to 9 FTEs in FY 2022.  FDA has successfully fulfilled 100 percent of its hiring target for FY 2021 and 56 percent of its hiring target for FY 2022 as of September 30, 2022.  With a total of 7 FTEs remaining to hire through FY 2022, FDA will continue hiring new FTEs to meet its commitments as agreed upon in the PDUFA VI Commitment Letter.

**Table 37.  Number of FTEs Hired as Agreed Upon in the PDUFA VI Commitment Letter**

| Center | FY 2021 Hires* | FY 2022 Hires* | Change in Number of FTEs Hired |
|--------|---------------|----------------|-------------------------------|
| CDER | 17 | 5 | -12 |
| CBER | 1 | 0 | -1 |
| ORA | 0 | 0 | 0 |
| OC | 0 | 0 | 0 |

* A *hire* is defined as someone who has been confirmed as on board by the date indicated in a full-time position at the noted Center.  Although some hires are recruited from outside the Center/FDA, a hire can also be a current Center/FDA employee who is changing positions within the Agency.

## 2.    Changes in the number of FTEs funded by budget authority at FDA by division within CDER, CBER, ORA, and OC

The data in the table below show the change from FY 2021 to FY 2022 in the number of FTEs funded by budget authority at FDA by each division within CDER, CBER, ORA, and OC.  This table reflects the number of FTEs funded by budget authority for the PDUFA VI program.  For this table, *budget authority* refers to FDA's non-user fee annual appropriations.  To address the requirement that information on the number of FTEs funded by budget authority be presented "by each division," the information in this table is broken down to the office level for the Centers, ORA, and OC.  FDA uses a 2,080-hour workload to equate to one FTE, and this calculation is reflected in the table below.  Data for FY 2022 and the previous fiscal year, FY 2021, are presented and compared to show the change in the number of FTEs over the last 2 fiscal years committed to PDUFA work.  The number of FTEs funded by budget authority for FY 2021 are those FTEs as of September 30, 2021.  The number of FTEs funded by budget authority for FY 2022 are those FTEs as of September 30, 2022.

FDA reported an overall decrease in budget authority-funded FTEs in FY 2022 compared to FY 2021.

**Table 38.  Number of FTEs Funded by Budget Authority**

| Center and Office | Number of PDUFA Program FTEs Funded by Budget Authority* | | Change in Number of PDUFA Program FTEs Funded by Budget Authority |
|---|---|---|---|
| | **FY 2021** | **FY 2022** | |
| CDER | | | |
| Office of Communications | 3.1 | 7.3 | 4.2 |
| Office of Compliance | 21.3 | 17.3 | -4.0 |
| Office of the Center Director | 0.8 | 7.3 | 6.5 |
| Office of Executive Programs | 7.5 | 1.8 | -5.7 |
| Office of Generic Drugs | 4.5 | 4.4 | -0.1 |
| Office of Management | 1.6 | 11.5 | 9.9 |
| Office of Medical Policy | 5.1 | 15.0 | 9.9 |
| Office of New Drugs | 137.6 | 66.3 | -71.3 |
| Office of Pharmaceutical Quality | 73.4 | 46.9 | -26.5 |
| Office of Regulatory Policy | 9.5 | 18.3 | 8.8 |
| Office of Surveillance and Epidemiology | 20.9 | 36.2 | 15.3 |
| Office of Strategic Programs | 4.8 | 14.4 | 9.6 |
| Office of Information Management and Technology | 0.1 | 0.0 | -0.1 |
| Office of Translational Sciences | 33.7 | 21.2 | -12.5 |
| Other Offices | 3.4 | 0.3 | -3.1 |
| Working Capital Fund (WCF) | 55.5 | 51.7 | -5.3 |
| CDRH | | | |
| Office of Product Evaluation and Quality | 7.1 | 2.1 | -5.0 |
| Office of Management | 1.2 | 0.0 | -1.2 |
| Office of Science and Engineering Laboratories | 0.6 | 0.3 | -0.3 |
| Office of Communication and Education | 1.1 | 0.0 | -1.1 |
| Office of Policy | 0.3 | 0.0 | -0.3 |

| Center and Office | Number of PDUFA Program FTEs Funded by Budget Authority* | | Change in Number of PDUFA Program FTEs Funded by Budget Authority |
|---|---|---|---|
| | FY 2021 | FY 2022 | |
| Office of Strategic Partnership and Technology Innovation | 0.1 | 0.1 | 0.0 |
| Office of the Center Director | 0.1 | 0.0 | -0.1 |
| Office of Information Management and Technology | 0.1 | 0.1 | 0.0 |
| WCF | 0.9 | 0.8 | -0.1 |
| CBER | | | |
| Office of Biostatistics and Epidemiology | 13.7 | 6.2 | -7.5 |
| Office of Blood Research and Review | 4.9 | 5.3 | 0.4 |
| Office of Compliance and Biologics Quality | 22.8 | 22.0 | -0.8 |
| Office of Tissues and Advanced Therapies | 59.5 | 57.4 | -2.1 |
| Office of Vaccines Research and Review | 96.4 | 96.3 | -0.1 |
| Office of Communication Outreach and Development | 11.9 | 9.7 | -2.2 |
| Office of the Center Director | 20.3 | 14.0 | -6.3 |
| Office of Management | 17.5 | 21.5 | 4.0 |
| Office of Information Management and Technology | 0.0 | 1.8 | 1.8 |
| Office of Biostatistics and Pharmacovigilance | NA | 7.5 | 7.5 |
| Office of Regulatory Operations‡ | NA | 5.4 | 5.4 |
| Other Offices | 2.0 | 0.0 | -2.0 |
| WCF | 34.0 | 33.4 | -0.6 |
| OC | | | |
| OC Immediate Office | 2.3 | 2.7 | 0.4 |
| Office of the Chief Counsel | 6.4 | 7.2 | 0.8 |
| Office of the Chief Scientist | 4.6 | 4.6 | 0.0 |
| Office of Clinical Policy and Programs | 9.9 | 11.6 | 1.7 |

| Center and Office | Number of PDUFA Program FTEs Funded by Budget Authority* | | Change in Number of PDUFA Program FTEs Funded by Budget Authority |
|---|---|---|---|
| | FY 2021 | FY 2022 | |
| Office of External Affairs | 2.6 | 3.2 | 0.6 |
| Office of International Programs | 0.0 | 0.0 | 0.0 |
| Office of Operations | 8.7 | 10.9 | 2.2 |
| Office of Policy, Legislation, and International Affairs | 4.6 | 6.5 | 1.9 |
| Office of Special Medical Programs | 0.0 | 0.0 | 0.0 |
| WCF | 13.0 | 12.7 | -0.3 |
| ORA | | | |
| Office of Pharmaceutical Quality Operations | 91.0 | 99.1 | 8.1 |
| Office of Global Partnerships and Strategy | 0.7 | 0.4 | -0.3 |
| WCF | 8.4 | 8.7 | 0.3 |

\* This table includes PDUFA program FTE calculated through WCF assessments for certain centrally administered services provided to CDER, CDRH, CBER, ORA, and OC.  Because many employees under OC and WCF do not report time, an average cost per OC and WCF FTE was applied to derive the number of PDUFA program FTEs funded by budget authority.

†A reorganization in CBER created this new office, which was previously a part of the Office of Biostatistics and Epidemiology.

‡A reorganization in CBER created this new office, which was previously a part of the Office of the Center Director.

### B.    Changes in the fee revenue amounts and costs for the review process

Section 903(a) of FDARA amended the FD&C Act to require FDA to provide data, an analysis, and a discussion of the changes in the fee revenue amounts and costs for the process for the review of human drugs, including identifying drivers of such changes.  Accordingly, the table below provides data for the PDUFA fee revenue amounts and process costs for FY 2021 and FY 2022, as well as the changes in these amounts from FY 2021 to FY 2022.  Relevant information about the data provided is as follows:

- *Fee Revenue Amounts* represent FDA's net collection of human drug user fees.

- *Review Process Costs* represent FDA's total expenditure on the PDUFA program.

- Numbers are provided for both the most recent fiscal year (FY 2022) and the prior fiscal year (FY 2021).  Although FDARA does not explicitly require this data, they do provide relevant context necessary to interpret the required information.

43

In FY 2022, FDA had net collections of $1.159 billion in prescription drug user fees, spent $1.13 billion in user fees for the human drug review process, and carried a cumulative balance of $288 million forward.  Detailed financial information for the PDUFA user fee program can be found in the FY 2022 PDUFA Financial Report.[8]

The process for setting the annual target revenue is set forth in the statute.  For FY 2022, the base revenue amount is $1,098,077,960.  The FY 2022 base revenue amount is adjusted for inflation and for the resource capacity needs for the process for the review of human drug applications (the capacity planning adjustment).  An additional dollar amount specified in the statute (see section 736(b)(1)(F) of the FD&C Act) is then added to provide for additional FTE positions to support PDUFA VI initiatives.  The FY 2022 revenue amount may be adjusted further, if necessary, to provide for sufficient operating reserves of carryover user fees.  Finally, the amount is adjusted to provide for additional direct costs yielding a total adjusted fee revenue amount of $1,200,129,000 (rounded to the nearest thousand dollars), which funds PDUFA VI initiatives.

In FY 2022, PDUFA review process costs decreased slightly from FY 2021.

**Table 39.  Changes in the Fee Revenue Amounts and Review Process Costs**

| Fiscal Year | FY 2021 | FY 2022 | Change from FY 2021 to FY 2022 |
|---|---|---|---|
| Net Fiscal Year Collections | $1,152,538,861 | $1,159,139,951 | +0.5% |
| Review Process Cost | $1,499,064,056 | $1,480,601,875 | -1.2% |

## C.    Number of Employees for Whom Time Reporting Is Required

Section 903(a) of FDARA amended the FD&C Act to require FDA to provide—for CDER, CBER, ORA, and OC—the number of employees for whom time reporting is required and the number of employees for whom time reporting is not required.  Accordingly, the table below provides the number of employees within CDER, CBER, ORA, and OC who are required to report their time and those who are not required to report their time as of September 30, 2022.

These data reflect time reporting across all employees in each entity, rather than only those engaged in PDUFA program activities.

---

[8] See https://www.fda.gov/about-fda/user-fee-financial-reports/pdufa-financial-reports.

**Table 40.  Time Reporting Requirement for FY 2022**

| Center | FTEs for Which Time Reporting Is Required | FTEs for Which Time Reporting Is Not Required |
|--------|-------------------------------------------|-----------------------------------------------|
| CDER   | 5,430                                     | 12                                            |
| CBER   | 1,232                                     | 5                                             |
| ORA    | 4,422                                     | 280                                           |
| OC     | 55                                        | 2,632                                         |

# Appendix A:  List of Approved Applications

This appendix includes detailed review histories of the NDA and BLA submissions approved under PDUFA VI in FY 2022.  Approvals are grouped by priority designation and submission year and listed in order of total approval time.  *Approval time* is presented in months and includes each review cycle's time with FDA, time with the sponsor, and the total time on that application.

Review histories of the NDA and BLA submissions approved prior to FY 2022 can be found in the appendices of the earlier PDUFA performance reports.[9]

When determining total time, FDA calculates the number of months and rounds to the nearest tenth.  Therefore, when cycle times are added, rounding discrepancies may occur.

Because months consist of varying numbers of days, FDA uses the average number of days in a month for the average year length, which considers leap years, to calculate review time in months.  Prior to FY 2022, FDA did not consider leap years in its calculations, which may have caused a submission to appear overdue even though it was approved on the goal date.

**Terms and Coding Used in Tables in This Appendix**

Action Codes:
AE = Approvable
AP = Approved
CR = Complete Response
NA = Not Approvable
TA = Tentative Approval
WD = Withdrawn

▲ Denotes Class 1 Resubmission (2-month review-time goal)

△ Denotes Class 2 Resubmission (6-month review-time goal)

◊ Expedited review and TA of an NDA by FDA for fixed dose combinations and co-packaged antiretroviral medications as part of the President's Emergency Plan for AIDS Relief

♦ Application reviewed under the program with review goals starting from the 60-day filing date, rather than the submission date

♯ Major amendment was received, which extended the action goal date by 3 months[10]

---

[9] http://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.
[10] Under PDUFA VI, a major amendment can be received any time during the review cycle and extend the goal date by 3 months.  If the review cycle occurred prior to FY 2013, the major amendment must have been received within 3 months of the action due date to extend the action goal date by 3 months.

**Table A-1.  FY 2022 Priority NDA and BLA Approvals (by Fiscal Year of Receipt)**

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| *Submitted in FY 2022* | | | | | | | |
| midazolam | RAFA LABORATORIES Ltd. | N | First | 4.4 | AP | 4.4 | Y |
| IMBRUVICA (ibrutinib) | PHARMACYCLICS LLC | N | First | 5.9 | AP | 5.9 | Y |
| RADICAVA ORS (edaravone) | MITSUBISHI TANABE PHARMA Corp. | N | First | 5.9 | AP | 5.9 | Y |
| VIJOICE (alpelisib) | NOVARTIS PHARMACEUTICALS Corp. | N | First | 5.9 | AP | 5.9 | Y |
| ELUCIREM (gadopiclenol) | GUERBET, LLC | Y | First | 8.0 | AP | 8.0 | Y♦ |
| LYTGOBI (futibatinib) | TAIHO ONCOLOGY Inc. | Y | First | 8.0 | AP | 8.0 | Y♦ |
| XENPOZYME (olipudase alfa-rpcp) | GENZYME CORPORATION | Y | First | 9.9 | AP | 9.9 | Y#♦ |
| SKYSONA (elivaldogene autotemcel) | bluebird bio Inc. | Y | First | 10.9 | AP | 10.9 | Y#♦ |
| RELYVRIO (sodium phenylbutyrate and taurursodiol) | AMYLYX PHARMACEUTICALS Inc. | Y | First | 11.0 | AP | 11.0 | Y#♦ |
| SPEVIGO (spesolimab-sbzo) | BOEHRINGER INGELHEIM PHARMACEUTICALS, Inc. | Y | First | 11.0 | AP | 11.0 | Y#♦ |
| *Submitted in FY 2021* | | | | | | | |
| SCEMBLIX (asciminib) | NOVARTIS PHARMACEUTICALS Corp. | Y | First | 4.2 | AP | 4.2 | Y♦ |
| APRETUDE (cabotegravir) | VIIV HEALTHCARE Co. | N | First | 4.9 | AP | 4.9 | Y |
| SPIKEVAX (COVID-19 Vaccine, mRNA) | ModernaTX, Inc. | Y | First | 5.2 | AP | 5.2 | Y♦ |
| OXBRYTA (voxelotor) | GLOBAL BLOOD THERAPEUTICS Inc. | N | First | 5.7 | AP | 5.7 | Y |
| FYARRO (sirolimus protein-bound particles for injectable suspension (albumin-bound) | AADI BIOSCIENCE Inc. | N | First | 5.8 | AP | 5.8 | Y |
| naloxone | KALEO Inc. | N | First | 5.9 | AP | 5.9 | Y |
| TRIUMEQ PD (abacavir, dolutegravir, and lamivudine) | VIIV HEALTHCARE Co. | N | First | 5.9 | AP | 5.9 | Y |
| XARELTO (rivaroxaban) | JANSSEN PHARMACEUTICALS Inc. | N | First | 5.9 | AP | 5.9 | Y |
| SUSVIMO (ranibizumab) | GENENTECH, Inc. | N | First | 6.0 | AP | 6.0 | Y |
| XACIATO (clindamycin phosphate) | DARE BIOSCIENCE Inc. | N | First | 6.0 | AP | 6.0 | Y |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KIMMTRAK (tebentafusp-tebn) | IMMUNOCORE LIMITED | Y | First | 7.1 | AP | 7.1 | Y♦ |
| TEZSPIRE (tezepelumab-ekko) | ASTRAZENECA AB | Y | First | 7.4 | AP | 7.4 | Y♦ |
| PLUVICTO (lutetium (177lu) vipivotide tetraxetan) | ADVANCED ACCELERATOR APPLICATIONS USA Inc. | Y | First | 7.8 | AP | 7.8 | Y♦ |
| MOUNJARO (tirzepatide) | ELI LILLY AND Co. | Y | First | 7.9 | AP | 7.9 | Y♦ |
| ZTALMY (ganaxolone) | MARINUS PHARMACEUTICALS Inc. | Y | First | 7.9 | AP | 7.9 | Y♦ |
| LIVTENCITY (maribavir) | TAKEDA PHARMACEUTICALS USA Inc. | Y | First | 8.0 | AP | 8.0 | Y♦ |
| OPDUALAG (nivolumab and relatlimab-rmbw) | BRISTOL-MYERS SQUIBB COMPANY | Y | First | 8.0 | AP | 8.0 | Y♦ |
| PYRUKYND (mitapivat) | AGIOS PHARMACEUTICALS Inc. | Y | First | 8.0 | AP | 8.0 | Y♦ |
| VABYSMO (faricimab-svoa) | GENENTECH, Inc. | Y | First | 8.0 | AP | 8.0 | Y♦ |
| VOQUEZNA TRIPLE PAK (vonoprazan, amoxicillin, clarithromycin, co-packaged) | PHATHOM PHARMACEUTICALS Inc. | Y | First | 8.0 | AP | 8.0 | Y♦ |
| VOQUEZNA DUAL PAK (vonoprazan, amoxicillin co-packaged) | PHATHOM PHARMACEUTICALS Inc. | N[11] | First | 8.0 | AP | 8.0 | Y |
| NEPHROSCAN (technetium tc99m succimer) | THERAGNOSTICS Inc. | N | First | 9.0 | AP | 9.0 | Y# |
| SKYRIZI (risankizumab-rzaa) | ABBVIE Inc. | N | First | 9.0 | AP | 9.0 | Y# |
| TARPEYO (budesonide) | CALLIDITAS THERAPEUTICS AB | N | First | 9.0 | AP | 9.0 | Y# |
| ZYNTEGLO (betibeglogene autotemcel) | bluebird bio Inc. | Y | First | 10.9 | AP | 10.9 | Y#♦ |
| CARVYKTI (ciltacabtagene autoleucel) | Janssen Biotech, Inc. | Y | First | 11.0 | AP | 11.0 | Y#♦ |
| CYTALUX (pafolacianine sodium) | ON TARGET LABORATORIES Inc. | Y | First | 11.0 | AP | 11.0 | Y#♦ |
| VIVJOA (oteseconazole) | MYCOVIA PHARMACEUTICALS Inc. | Y | First | 11.0 | AP | 11.0 | Y#♦ |
| VONJO (pacritinib) | CTI BIOPHARMA Corp. | Y | First | 11.0 | AP | 11.0 | Y#♦ |
| TYVASO DPI (treprostinil) | UNITED THERAPEUTICS Corp. | N | First | 6.0 | CR | 6.0 | Y |
| | | | Sponsor | 2.3 | | 8.3 | |

---

[11] The applicant submitted two NDAs for the same new moiety (vonoprazan), but one of the NDAs is in combination with two currently marketed drugs (amoxicillin and clarithromycin). The other NDA is in combination with only one currently marketed drug (amoxicillin). Only one NDA retains the NME designation upon approval; in this case, the NDA for the vonoprazan along with amoxicillin and clarithromycin retained the NME designation.

| | | | Second | 5.0 | AP | 13.3 | Y#▲ |
|---|---|---|---|---|---|---|---|
| AUVELITY (dextromethorphan hydrobromide and bupropion hydrochloride) | AXSOME THERAPEUTICS Inc. | N | First | 17.8 | AP | 17.8 | N |
| *Submitted in FY 2020* | | | | | | | |
| VOXZOGO (vosoritide)[12] | BIOMARIN PHARMACEUTICAL Inc. | Y | First | 15.0 | AP | 15.0 | Y#♦ |
| CIBINQO (abrocitinib) | PFIZER Inc. | Y | First | 16.7 | AP | 16.7 | N#♦ |
| ENJAYMO (sutimlimab-jome) | BIOVERATIV USA, Inc. | Y | First | 8.0 | CR | 8.0 | Y♦ |
| | | | Sponsor | 8.7 | | 16.7 | |
| | | | Second | 6.0 | AP | 22.7 | Y△ |

**Table A-2.  FY 2022 Standard NDA and BLA Approvals (by Fiscal Year of Receipt)**

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| **Submitted in FY 2022** | | | | | | | |
| IHEEZO (chloroprocaine hydrochloride) | SINTETICA SA | N | First | 9.4 | AP | 9.4 | Y |
| norepinephrine bitartrate | INFORLIFE SA | N | First | 9.9 | AP | 9.9 | Y |
| APONVIE (aprepitant) | HERON THERAPEUTICS Inc. | N | First | 10.0 | AP | 10.0 | Y |
| CALQUENCE (acalabrutinib maleate) | ASTRAZENECA UK Ltd. | N | First | 10.0 | AP | 10.0 | Y |
| **Submitted in FY 2021** | | | | | | | |
| LOCAMETZ (gallium (68ga) gozetotide) | ADVANCED ACCELERATOR APPLICATIONS USA Inc. A NOVARTIS Co. | N | First | 7.8 | AP | 7.8 | Y |
| VUITY (pilocarpine hydrochloride) | ABBVIE Inc. | N | First | 8.1 | AP | 8.1 | Y |
| paclitaxel | TEVA PHARMACEUTICALS Inc. | N | First | 9.5 | TA | 9.5 | Y |
| atropine sulfate | BAUSCH AND LOMB Inc. | N | First | 9.6 | AP | 9.6 | Y |
| DARTISLA ODT (glycopyrrolate) | EDENBRIDGE PHARMACEUTICALS LLC | N | First | 9.6 | AP | 9.6 | Y |
| ENTADFI (finasteride and tadalafil) | VERU Inc. | N | First | 9.7 | AP | 9.7 | Y |
| ACUVUE THERAVISION WITH KETOTIFEN (etafilcon a lens with ketotifen) | JOHNSON AND JOHNSON VISION CARE Inc. | N | First | 9.9 | AP | 9.9 | Y |
| BLUDIGO (indigotindisulfonate sodium) | PROVEPHARM SAS | N | First | 9.9 | AP | 9.9 | Y |
| CUVRIOR (trientine tetrahydrochloride) | ORPHALAN SA | N | First | 9.9 | AP | 9.9 | Y |
| diltiazem hydrochloride | EXELA PHARMA SCIENCES LLC | N | First | 9.9 | AP | 9.9 | Y |
| dolutegravir, lamivudine and tenofovir alafenamide | CIPLA Ltd. | N | First | 9.9 | TA | 9.9 | Y◊ |
| TYRVAYA (varenicline solution) | OYSTER POINT PHARMA Inc. | N | First | 9.9 | AP | 9.9 | Y |
| ASPRUZYO (ranolazine) | SUN PHARMA INDUSTRIES Ltd. | N | First | 10.0 | AP | 10.0 | Y |
| bendamustine hydrochloride | APOTEX Inc. | N | First | 10.0 | TA | 10.0 | Y |
| bendamustine hydrochloride | DR REDDYS LABORATORIES Ltd. | N | First | 10.0 | TA | 10.0 | Y |
| bendamustine hydrochloride | CELERITY PHARMACEUTICALS LLC | N | First | 10.0 | TA | 10.0 | Y |
| bortezomib | MAIA PHARMACEUTICALS Inc. | N | First | 10.0 | AP | 10.0 | Y |

50

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CELMITY (citalopram) | ALMATICA PHARMA Inc. | N | First | 10.0 | AP | 10.0 | Y |
| dolutegravir, lamivudine and tenofovir alafenamide | LAURUS LABS Ltd. | N | First | 10.0 | TA | 10.0 | Y◊ |
| drospirenone | EXELTIS USA Inc. | N | First | 10.0 | AP | 10.0 | Y |
| ERMEZA (levothyroxine sodium) | MYLAN PHARMACEUTICALS Inc. A VIATRIS Co. | N | First | 10.0 | AP | 10.0 | Y |
| FLEQSUVY (baclofen) | AZURITY PHARMACEUTICALS Inc. | N | First | 10.0 | AP | 10.0 | Y |
| glycopyrrolate | FRESENIUS KABI USA LLC | N | First | 10.0 | AP | 10.0 | Y |
| LYVISPAH (baclofen) | AMNEAL PHARMACEUTICALS LLC | N | First | 10.0 | AP | 10.0 | Y |
| midazolam | EXELA PHARMA SCIENCES LLC | N | First | 10.0 | AP | 10.0 | Y |
| NASONEX 24HR ALLERGY (mometasone furoate) | PERRIGO PHARMA INTERNATIONAL DAC | N | First | 10.0 | AP | 10.0 | Y |
| RECORLEV (levoketoconazole) | STRONGBRIDGE DUBLIN Ltd. | N | First | 10.0 | AP | 10.0 | Y |
| RELEXXII (methylphenidate hydrochloride) | OSMOTICA PHARMACEUTICAL US LLC | N | First | 10.0 | AP | 10.0 | Y |
| roflumilast | ARCUTIS BIOTHERAPEUTICS Inc. | N | First | 10.0 | AP | 10.0 | Y |
| sertraline hydrochloride capsules | ALMATICA PHARMA LLC | N | First | 10.0 | AP | 10.0 | Y |
| testosterone cypionate | SLAYBACK PHARMA LLC | N | First | 10.0 | AP | 10.0 | Y |
| venlafaxine extended-release tablets | ALMATICA PHARMA LLC | N | First | 10.0 | AP | 10.0 | Y |
| PHEBURANE (sodium phenylbutyrate) | MEDUNIK CANADA Inc. | N | First | 10.1 | AP | 10.1 | N |
| VTAMA (tapinarof) | DERMAVANT SCIENCES Inc. | Y | First | 11.9 | AP | 11.9 | Y♦ |
| PREHEVBRIO (Hepatitis B Vaccine (Recombinant)) | VBI Vaccines (Delaware), Inc. | Y | First | 12.0 | AP | 12.0 | Y♦ |
| PRIORIX (Measles, Mumps and Rubella Virus Vaccine Live) | GlaxoSmithKline Biologicals | Y | First | 12.0 | AP | 12.0 | Y♦ |
| QUVIVIQ (daridorexant) | IDORSIA PHARMACEUTICALS Ltd. | Y | First | 12.0 | AP | 12.0 | Y♦ |
| SOTYKTU (deucravacitinib) | BRISTOL MYERS SQUIBB Co. | Y | First | 12.0 | AP | 12.0 | Y♦ |
| VYVGART (efgartigimod alfa-fcab) | ARGENX BV | Y | First | 12.0 | AP | 12.0 | Y♦ |
| TASCENSO ODT (fingolimod) | HANDA NEUROSCIENCE LLC | N | First | 10.0 | TA | 10.0 | Y |
| | | | Sponsor | 0.3 | | 10.3 | |
| | | | Second | 1.9 | AP | 12.2 | Y▲ |
| TPOXX (tecovirimat) | SIGA TECHNOLOGIES Inc. | N | First | 12.6 | AP | 12.6 | Y# |
| lanreotide acetate | INVAGEN PHARMACEUTICALS Inc. | N | First | 12.7 | AP | 12.7 | N |

| DHIVY (carbidopa and levodopa) | AVION PHARMACEUTICALS LLC | N | First | 12.9 | AP | 12.9 | Y# |
|---|---|---|---|---|---|---|---|
| XELSTRYM (dextroamphetamine) | NOVEN PHARMACEUTICALS Inc. | N | First | 12.9 | AP | 12.9 | Y# |
| EPRONTIA (topiramate) | AZURITY PHARMACEUTICALS Inc. | N | First | 13.0 | AP | 13.0 | Y# |
| IGALMI (dexmedetomidine) | BIOXCEL THERAPEUTICS Inc. | N | First | 13.0 | AP | 13.0 | Y# |
| AMVUTTRA (vutrisiran) | ALNYLAM PHARMACEUTICALS Inc. | Y | First | 14.0 | AP | 14.0 | Y#♦ |
| CAMZYOS (mavacamten) | MYOKARDIA Inc. | Y | First | 14.9 | AP | 14.9 | Y#♦ |
| KYZATREX (testosterone undecanoate) | MARIUS PHARMACEUTICALS LLC | N | First | 9.7 | CR | 9.7 | Y |
| | | | Sponsor | 3.2 | | 12.9 | |
| | | | Second | 5.9 | AP | 18.8 | Y△ |

Second          5.8AP          21.1 Y△

| SEGLENTIS (celecoxib and tramadol hydrochloride) | KOWA PHARMACEUTICALS AMERICA Inc. | N | First | 13.0 | CR | 13.0 | Y# |
| | | | Sponsor | 10.0 | | 23.0 | |
| | | | Second | 6.0 | AP | 29.0 | Y△ |

| pemetrexed | HOSPIRA Inc. | N | First | 9.8 | CR | 9.8 | Y |
| | | | Sponsor | 36.0 | | 45.8 | |
| | | | Second | 6.0 | TA | 51.8 | Y △ |

# Appendix B:  Filed Application Numbers by Review Division

The tables below and on the pages that follow show the number of applications filed in FY 2022 for various application types and review designations broken out by review division.  This reporting for PDUFA VI is required under section 736B(a) of the FD&C Act.

## Table B-1.  Original Applications Filed in FY 2022 by Review Division/Office

| Review Division/Office | Priority NDAs | Standard NDAs | Priority BLAs | Standard BLAs | Undesignated Original Applications |
|---|---|---|---|---|---|
| **CDER Review Divisions** | | | | | |
| Division of Anesthesiology, Addiction Medicine, and Pain Medicine | 0 | 2 | 0 | 0 | 1 |
| Division of Anti-Infectives | 2 | 2 | 0 | 0 | 1 |
| Division of Antivirals | 1 | 3 | 2 | 0 | 0 |
| Division of Cardiology and Nephrology | 1 | 6 | 0 | 0 | 1 |
| Division of Dermatology and Dentistry | 0 | 2 | 1 | 0 | 2 |
| Division of Diabetes, Lipid Disorders, and Obesity | 0 | 1 | 0 | 0 | 0 |
| Division of Gastroenterology | 0 | 3 | 0 | 1 | 0 |
| Division of General Endocrinology | 1 | 0 | 0 | 0 | 1 |
| Division of Hematologic Malignancies I | 1 | 4 | 0 | 0 | 1 |
| Division of Hematologic Malignancies II | 1 | 4 | 4 | 0 | 0 |
| Division of Hepatology and Nutrition | 0 | 1 | 0 | 0 | 0 |
| Division of Imaging and Radiation Medicine | 1 | 3 | 0 | 0 | 2 |
| Division of Neurology I | 5 | 5 | 2 | 0 | 2 |
| Division of Neurology II | 2 | 2 | 0 | 0 | 0 |
| Division of Non-Malignant Hematology | 0 | 5 | 0 | 0 | 2 |
| Division of Non-Prescription Drugs I | 0 | 0 | 0 | 0 | 0 |
| Division of Non-Prescription Drugs II | 0 | 0 | 0 | 0 | 0 |

| Review Division/Office | Priority NDAs | Standard NDAs | Priority BLAs | Standard BLAs | Undesignated Original Applications |
|---|---|---|---|---|---|
| Division of Oncology I | 1 | 2 | 1 | 2 | 1 |
| Division of Oncology II | 1 | 2 | 1 | 1 | 2 |
| Division of Oncology III | 1 | 0 | 2 | 0 | 0 |
| Division of Ophthalmology | 1 | 5 | 0 | 1 | 1 |
| Division of Psychiatry | 0 | 4 | 0 | 0 | 1 |
| Division of Pulmonology, Allergy, and Critical Care | 2 | 1 | 0 | 0 | 0 |
| Division of Rare Diseases and Medical Genetics | 0 | 0 | 2 | 0 | 0 |
| Division of Rheumatology and Transplant Medicine | 0 | 1 | 0 | 0 | 0 |
| Division of Urology, Obstetrics, and Gynecology | 1 | 1 | 0 | 1 | 0 |
| *CDER Totals* | *22* | *59* | *15* | *6* | *18* |
| **CBER Review Offices** | | | | | |
| Office of Blood Research and Review | 0 | 0 | 0 | 0 | 0 |
| Office of Tissues and Advanced Therapies | 0 | 0 | 7 | 2 | 0 |
| Office of Vaccines Research and Review | 0 | 0 | 0 | 5 | 0 |
| *CBER Totals* | *0* | *0* | *7* | *7* | *0* |
| **FDA Totals** | **22** | **59** | **22** | **13** | **18** |

**Table B-2.  Efficacy Supplements Filed in FY 2022 by Review Division/Office**

| Review Division/Office | Priority Efficacy Supplements | Standard Efficacy Supplements | Undesignated Efficacy Supplements |
|---|---|---|---|
| **CDER Review Divisions** | | | |
| Division of Anesthesiology, Addiction Medicine, and Pain Medicine | 0 | 2 | 1 |
| Division of Anti-Infectives | 2 | 3 | 0 |
| Division of Antivirals | 8 | 4 | 0 |

| Review Division/Office | Priority Efficacy Supplements | Standard Efficacy Supplements | Undesignated Efficacy Supplements |
|---|---|---|---|
| Division of Cardiology and Nephrology | 0 | 5 | 1 |
| Division of Dermatology and Dentistry | 5 | 3 | 1 |
| Division of Diabetes, Lipid Disorders, and Obesity | 2 | 4 | 3 |
| Division of Gastroenterology | 1 | 3 | 0 |
| Division of General Endocrinology | 0 | 7 | 0 |
| Division of Hematologic Malignancies I | 6 | 6 | 0 |
| Division of Hematologic Malignancies II | 5 | 6 | 0 |
| Division of Hepatology and Nutrition | 0 | 0 | 1 |
| Division of Imaging and Radiation Medicine | 3 | 3 | 0 |
| Division of Neurology I | 3 | 4 | 0 |
| Division of Neurology II | 0 | 9 | 0 |
| Division of Non-Malignant Hematology | 3 | 3 | 0 |
| Division of Non-Prescription Drugs I | 0 | 3 | 0 |
| Division of Non-Prescription Drugs II | 0 | 2 | 0 |
| Division of Oncology I | 8 | 29 | 2 |
| Division of Oncology II | 7 | 11 | 0 |
| Division of Oncology III | 7 | 6 | 4 |
| Division of Ophthalmology | 1 | 4 | 0 |
| Division of Psychiatry | 1 | 5 | 0 |
| Division of Pulmonology, Allergy, and Critical Care | 2 | 7 | 0 |
| Division of Rare Diseases and Medical Genetics | 0 | 1 | 0 |
| Division of Rheumatology and Transplant Medicine | 3 | 2 | 2 |
| Division of Urology, Obstetrics, and Gynecology | 0 | 7 | 0 |

| Review Division/Office | Priority Efficacy Supplements | Standard Efficacy Supplements | Undesignated Efficacy Supplements |
|---|---|---|---|
| *CDER Totals* | *67* | *139* | *15* |
| **CBER Review Offices** | | | |
| Office of Blood Research and Review | 0 | 0 | 0 |
| Office of Tissues and Advanced Therapies | 1 | 2 | 0 |
| Office of Vaccines Research and Review | 1 | 18 | 0 |
| *CBER Totals* | *2* | *20* | *0* |
| **FDA Totals** | **69** | **159** | **15** |

**Table B-3.  Submissions with Special Designations Filed in FY 2022 by Review Division/Office**

| Review Division/Office | Accelerated Approval | Fast Track Products | Orphan Designations | Breakthrough Designations* |
|---|---|---|---|---|
| **CDER Review Divisions** | | | | |
| Division of Anesthesiology, Addiction Medicine, and Pain Medicine | 0 | 0 | 0 | 1 |
| Division of Anti-Infectives | 0 | 3 | 1 | 1 |
| Division of Antivirals | 1 | 3 | 1 | 0 |
| Division of Cardiology and Nephrology | 1 | 1 | 2 | 3 |
| Division of Dermatology and Dentistry | 0 | 1 | 1 | 1 |
| Division of Diabetes, Lipid Disorders, and Obesity | 0 | 0 | 0 | 0 |
| Division of Gastroenterology | 0 | 0 | 1 | 0 |
| Division of General Endocrinology | 0 | 1 | 2 | 0 |
| Division of Hematologic Malignancies I | 0 | 1 | 5 | 0 |
| Division of Hematologic Malignancies II | 3 | 1 | 6 | 1 |
| Division of Hepatology and Nutrition | 0 | 0 | 0 | 0 |
| Division of Imaging and Radiation Medicine | 0 | 0 | 0 | 0 |
| Division of Neurology I | 2 | 6 | 11 | 2 |

| Review Division/Office | Accelerated Approval | Fast Track Products | Orphan Designations | Breakthrough Designations* |
|---|---|---|---|---|
| Division of Neurology II | 0 | 1 | 1 | 0 |
| Division of Non-Malignant Hematology | 0 | 0 | 5 | 0 |
| Division of Non-Prescription Drugs I | 0 | 0 | 0 | 0 |
| Division of Non-Prescription Drugs II | 0 | 0 | 0 | 0 |
| Division of Oncology I | 1 | 4 | 1 | 2 |
| Division of Oncology II | 1 | 2 | 5 | 9 |
| Division of Oncology III | 1 | 2 | 3 | 1 |
| Division of Ophthalmology | 0 | 1 | 0 | 0 |
| Division of Psychiatry | 0 | 0 | 0 | 0 |
| Division of Pulmonology, Allergy, and Critical Care | 0 | 1 | 1 | 1 |
| Division of Rare Diseases and Medical Genetics | 0 | 2 | 2 | 1 |
| Division of Rheumatology and Transplant Medicine | 0 | 0 | 0 | 0 |
| Division of Urology, Obstetrics, and Gynecology | 0 | 0 | 0 | 0 |
| *CDER Totals* | *10* | *30* | *48* | *23* |
| **CBER Review Offices** | | | | |
| Office of Blood Research and Review | 0 | 0 | 0 | 0 |
| Office of Tissues and Advanced Therapies | 0 | 2 | 7 | 3 |
| Office of Vaccines Research and Review | 0 | 3 | 3 | 3 |
| *CBER Totals* | *0* | *5* | *10* | *6* |
| **FDA Totals** | **10** | **35** | **58** | **29** |

\* This column does not represent filed figures; rather it shows the number of BT designations granted on INDs, NDAs, and BLAs during FY 2022.  BT designation is granted based on indication, and therefore, one submission may have more than one BT designation granted.

60

# Appendix C:  Analysis of Use of Funds

On August 18, 2017, FDARA was signed into law.  FDARA amended the FD&C Act to, among other things, revise and extend the user fee programs for prescription drugs, generic drugs, medical devices, and biosimilar biological products.

FDARA requires, in the annual performance reports of each of the human medical product user fee programs, specified analyses of the use of funds to include information such as the differences between aggregate numbers of applications and approvals, an analysis of performance enhancement goals, and the most common causes and trends affecting the ability to meet goals.  In addition, FDARA (specifically, section 904) requires the issuance of corrective action reports.

## A.    Original Application Approval Cycle Summary

The following table addresses section 904(a)(1) of FDARA (section 736B(a)(5)(A) of the FD&C Act), pertaining to PDUFA, which requires FDA to include data showing the aggregate number of approvals that occurred during FY 2022.  Data represent all the original NDA and BLA approvals that occurred during FY 2022, regardless of when the application was received.  Data are presented by the type of application and performance goal, as well as whether the approval occurred on time or was overdue on the performance goal.

This table captures first cycle approvals, multiple cycle approvals, and tentative approvals. However, performance is calculated based only on the first cycle in which the application received an approval or tentative approval.  Any subsequent tentative or full approvals, after the first tentative approval action, would not affect the performance metric regardless of the fiscal year of the first tentative approval.

Figures provided in the table below are indicated in detail in Appendix A of this report, which provides a detailed review history of the NDAs and BLAs approved under PDUFA during FY 2022.

**Table C-1.  FY 2022 Original Application Approval Cycle Summary**

| Approval Cycle Type | Performance Goal:  Act on 90 Percent Within | Approval Count | On Time | Overdue | Percent On Time |
|---|---|---|---|---|---|
| First Cycle Priority NMEs & BLAs | 6 months of filing date | 27 | 26 | 1 | **96%** |
| First Cycle Standard NMEs & BLAs | 10 months of filing date | 9 | 9 | 0 | **100%** |
| First Cycle Priority Non-NME NDAs | 6 months | 15 | 14 | 1 | **93%** |
| First Cycle Standard Non-NME NDAs | 10 months | 52 | 48 | 4 | **92%** |
| Class 1 Resubmissions | 2 months | 1 | 1 | 0 | **100%** |
| Class 2 Resubmissions | 6 months | 34 | 30 | 4 | **88%** |
| **Total** | | **138** | **128** | **10** | **--*** |

\* Performance is not calculated on combined goals.

## B.    Performance Enhancement Goals

The following table addresses section 904(a)(1) of FDARA (section 736B(a)(5)(B) of the FD&C Act), pertaining to PDUFA, which requires FDA to include relevant data to determine whether CDER and CBER have met performance enhancement goals identified in the letters described in section 101(b) of the Prescription Drug User Fee Amendments of 2017 for the applicable fiscal year.  A link to each performance enhancement goal completed under PDUFA VI can be found on FDA's website.[14]

For this report, *performance enhancement goals* are defined as any non-review performance goal described in PDUFA with a specified goal date that falls within the applicable fiscal year.

The table below represents FDA's FY 2021 updated performance.

---

[14] https://www.fda.gov/industry/prescription-drug-user-fee-amendments/completed-pdufa-vi-deliverables.

**Table C-2.  FY 2021 Performance Enhancement Goals (Updated)**

| Performance Enhancement Goal | Target Goal Date | On Time (Y/N) | Actual Completion Date | Comments |
|---|---|---|---|---|
| FY 2021 PDUFA Quarterly Hiring Web Posting (Quarter 4) | 10/14/2021 | N | 10/21/2021 | This target goal date is an internal goal set by FDA.  The Commitment Letter does not specify a timeline for posting.<br><br>FDARA hiring data (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data) |

The table below represents FDA's FY 2022 performance.

**Table C-3.  FY 2022 Performance Enhancement Goals**

| Performance Enhancement Goal | Target Goal Date | On Time (Y/N) | Actual Completion Date | Comments |
|---|---|---|---|---|
| CY 2021 FDA Data Standards Action Plan Quarterly Updates (Quarter 4) | 12/31/2021 | Y | 10/26/2021 | Data Standards Program Strategic Plan and Board (see https://www.fda.gov/drugs/electronic-regulatory-submission-and-review/data-standards-program-strategic-plan-and-board) |
| Final Assessment for Hiring and Retention | 12/31/2021 | Y | 12/10/2021 | FDA Final Hiring and Retention Assessment Final Report (see https://www.fda.gov/media/154873/download) |
| FY 2022 PDUFA Quarterly Hiring Web Posting (Quarter 1) | 1/14/2022 | Y | 1/13/2022 | FDARA hiring data (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data) |
| CY 2022 FDA Data Standards Action Plan Quarterly Updates (Quarter 1) | 3/30/2022 | Y | 2/9/2022 | Data Standards Program Strategic Plan and Board (see https://www.fda.gov/drugs/electronic-regulatory-submission-and-review/data-standards-program-strategic-plan-and-board) |
| Public Meeting for Final Assessment for Hiring and Retention | 3/30/2022 | Y | 3/15/2022 | FDA PDUFA Hiring and Retention Final Assessment Public Meeting (see https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/fda-pdufa-hiring-and-retention-final-assessment-public-meeting-03152022) |
| FY 2022 Annual Update to 5-Year Financial Plan | 3/31/2022 | Y | 3/30/2022 | User Fee Five-Year Financial Plans (see https://www.fda.gov/about-fda/user-fee-reports/user-fee-five-year-financial-plans) |
| FY 2022 PDUFA Quarterly Hiring Web Posting (Quarter 2) | 4/14/2022 | Y | 4/12/2022 | FDARA hiring data (see https://www.fda.gov/industry/prescription |

| | | | | |
|---|---|---|---|---|
| | | | | -drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data) |
| CY 2022 FDA Data Standards Action Plan Quarterly Updates (Quarter 2) | 6/20/2022 | Y | 5/5/2022 | Data Standards Program Strategic Plan and Board (see https://www.fda.gov/drugs/electronic-regulatory-submission-and-review/data-standards-program-strategic-plan-and-board) |
| FY 2022 Financial Public Meeting | 6/30/2022 | Y | 6/7/2022 | 2022 Financial Transparency and Efficiency of the Prescription Drug User Fee Act, Biosimilar User Fee Act, and Generic User Fee Amendments (see https://www.fda.gov/drugs/news-events-human-drugs/2022-financial-transparency-and-efficiency-prescription-drug-user-fee-act-biosimilar-user-fee-act) |
| FY 2022 PDUFA Quarterly Hiring Web Posting (Quarter 3) | 7/14/2022 | N | 7/26/2022 | This target goal date is an internal goal set by FDA. The Commitment Letter does not specify a timeline for posting.<br><br>FDARA hiring data (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data) |
| Analyze and Report on the Impact of the Sentinel Expansion and Integration on FDA's Use of Sentinel for Regulatory Purposes | 9/30/2022 | Y | 6/25/2019 | FDA's Sentinel Initiative (see https://www.fda.gov/safety/fdas-sentinel-initiative#:~:text=Sentinel%20is%20the%20FDA's%20national,FDA%20launched%20the%20Sentinel%20Initiative and click on the "Sentinel Initiative" link)<br><br>Also, FDA published a report titled *Assessment in Support of Sentinel System* (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/pdufa-vi-commitment-assessment-support-sentinel-system) |
| FY 2022 Annual ESG and Standard Metrics - Submission Statistics | 9/30/2022 | Y | 9/15/2021 | Submission Statistics (see https://www.fda.gov/industry/about-esg/submission-statistics) |
| FY 2022 Annual Public Meeting for IT Strategic Plan | 9/30/2022 | Y | 4/12/2022 | PDUFA VI Information Technology Goals and Progress (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/pdufa-vi-information-technology-goals-and-progress) |
| Assessment of Postmarket Safety Systems and Processes | 9/30/2022 | Y | 7/29/2022 | |
| Evaluation of the Implementation of the Benefit-Risk Framework in the Human Drug Review Program | 9/30/2022 | Y | 9/2/2022 | |

| | | | | |
|---|---|---|---|---|
| CY 2022 FDA Data Standards Action Plan Quarterly Updates (Quarter 3) | 9/30/2022 | Y | 8/10/2022 | Data Standards Program Strategic Plan and Board (see https://www.fda.gov/drugs/electronic-regulatory-submission-and-review/data-standards-program-strategic-plan-and-board) |
| Final Guidance on Bridging Studies, Including the Bridging of Data from Combination Products | 9/30/2022 | N | N/A | A draft guidance document on this topic was published in December 2019 (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/bridging-drug-device-and-biologic-device-combination-products), and the final guidance document is in progress. |
| FY 2022 Annual Discussion of IT Strategic Plan | 9/30/2022 | Y | 8/6/2021 | |
| FY 2022 E-subs and Data Standards Quarterly Meetings (Quarter 1) | 9/30/2022 | Y | 11/9/2021 | |
| FY 2022 E-subs and Data Standards Quarterly Meetings (Quarter 2) | 9/30/2022 | Y | 2/22/2022 | |
| FY 2022 E-subs and Data Standards Quarterly Meetings (Quarter 3) | 9/30/2022 | Y | 6/14/2022 | |
| FY 2022 E-subs and Data Standards Quarterly Meetings (Quarter 4) | 9/30/2022 | Y | 9/12/2022 | |
| FY 2022 MIDD Quarterly Selections and Meetings (Quarter 1) | 9/30/2022 | Y | 10/8/2021 | |
| FY 2022 MIDD Quarterly Selections and Meetings (Quarter 2) | 9/30/2022 | Y | 1/12/2022 | |
| FY 2022 MIDD Quarterly Selections and Meetings (Quarter 3) | 9/30/2022 | Y | 4/8/2022 | |
| FY 2022 MIDD Quarterly Selections and Meetings (Quarter 4) | 9/30/2022 | Y | 7/8/2022 | |
| Final Guidance on Patient-Oriented Labeling | 9/30/2022 | Y | 7/15/2022 | Instructions for Use – Patient Labeling for Human Prescription Drug and Biological Products – Content and Format (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/instructions-use-patient-labeling-human-prescription-drug-and-biological-products-content-and-format) |
| FY 2022 CID Pilot Program Quarterly Meetings (Quarter 1) | 9/30/2022 | Y | 12/12/2021 | |
| FY 2022 CID Pilot Program Quarterly Meetings (Quarter 2) | 9/30/2022 | Y | 1/28/2022 | |

| | | | | |
|---|---|---|---|---|
| FY 2022 CID Pilot Program Quarterly Meetings (Quarter 3) | 9/30/2022 | Y | 4/29/2022 | |
| FY 2022 CID Pilot Program Quarterly Meetings (Quarter 4) | 9/30/2022 | Y | 7/29/2022 | |
| FY 2022 PDUFA Hiring Goals | 9/30/2022 | N | N/A | FDA's FY 2022 hiring goal was for nine FTEs, and five FTEs were onboarded (56% of the FY 2022 hiring goal).<br><br>FDARA hiring data (see https://www.fda.gov/industry/prescription-drug-user-fee-amendments/food-and-drug-administration-reauthorization-act-2017-fdara-hiring-data) |
| Hold MIDD Public Workshop on Disease Progression Model Development | N/A | Y | 11/19/2021 | Best Practices for Development and Application of Disease Progression Models (see https://www.fda.gov/drugs/news-events-human-drugs/best-practices-development-and-application-disease-progression-models-11192021) |
| Publish Summary Topics Discussed in MIDD Public Workshop on Disease Progression Model Development | N/A | N | N/A | The summary is currently in progress. |
| Hold MIDD Public Workshop on Immunogenicity and Correlates of Protection | N/A | Y | 6/9/2021 | Model Informed Drug Development Approaches for Immunogenicity Assessments (see https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/model-informed-drug-development-approaches-immunogenicity-assessments-06092021-06092021) |
| Publish Summary Topics Discussed in MIDD Public Workshop on Immunogenicity and Correlates of Protection | N/A | Y | 3/6/2022 | Summary of a Public FDA Workshop: Model Informed Drug Development Approaches for Immunogenicity Assessments (see https://doi.org/10.1002/cpt.2572) |
| Focused Guidance on Specific Biomarkers Uses and Contexts to Supplement Draft Guidance on General Evidentiary Standards | N/A | N | N/A | After the guidance document on evidentiary framework for biomarker qualification is published, FDA will continue to evaluate the potential need for a supplemental focused guidance and publish such guidance accordingly. |

## C.    Common Causes and Trends Impacting Ability to Meet Goals

The following table addresses section 904(a)(1) of FDARA (section 736B(a)(5)(C) of the FD&C Act), pertaining to PDUFA, which requires FDA to identify the most common causes and trends of external or other circumstances affecting the ability of FDA, including CDER, CBER, and ORA, to meet the review time and performance enhancement goals identified in the letters described in section 101(b) of the Prescription Drug User Fee Amendments of 2017.

66

**Table C-4.  FY 2022 Performance Results**

| Cause or Trend | Impact on FDA's Commitments |
|---|---|
| Public Health Emergencies | • The continuing COVID-19 health pandemic and the emergence of monkeypox required FDA to shift resources towards addressing these health emergencies, which impacted the goals that were eventually missed.  The increased workload, including Emergency Use Authorizations and meeting requests, continue to constrain FDA's resources.[*]<br><br>• Required in-person inspections may not have been able to be conducted within normal time frames due to restrictions set forth by other national entities and travel restrictions in place to protect the safety and well-being of staff. |
| Specialty Candidates | • The federal hiring process (e.g., security and ethics clearances) delayed the onboarding process.  In addition to last minute declinations from candidates, some hiring managers were faced with difficulties in finding candidates with the specific specialty needed to conduct the work. |
| High Volume of Meeting Requests and Hiring Challenges | • In FY 2022, FDA continued to receive an increased volume of meeting requests as compared to the pre-pandemic levels.  Challenges in hiring led to net increased staffing that still did not meet the high demand of the review and formal meeting workload. |

[*] Additional information on FDA's COVID-19 pandemic-related activities may be found on the Coronavirus Treatment Acceleration Program (CTAP) website (see https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap) and the Emergency Use Authorization web page (see https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization).

# Appendix D:  FY 2022 Corrective Action Report

On August 18, 2017, FDARA (Public Law 115-52) was signed into law.  FDARA amended the FD&C Act to revise and extend the user fee programs for drugs, biologics, medical devices, and biosimilar biological products, as well as to perform other purposes.  Among the provisions of Title IX, section 904 of FDARA, FDA is required to publicly issue an analysis of its use of funds, which includes a corrective action report that details FDA's progress in meeting the review and performance enhancement goals identified in PDUFA VI for the applicable fiscal year.

If each of the review and performance enhancement goals for the applicable fiscal year have been met, the corrective action report shall include recommendations on ways in which the Secretary can improve and streamline the human drug application process.

For any of the review and performance enhancement goals during the applicable fiscal year that were not met, the corrective action report shall include a justification, as applicable, for the types of circumstances and trends that contributed to missed review goal times; and with respect to performance enhancement goals that were not met, a description of the efforts that FDA has put in place to improve the ability of the Agency to meet each goal in the coming fiscal year.  Such a description of corrective efforts is not required by statute for review time goals, but FDA is providing this information regardless in an effort to be complete.

This report satisfies this reporting requirement.

## A.    Executive Summary

Table D-1 below represents FDA's FY 2021 updated performance results for goal types that the Agency was not able to fully report in last year's report.  If a goal type is not listed in this table for FY 2021, then the Agency fully reported on it in last year's report.[15]

**Table D-1.  FY 2021 Review Goal Performance Results (Updated)**

| Goal Type | Circumstances and Trends Impacting the Ability to Meet the Goal Date | Corrective Action Plan |
|---|---|---|
| Procedural and Process Goals | • Major Dispute Resolutions<br><br>○ In FY 2021, FDA received 14 requests for formal dispute resolution, many accompanied by a request for a Type A meeting.<br>○ Dispute resolution typically involves complex regulatory, policy, and legal issues, necessitating coordination across multiple offices as well as participation of leadership at the Center, Super Office, Office, and Review Division level.<br>○ The management of disputes increases the workload for numerous staff already experiencing a heavy load of other regulatory, review, policy, and legal work. | • Major Dispute Resolutions<br><br>○ FDA continues to assess ways to more effectively handle the large volume of requests for formal dispute resolution received each year in addition to completing other regulatory and review work. |

**Table D-2. FY 2022 Review Goal Performance Results**

| Goal Type | Circumstances and Trends Impacting Ability to Meet Goal Date | Corrective Action Plan |
|---|---|---|
| Procedural and Processing Goals | • Meeting Management Goals:<br><br>○ There were 4,384 meeting requests in FY 2022.  The volume of formal PDUFA meeting requests continued to be high compared to pre-pandemic levels.<br>○ In addition to regular workloads, the workload continued to increase due to the ongoing COVID-19 pandemic and the emergence of monkeypox.<br>○ An increased workload, including for Emergency Use Authorizations and meeting requests, continue to constrain FDA's resources. | • Meeting Management Goals:<br><br>○ FDA continues to assess ways to more effectively handle the large volume of formal meeting requests received each year in addition to completing other regulatory and review work. |
|  | • Human Factors Protocol Submissions: | • Human Factors Protocol Submissions Goals: |

---

| Goal Type | Circumstances and Trends Impacting Ability to Meet Goal Date | Corrective Action Plan |
|---|---|---|
| | o In FY 2022, FDA received 59 human factors protocol submissions that were subject to PDUFA goal dates. <br> o Staffing levels for work related to these submissions is inadequate due to the volume of workload, loss of staff, and continued prioritization of work related to the COVID-19 pandemic. <br> o Due to the technical and specialized nature of the work, staff with appropriate training and background are needed, and the use of non-specialized staff to support the work requires a larger learning curve before such staff can achieve the same capacity and efficiency as an experienced employee. | o FDA will re-evaluate its resource allocation to ensure that adequate resources are allotted to support the high workload of the human factors program. <br> o FDA will continue to use the hiring authority granted under the 21st Century Cures Act to advance hiring. Hiring managers will continue to increase their use of innovative recruitment tools to identify candidates with the specialized training and background needed for the technical work. |
| | • Major Dispute Resolutions <br><br> o In FY 2022, FDA received 13 requests for formal dispute resolution, many accompanied by a request for a Type A meeting. <br> o Dispute resolution typically involves complex regulatory, policy, and legal issues, necessitating coordination across multiple offices as well as participation of leadership at the Center, Super Office, Office, and Review Division level. <br> o The management of disputes increases the workload for numerous staff already experiencing a heavy load of other regulatory, review, policy, and legal work. | • Major Dispute Resolution <br><br> o FDA continues to assess ways to more effectively handle the large volume of requests for formal dispute resolution received each year in addition to completing other regulatory and review work. |
| | • Proprietary Name Submitted During IND Phase <br><br> o In FY 2022, FDA received 191 proprietary name submissions during the IND phase that were subject to PDUFA goal dates. <br> o An increasing proprietary name submission workload, combined with staffing shortages stemming from the COVID-19 response and other factors, impacted performance on proprietary name submission procedural goals during the IND phase. | • Proprietary Name Submitted During IND Phase <br><br> o FDA will re-evaluate its resource allocation to ensure that adequate resources are allotted to support the proprietary name program. <br> o FDA will continue to use hiring authority to advance hiring. <br> o FDA will continue to strive to meet PDUFA goals related to proprietary name submissions. |

70

**Table D-3.  FY 2022 Performance Enhancement Goal Performance Results**

| Goal Type | Circumstances and Trends Impacting Ability to Meet Goal Date | Corrective Action Plan |
|---|---|---|
| Guidance Documents | • Final guidance document on bridging studies:<br><br>  o  In FY 2022, staffing levels for work on this guidance document were reduced for extensive periods of time due to the loss of experienced employees who left the Agency or took on different roles and due to the continued prioritization of work related to the COVID-19 pandemic. | • Final guidance document on bridging studies:<br><br>  o  Once adequate resources/personnel are available, FDA will resume its work on finalizing this guidance document. |
| Human Capital/Hiring | • CDER's FY 2022 PDUFA hiring goals were not met; however, constant recruitment efforts and sourcing strategies were used on all vacancies throughout the year consistent with the corrective actions outlined in the FY 2021 report to Congress.  For the four remaining vacancies, one candidate is pending a final offer, and one candidate accepted the position but later declined to onboard.  In addition to last-minute declinations from candidates, some hiring managers were faced with difficulties in finding candidates with the specific specialty needed to conduct the work. | o  CDER plans to continue to advance the corrective actions outlined in the FY 2021 report to Congress and pursue new strategies to support hiring.  In addition, CDER plans to partner with the Office of Talent Solutions to expand its outreach capacity and recruitment strategies to mitigate the challenges faced with finding candidates with unique specialties in FY 2022. |

## B.    PDUFA Review Goals

The following section addresses section 904(a)(2)(B) of FDARA (section 736B(c)(2)(A) of the FD&C Act), which requires FDA to provide a justification for the determination of review goals missed during FY 2022, and a description of the circumstances and any trends related to missed review goals.

This section presents PDUFA performance and workload information for two different types of goals: (1) review of applications and other submissions pertaining to human drugs and biologics and (2) meeting management and other procedural goals related to responses and notifications in the human drug review process.

This section includes all PDUFA VI goals as they pertain to receipts/filed submissions in FY 2022.

## I.    FY 2021 Updated Review Goal Performance Results

A.    *Summary of Performance:*

FDA missed the following procedural and processing goal:  Major Dispute Resolution.

B.    *Justification:*

In FY 2021, FDA received 14 requests for formal dispute resolution, many accompanied by request for a Type A meeting.  Dispute resolution typically involves complex regulatory, policy, and legal issues, necessitating coordination across multiple offices as well as participation of leadership at the Center, Super Office, Office, and Review Division level.  The management of disputes increases the workload for numerous staff already experiencing a heavy load of other regulatory, review, policy, and legal work.

C.    *FY 2022 Corrective Actions:*

FDA continues to assess ways to more effectively handle the large volume of requests for formal dispute resolution received each year in addition to completing other regulatory and review work.

## II.     FY 2022 Review and Procedural and Processing Performance Results

A.     *Summary of Performance:*

FDA missed the following procedural and processing goals:

- Meeting request for Type A, B, B(EOP), and C
- Meeting scheduling for Type A, B, B(EOP), and C
- Final written response for Type A, B, B(EOP), and C
- Meeting preliminary response for Type B(EOP)
- Human Factors Protocol Submission
- Major Dispute Resolution
- Proprietary Name Submitted During IND Phase

B.     *Justification:*

Meeting Management Goals

In FY 2022, in addition to FDA's application review workload, FDA held or provided written responses to over 4,100 formal PDUFA meetings.  Prior to the public health emergency, formal meetings were steadily increasing each year at a rate that ranged between 2 percent and 8 percent.  While the number of FY 2022 formal meetings held or written responses issued decreased slightly (-4%) when compared to FY 2021, the FY 2022 formal meetings still represented a 16 percent increase in meetings when compared to pre-pandemic numbers.  Although the Agency was able to hire additional staff, difficulties related to the hiring process resulted in net gains that were not sufficient to handle this increased meeting workload.

Human Factors Protocol Submissions

In FY 2022, FDA received 59 human factors protocol submissions that were subject to PDUFA goal dates.  The continued high workload, insufficient staffing, and difficulty hiring new staff with the background and experience to conduct this specialized work resulted in difficulty achieving the human factors protocol submission goal.

Major Dispute Resolution

FDA continues to assess ways to more effectively handle the large volume of requests for formal dispute resolution received each year in addition to completing other regulatory and review work.

Proprietary Name Submitted During IND Phase

In FY 2022, FDA received 191 proprietary name submissions during the IND phase that were subject to PDUFA goal dates. An increasing proprietary name submission workload, combined with staffing shortages stemming from the COVID-19 response and other factors, impacted performance on proprietary name submission procedural goals during the IND phase.

C.    *FY 2023 Corrective Actions:*

Review and Meeting Management Goals

FDA continues to assess ways to more effectively handle the marketing applications, meeting requests, and other regulatory submissions received each year. In addition, FDA continues to work on improving hiring.

Human Factors Protocol Submissions

FDA will re-evaluate its resource allocation to ensure that adequate resources are allotted to support the high workload in the human factors program.

FDA will also continue to use the hiring authority granted under the 21st Century Cures Act to advance hiring. Hiring managers will continue to increase their use of innovative recruitment tools to identify candidates with the specialized training and background needed for the technical work.

Major Dispute Resolution

FDA continues to assess ways to more effectively handle the large volume of requests for formal dispute resolution received each year in addition to completing other regulatory and review work.

Proprietary Name Submitted During IND Phase

FDA will re-evaluate its resource allocation to ensure that adequate resources are allotted to support the proprietary name program and will continue to use its hiring authority to advance hiring.

## C.    PDUFA Performance Enhancement Goals

The following section addresses section 904(a)(2) of FDARA (section 736B(c)(2) of the FD&C
Act), which requires FDA to provide a justification for missed performance enhancement goals
and a description of the efforts FDA has put in place to improve the ability of the Agency to
meet each goal in the coming fiscal year (included here under the heading "FY 2023 Corrective
Actions").

This section presents non-review performance goals cited in the PDUFA VI Commitment Letter
with required completion dates in FY 2022.  For this report, *performance enhancement goals* are
defined as any non-review performance goal with a specified deadline as named in the PDUFA
Commitment Letter.  Performance enhancement goals with specified completion dates in FY
2023 will be covered in subsequent corrective action reports.

## III.    Guidances

*A.    Summary of Performance:*

The PDUFA goal date for the following guidance documents were missed:

- Final guidance document on bridging studies, including the bridging of
  data from combination products that employ different device components
  for the same drug or biologic and the same device component across
  different drugs and biologics.

*B.    Justification:*

In FY 2022, staffing levels for this work were reduced for extensive periods of
time due to the loss of experienced employees who left the Agency or took on
different roles and due to the continued prioritization of work related to the
COVID-19 pandemic.

*C.    FY 2023 Corrective Actions:*

Once adequate resources/personnel are available, FDA will resume work on
finalizing this guidance.

## IV.    Human Capital/Hiring

*A.    Summary of Performance:*

FDA missed the PDUFA goal for hiring in FY 2022.  Specifically, five out of nine
employees (56 percent) were hired.

B.  *Justification:*

CDER's FY 2022 PDUFA hiring goals were not met; however, constant recruitment efforts and sourcing strategies were used on all vacancies throughout the year consistent with the corrective actions outlined in the FY 2021 report to Congress.  For the four remaining vacancies, one candidate is pending a final offer, and one candidate accepted the position but later declined to onboard.  In addition to last-minute declinations from candidates, some hiring managers were faced with difficulties in finding candidates with the specific specialty needed to conduct the work.

C.  *FY 2023 Corrective Actions:*

CDER plans to continue to advance the corrective actions outlined in the FY 2021 report to Congress and pursue new strategies to support hiring.  In addition, CDER plans to partner with the Office of Talent Solutions to expand its outreach capacity and recruitment strategies to mitigate the challenges faced with finding candidates with unique specialties in FY 2022.

# Appendix E:  Definitions of Key Terms

A.  The phrase *review and act on* means the issuance of a complete action letter after the complete review of a filed complete application.  The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.

B.  Review Performance Goal Extensions

1.  Major Amendments

a.  A major amendment to an original application, efficacy supplement, or Class 2 resubmission of any of these applications, submitted at any time during the review cycle, may extend the goal date by 3 months.  [Note:  If the review cycle occurred prior to FY 2013, the major amendment must have been received within 3 months of the action due date to extend the action goal date by 3 months.]

b.  A major amendment may include, for example, a major new clinical safety/efficacy study report; major re-analysis of previously submitted study (studies); submission of a Risk Evaluation and Mitigation Strategy (REMS) with Elements to Assure Safe Use (ETASU) not included in the original application; or significant amendment to a previously submitted REMS with ETASU.  Generally, changes to REMS that do not include ETASU and minor changes to REMS with ETASU will not be considered major amendments.

c.  A major amendment to a manufacturing supplement submitted at any time during the review cycle may extend the goal date by 2 months.  [Note:  If the review cycle occurred prior to FY 2013, the major amendment must have been received within 2 months of the action due date to extend the action goal date by 2 months.]

d.  Only one extension can be given per review cycle.

e.  Consistent with the underlying principles articulated in the Good Review Management Principles and Practices for PDUFA Products guidance,[16] FDA's decision to extend the review clock should, except in rare circumstances, be limited to occasions where review of the new information could address outstanding deficiencies in the application and lead to approval in the current review cycle.

2.  Inspection of Facilities Not Adequately Identified in an Original Application or Supplement

a.  All original applications, including those in the "Program," and supplements are expected to include a comprehensive and readily located list of all manufacturing facilities included or referenced in the application or supplement.  This list provides

---

[16] https://www.fda.gov/media/132157/download.

FDA with information needed to schedule inspections of manufacturing facilities that may be necessary before approval of the original application or supplement.

b.  If, during FDA's review of an original application or supplement, the Agency identifies a manufacturing facility that was not included in the comprehensive and readily located list, the goal date may be extended.

    i.  If FDA identifies the need to inspect a manufacturing facility that is not included as part of the comprehensive and readily located list in an original application or efficacy supplement, the goal date may be extended by 3 months.

    ii.  If FDA identifies the need to inspect a manufacturing facility that is not included as part of the comprehensive and readily located list in a manufacturing supplement, the goal date may be extended by 2 months.

C.  A *resubmitted original application* is an applicant's complete response to an action letter addressing all identified deficiencies.

D.  *Class 1 resubmitted applications* are applications resubmitted after a complete response letter (or a not approvable or approvable letter) that include the following items only (or combinations of these items):

1.  Final printed labeling

2.  Draft labeling

3.  Safety updates submitted in the same format, including tabulations, as the original safety submission with new data and changes highlighted (except when large amounts of new information, including important new adverse experiences not previously reported with the product, are presented in the resubmission)

4.  Stability updates to support provisional or final dating periods

5.  Commitments to perform postmarketing studies, including proposals for such studies

6.  Assay validation data

7.  Final release testing on the last 1-2 lots used to support approval

8.  A minor reanalysis of data previously submitted to the application (determined by the Agency as fitting the Class 1 category)

9.  Other minor clarifying information (determined by the Agency as fitting the Class 1 category)

10. Other specific items may be added later as the Agency gains experience with the scheme and will be communicated via guidance documents to industry

E.  *Class 2 resubmissions* are resubmissions that include any other items, including any item that would require presentation to an advisory committee.

78

F.  Meeting requests commit FDA to notify the requestor of a formal meeting in writing within 14 days of request for Type A and Type B(EOP) meetings or within 21 days of request for Type B and Type C meetings.

G.  Scheduled meetings should be made within 30 days of receipt of request for Type A meetings, 60 days for Type B meetings, 70 days for Type B(EOP) meetings, and 75 days for Type C meetings.  If the requested date for any of these types of meetings is greater than 30, 60, 70, or 75 days, as appropriate, from the date the request is received by FDA, the meeting date should be within 14 days of the requested date.

H.  Preliminary responses to sponsor questions contained in the background package for Type B(EOP) meetings should be sent to the sponsor no later than 5 calendar days prior to the meeting date.

I.  Meeting minutes are to be prepared by FDA clearly outlining agreements, disagreements, issues for further discussion, and action items.  They will be available to the sponsor within 30 days of the meeting.

J.  A Type A Meeting is a meeting that is necessary for an otherwise stalled drug development program to proceed (a "critical path" meeting) or to address an important safety issue.

K.  A Type B meeting includes pre-IND meetings and pre-NDA/BLA meetings, while Type B(EOP) meetings are reserved for certain End-of-Phase 1 meetings (i.e., for 21 CFR part 312 subpart E or 21 CFR part 314 subpart H or similar products) and End-of-Phase 2/pre-Phase 3 meetings.  Meetings regarding REMS or postmarketing requirements that occur outside the context of the review of a marketing application will also generally be considered Type B meetings.

L.  A Type C Meeting is any other type of meeting.

M. The performance goals and procedures also apply to original applications and supplements for human drugs initially marketed on an over-the-counter (OTC) basis through an NDA or switched from prescription to OTC status through an NDA or supplement.

N.  IT-specific definitions:

1.  *Program* refers to the organizational resources, procedures, and activities assigned to conduct "the process for the review of human drug applications," as defined in PDUFA.

2.  *Standards-base* means compliant with published specifications that address terminology or information exchange between FDA and regulated parties or external stakeholders, as adopted by FDA or other agencies of the federal government, and often based on the publications of national or international Standards Development Organizations.

3.  *FDA Standards* means technical specifications that have been adopted and published by FDA through the appropriate governance process.  FDA standards may apply to terminology, information exchange, engineering or technology specifications, or other technical matters related to information systems.  FDA standards often are based on the

79

publications of other federal agencies or the publications of national or international Standards Development Organizations.

4.  *Product life cycle* means the sequential stages of human drug development, regulatory review and approval, postmarket surveillance and risk management, and where applicable, withdrawal of an approved drug from the market.  In the context of the process for the review of human drug applications, the product life cycle begins with the earliest regulatory submissions in the IND phase, continues through the NDA or BLA review phase, and includes postmarket surveillance and risk management activities as covered under the process for the review of human drug applications.

O.  Special Protocol Assessments:  Upon specific request by a sponsor, FDA will evaluate certain protocols and issues to assess whether the design is adequate to meet scientific and regulatory requirements identified by the sponsor.

The Application Integrity Policy focuses on the integrity of data and information in applications submitted to FDA for review and approval.  It describes FDA's approach regarding the review of applications that may be affected by wrongful acts that raise significant questions regarding data reliability.  More information on the policy is available at http://www.fda.gov/media/71236/download.

This report was prepared by FDA's Office of Planning, Evaluation, and Risk Management in collaboration with FDA's Center for Biologics Evaluation and Research and Center for Drug Evaluation and Research. For information on obtaining additional copies, please contact:

Office of Planning, Evaluation, and Risk Management
Office of the Commissioner
U.S. Food and Drug Administration
10903 New Hampshire Ave.
Silver Spring, MD 20993-0002
Phone: (301) 796-4850
Email: OPERM_ADMIN_Team@fda.hhs.gov


This report is available on FDA's home page at https://www.fda.gov/.



# EXHIBIT 60

# Performance Report to Congress

# Prescription Drug User Fee Act

## FY 2023



# Executive Summary

The Prescription Drug User Fee Act (PDUFA) was enacted in 1992 and authorized the Food and Drug Administration (FDA or Agency) to collect user fees from pharmaceutical and biotechnology companies for the review of certain human drug and biological products.  With respect to products covered by PDUFA, the FDA committed to certain review performance goals, procedural and processing goals, and other commitments.

PDUFA has been reauthorized by Congress every 5 years.  The sixth reauthorization (known as PDUFA VII) occurred on September 30, 2022, when the President signed into law the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Public Law No. 117-180, of which Division F is titled the FDA User Fee Reauthorization Act of 2022 (FUFRA).  FUFRA amends the Federal Food, Drug, and Cosmetic Act (FD&C Act) to reauthorize the PDUFA program for an additional 5 years and is effective from fiscal year (FY) 2023 through FY 2027.

As directed by Congress, FDA developed proposed enhancements for PDUFA VII in consultation with drug industry representatives, patient and consumer advocates, health care professionals, and other public stakeholders.  These discussions led to the current set of performance goals for the FY 2023 to FY 2027 period, detailed in a document commonly known as the PDUFA VII Commitment Letter.[1]

This report summarizes FDA's performance results in meeting PDUFA goals and commitments for FY 2022 and FY 2023.  Specifically, this report updates performance data for submissions received in FY 2022 (initially reported in the FY 2022 PDUFA performance report)[2] and presents preliminary data on FDA's progress in meeting FY 2023 goals.  Updates on FDA's accomplishments related to additional PDUFA VII commitments for FY 2023 and historical review trend data are also included.  Appendices include details of review cycle data on all original new drug applications (NDAs) and biologics license applications (BLAs) approved during FY 2023, the number and characteristics of applications filed by review division, and definitions of key terms used in this report.  In addition, descriptions of the various submission types are included on page 4 of this report.

The estimated[3] median approval times for priority NDAs and BLAs received in FY 2022 are the same compared to the estimated median approval times for priority NDAs and BLAs received in FY 2021.  The preliminary data show that the percentage of priority

---

[1] https://www.fda.gov/media/151712/download.

[2] http://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

[3] The median approval time is estimated because an application can receive an approval after multiple review cycles, thus impacting the median approval time for all applications in a given receipt cohort. Some applications may be approved several years after their original receipt.

and standard applications filed in FY 2022 and approved during the first review cycle were 81 percent and 52 percent, respectively.

## A.    Achievements in FY 2023

In FY 2023, although the Agency continued to appropriately allocate resources to work focused on the pandemic, according to preliminary data, FDA met or exceeded 9 of the 10 review performance goals.  For example, 100 percent of current performance goals were achieved for Original Standard new molecular entities (NMEs) and BLAs, Original Standard non-NME, Priority NDA and BLA Efficacy Supplements, and Class 1 and Class 2 Resubmitted NDA and BLA Efficacy Supplements.

## B.    Review Performance Results

The FY 2022 cohort had a workload of 3,131 goal closing actions.  FDA met or exceeded the 90 percent performance level for 12 of the 12 review performance goals for FY 2022.

For the FY 2023 cohort, FDA had completed 1,940 actions as of September 30, 2023.  FDA is currently meeting or exceeding nine of the 10 review performance goals for FY 2023.  With 1,535 submissions under review and still within the PDUFA goal date, FDA has the potential to meet or exceed nine of the 10 review performance goals for FY 2023.

## C.    Procedural and Processing Performance Results

For the FY 2022 cohort, FDA's workload for activities related to procedural and processing goals and commitments (i.e., meeting management, procedural responses, and procedural notifications) totaled 11,012 actions.  FDA met or exceeded the performance level for seven of the 20 procedural and processing goals for FY 2022.

For the FY 2023 cohort, FDA is currently meeting or exceeding 15 of the 29 procedural and processing goals.  There are 30 procedural and processing goals, but only 29 had applicable submissions.  With 1,239 submissions under review and still within the PDUFA goal date, FDA has the potential to meet or exceed 18 of the 28 applicable procedural and processing goal commitments for FY 2023.[4]

---

[4] The highest potential performance is not calculated for the two PMR goals as it is not possible to accurately predict the number of pending submissions that will be approved with PMRs.

## D.    Additional PDUFA VII Commitments

To highlight just a few achievements, there were several important PDUFA commitments completed in FY 2023, including the following:

- Establishing the Advancing Real-World Evidence Program and selection of initial meeting requests.

- Publishing a guidance and holding a public webinar related to patient-focused drug development.

- Modernizing and enhancing the assessments of Risk Evaluation and Mitigation Strategies by establishing review performance goals and developing new letter templates.

- Publishing a draft guidance on decentralized clinical trials that addresses the use of digital health technologies to capture clinical trial information directly from participants.  These technologies are intended to improve trial access for patients, particularly those with difficulty getting to research sites.

- Performing enhancements related to product quality reviews; approaches to chemistry, manufacturing, and controls (CMC); and innovative manufacturing technologies through:

  - Promoting enhanced communications between FDA and Sponsors during application review
  - Issuing a MAPP and establishing pilot programs to facilitate CMC readiness for products with accelerated clinical development
  - Publishing a draft guidance on alternative tools to assess manufacturing facilities

- Enhancing FDA's financial transparency and efficiency by publishing updates to the FY 2023 PDUFA Five-Year Financial Plan

- Enhancing the recruitment and retention of review personnel

# Table of Contents

**I.    Introduction**...................................................................................................... **1**

    *A.    Information Presented in This Report*............................................................. 1

**II.    PDUFA Review Goals** ........................................................................................ **6**

    *A.    Review Workload:  FY 2018 to FY 2023* ....................................................... 6

    *B.    Final FY 2022 Review Goal Performance Results* ........................................ 7

    *C.    Final FY 2022 Review Goal Performance Details* ........................................ 8

    *D.    Preliminary FY 2023 Review Goal Performance Results* ............................ 10

    *E.    Preliminary FY 2023 Review Goal Performance Details* ............................. 11

**III.    PDUFA Procedural and Processing Goals and Commitments** ...................... **14**

    *A.    Procedural and Processing Workload:  FY 2018 to FY 2023* ...................... 14

    *B.    Final FY 2022 Procedural and Processing Performance Results* ................ 16

    *C.    Final FY 2022 Procedural and Processing Performance Details* ................ 17

    *D.    Preliminary FY 2023 Procedural and Processing Performance Results* ...... 20

    *E.    Preliminary FY 2023 Procedural and Processing Performance Details* ....... 22

**IV.    PDUFA Trend Graphs**.................................................................................... **28**

**V.    Additional PDUFA VII Commitments** ............................................................ **31**

    *A.    Section I.K:  Enhancing Regulatory Science and Expediting Drug Development* ............................................................................................... 34

    *B.    Section I.L:  Enhancing Regulatory Decision Tools to Support Drug Development and Review* ........................................................................... 42

    *C.    Section I.M:  Enhancement and Modernization of FDA's Drug Safety System* ........................................................................................................ 44

    *D.    Section I.N:  Enhancements Related to Product Quality Reviews, Chemistry, Manufacturing, and Control Approaches, and Advancing the Utilization of Innovative Manufacturing Technologies* ........................................................ 45

    *E.    Section I.O:  Enhancing CBER's Capacity to Support Development, Review, and Approval of Cell and Gene Therapy Products* ........................................ 47

*F.*    *Section I.P:  Supporting Review of New Allergenic Extract Products*........... 48

*G.*    *Section II:  Enhancing the Management of User Fee Resources*................. 49

*H.*    *Section III:  Improving FDA's Hiring and Retention of Review Staff* ............. 49

*I.*    *Section IV:  Information Technology and Bioinformatics Goals*................... 50

*J.*    *Additional PDUFA VII Review Program Reporting*....................................... 52

    1.    Hiring and Placement of New PDUFA VII Staff at FDA ...................... 52

**VI.    Rationale for PDUFA Program Changes**............................................. **53**

*A.*    *Changes in the Number of Individuals Hired as Agreed in the PDUFA VII Commitment Letter, the Number of Remaining Vacancies, the Number of Full-Time Equivalents (FTEs) Funded by Fees Collected Pursuant to Section 736, and the Number of FTEs Funded by Budget Authority by Division Within CDER, CBER, ORA, and OC* ...................................................................... 54

    1.    Changes in the Number of Individuals Hired as Agreed Upon in the PDUFA VII Commitment Letter and Remaining Vacancies ................ 54

    2.    Change in the Number of FTEs Funded by Budget Authority and Number of FTEs Funded by Fees by Division Within CDER, CBER, ORA, and OC .................................................................................. 54

*B.*    *Changes in the Average Total Cost Per FTE in the Prescription Drug Review Program* ............................................................................................ 57

*C.*    *Number of Employees for Whom Time Reporting Is Required* ................... 59

*D.*    *Changes in the Average FTE Hours Required to Complete the Review of each Type of Human Drug Application*........................................................ 59

**Appendix A:  List of Approved Applications** ................................................. **61**

**Appendix B:  Filed Application Numbers by Review Division** .............................. **75**

**Appendix C:  Analysis of Use of Funds** ........................................................ **81**

*A.*    *Original Application Approval Cycle Summary*............................................. 81

*B.*    *Performance Enhancement Goals* ............................................................. 82

*C.*    *Common Causes and Trends Impacting Ability to Meet Goals* ................... 88

**Appendix D:  FY 2023 Corrective Action Report** ........................................... **89**

*A.*    *Executive Summary* ................................................................................. 89

*B.*    *PDUFA Review Goals*.............................................................................. 92

*C.*    *PDUFA Performance Enhancement Goals* ................................................... 95

**Appendix E:  Definitions of Key Terms** ........................................................ **98**

# Acronym List

| | |
|---|---|
| **BLA** | Biologics License Application |
| **BT** | Breakthrough Therapy |
| **CBER** | Center for Biologics Evaluation and Research |
| **CDER** | Center for Drug Evaluation and Research |
| **DHT** | Digital Health Technology |
| **EOP** | End of Phase |
| **ETASU** | Elements to Assure Safe Use |
| **FDA** | Food and Drug Administration |
| **FD&C Act** | Federal Food, Drug, and Cosmetic Act |
| **FDARA** | FDA Reauthorization Act of 2017 |
| **FTE** | Full-Time Equivalent |
| **FUFRA** | FDA User Fee Reauthorization Act of 2022 |
| **FY** | Fiscal Year (October 1 to September 30) |
| **IND** | Investigational New Drug |
| **IT** | Information Technology |
| **NDA** | New Drug Application |
| **NME** | New Molecular Entity |
| **OC** | Office of the Commissioner |
| **OND** | Office of New Drugs |
| **ORA** | Office of Regulatory Affairs |
| **PDUFA** | Prescription Drug User Fee Act |
| **PMR** | Postmarketing Requirement |
| **REMS** | Risk Evaluation and Mitigation Strategy |

# I.    Introduction

On September 30, 2022, the President signed the FDA Reauthorization Act of 2022 (FUFRA) into law, which included the sixth reauthorization of the Prescription Drug User Fee Act (PDUFA) for fiscal year (FY) 2023 through FY 2027, known as PDUFA VII. PDUFA VII continues to provide the Food and Drug Administration (FDA or Agency) with a consistent source of funding to help maintain a predictable and efficient review process for human drugs and biological products.  In commitments tied to this funding, FDA agreed to certain review performance goals, such as reviewing and acting on new drug application (NDA) and biologics license application (BLA) submissions within predictable time frames.

Since the enactment of PDUFA I in 1992, FDA has used PDUFA resources to significantly reduce the time needed to evaluate new drugs and biological products without compromising its rigorous standards for a demonstration of safety, efficacy, and quality of these products before approval.  The efficiency gains under PDUFA have revolutionized the drug review process in the United States and enabled FDA to ensure more timely access to innovative and important new therapies for patients.

More information on the history of PDUFA is available on FDA's website.[1]

## A.    Information Presented in This Report

This report presents PDUFA performance and workload information for two different types of goals: (1) the review of applications and other submissions pertaining to human drugs and biological products and (2) meeting management and other procedural goals related to responses and notifications in the human drug review process.  PDUFA workload information for these goals is included in the tables that follow.  Significant components of the PDUFA workload (such as reviews of investigational new drug (IND) applications, labeling supplements, and annual reports, as well as the ongoing monitoring of drug safety in the postmarket setting) are not captured by PDUFA goals and are therefore not presented in this report.

PDUFA performance information related to achieving these two types of goals includes reviews of submissions pending from the previous fiscal year as well as reviews of submissions received during the current fiscal year.  This report presents the final

---

[1] http://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

performance results for the FY 2022 cohort of submissions based on actions completed in FY 2022 and FY 2023. In addition, this report includes the preliminary performance results for the FY 2023 cohort of submissions that had actions completed or due for completion in FY 2023. Final performance for the FY 2023 cohort will be presented in the FY 2024 PDUFA performance report and will include actions for submissions still pending within the PDUFA goal date as of September 30, 2023.

The following information refers to FDA's performance presented in this report.

- The following terminology is used throughout this document:
    - *Application* means a new, original application.
    - *Supplement* means a request to approve a change in an application that has been approved.
    - *Resubmission* means a resubmitted application or supplement in response to a complete response, approvable, not approvable, or tentative approval letter.
    - *New molecular entities (NMEs)* refer only to NMEs that are submitted for approval under NDAs (not BLAs).
    - *Submission* applies to all the above.
    - *Action* refers to an FDA decision on any of the above, including an approval, a tentative approval, a complete response, or withdrawal of the submission by the sponsor.

- Under PDUFA VII, the preliminary counts of NMEs in workload tables for the current fiscal year may not reflect the final determination of NME status for that fiscal year. FDA often receives multiple submissions for the same NME (e.g., different dosage forms). All such submissions are initially designated as NMEs, and once FDA approves the first of the multiple submissions, the other submissions will be designated as non-NMEs, and workload numbers will be appropriately updated in later years.

- The data presented in this report do not include biosimilar INDs or biosimilar BLAs. These data are presented in the annual Biosimilar User Fee Act (BsUFA) Performance Reports located on FDA's website.[2]

- FDA files applications only that are sufficiently complete to permit a substantive review. The Agency makes a filing decision within 60 days of an original application's receipt by FDA. FDA's review of an application begins once the application is received. For NME NDAs and original BLAs reviewed under the

---

[2]http://www.fda.gov/about-fda/user-fee-performance-reports/bsufa-performance-reports.

program (see the PDUFA VII Commitment Letter[3] for more information), the PDUFA clock begins after the conclusion of the 60-day filing period.  For all other submissions, the PDUFA clock begins upon FDA's receipt of the application.

- FDA annually reports PDUFA performance data for each fiscal year receipt cohort (defined as submissions filed from October 1 to September 30 of the following year).  In each fiscal year, FDA receives submissions that will have associated goals due in the following fiscal year.  For these submissions, FDA's performance data will be reported in subsequent fiscal years, either after the Agency takes an action or when the goal becomes overdue, whichever comes first.

- Submission types (e.g., responses to clinical holds) with shorter (e.g., 30-day) review time goals tend to have a larger percentage of reviews completed by the end of the fiscal year, and these submission types' preliminary performance data are a more reliable indicator of their final performance results.  However, submission types (e.g., standard NME NDA/BLA) with longer (e.g., within 10 months of the 60-day filing date) review time goals tend to have a smaller percentage of reviews completed within the reporting period, and these submission types' preliminary performance data are a less reliable indicator of their final performance results.

- Final performance results for FY 2022 submissions are shown as the percentage of submissions that were reviewed within the specified goal timeline.  Submission types with 90 percent or more submissions reviewed by the goal date are shown as having met the goal.

- Preliminary performance results for FY 2023 submissions are shown as the percentage of submissions reviewed on time as of September 30, 2023, excluding actions pending within the PDUFA goal date.  Submission types with a current performance result of 90 percent or more reviewed by the goal date are shown as currently meeting the goal.[4]  The highest possible percent of reviews that may be completed on time (i.e., the highest possible performance results) if all non-overdue pending reviews are completed within the goal is also shown.

- Filed applications and supplements include submissions that have been filed or are in pending filing status.  Data do not include submissions that are

---

[3] https://www.fda.gov/media/151712/download.

[4] There are four processing and procedural performance goals with performance thresholds at 50 percent and two goals at 60 percent.  Therefore, a current performance result at these rates or higher will be shown as currently meeting the goal.

unacceptable for filing because of nonpayment of user fees, have been withdrawn within 60 days of receipt, or have been refused to file.

- FY 2023 workload and performance figures include applications that are identified as *undesignated*, which means they are still within the 60-day filing date and have not yet had a review designation, standard or priority, made.

- For resubmitted applications, the applicable performance goal is determined by the fiscal year in which the resubmission is received, rather than the year in which the original application was submitted.

- Unless otherwise noted, all performance data are as of September 30, 2023.

- Definitions of key terms used throughout this report can be found in Appendix E.

<div style="border:1px dashed">

### Submission Types Included in This Report

- **NDA** – When the sponsor of a new drug believes that enough evidence on the drug's safety and effectiveness has been obtained to meet FDA's requirements for marketing approval, the sponsor submits to FDA an NDA.  The application must contain data from specific technical viewpoints for review, including chemical, pharmacological, medical, biopharmaceutical, and statistical.  If the NDA is approved, the product may be marketed in the United States.

- **NME** – An NME is an active ingredient that contains no active moiety that has been previously approved by FDA in an application submitted under section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) or has been previously marketed as a drug in the United States.

- **BLA** – A BLA is a submission that contains specific information on the manufacturing processes, chemistry, pharmacology, clinical pharmacology, and the clinical effects of a biological product.  If the information provided meets FDA requirements, the application is approved, and a license is issued allowing the firm to market the product.

- **Resubmission** – A resubmitted original application or supplement is a complete response to an FDA action letter that addresses all identified deficiencies.

- **Supplement** – A supplement is an application to allow a company to make changes in a product that already has an approved NDA or to seek FDA approval for new uses of an approved drug.  The Center for Drug Evaluation and Research (CDER) must approve all major NDA changes (in packaging or ingredients, for instance) to ensure the conditions originally set for the product are still being met.

**Source:**  http://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms

</div>

## II.    PDUFA Review Goals

### A.    Review Workload:  FY 2018 to FY 2023

In the table below, preliminary workload numbers from FY 2023 are compared to the previous 5-year averages for original NDAs and BLAs, resubmissions, and supplements, and the workload numbers for the previous 5 years are presented.  FDA saw an increase between FY 2022 and FY 2023 in the numbers of original priority non-NME NDAs, original standard non-NME NDAs, Class 1 and Class 2 resubmitted NDAs and BLAs, NDA and BLA manufacturing supplements requiring prior approval, and NDA and BLA manufacturing supplements not requiring prior approval.

Definitions of Class 1 and Class 2 resubmissions and other terms are found in Appendix E.  The data presented in this section represent receipts by FDA of the submission types listed in Table 1.

### Table 1.  Workload for Applications and Submissions

| Submission Type | FY 18 | FY 19 | FY 20 | FY 21 | FY 22* | FY 23 | FY 18 to FY 22 5-Year Average | FY 23 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Original Priority NMEs and BLAs | 48 | 44 | 54 | 52 | 43 | 39** | 48 | -19% |
| Original Standard NMEs and BLAs | 22 | 35 | 29 | 29 | 33 | 25 | 30 | -17% |
| Original Priority Non-NME NDAs | 16 | 16 | 14 | 22 | 11 | 32** | 16 | 100% |
| Original Standard Non-NME NDAs | 69 | 68 | 59 | 72 | 44 | 60 | 62 | -3% |
| Class 1 Resubmitted NDAs and BLAs | 9 | 8 | 5 | 5 | 8 | 9 | 7 | 29% |
| Class 2 Resubmitted NDAs and BLAs | 50 | 41 | 57 | 51 | 59 | 64 | 52 | 23% |
| Priority NDA and BLA Efficacy Supplements | 97 | 81 | 112 | 100 | 77 | 71** | 93 | -24% |
| Standard NDA and BLA EfficacySupplements | 177 | 197 | 195 | 173 | 171 | 164 | 183 | -10% |
| Class 1 Resubmitted NDA and BLA Efficacy Supplements | 3 | 4 | 3 | 3 | 1 | 1 | 3 | -67% |

| Submission Type | FY 18 | FY 19 | FY 20 | FY 21 | FY 22* | FY 23 | FY 18 to FY 22 5-Year Average | FY 23 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Class 2 Resubmitted NDA and BLA Efficacy Supplements | 11 | 2 | 20 | 10 | 11 | 3 | 11 | -73% |
| NDA and BLA Manufacturing Supplements Requiring Prior Approval | 992 | 973 | 1,168 | 1,243 | 1,155 | 1,349 | 1,106 | 22% |
| NDA and BLA Manufacturing Supplements Not Requiring Prior Approval | 1,610 | 1,450 | 1,717 | 1,779 | 1,518 | 1,658 | 1,615 | 3% |

\* FY 2022 numbers were changed to reflect updates to the data presented in the FY 2022 PDUFA performance report.
\*\* Some applications have not yet received a review priority designation.  There were four undesignated NMEs and BLAs counted as Priority NMEs and BLAs, 15 undesignated non-NME NDAs counted as Priority non-NME NDAs, and 11 undesignated efficacy supplements counted as Priority NDA and BLA Efficacy Supplements in the table above.  Performance results in all categories may change once designations are made for these applications, and the table will then be updated accordingly, as appropriate, in the FY 2024 PDUFA performance report.

## B.    Final FY 2022 Review Goal Performance Results

The final FY 2022 review goal performance results are presented in Table 2.  The final performance results for submission types that met or exceeded the goal (i.e., 90 percent or more actions were completed by the goal date) are shown in bold text.  FDA met or exceeded the 90-percent performance level for 12 review performance goals in FY 2022.

### Table 2.  FY 2022 Final Review Goal Performance Results

| Submission Type | Goal:  Act on 90 Percent Within | Total | FY 2022 Performance |
|---|---|---|---|
| Original Priority NMEs and BLAs | 6 months of filing date | 43 of 43 on time | **100%** |
| Original Standard NMEs and BLAs | 10 months of filing date | 31 of 31 on time | **100%** |
| Original Priority Non-NME NDAs | 6 months | 10 of 11 on time | **91%** |
| Original Standard Non-NME NDAs | 10 months | 42 of 43 on time | **98%** |
| Class 1 Resubmitted NDAs and BLAs | 2 months | 8 of 8 on time | **100%** |

| Submission Type | Goal:  Act on 90 Percent Within | Total | FY 2022 Performance |
|---|---|---|---|
| Class 2 Resubmitted NDAs and BLAs | 6 months | 57 of 59 on time | **97%** |
| Priority NDA and BLA Efficacy Supplements | 6 months | 71 of 77 on time | **92%** |
| Standard NDA and BLA Efficacy Supplements | 10 months | 162 of 170 on time | **95%** |
| Class 1 Resubmitted NDA and BLA Efficacy Supplements | 2 months | 1 of 1 on time | **100%** |
| Class 2 Resubmitted NDA and BLA Efficacy Supplements | 6 months | 11 of 11 on time | **100%** |
| NDA and BLA Manufacturing Supplements Requiring Prior Approval | 4 months | 1,105 of 1,155 on time | **96%** |
| NDA and BLA Manufacturing Supplements Not Requiring Prior Approval | 6 months | 1,496 of 1,518 on time | **99%** |

## C.    Final FY 2022 Review Goal Performance Details

Tables 3 to 7 detail the final performance data for the FY 2022 cohort of submissions. These data include the number of submissions reviewed *on time* (i.e., acted on by the PDUFA goal date) or *overdue* (i.e., acted on past the goal date or pending past the goal date) and the final *percent on time* (i.e., final performance with no actions pending within the PDUFA goal date).  The performance data presented here have been updated from the preliminary performance information reported in the FY 2022 PDUFA performance report.

**Table 3.  FY 2022 Original Applications**

| Original Application Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Priority NMEs & BLAs | 6 months of filing date | 43 | 43 | 0 | 100% |
| Standard NMEs & BLAs | 10 months of filing date | 33 | 31 | 0 | 100%[*] |
| Priority Non-NME NDAs | 6 months | 11 | 10 | 1 | 91% |
| Standard Non-NME NDAs | 10 months | 44 | 42 | 1 | 98%[†] |

[*]  Two standard NMEs and BLAs are pending within goal as of September 30, 2023.  Regardless of the action, the final performance result will remain above 90 percent.

[†]  One standard non-NME NDA is pending within goal as of September 30, 2023.  Regardless of the action, the final performance result will remain above 90 percent.

**Table 4.  FY 2022 Resubmitted Original Applications**

| Resubmitted Application Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Class 1 | 2 months | 8 | 8 | 0 | 100% |
| Class 2 | 6 months | 59 | 57 | 2 | 97% |

**Table 5.  FY 2022 Efficacy Supplements**

| Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Priority | 6 months | 77 | 71 | 6 | 92% |
| Standard | 10 months | 171 | 162 | 8 | 95%[††] |

[††] One standard efficacy supplement is pending within goal as of September 30, 2023.  Regardless of the action, the final performance result will remain above 90 percent.

**Table 6.  FY 2022 Resubmitted Efficacy Supplements**

| Resubmitted Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Class 1 | 2 months | 1 | 1 | 0 | 100% |
| Class 2 | 6 months | 11 | 11 | 0 | 100% |

**Table 7.  FY 2022 Manufacturing Supplements**

| Manufacturing Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Prior Approval Required | 4 months | 1,155 | 1,105 | 50 | 96% |
| Prior Approval Not Required | 6 months | 1,518 | 1,496 | 22 | 99% |

## D.    Preliminary FY 2023 Review Goal Performance Results

The preliminary FY 2023 review goal performance results are presented in Table 8.

- The *progress* (i.e., the number of reviews completed) and the total number of submissions received for each submission type are shown in the second column. *Current performance* includes submissions reviewed *on time* (i.e., acted on by the PDUFA goal date) or *overdue* (i.e., acted on past the goal date or pending past the goal date).  The current performance results for submission types with a greater proportion of reviews completed will be more representative of the final performance results.  The *highest possible final performance* is the best potential final performance result, which accounts for actions pending within the PDUFA goal date.

- The current performance results for submission types that are meeting the performance goal (i.e., 90 percent or more reviews were completed by the goal date) as of September 30, 2023, are shown in bold text.  FDA is currently meeting or exceeding the 90-percent performance level for nine performance goals.

- If all non-overdue pending submissions are reviewed on time, FDA will achieve the performance results presented in the Highest Possible Final Performance column.  FDA has the potential to meet or exceed the 90-percent performance

level for nine review performance goals.

**Table 8.  FY 2023 Preliminary Review Goal Performance Results**

| Submission Type | Progress* | Goal:  Act on 90 Percent Within | FY 2023 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Original Priority NMEs and BLAs | 11 of 35 complete | 6 months of filing date | **91%** | 97% |
| Original Standard NMEs and BLAs | 1 of 25 complete | 10 months of filing date | **100%** | 100% |
| Original Priority Non-NME NDAs | 12 of 17 complete | 6 months | 83% | 88% |
| Original Standard Non-NME NDAs | 8 of 60 complete | 10 months | **100%** | 100% |
| Class 1 Resubmitted NDAs and BLAs | 9 of 9 complete | 2 months | **93%** | 96% |
| Class 2 Resubmitted NDAs and BLAs | 37 of 64 complete | 6 months | | |
| Priority NDA and BLA Efficacy Supplements | 37 of 60 complete | 6 months | **100%** | 100% |
| Standard NDA and BLA Efficacy Supplements | 49 of 164 complete | 10 months | **98%** | 99% |
| Class 1 Resubmitted NDA and BLA Efficacy Supplements | 1 of 1 complete | 2 months | **100%** | 100% |
| Class 2 Resubmitted NDA and BLA Efficacy Supplements | 2 of 3 complete | 6 months | | |
| NDA and BLA Manufacturing Supplements Requiring Prior Approval | 869 of 1,349 complete | 4 months | **97%** | 98% |
| NDA and BLA Manufacturing Supplements Not Requiring Prior Approval | 904 of 1,658 complete | 6 months | **97%** | 98% |

\* This column does not include undesignated applications in the total.  Undesignated applications have only pending status.

## E.    Preliminary FY 2023 Review Goal Performance Details

The following detailed performance information for the FY 2023 cohort submissions includes the number of submissions filed, reviewed on time (i.e., acted on by the PDUFA goal date), and overdue (i.e., acted on past the goal date or pending past the goal date).  The number of submissions not yet acted on but still pending within the PDUFA goal date (pending within goal) is also provided, along with the highest possible percent of reviews that may be completed on time (highest possible percent on time).

**Table 9.  FY 2023 Original Applications**

| Original Application Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Priority NMEs & BLAs | 6 months of filing date | 35 | 10 | 1 | 24 | 91% | 97% |
| Standard NMEs & BLAs | 10 months of filing date | 25 | 1 | 0 | 24 | 100% | 100% |
| Priority Non-NME NDAs | 6 months | 17 | 10 | 2 | 5 | 83% | 88% |
| Standard Non-NME NDAs | 10 months | 60 | 8 | 0 | 52 | 100% | 100% |
| Review Priority Undesignated* | N/A | 19 | -- | -- | -- | -- | -- |
| Total | | 156 | 29 | 3 | 105 | -- | -- |

\*  These applications have not yet received a review priority designation.

**Table 10.  FY 2023 Resubmitted Original Applications**

| Resubmitted Application Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Class 1 | 2 months | 9 | 9 | 0 | 0 | 93% | 96% |
| Class 2 | 6 months | 64 | 34 | 3 | 27 | | |

**Table 11.  FY 2023 Efficacy Supplements**

| Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Priority | 6 months | 60 | 37 | 0 | 23 | 100% | 100% |
| Standard | 10 months | 164 | 48 | 1 | 115 | 98% | 99% |
| Review Priority Undesignated* | N/A | 11 | -- | -- | -- | -- | -- |

\*  These applications have not yet received a review priority designation.

**Table 12.  FY 2023 Resubmitted Efficacy Supplements**

| Resubmitted Efficacy Supplement Type | Goal:  Act on 90 Percent Within | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Class 1 | 2 months | 1 | 1 | 0 | 0 | 100% | 100% |
| Class 2 | 6 months | 3 | 2 | 0 | 1 | | |

**Table 13.  FY 2023 Manufacturing Supplements**

| Manufacturing Supplement Type | Goal:  Act on 90 Percent Within | Filed | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Prior Approval Required | 4 months | 1,349 | 840 | 29 | 480 | 97% | 98% |
| Prior Approval Not Required | 6 months | 1,658 | 878 | 26 | 754 | 97% | 98% |
| Review Priority Undesignated* | N/A | 0 | -- | -- | -- | -- | -- |

*  These applications have not yet received a review priority designation.

# III.    PDUFA Procedural and Processing Goals and Commitments

## A. Procedural and Processing Workload:  FY 2018 to FY 2023

The FY 2023 procedural and processing workload, which includes activities related to meeting management, procedural responses, and procedural notifications, is compared to the previous 5-year averages in Table 14.  The upward trend of meeting management workload continued into FY 2023.

New categories of Type D meeting and Type INTERACT meeting,  were created under PDUFA VII.  These new categories also included new meeting metrics for Type D and Type INTERACT Meetings: Scheduled, Written Response, and Preliminary Response. Meeting type definitions and other terms can be found in Appendix E.  The table shows updated final FY 2022 performance and presents new reporting required under PDUFA VII.

### Table 14.  Meeting Management, Procedural Responses, and Procedural Notifications Workload

| Submission/Request Type | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022* | FY 2023 | FY 2018 to FY 2022 5-Year Average | FY 2023 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Type A Meeting Requests± | 146 | 153 | 182 | 178 | 211 | 268** | 174 | 54% |
| Type B Meeting Requests± | 1,609 | 1,725 | 2,438 | 2,332 | 2,174 | 1,895 | 2,056 | -8% |
| Type B(EOP) Meeting Requests± | 343 | 343 | 350 | 347 | 304 | 297 | 337 | -12% |
| Type C Meeting Requests± | 1,403 | 1,550 | 1,716 | 1,706 | 1,699 | 1,461 | 1,615 | -10% |
| Type D Meeting Requests± | -- | -- | -- | -- | -- | 371 | -- | -- |
| Type INTERACT Requests± | -- | -- | -- | -- | -- | 111 | -- | -- |
| Type A Meetings Scheduled | 127 | 130 | 147 | 143 | 157 | 233** | 141 | 65% |
| Type B Meetings Scheduled | 945 | 936 | 869 | 741 | 714 | 636 | 841 | -24% |
| Type B(EOP) Meetings Scheduled | 324 | 325 | 322 | 282 | 259 | 258 | 302 | -15% |

| Submission/Request Type | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022* | FY 2023 | FY 2018 to FY 2022 5-Year Average | FY 2023 Compared to 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| Type C Meetings Scheduled | 640 | 732 | 699 | 648 | 619 | 574 | 668 | -14% |
| Type D Meetings Scheduled | -- | -- | -- | -- | -- | 84 | --[†] | --[†] |
| Type INTERACT Meetings Scheduled | -- | -- | -- | -- | -- | 20 | --[†] | --[†] |
| Type A Written Response | 6 | 6 | 13 | 11 | 19 | 11 | 11 | 0% |
| Type B Written Response | 578 | 719 | 1,430 | 1,451 | 1,341 | 1,158 | 1,104 | 5% |
| Type B(EOP) Written Response | 14 | 11 | 23 | 49 | 38 | 28 | 27 | 4% |
| Type C Written Response | 686 | 728 | 905 | 918 | 974 | 793 | 842 | -6% |
| Type D Meeting Written Response | -- | -- | -- | -- | -- | 261 | --[†] | --[†] |
| Type INTERACT Written Response | -- | -- | -- | -- | -- | 28 | --[†] | --[†] |
| Preliminary Response for Type B(EOP) Meetings | 303 | 305 | 309 | 271 | 246 | 253 | 287 | -12% |
| Preliminary Response for Type D Meetings | -- | -- | -- | -- | -- | 88 | --[†] | --[†] |
| Preliminary Response for Type INTERACT Meetings | -- | -- | -- | -- | -- | 30 | --[†] | --[†] |
| Meeting Minutes | 1,541 | 1,638 | 1,515 | 1,363 | 1,281 | 1,239 | 1,468 | -16% |
| Responses to Clinical Holds | 199 | 197 | 261 | 275 | 344 | 278 | 255 | 9% |
| Major Dispute Resolutions | 23 | 28 | 35 | 14 | 12 | 15 | 22 | -32% |
| Special Protocol Assessments | 160 | 158 | 148 | 150 | 167 | 138 | 157 | -12% |
| Review of Proprietary Names Submitted During IND Phase | 159 | 212 | 224 | 211 | 188 | 150 | 199 | -25% |
| Review of Proprietary Names Submitted During NDA/BLA Phase | 228 | 230 | 255 | 223 | 206 | 235 | 228 | 3% |
| Human Factors Protocol Submissions to NDAs, BLAs, or INDs | -- | 70 | 79 | 79 | 59 | -- | --[†] | --[†] |
| Human Factors Protocol Submissions to INDs | -- | -- | -- | -- | -- | 63 | --[†] | --[†] |

\*  FY 2022 numbers were changed to reflect updates to the data presented in the FY 2022 PDUFA performance report.

\*\* Some meeting requests and the subsequent scheduling of meetings are for requests where the type cannot be initially determined.  There were 96 undesignated meetings counted as Type A meeting requests and scheduled in the table above. Performance in all categories will change once designations are made for these requests and scheduling and will be updated in the FY 2024 PDUFA performance report.

†  Because of changing reporting requirements, no past average is presented for this area.

±  Excludes meetings withdrawn prior to the meeting granted/denied response goal date.

## B. Final FY 2022 Procedural and Processing Performance Results

Table 15 presents the final performance results for FY 2022 submissions in meeting goals related to meeting management, procedural responses, and procedural notifications.  The final performance results for submission types that met or exceeded the goal (e.g., 90 percent or more reviews were completed by the goal date) are shown in bold text.  FDA exceeded the performance level for seven of the 20 procedural and processing goals in FY 2022.

### Table 15.  FY 2022 Final Procedural and Processing Performance Results

| Submission/Request Type | Goal:  90 Percent | Total | FY 2022 Performance |
|---|---|---|---|
| Type A Meeting Requests* | Respond within 14 days | 195 of 211 on time | **92%** |
| Type B Meeting Requests* | Respond within 21 days | 1,976 of 2,174 on time | **91%** |
| Type B(EOP) Meeting Requests* | Respond within 14 days | 269 of 304 on time | 88% |
| Type C Meeting Requests* | Respond within 21 days | 1,534 of 1,699 on time | **90%** |
| Type A Meetings Scheduled | Schedule within 30 days | 114 of 157 on time | 73% |
| Type B Meetings Scheduled | Schedule within 60 days | 573 of 714 on time | 80% |
| Type B(EOP) Meetings Scheduled | Schedule within 70 days | 219 of 259 on time | 85% |
| Type C Meetings Scheduled | Schedule within 75 days | 520 of 619 on time | 84% |
| Type A Written Response | Respond within 30 days | 16 of 19 on time | 84% |
| Type B Written Response | Respond within 60 days | 877 of 1,341 on time | 65% |
| Type B(EOP) Written Response | Respond within 70 days | 29 of 38 on time | 76% |
| Type C Written Response | Respond within 75 days | 736 of 974 on time | 76% |

| Submission/Request Type | Goal: 90 Percent | Total | FY 2022 Performance |
|---|---|---|---|
| Preliminary Response for Type B(EOP) Meetings | Issue no later than 5 days prior to meeting date | 222 of 246 on time | **90%** |
| Meeting Minutes | Issue within 30 days after meeting date | 1,203 of 1,281 on time | **94%** |
| Responses to Clinical Holds | Respond within 30 days | 304 of 344 on time | 88% |
| Major Dispute Resolutions | Respond within 30 days | 9 of 12 on time | 75% |
| Special Protocol Assessments | Respond within 45 days | 159 of 167 on time | **95%** |
| Proprietary Name Submitted During IND Phase | Review and respond within 180 days | 69 of 188 on time | 37% |
| Proprietary Name Submitted During NDA/BLA Phase | Review and respond within 90 days | 199 of 206 on time | **97%** |
| Human Factors Protocol Submissions to NDAs, BLAs, or INDs | Respond within 60 days | 33 of 59 on time | 56% |

*  Excludes meetings withdrawn prior to the meeting granted/denied response goal date.

## C. Final FY 2022 Procedural and Processing Performance Details

Tables 16 to 22 detail the final performance data for the FY 2022 cohort of submissions. These data include the number of submissions reviewed on time (i.e., acted on by the PDUFA goal date) or overdue (i.e., acted on past the goal date or pending past the goal date) and the final percent on time (i.e., final performance with no actions pending within the PDUFA goal date).  The performance data presented here have been updated from the preliminary performance information reported in the FY 2022 PDUFA performance report.

### Table 16.  FY 2022 Meeting Management

| Type | Goal: 90 Percent | Received* | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Type A Meeting Requests^ | Respond within 14 days | 211 | 195 | 16 | **92%** |
| Type B Meeting Requests^ | Respond within 21 days | 2,174 | 1,976 | 198 | **91%** |
| Type B(EOP) Meeting Requests^ | Respond within 14 days | 304 | 269 | 35 | 88% |

| Type | Goal: 90 Percent | Received* | On Time | Overdue | Percent on Time |
|------|------------------|-----------|---------|---------|-----------------|
| Type C Meeting Requests^ | Respond within 21 days | 1,699 | 1,534 | 165 | **90%** |
| Type A Meetings Scheduled | Schedule within 30 days | 157 | 114 | 43 | 73% |
| Type B Meetings Scheduled | Schedule within 60 days | 714 | 573 | 141 | 80% |
| Type B(EOP) Meetings Scheduled | Schedule within 70 days | 259 | 219 | 40 | 85% |
| Type C Meetings Scheduled | Schedule within 75 days | 619 | 520 | 99 | 84% |
| Type A Written Response | Respond within 30 days | 19 | 16 | 3 | 84% |
| Type B Written Response | Respond within 60 days | 1,341 | 877 | 464 | 65% |
| Type B(EOP) Written Response | Respond within 70 days | 38 | 29 | 9 | 76% |
| Type C Written Response | Respond within 75 days | 974 | 736 | 238 | 76% |
| Preliminary Response for Type B(EOP) Meetings | Issue no later than 5 days prior to meeting date | 246 | 222 | 24 | **90%** |
| Meeting Minutes | Issue within 30 days after meeting date | 1,281 | 1,203 | 78 | **94%** |

\*  Not all meeting requests are granted; therefore, the number of meetings scheduled may differ from the number of meeting requests received.  Not all scheduled meetings are held; therefore, the number of meeting minutes may differ from the number of meetings scheduled.

^  Excludes meetings withdrawn prior to the meeting granted/denied response goal date.

### Table 17.  FY 2022 Responses to Clinical Holds

| Goal | Received | On Time | Overdue | Percent on Time |
|------|----------|---------|---------|-----------------|
| Respond to 90 percent within 30 days | 344 | 304 | 40 | 88% |

**Table 18.  FY 2022 Major Dispute Resolutions**

| Goal | Responses* | On Time | Overdue | Percent on Time |
|---|---|---|---|---|
| Respond to 90 percent within 30 days | 12 | 9 | 3 | 75% |

\*  This figure represents the number of FDA-generated 30-day responses to requests for review that have been received.  This figure is not representative of the number of unique appeals received that have been reviewed as there may be more than one response to an original appeal.

**Table 19.  FY 2022 Special Protocol Assessments**

| Goal | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|
| Respond to 90 percent within 45 days | 167 | 159 | 8 | 95% |

**Table 20.  FY 2022 Special Protocol Assessments Resubmissions**

| SPAs with Resubmissions | Applications with 1 Resubmission | Applications with 2 Resubmissions | Applications with 3 Resubmissions | Applications with 4 Resubmissions | Total Resubmissions |
|---|---|---|---|---|---|
| 15 | 14 | 1 | 0 | 0 | 16 |

**Table 21.  FY 2022 Drug/Biological Product Proprietary Names**

| Submission Type | Goal:  90 Percent | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Proprietary Name Submitted During IND Phase | Review and respond within 180 days | 188 | 69 | 119 | 37% |
| Proprietary Name Submitted During NDA/BLA Phase | Review and respond within 90 days | 206 | 199 | 7 | 97% |

**Table 22.  FY 2022 Human Factors Protocol Submissions**

| Submission Type | Goal:  90 Percent | Received | On Time | Overdue | Percent on Time |
|---|---|---|---|---|---|
| Human Factors Protocol Submissions to NDAs, BLAs, or INDs | Respond within 60 days | 59 | 33 | 26 | 56% |

## D. Preliminary FY 2023 Procedural and Processing Performance Results

Table 23 presents preliminary performance results for FY 2023 submissions in achieving goals related to meeting management, procedural responses, and procedural notifications as outlined under PDUFA VII.

- The *progress* (i.e., the number of review activities completed or pending overdue) and the total number of submissions received for each submission type are shown in the second column.  *Current performance* includes the number of submissions reviewed *on time* (i.e., acted on by the PDUFA goal date) or *overdue* (i.e., acted on past the goal date or pending past the goal date).  *Highest possible final performance* is the best potential final performance result, which accounts for actions pending within the PDUFA goal date.

- The current performance results for submission types that are meeting the performance goal as of September 30, 2023, are shown in bold text.  FDA is currently meeting or exceeding the performance level for 15 of the 29[5] applicable procedural and processing goals (e.g., 90 percent or more reviews were completed by the goal date).  If all pending submissions are reviewed on time, FDA has the potential to meet 18 of the 28 applicable goals, as seen in the Highest Possible Final Performance column.[6]

**Table 23.  FY 2023 Preliminary Procedural and Processing Performance Results**

| Submission/Request Type | Progress | Goal:  90 Percent | FY 2023 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Type A Meeting Requests*† | 186 of 268 complete | Respond within 14 days | 87% | 91% |
| Type B Meeting Requests* | 1,864 of 1,895 complete | Respond within 21 days | **92%** | 92% |
| Type B(EOP) Meeting Requests* | 293 of 297 complete | Respond within 14 days | 87% | 87% |
| Type C Meeting Requests* | 1,439 of 1,461 complete | Respond within 21 days | **95%** | 95% |

---

[5] There are 30 procedural and processing goals, but only 29 had applicable submissions.
[6] The highest potential performance is not calculated for the two PMR goals as is it not possible to accurately predict the number of pending submissions that will be approved with PMRs.

| Submission/Request Type | Progress | Goal: 90 Percent | FY 2023 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Type D Meeting Requests* | 367 of 371 complete | Respond within 14 days | 89% | 89% |
| Type INTERACT Requests* | 106 of 111 complete | Respond within 21 days | **94%** | 95% |
| Type A Meetings Scheduled† | 139 of 233 complete | Schedule within 30 days | 71% | 82% |
| Type B Meetings Scheduled | 591 of 636 complete | Schedule within 60 days | 78% | 79% |
| Type B(EOP) Meetings Scheduled | 246 of 258 complete | Schedule within 70 days | 78% | 79% |
| Type C Meetings Scheduled | 537 of 574 complete | Schedule within 75 days | 82% | 83% |
| Type A Written Response | 11 of 11 complete | Respond within 30 days | **91%** | 91% |
| Type B Written Response | 1,013 of 1,158 complete | Respond within 60 days | 74% | 77% |
| Type B(EOP) Written Response | 25 of 28 complete | Respond within 70 days | **96%** | 96% |
| Type C Written Response | 653 of 793 complete | Respond within 75 days | 83% | 86% |
| Preliminary Response for Type B(EOP) Meetings | 198 of 253 complete | Issue no later than 5 days prior to meeting date | 89% | 92% |
| Preliminary Response for Type D Meetings | 73 of 88 complete | Issue no later than 5 days prior to meeting date | 89% | 91% |
| Preliminary Response for Type INTERACT Meetings | 20 of 30 complete | Issue no later than 5 days prior to meeting date | 75% | 83% |
| Meeting Minutes | 915 of 1,239 complete | Issue within 30 days after meeting date | **94%** | 95% |
| Responses to Clinical Holds | 261 of 278 complete | Respond within 30 days | 89% | 90% |
| Major Dispute Resolutions | 13 of 15 complete | Respond within 30 days | **92%** | 93% |
| Special Protocol Assessments | 127 of 138 complete | Respond within 45 days | **95%** | 96% |
| Proprietary Name Submitted During IND Phase | 85 of 150 complete | Review and respond within 180 days | **94%** | 97% |

| Submission/Request Type | Progress | Goal: 90 Percent | FY 2023 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Proprietary Name Submitted During NDA/BLA Phase | 186 of 235 complete | Review and respond within 90 days | **93%** | 94% |
| Human Factors Protocol Submissions to INDs | 53 of 63 complete | Respond within 60 days | 26% | 38% |

\* Excludes meetings withdrawn prior to the meeting granted/denied response goal date.
† Some meeting requests and subsequent scheduling of meetings are for requests where the type cannot be initially determined.
There were 96 undesignated meetings counted as Type A meeting requests and scheduled in the table above. Performance in all categories will change once designations are made for these requests and scheduling and will be updated in the FY 2024 PDUFA performance report.

| Submission/Request Type | Progress | Goal: 50 Percent | FY 2023 Current Performance | Highest Possible Final Performance |
|---|---|---|---|---|
| Type D Meetings Scheduled | 81 of 84 complete | Schedule within 50 days | **84%** | 85% |
| Type INTERACT Scheduled | 20 of 20 complete | Schedule within 75 days | **85%** | 85% |
| Type D Meeting Written Response | 212 of 261 complete | Respond within 50 days | **87%** | 90% |
| Type INTERACT Written Response | 23 of 28 complete | Respond within 75 days | **91%** | 93% |

## E.    Preliminary FY 2023 Procedural and Processing Performance Details

The following detailed performance information for FY 2023 cohort submissions includes the number of submissions *received*, reviewed *on time* (i.e., acted on by the PDUFA goal date), and *overdue* (i.e., acted on past the goal date or pending past the goal date). The number of submissions not yet acted on but still pending within the PDUFA goal date (*Pending Within Goal*) is also provided, along with the highest possible percent of reviews that may be completed on time (*Highest Possible Percent on Time*).

**Table 24.  FY 2023 Meeting Management**

| Type | Goal:  90 Percent | Received* | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Type A Meeting Requests†± | Respond within 14 days | 268 | 162 | 24 | 82 | 87% | 91% |
| Type B Meeting Requests± | Respond within 21 days | 1,895 | 1,721 | 143 | 31 | 92% | 92% |
| Type B(EOP) Meeting Requests± | Respond within 14 days | 297 | 255 | 38 | 4 | 87% | 87% |
| Type C Meeting Requests± | Respond within 21 days | 1,461 | 1,360 | 79 | 22 | 95% | 95% |
| Type D Meeting Requests± | Respond within 14 days | 371 | 328 | 39 | 4 | 89% | 89% |
| Type INTERACT Meeting Requests± | Respond within 21 days | 111 | 100 | 6 | 5 | 94% | 95% |
| Type A Meetings Scheduled† | Schedule within 30 days | 233 | 98 | 41 | 94 | 71% | 82% |
| Type B Meetings Scheduled | Schedule within 60 days | 636 | 459 | 132 | 45 | 78% | 79% |
| Type B(EOP) Meetings Scheduled | Schedule within 70 days | 258 | 193 | 53 | 12 | 78% | 79% |
| Type C Meetings Scheduled | Schedule within 75 days | 574 | 442 | 95 | 37 | 82% | 83% |
| Type A Written Response | Respond within 30 days | 11 | 10 | 1 | 0 | 91% | 91% |
| Type B Written Response | Respond within 60 days | 1,158 | 749 | 264 | 145 | 74% | 77% |
| Type B(EOP) Written Response | Respond within 70 days | 28 | 24 | 1 | 3 | 96% | 96% |
| Type C Written Response | Respond within 75 days | 793 | 540 | 113 | 140 | 83% | 86% |
| Preliminary Response for Type B(EOP) Meetings | Issue no later than 5 days prior to meeting date | 253 | 177 | 21 | 55 | 89% | 92% |
| Preliminary Response for Type D Meetings | Issue no later than 5 days prior to meeting date | 88 | 65 | 8 | 15 | 89% | 91% |
| Preliminary Response for Type INTERACT Meetings | Issue no later than 5 days prior to meeting date | 30 | 15 | 5 | 10 | 75% | 83% |
| Meeting Minutes | Issue within 30 days after meeting date | 1,239 | 856 | 59 | 324 | 94% | 95% |

\* Not all meeting requests are granted; therefore, the number of meetings scheduled may differ from the number of meeting requests received.  Not all scheduled meetings are held; therefore, the number of meeting minutes may differ from the number of meetings scheduled.

† Some meeting requests and subsequent scheduling of meetings are for requests where the type cannot be initially determined.  There were 96 undesignated meetings counted as Type A meeting requests and scheduled in the table above.  Performance in all categories will change once designations are made for these requests and scheduling and will be updated in the FY 2024 PDUFA performance report.

± Excludes meetings withdrawn prior to the meeting granted/denied response goal date.

| Type | Goal: 50 Percent | Received* | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Type D Meetings Scheduled | Schedule within 50 days | 84 | 68 | 13 | 3 | 84% | 85% |
| Type INTERACT Scheduled | Schedule within 75 days | 20 | 17 | 3 | 0 | 85% | 85% |
| Type D Written Response | Respond within 50 days | 261 | 185 | 27 | 49 | 87% | 90% |
| Type INTERACT Written Response | Respond within 75 days | 28 | 21 | 2 | 5 | 91% | 93% |

\* Not all meeting requests are granted; therefore, the number of meetings scheduled may differ from the number of meeting requests received.  Not all scheduled meetings are held; therefore, the number of meeting minutes may differ from the number of meetings scheduled.

### Table 25.  FY 2023 Responses to Clinical Holds

| Goal | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|
| Respond to 90 percent within 30 days | 278 | 232 | 29 | 17 | 89% | 90% |

**Table 26.  FY 2023 Major Dispute Resolutions**

| Goal | Responses* | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|
| Respond to 90 percent within 30 days | 15 | 12 | 1 | 2 | 92% | 93% |

\* This figure represents the number of FDA-generated 30-day responses to requests for review that have been received.  This figure is not representative of the number of unique appeals received that have been reviewed as there may be more than one response to an original appeal.

**Table 27.  FY 2023 Special Protocol Assessments**

| Goal | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|
| Respond to 90 percent within 45 days | 138 | 121 | 6 | 11 | 95% | 96% |

**Table 28.  FY 2023 Special Protocol Assessments Resubmissions**

| SPAs with Resubmissions | Applications with1 Resubmission | Applications with2 Resubmissions | Applications with3 Resubmissions | Applications with4 Resubmissions | Total Resubmissions |
|---|---|---|---|---|---|
| 24 | 22 | 2 | 0 | 0 | 26 |

**Table 29.  FY 2023 Drug/Biological Product Proprietary Names**

| Submission Type | Goal:  90 Percent | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Proprietary Name Submitted During IND Phase | Review and respond within 180 days | 150 | 80 | 5 | 65 | 94% | 97% |

| Submission Type | Goal: 90 Percent | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Proprietary Name Submitted During NDA/BLA Phase | Review and respond within 90 days | 235 | 173 | 13 | 49 | 93% | 94% |

**Table 30.  FY 2023 Human Factors Protocol Submissions**

| Submission Type | Goal: 90 Percent | Received | On Time | Overdue | Pending Within Goal | Current Percent on Time | Highest Possible Percent on Time |
|---|---|---|---|---|---|---|---|
| Human Factors Protocol Submissions to INDs | Respond within 60 days | 63 | 14 | 39 | 10 | 26% | 38% |

Under PDUFA VII, FDA committed to communicating details on anticipated Postmarketing Requirements (PMRs) for NME NDAs and BLAs required under Section 505(o)(3), PREA, Accelerated Approval, and the Animal Rule to the Applicant prior to the PDUFA action goal date.  These communications summarize FDA's preliminary evaluation of required post marketing studies, including the study purpose, critical study design elements including type of study and study population, timelines for discussions and engagement on the PMR for the remainder of the review cycle, and for 505(o)(3) PMRs the specific serious risk.

Below is the performance for communication of anticipated PMRs for NME NDAs and BLAs that were received in FY 2023 and approved with PMRs, regardless of approval date.

**Table 31.  FY 2023 Communication of Anticipated Postmarketing Requirements**

| Application Type | Goal: 60 Percent | Approved Applications with PMRs | On Time[1] | Overdue[2] | Current Percent on Time |
|---|---|---|---|---|---|
| Priority NME NDAs and original BLAs | Communicate PMRs 6 weeks prior to action goal date | 5 | 5 | 0 | 100% |

| | | | | | |
|---|---|---|---|---|---|
| Standard NME NDAs and original BLAs | Communicate PMRs 8 weeks prior to action goal | 0 | 0 | 0 | -- |

[1] On time refers to the number of approved applications with PMRs where the PMRs required at approval were communicated by the 6- or 8-week goal date.

[2] Overdue refers to the number of approved applications with PMRs where the PMRs required at approval were not communicated by the 6- or 8-week goal date.

## IV.    PDUFA Trend Graphs

The number of NDAs and BLAs filed from FY 2014 to FY 2023 is presented in Figure 1. The total number of all original applications (NDAs and BLAs) filed in FY 2023 increased from the number filed in FY 2022.

### Figure 1.  Total NDAs and BLAs Filed



*   FY 2022 numbers were changed to reflect updates to the data presented in the FY 2022 PDUFA performance report.

**   Some applications filed in FY 2023 have not yet received a review priority designation.  The undesignated NDAs and BLAs are counted as Priority NDAs and BLAs.  Designation may change and the table will then be updated accordingly, as appropriate, in the FY 2024 PDUFA performance report.

The median total times to approval for priority and standard applications received from FY 2013 through FY 2022 are presented in the graph below.[7]  The data represented in Figure 2 are updated based on the approvals reported in Appendix A.  FY 2023 data are too preliminary to estimate the median approval time.

### Figure 2.  Median Time to Application Approval for All Filed NDAs and BLAs (Months)



*  The median approval times for the 3 most recent years are estimated.
†  The data represented in this figure are based on the approvals reported in Appendix A.

---

[7] The total time for applications that are approved in the first cycle includes only FDA's response times.  Applications approved after multiple review cycles include both FDA's and sponsor's response times.  The *median total approval time* is the median of all application times for a given cohort, including applications with multiple review cycles.

Figure 3 depicts the percentages of priority and standard NDAs and BLAs approved in the first review cycle for the receipt cohorts from FY 2012 to FY 2022. These percentages are based on the approvals reported in Appendix A. The percentage of standard applications in first-cycle approvals decreased in FY 2022. For the FY 2022 cohort, which is still preliminary, 52 percent of standard applications were approved on the first cycle. First-cycle approvals for approved priority applications increased in FY 2022, with 81 percent of approved priority applications being approved on the first cycle. The FY 2023 data are too preliminary to estimate the percent of first-cycle approvals.

### Figure 3.  Percent of NDAs and BLAs Approved on the First Cycle



\* First-cycle approvals are still possible for FY 2022 standard applications, so the data are preliminary.

† The data were changed to reflect updates to the data presented in the FY 2022 PDUFA performance report.

\*\* The data represented in this graph are based on the approvals reported in Appendix A.

# V.    Additional PDUFA VII Commitments

Under Section VI ("Progress reporting for PDUFA VII and Continuing PDUFA VI initiatives") of the PDUFA VII Commitment Letter, FDA committed to report its progress on the specific commitments identified in the following sections of the Commitment Letter:[8]

- Section I.C:  New Molecular Entity (NME) Milestones and Postmarketing Requirements (PMRs)

- Section I.D:  Split Real Time Application Review (STAR) Pilot Program

- Section I.J:  Meeting Management Goals

- Section I.K:  Enhancing Regulatory Science and Expediting Drug Development

- Section I.L:  Enhancing Regulatory Decision Tools to Support Drug Development and Review

- Section I.M:  Enhancement and Modernization of the FDA Drug Safety System

- Section I.N:  Enhancing Related to Product Quality Reviews, Chemistry, Manufacturing, and Control Approaches, and Advancing the Utilization of Innovative Manufacturing Technologies

- Section I.O:   Enhancing CBER's Capacity to Support Development, Review, and Approval of Cell and Gene Therapy Products

- Section I.P:   Supporting Review of New Allergenic Extract Products

- Section II:     Continued Enhancement of User Fee Resource Management

- Section III:    Improving FDA Hiring and Retention of Review Staff

- Section IV:    Information Technology and Bioinformatics Goals

---

[8] https://www.fda.gov/media/151712/download.

Further, section 736B(a) of the FD&C Act, as amended by section 103 of FDARA, requires FDA to report on the Agency's performance under PDUFA VII.

FDA and industry designed these enhancements to improve the efficiency of drug development and the human drug review process.  The progress reports in this section detail the work FDA performed in FY 2023 with updates on commitments in respective sections of the Commitment Letter cited above in the list.  In addition, this report includes updates on FDA's accomplishments under Section II:  Continued Enhancing Management of User Fee Resources, Section III:  Improving FDA Hiring and Retention of Review Staff, and Section IV:  Information Technology and Bioinformatics Goals.  The Section II progress reports are duplicated in the FY 2023 PDUFA VII Financial Report.  Each accomplishment includes a reference to a specific section of the Commitment Letter.  External references are also provided to published guidances, meeting summaries, and other pertinent public information.

FDA is dedicated to the goals outlined in these sections of the Commitment Letter.  When applicable, for each section, additional information is included on other activities FDA has conducted that are not specifically committed but further the goals outlined in the Commitment Letter.

### Table 32.  FDA's Overall FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| I.A Review Performance Goals | • None |
| I.B Program for Enhanced Review Transparency and Communication for NME NDAs and Original BLAs | • None |
| I.C New Molecular Entity (NME) Milestones and Postmarketing Requirements (PMRs) | • Conduct training for Pre-Approval Review of PMRs.<br>• Implement Post Approval Review of PMRs.<br>• Implement Pre-Approval Review of PMRs.<br>• Conducted training for external and internal stakeholders related to new PMR commitments.<br>• Created and implemented new processes in DARRTS for communicating anticipated PMRs, which include two new templates and communication codes and updating and revising several other pre-existing templates.<br>• Created and implemented new processes in DARRTS for responding to postapproval release requests of PMRs, which included developing several |

<table>
<tr><td></td><td>

new letter and memo templates, and their communication and supporting document codes, and revising several pre-existing letters templates and documents.

- Collaborated on the development and dissemination of reports that track preapproval PMR communication goals and postapproval PMR release request notification goals.

- Started reviewing and updating MAPPs related to PMR commitments as appropriate.

- Continue to monitor the effectiveness of these new processes and templates making revisions as needed.

- Implemented Commitments for Pre-Approval Review of PMRs

  o Conducted Training for Pre-Approval Review of PMRs.

  o Created and implemented new processes in DARRTS for communicating anticipated PMRs, which include two new templates and communication codes and updating and revising several other pre-existing templates.

- Implemented Commitments for Post Approval Review of PMRs

  o Created and implemented new processes in DARRTS for responding to postapproval release requests of PMRs.

  o Developed several new letter and memo templates, and their communication and supporting document codes, and revising several pre-existing letters templates and documents.

</td></tr>
<tr><td>

I.D Split Real Time Application Review (STAR) Pilot Program

</td><td>

- Implement STAR Pilot Program

  o The STAR Pilot Program became available for qualifying efficacy supplements beginning on October 1, 2022.

  o Business processes, tools, and templates were developed to facilitate the program.

- Develop STAR Web Page

  o A public-facing web page (https://www.fda.gov/drugs/development-resources/split-real-time-application-review-star) was created on FDA.gov to provide further information for the STAR program.

- Conduct STAR Employee Training

  o An internal STAR program resource page was made available in October 2022.

  o Internal training related to STAR processes was provided beginning in October 2022. STAR training was recorded for future use.

</td></tr>
</table>

| | |
|---|---|
| I.E Expedited Reviews | • None |
| I.F Review of Proprietary Names to Reduce Medication Errors | • None |
| I.G Major Dispute Resolution | • None |
| I.H Clinical Holds | • None |
| I.I Special Protocol Assessment and Agreement | • None |
| I.J Meeting Management Goals | • FDA updated IT systems with new timelines and definitions to accommodate the following new PDUFA VII meeting types/interactions:<br><br>  ○ INTERACT Meetings<br>  ○ Type D Meetings<br>  ○ Written Response for Clarification<br><br>• FDA also published a revised draft *Guidance on Formal Meetings Between FDA and Sponsors* (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-pdufa-products).<br><br>• Additionally, FDA is planning for internal assessments of meetings to prepare for and support a public workshop to discuss meeting best practices by July 30, 2024. |

## A. Section I.K:  Enhancing Regulatory Science and Expediting Drug Development

### Table 33.  Section I.K's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| I.K.1 Promoting Innovation Through Enhanced Communication Between FDA and | • FDA is actively planning and preparing for the public workshop to discuss meeting best practices, to be held by no later than July 30, 2024. |

| | |
|---|---|
| Sponsors During Drug Development | |
| I.K.2 Ensuring Sustained Success of Breakthrough Therapy Program | • None |
| I.K.3 Early Consultation on the Use of New Surrogate Endpoints | • None |
| I.K.4 Advancing Drug Development of Drugs for Rare Diseases | **OVERALL**<br><br>Advancing drug development for rare diseases is a cross-Agency collaborative effort. In FY 2023, CDER's Rare Diseases Team (RDT) and the Center for Biologics Evaluation and Research (CBER) engaged in critical rare disease drug development enhancement activities. In FY 2023, CDER's Accelerating Rare disease Cures Program (CDER ARC Program), which was launched in May 2022, worked to accelerate, and promote the development of effective and safe treatment options that address the unmet needs of patients with rare diseases. The CDER ARC Program is managed by the RDT and is governed by senior leadership in policy, review, and engagement from CDER's Office of the Center Director, Office of New Drugs (OND) and Office of Translational Sciences (OTS).  CBER collaborates with CDER on specific cross-cutting efforts under the CDER ARC Program.<br><br>**EXPERTISE IN REVIEW**<br><br>• In FY 2023, the RDT continued to consult on or contribute to the approval of rare disease drug applications across the review divisions in OND regarding the design of trials, the assessment of substantial evidence of effectiveness, the selection of endpoints and the labeling of rare disease products.<br><br>• CBER continued to ensure that its review offices considered flexible and feasible approaches in the review of biologics for rare diseases through sharing of expert review practices and case study presentations during CBER Rare Disease Coordinating Committee meetings.<br><br>• CDER's Office of Rare Diseases, Pediatrics, Urologic and Reproductive Medicine (ORPURM), in conjunction with the RDT, continued to facilitate CDER's Rare Disease Drug Development Council meetings. Members of CDER's Division of Rare Diseases and Medical Genetics (DRDMG) and RDT serve on the council. The council meetings are a forum (1) to discuss cross-cutting rare disease issues with leaders in rare disease drug development across OND and OTS and (2) to solicit input from OND and OTS on rare disease applications. |

- The RDT is the CDER program lead for the development and implementation of the PDUFA VII Rare Disease Endpoint Advancement (RDEA) Pilot Program. This joint CDER/CBER pilot program supports novel efficacy endpoint development for rare disease treatments. FDA began receiving RDEA proposal submissions for quarter 4 of 2023 on July 1, 2023, with a submission deadline of September 30, 2023.  One submission will be selected for quarter 4 of 2023. The program will continue receiving quarterly submissions through June 2027, with the goal of admitting up to three proposals per year into the program.

- The RDT worked closely with other offices within CDER to continue to provide expertise for the rare disease pediatric voucher program.

- In July 2023, DRDMG and CBER's Office of Therapeutic Products launched an informal forum for quarterly internal reviewer discussion of rare disease products and indications. This informal forum serves as an opportunity for CBER and CDER medical officers to interact and work more closely together on rare disease specific issues that are relevant to both centers.

- In September 2023, CBER and CDER jointly announced the Support for clinical Trials Advancing Rare Disease Therapeutics (START) pilot program. The goal of the START pilot program is to further accelerate the pace of development of certain CBER- and CDER- novel drug and biological products that are intended to treat a rare disease by addressing issues related to the development of individual products through more rapid communication mechanisms.  In CDER, the START pilot program is being implemented by RDT and in CBER, it is being implemented by the Office of Therapeutic Products.

**<u>EDUCATION AND TRAINING</u>**

- In FY 2023, the RDT and CBER continued to train CDER and CBER review staff, as well as other FDA staff, in areas of rare disease drug development.

- In September 2023, the RDT, in collaboration with CBER and other FDA offices, held a 2-day annual reviewer training event titled *The Role of Translational Science and Confirmatory Evidence in Rare Disease Product Development*.  This training focused on presentations, discussion, successful rare disease case examples from CDER and CBER, and RDT regulatory research projects related to the newly released guidance *Demonstrating Substantial Evidence of Effectiveness Based on One Adequate and Well-Controlled Clinical Investigation and Confirmatory Evidence*.  Over 500 staff attended the program.

- The RDT hosts a rare diseases seminar series.  During these seminars, which host internal and external speakers for all FDA staff, timely and innovative topics pertaining to rare diseases are presented, such as

information on model informed drug development in rare diseases or the complexities of disease agnostic platform trials for rare diseases. CBER staff were integral contributors of topic ideas to this series.

- The RDT, in conjunction with DRDMG and ORPURM, distributed an internal FDA rare disease newsletter, Zebragram. The newsletter, for FDA staff, provided not only news relating to rare disease science, regulations, and policies within OND, across the Agency, and with key stakeholders, but also on information about rare disease drug and biological product applications from across CDER and CBER. CBER's rare disease program staff routinely contributed content to this newsletter on CBER rare disease activities and ensured a wide distribution of it within its Center.

**EXTERNAL OUTREACH**

- In FY 2023, the RDT, in collaboration with CBER, continued its outreach activities with external stakeholders to advance rare disease drug development by engaging and presenting at multiple meetings, poster presentations, and speaking engagements, and by publishing on regulatory rare disease topics.

- In FY 2023, CDER, in conjunction with the RDT, enhanced the CDER ARC Program website[9] with rare disease information and resources to create a "one-stop site" for external stakeholders and FDA staff. CDER also launched its quarterly CDER ARC Program newsletter in November 2022 to provide external stakeholders and FDA staff with highlights of rare disease drug development news.

- The RDT and CBER rare disease program staff interacted with FDA's Office of Orphan Products Development (OOPD) on rare disease activities, such as bimonthly planning meetings for and participation in FDA Rare Disease Day 2023, which was a public meeting, titled *Intersections with Rare Diseases: A Patient-Focused Event*, on February 27, 2023. The RDT and CBER staff also contributes to the review of extramural grants on natural history studies for the OOPD's Rare Neurodegenerative Disease Grant Program.

- CDER-RDT, CBER, the Center for Devices and Radiological Health, and the Office of the Commissioner's rare disease subject-matter experts participated in the October 2022 NORD Summit by coordinating an FDA plenary session on real-world data and real-world evidence. The RDT also facilitated FDA participation in other sessions and presented two posters at the Summit, one on novel drug approvals and the other on the International Rare Disease Cluster. The RDT and CBER also reviewed abstracts for selection of Summit poster presentations.

---

[9] https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/accelerating-rare-disease-cures-arc-program.

|  | <ul><li>In May 2023, the RDT, along with CDER's Office of Biostatistics and the Johns Hopkins University Center of Excellence in Regulatory Science and Innovation (CERSI), co-sponsored a 2-day workshop called *Addressing Challenges in the Design and Analysis of Rare Disease Clinical Trials: Considerations and Tools*.[10]  The workshop provided information on collection and use of fit-for-purpose data for rare disease drug development, and adaptive design and analysis methods in small population clinical trials.  This workshop targeted academic investigators, patient groups, and small or emerging pharmaceutical or biotechnology companies that are often the sponsors for rare disease drug development but may lack regulatory experience.</li><li>In May 2023, CDER, in collaboration with the University of Maryland CERSI, co-sponsored a 1-day workshop titled *Creating a Roadmap to Quantitative Systems Pharmacology-informed Rare Disease Drug Development*.[11]  This workshop included presentations on the potential utility and challenges of quantitative systems pharmacology in rare disease drug development.</li><li>In June 2023, CDER and CBER in collaboration with the Duke-Margolis Center for Health Policy held the first public workshop, *Rare Disease Endpoint Advancement Pilot Program Workshop:  Novel Endpoints for Rare Disease Drug Development*, of the RDEA Pilot Program.[12]  Topics included case study presentations on different types of endpoints and RDEA program overview, process, and requirements.  The RDEA Pilot Program external web page[13] was significantly expanded in early June 2023.</li><li>CDER ARC Program's Learning and Education to ADvance and Empower Rare Disease Drug Developers (LEADER 3D) is RDT's initiative focused on developing and disseminating accessible educational materials for Rare Disease Drug Development (RDDD) stakeholders.  Internal FDA and external outreach was conducted via interviews and public docket comments seeking input to identify knowledge gaps for stakeholders about regulatory process of rare disease drug development.  The information gathered from stakeholders was divided into six relevant topics of interest (1) nonclinical, (2) dose-finding, (3) natural history studies and registries, (4) novel endpoints and biomarkers, (5) clinical trial design and analysis, and (6) RDDD regulatory considerations.  An analysis of the information gathered will be used to inform the development and dissemination of educational materials specific to RDDD.</li></ul> |

---

[10] https://www.fda.gov/drugs/news-events-human-drugs/fda-cder-jhu-cersi-workshop-addressing-challenges-design-and-analysis-rare-disease-clinical-trials.
[11] https://cersi.umd.edu/event/17946/creating-a-roadmap-to-quantitative-systems-pharmacology-informed-rare--disease-drug-development.
[12] https://www.fda.gov/drugs/news-events-human-drugs/fda-cder-and-cber-duke-margolis-center-health-policy-rare-disease-endpoint-advancement-pilot-program.
[13] https://www.fda.gov/drugs/development-resources/rare-disease-endpoint-advancement-pilot-program.

|  | • In June 2023, the RDT and CDER's OTS presented a poster, *Confirmatory Evidence of Effectiveness Used to Support Non-Oncologic Rare Disease Novel Drug Marketing Application Approvals, CY 2020 – 2022,* at the 2023 FDA Science Forum.<br><br>• In August 2023, RDT presented a poster, *Rare Disease Patient Experience Use in Clinical Trial Design and Endpoint Selection for Novel Orphan Drug Development*, at the FDA Annual Student Scientific Research Day.<br><br>• The RDT led and facilitated the International Rare Diseases Cluster for FDA.  In addition to including CDER and CBER at the FDA, this cluster includes two other regulatory agencies—namely, the European Medicines Agency and Health Canada. These cluster meetings include exchange of information on the development and scientific evaluation of medicines for rare diseases, such as conducting clinical trials in small populations, obtaining preclinical evidence to support development programs, risk management strategies for long-term safety issues and the design of post-marketing studies. In FY 2023, there were 9 cluster meetings discussing 20 topics.  CBER staff gave presentations at four of the nine Cluster meetings held with the European Medicines Agency and Health Canada.<br><br>• The RDT and CBER rare disease program staff participate on the International Rare Diseases Research Consortium's (IRDiRC's) Regulatory Science Committee, which includes representation from regulatory bodies, patient groups, the biotech and pharmaceutical industries, public and not-for-profit organizations, clinicians, and scientists. The committee works to identify pathways for regulatory harmonization in consideration of global regulatory challenges surrounding therapeutic innovation in rare disease drug development. In March 2023, the RDT and CBER rare disease program staff presented at the RE(ACT) Congress and IRDiRC conference in Berlin, Germany.<br><br>• CDER and CBER rare disease experts collaboratively ensured the relevance of rare diseases for four guidance documents for industry to facilitate rare disease drug development. Two of these were draft guidances —one titled *Considerations for the Design and Conduct of Externally Controlled Trials for Drugs and Biological Products*[14] and one titled *Demonstrating Substantial Evidence of Effectiveness Based on One Adequate and Well-Controlled Clinical Investigation and Confirmatory Evidence.*[15]  The third guidance, *Considerations for the Use of Real-World Data and Real-World Evidence To Support Regulatory Decision-Making for Drug and Biological Products,*[16] and the fourth guidance, *Rare Diseases:  Considerations for the* |
|---|---|

[14] https://www.fda.gov/media/164960/download.
[15] https://www.fda.gov/media/172166/download.
[16] https://www.fda.gov/media/171667/download.

*Development of Drugs and Biological Products*[17] finalized a draft guidance on this topic.  In addition, DRDMG issued the revised draft guidance *Inborn Errors of Metabolism That Use Dietary Management: Considerations for Optimizing and Standardizing Diet in Clinical Trials for Drug Product Development.*[18]

- In February 2023, the CDER ARC Program announced the addition of "Original Rare Disease Application Approval" and "Novel Rare Disease Drugs Approval" filters to CDER's Drugs and Biologics Dashboard on FDA-TRACK.[19]  FDA-TRACK is an agency-wide performance management program that reports on performance measures and key projects for various FDA Centers and Programs. With this new filter, visitors can toggle-view the history of CDER's cumulative drug approvals to view those which were approved for the treatment of rare diseases. This information, curated by the RDT, provides a more accessible view to the rare disease community about the development and approval of safe and effective drugs to treat rare diseases. Current rare disease approval information is provided for September 1, 2022, to June 30, 2023. The FDA-TRACK will be updated quarterly with additional rare disease information.

- ORPURM, DRDMG, and the RDT made over 30 presentations to the public on various rare disease topics.

- CDER staff and reviewers in DRDMG published an FDA approval summary for Lonafarib, a drug treatment for two rare conditions, Hutchinson-Gilford progeria syndrome and processing-deficient progeroid laminopathies.[1]  In addition, the RDT and other CDER staff contributed to various chapters of the book *Drug Development for Rare Diseases.*[2]

- In the first three quarters of FY 2023, CBER staff participated in a minimum of 132 outreach activities intended to support the development of biological products for rare diseases. These activities included presentations (72%), publications (20%), and posters/abstracts (8%) internal to FDA and diverse external rare disease stakeholders.

- The RDT and CBER staff attended multiple Patient-Focused Drug Development (PFDD) and Patient Listening Sessions for rare diseases. The PFDD meetings, some of which were hosted by patient organizations, provided a systematic approach to help ensure that patients' experiences, perspectives, needs, and priorities are captured and meaningfully incorporated into drug development and evaluation. These listening sessions enabled FDA medical product centers to

---

[17] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/rare-diseases-considerations-development-drugs-and-biological-products.
[18] https://www.fda.gov/media/114764/download.
[19] https://www.fda.gov/about-fda/fda-track-agency-wide-program-performance/fda-track-center-drug-evaluation-and-research-pre-approval-safety-review-drugs-and-biologics.

|  | engage informally with patients and caregivers, including those belonging to under-represented communities, allowing them to share with the Agency their experiences living with a disease/condition. Similar to PFDD meetings, the listening sessions help the Agency inform medical product development, clinical trial design, patient preferences, and shape regulatory thinking.<br><br>• In FY 2023, CBER held the following rare disease-relevant workshops and webinars on cell and gene therapy topics for industry and patient stakeholders, including:<br><br>　o OTP Town Hall: *Nonclinical Assessment of Cell and Gene Therapy Products*[20]<br>　o *Methods and Approaches for Capturing Post-Approval Safety and Efficacy Data on Cell and Gene Therapy Products*[21]<br>　o OTP Town Hall: *Gene Therapy Chemistry, Manufacturing, and Controls* – April 2023[22]<br>　o *Clinical Trials: The Patient Experience*[23]<br>　o OTAT Town Hall: *Clinical Development of Gene Therapy Products for Rare Diseases*[24]<br><br>In August 2023, CBER launched the web page CBER Rare Disease Program,[25] a new, publicly available, rare disease resource.  This page includes highlights of CBER Rare Disease Program activities including collaborative efforts with partners at FDA and beyond.  The page also provides annual listings of CBER's recent orphan approvals starting from 2022 and CBER Rare Disease Program Frequently Asked Questions | FDA.[26] |
|---|---|
| Would I.K.5 Advancing Development of Drug-Device and Biologic-Device Combination Products Regulated by CBER and CDER | • Establish review of Human Factors Validation Study protocols<br><br>　o Updated human factors validation study protocol review templates and best practice documents to facilitate review and provide sponsor with written comments for 90% of human factors validation protocol submissions within 60 days of receipt of protocol submission.<br><br>• Establish review of use-related risk analysis |

---

[20] https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/otp-town-hall-nonclinical-assessment-cell-and-gene-therapy-products-08302023.

[21] https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/methods-and-approaches-capturing-post-approval-safety-and-efficacy-data-cell-and-gene-therapy.

[22] https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/otp-town-hall-gene-therapy-chemistry-manufacturing-and-controls-april-2023-04252023.

[23] https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/clinical-trials-patient-experience-04132023.

[24] https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/otat-town-hall-clinical-development-gene-therapy-products-rare-diseases-02072023.

[25] https://www.fda.gov/vaccines-blood-biologics/cber-rare-disease-program.

[26] https://www.fda.gov/vaccines-blood-biologics/cber-rare-disease-program-frequently-asked-questions.

| | |
|---|---|
| | ○ Updated use-related risk analysis review templates and best practice documents to facilitate review and provide sponsor with written comments for 50% of filed submissions, within 60 days of receipt of submission for FY 2024. |
| I.K.6 Enhancing Use of Real-World Evidence for Use in Regulatory Decision-Making | • Announced establishment of the Advancing Real-World Evidence Program in a *Federal Register* notice (FRN) (https://www.federalregister.gov/documents/2022/10/20/2022-22795/advancing-real-world-evidence-program) and provided additional program details on the Advancing Real-World Evidence web page (https://www.fda.gov/drugs/development-resources/advancing-real-world-evidence-program) (I.K.6.a & I.K.6.b).<br><br>• Completed evaluation and selection of initial meeting requests received for first semi-annual submission cycle ending March 31, 2023 (I.K.6.b). |

## B.    Section I.L:  Enhancing Regulatory Decision Tools to Support Drug Development and Review

**Table 34.  Section I.L's FY 2023 Commitments and Accomplishments**

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| I.L.1 Enhancing the Incorporation of the Patient's Voice in Drug Development and Decision-Making | • In April 2023, FDA published the draft guidance document *Patient-Focused Drug Development: Incorporating Clinical Outcome Assessments into Endpoints for Regulatory Decision-Making* (PFDD Guidance 4).[27] The comments will be reviewed and considered as part of the process to finalize this guidance document.<br><br>• In May 2023, FDA conducted a public webinar to provide an overview of PFDD Guidance 4 and to answer stakeholder questions.<br><br>• In May 2023, FDA issued a public docket to collect comments on methodological challenges related to patient experience data.[28] The comments will be summarized, will help FDA (1) plan two public workshops focused on methodological issues and (2) identify priorities for future work.<br><br>• FDA staff members continued to interact with patient stakeholders to systematically obtain the patient perspective on specific diseases and their treatments. These interactions included conducting one FDA-led PFDD meeting on Long COVID, participating in 18 Patient Listening Sessions, and |

---

[27] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/patient-focused-drug-development-incorporating-clinical-outcome-assessments-endpoints-regulatory.
[28] https://www.federalregister.gov/documents/2023/05/02/2023-09265/methodological-challenges-related-to-patient-experience-data-request-for-information-and-comments.

|  | participating in 12 externally led PFDD meetings. FDA staff across review divisions were also active participants at many patient-led meetings such as the *National Organization for Rare Disorders (NORD) Annual Summit, Patients as Partners,* the *International Rett Syndrome Foundation Annual Meeting*, and many others.<br><br>• FDA continued the Standard Core Clinical Endpoints and Grant Program that (1) funds the development of core outcome sets in a variety of clinical divisions and (2) increases the familiarity and understanding of the development of Clinical Outcome Assessments within review divisions and other areas.<br><br>• FDA continued to strengthen its capacity to facilitate the development and use of Patient-Focused methods to inform drug development and regulatory decisions. FDA expanded internal staff training and external outreach to industry sponsors and other involved stakeholders with an emphasis on PFDD methods and tools-related guidance to achieve broad acceptance and integration into regulatory decision-making across review divisions and industry development programs.<br><br>    ○ FDA provided staff trainings on Patient-Focused methodologies. These trainings included a training on PFDD Guidance 4 which was provided to the CDER Office of Biostatistics in November 2022 and a widely attended training for reviewers from across the Agency on the *Patient-Focused Drug Development Guidance* series, that was hosted by the FDA Statistical Association in September 2023. In addition, FDA staff provided ongoing just-in-time in-service trainings to review divisions throughout the fiscal year.<br><br>    ○ FDA conducted targeted outreach to industry and methodological consulting organizations to provide a variety of presentations, sessions, and resources. Selected examples include participation in multiple FDA public webinars as well as participating as moderators, presenters and panelists in meetings hosted by the Professional Society for Health Economics and Outcomes Research (ISPOR), the Drug Information Association (DIA) Annual Global Meeting, the Biotechnology Innovation Organization (BIO) International Convention, the Duke-Industry Statistics Symposium, and the NHLBI Biostatistics Workshop on Clinical Trial Designs. In addition, FDA continued to engage an external expert through the Intergovernmental Personnel Act to support the review of patient experience data. |
|---|---|
| I.L.2 Enhancing the Benefit-Risk Assessment in Regulatory Decision-Making | • None |
| I.L.3 Advancing Model-Informed | • On Jan. 11, 2023, an FRN was published (https://www.fda.gov/media/151712/download) announcing the continuation of the MIDD Paired Meeting Program. |

| Drug Development | • FDA continued to select proposals on a quarterly basis for the Model-Informed Drug Development Paired Meeting Program. A cross-center internal review committee convened every quarter to review and provide recommendations on prioritization and selection of proposals. Industry meetings were led by the Office of Clinical Pharmacology and consisted of a multidisciplinary team to ensure alignment across disciplines.<br><br>• The Office of Clinical Pharmacology granted six MIDD meeting requests out of eight meeting requests received from October 2022 to September 2023.<br><br>• A working group was created to develop a Request for Information (RFI) to gather public input on priority focus areas for future policy development and stakeholder engagement. |
|---|---|
| I.L.4 Enhancing Capacity to Review Complex Innovative Designs | • Published an FRN on October 20, 2022 (https://www.federalregister.gov/documents/2022/10/20/2022-22794/complex-innovative-design-paired-meeting-program) for the Paired Meeting Program. |
| I.L.5 Enhancing Capacity to Support Analysis Data Standards for Product Development and Review | • None |
| I.L.6 Enhancing Drug Development Tools Qualification Pathway for Biomarkers | • None |

## C.    Section I.M:  Enhancement and Modernization of FDA's Drug Safety System

### Table 35.  Section I.M's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| I.M.1 Modernization and Improvement of REMS Assessments | • Establish Review Performance Goals for Risk Evaluation and Mitigation Strategy (REMS) methodological approaches and study protocols |

| | |
|---|---|
| | o Created and implemented goal dates in DARRTS for REMS Methodology submissions<br><br>o Created new communication and supporting document codes in DARRTS to support the REMS methodology review process<br><br>o Developed and cleared new letter templates to support the REMS methodology review process.  The letter templates are available in the CDER Standard Templates SharePoint site<br><br>o Updated the 356h form and instructions to include REMS methodology submissions<br><br>o Developed a report to track REMS methodology goal dates |
| I.M.2 Optimization of the Sentinel Initiative | • Conduct Public Workshop on Negative Controls<br><br>FDA satisfied the commitment to complete a public workshop on use of negative controls by September 30, 2023.<br><br>o FDA hosted a virtual public workshop titled *Understanding the Use of Negative Controls to Assess the Validity of Non-Interventional Studies of Treatment Using Real-World Evidence* on March 8, 2023.<br>o Subject matter experts provided their perspectives on basic concepts for use of negative controls and presented examples of specific analytic approaches.<br>o Scientists from CBER and CDER described their proposed methods development projects and requested feedback from the public through comments submitted to the FRN and comments provided on the day of the workshop.<br><br>• Conduct Public Workshop on Post Market Pregnancy Data<br><br>FDA satisfied the commitment to complete a public workshop on pregnancy safety studies by September 30, 2023.<br><br>o FDA hosted a 2-day, hybrid public workshop titled *Optimizing the Use of Postapproval Pregnancy Safety Studies* on September 18 and 19, 2023.<br><br>o The workshop discussed considerations for further development of a framework that describes how data from different types of postapproval pregnancy safety studies might optimally be used when it has been determined that these data should be collected. |

## D. Section I.N:  Enhancements Related to Product Quality Reviews, Chemistry, Manufacturing, and Control Approaches, and

## Advancing the Utilization of Innovative Manufacturing Technologies

### Table 36.  Section I.N's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| I. N.1 Enhancing Communication Between FDA and Sponsors During Application Review | • CDER/OPQ updated NDA Integrated Quality Assessment (IQA) SOP (OPQ-ALL-SOP-0006), the NDA IQA Assessment Guide, and the NDA IQA Template. CDER/OPQ also conducted a chemistry, manufacturing, and control (CMC) assessment training via the Quality Management Information System, which is due for completion on September 20, 2023.<br><br>• CDER/OPQ updated and externally published the MAPP 5016.8, Rev. 1 (Four-Part Harmony MAPP) (https://www.fda.gov/media/171613/download?attachment) on August 25, 2023, with an effective date of September 22, 2023.<br><br>• CDER/OPQ conducted live training for the revised Four Part Harmony MAPP on September 15, 2023. The recorded training was posted in LMS on September 20, 2023.<br><br>• CBER updated SOPP 8401.1 to include requirements for information requests to be written in Four-Part Harmony with an effective date of October 1, 2022: https://www.fda.gov/media/85301/download. CBER conducted two live trainings on Four-Part Harmony on May 31, 2023, and July 21, 2023. The recorded training was posted internally on July 31, 2023. |
| I. N.2 Enhancing Inspection Communication for Applications, not Including Supplements | • Enhance Inspection Communication for Applications<br><br>  o Enhanced communications inspection language has been included in the revised compliance program for Pre-Approval inspection (PAI) and Pre-License inspection (PLI). |
| I.N.3 Alternative Tools to Assess Manufacturing Facilities Named in Pending Applications | • Publish Draft Guidance on Alternative Tools to Assess Manufacturing Facilities<br><br>  o The draft guidance published on September 22, 2023, and can be found on FDA's public website (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/alternative-tools-assessing-drug-manufacturing-facilities-identified-pending-applications). |
| I.N.4 Facilitating Chemistry, Manufacturing, and Controls Readiness for Products with | • Implemented the CMC Development and Readiness Pilot Program on April 1, 2023.<br><br>• Published the FRN announcing the CMC Development and Readiness Pilot Program on October 31, 2022. |

| Accelerated Clinical Development | • On September 11, 2023, the Year 2 FRN was published (https://www.federalregister.gov/documents/2023/09/11/2023-19502/chemistry-manufacturing-and-controls-development-and-readiness-pilot-program-program-announcement<br><br>• Published CDER's MAPP 5015.13, Quality Assessment for Products in Expedited Programs (effective December 7, 2022) (https://www.fda.gov/media/162786/download).<br><br>• Created the CMC Development and Readiness Pilot website on March 16, 2023 (https://www.fda.gov/drugs/pharmaceutical-quality-resources/chemistry-manufacturing-and-controls-development-and-readiness-pilot-cdrp-program).<br><br>• CDER accepted one applicant's request to participate in the pilot program and has proceeded to disclosure agreement discussions.<br><br>• CBER described the CDRP program in several conferences and OTP CGT Town Hall meetings, to make sponsors aware of this new initiative.<br><br>• CBER developed various job aids, letter templates, review templates and a tracker to follow the status of these applications.<br><br>• CBER received three applications with two in OTP and one in OVRR. Of these three applications, two applications did not qualify as they did not meet specific pre-requisites for enrollment in the program such as not having either BT or RMAT designations.<br><br>• One application was eligible and has been selected for further evaluation and has proceeded to disclosure agreement discussions. |
|---|---|
| I.N.5 Advancing Utilization and Implementation of Innovative Manufacturing | • *The Innovative Manufacturing Public Workshop* was held on June 8, 2023 (https://healthpolicy.duke.edu/events/advancing-utilization-and-supporting-implementation-innovative-manufacturing-approaches). The FRN was posted on April 26, 2023. (https://www.federalregister.gov/documents/2023/04/24/2023-08545/advancing-the-utilization-and-supporting-the-implementation-of-innovative-manufacturing-approaches) |

## E. Section I.O:  Enhancing CBER's Capacity to Support Development, Review, and Approval of Cell and Gene Therapy Products

### Table 37.  Section I.O's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|

| I.O.1 Patient-Focused Drug Development | • FDA conducted a PFDD public meeting on gene therapy products.<br><br>○ FDA hosted a virtual patient-focused drug development listening meeting titled *FDA CBER OTAT Patient-Focused Drug Development Listening Meeting — Patient Perspectives on Gene Therapy Products* on November 15, 2022.<br><br>○ This virtual listening meeting was an opportunity for patients, caregivers, patient advocates, and other important stakeholders to share their understanding and expectations regarding gene therapy risks and benefits and involvement in clinical study design and execution for these products. |
|---|---|
| I.O.2 Novel Approaches to Development of Cell and Gene Therapy | • None |
| I.L.3 Advancing Model-Informed Drug Development | • None |
| I. O.4 Leveraging Knowledge | • None |

## F. Section I.P:  Supporting Review of New Allergenic Extract Products

### Table 38.  Section I.P's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| I.P.1 Allergenic Extract Products Licensed After October 1, 2022 | • Incorporate Review of Allergenic Extract Products<br><br>○ CBER updated all relevant SOPPs, process documents, and templates to reflect allergenic extracts covered under PDUFA VII and posted the updates internally and externally on September 30, 2022.<br><br>○ CBER trained staff on September 16, 2022, and September 19, 2022, on allergenic extract products and posted the recording internally. |
| I.P.2 Allergenic Extract Products Licensed Before October 1, 2022 | • None |

## G. Section II:  Enhancing the Management of User Fee Resources

### Table 39.  Section II's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| II.A Resource Capacity Planning and Modernized Time Reporting | • The Resource Capacity Planning Implementation Plan (https://www.fda.gov/media/166677/download?attachment) was published in March 2023. |
| II.B Financial Transparency and Efficiency | • FDA published the FY 2023 PDUFA Five-Year Financial Plan update (see https://www.fda.gov/about-fda/user-fee-reports/user-fee-five-year-financial-plans) in April 2023 (II.B.2).<br><br>• FDA held a public meeting on the FY 2023 financial plan on June 8, 2023 (see https://www.fda.gov/drugs/news-events-human-drugs/2023-financial-transparency-and-efficiency-prescription-drug-user-fee-act-biosimilar-user-fee-act) (II.B.3). |

## H. Section III:  Improving FDA's Hiring and Retention of Review Staff

### Table 40.  Section III's FY 2023 Commitments and Accomplishments

| Commitment Title | FY 2023 Accomplishments |
|---|---|
| III.A Set Clear Goals for Human Drug Review Program Hiring | • FDA has provided updated hiring data for FY 2023 PDUFA VII hires by posting the information on the public website within 2 weeks past the end date of the quarter.  The numbers can be found on the website at https://www.fda.gov/industry/prescription-drug-user-fee-amendments/pdufa-and-bsufa-quarterly-hiring-updates.<br><br>• In August, FDA has also began providing updated net hiring data on the public website.  The hiring data can be found here at https://www.fda.gov/industry/fda-user-fee-programs/center-drug-evaluation-and-research-center-biologics-evaluation-and-research-net-hiring-data-fy-2023 |
| III.B Assessment of Hiring and Retention | • None |

# I.  Section IV:  Information Technology and Bioinformatics Goals

## Table 41.  Section IV's FY 2023 Commitments and Accomplishments

| Goal | FY 2023 Accomplishments |
|------|-------------------------|
| IV.A Enhancing Transparency and Leveraging Modern Technology | • FDA conducted the annual PDUFA VII FDA-Industry IT Leadership meeting kickoff on March 9, 2023.<br><br>• FDA Published Data Standards Action Plan FY 2023<br><br>    o Quarter 1 (version 1.0) on March 2, 2023,<br>    o Q2 (v1.1) on May 10, 2023, and<br>    o Q3 (v1.2) on August 18, 2023<br><br>• FDA published the Data Standards Catalog<br><br>    o Version 9.0 on January 25, 2023, and<br>    o Version 9.1 on April 19, 2023<br><br>• FDA held quarterly PDUFA standing meetings with industry on November 15, 2022; February 7, 2023; June 6, 2023; and September 12, 2023.<br><br>• FDA's Data and IT Modernization Strategy was completed early on September 19, 2023, and posted to the *Federal Register* (https://www.federalregister.gov/d/2023-20136) for public comments (to close on October 30, 2023)<br><br>• CBER drafted its Modernization Roadmap and ensured its alignment with FDA's overall strategy<br><br>    o CBER's IT Modernization Roadmap was published on May 26, 2022. The Roadmap was shared with public stakeholders at conferences, such as RAPS convergence in September 2022 and the PDUFA annual meeting with industry in September 2023.<br><br>    o Updates to the roadmap, performance metrics, and accomplishments and challenges were shared at the annual leadership meeting held on March 9, 2023.<br><br>    o Updates to the roadmap  were also presented at the PDUFA annual meeting with industry in September 2023.<br><br>• FDA completed an assessment on challenges and barriers to cloud technologies.  A summary of the assessment's findings will be publicly available within 6-months of the assessment completion.<br><br>• FDA completed the enhancement of internal systems to support the review and tracking of Digital Health Technology (DHT)-related submissions |

| | |
|---|---|
| | • FDA launched the first cloud-based demonstration project focused on the receipt, validation, cleansing, and analysis of DHT data on a third-party platform.<br><br>   o FDA held a listening session with industry on September 12, 2023, to identify potential additional demonstration projects.<br><br>   o CBER assessed PDUFA bioinformatics capabilities as part of the PDUFA VII Agreement to assure support for bioinformatic activities and computational biology used in the review of human drugs and biologics. A summary will be shared at the Leadership meeting. |
| IV.B Expanding and Enhancing Bioinformatics Support | • None |
| IV.C Enhancing Use of Digital Health Technologies to Support Drug Development and Review | • FDA satisfied the following end of FY 2023's quarter 2 commitments that support the use of DHTs in drug development.<br><br>   o Published the Framework for the Use of Digital Health Technologies in Drug and Biological Product Development (https://www.fda.gov/media/166396/download?attachment) (IV.C.1).<br><br>   o Established a DHT committee and made its purpose publicly available on the newly developed DHT for Drug Development web page (https://www.fda.gov/science-research/science-and-research-special-topics/digital-health-technologies-dhts-drug-development) (IV.C.2).<br><br>   o On March 28-29, 2023, convened the first of a series of five public meetings with key stakeholders titled *Understanding Priorities for the Use of DHTs to Support Clinical Trials for Drug Development and Review* (see https://healthpolicy.duke.edu/events/digitalhealthtechnologies) (IV.C.3).<br><br>• FDA published, in December 2021, the draft guidance *Digital Health Technologies for Remote Data Acquisition in Clinical Investigations* (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/digital-health-technologies-remote-data-acquisition-clinical-investigations).  FDA is working toward finalizing the draft guidance (IV.C.5).<br><br>• FDA published, on September 19, 2023, the draft guidance *Regulatory Considerations for Prescription Drug Use-Related Software* (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/regulatory-considerations-prescription-drug-use-related-software), which satisfies the Agency's commitment to publish it by the end of FY 2023 (IV.C.6).<br><br>• Enhance Internal Systems to Support DHT Review |

| | |
|---|---|
| | ○ On March 20, 2023, FDA completed the enhancement of its internal systems to support the review and tracking of DHT-related submissions<br><br>• Establish DHT Secure Cloud Technology<br><br>○ FDA has already established a secure cloud technology, which interacts with over 30 cloud-service providers and hosts over 100 cloud-based systems.<br><br>○ FDA's IT modernization strategy and objectives are outlined in Technology, Data, Enterprise, Cybersecurity, and Leadership Modernization Action Plans (TMAP, DMAP, EMAP, CMAP, and LMAP, respectively). Central to these efforts is FDA's data and IT strategy, which began its journey in February 2023 and has an expected completion date of September 30, 2023.<br><br>○ As part of this strategy, FDA set the vision for its "NexGen ESG," which will fully transition FDA's Electronic Submission Gateway into the Agency's secure cloud environment by 2025.<br><br>○ FDA continues this journey by enhancing its infrastructure and analytical environment, which will enable the seamless exchange and processing of continuously expanding and evolving data, such as DHT<br><br>○ Using established systems, FDA launched the first cloud-based demonstration project focused on the receipt, validation, cleansing, and analysis of DHT data on a third-party platform. |

[1] https://pubmed.ncbi.nlm.nih.gov/36507973/.
[2] https://www.taylorfrancis.com/books/edit/10.1201/9781003080954/drug-development-rare-diseases-bo-yang-yang-song-yijie-zhou.

## J.  Additional PDUFA VII Review Program Reporting

### 1. Hiring and Placement of New PDUFA VII Staff at FDA

The hiring and placement of new staff at FDA under PDUFA VII are reported on a quarterly basis and posted on the FDARA hiring performance web page[29].  FDA reports its progress in hiring new staff to support new initiatives in the annual PDUFA financial report, as per the PDUFA VII Commitment Letter.

---

[29] https://www.fda.gov/ForIndustry/UserFees/PrescriptionDrugUserFee/ucm604305.htm.

# VI.   Rationale for PDUFA Program Changes

Section 736B(a)(4) of the FD&C Act requires the annual PDUFA performance reporting requirements to include the following:

(A)   data, analysis, and discussion of the changes in the number of individuals hired as agreed upon in the letters described in section 1001(b) of the Prescription Drug User Fee Amendments of 2022 and the number of remaining vacancies, the number of full-time equivalents funded by fees collected pursuant to section 736, and the number of full time equivalents funded by budget authority at the Food and Drug Administration by each division within the Center for Drug Evaluation and Research, the Center for Biologics Evaluation and Research, the Office of Regulatory Affairs, and the Office of the Commissioner;

(B)   data, analysis, and discussion of the changes in the fee revenue amounts and costs for human prescription drug activities, including:

(i)    identifying drivers of such changes; and

(ii)   changes in the total average cost per full-time equivalent in the prescription drug review program

(C)   for each of the Center for Drug Evaluation and Research, the Center for Biologics Evaluation and Research, the Office of Regulatory Affairs, and the Office of the Commissioner, the number of employees for whom time reporting is required and the number of employees for whom time reporting is not required; and

(D)   data, analysis, and discussion of the changes in the average full-time equivalent hours required to complete review of each type of human drug applications.

The information below fulfills these reporting requirements.

**A.    Changes in the Number of Individuals Hired as Agreed in the PDUFA VII Commitment Letter, the Number of Remaining Vacancies, the Number of Full-Time Equivalents (FTEs) Funded by Fees Collected Pursuant to Section 736, and the Number of FTEs Funded by Budget Authority by Division Within CDER, CBER, ORA, and OC**

*1.* Changes in the Number of Individuals Hired as Agreed Upon in the PDUFA VII Commitment Letter and Remaining Vacancies

FDA is committed to hiring 352 FTEs from FY 2023 to FY 2027 as agreed upon in the PDUFA VII Commitment Letter. FDA has successfully hired 151 FTEs of the 352 FTEs (43 percent) as of September 30, 2023. The data in the following table show the total number of FTEs hired towards the FY 2022 and FY 2023 hiring targets as agreed upon in the PDUFA VII Commitment Letter and the change in the number of FTE hires from FY 2022 to FY 2023.

**Table 42.  Number of Individuals Hired as Agreed Upon in the PDUFA VII Commitment Letter and Remaining Vacancies**

| Center | Number Hired in FY 2022* | Number Hired in FY 2023 | Change in Number Hired | Remaining Vacancies in FY 2022* | Remaining Vacancies in FY 2023 | Change in Number of Remaining Vacancies |
|---|---|---|---|---|---|---|
| CDER | 0 | 41 | 41 | 0 | 36 | 36 |
| CBER | 0 | 109 | 109 | 0 | 23 | 23 |
| ORA | 0 | 1 | 1 | 0 | 0 | 0 |
| OC | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 0 | 151 | 151 | 0 | 59 | 59 |

\*  PDUFA VII became effective in FY 2023; therefore, there are neither PDUFA VII hires nor remaining vacancies in FY 2022. A *hire* is defined as someone who has been confirmed as on board by the date indicated in a full-time position at the noted Center. Although some hires are recruited from outside the Center/FDA, a hire can also be a current Center/FDA employee who is changing positions within the Agency.

*2. Change in the Number of FTEs Funded by Budget Authority and Number of FTEs Funded by Fees by Division Within CDER, CBER, ORA, and OC*

The data in the table below show the number of User Fee and Budget Authority funded FTEs at FDA by each division within CDER, CBER, ORA and OC.  This table reflects the number of FTEs funded by User Fee and Budget Authority for the PDUFA VII program.  For this table, "budget authority" refers to FDA's non-user fee annual appropriations.  To address the requirement that information on the number of FTEs funded by budget authority be presented "by each division," the information in this table is broken down to the office level for the Centers, ORA, and OC.  FDA uses a 2080-hour workload to equate to one FTE, and this calculation is reflected in the table below.  Data for FY 2023 represent the number of FTEs committed to PDUFA work.  The number of FTEs funded by User Fee and budget authority for FY 2023 are those FTEs as of September 30, 2023.

**Table 43.  Number of FTEs Funded by Budget Authority and Number of FTEs funded byFees by Division Within CDER, CBER, ORA, and OC**

| Center and Office | Number of FTEs Funded by Budget Authority | | Change in the Number of FTEs Funded by Budget Authority | Number of FTEs Funded by Fees | | Change in the Number of FTEs Funded by Fees |
|---|---|---|---|---|---|---|
| | FY 2022 | FY 2023 | | FY 2022 | FY 2023 | |
| CDER | | | | | | |
| Office of Communications | 7.39 | 7.51 | 0.12 | 36.10 | 39.38 | 3.28 |
| Office of Compliance | 20.79 | 14.95 | -5.84 | 64.72 | 77.98 | 13.26 |
| Office of the Center Director | 7.37 | 2.06 | -5.31 | 33.61 | 36.84 | 3.23 |
| Office of Executive Programs | 2.09 | 3.65 | 1.56 | 65.46 | 65.91 | 0.45 |
| Office of Generic Drugs | 4.38 | 3.76 | -0.62 | 1.54 | 3.40 | 1.86 |
| Office of Management | 15.09 | 9.00 | -6.09 | 100.82 | 79.18 | -21.64 |
| Office of Medical Policy | 11.61 | 7.12 | -4.49 | 79.32 | 107.52 | 28.20 |
| Office of New Drugs | 57.57 | 132.16 | 74.59 | 1146.55 | 1162.77 | 16.22 |
| Office of Pharmaceutical Quality | 25.09 | 58.59 | 33.50 | 395.18 | 387.35 | -7.83 |
| Office of Regulatory Policy | 18.44 | 15.49 | -2.95 | 38.93 | 46.08 | 7.15 |
| Office of Surveillance and Epidemiology | 32.88 | 13.37 | -19.51 | 185.49 | 213.49 | 28.00 |
| Office of Strategic Programs | 13.43 | 5.12 | -8.31 | 75.20 | 76.81 | 1.61 |
| Office of Information Management and Technology | 0.00 | 0.12 | 0.12 | 0.00 | 4.90 | 4.90 |

| Office of Translational Sciences | 11.42 | 34.37 | 22.95 | 526.73 | 518.08 | -8.65 |
|---|---|---|---|---|---|---|
| Other Offices | 0.15 | 0.66 | 0.51 | 5.48 | | -5.48 |
| Working Capital Fund (WCF) | 51.70 | 56.62 | 4.92 | 161.46 | 156.41 | -5.05 |
| **CDRH** | | | | | | |
| Office of Product Evaluation and Quality | 2.10 | 1.06 | -1.04 | 15.20 | 12.60 | -2.60 |
| Office of Management | 0.00 | 0.50 | 0.50 | 0.20 | 0.58 | 0.38 |
| Office of Science and Engineering Laboratories | 0.30 | 0.22 | -0.08 | 0.10 | 0.00 | -0.10 |
| Office of Communication and Education | 0.00 | 0.36 | 0.36 | | 0.38 | 0.38 |
| Office of Policy | 0.00 | 0.05 | 0.05 | 0.20 | 0.15 | -0.05 |
| Office of Strategic Partnership and Technology Innovation | 0.10 | 0.05 | -0.05 | 0.00 | 0.00 | 0.00 |
| Office of the Center Director | 0.00 | 0.15 | 0.15 | 0.00 | 0.09 | 0.09 |
| Office of Information Management and Technology | 0.10 | 0.05 | -0.05 | 0.00 | 0.00 | 0.00 |
| WCF | 0.80 | 0.59 | -0.21 | 1.75 | 0.78 | -0.97 |
| **CBER** | | | 0.00 | | | |
| Office of Biostatistics and Epidemiology / Office of Biostatistics and Pharmacovigilance[†] | 13.71 | 25.59 | 11.88 | 64.53 | 68.37 | 3.83 |
| Office of Blood Research and Review | 5.26 | 6.83 | 1.57 | 6.80 | 7.26 | 0.46 |
| Office of Compliance and Biologics Quality | 21.97 | 23.04 | 1.07 | 72.42 | 82.37 | 9.95 |
| Office of Tissues and Advanced Therapies / Office of Therapeutic Products[‡] | 57.44 | 60.53 | 3.10 | 180.06 | 187.99 | 7.93 |
| Office of Vaccines Research and Review | 96.30 | 97.06 | 0.76 | 118.49 | 126.99 | 8.49 |
| Office of Communication Outreach and Development | 9.74 | 7.67 | -2.07 | 34.06 | 38.04 | 3.98 |
| Office of the Center Director | 13.95 | 8.20 | -5.75 | 35.00 | 22.46 | -12.54 |
| Office of Regulatory Operations[§] | 5.38 | 9.18 | 3.80 | 20.44 | 38.66 | 18.22 |
| Office of Management | 21.53 | 13.52 | -8.01 | 55.53 | 62.29 | 6.76 |
| Office of Information Management and Technology | 1.78 | 1.54 | -0.24 | 3.97 | 3.91 | -0.06 |
| WCF | 33.37 | 36.11 | 2.74 | 46.12 | 49.27 | 3.15 |

| OC | | | | | | |
|---|---|---|---|---|---|---|
| OC Immediate Office | 2.70 | 6.09 | 3.39 | 12.33 | 15.08 | 2.75 |
| Office of the Chief Counsel | 7.20 | 12.94 | 5.74 | 33.06 | 32.07 | -0.99 |
| Office of the Chief Scientist | 4.60 | 7.84 | 3.24 | 21.05 | 19.42 | -1.63 |
| Office of Clinical Policy and Programs | 11.60 | 20.56 | 8.96 | 53.19 | 50.95 | -2.24 |
| Office of Digital Transformation | 0.00 | 0.64 | 0.64 | 3.09 | 1.59 | -1.50 |
| Office of Enterprise Management Services | 0.00 | 3.59 | 3.59 | 10.55 | 8.89 | -1.66 |
| Office of External Affairs | 3.20 | 6.34 | 3.14 | 14.51 | 15.72 | 1.21 |
| Office of Global Policy and Strategy | 0.00 | 0.40 | 0.40 | 2.00 | 0.99 | -1.01 |
| Office of International Programs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office of Operations | 10.90 | 12.66 | 1.76 | 36.32 | 31.37 | -4.95 |
| Office of Policy, Legislation, and International Affairs | 6.50 | 9.67 | 3.17 | 29.89 | 23.97 | -5.92 |
| WCF | 12.70 | 6.34 | -6.36 | 13.78 | 18.42 | 4.64 |
| ORA | | | | | | |
| Office of Pharmaceutical Quality Operations | 99.10 | 106.80 | 7.70 | 47.40 | 45.59 | -1.81 |
| Office of Global Partnerships and Strategy | 0.40 | | -0.40 | | | |
| WCF | 8.70 | 9.53 | 0.83 | 3.37 | 3.01 | -0.36 |

\* This table includes PDUFA program FTEs calculated through WCF assessments for certain centrally administered services provided to CDER, Center for Devices and Radiological Health, CBER, ORA, and OC. Because many employees under OC and WCF do not report time, an average cost per OC and WCF FTE was applied to derive the number of PDUFA program FTEs funded by budget authority.

† CBER's Office of Biostatistics and Epidemiology was reorganized to the Office of Biostatistics and Pharmacovigilance in FY 2023.

‡ CBER's Office of Tissues and Advanced Therapies was reorganized to the Office of Therapeutic Products in FY 2023.

§ The FY 2023 reorganization of CBER created a new office – the Office of Regulatory Operations.  Prior to the reorganization, this office was under the Office the Center Director.

## B.    Changes in the Average Total Cost Per FTE in the Prescription Drug Review Program

Section 736B(a)(4) of the FD&C Act requires FDA to provide data, analysis, and discussion of the changes in the fee revenue amounts and costs for the process for the review of prescription drugs, including identifying drivers of such changes and changes in the average total cost per FTE in the prescription drug review program.  Accordingly, the table below provides data for the PDUFA fee revenue amounts and process costs

for FY 2022 and FY 2023, as well as the changes in these amounts from FY 2022 to FY 2023.  As amended by FDORA section 3206, FDA is also required to report on changes in the total average cost per FTE in the PDUFA program.  Relevant information about the data provided is as follows:

- *Fee Revenue Amounts* represent FDA's net collection of human drug user fees.

- *Review Process Costs* represent FDA's total expenditure on the PDUFA program.

- Numbers are provided for both the most recent fiscal year (FY 2023) and the prior fiscal year (FY 2022).  Although FDARA does not explicitly require this data, they do provide relevant context necessary to interpret the required information.

In FY 2022, FDA had net collections of $1,159,139,951.00 in prescription drug user fees, spent $1,129,727,665 in user fees for the human drug review process, and carried a cumulative balance of $287,669,825 forward for future fiscal years.  Detailed financial information for the PDUFA user fee program can be found in the FY 2023 PDUFA financial report.[30]

The process for setting the annual target revenue is set forth in the statute.  For FY 2023, the base revenue amount is $1,151,522,958.  The FY 2023 base revenue amount is adjusted for inflation and for the resource capacity needs for the process for the review of human drug applications (the capacity planning adjustment).  An additional dollar amount specified in the statute (see section 736(b)(1)(F) of the FD&C Act) is then added to provide for additional FTE positions to support PDUFA VII initiatives.  The FY 2023 revenue amount may be adjusted further, if necessary, to provide for sufficient operating reserves of carryover user fees.  Finally, the amount is adjusted to provide for additional direct costs yielding a total adjusted fee revenue amount of $1,310,319,000 (rounded to the nearest thousand dollars).

In FY 2023, PDUFA review process costs increased from FY 2022.

**Table 44.  Changes in the Average Total Cost Per FTE in the Prescription Drug Review Program**

---

[30] See https://www.fda.gov/about-fda/user-fee-financial-reports/pdufa-financial-reports.

| Revenue/Cost | FY 2022 | FY 2023 | Change from FY 2022 to FY 2023 |
|---|---|---|---|
| Fee Revenue Amounts (Net Collections) | $1,159,139,951 | $1,222,888,088 | +5% |
| Process Cost (Cost of Activities) | $1,480,601,875 | $1,686,733,841 | +14% |
| Average total cost per FTE | $206,123 | $216,474 | +5% |

## C.    Number of Employees for Whom Time Reporting Is Required

Section 736B(a)(4) of the FD&C Act requires FDA to provide—for CDER, CBER, ORA, and OCthe number of employees for whom time reporting is required and the number of employees for whom time reporting is not required.  Accordingly, the table below provides the number of employees within CDER, CBER, ORA, and OC who are required to report their time and those who are not required to report their time as of September 30, 2023.

These data reflect time reporting across all employees in each entity, rather than only those engaged in PDUFA program activities.

### Table 45.  Time Reporting Requirement for FY 2023

| Center | FTEs for Whom Time Reporting Is Required | FTEs for Which Time Reporting Is Not Required |
|---|---|---|
| CDER | 5,739 | 0 |
| CBER | 1,260 | 8 |
| ORA | 4,592 | 0 |
| OC | 61 | 2,606 |
| **Total** | **11,652** | **2,614** |

## D.    Changes in the Average FTE Hours Required to Complete the Review of each Type of Human Drug Application

Section 736B(a)(4) of the FD&C Act, as amended by the FDORA section 3626 requires that FDA provide data, analysis, and discussion of the changes in the average full-time equivalent hours required to complete review of each type of human drug application.

**Table 46.  Changes in the Average FTE Hours Required to Complete the Review of Each Type of Human Drug Applications**

| Application Type | Average FTE Hours Required to Complete Application Reviews in FY 2022 | Average FTE Hours Required to Complete Application Reviews inFY 2023 | Change from FY 2022 to FY 2023 |
|---|---|---|---|
| PDUFA NME and BLA Applications | 6,256 | 7,386 | 1,130 |
| PDUFA Non-NME Applications | 2,651 | 2,434 | -217 |
| **Total** | **8,907** | **9,820** | **913** |

To calculate the average hours required to complete review of PDUFA applications, FDA compared the 3-year average (sum of hours reported divided by the sum of applications submitted) ending in FY 2022 to the 3-year average ending in FY 2023.  As application review activities span multiple fiscal years, this method provides an interpretable benchmark for any shifts in average hours required to complete application reviews over time.

# Appendix A:  List of Approved Applications

This appendix includes detailed review histories of the NDA and BLA submissions approved under PDUFA VII in FY 2023.  Approvals are grouped by priority designation and submission year and listed in order of total approval time.  *Approval time* is presented in months and includes each review cycle's time with FDA, time with the sponsor, and the total time on that application.

Review histories of the NDA and BLA submissions approved prior to FY 2023 can be found in the appendices of the earlier PDUFA performance reports.[1]

When determining total time, FDA calculates the number of months and rounds to the nearest tenth.  Therefore, when cycle times are added, rounding discrepancies may occur.

Because months consist of varying numbers of days, FDA uses the average number of days in a month for the average year length, which takes into account leap years, to calculate review time in months.  Prior to FY 2022, FDA did not take into account leap years in our calculations, which may have caused a submission to appear overdue even though it was approved on the goal date.

**Terms and Coding Used in Tables in This Appendix**

Action Codes:
AE = Approvable
AP = Approved
CR = Complete Response
NA = Not Approvable
TA = Tentative Approval
WD = Withdrawn

▲ Denotes Class 1 Resubmission (2-month review-time goal)
△ Denotes Class 2 Resubmission (6-month review-time goal)
◊ Expedited review and TA of an NDA by FDA for fixed dose combinations and co-packaged antiretroviral medications as part of the President's Emergency Plan for AIDS Relief
♦ Application reviewed under the program with review goals starting from the 60-day filing date, rather than the submission date

---

[1] http://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

♯ Major amendment was received, which extended the action goal date by 3 months[2]

**Table A-1.  FY 2023 Priority NDA and BLA Approvals (by Fiscal Year of Receipt)**

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| *Submitted in FY 2023* | | | | | | | |
| AKEEGA (niraparib and abiraterone acetate) | JANSSEN BIOTECH Inc. | N | FIRST | 5.4 | AP | 5.4 | Y♦ |
| abacavir, dolutegravir and lamivudine tablet for oral suspension | AUROBINDO PHARMA Ltd. | N | FIRST | 5.9 | TA | 5.9 | Y |
| abacavir, dolutegravir and lamivudine | MYLAN LABORATORIES Ltd. | N | FIRST | 5.9 | TA | 5.9 | Y |
| BOSULIF (bosutinib) | PF PRISM CV | N | FIRST | 5.9 | AP | 5.9 | Y |
| OPVEE (nalmefene hydrochloride) | INDIVIOR Inc. | N | FIRST | 5.9 | AP | 5.9 | Y |
| TRIKAFTA (elexacaftor/ tezacaftor/ ivacaftor) | VERTEX PHARMACEUTICALS Inc. | N | FIRST | 5.9 | AP | 5.9 | Y |
| dolutegravir | LAURUS GENERICS Inc. | N | FIRST | 6.0 | TA | 6.0 | Y |
| COLUMVI (glofitamab-gxbm) | GENENTECH, Inc. | Y | FIRST | 7.4 | AP | 7.4 | Y♦ |
| EYLEA HD (aflibercept) | REGENERON PHARMACEUTICALS, Inc. | N | FIRST | 6.0 | CR | 6.0 | Y |
| | | | Sponsor | 0.2 | | 6.2 | |
| | | | SECOND | 1.5 | AP | 7.5 | Y△ |
| IZERVAY (avacincaptad pegol) | IVERIC BIO Inc. | Y | FIRST | 7.5 | AP | 7.5 | Y♦ |
| ELREXFIO (elranatamab-bcmm) | PFIZER Inc. | Y | FIRST | 7.8 | AP | 7.8 | Y♦ |

---

[2] Under PDUFA VI, a major amendment can be received any time during the review cycle and extend the goal date by 3 months.  If the review cycle occurred prior to FY 2013, the major amendment must have been received within 3 months of the action due date to extend the action goal date by 3 months.

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| VEOPOZ (pozelimab-bbfg) | REGENERON PHARMACEUTICALS, Inc. | Y | FIRST | 7.9 | AP | 7.9 | Y♦ |
| Respiratory Syncytial Virus Vaccine | Pfizer Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| RYSTIGGO (rozanolixizumab-noli) | UCB, Inc. | Y | FIRST | 8.0 | AP | 8.0 | N♦ |
| TALVEY (talquetamab-tgvs) | JANSSEN BIOTECH, Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| ZURZUVAE (zuranolone) | SAGE THERAPEUTICS Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| RIVIVE (naloxone hydrochloride) | HARM REDUCTION THERAPEUTICS Inc. | N | FIRST | 9.0 | AP | 9.0 | Y# |
| *Submitted in FY 2022* | | | | | | | |
| MEKINIST (trametinib) | NOVARTIS PHARMACEUTICALS Corp. | N | FIRST | 6.9 | AP | 6.9 | Y# |
| TAFINLAR (dabrafenib) | NOVARTIS PHARMACEUTICALS Corp. | N | FIRST | 6.9 | AP | 6.9 | Y# |
| ORSERDU (elacestrant) | STEMLINE THERAPEUTICS Inc. | Y | FIRST | 7.4 | AP | 7.4 | Y♦ |
| ZYNYZ (retifanlimab-dlwr) | INCYTE CORPORATION | Y | FIRST | 7.4 | AP | 7.4 | Y♦ |
| ELAHERE (mirvetuximab soravtansine-gynx) | IMMUNOGEN, Inc. | Y | FIRST | 7.6 | AP | 7.6 | Y♦ |
| ALTUVIIIO (antihemophilic factor (recombinant), Fc-VWF-XTEN fusion protein-ehtl) | Bioverativ Therapeutics, Inc. | Y | FIRST | 7.7 | AP | 7.7 | Y♦ |
| JOENJA (leniolisib phosphate) | PHARMING TECHNOLOGIES BV | Y | FIRST | 7.8 | AP | 7.8 | Y♦ |
| LUNSUMIO (mosunetuzumab-axgb) | GENENTECH, Inc. | Y | FIRST | 7.8 | AP | 7.8 | Y♦ |
| XACDURO (sulbactam for | ENTASIS THERAPEUTICS Inc. | Y | FIRST | 7.8 | AP | 7.8 | Y♦ |

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| injection; durlobactam for injection) | | | | | | | |
| DAYBUE (trofinetide) | ACADIA PHARMACEUTICALS Inc. | Y | FIRST | 7.9 | AP | 7.9 | Y♦ |
| EPKINLY (epcoritamab-bysp) | GENMAB US, Inc. | Y | FIRST | 7.9 | AP | 7.9 | Y♦ |
| HEMGENIX (etranacogene dezaparvovec-drlb) | CSL Behring LLC | Y | FIRST | 7.9 | AP | 7.9 | Y♦ |
| IMJUDO (tremelimumab) | ASTRAZENECA AB | Y | FIRST | 7.9 | AP | 7.9 | Y♦ |
| ABRYSVO (Respiratory Syncytial Virus Vaccine) | Pfizer Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| AREXVY (Respiratory Syncytial Virus Vaccine, Adjuvanted) | GlaxoSmithKline Biologicals | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| JAYPIRCA (pirtobrutinib) | LOXO ONCOLOGY Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| LAMZEDE (velmanase alfa-tycv) | CHIESI FARMACEUTICI S.P.A. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| LEQEMBI (lecanemab-irmb) | EISAI, INCORPORATED | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| REZZAYO (rezafungin) | CIDARA THERAPEUTICS Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| VOWST (Fecal Microbiota Spores) | Seres Therapeutics, Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| ELEVIDYS (delandistrogene moxeparvovec-rokl) | Sarepta Therapeutics, Inc. | Y | FIRST | 8.8 | AP | 8.8 | N♦ |
| LODOCO (colchicine) | AGEPHA PHARMA FZ LLC | N | FIRST | 8.8 | AP | 8.8 | Y# |
| SYFOVRE (pegcetacoplan) | APELLIS PHARMACEUTICALS Inc. | N | FIRST | 8.8 | AP | 8.8 | Y# |
| SEZABY (phenobarbital) | SUN PHARMACEUTICAL INDUSTRIES Inc. | N | FIRST | 9.0 | AP | 9.0 | Y# |

*Appendix A*                                                                 *Page 64*

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| VYVGART HYTRULO (efgartigimod alfa and hyaluronidase-qvfc) | ARGENX BV | N | FIRST | 9.0 | AP | 9.0 | Y# |
| TECVAYLI (teclistamab-cqyv) | JANSSEN BIOTECH, Inc. | Y | FIRST | 9.9 | AP | 9.9 | Y#♦ |
| OMISIRGE (omidubicel-onlv) | Gamida Cell Ltd. | Y | FIRST | 10.5 | AP | 10.5 | Y#♦ |
| VEOZAH (fezolinetant) | ASTELLAS PHARMA US Inc. | Y | FIRST | 10.6 | AP | 10.6 | Y#♦ |
| PAXLOVID (nirmatrelvir and ritonavir) | PFIZER Inc. | Y | FIRST | 10.8 | AP | 10.8 | Y#♦ |
| Vanflyta | DAIICHI SANKYO Inc. | Y | FIRST | 10.8 | AP | 10.8 | Y#♦ |
| QALSODY (tofersen) | BIOGEN MA Inc. | Y | FIRST | 11.0 | AP | 11.0 | Y#♦ |
| SKYCLARYS (omaveloxolone) | REATA PHARMACEUTICALS Inc. | Y | FIRST | 11.0 | AP | 11.0 | Y#♦ |
| VYJUVEK (beremagene geperpavec-svdt) | Krystal Biotech, Inc. | Y | FIRST | 11.0 | AP | 11.0 | Y#♦ |
| FILSPARI (sparsentan) | TRAVERE THERAPEUTICS Inc. | Y | FIRST | 11.1 | AP | 11.1 | Y#♦ |
| SOHONOS (palovarotene) | IPSEN BIOPHARMACEUTICALS Inc. | Y | FIRST | 7.8 | CR | 7.8 | Y♦ |
| | | | Sponsor | 1.8 | | 9.6 | |
| | | | SECOND | 5.9 | AP | 15.5 | Y△ |
| **Submitted in FY 2021** | | | | | | | |
| SUNLENCA (lenacapavir) | GILEAD SCIENCES Inc. | Y | FIRST | 8.0 | AP | 8.0 | Y♦ |
| SUNLENCA (lenacapavir) | GILEAD SCIENCES Inc. | N[3] | FIRST | 8.0 | AP | 8.0 | Y♦ |
| TZIELD (teplizumab-mzwv) | PROVENTION BIO, Inc. | Y | FIRST | 8.0 | CR | 8.0 | Y♦ |
| | | | Sponsor | 7.6 | | 15.6 | |

[3] The applicant submitted two NDAs for the same moiety but different dosage forms (i.e., tablet versus injection), and only one retains the NME designation upon approval; in this case, the NDA for the tablet form retained the NME designation.

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| | | | SECOND | 9.0 | AP | 24.6 | Y#△ |
| *Submitted in FY 2020* | | | | | | | |
| ELFABRIO (pegunigalsidase alfa-iwxj) | CHIESI FARMACEUTICI S.P.A. | Y | FIRST | 11.0 | CR | 11.0 | Y#♦ |
| | | | Sponsor | 18.4 | | 29.4 | |
| | | | SECOND | 5.9 | AP | 35.3 | Y |
| ROCTAVIAN (valoctocogene roxaparvovec-rvox) | Biomarin Pharmaceutical Inc. | Y | FIRST | 7.8 | CR | 7.8 | Y# |
| | | | Sponsor | 26.2 | | 34.0 | |
| | | | SECOND | 9.0 | AP | 43.0 | Y△ |
| *Submitted in FY 2018* | | | | | | | |
| ADSTILADRIN (nadofaragene firadenovec-vncg) | Ferring Pharmaceuticals A/S | Y | FIRST | 7.7 | CR | 7.7 | Y♦ |
| | | | Sponsor | 26.2 | | 33.9 | |
| | | | SECOND | 5.6 | AP | 39.5 | Y△ |
| *Submitted in FY 2017* | | | | | | | |
| sincalide | MAIA PHARMACEUTICALS Inc. | N | FIRST | 6.0 | TA | 6.0 | Y |
| | | | Sponsor | 55.1 | | 61.1 | |
| | | | SECOND | 1.9 | AP | 63.0 | Y▲ |
| BRIXADI (buprenorphine hydrochloride) | BRAEBURN Inc. | N | FIRST | 6.0 | CR | 6.0 | Y |
| | | | Sponsor | 5.2 | | 11.2 | |
| | | | SECOND | 5.8 | TA | 17.0 | Y |
| | | | Sponsor | 17.3 | | 34.3 | |
| | | | THIRD | 6.0 | CR | 40.3 | Y |
| | | | Sponsor | 6.4 | | 46.7 | |
| | | | FOURTH | 6.0 | CR | 52.7 | Y |
| | | | Sponsor | 11.3 | | 64.0 | |
| | | | FIFTH | 5.9 | AP | 69.9 | Y△ |

**Table A-2. FY 2023 Standard NDA and BLA Approvals (by Fiscal Year of Receipt)**

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| *Submitted in FY 2023* | | | | | | | |
| XALKORI (crizotinib) | PF PRISM CV | N | FIRST | 9.3 | AP | 9.3 | Y |
| melphalan hydrochloride injection | APOTEX Inc. | N | FIRST | 9.9 | AP | 9.9 | Y |
| RYZUMVI (phentolamine) | OCUPHIRE PHARMA Inc. | N | FIRST | 9.9 | AP | 9.9 | Y |
| LIKMEZ (metronidazole) | SAPTALIS PHARMACEUTICALS LLC | N | FIRST | 10.0 | AP | 10.0 | Y |
| micafungin in 0.9% sodium chloride | BAXTER HEALTHCARE Corp. | N | FIRST | 10.0 | AP | 10.0 | Y |
| vasopressin in 0.9% sodium chloride injection | BAXTER HEALTHCARE Corp. | N | FIRST | 10.0 | AP | 10.0 | Y |
| *Submitted in FY 2022* | | | | | | | |
| BEYFORTUS (nirsevimab-alip) | ASTRAZENECA AB | Y | FIRST | 9.7 | AP | 9.7 | Y♦ |
| Docetaxel | INGENUS PHARMACEUTICALS LLC | N | FIRST | 9.7 | AP | 9.7 | Y |
| VEVYE (cyclosporine) | HARROW EYE LLC | N | FIRST | 9.7 | AP | 9.7 | Y |
| cyclophosphamide | NEVAKAR INJECTABLES Inc. | N | FIRST | 9.8 | AP | 9.8 | Y |
| IYUZEH (latanoprost) | THEA PHARMA Inc. | N | FIRST | 9.8 | AP | 9.8 | Y |
| AUSTEDO XR (deutetrabenazine) | TEVA NEUROSCIENCE Inc. | N | FIRST | 9.9 | AP | 9.9 | Y |
| dolutegravir, lamivudine and tenofovir alafenamide | LUPIN Ltd. | N | FIRST | 9.9 | TA | 9.9 | Y |
| MOTPOLY XR (lacosamide) | AUCTA PHARMACEUTICALS Inc. | N | FIRST | 9.9 | AP | 9.9 | Y |
| ABILIFY ASIMTUFII (aripiprazole) | OTSUKA PHARMACEUTICAL Co. Ltd. | N | FIRST | 10.0 | AP | 10.0 | Y |
| ADRENALIN (epinephrine in sodium chloride) | PAR STERILE PRODUCTS LLC | N | FIRST | 10.0 | AP | 10.0 | Y |
| ALVAIZ (eltrombopag choline) | TEVA PHARMACEUTICALS Inc. | N | FIRST | 10.0 | TA | 10.0 | Y |

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| cefazolin for injection | HIKMA PHARMACEUTICALS USA Inc. | N | FIRST | 10.0 | AP | 10.0 | Y |
| daptomycin for injection, 350mg/vial and 500 mg/vial | XELLIA PHARMACEUTICALS APS | N | FIRST | 10.0 | AP | 10.0 | Y |
| SYMBICORT AEROSPHERE (budesonide and formeterol fumarate) | ASTRAZENECA PHARMACEUTICALS LP | N | FIRST | 10.0 | AP | 10.0 | Y |
| kit for the preparation of technetium tc 99m mertiatide | JUBILANT DRAXIMAGE Inc. | N | FIRST | 10.1 | AP | 10.1 | Y |
| PREVDUO (neostigmine methylsulfate and glycopyrrolate) | SLAYBACK PHARMA LLC | N | FIRST | 10.0 | AP | 10.0 | Y |
| AIRSUPRA (albuterol and budesonide) | ASTRAZENECA PHARMACEUTICALS LP | N | FIRST | 10.1 | AP | 10.1 | Y |
| fentanyl citrate | EXELA PHARMA SCIENCES LLC | N | FIRST | 10.1 | AP | 10.1 | Y |
| MIEBO (perfluorohexyloctane) | BAUSCH AND LOMB Inc. | Y | FIRST | 10.6 | AP | 10.6 | Y♦ |
| XDEMVY (lotilaner) | TARSUS PHARMACEUTICALS Inc. | Y | FIRST | 10.9 | AP | 10.9 | Y♦ |
| BALFAXAR (Prothrombin complex concentrate, human-lans) | Octapharma Pharmazeutika Produktionsges.m.b.H. | Y | FIRST | 11.8 | AP | 11.8 | Y♦ |
| KRAZATI (adagrasib) | MIRATI THERAPEUTICS Inc. | Y | FIRST | 11.9 | AP | 11.9 | Y♦ |
| APHEXDA (motixafortide) | BIOLINERX Ltd. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| INPEFA (sotagliflozin) | LEXICON PHARMACEUTICALS Inc. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| JESDUVROQ (daprodustat) | GLAXOSMITHKLINE INTELLECTUAL PROPERTY NO 2 Ltd. ENGLAND | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| LITFULO (ritlecitinib) | PFIZER Inc. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| POSLUMA (flotufolastat f 18) | BLUE EARTH DIAGNOSTICS Ltd. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| REBYOTA (Microbiota Transplantation, Frozen Preparation) | Ferring Pharmaceuticals Inc. | Y | FIRST | 12.0 | AP | 12.0 | Y#♦ |
| REZLIDHIA (olutasidenib) | RIGEL PHARMACEUTICALS Inc. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| RIVFLOZA (nedosiran) | NOVO NORDISK Inc. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| ZAVZPRET (zavegepant) | PFIZER Inc. | Y | FIRST | 12.0 | AP | 12.0 | Y♦ |
| cyclophosphamide injection | SANDOZ Inc. | N | FIRST | 13.0 | AP | 13.0 | Y# |
| zolpidem tartrate | ALMATICA PHARMA Inc. | N | FIRST | 10.0 | CR | 10.0 | Y |
| | | | Sponsor | 11.8 | | 11.8 | |
| | | | SECOND | 2.0 | AP | 13.8 | Y▲ |
| BRENZAVVY (bexagliflozin) | THERACOSBIO LLC | Y | FIRST | 14.9 | AP | 14.9 | Y#♦ |
| CYFENDUS (Anthrax Vaccine Adsorbed, Adjuvanted) | Emergent Product Development Gaithersburg, Inc. | Y | FIRST | 15.0 | AP | 15.0 | Y#♦ |
| OJJAARA (momelotinib) | GLAXOSMITHKLINE LLC | Y | FIRST | 15.0 | AP | 15.0 | Y#♦ |
| PHYRAGO (dasatinib) | NANOCOPOEIA LLC | N | FIRST | 9.7 | CR | 9.7 | Y |
| | | | Sponsor | 0.2 | | 9.9 | |
| | | | SECOND | 5.8 | TA | 15.7 | Y△ |
| dolutegravir, emtricitabine and tenofovir alafenamide | AUROBINDO PHARMA Ltd. | N | FIRST | 9.5 | CR | 9.5 | Y |
| | | | Sponsor | 1.5 | | 11 | |
| | | | SECOND | 5.9 | TA | 16.9 | Y△ |
| dolutegravir, lamivudine and tenofovir disoproxil fumarate tablets, 50 mg/300 mg/300 mg | STRIDES PHARMA GLOBAL PTE Ltd. | N | FIRST | 10.0 | CR | 10.0 | Y |
| | | | Sponsor | 1.7 | | 11.7 | |
| | | | SECOND | 6.0 | TA | 17.7 | Y△ |
| FOCINVEZ (fosaprepitant injection) | SPES PHARMACEUTICALS Inc. | N | FIRST | 9.9 | CR | 9.9 | Y |
| | | | Sponsor | 4.3 | | 14.2 | |
| | | | SECOND | 5.7 | AP | 19.9 | Y△ |

*Appendix A*                                                                 *Page 69*

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| XENOVIEW (hyperpolarized 129-xe) | POLAREAN Inc. | Y | FIRST | 12.0 | CR | 12.0 | Y |
| | | | Sponsor | 5.8 | | 17.8 | |
| | | | SECOND | 8.8 | AP | 26.6 | Y#△ |
| *Submitted in FY 2021* | | | | | | | |
| ZEJULA (niraparib) | GLAXOSMITHKLINE LLC | N | FIRST | 9.9 | AP | 9.9 | Y |
| BRIUMVI (ublituximab-xiiy) | TG THERAPEUTICS, Inc. | Y | FIRST | 15.0 | AP | 15.0 | Y#♦ |
| bendamustine hydrochloride | BAXTER HEALTHCARE Corp. | N | FIRST | 10.0 | TA | 10.0 | Y |
| | | | Sponsor | 3.6 | | 13.6 | |
| | | | SECOND | 1.5 | AP | 15.1 | Y▲ |
| OLPRUVA (sodium phenylbutyrate) | ACER THERAPEUTICS Inc. | N | FIRST | 10.3 | CR | 10.3 | N |
| | | | Sponsor | 1.0 | | 11.3 | |
| | | | SECOND | 5.3 | AP | 16.6 | Y△ |
| bendamustine hydrochloride | APOTEX Inc. | N | FIRST | 10.0 | TA | 10.0 | Y |
| | | | Sponsor | 6.0 | | 16.0 | |
| | | | SECOND | 2.0 | AP | 18.0 | Y▲ |
| paclitaxel | TEVA PHARMACEUTICALS Inc. | N | FIRST | 9.5 | TA | 9.5 | Y |
| | | | Sponsor | 4.8 | | 14.3 | |
| | | | SECOND | 2.0 | TA | 16.3 | Y▲ |
| | | | Sponsor | 1.2 | | 17.5 | |
| | | | THIRD | 1.9 | AP | 19.4 | Y▲ |
| JYLAMVO (methotrexate) | THERAKIND Ltd. | N | FIRST | 9.7 | CR | 9.7 | Y |
| | | | Sponsor | 5.3 | | 15.0 | |
| | | | SECOND | 6.0 | AP | 21.0 | Y△ |
| SUFLAVE (polyethylene glycol 3350, sodium sulfate, potassium chloride, magnesium sulfate, and sodium chloride) | BRAINTREE LABORATORIES Inc. | N | FIRST | 10.0 | CR | 10.0 | Y |
| | | | Sponsor | 8.6 | | 18.6 | |
| | | | SECOND | 3.7 | AP | 22.3 | Y△ |
| UZEDY (risperidone) | TEVA NEUROSCIENCE Inc. | N | FIRST | 9.9 | CR | 9.9 | Y |
| | | | Sponsor | 6.4 | | 16.3 | |
| | | | SECOND | 6.0 | AP | 22.3 | Y△ |
| OPFOLDA (miglustat) | AMICUS THERAPEUTICS US LLC | N | FIRST | 26.0 | AP | 26.0 | N# |

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| POMBILITI (cipaglucosidase alfa-atga) | AMICUS THERAPEUTICS US, LLC | Y | FIRST | 26.0 | AP | 26.0 | N#♦ |
| XENOVIEW (hyperpolarized 129-xe) | POLAREAN Inc. | Y | FIRST | 12.0 | CR | 12.0 | Y |
| | | | Sponsor | 5.8 | | 17.8 | |
| | | | SECOND | 8.8 | AP | 26.6 | Y#△ |
| MYDCOMBI (tropicamide and phenylephrine) | EYENOVIA Inc. | N | FIRST | 9.8 | CR | 9.8 | Y |
| | | | Sponsor | 12.6 | | 22.4 | |
| | | | SECOND | 5.8 | AP | 28.2 | Y△ |
| LUMRYZ (sodium oxybate) | AVADEL CNS PHARMACEUTICALS LLC | N | FIRST | 19.1 | TA | 19.1 | N |
| | | | Sponsor | 7.4 | | 26.5 | |
| | | | SECOND | 2.0 | AP | 28.5 | Y▲ |
| LIQREV (sildenafil) | CMP DEVELOPMENT LLC | N | FIRST | 10.0 | CR | 10.0 | Y |
| | | | Sponsor | 2.8 | | 12.8 | |
| | | | SECOND | 5.9 | CR | 18.7 | Y△ |
| | | | Sponsor | 4.0 | | 22.7 | |
| | | | THIRD | 8.0 | AP | 30.7 | N△ |
| NGENLA (somatrogon-ghla) | PFIZER IRELAND PHARMACEUTICALS | Y | FIRST | 15.0 | CR | 15.0 | Y#♦ |
| | | | Sponsor | 10.0 | | 25.0 | |
| | | | SECOND | 7.1 | AP | 32.1 | N |
| meropenem | HQ SPECIALTY PHARMA Corp. | N | FIRST | 9.9 | CR | 9.9 | Y |
| | | | Sponsor | 16.4 | | 26.3 | |
| | | | SECOND | 5.9 | AP | 32.2 | Y△ |
| *Submitted in FY 2020* | | | | | | | |
| norepinephrine in 0.9% sodium chloride | LONG GROVE PHARMACEUTICALS LLC | N | FIRST | 9.9 | CR | 9.9 | Y |
| | | | Sponsor | 9.8 | | 19.7 | |
| | | | SECOND | 5.9 | AP | 25.6 | Y△ |
| dolutegravir, emtricitabine and tenofovir alafenamide | LUPIN Ltd. | N | FIRST | 12.4 | CR | 12.4 | N |
| | | | Sponsor | 10.1 | | 22.5 | |
| | | | SECOND | 6.0 | AP | 28.5 | Y△ |
| LANTIDRA (donislecel-jujn) | CellTrans Inc. | Y | FIRST | 15.0 | CR | 15.0 | Y#♦ |
| | | | Sponsor | 16.4 | | 31.4 | |
| | | | SECOND | 5.9 | AP | 37.3 | Y△ |
| NEXOBRID (anacaulase-bcdb) | MEDIWOUND, Ltd.. | Y | FIRST | 11.9 | CR | 11.9 | Y♦ |
| | | | Sponsor | 12.2 | | 24.1 | |
| | | | SECOND | 5.9 | AP | 30.0 | Y |
| pemetrexed | | N | FIRST | 9.9 | CR | 9.9 | Y |

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| | SHILPA MEDICARE Ltd. | | Sponsor | 3.7 | | 13.6 | |
| | | | SECOND | 6.0 | CR | 19.6 | Y△ |
| | | | Sponsor | 4.3 | | 23.9 | |
| | | | THIRD | 8.9 | AP | 32.8 | Y#△ |
| ATORVALIQ (atorvastatin) | CMP DEVELOPMENT LLC | N | FIRST | 9.1 | CR | 9.1 | Y |
| | | | Sponsor | 21.5 | | 30.6 | |
| | | | SECOND | 6.0 | AP | 36.6 | Y△ |
| TECHNEGAS (technetium tc 99m carbon) | CYCLOMEDICA AUSTRALIA PTY Ltd. | N | FIRST | 15.0 | CR | 15.0 | Y#♦ |
| | | | Sponsor | 21.1 | | 36.1 | |
| | | | SECOND | 6.1 | AP | 42.1 | Y△ |
| *Submitted in FY 2019* | | | | | | | |
| RYKINDO (risperidone) | SHANDONG LUYE PHARMACEUTICAL Co. Ltd. | N | FIRST | 10.1 | CR | 10.1 | Y |
| | | | Sponsor | 18.7 | | 28.8 | |
| | | | SECOND | 6.0 | CR | 34.8 | Y△ |
| | | | Sponsor | 4.8 | | 39.6 | |
| | | | THIRD | 6.0 | AP | 45.6 | Y△ |
| YCANTH (cantharidin) | VERRICA PHARMACEUTICALS Inc. | N | FIRST | 10.0 | CR | 10.0 | Y |
| | | | Sponsor | 5.4 | | 15.4 | |
| | | | SECOND | 8.8 | CR | 24.2 | Y#△ |
| | | | Sponsor | 2.3 | | 26.5 | |
| | | | THIRD | 5.9 | CR | 32.4 | Y△ |
| | | | Sponsor | 8.0 | | 40.4 | |
| | | | FOURTH | 5.9 | AP | 46.3 | Y△ |
| RIZAFILM (rizatriptan) | INTELGENX Corp. | N | FIRST | 5.8 | CR | 5.8 | Y△ |
| | | | Sponsor | 6.0 | | 11.8 | |
| | | | SECOND | 5.9 | CR | 17.7 | Y△ |
| | | | Sponsor | 30.8 | | 48.5 | |
| | | | THIRD | 5.9 | AP | 54.4 | Y△ |
| ENTYVIO (vedolizumab) | TAKEDA PHARMACEUTICALS U.S.A., Inc. | N | FIRST | 9.4 | CR | 9.4 | Y |
| | | | Sponsor | 39.3 | | 48.7 | |
| | | | SECOND | 6.0 | AP | 54.7 | Y△ |
| *Submitted in FY 2018* | | | | | | | |
| VIVIMUSTA (bendamustine hydrochloride) | SLAYBACK PHARMA LLC | N | FIRST | 9.5 | CR | 9.5 | Y |
| | | | Sponsor | 0.5 | | 10.0 | |
| | | | SECOND | 2.5 | CR | 12.5 | Y△ |
| | | | Sponsor | 5.0 | | 17.5 | |

*Appendix A*                                                                 *Page 72*

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
| | | | THIRD | 4.6 | TA | 22.1 | Y#△ |
| | | | Sponsor | 11.5 | | 33.6 | |
| | | | FOURTH | 9.0 | TA | 42.6 | Y△ |
| | | | Sponsor | 3.4 | | 46.0 | |
| | | | FIFTH | 2.0 | TA | 48.0 | Y▲ |
| | | | Sponsor | 1.4 | | 49.4 | |
| | | | SIXTH | 2.0 | AP | 51.4 | Y▲ |
| bendamustine | HOSPIRA Inc. | N | FIRST | 10.1 | TA | 10.1 | Y |
| | | | Sponsor | 41.0 | | 51.1 | |
| | | | SECOND | 5.5 | AP | 56.6 | Y△ |
| dolutegravir, lamivudine, and tenofovir disoproxil fumarate | EMCURE PHARMACEUTICALS Ltd. | N | FIRST | 9.6 | CR | 9.6 | Y |
| | | | Sponsor | 18.1 | | 27.7 | |
| | | | SECOND | 11.6 | CR | 39.3 | N△ |
| | | | Sponsor | 15.9 | | 55.2 | |
| | | | THIRD | 5.9 | TA | 61.1 | Y△ |
| cefazolin | HQ SPECIALTY PHARMA Corp. | N | FIRST | 9.9 | CR | 9.9 | Y |
| | | | Sponsor | 8.4 | | 18.3 | |
| | | | SECOND | 5.8 | CR | 24.1 | Y△ |
| | | | Sponsor | 6.4 | | 30.5 | |
| | | | THIRD | 6.0 | CR | 36.5 | Y△ |
| | | | Sponsor | 22.0 | | 58.5 | |
| | | | FOURTH | 5.9 | AP | 64.4 | Y△ |
| *Submitted in FY 2017* | | | | | | | |
| FUROSCIX INFUSOR (furosemide) | SCPHARMACEUTICALS Inc. | N | FIRST | 9.6 | CR | 9.6 | Y |
| | | | Sponsor | 24.6 | | 34.2 | |
| | | | SECOND | 5.1 | CR | 39.3 | Y△ |
| | | | Sponsor | 16.1 | | 55.4 | |
| | | | THIRD | 6.0 | AP | 61.4 | Y△ |
| vancomycin hydrochloride for injection | ZHEJIANG NOVUS PHARMACEUTICALS Co. Ltd. | N | FIRST | 9.9 | CR | 9.9 | Y |
| | | | Sponsor | 23.5 | | 33.4 | |
| | | | SECOND | 6.0 | CR | 39.4 | Y△ |
| | | | Sponsor | 3.0 | | 42.4 | |
| | | | THIRD | 5.9 | CR | 48.3 | Y△ |
| | | | Sponsor | 10.8 | | 59.1 | |
| | | | FOURTH | 6.0 | AP | 65.1 | Y△ |
| cyclophosphamide | | N | FIRST | 9.8 | CR | 9.8 | Y |

| Proprietary Name (Established Name) | Applicant | NME (Y/N) | Review Cycle | Cycle Time (Mos.) | Cycle Result | Total Time (Mos.) | Goal Met |
|---|---|---|---|---|---|---|---|
|  |  |  | Sponsor | 3.4 |  | 13.2 |  |
|  |  |  | SECOND | 5.9 | CR | 19.1 | Y△ |
|  |  |  | Sponsor | 0.6 |  | 19.7 |  |
|  |  |  | THIRD | 6 | CR | 25.7 | Y△ |
|  |  |  | Sponsor | 0.5 |  | 26.2 |  |
|  | DR REDDYS LABORATORIES Ltd. |  | FOURTH | 5.6 | CR | 31.8 | Y△ |
|  |  |  | Sponsor | 0.9 |  | 32.7 |  |
|  |  |  | FIFTH | 4.6 | CR | 37.3 | Y△ |
|  |  |  | Sponsor | 11.9 |  | 49.2 |  |
|  |  |  | SIXTH | 5.5 | CR | 54.7 | Y△ |
|  |  |  | Sponsor | 8 |  | 62.7 |  |
|  |  |  | SEVENTH | 5.7 | AP | 68.4 | Y△ |
| COMBOGESIC (acetaminophen and ibuprofen) | AFT PHARMACEUTICALS Ltd. | N | FIRST | 9.7 | CR | 9.7 | Y |
|  |  |  | Sponsor | 28.5 |  | 38.2 |  |
|  |  |  | SECOND | 6.0 | CR | 44.2 | Y△ |
|  |  |  | Sponsor | 8.6 |  | 52.8 |  |
|  |  |  | THIRD | 19.1 | AP | 71.9 | N△ |
| **Submitted in FY 2016** | | | | | | | |
| cabazitaxel | SANDOZ Inc. | N | FIRST | 10.0 | TA | 10.0 | Y |
|  |  |  | Sponsor | 64.2 |  | 74.2 |  |
|  |  |  | SECOND | 5.9 | AP | 80.1 | Y△ |
| REXTOVY (naloxone hydrochloride) | AMPHASTAR PHARMACEUTICALS Inc. | N | FIRST | 10.0 | CR | 10.0 | Y |
|  |  |  | Sponsor | 66.6 |  | 76.6 |  |
|  |  |  | SECOND | 5.9 | AP | 82.5 | Y△ |
| **Submitted in FY 2012** | | | | | | | |
| HEPZATO (melphalan hydrochloride) | DELCATH SYSTEMS Inc. | N | FIRST | 12.9 | CR | 12.9 | Y# |
|  |  |  | Sponsor | 113.1 |  | 126 |  |
|  |  |  | SECOND | 5.9 | AP | 131.9 | Y△ |
| **Submitted in FY 2001** | | | | | | | |
| EXXUA (gepirone) | FABRE KRAMER PHARMACEUTICALS Inc. | Y | FIRST | 9.9 | NA | 9.9 | Y |
|  |  |  | Sponsor | 21.3 |  | 31.2 |  |
|  |  |  | SECOND | 6.0 | NA | 37.2 | Y△ |
|  |  |  | Sponsor | 34.3 |  | 71.5 |  |
|  |  |  | THREE | 6.0 | NA | 77.5 | Y△ |
|  |  |  | Sponsor | 181.7 |  | 259.2 |  |
|  |  |  | FOUR | 9.0 | AP | 268.2 | Y#△ |

# Appendix B:  Filed Application Numbers by Review Division

The tables below and on the pages that follow show the number of applications filed in FY 2023 for various application types and review designations broken out by review division.  This reporting for PDUFA VII is required under section 736B(a) of the FD&C Act.

### Table B-1.  Original Applications Filed in FY 2023 by Review Division/Office

| Review Division/Office | Priority NDAs | Standard NDAs | Priority BLAs | Standard BLAs | Undesignated Original Applications |
|---|---|---|---|---|---|
| **CDER Review Divisions** | | | | | |
| Division of Anesthesiology, Addiction Medicine, and Pain Medicine | 1 | 8 | 0 | 0 | 2 |
| Division of Anti-Infectives | 5 | 2 | 0 | 0 | 0 |
| Division of Antivirals | 4 | 0 | 0 | 0 | 0 |
| Division of Cardiology and Nephrology | 1 | 13 | 1 | 0 | 1 |
| Division of Dermatology and Dentistry | 1 | 5 | 0 | 0 | 1 |
| Division of Diabetes, Lipid Disorders, and Obesity | 2 | 1 | 0 | 1 | 1 |
| Division of Gastroenterology | 1 | 1 | 1 | 2 | 4 |
| Division of General Endocrinology | 0 | 2 | 0 | 0 | 0 |
| Division of Hematologic Malignancies I | 1 | 2 | 0 | 0 | 1 |
| Division of Hematologic Malignancies II | 0 | 2 | 5 | 0 | 1 |
| Division of Hepatology and Nutrition | 1 | 0 | 0 | 0 | 1 |
| Division of Imaging and Radiation Medicine | 1 | 0 | 0 | 0 | 1 |
| Division of Neurology I | 1 | 5 | 1 | 0 | 0 |

| Review Division/Office | Priority NDAs | Standard NDAs | Priority BLAs | Standard BLAs | Undesignated Original Applications |
|---|---|---|---|---|---|
| Division of Neurology II | 0 | 4 | 0 | 0 | 0 |
| Division of Non-Malignant Hematology | 2 | 2 | 0 | 1 | 0 |
| Division of Non-Prescription Drugs I | 1 | 0 | 0 | 0 | 2 |
| Division of Non-Prescription Drugs II | 0 | 1 | 0 | 0 | 0 |
| Division of Oncology I | 2 | 2 | 0 | 0 | 0 |
| Division of Oncology II | 3 | 3 | 0 | 1 | 2 |
| Division of Oncology III | 2 | 1 | 1 | 3 | 0 |
| Division of Ophthalmology | 2 | 7 | 1 | 0 | 0 |
| Division of Psychiatry | 1 | 7 | 0 | 0 | 0 |
| Division of Pulmonology, Allergy, and Critical Care | 1 | 1 | 0 | 0 | 0 |
| Division of Rare Diseases and Medical Genetics | 0 | 0 | 0 | 0 | 0 |
| Division of Rheumatology and Transplant Medicine | 0 | 1 | 0 | 1 | 0 |
| Division of Urology, Obstetrics, and Gynecology | 0 | 2 | 0 | 0 | 2 |
| *CDER Totals* | *33* | *72* | *10* | *9* | *19* |
| **CBER Review Offices** | | | | | |
| Office of Blood Research and Review | 0 | 0 | 0 | 0 | 0 |
| Office of Tissues and Advanced Therapies | 0 | 0 | 6 | 3 | 0 |
| Office of Vaccines Research and Review | 0 | 0 | 3 | 1 | 0 |
| *CBER Totals* | *0* | *0* | *9* | *4* | *0* |
| **FDA Totals** | **33** | **72** | **19** | **13** | **19** |

## Table B-2.  Efficacy Supplements Filed in FY 2023 by Review Division/Office

| Review Division/Office | Priority Efficacy Supplements | Standard Efficacy Supplements | Undesignated Efficacy Supplements |
|---|---|---|---|
| **CDER Review Divisions** | | | |
| Division of Anesthesiology, Addiction Medicine, and Pain Medicine | 2 | 2 | 0 |
| Division of Anti-Infectives | 4 | 2 | 3 |
| Division of Antivirals | 8 | 8 | 1 |
| Division of Cardiology and Nephrology | 1 | 9 | 0 |
| Division of Dermatology and Dentistry | 1 | 10 | 1 |
| Division of Diabetes, Lipid Disorders, and Obesity | 6 | 12 | 1 |
| Division of Gastroenterology | 1 | 1 | 0 |
| Division of General Endocrinology | 0 | 3 | 0 |
| Division of Hematologic Malignancies I | 5 | 0 | 1 |
| Division of Hematologic Malignancies II | 1 | 7 | 0 |
| Division of Hepatology and Nutrition | 1 | 2 | 0 |
| Division of Imaging and Radiation Medicine | 0 | 1 | 0 |
| Division of Neurology I | 1 | 4 | 0 |
| Division of Neurology II | 0 | 3 | 0 |
| Division of Non-Malignant Hematology | 2 | 3 | 0 |
| Division of Non-Prescription Drugs I | 0 | 0 | 0 |
| Division of Non-Prescription Drugs II | 0 | 0 | 0 |
| Division of Oncology I | 13 | 22 | 0 |
| Division of Oncology II | 1 | 20 | 3 |

| Review Division/Office | Priority Efficacy Supplements | Standard Efficacy Supplements | Undesignated Efficacy Supplements |
|---|---|---|---|
| Division of Oncology III | 3 | 8 | 0 |
| Division of Ophthalmology | 0 | 3 | 0 |
| Division of Psychiatry | 3 | 5 | 0 |
| Division of Pulmonology, Allergy, and Critical Care | 4 | 7 | 0 |
| Division of Rare Diseases and Medical Genetics | 0 | 1 | 0 |
| Division of Rheumatology and Transplant Medicine | 0 | 10 | 1 |
| Division of Urology, Obstetrics, and Gynecology | 0 | 3 | 0 |
| *CDER Totals* | *57* | *146* | *11* |
| | | | |
| Office of Blood Research and Review | 0 | 0 | 0 |
| Office of Tissues and Advanced Therapies | 2 | 11 | 0 |
| Office of Vaccines Research and Review | 1 | 7 | 0 |
| *CBER Totals* | *3* | *18* | *0* |
| **FDA Totals** | **60** | **164** | **11** |

## Table B-3. Submissions with Special Designations Filed in FY 2023 by Review Division/Office

| Review Division/Office | Accelerated Approval | Fast Track Products | Orphan Designations | Breakthrough Designations* | IND Applications Submitted |
|---|---|---|---|---|---|
| **CDER Review Divisions** | | | | | |
| Division of Anesthesiology, Addiction Medicine, and Pain Medicine | 0 | 1 | 0 | 1 | 88 |
| Division of Anti-Infectives | 0 | 4 | 2 | 0 | 27 |
| Division of Antivirals | 0 | 2 | 0 | 0 | 52 |

| Review Division/Office | Accelerated Approval | Fast Track Products | Orphan Designations | Breakthrough Designations* | IND Applications Submitted |
|---|---|---|---|---|---|
| Division of Cardiology and Nephrology | 0 | 0 | 3 | 2 | 117 |
| Division of Dermatology and Dentistry | 0 | 1 | 1 | 1 | 75 |
| Division of Diabetes, Lipid Disorders, and Obesity | 0 | 1 | 1 | 1 | 50 |
| Division of Gastroenterology | 0 | 2 | 1 | 0 | 43 |
| Division of General Endocrinology | 0 | 1 | 0 | 0 | 16 |
| Division of Hematologic Malignancies I | 0 | 0 | 2 | 2 | 71 |
| Division of Hematologic Malignancies II | 4 | 4 | 4 | 2 | 98 |
| Division of Hepatology and Nutrition | 1 | 1 | 0 | 4 | 29 |
| Division of Imaging and Radiation Medicine | 0 | 1 | 0 | 2 | 75 |
| Division of Neurology I | 0 | 1 | 4 | 1 | 59 |
| Division of Neurology II | 0 | 1 | 2 | 1 | 46 |
| Division of Non-Malignant Hematology | 0 | 1 | 4 | 0 | 49 |
| Division of Non-Prescription Drugs I | 0 | 1 | 0 | 0 | 0 |
| Division of Non-Prescription Drugs II | 0 | 0 | 0 | 0 | 2 |
| Division of Oncology I | 0 | 1 | 0 | 2 | 239 |
| Division of Oncology II | 0 | 1 | 7 | 5 | 205 |
| Division of Oncology III | 0 | 3 | 5 | 6 | 135 |
| Division of Ophthalmology | 0 | 1 | 1 | 1 | 60 |

| Review Division/Office | Accelerated Approval | Fast Track Products | Orphan Designations | Breakthrough Designations* | IND Applications Submitted |
|---|---|---|---|---|---|
| Division of Psychiatry | 0 | 1 | 0 | 0 | 81 |
| Division of Pulmonology, Allergy, and Critical Care | 0 | 1 | 1 | 1 | 64 |
| Division of Rare Diseases and Medical Genetics | 0 | 0 | 0 | 0 | 11 |
| Division of Rheumatology and Transplant Medicine | 0 | 0 | 0 | 0 | 44 |
| Division of Urology, Obstetrics, and Gynecology | 0 | 0 | 0 | 0 | 21 |
| *CDER Totals* | *5* | *30* | *38* | *32* | *1,757* |
| | | | | | |
| Office of Blood Research and Review | 0 | 0 | 0 | 0 | 0 |
| Office of Tissues and Advanced Therapies | 0 | 6 | 7 | 1 | 12 |
| Office of Vaccines Research and Review | 0 | 3 | 0 | 2 | 1 |
| *CBER Totals* | *0* | *9* | *7* | *3* | *13* |
| **FDA Totals** | **5** | **39** | **45** | **35** | **1,770** |

* This column does not represent filed figures; rather it shows the number of BT designations granted on INDs, NDAs, and BLAs during FY 2023.  BT designation is granted based on indication, and therefore, one submission may have more than one BT designation granted.

# Appendix C:  Analysis of Use of Funds

On September 30, 2022, FUFRA was signed into law.  FUFRA reauthorized the user fee programs for prescription drugs, generic drugs, medical devices, and biosimilar biological products.

## A.    Original Application Approval Cycle Summary

The following table addresses section 904(a)(1) of FDARA (section 736B(a)(5)(A) of the FD&C Act), pertaining to PDUFA, which requires FDA to include data showing the aggregate number of approvals that occurred during FY 2023.  Data represent all the original NDA and BLA approvals that occurred during FY 2023, regardless of when the application was received.  Data are presented by the type of application and performance goal, as well as whether the approval occurred on time or was overdue on the performance goal.

This table captures not only first cycle approvals, but also multiple cycle approvals.  For applications that were approved after multiple cycles, the performance metric is counted for the last cycle when the approval was given.  Approval counts also include applications that were given a tentative approval.

Figures provided in the table below are indicated in detail in Appendix A of this report, which provides a detailed review history of the NDAs and BLAs approved under PDUFA during FY 2023.[1]

---

[1] Performance is calculated only on the first cycle in which the application received an approval or tentative approval. Any subsequent tentative or full approvals, after the first tentative approval action, will not affect the performance metric regardless of the fiscal year of the first tentative approval.

**Table C-1.  FY 2023 Original Application Approval Cycle Summary**

| Approval Cycle Type | Performance Goal: Act on 90 Percent Within | Approval Count | On Time | Overdue | Percent On Time |
|---|---|---|---|---|---|
| First Cycle Priority NMEs & BLAs | 6 months of filing date | 36 | 34 | 2 | **94%** |
| First Cycle Standard NMEs & BLAs | 10 months of filing date | 19 | 18 | 1 | **95%** |
| First Cycle Priority Non-NME NDAs | 6 months | 14 | 14 | 0 | **100%** |
| First Cycle Standard Non-NME NDAs | 10 months | 26 | 25 | 1 | **96%** |
| Class 1 Resubmissions | 2 months | 8 | 8 | 0 | **100%** |
| Class 2 Resubmissions | 6 months | 43 | 38 | 4 | **88%** |
| **Total** | | **146** | **138** | **8** | **--*** |

&ast; Performance is not calculated on combined goals.

## B.    Performance Enhancement Goals

Section 736B(a)(5)(B) of the FD&C Act, which requires FDA to include relevant data to determine whether CDER and CBER have met performance enhancement goals identified in the letters described in section 101(b) of the Prescription Drug User Fee Amendments of 2017 for the applicable fiscal year.  A link to each performance enhancement goal completed under PDUFA VI can be found on FDA's website.[2]

For purposes of this report, *performance enhancement goals* are defined as any non-review performance goal described in PDUFA with a specified goal date that falls within the applicable fiscal year.

The table below represents FDA's FY 2022 updated performance enhancement goals.

---

[2]https://www.fda.gov/industry/prescription-drug-user-fee-amendments/completed-pdufa-vi-deliverables.

### Table C-2.  FY 2022 Performance Enhancement Goals (Updated)

| Performance Enhancement Goal | Target Goal Date | On Time (Y/N) | Actual Completion Date | Comments |
|---|---|---|---|---|
| Final Guidance on Bridging Studies, Including the Bridging of Data from Combination Products | 9/30/2022 | N | N/A | A draft guidance document on this topic was published in December 2019 (see https://www.fda.gov/regulatory-information/search-fda-guidance-documents/bridging-drug-device-and-biologic-device-combination-products), and the final guidance document is in progress. |
| FY 2022 PDUFA Hiring Goals | 9/30/2022 | N | 9/24/2023 | |
| Publish Summary Topics Discussed in MIDD Workshop on Disease Progression Model Development | N/A | N/A | N/A | The summary is currently in progress. For information about the workshop, see https://www.fda.gov/drugs/news-eventshuman-drugs/best-practicesdevelopment-and-application-diseaseprogression-models-11192021. |
| Focused Guidance on Specific Biomarker Uses and Contexts to Supplement Draft Guidance on General Evidentiary Standards | N/A | N/A | N/A | After the guidance document on evidentiary framework for biomarker qualification is published, FDA will continue to evaluate the potential need for a supplemental focused guidance and publish such guidance accordingly. |

The table below represents FDA's FY 2023 performance enhancement goals.

### Table C-3.  FY 2023 Performance Enhancement Goals

| Performance Enhancement Goal | Target Goal Date | On Time (Y/N) | Actual Completion Date | Comments |
|---|---|---|---|---|
| Update PDUFA Program | 10/1/2022 | Y | 10/1/2022 | |
| Conduct Training for Pre-Approval Review of PMRs | 10/1/2022 | Y | 10/1/2022 | |
| Implement Post Approval Review of PMRs | 10/1/2022 | Y | 10/1/2022 | |
| Implement Pre-Approval Review of PMRs | 10/1/2022 | Y | 10/1/2022 | |

| Implement STAR Pilot Program | 10/1/2022 | Y | 10/1/2022 | |
|---|---|---|---|---|
| Develop STAR Web Page | 10/1/2022 | Y | 10/1/2022 | https://www.fda.gov/drugs/development-resources/split-real-time-application-review-star |
| Implement INTERACT Meeting Management | 10/1/2022 | Y | 9/30/2022 | |
| Implement Type D Meetings | 10/1/2022 | Y | 9/30/2022 | |
| Implement WRO for Clarification | 10/1/2022 | Y | 9/30/2022 | |
| Publish Revised Draft Guidance on Formal Meetings Between FDA and Sponsors | 9/30/2023 | Y | 9/22/2023 | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-pdufa-products |
| Launch Rare Disease Endpoint Advancement Pilot Program | 10/1/2022 | Y | 9/30/2022 | https://www.fda.gov/drugs/development-resources/rare-disease-endpoint-advancement-pilot-program#:~:text=The%20RDEA%20Pilot%20Program%20is,the%20efficacy%20endpoint%20development%20process |
| Establish Human Factors Validation Study Review Protocols | 10/1/2022 | Y | 10/1/2022 | |
| Implement Use-Related Risk Analysis Review | 10/1/2022 | Y | 03/08/2023 | |
| Implement Advancing Real-World Evidence Program | 12/31/2022 | Y | 10/22/2022 | |
| Issue RFI for PFDD | 6/30/2023 | Y | 5/2/2023 | https://www.federalregister.gov/documents/2023/05/02/2023-09265/methodological-challenges-related-to-patient-experience-data-request-for-information-and-comments |
| Implement MIDD program | 10/1/2022 | Y | 9/30/2022 | |
| Publish FRN on Continuation of MIDD | 12/31/2022 | N | 1/11/2023 | https://www.federalregister.gov/documents/2023/01/11/2023-00389/prescription-drug-user-fee-act-of-2023-vii-meetings-program-for-model-informed-drug-development<br>See corrective actions. |
| Publish FRN for Paired Meeting Program | 12/31/2022 | Y | 10/20/2022 | https://www.federalregister.gov/documents/2022/10/20/2022-22794/complex-innovative-design-paired-meeting-program |

| | | | | |
|---|---|---|---|---|
| Establish Review Performance Goals for REMS methodological approaches and study protocols | 10/1/2023 | Y | 8/18/2023 | |
| Conduct Public Workshop on Negative Controls | 9/30/2023 | Y | 3/8/2023 | https://healthpolicy.duke.edu/events/understanding-use-negative-controls-assess-validity-non-interventional-studies-treatment |
| Conduct Public Workshop on Post Market Pregnancy Data | 9/30/2023 | Y | 9/18/2023 | https://healthpolicy.duke.edu/events/optimizing-use-postapproval-pregnancy-safety-studies |
| Conduct Four Part Harmony MAPP/SOPP Training | 9/30/2023 | Y | 9/15/2023 | |
| Update and Conduct CMC Assessment Training | 9/30/2023 | Y | 9/15/2023 | |
| Update Four Part Harmony MAPP & SOPP | 9/30/2023 | Y | 8/25/2023 | https://www.fda.gov/media/171613/download?attachment |
| Enhance Inspection Communication for Applications | 10/1/2022 | Y | 9/16/2022 | |
| Publish Draft Guidance on Alternative Tools to Assess Manufacturing Facilities | 9/30/2023 | Y | 9/22/2023 | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/alternative-tools-assessing-drug-manufacturing-facilities-identified-pending-applications |
| Implement CMC Development and Readiness Pilot | 9/30/2023 | Y | 4/1/2023 | |
| Publish FRN Announcing CMC Development and Readiness Pilot | 12/31/2022 | Y | 10/31/2022 | https://www.federalregister.gov/documents/2022/10/31/2022-23575/chemistry-manufacturing-and-controls-development-and-readiness-pilot-program-program-announcement |
| Publish MAPP on Approaches to Address CMC Challenges | 12/31/2022 | Y | 11/1/2022 | https://www.fda.gov/media/162786/download |
| Conduct Innovative Manufacturing Public Workshop | 9/30/2023 | Y | 6/8/2023 | https://healthpolicy.duke.edu/events/advancing-utilization-and-supporting-implementation-innovative-manufacturing-approaches |
| Conduct PFDD Public Meeting on Gene Therapy Products | 9/30/2023 | Y | 11/15/2022 | https://www.fda.gov/news-events/fda-meetings-conferences-and-workshops/fda-cber-otat-patient-focused-drug-development-listening-meeting-patient-perspectives-gene-therapy |

| Incorporate Review of Allergenic Extract Products | 10/1/2022 | Y | 10/1/2022 | |
| Publish Capacity Planning Implementation Plan | 3/31/2023 | Y | 3/29/2023 | https://www.fda.gov/industry/fda-user-fee-programs/resource-capacity-planning-and-modernized-time-reporting |
| Publish Five-Year Financial Plan | 3/31/2023 | Y | 3/31/2023 | https://www.fda.gov/about-fda/user-fee-reports/user-fee-five-year-financial-plans |
| Conduct Public Meeting Financial Plan FY23 | 6/30/2023 | Y | 6/8/2023 | https://www.fda.gov/drugs/news-events-human-drugs/2023-financial-transparency-and-efficiency-prescription-drug-user-fee-act-biosimilar-user-fee-act |
| Hiring PDUFA Human Drug Review Program Staff FY23 | 9/30/2023 | N | N/A | https://www.fda.gov/industry/prescription-drug-user-fee-amendments/pdufa-and-bsufa-quarterly-hiring-updates See corrective actions. |
| Quarterly Hiring Reporting Q1 FY23 | 1/21/2023 | N | 1/26/2023 | https://www.fda.gov/industry/prescription-drug-user-fee-amendments/pdufa-and-bsufa-quarterly-hiring-updates FDA sets the target goal date for these postings because the Commitment Letter does not specify a date. FDA achieved timely postings, so no corrective actions are needed. |
| Quarterly Hiring Reporting Q2 FY23 | 4/21/2023 | Y | 4/10/2023 | |
| Quarterly Hiring Reporting Q3 FY23 | 7/21/2023 | Y | 7/12/2023 | |
| Annual PDUFA VII FDA-Industry IT Leadership Meeting Kickoff | 9/30/2023 | Y | 3/9/2023 | |
| Publish Data Standards Action Plan Q1 FY23 | 12/31/2022 | Y | 11/9/2022 | https://www.fda.gov/drugs/electronic-regulatory-submission-and-review/data-standards-program-strategic-plan-and-board |
| Publish Data Standards Action Plan Q2 FY23 | 3/31/2023 | Y | 3/1/2023 | |
| Publish Data Standards Action Plan Q3 FY23 | 6/30/2023 | Y | 5/9/2023 | |
| Publish Data Standards Action Plan Q4 FY23 | 9/30/2023 | Y | 8/14/2023 | |

| | | | | |
|---|---|---|---|---|
| Quarterly PDUFA Standing Meetings with Industry FY23 | 9/30/2023 | Y | 9/12/2023 | Meetings were held on 11/15/2022, 2/7/2023, 6/6/2023, and 9/12/2023. |
| Develop and Update Data and Tech Modernization Strategy FY23 | 9/30/2023 | Y | 9/19/2023 | https://www.fda.gov/about-fda/office-digital-transformation/fda-information-technology-strategy-fy-2024-fy-2027 |
| Establish CBER Modernization Roadmap | 9/30/2022 | Y | 5/26/2022 | |
| CBER Roadmap Updates FY23 | 9/30/2023 | Y | 3/31/2023 | |
| Complete Assessment on Challenges and Barriers to Cloud Technologies | 6/30/2023 | Y | 6/30/2023 | |
| Initiate Demonstration Project (1) on Cloud Based Technologies | 9/30/2023 | Y | 9/28/2023 | |
| Assess and Share Bioinformatics Capabilities FY23 | 9/30/2023 | Y | 9/27/2023 | |
| Establish DHT Framework Document | 3/31/2023 | Y | 3/23/2023 | https://www.fda.gov/media/166396/download?attachment |
| Establish DHT Steering Committee | 3/31/2023 | Y | 2/28/2023 | |
| Publish Website of DHT Committee | 3/31/2023 | Y | 2/28/2023 | https://www.fda.gov/science-research/science-and-research-special-topics/digital-health-technologies-dhts-drug-development |
| Conduct DHT Public Meeting 1 | 3/31/2023 | Y | 1/31/2023 | https://healthpolicy.duke.edu/events/digitalhealthtechnologies |
| Publish Draft, Revised, or Final Guidance on DHTs | 12/31/2022 | Y | 12/23/2021 | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/digital-health-technologies-remote-data-acquisition-clinical-investigations |
| Publish Draft, Revised, or Final Guidance on Drug Use Related Software | 9/30/2023 | Y | 9/19/2023 | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/regulatory-considerations-prescription-drug-use-related-software |
| Enhance Internal Systems to Support DHT Review | 3/31/2023 | Y | 3/20/2023 | |
| Establish DHT Secure Cloud Technology | 9/30/2023 | Y | 6/5/2023 | |

## C.    Common Causes and Trends Impacting Ability to Meet Goals

The following table addresses section 904(a)(1) of FDARA (section 736B(a)(5)(C) of the FD&C Act), pertaining to PDUFA, which requires FDA to identify the most common causes and trends of external or other circumstances affecting the ability of FDA, including CDER, CBER, and ORA, to meet the review time and performance enhancement goals identified in the letters described in section 101(b) of the Prescription Drug User Fee Amendments of 2017.

**Table C-4.  FY 2023 Performance Results**

| Cause or Trend | Impact on FDA's Commitments |
|---|---|
| High Volume of Meeting Requests | • In FY 2023, FDA continued to receive an increased volume of meeting requests as compared to the pre-pandemic levels. While new staff have been hired, resulting in a net increase in staff, the relative inexperience of new staff continued to impact the Agency's ability to meet the high demand of the review and formal meeting workload. |
| Specialty Candidates | • The federal hiring process (e.g., security and ethics clearances) delayed the onboarding process. In addition to last minute declinations from candidates, some hiring managers were faced with difficulties in finding candidates with the specific specialty needed to conduct the work. |

# Appendix D:  FY 2023 Corrective Action Report

Section 736B(a)(4) of the FD&C Act requires FDA to publicly issue a corrective action report that details its progress in meeting the review and performance enhancement goals identified in the PDUFA VII Commitment Letter for the applicable fiscal year.

If each of the review and performance enhancement goals for the applicable fiscal year have been met, the corrective action report shall include recommendations on ways in which the Secretary can improve and streamline the human drug application process.

For any of the review and performance enhancement goals during the applicable fiscal year that were not met, the corrective action report shall include a justification, as applicable, for the types of circumstances and trends that contributed to missed review goal times; and with respect to performance enhancement goals that were not met, a description of the efforts that FDA has put in place to improve the ability of the Agency to meet each goal in the coming fiscal year.  Such a description of corrective efforts is not required by statute for review time goals, but FDA is providing this information regardless in an effort to be complete.

This report satisfies this reporting requirement.

## A.    Executive Summary

Table D-1 below represents FDA's FY 2022 updated performance results for goal types that the Agency was not able to fully report in last year's report.  If a goal type is not listed in this table for FY 2022, then the Agency fully reported on it in last year's report.[1]

**Table D-1.  FY 2022 Review and Procedural and Process Goal Performance Results (Updated)**

| Goal Type | Circumstances and Trends Impacting the Ability to Meet the Goal Date | Corrective Action Plan |
|---|---|---|
| Procedural and Process Goals | • Response to Clinical Hold<br><br>○ In FY 2022, FDA received 344 responses to clinical holds that were subject to PDUFA goal dates. This represents a 35% increase over the 5-year average. FDA completed 88% of these reviews on time. | • FDA will continue to strive to meet PDUFA goals related to Response to Clinical Holds and re-evaluate resource allocation to ensure that adequate resources are allotted. |

---

[1] https://www.fda.gov/about-fda/user-fee-performance-reports/pdufa-performance-reports.

| | Missing the goal for only five responses to clinical holds resulted in the missed goal.<br>○ An increasing workload, combined with under-staffing, impacted performance on Response to Clinical Hold. | |

**Table D-2.  FY 2023 Review and Procedural and Process Goal Performance Results**

| Goal Type | Circumstances and Trends Impacting Ability to Meet Goal Date | Corrective Action Plan |
|---|---|---|
| Review Goals | • Original Priority non-NME NDAs<br><br>○ In FY 2023, FDA received 17 original priority non-NME NDAs subject to the PDUFA goal dates. | • Review Goals<br><br>○ FDA continues to hire new staff and to assess ways to handle the large volume of review and other regulatory work more effectively. |
| Procedural and Processing Goals | • Meeting Management Goals:<br><br>○ There were 4,403 meeting requests in FY 2023.  The volume of formal PDUFA meeting requests continued to be high compared to pre-pandemic levels.<br><br>○ A sustained high workload, including marketing applications, Emergency Use Authorizations, and meeting requests, continue to constrain FDA's resources. | • Meeting Management Goals:<br><br>○ FDA continues to assess ways to handle the large volume of formal meeting requests received each year more effectively in addition to completing other regulatory and review work. |
| Procedural and Processing Goals | • Human Factors Protocol Submissions to INDs<br><br>○ In FY 2023, FDA received 63 Human Factors Protocol Submissions to INDs that were subject to PDUFA goal dates<br><br>○ Staffing levels for work related to these submissions is inadequate due to the volume of workload and loss of staff.<br><br>○ Due to the technical and specialized nature of the work, staff with appropriate training and background are needed, and the use of non-specialized staff to support the work requires a larger learning curve before such staff can achieve the same capacity and efficiency as an experienced employee. | • FDA will continue to strive to meet PDUFA goals related to Human Factors Protocol Submissions and re-evaluate resource allocation to ensure that adequate resources are allotted to support the high workload of the human factors program.<br><br>• FDA has recruited, onboarded, and begun to train new staff to conduct this specialized work.<br><br>• FDA will continue to use the hiring authority granted under the 21st Century Cures Act to advance hiring. |

| | | |
|---|---|---|
| | | • Hiring managers will continue to increase their use of innovative recruitment tools to identify candidates with the specialized training and background needed for the technical work. |
| | • Response to Clinical Holds<br><br>   o In FY 2023, FDA received 278 responses to clinical holds that were subject to PDUFA goal dates.<br><br>   o FDA continues to receive and higher than average number of Response to Clinical Holds, particularly when compared to pre-pandemic levels<br><br>   o Although preliminary data reflect a missed goal in FY 2023, FDA has the potential to successfully meet this goal when the final response rate is reported in FY 2024.<br><br>   o An increasing workload, combined with under-staffing, impacted FDA's performance on Response to Clinical Hold. | • Response to Clinical Holds<br><br>   o FDA will continue to strive to meet PDUFA goals related to Response to Clinical Holds and re-evaluate resource allocation to ensure that adequate resources are allotted. |

**Table D-3. FY 2023 Performance Enhancement Goal Performance Results**

| Goal Type | Circumstances and Trends Impacting Ability to Meet Goal Date | Corrective Action Plan |
|---|---|---|
| *Federal Register* Notice | • The preparation and clearance of the FRN required extensive internal discussion prior to finalization and submission. It was important to ensure that the shared information would continue to advance Model-Informed Drug Development. Final clearance also involved multiple offices and regulatory authorities across FDA and an extensive effort was needed to ensure that the FRN aligned with, and did not undermine, important regulatory frameworks. | • The FRN was published on January 11, 2023. FDA will continue to streamline internal processes to speed publishing and mitigate the risk of missing timelines. |

| Goal Type | Circumstances and Trends Impacting Ability to Meet Goal Date | Corrective Action Plan |
|---|---|---|
| Hiring | • CDER's FY 23 PDUFA VII hiring goals were not met; however, constant recruitment efforts and sourcing strategies were used on all vacancies throughout the year consistent with the corrective actions outlined in the FY 2022 PDUFA report to Congress.  Of the remaining vacancies, nine had candidates set to enter on duty during FY 2024, and 24 had candidates identified who were pending final offers.  In addition to declinations from candidates, some hiring managers were faced with difficulties in finding candidates with the specific specialty needed to conduct the work. | • FDA plans to continue to advance the corrective actions outlined in the FY 2022 report to Congress and pursue new strategies to support hiring. FDA will fill the remaining PDUFA VII positions allocated for FY 2023 and will continue to track hiring progress until all 210 are on board. |

## B.    PDUFA Review Goals

The following section addresses section 904(a)(2)(B) of FDARA (section 736B(c)(2)(A) of the FD&C Act), which requires FDA to provide a justification for the determination of review goals missed during FY 2023, and a description of the circumstances and any trends related to missed review goals.

This section presents PDUFA performance and workload information for two different types of goals: (1) review of applications and other submissions pertaining to human drugs and biologics and (2) meeting management and other procedural goals related to responses and notifications in the human drug review process.

This section includes all PDUFA VII goals as they pertain to receipts/filed submissions in FY 2023.

If a goal type is not listed for FY 2022, then the Agency fully reported on it in last year's report.

## I.    FY 2022 Updated Review and Procedural and Processing Goal Performance Results

### A.    *Summary of Performance:*

FDA did not miss any review goals in FY 2022.

FDA missed the following procedural and processing goal:

- Response to Clinical Holds

B.    *Justification:*

<u>Response to Clinical Holds</u>

In FY 2022, FDA received 344 responses to clinical holds that were
subject to PDUFA goal dates.  Eighty-eight percent of response to clinical
holds were achieved on time.  A delay in only five responses to clinical
hold resulted in a missed goal.  FDA continues to receive a higher-than-
average number of responses to clinical holds, particularly when
compared to pre-pandemic levels.  The sustained increase in workload,
combined with under-staffing, impacted performance on the Response to
Clinical Hold goal.

C.    *FY 2023 Corrective Actions:*

<u>Response to Clinical Holds</u>

FDA will continue to strive to meet PDUFA goals related to Response to
Clinical Holds and re-evaluate resource allocation to ensure that adequate
resources are allotted.

## II.    FY 2023 Review and Procedural and Processing Performance Results

A.    *Summary of Performance:*

FDA missed the following review goal:

- Original Priority Non-NME NDAs

FDA missed the following procedural and processing goals:

- Meeting request for Type A, B(EOP), and D
- Meeting scheduling for Type A, B, B(EOP), and C
- Final written response for Type B, and C
- Meeting preliminary response for Type B(EOP), D, and INTERACT
- Response to Clinical Holds
- Human Factors Protocol Submissions to INDs

B.    *Justification:*

Review Goal:  Original Priority Non-NME NDAs

In FY 2023, FDA received 17 original priority non-NME NDAs subject to the PDUFA goal dates.  FDA saw an increase of 19% in original marketing application submissions between FY 2022 and FY 2023, with a 67-percent increase in the number of non-NME NDAs.  This review work, in addition to other regulatory work, contributed to a sustained high workload that impacted performance.

Procedural and Processing Goal:  Meeting Management Goals

In FY 2023, in addition to FDA's application review workload, FDA held or provided written responses to over 4,403 formal PDUFA meetings.  Prior to the public health emergency, formal meetings were steadily increasing each year at a rate that ranged between two percent and 24 percent.  Although the number of FY 2023 formal meetings held or written responses issued decreased slightly (-7%) when compared to FY 2022, the FY 2023 formal meetings still represented a 24-percent increase in meetings when compared to 3-year (FY 2017 to FY 2019) pre-pandemic average numbers.  Although the Agency was able to hire additional staff, difficulties related to the hiring process resulted in net gains that were not sufficient to handle the increased meeting workload seen.

Procedural and Processing Goal:  Response to Clinical Holds

In FY 2023, FDA received 278 responses to clinical holds that were subject to PDUFA goal dates.  FDA continues to receive a higher-than-average number of Response to Clinical Holds, particularly when compared to pre-pandemic levels.  An increasing workload impacted FDA's performance on Response to Clinical Hold.  Although preliminary data reflect a missed goal in FY 2023, FDA has the potential to successfully meet this goal when the final response rate is reported in FY 2024.

Procedural and Processing Goal:  Human Factors Protocol Submission to INDs

In FY 2023, FDA received 63 human factors protocol submissions that were subject to PDUFA goal dates. The continued high workload, insufficient staffing, and difficulty hiring new staff with the background and experience to conduct this specialized work resulted in difficulty achieving the human factors validation study protocol submission goal.

C.    *FY 2024 Corrective Actions:*

Review Goal and Meeting Management Goals

FDA continues to assess ways to handle the marketing applications, meeting requests, and other regulatory submissions received each year more effectively.  In addition, FDA continues to work on improving hiring.

Response to Clinical Holds

FDA will continue to strive to meet PDUFA goals related to Response to Clinical Holds and re-evaluate resource allocation to ensure that adequate resources are allotted.

Human Factors Protocol Submissions

FDA will continue to strive to meet PDUFA goals related the Human Factors Protocol Submissions and re-evaluate resource allocation to ensure that adequate resources are allotted to support the high workload in the human factors program.

FDA has recruited, onboarded, and begun to train new staff to conduct this specialized work and will also continue to use the hiring authority granted under the 21st Century Cures Act to advance hiring.  Hiring managers will continue to increase their use of innovative recruitment tools to identify candidates with the specialized training and background needed for the technical work.

## C.    PDUFA Performance Enhancement Goals

The following section addresses section 904(a)(2) of FDARA (section 736B(c)(2) of the FD&C Act), which requires FDA to provide a justification for missed performance enhancement goals and a description of the efforts FDA has put in place to improve the

ability of the Agency to meet each goal in the coming fiscal year (included here under the heading "FY 2024 Corrective Actions").

This section presents non-review performance goals cited in the PDUFA VII Commitment Letter with required completion dates in FY 2023.  For the purposes of this report, *performance enhancement goals* are defined as any non-review performance goal with a specified deadline as named in the PDUFA Commitment Letter. Performance enhancement goals with specified completion dates in FY 2024 will be covered in subsequent corrective action reports.

I.    *Federal Register* **Notice**

A.    *Summary of Performance:*

FDA missed the PDUFA goal date to publish an FRN on continuation of the Model-Informed Drug Development program.  The FRN, due by December 31, 2022, was published on January 12, 2023.

B.    *Justification:*

The preparation and clearance of the FRN required extensive internal discussion prior to finalization and submission.  It was important to ensure that the shared information would continue to advance Model-Informed Drug Development.  Final clearance also involved multiple offices and regulatory authorities across FDA, and an extensive effort was needed to ensure that the FRN aligned with, and did not undermine, important regulatory frameworks.

C.    *FY 2023 Corrective Actions:*

The FRN was published on January 11, 2023. FDA will continue to streamline internal processes to speed publishing and mitigate the risk of missing timelines.

II.   **Hiring**

A.    *Summary of Performance:*

FDA missed the PDUFA VII goal for hiring in FY 2023.  As of September 29, 2023, 151 of 210 FTEs were hired.

B.    *Justification:*

FDA's FY 2023 PDUFA VII hiring goals were not met; however, constant recruitment efforts and sourcing strategies were used on all vacancies throughout the year consistent with the corrective actions outlined in the FY 2022 PDUFA report to Congress. Of the remaining vacancies, nine had candidates set to enter on duty during FY 2024, and 24 had candidates identified who were pending final offers.  In addition to declinations from candidates, some hiring managers were faced with difficulties in finding candidates with the specific specialty needed to conduct the work.

C.    *FY 2024 Corrective Actions:*

FDA plans to continue to advance the corrective actions outlined in the FY 2022 report to Congress and pursue new strategies to support hiring. FDA will fill the remaining PDUFA VII positions allocated for FY 2023 and will continue to track hiring progress until all 210 are on board.

# Appendix E:  Definitions of Key Terms

A. The phrase *review and act on* means the issuance of a complete action letter after the complete review of a filed complete application.  The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.

B. Review Performance Goal Extensions

1. Major Amendments

   a. A major amendment to an original application, efficacy supplement, or Class 2 resubmission of any of these applications, submitted at any time during the review cycle, may extend the goal date by 3 months.  [Note:  If the review cycle occurred prior to FY 2013, the major amendment must have been received within 3 months of the action due date to extend the action goal date by 3 months.]

   b. A major amendment may include, for example, a major new clinical safety/efficacy study report; major re-analysis of previously submitted study (studies); submission of a Risk Evaluation and Mitigation Strategy (REMS) with Elements to Assure Safe Use (ETASU) not included in the original application; or significant amendment to a previously submitted REMS with ETASU.  Generally, changes to REMS that do not include ETASU and minor changes to REMS with ETASU will not be considered major amendments.

   c. A major amendment to a manufacturing supplement submitted at any time during the review cycle may extend the goal date by 2 months.  [Note:  If the review cycle occurred prior to FY 2013, the major amendment must have been received within 2 months of the action due date to extend the action goal date by 2 months.]

   d. Only one extension can be given per review cycle.

   e. Consistent with the underlying principles articulated in the Good Review Management Principles and Practices for PDUFA Products guidance,[1] FDA's decision to extend the review clock should, except in rare circumstances, be limited to occasions where review of the new information could address outstanding deficiencies in the application and lead to approval in the current review cycle.

---

[1] https://www.fda.gov/media/151712/download.

2. Inspection of Facilities Not Adequately Identified in an Original Application or Supplement

   a. All original applications, including those in the "Program," and supplements are expected to include a comprehensive and readily located list of all manufacturing facilities included or referenced in the application or supplement.  This list provides FDA with information needed to schedule inspections of manufacturing facilities that may be necessary before approval of the original application or supplement.

   b. If, during FDA's review of an original application or supplement, the Agency identifies a manufacturing facility that was not included in the comprehensive and readily located list, the goal date may be extended.

      i. If FDA identifies the need to inspect a manufacturing facility that is not included as part of the comprehensive and readily located list in an original application or efficacy supplement, the goal date may be extended by 3 months.

      ii. If FDA identifies the need to inspect a manufacturing facility that is not included as part of the comprehensive and readily located list in a manufacturing supplement, the goal date may be extended by 2 months.

C. A *resubmitted original application* is an applicant's complete response to an action letter addressing all identified deficiencies.

D. *Class 1 resubmitted applications* are applications resubmitted after a complete response letter (or a not approvable or approvable letter) that include the following items only (or combinations of these items):

1. Final printed labeling

2. Draft labeling

3. Safety updates submitted in the same format, including tabulations, as the original safety submission with new data and changes highlighted (except when large amounts of new information, including important new adverse experiences not previously reported with the product, are presented in the resubmission)

4. Stability updates to support provisional or final dating periods

5. Commitments to perform postmarketing studies, including proposals for such studies

6. Assay validation data

7. Final release testing on the last 1-2 lots used to support approval

8. A minor reanalysis of data previously submitted to the application (determined by the Agency as fitting the Class 1 category)

9. Other minor clarifying information (determined by the Agency as fitting the Class 1 category)

10. Other specific items may be added later as the Agency gains experience with the scheme and will be communicated via guidance documents to industry

E. *Class 2 resubmissions* are resubmissions that include any other items, including any item that would require presentation to an advisory committee.

F. Meeting requests commit FDA to notify the requestor of a formal meeting in writing within 14 days of request for Type A, Type B(EOP), and Type D meetings or within 21 days of request for Type B, Type C, and Type INTERACT meetings.

G. Scheduled meetings should be made within 30 days of receipt of request for Type A meetings, 60 days for Type B meetings, 70 days for Type B(EOP) meetings, 75 days for Type C and Type INTERACT meetings, and 50 days for Type D meetings.  If the requested date for any of these types of meetings is greater than 30, 50, 60, 70, or 75 days, as appropriate, from the date the request is received by FDA, the meeting date should be within 14 days of the requested date.

H. Preliminary responses to sponsor questions contained in the background package for Type B(EOP), D, and INTERACT meetings should be sent to the sponsor no later than 5 calendar days prior to the meeting date.

I. Meeting minutes are to be prepared by FDA clearly outlining agreements, disagreements, issues for further discussion, and action items.  They will be available to the sponsor within 30 days of the meeting.

J. A Type A meeting is a meeting that is necessary for an otherwise stalled drug development program to proceed (a "critical path" meeting) or to address an important safety issue.

K. A Type B meeting includes pre-IND meetings and pre-NDA/BLA meetings, while Type B(EOP) meetings are reserved for certain End-of-Phase 1 meetings (i.e., for 21 CFR part 312 subpart E or 21 CFR part 314 subpart H or similar products) and End-of-Phase 2/pre-Phase 3 meetings.  Meetings regarding REMS or postmarketing requirements that occur outside the context of the review of a marketing application will also generally be considered Type B meetings.

L. A Type C meeting is any other type of meeting.

M. A Type D meeting is focused on a narrow set of issues (e.g., often one, but typically not

more than two issues and associated questions).

N. An Initial Targeted Engagement for Regulatory Advice on CBER/CDER Products (INTERACT) meeting is intended for novel questions and unique challenges in early development (i.e., prior to filing of an IND).

O. The performance goals and procedures also apply to original applications and supplements for human drugs initially marketed on an over-the-counter (OTC) basis through an NDA or switched from prescription to OTC status through an NDA or supplement.

P. IT-specific definitions:

1. *Program* refers to the organizational resources, procedures, and activities assigned to conduct "the process for the review of human drug applications," as defined in PDUFA.

2. *Standards-base* means compliant with published specifications that address terminology or information exchange between FDA and regulated parties or external stakeholders, as adopted by FDA or other agencies of the federal government, and often based on the publications of national or international Standards Development Organizations.

3. *FDA Standards* means technical specifications that have been adopted and published by FDA through the appropriate governance process. FDA standards may apply to terminology, information exchange, engineering or technology specifications, or other technical matters related to information systems. FDA standards often are based on the publications of other federal agencies or the publications of national or international Standards Development Organizations.

4. *Product life cycle* means the sequential stages of human drug development, regulatory review and approval, postmarket surveillance and risk management, and where applicable, withdrawal of an approved drug from the market. In the context of the process for the review of human drug applications, the product life cycle begins with the earliest regulatory submissions in the IND phase, continues through the NDA or BLA review phase, and includes postmarket surveillance and risk management activities as covered under the process for the review of human drug applications.

Q. Special Protocol Assessments: Upon specific request by a sponsor, FDA will evaluate certain protocols and issues to assess whether the design is adequate to meet scientific and regulatory requirements identified by the sponsor.

R. The Application Integrity Policy focuses on the integrity of data and information in applications submitted to FDA for review and approval. It describes FDA's approach

regarding the review of applications that may be affected by wrongful acts that raise significant questions regarding data reliability.  More information on the policy is available at http://www.fda.gov/media/71236/download.

This report was prepared by FDA's Office of Planning, Evaluation, and Risk Management in collaboration with FDA's Center for Biologics Evaluation and Research and Center for Drug Evaluation and Research.  For information on obtaining additional copies, please contact:

Office of Planning, Evaluation, and Risk Management
Office of the Commissioner
U.S. Food and Drug Administration
10903 New Hampshire Ave.
Silver Spring, MD  20993-0002
Phone: (301) 796-4850
Email: OPERM_ADMIN_Team@fda.hhs.gov

This report is available on FDA's home page at https://www.fda.gov/.

