# EXHIBIT 61

CONFIDENTIAL



# Review of Request for Orphan Drug Designation

| | | |
|---|---|---|
| 1 | **For Original Requests**<br>    **\*Date of Request:**<br>    **\*Date Received by FDA:** | Click here to enter a date.<br>Click here to enter a date. |
| 2 | **For Amendments:**<br>**\*Date Original Request Received:**<br>**\*Date of Amendment:**<br>**\*Date Amendment Received:** | 4/20/2016<br>10/13/2017<br>12/13/2017 |
| 3 | **Date Review Completed:** | 12/21/2017 |
| 4 | **\*Designation Number:** | 16-5302 |
| 5 | **\*Prior or Related  Designation Number:**<br>(e.g., if the 1-year deficiency response period to prior similar submission was exceeded) | |
| 6 | **\*Chemical Name:** | |
| 7 | **\*Generic  Name:** | FT218 (sodium oxybate for extended-release oral suspension) |
| 8 | **Other (Code) Name:** | |
| 9 | **\*Sponsor:** | Flamel Ireland Limited<br>Block 10-1 Blanchardstown Corporate Park<br>Ballycoolin<br>Dublin 15<br>Ireland |
| 10 | **\*Proposed Orphan Disease or Condition:** | For the treatment of cataplexy and excessive daytime sleepiness in narcolepsy |
| 11 | **\*Sponsor Resident Agent or Contact:** | U.S. Agent for Flamel<br>Marla Scarola<br>Phone: 202.730.4129<br>E-mail: marla.scarola@weinberggroup.com |
| 12 | **\*Manufacturer:** | The drug substance, sodium oxybate is manufactured in accordance with Good Manufacturing Practice at the following facilities: |

FDA-Jazz-000461

CONFIDENTIAL

| | | |
|---|---|---|
| | | EUTICALS INC.<br>2460 West Bennett Street<br>Springfield, Missouri 65807<br><br>Manufacture of FT218 drug product is conducted in accordance with Good Manufacturing Practice at the following facility:<br>RECIPHARM<br>Parc Industriel Bersol 1<br>11 Avenue Gustave Eiffel<br>33608 Pessac<br>France |
| 13 | *Regulatory Status: | FT218 is currently being tested under IND 126,321 for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy. It is not approved or marketed in any country including the US for any indication. No adverse regulatory actions have been taken against FT218 in any country. |
| 14 | * Sponsor Provided Self-Certification?<br>*If no, request from sponsor.* | Yes ☐   No ☐ |
| 15 | Orphan Drug Designation History: | Six drugs currently hold orphan drug designation for the treatment of narcolepsy: DRU-2016-5268, DRU-2012-3751, DRU-2010-3072, DRU-1994-858, DRU-1993-737 and DRU-1987-263. Two have been approved: DRU-1994-858 (oxybate) and DRU-1993-737 (modafinil). |

*Filled out by Program Support Team

| | | |
|---|---|---|
| 16 | Disease Proposed by Sponsor:<br>*(Provide several line descriptors not to exceed two paragraphs; cite page numbers in the request for more details.)* | Narcolepsy is a neurological disorder characterized by excessive daytime sleepiness, cataplexy, hypnagogic hallucination and sleep paralysis. The prevalence of narcolepsy in the US is 0.02-0.18%. Narcolepsy preferentially affects males with a male to female ratio of 2 to 1. Narcolepsy is thought to have genetic predispositions. Certain human leukocyte antigen (HLA) subtypes and abnormal hypocretin (orexin) neurotransmission have been associated with narcolepsy. An autoimmune etiology is also suggested.<br>The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) defines narcolepsy as recurrent episodes of irrepressible need to sleep, lapsing into sleep, or napping occurring within the same day. These sudden sleep attacks may occur during any type of activity at any time of the day. |

FDA-Jazz-000462

|   |   |   |
|---|---|---|
|   |   | Although narcolepsy has traditionally been a disease of adulthood, most cases have their onset in childhood or adolescence. Sleep attacks must have been occurring at least three times per week over the past 3 months for the diagnosis of narcolepsy. There also must be the presence of at least one of the following:<br>• Episodes of cataplexy occurring at least a few times per month<br>• Hypocretin deficiency<br>• REM sleep latency ≤15 minutes, or a mean sleep latency ≤8 minutes and two or more sleep-onset REM periods (SOREMPs)<br>Two tests that are considered essential in confirming a diagnosis of narcolepsy are the polysomnogram (PSG) and the Multiple Sleep Latency Test (MSLT). Three forms of narcolepsy are recognized: narcolepsy with cataplexy, narcolepsy without cataplexy, and narcolepsy due to a medical condition. Treatments of narcolepsy include both pharmacologic and nonpharmacologic approache . Pharmacologic treatment of narcolepsy involves the use of central nervous system (CNS) stimulants such as methylphenidate, modafinil, dextroamphetamine sulfate, methamphetamine, and amphetamine. Modafinil (Provigil, Modasomil, Modiodal, Vigil) is the first-line pharmacological treatment of excessive daytime sleepiness and irresistible episodes of sleep in association with behavioral measures. Sodium Oxybate (XYREM®) is currently the first-line treatment for cataplexy in patients with narcolepsy. Antidepressants, either tricyclics or newer antidepressants, are used treatments. Clinical trials on intravenous immunoglobulin (IVIg) have shown some promising results. |
| 17 | "Same Drug(s)" already approved for the same indication? | Yes ☒  No ☐ |
| 18 | If YES, list the drug(s) | Xyrem®, sodium oxybate oral solution (500 mg/ml), is currently approved by the FDA under NDA 21196 for the treatment of cataplexy and excessive daytime ~~in~~ narcolepsy. *sleepiness* |
| 19 | If YES, has the sponsor provided a plausible hypothesis for clinical superiority over all previously approved same drugs? | Yes ☒  No ☐ |
| 20 | List all hypotheses presented by the sponsor. | The sponsor claims that FT218 provides a major contribution to patient care (MC to PC) over the approved marketed product Xyrem® (NDA 021196) by reducing the twice nightly dosing to once before bedtime. The sponsor did not make |

FDA-Jazz-000463

CONFIDENTIAL

| | | |
|---|---|---|
| | | claims on superior clinical safety and efficacy. |
| 21 | If **YES**, provide an analysis of, at a minimum, the plausible hypothesis for clinical superiority that will be the basis of the designation. If **NO**, provide an analysis why all hypotheses presented by the sponsor are not plausible. | Upon review of the original request, OOPD issued the following deficiency on August 23, 2016: The OOPD acknowledges that the proposed dosing regimen of FT218 is more convenient to the patient and/or caregivers than that of Xyrem®. However, based on your current submission, this reduction in dosing frequency is not considered as providing a major contribution to patient care. You have also not submitted a plausible hypothesis for superior efficacy or safety for your product over the approved product used per marketing label.<br><br>This amendment (submitted on 10/13/2017) contains the sponsor's response to OOPD's deficiency letter dated 08/23/2016. The sponsor provided letters from four Key Opinion Leaders (Dr. Krahn, Dr. Kryger, Dr. Roth and Dr. Swick) in the field of narcolepsy describing their experiences with narcolepsy patients and how they expect a reduction in dosing frequency to impact their patients to support the sponsor's claim of major contribution to patient care (MCTPC).<br><br>Sponsor rationale for MCTPC (as described in the original submission and in this amendment by the four narcolepsy experts):<br>1. The sponsor cited a statement distributed at the September 24, 2013 FDA meeting on Drug Development for Narcolepsy: "...an ideal therapy included, a drug that would provide consistent and adequate control of the daytime sleepiness without the hard crash and one that would require dose taken at bedtime resulting in 8 hours of restorative sleep".<br>2. Eliminate the obvious disadvantage of needing to disrupt sleep in order to take a drug that promotes sleep.<br>3. Reduce the potential for decreased efficacy if the second of dose of Xyrem® is missed.<br>4. Eliminate the need to disrupt the sleep of roommates and partners or parents/caregivers of affected children.<br>5. Reduce safety risks of a second nightly dose of Xyrem® which include:<br>6. Potential for consumption of the product left on a bedside table by a child |

FDA-Jazz-000464

CONFIDENTIAL

7. Risk of falls or other accidental injuries if the second dose is not consumed in bed because of the rapid onset of effects
8. The risk of accidental measurement errors in nightly dose preparations
9. Potential impact on diversion: FT218 will be provided as white granules as opposed to Xyrem® which is a clear to slightly opalescent oral solution. Since sodium oxybate has a history of being the "date-rape drug", the appearance and mouth feel of the white granules could alert the target of the misuse that a substance has been added to his/her drink.

After initial review of this amendment, OOPD sent a formal consult request to Division of Neurology Products (DNP) in the Center for Drug Evaluation and Research (CDER) on November 2, 2017, in which OOPD asked DNP's opinion on whether the once nightly dosing would constitute as MCTPC.

CDER/DNP consult (attached with this review) was received by OOPD on December 20, 2017. DNP agrees that the once nightly dosing would be considered as major contribution to patient care. Dr. Mani provided the following statement in his consult review: "Assuming that it is determined by the Agency that any sodium oxybate product (such as FT218) can be administered once each night, at bedtime, rather than twice in a night as is the case for the currently approved marketed sodium oxybate product, Xyrem (for the same indications as Xyrem), that would be a major contribution to patient care. The reasons for the view summarized in the previous paragraph are readily apparent, and have already been outlined in Section 5. Most notably, a once-before-bedtime dosing regime for sodium oxybate would be more convenient (and less disruptive of patient sleep), and more safe, than the administration of two separate doses each night as is the case with Xyrem.". Dr. Mani also stated in Section 5 of his review: "A once-nightly dosing regimen may present less risk to a patient than a twice-nightly regimen. The twice nightly dosing regimen for Xyrem has, for example, resulted in several patients getting out of bed to take the second dose (contrary to what is recommended in the Prescribing Information), while under the sedating effects of the first dose, and falling and sustaining serious injuries as a result."

Taken into consideration of information provided in the sponsor's original submission and amendment, as well as

FDA-Jazz-000465

| | | |
|---|---|---|
| | | CDER/DNP consult, OOPD determines that the sponsor has provided a plausible hypothesis for clinical superiority based on major contribution to patient care.<br><br>In addition, as stated by Dr. Mani, cases have been reported that patients fell and sustained serious injuries when getting out of bed to take the second dose of Xyrem® while under the sedating effects of the first dose. A once before bedtime dosing regimen enabled by FT218 would reduce the risk of falling and subsequent injuries in these patients, therefore, provides a plausible hypothesis of better safety. |
| 22 | If **YES**, select one type of clinical superiority and describe in one sentence the plausible hypothesis that will be the basis for designation. If **NO**, leave blank. | Safety ☒   Effectiveness ☐   MC to PC ☒<br>**Plausible Hypothesis:**<br>1. FT218 would provide major contribution to patient care compared to Xyrem® by eliminating the need to disrupt sleep.<br>2. FT218 would provide better safety compared Xyrem® by reducing the risk of falls and subsequent injuries during nighttime. |
| 23 | **Is subject of request for Orphan Drug Designation a subset of a disease or condition?** | Yes ☐   No ☒ |
| 24 | If **YES**, is the sponsor seeking a designation for a pediatric subpopulation of a common disease? | Yes ☐   No ☐ |
| 25 | If **YES**, has the sponsor submitted a property of the product that would limit the product's use to the subset of the disease or condition? | Yes ☐   No ☐ |
| 26 | If **YES**, describe property that limits use of product to targeted subset.  If **NO** describe if the sponsor has made any attempt at explaining why use of the product is limited to the subset of interest. | |
| 27 | **Sponsor's Population Estimate and Estimating Methodology :** *(cite page number in the request)* | *Prevalence of narcolepsy in the US is estimated to be 182,412.*<br><br>*For more information, please see my previous review on the original submission.* |

FDA-Jazz-000466

CONFIDENTIAL

| 28 | Reviewer agrees with sponsor's assessment that the population is less than 200,000. | Yes ☒   No ☐ |
|----|----|----|
| 29 | If the reviewer has concerns with population provided by the sponsor, list concerns and include any calculations performed by the reviewer. | |
| 30 | **Scientific Rationale:** Describe the drug and provide a brief description of the mechanism of action if known. | Please see my previous review on the original submission. Scientific rationale is adequate. |
| 31 | Is the disease treated by the product the disease that is the subject of the request for orphan drug designation? | Yes ☒   No ☐ |
| 32 | If the disease or condition treated by the product is not the subject of the request for orphan drug designation, describe the disease or condition for the purposes of orphan drug designation and why you believe that to be the case. | |
| 33 | If **YES**, does the sponsor rely on human data? | Yes ☒   No ☐ |
| 34 | If **YES**, provide a brief description of the human data with page reference to the designation request. No need to describe all human studies. Briefly describe best study and note that others exist. If **NO**, go to Animal Data. | |
| 35 | **Animal Data:** are the data from an appropriate animal model of the disease? | Yes ☐   No ☐ |
| 36 | Provide a brief description of the animal data (if any) and make comment upon adequacy of the data (appropriate animal model, appropriate timing of drug delivery, etc.) | |

FDA-Jazz-000467

CONFIDENTIAL

| 37 | If no animal or human data are provided, is there an appropriate animal model of the disease or condition? | Yes ☐  No ☐ |
|----|----|----|
| 38 | If **NO**, are there in vitro data and other supportive data to provide an adequate scientific rationale? | Yes ☐  No ☐ |
| 39 | Describe the in vitro or other supportive data used to provide an adequate scientific rationale. | |

| 40 | Recommendation: | Designate: ☒    Abeyance: ☐    Denial: ☐ |
|----|----|----|
| 41 | **Summarize the Recommendation:** | This amendment contains the sponsor's response to OOPD's deficiency letter dated August 23, 2016. Taken into consideration of information submitted by the sponsor and CDER/DNP consult, OOPD has determined that the sponsor has established plausible hypotheses of clinical superiority of FT218 over Xyrem® by providing major contribution to patient care and better safety. Scientific rationale is adequate. The estimated population of narcolepsy is 182,412 in the US. Therefore, I recommend this orphan drug designation request be granted. |

Date: 12/21/2017

**Gumei Liu, MD, PhD, Staff Fellow**

Concur: _____    Date: 12/26/2017

Henry H. Startzman III, M.D.
Director, Orphan Drug Designation Program

***Secondary Reviewer Comments (optional):*** *for example, is a meeting with the sponsor recommended?*

Safty also due to possible dosing errors with formation of a second dose. Surjinate for Treatment of Narolepsy.    NHS

FDA-Jazz-000468

**CONFIDENTIAL**

## Orphan Drug (OD) and Rare Pediatric Disease (RPD) Designation Checklist

- Completed by Designation Reviewer and placed behind a completed orphan designation review when the review results in a recommendation for Orphan Drug or RPD designation status being awarded.
- Completed review and checklist are submitted to the Director, Orphan Drug Designation Program.
- Checklist will aid the Designation Administrator to correctly populate the Designation Database at the time the designation letter is issued to Sponsor.

| | |
|---|---|
| *Designation Application # 16-5302* | |
| *Generic, Chemical or Meaningful Descriptive Name:* ~~FT218~~ (sodium oxybate ✗ extended-release oral suspension) | |
| *Orphan or RPD Designation:* ~~For the treatment of cataplexy and excessive daytime sleepiness in~~ narcolepsy   *Disease is Narcolepsy. Treatment of Narcolepsy* | |
| *Patient Population Estimate:* 182,412 | |
| *IND # 126321* | |
| *Circle whether the product is a DRUG or BIOLOGIC (if combination product, circle primary mode of action)* | |

*Check if any of the following apply for Orphan Drug (OD) or Rare Pediatric Disease (RPD) Designation Letters:*

| | | |
|---|---|---|
| | OD and RPD OPTION 1 | Please note that the designation granted is broader than the indication proposed in your designation request. |
| | OD OPTION 2 | Please note that the designation granted is based on the information you submitted and reliance upon additional supportive information. |
| x | OD OPTION 3 | Our decision to grant designation is based on the *plausible hypothesis* that your drug may be clinically superior to the same drug(s) already approved for the same indication because your drug may [be more safe/provide a major contribution to patient care] due to [that the once before bedtime dosing regimen of FT218 eliminates the need to disrupt sleep and reduces risks of falls and subsequent injuries during nighttime] |
| | RPD OPTION 2 | We determined that [disease name] meets the definition of a rare pediatric disease based on the information you submitted and reliance upon additional supportive information. |
| | RPD OPTION 3 | *USE IF WE CANNOT DESIGNATE THE MARKETING APPLICATION* |
| | RPD OPTION 4 | *USE IF WE CONDITIONALLY DESIGNATE THE APPLICATION* |

*For Database:*

| | | |
|---|---|---|
| | Combination Product | *potential for product to be classified as a drug-biologic, drug-device, biologic-device or biologic-drug-device* |
| | Personalized Medicine | *uses genetic or other biomarker information to make treatment decisions about patients* |
| | Bioterrorism | *designated for counter-terrorism use* |
| x | Serious | *designated for a serious and life threatening disease or condition* |
| x | Same drug designated for same use | *If checked, specify other orphan drug designation file number(s): DRU-1994-858* |
| x | MCTPC | *designated on a hypothesis that the product is clinically superior in that it will provide a major contribution to patient care [21 CFR 316.3(a)(3)(iii)]* |
| x | Safety | *designated on a hypothesis that the product is clinically superior in that it will provide greater safety in a substantial portion of the target population [21 CFR 316.3(a)(3)(ii)]* |
| | Efficacy | *designated on a hypothesis that the product is clinically superior in that it will provide greater effectiveness [21 CFR 316.3(a)(3)(i)]* |
| | Orphan Subset | *designated for a subset of a non-orphan disease or condition* |
| | Policy Issue | *contains issue(s) that could be used to set precedence and/or is controversial. **If checked, briefly describe issue below so that Designation Administrator can note in Designation Database comment field:*** |
| | Economic | *designated based on nonrecovery of costs* |
| | EMA submission | *application for same product/disease has been submitted to EMA* |
| | EMA designation | *same product/disease holds EMA designation* |

CONFIDENTIAL

| Specialty (Select up to 3 pertinent specialties from the Groups below and number 1 to 3 from greatest to least importance. Specialty 1 must be from Group A but specialties 2 and 3 can be any listed in Group A or B). | | | |
|---|---|---|---|
| **Group A** | | **Group B** | |
| | Analgesics/Anesthesiology | Orthopedics | *Bone Marrow Transplant* |
| | Cardiology | Otolaryngology/Head & Neck | *Burn* |
| | Dental | Pharmacology/Toxicology/Poisoning/Chelators | *Devices* |
| | Dermatology | Physical Medicine and Rehabilitation | *Gene Therapy* |
| | Endocrinology | Psychiatry | *Geriatrics* |
| | Gastroenterology/Liver | Pulmonary | *HIV/AIDS* |
| | Genetics | Radiopharmaceutical/Nuclear Medicine/Radiology | *Laser/Photodynamic Therapy* |
| | Hematology | Rheumatology | *Medical Foods* |
| | Immunology | Substance Abuse | *Neonatology* |
| | Infectious Diseases | Transplant | *Neurosurgery* |
| | Metabolism | Urology | *Nutrition* |
| | Nephrology | Vascular | *Pain* |
| x | Neurology | | *Pediatrics* |
| | Obstetrics and Gynecology | | *Sickle Cell Disease* |
| | Oncology | | *Supplement* |
| | Ophthalmology | | |

Version 10/4/2017

# EXHIBIT 62



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Public Health Service**
**Food and Drug Administration**
**Office of Orphan Products Development**

# Exclusivity Memorandum

| | |
|---|---|
| **Date:** | See electronic signature date |
| **From:** | Roberta Szydlo, RPh, MBA, Senior Program Management Officer |
| **Through:** | Henry Startzman III, MD, Director, Orphan Drug Designation Program<br>Aaron Friedman, JD, Associate Director for Policy |
| **To File #:** | DRU-2016-5302 |
| **Name of drug or biologic:** | Lumryz (sodium oxybate) for extended-release oral suspension |
| **Orphan designation:** | Treatment of narcolepsy |
| **Designation date:** | 01/08/2018 |
| **Sponsor name:** | Flamel Ireland Limited dba Avadel Ireland |
| **NDA, sNDA, BLA, or sBLA #:** | NDA 214755 |
| **Approval date:** | 05/01/2023 |
| **Approved indication:** | Treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy |

FDA-Jazz-000522

| Is the approval within scope of designation? | Yes ☒    No ☐ | | | |
|---|---|---|---|---|
| Comments: | The approved indication for Lumryz above is within the scope of the orphan-drug designation for the treatment of narcolepsy. | | | |
| Has the same drug or biologic been previously approved? | Yes ☐    No ☐ | Is the drug or biologic a New Molecular Entity (NME) or New Biological Entity (NBE)? | Yes ☐    No ☐ | |
| Comments: | See appended memo and consults for analysis regarding Lumryz's eligibility for its own term of ODE. We note that the appended documents also address Lumryz's approvability in light of Xywav's unexpired ODE, but the analysis also includes FDA's decision regarding Lumryz's eligibility for its own term of ODE. | | | |
| Has the same drug or biologic already been approved for the same indication? | Yes ☐    No ☐ | | | |
| Comments: | See appended memo and consults for analysis regarding Lumryz's eligibility for its own term of ODE. We note that the appended documents also address Lumryz's approvability in light of Xywav's unexpired ODE, but the analysis also includes FDA's decision regarding Lumryz's eligibility for its own term of ODE. | | | |
| Has clinical superiority been demonstrated? | Yes ☐    No ☐    Not Applicable ☐ | | | |
| Comments: | See appended memo and consults for analysis regarding Lumryz's eligibility for its own term of ODE. We note that the appended documents also address Lumryz's approvability in light of Xywav's unexpired ODE, but the analysis also includes FDA's decision regarding Lumryz's eligibility for its own term of ODE. | | | |
| Recommendation: | **Recognize Exclusivity: Yes ☒    No ☐**<br><br>Lumryz (sodium oxybate) for extended-release oral suspension is eligible for orphan-drug exclusivity for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy. | | | |

**Additional comments (optional):**

FDA-Jazz-000523



Office of Orphan Products Development<br>
Food and Drug Administration<br>
10903 New Hampshire Avenue<br>
WO32-5271<br>
Silver Spring, MD 20993

May 1, 2023

Sidley Austin LLP
Counsel to Jazz Pharmaceuticals, Inc.
1501 K Street, N.W.
Washington, D.C. 20005

Attention: Sean C. Griffin and Kwaku A. Akowuah

Re: Determination that Xywav's (NDA 212690) unexpired orphan-drug exclusivity ("ODE") does not block approval of Lumryz (NDA 214755)

Dear Mr. Griffin and Mr. Akowuah:

We have considered the submissions described in greater detail herein from Jazz Pharmaceuticals, Inc. ("Jazz") and Sidley Austin LLP ("Sidley") as counsel to Jazz.  FDA's Office of Orphan Products Development ("OOPD" or "we") provides the response below.

## I.     Introduction

Herein, this analysis evaluates whether the ODE for Xywav (calcium, magnesium, potassium, and sodium oxybates) blocks the approval of NDA 214755 for Lumryz (sodium oxybate) for extended-release oral suspension submitted by Avadel CNS Pharmaceuticals, LLC ("Avadel") for the treatment of cataplexy or excessive daytime sleepiness ("EDS") in adults with narcolepsy. Xywav became eligible for ODE for the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy because its sponsor, Jazz, demonstrated at the time of approval that Xywav was clinically superior to Xyrem, which was previously approved for the same indication.  Under section 527(a) of the Federal Food, Drug, & Cosmetic Act ("FD&C Act"), the ODE for Xywav prevents FDA from approving a new drug product that is the "same drug" as Xywav for the same use or indication until its exclusivity expires on July 21, 2027.[1]  By regulation, a drug is the "same drug" as Xywav if it contains the same active moiety (oxybate)

---

[1] Section 527(a) of the FD&C Act; *see also* 21 CFR § 316.31.  *See also* FDA, Clarification of Orphan-Drug Exclusivity Following *Catalyst Pharms., Inc. v. Becerra*, 88 Fed. Reg. 4086 (Jan. 24, 2023).

1

FDA-Jazz-000524

for the same use or indication (the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy)[2] unless the new drug product is clinically superior to Xywav.[3]  For the reasons described below, we conclude that Lumryz is clinically superior to Xywav and is thus not considered to be the "same drug" as Xywav within the meaning of 21 CFR § 316.3(b)(14) and section 527(a) of the FD&C Act.  Therefore, Xywav's ODE does not block approval of NDA 214755 for Lumryz for the treatment of cataplexy or EDS in adults with narcolepsy.

We also conclude that Lumryz is eligible for its own term of ODE because it is clinically superior to both Xywav and Xyrem.  Under section 527(c)(1) of the FD&C Act, if FDA has previously approved a drug that is otherwise the same drug for the same use or indication, the subsequent drug may be eligible for its own term of ODE if the sponsor demonstrates that its product is clinically superior to every such previously approved drug.[4]  As set forth below, we have determined that Avadel has demonstrated Lumryz's clinical superiority to every previously approved oxybate drug for the same use or indication, i.e., both Xywav and Xyrem.  Therefore, Lumryz is eligible for its own term of ODE for the treatment of cataplexy or EDS in adults with narcolepsy.

OOPD consulted with agency sleep experts and the Division of Neurology 1 ("DN1") in making this determination,[5] and their scientific thinking and expert opinions have been integral to this decision.  As discussed below, FDA's determination is based on careful consideration of the relevant scientific, legal, and regulatory issues raised and the materials submitted by outside parties.  On December 15, 2020, Avadel submitted to OOPD and to the file for NDA 214755 an "exclusivity claim."[6]  On July 14, 2021, Avadel submitted to OOPD and to the file for NDA 214755 a supplement to its "exclusivity claim."[7]  On July 21, 2021, Avadel sent a letter to OOPD and to FDA's Office of Chief Counsel ("OCC") presenting arguments why Lumryz's NDA should be eligible for approval notwithstanding Xywav's ODE.[8]  On October 25, 2021, Latham & Watkins LLP as counsel to Avadel sent OCC a letter presenting arguments about the approvability of Lumryz's NDA.[9]  On August 30, 2022, Avadel sent a letter to OOPD with additional arguments about clinical superiority.[10]

---

[2] The indication for Lumryz is "the treatment of cataplexy or EDS in adults with narcolepsy," which is not co-extensive with, but falls entirely within, the scope of Xywav's ODE because Xywav's ODE includes a broader age range.

[3] 21 CFR § 316.3(b)(14).

[4] Section 527(c)(1) of the FD&C Act; *see also* 21 CFR § 316.34(c).

[5] *See* Mahadevappa Hunasikatti MD FCCP and Nargues Weir MD FCCP FAASM ATSF, *Consult request on Lumryz* (Apr. 29, 2023) [hereinafter Sleep Expert Consult]; DN1, *Office of Orphan Products Development Consult Request #16-5302* at (May 1, 2023) [hereinafter DN1 Lumryz Consult].

[6] Avadel, *Exclusivity Claim* (Dec. 15, 2020).

[7] Avadel, *Exclusivity Claim – Supplemental Information in Demonstration of Clinical Superiority of FT218* (Jul. 14, 2021).

[8] Letter from Jerad G. Seurer to Nicole Wolanski and Mark Raza, *Approval and Orphan Drug Exclusivity for FT218 (sodium oxybate for extended-release oral suspension)* (Jul. 21, 2021).

[9] Letter from John R. Manthei to Elizabeth Dickinson, *Lumryz (sodium oxybate) for extended-release oral suspension (NDA 214755)* (Oct. 25, 2021).

[10] Letter from Jennifer Gudeman to Sandra Retzky, *Orphan Drug Considerations for LUMRYZ (sodium oxybate) for Extended-Release Oral Suspension – DRU 2016-5302* (Aug. 30, 2022).

FDA-Jazz-000525

In addition to the submissions OOPD received from Avadel and its counsel, OOPD received submissions from Jazz.  On September 16, 2021, Jazz sent a letter to OOPD presenting arguments why Lumryz is not clinically superior to Xywav ("Jazz's September 2021 Letter").[11] On December 6, 2022, Sidley as counsel to Jazz sent OCC a letter presenting arguments why Lumryz is not clinically superior to Xywav ("Sidley Letter") and requested a meeting with OCC.[12]  On January 18, 2023, FDA met with Sidley during which Sidley presented a slide deck ("Sidley Slides").[13]  In this analysis, the arguments presented in Jazz's September 2021 Letter, the Sidley Letter, and the Sidley Slides are collectively referred to as Jazz's arguments.[14]

## II.    Legal Background

### A.    Orphan-Drug Designation ("ODD")

Congress enacted the Orphan Drug Act in 1983 to provide incentives for the development of drugs for rare diseases or conditions that would not otherwise be developed due to the small patient population and lack of profitability of such drugs.[15]  Section 526 of the FD&C Act defines a "rare disease or condition," in relevant part, as any disease or condition that affects less than 200,000 persons in the United States.[16]  To be eligible for ODD incentives — including tax credits for qualified clinical testing, exemption from the application user fee, and, potentially, ODE — the sponsor of a drug must request ODD for a rare disease or condition under section 526 of the FD&C Act, and FDA must grant ODD.[17]  FDA's regulations at 21 CFR Part 316 lay out the requirements for an ODD submission.[18]  A sponsor of a drug that is "otherwise the same as an already approved drug may seek and obtain ODD for the subsequent drug for the same rare disease or condition if it can present a plausible hypothesis that its drug may be clinically superior to the first drug."[19]

---

[11] Letter from Dennis Ahern to Sandra Retzky, *Considerations Regarding Clinical Superiority for Oxybate Products* (Sep 16, 2021) [hereinafter Jazz's September 2021 Letter].

[12] Letter from Sean C. Griffin to Shoshana Hutchinson, *Orphan Drug Exclusivity for NDA 212690* (Dec. 6, 2022) [hereinafter Sidley Letter].

[13] *See* Sidley, Presentation to the Office of Chief Counsel of behalf of Jazz Pharmaceuticals, Inc. (Jan. 18, 2023) [hereinafter Sidley Slides]. This meeting was listening only for FDA.

[14] We also note that on November 29, 2022, TREND Community, a patient advocacy organization, sent a letter to OOPD presenting arguments and patient testimonials why there is a need for a once-nightly oxybate therapy.  Letter from Maria Picone to FDA (Nov. 29, 2022).  Then on January 2, 2023, Clete A. Kushida, M.D., Ph.D. sent a letter to OOPD to present arguments that Lumryz is clinically superior to the existing oxybate therapies, Xyrem and Xywav.  Letter from Clete A. Kushida to Sandra Retzky (Jan. 3, 2023).  These letters did not serve as a basis for FDA's decision.

[15] Pub. L. No. 97-414, 96 Stat. 2049 (1983).

[16] *See* section 526(a)(2)(A) of the FD&C Act.

[17] *See* section 526(a)(1) of the FD&C Act.  A sponsor must request ODD prior to submitting a marketing application for the drug for the relevant disease.

[18] *See, e.g.*, 21 CFR §§ 316.20-21.

[19] 21 CFR § 316.20(a).

3

FDA-Jazz-000526

### B.  ODE

One important incentive Congress provided in the Orphan Drug Act for sponsors developing drugs for rare diseases is the potential for a drug to become eligible for ODE.  Section 527(a) states, in relevant part:

> Except as provided in subsection (b), if the Secretary-
>
> (1) approves an application filed pursuant to section 505, or
>
> (2) issues a license under section 351 of the Public Health Service Act
>
> for a drug designated under section 526 for a rare disease or condition, the Secretary may not approve another application . . . or issue another license . . . for the same drug for the same disease or condition for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license. . . .

In short, ODE prevents FDA from approving or licensing the same drug for the same use or indication for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of approval or licensure.[20]

The statute provides two exceptions to ODE at section 527(b), under which FDA may approve an application for the same drug as a drug with ODE for the same use or indication.  First, FDA may approve such an application if the agency finds that the sponsor of the drug with ODE cannot "ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition."[21]  Second, FDA may also approve such an application if the sponsor of the drug with ODE consents to the approval of the application.[22]

As explained below, FDA interprets section 527(a) in two contexts: 1) to determine whether a drug is eligible for ODE and 2) to determine whether certain pending drugs may be approved during an approved drug's unexpired ODE (i.e., the scope of ODE).

### i.  Eligibility for ODE

An orphan-designated drug becomes eligible for ODE under section 527(a) of the FD&C Act once FDA approves or licenses it for the designated rare disease or condition, subject to the additional condition of clinical superiority in section 527(c) of the FD&C Act, when applicable. Section 527(c)(1) states:

> If a sponsor of a drug that is designated under section 526 and is otherwise the same, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval or exclusive licensure described in subsection (a) for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a

---

[20] *See* section 527(a) of the FD&C Act; *see also, e.g.*, 21 CFR §§ 316.31, 316.34, 316.3(b)(14).
[21] Section 527(b)(1) of the FD&C Act.
[22] Section 527(b)(2) of the FD&C Act.

FDA-Jazz-000527

condition of such exclusive approval or licensure, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.

When applicable, FDA requires the sponsor of a subsequent drug to demonstrate clinical superiority to all (i.e., each and every) previously approved drugs with the same active moiety for the same indication or use to be eligible for its own term of ODE.[23]

Section 527(c)(2) of the FD&C Act defines "clinically superior" for the purposes of meeting the condition of clinical superiority in section 527(c)(1) to mean "the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care."[24]  The orphan-drug regulations at 21 CFR § 316.3(b)(3) define "clinically superior" as follows:

> *Clinically superior* means that a drug is shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug) in one or more of the following ways:
>
> > (i) Greater effectiveness than an approved drug (as assessed by effect on a clinically meaningful endpoint in adequate and well controlled clinical trials). Generally, this would represent the same kind of evidence needed to support a comparative effectiveness claim for two different drugs; in most cases, direct comparative clinical trials would be necessary; or
> >
> > (ii) Greater safety in a substantial portion of the target populations, for example, by the elimination of an ingredient or contaminant that is associated with relatively frequent adverse effects. In some cases, direct comparative clinical trials will be necessary; or
> >
> > (iii) In unusual cases, where neither greater safety nor greater effectiveness has been shown, a demonstration that the drug otherwise makes a major contribution to patient care.[25]

Section 527(c) of the FD&C Act was enacted by Congress under the FDA Reauthorization Act of 2017 ("FDARA"), and the applicability of the section was clarified in the Consolidated Appropriations Act, 2021 (2020).  Prior to FDARA, FDA had relied upon its regulations to require a drug that is otherwise the same drug as a previously approved drug for the same use or indication to demonstrate clinical superiority to the previously approved drug for it to be eligible for ODE.  *See, e.g.*, 21 CFR § 316.34(c) stating that "If a drug is otherwise the same drug as a previously approved drug for the same use or indication, FDA will not recognize orphan-drug exclusive approval if the sponsor fails to demonstrate upon approval that the drug is clinically superior to the previously approved drug." *See also* 21 CFR § 316.3(b)(3) & § 316.3(b)(14).  In

---

[23] 21 CFR § 316.3(b)(14) defines "same drug" to mean, in relevant part, "a drug that contains the same active moiety as a previously approved drug and is intended for the same use . . . except that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug."  Further discussion of this definition appears in the subsequent subsection.

[24] Section 527(c)(2) of the FD&C Act.

[25] 21 CFR § 316.3(b)(3).

FDA-Jazz-000528

response to court losses on the specific issue of whether FDA could impose such a clinical superiority requirement as a precondition for eligibility for ODE, Congress amended the statute to give the agency explicit statutory authority to do so.

Section 527(c)(1) states that if a sponsor "is seeking exclusive approval or exclusive licensure described in subsection (a)" for an otherwise same drug that has already been approved or licensed for the same disease or condition, "as a condition of such exclusive approval or licensure," the sponsor must demonstrate "that such drug is clinically superior to any already approved or licensed drug that is the same drug."  As the text demonstrates, section 527(c) only concerns potential eligibility of a subsequent drug for its own period of ODE and does not address whether a subsequent drug's approval is blocked by another drug's ODE even where clinical superiority of the subsequent drug has been shown.  As described further below, the blocking effect of ODE of a previously approved drug is instead described in 527(a) of the FD&C Act.

### ii.  Scope of ODE

As explained above, under section 527(a) of the FD&C Act, ODE prevents FDA from approving or licensing the same drug for the same use or indication for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of approval or licensure.  FDA looks to the definition of "same drug" at 21 CFR § 316.3(b)(14) in determining whether a subsequent drug is the same drug for the same indication or use as a previously approved drug with unexpired ODE.  That regulation defines "same drug" to mean, in relevant part, "a drug that contains the same active moiety as a previously approved drug and is intended for the same use . . . except that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug."[26]  Thus, under FDA's validly promulgated and longstanding regulations, the "same drug" definition has a chemical and clinical component.  In the 1992 Final Rule for the orphan-drug regulations, FDA explained that "two drugs would be considered the same drug if the principal, but not necessarily all, structural features of the two drugs were the same, unless the subsequent drug were shown to be clinically superior" and that "either differences in active moiety or clinical superiority will be sufficient to make two micromolecular drugs different."[27]  Accordingly, if the sponsor of the subsequent drug for the same indication or use can demonstrate that its drug has a different active moiety[28] or is clinically superior[29] to the drug with ODE (i.e., the "first drug"), the subsequent drug will not be considered to be the "same drug" as the drug with ODE, and that drug's ODE will not block approval of the application for the subsequent drug for the same indication or use.[30]

Interpreting section 527(a) of the FD&C Act in this manner does not create an exception to ODE analogous to those codified at section 527(b) of the FD&C Act that were discussed above; the

---

[26] 21 CFR § 316.3(b)(14).

[27] *See* FDA, *Orphan Drug Regulations, Final Rule,* 57 Fed. Reg. 62076, 62078 (Dec. 29, 1992) [hereinafter 1992 Final Rule].

[28] *See* 21 CFR § 316.3(b)(2) for orphan-drug definition of "active moiety."

[29] *See* 21 CFR § 316.3(b)(3) defining "clinically superior."

[30] 1992 Final Rule, 57 Fed. Reg. at 62078 ("Assuming that a subsequent drug's marketing application is otherwise approvable, FDA will not interpret the Orphan Drug Act to block approval of any drug proved to be clinically superior to a drug with currently effective exclusive marketing rights.").

6

exceptions at 527(b) concern instances where FDA determines that a drug is the same drug for the same indication or use but is approvable nonetheless despite another same drug's unexpired ODE. Drugs that are approved under the exceptions at section 527(b) would be chemically and clinically the same as the drug with unexpired ODE and would not include clinically superior drugs.

In summary, for a determination under section 527(a) as to whether a drug's unexpired ODE blocks approval of a subsequent drug, FDA compares the subsequent drug to the drug with unexpired ODE. In circumstances in which the subsequent drug contains the same active moiety for the same indication or use as the drug with unexpired ODE, FDA determines whether the subsequent drug is clinically superior to the drug with ODE. If it is clinically superior, the subsequent drug is not considered to be the "same drug," and thus its approval for the same indication or use is not blocked. By contrast, for a determination under section 527(c) of the FD&C Act as to whether a subsequent drug with the same active moiety for the same indication or use as a previously approved drug is eligible under section 527(a) for its own term of ODE, FDA compares the subsequent drug to all such previously approved drugs, even if ODE for those drugs has expired. If the subsequent drug is clinically superior to each, then it is eligible for its own term of ODE.

## C. Clinical Superiority

As explained above, section 527(c)(2) of the FD&C Act defines clinically superior to mean that "the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, *or* by providing a [MCTPC]," and 21 CFR § 316.3(b)(3) defines clinically superior to mean that "a drug is shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug) in *one or more* of the following ways:" greater effectiveness, greater safety, or a MCTPC (emphasis added). In both definitions, the subsequent drug must provide a significant therapeutic advantage "over and above" an already approved drug in just one way— greater efficacy, greater safety, *or* by providing a MCTPC—to be considered clinically superior. Neither the plain reading of the statute nor that of the regulation imposes an additional requirement that in order to provide a significant therapeutic advantage in one of the three measures, the drug must also be at least comparable in the other two measures.

There is at least one instance in which FDA determined that a subsequent drug is clinically superior based on greater efficacy even though the drug was less safe in one measure than the previously approved drug with ODE. Specifically, FDA considered whether different interferon beta products for relapsing remitting multiple sclerosis ("RRMS") were clinically superior to one another. This situation involved three interferon beta products for the same use. The first interferon beta for treatment of RRMS, Betaseron, was approved on July 23, 1993, and was eligible for ODE until July 23, 2000. During Betaseron's period of ODE, a different sponsor, Biogen, sought marketing approval for another interferon beta product for RRMS called Avonex. FDA determined that Biogen demonstrated that Avonex was clinically superior to Betaseron because Avonex was safer due to elimination of skin necrosis at injection sites.[31] As a result,

---

[31] FDA, *Memorandum, Clinical Superiority of Biogen's interferon product, Avonex*, DRU-1991-627 (Apr. 16, 1996).

FDA-Jazz-000530

Avonex was a different drug than Betaseron under the orphan-drug regulations, and Betaseron's ODE did not block its approval. On May 17, 1996, FDA approved Avonex for RRMS, and it was eligible for its own term of ODE until May 17, 2003. Subsequently, during Avonex's period of ODE, a third sponsor, Serono, sought approval for an interferon beta product for RRMS called Rebif. Serono demonstrated that Rebif was more effective than Avonex based on a study showing that patients taking Rebif were less likely to experience multiple sclerosis exacerbations than patients taking Avonex.[32] However, Rebif patients experienced skin necrosis at injection sites that Avonex patients did not (i.e., the same adverse event that was present with Betaseron that led to the determination that Avonex was clinically superior to Betaseron based on safety).[33]

FDA concluded that Rebif was clinically superior to Avonex based on greater effectiveness, and that the safety considerations of Rebif compared to Avonex were "not directly relevant" to the clinical superiority determination.[34] In making its decision, FDA explained the following:

> [T]he regulations do not state that clinical superiority must be based on overall risk benefit being deemed superior for the subsequent product compared to the prior product. In fact, the regulations indicate that only a selected aspect may constitute a sufficient basis to reach a conclusion of clinical superiority. That is, the aspects not selected by the sponsor for focus (e.g., safety when efficacy is selected; efficacy when safety is selected) do not require a comparative assessment. The regulations require neither that all aspects of known efficacy nor all aspects of safety be shown to be superior. Nor do the regulations indicate that other aspects of safety or efficacy be shown "comparable" when only one specific aspect of safety or efficacy is shown to be superior.[35]

FDA also stated:

> There is no additional requirement that the subsequent product, although clinically superior in one parameter, must also be shown to be at least equal in all others. This would set an inappropriate and nearly impossible burden (in terms of clinical trial design) on the sponsor of a second product. A more meaningful standard is a significant therapeutic benefit in terms of increased effectiveness and adequate safety, or increased safety and adequate effectiveness. The balancing of risks and benefits embodied in a drug product as a whole is done when the agency determines whether the drug may be approved for the particular use.[36]

### D. MCTPC

---

[32] *See* FDA, *BLA STN 103780/0 Comparative Study of Rebif to Avonex and Orphan Exclusivity* at 20 (Mar. 7, 2002) [hereinafter CBER Rebif memo].

[33] *Id.*

[34] *Id.*

[35] *Id.* at 3-4. *See also id.* at 10-11 ("Orphan drug regulations do not state that all known clinical actions of a product must be shown superior to the competitor."); *id.* at 20 ("[T]he orphan drug regulations do not require that safety superior or even identical between two drugs when a clinical efficacy comparison is employed for the demonstration of being not the 'same drug.'").

[36] FDA, *Memorandum, OOPD Analysis of Exclusivity Issues Raised in the Serono BLA for Rebif* at 3 (Mar. 7, 2002) [hereinafter OOPD Rebif memo].

8

FDA-Jazz-000531

Because of the diverse ways in which drugs may qualify as clinically superior (and therefore not the "same drug") under the law, FDA evaluates clinical superiority on a case-by-case basis.[37] Specifically, with respect to MCTPC, to preserve the statutory incentive to develop orphan drugs, the agency has stated that MCTPC is "intended to constitute a narrow category."[38] Regarding how to demonstrate a MCTPC, the agency has also stated:

- "There is no way to quantify such superiority in a general way.  The amount and kind of superiority needed would vary depending on many factors, including the nature and severity of the disease or condition, the quality of the evidence presented, and diverse other factors."[39]

- "The following factors, when applicable to severe or life-threatening diseases, may in appropriate cases be taken into consideration when determining whether a drug makes a major contribution to patient care: convenient treatment location; duration of treatment; patient comfort; reduced treatment burden; advances in ease and comfort of drug administration; longer periods between doses; and potential for self-administration."[40]

- MCTPC "determinations can be complex and encompass consideration of a number of factors that potentially implicate safety and effectiveness, which are evaluated on a case-by-case basis for each drug product."[41]

Relative effectiveness and safety of the drug may be relevant in assessing whether a drug makes a MCTPC, and a drug must meet FDA's safety and effectiveness standards to obtain approval, but, as explained above, nothing in the statute or regulation requires comparable effectiveness and safety.  In the Rebif example noted above, FDA stated with respect to MCTPC:

> This analysis may involve multiple aspects of the drug product, since the benefit to the patient is likely to be greater convenience or less discomfort, and the very term "major contribution to patient care" implies a more global assessment. So, for example, an assessment of the safety or effectiveness of the new form of the subsequent product might be considered in determining whether the drug made a major contribution to patient care. However, even in this instance, there can not [sic] be an infinite number of comparison criteria if this provision of the regulation is to be meaningful.[42]

For example, if the administration of a drug were changed from intravenous (IV) to oral, FDA would consider, if appropriate, whether any adverse events diminished the advantage of the

---

[37] *See* FDA, *Orphan Drug Regulations, Proposed Rule*, 56 Fed. Reg. 3338, 3340 (Jan. 29, 1991) [hereinafter 1991 Proposed Rule] ("The content of this evidence [needed for a demonstration of clinical superiority] will depend on the nature of the superiority claimed."); *see also* 1992 Final Rule, 57 Fed. Reg. at 62079 (stating that a major contribution to patient care "determination will have to be made on a case-by-case basis.").

[38] 1991 Proposed Rule, 56 Fed. Reg. at 3343.

[39] 1992 Final Rule, 57 Fed. Reg. at 62078.

[40] FDA, *Orphan Drug Regulations, Final Rule*, 78 Fed. Reg. 35117, 35125 (Jun. 12, 2013) [hereinafter 2013 Final Rule].

[41] *Id*. at 35124.

[42] CBER Rebif memo, *supra* note 32, at 3.

9

FDA-Jazz-000532

change in administration from IV or oral.  In that respect, safety concerns could inform the MCTPC analysis, but a safety concern present in a subsequent drug that was not present in the previous drug would not automatically defeat a MCTPC finding.  That determination would be made on a case-by-case basis and depend upon the nature of the safety concern weighed against the benefits of the MCTPC.

## III.    Factual Background

This matter involves three different drug products that contain the same active moiety (oxybate)[43] for the treatment of cataplexy or EDS in patients with narcolepsy.  Jazz is the current sponsor of Xyrem (sodium oxybate) and Xywav (calcium, magnesium, potassium, and sodium oxybates).  Avadel is the sponsor of Lumryz (sodium oxybate).

### A.  Normal Sleep and Narcolepsy

The following background concerning normal sleep and narcolepsy is based on OOPD's consultation with two board certified sleep experts in FDA ("Sleep Expert Consult").[44]

Adequate sleep is essential for humans as it physically and psychologically restores bodily functions.[45]  Without adequate sleep, humans function poorly and may die prematurely.[46]  Chronic sleep loss, sometimes called sleep debt, is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health.[47]

Normal sleep architecture is characterized in adults as a progression of 90 to 120 minute sleep cycles starting with non-REM Stage 1 sleep (NREM or N1 sleep), then non-REM Stage 2 (NREM or N2) sleep, then non-REM Stage 3 (NREM or N3) sleep, and ending in Rapid Eye Movement (REM or Stage R) sleep.[48]  Rapid eye movements and dreaming occur during Stage R.[49]  After Stage R, the normal adult has a very brief return to Stage Wake (Stage W), in the transition of going from cycle to cycle, though this awakening is not typically remembered, is normal and does not contribute to sleep fragmentation, sleep loss, or daytime sleepiness.[50]  The

---

[43] The active moiety oxybate may also be referred to as gamma-hydroxybutyrate (GHB).

[44] Sleep Expert Consult, *supra* note 5.  These physicians are boarded in (1) internal medicine; (2) pulmonology; (3) critical care medicine; (4) and sleep.  One of the consultants continues to see patients in a sleep clinic.  Statements in this subsection of the document are based on statements in this consult.

[45] Kiran Maski, *Insufficient sleep: Evaluation and management*, UpToDate (May 23, 2022), https://www.uptodate.com/contents/insufficient-sleep-evaluation-and-management.

[46] Chiara Cirelli, *Insufficient sleep: Definition, epidemiology, and adverse outcomes*, UpToDate (Oct 10, 2022), https://www.uptodate.com/contents/insufficient-sleep-definition-epidemiology-and-adverse-outcomes.

[47] *Id*.

[48] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022), https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep.

[49] James A. Rowley & M. Safwan Badr, *Chapter 1: Normal Sleep, in* Essentials of Sleep Medicine 3, at 5 (M. Safwan Badr & Jennifer L. Martin eds., 2nd ed. 2022).

[50] Mary A. Carskadon & William C. Dement, *Monitoring and staging humas sleep, Chapter 2—Normal Human Sleep: An Overview, in* Principles and practice of sleep medicine at 12 (M.H. Kryger et al., eds., 5th ed. 2011); *see also* Rowley, *supra* note 49, at 5 (Fig. 1.2).

10

FDA-Jazz-000533

normal sleep cyclical pattern typically repeats four to five times per night.[51]  Cycling progression through these stages is the basic structural organization of normal sleep and is called "sleep architecture."[52]

Each sleep stage has unique features.  Stage N1 sleep is light sleep (easily arousable), Stage N2 sleep is intermediate in depth (less light sleep), and Stage N3 is deep sleep, otherwise known as restorative sleep, slow-wave sleep (SWS), or delta sleep.[53]  Brain activity is low during Stage N3 sleep, and importantly, many recovery functions in the body occur only in this stage of sleep.[54]  Normally, the sleep cycles progress through the night with increasing time in Stage N3 during initial sleep cycles and increasing REM sleep in each later sleep cycle during the night.[55]

Stage N3 sleep has a unique and important role in restoring the mind and body.[56]  With sleep loss or deprivation or interruption, one enters Stage N3 sleep earlier and with increased quantity during the night.[57]  Thus, the body attempts to achieve sleep equilibrium by rapidly restoring this critical stage of sleep.[58]  On polysomnography (PSG)—a diagnostic full sleep study with an electroencephalogram (EEG)—REM sleep is a time of active brain EEG waves and physiological instability characterized by somewhat irregular heart rate and breathing patterns.[59]  REM is associated with paralysis of all muscles except the essential respiratory muscles (e.g., the diaphragm).[60]

When an arousal occurs (e.g., when waking up to take medication during the night after falling asleep), there is a shift in an EEG pattern—one that leads to a longer Stage W with alertness or consciousness, even if not remembered.[61]  That duration of time in Stage W is prolonged and will adversely impact a clinical measure called Wake After Sleep Onset (WASO)—a metric of how much wakefulness happens in a night of sleep.[62]  In treating sleep disorders, including narcolepsy, the goal is to maximize the time in sleep and minimize wake time (i.e., minimize WASO).[63]  Disruption of sleep leads to the inability to enter Stage N3, or disruption of N3, and such individuals will revert back to Stage W and subsequently progress to Stage N1 sleep and so

---

[51] Kirsch, *supra* note 48.

[52] Rowley, *supra* note 49, at 5.

[53] Carskadon, *supra* note 50, at 11.

[54] Derk-Jan Dijk, *Regulation and Functional Correlates of Slow Wave Sleep*, Supp. To Vol. 5 No. 2 Journal of Clinical Sleep Medicine, S6, at S6 (2009).

[55] Carskadon, *supra* note 50, at 11.

[56] Lixia Chen et al.*, The association between sleep architecture, quality of life, and hypertension in patients with obstructive sleep apnea*, 27 Sleep and Breathing 191, at 192 (2023).

[57] Kirsch, *supra* note 48; *see also* Carskadon, *supra* note 50, at 15.

[58] *See* Sleep Expert Consult, *supra* note 5, at 4.

[59] Ye Zhang et al., *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*, 58 Sleep Medicine Reviews at 1 (2021); *see also* David W. Carley & Sarah S. Farabi, *Physiology of Sleep*, 29 Diabetes Spectr. 5, at 6; *see also* Kirsch, *supra* note 48; *see also* Carskadon, *supra* note 50, at 3-4.

[60] Rowley, *supra* note 49 at 5.

[61] Kirsch, *supra* note 48; *see also* Pierre Philip et al., *Sleep Fragmentation in Normals: A Model for Sleepiness Associated with Upper Airway Resistance Syndrome*, 17 Sleep 242, at 244-245 (1994).

[62] Eric Suni, *Wakefulness After Sleep Onset*, Sleep Foundation (updated Jan. 18, 2023), https://www.sleepfoundation.org/sleep-studies/wakefulness-after-sleep-onset.

[63] *See* Sleep Expert Consult, *supra* note 5, at 5.

11

FDA-Jazz-000534

forth.[64]  The disruption changes sleep architecture and will increase WASO.[65]  This disruption is something to be avoided in the narcoleptic patient, if possible.[66]

Narcolepsy is a disorder of REM intrusion into wakefulness.[67]  Sudden REM sleep onset during wakefulness causes loss of motor tone (i.e., sleep paralysis) along with a dream like state called cataplexy.[68]  REM intrusion can also occur during sleep, disrupting the normal sleep architecture described above.[69]  Individuals with narcolepsy "generally fall asleep rapidly but can spontaneously awaken several times during the night and have difficulty returning to sleep.  This sleep maintenance insomnia seems paradoxical in a disorder characterized by daytime sleepiness, and it may reflect a low threshold to transition from sleep to wakefulness."[70]  REM intrusion in sleep shifts sleep stages and prevents sleep continuity (also called sleep consolidation), fragments normal sleep architecture, and prevents sufficient deep sleep (i.e., prevents N3 restorative sleep from occurring because the sleep stages keep shifting to lighter sleep).[71]  Often Stage N1 increases at the debt of Stage N3 sleep given the increased number of shifts between sleep stages.[72]  This results in daytime sleepiness with the consequences of sleep fragmentation or sleep deprivation (i.e., altered sleep architecture which may affect daytime performance).[73]

EDS is the most common and chronic symptom of narcolepsy.[74]  Per Scammell: "[t]he sleepiness may be so severe that patients with narcolepsy can rapidly doze off with little warning; these episodes are commonly referred to as 'sleep attacks.'"[75]  Another symptom of narcolepsy, cataplexy, is an "emotionally-triggered transient muscle weakness" that can cause a patient to collapse.[76]

For narcolepsy, the goals of therapy are "to achieve 'normal' alertness during conventional waking hours or to maximize alertness at important times of the day, (e.g., during work, school, or while driving)," and to the extent possible, promote normal sleep at night.[77]  Management of narcolepsy is multimodal and includes non-pharmacologic and pharmacologic treatment.[78]  Non-pharmacologic care, including "sleep hygiene," is "critical to obtaining adequate, quality sleep

---

[64] Richard Berry et al., The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications, American Academy of Sleep Medicine (AASM) (2020), version 2.6 at 22-33.
[65] See Sleep Expert Consult, supra note 5, at 6.
[66] Id.
[67] Thomas E Scammell, Clinical features and diagnosis of narcolepsy in adults, UpToDate (Jul. 12, 2022), https://www.uptodate.com/contents/clinical-features-and-diagnosis-of-narcolepsy-in-adults.
[68] Id.
[69] Imran Ahmed & Michael Thorpy, Chapter 15: Narcolepsy and Idiopathic Hypersomnia, in Essentials of Sleep Medicine 327, at 328 (M. Safwan Badr & Jennifer L. Martin eds., 2nd ed. 2022).
[70] Scammell, Clinical, supra note 67.
[71] Michelle T. Cao & Christian Guilleminault, Chapter 90: Narcolepsy: Diagnosis and Management, in Neurologic Disorders 873, at 873; see also Zhang, supra note 59 at 11.
[72] Sleep Expert Consult, supra note 5, at 6.
[73] Id. at 6-7.
[74] Scammell, Clinical, supra note 67; see also Cao, supra note 71, at 873.
[75] Scammell, Clinical, supra note 67.
[76] Id.
[77] Thomas E Scammell, Treatment of narcolepsy in adults, UpToDate (Nov. 14, 2022), https://www.uptodate.com/contents/treatment-of-narcolepsy-in-adults.
[78] Kiran Maski et al., Treatment of central disorders of hypersomnolence: an American Academy of Sleep Medicine clinical practice guideline, 17 Journal of Clinical Sleep Medicine 1881, at 1892 (2021).

12

on an ongoing basis."[79]  Sleep hygiene means consistent sleep scheduling, a bedtime routine of personal care, napping, daily exercise, and a sleep environment conducive to sleep without interruptions.[80]

In addition to behavioral changes promoting good sleep hygiene, most patients with narcolepsy also require pharmacotherapy.[81]  Oxybate salts are one class of drugs that improves symptoms of EDS and decreases episodes of cataplexy.[82]  Per Scammell, especially for patients with severe and disabling sleepiness:

> Oxybates have a different mechanism of action than other narcolepsy medications and act primarily through *consolidating nighttime sleep*. Although risks and side effects, as well as cost, may be higher with oxybates, they can offer the best chance of optimal symptom control with monotherapy. For patients with a good response to oxybates, other wake-promoting medications may be able to be tapered.[83]

As explained above, "consolidating nighttime sleep" means ensuring sleep continuity through the normal stages of sleep architecture.  Therefore, oxybate products are intended to decrease nocturnal arousals (also known as nighttime or nocturnal awakenings) to decrease sleep fragmentation that leads to poor quality sleep.  Importantly, as explained in more detail below, the effectiveness of Xyrem and Xywav wanes during the night, so their labeling recommends that patients awaken for a second dose.  Lumryz, as a once nightly formulation, will eliminate such nocturnal arousal, thus minimizing disturbances and decreasing sleep fragmentation.

## B.  Regulatory History of Oxybate Products for Narcolepsy

On November 7, 1994, FDA granted ODD to Jazz's predecessor Orphan Medical, Inc. for oxybate[84] for the treatment of narcolepsy.  On July 17, 2002, FDA approved Xyrem for the treatment of cataplexy associated with narcolepsy, and Xyrem was eligible for ODE for the treatment of cataplexy associated with narcolepsy until July 17, 2009.  On November 18, 2005, FDA approved Xyrem for a new indication, the treatment of EDS in patients with narcolepsy, and Xyrem was eligible for a new term of ODE for the treatment of EDS in patients with narcolepsy until November 18, 2012.  Both of those periods of ODE have since expired.  Finally, on October 26, 2018, FDA approved Xyrem for the treatment of cataplexy or EDS in pediatric patients 7 years of age and older with narcolepsy.  Prior to this approval, the safety and effectiveness of Xyrem in pediatric patients had not been established, and therefore this approval

---

[79] Maski, *Insufficient*, *supra* note 45.
[80] *See* National Sleep Foundation, *10 Tips for a Better Night's Sleep*, https://www.thensf.org/sleep-tips/; *see also* American Academy of Sleep Medicine, *How to sleep better*, https://aasm.org/resources/pdf/products/howtosleepbetter_web.pdf; *see also* Ahmed, *supra* note 69 at 340.
[81] Timothy I. Morgenthaler et al., *Practice Parameters for the Treatment of Narcolepsy and other Hypersomnias of Central Origin,* 30 Sleep 1705 at 1705-1711 (2007).
[82] Scammell, *Treatment*, *supra* note 77.
[83] *Id*. (emphasis added).
[84] We note that ODD letters and the ODD database often refer to the generic name of the drug the sponsor uses in its request for designation rather than the active moiety, but the ODD applies to the active moiety (here, oxybate for the treatment of narcolepsy).

13

expanded the indication to a new patient population. Xyrem was eligible for ODE for the treatment of cataplexy or EDS in pediatric patients 7 years of age and older with narcolepsy, which will run until October 26, 2025.[85]

Xyrem has a concentration of 0.5 grams (g)/milliliter (mL) of sodium oxybate, equivalent to 0.413 g/mL of oxybate.[86] Xyrem is taken in 2 doses at night, the first dose at bedtime with the second dose taken 2.5 to 4 hours later.[87] For adults, the initial starting dose is 4.5 g per night, which can be increased in increments of 1.5 g per night at weekly intervals to a maximum of 9 g per night.[88] The maximum dose of 9 g contains approximately 1,640 milligrams (mg) of sodium.[89] This amount can make up a large portion of the maximum daily recommended sodium (for example, CDC guidelines recommend less than 2,300 mg of sodium each day as part of a healthy eating pattern).[90] Due to its high sodium content, Xyrem's labeling includes a Warning and Precaution on use of the drug in patients sensitive to high sodium intake and recommends consideration of the amount of daily sodium intake in each dose of Xyrem for patients sensitive to sodium intake (e.g., those with heart failure, hypertension, or renal impairment).[91] The sodium warning is listed last of eight warnings, and warnings are listed in order of relative clinical significance.[92]

Subsequently, Jazz developed a low-sodium alternative to Xyrem called Xywav. Xywav consists of 4 active ingredients, all of which have oxybate as the active moiety: calcium oxybate (0.234 g/mL), potassium oxybate (0.130 g/mL), magnesium oxybate (0.096 g/mL), and sodium oxybate (0.040 g/mL) — equivalent to 0.413 g/mL of oxybate, the same as Xyrem.[93] The total salt concentration is 0.5 g/mL.[94] Also like Xyrem, the recommended starting dosage for Xywav in adults is 4.5 g per night administered orally, divided into two doses, one at bedtime with the second dose to be taken 2.5 to 4 hours later.[95] Xywav can be titrated by increments of up to 1.5 g per night per week to the recommended maximum dosage of 9 g per night.[96] At the maximum

---

[85] Pediatric exclusivity extends Xyrem's ODE until April 26, 2026.

[86] Xyrem FDA-Approved Labeling at Section 3 (Apr. 2023), available at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/021196s042lbl.pdf [hereinafter Xyrem 2023 Labeling].

[87] Id. at section 2.1. Note that the labeling describes dosage "per night" regardless of whether the patient primarily sleeps during the day or night. This analysis will also use the word "night" to refer to the patient's bedtime.

[88] Id. at section 2.1.

[89] Id. at section 5.8.

[90] See CDC, About Sodium, available at: https://www.cdc.gov/salt/food.htm.

[91] Xyrem 2023 Labeling, supra note 86, at section 5.8. The warning states, "Xyrem has a high salt content. In patients sensitive to salt intake (e.g., those with heart failure, hypertension, or renal impairment), consider the amount of daily sodium intake in each dose of Xyrem. Table 3 provides the approximate sodium content per Xyrem dose."

[92] See FDA, Guidance for Industry, Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format at 7 (Oct. 2011) (available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/warnings-and-precautions-contraindications-and-boxed-warning-sections-labeling-human-prescription) ("The order in which adverse reactions are presented in the WARNINGS AND PRECAUTIONS section should reflect the relative clinical significance of the adverse reactions").

[93] Xywav FDA-Approved Labeling at section 3 (Apr. 2023), available at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/212690s011lbl.pdf [hereinafter Xywav 2023 Labeling].

[94] Id.

[95] Id. at section 2.1.

[96] Id.

14

dose for adults, the sodium content of Xywav is 131 mg.[97]  Therefore, unlike Xyrem, there are no Warnings and Precautions in Xywav's labeling related to that drug's use in patients sensitive to high sodium intake.

Because the active moiety in Xywav is also oxybate, Xywav is covered by Jazz's ODD for oxybate for the treatment of narcolepsy.  On July 21, 2020, FDA approved Xywav for the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy.  In order for Xywav to be eligible for ODE, Jazz was required to demonstrate that Xywav was clinically superior to Xyrem.[98]  OOPD determined that Xywav was clinically superior to Xyrem because the reduced sodium in Xywav provides greater safety in a substantial portion of the target population.[99]  Specifically, at the effective daily dose of 6 g to 9 g, Xyrem adds approximately 1,100 mg to 1,640 mg of sodium to each patient's daily sodium intake, compared to Xywav, which adds only 87 to 131 mg of sodium to each patient's daily sodium intake for the same recommended daily dose.[100]  OOPD concluded, "the differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated."[101]  OOPD noted that whether sodium content of Xyrem increases cardiovascular risks in patients with narcolepsy has never been specifically or adequately investigated; however, the general base of knowledge about the effects of sodium support that the amount of sodium in Xyrem would increase cardiovascular risks in patients with narcolepsy.[102]

Because FDA found Xywav to be clinically superior to Xyrem, Xywav was eligible for ODE.[103]  On June 24, 2021, OOPD sent a letter to Jazz stating that it is eligible for ODE for Xywav for the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy, effective as of the July 21, 2020, approval of NDA 212690.[104]  Xywav's ODE for this indication will run until July 21, 2027.

---

[97] NDA 212690 Clinical Review at 7 (available at:
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2020/212690Orig1s000MedR.pdf).
[98] Section 527(c)(1) of the FD&C Act.
[99] *See* FDA, *Exclusivity Memorandum DRU-1994-858, Xywav (calcium, magnesium, potassium, and sodium oxybates)* at 6 (Sep. 30, 2021) [hereinafter Xywav Exclusivity Memo].  During OOPD's assessment of Xywav's clinical superiority over Xyrem, OOPD received and considered two letters from Jazz containing arguments why Xywav is clinically superior to Xyrem.  *See* letter from Arthur Merlin d'Estreux to Janet Maynard, *Orphan Drug Exclusivity for JZP-258, NDA No. 212690* (Apr. 24, 2020); *see also* letter from Robert Iannone to Janey Maynard, *Request to Expedite Recognition of Orphan Drug Exclusivity for XYWAV (NDA 212690)* (Apr. 19, 2021).
Additionally, OOPD received and considered a letter from Avadel providing arguments why Xywav is not clinically superior to Xyrem.  S*ee* letter from Jennifer Gudeman to Janet Maynard, *Sodium Oxybate for the Treatment of Narcolepsy* (Dec. 8, 2020).  OOPD also consulted with the Division of Neurology 1 ("DN1") in the Center for Drug Evaluation and Research ("CDER").  *See* DN1, *Consult Request NDA 212690 Xywav* (Nov. 27, 2020) [hereinafter DN1 2020 Xywav Consult]; *See also* DN1, *Consult Request NDA 212690 Xywav* (Mar. 8, 2021).
[100] Xywav Exclusivity Memo, *supra* note 99, at 3.
[101] FDA, *Clinical Superiority Findings*, available at https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings.
[102] Xywav Exclusivity Memo, *supra* note 99, at 5.
[103] *See* section 527(c) of the FD&C Act.
[104] Letter from Nicole Wolanski to Jazz Pharmaceuticals, Inc., *Orphan-Drug Exclusivity Letter DRU-1994-858* (June 24, 2021).  OOPD also responded to Avadel's letter to explain that we considered their arguments before concluding that Xywav was eligible for ODE.  *See* letter from Nicole Wolanski to Jennifer Gudeman, *Sodium Oxybate for the Treatment of Narcolepsy* (Jun. 24, 2021).

15

FDA-Jazz-000538

Concurrently, Avadel developed Lumryz, an extended-release oral suspension version of sodium oxybate for the treatment of narcolepsy. The active moiety in Lumryz, like both Xyrem and Xywav, is oxybate. While Xyrem and Xywav are both dosed twice per night, with the patient instructed to wake from sleep to take the second dose, Lumryz is dosed once per night before sleep. Therefore, Lumryz's labeling does not advise an awakening to take a second dose for proper administration.[105] At the recommended daily dose of 6 g to 9 g, Xyrem and Lumryz both have the same sodium content (approximately 1,100 mg to 1,640 mg). As explained above, at the same recommended daily dose of 6 g to 9 g, Xywav has a lower sodium content of 87 mg to 131 mg. See Table 1 for a summary of the differences among the drugs.

Table 1: Comparison of Xyrem, Xywav, and Lumryz Dosing and Sodium Content per Daily Dose

| Drug | Dosing | Amount of sodium at the recommended daily dose of 6 g to 9 g |
|---|---|---|
| Xyrem | Twice-per-night | 1,100 mg to 1,640 mg |
| Xywav | Twice-per-night | 87 mg to 131 mg |
| Lumryz | Once-per-night | 1,100 mg to 1,640 mg |

On April 20, 2016, Avadel[106] requested ODD for oxybate[107] for the treatment of narcolepsy. At the time of the request for designation, Xyrem was already approved for a narcolepsy indication, but Xywav was not yet approved. Because Avadel was seeking ODD for oxybate for the same disease for which Xyrem was approved, Avadel was required to provide a plausible hypothesis that its drug was clinically superior to Xyrem to be eligible for ODD.[108]

Upon review of the initial request for designation, OOPD asked Avadel to provide additional support for its hypothesis for clinical superiority.[109] Avadel submitted an amendment to its request for designation on October 13, 2017. At that time, to determine whether the plausible hypothesis standard for ODD had been met, OOPD consulted with clinical experts in the Division of Neurology Products (DNP) regarding the benefit of Lumryz's once-per-night dosing over Xyrem's twice-per-night dosing.[110] DNP stated that if a formulation of sodium oxybate can be administered only once each night, it would have advantages over a sodium oxybate drug administered twice-per-night, like Xyrem.[111] DNP cited several reasons such a formulation could be clinically superior, including that a drug administered once per night would be much more convenient and less disruptive for patients, and that a drug administered once-per-night may present less risk to patients, for example risks from falls when waking up to take the second

---

[105] Lumryz, FDA-Approved Labeling (May 2023) [hereinafter Lumryz Labeling].

[106] Avadel submitted the request for designation under the name Flamel Ireland Limited. In 2017, there was a cross-border merger of Flamel and Avadel; the latter entity survived the merger as the public holding company.

[107] At the time, Avadel referred to its product as FT218 or sodium oxybate for extended-release oral suspension. *See also supra* note 84.

[108] 21 CFR § 316.20(a).

[109] FDA, *Review of Request for ODD for sodium oxybate, DRU-2016-5302* at 5 (Jul. 28, 2016); *see also* Letter from Gayatri R. Rao to The Weinberg Group, Inc., *Deficiency Letter, DRU-2016-5302* (Aug. 23, 2016).

[110] As the result of a reorganization of the CDER, the review division responsible for oxybate drug products for the treatment of narcolepsy is now called the Division of Neurology 1 (DN1).

[111] Division of Neurology Products, *Sodium Oxybate Consultation Request* at 9 (Nov. 24, 2017).

16

FDA-Jazz-000539

dose.[112]  DNP's response supported OOPD's conclusion that there was a plausible hypothesis that Lumryz may be clinically superior to Xyrem based on providing greater safety or by making a MCTPC over Xyrem.[113]  Therefore, on January 8, 2018, FDA granted Avadel's request for ODD for oxybate for treatment of narcolepsy.[114]

On December 15, 2020, Avadel submitted NDA 214755 for Lumryz.  On July 18, 2022, FDA tentatively approved Lumryz for the treatment of cataplexy or EDS in adults with narcolepsy. The Tentative Approval Letter stated, "This letter does not address whether any orphan drug exclusivity (ODE) recognized for Xyrem under NDA 021196 or for Xywav (calcium, magnesium, potassium, and sodium oxybates) oral solution under NDA 212690 affects the approvability of Avadel's application."[115]  On March 1, 2023, Avadel submitted an amendment to NDA 214755 requesting final approval.

## IV.  Discussion

### A.  Applicability of the Clinical Superiority Standard

Xywav currently has ODE for the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy, and as such, FDA may not approve another sponsor's marketing application for the same drug for the same use or indication until its exclusivity expires on July 21, 2027.[116]  Lumryz contains the same active moiety as Xywav (oxybate), and Avadel is seeking approval for Lumryz for an indication covered by Xywav's unexpired ODE (the treatment of cataplexy or EDS in adults with narcolepsy).  Under the orphan-drug regulations, Lumryz is the "same drug" as Xywav unless Lumryz is clinically superior to Xywav.[117]  If Lumryz is clinically superior to Xywav, then it is not the "same drug" as Xywav, and Xywav's ODE will not block Lumryz's approval.[118]

---

[112] *Id.* at 8-9.

[113] FDA, *Review of Amended Request for Orphan Drug Designation for sodium oxybate, DRU-2016-5302* at 4-6 (Dec. 21, 2017).  The standard for ODD is a "plausible hypothesis" that the subsequent drug may be clinically superior to the first drug. When FDA grants ODD to a drug that is otherwise the same drug as a previously approved drug for the same rare disease or condition based on a plausible hypothesis of clinical superiority, that means FDA agrees that the sponsor "may be able to produce a clinically superior drug," not that the sponsor has provided evidence that its drug in fact would be clinically superior.  *See* 1991 Proposed Rule, 56 Fed. Reg. at 3340.  This is a lower standard than is required to demonstrate clinical superiority for the purposes of determining whether a drug's ODE blocks approval of another drug or determining eligibility for ODE.

[114] Letter from Debra Y. Lewis to The Weinberg Group Inc., *Designation letter for sodium oxybate, DRU-2016-5302* (Jan. 8, 2018). See also *supra* note 84.

[115] Letter from Teresa Buracchio to Marla E. Scarola, *Tentative Approval Letter* (Jul. 18, 2022).

[116] Section 527(a) of the FD&C Act; 21 CFR §§ 316.31 & 316.3(b)(14).

[117] 21 CFR § 316.3(b)(14).

[118] Jazz asserts that for FDA to approve Lumryz, Lumryz must be clinically superior to Xywav.  *See* Sidley Letter, *supra* note 12, at 5-8.  We agree with this conclusion but note that Jazz at one point appears to arrive at this conclusion based on an incorrect interpretation of the law, citing to section 527(c) of the FD&C Act (the condition of clinical superiority to be eligible for ODE) as an exception to ODE.  *See, e.g., id.* at 7 ("Thus, section 527(c)(1) provides that a later-in-time applicant can break through unexpired exclusivity (or obtain new exclusivity) only by demonstrating that its proposed drug will be 'clinically superior to *any already approved or licensed drug that is the same drug.*' 21 U.S.C. § 360cc(c)(1) . . .").  Later, Jazz changed its position during the meeting between Sidley and OCC.  *See* Sidley Slides, *supra* note 13, at 10 (stating that section 527(c) cannot be read as a third exception to ODE

17

Avadel is not seeking approval for Lumryz for an indication covered by Xyrem's unexpired
ODE.[119]  Upon approval, in order to be eligible for its own term of ODE, an orphan-designated
drug must be clinically superior to all otherwise same drugs previously approved for the same
use or indication.[120]  Accordingly, if Lumryz is clinically superior to Xywav and Xyrem, then it
will be eligible for its own term of ODE.

### i.  Clinical superiority can overcome ODE

As explained above, the definition of "same drug" in the orphan-drug regulations states that if a
subsequent drug that has the same active moiety and is for the same use as a previously approved
drug "can be shown to be clinically superior to the first drug, it will not be considered to be the
same drug."[121]  Accordingly, if a subsequent drug is clinically superior to a drug with ODE that
has the same active moiety and is for the same indication or use, approval of the subsequent drug
is not blocked by that drug's ODE.  Jazz provides three arguments why FDA cannot apply the
definition of "same drug" here to determine that Lumryz is a different drug than Xywav, and
thus not blocked by Xywav's ODE.

First, Jazz argues that *Depomed* and *Eagle* struck down FDA's definition of "same drug."[122]  As
a threshold matter, *Depomed* and *Eagle* concerned a different set of facts and a distinct legal
issue.  Those cases addressed FDA's authority to require a demonstration of clinical superiority
as a condition for eligibility for ODE prior to the addition of section 527(c) to the FD&C Act.
Jazz acknowledges this, stating, "Section 527(c) thus addresses the specific factual scenario at
issue in *Depomed*, *Eagle*, and *United Therapeutics* by providing that subsequent periods of ODE
cannot be obtained without proof of clinical superiority."[123]  Thus, the holdings of these cases
concern eligibility for ODE, not the scope of ODE (i.e., what ODE blocks).  The district court in
*Eagle Pharms* explicitly stated: "[t]he scope of Bendeka's exclusivity is an issue that the FDA
must determine in the first instance."[124]

---

and that section 527(c) addresses only serial grants of exclusivity).  Section 527(c) only concerns potential eligibility
of a subsequent drug (like Lumryz) for its own period of ODE; it does not address whether a subsequent drug's
(Lumryz's) approval is blocked by Xywav's ODE.  See section II.B of document for further explanation.
[119] Avadel is only seeking approval for the treatment of cataplexy or EDS in the adult population with narcolepsy,
and Xyrem's ODE only blocks approval of the same drug for the treatment of cataplexy or EDS in the pediatric
population. Jazz acknowledges that "[. . .] the unexpired ODE for XYREM is not at issue (because Avadel's
proposed labeling omits pediatric use)."  Sidley Slides, *supra* note 13, at 7.
[120] Section 527(c)(1) of the FD&C Act.
[121] 21 CFR § 316.3(b)(14)(i); *see also* similar language in 316.3(b)(14)(ii).
[122] Sidley Letter, *supra* note 12, at 6; *see also* Sidley Slides, *supra* note 13, at 14.
[123] Sidley Slides, *supra* note 13, at 10.
[124] *Eagle Pharms., Inc. v. Azar*, No. CV 16-790 (TJK), 2018 WL 3838223, at *3 (D.D.C. Aug. 1, 2018). *See also id.*
at *2 ("But the Order did not adopt Eagle's (or any other party's) interpretation of the scope of Bendeka's
exclusivity."); *id.* ("And as Defendants repeatedly and correctly assert, the scope of Bendeka's exclusivity was not
before the Court in this litigation *See, e.g.*, Defs.' Mot. at 7 ('Eagle repeatedly emphasized that the scope of
exclusivity for Bendeka was a separate issue from the existence of any such exclusivity, indicating that only the
latter was properly before this Court.'). Rather, the issue was whether Bendeka should enjoy orphan-drug
exclusivity at all. Accordingly, that was the only issue that the Court's Opinion and Order addressed, as Defendants
acknowledge. *See id.* at 2, 9; Defs.' Reply at 2. And doing so did not require the Court to address whether Bendeka
is the same drug as Treanda under either the FDA's regulations or the statute."). *See also* FDA, *Dear Applicants for*

18

Jazz nonetheless points to several quotations from the cases in looking for support, but these quotations do not speak directly to the situation at issue with Lumryz.  The first quotation,[125] from the background section of the *Depomed* decision, simply describes how the definition of "same drug" "effectively limits the scope of exclusivity," but neither *Depomed* nor *Eagle* addressed the scope of the plaintiffs' exclusivity (i.e., whether approval of another sponsor's drug was blocked by the plaintiffs' exclusivity).[126]  Jazz also quotes language in the *Depomed* decision stating, "This Court will not impute to Congress an intention to authorize an exception that Congress itself did not think worth enacting."[127]  However, the regulatory definition of "same drug" does not create an extra-statutory "exception" to ODE.  As explained in section II.B above, under section 527(a), FDA may not approve another sponsor's application for the same drug for the same use or indication as a drug with ODE.[128]  Exceptions to ODE describe situations where FDA can nevertheless approve another sponsor's application for the same drug for the same use or indication during a period of unexpired ODE.[129]  Instead of creating such an exception to ODE where same drugs for the same indications or uses can be approved despite a drug's unexpired ODE, the definition of "same drug" identifies certain drugs that are not the same (e.g., clinically superior drugs) and, in this context, helps clarify the scope of ODE once it has attached.  When a subsequent drug that is otherwise the same drug (i.e., contains the same active moiety and is for the same use or indication) as a drug with unexpired ODE and is found to be clinically superior to that drug with unexpired ODE, then the subsequent drug is not the "same drug," and the unexpired ODE cannot block approval of that drug under section 527(a) of the FD&C Act (because such ODE can only block same drugs for the same uses or indications).[130]  That section 527(b) enumerates two exceptions to ODE does not undermine the

*Certain Products Containing Bendamustine Letter*, Docket No. FDA-2018-N-3773 (Feb. 20, 2019) ("FDA has . . . determined that the agency will continue to apply its existing 'same drug' regulation when determining the scope of Bendeka's exclusivity (i.e., exclusivity prevents the approval of any other drug with the same active moiety (here, bendamustine) for the exclusivity-protected indications.").

[125] Sidley Slides, *supra* note 13, at 14 (quoting *Depomed v. HHS*, 66 F. Supp. 3d 217 (D.D.C. 2014) ("FDA's 'insertion of the 'same drug' concept … effectively limits the scope of exclusivity protection because under the regulations, only if a new drug uses the same [active moiety] to treat the same disease or condition … and the new drug is also not found to be 'clinically superior' to the existing orphan drug will the FDA … forbid its marketing within the exclusivity period.'").

[126] *Depomed.v. HHS*, 66 F. Supp. 3d 217 (D.D.C. 2014); *see also Eagle Pharms., Inc. v. Azar*, 952 F.3d 323 (D.C. Cir. 2020).

[127] Sidley Letter, supra note 12, at 6; see also Sidley Slides, supra note 13, at 14.  Similarly, the Sidley Letter also later quotes from *Depomed*, "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied."  Sidley Letter, supra note 12, at 8.

[128] Section 527(a) of the FD&C Act.

[129] The exceptions to 527(a) of the FD&C Act are enumerated in section 527(b).

[130] This distinction between an exception to ODE and a definitional exclusion from the term "same drug" is a meaningful one.  The exceptions to ODE under section 527(b) set forth the circumstances under which FDA may approve an application even though it is for the same drug for the same indication or use as the drug that has ODE.  Meanwhile, a subsequent drug that is clinically superior to the drug with ODE is simply not the same drug as the drug that has ODE and is therefore excluded from the scope of subsequent drugs that are blocked by that ODE.  A standard illustration of this distinction, familiar to most law students, is the evidentiary rule against hearsay.  Federal Rule of Evidence 802 provides that hearsay is generally inadmissible.  Rules 801(c)-(d) exclude certain statements from the definition of hearsay: 801(c) limits hearsay to out-of-court statements offered for their truth, while 801(d) further specifies certain statements that are "not hearsay."  Meanwhile, Rules 803, 804, and 807 provide for certain exceptions to the rule against hearsay—statements that meet the definition of hearsay, but that are nevertheless not

19

agency's conclusion that a clinically superior drug is definitionally not the "same drug," and therefore its approval is not blocked by ODE.

Jazz also cites quotations from *Eagle* critiquing "FDA's imposition of its clinical-superiority requirement" and that FDA's "interpretation reads a limitation into the text that is not there."[131] Again, *Eagle* concerned FDA's imposition of the condition of clinical superiority for a sponsor to be eligible for its own period of ODE, which is not at issue here.  We have already recognized that Xywav is eligible for ODE.  Xywav's ODE, however, only blocks approval of the same drug for the same indication or use.

Second, Jazz argues that the enactment of section 527(c) of the FD&C Act superseded and invalidated the regulatory definition of "same drug."  Specifically, Jazz argues that the regulatory definition of "same drug" is inconsistent with section 527(c)(1), because the statute does not contain what Jazz refers to as the "'not-the-same' fiction."[132]  However, Jazz ignores crucial words in the statute.  As explained above, Section 527(c)(1) requires a demonstration of clinical superiority when the sponsor of a drug is seeking ODE for "a drug that is designated under section 526 and *is otherwise the same*, as determined by the Secretary, as an already approved or licensed drug" for the same use or indication.[133]  The orphan-drug regulations, which predate section 527(c)(1), use this same phrase; *see, e.g.*, 21 CFR § 316.3(b)(3) (stating "that a drug is shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is *otherwise the same drug*)" (emphasis added)); 21 CFR § 316.34(c) ("If a drug is *otherwise the same drug* as a previously approved drug for the same use or indication, FDA will not recognize orphan-drug exclusive approval if the sponsor fails to demonstrate upon approval that the drug is clinically superior to the previously approved drug." (emphasis added)); Congress legislated against this backdrop.  Black's Law Dictionary defines "otherwise" as:

> **otherwise** *adv.* (bef. 12c) **1.** In a different way; in another manner <David Berkowitz, otherwise known as Son of Sam>. **2.** By other causes or means <to succeed by hard work and otherwise>. **3.** In other conditions or circumstances <to know him otherwise than through law practice>. **4.** Except for what has just been mentioned <page 99 was illegible; otherwise, the records were easy to decipher>. **5.** Busy doing something else <she was otherwise engaged that day>. **6.** To the contrary; differently <although the economists say that legal markets are soft, many law-firm leaders think otherwise>. • The term *otherwise* tends to be quite broad in scope.

---

[131] Sidley Letter, supra note 12, at 6; see also Sidley Slides, supra note 13, at 14.

[132] Sidley Slides, *supra* note 13, at 15-16.  *Id.* at 15 (arguing that "[t]he statute does not rely on any legal fiction and does not pretend that a clinically superior product is no longer "the same" as prior drugs that contain the same active moiety; that "[i]nstead, the statute created a clinical superiority requirement that embraces 'sameness;'" that "[p]ursuant to section 527(c)(1), a second or further period of ODE is conditioned on a demonstration that the proposed drug is 'clinically superior to any already approved or licensed drug that is the same drug;'" and that "[p]er the statute XYWAV remains 'the same drug' as other oxybates even though it is clinically superior").

[133] Section 527(c)(1) of the FD&C Act (emphasis added).

subject to the rule against hearsay.  Exceptions to the rule against hearsay and exclusions from its definition are therefore addressed separately.  The same is true here.

20

These dictionary definitions make clear that "otherwise" connotes difference. By using the phrase "otherwise the same" the statute (and regulations) acknowledges that a clinically superior drug is not, in fact, considered to be the same as a previously approved drug. The orphan-drug regulations defining "same drug" state that "if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug," which is entirely consistent with section 527(c)'s description of a clinical superior drug as one that is "otherwise the same" as (i.e., different than) a previously approved drug. FDA has previously considered whether the enactment of the FDARA provisions at section 527 conflicted with its regulations and concluded that "FDA's current regulations are consistent with FDARA."[134]

Third, Jazz argues that allowing a clinically superior drug to overcome the ODE of an otherwise same drug goes against the intent of Congress and renders ODE meaningless.[135] FDA disagrees. As Jazz itself acknowledges, Congress expressed an interest in incentivizing the development of clinically superior products.[136] The ODE framework executes that intention in two ways: first, clinically superior drugs can be eligible for their own terms of ODE; second, clinically superior drugs can be approved during the ODE period for a drug that is otherwise the same as the clinically superior drug because they fall outside the scope of that drug's ODE. Although ODE does not block as much as Jazz would prefer in this instance, that does not render ODE "meaningless." Xywav's ODE blocks FDA approval of all applications from other sponsors for the same drug for the same use or indication for seven years (subject to the exceptions in section 527(b)), a valuable benefit that is not just limited to blocking FDA's approval of generic drugs referencing Xywav.

### ii. MCTPC in Relation to Safety

As explained above, Lumryz may demonstrate clinical superiority to Xywav by showing that it provides a significant therapeutic advantage through greater effectiveness, greater safety, or by making a MCTPC. Doing so would render Lumryz a different drug than Xywav such that Xywav's ODE would not block Lumryz's approval. Importantly, as explained above, one drug can demonstrate a MCTPC over a previously approved drug even if the drug is not as effective or safe in every respect as the previously approved drug. Jazz tries to argue otherwise. Jazz claims that "longstanding FDA policy requires the second-in-time drug to achieve at least comparable safety as the earlier drug" in order to be clinically superior.[137] Additionally, Jazz claims that "to be eligible for clinical superiority a drug must also provide safety at least comparable to the approved drug" and that "a new drug that is less safe than an already approved orphan drug cannot be considered 'clinically superior' to the first drug."[138] The same argument is also made in the Sidley Letter, which states, "clinical superiority cannot be demonstrated through tradeoffs—a later drug is not clinically superior if it sacrifices the safety or efficacy

---

[134] *Dear Applicants for Certain Products Containing Bendamustine Letter*, *supra* note 124. Jazz points to section 527(d) of the FD&C Act to suggest that the agency cannot apply its definition of "same drug" to interpret the statute and its regulations at Subpart D of Part 316. As noted here, FDA has previously considered this issue and concluded that FDA's current regulations are consistent with FDARA.
[135] Sidley Letter, *supra* note 12, at 8; *see also* Sidley Slides, *supra* note 13, at 17.
[136] Sidley Slides, *supra* note 13, at 17.
[137] Jazz's September 2021 Letter, *supra* note 11, at 1.
[138] *Id*. at 2.

21

achieved by its predecessors."[139]  In the Sidley Slides, Jazz relies on the words "over and above" in section 527(c)(2) to argue that clinical superiority requires "progress" and thus a drug cannot be clinically superior to a previously approved drug if it is also less safe than the previously approved drug.  These assertions are not correct.

First, the words "over and above," in the context of the statute and regulation at 21 CFR § 316.3(b)(3), cannot be read to mean a drug must be as safe as a previously approved drug to make a MCTPC.  As explained in section II.C above, section 527(c)(2) of the FD&C Act defines clinically superior to mean that "the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, *or* by providing a [MCTPC]," and 21 CFR § 316.3(b)(3) defines clinically superior to mean that "a drug is shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug) in *one or more* of the following ways:" greater effectiveness, greater safety, or a MCTPC (emphasis added).  Jazz conveniently ignores the italicized statutory and regulatory language in these definitions.  In both definitions, the subsequent drug must provide a significant therapeutic advantage "over and above" an already approved drug in just one way—greater efficacy, greater safety, *or* by providing a MCTPC—to be considered clinically superior.  The plain reading of both the statute and the regulation does not impose an additional requirement that in order to provide a significant therapeutic advantage in one of the three measures, the drug must also be at least comparable in the other two measures.  The relative effectiveness and safety of the drug may be relevant in assessing whether a drug makes a MCTPC, and a drug must meet FDA's fundamental safety and effectiveness thresholds to obtain approval (see section II.D above), but nothing in the statute or regulation requires comparable effectiveness and safety in every respect.

In fact, in the 2011 proposed rule for amending the orphan-drug regulations, FDA proposed adding such a requirement to the regulation.[140]  Specifically, FDA proposed adding that a demonstration of MCTPC must also include "a demonstration that the drug provides safety and effectiveness comparable to the approved drug."[141]  In the 2013 final rule, however, FDA did not adopt that proposed change, so as not to create "a new standard" for MCTPC.[142]  Instead, FDA stated that MCTPC "determinations can be complex and encompass consideration of a number of factors that potentially implicate safety and effectiveness, which are evaluated on a case-by-case basis for each drug product."[143]

Jazz points to the 2011 proposed rule to argue that a "comparable safety showing" is "consistent with longstanding FDA policy."[144]  To the contrary, as discussed above, the final rule makes clear that requiring a showing of comparable safety and effectiveness for a MCTPC would create a "new standard."[145]  Jazz also claims that it "could find no precedent where FDA has endorsed a

---

[139] Sidley Letter, *supra* note 12, at 8-9; *see also* Sidley Slides, *supra* note 13, at 29.
[140] FDA*, Orphan Drug Regulations, Proposed Rule*, 76 Fed. Reg. 64868, 64871 (Oct. 19, 2011) [hereinafter 2011 Proposed Rule].
[141] *Id*. at 64878.
[142] 2013 Final Rule, 78 Fed. Reg. at 35124.
[143] *Id*.
[144] Jazz's September 2021 Letter, *supra* note 11, at 2 footnote 4 (referencing 2011 Proposed Rule, 76 Fed. Reg. at 64876).
[145] 2013 Final Rule, 78 Fed. Reg. at 35124.

22

comparably effective but less safe product as clinically superior."[146]  However, more
importantly, based on our review, agency precedent is devoid of instances in which we refused to
find a MCTPC for a drug based on a failure to show comparable safety or efficacy.[147]  As
explained above, safety concerns could inform a MCTPC analysis, but a safety concern present
in a subsequent drug that was not present in the previous drug would not automatically defeat a
finding of MCTPC.  That determination would be made on a case-by-case basis and depend upon
the nature of the safety concern weighed against the benefits of the MCTPC.  As described in
detail in section II.C, FDA's ODE determination regarding Rebif provides at least one instance
where we found a drug to be clinically superior based on greater efficacy even though the drug
was less safe in one measure than the previously approved drug with ODE.  As noted above,
Rebif patients experienced skin necrosis at injection sites that patients on a previously approved
drug (Avonex) did not (i.e., the same adverse event that was present with the previously
approved drug Betaseron that led to the determination that Avonex was clinically superior to
Betaseron based on safety).[148] While this clinical superiority determination was not based on a
MCTPC finding, the example nonetheless demonstrates that the agency does not require
comparable safety and efficacy to be considered clinically superior.

Jazz claims that FDA's clinical superiority analyses include an assessment of whether the
subsequent drug is at least "not less safe than" the previously approved drug to support its
assertion that "a new drug that is less safe than an already approved orphan drug cannot be
considered 'clinically superior' to the first drug."[149]  To support these claims, Jazz cites
examples where FDA considered whether a previously approved drug is at least not less safe.[150]
As discussed below, although these examples discuss the relative safety of two drugs, they do
not support a conclusion that a drug *must* be at least "not less safe" than an already approved
drug to be clinically superior to that drug.  FDA has considered whether a subsequent drug has
comparable safety and efficacy to the previously approved drug as part of an overall assessment
of whether the subsequent drug makes a MCTPC.  For example, to reiterate what we said above,
where certain adverse events associated with a change in administration raise safety concerns for
a subsequent drug that are not present for a previous drug, FDA could consider such information
to determine whether the safety concerns affect the agency's finding that certain benefits of the
drug create a MCTPC, but such safety concerns would not automatically lead FDA to deny the
drug approval or exclusivity based on a finding that the drug was not clinically superior.

The specific examples provided by Jazz do not counsel otherwise.  First, Jazz cites to OOPD's
statements, in determining that Revcovi (elapegademase-lvlr) is clinically superior to Adagen
(pegademase bovine), that "OOPD does not need to determine whether Revcovi is in fact more
safe than Adagen. Clinical superiority based on effectiveness has been demonstrated, and

[146] Jazz's September 2021 Letter, *supra* note 11, at 1.
[147] We are aware of certain language in agency documents that could be interpreted as suggesting FDA has such a
policy. As described further below, despite these statements, none of FDA's past precedents that OOPD reviewed
manifest application of such a policy upon approval when FDA is determining eligibility for ODE or when it is
considering whether a drug may be approved in light of another sponsor's ODE.  Given the quantum of information
suggesting otherwise, it is clear that those statements do not reflect such an agency policy.
[148] CBER Rebif memo, *supra* note 32, at 20.
[149] Jazz's September 2021 Letter, *supra* note 11, at 2.
[150] *Id*. at 2 footnote 4; *see also* Sidley Slides, *supra* note 13, at 30.

23

FDA-Jazz-000546

Revcovi is at least not less safe than Adagen."[151]  Revcovi and Adagen are both enzyme replacement therapies used to treat adenosine deaminase ("ADA") deficiency in patients with severe combined immunodeficiency.  Adagen is derived from a bovine source, while Revcovi is recombinant (i.e., made in a laboratory).  OOPD determined that Revcovi is clinically superior to Adagen based on a consult with expert clinicians in the review division, who found that Revcovi is more effective as it provides more stable plasma ADA activity, more consistently above the therapeutic threshold associated with clinical benefit associated with long term survival.[152]  Because OOPD found Revcovi to be clinically superior based on greater efficacy, it did not need to determine if Revcovi also provided greater safety.  Efficacy and safety are alternative prongs for clinical superiority.  Nothing in OOPD's reasoning suggests that the fact that Revcovi was "not less safe than Adagen" was a factor in OOPD's finding of clinical superiority based on greater effectiveness or that if Revcovi had been less safe, then Revcovi could not have been found to be clinically superior.  Nor do OOPD's statements mean that FDA has a policy that in order to be clinically superior based on efficacy, a subsequent drug must also provide safety at least comparable to the previously approved drug.

Second, Jazz cites an ODD memo regarding a potential plausible hypothesis of clinical superiority of enteric-coated cysteamine (later named Procysbi (cysteamine bitartrate)) over another cysteamine product for the treatment of cystinosis.[153]  Enteric-coated cysteamine had ODD for the treatment of cystinosis based on a plausible hypothesis that enteric-coated cysteamine may be clinically superior to the previously approved cysteamine product for the same disease based on safety by causing less nausea and vomiting.[154]  Note that at the time of the cited memo, OOPD was not conducting an analysis of whether the sponsor had, in fact, demonstrated clinical superiority.  The memo responded to a June 23, 2008, letter from the sponsor asking to update the hypothesis that was the basis of the ODD.[155]  OOPD reviewed this request, and in the memo cited by Jazz, explained that OOPD assesses MCTPC "individually" (on a case-by-case basis) and considers factors including "the nature of the orphan indication, course of treatment for the indication, and benefits that could be obtained from the new product."[156]  The memo then states, as cited by Jazz, "Inherent in this analysis is the general assumption that changes in drug administration would maintain a similar or improved adverse event profile and similar efficacy."[157]  As explained below, this statement is consistent with and reflects the MCTPC standard we described above.

At the ODD stage, as is the case in the Procysbi memo, FDA does not have full safety, efficacy, and other data for the drug necessary to make a definitive determination about clinical

---

[151] Jazz's September 2021 Letter, *supra* note 11, at 2 footnote 4.

[152] FDA, *Exclusivity Memorandum, DRU-2014-4675, Revcovi (elapegademase-lvlr)* at 3 (Oct. 14, 2020).

[153] Jazz's September 2021 Letter, *supra* note 11, at 2 footnote 4; *see also* Sidley Slides, *supra* note 13, at 30.

[154] FDA, Review of Request for ODD for enteric-coated cysteamine, DRU-2006-2310 (Oct. 10, 2006) [hereinafter Procysbi Designation Memo].

[155] Letter from Ted Daley to Timothy Cote, *Orphan Drug Exclusivity Determination for Delayed-release Cysteamine Bitartrate Capsules (i.e., enteric-coated beads) for Treatment of Cystinosis, DRU-2006-2310* (Jun. 23, 2008).  Note that there is no requirement for a sponsor to update the hypothesis of clinical superiority upon which an ODD is based.  This sponsor seemingly wanted to know if OOPD would accept the hypothesis for clinical superiority as it anticipated later submitting a marketing application for which it wanted ODE.

[156] FDA, *Memorandum, Request for OOPD Opinion, DRU-2006-2310* (Mar. 3, 2009) [hereinafter Procysbi 2009 memo].

[157] *Id.*

FDA-Jazz-000547

superiority; therefore, for the plausible hypothesis analysis at the ODD stage, unless a safety or efficacy concern is readily apparent to the agency absent receipt of safety and efficacy data in the sponsor's application for approval, we generally assume that the drug provides comparable safety and efficacy.[158] At the approval stage, once such safety and efficacy data about the drug has been submitted in an application for marketing approval, that general assumption may or may not still apply, depending on what the submitted data shows. As we stated above, FDA may consider whether, for example, any adverse events documented within the drug's safety data submitted in its application for approval diminish the advantages of, for example, a change in route or frequency of administration. In that respect, as explained above, safety concerns could inform the MCTPC analysis, but a safety concern present in a subsequent drug that was not present in the previous drug would not automatically disqualify the drug from obtaining a MCTPC finding. As stated above, clinical superiority analyses can "vary depending on many factors"[159] and MCTPC "implies a more global assessment."[160]

In the case of Procysbi, upon approval, FDA found that Procysbi was clinically superior to the previously approved cysteamine product Cystagon based upon a MCTPC finding. The reviewer noted that the safety profile for Procysbi and Cystagon were similar "although a higher incidence of GI AEs were observed in the pivotal trial with delayed-release cysteamine in comparison to Cystagon."[161] If anything, this example shows that FDA has made a MCTPC finding upon approval where a drug was potentially less safe in at least one respect than the previously approved drug.

Third, Jazz cites to a memo about the clinical superiority of BeneFix (coagulation factor IX (recombinant)) based on safety to previously approved factor IX products for the prevention of bleeding in hemophilia B.[162] The memo considers whether a demonstration of greater safety under 21 CFR § 316.3(b)(3)(ii) requires a demonstration of a single safety advantage without regard for other safety considerations, or a demonstration of an overall increase in safety considering all aspects of safety.[163] The memo does not conclude which standard is applicable, but finds that BeneFix provides greater safety under both standards.[164] Each of the quotations

---

[158] Jazz also cites to FDA's review of a request for ODD for Ravicti as another example of a requirement for comparable safety. *See* Sidley Slides, *supra* note 13, at 30. This is another example of FDA considering whether there is a plausible hypothesis of clinical superiority, not a demonstration of clinical superiority. In this example, FDA was concerned that the sponsor did not adequately explain why the new dosage form would represent a significant advantage over the previous dosage form, and FDA was concerned that the new dosage form could introduce new safety risks that were not accounted for in the sponsor's hypothesis. *See* FDA, *Review of Request for Orphan-Drug Designation*, 05-2035, Glyceryl tri(4-phenylbutyrate) at 4 (Sep. 2, 2005) ("[I]t is unclear whether the glycerol byproduct of GT4P metabolism would pose its own safety risk in chronic use of the drug."). Thus, a safety concern was readily apparent to the agency at the designation stage absent receipt of safety data in the sponsor's application for approval. Without additional information about the potential safety of the drug and without additional information about the advantages of the drug, FDA was unable to determine there was a plausibly hypothesis of clinical superiority that would warrant ODE.

[159] 1992 Final Rule, 57 Fed. Reg. at 62078.

[160] OOPD Rebif memo, *supra* note 36, at 3.

[161] FDA, *Review of an Amended Request for Orphan Drug Designation, 2006-2310, Procysbi (enteric-coated cysteamine)* at 6 (May 28, 2013) [hereinafter Procysbi Exclusivity Memo].

[162] Jazz's September 2021 Letter, *supra* note 11, at 2 footnote 4.

[163] FDA, *Memorandum, Orphan Product Status of BeneFix Coagulation Factor IX (Recombinant)* (Jan. 21, 1997) [hereinafter "BeneFix memo"].

[164] *Id.*

25

that Jazz cites are in the context of considering whether one safety advantage needs to be compared to safety concerns in order to make an assessment about greater safety under 21 CFR § 316.3(b)(3)(ii). This is a different question than whether a drug can be clinically superior overall if it is less safe in one respect than the previously approved drug. The first quotation (i.e., "A significant risk associated with the new drug, that is not shared by the approved orphan, would likely render the new drug unapprovable") is making the obvious point that significant new safety risks inform FDA's evaluation of the fundamental safety of a drug for marketing approval under section 505 of the FD&C Act. The other two quotations (i.e., "it would be unreasonable to ignore an apparent risk that may outweigh the purported advantage of a new drug," and "[s]ince there is no established risk to 'outweigh' the enhanced viral safety of BeneFix, the significant therapeutic advantage of BeneFix has not been outweighed by anything") describe a situation where a safety risk associated with the subsequent drug would need to be considered in an overall assessment of safety, but not necessarily prevent a finding of greater safety. These quotations do not support Jazz's position.

Fourth, Jazz cites FDA's determination that Signifor LAR (pasireotide)—a "long-acting release" formulation—made a MCTPC by providing once-per-month dosing as compared to twice-per-day pasireotide to treat Cushing's disease.[165] Specifically, Jazz cites to the statement that "[t]here are no notable differences in the safety and efficacy profiles between the immediate release and long-acting formulations."[166] Again, stating that there are no notable differences in safety is not the same as stating that if Signifor LAR were less safe then it could not make a MCTPC. The exclusivity memorandum for Signifor LAR does not state that having comparable safety was a requirement to finding a MCTPC.[167]

Overall, none of these examples support that FDA will consider a new drug to be clinically superior to a previously approved drug only if the new drug is at least as safe as the previously approved drug.

Finally, Jazz tries to argue from a policy perspective that finding clinical superiority based on one significant advantage to patients even if the drug is less safe in some other measure would undermine the value of the ODE incentive.[168] FDA disagrees. FDA interprets the purpose of the Orphan Drug Act to incentivize the development of better versions of drugs for the treatment or prevention of rare diseases or conditions. FDA believes that a drug may provide a significant therapeutic advantage to patients over a previously approved drug even if, for example, it is less safe in one measure than the previously approved drug. If new drugs were required to be at least as safe as the previously approved drugs, that would prevent a drug that provides a significant therapeutic advantage and otherwise meets FDA's approval standard from coming to the market during the duration of the previously approved drug's ODE. Implementing ODE requires balancing the need to incentivize the development of drugs for rare diseases or conditions and the need for patients to access better versions of such drugs. Requiring comparable safety on

---

[165] Sidley Slides, *supra* note 13, at 30.
[166] *Id.* (quoting clinical superiority findings available at https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings).
[167] FDA, *Exclusivity Memorandum*, 09-2887 Signifor LAR (Apr. 3, 2019) [*hereinafter* Signifor Exclusivity Memo].
[168] Jazz's September 2021 Letter, *supra* note 11, at 20. *See also id.* at 1 ("Because the concept of clinical superiority does not include regression, longstanding FDA policy requires the second-in-time drug to achieve at least comparable safety as the earlier drug").

26

every measure before a drug can be found to be clinically superior would be an arbitrarily rigid requirement that would significantly delay approval of drugs with important therapeutic advantages for patients with rare diseases.

FDA has adopted a more nuanced approach to clinical superiority, where a potential MCTPC is considered in the overall context of the safety, efficacy, and other features of the drug to determine if there is an overall significant therapeutic advantage of the new drug. As FDA has stated, MCTPC "determinations can be complex and encompass consideration of a number of factors that potentially implicate safety and effectiveness, which are evaluated on a case-by-case basis for each drug product."[169] Improvements to drugs are not necessarily linear, where every version of a drug builds off and is better in every respect than the one that came before. An improvement in one respect may benefit patients, even if there is a disadvantage in another aspect of the drug. As FDA has stated, "there can not [sic] be an infinite number of comparison criteria if this provision of the regulation is to be meaningful."[170] That is not to say that a small advantage provided by a new drug should overcome a large disadvantage also introduced by the drug; however, it would not serve the purpose of the Orphan Drug Act—and public health—if a drug were automatically disqualified from being clinically superior if it were less safe in one regard, while still meeting FDA's approval standards for safety.

### B. Lumryz is Clinically Superior to Xyrem and Xywav

Avadel has not contended that Lumryz has greater effectiveness than Xyrem and Xywav, and DN1 has concluded that "[t]here is no evidence suggesting that the efficacy of Lumryz is different from that of Xyrem or Xywav."[171] Avadel did present arguments why it believes that Lumryz provides greater safety than Xyrem and Xywav,[172] but OOPD concludes that Avadel has not demonstrated that Lumryz provides greater safety than either Xyrem or Xywav.[173] DN1 has also concluded that Avadel's arguments do not support a finding of greater safety of Lumryz over either Xyrem or Xywav.[174] Because Avadel has not demonstrated either greater effectiveness or greater safety, Lumryz can be deemed to be clinically superior over Xyrem and Xywav only if Lumryz makes a MCTPC over the previously approved drugs.[175] As explained below, FDA concludes that Lumryz makes a MCTPC over Xyrem and Xywav.

Based on a review of the arguments submitted by Avadel and Jazz, consultation with DN1,[176] and consultation with two board certified sleep experts in FDA,[177] OOPD finds that Lumryz makes a MCTPC over Xyrem and Xywav by providing a once-nightly dosing regimen that

---

[169] 2013 Final Rule, 78 Fed. Reg. at 35124.
[170] *See* OOPD Rebif memo, *supra* note 36, at 3 (emphasis added).
[171] DN1 Lumryz Consult, *supra* note 5, at 3. There has been no head-to-head study to directly compare Lumryz to Xyrem or Xywav.
[172] *See* Avadel's Exclusivity Claim, *supra* note 6; *see also* Avadel's Exclusivity Claim Supplement, *supra* note 7.
[173] For the purposes of this analysis, OOPD will not include a response to each of Avadel's claims of greater safety. OOPD ultimately finds Lumryz to be clinically superior to Xyrem and Xywav based on making a MCTPC, and Avadel's arguments about greater safety do not factor into the MCTPC finding.
[174] DN1 Lumryz Consult, *supra* note 5, at 3.
[175] 21 CFR § 316.3(b)(3)(iii).
[176] DN1 Lumryz Consult, *supra* note 5.
[177] *See* Sleep Expert Consult, *supra* note 5.

27

FDA-Jazz-000550

avoids a nocturnal arousal to take a second dose.  Crucial to this finding is that the three oxybate products are for the treatment of symptoms of narcolepsy—a chronic sleep disorder.  The purpose of oxybate treatment is to consolidate a narcoleptic's sleep to improve daytime symptoms of EDS and cataplexy.[178]  As explained in more detail below, waking up to take a second dose of Xyrem and Xywav is antithetical to the goal of improving sleep.  This is compounded by the fact that narcolepsy is a chronic condition and patients may need treatment for the remainder of their lives.

As explained by FDA's sleep experts in greater detail in their consult, even with a single nocturnal arousal, there can be impairment of alertness and decline in cognitive performance the following day.[179]  It is known that disrupting sleep, even briefly, changes sleep architecture—the normal pattern of NREM and REM cycles requisite for daily restoration.[180]  As explained in section III.A of this document and by FDA's sleep experts, when an arousal occurs (e.g., when waking up to take medication during the night after falling asleep), there is a shift in an EEG pattern—one that leads to a longer Stage W with alertness or consciousness, even if not remembered.[181]  The duration of time in Stage W necessary to take the second dose and fall back asleep is prolonged and will adversely impact WASO.[182]  In treating sleep disorders, including narcolepsy, the goal is to maximize the time in sleep and minimize wake time (i.e., minimize WASO).[183]  Hence, nocturnal arousals should be avoided—especially in those with sleep disorders—as the goal of treatment is to restore normal sleep architecture.[184]

Xyrem and Xywav are administered in two divided doses, with the first dose taken at bedtime and second dose taken 2.5 to 4 hours later.  FDA's sleep experts have concluded that awakening to take a second dose of Xyrem or Xywav is not optimally supportive of the continual sleep necessary for narcolepsy patients to restore sleep architecture and daytime alertness with more normal functioning.[185]  Such dosing necessitates awakening from sleep, prompting a nocturnal arousal.[186]  Both Xyrem and Xywav labeling explain that after a dose, it usually takes at least 5 to 15 minutes to fall asleep, which means it usually takes at least 5 to 15 minutes to fall back asleep after taking the second dose.[187]  Awakening to take a second dose necessarily disrupts sleep and causes fragmented sleep.[188]  A person with disrupted sleep cannot simply return to sleep and resume their normal sleep cycle.[189]  Disruption of sleep leads to the inability to enter Stage N3, or disruption of N3, and such individuals will revert back to Stage W and subsequently progress to Stage N1 sleep and so forth.[190]  So, upon taking a second dose of Xyrem or Xywav,

---

[178] Scammell, *Treatment*, *supra* note 77.

[179] *See* Sleep Expert Consult, *supra* note 5, at 7-8; *see also* Cirelli, *supra* note 46.

[180] Sleep Expert Consult, *supra* note 5, at 8; *see also* Philip, *supra* note 61, at 244-245.

[181] Kirsch, *supra* note 48; *see also* Philip, *supra* note 61, at 244-245.

[182] Sleep Expert Consult, *supra* note 5, at 5; *see also* Suni, *supra* note 62.

[183] Sleep Expert Consult, *supra* note 5, at 5.

[184] *Id*. at 6; *see also* Scammell, *Treatment*, *supra* note 77.

[185] *See* Sleep Expert Consult, *supra* note 5, at 7.

[186] *Id*. at 7 footnote 45 ("It is self-evident that an arousal occurs upon taking the second dose of Xyrem or Xywav because some degree of consciousness or alertness is needed for the voluntary movements involved in taking medicine").

[187] Xyrem 2023 Labeling, *supra* note 86, at section 2.3; Xywav 2023 Labeling, *supra* note 93, at section 2.4.

[188] Sleep Expert Consult, *supra* note 5, at 5.

[189] Sleep Expert Consult, *supra* note 5, at 8.

[190] *Id*. at 6; *see also* Berry *supra* note 64, at 22-33.

28

after the minimum 5-15 minutes to return to sleep, such sleep does not resume where the patient left off to take their medication.[191]  If patients do not intentionally awaken to take the second dose (e.g., by setting an alarm), the effect of the drug will wear off, and the patients may awaken anyway and need the second dosing to return to sleep.[192]  As explained above, the disruption changes sleep architecture and will increase WASO and is something to be avoided in the narcoleptic patient, if possible.[193]

In contrast to Xyrem and Xywav, Lumryz is an extended-release formulation that is indicated to be administered once daily at bedtime.  Importantly, patients on Lumryz do not need to wake mid-sleep to take a second dose.  The dosing regimen of Lumryz "provides an opportunity for narcolepsy patients to achieve normal sleep architecture, which is not a possibility for a patient on Xyrem or Xywav who must either wake up to take a second dose (disrupting sleep architecture) or allow the drug to wear off after 2.5-4 hours (reverting patients back to their naturally occurring, disrupted sleep architecture)."[194]  This is medically relevant because the purpose of oxybate therapy is to improve sleep consolidation.[195]  Additionally, the benefit provided by the dosing regimen of Lumryz is germane to several of the factors that FDA may consider when determining if a drug makes a MCTPC.[196]  Lumryz's extended release properties provide for longer periods between doses, which is significant not only because it reduces the nightly number of doses from two to one but also because it eliminates the need to awaken in the middle of sleep to take a second dose.  FDA considers this to be significantly more convenient for patients, an advancement in the ease of drug administration, and a reduction in treatment burden.  As explained by FDA's sleep experts, patients taking Xyrem and Xywav typically prepare both doses before bed, may need to set an alarm to wake up at the proper time to take the second dose, and then may require 5-15 or more minutes to return to sleep.  Aside from the medical benefits of not having to awaken to take a second dose already explained above, it is inherently more convenient, easier, and less burdensome for patients to forgo that process on a nightly basis.  Importantly, this is in the context of a chronic neurological condition that requires potentially lifelong treatment.

### i.  MCTPC Finding Consistent with Past Precedent

Our basis for finding a MCTPC for Lumryz is similar to FDA's MCTPC finding for Procysbi.  As introduced above, Procysbi is an enteric-coated cysteamine product that has ODD for the treatment of cystinosis.  The ODD was based in part on a plausible hypothesis that enteric-coated cysteamine would be clinically superior to the previously approved cysteamine product, Cystagon, for the same disease based on safety by causing less nausea and vomiting.[197]  Procysbi

---

[191] Sleep Expert Consult, *supra* note 5, at 8.
[192] *Id.* at 7.
[193] *Id.* at 6.
[194] *Id.* at 8.
[195] Scammell, *Treatment*, *supra* note 77.
[196] *See, e.g.*, 2013 Final Rule, 78 Fed. Reg. at 35125 ("The following factors, when applicable to severe or life-threatening diseases, may in appropriate cases be taken into consideration when determining whether a drug makes a major contribution to patient care: convenient treatment location; duration of treatment; patient comfort; reduced treatment burden; advances in ease and comfort of drug administration; longer periods between doses; and potential for self-administration").
[197] Procysbi Designation Memo, *supra* note 154.

FDA-Jazz-000552

was first approved on April 20, 2013, and to be eligible for ODE, FDA required a demonstration of clinical superiority over Cystagon.  Cystagon was labeled to be dosed every six hours, whereas Procysbi was labeled to be dosed every 12 hours (a reduction of 50%).[198]  By requiring dosing every six hours, patients taking Cystagon would be required to awaken from sleep to take a dose in order to administer the drug as labeled.[199]  FDA concluded that many patients taking Cystagon were unable to follow the strict six-hour-dosing schedule, and that strict six-hour-dosing was required for the drug to be clinically beneficial (by maintaining white blood cell cystine levels below 1.0 nmol/½ cystine/mg protein).[200]  FDA found that Procysbi made a MCTPC over Cystagon, because Procysbi is effective at 12-hour-dosing, and many patients are unable to follow Cystagon's strict six-hour-dosing, especially due to the need to awaken from sleep to ensure a timely dose.[201]  Similar to Procysbi, Lumryz provides for 50% reduction in dosing frequency that eliminates the need to awaken to take a dose in order to achieve the medication's intended benefit.

### ii. Consideration of Sodium Differences

OOPD has also considered whether other relevant factors inform whether Lumryz makes a MCTPC over Xyrem and Xywav.[202]  Specifically, we considered the sodium differences between Lumryz and Xywav.  At the recommended daily dose of 6 g to 9 g, Lumryz contains approximately 1,100 mg to 1,640 mg of sodium whereas Xywav contains 87 mg to 131 mg.

At the recommended daily dose of 6 g to 9 g, Xyrem and Lumryz both have the same sodium content (approximately 1,100 mg to 1,640 mg).  The difference in sodium content between Xywav and Xyrem was explained in a DN1 consult for OOPD's Xywav ODE determination:

> Given the differences in sodium content between Xywav and Xyrem, Xywav is safer and thus clinically superior to Xyrem in the following: all patients with narcolepsy; the substantial proportion of the narcolepsy population that is salt-sensitive (i.e., individuals who have greater changes in blood pressure with changes in salt intake than those who are not salt sensitive, representing about 50% of the general population); the substantial proportion of the narcolepsy population that is hypertensive (about 30% of the general population is hypertensive); and the substantial proportion of the narcolepsy population (39%) who cannot be prescribed Xyrem due to co-existing medical conditions that can be made worse as a result of the high sodium content of Xyrem.[203]

This division consult also states:

---

[198] Procysbi Exclusivity Memo, *supra* note 161, at 9-10.

[199] *Id* at 5.

[200] *Id*. at 9.

[201] *Id*. at 10.  The reviewer also observed that the safety profile for Procysbi and Cystagon were similar "although a higher incidence of GI AEs were observed in the pivotal trial with delayed-release cysteamine in comparison to Cystagon."  *Id.* at 6.  The clinical superiority finding for Procysbi reflects multiple MCTPC factors, such as longer period between doses, increased ease of administration, and reduced treatment burden.

[202] *See* OOPD Rebif memo, *supra* note 36, at 3 ("an assessment of the safety or effectiveness of the new form of the subsequent product might be considered in determining whether the drug made a major contribution to patient care").

[203] DN1 2020 Xywav Consult, *supra* note 99, at 6.

FDA-Jazz-000553

The relationship between daily salt intake and cardiovascular morbidity is widely accepted, as is the need for salt intake to be generally restricted and not only in subjects with conditions such as hypertension, cardiac failure, and impaired renal function. The difference in sodium content between Xywav and Xyrem is both substantial and clinically meaningful when daily sodium intake requires restriction in patients who concomitantly have conditions such as cardiac failure, hypertension, and renal impairment. Xywav rather than Xyrem will be the medication of choice in such patients. Such patients, especially those with hypertension, may constitute a significant proportion of those with cataplexy and excessive daytime sleepiness in narcolepsy. The difference in sodium content between Xywav and Xyrem is also very likely to be clinically meaningful in all patients with narcolepsy, including those who are salt sensitive.[204]

OOPD found Xywav to be clinically superior (within the meaning of the orphan-drug regulations) to Xyrem because the reduction of sodium "will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated."[205]

OOPD acknowledges that the sodium content of Lumryz raises the same safety concern that was present for Xyrem and that is not present with Xywav.  The agency stated in the consult response quoted above that the difference in sodium content between Xywav and Xyrem is "very likely to be clinically meaningful in all patients with narcolepsy"[206] and that "[g]iven the differences in sodium content between Xywav and Xyrem, Xywav is safer and thus clinically superior to Xyrem in [. . .] all patients with narcolepsy."[207]  The logic of these statements, if extended here, would mean that the difference in sodium content between Xywav and Lumryz is likely to be clinically meaningful in all patients with narcolepsy and that Xywav is safer than Lumryz in all such patients, albeit based solely on one specific measure, i.e., reduced sodium.  Nonetheless, FDA has concluded that Lumryz is clinically superior to Xywav as a MCTPC given the benefit of Lumryz's once-nightly dosing despite Xywav's greater safety due to reduced sodium.  First, as explained above, there is no requirement for comparable safety when making a MCTPC finding, and finding clinical superiority based on one parameter — greater safety, greater efficacy, or a MCTPC — is sufficient to meet the clinical superiority standard.[208]  Second, for the reasons explained below, we believe that the benefit of Lumryz's once-nightly dosing outweighs the safety concern raised by its increased sodium content for a substantial number of narcolepsy patients.  Neither the statute nor regulations require a MCTPC to benefit the entire patient population for which a drug is intended.

Although it is widely accepted that individuals should limit sodium intake generally, the warning in Lumryz's labeling regarding sodium is directed only at "patients sensitive to sodium intake"

---

[204] *Id*. at 9-10.
[205] FDA, Clinical Superiority Findings, available at https://www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings.
[206] DN1 2020 Xywav Consult, *supra* note 99, at 10.
[207] *Id*. at 6.
[208] As OOPD stated in the Rebif example above, for one drug to be clinically superior in one parameter, it does not also need to be at least equal in all others. *See* OOPD Rebif memo, *supra* note 36, at 3.

31

such as "those with heart failure, hypertension, or renal impairment."[209]  For narcolepsy patients who are not sensitive to sodium intake, OOPD concludes that a once-nightly dosed oxybate drug will provide a significant therapeutic advantage.  It is true that patients who are not sensitive to sodium could also benefit from a reduction in sodium, but we consider the benefit offered by once-nightly dosing to outweigh the risk of increased sodium intake in such patients because having to wake up to take a second dose is antithetical to oxybate's goal of improving sleep; disrupting sleep contributes to chronic sleep loss, which is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health; and there are other ways such patients may reduce sodium in their diet.[210]  For narcolepsy patients who are sensitive to sodium, healthcare practitioners would need to weigh the benefits of once-nightly dosing against the severity of the patient's sodium sensitivity and the nature of their comorbidities to determine whether, in the practitioners' judgment, use of Lumryz or Xywav was appropriate.  For certain sodium-sensitive patients with narcolepsy, the benefit offered by once-nightly dosing would outweigh the risk of increased sodium intake for the same reasons (e.g., having to wake up to take a second dose is antithetical to oxybate's goal of improving sleep; disrupting sleep contributes to chronic sleep loss, which is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health; and there are other ways such patients may reduce sodium in their diet).[211]

For a drug to make a MCTPC, the drug should provide adequate safety to meet the approval standard (not necessarily the same or greater safety as a previously approved drug).  FDA has weighed the benefits and the risks of Lumryz and determined that the safety profile is adequate to meet the requirements for marketing approval.[212]  Thus, although Lumryz has an increased sodium burden compared to Xywav, the safety risk from such an increase is not significant enough to preclude Lumryz from meeting the requirements for marketing approval.  The safety risk associated with sodium for Lumryz is mitigated by labeling with an appropriate warning and precaution for patients sensitive to high sodium intake,[213] as has been done for Xyrem.[214]

In summary, OOPD concludes that the benefits of Lumryz's once-nightly dosing rise to the level of making a MCTPC because Lumryz's dosing provides for oxybate therapy that does not involve disrupting or fragmenting sleep, whereas Xyrem and Xywav necessitate a nocturnal awakening to take a second dose, which disrupts sleep architecture in patients with known sleep

---

[209] Lumryz labeling, *supra* note 105, at section 5.8.

[210] Sleep Expert Consult, *supra* note 5, at 2.  Jazz argues that approving Lumryz would undermine FDA's policy regarding the benefits of reducing daily sodium intake. Jazz's September 2021 Letter, *supra* note 11, at 20.  FDA acknowledges the importance of reducing sodium intake generally, and this determination does not erode that stance merely because we have concluded that sodium can be reduced by other means for patients who would benefit from taking this drug.

[211] We note that the DN1 Lumryz Consult explains that "the available safety data for Lumryz do not indicate that the higher sodium content of each dose of that drug is reflected in a greater incidence of adverse events than is observed with equivalent doses of Xywav." DN1 Lumryz Consult, *supra* note 5, at 3.

[212] DN1 Lumryz Consult, *supra* note 5, at 3 ("the safety profile of Lumryz meets the Agency's standards for approval.").  *See also* OOPD Rebif memo, *supra* note 36, at 3 ("A more meaningful standard is a significant therapeutic benefit in terms of increased effectiveness and adequate safety, or increased safety and adequate effectiveness.").

[213] *See* Lumryz Labeling, *supra* note 105, at section 5.8.

[214] *See* Xyrem 2023 Labeling, *supra* note 86, at section 5.8.

32

FDA-Jazz-000555

disorder.  This decision is based on consultations with DN1 and FDA sleep experts and relies on the scientific understanding about treating narcolepsy by minimizing nocturnal arousals and consolidating sleep.  OOPD believes that the science supports a finding that the MCTPC provided by Lumryz over Xyrem and Xywav has been demonstrated.

## V.    Jazz's Arguments Are Not Persuasive

### A.  Safety

Jazz argues that Lumryz does not provide greater safety than Xyrem and Xywav and is less safe than Xyrem and Xywav in several ways.[215]  As explained above, OOPD's determination that Lumryz is clinically superior to Xyrem and Xywav is not based on Lumryz providing greater safety than Xyrem and Xywav.  Therefore, OOPD has not responded to each safety argument from Jazz.[216]  In addition, OOPD has acknowledged above that Lumryz has a higher sodium content than Xywav and addressed why Lumryz is still clinically superior to Xywav.  Finally, as explained below, OOPD is not convinced by Jazz's remaining arguments that there are additional ways that Lumryz is less safe than Xyrem and Xywav.

First, Jazz argues that the risk of falls may be greater with Lumryz than with Xyrem and Xywav.[217]  Jazz characterizes its argument as speculation ("one can equally speculate about alternate scenarios in which nocturnal awakenings and falls increase due to [Lumryz's] extended-release formulation") and hypothesis ("[Lumryz] introduces its own hypothetical fall risks").[218]  Jazz speculates that because Lumryz is an extended release formulation, if a patient were to awaken and get out of bed, the patient using Lumryz would have more active drug in their blood compared to Xyrem and Xywav and could be at a higher risk for falls.[219]  Jazz also states that Lumryz has "apparently higher rates of enuresis" (i.e., bedwetting), which may lead to more falls.[220]  Jazz's claim is based on a cross-study comparison showing a higher rate of enuresis with Lumryz compared to Xyrem and Xywav.  Cross-study comparisons refers to drug studies in which a given drug is independently investigated from a second drug and does not allow direct comparison of results from one study to the other.  Inferences cannot be reliably drawn as the two study populations and conditions of each study may not be the same.  OOPD consistently has rejected use of such comparisons to conclude one drug has a higher rate of an adverse event than another drug.  Nevertheless, even if Lumryz were to have a higher rate of enuresis than Xyrem and Xywav, Jazz's argument is based on speculation that enuresis may lead to falls, because the patient may wake up, get out of bed, and change their sheets.[221]  DN1 agrees

---

[215] Jazz's September 2021 Letter, *supra* note 11, at 6-15.
[216] *See* Jazz's September 2021 Letter, *supra* note 11, at 6-15.  These arguments include that the pivotal REST-ON study was not designed to detect superiority (at 7-8), that findings of greater safety for other drugs were based on more data than is available for Lumryz (at 8-9), that there is insufficient evidence to support that the risk of falls is reduced with Lumryz compared to Xyrem and Xywav (at 10-13), that there is insufficient evidence to support that Lumryz will have better rates of adherence than Xyrem and Xywav (at 13-15), and that there is insufficient evidence to support that Lumryz will have lower rates of diversion (i.e., illegally transferring the drug to another person) than Xyrem and Xywav (at 15).
[217] Jazz's September 2021 Letter, *supra* note 11, at 12-13.
[218] *Id.*
[219] *Id.* at 12.
[220] *Id.*
[221] *Id.*

33

that Jazz's arguments are speculative and is not aware of any data to support their arguments.[222] Ultimately, as Jazz admits, its arguments are based on speculation and hypotheses, and there are no scientific data to support a conclusion that there is a higher risk for falls with Lumryz compared to Xyrem and Xywav.

Second, Jazz argues that Lumryz may have worse adherence rates than Xyrem and Xywav.[223] Jazz states that patients taking Lumryz may decide to skip taking their medication on nights when they do not expect to get 8-10 hours of sleep before they need to awaken the next day, or on nights where they do not limit fluid intake or consume alcohol.[224]  Jazz contrasts this with patients taking Xyrem or Xywav who, according to Jazz, in similar situations may choose to forgo the second dose on a given night instead of forgoing oxybate treatment entirely on such a night.[225]  These assertions that Lumryz will have lower rates of adherence than Xyrem and Xywav appear to be based upon speculation,[226] and we are unaware of any scientifically valid evidence to suggest that adherence should be different between the two drugs.[227]

Third, Jazz speculates that Lumryz may have higher rates of diversion (i.e., illegally transferring the drug to another person) than Xyrem and Xywav.[228]  Jazz suggests without evidence that Lumryz has "greater concealability and ease of transport" compared to Xyrem and Xywav, which would make Lumryz easier to divert.[229]  Jazz also suggests without evidence that multiple doses of Lumryz can more easily be combined into a single, more powerful dose than Xyrem and Xywav.[230]  Jazz presents no evidence that Lumryz would be easier to conceal, transport, and combine into a large dose than Xyrem and Xywav, and FDA is not aware of any such data.[231]

Fourth and finally, Jazz argues that Lumryz is less safe than Xyrem and Xywav because the dose of Lumryz cannot be adjusted, whereas the dose of Xyrem and Xywav can be adjusted. Specifically, Lumryz comes in four dosage strengths: 4.5 g, 6 g, 7.5 g, and 9 g,[232] and thus the dose of Lumryz can be adjusted to those four strengths.  Xyrem and Xywav are oral solutions, in concentrations of 0.5 g per mL,[233] and administered using a dosing syringe that measures dosing

---

[222] DN1 Lumryz Consult, *supra* note 5 at 6.

[223] Jazz's September 2021 Letter, *supra* note 11, at 14-15.

[224] *Id*. at 14.

[225] *Id*.

[226] We also note that alcohol ingestion is contraindicated for all three medicines.

[227] Jazz also argues: "FT218 patients who do take their medication in these scenarios may also be non-adherent and at greater risk.  Patients who take their FT218 with less than 8-10 hours to spend in bed before arising the next morning will be at greater risk of next-day impairment. And patients who do not follow Avadel's recommendation to limit fluid intake for 'several hours before dosing,' or who ingest alcohol, will be at greater risk of enuresis, bed exits, falls, serious respiratory depression, and death."  Jazz's September 2021 Letter, *supra* note 11, at 14.  The DN1 consult states, and OOPD agrees that: "This is again a speculative argument. There should not be a significant difference in the risks cited between Lumryz and Xywav/Xyrem, if those drugs are used as recommended in labeling." DN1 Lumryz Consult, *supra* note 5, at 6.

[228] Jazz's September 2021 Letter, *supra* note 11, at 15.

[229] *Id*.

[230] *Id*.

[231] DN1 Lumryz Consult, *supra* note 5, at 7.

[232] Lumryz labeling, *supra* note 105, at section 3.

[233] Xyrem 2023 Labeling, *supra* note 86, at section 3; Xywav 2023 Labeling, *supra* note 93, at section 3.

34

FDA-Jazz-000557

increments of 0.25 g.[234]  Jazz argues that the limited ability to dose adjust Lumryz makes it less
safe than Xyrem and Xywav for patients who would need to adjust the dose, including patients
taking the anti-epileptic medication divalproex, patients taking other central nervous system
("CNS") depressants, and patients who are hepatically impaired.[235]

Regarding patients taking divalproex sodium, no significant pharmacokinetic interaction between
Lumryz and divalproex sodium was observed in a drug-drug interaction study conducted by
Avadel, so Lumryz's labeling does not include a specific dose reduction recommendation when
Lumryz is co-administered with divalproex sodium.[236]  Therefore, a specific dose reduction
recommendation, such as that present in Xyrem and Xywav's labeling related to Xyrem and
Xywav patients taking divalproex sodium, is not necessary for Lumryz patients also taking
divalproex sodium.  Although FDA concluded that a pharmacodynamic interaction between
Lumryz and divalproex sodium cannot be ruled out given that both Lumryz and divalproex
sodium are CNS depressants, it has determined that the description of the general risks
associated with use of CNS depressants in section 5.1 of Lumryz's labeling is sufficient to
inform healthcare prescribers of the risks associated with using Lumryz with other CNS
depressants, including divalproex sodium.[237]

Regarding patients taking CNS depressants, the labeling for Xyrem, Xywav, and Lumryz have a
contraindication for the use of some CNS depressants (i.e., alcohol and sedative hypnotics) with
each of those drugs.  The labeling for all three drugs contains the same warning that "Use of
other CNS depressants may potentiate the CNS-depressant effects of" Xyrem/Xywav/and
Lumryz,[238] and a recommendation that "[i]f use of these CNS depressants in combination with"
Xyrem/Xywav/Lumryz "is required, dose reduction or discontinuation of one or more CNS
depressants" (including Xyrem/Xywav/Lumryz) "should be considered."[239]  Therefore, a patient
taking Xyrem or Xywav and another CNS depressant has the option to reduce the dose of
Xyrem/Xywav or the other CNS depressant (along with the option to discontinue Xyrem/Xywav
or the other CNS depressant).  A patient taking Lumryz and another CNS depressant has the
option to reduce the dose of Lumryz to one of the set doses below the maximum of 9 g (4.5 g, 6
g, 7.5 g) or reduce the dose of the other CNS depressant (along with the option to discontinue
Lumryz or the other CNS depressant).  A patient taking Xyrem or Xywav and another CNS
depressant may have more options for dose adjustment than a patient taking Lumryz and another
CNS depressant, but this does not mean that Lumryz is less safe than Xywav and Xyrem in
patients taking another CNS depressant.  Lumryz's labeling mitigates the risk posed by
concurrent use of another CNS depressant by providing the same warning in section 5.1 as
provided by Xyrem and Xywav.  Lumryz patients have the option to reduce the dose of Lumryz
to one of the set doses or reduce the dose of the other CNS depressant. Patients who cannot

[234] Xyrem 2023 Labeling, *supra* note 86, at Instructions for Use; Xywav 2023 Labeling, *supra* note 93, at Instructions for use.
[235] Jazz's September 2021 Letter, *supra* note 11, at 19-20.
[236] DN1 Lumryz Consult, *supra* note 5, at 7.
[237] *See* Clinical Pharmacology Review, NDA 214755 (October 14, 2021); *see* Addendum to Clinical Pharmacology Review, NDA 214755 (May 24, 2022).
[238] Xyrem 2023 Labeling, *supra* note 86, at section 7.1; Xywav 2023 Labeling, *supra* note 93, at section 7.1; and Lumryz Labeling, *supra* note 105, at section 7.1.
[239] Xyrem 2023 Labeling, *supra* note 86, at section 5.1; Xywav 2023 Labeling, *supra* note 93, at section 5.1; and Lumryz Labeling, *supra* note 105, at section 5.1.

35

reduce the dose of the other CNS depressant and need to reduce the dose of oxybate below 4.5 g or at more precise increments than 1.5 g might not be able to use Lumryz but may be able to use Xyrem and Xywav. This in theory could be a disadvantage of Lumryz for this very particular set of patients (i.e., patients taking oxybate and another CNS depressant who cannot reduce the dose of the other CNS depressant and need to reduce the dose of oxybate below 4.5 g or at more precise increments than 1.5 g), but Jazz has provided no evidence to support and FDA is not aware of any such evidence that this population even exists.[240]

Finally, regarding patients who are hepatically impaired, Jazz's September 2021 Letter states that "1.8% of U.S. adults have been diagnosed with liver disease," and that "it is reported that diseases of the digestive system (including liver disease) are more frequently reported in patients with narcolepsy compared to the general population."[241] This statistic does not provide an estimate of the number of narcolepsy patients with hepatic impairment, but according to DN1, patients with narcolepsy have not been reported to have coexisting hepatic impairment.[242] Nevertheless, for patients with hepatic impairment, the labeling for Xyrem and Xywav recommends that the starting dose should be reduced by half,[243] whereas the labeling for Lumryz states that Lumryz "should not be initiated in patients with hepatic impairment because appropriate dosage adjustments for initiation of LUMRYZ cannot be made with the available dosage strengths."[244] However, the labeling also states that "[p]atients with hepatic impairment who have been titrated to a maintenance dosage of another oxybate product can be switched to LUMRYZ if the appropriate dosage strength is available."[245] Therefore, Lumryz is labeled for use by some patients with hepatic impairment, but not all such patients. This does not mean that Lumryz is less safe than Xyrem and Xywav in patients with hepatic impairment because when used as labeled, Lumryz should not be used in patients with hepatic impairment who cannot be switched to Lumryz.

In summary, the limited ability to adjust Lumryz's dosage compared to Xyrem and Xywav does not make Lumryz less safe than Xyrem or Xywav. At most, the increased ability to adjust the dose of Xyrem and Xywav compared to Lumryz provides a minor convenience. For the potential limited number of patients who require a lower or more adjustable dose (i.e., (1) patients taking oxybate and another CNS depressant who cannot reduce the dose of the other CNS depressant and need to reduce the dose of oxybate below 4.5 g or at more precise increments than 1.5 g, and (2) patients with hepatic impairment that cannot be switched to Lumryz), Lumryz may not be the right product for them. Nevertheless, given the paucity of evidence supporting the existence of such population, we still conclude that Lumryz makes a MCTPC over Xyrem and Xywav by providing a once-nightly dosing regimen. As discussed above, MCTPC requires a "global assessment" and there "can not [sic] be an infinite number of

---

[240] Jazz's September 2021 Letter, *supra* note 11, at 19 footnote 104 states, "in the latest Xywav and Xyrem REMS Assessment Report, e.g., 6.2% of patients reported use of benzodiazepines, 4.6% reported use of muscle relaxants, and 4.3% reported use of opioid analgesics and subsequently received a shipment of Xyrem or Xywav." This does not reflect a percentage of patients who cannot reduce the dose of the other CNS depressant and need to reduce the dose of oxybate below 4.5 g or at more precise increments than 1.5 g.

[241] Jazz's September 2021 Letter, *supra* note 11, at 19 footnote 104.

[242] DN1 Lumryz Consult, *supra* note 5, at 8.

[243] Xyrem 2023 Labeling, *supra* note 86, at section 8.6; Xywav 2023 Labeling, *supra* note 93, at section 8.6.

[244] Lumryz Labeling, *supra* note 105, at section 8.6.

[245] *Id*.

36

comparison criteria."[246]  The advantage of Lumryz's once-nightly dosing is a significant advantage for patients who can take Lumryz and rises to the level of a MCTPC.  What is more, Jazz has not demonstrated any safety concerns regarding Lumryz compared to Xyrem and Xywav, aside from the previously discussed lower sodium of Xywav compared to Lumryz.  OOPD has already factored in the safety risk associated with the differences in the content of sodium between Lumryz and Xywav, as discussed above, and concluded that Lumryz makes a MCTPC.

### B.  MCTPC

Jazz also raised several arguments why Avadel has not met the standard to demonstrate that Lumryz makes a MCTPC over Xyrem and Xywav.

First, Jazz suggests that head-to-head comparative trials should be required for FDA to find that Lumryz makes a MCTPC.[247]  We do not agree; comparative trials are not required for a demonstration of MCTPC.  The definition of "clinically superior" in the regulation states that demonstrating greater effectiveness requires direct comparative clinical trials "in most cases," and that demonstrating greater safety requires direct comparative clinical trials "in some cases,"[248] but similar or comparable language for a MCTPC is absent.[249]  Consistent with the regulation, FDA does not require direct comparative clinical trials to demonstrate that a drug makes a MCTPC.[250]  Additionally, the types of factors that FDA considers when determining MCTPC (e.g., convenient treatment location; duration of treatment; patient comfort; reduced treatment burden; advances in ease and comfort of drug administration; longer periods between doses; and potential for self-administration)[251] are not typically studied in a clinical trial for marketing approval.

---

[246] OOPD Rebif memo, *supra* note 36, at 3.

[247] Jazz's September 2021 Letter, *supra* note 11, at 15; *see also* Sidley Letter, *supra* note 12, at 9; *see also* Sidley Slides, *supra* note 13, at 31.

[248] The clinical superiority findings for BeneFix and Xywav are two examples where FDA found greater safety without direct comparative trials.  For BeneFix, FDA concluded that even without direct comparative trials, there was an established epidemiological understanding that certain viruses can be transmitted by plasma-derived coagulation factor IX preparations, and that because those viruses do not exist in the source material for BeneFix, it was reasonable to conclude that the risk of transmitting these viruses is removed for treatment with BeneFix compared to the previously approved drugs.  *See* BeneFix memo, *supra* note 163, at 2.  Similarly for Xywav, FDA concluded that even without comparative trials, Xywav was clinically superior to Xyrem based on the established scientific knowledge that Xywav's reduced sodium would be clinically meaningful in reducing cardiovascular morbidity as compared to Xyrem.  *See* Xywav Exclusivity Memo, *supra* note 99.

[249] 21 CFR § 316.3(b)(3).

[250] *See, e.g.*, FDA, *Exclusivity Memorandum DRU-2012-3825, Valtoco (diazepam nasal spray)* (Jan. 10, 2020) (finding an intranasal spray formulation makes a MCTPC over a rectal gel formulation without head-to-head comparative trials, because rectal administration is inherently invasive for the patient and difficult to administer, whereas intranasal administration is inherently more comfortable); Signifor Exclusivity Memo, *supra* note 167 (finding an intramuscular injection dosed once monthly makes a MCTPC over a subcutaneous injection dosed twice daily without head-to-head comparative trials, because of the greatly reduced injections per month); FDA, *Exclusivity Memorandum DRU-2015-5130, Ultomiris (ravulizumab-cwvz)* (Sep. 4, 2020) (finding dosing every eight weeks makes a MCTPC over dosing every two weeks without head-to-head comparative trials, because of the heavy burden associated with each dose); Procysbi Exclusivity Memo, *supra* note 161 (finding dosing every 12 hours makes a MCTPC over dosing every six hours without head-to-head comparative trials, because many patients were unable to follow a strict six-hour-dosing, especially due to the need to awaken from sleep to ensure a timely dose).

[251] 2013 Final Rule, 78 Fed. Reg. at 35125.

FDA-Jazz-000560

Jazz points to quotations from the regulation preambles to suggest that head-to-head comparative trials should be required for FDA to find that Lumryz makes a MCTPC. Specifically, Jazz cites the 1992 Final Rule, where it states, "While comparative trials are, of course, preferred and will usually be required, it is possible that, in some circumstances, a demonstration of a major contribution to patient care can be made without such trials."[252] Although this comment in the preamble could suggest that findings of MCTPC will usually be supported by comparative trials, the statement makes clear that a demonstration of MCTPC does not require such trials.[253] More importantly, in practice, FDA has not required comparative trials to support findings of MCTPC.[254] Jazz also points to the 1992 Final Rule, where it states, "As stated, the kinds of data needed to demonstrate clinical superiority for purposes of the Orphan Drug Act will be the same as the kinds of data required to allow label claims of superiority."[255] In context, this quotation is discussing the final rule, and the words "[a]s stated" mean "as stated in the final rule."[256] As explained above, the final rule requires clinical trials "in most cases" to demonstrate greater efficacy, and "in some cases" to demonstrate greater safety, but does not require clinical trials for a MCTPC.[257] Because the quotation is referring to what is stated in the final rule, it cannot be read to superimpose a requirement that there be clinical trials to demonstrate a MCTPC particularly in light of text in the final rule that suggests otherwise.[258] Additionally, in context, the quotation is responding to a comment on the proposed rule that suggested FDA require rigorous double-blind, head-to-head comparative clinical trials such as those required to support other comparative safety and efficacy claims.[259] The comment only addressed types of studies for safety and efficacy claims. Thus, FDA's response to the comment only addresses clinical superiority based on greater safety and efficacy. As stated above, in practice, FDA has not required comparative trials to support findings of MCTPC.[260] Finally, if comparative trials were required to demonstrate a MCTPC, that would be inconsistent with FDA's statements that MCTPC is judged on a case-by-case basis and that FDA may take into consideration factors, such as convenient treatment location and patient comfort. Comparative trials are not required to find that Lumryz makes a MCTPC.

Second, Jazz argues that the standard for finding a demonstration of clinical superiority is higher than the standard for finding a plausible hypothesis of clinical superiority and that Avadel has not met that standard for Lumryz. Jazz states that a "mere hypothesis is not enough to support a

---

[252] Jazz's September 2021 Letter, *supra* note 11, at 15 (quoting 1992 Final Rule, 57 Fed. Reg. at 62079); *see also* Sidley Slides, *supra* note 13, at 31.

[253] To the extent the statement could also be read to be discussing clinical superiority generally, it is simply restating the commonly accepted preference for demonstrating clinical superiority through greater efficacy or greater safety using comparative clinical trials, yet a sponsor can also demonstrate clinical superiority through a MCTPC without such trials.

[254] *See supra* note 250.

[255] Sidley Letter, *supra* note 12, at 9 (quoting 1992 Final Rule, 57 Fed. Reg. at 62078).

[256] *See* 1992 Final Rule, 57 Fed. Reg. at 62078.

[257] 21 CFR § 316.3(b)(3).

[258] Jazz also cites to 21 CFR § 202.1(e)(6)(ii) regarding the level of evidence required for advertising claims. *See* Sidley Letter, *supra* note 12, at 9. The level of evidence required to make advertising claims comes from a different part of the regulation and is not connected to the level of evidence required to demonstrate clinical superiority for the purposes of the orphan-drug regulations.

[259] *See* 1992 Final Rule, 57 Fed. Reg. at 62078.

[260] *See supra* note 250.

38

FDA-Jazz-000561

finding of clinical superiority,"[261] because the standard for being eligible for ODE is higher than the "plausible hypothesis" standard and the sponsor bears the burden to demonstrate that its drug is in fact clinically superior to the previously approved drug.[262]

As a threshold matter, FDA agrees that the standard for clinical superiority for approval and ODE eligibility is higher than the "plausible hypothesis standard" for ODD.[263]  Specifically, the condition of clinical superiority for ODE eligibility requires that a sponsor "demonstrate" clinical superiority,[264] and "different drug" status for a drug that is otherwise same drug as one with ODE also requires a demonstration of clinical superiority.[265]  FDA has explained that the difference in standards is meant to meet the intent of the Orphan Drug Act by encouraging "the development of improved versions of existing drugs" by having a lower standard for designation, "while protecting any applicable orphan-drug exclusivity" by requiring an actual demonstration of clinical superiority to overcome such ODE.[266]

Jazz argues that Avadel's evidence for clinical superiority is hypothetical and does not meet the demonstration standard.[267]  Jazz appears to base this argument on an assumption as to what evidence and arguments Avadel has submitted to FDA and what FDA has found compelling in demonstrating clinical superiority.  Specifically, Jazz cites public statements from Avadel about market research concerning patient preference for a once-nightly formulation and prescriber surveys that dosing-related challenges are to blame for oxybate-eligible patients not taking oxybate.[268]  OOPD, however, is not relying on the cited market research and prescriber surveys in its determination that Lumryz makes a MCTPC, and therefore Jazz's arguments about these sources are moot.

The clinical superiority of Lumryz is not merely hypothetical.  As explained above, the science underlying sleep hygiene supports the finding that in the context of oxybate drugs for the treatment of narcolepsy, where the purpose of therapy is to promote sleep consolidation, a drug with once-nightly dosing that avoids disrupting sleep consolidation by avoiding a nocturnal awakening to take a second dose makes a MCTPC over the previously approved drugs for which the patient awakens and disrupts sleep consolidation to take a second dose.  Awakening to take a second dose of Xyrem or Xywav fragments sleep and disrupts sleep architecture.  If possible, this should be avoided in a narcoleptic patient.  Sleep consolidation is the intended purpose of oxybate therapy.  Lumryz provides a treatment option that avoids the need to awaken to take a second dose.  Thus, based on its scientific expertise and consultation of the literature, FDA has determined that the clinical superiority of Lumryz has been demonstrated.

---

[261] Jazz's September 2021 Letter, *supra* note 11, at 2; *see also* Sidley Slides, *supra* note 13, at 21.
[262] Jazz's September 2021 Letter, *supra* note 11, at 3.
[263] 21 CFR § 316.20(a).
[264] Section 527(c)(1) of the FD&C Act.
[265] 2013 Final Rule, 78 Fed. Reg. at 35122 ("allowing the subsequent drug to be approved during the pendency of the already approved drug's exclusivity period (if any) . . . provided that clinical superiority is demonstrated upon approval").
[266] *Id*.
[267] Jazz's September 2021 Letter, *supra* note 11, at 16-18.
[268] *Id*. at 16; *see also* Sidley Slides, *supra* note 13, at 31.

39

FDA-Jazz-000562

The type of evidence on which FDA is basing its finding of Lumryz's demonstration of clinical superiority over Xywav and Xyrem is quite similar to the type of evidence on which FDA based its finding of Xywav's demonstration of clinical superiority over Xyrem. FDA found Xywav clinically superior to Xyrem based on greater safety because Xywav provided less sodium than Xyrem, and scientific literature exists that shows reduced dietary sodium generally would be clinically meaningful in reducing cardiovascular morbidity in the general population.[269] Jazz did not conduct a head-to-head trial to compare the safety of Xywav and Xyrem.[270] Nevertheless, the underlying science supported that "[t]he relationship between daily salt intake and cardiovascular morbidity is widely accepted, as is the need for salt intake to be generally restricted."[271] That was sufficient for OOPD to conclude that Xywav was clinically superior to Xyrem, because, as OOPD explained, "although it has never been specifically and adequately investigated whether the sodium content of Xyrem increases cardiovascular risks in patients with narcolepsy, the general base of knowledge about the effects of sodium support that the amount of sodium in Xyrem would increase cardiovascular risks in patients with narcolepsy."[272] By similar logic, for Lumryz, FDA has found that the scientific knowledge of sleep hygiene and the importance of consolidating sleep to treat narcolepsy supports its finding that a drug that avoids a nocturnal awakening to take a second dose provides a significant therapeutic advantage over and above that provided by a drug that necessitates a nocturnal awakening to take a complete nightly dosage.

Third, Jazz argues that Lumryz does not meet the standard for clinical superiority because the change from Xyrem and Xywav's twice-nightly dosing to Lumryz's once-nightly dosing does not meet the "high bar" to be considered a MCTPC.[273] Jazz argues that because MCTPC represents a "narrow category"[274] of "unusual cases,"[275] FDA's prior MCTPC findings have been based on "much more substantial quantitative and qualitative improvements" than Lumryz's "50% decrease in dosing frequency relative to Xyrem and Xywav."[276] Jazz cites to two examples where FDA found a MCTPC for a drug going from twice-a-day dosing to once-monthly dosing and a drug going from administration that took one hour to taking one minute.[277] FDA does not agree with Jazz's arguments and finds that Lumryz's benefit meets the narrow category of MCTPC. All MCTPC determinations are made on a case-by-case basis, and the nature and severity of the disease or condition is a relevant factor.[278] More goes into a MCTPC determination than merely a quantitative assessment of the percentage reduction in dosing frequency. For Lumryz, the reduction in the number of doses makes a MCTPC because the dosing eliminates the need to awaken in the middle of sleep to take the second dose. This is relevant in the context of treating narcolepsy with oxybate because the goal of narcolepsy therapy is to enhance sleep consolidation; awakening to take a second dose works directly

---

[269] Xywav Exclusivity Memo, *supra* note 99, at 3.

[270] *Id*.

[271] *Id*. (quoting DN1 2020 Xywav Consult).

[272] Xywav Exclusivity Memo, *supra* note 99, at 5.

[273] Jazz's September 2021 Letter, *supra* note 11, at 15-16.

[274] *Id*., at 15 (quoting 1991 Proposed Rule, 56 Fed. Reg. at 3343).

[275] *Id*. (quoting 21 CFR § 316.3(b)(3)).

[276] *Id*. at 16.

[277] *Id*.

[278] 1992 Final Rule, 57 Fed. Reg. at 62078.

40

against this goal. Furthermore, as noted above, our basis for finding a MCTPC for Lumryz is similar to our basis for FDA's MCTPC finding for Procysbi.

Fourth, and finally, Jazz argues that FDA should not consider Lumryz to make a MCTPC because FDA did not grant priority review for Lumryz's marketing application.[279] Jazz notes that the standard for priority review is similar to the standard for clinical superiority.[280] A review designation type (standard or priority review) for a marketing application is determined on a case-by-case basis at the time that an application is filed based on the information and data available at the time the application is submitted.[281] As described in the guidance for industry, *Expedited Programs for Serious Conditions – Drug and Biologics* (May 2014), "[a]n application will receive priority review designation if it is for a drug that treats a serious condition and, if approved, would provide a significant improvement in safety or effectiveness."[282] "Significant improvement" may be illustrated by the following examples: (1) evidence of increased effectiveness in treatment, prevention, or diagnosis of a serious or life-threatening condition; (2) elimination or substantial reduction of a treatment-limiting adverse reaction; (3) documented enhancement of patient compliance that is expected to lead to an improvement in serious outcomes; or (4) evidence of safety and effectiveness in a new subpopulation.[283]

The clinical superiority standard, as described throughout this analysis, includes that "the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care."[284] FDA makes clinical superiority determinations for the purposes of approval and ODE eligibility *after* the agency has conducted a full and substantive review of the relevant marketing application and determined if the drug meets the safety and efficacy requirements for approval; whereas, the priority review designation is made at the time of submission of the marketing application, based upon a "[p]reliminary review."[285] Although the concepts of "clinical superiority" in the orphan-drug context and "significant improvement" in the priority review context may have some practical overlap, the standard for demonstrating clinical superiority differs from the standard for priority review designation; the analyses are conducted at different times in the review of a marketing application and involve different levels of data scrutiny. Given these differences, there are many reasons why FDA could deny priority review for a marketing application for a drug and find clinical superiority for that drug.[286] FDA's decision not to grant priority review for the Lumryz application is not inconsistent with its determination that Lumryz makes a MCTPC over Xyrem and Xywav.

---

[279] Jazz's September 2021 Letter, *supra* note 11, at 16; *see also* Sidley Slides, *supra* note 13, at 34.
[280] Sidley Slides, *supra* note 13, at 34.
[281] *See* CDER's Manual of Policies and Procedures 6020.3 Rev. 2, Review Designation Policy: Priority (P) and Standard (S) at 3-4, June 2013, https://www.fda.gov/media/72723/download.
[282] *Expedited Programs for Serious Conditions – Drug and Biologics* (May 2014) at 2-3 (accessed at https://www.fda.gov/media/86377/download).
[283] *Id.*
[284] Section 527(c)(2) of the FD&C Act; *see also* 21 CFR § 316.3(b)(3).
[285] MAPP 6020.3 Rev. 2, *supra* note 281, at 6.
[286] The drug Valtoco (diazepam nasal spray) is another recent example where FDA granted standard review designation for an application but found clinical superiority over a previously approved otherwise same drug for the same indication or use upon approval.

41

FDA-Jazz-000564

In sum, FDA finds Jazz's arguments about why Lumryz does not make a MCTPC over Xyrem and Xywav unpersuasive.

## VI.    Conclusion

For the reasons explained above, we have determined that Lumryz, which is dosed once nightly, is clinically superior to Xyrem and Xywav, which are dosed twice nightly.  *See* 21 CFR § 316.3(b)(3).  Because Lumryz is clinically superior to Xywav and, therefore, not the "same drug" as Xywav under 21 CFR § 316.3(b)(14) and section 527(a) of the FD&C Act, Xywav's unexpired ODE does not block marketing approval of Lumryz.  Additionally, because of its clinical superiority to Xyrem and Xywav, Lumryz has met the condition set forth at section 527(c) of the FD&C Act, and Lumryz is eligible for its own term of ODE for the treatment of cataplexy or EDS in adults with narcolepsy under section 527(a) of the FD&C Act.


Sandra Retzky -S
Digitally signed by Sandra Retzky -S
Date: 2023.05.01 09:58:53 -04'00'

_____
Sandra S. Retzky, D.O., J.D., M.P.H.
Director
Office of Orphan Products Development


cc:
Jazz Pharmaceuticals, Inc.
Attn: Arthur Merlin d'Estreux
Arthur.MerlindEstreux@jazzpharma.com

ProPharma Group
U.S. Agent for Flamel Ireland Ltd. dba Avadel Ireland
Attn: Marla Scarola
marla.scarola@propharmagroup.com


42

# MEMORANDUM

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PUBLIC HEALTH SERVICE**
**FOOD AND DRUG ADMINISTRATION**

---

**Division of Neurology 1 (DN1)**
**Office of Neuroscience (ON)**
**Center for Drug Evaluation and Research**

**Date: May 1, 2023**

**From: Ranjit Mani, MD**
**Clinical Reviewer, DN1**

**Teresa Buracchio, MD**
**Deputy Director, ON[1]**

**Subject:** <u>**Office of Orphan Products Development Consult Request #16-5302**</u>
**NDA 214755**
**Lumryz (Sodium Oxybate Extended-Release for Oral Suspension [FT218])**
**Request for Orphan Drug Exclusivity**

**To: Director**
**Office of Orphan Products Development**

**Document Type: Consult**

---

**Enclosed is the Division's response to your request**

---

[1] This consult memo was substantially reviewed and prepared by Teresa Buracchio in her former capacity as Director of the Division of Neurology 1. In her current capacity as Deputy Director of the Office of Neuroscience, she continues to be involved in the review and preparation of this consult and is authorized to sign this consult, among other things, for Lumryz.

## Review and Evaluation of Clinical Data

| | |
|---|---|
| **NDA (Serial Number)** | **214755** |
| **Sponsor:** | **Avadel** |
| **Product:** | **Lumryz*** |
| **Proposed Indication:** | **Narcolepsy** |
| **Reviewer:** | **Ranjit B. Mani, M.D.** |

*Sodium Oxybate Extended-Release for Oral Suspension (FT218)

## 1. Background

Avadel submitted an original New Drug Application (NDA), #214755, for Sodium Oxybate Extended-Release for Oral Suspension (FT218), which carries the proprietary name "Lumryz," on December 15, 2020. This NDA seeks approval of Lumryz for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy. The issue currently before the agency is whether Lumryz is clinically superior (as defined in the orphan-drug regulations) to Jazz's approved oxybate-containing product, Xywav, as well as Jazz's other oxybate-containing product, Xyrem. The answer to this question will inform whether Lumryz can be approved and whether Lumryz is eligible for its own term of orphan-drug exclusivity (ODE). Jazz, Avadel, and their counsel have made multiple submissions to the agency regarding ODE and Lumryz's approvability. This memorandum memorializes responses to questions posed by the Office of Orphan Products Development (OOPD) to the Division since NDA 214755 was submitted on December 15, 2020, regarding Lumryz and responses to those questions.

Whether Lumryz is clinically superior to Xywav and Xyrem was previously addressed by this Division in a consultation memorandum completed on August 31, 2021 (appended to this memorandum). This current memorandum updates and supersedes that August 31, 2021 response after further refinement of OOPD and the Division's thinking based on careful consideration of the legal, regulatory, and scientific issues raised by this question; information submitted by the sponsors of Lumryz and Xywav/Xyrem; and the agency's own scientific expertise and precedent.

The following provides additional background information:

- Currently, two products are approved for the treatment of cataplexy or excessive daytime sleepiness in patients 7 years and older with narcolepsy. These are Xyrem (sodium oxybate oral solution) and Xywav (a low-sodium oxybate oral solution formulation containing a mixture of calcium, magnesium, potassium, and sodium oxybates); the manufacturer of both formulations is Jazz Pharmaceuticals, Inc. Generic formulations of sodium oxybate oral solution have also been approved for the treatment of cataplexy or excessive daytime sleepiness in narcolepsy.

FDA-Jazz-000567

- Lumryz was granted a tentative approval on July 18, 2022, for the treatment of cataplexy or excessive daytime sleepiness in adults with narcolepsy.

- While the currently-approved formulations of sodium oxybate, Xyrem and Xywav, are liquids, Sodium Oxybate for Extended-Release Oral Suspension (FT218; Lumryz) is a powder for oral suspension. Whereas the approved formulation Xyrem is administered in two separate doses nightly, separated by an interval of 2.5 to 4.0 hours, Sodium Oxybate for Extended-Release Oral Suspension (FT218) is administered once nightly.

- The maximum recommended doses of Xyrem and Xywav are each 9 grams per night, as is the maximum recommended dose of Lumryz. The sodium content of the 9-gram doses of Xyrem, Xywav, and Lumryz is 1640 mg, 131 mg, and 1640 mg, respectively.

## 2. OOPD Questions and DN1 Responses

1. **Is there any evidence to suggest that the efficacy of Lumryz may be different from Xyrem or Xywav? If so, please elaborate.**

**DN1 Response**
There is no evidence suggesting that the efficacy of Lumryz is different from that of Xyrem or Xywav.

2. **Is there any evidence, including in Avadel's submissions, to support that Lumryz provides greater safety in a substantial portion of the target population when compared to Xyrem or Xywav?**

**DN1 Response**
The available data do not indicate that Lumryz provides greater safety in a substantial proportion of patients in the target population (i.e., patients who have narcolepsy with cataplexy and/or excessive daytime sleepiness) than Xyrem or Xywav, despite the arguments provided by the applicant.  In broad terms, the safety profiles of all 3 products (Lumryz, Xyrem, and Xywav) are not substantially different, but the sodium content of Lumryz is higher than that of an equivalent dose of Xywav and the same as that of an equivalent dose of Xyrem. To address this safety concern, Lumryz's labeling includes a warning (similar to Xyrem's labeling), which states: "LUMRYZ has a high sodium content. In patients sensitive to sodium intake (e.g., those with heart failure, hypertension, or renal impairment), consider the amount of daily sodium intake in each dose of LUMRYZ."  We note that available safety data for Lumryz do not indicate that the higher sodium content of each dose of that drug is reflected in a greater incidence of adverse events than is observed with equivalent doses of Xywav, which has a lower sodium content. The safety profile of Lumryz meets the Agency's standards for approval.

FDA-Jazz-000568

Ranjit B. Mani, MD, HFD-120 Medical Review                                    Page 4 of 9
NDA 214755, Lumryz*, Avadel

3. **Does the review division consider Lumryz to be clinically superior based on a major contribution to patient care (MCTPC)?**

**DN1 Response**

In a prior consultation dated August 31, 2021, DN1 stated: "While the once-nightly regimen of Lumryz will be more convenient for patients than a twice-nightly regimen, that attribute cannot be considered a [MCTPC]." Following that consultation, DN1 has reconsidered its conclusion in light of several factors, including scientific, legal, and regulatory considerations raised by OOPD and the expert opinion of FDA's sleep team, which is also memorialized in a separate consult response.[2] OOPD has clarified that MCTPC determinations include consideration of factors such as reduced treatment burden, advances in ease of drug administration, and longer periods between doses; that the orphan-drug regulations do not require a drug to be clinically superior for all patients for whom the drug is indicated; and that a drug does not need to have comparable safety to another drug to make a MCTPC over the other drug. OOPD has also made the Division aware of a previous MCTPC determination with delayed release cysteamine (Procysbi) for the treatment of cystinosis. In that case, FDA determined that Procysbi met the MCTPC standard based on dosing every 12 hours compared to dosing every 6 hours for immediate release cysteamine. The need to awaken the patient to maintain an every 6-hour dosing regimen with cysteamine and the chronic nature of the disease were important considerations in that MCTPC determination.

Previously, in its August 31, 2021 response, the Division did not fully consider the issues raised in the paragraph above. The Division has since carefully reconsidered whether Lumryz's once-nightly dosing may rise to the level of a MCTPC in the setting of a chronic disease such as narcolepsy and now concludes that awakening to take medication on a nightly basis for a long duration of treatment (e.g., every night for the remainder of the patient's life, because narcolepsy is a chronic condition) would have a significant negative impact on patient care and counteract the purpose of oxybate therapy. In particular, we note that FDA's sleep team, based on a robust scientific review of the literature and their own scientific expertise, have explained that Lumryz provides an opportunity for narcolepsy patients to achieve normal sleep architecture, which is not a possibility for a patient on Xyrem or Xywav who must either wake up to take a second dose (disrupting sleep architecture) or allow the drug to wear off after 2.5-4 hours (reverting patients back to their naturally occurring, disrupted sleep architecture). We agree with this conclusion. The delayed release cysteamine exclusivity memo also informs our reassessment of MCTPC. For that decision FDA considered that less frequent dosing eliminated the need to awaken to take a dose in a situation where the timing of the dose was critical to achieving the drug's intended benefit.

---

[2] *See generally* Mahadevappa Hunasikatti MD FCCP and Nargues Weir MD FCCP FAASM ATSF, *Consult request on Lumryz* (Apr. 29, 2023) ("Sleep Expert Consult").

FDA-Jazz-000569

The Division also acknowledges the sodium content of Lumryz raises the same safety concern that was present for Xyrem and that is not present for Xywav. However, it is our opinion that the benefit of Lumryz's once-nightly dosing outweighs the safety concern raised by its increased sodium content for a substantial number of narcolepsy patients. Although it is widely accepted that individuals generally should limit sodium intake, the warning in Lumryz's labeling regarding sodium is directed only at patients sensitive to sodium intake such as those with heart failure, hypertension, or renal impairment. For narcolepsy patients who are not sensitive to sodium intake, it is our opinion that a once-nightly dosed oxybate drug will provide a significant therapeutic advantage. It is true that patients who are not sensitive to sodium could also benefit from a reduction in sodium, but it is our opinion that the benefit offered by once-nightly dosing outweighs the risk of increased sodium intake in such patients because, for example, having to wake up to take a second dose is antithetical to oxybate's goal of improving sleep, and there are other ways such patients may reduce sodium in their diet.[3] For narcolepsy patients who are sensitive to sodium, healthcare practitioners would need to weigh the benefits of once-nightly dosing against the severity of the patient's sodium sensitivity and the nature of their comorbidities to determine whether, in the practitioners' judgment, use of Lumryz or Xywav was appropriate. For certain sodium-sensitive patients with narcolepsy, the benefit offered by once-nightly dosing would outweigh the risk of increased sodium intake for the same reasons (e.g., having to wake up to take a second dose is antithetical to oxybate's goal of improving sleep, and there are other ways such patients may reduce sodium in their diet).

Taking all of these factors into consideration and for the reasons explained above, DN1 has reconsidered its prior assessment dated August 31, 2021, and now concludes that Lumryz provides a MCTPC over Xywav and Xyrem.

4. **Risk of Falls**. **Can you address the arguments Jazz raised in its letter dated September 16, 2021 ("Jazz's September 2021 Letter") on pages 12-13 that Lumryz may increase the risk of falls over Xywav? Specifically, is there any basis for thinking, as Jazz speculates, that "nocturnal awakenings and falls increase due to FT218's extended-release formulation"? Is there any basis for thinking that "FT218 patients who get out of bed will have sustained therapeutic blood levels of oxybate throughout the night, potentially putting them at higher risk of falls than with…Xywav's immediate release formulations" or that "FT218's apparently higher rates of enuresis may lead to more falls"?**

---

[3] We note that the sleep expert consult explains that disrupting sleep contributes to chronic sleep loss, which is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health.

**DN1 Response**
This is entirely speculative. We are unaware of data to support these statements. We note that our clinical superiority recommendation is not based on a claim of superior safety for Lumryz.

5. <u>Adherence</u>. **Can you address the arguments on pages 13-15 of Jazz's September 2021 Letter that "one can equally speculate that FT218's extended-release formulation will result in reduced adherence compared to…Xywav"?**

   a. **Is there any basis for thinking that Lumryz will result in reduced adherence compared to Xywav?  Is there any basis for thinking that patients will be more likely to forgo taking Lumryz compared to Xywav in situations where they do not expect to be able to sleep for 8-10 hours, or if they had not been limiting fluid intake or had been ingesting alcohol?**

      **DN1 Response**
      This is also a speculative argument. We have no scientifically valid evidence to suggest that adherence should be different between the two drugs. Additionally, use of alcohol with oxybate is contraindicated in the PI.

      We also note that adherence did not factor into the Division's clinical superiority determination described above.

   b. **Is there any basis for thinking that "[p]atients who take their FT218 with less than 8-10 hours to spend in bed before arising the next morning will be at greater risk of next-day impairment [over Xywav]"? And is there any basis for thinking that "patients who do not follow Avadel's recommendation to limit fluid intake for 'several hours before dosing,' or who ingest alcohol, will be at greater risk of enuresis, bed exits, falls, serious respiratory depression, and death"?**

      **DN1 Response**
      This is again a speculative argument. There should not be a significant difference in the risks cited between Lumryz and Xywav/Xyrem, if those drugs are used as recommended in labeling.

6. <u>Diversion</u>.  **Can you address the arguments on page 15 of Jazz's September 2021 Letter that there is an increased risk of diversion and abuse with Lumryz compared to Xywav? Is there any basis for thinking that it is easier to conceal and transport Lumryz sachets and that it would lead to more diversion compared to Xywav? Is there any basis for thinking that combining multiple Lumryz**

FDA-Jazz-000571

**sachets is easier than creating an equivalent dose of Xywav and that
will lead to a greater risk of diversion and abuse?**

**DN1 Response**
This is also a speculative argument. The Division is not making a clinical
superiority recommendation for Lumryz based on superiority with regard to
diversion. There is no evidence to suggest that Lumryz would be any different
from Xywav in that regard. There is no reason to think that a sachet would be any
easier to divert than a solution. Vials can be as easily transported as sachets,
and a powder poured into a drink may dissolve less rapidly and be more
noticeable than a solution.

7. **Dose Adjustment**.  Can you address the arguments on pages 19-20 of
   Jazz's September 2021 Letter that Lumryz is less safe than Xyrem
   and Xywav because patients cannot dose adjust Lumryz?

**DN1 Response**
Lumryz comes in four dosage strengths: 4.5 g, 6 g, 7.5 g, and 9 g, and thus the
dose of Lumryz can be adjusted to those four strengths.  Xyrem and Xywav are
oral solutions, in concentrations of 0.5 g per mL, and administered using a dosing
syringe that measures dosing increments of 0.25 g.  Jazz argues that the limited
ability to dose adjust Lumryz makes it less safe than Xyrem and Xywav for
patients who would need to adjust the dose, including patients taking the anti-
epileptic medication divalproex, patients taking other central nervous system
("CNS") depressants, and patients who are hepatically impaired.  We do not
agree with these arguments.

Regarding patients taking divalproex sodium, no significant pharmacokinetic
interaction between Lumryz and divalproex sodium was observed in a drug-drug
interaction study conducted by Avadel, so Lumryz's labeling does not include a
specific dose reduction recommendation when Lumryz is co-administered with
divalproex sodium.  Therefore, a specific dose reduction recommendation, such
as that present in Xyrem and Xywav's labeling related to Xyrem and Xywav
patients taking divalproex sodium, is not necessary for Lumryz patients also
taking divalproex sodium.  Although FDA concluded that a pharmacodynamic
interaction between Lumryz and divalproex sodium cannot be ruled out given that
both Lumryz and divalproex sodium are CNS depressants, it has determined that
the description of the general risks associated with use of CNS depressants in
section 5.1 of Lumryz's labeling is sufficient to inform healthcare prescribers of
the risks associated with using Lumryz with other CNS depressants, including
divalproex sodium.[4]

We note that the labeling for Xyrem, Xywav, and Lumryz have a contraindication
for the use of some central nervous system (CNS) depressants (i.e., alcohol and

---

[4] See Clinical Pharmacology Review, NDA 214755 (October 14, 2021); see Addendum to Clinical
Pharmacology Review, NDA 214755 (May 24, 2022).

FDA-Jazz-000572

sedative hypnotics) with each of those drugs.  Aside from those CNS depressants contraindicated, Section 7.1 describes a potential pharmacodynamic effect where other CNS depressants may potentiate the CNS-depressant effects of Xyrem, Xywav, or Lumryz.  Section 5.1 in the labeling for Xyrem, Xywav, and Lumryz state that "[i]f use of these CNS depressants in combination with" Xyrem. Xywav, or Lumryz "is required, dose reduction or discontinuation of one or more CNS depressants" including Xyrem, Xywav, or Lumryz "should be considered." Therefore, a patient taking Xyrem or Xywav and another CNS depressant has the option to reduce the dose of Xyrem/Xywav or the other CNS depressant (along with the option to discontinue Xyrem/Xywav or the other CNS depressant).  A patient taking Lumryz and another CNS depressant has the option to reduce the dose of Lumryz to one of the set doses below the maximum of 9 g (4.5 g, 6 g, 7.5 g) or reduce the dose of the other CNS depressant (along with the option to discontinue Lumryz or the other CNS depressant).  A patient taking Xyrem or Xywav and another CNS depressant may have more options for dose adjustment than a patient taking Lumryz and another CNS depressant, but this does not mean that Lumryz is less safe than Xywav and Xyrem in patients taking another CNS depressant.  Lumryz's labeling mitigates the risk posed by concurrent use of another CNS depressant by providing the same warning in section 5.1 as provided by Xyrem and Xywav.  Lumryz patients have the option to reduce the dose of Lumryz to one of the set doses or reduce the dose of the other CNS depressant.  Patients who cannot reduce the dose of the other CNS depressant and need to reduce the dose of oxybate below 4.5 g or at more precise increments than 1.5 g might not be able to use Lumryz but may be able to use Xyrem and Xywav.  This in theory could be a disadvantage of Lumryz for this very particular set of patients (i.e., patients taking oxybate and another CNS depressant who cannot reduce the dose of the other CNS depressant and need to reduce the dose of oxybate below 4.5 g or at more precise increments than 1.5 g), but Jazz has provided no evidence to support and FDA is not aware of any such evidence that this population even exists.

The safety of these oxybate products in patients with hepatic impairment is addressed in Section 8.6 of their respective labeling. The labeling for Xyrem and Xywav recommends that the starting dose should be reduced by half, whereas the labeling for Lumryz states that Lumryz should not be initiated in patients with hepatic impairment because appropriate dosage adjustments for initiation of Lumryz cannot be made with the available dosage strengths.  The labeling for Lumryz also states that patients with hepatic impairment who have been titrated to a maintenance dosage of another oxybate product can be switched to Lumryz if the appropriate dosage strength is available. Therefore, Lumryz is labeled for use by some patients with hepatic impairment but not all such patients.  Patients with narcolepsy have not been reported to have coexisting hepatic impairment, and Lumryz should not be less safe than Xyrem or Xywav in patients with hepatic impairment because when used as labeled, Lumryz should not be used in patients with hepatic impairment who cannot be switched to Lumryz.

For the reasons described above, Lumryz is not less safe than Xywav for reasons related to dose adjustment.

## 3. Summary Comments

Our conclusion is that Lumryz provides a major contribution to patient care over Xywav. The basis for that opinion is explained above.

Ranjit B. Mani - S
Digitally signed by Ranjit B. Mani -S
Date: 2023.05.01 09:35:48 -04'00'

Ranjit B. Mani, M.D.
Medical Reviewer, DN1

Teresa Buracchio -S
Digitally signed by Teresa Buracchio -S
Date: 2023.05.01 09:48:41 -04'00'

Teresa Buracchio, M.D.
Deputy Director, ON

rbm
cc:
HFD-120
NDA 214755

# MEMORANDUM

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PUBLIC HEALTH SERVICE**
**FOOD AND DRUG ADMINISTRATION**

---

**Division of Neurology 1**
**Office of Neuroscience**
**Center for Drug Evaluation and Research**

**Date: August 30, 2021**

**From: Eric Bastings, MD**
        **Division Director (Acting)**

**Subject:    Office of Orphan Products Development Consult Request #16-5302**
              **NDA 214755:**
              **Lumryz (Sodium Oxybate Extended-Release for Oral Suspension [FT218])**
              **Request for Orphan Drug Exclusivity**

**To: Director**
    **Office of Orphan Products Development**

**Document Type: Consult**

---

**Enclosed is the Division's response to your request**

FDA-Jazz-000575

## Review and Evaluation of Clinical Data

| | |
|---|---|
| **NDA:** | **214755** |
| **Sponsor:** | **Avadel** |
| **Product:** | **Lumryz\*** |
| **Proposed Indication:** | **Narcolepsy** |
| **Material Submitted:** | **Consultation Request** |
| **Date Of Request:** | **7/6/21** |
| **Date Request Received By Reviewer:** | **7/6/21** |
| **Date Review Completed:** | **8/30/21** |
| **Reviewer:** | **Ranjit B. Mani, M.D.** |

\*Sodium Oxybate Extended-Release for Oral Suspension (FT218)

## 1.  Background

This consultation request has been received from the Office of Orphan Products Development (OOPD), and pertains to a request from the sponsor for <u>orphan drug exclusivity</u> for Sodium Oxybate Extended-Release for Oral Suspension (FT218), which carries the proprietary name "Lumryz™." This request for orphan drug exclusivity for Lumryz™ was submitted on December 15, 2020.

An original New Drug Application (NDA), #214755, seeking the approval of Lumryz™ for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy is currently under review by the Agency. That application was also submitted on December 15, 2020, and included a copy of the request for orphan drug exclusivity that was submitted on the same date.

A supplement to the main request (dated December 15, 2020) for orphan drug exclusivity for Lumryz™ was submitted on July 14, 2021, and is also currently under review by OOPD. That supplement was also submitted to NDA 214755 and its contents will also be addressed in this consultative review. That supplement is entitled "*Exclusivity Claim – Supplemental Information in Demonstration of Clinical Superiority of FT218.*"

Currently, two products are approved for the treatment of cataplexy or excessive daytime sleepiness, (both products) in patients 7 years and older with narcolepsy. These are Xyrem® (sodium oxybate oral solution) and Xywav™ (a low-sodium oxybate oral solution formulation containing a mixture of calcium, magnesium, potassium, and sodium oxybates); the manufacturer of both formulations is Jazz Pharmaceuticals, Inc. Generic formulations of sodium oxybate oral solution have also been approved for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy.

**While the currently-approved formulations of sodium oxybate, Xyrem® and Xywav™, are liquids, Sodium Oxybate for Extended-Release Oral Suspension (FT218) is a powder for oral suspension. Whereas the**

Ranjit B. Mani, MD, HFD-120 Medical Review
NDA 214755, Lumryz™, Consultation          8/30/21

**approved formulation Xyrem® is administered in two separate doses nightly, separated by an interval of 2.5 to 4.0 hours, the sponsor anticipates that Sodium Oxybate for Extended-Release Oral Suspension (FT218) will be administered once nightly.**

In this review, the names "Lumryz™," "Sodium Oxybate Extended-Release for Oral Suspension," and "FT218," will be used interchangeably. The term "applicant" has also been interchangeably with sponsor.

## 2.  Text Of Main Consultation Request

The full text of this consultation request, dated July 6, 2021, is copied verbatim below in purple font. That text is both comprehensive and self-explanatory.

Background:

The Office of Orphan Products Development (OOPD) granted orphan drug designation to sodium oxybate extended-release oral suspension on 1/08/2018 for the treatment of narcolepsy.  With input from the review division (consult dated 11/24/17), this designation was granted based on a plausible hypothesis that the drug may be clinically superior to the same drug that was already approved for the same indication because it "may be more safe due to the ramifications associated with the dosing regimen for the previously approved sodium oxybate in treating patients with narcolepsy."  On 12/15/2020, the sponsor, Avadel, submitted a marketing application for sodium oxybate extended-release oral suspension, with the proposed trade name Lumryz, for the treatment of cataplexy and excessive daytime sleepiness in adults with narcolepsy (NDA 214755).

Another sponsor, Jazz, has received marketing approval for the same active moiety, oxybate, for use in the treatment of narcolepsy.  Specifically, Xywav (calcium, magnesium, potassium, and sodium oxybates) was approved on 7/21/2020 and has orphan-drug exclusivity (ODE) until 7/21/2027 for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy. In addition, Xyrem (sodium oxybate) was previously approved for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy.  Xyrem has ODE only for the portion of the indication pertaining to pediatric patients until 10/26/2025.

In order for Lumryz to receive marketing approval for the treatment of cataplexy and EDS in adults with narcolepsy, it must be clinically superior, as defined in the orphan drug regulations, to the previously approved same drugs, Xywav and Xyrem, for the same indication.  If Lumryz is clinically superior to Xywav and Xyrem, it may also be eligible for its own 7-year period of ODE.  For the purpose of orphan drug exclusivity, clinical superiority can be based on greater effectiveness, greater safety in a substantial portion of the target population, or a major contribution to patient care (MCTPC), with

FDA-Jazz-000577

all else being equal (see definition below).  Please note that for orphan drug exclusivity purposes we apply the definition of clinical superiority from the regulations below and do not apply the substantial evidence standard as is required for a labeling claim.

Avadel submitted a request to the OOPD on 12/15/20 for orphan drug exclusivity for Lumryz based on clinical superiority over Xyrem and Xywav.  The same request was also submitted to the NDA on the same date (see NDA 214755 eCTD Sequence Number 0001).  In this document, the sponsor contends that Lumryz is clinically superior to Xyrem and Xywav with respect to safety and it also provides a major contribution to patient care (MCTPC).  Appendix 2 of Avadel's submission contains several letters from Key Opinion Leaders in the field of narcolepsy and patient advocacy groups which support Avadel's arguments.

Safety:
Avadel notes that both Xyrem and Xywav require a twice-nightly dosing regimen, once at bedtime and once again 2.5-4 hours later.  In contrast, Lumryz is an extended-release formulation of sodium oxybate that is given once nightly and therefore obviates the need for awakening to take a second dose.  Avadel argues that this provides a safety advantage for Lumryz because it reduces the risk of nighttime falls.  This is due to the fact that patients that forcibly wake after receiving one dose of Xyrem may get out of bed, ambulate, and fall because of a drug-induced groggy or stuporous state.  Also, because of the rapid onset of effects, patients are at risk of falls or other accidental injuries if the second dose of Xyrem is not consumed while they are in bed.  To support their argument, Avadel has provided an analysis of cases of falls in patients receiving Xyrem that were reported to the FDA Adverse Event Reporting System (FAERS) database.  Avadel indicates that for the time period from 1/01/03 to 6/30/20, there were 2,056 cases that reported a reaction of fall in patients receiving Xyrem, and they have reviewed 120 of these cases.  Of these, there were 14 (11.67%) in which a patient experienced a fall after the second dose of Xyrem.  Injuries reported include lacerations and various broken bones.  In some cases following these injuries, Xyrem was discontinued or the dose was reduced.

In addition, Avadel indicates that PK differences between these drugs result in Lumryz having lower rates of well-known adverse events compared to Xyrem.  They have provided a summary of reported rates of nausea, vomiting, dizziness, somnolence, and tremor for Lumryz and Xyrem.  Although it does not appear that these two drugs were compared in a head-to-head manner, and the orphan drug regulations do not necessarily require head-to-head studies to support clinical superiority based on safety, generally, the rates of nausea, vomiting, and dizziness provided appear to be lower with Lumryz versus Xyrem.

Avadel also indicates that there is a risk of misuse associated with the second dose of Xyrem because patients are supposed to measure out both nightly doses prior to

FDA-Jazz-000578

bedtime and place the second dose near the bed. They note that a child could consume the second dose if the child-resistant container is not used, the second dose could be stolen, or patients could accidently consume both doses.

Another argument presented by Avadel related to safety concerns, illicit use and diversion. They note that Lumryz will be formulated as white granules while Xyrem is a clear to slightly opalescent oral solution. Avadel states that Lumryz will be cloudy in solution and both its appearance and gritty consistency should alert individuals if it has been added to their drink. They also note that Lumryz tastes salty and bitter; however, they do not describe the taste of Xyrem or Xywav, and they do not describe the appearance of Xywav.

Avadel's last argument regarding safety concerns sodium content in Lumryz, Xyrem, and Xywav. Lumryz contains a similar amount of sodium as Xyrem. Avadel argues that the reduced sodium in Xywav does not render Xywav clinically superior to Xyrem. These arguments have already been evaluated in DN1 consult responses to OOPD dated 11/27/20 and 3/08/21 regarding Xywav. Avadel concludes that overall, the safety, efficacy, and quality of life issues related to the second dose of twice-nightly sodium oxybate present a greater risk to patients than sodium content, and each of these greater risks is significantly improved and addressed with the once-nightly formulation of Lumryz.

Major Contribution to Patient Care:
Avadel provides other arguments that appear to be aimed at making a case for Lumryz providing a MCTPC. The OOPD notes that a MCTPC can only be considered in cases where greater effectiveness or greater safety have not been demonstrated. To support their argument, Avadel references a survey of 1,350 individuals impacted by narcolepsy, the results of which were distributed at the September 24, 2013 FDA Meeting on Drug Development for Narcolepsy. This survey found that patients' ideal therapy was "a drug that would provide consistent and adequate control of the daytime sleepiness without the hard crash and one that would require one dose taken at bedtime resulting in 8 hours of restorative sleep." Avadel also conducted a study using publicly available digital Xyrem and narcoleptic-related data from 9/01/17 to 10/15/19. Sources included things such as blogs, forums, message boards, social media outlets, and OpenFDA. Data are provided from this study regarding the volume and type of quality of life issues that are associated with the need for a second nightly dose of Xyrem, such as trouble waking up to take the second dose.

Avadel also indicates that there is a food effect which appears to be more pronounced with Xyrem and Xywav compared to Lumryz. They note that both the Xyrem and Xywav labels instruct patients to take the first nightly dose at least two hours after eating. Examples are mentioned of patients reporting reduced effectiveness after taking Xyrem too close to a meal. Avadel states that Lumryz's reduced food effect and subsequent impact on blood levels, could result in greater efficacy and improved quality of life.

FDA-Jazz-000579

In addition, Avadel conducted a Discrete Choice Experiment (DCE) to quantitatively characterize the preferred treatment attributes of narcolepsy patients.  This consisted of a 30-minute web-based survey of 75 narcolepsy patients that were past or current Xyrem users.  This survey found that dosing frequency (once nightly vs. twice nightly) was the single most important attribute when selecting a narcolepsy treatment, and the most common reasons for overall product preference were lack of need to wake up in the middle of the night to take a second dose (48%), fewer side effects (46%), and ease of taking/handling (32%).

The OOPD notes that most of the arguments provided regarding a MCTPC, suggest that Lumryz would provide greater convenience than Xyrem and Xywav, and that patients may prefer it over these other oxybate products.  Improved convenience and patient preference alone may not rise to the level to support a claim of clinical superiority for the purpose of orphan drug exclusivity.  However, given that narcolepsy is a chronic sleep disorder and requires long-term therapy, the impact that Lumryz's once-nightly dosing may have on patient quality of life may be substantial enough to constitute a MCTPC.  In addition, the fact that there is no second nightly dose for patients to potentially miss and effect the efficacy of the drug may also render Lumryz as a MCTPC compared to Xyrem and Xywav.

In summary, one of the definitions of clinical superiority that is stated in the orphan drug regulations is greater safety in a substantial portion of the target populations.  "Substantial" is not defined in the regulations.  Thus, it is not necessary for a drug to provide greater safety in all of the indicated population in order for it to be considered clinically superior.  This definition also  recently served as the basis for finding Xywav clinically superior to Xyrem since the differences in the sodium content of these two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated.  Among the arguments provided by Avadel, the OOPD finds most persuasive the argument for greater safety due to reduced fall potential with Lumryz compared to Xyrem and Xywav.  It appears that there may be a substantial portion of the indicated population of adult patients with narcolepsy that may achieve greater safety with Lumryz due to its once nightly dosing compared to the twice nightly dosing required for Xyrem and Xywav.

**Consult Questions:**
1. Is there any evidence to suggest that the efficacy of Lumryz may be substantially different from Xyrem or Xywav?  If so, please elaborate.

2. Does the review division agree that Lumryz provides greater safety in a substantial portion of the target population when compared to Xyrem and Xywav?  If so, what safety advantage does Lumryz provide?  Please elaborate.  (As a reminder, the orphan drug regulations do not require head-to-head studies for safety.)

Ranjit B. Mani, MD, HFD-120 Medical Review                                    Page 7 of 12
NDA 214755, Lumryz™, Consultation          8/30/21

3.  Does the review division agree with the sponsor that Lumryz has less potential for illicit use and diversion compared to Xyrem and Xywav?  Please explain.

4.  Does the review division consider Lumryz to provide a major contribution to patient care (MCTPC) compared to Xyrem and Xywav?  If so, on what basis?

5. Are there any other issues not addressed above that the review division would like the OOPD to consider in its determination of eligibility for orphan-drug exclusivity for Lumryz?

**Regulations:**

21 CFR 316.3(b)(3) defines clinical superiority as follows:
> (3) Clinically superior means that a drug is shown to provide a significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug) in one or more of the following ways:
> (i) Greater effectiveness than an approved drug (as assessed by effect on a clinically meaningful endpoint in adequate and well controlled clinical trials). Generally, this would represent the same kind of evidence needed to support a comparative effectiveness claim for two different drugs; in most cases, direct comparative clinical trials would be necessary; or
> (ii) Greater safety in a substantial portion of the target populations, for example, by the elimination of an ingredient or contaminant that is associated with relatively frequent adverse effects. In some cases, direct comparative clinical trials will be necessary; or
> (iii) In unusual cases, where neither greater safety nor greater effectiveness has been shown, a demonstration that the drug otherwise makes a major contribution to patient care.

## 3.  Contents Of Review

The contents of this consultative review will be in the same consecutive order as below.

- Request for priority review designation for Lumryz™.

- Response to questions in original OOPD consultation request of July 6, 2021.

- Supplement to request for orphan exclusivity: July 14, 2021.

- Summary comments.

Ranjit B. Mani, MD, HFD-120 Medical Review                                      Page 8 of 12
NDA 214755, Lumryz™, Consultation          8/30/21

## 4.  Request For Priority Review Designation For Lumryz™

A request for priority review designation accompanied the original submission of
NDA 214755. That request was denied by the Agency after full review of its
contents. As many components of that request are pertinent to the current
consultation, the Agency's criteria for priority review designation, the contents of
that request, and the Agency's action in response to that request are further
summarized below.

The full text of the applicant's priority review request is available at the following
link

\\CDSESUB1\evsprod\nda214755\0001\m1\us\12-cov-let\priority-review-
request.pdf

### *4.1  Criteria For Granting Priority Review Designation*

The core criteria for granting priority review designation to a marketing
application for a drug or biologic are as follows:

1.  The product is intended to treat a serious condition.

2.  The product if approved would provide a significant improvement in safety
    or effectiveness

These criteria are discussed in more detail in an Agency Guidance for Industry
publication entitled "*Expedited Programs for Serious Conditions – Drugs and
Biologics*" (May 2014) available at:

https://www.fda.gov/media/86377/download

### *4.2  Summary Basis For Applicant's Request For Priority Review
Designation*

The applicant's request for priority review designation for Lumryz™ was based
on the following overall conclusion: the once-nightly dosing regimen for that
product would provide a significant improvement in safety and effectiveness in
the treatment of cataplexy and excessive daytime sleepiness in narcolepsy
compared to currently available therapies, including Xyrem® and Xywav™.

The above overall conclusion was based in turn on the following summary
assertions (for which additional data was provided in the request).

- A once-nightly dosing regimen, as with Lumryz™ would remove the
  anxiety and sleep disruption resulting from the need to awaken to take a
  second dose (as is the case with Xyrem® and Xywav™).

- A once-nightly dosing regimen would be less likely to result in missed doses, and would thus improve effectiveness and quality of life, as compared with a twice-nightly regimen.

- The need to awaken at night to take a second dose (as with Xyrem® and Xywav™) increases the risk of adverse events, such as falls. Since the $C_{max}$ of oxybate products may correlate with other adverse events such as nausea and vomiting, a second $C_{max}$ as occurs the twice-nightly formulations make increase the risk of those adverse events, too.

- Data from the key efficacy study of Lumryz™ (Study CLFT218-1501; REST-ON) indicate that the better known adverse events associated with sodium oxybate are less frequent with Lumryz™ than with Xyrem®.

- Data from a patient survey indicate a preference for a once-nightly dosing regimen (i.e., with Lumryz™) than for the twice-nightly regimen used for Xyrem® and Xywav™.

<u>It is readily apparent that the arguments used by the applicant in support of the priority review designation request for Lumryz™ were very similar to those used in support of the current request for orphan exclusivity currently under review.</u>

### *4.3  Agency Action In Response To Request For Priority Review Designation*

The Agency was not persuaded by the arguments used in support of the applicant's request for priority review designation and in a letter dated February 26, 2021, assigned this application a standard review.

## 5.  Response To Questions In Original OOPD Consultation Request Of July 6, 2021

Please note that our responses to the question are based in part on our preliminary review of data submitted with NDA 214755, the review of which is ongoing, and of the available data for Xyrem® and Xywav™.

*Question 1. Is there any evidence to suggest that the efficacy of Lumryz may be substantially different from Xyrem or Xywav?  If so, please elaborate.*

**Division of Neurology 1 Response to Question 1**
There is no evidence suggesting that the efficacy of Lumryz™ is substantially different from that of Xyrem® or Xywav™.

***Question 2. Does the review division agree that Lumryz provides greater safety in a substantial portion of the target population when compared to Xyrem and Xywav?  If so, what safety advantage does Lumryz provide? Please elaborate.  (As a reminder, the orphan drug regulations do not require head-to-head studies for safety.)***

### Division of Neurology 1 Response to Question 2.
The available data do not indicate that Lumryz™ provides greater safety in a substantial proportion of patients in the target population (i.e., patients who have narcolepsy with cataplexy and/or excessive daytime sleepiness) than Xyrem® or Xywav™, despite the arguments provided by the applicant. Very limited conclusions, if any, can be drawn from the comparison of the frequency of specific individual adverse events seen with Lumryz™ with those seen  with Xyrem® that has been presented by the sponsor. That comparison is flawed for a number of readily-evident reasons. In broad terms, the safety profiles of all 3 products (Lumryz™, Xyrem®, and Xywav™) are not substantially different.

***Question 3.  Does the review division agree with the sponsor that Lumryz has less potential for illicit use and diversion compared to Xyrem and Xywav?  Please explain.***

### Division of Neurology 1 Response to Question 3
We are not persuaded by the applicant's arguments that Lumryz™ has meaningfully less potential for illicit use and diversion compared with Xyrem® and Xywav™, based either on the appearance and taste of each these products, or on the administration of a once-nightly dose of Lumryz™ versus two nightly doses of Xyrem® and Xywav™.

***Question 4. Does the review division consider Lumryz to provide a major contribution to patient care (MCTPC) compared to Xyrem and Xywav?  If so, on what basis?***

### Division of Neurology 1 Response to Question 4
While the once-nightly regimen of Lumryz™ will be more convenient for patients than a twice-nightly regimen, that attribute cannot be considered a major contribution to patient care.

***Question 5. Are there any other issues not addressed above that the review division would like the OOPD to consider in its determination of eligibility for orphan-drug exclusivity for Lumryz?***

### Division of Neurology 1 Response to Question 5

Ranjit B. Mani, MD, HFD-120 Medical Review                                    Page 11 of 12
NDA 214755, Lumryz™, Consultation                8/30/21

From the perspective of this Division, there are no other issues that appear to warrant further consideration by OOPD when determining the eligibility of Lumryz™ for the grant of orphan drug exclusivity,

# 6.  Supplement To Request For Orphan Exclusivity: July 14, 2021

As noted earlier, this supplement to the original request for orphan exclusivity for Lumryz™ is being primarily reviewed by OOPD. However, this Division has been asked to review and comment on this supplement in conjunction with the response to the original consultation request of July 6, 2021.

## 6.1  Summary Of Supplement To Original Request For Orphan Exclusivity

As already noted, this supplement is entitled "*Exclusivity Claim – Supplemental Information in Demonstration of Clinical Superiority of FT218.*"

A full link to the contents of this supplement is available at the link below:

\\CDSESUB1\evsprod\nda214755\0022\m1\us\13-admin-info\exclusivity-ode.pdf

The key observations and assertions made by the applicant in this supplement are as follows.

- A proportion of the 67 patients who transitioned from twice-nightly Xyrem® or Xywav™ to once-nightly Lumryz™ in an interim analysis of an ongoing open-label uncontrolled study CLFT218-1901 reported the following while receiving the twice-nightly regimen: falls while taking the second nightly dose (6%), nausea and/or vomiting after taking the second nightly dose (23%), missing the second nightly dose at least once over a 3-month (85%), and "anxiety related to the second nightly dose" (21%). 28 out of 30 patients who had completed 3 months of stable dosing with FT218 preferred the once-nightly regimen of Lumryz™ to the twice nightly regimen of either Xyrem® or Xywav™.

- A market analysis of physicians experienced in prescribing Xyrem® and Xywav™ may have suggested that a once-nightly regimen may be preferred to a twice-nightly regimen by patients.

- Poor sleep quality, sleep interruption, short sleep duration, and other sleep disturbances may all be associated in themselves with an increased cardiovascular risk based on a review of the medical literature (further details are provided in this submission). A once-nightly dosing regimen, as with Lumryz™, is less likely to interrupt sleep than a twice-nightly regimen, as with Xyrem® and Xywav™, which cannot result a normal sleep pattern. Data from the efficacy study CLFT218-1501 included in NDA 214755 indicate that patients receiving Lumryz™ have an improvement in several

parameters that measure nocturnal sleep. Thus Lumryz™ has the potential to provide a cardiovascular safety benefit, unlike Xyrem® and Xywav™ which may be associated with an increased cardiovascular risk on account of the interruption in nighttime sleep associated with the need to taking a second dose.

### 6.2  Division Of Neurology 1 Comments

The contents of this supplement suggest, not unexpectedly, that patients may prefer a once-nightly dosing regimen (as with Lumryz™) to a twice-nightly dosing regimen (as with Xyrem® and Xywav™).

Any conclusions that Lumryz™ may have the potential for being associated with a lower cardiovascular risk than Xyrem® or Xywav™ on account of being administered only once-nightly are at best highly speculative.

## 7.  Summary Comments

In this Division's opinion, no evidence has been provided by the applicant that Lumryz™ is clinically superior to Xyrem® or Xywav™ as defined in the orphan drug regulations [21 CFR 316.3(b)(3)].

Ranjit B. Mani -S
Digitally signed by Ranjit B. Mani -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, cn=Ranjit B. Mani -S, 0.9.2342.19200300.100.1.1=1300122852
Date: 2021.08.31 12:13:34 -04'00'

_____
Ranjit B. Mani, M.D.
Medical Reviewer

Eric P. Bastings -S
Digitally signed by Eric P. Bastings -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, 0.9.2342.19200300.100.1.1=1300158815; cn=Eric P. Bastings -S
Date: 2021.08.31 14:01:43 -04'00'

_____
Eric Bastings, M.D.
Division Director (Acting)

cc:
HFD-120
IND

| **Date:** | April 29, 2023 | |
|---|---|---|
| **From:** | Mahadevappa Hunasikatti, MD FCCP | *Mahadevappa Hunasikatti -S* Digitally signed by Mahadevappa Hunasikatti -S Date: 2023.04.29 08:46:03 -04'00' |
| | Nargues Weir, MD FCCP FAASM ATSF | *Nargues A. Weir -S* Digitally signed by Nargues A. Weir -S Date: 2023.04.29 06:53:17 -04'00' |
| | Sleep Team/DSRA/OHT1/CDRH | |
| **Through:** | Rachana Visaria Ph.D. Assistant Director/Sleep Team/DSRA/OHT1/CDRH | *Rachana Visaria -S* Digitally signed by Rachana Visaria -S Date: 2023.04.29 10:44:41 -04'00' |
| **To:** | Sandra Retzky DO, JD, MPH Director, Office of Orphan Product Development | |
| **OPCR:** | DRU 16-5302 | |
| **Subject:** | Consult request on Lumryz (extended-release sodium oxybate) administered as an oral solution once at bedtime for treatment of cataplexy or excessive daytime sleepiness associated with narcolepsy. | |

OOPD ("you") have consulted the Sleep Team/DSRA/OHT1/CDRH for input on whether Lumryz (extended-release sodium oxybate), with once nightly administration, is "clinically superior" to Xywav and Xyrem based on being a "major contribution to patient care" or MCTPC. Specifically, you seek our opinion, as board certified sleep specialists, on whether Lumryz, with once nightly dosing, makes a MCTPC over Xywav and Xyrem, both with twice nightly dosing, and if so, why. We understand that other factors may also inform the agency's MCTPC determination, and this memo considers solely Lumryz's once nightly dosing.

**Summary Response**

It is our opinion that Lumryz is clinically superior because it provides a significant therapeutic advantage over and above that of Xywav and Xyrem. The underpinning of our rationale is that patients with narcolepsy, a sleep disorder, will not need to awaken from sleep to take a second dose of Lumryz—which is dosed only once at bedtime—unlike Xywav and Xyrem, which are both labeled for twice nightly dosing.[1] From a therapeutic perspective, it is highly desirable to eliminate, or at least minimize, nocturnal arousals from sleep—especially for patients who have

---

[1] *See* Section 2.1, *Adult Dosing Information*, Xyrem labeling, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=926eb076-a4a8-45e4-91ef-411f0aa4f3ca); *See* Section 2.1 *Dosing Information in Adult Patients with Narcolepsy*, Xywav labeling (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e0ae43a-037f-42af-8e23-a0e51d75abe8).

1

FDA-Jazz-000587

a sleep disorder and seek treatment.[2] A nocturnal arousal from sleep to take a second dose of sleep medication will fragment sleep and disrupt sleep architecture.[3, 4, 5]

The goal of treatment for all sleep disorders—including narcolepsy—is to restore a normal sleep pattern. To that end, not awakening the patient to take a second dose of sleep medication is highly preferable from a clinical standpoint. Therefore, a once nightly dose of oxybate, makes a MCTPC because Lumryz, as compared to Xywav and Xyrem, avoids an arousal from sleep and will help to minimize sleep disruption.

**Normal sleep**

Adequate sleep is essential for humans as it physically and psychologically restores bodily functions.[6] Without adequate sleep, humans function poorly and may die prematurely.[7] Chronic sleep loss, sometimes called sleep debt, is well known to cause reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health.[8]

---

[2] The American Academy of Sleep Medicine (AASM) defines "arousal" as a finding on a sleep study using an electroencephalogram (EEG) to view brain wave patterns. An arousal leads to wakefulness and is a type of sleep disturbance in which the person awakens, or shifts to lighter sleep, preventing progression to deeper more restorative sleep. Richard Berry, et. al, *The AASM Manual for the Scoring of Sleep and Associated Events (ver 2.6)* American Academy of Sleep Medicine *(Jan 2020)* at 46 (describing rules in adults that define arousals by certain EEG wave patterns and behavioral cues, e.g., eyes open, chin movement, etc. Arousals shift sleep stages, N2, N3, and R, back to stage N1 or stage Wake, and this fragments and disrupts sleep.). Awakening to take a second dose of oxybate, and having to set an alarm to do so (*see* fn 5 on AASM terminology defining arousal by Berry; *see* fn 27 on Xyrem and Xywav labeling) will cause sleep disruption and negatively impact sleep consolidation which is important for restorative sleep.

[3] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (explaining that "[s]coring of sleep stages occurs in 30-second epochs based on current American Academy of Sleep Medicine (AASM) scoring rules."). *See* Richard Berry, et. al, *Arousal rule*, *The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications*, American Academy of Sleep Medicine (2020), version 2.6 at 46.

[4] Richard Berry, et. al, *Arousal rule*, *The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications*, American Academy of Sleep Medicine (AASM) (2020), version 2.6 at 46 (explaining that arousals are defined with EEG criteria during stages N1, N2, N3, or R and are based on "an abrupt shift of EEG frequency . . . that lasts at least 3 seconds, with at least 10 seconds of stable sleep preceding this stage."). When an individual awakens to take a second dose of medicine an "arousal" occurs because "behavioral cues, including open eyes [and] movement . . . demonstrates alertness"—a change in consciousness. *See* Douglas Kirsch, *Stages and architecture of normal sleep,* UpToDate (Sep 12 , 2022). These behavioral cues inevitably occur in order to take a second dose of medicine, and even if the awakening is not remembered, nonetheless, it will fragment or disrupt sleep and is counterproductive to the treatment of narcolepsy.

[5] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (stating that: "[s]leep is a rapidly reversible state of reduced responsiveness, motor activity, and metabolism. It is a phenomenon observed in all animals in some form; this universality suggests that the act of sleeping likely has some evolutionary relevance. Humans spend approximately one-third of their life, or about eight hours per night, sleeping. The purpose of sleeping is poorly understood, however, and multiple theories exist. These theories include restoration, energy conservation, and memory consolidation.") (internal citation omitted).

[6] Kiran Maski, *Insufficient sleep: evaluation and management*, UpToDate (May 23, 2022) at https://www.uptodate.com/contents/insufficient-sleep-evaluation-and-management?search=sleep&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1).

[7] Chiara Cirelli, *Insufficient sleep: Definition, epidemiology, and adverse outcomes*, UpToDate (Oct 10, 2022) at https://www.uptodate.com/contents/insufficient-sleep-definition-epidemiology-and-adverse-outcomes). (explaining that "individuals may experience reduced performance, increased risk for accidents and death, and detrimental effects on both psychological and physical health.").

[8] *Id*.

FDA-Jazz-000588

Normal sleep architecture is characterized in adults as a progression of 90 to 120 minute sleep cycles starting with non-REM Stage 1 sleep (NREM or N1 sleep), then non-REM Stage 2 (NREM or N2) sleep, then non-REM Stage 3 (NREM or N3) sleep, and ending in Rapid Eye Movement (REM or stage R) sleep.[9] "Stage R is characterized by the presence of rapid eye movements and . . . is a unique time of the night in that dreaming occurs during Stage R sleep."[10] After Stage R, the normal adult has a very brief return to stage Wake (stage W), in the transition of going from cycle to cycle, though this awakening is not typically remembered, is normal and does not contribute to sleep fragmentation, sleep loss, or daytime sleepiness.[11, 12] It is part of the normal structure of sleep.[13] The normal sleep cyclical pattern repeats 4-5 times per night allowing sufficient time for all the purposes of sleep to be met.[14] Cycling progression through these stages is the basic structural organization of normal sleep and is called "sleep architecture."[15]

Each sleep stage has unique features. Stage N1 sleep is light sleep (easily arousable), Stage N2 sleep is intermediate in depth (less light sleep), and Stage N3 is deep sleep, otherwise known as restorative sleep, slow-wave sleep (SWS), or delta sleep.[16] Brain activity is low during Stage N3 sleep, and importantly, many recovery functions in the body occur only in this stage of sleep.[17] "For an average individual in their second decade, Stage N1 is 2–5% of the total sleep

---

[9] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?source=history_widget) (stating that "[s]coring of sleep stages occurs in 30-second epochs based on current American Academy of Sleep Medicine (AASM) scoring rules." Figure 10 portrays a hypnogram [sleep study] of a 36-year-old man in a sleep laboratory and it "represents the movement of a patient through various sleep cycles over the course of a single night . . . .").

[10] James A. Rowley & M. Safwan Badr, *Normal Sleep* at 3-5 in Chapter 1, *Essentials of Sleep Medicine a Practical Approach to Patients with Sleep Complaints*, (Meir Kryger et al. eds., 6th ed. 2017)

[11] *See* Figure 1.2, James A. Rowley & M. Safwan Badr, *Normal Sleep* at 5 in Chapter 1, *Essentials of Sleep Medicine a Practical Approach to Patients with Sleep Complaints*, (Meir Kryger et al. eds., 6th ed. 2017) (depicting normal sleep architecture which includes 4-5 sleep cycles per night with five progressive stages, beginning at stage W and ending in stage R before the cycle begins anew).

[12] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate (Sep 12, 2022) (explaining that: "[t]he polysomnogram is the primary tool for assessing sleep in the laboratory for both clinical and research purposes. During a polysomnogram, electroencephalography (EEG) and other sensors are used to categorize sleep in discrete stages.").

[13] M. A. Carskadon & W. C. Dement. *Monitoring and staging human sleep*, Chapter 2, in *Principles and practice of sleep medicine*, (Meir Kryger, et. al eds., 5th ed. 2011) at 12 (accessed at http://apsychoserver.psych.arizona.edu/jjbareprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) (explaining that "[b]rief episodes of wakefulness tend to intrude later in the night, usually near REM sleep transitions, and they usually do not last long enough to be remembered in the morning".)

[14] C. S. Nayak, et. al, *EEG Normal Sleep*. (accessed at https://www.ncbi.nlm.nih.gov/books/NBK537023/) (explaining that "[i]n normal adults, each cycle lasts for about 90 to 120 minutes, and there are about 4 to 5 such cycles that occur during a normal 8 hour night sleep.").

[15] James A. Rowley and M. Safwan Badr, *Normal Sleep*, Chapter 1 at 3-5 in *Essentials of Sleep Medicine A Practical Approach to Patients with Sleep Complaints,* 2e (M. Safwan Badr ed., 2022) (describing sleep architecture as "the organization of the sleep stages over the course of the night.").

[16] M. A. Carskadon & W. C. Dement. *Monitoring and staging human sleep*, Chapter 2, in *Principles and practice of sleep medicine*, (Meir Kryger, et. al eds., 5th ed. 2011) (accessed at http://apsychoserver.psych.arizona.edu/jjbareprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) at 11 (explaining that "[i]nvestigators often refer to the combined stages 3 and 4 sleep as slow-wave sleep [SWS], delta sleep, or deep sleep."). In the most current sleep terminology, Stage 4 is now part of Stage 3 and is no longer considered an independent sleep stage.

[17] D-J Dijk, et. al, *Regulation and functional correlates of slow wave sleep*, Journal of Clinical Sleep Medicine (2009) (accessed at https://pubmed.ncbi.nlm.nih.gov/19998869/ at 1 (stating that "[d]eep nonrapid eye movement

3

FDA-Jazz-000589

time, Stage N2 is 45–55%, Stage N3 13–23%, and Stage R is 20–25%."[18] Normally, the sleep cycles progress through the night with increasing time in Stage N3 during initial sleep cycles and increasing REM sleep in each later sleep cycle during the night.[19]

Stage N3 sleep has a unique and important role in restoring the mind and body.[20] With sleep loss or deprivation or interruption, one enters Stage N3 sleep earlier and with increased quantity during the night.[21] Thus, the body attempts to achieve sleep equilibrium by rapidly restoring this critical stage of sleep.  On polysomnography (PSG)—a diagnostic full sleep study with an electroencephalogram (EEG)—REM sleep is a time of active brain EEG waves and physiological instability characterized by somewhat irregular heart rate and breathing patterns.[22, 23] REM is associated with paralysis of all muscles except the essential respiratory muscles (the diaphragm).[24]

---

[18] James A. Rowley and M. Safwan Badr, *Normal Sleep*, Chapter 1 at 3-5 in *Essentials of Sleep Medicine A Practical Approach to Patients with Sleep Complaints* (M. Safwan Badr, ed., 2nd ed. 2022). The second decade of life is often used as a standard or heuristic in sleep medicine literature.  The percent of time spent in each sleep stage declines with age when adulthood is reached. *See, also, Kirsch* (explaining how "[s]leep architecture also varies across the lifespan."); Figure 11: graphic representation of the changes of sleep as humans age. The graph portrays "age-related trends for stage 1 sleep, stage 2 sleep, slow wave sleep, rapid eye movement sleep, wake after sleep onset, and sleep latency (in minutes)."

[19] *See* fn 13, Figure 2-7 at 11 (picturing a sleep histogram with the progression of sleep stages across a single night in a normal young adult). The text describes the ideal or average pattern of time spent per stage.

[20] Lixia Chen, *et. al, The association between sleep architecture, quality of life, and hypertension in patients with obstructive sleep apnea*,  Sleep and Breathing  (2023) (accessed at https://doi.org/10.1007/s11325-022-02589-z at 192 (explaining  that "N3 or SWS sleep is considered the most 'restorative' type of sleep  . . . .").

[21] Douglas Kirsch, *Stages and architecture of normal sleep* UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?search=stage%20N3%20sleep%20and%20sleep%20loss&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1 (explaining "[p]rior acute or chronic sleep deprivation may cause increases in stage N3 sleep and REM sleep."). *See also* M.A Carskadon and W. C. Dement Monitoring and staging human sleep, Chapter 2, in *Principles and Practice of Sleep Medicine*, (Meir Kryger, et. al eds., 5th ed. 2011) accessed at http://apsychoserver.psych.arizona.edu/jjbareprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) at 12, 15 (stating that "[t]he SWS pattern reflects the homeostatic sleep system, highest at sleep onset and diminishing across the night as sleep pressure wanes. . . . Therefore, with total sleep loss, SWS tends to be preferentially recovered compared with REM sleep, which tends to recover only after the recuperation of SWS.").

[22] Ye Zhang, *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*, Sleep Medicine Reviews (Aug 2021) at 1 (stating that: [p]olysomnography . . . is the gold standard for objectively assessing sleep quantity and sleep quality."). See also Carley, et. al *Physiology of Sleep* at 6 (explaining that: "[p]hysiologically, the gold standard for assessment of sleep and wake states is the laboratory polysomnogram (PSG)" and further describing the numerous noninvasive sensors are attached to a subject).

[23] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?search=stage%20N3%20sleep%20and%20sleep%20loss&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=10; M. A. Carskadon & W. C. Dement. *Monitoring and staging human sleep*, Chapter 2, in *Principles and practice of sleep medicine*, (Meir Kryger, et. al eds., 5e. 2011) (accessed at http://apsychoserver.psych.arizona.edu/jjbareprints/psyc501a/readings/Carskadon%20Dement%202011.pdf) at 3-4 (explaining that REM sleep is characterized by bursts of rapid eye movements, muscle twitches and cardiorespiratory irregularities. "The mental activity of human REM sleep is associated with dreaming, based on vivid dream recall reported after approximately 80% of arousals from this state of sleep. . . . A shorthand definition of REM sleep, therefore, is an activated brain in a paralyzed body.").

[24] *See* James A. Rowley & M. Safwan Badr, *Normal Sleep*, Chapter 1 in *Essentials of Sleep Medicine A Practical Approach to Patients with Sleep Complaints,* (ed. M. Safwan Badr, 2nd ed. 2022) at 5.

FDA-Jazz-000590

**Arousals**

When an arousal occurs, e.g., to take medication during the night after falling asleep, there is a shift in an EEG pattern—one that leads to a longer stage W with alertness or consciousness, even if not remembered.[25] Both Xyrem and Xywav labeling explain that after a dose, it usually takes at least 5 to 15 minutes to fall asleep, which means it usually takes at least 5 to 15 minutes to fall back asleep after taking the second dose.[26] Awakening to take a second dose necessarily disrupts sleep and causes fragmented sleep.[27, 28] That duration of time in stage W is prolonged and will adversely impact a clinical measure called Wake After Sleep Onset (WASO)—a metric of how much wakefulness happens in a night of sleep.[29] In treating sleep disorders, including

---

[25] Douglas Kirsch, *Stages and architecture of normal sleep*, UpToDate UpToDate (Sep 12, 2022) (accessed at https://www.uptodate.com/contents/stages-and-architecture-of-normal-sleep?search=stage%20N3%20sleep%20and%20sleep%20loss&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=10) (explaining that arousals "bring[] the individual from deeper to lighter sleep or to wakefulness." *See also* Pierre Philip, et. al, *Sleep Fragmentation in Normals: A Model for Sleepiness Associated with Upper Airway Resistance Syndrome.* Sleep (Apr 1994) at 244-245 (explaining that in an experiment simulating arousals in healthy young volunteers, "the mean duration of an EEG arousal was 11 seconds. Sleep architecture was significantly modified after sleep fragmentation [using the external stimulation]. There was a significant increase in stage 1 NREM sleep from a mean of $10.4 \pm 8\%$ to $23 \pm 6\%$. . . . [D]espite prolongation of sleep to avoid sleep deprivation and a protocol set up to obtain sleep fragmentation with transient arousals only, the sleep architecture was significantly altered compared to the baseline night."). This study demonstrates that even short arousals will significantly increase wakefulness and disrupt sleep leading to sleep fragmentation resulting with new daytime complaints of sleepiness. The authors state: "[t]his investigation thus indicates a progressive increase in daytime sleepiness from morning to evening after 1 night of sleep fragmentation."

[26] Section 2.3 *Important Administration Instructions for All Patients*, Xyrem, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=926eb076-a4a8-45e4-91ef-411f0aa4f3ca) (the product labeling stating that "[p]atients will often fall asleep *within 5 minutes of taking Xyrem, and will usually fall asleep within 15 minutes*, though the time it takes any individual patient to fall asleep may vary from night to night. Patients may need to set an alarm to awaken for the second dose. Rarely, patients may take up to 2 hours to fall asleep.) (emphasis added); Section 2.4 *Important Administration Instructions for All Patients*, Xywav, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e0ae43a-037f-42af-8e23-a0e51d75abe8) (explaining that "[p]atients will often *fall asleep within 5 minutes of taking XYWAV, and will usually fall asleep within 15 minutes*, though the time it takes any individual patient to fall asleep may vary from night to night." (emphasis added).

[27] The term "arousal" is based on PSG—a test used to diagnose sleep disorders—which is performed at night and "nocturnal arousals" are those arousals that occur at night. The definition of "arousal" is derived from the AASM Scoring Manual v 2.6, page 19 and fn 3 *supra*, defines wakefulness as Stage Wake. Arousals will lead to wakefulness or lighter stage sleep. Wakefulness also refers to a clinical term of the state of not being asleep with varying degrees of consciousness. *See* Jonathan R.L. Schwartz & Thomas Roth, *Neurophysiology of Sleep and Wakefulness: Basic Science and Clinical Implications*, Current Neuropharmacology (2008) at 367, 370 (accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2701283) (describing the states of sleep and wake as an "on-off switch" between these behaviors, called a "sleep-wake switch." Per Schwartz and Roth: "[t]hese findings suggest that when the self-reinforcing properties of the circuitry are weakened, individuals shift back and forth between sleep and wakefulness more frequently as well." *See, also* Figure 3 at 370—a schematic diagram of the "flip-flop switch model." This scientific explanation means that sleep and wake are two distinct states, when one is "on" the other must be "off." Arousals, like that for taking a second dose of oxybate, flips the switch from "off" to "on" and this undoubtedly will disrupt sleep, cause fragmented sleep, and sleep loss.

[28] *See* fn 2 for the American Academy of Sleep Medicine's definition of "arousal."

[29] *What Is Wakefulness After Sleep Onset (WASO)?* Sleep Foundation (accessed at https://www.sleepfoundation.org/sleep-studies/wakefulness-after-sleep-onset#:~:text=Wakefulness%20after%20sleep%20onset%20is,their%20WASO%20is%2025%20minutes) (explaining that "[w]akefulness after sleep onset [WASO] is a measurement used to assess a person's sleep. It is the total number of minutes that a person is awake after having initially fallen asleep. For example, if someone wakes up once during the night and is awake for 25 minutes, their WASO is 25 minutes.").

FDA-Jazz-000591

narcolepsy, the goal is to maximize the time in sleep and minimize wake time. i.e., minimize WASO.

Disruption of sleep leads to the inability to enter Stage N3, or disruption of N3, and such individuals will revert back to Stage W and subsequently progress to Stage N1 sleep and so forth.[30] The disruption changes sleep architecture and will increase WASO. This disruption is something to be avoided in the narcoleptic patient, if possible.

**Narcolepsy**

Narcolepsy is a disorder of REM intrusion into wakefulness.[31] Sudden REM sleep onset during wakefulness causes loss of motor tone (sleep paralysis) along with a dream like state called cataplexy.[32] REM intrusion can also occur during sleep, disrupting the normal sleep architecture described above.[33] Individuals with narcolepsy "generally fall asleep rapidly but can spontaneously awaken several times during the night and have difficulty returning to sleep. This sleep maintenance insomnia seems paradoxical in a disorder characterized by daytime sleepiness, and it may reflect a low threshold to transition from sleep to wakefulness."[34] REM intrusion shifts sleep stages and prevents sleep continuity (also called sleep consolidation), fragments normal sleep architecture, and prevents sufficient deep sleep (prevents N3 restorative sleep from occurring because the sleep stages keep shifting to lighter sleep).[35] Often Stage N1 increases at the debt of Stage N3 sleep given the increased number of shifts between sleep stages.[36] This is seen in many sleep disorders, including narcolepsy.[37] This results in daytime sleepiness with the

---

[30] Richard Berry, et. al, *Arousal rule*, The AASM Manual for the Scoring of Sleep and Associated Events, Rules, Terminology and Technical Specifications, American Academy of Sleep Medicine (AASM) (2020), version 2.6 at 22-32.

[31] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022) (accessed at https://www.uptodate.com/contents/clinical-features-and-diagnosis-of-narcolepsy-in-adults?search=narcolepsy%20&source=search_result&selectedTitle=1~120&usage_type=default&display_rank=1).

[32] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022).

[33] Imran Ahmed & Michael Thorpy, *Narcolepsy and Idiopathic Hypersomnia*, at 328 in Chapter 15 in *Essentials of Sleep Medicine* (M. Safwan Badr et. al, eds., 2nd ed. 2022) (explaining that "[t]he effects of narcolepsy can be considered a manifestation of REM sleep dissociation, with features of REM sleep that intrude into [the NREM stages of] sleep and wakefulness" , instead of progressing normally).

[34] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022).

[35] Michelle T. Cao, et. al, *Narcolepsy: Diagnosis and Management* (explaining that "[n]arcolepsy disrupts the maintenance and orderly occurrence of wake and sleep stages."); Ye Zhang, *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*, Sleep Medicine Reviews (Aug 2021) (accessed at https://pubmed.ncbi.nlm.nih.gov/33934047/) at 11 (stating that: "nighttime PSG changes . . . demonstrate[] poor sleep continuity and altered sleep architecture in narcolepsy. It has been suggested that some PSG changes in narcolepsy such as frequent SS [stage shifts] and short bouts of wakefulness occur primarily in the second NREM sleep episode which hinders slow wave activity and provides inadequate NREM intensity."). Slow wave sleep only occurs in N3 and when SWS does not occur with enough intensity, an individual does not get restorative sleep. *See* fn 18 (explaining that: "[d]eep nonrapid eye movement (NREM) sleep, also known as slow wave sleep (SWS), is considered to be the most restorative sleep stage and to be associated with sleep quality and maintenance of sleep.").

[36] Ye Zhang, *Polysomnographic nighttime features of narcolepsy: A systematic review and meta-analysis*. Sleep Med Reviews. (Aug 2021) (accessed at https://pubmed.ncbi.nlm.nih.gov/33934047/) at 1 (stating "[m]eta-analyses revealed significant reductions in sleep latency, sleep efficiency, *slow wave sleep percentage*, rapid eye movement sleep (REM) latency, cyclic alternating pattern rate, and increases in total sleep time, *wake time after sleep onset (WASO), awakening numbers (AWN) per hour, stage shift (SS) per hour, N1 percentage*, apnea hypopnea index, and periodic limb movement *index in narcolepsy patients* compared with [healthy controls]") (emphasis added).

[37] *Zhang* at 4 (explaining that a "meta-analysis revealed significantly decreased . . . SWS% . . . and increased . . . N1 percentage" in narcolepsy compared with healthy controls.").

6

FDA-Jazz-000592

consequences of sleep fragmentation or sleep deprivation, i.e., altered sleep architecture which may affect daytime performance.[38]

EDS is the most common and chronic symptom of narcolepsy.[39]  Per Scammell: "[t]he sleepiness may be so severe that patients with narcolepsy can rapidly doze off with little warning; these episodes are commonly referred to as 'sleep attacks.'"[40]  Another symptom of narcolepsy, cataplexy, is an "emotionally-triggered transient muscle weakness" that can cause a patient to collapse.[41]

**Xyrem, Xywav, and Lumryz**

The FDA-approved labeling for Xyrem and Xywav instructs patients to awaken to take a second dose approximately 2.5 to 4 hours after initial administration and falling asleep.[42]  If patients do not intentionally awaken to take the second dose (e.g., by setting an alarm), the effects of the drug will wear off, and the patients may awaken anyway and need the second dosing to return to sleep. It is our opinion that awakening to take a second dose of sleep medication, such as Xywav or Xyrem, is not optimally supportive of the continual sleep necessary to restore sleep architecture and daytime alertness with more normal functioning.

Lumryz combines both short-acting and long-acting salts of sodium oxybate allowing once nightly dosing.[43] Lumryz provides "a proprietary drug delivery technology . . .  [and this] technology provides an early single peak, following a gradual decline in [oxybate] concentration . . . The premeasured dosing packets contain a mix of immediate-release and controlled-release microparticles of [oxybate]."[44] This formulation of oxybate provides a novel dosing characteristic of once nightly dosing, which in our expert opinion provides a MCTPC over the immediate-release formulations alone, i.e., Xyrem and Xywav.

As stated above, Xyrem and Xywav are both dosed twice nightly, which means patients experience a nocturnal arousal to take the medication.[45]  Such arousals lead to awakening, i.e., consciousness, and this awakening disrupts sleep with the detrimental and harmful consequences that are known to occur with sleep loss.[46] Even with a single nocturnal arousal, there can be

---

[38] *Id.* at 1 (stating "[n]arcolepsy . . . is one of the most common causes of excessive daytime sleepiness (EDS) and is associated with an increased risk of car accidents, occupational problems, and injuries.").

[39] Thomas E. Scammell, *Clinical features and diagnosis of narcolepsy in adults*, UpToDate (Jul 12, 2022).

[40] *Id*.

[41] *Id*.

[42] Section 2.1, *Dosage and administration*, Xyrem labeling, (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=926eb076-a4a8-45e4-91ef-411f0aa4f3ca); Section 2.1, *Dosage and administration*, Xywav labeling (accessed at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e0ae43a-037f-42af-8e23-a0e51d75abe8).

[43] Clete A. Kushida, et. al, *Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy*, Sleep (Jun 2022) at 2 (accessed at https://pubmed.ncbi.nlm.nih.gov/34358324/).

[44] Clete A. Kushida, et. al, *Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy*. Sleep (Jun 2022) at 2 (accessed at https://pubmed.ncbi.nlm.nih.gov/34358324/).

[45] It is self-evident that an arousal occurs upon taking the second dose of Xyrem or Xywav because some degree of consciousness or alertness is needed for the voluntary movements involved in taking medicine.

[46] *See* fn 3, 5 *supra*.

7

FDA-Jazz-000593

impairment of alertness and decline in cognitive performance the following day.[47] It is known that disrupting sleep, even briefly, changes sleep architecture—the normal pattern of NREM and REM cycles requisite for daily restoration.[48] Nocturnal arousals should be avoided—especially in those with sleep disorders—as the goal of treatment is to restore normal sleep architecture.[49]

It is incorrect to assume that a person with disrupted sleep can simply return to sleep and resume their normal sleep cycle. Rather, upon taking a second dose of Xyrem or Xywav, it may take at least 5-15 minutes to return to sleep—and such sleep does not resume where the patient left off to take their medication.  Rather a new cycle of sleep must begin anew.[50] Thus, this disruption to take a second dose of Xyrem or Xywav should be avoided, if possible. An oxybate product that is dosed once nightly provides an opportunity for narcolepsy patients to achieve normal sleep architecture, which is not a possibility for a patient on Xyrem or Xywav who must either wake up to take a second dose (disrupting sleep architecture) or allow the drug to wear off after 2.5-4 hours (reverting patients back to their naturally occurring, disrupted sleep architecture)."[51]

**Conclusion**

In summary, in our opinion, Lumryz provides a MCTPC over Xyrem and Xywav due to its once nightly dosing because, in treating a sleep disorder, it is best to eliminate or minimize nocturnal arousals to improve sleep quality and sleep architecture. This is a significant therapeutic advantage over the short-acting oxybate products. We defer to OOPD and the DN1 to determine

---

[47] Chiara Cirelli, Insufficient sleep: Definition, epidemiology, and adverse outcomes, UpToDate (Oct 10, 2022) at https://www.uptodate.com/contents/insufficient-sleep-definition-epidemiology-and-adverse-outcomes) (stating that: "[s]leep has two dimensions: duration (quantity) and depth (quality). When individuals fail to obtain adequate duration or quality of sleep, daytime alertness and function suffer. In response to sleep deprivation, sleep is often both longer and deeper. In many cases, however, sleep intensity can change without major changes in sleep duration. Sleep duration alone is therefore not a good indicator of how much sleep is needed to feel refreshed in the morning and function properly. . . . Sleep insufficiency exists when sleep is insufficient to support adequate alertness, performance, and health, either because of reduced total sleep time (decreased quantity) or *fragmentation of sleep by brief arousals (decreased quality)*") (emphasis added).

[48] *See* fn 26 *supra*. Once an arousal occurs, falling back to sleep begins at N1, not where the person left off in their sleep cycle prior to the arousal, and therefore, arousals will change sleep architecture.

[49] Thomas E. Scammell, *Treatment of narcolepsy in adults*, UpToDate (Nov 14, 2022) accessed at https://www.uptodate.com/contents/treatment-of-narcolepsy-in-adults?source=history_widget (explaining that "[m]anagement of narcolepsy is symptomatic, and there are no disease-modifying therapies yet available. . . . Sleep deprivation [including nocturnal arousals] may worsen narcolepsy symptoms, and therefore patients should be counseled to maintain a regular and adequate sleep schedule.").

[50] This is because once arousal occurs, falling back to sleep begins at N1, not where the person left off in their sleep cycle prior to the arousal—a missed opportunity to get into deep sleep (N3) which is restorative sleep.

[51] *See* Figure 1, Emmanuel Mignot, et. al, *Sleep problems in narcolepsy and the role of hypocretin/orexin deficiency* in Steiner MA, (eds): *The Orexin System. Basic Science and Role in Sleep Pathology*, Frontiers in Neurol Neuroscience (2021) at 105 (depicting a 24-hour hypnogram (a sleep study which is read from left to right). Panels 1(a) and 1(b) are hypnograms from the same patient suffering from narcolepsy. In Figure (a), the patient is close to onset of disease; Figure (b) is the same patient 6 months after diagnosis. Figure c is a control (person with no sleep disease). Figures 1(a) and 1(b) represent the natural state of narcolepsy. During the day, the patient is falling asleep and has periods of daytime REM sleep (blue bars). The fine needle like projections during nighttime sleep (after 8pm) shows cycling between N1 and wake representing fragmented sleep. This is not restorative sleep because rapid cycling to wake and N1 prevent stable progression to deeper stages of restorative sleep. The patient will be impacted the following day because their sleep has been disrupted—even if they do not awaken during the night—and this is what occurs when oxybate wears off.).

FDA-Jazz-000594

whether and how considerations other than those considered in this consult may factor into the
agency's MCTPC analysis.

9

FDA-Jazz-000595



Roberta Szydlo

Digitally signed by Roberta Szydlo

Date: 5/1/2023 11:37 AM EDT
GUID: 51407

Aaron Friedman

Digitally signed by Aaron Friedman

Date: 5/1/2023 11:42 AM EDT
GUID: 51404

Henry Startzman

Digitally signed by Henry Startzman

Date: 5/1/2023 12:03 PM EDT
GUID: 51405

Sandra Retzky

Digitally signed by Sandra Retzky

Date: 5/1/2023 12:10 PM EDT
GUID: 51406

FDA-Jazz-000596

# EXHIBIT 63

CONFIDENTIAL



Office of Orphan Products Development
Food and Drug Administration
10903 New Hampshire Avenue
WO32-5271
Silver Spring, MD 20993

ProPharma Group
1129 20th Street Northwest
Suite 600
Washington, DC 20036

Attention:    Marla Scarola, MS
US Agent for Flamel Ireland Limited dba Avadel Ireland
marla.scarola@propharma.com

Re: Orphan-drug designation DRU-2019-7038

Dear Ms. Scarola:

This letter refers to your oxybate drug that was designated as a drug for a rare disease or condition pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 360bb) on January 8, 2018, for "treatment of narcolepsy." We also refer to the letter from the Center for Drug Evaluation and Research, dated May 1, 2023, approving New Drug Application (NDA 214755) for Lumryz (sodium oxybate).

Lumryz is eligible for seven years of orphan-drug exclusive approval pursuant to section 527 of the FD&C Act (21 U.S.C. 360cc) for *treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy*. The period of exclusive approval expires seven years after May 1, 2023, the date of approval of the NDA 214755. The scope of orphan-drug exclusive approval is described under 21 CFR 316.31.

In accordance with section 527(e)(2) of the FD&C Act (21 U.S.C. 360cc(e)(2)), FDA's summary of the clinical superiority finding will be posted at https://www.fda.gov/orphan.

It is the sponsor's responsibility to assure the availability of sufficient quantities of this drug to meet the needs of patients. Failure to do so could result in the withdrawal of the drug's exclusive approval as stipulated under 21 CFR 316.36(b).

CONFIDENTIAL

Should you have any questions, please contact our office by phone at 301-796-8660 or by email at orphan@fda.hhs.gov.

Sincerely,

*{See appended electronic signature page}*

Director
Office of Orphan Products Development

FDA-Jazz-001429

CONFIDENTIAL



Sandra Retzky

Digitally signed by Sandra Retzky

Date: 5/1/2023 12:08 PM EDT
GUID: 51403

FDA-Jazz-001430

# EXHIBIT 64

*Read In Open Court on 3-4-24*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 21-691-GBW |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | |
| Plaintiffs, | C.A. No. 21-1138-GBW |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | |
| Plaintiffs, | C.A. No. 21-1594-GBW |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |

**VERDICT FORM**

**Instructions:** When answering the following questions and completing this Verdict Form, please follow the instructions provided and follow the Jury Instructions that you have been given. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

As used herein:

1. "Jazz" collectively refers to Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited.

2. "Avadel" refers to Defendant Avadel CNS Pharmaceuticals, LLC.

3. The "'488 Patent" refers to U.S. Patent No. 10,758,488.

4. The "'782 Patent" refers to U.S. Patent No. 11,147,782.

5. The "Asserted Patents" or the "Patents-in-Suit" refers collectively to the '488 Patent and the '782 Patent.

We, the jury, unanimously find as follows.

## QUESTION NO 1:

Did Jazz prove by a preponderance of the evidence that Avadel's LUMRYZ product infringes any of the following claims of the '488 Patent?

**If you find Jazz proved by a preponderance of the evidence that LUMRYZ infringes a claim, place a check mark next to "Yes" for that claim.**

| '488 Patent | | | | | |
|---|---|---|---|---|---|
| Claim 7 | Yes _____ | (for Jazz) | No ___√___ | (for Avadel) |
| Claim 11 | Yes _____ | (for Jazz) | No ___√___ | (for Avadel) |

**QUESTION NO 2:**

For each claim of the '488 Patent listed below, did Avadel prove by clear and convincing evidence that the claim is invalid for lack of sufficient written description?

**If you find a claim invalid for lack of written description, answer "Yes," otherwise, answer "No."**

| '488 Patent | | | | |
|---|---|---|---|---|
| Claim 7 | Yes _____ (for Avadel) | No __✓____ (for Jazz) |
| Claim 11 | Yes _____ (for Avadel) | No __✓____ (for Jazz) |

## QUESTION NO 3:

For each claim of the '488 Patent listed below, did Avadel prove by clear and convincing evidence that the claim is invalid for lack of enablement?

**If you find a claim invalid for lack of enablement, answer "Yes," otherwise, answer "No."**

| '488 Patent | | | | |
|---|---|---|---|---|
| Claim 7 | Yes _____ | (for Avadel) | No ___√___ | (for Jazz) |
| Claim 11 | Yes _____ | (for Avadel) | No ___√___ | (for Jazz) |

**QUESTION NO 4:**

For each claim of the '488 Patent listed below, did Avadel prove by clear and convincing evidence that the patent is invalid for failure to name the correct inventors?

**If you find the patent invalid for failure to name the correct inventors, answer "Yes," otherwise, answer "No."**

| '488 Patent | | | | |
|---|---|---|---|---|
| Claim 7 | Yes _____ (for Avadel) | No ____✓____ (for Jazz) |
| Claim 11 | Yes _____ (for Avadel) | No ____✓____ (for Jazz) |

**QUESTION NO 5:**

Did Avadel prove by clear and convincing evidence that the '488 patent is invalid because it is derived from someone other than the presently named inventors?

**If you find the patent invalid because it is derived from someone other than the presently named inventors, answer "Yes," otherwise, answer "No."**

| '488 Patent: | Yes _____ (for Avadel) | No ___√___ (for Jazz) |
|---|---|---|

**QUESTION NO 6:**

For each claim of the '782 Patent listed below, did Avadel prove by clear and convincing evidence that the claim is invalid for lack of sufficient written description?

**If you find a claim invalid for lack of written description, answer "Yes," otherwise, answer "No."**

| '782 Patent | | | | | |
|---|---|---|---|---|---|
| Claim 24 | Yes _____ | (for Avadel) | No __√__ | (for Jazz) |

**QUESTION NO 7:**

For each claim of the '782 Patent listed below, did Avadel prove by clear and convincing evidence that the claim is invalid for lack of enablement?

**If you find a claim invalid for lack of enablement, answer "Yes," otherwise, answer "No."**

| '782 Patent | | | | | |
|---|---|---|---|---|---|
| Claim 24 | Yes _____ (for Avadel) | No ___√___ (for Jazz) |

## QUESTION NO 8:

For each claim of the '782 Patent listed below, did Avadel prove by clear and convincing evidence that the patent is invalid for failure to name the correct inventors?

| '782 Patent | | | | |
|---|---|---|---|---|
| Claim 24 | Yes _____ (for Avadel) | No __√__ (for Jazz) | | |

THE JURY IS NOT BEING ASKED TO DECIDE IF CLAIM 24 OF THE '782 PATENT PATENT IS INFRINGED. INFRINGEMENT OF CLAIM 24 THE '782 PATENT HAS BEEN STIPULATED TO BY THE PARTIES.

ANSWER QUESTION NINE ONLY IF THERE IS A CLAIM OF AN ASSERTED PATENT THAT IS BOTH INFRINGED AND NOT INVALID.

**QUESTION NO. 9.**

What is the reasonable royalty to which Jazz is entitled for Avadel's past infringement?

Royalty Rate: ___3. 5___ %

Amount of Past Sales to Apply Royalty Rate: $ 6,673,223.82

Total Amount for Past Infringement Based on Royalty Rate: $ 233,562 . 83

(Royalty Rate x Amount of Past Sales = Total Amount for Past Infringement Based on Royalty Rate)

\* \* \*

*Please proceed to the last page, sign and date the verdict form, and return it to the court clerk.*

- 11 -

## UNANIMOUS VERDICT

UPON REACHING A UNANIMOUS VERDICT ON EACH QUESTION ABOVE, EACH JUROR MUST SIGN BELOW.

We, the jury, unanimously agree to the answers to the above questions and return them under the instructions of this Court as our verdict in this case.

REDACTED

Dated:  3 / 1 / 2024

# EXHIBIT 65

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 66

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 67

# United States Court of Appeals
# for the Federal Circuit

———————————

**JAZZ PHARMACEUTICALS, INC.,**
*Plaintiff-Appellee*

**v.**

**AVADEL CNS PHARMACEUTICALS, LLC,**
*Defendant-Appellant*

———————————

2024-2274

———————————

Appeal from the United States District Court for the District of Delaware in No. 1:21-cv-00691-GBW, Judge Gregory Brian Williams.

--------------------------------------------------

**JAZZ PHARMACEUTICALS, INC., JAZZ PHARMACEUTICALS IRELAND LIMITED,**
*Plaintiffs-Appellees*

**v.**

**AVADEL CNS PHARMACEUTICALS, LLC,**
*Defendant-Appellant*

———————————

2024-2277

———————————

Appeal from the United States District Court for the District of Delaware in No. 1:21-cv-01138-GBW, Judge Gregory Brian Williams.

---------------------------------------------------

**JAZZ PHARMACEUTICALS, INC., JAZZ PHARMACEUTICALS IRELAND LIMITED,**
*Plaintiffs-Appellees*

**v.**

**AVADEL CNS PHARMACEUTICALS, LLC,**
*Defendant-Appellant*

_____

2024-2278

_____

Appeal from the United States District Court for the District of Delaware in No. 1:21-cv-01594-GBW, Judge Gregory Brian Williams.

_____

Decided: May 6, 2025

_____

FRANK CALVOSA, I, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, argued for plaintiff-appellee. Also represented by GABRIEL P. BRIER, FRANCIS DOMINIC CERRITO, QUENTIN JORGENSEN, ELLYDE R. THOMPSON; ISAAC SAIDEL-GOLEY, Boston, MA.

GABRIEL K. BELL, Latham & Watkins LLP, Washington, DC, argued for defendant-appellant. Also represented by ALEXANDER G. SIEMERS; KENNETH G. SCHULER, MARC NATHAN ZUBICK, Chicago, IL; HERMAN H. YUE, New York,

NY; KIRA ALEXIS DAVIS, Morrison & Foerster LLP, Los Angeles, CA; DARALYN JEANNINE DURIE, San Francisco, CA; DANIEL M. SILVER, McCarter & English, LLP, Wilmington, DE.

————————————

Before LOURIE, REYNA, and TARANTO, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Avadel CNS Pharmaceuticals, LLC ("Avadel") appeals from the decision of the U.S. District Court for the District of Delaware permanently enjoining it from seeking approval from the U.S. Food and Drug Administration ("the FDA") of its product, Lumryz, for the treatment of idiopathic hypersomnia, as well as from marketing Lumryz for that indication. *Jazz Pharms., Inc. v. Avadel CNS Pharms. LLC*, No. 21-cv-691, 2024 WL 4005200 (D. Del. Aug. 27, 2024) ("*Permanent Injunction Order*"); *see Jazz Pharms., Inc. v. Avadel CNS Pharms. LLC*, No. 21-cv-691, 2024 WL 4100159 (D. Del. Aug. 27, 2024) ("*Decision*"). As the district court later clarified in an order denying Avadel's motion to stay the injunction pending appeal, Avadel is specifically enjoined from: (1) offering open-label extensions to clinical trial participants, (2) applying for FDA approval of Lumryz for idiopathic hypersomnia, and (3) initiating new clinical trials or studies after the *Permanent Injunction Order*'s effective date. *Jazz Pharms., Inc. v. Avadel CNS Pharms. LLC*, No. 21-cv-691 (D. Del. Sep. 24, 2024) ("*Stay Order*"), J.A. 38–44.

For the following reasons, we reverse-in-part, vacate-in-part, and remand.

BACKGROUND

I

Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz") manufacture and sell two sodium oxybate products: Xyrem®, a sodium oxybate

oral solution approved for the treatment of excessive day-
time sleepiness ("EDS") and cataplexy in adult and pediat-
ric patients with narcolepsy, and Xywav®, a low-sodium
oxybate product approved for the same indications as
Xyrem, as well as for the treatment of idiopathic hyper-
somnia.  Idiopathic hypersomnia, or "IH," is a chronic neu-
rological condition "on a spectrum with narcolepsy" that is
similarly characterized by EDS.  J.A. 5666.  Xywav is the
first and, currently, only FDA-approved treatment for IH.

Jazz is not without competition, however.  On Decem-
ber 15, 2020, Avadel submitted a New Drug Application
("NDA") to the FDA pursuant to section 505(b)(2) of the
Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C.
§ 355(b)(2), seeking approval of its own product, Lumryz, a
once-nightly formulation of sodium oxybate for the treat-
ment of EDS and cataplexy in adults with narcolepsy.  An
NDA filed under that section is commonly referred to as a
"paper NDA," which, unlike an Abbreviated New Drug Ap-
plication ("ANDA"), requires the applicant to submit safety
and efficacy data.  *See AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042, 1045–46 (Fed. Cir. 2010).  But such data
need not have been developed by the applicant; rather, the
applicant may rely on existing FDA findings of safety and
efficacy for already-approved drugs, or on other studies not
performed by the applicant.  *Takeda Pharms. U.S.A., Inc.
v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 629 (Fed. Cir.
2015).  Avadel's paper NDA relied in part on the FDA's
findings of safety and efficacy for Jazz's Xyrem.
J.A. 9255–56.

On March 23, 2021, three months after Avadel submit-
ted its paper NDA, Jazz filed a patent application entitled
"GHB [*i.e.*, oxybate] Formulation and Method for its Man-
ufacture," which issued on October 19, 2021, as U.S. Patent
11,147,782 ("the '782 patent").  Relevant here, claims 14
and 24 of the '782 patent recite:

14. A unit dose comprising a formulation of gamma-hydroxybutyrate,

> wherein the formulation comprises:
>
> a plurality of immediate release particles comprising gamma-hydroxybutyrate;
>
> a plurality of modified release particles comprising gamma-hydroxybutyrate;
>
> a viscosity enhancing agent; and
>
> an acid;
>
> wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles.
>
> 24. The unit dose of claim 14, wherein the unit dose is a sachet.

'782 patent, col. 26 ll. 9–20, 54–55.  The '782 patent will expire on February 18, 2036.

Neither of Jazz's Xyrem and Xywav products practices claim 24 of the '782 patent, the only asserted claim in this litigation.  Indeed, the '782 patent is not listed in the Orange Book for either Xyrem or Xywav, indicating Jazz's view that the '782 patent does not claim those drugs or their use.  *See* 21 U.S.C. § 355(b)(1)(A)(viii) (providing the statutory requirements for listing a patent in the Orange Book).  As such, in pursuing its paper NDA for Lumryz, Avadel did not need to make—and, indeed, did not make—any patent certifications under § 355(b)(2)(A) as to the '782 patent.[1]

---

[1] As with an ANDA, a paper NDA requires the applicant to submit a certification that, for example, any patent

II

On November 10, 2021, roughly one month after the '782 patent issued and eleven months after Avadel submitted its paper NDA, Jazz filed a complaint in the U.S. District Court for the District of Delaware, alleging that Avadel's FDA submission "constitute[d] infringement [of the '782 patent] under 35 U.S.C. § 271(e)(2)(A)." J.A. 10167. That statute provides:

> It shall be an act of infringement to submit an application . . . described in section 505(b)(2) of [the FDCA] for a drug claimed in a patent . . . if the purpose of such submission is to obtain approval under [the FDCA] to engage in the commercial manufacture, use, or sale of a drug . . . claimed in a patent . . . before the expiration of such patent.

§ 271(e)(2)(A). In its claim for relief, Jazz sought, *inter alia*, a permanent injunction under 35 U.S.C. § 271(e)(4)(B),[2] as well as damages for any of Avadel's infringement "other than those acts expressly exempted by 35 U.S.C. § 271(e)(1)."[3] J.A. 10169–70. Accordingly, at the time of

———————————

that "claims the drug" for which the relied-upon investigations were conducted "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." *See* § 355(b)(2)(A)(i)–(iv).

[2] For an act of infringement under § 271(e)(2), as Jazz's complaint alleged, the statute provides that "injunctive relief may be granted . . . to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug . . . ." § 271(e)(4)(B).

[3] The statute expressly excludes from infringement any infringing activities done "solely for uses reasonably related to the development and submission of information"

the initial filing of Jazz's complaint, this lawsuit appeared to fall within the bounds of the Hatch-Waxman Act insofar as the alleged infringement "ar[ose] from Avadel's *filing* of a New Drug Application." J.A. 10157 (emphasis added). That is, Jazz's claims were based on an artificial act of infringement under § 271(e)(2), and not on any actual acts of infringement under § 271(a)–(c). *See* J.A. 10167; J.A. 7741 (Avadel letter to district court explaining that "Jazz initiated this series of actions under the Hatch-Waxman Act"); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990) (explaining that § 271(e)(2) "define[s] a new (and somewhat artificial) act of infringement for a very limited and technical purpose that relates only to certain drug applications").

That changed, however, on May 1, 2023, when the FDA approved Avadel's paper NDA and on June 5, 2023, when Avadel commercially launched Lumryz.[4] Consequently, on June 8, 2023, the parties stipulated, subject to the district court's approval, to allow Jazz leave to amend its complaint. Stipulation to Amend Complaint, *Jazz Pharms., Inc. v. Avadel CNS Pharms. LLC*, No. 21-cv-1594 (D. Del. June 8, 2023), ECF No. 209. Specifically, Jazz amended its complaint to remove any allegations of "artificial"

---

to the FDA. § 271(e)(1) ("the safe-harbor provision" or "the safe harbor").

[4] Because the '782 patent is not listed in the Orange Book for Xyrem, the filing of Jazz's complaint did not trigger a 30-month regulatory stay on the FDA's approval of Avadel's paper NDA. *See* 21 U.S.C. § 355(c)(3)(C); *see also* Oral Arg. 9:30–9:38, *available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl=24-2274_02072025.mp3 (counsel for Avadel noting that "the reason we're not dealing with an automatic stay is we're not dealing with an Orange Book-listed patent here. Jazz doesn't practice the patent that [it's] asserting.").

8                          JAZZ PHARMACEUTICALS, INC. v.
                           AVADEL CNS PHARMACEUTICALS, LLC

infringement under § 271(e)(2), replacing them with af-
firmative allegations that Avadel had and would infringe
the '782 patent under each of § 271(a)–(c) by making and
selling the now-FDA-approved Lumryz. *Compare* J.A.
10167–68, *with* J.A. 10007. Jazz further amended its com-
plaint to remove its prayer for a permanent injunction un-
der § 271(e)(4)(B), but otherwise maintained its requests
for injunctive relief and damages against infringing activi-
ties, other than damages for acts exempted by § 271(e)(1).
*Compare* J.A. 10169–70, *with* J.A. 10008.

Following discovery and prior to trial, the parties stip-
ulated that Lumryz would infringe claim 24 of the '782 pa-
tent if that claim was not found to be invalid. J.A. 4312.
And after a five-day trial, a jury found that Avadel had
failed to prove the invalidity of that claim. J.A. 4387–89.
The jury awarded Jazz a reasonable royalty of $233,562.83
for Avadel's past infringement. J.A. 4390.

                                  III

On April 12, 2024, following trial, Jazz moved for a per-
manent injunction under 35 U.S.C. § 283 seeking to pre-
vent Avadel from making, using, or selling Lumryz until
expiration of the '782 patent, February 18, 2036.
J.A. 4545–47. Jazz proposed to exclude from the injunc-
tion, however, Avadel's making, using, and selling Lumryz
"(a) for the patients who have been prescribed Lumryz as
of the effective date of the injunction . . . ; (b) in currently-
ongoing clinical trials and studies; (c) to update data in old
studies if necessary; and (d) to re-run necessary tests for
quality control for regulators or customers." J.A. 4550.
And, "[f]or the avoidance of doubt," Jazz proposed that alt-
hough Avadel "may continue to use Lumryz in currently-
ongoing clinical trials and studies . . . , [it] may not seek ap-
proval from the [FDA] for any indication that was not al-
ready part of Lumryz's approved product labeling as of
March 4, 2024." *Id.* Jazz's motion was fully briefed, and
an oral hearing was held on June 4, 2024.

While Jazz's motion was pending, on August 1, 2024, Avadel launched its REVITALYZ clinical trial, a "double-blind, placebo-controlled, randomized withdrawal, multi-center study of the efficacy and safety of Lumryz with an open-label extension period in patients diagnosed with [IH]." J.A. 7529 (citing *Safety and Efficacy of [Lumryz] in Idiopathic Hypersomnia (REVITALYZ)*, ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT06525077?term=NCT06525077&rank=1). Relevant here, an open-label extension ("OLE") period "allows clinical trial participants to receive a trial drug past the formal completion of the trial, both to gather additional safety data for submission to the FDA and to maintain continuity of patient treatment." J.A. 7511–12.

On August 27, 2024, the district court granted in part Jazz's motion. Specifically, it granted a "limited perma-nent injunction prohibiting Avadel from seeking approval from the [FDA] and marketing Lumryz for the treatment of IH." *Permanent Injunction Order*, at *1. But, as Jazz had proposed, it excluded from the injunction Avadel's making, using, and selling Lumryz for use "in currently-ongoing clinical trials and studies." *Id.* It further adopted Jazz's proposed language that, "[f]or the avoidance of doubt, . . . while Avadel may continue to use Lumryz in currently-ongoing clinical trials and studies . . ., Avadel may not seek approval of Lumryz from the FDA for the treatment of IH or for any indication that was not already part of Lumryz's approved product labeling as of March 4, 2024." *Id.* Avadel filed a Notice of Appeal the next day. J.A. 341.[5]

_____

[5]    The district court also denied in part Jazz's motion. Specifically, the court refused to enjoin Avadel from mak-ing, using, and selling Lumryz for the treatment of narco-lepsy—its FDA-approved indication. *See Decision*, at *1. The court found that enjoining such activities threatened a

## IV

One week later, on September 3, 2024, Avadel filed an emergency motion in the district court to stay the injunction pending appeal, arguing that enjoining Avadel from initiating new clinical trials and seeking approval from the FDA to market Lumryz for the treatment of IH (or any other indication) "overlook[ed] a crucial feature of federal patent law"—the safe-harbor provision. J.A. 7496. Avadel argued that, under the safe harbor, the enjoined activities are "entirely non-infringing," such that the injunction exceeds its lawful scope. J.A. 7502. And it told the court that Jazz had demanded that, pursuant to the injunction, Avadel cease enrolling new patients in its ongoing REVITALYZ trial and "terminate the [OLE] period for those who ha[d] already been enrolled" and prescribed Lumryz as part of that trial. J.A. 7511. Jazz opposed the motion, arguing that Avadel's arguments were misplaced because the safe harbor is an affirmative defense that Avadel never pleaded or pursued, and that therefore had been waived. J.A. 7542.

In a memorandum order, the district court denied Avadel's motion to stay the injunction. *See Stay Order*, J.A. 39. In doing so, the court "[found] it pertinent to discuss and clarify the scope of conduct enjoined." *Id.*, J.A. 40. It began by clarifying what activities were *not* covered by the injunction. Under the injunction's "explicit terms," the district court explained, Avadel may continue to make, use, and sell Lumryz for its REVITALYZ clinical study because that trial was initiated prior to entry of the injunction. *Id.*,

---

"substantial harm to the public interest" that outweighed any irreparable injury to Jazz. *Id.* at *9. Instead, the court determined that Jazz is entitled to a reasonable royalty for Avadel's ongoing sales of Lumryz for narcolepsy. *Id.* at *13. Jazz does not appeal from that partial denial, so we do not address it further.

J.A. 40–41. It further clarified that Avadel was not enjoined from enrolling new subjects in that already ongoing study. *Id.* at 41. And finally, it stated that, "while the [*Permanent Injunction Order*] enjoins Avadel from seeking FDA approval for IH, [it] does not enjoin Avadel from *submitting information or results* from ongoing studies to the FDA." *Id.*

The district court then clarified that Avadel *is* enjoined from: "(1) offering open-label extensions to [REVITALYZ] trial participants; (2) applying for FDA approval of Lumryz for IH; and (3) initiating *new* clinical trials or studies after the [*Permanent Injunction Order*]'s effective date." *Id.* Having clarified the specific activities precluded by the injunction, the court proceeded to determine whether Avadel had made the requisite showings as to each of those activities to warrant a stay. And finding that Avadel had not demonstrated a substantial risk of immediate and irreparable harm for any of those activities, the district court denied the motion. *Id.*

Avadel timely amended its Notice of Appeal to include both the *Permanent Injunction Order* and the *Stay Order*. *Jazz Pharms.*, No. 21-cv-1594 (D. Del. Sep. 27, 2024), ECF No. 584. We have jurisdiction under 28 U.S.C. § 1292(c)(1).[6]

---

[6] On October 2, 2024, a motions panel of this court granted Avadel's motion to stay the district court's injunction "insofar as it enjoins 'initiating new clinical trials or studies,'" but declined to stay the injunction in all other respects due to Avadel's "failure to establish irreparable injury." Appeal No. 24-2274, ECF No. 30.

DISCUSSION

I

An injunction is a "drastic and extraordinary remedy" rooted in well-established principles of equity. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).  To show entitlement to a permanent injunction, a plaintiff must establish: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction" ("the *eBay* factors").  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "[D]istrict courts are frequently admonished not to issue sweeping injunctions against potentially infringing activities in patent cases, but to restrict the scope of the injunction to the particular adjudicated infringing activity."  *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1344 (Fed. Cir. 2012) (collecting cases).  Permanent injunctions of proper scope are provided for by law.  But this is not such a case.

We review the district court's grant of a permanent injunction and the scope of that injunction for abuse of discretion.  *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993).  "An abuse of discretion may be established by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings."  *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367 (Fed. Cir. 1996).  Legal error therefore constitutes an abuse of discretion.  *See id.*

## II

For clarity and precision, we address each of the individually enjoined activities separately. Those activities are (1) initiating new clinical trials for Lumryz, (2) offering open-label extensions in ongoing clinical trials, and (3) applying for FDA approval of Lumryz for IH. *See Stay Order*, J.A. 41.

### A. Initiating New Clinical Trials for Lumryz

In 1984, Congress enacted the Hatch-Waxman Act with one of its purposes being "mak[ing] available more low cost generic drugs." H.R. Rep. No. 98-857, pt. 1, at 14 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 2647, 2647. To that end, Congress created the safe-harbor provision, § 271(e)(1), "to establish that experimentation with a patented drug product, when the purpose is to prepare for commercial activity which will begin after a valid patent expires, is not a patent infringement." *Id.* at 45–46 (abrogating *Roche Prods., Inc. v. Bolar Pharm. Co.*, 733 F.2d 858 (Fed. Cir. 1984)). Congress determined that "experimental activity does not have any adverse economic impact on the patent owner's exclusivity during the life of a patent, but prevention of such activity would extend the patent owner's commercial exclusivity beyond the patent expiration date." *Id.* at 46 (also emphasizing that, upon patent expiration, "immediate competition should be encouraged"). As such, Congress provided that, "[i]n any action for patent infringement brought under [§ 271], *no injunctive or other relief may be granted* which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under [the safe-harbor provision, § 271(e)(1)]." 35 U.S.C. § 271(e)(3) (emphasis added).

The plain language and purposes of the Hatch-Waxman Act make it clear that enjoining Avadel from initiating new clinical trials for Lumryz (for IH or otherwise) until expiration of the '782 patent is unlawful and, therefore, an

abuse of discretion. That activity is statutorily non-infring-
ing under § 271(e)(1) and statutorily precluded from being
enjoined under § 271(e)(3). As the Supreme Court has ex-
plained, it is "apparent from the statutory text" that
§ 271(e)(1) "exempt[s] from infringement . . . all uses of pa-
tented inventions that are reasonably related to the devel-
opment and submission of *any* information under the
FDCA . . . necessarily includ[ing] preclinical studies of pa-
tented compounds that are appropriate for submission to
the FDA." *Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193, 202 (2005). The injunction prohibiting
Avadel from initiating new clinical trials is therefore over-
broad as a matter of law.

Resisting that conclusion, Jazz challenges that the safe
harbor provides an "affirmative defense" requiring factual
development that Avadel failed to plead or develop in the
district court such that it is waived. Jazz Br. 29–42. Jazz
argues, for example, that "Avadel presented no evidence
that each use of Lumryz in each future clinical trial" qual-
ifies for safe-harbor protection, and that "Avadel has not
proved . . . that its IH activities are *solely* for uses reason-
ably related to the development and submission of infor-
mation to the FDA." *Id.* at 45–47. We are unpersuaded.

Jazz is correct that, in some circumstances, reliance on
the safe harbor requires factual development. *E.g.*, *Amgen
Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1337 (Fed. Cir. 2019);
*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
96 F.4th 1347, 1353 (Fed. Cir. 2024). But that is because
applicability of the safe harbor typically arises in situations
where the patent owner alleges that certain past or current
activities of the defendant, activities that the defendant be-
lieves fall within the scope of the safe harbor, constitute
infringement. In those cases, then, there is a burden on
the defendant to establish *in fact* that the accused activities
are non-infringing under the safe harbor. And those cases
are resolved when the factfinder adjudicates that issue.

This case, however, is factually and procedurally unique in our safe-harbor jurisprudence. The subject of this appeal is not whether any current or former activities of Avadel with respect to Lumryz are infringing. Indeed, Avadel stipulated that its manufacture, use, and sale of Lumryz infringe the '782 patent. Avadel therefore does not invoke § 271(e)(1) as a defense to negate its own liability. Instead, Avadel's argument is that the district court's forward-looking injunction is unlawful on its face insofar as it necessarily enjoins Avadel from making, using, and selling Lumryz "solely for uses reasonably related to the development and submission of information" to the FDA, *i.e.*, noninfringing activities, in violation of § 271(e)(3). That *facial* challenge, contrary to Jazz's position, is a purely legal invocation of the safe harbor and does not require factual development.

We therefore reject Jazz's argument that Avadel waived its reliance on the safe-harbor provision. At most, Avadel forfeited its argument by unclearly developing it in the district court. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (explaining that a party forfeits undeveloped arguments on appeal). But we have discretion to consider forfeited arguments, *see In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020), and we exercise that discretion here where Avadel's argument turns entirely on a legal question.

What is more, Jazz has never alleged that any of Avadel's activities with respect to its future clinical trials are infringing. Therefore, there has never been an opportunity for Avadel to develop any facts to support a safe-harbor defense as to those activities, let alone sufficient facts to allow a factfinder to adjudicate that issue. Put simply, Jazz's argument that Avadel "presented no evidence that *each use* of Lumryz in *each future clinical trial*" qualifies for safe-harbor protection is premature. Jazz Br. 46 (emphases added). As we have explained, § 271(e)(3) "makes clear that *no* injunction may issue until the § 271(e)(1)

exception has been adjudicated and ruled out." *Eli Lilly & Co. v. Medtronic, Inc.*, 915 F.2d 670, 674 (Fed. Cir. 1990), *superseded by statute on other grounds as discussed in Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000). Thus, Jazz's additional argument that, even if initiating new clinical trials is non-infringing, the district court has discretion to "narrowly enjoin[]" non-infringing activities "as necessary to prevent infringing conduct," falls short. *See* Jazz Br. 57–60 (citing *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 890 n.9 (Fed. Cir. 2011) (en banc)). Although that may be true in other contexts, Jazz's argument cannot be squared with the plain language of § 271(e)(3), which leaves no room for such discretion here.

Accordingly, we reverse the district court's injunction prohibiting Avadel from initiating any new clinical trials for Lumryz as unlawfully overbroad. Reversal, as opposed to vacatur, is appropriate here where the enjoined activities have never been accused of infringement. As such, there is no support in the record to sustain a determination one way or the other on whether the safe-harbor provision applies to those activities. *Cf. Eli Lilly*, 915 F.2d at 674–75 (vacating permanent injunction that preemptively carved out § 271(e)(1) activities where merits case had been remanded for trial on the applicability of the safe harbor to those accused activities).

We do note that our conclusion does not necessarily leave Jazz without recourse. If Jazz comes to believe that Avadel is making, using, or selling Lumryz, a product adjudicated to be infringing, for uses other than those "reasonably related to the development and submission of information" to the FDA, Jazz is free to challenge those activities.[7] At that point, we agree that, to negate liability, it

---

    [7] We do not speculate which activities may, in light of the district court's refusal to enjoin Avadel from making,

may be "incumbent upon Avadel to plead" its entitlement to safe-harbor protection as to each of those accused activities. Jazz Br. 32. But to enjoin Avadel outright from those activities at this juncture, before they have been adjudicated to infringe, exceeds the bounds of the law.

### B. Offering OLEs in Ongoing Clinical Trials

Next, we consider the scope of the injunction insofar as it enjoins Avadel from offering OLEs to trial participants, including those currently enrolled in the ongoing REVITALYZ trial. *See Stay Order*, J.A. 41. As noted above, OLEs allow clinical trial participants to continue taking the drug after their trial participation is complete. *See* J.A. 7512. This may be done to maintain continuity of patient treatment and to "better characterize the safety of a drug late in its development." *Id.* (citing *Expanded Access to Investigational Drugs for Treatment Use—Questions and Answers*, U.S. Dep't of Health & Hum. Servs. (2017), https://www.fda.gov/media/85675/download). Pursuant to the district court's clarification of the injunction, *see Stay Order*, J.A. 41, Avadel cannot offer this OLE period to patients enrolled in the ongoing REVITALYZ trial. As such, those patients will be terminated from Lumryz treatment upon the end of their participation in the trial.

The parties debate extensively on appeal the nature of OLEs and whether Avadel's use of OLEs is an activity protected by the safe harbor. We do not comment on those arguments. Those arguments were not raised in the district court until Avadel's emergency motion to stay the injunction pending appeal. Therefore, the district court only addressed that activity in the context of clarifying the scope of the injunction—not whether those activities could or should be enjoined in the first place pursuant to the *eBay*

_____

using, or selling Lumryz for narcolepsy, be suitable for such a claim.

factors. Moreover, much like Avadel's activities related to its future clinical trials discussed above, whether Avadel's use of an OLE period is a safe-harbor activity is a question of fact that has not yet been accused, let alone adjudicated.

Accordingly, because this activity has never been accused of infringement, and because "[t]he statute clearly requires that the § 271(e)(1) issue be decided prior to the grant of injunctive relief," *Eli Lilly*, 915 F.2d at 674, we reverse the injunction insofar as it enjoins Avadel from offering OLEs to patients in clinical trials. Only if and when that activity is adjudicated to fall outside the protection of the safe harbor, and only if and when the district court finds the *eBay* factors to favor an injunction, may it be permanently enjoined.

### C. Applying for FDA Approval of Lumryz for IH

Finally, we consider whether the district court abused its discretion by enjoining Avadel from applying for FDA approval of Lumryz for any indication that was not part of its label as of March 4, 2024. For the following reasons, we vacate the injunction in this respect and remand.

Avadel argues that enjoining it from submitting an application for FDA approval of the IH indication constituted legal error because the Hatch-Waxman Act "makes clear that seeking FDA approval in and of itself is not infringing activity." Avadel Br. 24. Avadel's argument is two-pronged. First, it argues that "the mere submission of an FDA application" is not a "use" of a patented invention and therefore not an infringement under § 271(a). *Id.* Alternatively, it argues that, even if the submission is a "use," the safe harbor provides that "uses reasonably related to the . . . submission of information" to the FDA are non-infringing. *Id.* at 24–25. And because "[a]n application for FDA approval *is* a 'submission of information' to the FDA," that application is necessarily non-infringing. *Id.* at 25.

JAZZ PHARMACEUTICALS, INC. v.                    19
AVADEL CNS PHARMACEUTICALS, LLC

We agree that the submission of an application to the FDA is not infringement under § 271(a). That activity is not a making, using, offering to sell, selling, or importing of a patented invention. And because applicability of the safe harbor is dependent on there being a predicate infringing activity (indeed, absent an infringing act, there would be no need for safe-harbor protection), submitting an application for FDA approval is not an activity that triggers the safe harbor.

Although we need not reach Avadel's alternative argument that submitting an application to the FDA, even if it were an infringing "use," would be protected under the safe harbor, we briefly note that the argument rests on a misreading of the statute. The "solely for uses" clause of § 271(e)(1) *modifies* the infringing act—it does not define the infringing act itself. That is, the inquiry looks to the alleged infringing activity—the making, using, selling, offering to sell, or importing—and asks whether the purpose of *that* activity was "solely for uses reasonably related to the . . . submission of information" to the FDA. § 271(e)(1); *see Amgen*, 944 F.3d at 1339. It does not follow from the plain language that the "submission of information" itself is non-infringing under that provision.

But concluding that the submission of an application to the FDA is not infringement under § 271(a) does not end the matter because that activity *is* infringement under § 271(e)(2). That section, which neither party meaningfully addresses on appeal, provides:

> It *shall be an act of infringement to submit an application* under section 505(j) of the [FDCA] or described in section 505(b)(2) of [the FDCA] for a drug claimed in a patent or the use of which is claimed in a patent.

§ 271(e)(2)(A) (emphasis added). That language plainly states that the *submission* of an ANDA (under section 505(j) of the FDCA) or a paper NDA (under section

505(b)(2) of the FDCA for a drug claimed in a patent is an act of infringement.  That understanding is consistent with precedent (and our conclusion above) that such submissions are not *actual* acts of infringement under § 271(a) because they are not a making, using, or selling of the patented invention, but instead *artificial* acts of infringement that provide a basis for litigation.  *See Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) ("The act of infringement that gives rise to a case or controversy under section 271(e)(2) has been stated to be 'artificial,' in the sense that a specific infringing composition has not yet been made, used, or sold, and is thus not necessarily available for a court to compare to the claims." (quoting *Eli Lilly*, 496 U.S. at 677)).  Even Avadel admits that the submission of an ANDA under section 505(j) of the FDCA would be "an act of artificial infringement if the purpose of the submission is to obtain approval with respect to 'a drug claimed in a patent or the use of which is claimed in a patent.'"  Avadel Br. 24 n.7 (quoting § 271(e)(2)(A)).  Curiously, however, Avadel leaves out of its recitation of the statutory language that the submission of a paper NDA under section 505(b)(2) of the FDCA is also an artificial act of infringement when it is done for that purpose.  And that is where we observe a critical, unresolved, and unbriefed issue underlying the parties' arguments on appeal.

As noted above, Avadel's initial submission for approval of Lumryz for the treatment of narcolepsy was a paper NDA filed under § 505(b)(2) of the FDCA, 21 U.S.C. § 355(b)(2).  *See* J.A. 9255, 9267.  But because Jazz's '782 patent is not listed in the Orange Book, Avadel did not submit with its application a patent certification under § 355(b)(2)(A)(iv) (a "paragraph iv" certification) as to that patent, which would have given notice to Jazz of Avadel's FDA filing and entitled Jazz to a 30-month stay of the FDA's approval of that application upon the initiation of a lawsuit.  *See* § 355(c)(3)(C).  One way or another, even without that paragraph iv notice, Jazz learned of Avadel's filing

and brought its claim for infringement under 35 U.S.C.
§ 271(e)(2)(A), alleging that Avadel's submission of its pa-
per NDA constituted infringement.

At oral argument, Avadel argued for the first time that
its paper NDA for Lumryz would not trigger a claim for in-
fringement under § 271(e)(2) because the '782 patent is not
an Orange Book patent. *See* Oral Arg. 12:06–12:13 (coun-
sel for Avadel arguing that Avadel's supplemental NDA
would not trigger § 271(e)(2) because "there's no Orange
Book-listed patent, there's no paragraph iv certification
that would trigger [§ 271(e)(2)] infringement"). Thus, in
Avadel's view, it is not the *submission* of the paper NDA
itself that triggers infringement, but the accompanying *cer-
tification* giving notice to a patent owner of that submis-
sion.[8]  Put otherwise, Avadel argues that only applications
for FDA approval that require paragraph iv certifications
against Orange Book patents trigger infringement under
§ 271(e)(2). Avadel admitted at argument that that inter-
pretation of § 271(e)(2) is "not in the text necessarily," but
suggested that "the Supreme Court has read it to be." *See*
Oral Arg. 11:57–12:05 (not citing authority). Jazz does not
appear to have taken a firm position on this issue.

Avadel is incorrect in its assertion that it is the certifi-
cation relating to an Orange Book patent that constitutes

-------

[8]  We observe that this position may be consistent
with Avadel's answer to Jazz's original complaint, which
included an "Improper Hatch-Waxman Suit" defense, al-
leging that, based on Avadel's paper NDA for the narco-
lepsy indication, "Jazz is not entitled to any relief under
that Statute, including a permanent injunction pursuant
to 35 U.S.C. § 271(e)(4)(B)." J.A. 10381. But because this
dispute transformed into one arising under § 271(a)–(c)
mid-litigation, upon the FDA's approval of Lumryz, the
merits of that defense were never adjudicated.

the artificial act of infringement.  Section 271(e)(2) makes plain that it is the *submission* of the application, ANDA or paper NDA, that is the infringement.  Further, the statute provides that such submission is infringement if it seeks approval of "a drug claimed in *a* patent or the use of which is claimed in *a* patent."  § 271(e)(2) (emphases added).  The provision does not mention or otherwise appear to limit the act of infringement to only Orange Book patents.  Rather, its plain language would seem to render any ANDA or paper NDA submitted in the face of any existing patent that claims the applied-for drug or its use to be an act of infringement.

On the other hand, the placement of § 271(e)(2) within the context of the Hatch-Waxman Act suggests that the provision may only apply where the ANDA or paper NDA seeks approval of a drug claimed in an Orange Book patent. That interpretation would comport with Congress's intention of triggering litigation, after notice is given to a patent owner and regulatory approval is stayed, to hasten the introduction of generic drugs to the market if the relevant patents are found to be invalid or not infringed.  Indeed, portions of the legislative history of the Act suggest that Congress "expect[ed] that infringement actions . . . w[ould] only be brought in the instance described in section 271(e)(2), where a party submitting an [ANDA] *certifies* that a patent is invalid or non-infringed and *gives the required notice of that certification* to the patent owner." H.R. Rep. No. 98-857, pt. 1, at 46 (emphases added).  After all, we have not been made aware of any cases before or after the enactment of the Hatch-Waxman Act where a regulatory filing alone was held to be a patent infringement.

Nonetheless, as the issue was raised only at oral argument and not briefed, we leave it for the district court to address in the first instance on remand, if it remains contested.  But the resolution of that issue may be determinative in resolving the parties' dispute about the scope of the injunction.

If Avadel's submission of its paper NDA for Lum-ryz—for the treatment of IH or any other indication—is an act of infringement under § 271(e)(2), then the district court's injunction barring Avadel from seeking FDA approval of any new indications of Lumryz was unlawful. That is because the injunction exceeds the scope of the limited remedies available to a patent owner for that artificial act of infringement.  Specifically, under § 271(e)(4), "the only remedies" that would be available are: (1) an order setting the effective date of any FDA approval of Lumryz to be no sooner than February 18, 2036, the expiration date of the '782 patent; (2) an injunction preventing Avadel's *commercial* activities relating to Lumryz; and (3) damages for any of Avadel's past commercial activities relating to Lum-ryz.  § 271(e)(4)(A)–(C).[9]  None of those remedies permits a court to enjoin an adjudicated infringer from applying for additional FDA approvals of a patented drug.  To conclude otherwise would run afoul of not only the text of the statute, but also the precise purpose of the Hatch-Waxman Act to encourage "immediate competition" upon expiration of relevant patents.  H.R. Rep. No. 98-857, at 46.  If Avadel cannot apply for approval of Lumryz until after the '782 patent expires, Jazz will receive a *de facto* extension of patent term to which it is not otherwise entitled for the amount of time it takes the FDA to consider and grant that application.  *See Eli Lilly*, 496 U.S. at 676.

If, however, Avadel's submission of its paper NDA is *not* an act of infringement under § 271(e)(2), then the remedies available to Jazz are no longer limited by § 271(e)(4). In that case, it was not improper for the district court to

---

[9]   The fourth remedy specified in § 271(e)(4)(D) applies only to certain cases involving the Biologics Price Competition and Innovation Act of 2009, Pub. L. No. 111–148, §§ 7001–7003, 124 Stat. 119, 804–21 (2010).  Accordingly, it is not relevant here.

consider whether enjoining Lumryz from engaging in that activity was warranted based on a full consideration of the *eBay* factors. However, because that activity would not constitute infringement—under either § 271(e)(2) or § 271(a)—to properly enjoin that activity, the district court must have concluded that the injunction was *necessary* to prevent infringement. *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1367 (Fed. Cir. 1998) (explaining that an injunction may reach non-infringing activities, but that "[i]t is necessary . . . that the injunction *prevent infringement*" of a patent); *accord TiVo Inc.*, 646 F.3d at 890 n.9.

Here, the district court enjoined Avadel from seeking FDA approval of new indications because it found that "Lumryz's entrance into the IH market would undoubtedly cause Jazz to suffer significant injury." *Decision*, at *10. Unlike the narcolepsy indication, the district court explained, "Jazz's Xywav is the only FDA-approved treatment for IH," and therefore, "Avadel's entrance into the market would strip Jazz of a unique selling point critical to growing its reputation and goodwill." *Id.* That analysis is insufficient to support the injunction at issue here.

It well may be that Jazz would be irreparably harmed upon Lumryz's entrance into the IH market. But entitlement to an injunction requires a showing that there is a "causal nexus" between the alleged irreparable harm and the *enjoined activity*. *See Apple Inc.*, 735 F.3d at 1359–60 (explaining that a patentee must establish "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement"). Here, the only findings to support enjoining Avadel from seeking FDA approval relate to the harm Jazz would suffer if Avadel were to enter the market for the IH indication—not if Avadel were merely to apply for FDA approval of that indication. Although Avadel's ability to enter the market is, in part, dependent on Avadel seeking FDA approval, it does not follow that enjoining Avadel's application would be *necessary* to prevent infringement. *See Johns Hopkins Univ.*, 152 F.3d at 1367.

Future infringement, *e.g.*, commercialization of Lumryz for IH, can only occur if and when the FDA approves Lumryz for that indication. And any number of things may prevent that approval from ever arriving. Avadel may decide the financial investment in pursuing the approval does not comport with its business prospects. Clinical trials may fail. The district court's analysis is simply too speculative and tenuous to reasonably conclude from its findings that enjoining Avadel from applying for FDA approval is necessary to prevent future infringement.

For those reasons, we vacate the injunction insofar as it bars Avadel from submitting an application for FDA approval of any indication not part of Lumryz's approved product label as of March 4, 2024, and we remand to the district court. On remand, if the issue remains contested, the district court is instructed to consider in the first instance whether Avadel's submission of a paper NDA for an additional indication of Lumryz would be an act of infringement under 35 U.S.C. § 271(e)(2). If so, as discussed above, the district court must conclude that that activity cannot be enjoined. If, however, the district court determines that that submission would not be an act of infringement, the district court must address the *eBay* factors anew in accordance with this opinion before again enjoining that activity.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. We reverse the injunction to the extent it enjoins Avadel from initiating new clinical trials for Lumryz and from offering OLE periods to current clinical trial participants. We vacate the injunction to the extent it enjoins Avadel from seeking FDA approval for new indications of Lumryz, and remand to the district court for reconsideration of that issue in light of this opinion.

**REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**

C<small>OSTS</small>

The parties shall bear their own costs.

# EXHIBIT 68

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAZZ PHARMACEUTICALS, INC.,

    Plaintiff,

v.

AVADEL CNS PHARMACEUTICALS, LLC,

    Defendant.

C.A. No. 21-691-GBW

## ORDER AND JUDGMENT

WHEREAS, the Court has reviewed the parties' filings related to Defendant Avadel CNS Pharmaceuticals LLC's ("Avadel") renewed motion for judgment on the pleadings (the "Renewed Motion", D.I. 117) with respect to its counterclaim seeking delisting of Plaintiff Jazz Pharmaceuticals, Inc.'s ("Jazz") U.S. Patent No. 8,731,963 ("the '963 patent") from the FDA publication, "Approved Drug Products with Therapeutic Equivalence Evaluations" ("the Orange Book"); and

WHEREAS, the Court issued a Memorandum Opinion concluding that Avadel is entitled to an Order requiring Jazz to delete the patent information from the Orange Book because the '963 patent does not claim either "the drug for which the application was approved" or "an approved method of using the drug" consistent with 21 U.S.C. § 355(c)(3)(D)(ii)(I).

THEREFORE, IT IS HEREBY ORDERED, that Avadel's Renewed Motion is GRANTED.

IT IS FURTHER ORDERED that, within fourteen (14) days from the date of this Order, Jazz is directed by mandatory injunction under 21 U.S.C. § 355(c)(3)(D)(ii)(I) to submit to the

FDA a request enclosing this Order to delete the '963 patent from the Orange Book entry for Xyrem®;

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of Avadel and against Jazz on Count III of Avadel's Answer to Complaint for Patent Infringement, Defenses, and Counterclaims (D.I. 11).

SO ORDERED this 18th day of November, 2022.

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT 69




# U.S. FOOD & DRUG
## ADMINISTRATION

Office of Orphan Products Development
Food and Drug Administration
WO32- 5295
10903 New Hampshire Avenue
Silver Spring, MD  20993

JAN 0 8 2018

The Weinberg Group Inc.
1129 Twentieth St., NW, Suite 600
Washington, DC  20036

Attention:    Marla Scarola, MS
              Senior Consultant
              marla.scarola@weinberggroup.com

Re: Designation request # DRU-2016-5302
    Amendment dated:        October 13, 2017
    Amendment received:     October 13, 2017

Dear Ms. Scarola:

This letter responds to your amended request submitted on behalf of Flamel Ireland Limited for orphan-drug designation of sodium oxybate for extended-release oral suspension for "treatment of cataplexy and excessive daytime sleepiness in narcolepsy."

Pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bb), your orphan-drug designation request of sodium oxybate extended-release oral suspension is granted for *treatment of narcolepsy*.  Please note that the designation granted is broader than the indication proposed in your designation request

Our decision to grant designation is based on the *plausible hypothesis* that your drug may be clinically superior to the same drug(s) already approved for the same indication because your drug may be more safe due to the ramifications associated with the dosing regimen for the previously approved sodium oxybate in treating patients with narcolepsy.  *See* section 527 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360cc) and 21 CFR 316.3(b)(3) (defining "clinically superior"); *and see* 21 CFR 316.3(b)(14) (defining "same drug" in this context).  Our determination that this hypothesis is plausible does not suggest that this is the only plausible hypothesis for your drug to be clinically superior to any same drug(s) already approved for the same indication.

FDA-Jazz-000836

The Weinberg Group Inc.                                                                          2

In order to obtain orphan-drug exclusivity upon approval, you will need to demonstrate that
your drug is clinically superior to any already approved version of the same drug for the
same indication.  Failure to demonstrate clinical superiority over the already approved same
drug(s) will result in your drug not receiving orphan-drug exclusivity.  *See* 21 CFR
316.34(c).  The demonstration of clinical superiority does not need to substantiate the
precise hypothesis upon which we based this designation, but instead may demonstrate
clinical superiority any way that meets the statutory definition.

If your drug receives marketing approval for an indication broader than what is designated,
it may not be entitled to exclusive marketing rights under section 527 (21 U.S.C. 360cc).
Therefore, prior to submission of your marketing application, we request that you compare
the drug's orphan designation with the proposed marketing indication and submit additional
information to amend the orphan-drug designation if warranted.  21 CFR 316.26.

You must submit to the Office of Orphan Products Development a brief progress report of
drug development within 14 months after this date and annually thereafter until marketing
approval.  21 CFR 316.30.

Please notify this Office within 30 days of submitting a marketing application for the drug's
designated use.  Once your marketing application is approved, please contact Jeffrey
Fritsch, RPh at 301-796-8682 or alternatively at 301-796-8660 to assess eligibility for
orphan-drug exclusivity.

If you have questions regarding the development of your designated product, please feel
free to contact Gumei Liu, MD, PhD, at 301-796-0495 or alternatively at 301-796-8660.
Congratulations on obtaining your orphan-drug designation.

Sincerely,

Debra Y. Lewis, OD, MBA
Acting Director
Office of Orphan Products Development

# EXHIBIT 70

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 71

**S&P Global**
Market Intelligence

# Jazz Pharmaceuticals plc NasdaqGS:JAZZ FQ4 2015 Earnings Call Transcripts

## Tuesday, February 23, 2016 9:30 PM GMT

## S&P Global Market Intelligence Estimates

| | -FQ4 2015- | | | -FQ1 2016- | -FY 2015- | | | -FY 2016- |
|---|---|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS |
| EPS Normalized | 2.60 | 2.60 | ●0.00 | 2.48 | 9.53 | 9.52 | ▼(0.10 %) | 11.42 |
| Revenue (mm) | 349.83 | 340.88 | ▼(2.56 %) | 347.80 | 1334.32 | 1324.80 | ▼(0.71 %) | 1533.15 |

Currency: USD
Consensus as of  Feb-22-2016 12:28 PM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| | - EPS NORMALIZED - | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| FQ1 2015 | 2.15 | 1.99 | ▼(7.44 %) |
| FQ2 2015 | 2.41 | 2.41 | ●0.00 % |
| FQ3 2015 | 2.56 | 2.52 | ▼(1.56 %) |
| FQ4 2015 | 2.60 | 2.60 | ●0.00 % |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................................... | 3 |
| Presentation | ................................................................................... | 4 |
| Question and Answer | ................................................................................... | 10 |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

**EXECUTIVES**

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

**Katherine A. Littrell**
*Vice President of Investor Relations*

**Matthew P. Young**
*Executive VP & CFO*

**Michael P. Miller**
*Executive Vice President of US Commercial*

**Russell J. Cox**
*Former Executive VP & COO*

**ANALYSTS**

**Ami Fadia**
*UBS Investment Bank, Research Division*

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**David A. Amsellem**
*Piper Jaffray Companies, Research Division*

**David George Buck**
*Northland Capital Markets, Research Division*

**David William Maris**
*BMO Capital Markets U.S.*

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

**Gregory Daniel Fraser**
*BofA Merrill Lynch, Research Division*

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

**Jason Matthew Gerberry**
*SVB Leerink LLC, Research Division*

**Jessica Macomber Fye**
*JP Morgan Chase & Co, Research Division*

**John Thomas Boris**
*SunTrust Robinson Humphrey, Inc., Research Division*

**Kenneth Charles Cacciatore**
*Cowen and Company, LLC, Research Division*

**Liav Abraham**
*Citigroup Inc, Research Division*

**Louise Alesandra Chen**
*Guggenheim Securities, LLC, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

## Operator

Good day, and welcome to the Jazz Pharmaceuticals plc Full Year and Fourth Quarter 2015 Earnings Conference Call. [Operator Instructions] As a reminder, this call is being recorded.

I will now turn the call over to Kathee Littrell, Head of Investor Relations at Jazz Pharmaceuticals.

## Katherine A. Littrell
*Vice President of Investor Relations*

Thank you, Cath, and thank you for joining our Investor Call. Today, we reported our fourth quarter and full year financial results and 2015 financial guidance in a press release. The release and the slide presentation accompanying this call are available on the Investors section of our website.

With me for today's call are Bruce Cozadd, Chairman of the Board and CEO; Matt Young, our Chief Financial Officer; Russ Cox, our Chief Operating Officer; Mike Miller, our Head of U.S. Commercial; and Karen Smith, Global Head of R&D and Chief Medical Officer. Following some remarks, we'll open the call for your questions.

I'd like to remind you that some of the statements we will make on this call relate to future events and future performance rather than historical facts and are forward-looking statements. Examples of forward-looking statements include statements related to our 2016 financial guidance and goals; future product sales and volume due to regulatory, litigation and intellectual property-related events; clinical trials and other product development activities; our commercial goals and initiatives, including the potential approval of our NDA for defibrotide and commercial launch of defibrotide in the U.S.; our corporate development efforts and the timing of such events and activities.

These forward-looking statements involve numerous risks and uncertainties that could cause actual events, performance and results to differ materially. These risks and uncertainties are identified and described in today's press release, the slide presentation accompanying this call and under Risk Factors in our Form 10-Q for the quarter ended September 30, 2015, and our Form 10-K for the year ended December 31, 2015, that we expect to file shortly. We undertake no duty or obligation to update any forward-looking statements we make today.

On this call, we will discuss several non-GAAP financial measures, including historical and expected 2016 adjusted net income attributable to Jazz Pharmaceuticals and the related per-share measures and historical and expected 2016 adjusted SG&A and R&D expenses. We believe that these non-GAAP financial measures are helpful in understanding our past financial performance and potential future results. They are not meant to be considered in isolation or as a substitute for comparable reported GAAP measures. Reconciliations of GAAP to non-GAAP financial measures discussed on this call are included in today's press release and the slide presentation accompanying this call. Both are posted in the Investors section of our website.

I'll now turn the call over to Bruce.

## Bruce C. Cozadd
*Co-Founder, Chairman & CEO*

Good afternoon, everyone, and thank you for joining us. Our solid progress as a company in 2015 has positioned us well for 2016 and beyond. In 2015, we grew both our top and bottom line, consistent with guidance, and also made important progress on a number of fronts. We've implemented our approved REMS for Xyrem, realigned our European team to focus exclusively in hematology and oncology, launched our Phase III program for JZP-110 and completed our NDA submission for defibrotide.

With our guidance today, you can see that we plan to grow our top and bottom line nicely again in 2016 while advancing our development pipeline in meaningful ways. Our PDUFA date on our defibrotide NDA is

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

next month, and this year, we plan to start a clinical trial of defibrotide in prevention of VOD in high-risk patients, complete enrollment in our study of Xyrem in pediatric patients and complete enrollment in, and see top line data from, our JZP-110 program. And we are well positioned to broaden our business through corporate development, with a strong balance sheet, significant cash and overall market valuations that are more conducive to transactions that we generate strong returns. Current market conditions are also allowing us to repurchase stock under our existing $300 million stock repurchase program at extremely attractive prices.

In short, we're well positioned to deliver results in 2016 that we believe will generate increased shareholder value.

I'll now update you on key commercial, legal, regulatory and clinical development activities during the fourth quarter, highlight some key events that we expect in 2016 and then turn the call over to Matt to review our financial results for the quarter and full year and provide 2016 financial guidance.

Let me start my comments with our SLEEP therapeutic area and our lead product, Xyrem.

In 2015, we continued to see strong underlying organic demand for Xyrem. In the fourth quarter, the average number of active Xyrem patients grew to a record 12,550. During the fourth quarter of 2015, Xyrem bottle growth was negatively impacted by the operational disruptions to central pharmacy, resulting in approximately 1% growth compared to the strong fourth quarter of 2014. Volume growth during the first half of 2015, prior to the REMS implementation in late August, was approximately 10% compared with the same period of 2014, while our full year 2015 volume growth was 6%. By the end of 2015, our operational metrics at the central pharmacy had returned to normal, and we expect high single-digit volume growth this year.

As expected, in the increasingly complex managed care environment for the Specialty Pharmaceuticals category, we observed further increases in the rate of Xyrem prior authorizations and reauthorizations during 2015 and are seeing further increases in reauthorizations in early 2016. These prior auths and reauths lead to an increased workload for physician offices and the central pharmacy. However, we are pleased that high reimbursement approval rates for patients remain steady. We believe that the central pharmacy is prepared to handle the increased prior authorizations and reauthorizations, including typical first quarter payer churn, as a result of significant improvements in central pharmacy processes and increased staffing put in place during the second half of 2015.

Turning now to key Xyrem growth opportunities. We believe that we have an opportunity to further penetrate our physician dates by targeting health care providers with high narcolepsy diagnoses and low utilization of Xyrem; educate health care providers on the early recognition, diagnosis and treatment of narcolepsy, including use of tools like the Swiss Narcolepsy Scale, help diagnose narcolepsy with cataplexy; enhance patient and health care provider office services in this increasingly complex reimbursement environment; and continue to provide unbranded, web-based disease awareness to increase the diagnosis of narcolepsy in the U.S.

Turning to a brief legal and intellectual property update on Xyrem. Patent litigation continues in the District Court in New Jersey. No trial dates have been set in any of the cases. We anticipate the trial of a portion of the case against the first filer, Roxane Laboratories, would not occur any earlier than the second quarter of 2016.

Activity on challenges to our patents with U.S. Patent and Trademark Office Patent Trial and Appeal Board, or PTAB, is continuing. In July 2015, PTAB instituted proceedings for inter partes review, or IPR, on 6 of our distribution patents listed in the Orange Book for Xyrem. And we expect the decision for PTAB on those petitions in mid-July 2016.

Additional IPR petitions challenging certain of our distribution, method of use and formulation of patents covering Xyrem have also been filed, but PTAB has not yet ruled on institution of those proceedings. For further details, please see our 2015 Form 10-K which we will file shortly.

Now turning to our development program for JZP-110. We are enrolling patients in the Phase III safety and efficacy studies, and we expect the preliminary efficacy results from the 3 of our Phase III studies in

narcolepsy and in obstructive sleep apnea will be available at the end of 2016. Subject to these results, we anticipate submitting an NDA next year.

We plan to enroll other studies to support the NDA during 2016, including a planned study of driving performance in narcolepsy and OSA that we expect to begin this quarter.

Studying the effects of JZP-110 on driving performance will allow for assessment of potential impairments and improvement in patient populations where there are known increases in accident risks relative to people with the same age and gender who do not have a sleep disorder.

We also expect to present our human abuse liability results mid-year, and we'll provide more detail once the relevant meetings are confirmed.

Now on to Erwinaze. We continue to believe that Erwinaze has the potential to help more patients in the adolescent and young adult population with acute lymphoblastic leukemia, as more adult oncology centers are using pediatric-inspired asparaginase protocols for the treatment of some of their ALL patients. We also saw additional adult accounts for Erwinaze for the first time in 2015.

In 2016, the sales force will focus on educating new physicians who are treating adolescents and young adult patients with ALL to reinforce the impact of asparaginase-based protocols on patient outcomes. We continued our support in medical education through CME symposia at the American Society of Hematology in December where the session focused on adult ALL.

As part of our preparation for potential defibrotide U.S. launch, we completed hiring and training our hematology/oncology sales force, increasing from 25 to 35 representatives, and adding to the depth of our experience in the transplant setting. The 10 new sales representatives entered near Erwinaze territories as of January 1.

The hematology/oncology sales force is prepared to sell both Erwinaze and defibrotide, following FDA approval of defibrotide in the U.S.

We continue to observe strong Defitelio volume growth in the EU and are pleased to see better-than-expected usage of Defitelio in countries such as France and Italy where we do not currently have centralized reimbursement.

Our efforts in the EU are focused on providing medical education, an early identification of the warning signs of veno-occlusive disease, or VOD; VOD pathophysiology; appropriate diagnosis; and the importance of prompt treatment with Defitelio.

Our PDUFA date is March 31, and we are well-prepared for our planned launch of defibrotide in the U.S. after FDA approval of our NDA. Our initiatives were focused on increasing the timely recognition of VOD and educating health care providers on the importance of treatment with defibrotide.

In preparation for our planned U.S. launch, we had a strong presence at the American Society of Hematology Meeting in December with multiple abstract presentations; have medical science liaisons available to address defibrotide questions upon request; submitted the new technology add-on payment application for defibrotide to CMS; published pivotal data in blood last month; provided training to our hematology/oncology sales representatives; and had a strong presence at the American Society of Bone Marrow Transplant Meetings this past weekend. Our reimbursement account managers, who will focus on ensuring that key hospital decision-makers such, as P&T committees, have an understanding of defibrotide's clinical value and understand the importance of rapid formulary approval to ensure patients have access to defibrotide in the EU. [ph]

And importantly, they will also provide disease education to payers.

In summary, in 2016, we look forward to delivering on key financial, commercial and R&D goals that have the potential to drive significant value creation moving forward. In 2016 and beyond, we will continue to invest in our key products, Xyrem, Erwinaze and Defitelio and product candidate, JZP-110, as we pursue life cycle management and line extensions that have the potential to generate important new therapeutic options for patients and expand our business.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And we remain enthusiastic about opportunities to further enhance and diversify our portfolio through corporate development activities.

Matt, let me now turn the call over to you.

**Matthew P. Young**
*Executive VP & CFO*

Thanks, Bruce, and good afternoon, everyone. We are pleased with our continued growth and strong performance in 2015 compared to 2014, as total revenues increased by 13% and adjusted net income and EPS attributable to Jazz increased by 15%. The growth in 2015 was driven primarily by higher sales of Xyrem.

Total net revenues of $1.32 billion for the full year 2015 and adjusted EPS of $9.52 per share were consistent with expectations, while GAAP EPS of $5.23 per share was below the guidance we gave on November 9, 2015, primarily due to the increase in GAAP SG&A expenses related to a onetime charge for settlement of a contract claim originally asserted against Azur Pharma Public Limited Company prior to the 2012 merger between Azur and Jazz.

For 2016, we expect strong top and bottom line growth, driven by revenue from Xyrem, Erwinaze, Defitelio in the EU and a product launch of defibrotide in the U.S. We anticipate total revenues for 2016 to be in the range of $1.49 billion to $1.55 billion, up 12% to 17% from 2015.

Net sales of Xyrem for 2015 were $955 million, up 23% from $779 million in 2014. Net sales of Xyrem for the fourth quarter of 2015 were $252 million, up 13% from $223 million in the same period of 2014.

Our Xyrem net sales guidance for 2016 is in the range of $1.095 billion to $1.13 billion, representing expected growth of 15% to 18%. This guidance reflects the recent price increase of approximately 9% and our expectation of high single-digit volume growth during 2016.

As we look forward to 2016, I'll remind you that there is a fourth quarter to first quarter pattern that we see in Xyrem volumes related to payer churn in the industry and higher gross to net adjustments that typically occur in the first quarter.

Turning to Erwinaze. Worldwide net sales for 2015 were $203 million, up 2% compared to net sales of $200 million in 2014. Net sales of Erwinaze for the fourth quarter of 2015 decreased by 4% to $50 million compared to $53 million in the same period of 2014.

Foreign exchange rates negatively impacted Erwinaze net sales by approximately $1 million and $7 million for the fourth quarter and full year 2015, respectively.

During the fourth quarter, we experienced Erwinaze supply challenges that required us to work with our distributors to prioritize getting drug to patients who had been prescribed Erwinaze. In the U.S., fourth quarter volume increased approximately 7% compared to the prior year. In the fourth quarter of 2015, sales of Erwinaze were lower in the third quarter due to our supply challenges that led to depletion of inventory at McKesson compared to our anticipated fourth quarter increase in net inventory level.

While we replenished inventory early in the first quarter of 2016, we expect that inventory may be depleted again from time to time this year and that inventory levels will continue to fluctuate. We will need to continue to proactively manage to supply and meet product demand.

For 2016, we expect Erwinaze net sales in the range of $200 million to $225 million. Our 2016 guidance has taken into account our 3% price increase in late January in the U.S., our fluctuations in inventory from supply challenges and our intent to resupply McKesson to its standard inventory level by the end of the year.

Defitelio net sales for 2015 were $71 million, down 4% from $73 million in 2014 on a pro forma basis. Net sales of Defitelio for the fourth quarter of 2015 were $18 million, a slight decrease from 2014. Foreign exchange rates negatively impacted Defitelio net sales by approximately $3 million and $14 million for the fourth quarter and full year 2015, respectively.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

However, product sales volume was strong and consistent with our guidance assumptions.

For 2016, we expect Defitelio defibrotide net sales in the range of $100 million to $125 million. This guidance assumes the approval of Defitelio occurs in the U.S. on the FDA PDUFA date of March 31, 2016.

Turning to Prialt. Net sales for 2015 and 2014 were $26 million. Net sales of Prialt for the fourth quarter of 2015 decreased to $6 million compared to $10 million in the same period of 2014, primarily due to the timing of shipments to Eisai Co., the European distributor of Prialt.

Turning to operating expenses. Adjusted SG&A expenses for 2015 were $355 million or 27% of revenue compared to $321 million, also 27% of revenue in 2014.

Adjusted SG&A expenses for the fourth quarter of 2015 were $87 million or 26% of revenue compared to $83 million or 25% of revenue in the same period of 2014. The increase in adjusted SG&A in both periods was primarily due to higher headcount and other expenses resulting from the expansion of our business.

For 2016, our adjusted SG&A expenses are expected to be within the range of $390 million to $410 million or 25% to 27% of 2016 revenue guidance.

Adjusted SG&A expenses are expected to increase, primarily due to investments in the planned launch of Defitelio in the U.S. and in Xyrem and our central pharmacy services as well as expected increases in litigation and other business-related expenses.

Also, I will remind you that when we look at fourth quarter to first quarter adjusted SG&A trends, our adjusted SG&A expenses have historically increased due to our typical pattern of spending during the first quarter, and in 2016, will also include the Defitelio launch expenses in the first quarter.

Adjusted R&D expenses for 2015 were $97 million or 7% of revenue compared to $72 million or 6% of revenue for 2014.

Adjusted R&D expenses for the fourth quarter of 2015 were $26 million or 8% of total revenues compared to $21 million or 6% of revenues for 2014.

The increase in R&D expenses was due primarily to higher costs of clinical studies and outside services for the development of new product candidates and line extensions for the company's existing products.

For 2016, our adjusted R&D expenses are expected to increase and be in the range of $115 million to $130 million or approximately 7% to 9% of 2016 revenue guidance.

R&D expenses are expected to increase, primarily due to continued investment into the late-stage clinical development program for JZP-110, including exploring additional new indications; evaluation of Xyrem in pediatric narcolepsy; other activities related to the potential development of options for narcolepsy patients that would provide clinical meaningful improvements compared to Xyrem, including once-nightly dosing; development of defibrotide in the prevention of VOD and exploration of potential additional new indications; as well as our efforts in life cycle management or line extensions for Erwinaze.

Our adjusted non-GAAP effective tax rate for 2016 is expected to be similar to our 2015 rate.

We anticipate our 2016 non-GAAP adjusted EPS to be in the range of $10.90 to $11.30 per share, which represents growth of 14% to 19% compared to 2015.

In 2015, the company spent $62 million repurchasing shares at an average cost of $150.24 per ordinary share, leaving us with approximately $260 million remaining under our current share repurchase program.

As of December 31, 2015, the outstanding principal balance of the company's long-term debt was $1.3 billion, and cash and capital equivalents were $989 million.

Our main uses of cash during the fourth quarter included repayment of the revolving credit facility balance of $80 million in October and repurchase of $40 million of ordinary shares under the share repurchase program.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our cash and cash equivalents, together with our undrawn capacity under the revolving credit facility, total over $1.7 billion.

We're confident in our ability to pursue corporate development initiatives that pivot our strategic criteria in 2016. We are focused on opportunities that have the potential to deliver long-term growth and returns to our shareholders. All the while, we remain focused on our mission of delivering meaningful products to patients.

In closing, 2015 was a solid year for Jazz Pharmaceuticals, and we expect to continue our positive momentum into 2016 with our planned U.S. launch of Defitelio, growth from key products, investments and continued advancement of our clinical development pipeline and pursue the strategic corporate development opportunities.

Thank you for joining us on the call today, and I'll now ask Kathee to make a brief comment about our Q&A session.

**Katherine A. Littrell**
*Vice President of Investor Relations*
Thank you, Matt. [Operator Instructions] With that said, I'll turn the call back to the operator to open up the line for your questions today.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from the line of David Amsellem with Piper Jaffray.

**David A. Amsellem**
*Piper Jaffray Companies, Research Division*

So I had a question on defibrotide. I wanted to get your early thoughts on how you think the payer landscape in the U.S. will evolve regarding early intervention in VOD. And I guess the broader question is how should we think about the potential for restrictive environment here versus what you had experienced early on in Europe.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Let me have Mike address that.

**Michael P. Miller**
*Executive Vice President of US Commercial*

Sure. This is Mike Miller. With regard to the payer landscape with defibrotide, the commercial payers themselves contract with the institutions due to the bone marrow transplant on a rate -- contract rate basis. So we do not anticipate step-ins by payers on the use of the drug. Where I do think we have to make our valid clinical arguments to the merit of the drug is in the institutions and in the clinical practice. And it has to be established that this is a condition with high mortality. This is a very expensive sequelae of bone marrow transplant that can run into hundreds of thousands of dollars to these patients that end up in ICU. So I think our health economic and outcome research data will help us a lot in that regard. And we feel very good going into that environment.

**Operator**

Our next question comes from the line of Jessica Fye with JPMorgan.

**Jessica Macomber Fye**
*JP Morgan Chase & Co, Research Division*

It's -- can you refer to the stock buyback in your prepared remarks. I guess, with the stock price down here, how do you weigh potentially aggressively buying in your own shares versus keeping some dry powder for future business development?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, Jessica, great question. Because they're both great opportunities for us. Buying back our stock at these levels is not an opportunity we necessarily would have thought we would have had going back a number of months, and we believe is a pretty attractive thing for us to do for our shareholders. But we've been very clear that our priority is to diversify our current and long-term portfolio through activity on the corporate development front. And as attractive as it is to buy our stock at these levels, it's also true that other valuations pull back in the market, and that makes the returns we think we can earn on smart corporate development investments also very attractive to us. So it's a balance. The $300 million stock repurchase program that we announced in November is something that we, in general, intended to spend over a couple of years. But I will say that these prices will probably be a little more aggressive at taking advantage of that. But I think you've heard in Matt's comments in terms of our balance sheet, our cash, our undrawn revolvers, and of course, we believe we've got capacity beyond that, that we do feel we're also well positioned in terms of capacity on the core dev front.

**Operator**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question comes from the line of David Buck with Northland Capital Markets.

**David George Buck**
*Northland Capital Markets, Research Division*

First one is on revenue before -- Bruce, on defibrotide, can you talk a little bit about what type of access you'd be expecting from -- beyond the patients that you've sort of identified already? How quick of a ramp would you expect for that line item? And what type of volume growth you embedded in Europe? And just a quick one, if I could sneak it in. Any gross-to-net changes that you're assuming for 2016? And can you give me a quick update on once-nightly potential for sodium oxybate?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Thank you for that one question. [indiscernible]. So on defibrotide, let me just put that question into 2 pieces on sort of how we think about initial uptake in the U.S. given that we have had a treatment IND open for some time. And then maybe I'll separate out and have Russ talk about volume growth in Europe a little bit. Mike, you want to take the first part?

**Michael P. Miller**
*Executive Vice President of US Commercial*

Sure. So the first and most important strategic imperative we have for the launch is to educate around VOD. While the IND, the TIND study, was useful and getting practice on some of these sites, VOD is underdiagnosed. And as a result, many people die of VOD, that shouldn't. So we have, I think, a challenge in front of us in terms of education. We look forward to that. We've tested messaging, and we think that the audience was quite receptive.

**Russell J. Cox**
*Former Executive VP & COO*

Yes, as it relates to Europe, we've seen a number of countries that continue to grow well. We've seen a fair amount of variability from the time that we launched from today. It started initially more in sort of severe VOD, and you can kind of see physicians now moving more towards early treatment. And so I think that the same will hold true in terms of the way that initially you'll see uptake in the U.S. So maybe I'll have Matt talk about gross-to-net.

**Matthew P. Young**
*Executive VP & CFO*

David, on the gross-to-net for U.S. sales, principally, obviously we're talking about Xyrem, we're not seeing any meaningful changes this year. We did, as I will remind people, have some positive trending in gross-to-net over the last couple of years, but I'd expect that to be based generally on payer mix working very slightly against to sort of neutral this year. Erwinaze, I think we will continue to see some increased 3 quarters [ph] of utilization and, as a result, some incremental increase in gross-to-net there, though much less severe than last year where that was a much more meaningful move. And then we'll see a little bit of a headwind there also pick up as it relates to Prialt, but relatively marginal.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And then on once-nightly sodium oxybate, nothing in particular to disclose at this point. Just as a reminder, we've got several initiatives moving forward around potential better treatment options for patients with narcolepsy. And it is certainly possible we will have more to say later this year. Obviously, that depends on how things go, but nothing to say at this point.

**Operator**

Our next question comes from the line of Ken Cacciatore with Cowen and Company.

**Kenneth Charles Cacciatore**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

*Cowen and Company, LLC, Research Division*

Just a question around your commentary surrounding the Xyrem litigation. I just want to clarify, Bruce, did you say that we may get litigation in Q2? And then also, just looking to hear you kind of talk aloud about the confluence of -- if a trial was to start before you start to get ruling for the PTAB, how all of that gets factored into trying to strike an agreement and if an agreement could be reached? Just the timing would seem odd and difficult. And maybe you could help square that away in our head.

### Bruce C. Cozadd
*Co-Founder, Chairman & CEO*

Yes. So I did say that the first piece of Xyrem litigation could go to trial essentially no earlier than the second quarter. That doesn't mean it will happen in second quarter, but no earlier than the second quarter. And in terms of the confluence of events, this is a complex situation, as we've been talking about for many years, a significant amount of IP with 20 patents covering Xyrem, 3 different patent families; multiple ANDA filers; litigation bifurcated in the multiple cases and multiple pieces; IPR challenges, some of which have been picked up, some of which haven't; some regulatory complexity around, whether there'll be a single-shared REMS or whether FDA will consider a waiver REMS and how that would be comparable and whether that might also fall within some of our IP. We also, of course, are working on multiple development programs to come up with a better product. So there are a lot of pieces here. And I appreciate your question about how would that affect the potential for a business resolution or some sort of settlement agreement at any point you're specifically asking as we approach a trial. I don't think that prevents us from going that route. That's one route we could go, not the only route we could go. And I think, historically, we've said that settlement is something we'd consider. We thought that was in the best interest of our shareholders. And that in terms of timing of that, in our industry generally, not that I can promise anything with this case, but in our general -- industry generally, those settlements tend to occur as you get closer to or, in fact, into trial.

### Operator

Our next question comes from the line of Louise Chen with Guggenheim.

### Louise Alesandra Chen
*Guggenheim Securities, LLC, Research Division*

So curious, what has held you back on deals? Is it valuation or lack of the right opportunity? And also, how do you think about M&A versus other capital allocation strategies now that the market doesn't necessarily reward companies for a large transformational deal?

### Bruce C. Cozadd
*Co-Founder, Chairman & CEO*

Sure. I think, we -- Louise, we think about it basically the same way we always have, which is we're looking for differentiated products that do a lot for patients. And with that, we expect to be able to grow those products over time, to invest in developing those products hopefully for broader use as we're seeing with JZP-110 and defibrotide and ultimately, to build franchises around them. That we believe, could generate attractive margins and allow us to build a durable business. So as far as what has held us back, obviously, last -- we've seen a relatively meaningful shift in valuations from last year, where we'd say while there was some confounding of getting things done in that environment, we did see and pursue many opportunities during that period of time. And whether it be valuations or, in some cases, waiting for an evolution in the dialogue thus an event to move us in the right direction, we are often looking at situations for a long period of time before they come to fruition as we -- some of the deals we have completed in the past. So really, for us, not much has changed, and we continue to see a great dashboard of opportunities in front of us today that continue to range from smaller to larger. And as it relates to immediate stock price reactions that was never really the driver for us anyway, I think we're focused on it if there are very good deals for our shareholders, then ultimately, we'll be able to build or will turn around that.

### Operator

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question comes from the line of Jason Gerberry with Leerink.

**Jason Matthew Gerberry**
*SVB Leerink LLC, Research Division*

Just had a quick question regarding the operating margin profile of the business. I think you're kind of creeping upwards to 60% on an EBIT margin profile, which is relatively higher relative to industry peers. And can you just walk us through how you think about the up margin profile of this business in the next few years, just assuming no external transactions are done. And in the step-up in R&D, is that mainly JZP-110 or at the Xyrem life cycle management albeit a part of the R&D cost step-up?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. So Jason, let me make some general comments. I'll hand your specific question about R&D over to Matt. As I think about our operating margins going forward, we've seen gross margin generally drift upward a little bit, but I would also say cost of goods is not a big driver of our cost structure. And I think, particularly as we look at challenges around Erwinaze supply had probably traded a little margin for better continuity of products, just making sure we can do what's right by patients. So while in general, I would say gross margins are probably trending in the right direction, I'm not sure that's a big, strategic imperative for us. On the SG&A and the R&D side, we're trying to make good investment decisions based on generating return for our shareholders. And a few places we've consciously increased expenses I think makes sense for us, as we look at SG&A expense is going up a little bit as we prepare for a U.S. launch of what we think is an important new product, we're pretty excited about making that investment. I will say we're a little less excited about the legal expense we're incurring, but we also think it's a very strategic investment for us. So some of the places we're driving increased investments we're confident are the right thing to do for our business, although as Matt ran you through the numbers, in general, SG&A spending as a percentage of total revenue is actually maybe coming down a little bit. R&D, we've been very clear, I think, with everybody that we expect R&D spend as a percentage of top line to go up over time. Now that's going up to the extent we've got value-creating programs we're ready to invest in. JZP-110 is obviously in that phase regarding any commitment to do the next defibrotide trial that we also think is really important. And honestly, I hope we're back to you with other programs or other indications for existing molecules that we feel really good about investing in, too. I don't think that increase, as a percentage of top line, is going to be sudden or dramatic of the trend. I think is we'd like to be in a position to have them more visible valuable product pipeline that our investors can evaluate as part of our long-term growth potential. So Matt, maybe I can have you comment on specifically what's driving the increase in R&D in 2016.

**Matthew P. Young**
*Executive VP & CFO*

Sure. Yes, Jason, the largest part is increases around JZP-110. Recall we talked about that being a roughly $100 million program overall, mostly in 2015 and '16, but it got started in terms of enrollment more like middle of 2015. And we talked about top line data quite late this year. So you'll see more spend in '16 versus '15 on that as well as related to clinical studies and driving studies and other things in addition to that indication expansion where we'll be doing some exploration there as well. So beyond that, we also are looking to start the defibrotide prevention study in VOD this year as well. And we do have some other life cycle management activities that do include investments around oxybate but also around asparaginase. So we have all of those embedded in the numbers we provided.

**Operator**

Our next question comes from the line of Douglas Tsao with Barclays.

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

So just first, maybe, Matt, if you could provide a little more help with us in understanding the growth of Defitelio between U.S. and EU and sort of thinking ahead of sort of that launch curve in the U.S. And

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

then just, Bruce, maybe provide a little bit more detail in terms of the supply disruptions we've seen in Erwinaze. I know we sort of had a similar situation a couple of years ago. Was it basically the same issues? And I promised Jason Gerberry I would not ask you about the Warriors tonight because I guess, I learned he's a CAVS fan, I'm a Knicks fan so I'm really not in any position to ask those questions.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Thanks, Doug, for holding off on that one. So let's talk a little bit about what if anything we can say, Matt, on defibrotide breakdown of geographic revenues.

**Matthew P. Young**
*Executive VP & CFO*

Yes. So recall in 2016, what we've modeled in providing the guidance is a March 31 launch date, so we'll be looking at roughly 9 months of sales for a product with a small epidemiology in a market where while it existed under a treatment IND, we had less physician experience than we did in Europe. So we'll see that market build over time and probably also start with pediatric volumes in a greater degree than adults. So embedded in that is what we think is an achievable growth rate in those first 9 months in terms of addressable patients. Related to Europe, we're still continuing, as I think Russ alluded to earlier, to see good double-digit volume growth. We don't anticipate the same kinds of swings this year as we did in FX last year where, again, we saw a $14 million headwind on the year overall. So we should expect to see more of that double-digit volume growth flow through as it relates to the European number.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And then, Doug, on your supply disruption on Erwinaze side, just to be clear, thus far, we've largely been able to ensure that our constrained supply situation doesn't get in the way of treating these patients that really need the drug. So the disruption you've seen for the most part thus far has just been us having to more carefully manage a smaller inventory at our distributor, I wish, does impact our reported revenues. We've got to do a good job in 2016 at improving the supply situation for Erwinaze. We have to build through a variety of means -- additional capacity that doesn't necessarily need a new facility, but we need to get more capacity out of our supplier, working hand-in-hand with our supplier and do a really good job again of managing the supply we do have to achieve our objective, which is to help patients. And I think we're just warning you that we're close to that capacity limit. We came real close to it toward the end of last year, and early this year. That may happen again, and we need to manage it well. And I think, in our commentary, we were trying to also tell you, depending on where we are at the end of any quarter with our inventory level at the distributor, you may see a little fluctuation quarter-to-quarter in what we report.

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

Could some of these supply constraints affect how clinicians use the products and since we are trying to expand into adults and sort of the adolescent population?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Well, our objective would be no. We don't want people have to make treatment decisions based on our supply situation. But to the extent that we have to tell accounts they can't stock as much as they'd like to at the facility level because we're carefully managing it, could that impact their confidence in using it more broadly? Conceivably it could. Again, our job is to be pretty transparent about what we're trying to do, which is to make sure that the product we do have goes to treat active patients rather than sitting on the shelf somewhere when another patient is in need.

**Operator**

Our next question comes from the line of Annabel Samimy with Stifel.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

I want to ask you about the growth in Xyrem. You've been -- I guess, how confident are you that you can continue to penetrate the market you've been talking for some time about initiatives to drive this growth, like awareness and diagnosis and tapping into physicians that have lower use? But it seems like patient growth has sort of hovered around 12,000 and changed for some time even, I guess, before the REMS issue. So I guess what is it that's going to be driving the volume growth? Is it going to be the new patients? Or is it going to be different types of compliance issues there? If you can give us a little bit more color there around your confidence on breaking through that 12,000 range.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. So Annabel, a couple of comments. First of all, of the data we give you, I would say, our volume growth and our revenue number is the most important number to look at. That's actual number of bottles we ship. The active patients number is a much cruder figure that's an average over time and can be bumpy quarter-to-quarter, probably more so than our true underlying business. In terms of where's growth going to come from, we've continued to see really good growth with this product many, many years after its initial commercialization. The fact that we were growing 10% volume first half of 2015 over 2014, I have to say, we're really, really pleased with. And despite the operational difficulties we ran into, starting in late August and really through the end of the third quarter and through most of the fourth quarter, to say that despite that we did 6% volume growth isn't too bad either. Now we think we could have done better than that without that disruption, and we're certainly hoping to see north of 6% this year. But we're actually pretty pleased with our growth.

**Operator**

Our next question comes from the line of Mark Goodman with UBS.

**Ami Fadia**
*UBS Investment Bank, Research Division*

This is Ami Fadia on behalf of Mark. I had a 2-part question regarding your guidance for 2016. Firstly on Xyrem, you mentioned that some of the issues with respect to the REMS program have been sorted out. So my question is what type of volume growth are you seeing in the first quarter? Is it in the high single-digit already? Or should we think about it is an acceleration in the volume growth as the year progresses? And on the pricing side, the price increase, when should we start to see the effect? Would that be immediate? Or is that going to be something that's sort of comes up over the course of the year? And then secondly on Erwinaze, what was the inventory drawdown in the fourth quarter? And how much of an inventory impact have you baked into your 2016 guidance?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So Ami, let me take that the 2 Xyrem questions and maybe have Matt talk about the Erwinaze inventory. On the volume growth, essentially as we said last month in our public disclosure, we do feel that the operating issues at the pharmacy are behind us. And so really, we're right back to essentially volume growth all year as opposed to it's going to start slow and speed up. Now I'd say that in reality, as you know, historically, sometimes we're comparing back the stronger quarters, sometimes we're preparing back to weaker quarters. So that can be a little bumpy. But in general, we think we ought to be right back on track to the growth in volumes really reflecting the underlying organic demand for the product. And on your question about the impact of pricing increase, that's immediate. So, Matt, any extra color we can provide on extent of impact on Erwinaze inventory drawdown?

**Matthew P. Young**
*Executive VP & CFO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, sure. So typical inventory levels typically are in sort of that 20-day range. If you look at the end of the third quarter, we were at about 16, at the end of the fourth quarter, we're about 9. And then we have replenished supply. We want to get close to the average and so that's sort of our guidance for what we've loved to be at it 2016, again, it depends on our supply whether we can actually do that or not.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, and there be some variance about exactly where we are on March 31 through June 30 or September 30.

**Operator**

Our next question comes from the line of Greg Fraser with Deutsche Bank.

**Gregory Daniel Fraser**
*BofA Merrill Lynch, Research Division*

It's Greg Fraser on for Gregg Gilbert. On defibrotide, is it too early to talk about your pricing expectations for the U.S.? And if there's a very short answer to that, my secondary question is on Erwinaze. Can you just update us on your efforts to secure a backup supplier? Is that still something that you're working on?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So the answer to the first one is short. We're not prepared to give additional information at this time. And on the second one, whether there could be or should be a backup supplier is really a long-term strategic question for Erwinaze. It is not a question that will help us with any of our near-term issues, that is at minimum multi-year effort. And so really our focus right now is much more on ensuring we get maximum production, reliable production, out of the existing facility.

**Operator**

Our next question comes from the line of Irina Koffler with Mizuho.

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

If your trial with Roxane should happen to slip further back into the year, later than the PTAB decision that you're expecting in July, is there any sense of urgency on your part to maybe have settlement discussions ahead of the PTAB decision, especially if they could potentially weaken your position? That's question one. And then the second question is on the Defitelio guidance for $100 million to $125 million in 2016. If you were, for some reason, not to get approved, what would your range be then? I'm just trying to understand what the standalone would be like.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So maybe I'll have Matt take the second part of that question first, and then I'll come back on the Xyrem side.

**Matthew P. Young**
*Executive VP & CFO*

Yes, Irina, I would say, if you think about again strong double-digit volume growth for Europe, again with no real change in price in Europe, that would give you a trend line for the European business over the roughly $70 million we recorded in 2015. As it relates to what we'll say about the U.S. and if we do or don't get approved or what that scenario would look like, I think if we have that or a different timeline or something else, we can talk about that specific scenario and adjust our guidance appropriately at that time.

**Bruce C. Cozadd**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Co-Founder, Chairman & CEO*

And on your first part of your question, I can't comment specifically on probability or timing of the settlement. But I will comment that you said, wouldn't a PTAB decision potentially weaken your position? Of course, PTAB decision can go either way. You could argue, can strengthen our position and also remind you that a negative PTAB decision could be appealed into the court. So it's not quite the "one moment in time determines everything" scenario.

**Operator**

Our next question comes from the line of David Maris with Wells Fargo.

**David William Maris**
*BMO Capital Markets U.S.*

Bruce, you mentioned that you have been very active on the deal side of things despite not closing anything. So maybe you could talk a little bit about what's preventing that. I know most people would say, "Well, it always comes down to price." But with the market down and there are still good assets, does that make sellers a little bit less likely to sell? Would they rather have stock at this point because they want to participate in the upside? And as the prices have come down for franchises, do you start to widen the scope of the things that you might think about therapeutically?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, David. I think it doesn't necessarily cause us to widen our scope of the types of opportunities we'd look at. If their price is coming down, arguably, you can afford something a little bit bigger, but I don't think it changes the types of opportunities we're looking at. We have been active. I'm not sure it always comes down just to price. I think different deal structuring options definitely can help in different scenarios. And there may be companies out there with assets where they view the opportunity to participate in upside going forward as more attractive given their current price. I can't disagree with that. But I think we're well positioned. I think our balance sheet, liquidity put us in a good place, particularly on a relative basis. You can look at us in the vacuum or you can look at us relative to some other companies that I think levered up to do some deals on a higher priced environment, and maybe that gives us a little better positioning in the current market. But if you look at the 3 years before last year, we sort of, on average, did a couple of deals a year. We took last year off. Not that, that was our intent going into the year, but that's the way things worked out. And our hope is to get back to doing a series of transactions over time that our investors look at and say, fit our strategy, will generate good returns and broaden and diversify our business.

**Operator**

Our next question comes from the line of Liav Abraham with Citi.

**Liav Abraham**
*Citigroup Inc, Research Division*

Just wondering if you can provide an update on where you stand with potential Xyrem line extensions such as your once-daily formulation. And when we can -- when is it possible to receive an update on that? And any change in your sense of urgency in bringing some kind of new formulation to market?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So I would say no change in our sense of urgency. This is, has been and will remain a very high priority for us. That's why we've got multiple efforts underway. Nothing particular to report right now, although, as I did say a little bit earlier, I do think there's a good potential that we will have more to say this year. That obviously depends on how things work out on a number of fronts. But I do think we're reaching a point where we may, in fact, have some things to say. Not today, but as we go through the year.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

Our next question comes from the line of John Boris with SunTrust.

**John Thomas Boris**
*SunTrust Robinson Humphrey, Inc., Research Division*

Question is related to Xyrem, and it just relates to your commentary on settlement and standard industry practice quite frequently entering into settlements before litigating. Have you taken a look at the -- obviously, it's a completely different case but a case that has distribution patents around at the Celgene case and the uniqueness of that settlement. Just your thoughts around the construct of that in terms of allowing competition but in a controlled fashion with controlled market shares. So any thoughts around that? Secondly, on Xyrem, in the back half, there will be a competitor that's rolling out a clinical. Have you taken into account that a significant number of patients could be taken out of market -- I think they're enrolling about 300 in a competitive trial, with a substantial number of those coming out of the U.S. largely. Is that factored into your volume guidance?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, John. Certainly aware of the Celgene settlement but really can't comment on specifically how that might apply to our situation. But interesting deal, and you draw some parallels there that I think are relevant. Our Xyrem guidance does take into account what we think will happen to our business this year.

**Operator**

And our last question is from the line of David Buck with Northland Capital Markets.

**David George Buck**
*Northland Capital Markets, Research Division*

Maybe for Matt, can you talk a little bit about what the sales and earnings impact was from foreign exchange overall for 2015 and what the expectation embedded in the guidance is toward the sales and EPS impact from foreign exchange?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, sure, David. The impact overall for 2015 of FX was $22 million, so roughly $7 million with respect to Erwinaze, roughly $14 million rounded up to $22 million, about $14 million for Defitelio. And bottom line as we mentioned many times, was really relatively neutral, in fact, was maybe a slight gain, I think most of which occurred in the fourth quarter but in less than $2 million. And that relates to some balance sheet exposures we had in where we in terms of how we held our cash and intercompany loans, but also related to having a significant number of our expenses denominated in euro, given both European operations and our substantial presence in Ireland.

**Operator**

Thank you, and that does conclude today's Q&A portion of the call. I'd like to turn the call back over to Kathee Littrell for any closing remarks.

**Katherine A. Littrell**
*Vice President of Investor Relations*

Thanks, Cath. Thank you again for joining us today. We will be participating in the Cowen Healthcare Conference and the Barclays Healthcare Conference this quarter, and we hope to see many of you there. This will now end our call.

**Operator**

Ladies and gentlemen, thank you for participating in today's conference. This does conclude today's program. You may all disconnect. Everyone, have a great day.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 72

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service
Food and Drug Administration
Orphan Products Development

# Memorandum

| | |
|---|---|
| Date | January 28, 1997 |
| From | Director, Office of Orphan Products Development (HF-35) |
| Subject | Clinical Superiority of Genetics' Institute coagulation factor IX product, BeneFix™ |
| To | OOPD Application |

A Biological License Application (BLA) has been submitted by Genetics Institute for BeneFix™ Coagulation Factor IX (recombinant) for the treatment and prevention of bleeding in hemophilia B patients. BeneFix™ is the third coagulation factor IX to receive orphan drug designation for the treatment of hemophilia B. The other two products are plasma-derived Coagulation Factor IX (human): AlphaNine® (Alpha Therapeutic, approved December 31, 1990) and Mononine® (Centeon, then Armour Pharmaceutical, approved August 20, 1992). Mononine® was approved despite the orphan exclusivity of AlphaNine® because at that time the manufacturing process for Mononine® gave greater assurance of safety with respect to human blood-born viruses, especially hepatitis C. Currently, both products are manufactured by methods that are effective in reducing the risk of transmitting human viruses; however, these risks have not been totally eliminated. Furthermore, the potential risk of transmitting the causative agent of Creutzfeldt-Jakob disease (CJD) remains uncertain, but has led to the recall of large quantities of plasma derivatives.

BeneFix™ is the recombinant analog of the two plasma derived factor IX products. It has the same principal molecular structural features as AlphaNine® and Mononine® and is intended for the same use. Hence, BeneFix™ would be considered the same drug as AlphaNine® and Mononine® unless it can be shown to be clinically superior to the previously approved products. Since Genetics Institute does not claim nor would the information in the BLA support that BeneFix™ is more effective than the previously approved products, the claim to clinical superiority rests on the greater safety of BeneFix™.

By virtue of its source and manufacturing methods, BeneFix™ is inherently less likely to transmit human blood-born viruses and other infectious agents, and is also less likely to transmit animal-derived zoonotic agents than is AlphaNine® and Mononine®. The greater safety of BeneFix™ with respect to its reduced risk of disease transmission is attributable to two factors:

> 1. BeneFix™ is a recombinant product produced in CHO-derived cells *in vitro*, rather than from human plasma. Moreover, no human-derived protein is added during the production,

isolation or formulation of BeneFix™. Thus the risk of transmitting infectious agents that may be present in human plasma has been eliminated.

2. No animal derivative is added or used during the manufacutre of BeneFix™. In particular, the affinity chromatography methods used to produce Mononine® (immobilized murine Mab) and AlphaNine® (immobilized procine heparin) are not employed in the manufacture of BeneFix™. Thus the risk of transmitting animal derived zoonotic agents has been reduced.

No direct comparative studies between BeneFix™ and either AlphaNine® or Mononine® have been conducted to confirm the reduced risk of viral transmission presumed to exist for BeneFix™. Such studies would not be practical given the small number of hemophilia B patients and the infrequency at which most blood-born viruses are transmitted by the currently licensed products. However, it is known from epidemiological studies that human parvovirus B19 and, much less frequently, hepatitis A can be transmitted by plasma-derived coagulation factor IX preparations. These viruses do not exist in the source material from which BeneFix™ is produced, nor in any component utilized during its manufacture. Therefore, it is reasonable to conclude that, barring a breakdown in cGMPs, the risk associated with this and other human blood-born viruses has been eliminated in BeneFix™.

The Office of Orphan Product Development (OOPD) concurs with CBER's decision that the increased safety of BeneFix™ can be intuitively derived and does not need to be demonstrated in comparative trials. We also concur that the effects of viral and prion transmission are so catastrophic that even a very low frequency of occurrence represents a significant risk to patients with factor IX deficiency, and any reduction in this risk justifies a finding of greater safety. Like CBER, OOPD is very concerned that products not be deemed different based on trivial findings; however, the elimination of disease transmission represents a very significant benefit to the public health and is an adequate reason to allow a similar product to enter the market.

Marlene E. Haffner, M.D., M.P.H.
Rear Admiral, United States Public Health Service
Director, Office of Orphan Products Development

## Summary of Basis for Approval

**Reference Number:**        **96-1048**

**Drug Licensed Name:**      **Coagulation Factor IX (Recombinant)**

**Manufacturer:**            **Genetics Institute, Inc.**

**Drug Trade Name:**         **BeneFıx™**

### I.    Indication for use

BeneFıx™, Coagulation Factor IX (Recombinant), is indicated for the control and prevention of hemorrhagic episodes in patients with hemophilia B (congenital factor IX deficiency or Christmas disease). This indication includes the peri-operative management of hemophilia B patients undergoing surgery.

BeneFıx™ is not indicated for the treatment of other coagulation factor deficiencies (e.g., factors II, VII and X), nor for the treatment of hemophilia A patients with inhibitors to coagulation factor VIII, nor for the reversal of coumarin-induced anticoagulation. BeneFıx™ is also not indicated for the treatment of multiple liver-dependent coagulation factor deficiencies caused by liver disease or dysfunction.

### II.   Dosage Form, Route of Administration and Recommended Dosage

The BeneFıx™ is a sterile, non-pyrogenic, lyophilized powder for injection available in nominal dosage strengths of 1000, 500, and 250 International Units (I.U.) per vial. One International Unit is the amount of factor IX activity present in 1 ml of pooled, normal human plasma. Potency, in I.U., is determined by an in vitro one-stage clotting assay, using the World Health Organization International Standard for factor IX concentrates.

After reconstitution of the lyophilized powder with Sterile Water for Injection (USP), the 500 and 1000 I.U. dosage strengths of BeneFıx™ comprise approximately 100 I.U./ml, 0.26 M glycine, 1% sucrose, 10 mM L-histidine, and 0.005% polysorbate 80, pH 6.8. The reconstituted 250 I.U. dosage strength of BeneFıx™ comprises about one-half these concentrations or approximately 50 I.U./ml, 0.13 M glycine, 0.5% sucrose, 5 mM L-histidine, and 0.0025% polysorbate 80, pH 6.8. The 500 and 1000 I.U. dosage strengths of BeneFıx™ are approximately isotonic, whereas the 250 I.U. dosage strength is hypotonic.

The lyophilized formulation contains no preservatives, nor any added animal or human raw materials.

BeneFıx™ is administered only by intravenous infusion within 3 hours after reconstitution.

Treatment with BeneFıx™, as for all factor IX products, should be initiated under the supervision of a physician.

Clinical studies have shown that the recovery of BeneFıx™ is significantly lower (by about 28%) than that of a high purity, plasma-derived factor IX (see below). Empirically, one I.U. of BeneFıx™ per kilogram of body weight is expected to increase the circulating

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFIx™
Genetics Institute, Inc.

Page 2 of 13

activity of factor IX by 0.8 I.U./dl. The following formula provides a guide to empirical dosage calculations:

| Number of factor IX I.U. required | = | Body Weight (in kg) | × | Desired factor IX Increase (%) | × | 1.2 I.U./kg |
|---|---|---|---|---|---|---|

Alternatively, the estimation of the required dose of BeneFIx™ can be based on prior experience with plasma-derived factor IX and titrated upward if necessary to achieve the desired clinical response.

The proper dosage of BeneFIx™, as well as the frequency of infusion, can be expected to vary with the severity of the factor IX deficiency, the location and extent of bleeding, and the patient's clinical condition, age and recovery of factor IX. Dosing guidelines such as given in reference 1 may be useful in estimating appropriate dosage.

For surgical interventions and for life-threatening hemorrhage, precise monitoring of the factor IX replacement therapy using a factor IX activity assay is advised.

### III.   Manufacturing and Controls

#### A.   Manufacturing

The active ingredient in BeneFIx™ is Coagulation Factor IX (Recombinant), a 415-amino acid glycoprotein (approximately 55 kDa) that is produced in Chinese hamster ovary (CHO) cells. The production cells were stably transfected with the gene for the $Ala^{148}$ allelic form of plasma-derived factor IX, which by allelic frequency would account for 20% of the factor IX in current products (the remaining 80% having Thr at this position). The production cells were also stably transfected with the gene for the human paired basic amino acid cleaving enzyme (PACE), necessary for the efficient removal of the pro-peptide from the translation product.

The post-translational modifications of the recombinant molecule have been extensively characterized and appear to be generally similar to those of the plasma-derived molecule. Subtle differences have been noted in the complexity of the N-linked carbohydrates, those found in BeneFIx™ being a subset of those occurring in the natural product. BeneFIx™ is γ-carboxylated on an average of 11.5 residues, whereas 12 residues are normally γ-carboxylated. These minor differences are not known to alter the structure or function of BeneFIx™. Of greater significance, the sulfation of $Tyr^{155}$ (>90% in plasma derived factor IX vs. ~25% in BeneFIx™) and the phosphorylation of $Ser^{158}$ (unphosphorylated in BeneFIx™) appear to affect the in vivo recovery of the recombinant product (see discussion of the pharmacokinetic analysis of BeneFIx™ in the clinical summary).

---

1.   Roberts, H.R. and Eberst, M.E. 1993. Current management of hemophilia B. Hematolol. Oncol. Clin. North Amer. 7(6): 1269-1280.

A production campaign begins by thawing an ampoule of the production cells, maintained as a Working Cell Bank, expanding the culture in spinner flasks, a         bioreactor, and finally the         bioreactors in which production takes place in a batch-refeed mode. As many as         bioreactors may be utilized in a campaign, which may be inoculated from each other, or from the         bioreactor, as validated.

The production cell line has been adapted to suspension cell culture in defined growth medium that is not supplemented by human- or animal-derived proteins. Other than the proteins secreted by the production cell line, the only protein used in the production process for recombinant factor IX is recombinant human insulin (produced in *E. coli*) which is a component of the culture medium. In addition, both the MCB and the WCB have been adapted for growth and cryopreserved (-135°C) in the absence of human or animal protein.

Recombinant factor IX is purified from the culture medium by means of a four-step chromatography process. The purification process also contains a nanofiltration step capable of reducing viral burden. Other than use of the CHO cell line and recombinant human insulin made in *E. coli*, no human or plasma products are used in the manufacture or formulation of BeneFIx™.

The drug substance is manufactured at the Andover, Massachusetts facility of Genetics Institute. Frozen (-80°C) bulk is then shipped to a contract manufacturer         for final formulation, sterile filtration, aseptic filling and lyophilization. The contractor also tests the final containers for sterility and particulates, labels and packages the product and ships the released product to distribution centers. All other release testing and quality assurance functions are performed by Genetics Institute.

Final container testing includes potency, specific activity, activated factor IX, SDS-PAGE (purity and identity), SEC-HPLC (purity and protein concentration), sterility, endotoxin, appearance, moisture, solubility, pH and concentrations of the major excipients. The final drug product does not contain other proteins of any kind added as excipients or stabilizers.

**B.      Validation**

The production cell line has been cryopreserved as a Master Cell Bank (MCB), from which a Working Cell Bank (WCB) has been derived. The MCB, the WCB, and end-of-production cells have been characterized and found to be stable in genotype and free of any detectable bacterial, mycoplasmal, fungal or viral contamination.

The manufacturing process for BeneFIx™ has been validated for consistency, robustness, and for removal of impurities. In particular, validation studies and ongoing, periodic revalidation have been accepted in lieu of lot by lot testing of drug substance or final drug product to establish the removal of certain defined

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFix™
Genetics Institute, Inc.

Page 4 of 13

contaminants. These validation studies include removal of host cell proteins, PACE, rhInsulin, methotrexate, and DNA, and have indicated that each of these potential contaminants is reproducibly removed to acceptable levels in the final drug product.

Assays of the drug substance and the final container material have been validated for accuracy, precision and reproducibility. All final container lots have been shown to conform to requirements for identity, purity, potency and sterility according to 21 CFR Part 610. Five conformance lots have been submitted to CBER for testing and have been shown to meet the requirements for potency, residual moisture, and sterility.

Various steps in the purification process have been validated for their ability to remove viruses that may not have been detected in the production cells, above. Two of the chromatography columns and the nanofiltration step (molecular weight cutoff 70,000) were evaluated using appropriate model viruses (amphotropic murine leukemia virus; bovine parvovirus, human herpes simplex virus type I, reovirus type 3). Overall, the purification process has been show to reduce these viruses by a factor of at least $10^{10}$.

### Summary of Prospective Scale Evaluation of Removal/Inactivation

| Virus | Q Sepharose FF | Chelate-EMD-Cu(II) | Viresolve-70 | Overall |
|-------|----------------|--------------------|--------------|---------|
| A-MuLV | 6.11[a] | NA | >5.66 | >11.8 |
| BPV | 5.42 | 2.19 | 4.86 | 12.5 |
| HSV | 4.49 | 3.92 | >5.55 | >14.0 |
| Reo-3 | 5.45 | 0.15 | 5.86 | 11.3[b] |

[a]  $Log_{10}$ removal value.

[b]  Does not include the 0.15 LRV determined for the Chelate-EMD-Cu(II) column step.

### C.    Stability Studies

The stability of the drug substance has been investigated in four batches for up to 24 months. Data to date indicate that the drug substance is stable for 24 months when maintained at -80°C and for 6 months when maintained at -20°C.

The stability of the drug product has been investigated in three lots of the 250-I.U. dosage strength, one lot of the 500-I.U. dosage strength, and three lots of the 1000-I.U. dosage strength. Only one lot (1000 I.U.) has been studied under intended storage conditions for a full 24-month period. Data for 18 months have been accumulated for 5 other lots. Coupled with accelerated studies at room temperature and at 40°C, data to date indicate that the drug product is stable for 24 months when maintained at 2-8°C. The drug product is also stable for 6

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFix™
Genetics Institute, Inc.

Page 5 of 13

months at room temperature.  Studies of the reconstituted material have indicated that it is stable for at least 24 hours at room temperature, but nevertheless should be administered within three hours of reconstitution to assure aseptic use.

### D.    Labeling

The package insert and container and package labels are in compliance with 21 CFR §§ 201.57, 610.60, 610.61 and 610.62.  The trademark, BeneFix™, is not known to be in conflict with the trademark of any other biological product.

### E.    Establishment Inspections

A combined prelicense and biennial establishment inspection of the Andover, MA production facility of Genetics Institute was conducted from November 11 to 15, 1996 by inspectors from OELPS and OBRR, CBER and from BOS-DO.  The most recent biennial establishment inspection of the McPherson, Kansas facility of Sanofi Winthrop Pharmaceuticals was conducted from August 19 to 22, 1996 by inspectors from OELPS, CBER and from KAN-DO.  Both establishments were found to be in compliance with current good manufacturing practices.  Copies of the inspection reports are on file.

### F.    Environmental Assessment

A report of the impact on the environment is included in the license application.

BeneFIx™ produces a hemostatic correction in hemophilia B dogs similar to human pdFIX as exhibited by shortened whole blood clotting time, shortened partial thromboplastin time and correction of secondary bleeding times.

Intravenous doses up to 200 I.U./kg have been administered to dogs and rats without any observed toxicity other than those associated with the development of antibodies. High doses (≥500 I.U./kg) of BeneFIx™ administered to mice by intraperitoneal injection result in thromboses and consumptive coagulopathy. By comparison with the exposure data and toxicological findings in rats and dogs, the mouse appears to be uniquely susceptible to BeneFIx™ and is therefore of uncertain value with respect to human risk assessment.

The thrombogenic potential of BeneFIx™ was evaluated in the Wessler stasis model (New Zealand White rabbits). Studies were conducted comparing BeneFIx™ with one Coagulation Factor IX Complex (Human) (PCC) and two high purity Coagulation Factor IX (Human) products (pdFIX). The PCC was administered at doses of 15 and 50 I.U./kg and as expected, thrombi were observed at both doses. BeneFIx™ was administered at doses of 50, 150, 500 and 1000 I.U./kg and each pdFIX was administered at 1000 I.U./kg. Evidence of thrombosis was seen at the high dose of pdFIX but not at the higher doses of BeneFIx™. One animal that had been treated with BeneFIx™ at 150 I.U./kg became thrombotic, but because of the lack of a dose response relationship, the latter observation was judged not to be biologically relevant.

No reproductive, developmental or carcinogenicity studies were performed. The mutagenic and clastogenic potential of BeneFIx™ was assessed by means of the Ames assay and chromosomal aberration assay with human peripheral blood lymphocytes. Both studies yielded negative results at levels of BeneFIx™ estimated to be 60-100 times greater than anticipated in the clinical population.

## V.    Medical

Inspections of four of the clinical sites were conducted in October 1996. The sites were found to be in compliance with current good clinical practices with regard to the Coagulation Factor IX (Recombinant) studies.

Genetics Institute, Inc. conducted four clinical studies of BeneFIx™ safety and efficacy. The first study (C9407-21) was composed of three segments. The first segment, conducted in 11 patients, was a double-masked, crossover pharmacokinetic comparison of BeneFIx™ and a high purity Coagulation Factor IX (Human) (pdFIX). After completing the first study segment, all 11 patients administered BeneFIx™ as needed for spontaneous bleeding episodes (on-demand therapy) during the second study segment. Of these patients, 10 completed the 12-month visit. A third segment, surgical prophylaxis, was included if any of the 11 patients required surgery during study participation. This study is complete.

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFix™
Genetics Institute, Inc.

Page 7 of 13

The second study (C9408-21) is composed of three segments, the first of which is an open-label, baseline pharmacokinetic evaluation of BeneFix™ followed by replacement therapy with BeneFix™ as appropriate for the individual patient. The second treatment segment allows on-demand therapy identical to that of the second segment of study C9407-21 and routine secondary prophylaxis for the patients who have been on such a regimen for at least 6 months before participating in the study. As in the first study, a third segment provides for surgical prophylaxis if needed. Study C9408-21 is ongoing.

The third study (C9417-21) was a surgical prophylaxis study in which patients with factor IX deficiency were enrolled if they were to undergo elective, major surgical procedures that required factor IX replacement therapy. This study is complete.

The fourth study (C9418-21) is a study of BeneFix™ in previously untreated patients. This study is ongoing.

A safety update was submitted November 1, 1996, reporting results accrued as of August 31, 1996. The data reported in this submission were not included in the evaluation of efficacy. One adverse event was reported to the IND subsequent to the safety update.

A.    **Pharmacokinetics**

The crossover pharmacokinetic evaluation of BeneFix™ and pdFIX was performed at doses of 50 I.U./kg in 11 previously treated patients. The design of this study conformed to the guidelines published by the International Society on Thrombosis and Hemostasis  Both products were well tolerated and corrected the prolonged PTT characteristic of hemophilia B. Elimination half-lives for BeneFix™ and pdFIX were not significantly different (18.1 ± 5.1 hours and 17.7 ± 5.3 hours, respectively). However, the recovery of BeneFix™ was 28% lower than that of pdFIX (37.8 ± 14.0% and 52.6 ± 12.4%, respectively; p=0.0004). That is, BeneFix™ produced a mean increase in circulating factor IX activity of 0.84 I.U./dl per I.U./kg administered, compared to 1.17 I.U./dl per I.U./kg for pdFIX. These pharmacokinetic parameters were similar in subsequent evaluations at 6 and 12 months. These parameters also did not differ significantly among patients treated with four drug product lots manufactured from several batches of drug substance produced from 2 separate inoculum runs.

B.    **Previously Treated Patients**

The efficacy of BeneFix™ in previously treated patients with moderate or severe hemophilia B was assessed in an open-label phase 1/2 and phase 2/3 study of on-demand, self-administered treatment and peri-operative use of BeneFix™ (C9407-21 and C9408-21). The patients were not stratified according to the severity of the factor IX deficiency, nor was any attempt made to directly compare BeneFix™ with any other product. All endpoints were based on the subjective evaluation (Excellent, Good, Moderate, No Response, Failure) by either the patient or the physician. Routine secondary prophylaxis was also subjectively graded: Excellent, Effective, Inadequate, Failure.

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneF𝟏x™
Genetics Institute, Inc.

Page 8 of 13

A total of 37 patients have been enrolled in the efficacy portions of C9407-21 and C9408-21, of whom 36 were included in the efficacy analysis. Six lots of BeneF𝟏x™ from three separate campaigns were used in this study. No patient reported "failure" of treatment with BeneF𝟏x™, however, one patient discontinued participation at the one month follow-up visit because of a lack of response. In 35 of 36 patients who were treated for a bleeding episode, 82% of all bleeding episodes (301/369) required a single infusion of BeneF𝟏x™ for resolution and 5.7% (21/369) required three or more infusions. Of the infusions administered, 90% (437/488) were reported as providing excellent or good response. However, data correlating the initial dose administered with the severity of the bleeding episode were not obtained.

For patients treated on a routine secondary prophylaxis regimen 88% of responses (14/16) were rated as "excellent" or "effective" in preventing bleeding. Of 29 "spontaneous" (without concurrent injury) musculoskeletal bleeding episodes in patients on routine secondary prophylaxis, none occurred within 24 hours of an infusion and 7 occurred within 72 hours of an infusion. No data was provided regarding previous prophylactic use of pdFIX (e.g., dosing or effectiveness) or comparing the recoveries (or other pharmacokinetic parameters) of BeneF𝟏x™ with pdFIX. The data regarding prophylactic use of BeneF𝟏x™ is therefore considered preliminary.

Of the 36 patients enrolled in C9407-21 and C9408-21, 13 patients (on demand and prophylaxis) increased the dose of BeneF𝟏x™ administered for subsequent bleeding episodes or ongoing prophylaxis. The results regarding the effectiveness of these dose modifications are preliminary. However, in nine surgical patients, a dose-response relationship between pre-operative bolus BeneF𝟏x™ infusion and the first post-infusion activity was established (Pearson $r = 0.74$; $p = 0.0235$), suggesting that the lower in vivo recovery can be compensated for by a simple adjustment of the dose of BeneF𝟏x™ administered (see page 2).

C. **Surgery**

As of January 19,1996, 13 procedures had been performed in 12 patients (6 enrolled in PTP studies [C9407-21 and C9408-21] and 6 exclusively enrolled in the surgical study [C9417-21]).

During the surgical period, 97% of clinical responses were rated as excellent or good by the surgeon or investigator or, when appropriate, by the patient. One patient had moderate response and no response after a single tooth dental extraction which was complicated by significant fibrinolysis. Transfusion of blood products was necessary in only 3 of the 13 procedures (orthotopic liver transplantation and two knee arthroplasties). Estimated blood loss during and after surgery was considered as expected in all cases. No bleeding episodes during the postoperative period were reported.

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFix™
Genetics Institute, Inc.

Page 9 of 13

A total of 1,321,768 units of BeneFix™ were used in these surgical evaluations, including baseline PK evaluations. Total dose administered per procedure during the surgical period ranged from 10,000 I.U. for a dental procedure to 348,000 I.U. for bilateral knee arthroplasties. Preoperative doses ranged from 25 to 155 I.U./kg; doses used in the postoperative period ranged from 30 to 95 I.U./kg. Continuous infusion of BeneFix™ at a rate of 4.3 to 8.6 I.U./kg/hr was used in 3 surgeries. For the other 10 surgeries, a pulse replacement regimen was used.

**D.    Previously Untreated Patients**

Study C9418-21 is a multicenter, open-label phase 1/2 and 2/3 safety and efficacy study of on-demand or prophylactic self-administration and peri-operative use of BeneFix™. Nine patients had been enrolled of whom 3 had received product as of April 19, 1996. Only one patient had received product for treatment of bleeding episodes.

**E.    Safety**

As of August 31, 1996, the clinical studies of BeneFix™ had involved a total of 64 patients (44 previously treated patients, 11 previously untreated patients, and the 9 patients participating in the surgical study) who had received more than 7 million I.U. over a period of 18 months.

A total of 20 previously untreated patients had been enrolled, 11 of whom had been treated with BeneFix™. No adverse reactions related to therapy have been reported after 42 infusions.

Sixty mild adverse reactions definitely, probably, or possibly-related to therapy have been reported for 2458 infusions. These were: nausea (16), discomfort at the IV site (13), altered taste (10), burning sensation in jaw and skull (6), allergic rhinitis (3), lightheadedness (2), headache (2), dizziness (1), chest tightness (1), fever (1), phlebitis/cellulitis at IV site (1), drowsiness (1), dry cough/sneeze (1), rash (1), and a single hive (1). (Data include events reported to the Blood Products Advisory Committee, December 12, 1996.)

A low-level inhibitor was detected in one of 44 patients who had an extensive (>500 exposure days) previous history of treatment with pdFIX without evidence of an inhibitor. Seroconversion in this patient was first observed in the 9-month blood sample by ELISA at 39 exposure days. This patient was able to continue treatment with BeneFix™ with no anamnestic rise in inhibitor or anaphylaxis. By 12/96, the titer of this patient's inhibitor had decreased to undetectable levels. Samples from a second patient reacted weakly and variably in ELISA for antibody to factor IX, but the inhibitor assay remained consistently negative.

Subsequent to the filing of the safety update, Genetics Institute reported preliminary information regarding an acute renal infarct in a 31 year old male enrolled in protocol C9408-21. The patient apparently presented 12 days after the most recent infusion of BeneFix™, at which time he was admitted to hospital. The

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFix™
Genetics Institute, Inc.

Page 10 of 13

patient's workup was inconclusive as to the cause of the infarction, and the investigator judged that the event was unlikely to be related to the drug.

## F.    Post-Marketing (Phase IV) Studies

Genetics Institute has committed to continuing the following trials until completion during the post-marketing period:

C9408-21    Safety and Efficacy of Coagulation Factor IX ( Recombinant) in Previously Treated Patients with Moderate or Severe Hemophilia B.

All patients currently enrolled in this study will continue in the study for a period of 2 years.

C9418-21    Study of the Safety and Efficacy of Coagulation Factor IX ( Recombinant) in Previously Untreated Patients with Severe or Moderately Severe Hemophilia B

Approximately 30 patients with severe or moderately severe hemophilia B will be enrolled, at least 15 of whom will be severe hemophiliacs. All patients will be followed for at least 2 years and then up to 100 exposure days or 5 years, whichever is sooner.

## VI.    Blood Products Advisory Committee

On December 12, 1996, the Blood Products Advisory Committee considered the clinical data submitted in support of the license application for BeneFix™. The committee voted eight yes, five no, with one abstention that the safety data are adequate to support the approval of BeneFix™. In a subsequent vote, the committee voted unanimously for approval of the license application for BeneFix™ subject to continued surveillance for: i) major thrombotic events; ii) other adverse events; iii) inhibitor development; and iv) use in previously untreated patients.

The committee also voted unanimously that the recommended dosing of BeneFix™ be adjusted to account for the lower in vivo recovery of BeneFix™ as compared with pdFIX.

## VII.    Orphan Drug Considerations

BeneFix™ was designated an orphan drug by the Office of Orphan Products Development on October 3, 1994 (application #94-822). BeneFix™ is the third coagulation factor IX product to receive orphan drug designation for the treatment of hemophilia B. The other two products are plasma-derived Coagulation Factors IX (Human): AlphaNine® (Alpha Therapeutic, approved December 31, 1990) and Mononine® (Centeon, then Armour Pharmaceutical, approved August 20, 1992). Currently, both plasma-derived products are manufactured by methods that are effective in reducing the risk of transmitting human viruses, however these risks have not been totally eliminated. Furthermore, the potential risk of transmitting the causative agent of

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFix™
Genetics Institute, Inc.

Page 11 of 13

Creutzfeldt-Jakob disease (CJD) remains uncertain, but has led to the recall of large quantities of plasma derivatives.

BeneFix™ is the recombinant analog of the two plasma derived factor IX products. It has the same principal molecular structural features as AlphaNine® and Mononine® and is intended for the same use. Hence, BeneFix™ would be considered the same drug as AlphaNine® and Mononine® unless it can be shown to be clinically superior to the previously approved products. Genetics Institute claims the clinical superiority of BeneFix™ because of its greater safety compared to the plasma-derived products.

By virtue of its source and manufacturing methods, BeneFix™ is inherently less likely to transmit human blood-borne viruses and other infectious agents, and is also less likely to transmit animal-derived zoonotic agents than is AlphaNine® or Mononine®. The greater safety of BeneFix™ with respect to its reduced risk of disease transmission is attributable to two factors:

1. BeneFix™ is a recombinant product produced in CHO-derived cells in vitro, rather than from human plasma. Moreover, no human-derived protein is added during the production, isolation or formulation of BeneFix™. Thus the risk of transmitting infectious agents that may be present in human plasma has been eliminated.

2. No animal derived protein is added or used during the manufacture of BeneFix™. In particular, the affinity chromatography methods used to produce Mononine® (immobilized murine MAb) and AlphaNine® (immobilized porcine heparin), are not employed in the manufacture of BeneFix™. Thus the risk of transmitting animal derived zoonotic agents has been reduced.

No direct comparative studies between BeneFix™ and either AlphaNine® or Mononine® have been conducted to confirm the reduced risk of viral transmission presumed to exist for BeneFix™. Such studies would not be practical given the small number of hemophilia B patients and the infrequency at which most blood-borne viruses are transmitted by the currently licensed products. However, it is known from epidemiological studies that human parvovirus B19 and, much less frequently, hepatitis A can be transmitted by plasma-derived coagulation factor IX preparations. These viruses do not exist in the source material from which BeneFix™ is produced, nor in any component utilized during its manufacture. Therefore, it is reasonable to conclude that, barring a breakdown of cGMPs, the risk associated with these and other human blood-borne viruses has been eliminated in BeneFix™.

Thus, a significant therapeutic advantage of BeneFix™ (greater safety with respect to transmitting human viruses) over and above that provided by the approved orphan drugs, AlphaNine® and Mononine®, has been shown. In addition, BeneFix™ is otherwise licensable and no countervailing risks have been shown to be associated with BeneFix™. Therefore, BeneFix™ is clinically superior within the meaning of 21 CFR 316.3(b)(3) to

Summary Basis for Approval: 96-1048
Coagulation Factor IX (Recombinant) BeneFIX™
Genetics Institute, Inc.

Page 12 of 13

either AlphaNine® or Mononine®, and may be licensed despite the orphan exclusivity of the latter two products.

## VIII.  Package Insert

A copy of the approved package insert is attached.

SENT.BY:Xerox Telecopier 7020 ; 7- 8-97 ;11:59AM ;                →    301  827 3843;#15

Summary Basis for Approval: 96-1048                                    Page 12 of 12
Coagulation Factor IX (Recombinant) BeneFIX™
Genetics Institute, Inc.

Thomas J. Lynch, Ph.D.          Date        Mark J. Weinstein, Ph.D.       Date
HFM-340                                     HFM-340

Andrew Chang, Ph.D.             Date        Christine Kapfer               Date
HFM-340                                     HFM-340

Jaroslav G. Vostal, M.D., Ph.D. Date        Laura L. Wood                  Date
HFM-335                                     HFM-340

Alicia A. Gilbert               Date        Florence A. Kaltovich          Date
HFM-207                                     HFM-207

                                            Toby A. Silverman, M.D.        Date
Paul M. Aebersold, Ph.D.        Date        HFM-380
HFM-380

Jena M. Weber                   Date        Cornelius J. Lynch, Ph.D.      Date
HFM-380                                     HFM-215

Jose J. Tavarez Pagan           Date        Martin D. Green, Ph.D.         Date
HFM-650                                     HFM-579

**DEPARTMENT OF HEALTH & HUMAN SERVICES**        **Public Health Service**

Office of Orphan Products Development*(HF-35)*
Food and Drug Administration
5600 Fishers Lane
Rockville, MD  20857

April 11, 1994

Genetics Institute, Inc.
Attention: Frederick T. Gates, Ph.D.
Director, Regulatory Affairs
87 CambridgePark Drive
Cambridge, MA  02140

Dear Dr. Gates:

We are pleased to acknowledge receipt of your application for orphan drug designation submitted pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bb) for the following:

   Name of Drug:  coagulation factor IX (recombinant)

   Indication:  Treatment of hemophilia B.

   Date of Application:  April 7, 1994

   Date of Receipt:  April 8, 1994

   Our Reference Number:

We will correspond with you further after we have had the opportunity to review the application.  Please note that your drug or biological product will not be eligible for designation if you have filed a new drug application (NDA) or product license application (PLA) for this indication.  Please refer to our reference number in all future communications with this office.

If you have any questions, please call me at (301) 443-4718.

Sincerely yours,

*ℓ 4/11/94*

Peter L. Vaccari, R.Ph.
Senior Regulatory Management Officer

DEPARTMENT OF HEALTH & HUMAN SERVICES    Public Health Service

**Office of Orphan Products Development**(HF-35)
**Food and Drug Administration**
**5600 Fishers Lane**
**Rockville, MD 20857**
**(301) 443-4903**

May 11, 1994

Genetics Institute, Inc.
Attention: Frederick T. Gates, Ph.D.
Director, Regulatory Affairs
87 Cambridge Drive
Cambridge, MA 02140

Dear Dr. Gates:

Reference is made to your orphan drug application of April 7, 1994 submitted pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act for the designation of coagulation Factor IX, recombinant (rhFIX) as an orphan drug (

We have completed the review of this application and request that additional information be submitted summarizing the status, as well as any results, of all nonclinical studies for rhFIX. The information submitted to support the scientific rationale for the use of rhFIX in the treatment of hemophilia B is mostly dedicated to discussing the superiority of rhFIX over currently available blood-derived Factor IX products. Although this information suggests that a recombinant product offers significant advantages over a blood-derived product, the application does not provide the nonclinical data required under 21 CFR 316.20(b)(4). Partial data was provided about the manufacturing and testing process of the CHO line, as well as the half-life of rhFIX in dogs, but it is not clear if this nonclinical information was obtained in your own studies or elsewhere because it is is not referenced. Please clarify and provide copies of appropriate references used in support of any new submissions.

Further review of this application is being held in abeyance pending the receipt of the above requested information. A written response to this letter must be received within 90 days from the date of this communication or the file will be considered inactive and withdrawn. Following 90 days, further requests for designation of the same product for the same indication must be made in the form of a new designation application. Information contained in this file may be cross-referenced in support of a new designation request.

Your cooperation is appreciated.

Sincerely yours,

Marlene E. Haffner, M.D., M.P.H.
Director

DEPARTMENT OF HEALTH & HUMAN SERVICES          Public Health Service

---

Office of Orphan Products Development *(HF-35)*
Food and Drug Administration
5600 Fishers Lane
Rockville, MD  20857

October 3, 1994

Genetics Institute, Inc.
Attention: Frederick T. Gates, Ph.D.
Director, Regulatory Affairs
87 Cambridge Drive
Cambridge, MA  02140

Dear Dr. Gates:

Reference is made to your orphan drug application of April 7, 1994 submitted pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act for the designation of coagulation Factor IX (recombinant) as an orphan drug               We also refer to your amendments dated July 15 and September 15, 1994.

We have completed the review of this application, as amended, and have determined that coagulation Factor IX (recombinant) qualifies for orphan designation for the treatment of hemophilia B.  Please note that it is coagulation Factor IX (recombinant) and not its formulation that has received orphan designation.

Prior to marketing approval, sponsors of designated orphan products are requested to submit written notification to this Office of their intention to exercise orphan drug exclusivity if they are the first sponsor to obtain such approval for the drug.  This notification will assist FDA in assuring that approval for the marketing of the same drug is not granted to another firm for the statutory period of exclusivity.  Also please be advised that if coagulation Factor IX (recombinant) were approved for an indication broader than the orphan designation, your product might not be entitled to exclusive marketing rights pursuant to Section 527 of the FFDCA.  Therefore, prior to final marketing approval, sponsors of designated orphan products are requested to compare the designated orphan indication with the proposed marketing indication and to submit additional data to amend their orphan designation prior to marketing approval if warranted.

In addition, please inform this office annually as to the status of the development program, and at such time as a marketing application is submitted to the FDA for the use of coagulation Factor IX (recombinant) as designated.  If you need further assistance in the development of your product for marketing, please feel free to contact Ms. Erica McNeilly at (301) 443-4718.

Please refer to this letter as official notification of designation and congratulations on obtaining your orphan drug designation.

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Office of Orphan Products Development*(HF-35)*
Food and Drug Administration
5600 Fishers Lane
Rockville, MD  20857

March 25, 1996

Genetics Institute
Attention: John C. Petricciani, M.D.
Vice President, Regulatory Affairs
87 Cambridge Park Drive
Cambridge, MA 02140

Dear Dr. Petricciani:

This is in response to your January 31, 1996 request for a letter from the our office regarding PLA filing issues and whether the orphan exclusivity of AlphaNine and Mononine would prevent the Agency from accepting a PLA filing for coagulation factor IX, recombinant (rFIX).

When our office considered designating rFIX as an orphan product, we determined that Genetics Institute had submitted a medically plausible rationale for the potential clinical superiority (safer or more efficacious) of the drug and that the orphan exclusivity already held by AlphaNine and Mononine would not interfere with the designation of rFIX as an orphan drug.

Accordingly, the orphan exclusivity of AlphaNine and Mononine should not prevent the Agency from accepting Genetic Institute's PLA for filing.  In addition, rFIX would be eligible for licensing as a commercial product in the United States if the information in the PLA support a claim of greater safety than AlphaNine or Mononine.  On the basis of the manufacturing scheme for rFIX containing no human- or animal-derived proteins, rFIX should be inherently safer than plasma- derived products in that there is no potential for contaminants with plasma-derived pathogens.

If you have any other questions or concerns, please feel free to contact our office at (301) 827-3666.

Sincerely yours,

Marlene E. Haffner, M.D., M.P.H.
RADM, USPHS
Director, Office of Orphan Products Development

cc:

*Genetics Institute, Inc.*

87 CambridgePark Drive
Cambridge, Massachusetts 02140
Telephone (617) 876-1170
Telefax (617) 876-0388

One Burtt Road
Andover, Massachusetts 018
Telephone (508) 475-9214
Telefax (508) 475-0085

**GENETICS** ■ **INSTITUTE**

RECEIVED

JAN 13 1997

Office of Orphan
Products Development

Coagulation Factor IX (Recombinant) [rFIX]
Orphan Drug Application

Exercise of Orphan Drug Exclusivity

January 8, 1997

Marlene Haffner, M.D., M.P.H.
Office of Orphan Products Development
(HF-35)
Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20857

Dear Dr. Haffner:

By letter dated October 3, 1994, Genetics Institute, Inc. received orphan drug designation for Coagulation Factor IX (Recombinant) [rFIX]. The designation letter also indicated that prior to receipt of marketing approval for rFIX, Genetics Institute should submit written notification to you of Genetics Institute's intention to exercise orphan drug exclusivity. On August 29, 1996, Genetics Institute submitted a Biologics License Application for rFIX, and on December 12, 1996, the Blood Products Advisory Committee recommended approval of the product. Therefore, on behalf of Genetics Institute, we hereby notify the Office of Orphan Products Development of our intention to exercise orphan drug exclusivity for rFIX. This notification should facilitate recognition by the FDA of the exclusive approval of rFIX, in accordance with 21 CFR 316 Subpart D.

Please call me at (617) 498-8623, or Tim Ahern, Ph.D, Regulatory Affairs Associate, at (617) 498-8777, if you have any questions or require additional information.

Sincerely,

Frederick T. Gates, Ph.D.
Director, Regulatory Affairs

The information and data on this page and on all other pages marked with the following statement
THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.
are confidential business information or trade secrets of Genetics Institute, Inc., or its licensors and are exempt from disclosure under the Freedom of Information Act (5 USC 552), as set forth in 21 CFR 20.

## Review of Request for Orphan Designation

**Designation  Number:**                                                **FILE COPY**

|  |  |
|---|---|
| Date  Received  by FDA: | April 8, 1994 |
| Date  Received  by Reviewer: | April 8, 1994 |
| Date  Review  Completed: | April 29, 1994 |
| Date  Amendment  Received: | July 18, 1994 |
| Date  Additional  Information  Received: | September  16, 1994 |
| Date  Review  Completed: | September  20, 1994 |

**Product:**    Trade  Name:      has not been  established
               Generic  Name:    coagulation  Factor  IX (recombinant),  rhFIX

**Sponsor**

Genetics  Institute,  Incorporated
87 CambridgePark  Drive
Cambridge,  MA  02140
(617)  876-1170

**Contact  Person:**

Frederick  T. Gates,  Ph.D.
Director,  Regulatory  Affairs

**Regulatory  Status:**

RhFIX is currently  under  development  at Genetics  Institute.
e)

**Indication:**

Treatment  of hemophilia  B.

**Conclusions  and Recommendations   from April 29 Review:**

The sponsor  has presented  satisfactory  evidence  that the population  of patients  with
hemophilia  B in the United  States  will be clearly  less than  200,000, and  is approximately
6,000.

Most of the information  in the rationale  portion  of the application  discusses  the
superiority  of rhFIX over currently  available  blood-derived  Factor  IX products.
Although  this evidence  clearly  suggests  that a recombinant  product  offers  significant
advantages  over a blood-derived  product,  the application  does not supply  enough  data to
indicate  that rhFIX is anything  more than a concept.  The sponsor  states in the
application  that an IND will be submitted  to FDA in December  1994, so clinical
information  is not expected,  but preclinical  information  should have been  provided.  The
sponsor  does give some limited  information  about the manufacturing  and testing  process

of the CHO line, as well as the half-life of rhFIX in the dog, but it is not clear if this nonclinical information was obtained in the sponsor's own studies or elsewhere because this information is not referenced. The only preclinical reference submitted in the application discusses the first purification of Factor IX in CHO cells in 1986.

Data summarizing the status, as well as any results, of all preclinical studies for rhFIX should be submitted.

Sponsor's July 18 Response :

The sponsor provided a summary of their rhFIX preclinical studies, which were performed with product manufactured in their Andover facility. Three studies were discussed; the 28-day rat pharmacology study, 28-day dog pharmacology study, and single-dose dog pharmacokinetic (PK) study of rhFIX versus Mononine ™. The first two studies describe the antigenicity of rhFIX in the rat and dog. The last study found the two pharmacokinetic profiles of the two proteins to be similar, except that the area under the curve (AUC) value for Mononine ™ was 25% higher. This difference is thought to be due to the lower specific activity of Mononine ™ in comparison to rhFIX. The sponsor indicates that "on the basis of these preliminary studies, the efficacy of rhFIX is presently being assessed in hemophilia B dogs."

Evaluation of July 18 Response:

The sponsor has provided a summary of their completed preclinical data, performed using rhFIX manufactured in their own facility. This data does indicate that the sponsor has a product, but the completed studies are preclinical safety studies which do not provide any evidence of efficacy. The sponsor indicates that an efficacy study of rhFIX in dogs with hemophilia B are currently ongoing, but no information about this preclinical efficacy study is provided.

The sponsor was contacted September 1 and asked to submit the results of the preclinical study of rhFIX in the hemophilia B dog model.

Sponsor's September 15 Response :

The results of a study of rhFIX in three hemophilia B dogs were provided by the sponsor. The effect of rhFIX on clotting parameters in the hemophilia B dogs are the following:

| parameter | hemophilia dog | | normal dogs |
|---|---|---|---|
| | before treatment | after treatment | no treatment |
| whole blood clotting time | $53 \pm 10.6$ min | $10.3 \pm 1.0$ min | $7.5 \pm 1.5$ min |
| secondary bleeding time | $> 15$ min | $2.6 \pm 0.5$ min | $3.5 \pm 2.5$ min |
| partial thromboplastin time | $125 \pm 25$ sec | $60.5 \pm 15$ sec | $37.5 \pm 1.5$ sec |

3

The PK values reported for rhFIX was comparable to those obtained with human-derived factor IX in normal beagle dogs. The sponsor indicates that rhFIX can effectively restore normal hemostasis in dogs with hemophilia B.

Evaluation of September 1 Response:

The sponsor summarizes that the these preclinical results indicate that rhFIX can effectively restore normal hemostasis in dogs with hemophilia B and that pharmacokinetic values reported for rhFIX was comparable to those obtained with human-derived factor IX in normal beagle dogs. Although these are preclinical efficacy results, the data does provide satisfactory scientific rationale for the use of rhFIX in the treatment of hemophilia B.

Recommendation:

It is recommended that coagulation Factor IX (recombinant) (rhFIX) be designated an orphan product for the treatment of hemophilia B as required by Section 526 of the Orphan Drug Act.

*Erica K. McNeilly*

Erica K. McNeilly, R.Ph.
Reviewing Pharmacist

Concur: *Marlene E. Haffner*          Date: *27 September '94*
Marlene E. Haffner, M.D., M.P.H.

CC:
HF-35/OP File
HF-35/Chron
HF-35/EKMcNeilly   9/20/94   review-2.822

Review of Request for Orphan Designation        **FILE COPY**

Designation Number:

|                          |                      |
|--------------------------|----------------------|
| Date Received by FDA:    | April 8, 1994        |
| Date Received by Reviewer: | April 8, 1994      |
| Date Review Completed:   | April 29, 1994       |

Product:

|              |                                          |
|--------------|------------------------------------------|
| Trade Name:  | has not been established                 |
| Generic Name: | coagulation Factor IX (recombinant), rhFIX |

Sponsor :

Genetics Institute, Incorporated
87 CambridgePark Drive
Cambridge, MA  02140
(617) 876-1170

Contact Person:

Frederick T. Gates, Ph.D.
Director, Regulatory Affairs

Regulatory Status:

RhFIX is currently under development at Genetics Institute.

Indication:

Treatment of hemophilia B.

Disease Background Information:

Hemophilia is a sex-linked disorder of males.  It is characterized by excessive bleeding and a prolongation of blood clotting time.   There are three major types of hemophilia: hemophilia A, hemophilia B, and hemophilia C.  Hemophilia B, the topic of this application, is also known by its synonym Christmas disease, and is characterized by insufficient or abnormal synthesis of Factor IX.

Activated Factor IX, in the presence of activated Factor VIII, is required for activation of Factor X.  Activated Factor X converts prothrombin to thrombin, which in turn catalyzes the cleavage of fibrinogen to fibrin, resulting in the formation of a fibrin clot. Clinical symptoms of hemophilia B depend on the amount of active Factor IX produced by the patient.   Those with mild factor IX deficiency may only hemorrhage after trauma

2

or surgery. In severe cases, hemorrhaging can occur spontaneously, producing orthopedic deformities, organ dysfunction, or death[1]. About 50% of patients with hemophilia B have a mild course with only occasional bleeding, but 20% of patients have severe disease that requires regular prophylactic Factor IX replacement therapy.

The symptoms of hemophilia B symptoms are currently treated with ice packs to decrease swelling and discomfort and replacement therapy. Frozen fresh plasma may be used in instances of mild bleeding. For moderate to severe hemorrhaging, commercially prepared factor IX is used.

Population Estimate:

References submitted by the sponsor estimate the population with hemophilia B to range between a minimum of 3,900 to a maximum of 5,200[2,3]. The highest incidence of hemophilia B in any country is 2.3 per 100,000 in Ireland[4]. Given the current United States population of 260 million, the sponsor indicates that this incidence figure would yield a potential maximum prevalence of 6,000 persons in the United States.

Rationale for Use:

RhFIX exhibits a half-life in dogs comparable to purified plasma-derived factor IX.

The recombinant nature of this factor IX product offers clinical advantages over the approved blood-derived factor IX products, Alphanine™ and Mononine™. Three claims of clinical superiority are:

**The use of a recombinant product eliminates the risk of transmitting blood-derived pathogens.**
The approved factor IX products are blood derived and carry the risk of transmitting viruses, as well as deleterious nonviral contaminants, to the patient. Examples are contamination of blood-derived coagulation factors with parvovirus[6], hepatitis A[7], and the recent case of a recall of blood products due to Hepatitis C infection[8].

The sponsor does acknowledge the theoretical risk of transmission of viruses associated with the CHO cell culture, but knows of no reports of adverse events resulting from the use of recombinant therapeutic proteins associated with CHO cells that can be attributed to viruses. The CHO cells used in the production of rhFIX have been extensively tested for a large number of viruses and infectious agents and have been demonstrated to be free of any contaminating agent.

3

> A monoclonal antibody is not used in the preparation of this product, so it can be freely used in patients who might be allergic to mouse proteins.
>
> The use of a recombinant product does not involve the risk of thrombosis or disseminated intravascular coagulation (DIC) that is associated with co-administration of other contaminating coagulation factors. Thrombosis or DIC has been observed to follow administration of blood-derived factor IX concentrates, which contain certain amounts of factors II, VII, and X. Despite the improved purity of Mononine™ relative to other factor IX products, the package insert for Mononine™ still warns of such risks[9]

No information about any preclinical studies performed by the sponsor has been submitted. All of the information in this application about the product rhFIX has been summarized in the first paragraph of this section and only one reference was included to support this data.

Evaluation:

The sponsor has presented satisfactory evidence that the population of patients with hemophilia B in the United States will be clearly less than 200,000, and is approximately 6,000.

Most of the information in the rationale portions of the application discuss the superiority of rhFIX over currently available blood-derived Factor IX products. Although this evidence clearly suggests that a recombinant product offers significant advantages over a blood-derived product, the application does not supply enough data to indicate that rhFIX is anything more than a concept ... so clinical information is not expected, but preclinical information should have been provided. The sponsor does give some limited information about the manufacturing and testing process of the CHO line, as well as the half-life of rhFIX in the dog, but it is not clear if this nonclinical information was obtained in the sponsor's own studies or elsewhere because this information is not referenced. The only preclinical reference submitted in the application discusses the first purification of Factor IX in CHO cells in 1986.

Data summarizing the status, as well as any results, of all preclinical studies for rhFIX should be submitted.

Recommendation:

It is recommended that a deficiency letter be issued to the sponsor:

The information submitted to support the rationale portions of this orphan drug designation application are almost solely dedicated to discussing the superiority of rhFIX over currently available blood-derived Factor IX products. Although this evidence clearly suggests that a recombinant product offers significant advantages over a blood-derived product, the application does not supply the nonclinical data as required in

4

content and format of request for orphan-drug designation (21 CFR § 316.20). You have provided limited information about the manufacturing and testing process of the CHO line, as well as the half-life of rhFIX in the dog, but it is not clear if this nonclinical information was obtained in the your own studies or elsewhere because this information is not referenced. The only nonclinical reference submitted in your the application discusses the first purification of Factor IX in CHO cells in 1986.

Please submit additional information summarizing the status, as well as any results, of all your nonclinical studies for rhFIX.

Erica K. McNeilly, R.Ph.
Reviewing Pharmacist

Concur: _____    Date: 2 May '94
Marlene E. Haffner, M.D., M.P.H.

CC:
HF-35/OP File
HF-35/Chron
HF-35/EKMcNeilly  4/29/94

5

1.  Levine PH.  Clinical manifestations and therapy of hemophilias A and B.  In Hemostasis and Thrombosis: Basic Principles and Clinical Practice, 2nd Edition, RW Colman, J Hirsh, VJ Marder and EW Salzman, eds. (J.P. Lippincott Co., Philadelphia), pp. 97-111.  1990.

2.  Ibid.

3.  Roberts HR and Jones MR.  Hemophilia and related conditions - congenital deficiencies of prothrombin (factor II), factor V, and factors VII to XII.  In Hematology, 4th Edition, WJ Williams, E. Beutler, AJ Erslev, and MA Lichtman, eds. (McGraw-hill, New York). pp 1462-1464.  1990.

4.  Etzler, J.  Hemophilia statistics: Ireland, Status 1992.  IE/ST-2 Hemstat, World Federation of Hemophilia Information Clearing House.

5.  Kaufman RJ, Wasley LC, Furie BC, et.al.  Expression, purification, and characterization of recombinant gamma-carboxylated Factor IX synthesized in Chinese hamster ovary cells.  J. Biol. Chem 261:9622-9628.  1986.

6.  Azzi A, Ciappi S, Zakvrezeska K, et.al.  Human parvovirus B19 infection in hemophiliacs first infused with two high-purity virally attenuated factor VIII concentrates. Am. J., Hematol. 39:228-230.  1992.

7.  Mannucci PM.  Clinical evaluation of viral safety of coagulation factor Viii and IX concentrates.  Vox Sang 64:197-203.  1993.

8.  The Associated Press, Byline: L. Neergarrd.  Worldwide recall of blood product because of hepatitis fear.  February 25, 1994.

9.  Package insert for Mononine™.  August, 1992.

94 822

<u>Memorandum of Meeting</u>

<u>Date:</u> January 17, 1995

<u>Representing FDA, Office of Orphan Products Development (OPD):</u>

        Marlene Haffner, M.D., M.P.H., Director
        John J. McCormick, M.D., Medical Reviewer
        Erica McNeilly, R.Ph., Consumer Safety Officer

<u>Representing FDA, Center for Biologics Evaluation and Research (CBER), Office of Blood Research and Review, Division of Hematology :</u>

        Joseph C. Fratantoni, M.D., Director
        Mark Weinstein, M.D., Medical Reviewer

<u>Purpose:</u>  To discuss exclusivity issues encompassing recombinant factor VIII and recombinant factor IX products.

<u>Background:</u>  Recombinant factor IX, sponsored by Genetics Institute, was designated an orphan product on October 3, 1994. There are no recombinant factor IX products on the market, although two sponsors presently market human-derived factor IX. (                    .e

Pharmacia met with representatives from OPD and CBER on November 21, 1994 to discuss filing orphan designation for their recombinant factor VIII product. Currently, Miles and Baxter jointly hold exclusivity for recombinant factor VIII. Pharmacia will have to provide either evidence of clinical superiority or proof that their recombinant factor VIII is a different product to break this exclusivity.

<u>Discussion and Conclusions:</u>  The protein structure of Genetics Institute's recombinant factor IX is identical to human derived factor IX. However, the recombinant product will be formulated without the use of any human components so there is no risk of passing any pathogen found in human blood. It appears to both CBER and OPD that Genetic's Institute recombinant factor IX can be considered clinically superior to the presently marketed human-derived factor IX products, provided that equivocal efficacy can be determined between the recombinant and human-derived products.

The presently marketed recombinant factor VIII products are identical to the natural human derived factor VIII. Pharmacia's recombinant factor VIII product contains about half of the

2

amino acid (AA) sequence of the natural product. Deleting half of the AA sequence does not appear to alter the specific activity of the Pharmacia's product and Pharmacia states that their smaller, different molecule may potentially reduce immunogenicity risk because of fewer sites to produce antibodies. Pharmacia's product is manufactured with human albumin, although no albumin is used in the administration of the product.

It appears to CBER and OPD that Pharmacia's recombinant factor VIII product is potentially different from the currently marketed recombinant factor VIII products because there is a major difference in AA sequence. It also appears to CBER that this major difference in AA sequence is likely to produce a potential significant difference in antigenicity.

Erica K. McNeilly, CSO

cc: GCF-1/J. Cohen
    OP File ;
    HF-35/C_____
    HF-35/Attendees
    HF-35/E. McNeilly  recomfac.min  dt:1/20/95; ft: 1/24/95
    Concurrences: J.McCormick, M.Haffner 1/23/95.

*Genetics Institute, Inc.*

*87 CambridgePark Drive*
*Cambridge, Massachusetts 021[?]0*
*Telephone (617) 876–1170*
*Telefax (617) 876–0388*

**GENETICS INSTITUTE**

**FILE COPY**

Recombinant Human Factor IX (rhFIX)
Orphan Drug Application

September 15, 1994

Marlene Haffner, M.D., M.P.H.
Office of Orphan Products Development
(HF-35)
Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20857



Dear Dr. Haffner:

This letter is a follow-up to our telephone conversation with Erica McNeilly of September 1 concerning  ʃ              Genetics Institute's orphan drug application for  recombinant human Coagulation Factor IX (rhFIX). At her request, we are supplying a summary of the results of the preclinical study of rhFIX in the hemophilia B dog model that was recently completed (see attached). This study was performed in collaboration with Dr. Kenneth Brinkhous (University of North Carolina) using rhFIX manufactured by Genetics Institute.

Based on our telephone conversation, we understand that review of the summary provided here should be sufficient to complete the review of our orphan drug application. Please call me at (617) 498-8623, or Maryann Krane, Senior Regulatory Affairs Associate, at (617) 498-8737, if you have any questions.

Sincerely,

Frederick T. Gates, Ph.D.
Director, Regulatory Affairs

The information and data on this page and on all other pages marked with the following statement
THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.
are confidential business information or trade secrets of Genetics Institute, Inc., or its licensors and are exempt
from disclosure under the Freedom of Information Act (5 USC 552), as set forth in 21 CFR 20.

Marlene Haffner<br>
September 15, 1994<br>
Attachment

## Summary of the Hemophilia B Dog Study (PR-017-94)

The effect of intravenous administration of recombinant human Factor IX (rhFIX) has been studied in an in vivo canine model of hemophilia B. The study was designed to provide preliminary efficacy data of rhFIX prior to commencement of clinical trials.

rhFIX (40 IU/kg) was administered by intravenous bolus injection to three hemophilia B dogs. Blood samples for coagulation profiles, whole blood clotting times, factor IX activity assays, and rhFIX antigen determination were collected prior to treatment and during the 24 hours after treatment at the following time intervals: 0.25, 0.5, 1.0, 2.0, 4.0, 6.0, 8.0, 12.0, 18.0, 22.0, and 24.0 hrs. The effect of administration of rhFIX on clotting parameters in this model are depicted in Table 1. As indicated by the reduction in whole blood clotting time and secondary bleeding time to within the range observed for normal dogs, hemostasis was restored in the hemophilia B dog after treatment with rhFIX.

**Table 1. The effect of rhFIX on clotting parameters in hemophilia B dogs**

| Parameter | Hemophilia B Dogs | | Normal Dogs |
|---|---|---|---|
| | Before Treatment | After Treatment with rhFIX | No Treatment |
| Whole blood clotting time | 53 ±10.6 min | 10.3 ±1.0 min | 7.5 ±1.5 min |
| Secondary bleeding time[a] | >15 min | 2.6 ±0.5 min | 3.5 ±2.5 min |
| Partial thromboplastin time | 125 ±25 sec | 60.5 ±15 sec | 37.5 ±1.5 sec |

[a]Time for a clot to form after induction of blood flow by wiping away the primary clot from the site of a dog toenail clip.

Based on antigen analysis, it was determined that the clearance of rhFIX from plasma was biphasic. The distributional half-life was 0.38 ±0.33 hours and the elimination half-life was 11.4 ±1.4 hours. The PK values reported for rhFIX are comparable to those obtained with human plasma-derived factor IX in normal Beagle dogs (For a detailed description of the studies in normal Beagle dogs, see letter to Marlene Haffner, July 15, 1994, Attachment A).

In summary, the results indicate that rhFIX can effectively restore normal hemostasis in a canine model of hemophilia B. The pharmacokinetic behavior of the recombinant product is similar to the plasma-derived human protein.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.<br>
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

*Genetics Institute, Inc.*

*87 CambridgePark Drive*
*Cambridge, Massachusetts 02140*
*Telephone (617) 876–1170*
*Telefax (617) 876–0388*

**GENETICS** **INSTITUTE**

Recombinant Human Factor IX (rhFIX)
Orphan Drug Application
Ref. No. 94-822

July  15 , 1994

Marlene Haffner, M.D., M.P.H.
Office of Orphan Products Development
(HF-35)
Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20857

**FILE COPY**

**RECEIVED** 6 EKM #|1r|94

JUL 18 1994

Office of Orphan P  ducts Development

Dear Dr. Haffner:

Thank you for your letter of May 11, 1994 acknowledging review of our orphan drug application for  recombinant human Coagulation Factor IX (rhFIX)                As requested, we are responding within the 90-day period  to your inquiry concerning our manufacturing and testing process for our Chinese hamster ovary (CHO) cell line and the half-life of rhFIX in dogs. First, it is important to note that the reported nonclinical information was obtained in our own studies, and not elsewhere. Second, the rhFIX characterized in the studies was manufactured by Genetics Institute at our Andover facility.  Descriptions and results of the completed preclinical laboratory studies  are  summarized  on  the  following  pages.  A manuscript for publication, entitled "Evaluation of Recombinant Human Factor IX: Pharmacokinetic Studies in the Rat and Dog," which describes the studies in more detail, is reproduced here as Attachment A.  We hope the information provided in this letter is  sufficient to complete your review of our Orphan Drug Application.

As was stated in Section 7 of our Orphan Drug Application

We anticipate

the initial clinical testing of the drug to begin in patients in early 1995.

Please call me at (617) 498-8623, or Maryann Krane, Senior Regulatory Affairs Associate, at (617) 498-8737, if you have any questions or require additional information.

Sincerely,

Frederick T. Gates

Frederick T. Gates, Ph.D.
Director, Regulatory Affairs

The information and data on this page and on all other pages marked with the following statement
THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.
are confidential business information or trade secrets of Genetics Institute, Inc., or its licensors and are exempt
from disclosure under the Freedom of Information Act (5 USC 552), as set forth in 21 CFR 20.

## Summary of rhFIX Preclinical Studies

Preclinical studies with intravenous administration of recombinant human Factor IX (rhFIX) have been performed in Sprague-Dawley rats and Beagle dogs (Table 1). The studies were designed to provide preliminary pharmacologic and pharmacokinetic data of rhFIX to aid in the selection of appropriate dose and study duration in the Hemophilia B dog efficacy model and in the formal toxicology study of rhFIX in Beagle dogs.

**Table 1. Preclinical laboratory studies of rhFIX**

| Study |
| --- |
| 28-Day Rat Pharmacology Study |
| 28-Day Dog Pharmacology Study |
| Single-dose Dog PK Study of rhFIX vs. Mononine™ |

All of the studies described in the above table were performed by Genetics Institute, Inc., using rhFIX manufactured at Genetics Institute's Andover facility. Preliminary summaries of each study are included below. The section entitled "Single-dose PK comparison of rhFIX" is an across-study compilation of data from other studies listed in Table 1. A manuscript for publication, entitled "Evaluation of Recombinant Human Factor IX: Pharmacokinetic Studies in the Rat and the Dog," which describes the three studies in more detail, is reproduced here as Attachment A.

### 28-Day Rat Pharmacology Study

rhFIX (50 units/kg) was administered once daily via the tail vein to Sprague-Dawley rats for 28 days. Anti-human Factor IX antibody levels were determined in serum collected on study Days 1, 7, 14, 21, and 28. Only 1 rat developed antibodies during the 28-day period. rhFIX plasma concentrations were determined by ELISA on Days 1 and 28 of administration. Preliminary assessment of the pharmacokinetic data indicates a half-life of approximately 5.0 hr on Day 1. Plasma concentration data on Day 28, limited to 90 minutes post-dose, were slightly higher than the respective concentrations on Day 1, but no conclusions can be drawn concerning the observed difference due to the limited concentration data on Day 28 (See Attachment A, Figure 2).

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

### 28-Day Dog Pharmacology Study

A 28-day antigenicity study of rhFIX was conducted in Beagle dogs. A plasma-derived FIX product (Mononine™) was used as a study control.

rhFIX (40 units/kg) or Mononine (40 units/kg) were administered intravenously once daily to Beagle dogs for 28 or 14 days, respectively. Dogs receiving rhFIX were administered a final injection on Day 34, following a 6-day washout period.  Anti-human Factor IX antibody levels were determined in serum collected from dogs treated with Mononine or rhFIX on study Days 1, 7, and 14, or Days 1, 7, 14, 21, 28, 34, and 42, respectively.  Three of four dogs developed antibodies against Mononine by Day 14, and three of four dogs developed antibodies against rhFIX by Day 28. rhFIX did not appear to be any more antigenic than Mononine in the dog. Decreased appetite, especially during the first week of administration, was noted in all of the dogs receiving either Mononine or rhFIX. Two of four dogs in the Mononine group and one of four dogs in the rhFIX group had generalized reactions to the protein administration, consisting of transient weakness, tachycardia, tachypnea, and prolonged capillary refill time. All episodes resolved within minutes without treatment, and subsequent reactions failed to occur as the speed of bolus injection was decreased from 15 sec to 1 minute. These results support selection of a 14-day regimen in pharmacology and safety studies of rhFIX.

Pharmacokinetic studies of rhFIX were conducted on Days 1, 28, and 34 in the dogs which received rhFIX.  Increased clearance and decreased half-life of rhFIX was observed in the dogs which developed an antibody response. The apparent half-life of rhFIX on Day 1 in all four dogs and Days 28 and 34 in the one dog with no antibodies was approximately 12 - 14 hrs.

### Single-Dose Dog PK Study of rhFIX vs. Mononine

The pharmacokinetics of rhFIX were compared to plasma-derived FIX product (Mononine) after single IV doses (100 units/kg) in separate groups of normal Beagle dogs. rhFIX (n=5) and Mononine (n=3) appeared to exhibit similar plasma concentration profiles, as determined by ELISA. The estimated plasma half-lives were similar (Table 2), ranging in the individual animals from 12-14 hrs for rhFIX and from 11-15 hrs for Mononine. Peak plasma concentrations and clearance values of rhFIX and Mononine were comparable following the IV bolus dose. The approximately 25% higher AUC value observed for Mononine vs. rhFIX may be explained in part by the fact that although each dog received an identical amount of FIX in terms of activity units, due to the lower specific activity of Mononine relative to rhFIX (150 U/mg vs. 200 U/mg), the dogs injected with Mononine received 25% more protein. These preliminary findings in dogs suggest that the pharmacokinetic behavior of recombinant human FIX is similar to plasma-derived FIX.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

**Table 2. Preliminary Mean (±SE) rhFIX and Mononine PK Parameter Estimates from IV Bolus Injections (100 Units/kg) in Beagle Dogs**

| Product | $C_0$ (μg/mL) | AUC (μg×hr/mL) | $T_{1/2}$ (hr) | CLT (mL/hr/kg) | Vss (mL/kg) |
|---------|---------------|----------------|----------------|----------------|-------------|
| rhFIX | 4.3 ±0.3 | 35.3±2.3 | 13.2±1.6 | 14.4±1.0 | 222±19 |
| Mononine | 4.7±0.2 | 43.6±2.5 | 13.3±1.2 | 15.5±0.9 | 255±26 |

$C_0$, initial plasma concentration; AUC, area under concentration versus time curve; $T_{1/2}$, plasma-concentration half-life; CLT, total clearance; Vss, steady state volume of distribution.

## Single-dose PK Comparison of rhFIX

Table 3 compares preliminary pharmacokinetic data obtained from the dog studies described above. Interim analysis of the PK behavior of single 40 or 100 units/kg IV doses in separate groups of beagle dogs suggest that rhFIX plasma concentrations increased in proportion to dose over the dose range studied.

**Table 3. Preliminary Mean (±SE) rhFIX PK Parameters in Beagle Dogs After Single 40 and 100 U/kg IV Doses**

| N | Dose (U/kg) | $C_0$ (μg/mL) | AUC (μg×hr/mL) | $T_{1/2}$ (hr) | CLT (mL/hr/kg) | Vss (mL/kg) |
|---|-------------|---------------|----------------|----------------|----------------|-------------|
| 4 | 40 | 1.6 ±0.4 | 14.2±2.5 | 10.3±1.1 | 14.9±2.3 | 204±17 |
| 5 | 100 | 4.3±0.3 | 35.3±2.3 | 13.2±1.6 | 14.4±1.0 | 222±19 |

N, number of animals tested; see Footnote to Table 2 for explanation of other abbreviations.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

*Genetics Institute, Inc.*

87 *CambridgePark Drive*
*Cambridge, Massachusetts 02140*
*Telephone (617) 876-1170*
*Telefax (617) 876-0388*

*One Burtt Road*
*Andover, Massachusetts 01810*
*Telephone (508) 475-9214*
*Telefax (508) 475-0085*



GENETICS ■■ INSTITUTE

RECEIVED

APR 08 1994

FILE COPY

Office of Orphan Products Development

TO SKM 4/8/94

April 7, 1994

Marlene Haffner
Office of Orphan Products Development
(HF-35)
Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20857

On behalf of Genetics Institute, Inc. and in accordance with Section 526 of the Food, Drug and Cosmetic Act, enclosed with this letter, in duplicate, is a request for orphan drug designation for coagulation Factor IX (recombinant), also referred to as recombinant human Factor IX (rhFIX).

Recombinant human Factor IX is currently under development at Genetics Institute for the treatment of Hemophilia B in human subjects; in December, 1994, we expect to file with FDA an application for an Investigational New Drug exemption for rhFIX.

Sincerely,

Frederick T. Gates III

Frederick T. Gates, Ph.D.
Director, Regulatory Affairs

Encl.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.                    1

REQUEST FOR ORPHAN DRUG DESIGNATION:

COAGULATION FACTOR IX (RECOMBINANT)

[The following information is presented in the format as provided in 21 CFR § 316.20]

1.    **A statement that the sponsor requests orphan-drug designation for a rare disease or condition, which shall be identified with specificity.**

Genetics Institute, Inc. ("The Sponsor") requests orphan drug designation for Coagulation Factor IX (Recombinant) for the treatment of Hemophilia B.


_Frederick T. Gates III_                    _April 7, 1994_
Frederick T. Gates                          Date
Director, Regulatory Affairs

2.    (i)    **Name and address of the Sponsor;**

Genetics Institute, Inc.
87 CambridgePark Drive
Cambridge, MA 02140

(ii)    **Name and address of the sponsor's primary contact person;**

| | | |
|---|---|---|
| Frederick T. Gates, Ph.D. | | Maryann Krane |
| Director, Regulatory Affairs | | Senior Regulatory Affairs Associate |
| Genetics Institute, Inc. | or | Genetics Institute, Inc. |
| 87 CambridgePark Drive | | 87 CambridgePark Drive |
| Cambridge, MA 02140 | | Cambridge, MA 02140 |
| | | |
| Tel: (617) 498-8623 | | Tel: (617) 498-8737 |
| Fax: (617) 498-8876 | | Fax: (617) 498-8876 |

(iii)    **The generic and trade name, if any, of the drug or drug product;**

Generic name: coagulation Factor IX (recombinant).

No trade name has been established for the drug.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

(iv)    The name and address of the source of the drug if it is not manufactured
        by the sponsor.

3.    A description of the rare disease or condition for which the drug will be
      investigated, the proposed indication or indications for use of the drug, and the
      reasons why such therapy is needed.

The disease

Hemophilia B, or Christmas disease, is an X-linked recessively inherited disorder of
blood coagulation characterized by insufficient or abnormal synthesis of the blood clotting
protein Factor IX. Activated Factor IX, in the presence of activated Factor VIII, is
required for activation of Factor X. Activated Factor X subsequently converts
prothrombin to thrombin, which catalyzes the cleavage of fibrinogen to fibrin, resulting
in the formation of a fibrin clot. Depending on the level of biologically active Factor IX
the patient is able to produce, clinical symptoms after surgery or trauma range from only
moderate skin bruising or excessive hemorrhage to spontaneous hemorrhage into joints,
muscles or internal organs including the brain. Severe or recurring hemorrhages can
produce orthopedic deformity, organ dysfunction, or death (Levine, 1987).
Approximately 50% of patients have a mild course with only occasional bleeding
problems; the 20% of patients diagnosed with severe Hemophilia B have frequent
bleeding and sufficiently severe problems to warrant regular prophylactic Factor IX
replacement therapy.

The proposed indication and reason for therapy

The anticipated use for recombinant human Factor IX is the correction of the coagulation
deficit in congenital Hemophilia B, or Factor IX deficiency. Addition of biologically
active Factor IX to replace the deficiency reconstitutes the patient's ability to form a clot
and to control bleeding.  This product will provide specific and definitive replacement
of the Factor IX that is deficient in patients with Hemophilia B. It will be indicated for
replacement treatment to control and to prevent the hemorrhagic complications of
Hemophilia B, including spontaneous bleeding events, bleeding from contemplated or
performed surgery, bleeding from trauma, and recurring bleeding in patients who have
had numerous joint or soft tissue bleeding in the past, leading to or potentially leading
to orthopedic deformities and associated morbidity.

Treatment with replacement Factor IX can be used effectively to stop hemorrhages and
hemarthroses. Standard textbooks of hematology and medical practice recommend that
a blood level of 15 to 40% of normal Factor IX activity is sufficient to arrest minor
bleedings and prevent their progression; for more serious bleeding or surgery a higher

Page 2

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

level of up to 60 to 100% may be required (Bell and Jackson, 1988; Roberts et al., 1990; Menitove, 1990; Linker, 1991).

4.  **A description of the drug and a discussion of the scientific rationale for the use of the drug for the rare disease or condition, including all data from nonclinical laboratory studies, clinical investigations, and other relevant data that are available to the Sponsor, whether positive, negative, or inconclusive. Copies of pertinent unpublished and published papers are also required.**

(11-15 hrs, n=3).

Factor IX replacement therapy for Christmas disease, or Hemophilia B, is a long-established primary therapeutic intervention. Currently available treatments consist of the use of lyophilized plasma-derived prothrombin complex concentrates or chromatographically purified plasma-derived human Factor IX. Some brand names are Prothromplex TIM4™, Immunine™, Proplex™, Profilnine™, Alphanine®SD, and Mononine™. None of these therapeutics has been able to address the needs of the entire Hemophilia B patient population. The perceived disadvantages of each product class as well as selected factor IX products are listed in Tables 1 and 2. The use of prothrombin complexes has long been associated with a small but definite risk of thromboembolic complications and disseminated intravascular coagulation (Fyman et al., 1985, Small et al., 1982, Chavin et al., 1988). Despite assertions of superiority of Mononine relative to preexisting commercial preparations of Factor IX, Mononine has not gained universal acceptance by users. The risk of infection with human virus or nonviral pathogens from a blood-derived product such as Mononine cannot be totally eliminated (See Tables 1-3, and Section 5 for details). Consequently, prescription and use of such blood-derived products must consider this potential for contamination. The availability of a recombinant DNA-derived Factor IX preparation will provide physicians and patients alike a guarantee

Page 3

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

of freedom from blood-borne viral contamination, allowing the treatment of Hemophilia B to be unencumbered by any need for a risk analysis for blood-borne viruses or other nonviral contaminants of human plasma. As a result, patients will be able to more fully address their medical needs with respect to Factor IX. According to the National Hemophilia Foundation,

> Not only do these [recombinant Factor IX] products offer the potential of improved safety, but also, they open the door to the possibility of exciting new therapies. For example, as confidence in product safety increases, the willingness to treat on a preventive prophylactic basis (rather than episodic as it is now) is greatly increased. With effective prophylaxis, it would then be possible for newly diagnosed children not to experience spontaneous bleeding episodes. This in turn would be very important in helping to prevent painful and disabling joint damage (National Hemophilia Foundation, 1994).

5.  **Where the sponsor of a drug that is otherwise the same drug as an already-approved orphan drug seeks orphan-drug designation for the subsequent drug for the same rare disease or condition, an explanation of why the proposed variation may be clinically superior to the first drug.**

Mononine and Alphanine (but not Alphanine SD) are Factor IX products that have already received orphan drug designation. Recombinant human Factor IX may be clinically superior to the already-approved Factor IX orphan drugs for any of the following reasons:

> The use of recombinant human Factor IX eliminates the risk of transmitting blood-derived pathogens;

> No monoclonal antibody is used in the purification of the recombinant human Factor IX preparation, so that it may be used freely in patients who might be allergic to mouse proteins;

> The use of recombinant human Factor IX does not involve the risk of thrombosis or disseminated intravascular coagulation that is associated with co-administration of other contaminating coagulation factors.

Each of the above claims of superiority are treated separately in the following subsections A through C.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

A. The use of recombinant human Factor IX eliminates the risk of transmitting blood-derived pathogens

All currently available Factor IX preparations are blood-derived products. "The potential risk of viral transmission is a critical consideration in the development of coagulation factor concentrates derived from pooled human plasma" (Clinical Profile: Mononine). There is risk that prior to purification all plasma-derived products have been in contact with human viruses associated with adverse effects (e.g. HIV, Hantavirus, and Hepatitis A, B, C), as well as deleterious nonviral contaminants. *Although sincere and state-of-the-art efforts have been made to reduce the risk of viral transmission by better plasma screening, improved purification, and advanced inactivation procedures, the risk of transmission of untested, poorly understood, or previously unknown viruses or other plasma-derived contaminants cannot be eliminated from plasma-derived Factor IX products.* Such concerns were recently the subject of a Blood Products Advisory Committee meeting (September 23-24, 1993) at which an entire day was devoted to the discussion of blood product transmission of Hepatitis A and other non-lipid-enveloped viruses such as parvovirus. The topic was revisited only six months later by the committee in conjunction with a workshop on "The Role of Virus-Inactivated Plasma in Clinical Medicine" (March 23, 1994), sponsored by the Food and Drug Administration in conjunction with the National Heart, Lung, and Drug Institute, the American Association of Blood Banks, the American Red Cross, the Council of Community Blood Centers, and the Armed Services Blood Program. The issue of risk of viral transmission through blood and blood derivatives clearly is an active concern of U.S. health and regulatory agencies and their counterparts in many other countries. The risk of contamination of the blood supply with viruses and other pathogens is indicated by the existence of the FDA's elaborate system of precautions and the recall of more than 1% of all blood and blood products during the years 1991 and 1992 (Revelle, May 3, 1993). As recently as November, 1993, the Canadian Red Cross had to notify all hospital blood banks and hemophilia treatment programs to check their inventories for lots of a Factor IX Complex (Human) manufactured from plasma which may not have been adequately tested for HIV (HPB Press Release, November 19, 1993). According to a recent evaluation of the viral safety of coagulation factors VIII and IX, despite all efforts to reduce the risk of viral transmission from blood products, no plasma-derived coagulation factor concentrate can be considered virus-free (Mannucci, 1993).

Recent cases of contamination of blood-derived coagulation factors with parvovirus. Infections with the non-lipid-enveloped B19 parvovirus have developed in a number of Hemophilia A patients infused with a solvent/detergent-treated concentrate (Azzi et al., 1992). Subsequent analysis of 25 different brands of clotting factor concentrates using polymerase chain reaction (PCR) technology demonstrated that nearly a third of these clotting factor concentrates were found to be positive for B19 DNA. The B19 DNA-positive concentrates included a solvent/detergent-treated factor IX product (Biotransfusion), and a monoclonal antibody-purified Factor VIII product (Monoclate, Armour) (Zakrzewska, 1992). Currently, human plasma is not screened for B19 parvovirus contamination, and the Mononine purification process has not been

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

specifically validated for the removal of B19 parvovirus.

Recent cases of contamination of blood-derived coagulation factors with Hepatitis A. An outbreak of infection with Hepatitis A virus, another non-lipid-enveloped virus, occurred in 88 hemophiliacs in Europe, all treated exclusively with the solvent/detergent-inactivated factor VIII concentrates Emoclot Octa VI (Aima Derivati) or Octavi (Octapharma) (Mannucci, 1992; Gerritzen et al., 1992; Temperley, 1992). Hepatitis A virus RNA subsequently was detected in two of four batches of the Octapharma concentrate; one of the two positive batches had been administered to 4 of the hemophiliacs who developed acute Hepatitis A virus infection (Normann et al. 1992). Currently, human plasma is not routinely screened for Hepatitis A contamination.

Recognized risk of contamination of blood-derived coagulation factor with nonA, nonB hepatitis. Patients using Mononine are warned of the risk of blood-derived virus transmission, particularly nonA, nonB hepatitis (Package insert, Mononine: Warnings).

Recent case of recall of blood products because of Hepatitis C infection. On February 24, 1994, manufacture of the blood-derived immune globulin products Gammagard™ and Polygam™ was voluntarily discontinued and immediate market withdrawals were initiated because of safety concerns after clusters of patients receiving Gammagard became infected with the lipid-enveloped virus Hepatitis C. Polygam was recalled because its manufacture used the same facilities and production methods for making Gammagard, although not the same plasma pools (The Associated Press, 1994). This most recent report of potential viral infection through the use of a blood-derived product further underscores the present potential safety risks associated with blood-derived protein therapeutics.

Recognition of the inherent risk of blood-derived products. Despite efforts to demonstrate safety of the clotting factor concentrates with respect to viral contamination (Nowicki et al., 1993), concerns about the potential for infectivity are reflected in warnings such as the following, contained in the package insert of the already-approved Factor IX drug Mononine:

> This product is prepared from pooled human plasma which may contain the causative agents of hepatitis and other viral diseases. Prescribed manufacturing procedures utilized at the plasma collection centers, plasma testing laboratory, and the fractionation facility are designed to reduce the risk of transmitting viral infection. However, the risk of viral infectivity from this product cannot be totally eliminated.

Accordingly, the benefits and risks of treatment with such concentrates still require careful assessment prior to use. Recombinant human Factor IX will carry no such risk of contact with plasma-derived viruses or other plasma-derived contaminants, and therefore will be a product of greater purity and safety than presently available products.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

<u>Recognition of the superiority of recombinant vs. blood-derived Factor IX.</u> The above claim for superiority of recombinant Factor IX vs. blood-derived Factor IX is consistent with the remarks of FDA Commissioner David A. Kessler concerning the approval of Genetics Institute's other recombinant coagulation factor, Factor VIII [Antihemophilic Factor (Recombinant)]:

> The production of factor VIII by recombinant DNA technology eliminates even the theoretical possibility of the transmission of viruses from plasma. Its approval is a milestone in the history of treatment of hemophilia (USDHHS Press Release, December 10, 1992).

The recognition of superiority of recombinant Factor VIII was recently repeated in an FDA talk paper:

> The recombinant DNA technology eliminates even a theoretical possibility of the transmission of viruses from plasma (Revelle, March 1, 1993).

In a recent review of Factor IX concentrates for clinical use, Arthur R. Thompson, M.D., Ph.D. (Puget Sound Blood Center and University of Washington) concluded:

> More definitive viral safety would clearly be attained with a recombinant, or synthetic, Factor IX  (Thompson, 1993).

The medical literature contains additional recommendations for developing recombinant coagulation factors:

> Currently hemophilia B is treated by plasma protein replacement therapy. Although effective, this exposes patients to potential risks, such as hepatitis or HIV infection. The cloning of the factor IX gene raises prospects for developing safer therapies  (Kurachi et al., 1991).

> The main problems in the treatment of hemophiliacs include the viral and immunological safety of factor concentrates.... The current status of haemophilia therapy could shortly be changed by the application of recombinant genetic techniques (Bloom, 1991).

In a recent clinical evaluation of viral safety of coagulation factors, Dr. Pier Mannucci (Angelo Bianchi Bonomi Hemophilia and Thrombosis Center, IRCCS Maggiore Hospital, and University of Milan, Italy) asserted the following:

> Recombinant factor VIII should carry no risk of transmitting blood borne viruses (Mannucci, 1993).

He also noted that recombinant coagulation factors carry a theoretical risk of transmission

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

of viruses that might be associated with the mammalian cell cultures used to produce them, the bovine proteins that may be used in the cell culture medium and any murine monoclonal antibodies used to purify the coagulation factors. However, in contrast to the history of contamination of blood-derived products by deleterious viruses, there has been no report of adverse events resulting from the use of recombinant therapeutic proteins that are attributed to viruses associated with any Chinese hamster ovary cell culture process used for their production. The Chinese hamster ovary cells used for the production of recombinant human Factor IX and other recombinant products have been extensively tested for a large number of viruses and infectious agents and have been demonstrated to be free of any contaminating infectious agent. In addition, as stated previously (Section 4, above), no monoclonal antibodies nor murine or bovine materials of any kind are involved in the production of Genetics Institute's recombinant human Factor IX.

Finally, the National Hemophilia Foundation strongly urges the development of a recombinant form of Factor IX:

> Because recombinant products are not dependent upon human source plasma, the NHF believes that recombinant technology offers the potential of improved safety. Having a product that is truly free of any human viruses that can be transmitted through the dozens of infusions required each year by people with severe factor IX deficiencies would be an important step forward, particularly when you consider the damage that has been done to the hemophilia community as a result of HIV and hepatitis (National Hemophilia Foundation, 1994).

B. No monoclonal antibody is used to purify recombinant human Factor IX preparations.

As described in Section 4 above, the purification of recombinant human Factor IX does not use an immunoaffinity chromatography step. In contrast, purification of Mononine involves the use of an immunoaffinity chromatography step resulting in contact with and detectable contamination by murine protein. For this reason, known hypersensitivity to mouse protein is a contraindication to Mononine (Ref: Package insert: Mononine: Contraindication). This contraindication does not apply to recombinant human Factor IX.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC. DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

C. The use of recombinant human Factor IX does not involve the risk of thrombosis or disseminated intravascular coagulation that is associated with co-administration of other contaminating coagulation factors.

Thrombosis or disseminated intravascular coagulation (DIC) has been observed to follow administration of Factor IX complex concentrates which contain amounts of Factors II, VII, and X. Despite the increased purity of the orphan drug Mononine relative to earlier Factor IX products, physicians still are warned of such risks when administering Mononine:

> Patients given Mononine™ should be observed closely for signs or symptoms of intravascular coagulation or thrombosis. Because of the potential risk of thromboembolic complications, caution should be exercised when administering this concentrate to patients with liver disease, to patients post-operatively, to neonates, or to patients at risk of thromboembolic phenomena or disseminated intravascular coagulation. In each of these situations, the potential benefit of treatment with Mononine™ should be weighed against the risk of these complications (Package insert: Mononine: Precautions).

There is not even a theoretical possibility of contamination of recombinant human Factor IX with other coagulation factors.

6. **Where a drug is under development for only a subset of persons with a particular disease or condition, a demonstration that the subset is medically plausible.**

Recombinant human Factor IX is appropriate for use by all patients who have the coagulation deficit in congenital Hemophilia B.

7. **A summary of the regulatory status and marketing history of the drug in the United States and in foreign countries, e.g., IND and marketing application status and dispositions, what uses are under investigation and in what countries; for what indication is the drug approved in foreign countries; what adverse regulatory actions have been taken against the drug in any country.**

Recombinant human Factor IX is currently under development at Genetics Institute for the treatment of Hemophilia B in human subjects:

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

8.  **Documentation, with appended authoritative references, to demonstrate that:**

(i)  **the disease or condition for which the drug is intended affects fewer than 200,000 people in the United States or, if the drug is a vaccine, diagnostic drug, or preventive drug, the persons to whom the drug will be administered in the United States are fewer than 200,000 per year as specified in § 316.21 (b).**

The estimates of those afflicted with Hemophilia B in the United States range from approximately 2,800 to 6,000:

> Based on the incidence of the disease reported in current textbooks of hematology and assuming a current US population of 260 million people of which 48.8% are male (Statistical Abstract of the U.S., 1993), the estimates of those afflicted with Hemophilia B in the United States range between a minimum of 3,900 (Levine, 1987) to 4,200 (Hedner and Davie, 1987) and a maximum of 5,200 (Levine, 1987; Roberts and Jones, 1990).
> According to the National Hemophilia Foundation (1993), a prevalence study entitled "Blood Resources Studies" was conducted by the National Heart and Lung Institute in 1972. Based on information from this study the foundation estimated that 2,800 persons are afflicted with Hemophilia B in the United States.

> The highest reported incidence of Hemophilia B in a given country is 2.3 per 100,000 in Ireland (Etzler, 1992). Application of this recorded maximum incidence of Hemophilia B to calculate a potential maximum incidence for the United States yields a theoretical upper limit of approximately 6,000 persons afflicted with Hemophilia B in the United States.

Regardless of which source is deemed more appropriate, a patient population of less than 200,000 clearly has been established.

(ii)  **For a drug intended for diseases or conditions affecting 200,000 or more people, or for a vaccine, diagnostic drug, or preventive drug to be administered to 200,000 or more persons per year in the United States, there is no reasonable expectation that costs of research and development of the drug for the indication can be recovered by sales of the drug in the United States as specified in § 316.21 (c).**

Because recombinant human Factor IX is intended for diseases or conditions affecting fewer than 200,000 persons in the United States (See Section 8(i), above), this section does not apply.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC. DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

9.    A statement as to whether the Sponsor is the real party in interest of the development and the intended or actual production and sales of the product.

Genetics Institute, Inc. is the real party in interest of the development and the intended production and sales of the product recombinant human Factor IX.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

Table 1. Perceived disadvantages of commercially available Factor IX products.

| Factor IX product class | Perceived class disadvantages |
|---|---|
| **Crude complexes**<br>Examples:<br>  Bebulin VH (Immuno)<br>  Faktor IX HS (Behringwerke)<br>  Konyne 80 (Bayer/Miles)<br>  Profilnine HT (Alpha)<br>  Proplex (Baxter/Hyland) | Contain significant amounts of coagulation factors II, VII and X.<br>Small but definite risk of thromboembolic complications.<br>Risk of blood-derived virus and nonviral pathogen transmission. |
| **Activated complex**<br>Examples:<br>  Autoplex (Baxter)<br>  FEIBA (Immuno) | Contain significant amounts of coagulation factors II, VII and X.<br>Small but definite risk of thromboembolic complications.<br>Risk of blood-derived virus and nonviral pathogen transmission. |
| **Purified product**<br>Examples:<br>  AlphaNine SD (Alpha)<br>  Coagulation FIX (Baxter/ARC)<br>  FIX SD HP (Bio-Transfusion, France)<br>  High purity IX (Cent. Fract. Sanguine, Canada)<br>  Highly purified IX (Kabi, Sweden)<br>  Immunine (Immuno)<br>  IX-HP (Netherlands Red Cross)<br>  Mononine (Armour)<br>  Nanotiv (Kabi Pharmacia)<br>  Preconativ (Kabi Pharmacia)<br>  Prothromplex TIM4 (Immuno) | Risk of blood-derived virus and nonviral pathogen transmission.<br>[The risk was confirmed recently by detection of Parvovirus B19 DNA by PCR in Bio-Transfusion's FIX SD HP (Zakrzewska, 1992).] |

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

Table 2. Perceived disadvantages of the currently marketed Factor IX orphan drug Mononine.

---

Detectable contamination with mouse protein (Package insert).

Risk of blood-derived virus transmission, particularly nonA, nonB hepatitis (Package insert: Warnings).

B19 parvovirus, Hantavirus, Hepatitis A, B or C not used in virus-removal validation.

No routine testing of plasma pools for B19 parvovirus, Hantavirus, or Hepatitis A.

Risk of intravascular coagulation (Package insert: Warnings, Precautions).

---

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

Table 3. Safety issues associated with the virucidal methods applied to Factor IX products.

| Virucidal method | Safety issues associated with the virucidal method[1] | Factor IX products employing the virucidal method |
|---|---|---|
| Dry heat, 80°C, 72 h | Incomplete inactivation of B19 parvovirus (ref. in Mannucci et al. 1993). | Konyne 80 |
| Dry heat, 60°C, 144 h | No available prospective studies. Cases of HIV and hepatitis transmission observed when heating limited to 72 h. (ref. in Mannucci et al., 1993). | Proplex, Autoplex |
| Heating in solution (pasteurization), 60°C, 10 h | Antibodies to parvovirus B19 detected in patients (Azzi et al., 1992). Five cases of Hepatitis B or C (Mannucci et al., 1993; Gerritzen et al., 1993). | Faktor IX HS |
| Vapor heat | In an early prospective study of vapor heat-treated FIX, 4 of 28 patients developed Hepatitis B; one patient also developed Hepatitis C (referred to in Mannucci et al., 1993). | Bebulin VH* FEIBA* Immunine[+] Prothromplex TIM4[+] |
| Heating in suspension (n-heptane), 60°C, 20 h | 5 cases of hepatitis reported in factor VIII and factor IX concentrates manufactured by Alpha (referred to in Mannucci et al., 1993). | Profilnine HT AlphaNine |
| Solvent /detegent (TNBP and Tween 80, or Triton X-100, or cholate) | Antibodies to parvovirus B19 detected in patients (Azzi et al., 1992). 88 cases of Hepatitis A infection (Mannucci, 1992; Gerritzen, 1992; Temperley, 1992). | Coagulation FIX FIX SD HP (Bio-Transfusion) Highly purified IX (Green Cross) IX-HP Nanotiv AlphaNine SD |
| Sodium thiocyanate plus ultrafiltration | No available prospective studies. | Mononine |

[1] For a general review of viral safety issues related to coagulation factors see: Thompson, 1993; Mannucci, 1993.
* 60°C, 10 h, 1160 mbar.
+ 60°C, 10 h; 80°C, 1 h.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC. DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

The articles referenced herein are attached.



**References**

Azzi, A. Ciappi, S., Zakvrezeska, K., Morfini, M., Mariani, G., and Mannucci, P.M. (1992). Human parvovirus B19 infection in hemophiliacs first infused with two high-purity virally attenuated factor VIII concentrates. Am. J. Hematol. *39*: 228-230.

Bell, W.R. and Jackson, D.P. (1988). Disorders of blood coagulation. In The Principles and Practice of Medicine, A.M. Harvey, R.J., Johns, U.A., McKusick, A.H., Owens, and R. S. Ross, eds. (Appleton & Lange, Norwalk, Connecticutt), pp. 349-351 of 347-354.

Bithell, T.C. (1993) Hereditary coagulation disorders. In Wintrobe's Clinical Hematology, Ninth Edition, G.R. Lee, T.C. Bithell, J. Foerster, J.W. Athens, and J.N. Lukens, eds. (Lea & Febiger, Philadelphia), pp. 1446-1453 and 1462-1463 of 1422-1514.

Bloom, A.L. (1991) Progress in the clinical management of hemophilia. Thrombosis and Haemostasis *66*: 166-177.

Chavin, S.I., Siegel, D.M., Rocco, T.A., and Olson, J.P. (1988). Acute myocardial infarction during treatment with an activated prothrombin complex concentrate in a patient with factor VIII deficiency and a factor VIII inhibitor. Amer. Journal of Medicine *85*: 245-249.

Clinical Profile: Mononine™, Monoclonal Antibody-Purified, Coagulation Factor (Human), for Patients with Hemophilia B (Armour Pharmaceutical Co., Kanakee, Illinois) 43 pp.

Etzler, Jutta (1992) Hemophilia statistics: Ireland, Status 1992. IE/ST2-Hemstat, World Federation of Hemophilia Information Clearing House (Heidelberg, Germany) 1 page.

Fyman, P.N., Gotta, A., Casthely, P.A., Griepp, R., Ergin, M.A., and Goodman, K. (1985). Factor IX induced hypercoagulable state. Anesthesiology *62*: 515-516.

Gerritzen, A., Schneweis, K.E., Brackmann, H-H., Oldenburg, J., Hanfland, P., Gerlich, W.H., and Caspari, G. (1992) Acute hepatitis A in haemophiliacs. Lancet *340*: 1231-1232.

HPB (Health Protection Branch) Health and Welfare, Canada Press Release, November 19, 1993. "Withdrawal of Lots of Immuno Antihemophilic Factor IX", 2 pages.

Hedner, U. and Davie, E.W. (1987) Factor IX. In Hemostasis and Thrombosis: Basic Principles and Clinical Practice, 2nd Edition, R.W. Colman, J. Hirsh, V.J. Marder, and E.W. Salzman, eds. (J.P. Lippincott Co., Philadelphia), pp. 39-47.

Kaufman, R.J., Wasley, L.C., Furie, B.C., Furie, B., and Shoemaker, C.B. (1986) Expression,

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC. DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

purification, and characterization of recombinant *gamma*-carboxylated Factor IX synthesized in Chinese hamster ovary cells. J. Biol. Chem. *261*: 9622-9628.

Kurachi, K., Yao, S-N., Furukawa, M., and Kurachi, S. (1992) Deficiencies in Factors IX and VIII: what is known. Hospital Practice, *27*: 41-51.

Levine, P.H. (1987) Clinical manifestations and therapy of hemophilias A and B. In Hemostasis and Thrombosis: Basic Principles and Clinical Practice, 2nd Edition, R.W. Colman, J.Hirsh, V.J. Marder, and E.W. Salzman, eds. (J.P. Lippincott Co., Philadelphia), pp. 97-111.

Linker, C. (1991). Blood. In Current Medical Diagnosis and Treatment, 30th Edition, S.A. Schroeder, M.A. Krupp, L.M. Tierney, and S.J. McPhee, eds. (Appleton & Lange, Norwalk, Connecticutt), p. 387 of 344-396.

Mannucci, P.M. (1992). Outbreak of hepatitis A among Italian patients with haemophilia. Lancet *339*: 819.

Mannucci, P.M. (1993) Clinical evaluation of viral safety of coagulation factor VIII and IX concentrates. Vox Sang *64*: 197-203.

Menitove, J.E. (1990) Preparation and clinical use of plasma and plasma fractions. In Hematology, 4th Edition, W.J. Williams, E. Beutler, A.J. Erslev, and M.A. Lichtman, eds. (McGraw-Hill, New York), pp. 1665-1666 of 1659-1673.

National Hemophilia Foundation (1993) Statistics sheet, HANDI/NHF 1993, 2 pp.

National Hemophilia Foundation (1994) Letter to Genetics Institute, Inc., February 28, 1994, 2 pp.

Normann, A, Graff, J., Gerritzen, A, Brackmann, H-H., Flehmig, B. (1992). Detection of hepatitis A virus RNA in commercially available factor VIII preparation. Lancet *340*: 1232-1233.

Nowicki, M.J., Mosley, J.W., Koerper, M.A., Aledort, L.M., Lusher, J.M., and Hilgartner, M.W. (1993). Passive antibody to hepatitis A virus in US haemophiliacs. Lancet *341*: 562.

Package insert: Coagulation Factor IX (human) Mononine™, monoclonal antibody purified, IBM 12835/8-92, 3 pp.

Revelle, M. (March 1, 1993) Second recombinant antihaemophilic factor licensed. Talk papers: T93-11, Food and Drug Administration, 2 pages.

Revelle, M. (May 3, 1993) Safety of the blood supply. Talk Papers: T93-22, Food and Drug Administration, 2 pages.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

Roberts, H.R. and Jones, M.R. (1990) Hemophilia and related conditions - congenital deficiencies of prothrombin (factor II), factor V, and factors VII to XII. In Hematology, 4th Edition, W.J. Williams, E. Beutler, A.J. Erslev, and M.A. Lichtman, eds. (McGraw-Hill, New York). pp 1462-1464 of 1453-1473.

Small, M., Lowe, G.D.O., Douglas, J.T., Forbes, C.D., and Prentice, C.R.M. (1982). Factor IX thrombogenicity: in vivo effects on coagulation activation and a case report of disseminated intravascular coagulation. Thrombosis and Haemostasis *48*: 76-77.

Statistical Abstract of the United States, 113th Edition (1993) The National Data Book, U.S. Department of Commerce, Economics and Statistics Administration, Bureau of the Census, pp. 9, 14.

Temperley, I.J., Cotter, K.P., Walsh, T.J., Power, J., and Hillary, I.B. (1992) Clotting factors and hepatitis A. Lancet *340*: 1466.

The Associated Press, Byline: L. Neergaard (February 25, 1994) Worldwide recall of blood product because of hepatitis fear. 1 page.

Thompson, A.R. (1993) Factor IX concentrates for clinical use. Seminars in Thrombosis and Hemostasis *19*: 25-36.

USDHHS Press Release, December 10, 1992. "FDA announces the licensing of the first recombinant DNA-derived clotting factor...." P92-39, 2 pages.

Zakrzewska, K., Azzi, A., Patou, G., Morfini, M., Rafanelli, D., and Pattison, J.R. (1992) Human parvovirus B19 in clotting factor concentrates: B19 DNA detection by the nested polymerase chain reaction. Brit. J. Haematol. *81*: 407-412.

THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION OF GENETICS INSTITUTE, INC.
DO NOT COPY OR DISTRIBUTE WITHOUT WRITTEN PERMISSION.

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          **Public Health Service**

---

**Office of Orphan Products Development***(HF-35)*
**Food and Drug Administration**
**5600 Fishers Lane**
**Rockville, MD  20857**

February 12, 1997

Genetics Institute
87 Cambridge Park Drive
Cambridge, MA 02140

Attention:    Frederick T. Gates, Ph.D.
              Director, Regulatory Affairs

Dear Dr. Gates:

Reference is made to your orphan product BeneFix™ [Coagulation Factor IX, (Recombinant)], which was designated an orphan drug pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act (FFDCA) (21 U.S.C. § 360bb) on October 3, 1994                    for the treatment of hemophilia B.

This letter is to inform you that as the first sponsor of Coagulation Factor IX, (Recombinant) to obtain marketing approval for this indication, you are entitled to seven years of exclusive marketing approval pursuant to Section 527 of the FFDCA (21 U.S.C. § 360cc) for the use of Coagulation Factor IX, (Recombinant) for the control and prevention of hemorrhagic episodes in patients with hemophilia B (congenital factor IX deficiency or Christmas disease), including control and prevention of bleeding in surgical settings.  The exclusive seven year approval period began on February 11, 1997, the date of approval of your product licensing application (PLA 96-1048).

Thank you for your efforts in developing Coagulation Factor IX, (Recombinant) for the treatment of hemophilia B.  The Orphan Drug Act and orphan product development program were established due to the realization that resources and commitment devoted to the development of drugs for "orphan" populations may not provide financial returns.  It is with genuine gratitude that we recognize your efforts.

Also, please note that holders of exclusivity for approved orphan products are required to assure the availability of sufficient quantities of an orphan drug to meet the needs of patients.  Failure to do so could result in the withdrawal of the drug product's exclusive approval [21 CFR 316.36(b)].

Sincerely yours,

*Marlene E. Haffner*

Marlene E. Haffner, M.D., M.P.H.
Rear Admiral, United States Public Health Service
Director, Office of Orphan Products Development

# EXHIBIT 73

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

Our Reference Nos. 95-0979 & 95-0975

Burt A. Adelman, M.D..                                    MAY 1 7 1996
Vice President Development Operations
Biogen, Inc.
14 Cambridge Center
Cambridge, MA 02142

Dear Dr. Adelman:

Enclosed is Department of Health and Human Services Establishment License No.
1204 issued to Biogen, Inc., Cambridge, Massachusetts, in accordance with the
provisions of Title III Part F of the Public Health Service Act of July 1, 1944 (58 Stat.
702) controlling the manufacture and sale of biological products. This license
authorizes you to manufacture and ship for sale, barter or exchange those products for
which your establishment holds unsuspended and unrevoked product licenses issued
by the Department of Health and Human Services.

Also enclosed is a product license authorizing your establishment to manufacture and
ship for sale, barter, or exchange in interstate and foreign commerce, Interferon beta-
1a, under the trade name Avonex. Interferon beta-1a is approved for the treatment of
relapsing forms of multiple sclerosis to slow the accumulation of physical disability and
decrease the frequency of clinical exacerbations. The bulk product will be
manufactured at your Cambridge, Massachusetts facility. Formulation of the bulk and
filling into a 30 mcg fill size will take place at
        The product will be labeled and packaged at
                        . and distributed from


While you will not be required to submit samples of future lots of the product for
release, you are requested to submit semi-annual trend analyses of results from tests
performed for lot release.

The dating period for the dosage formulation of this product shall be 15 months from
the date of manufacture when stored at 2-8°C. The date of manufacture shall be
defined as the date of final sterile filtration of the bulk. Results of ongoing stability
studies should be submitted throughout the dating period as they become available
including the results of stability studies from the first three production lots.

Page 2 - Dr. Adelman

We acknowledge your letter of April 26, 1996 in which you commit to conduct the following:

1. A staged clinical research program in secondary chronic progressive multiple sclerosis that includes a randomized, controlled study using disability as the primary endpoint.

2. Randomized, controlled studies that will evaluate the dose efficacy relationship of Interferon beta-1a for the treatment of multiple sclerosis across the dose range of 30 to 90 mcg.

3. A randomized, controlled study to assess the usefulness of continued treatment with Interferon beta-1a beyond two years.

4. MRI assessments and examination of the strengths and weaknesses of MRI as a surrogate for clinical outcomes; evaluations to determine the extent of depression or aggravation of pre-existing psychiatric disease with Interferon beta-1a treatment; and evaluations of antibody formation against Interferon beta-1a, and assessment of possible clinical correlations with effectiveness when antibodies are developed. With regard to MRI assessments, you will prospectively define in study protocols the analytic plan to evaluate the correlation between MRI and clinical outcomes.

It is requested that adverse experience reports be submitted in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80) and that distribution reports be submitted as described (21 CFR 600.81). These requirements became effective on December 27, 1994. All adverse experience reports should be prominently identified according to 21 CFR 600.80 and be submitted to the Center for Biologics Evaluation and Research, HFM-210, Food and Drug Administration, 1401 Rockville Pike, Rockville, MD 20852-1448.

Please submit three copies of all final printed labeling at the time of use and include part II of the label transmittal form with completed implementation information. In addition, please submit three copies of introductory advertising and promotional labeling. You may wish to submit the proposed material in draft with FDA Form 2567 to the Center for Biologics Evaluation and Research, Advertising and Promotional Labeling Staff, HFM-202, 1401 Rockville Pike, Bethesda, MD 20852-1448. All promotional claims must be consistent with and not contrary to approved labeling. No comparative promotional claim or claim of superiority over other similar products should be made unless data to support such claims are submitted to and approved by the Center for Biologics Evaluation and Research.

Page 3 – Dr. Adelman

Please acknowledge receipt of the enclosed product license to the Director, Division of Application Review and Policy (HFM-585), and the enclosed establishment license to the Director, Division of Establishment Licensing (HFM-205), Center for Biologics Evaluation and Research.

Sincerely yours,


Jay P. Siegel, M.D., FACP
Director
Office of Therapeutics
  Research and Review
Center for Biologics
  Evaluation and Research

Jerome A. Donlon, M.D., Ph.D.
Director
Office of Establishment Licensing
  and Product Surveillance
Center for Biologics
  Evaluation and Research


Enclosures

# EXHIBIT 74

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service
Food and Drug Administration
Orphan Products Development

# Memorandum

| | |
|---|---|
| Date | April 16, 1996 |
| From | Director, Office of Orphan Products Development (HF-35) |
| Subject | Clinical Superiority of Biogen's interferon product, Avonex™ |
| To | OOPD Application #91-627 |

Following the November 14, 1995, meeting concerning Avonex™ and Betaseron™, OOPD evaluated data provided by CBER contained in the PLA for Avonex™. Based on these data, OOPD concluded that Avonex™ is clinically superior to Betaseron™ due to the absence of injection site skin necrosis events reported with Avonex™ compared to the occurrence of same event reported with Betaseron™. The package insert for the Berlex product reported that 85% of patients treated with Betaseron™ experience injection site reactions while only 4% of patients treated with Avonex™ experience injection site reactions. At least 10% of the lesions in patients treated with Betaseron™ required debridement, and some required skin grafting to achieve healing.

OOPD was faced with a similar situation involving two coagulation factor IX products, Mononine™, manufactured by the Armour Pharmaceutical Company, and AlphaNine®, manufactured by Alpha Therapeutic Corporation. AlphaNine® was approved first and had orphan exclusivity. Data submitted in the PLA for Mononine™ provided a reasonable basis to conclude that the viral inactivation process used by Armour for the production of Mononine™ may result in a product less likely to transmit hepatitis C infection than the AlphaNine® product. In view of the prospect of improved viral safety of Mononine™, OOPD concluded that Mononine™ is a safer drug than AlphaNine®. Therefore, since it is a safer drug, Mononine™ was determined to be clinically superior to AlphaNine® and the approval of the PLA for Mononine™ was not blocked by AlphaNine®.

Biogen has submitted data demonstrating that Avonex™ is a safer product because it causes substantially fewer injection site reactions than Betaseron™. Therefore, Avonex™ is clinically superior to Betaseron™ by virtue of its improved safety profile. Since Avonex™ is clinically superior to Betaseron™, under the Orphan Drug Act, Avonex™ is not the same product as Betaseron and approval of the PLA for Avonex™ is not blocked by the orphan exclusivity held by Betaseron™.

500

cc:
HF-35/Chron file
HF-35/OPD File # 88-318
HF-35/P.Vaccari biogen1.mem 3/16/96



DEPARTMENT OF HEALTH & HUMAN SERVICES        PUBLIC HEALTH SERVICE

**Memorandum**

Food and Drug Administration
Center for Biologics Evaluation and Research
1401 Rockville Pike
Rockville, MD 20852

Division of Clinical Trial Design and Analysis
HFM-576

Date:          3/29/96

From:          Marc Walton, DCTDA  *uкw*

Subject:       Clinical Superiority of Interferon beta-1a

Through:       Karen Weiss, Acting Director, DCTDA  *кw*

To:            David Finbloom, Acting Director, DCB

Per your request, this memorandum summarizes the information regarding the superior safety profile of Interferon beta-1a (Avonex) compared to Interferon beta-1b (Betaseron).

Avonex is clinically superior to Betaseron based upon improved safety, due to the occurrence of injection site skin necrosis with Betaseron (Interferon beta-1b), and the absence of such events with Avonex (Interferon beta-1a).

Analyses of the safety data submitted by Biogen in support of their PLA show that Injection Site Necrosis was not reported at all during the Phase 3 study (0%) in the 158 patients enrolled in the interferon group. In contrast, skin necrosis at the injection sites has become a concerning problem with Betaseron use in clinical practice, prompting a clinical report published in NEJM (332:1584, 1995). Injection Site Necrosis was reported as an adverse event in the Betaseron Phase 3 trial. It is described in the Package Insert, citing the 5% incidence in the 124 patients in the Phase 3 trial. If these incidences are treated as if events in a single trial and statistically comparable, then the difference in incidence rates is statistically significant ( p = 0.007, Fisher's Exact test).

This has continued to be an ongoing adverse event reported in post-marketing ADR. In the period of 10/93 to 9/15/95, Berlex has received 216 reports of skin necrosis at injection sites. Many reports note multiple skin lesions. Reported lesion sizes range from 0.2 cm diameter to a 20 x 14 cm lesion, with most less than 4 cm diameter. The depth is usually into the subcutaneous fat, with some reports of lesions that extend to the underlying fascia. Little information was reported on management of the lesions, but at least 10% of the lesions required debridement, and some have required skin grafting to achieve healing.

The 5% skin necrosis incidence seen in the Betaseron Phase 3 trial occurred in 124 patients exposed for 2 years each. The phase 3 trial assessment of absence of skin necrosis Avonex is based upon the 158 patients exposed to Avonex in the pivotal trial for periods of 11 months to 2

years. Although the duration of exposure is somewhat less, this appears to be adequate to form a judgement. Among the post-marketing ADR reports of 216 skin necrosis events with Betaseron, the majority occurred within the first 6 months of Betaseron use. Very few of the reported durations-of-use prior to the ADR were greater than 1 year.

The evidence of a difference in skin necrosis incidence is strengthened by the consistency with incidence of Injection Site Reaction in the two pivotal trials. The Betaseron Package Insert cites 85% of patients with Injection Site Reaction (37% in the placebo group). The Biogen PLA reports that only 4% of Avonex patients (6/158) experienced Injection Site Reaction (compared to 1% in the placebo group).

Additionally, Biogen is currently conducting an open label safety study of Interferon beta-1a in multiple sclerosis patients. The study uses the same dose and regimen proposed for licensure, 30µg IM weekly. The product used in this study (C94-801) is the BG9418 material. Biogen submitted a safety update report on this study on March 15, 1996. The data-cutoff date was stated as February 16, 1996.

This report contains information on adverse events in the 274 patients enrolled in study C94-801. These constitute 204 patients previously enrolled in the Biogen pivotal trial (108 from the interferon group, 96 from the placebo group) and 70 patients not previously in the Biogen study (of whom 67 had prior exposure to Betaseron). The duration of treatment in C94-801 ranges from 1 to 29 weeks:

| Weeks of Treatment | Number of Patients |
|---|---|
| 1 to 3 | 3 |
| 4 to 7 | 18 |
| 8 to 12 | 38 |
| 13 to 25 | 116 |
| 26 to 29 | 99 |

The mean duration of treatment is 18 weeks, median 15 weeks.

In this study, 264 of 274 patients have reported at least one adverse event. Excluding MS exacerbations, there have been 12 Serious Adverse Events in 8 patients. Of these, only a single episode with 2 events (depression and fecal impaction in the setting of an acute exacerbation) was assessed as likely related to the interferon injections by the investigator.

Injection site reaction was reported by 4 patients (1%), and injection site inflammation by 1 patient (<1%). There have been no reports of injection site skin necrosis.

Thus, interferon beta-1a treatment in this study shows a safety profile consistent with that seen in the pivotal trial, and continues to have a better safety profile than interferon beta-1b with regard to the injection site skin necrosis.

**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Public Health Service

Office of Orphan Products Development(HF-35)
Food and Drug Administration
5600 Fishers Lane
Rockville, MD  20857

January 4, 1994

Berlex Laboratories, Inc.
Attention:  Mr. Anthony Bourdakis
Director, Regulatory Affairs
15049 San Pablo Avenue, P.O. Box 4099
Richmond, CA  94804-0099

RECEIVED

JAN 10

BERLEX ... ...RIES, INC.
REGULATORY DEPT.

Dear Mr. Bourdakis:

Reference is made to your orphan product Betaseron® (interferon beta), which was designated an orphan drug pursuant to section 526 of the Federal Food, Drug, and Cosmetic Act (FFDCA) (21 U.S.C. § 360bb) on November 17, 1988 (application #88-318) for the treatment of multiple sclerosis.

We also refer to the letter of December 14, 1993 from Chiron Corporation notifying us that joint sponsorship of this application has been transferred to you from Chiron.

This letter is to inform you that as the first sponsor of interferon beta to obtain marketing approval for this indication, you are entitled to seven years of exclusive marketing approval pursuant to Section 527 of the FFDCA (21 U.S.C. § 360cc) for the use of interferon beta in the ambulatory patients with relapsing-remitting multiple sclerosis to reduce the frequency of clinical exacerbations.  The exclusive seven year approval period began on July 23, 1993, the date of approval of your product licensing application (PLA 92-0495).

Please note that holders of exclusivity for approved orphan products are required to assure the availability of sufficient quantities of an orphan drug to meet the needs of patients. Failure to do so could result in the withdrawal of the drug product's exclusive approval [21 CFR 316.36(b)].

Please also note that the orphan drug regulations [21 CFR 316.27(b)] provide that anyone to whom rights under the Orphan Drug Act are assigned also must assume responsibilities under the Act.  Hence, FDA will hold both Berlex and Chiron jointly responsible for compliance with the Act and FDA regulations since Chiron retains rights to exclusive marketing.

Sincerely yours,

Marlene E. Haffner, M.D., M.P.H.
Director

# EXHIBIT 75



| Filer | BIOGEN IDEC MA INC |
|---|---|
| Form Type | 10-Q - Quarterly report with comprehensive company overview |
| Date Filing | 08/11/1995 |

```
              SECURITIES AND EXCHANGE COMMISSION     Total Pages-   31
                    WASHINGTON, D.C. 20549           Exhibit Index- 14
```

                          FORM 10-Q

(Mark one)

[X] Quarterly Report Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934

For the quarterly period ended     June 30, 1995

                              OR

[ ] Transition Report Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934

For the transition period from                to

                 Commission File Number 0-12042


                       BIOGEN, INC.

      (Exact name of registrant as specified in its charter)


        Massachusetts                    04-3002117
   (State or other jurisdiction of    (I.R.S. Employer Identification No.)
    incorporation or organization)

 14 Cambridge Center, Cambridge, MA           02142
(Address of principal executive offices)    (Zip Code)


   Registrant's telephone number, including area code:  (617) 679-2000

   Former name, former address and former fiscal year, if changed since
last report:   Not Applicable


   Indicate by check mark whether the registrant (1) has filed all
reports required to be filed by Section 13 or 15(d) of the Securities
Exchange Act of 1934 during the preceding 12 months (or for such shorter
period that the registrant was required to file such reports), and (2) has
been subject to such filing requirements for the past 90 days.
                           Yes  X    No

   Number of shares outstanding of each of the issuer's classes of common
stock, as of August 4, 1995:

   Common Stock, par value $0.01              33,369,243
      (Title of each class)               (Number of Shares)


          B I O G E N , I N C .              Page 2


                       INDEX

                                             Page No.

PART I - FINANCIAL INFORMATION

  Condensed Consolidated Balance Sheets -
    June 30, 1995 and December 31, 1994 . . . . . . . . . . . . . . .3

  Condensed Consolidated Statements of Income -
    Three months and six months ended June 30, 1995 and 1994. . . . .4

  Condensed Consolidated Statements of Cash Flows -
    Six months ended June 30, 1995 and 1994 . . . . . . . . . . . . .5

  Notes to Condensed Consolidated Financial Statements. . . . . . . .6

  Management's Discussion and Analysis of Financial
    Condition and Results of Operations . . . . . . . . . . . . . . .7

  Report of Independent Accountants . . . . . . . . . . . . . . . . 12

PART II - OTHER INFORMATION . . . . . . . . . . . . . . . . . . . . 13

              * * * * * * * * * * * * * * * * * *

```
Note concerning trademarks:  Certain names mentioned in this report are
                             trademarks owned by Biogen, Inc. or its
                             affiliates.  Hirulog(TM) and AVONEX(TM)are
                             trademarks of Biogen, Inc.
```

```
              BIOGEN, INC. AND SUBSIDIARIES              Page 3

            CONDENSED CONSOLIDATED BALANCE SHEETS
                      (in thousands)
```

|  | June 30,1995 (unaudited) | Dec. 31,1994 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents. . . . . . . . | $ 46,738 | $ 54,682 |
| Marketable securities. . . . . . . . . . . | 227,903 | 213,120 |
| Accounts receivable. . . . . . . . . . . . | 16,900 | 18,502 |
| Other. . . . . . . . . . . . . . . . . . . | 10,610 | 8,480 |
| | -------- | -------- |
| Total current assets . . . . . . . . . | 302,151 | 294,784 |
| | -------- | -------- |
| Property and equipment | | |
| Total cost . . . . . . . . . . . . . . | 127,653 | 104,651 |
| Less accumulated depreciation. . . . . . | 35,277 | 31,489 |
| | -------- | -------- |
| Property and equipment, net. . . . . . . | 92,376 | 73,162 |
| | -------- | -------- |
| Other assets | | |
| Patents, net . . . . . . . . . . . . . . | 8,024 | 8,116 |
| Other. . . . . . . . . . . . . . . . . . | 1,834 | 1,800 |
| | -------- | -------- |
| Total other assets . . . . . . . . . . | 9,858 | 9,916 |
| | -------- | -------- |
| | $404,385 | $377,862 |
| | ======== | ======== |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accounts payable . . . . . . . . . . . . | $ 8,244 | $ 9,991 |
| Current portion long-term debt . . . . . | 1,667 | -- |
| Other current liabilities. . . . . . . . | 28,784 | 37,937 |
| | -------- | -------- |
| Total current liabilities. . . . . . . . | 38,695 | 47,928 |
| | -------- | -------- |
| Long-term debt . . . . . . . . . . . . . . | 23,333 | -- |
| | -------- | -------- |
| Shareholders' equity | | |
| Common stock . . . . . . . . . . . . . . | 334 | 331 |
| Additional paid-in capital . . . . . . . | 371,688 | 368,784 |
| Deficit. . . . . . . . . . . . . . . . . | (29,811) | (33,359) |
| Unrealized gain (loss) on | | |
| marketable securities . . . . . . . . | 87 | (5,867) |
| Accumulated translation adjustment . . . . | 59 | 45 |
| | -------- | -------- |
| Total shareholders' equity . . . . . . . | 342,357 | 329,934 |
| | -------- | -------- |
| | $404,385 | $377,862 |
| | ======== | ======== |

```
See Notes to Condensed Consolidated Financial Statements.
```

```
              BIOGEN, INC. AND SUBSIDIARIES              Page 4

          CONDENSED CONSOLIDATED STATEMENTS OF INCOME
                         (unaudited)
            (in thousands, except per share amounts)
```

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 1995 | 1994 | 1995 | 1994 |
| **REVENUES** | | | | |
| Royalties and product sales. . . | $32,717 | $32,793 | $64,670 | $73,960 |
| Interest . . . . . . . . . . . | 4,179 | 3,986 | 8,196 | 7,599 |
| | ------- | ------- | ------- | ------- |
| Total revenues . . . . . . . . | 36,896 | 36,779 | 72,866 | 81,559 |
| | ------- | ------- | ------- | ------- |
| **EXPENSES** | | | | |

```
Cost of sales. . . . . . . . .      2,648    2,146    5,152    4,617
Research and development . . . .    21,270   26,268   41,705   49,602
General and administrative . . .    10,003    5,607   17,524   11,570
Other. . . . . . . . . . . . .       2,056    1,947    4,517    2,050
                                   --------  -------  -------  -------
  Total expenses . . . . . . . .    35,977   35,968   68,898   67,839
                                   --------  -------  -------  -------

INCOME BEFORE INCOME TAXES. . . .      919      811    3,968   13,720

Income taxes. . . . . . . . . .        205      200      420    1,880
                                   --------  -------  -------  -------
NET INCOME. . . . . . . . . . .  $    714  $   611  $ 3,548  $11,840
                                   ======== =======  =======  =======

NET INCOME PER SHARE. . . . . .  $   0.02  $  0.02  $  0.10  $  0.34
                                   ======== =======  =======  =======

Average shares outstanding. . .     35,737   34,427   35,607   35,084
                                   ======== =======  =======  =======
```

See Notes to Condensed Consolidated Financial Statements.

                    BIOGEN, INC. AND SUBSIDIARIES                Page 5

              CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
                              (unaudited)
                            (in thousands)

                                              Six Months Ended
                                                  June 30,
                                              1995        1994

```
CASH FLOWS FROM OPERATING ACTIVITIES
  Net income . . . . . . . . . . . . . . . . $  3,548    $11,840
  Adjustments to reconcile net income to
    net cash provided from (used by)
    operating activities:
      Depreciation and amortization . . . . . . . .    5,001     3,646
      Other . . . . . . . . . . . . . . . . . . . .      302     1,345
    Changes in:
      Accounts receivable . . . . . . . . . . . .    1,602    15,091
      Other current assets. . . . . . . . . . . .   (2,130)     (810)
      Other assets. . . . . . . . . . . . . . .        (34)     (163)
      Accounts payable and
        other current liabilities. . . . . . . .  (10,900)      975
                                                   --------   -------
  Net cash provided from (used by)
    operating activities. . . . . . . . . . . . .   (2,611)    31,924
                                                   --------   -------
CASH FLOWS FROM INVESTING ACTIVITIES
  Purchases of marketable securities . . . . . (117,587)  (269,518)
  Proceeds from sales of marketable securities .  108,599   208,210
  Acquisitions of property and equipment . . . .  (23,002)  (14,844)
  Additions to patents . . . . . . . . . . . . .   (1,120)   (1,204)
                                                   --------   -------
  Net cash used by investing activities. . . . .  (33,110)  (77,356)
                                                   --------   -------
CASH FLOWS FROM FINANCING ACTIVITIES
  Proceeds from issuance of long-term debt . . .   25,000       --
  Issuance of common stock . . . . . . . . . . .    2,777     9,939
                                                   --------   -------
  Net cash provided from financing activities. .   27,777     9,939
                                                   --------   -------

NET DECREASE IN CASH AND CASH EQUIVALENTS . . .   (7,944)   (35,493)

CASH AND CASH EQUIVALENTS,
  BEGINNING OF PERIOD. . . . . . . . . . . . . .   54,682    74,546
                                                   --------   -------
CASH AND CASH EQUIVALENTS,
  END OF PERIOD. . . . . . . . . . . . . . . . . $ 46,738   $39,053
                                                   ========   =======
```

See Notes to Condensed Consolidated Financial Statements.

                    BIOGEN, INC. AND SUBSIDIARIES                Page 6

            NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                              (unaudited)

1.  In the opinion of management, the accompanying unaudited condensed
    consolidated financial statements include all adjustments, consisting

of only normal recurring accruals, necessary to present fairly the
financial position, results of operations and cash flows of the
Company.  The Company's accounting policies are described in the Notes
to Consolidated Financial Statements in the Company's 1994 Annual
Report.  Interim results are not necessarily indicative of the
operating results for the full year.

2.  During the third quarter of 1994, the Company incurred a pre-tax
    charge to other expenses of $25 million as a result of its decision to
    discontinue its major activities associated with Hirulog (TM)
    development.  The charge consists of cash payments to a third-party
    manufacturer for product manufactured for clinical trials and to cover
    a portion of other costs incurred by the manufacturer in anticipation
    of ongoing Hirulog (TM) related activities, and cash payments for
    clinical research organizations, clinical investigators and
    institutions involved in clinical trials to cover noncancellable costs
    incurred by them in conducting clinical trials and in connection with
    wind-down activities.  Discontinuance of the Hirulog (TM) program did
    not result in any termination of employees or internal restructuring
    costs.  As of June 30, 1995, $2.4 million remained in reserve and is
    expected to be settled by the end of 1995.

3.  In March 1995, the Company completed construction of its research
    laboratory and office building in Cambridge, Massachusetts and
    exercised its option to obtain a 7.5% secured term loan with a bank
    for $25 million.  The annual principal payable in each of the years
    1996 through 1999 is $1.7 million with the balance due May 8, 2005.

4.  As of December 31,1994, the Company had a deferred tax asset of $58
    million (before valuation allowance) consisting of the future tax
    benefits from net operating loss carry forwards and other tax credits.
    Under Statement of Financial Accounting Standards No. 109 ("SFAS
    109"), the Company would be required to recognize all or a portion of
    the $58 million deferred tax asset, with corresponding increases to
    net income and paid-in capital, if it believes that it is more likely
    than not, given the weight of all available evidence, that all or a
    portion of the benefits of the carry forward losses and tax credits
    will be realized through future profitable operations.  Given the
    possibility of fluctuations in the Company's revenue stream,
    anticipated increases in the Company's expenses, the uncertainties
    involved and number of milestones to be achieved in obtaining
    regulatory approval for the Company's AVONEX(TM) interferon beta-1a
    product and in successfully commercializing the product and the risks
    and uncertainties associated with taking new products through the
    development pipeline, the Company has concluded, based on the standard
    set forth in SFAS 109, that it is more likely than not that the
    Company will not realize any benefits from its deferred tax asset
    through future profitable operations, and it has therefore recorded a
    100% reserve against the asset.  The Company will assess the need for
    the valuation allowance at each balance sheet date based on all
    available evidence, in particular, the then current status of
    regulatory filings and commercialization efforts related to
    AVONEX(TM).

                    BIOGEN, INC. AND SUBSIDIARIES            Page 7

              MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
                    CONDITION AND RESULTS OF OPERATIONS


Overview

Biogen, Inc. (the "Company") is a biopharmaceutical company principally
engaged in developing and manufacturing drugs for human healthcare through
genetic engineering.  The Company's primary source of revenues consists of
royalties received from licensees that sell products based on technology
developed by the Company.  These royalties are primarily derived from sales
of alpha interferon and hepatitis B products.  The level of royalties that
Biogen receives is based on the level of product sales by its licensees
over which the Company has no control.  As a result, the Company's revenues
may be affected by the impact on licensees' product sales of short-term
trends, such as the initiation or expiration of a vaccination program in a
particular country, or long-term trends, such as the institution of pricing
reforms in a particular country.  Since the Company is not involved in the
development or sale of products by licensees, it is unable to accurately
predict the timing or potential impact of the events or trends which may
affect licensee sales or when and for how long these events and trends are
likely to affect the Company's royalty income.  The Company's revenues may
also reflect one-time events such as payment of initial license fees by new
licensees.  As a result, the Company's total revenues and income may
continue to fluctuate and quarter-to-quarter comparisons may not
necessarily be meaningful.  Until the Company markets its own products
directly, royalties are expected to be the major source of the Company's
revenues.

In 1994, the Company announced the results of a Phase III clinical trial of
its AVONEX(TM) interferon beta-1a product, for the treatment of multiple
sclerosis.  In light of the data from the trial, the Company filed during
1995 for a product license for AVONEX(TM) in the United States and market
approval for AVONEX(TM) in Europe and Canada.  If the Company is successful
in its efforts to obtain regulatory approval, the Company will market
AVONEX(TM) directly in major markets in the United States and Europe.

Results of Operations

For the second quarter ended June 30, 1995, the Company reported net income of $0.7 million or $0.02 per share as compared to net income of $0.6 million or $0.02 per share in the second quarter of 1994.  For the six months ended June 30, 1995, the Company had net income of $3.5 million or $0.10 per share as compared to net income of $11.8 million or $0.34 per share for the comparable period of 1994.

Total revenues for the second quarter of 1995 were $36.9 million, as compared to $36.8 million in the comparable quarter of 1994.  For the current quarter, ongoing royalties received from licensee sales of hepatitis B vaccines, sold by SmithKline Beecham plc ("SmithKline") and Merck & Co., Inc. ("Merck"), increased and offset the decrease in royalties received from Schering-Plough Corporation ("Schering-Plough"), the Company's licensee for alpha interferon.  Sales of hepatitis B vaccines outside the United States increased 20% from the prior year quarter.  The market for hepatitis B vaccines increased significantly in Europe, primarily in France, where a vaccination program for infants and adolescents was instituted during 1994.  It appears, however, that hepatitis B vaccine sales in France are beginning to return to normal

levels.  Alpha interferon sales by Schering-Plough declined in the current quarter, due primarily to lower sales in Japan, which were driven by a 17% government-mandated decrease in the price of alpha interferon, effective on April 1, 1994, and restrictions on off-label usage.

For the current six-month period, total revenues were $72.9 million as compared to $81.6 million in 1994.  Revenues from royalties and product sales for the current six-month period were lower than the comparable 1994 period, primarily because of the inclusion in the first quarter of 1994 of a one-time payment of approximately $10 million from Eli Lilly & Co. ("Lilly") under a licensing agreement covering certain patent rights for gene expression methods.  Under this agreement, Lilly paid the Company in the first quarter of 1994 approximately $10 million in royalties that related to sales occurring in the periods before the contract was signed.  Ongoing royalties received from licensee sales of hepatitis B vaccines in the six-month period of 1995 increased and offset the decrease in royalties received from licensee sales of alpha interferon.  Sales of hepatitis B vaccines outside the United States increased 48% from the prior year's six-month period and was primarily attributable to the vaccination program instituted in France.  Alpha interferon sales by Schering-Plough declined in the current six-month period, due primarily to lower sales in Japan.  In the near term, the Company expects overall sales of licensee products to continue at or slightly below current levels although royalty income may fluctuate depending on changes in sales volumes for specific products.  However, there are numerous health care reform initiatives currently underway in the United States and other major pharmaceutical markets and it is not yet clear what effect, if any, these initiatives or other developments may have on product sales by the Company's licensees.  In addition, these sales levels may fluctuate from quarter to quarter due to the timing and extent of major events such as new indication approvals, vaccination programs or licensing arrangements.

Interest income for the current quarter and six-month period increased from the comparable 1994 amounts due primarily to higher returns on invested funds.

Total expenses for the second quarter of 1995 were $36.0 million, approximately the same level as the 1994 quarter.  Cost of sales increased $0.5 million and primarily represents royalty obligations to third parties.  Research and development expense decreased $5.0 million, due to the Company's decision in the third quarter of 1994 to discontinue its major activities associated with development of Hirulog(TM) thrombin inhibitor.  The current quarter included costs for the production of clinical material by a contract manufacturer while the 1994 quarter had higher costs, primarily for Hirulog(TM) clinical development.  General and administrative expenses increased by $4.4 million due mostly to higher costs for market development efforts related to AVONEX(TM), continued development of the Company's European headquarters in Paris and personnel-related costs.  Other expenses included the effect of foreign exchange movements associated with the sale of certain accounts receivable and interest on debt obligations.

For the six-month period ended June 30, 1995, total expenses were $68.9 million as compared to $67.8 million in 1994.  Research and development expenses decreased $7.9 million, primarily due to higher costs in the 1994 period that were associated with the clinical development of Hirulog(TM).  The 1995 period included costs for the production of clinical material by a contract manufacturer.  The Company expects that in the long-term research and development expenses will increase as the Company expands its

development efforts with respect to new products and begins clinical trials of these products.  General and administrative expenses increased $6.0 million due mostly to higher costs for market development efforts related to AVONEX(TM), continued development of the Company's European headquarters and legal and personnel-related costs.  On May 4, 1995, the Company announced that it had filed with the European Medicines Evaluation Agency for European market approval of AVONEX(TM) for treatment of multiple sclerosis.  On May 22, 1995, the Company announced that it had filed with the U.S. Food and Drug Administration ("FDA") for U.S. market approval of AVONEX(TM) for treatment of multiple sclerosis.  On July 27, 1995, the Company also announced that it filed with Canada's Health Protection Branch for Canadian market approval of AVONEX(TM) for treatment of multiple sclerosis.  The Company expects that general and administrative expenses will increase in the near and long term as compared to 1994 as the Company

begins to put in place the commercial infrastructure and sales and
marketing organizations necessary to sell AVONEX(TM).  The anticipated
level of expense will depend on the status of regulatory approvals and the
resulting levels of commercial ramp-up activities.  Other expenses included
the effect of foreign exchange movements associated with the sale of
certain accounts receivable, losses from the sale of certain marketable
securities and interest on debt obligations.  In general, as development
efforts expand and as AVONEX(TM) ramp-up activities evolve, the Company
anticipates that expenses may equal or exceed revenues until such time as
the Company has successfully marketed AVONEX(TM).

Income tax expense for the 1995 and 1994 periods were substantially less
than the amount computed at U.S. federal statutory rates because of the
utilization of net operating loss carryforwards.  As of December 31, 1994,
the Company had a deferred tax asset of $58 million (before valuation
allowance) consisting of the future tax benefits from net operating loss
carry forwards and other tax credits.  If fully realized through sufficient
future profitability, this deferred tax asset will reduce future income tax
expense by $29 million and increase paid-in capital by $29 million.  The
Company has recorded a 100% valuation allowance against the net deferred
tax asset.  Realization of the deferred tax asset and future reversals of
the valuation allowance depend on the Company's ability to achieve future
profitability through earnings from existing sources and from sales of
AVONEX(TM) or other proprietary products.  The timing and amount of future
earnings will depend on the Company's success in obtaining approval for and
marketing and selling AVONEX(TM) and the results of clinical trials and
commercialization and development efforts with respect to other products
under development.  The Company will assess the need for the valuation
allowance at each balance sheet date based on all available evidence, in
particular the then current status of regulatory filings and
commercialization efforts related to its AVONEX(TM) product.

Financial Condition

At June 30, 1995, cash, cash equivalents and marketable securities amounted
to $274.6 million, a $6.8 million increase from the $267.8 million on hand
at the end of 1994.  Working capital increased $16.6 million to $263.5
million.  Net cash used by operating activities for the six months ended
June 30, 1995 was $2.6 million.  Other outflows of cash included investments
in property and equipment and patents of $24.1 million.  The Company's
common stock option and purchase plans provided $2.8 million and in the
first quarter of 1995, the Company received $25 million under a secured
term loan agreement with a bank.

                                                        Page 10
In March 1995, the Company completed construction of its research
laboratory and office building in Cambridge, Massachusetts and exercised
its option to obtain a 7.5% secured loan with a bank for $25 million.  The
annual principal payable in each of the years 1996 through 1999 is $1.7
million with the balance due May 8, 2005.

In the second quarter of 1995, the Company began construction of its
biologics manufacturing facility in Research Triangle Park, North Carolina.
The estimated cost of construction, including land, is $57 million.  As of
June 30, 1995, the Company had commitments totaling approximately $10
million on this project.  Until the facility is licensed by the FDA for the
manufacture of AVONEX(TM), the Company will manufacture AVONEX(TM) in its
Cambridge, Massachusetts facility.

In the first quarter of 1993, SmithKline initiated arbitration in the
United States regarding the rate of royalties payable from sales of
hepatitis B vaccines by SmithKline in the United States.  The amount paid
by SmithKline and in dispute as of December 31, 1994, was approximately $18
million.  In April 1995, an arbitration panel ruled in Biogen's favor.  On
June 30, 1995, SmithKline made a motion to vacate this award in the Federal
District Court for the Southern District of New York.  However, the Company
believes that an adverse ruling is not probable and, therefore, no amount
has been accrued.

The Company currently believes that the financial resources available to
it, including its current working capital and its existing and anticipated
contractual relationships, will be sufficient to finance its planned
operations and capital expenditures for the near term.  However, the
Company may have additional funding needs, the extent of which will depend
upon the level of royalties and product sales, the outcome of clinical
trial programs, the receipt and timing of required regulatory approvals for
products, the results of research and development efforts and business
expansion opportunities.  Accordingly, from time to time, the Company may
obtain funding through various means which could include collaborative
agreements, lease or mortgage financings, sales of equity or debt
securities and other financing arrangements.

Outlook

Having completed both of its ongoing Phase III studies and discontinued
Hirulog(TM) development in 1994, the Company has begun to expand its
development efforts related to other products in its pipeline.  The
expansion of the pipeline may include increases in spending on internal
projects, the acquisition of third party technologies or products or other
types of investments.  Since the Company does not currently market any
drugs directly, the Company has also begun to create a commercial
infrastructure both in the United States and in Europe to market and sell
AVONEX(TM).  The timing, nature and scope of the activities related to the
building of a commercial infrastructure will depend on the status of

regulatory filing and approval activities.  As development efforts expand
and as AVONEX(TM) ramp-up activities evolve, the Company anticipates that
expenses may equal or exceed revenues until such time as the Company has
successfully marketed AVONEX(TM).  As a result, the Company does not expect
past operating results to be indicative of future operating results.

Page 11

While in the past the Company's ability to achieve profitability has been
dependent mainly on the level of royalty revenues as compared to expenses,
in the future, profitability will be dependent on the outcome of a number
of factors.  These include:  the level of royalties from existing
licensees' product sales as compared to expenses, the timing and extent of
royalties from additional licensing opportunities, successful completion of
development and regulatory filing activities related to AVONEX(TM), receipt
of timely FDA and European regulatory approval for AVONEX(TM), the level of
revenues and profitability from AVONEX(TM) sales, if the product is
approved, the cost and success of developing and commercializing other
products the Company is developing and the cost and success of other
business opportunities that may arise from time to time.  There can be no
assurance that the Company will achieve a positive outcome with respect to
any of these factors, or that the timing and extent of the Company's
success with respect to any combination of these factors will be sufficient
to result in the profitability of the Company.

Page 12

With respect to the unaudited condensed consolidated financial information
of Biogen, Inc. and its subsidiaries at June 30, 1995 and for the three
month and six month periods ended June 30, 1995 and 1994, Price Waterhouse
LLP reported that they have applied limited procedures in accordance with
professional standards for a review of such information.  However, their
separate report dated July 27, 1995 appearing herein, states that they did
not audit and they do not express an opinion on that unaudited condensed
consolidated financial information.  Price Waterhouse LLP has not carried
out any significant or additional audit tests beyond those which would have
been necessary if their report had not been included.  Accordingly, the
degree of reliance on their report on such information should be restricted
in light of the limited nature of the review procedures applied.  Price
Waterhouse LLP is not subject to the liability provisions of Section 11 of
the Securities Act of 1933 for their report on the unaudited condensed
consolidated financial information because that report is not a "report" or
a "part" of the registration statement prepared or certified by Price
Waterhouse LLP within the meaning of sections 7 and 11 of the Act.

REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders of Biogen, Inc.

We have reviewed the accompanying condensed consolidated balance sheet of
Biogen, Inc. and its subsidiaries as of June 30, 1995, and the related
condensed consolidated statements of income for the three month and six
month periods ended June 30, 1995 and 1994 and of cash flows for the six
month periods ended June 30, 1995 and 1994. This financial information is
the responsibility of the Company's management.

We conducted our review in accordance with standards established by the
American Institute of Certified Public Accountants.  A review of interim
financial information consists principally of applying analytical
procedures to financial data and making inquiries of persons responsible
for financial and accounting matters.  It is substantially less in scope
than an audit conducted in accordance with generally accepted audit
standards, the objective of which is the expression of an opinion regarding
the financial statements taken as a whole.  Accordingly, we do not express
such an opinion.

Based on our review, we are not aware of any material modifications that
should be made to the accompanying condensed consolidated financial
information for it to be in conformity with generally accepted accounting
principles.

We previously audited in accordance with generally accepted auditing
standards, the consolidated balance sheet as of December 31, 1994, and the
related consolidated statements of income, of cash flows and of
shareholders' equity for the year then ended (not presented herein), and in
our report dated February 7, 1995 we expressed an unqualified opinion on
those consolidated financial statements.  In our opinion, the information
set forth in the accompanying condensed consolidated balance sheet as of
December 31, 1994, is fairly stated in all material respects in relation to
the consolidated balance sheet from which it has been derived.

/s/ Price Waterhouse LLP
- ------------------------
Boston, Massachusetts
July 27, 1995


PART II - OTHER INFORMATION          Page 13

Item 4 - Submission of Matters to a Vote of Security Holders

(a) The information set forth in this Item 4 relates to matters
    submitted to a vote at the Annual Meeting of Stockholders of
    Biogen, Inc. on June 23, 1995.

(b) Not Applicable

(c) A proposal to elect Alan Belzer, Kenneth Murray and James W.
    Stevens to serve for three year terms ending in 1998 and until
    their successors are duly elected and qualified was approved with
    the following vote:

| Nominee | For | Against |
|---|---|---|
| Alan Belzer | 27,041,399 | 390,143 |
| Kenneth Murray | 27,046,794 | 384,748 |
| James W. Stevens | 27,043,679 | 387,863 |

A proposal to ratify the selection of Price Waterhouse LLP as the
Company's independent accountants for the fiscal year ending
December 31, 1995 was approved with 27,326,966 affirmative votes
and 32,368 negative votes cast along with 72,208 abstentions.

A proposal to increase by 2,000,000 the aggregate number of
shares available for the grant of options under the 1985 Non-
Qualified Stock Option Plan and the 1982 Incentive Stock Option
Plan (the "Plans") and amendments to the Plans to limit to
600,000 the number of shares with respect to which options may be
granted under each Plan to any person in any year was approved,
with 17,394,493 affirmative votes and 6,138,604 negative votes
cast along with 156,627 abstentions and 3,741,818 broker non-
votes.

(d) Not applicable


Item 6 - Exhibits and Reports on Form 8-K

    (a) Exhibits

        No. 10.1    1985 Non-Qualified Stock Option Plan, as amended
                    through April 25, 1995.
        No. 10.2    1982 Incentive Stock Option Plan, as amended through
                    April 25, 1995.
        No. 11      Computation of Earnings per Share.
        No. 15      Letter from Price Waterhouse LLP.
    (b) There were no reports on Form 8-K filed for the quarter ended
        June 30, 1995.

                          SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.

                         BIOGEN, INC.

Dated:  August 11, 1995              /s/Timothy M. Kish
                            ----------------------------------
                                 Timothy M. Kish
                            Vice President-Finance and
                               Chief Financial Officer


                    EXHIBITS                    Page 14


Index to Exhibits.


        No. 10.1    1985 Non-Qualified Stock Option Plan.

        No. 10.2    1982 Incentive Stock Option Plan.

        No. 11      Computation of Earnings per Share.

        No. 15      Letter from Price Waterhouse.

# EXHIBIT 76

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
1401 Rockville Pike
Rockville MD 20852-1448

Our STN: BL 103780/0

March 7, 2002

Serono, Incorporated
Attention: Pamela Williamson Joyce
Vice President, Regulatory Affairs U.S.
One Technology Place
Rockland, MA 02370

Dear Ms. Williamson Joyce:

This letter hereby issues Department of Health and Human Services U.S. License No. 1574 to Serono, Incorporated, Rockland, Massachusetts, in accordance with the provisions of Section 351(a) of the Public Health Service Act controlling the manufacture and sale of biological products. This license authorizes you to introduce or deliver for introduction into interstate commerce, those products for which your company has demonstrated compliance with establishment and product standards.

Under this license you are authorized to manufacture the product Interferon beta-1a. Interferon beta-1a is indicated for the treatment of patients with relapsing forms of multiple sclerosis to decrease the frequency of clinical exacerbations and delay the accumulation of physical disability.

Under this authorization, you are approved to manufacture Interferon beta-1a drug substance at _____. Final formulated drug product will be manufactured, filled, labeled and packaged at _____. In accordance with approved labeling, your product will bear the proprietary name Rebif®, and will be marketed in 0.5 mL pre-filled, single-use syringes containing 44 mcg Interferon beta-1a and in a Starter Pack of syringes containing 22 mcg Interferon beta-1a.

The dating period for Interferon beta-1a shall be 24 months from the date of manufacture when stored at 2 - 8°C. The date of manufacture shall be defined as the date of final sterile filtration of the formulated drug product. The dating period for drug substance shall be 30 months when stored at -70°C. Results of ongoing stability studies should be submitted throughout the dating period, as they become available, including the results of stability studies from the first three production lots. The stability protocols in your license application are considered approved for the purpose of extending the expiration dating period of your drug substance and drug product as specified in 21 CFR 601.12.

You are not currently required to submit samples of future lots of Interferon beta-1a to the Center for Biologics Evaluation and Research (CBER) for release by the Director, CBER, under 21 CFR 610.2. FDA will continue to monitor compliance with 21 CFR 610.1 requiring assay and release of only those lots that meet release specification.

Page 2 – BL 103780/0

Any changes in the manufacturing, testing, packaging or labeling of Interferon beta-1a, or in the manufacturing facilities will require the submission of information to your biologics license application for our review and written approval consistent with 21 CFR 601.12.

As of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 FR 66632). Your request for waiver of the requirement for assessment of Interferon beta-1a in pediatric patients was granted on April 24, 2000.

We acknowledge your written commitments to provide additional information on ongoing studies and to conduct post-marketing studies as described in your letters of March 1, 2002, March 5, 2002, and March 6, 2002 as outlined below:

Chemistry, Manufacturing, and Controls

1.  To validate the precision of the ELISA screening assay and evaluate the sensitivity of this ELISA assay for antibodies to all forms of interferon beta used in the clinical trials. The results of these additional validation studies will be submitted by June 2002.

2.  To perform additional studies to validate the precision, sensitivity, and reproducibility of the neutralizing antibody assay. In addition, to evaluate the sensitivity of the neutralization assay for antibodies to all forms of interferon beta used in the clinical trials. The results of these additional validation studies will be submitted by June 2002.

3.  To validate the specificity of the neutralization assay. The results will be submitted by September 2002.

Clinical

4.  To conduct a study in 100 patients to evaluate the immunosuppressive effects of chronic Rebif® treatment. The finalized protocol will be submitted to CBER by January 2003. Patient enrollment will be completed by December 2003, data collection completed by March 2004, and the final report with SAS datasets and applicable revised draft labeling will be submitted to CBER by June 2004.

5.  To conduct a pregnancy registry study to prospectively collect data on 266 pregnant women exposed to Rebif® that will allow for an assessment of the potential risk from treatment to the mother, fetus and/or live born infant. The final protocol will be submitted to CBER by September 2002, and the study initiated by December 2002. Patient accrual will be completed by December 2007 and data collection completed by September 2008. The final study report, SAS datasets, and applicable revised draft labeling will be submitted to CBER by December 2008.

Page 3 – BL 103780/0

6.      To conduct a randomized, double-blind, dose-comparison, parallel group study of 22 mcg and 44 mcg TIW subcutaneous doses of Rebif® in 750 patients with relapsing-remitting multiple sclerosis. The final protocol will be submitted to CBER by December 2002, and the study initiated by May 2003. Patient enrollment will be completed by October 2004, and the final patient will complete the study by October 2006. Data collection will be finalized by December 2006, and the final report, SAS datasets, and applicable revised draft labeling will be submitted to CBER by April 2007.

Protocols should be submitted to your IND ⎯ with a cross-reference letter to the BLA.

7.      To submit a final study report, datasets and modified labeling based on 48-week results from study ⎯ by June 2002.

We acknowledge your agreement to incorporate appropriate assessments of depression, MRI effects and neutralizing antibodies in future moderate or large sized clinical studies.

It is required that adverse experience reports be submitted in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80) and that distribution reports be submitted as described (21 CFR 600.81). All adverse experience reports should be prominently identified according to 21 CFR 600.80 and be submitted to the Center for Biologics Evaluation and Research, HFM-210, Food and Drug Administration, 1401 Rockville Pike, Rockville, MD 20852-1448.

You are required to submit reports of biological product deviations in accordance with 21 CFR 600.14. All manufacturing deviations, including those associated with processing, testing, packing, labeling, storage, holding and distribution, should be promptly identified and investigated. If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, a report must be submitted on Form FDA-3486 to the Director, Office of Compliance and Biologics Quality, Center for Biologics Evaluation and Research, HFM-600, 1401 Rockville Pike, Rockville, MD 20852-1448.

Please submit all final printed labeling at the time of use and include implementation information on FDA Form 2567. Please provide a PDF-format electronic copy as well as original paper copies (ten for circulars and five for other labels). In addition, you may wish to submit three draft copies of the proposed introductory advertising and promotional labeling with an FDA Form 2567 or Form 2253 to the Center for Biologics Evaluation and Research, Advertising and Promotional Labeling Branch, HFM-602, 1401 Rockville Pike, Rockville, MD 20852-1448. Final printed advertising and promotional labeling should be submitted at the time of initial dissemination, accompanied by a FDA Form 2567 or Form 2253.

Page 4 – BL 103780/0

All promotional claims must be consistent with and not contrary to approved labeling. No comparative promotional claim or claim of superiority over other products should be made unless data to support such claims are submitted to and approved by the Center for Biologics Evaluation and Research.

Sincerely yours,

Steven A. Masiello
Director
Office of Compliance and
  Biologics Quality
Center for Biologics
  Evaluation and Research

for Jay P. Siegel, M.D., FACP
Director
Office of Therapeutics
  Research and Review
Center for Biologics
  Evaluation and Research

# EXHIBIT 77



02014525

P.E. 2/11/02

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

RECD S.E.C.

FEB 1 3 2002

1086

## FORM 6-K

### REPORT OF FOREIGN PRIVATE ISSUER
### PURSUANT TO RULE 13a-16 OR 15d-16 OF
### THE SECURITIES EXCHANGE ACT OF 1934

For the month of February, 2002.

Serono S.A.
(Registrant's Name)

15 bis, Chemin des Mines
Case Postale 54
CH-1211 Geneva 20
Switzerland
(Address of Principal Executive Offices)

PROCESSED
FEB 22 2002
THOMSON
FINANCIAL

1-15096
(Commission File No.)

(Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.)

Form 20-F __✓__ Form 40-F _____

(Indicate by check mark whether the registrant by furnishing the information contained in this form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.)

Yes _____ No __✓__

(If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b): 82-_____)

**≡ serono**

# Media Release

<u>FOR IMMEDIATE RELEASE</u>

### SERONO LAUNCHES SEROJET™ NEEDLE-FREE DEVICE TO DELIVER SEROSTIM® HUMAN GROWTH HORMONE

**SeroJet™ eliminates risk of accidental needle-stick injuries and provides patients with an alternative to traditional needles and syringes**

**Rockland, MA, February 12, 2002** -- Serono, Inc. today announced the US launch of SeroJet™[1], a needle-free option for delivering Serostim® [somatropin (rDNA origin) for injection], the company's recombinant human growth hormone (rHGH). Serono (SWX Swiss Exchange: SEO & NYSE: SRA) is the only company to provide a needle-free delivery system for growth hormone in the US. SeroJet™ offers patients an alternative to traditional needles and syringes for the subcutaneous administration of Serostim® thereby eliminating the risk of accidental needle-stick injuries. SeroJet™ is being offered at no additional cost to Serostim® patients.

"Because SeroJet™ is completely needle-free, it is an excellent alternative to traditional needles and syringes, especially for those AIDS patients who prefer needle-free delivery, have a history of intravenous drug use, or who have small children at home," commented Frederick T. Murray, MD, Executive Medical Director, Metabolic Endocrinology, Serono, Inc.

**Needle-Free Technology**
Utilizing a coiled spring mechanism, SeroJet™ delivers a finely dispersed, high-pressure stream of Serostim® through a point of entry in the skin that is five times smaller in area than that of a standard 28-gauge needle injection.[2]

"SeroJet™ is an important new delivery option for AIDS wasting patients on growth hormone therapy," said Isabelle Stillger, Executive Vice President, Metabolic Endocrinology Business Unit, Serono, Inc. "In addition, this system reduces the risk of needle stick injury, and can help minimize patient anxiety normally associated with traditional syringes."

Although infrequent, delivery-site reactions may occur with this device. As with any injection device, improper use of SeroJet™ may result in injury, including the transmission of blood-borne diseases such as hepatitis, HIV and AIDS. Users should adhere to strict safety and antiseptic precautions at all times. This device is not recommended for use in patients with blood disorders.

**SeroJet™ Support and Training**

Serono offers a wide range of support to people living with AIDS and health care providers. Serono is coordinating free training workshops for health care providers around the country so that they can teach patients to use SeroJet™ confidently and correctly. In addition, Serono has established The Nurse Network, a support service through which patients may speak directly to a registered nurse who has been trained on the SeroJet™ device. The nurses can answer questions and offer assistance to patients on proper technique with the device, maintenance and care of SeroJet™. A toll-free hotline for SeroJet™ (1-866-SEROJET) has been established to facilitate SeroJet™ orders, to answer questions from patients and health care providers, and to facilitate referrals to Serono's Nurse Network.

Additional information about SeroJet™ and related support services is also available online at **www.serojet.com**.

### ###

*Some of the statements in this press release are forward looking. Such statements are inherently subject to known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of Serono S.A. and affiliates to be materially different from those expected or anticipated in the forward-looking statements. Forward-looking statements are based on Serono's current expectations and assumptions, which may be affected by a number of factors, including those discussed in this press release and more fully described in Serono's Annual Report on Form 20-F filed with the U.S. Securities and Exchange Commission on April 23, 2001. These factors include any failure or delay in Serono's ability to develop new products, any failure to receive anticipated regulatory approvals, any problems in commercializing current products as a result of competition or other factors, our ability to obtain reimbursement coverage for our products, and government regulations limiting our ability to sell our products. Serono has no responsibility to update the forward-looking statements contained in this press release to reflect events or circumstances occurring after the date of this press release.*

### ###

**About Serono**

Serono is a global biotechnology leader. The Company has six recombinant products on the market, Gonal-F® (follitropin alfa for injection), Luveris® (lutropin alfa), Ovidrel®/Ovitrelle® (choriogonadotropin alfa for injection), Rebif® (interferon beta-1a), Serostim® [somatropin (rDNA origin) for injection] and Saizen® [somatropin (rDNA origin) for injection].[3] (Rebif® and Luveris® are not approved in the USA). In addition to being the world leader in reproductive health, Serono has strong market positions in neurology, metabolism and growth. The Company's research programs are focused on growing these businesses and on establishing new therapeutic areas. Currently, there are fifteen new molecules in development.

In 2000, Serono achieved worldwide revenues of US$1.240 billion, and a net income of US$301 million, making it the third largest biotech company in the world based on revenues. The Company operates in 45 countries, and its products are sold in over 100 countries. Bearer shares of Serono S.A., the holding company, are traded on the SWX Swiss Exchange (SEO) and its American Depositary Shares are traded on the New York Stock Exchange (SRA).

**For more information, please contact:**

**Serono, Inc., Rockland, MA**
**Media Relations:**
Tel.     781 681 2340
Fax     781 681 2935
www.seronousa.com

**Bioject Medical Technologies, Inc.**
Cecelia Heer
Investor Relations Manager
Tel.     973 605 8554
Fax     973 644 0991
John Gandolfo
Chief Financial Officer
Tel.     973 605 1022
www.bioject.com


-end-

---

[1] Customized version of the Vitajet 3, a registered trademark of Bioject, Inc. SeroJet™ was developed for Serostim® in partnership with Bioject Medical Technologies, Inc. (NASDAQ: BJCT), a leading developer and manufacturer of jet injection systems for drug delivery, under an exclusive licensing agreement with Serono. The device has been customized and tested for exclusive use with Serostim®, and will be marketed under the Serono brand.
[2] Data on file, Serono, Inc.
[3] Package inserts for the company's US products are available at www.seronousa.com or by calling 1-888-275-7376

**≣serono**

# Media Release

<u>FOR IMMEDIATE RELEASE</u>

### SERONO ANNOUNCES 2001 UNDERLYING SALES GROWTH OF 15%

### -FDA decision on REBIF expected during March 2002-

**Geneva, Switzerland, February 13, 2002 –**
Serono S.A. (SWX Swiss Exchange: SEO and NYSE: SRA)

➢  Fourth quarter sales up 17.1% to $338.4m and full year 2001 sales up 15.0% to $1,249.4m in local currencies on a like-for-like basis

➢  Rebif® further strengthens its position as the leading multiple sclerosis treatment outside the US with sales up 54.1% in local currencies to $379.6m. During 2001 Serono invested $30m for Rebif® in the US and the FDA decision on the BLA is expected in March 2002

➢  Manufacturing improvements drive continued improvement in gross margin to 82.9% for the full year, with biotech products now 82.2% of sales

➢  Net income up 5.2% to $316.7m and net cash flow from operating activities increased by 58.5% to $405.0m

➢  Seven new molecules entered pre-clinical development during 2001

"We have delivered a good all-round performance. Our business is in great shape, and we have made the necessary investments for continued growth," said Ernesto Bertarelli, Chief Executive Officer of Serono. "2001 was notable for our strengthened market leadership in multiple sclerosis, new product launches and excellent results in R&D," he continued.

## SALES UP 17.1% IN 4TH QUARTER ON LIKE-FOR-LIKE BASIS

Worldwide net sales were $1,249.4m for the full year 2001 (2000: $1,147.0m) and $338.4m in the fourth quarter (2000: $300.3m). Excluding the exceptional items represented by the recall of Crinone® and the discontinuation of Curosurf® sales, worldwide net sales increased in local currencies by 15.0% for the full year 2001 and by 17.1% in the fourth quarter.

The net negative currency impact in the full year 2001 was $30.5m due mainly to the weakness of European currencies against the US$.

-more-

**MULTIPLE SCLEROSIS: REBIF BECAME MARKET LEADER OUTSIDE THE US**

Sales of Rebif® in multiple sclerosis (MS) increased by 54.1% in local currencies to $379.6m for the full year 2001 (2000: $254.2m). Fourth quarter sales were $110.5m (2000: $74.5m).

During 2001 Rebif® became the market leader outside the US and in the fourth quarter we estimate its market share was 38% in value terms. Rebif® is now available in over 70 countries worldwide.

Serono invested $30m during the second half of 2001 in preparation for a US launch of Rebif® and expects an FDA decision on its Biologics License Application (BLA) during March 2002.

As anticipated, in the fourth quarter the European Commission approved a variation to expand EU labelling of Rebif® to include treatment of relapsing patients with secondary progressive multiple sclerosis.


**REPRODUCTIVE HEALTH: NEW PRODUCT LAUNCHES**

Excluding the Crinone® effect, worldwide reproductive health sales increased by 3.7% in local currencies during 2001.

Sales in reproductive health were $574.3m for the full year 2001 (2000: $592.3m) and fourth quarter sales were $154.8m (2000: $153.9m).

During the full year 2001, Gonal-F® sales increased by 14.7% in local currencies to $410.5m (2000: $365.9m), boosted by the launch of the multidose formulation. Fourth quarter sales were $109.7m (2000: $93.1m).

With the launches of the two new recombinant products Luveris® and Ovidrel®/Ovitrelle®, Serono became the only company to provide all three recombinant hormones for the treatment of infertility.


**GROWTH HORMONE: SAIZEN GROWS BY 23%**

For the full year 2001 Saizen® sales increased by 23.0% in local currencies to $107.3m (2000: $90.0m), and by 28.8% in local currencies during the fourth quarter to $28.9m (2000: $22.1m). This excellent performance is largely due to the continued success of the innovative delivery devices cool.click™ and one.click™. In August 2001, Saizen received approval in adult growth hormone deficiency in Europe.

For the full year 2001 Serostim® sales declined by 8.5% in local currencies to $125.3m (2000: $137.1m), and fourth quarter sales were $27.0m (2000: $33.8m). This performance reflects reimbursement issues and we expect market conditions to remain difficult in 2002. Serojet™, a needle-free injection device for use with Serostim® has just been launched in the US, offering patients a more user-friendly method of administration.

## SALES GROWTH LED BY EUROPE

Full year European sales increased by 22.8% in local currencies to $542.2m driven largely by continued penetration of Rebif® and Gonal-F®. North American sales were down slightly to $390.6 m (-3.0%). Strong sales performances were recorded in Asia Pacific at $54.4m (+32.3%), Middle East, Africa and Eastern Europe at $84.1m (+15.7%) and Oceania at $17.9 m (+27.5%). Despite difficult economic conditions in Argentina, sales in Latin America were $130.9m (+15.2%).

## FINANCIAL PERFORMANCE DRIVEN BY 2.9% POINTS INCREASE IN GROSS MARGIN

Royalty and licensing income for the full year 2001 increased 37.1% to $127.1m (2000: $92.7m). Fourth quarter royalty and licensing income increased 6.8% to $27.2m (2000: $25.5m).

Total revenues for the full year 2001 increased 13.5% in local currencies to $1,376.5m (2000: $1,239.7m). Fourth quarter total revenues increased 11.5% in local currencies to $365.6m (2000: $325.7m).

The gross margin for the full year 2001 increased to 82.9% of product sales (2000: 80.0%) as a result of further manufacturing improvements leading to higher production yields and the continued increase in the proportion of biotechnology products. Fourth quarter gross margin increased to 84.6% of product sales (2000: 82.4%).

Selling, general and administrative expenses for the full year 2001 were $446.9m or 35.8% of product sales (2000: $393.7m or 34.3% of product sales). Fourth quarter SG&A expenses were $126.7m or 37.4% of product sales (2000: $99.1m or 33.0% of product sales) due to the investment for Rebif® in the US and the launch costs for Luveris® and Ovitrelle®.

Research and Development expenses for the full year 2001 were $308.6m or 24.7% of product sales (2000: $263.2m or 22.9% of product sales). Fourth quarter R&D expenses were $80.0m or 23.7% of product sales (2000: $68.9m or 22.9% of product sales).

Operating income for the full year 2001 was $337.7m (2000: $321.7m) or 27.0% of product sales. Fourth quarter 2001 operating income was $88.1m or 26% of product sales (2000: $90.1m or 30% of product sales), this decrease being due to the investment for Rebif® in the US.

Net financial income for the full year 2001 declined by 1.7% to $51.4m (2000: $52.3m) due to falling interest rates in the second half and to an exceptional gain in 2000 of $20.7m in an investment fund. Fourth quarter net financial income was $2.9m (2000: $16.8m), including a net translation loss of $3.1m due to the devaluation of the Argentine peso.

Net income for the full year 2001 grew by 5.2% to $316.7m, or 25.3% of product sales (2000: $301.0m). Net income for the fourth quarter 2001 was $76.7m (2000: $90.7m), reflecting the investment for Rebif® in the US and lower interest income.

Basic earnings per share for 2001 increased to $19.72 per bearer share (2000: $19.50) and to 49.3 cents per American Depositary Share (2000: 48.8 cents).

**NET CASH FLOW FROM OPERATING ACTIVITIES UP 58.5%**

For the year ended December 31st, 2001, net cash flow from operating activities was $405.0m compared to $255.4m for 2000. This substantial improvement was driven by a higher operating result and tight management of working capital.

**DIVIDEND PROPOSAL**

The Board of Directors will propose to the Annual General Meeting a cash dividend of CHF6.25 per bearer share (2000: CHF 6.00), representing a payout ratio of 18.8% (2000: 18.2%).

**R&D NEWS**

During 2001, 7 new molecules entered pre-clinical development:
- A beta-sheet breaker peptide with activity in a model of Alzheimer's disease
- An oral IKK-2 inhibitor which has shown activity in a model of rheumatoid arthritis
- An orally active JNK inhibitor with potential in ischemic and inflammatory conditions
- A chemokine antagonist with promising activity in a multiple sclerosis model
- A low molecular weight oxytocin receptor antagonist with potential as a treatment for premature labour
- TACI and BCMA - these cell-surface receptors found on B-lymphocytes, which have potential for the treatment of autoimmune diseases, are being co-developed with ZymoGenetics.

-more-

During 2001 several collaborative agreements were signed with smaller biotech companies, including Evotec OAI, Inpharmatica, ZymoGenetics and Celera Genomics.

A phase 2 clinical trial of r-TBP-1 in patients with psoriasis or psoriatic arthritis has recently been initiated.

IL-18 binding protein recently moved from pre-clinical development into phase 1 clinical trials.  IL-18 bp has been shown to have activity in models of both rheumatoid arthritis and Crohn's disease.

**2002 financial calendar**

The financial calendar for 2002 is:

| | |
|---|---|
| Management Roadshow | March 25, London; March 26 New York; March 27 San Francisco; April 3 Geneva am, Zurich pm |
| First quarter results | April 23 |
| Annual General Meeting | May 22 |
| Second quarter results | July 24 |
| Third quarter results | October 23 |

**Conference Call and Webcast**

Serono will hold a conference call today, February 13, 2002, from 4.30 to 5.30 p.m. Central European Time (10.30 to 11.30 a.m. Eastern Standard Time) during which Serono Management will present the Company's Full Year 2001 Results and Business Update.  To join the telephone conference please dial +41 848 22 41 11 (from Europe), 0848 22 41 11 (from Switzerland) and +1 412 858 46 00 (from the U.S.).

Slides will be made available one hour prior to the start of the conference call via Serono's Corporate home page, www.serono.com.

The event will also be relayed by live webcast which interested parties may access via Serono's Corporate home page. The webcast will be available for replay until close of business on February 28, 2002.

-more-

### ###

*Some of the statements in this press release are forward looking. Such statements are inherently subject to known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of Serono S.A. and affiliates to be materially different from those expected or anticipated in the forward-looking statements. Forward-looking statements are based on Serono's current expectations and assumptions, which may be affected by a number of factors, including those discussed in this press release and more fully described in Serono's Annual Report on Form 20-F filed with the U.S. Securities and Exchange Commission on April 23, 2001. These factors include any failure or delay in Serono's ability to develop new products, any failure to receive anticipated regulatory approvals, any problems in commercializing current products as a result of competition or other factors, our ability to obtain reimbursement coverage for our products, and government regulations limiting our ability to sell our products. Serono has no responsibility to update the forward-looking statements contained in this press release to reflect events or circumstances occurring after the date of this press release.*

### ###

## About Serono

Serono is a global biotechnology leader. The Company has six recombinant products on the market, Gonal-F®, Luveris®, Ovidrel®/Ovitrelle®, Rebif®, Serostim® and Saizen® (Rebif® and Luveris® are not approved in the USA). In addition to being the world leader in reproductive health, Serono has strong market positions in neurology, metabolism and growth. The Company's research programs are focused on growing these businesses and on establishing new therapeutic areas. Currently, there are fifteen new molecules in development.

In 2001, Serono achieved worldwide revenues of US$1.38 billion, and a net income of US$317 million, making it the third largest biotech company in the world based on revenues. The Company operates in 45 countries, and its products are sold in over 100 countries. Bearer shares of Serono S.A., the holding company, are traded on the SWX Swiss Exchange (SEO) and its American Depositary Shares are traded on the New York Stock Exchange (SRA).

**For more information, please contact:**

**Serono in Geneva, Switzerland:**

| Media Relations: | Investor Relations: | Noonan/Russo Communications: |
|---|---|---|
| Tel:  +41-22-739 36 00 | Tel:  +41-22-739 36 01 | Tel:  +44-207 726 4452 |
| Fax:  +41-22-739 30 85 | Fax:  +41-22-739 30 22 | Fax:  +44-207 726 4453 |
| www.serono.com | Reuters: SEOZ.VX / SRA.N | www.noonanrusso.com |
|  | Bloomberg: SEO VX / SRA US |  |

**Serono,Inc., Rockland, MA**
**Media Relations:**
Tel.  +1 781 681 2340
Fax: +1 781 6812935
www.seronousa.com

On the following pages, there are:

- Tables detailing sales in dollars and local currencies by therapeutic area, geographic region and the top 10 products for the 3 and 12 months ended December 31, 2001 and 2000.
- The unaudited consolidated financial statements for the 3 and 12 months ended December 31, 2001 and 2000, including income statements, balance sheets and statements of cash flows, prepared in accordance with International Accounting Standards (I.A.S.).

## SALES BY THERAPEUTIC AREA

| | Three Months Ended December 31, 2001 | | | | Three Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % Change $ | % change L/C | $ million | % of sales |
| Reproductive Health | 154.8 | 45.7% | 0.6% | 0.2% | 153.9 | 51.3% |
| Multiple Sclerosis | 110.5 | 32.6% | 48.3% | 46.4% | 74.5 | 24.8% |
| AIDS Wasting | 27.0 | 8.0% | (20.3%) | (20.2%) | 33.8 | 11.3% |
| Growth | 28.9 | 8.5% | 30.4% | 28.8% | 22.1 | 7.4% |
| Others | 17.2 | 5.2% | 9.3% | 7.9% | 16.0 | 5.3% |
| Total sales (US$ million) | $ 338.4 | 100% | 12.7% | 12.1% | $ 300.3 | 100% |

## SALES BY GEOGRAPHIC REGION

| | Three Months Ended December 31, 2001 | | | | Three Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % change $ | % change L/C | $ million | % of sales |
| Europe | 153.5 | 45.4% | 28.4% | 24.8% | 119.6 | 39.8% |
| North America | 94.5 | 27.9% | (8.2%) | (7.5%) | 102.9 | 34.3% |
| Latin America | 38.2 | 11.3% | 27.9% | 27.9% | 29.9 | 9.9% |
| Others | 52.2 | 15.4% | 9.0% | 11.1% | 47.9 | 16.0% |
| Total sales (US$ million) | $ 338.4 | 100% | 12.7% | 12.1% | $ 300.3 | 100% |

## SALES BY THERAPEUTIC AREA

| | Twelve Months Ended December 31, 2001 | | | | Twelve Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % Change $ | % change L/C | $ million | % of sales |
| Reproductive Health | 574.3 | 46.0% | (3.0%) | (0.7%) | 592.3 | 51.6% |
| Multiple Sclerosis | 379.6 | 30.4% | 49.3% | 54.1% | 254.2 | 22.2% |
| AIDS Wasting | 125.3 | 10.0% | (8.6%) | (8.5%) | 137.1 | 12.0% |
| Growth | 107.3 | 8.6% | 19.2% | 23.0% | 90.0 | 7.8% |
| Others | 62.9 | 5.0% | (14.4%) | (12.3%) | 73.4 | 6.4% |
| Total sales (US$ million) | $1,249.4 | 100% | 8.9% | 11.6% | $1,147.0 | 100% |

## SALES BY GEOGRAPHIC REGION

| | Twelve Months Ended December 31, 2001 | | | | Twelve Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % change $ | % change L/C | $ million | % of sales |
| Europe | 542.2 | 43.4% | 17.9% | 22.8% | 460.1 | 40.1% |
| North America | 390.6 | 31.3% | (3.5%) | (3.0%) | 404.9 | 35.3% |
| Latin America | 130.9 | 10.5% | 15.2% | 15.2% | 113.6 | 9.9% |
| Others | 185.7 | 14.8% | 10.2% | 14.2% | 168.4 | 14.7% |
| Total sales (US$ million) | $1,249.4 | 100% | 8.9% | 11.6% | $ 1,147.0 | 100% |

## LIKE FOR LIKE SALES BY THERAPEUTIC AREA*

| | Three Months Ended December 31, 2001 | | | | Three Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % Change $ | % change L/C | $ million | % of sales |
| Reproductive Health (a) | 155.6 | 45.9% | 6.4% | 5.9% | 146.2 | 50.8% |
| Multiple Sclerosis | 110.5 | 32.6% | 48.3% | 46.4% | 74.5 | 25.9% |
| AIDS Wasting | 27.0 | 8.0% | (20.3%) | (20.2%) | 33.8 | 11.8% |
| Growth | 28.9 | 8.5% | 30.4% | 28.8% | 22.1 | 7.7% |
| Others (b) | 17.2 | 5.0% | 53.7% | 52.6% | 11.4 | 3.9% |
| Total sales (US$ million) | $ 339.2 | 100% | 17.8% | 17.1% | $ 288.0 | 100% |

## LIKE FOR LIKE SALES BY GEOGRAPHIC REGION*

| | Three Months Ended December 31, 2001 | | | | Three Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % change $ | % change L/C | $ million | % of sales |
| Europe | 153.3 | 45.2% | 34.5% | 30.8% | 114.0 | 39.6% |
| North America | 95.4 | 28.1% | (1.3%) | (0.6%) | 96.7 | 33.6% |
| Latin America | 38.2 | 11.3% | 29.8% | 29.8% | 29.4 | 10.2% |
| Others | 52.3 | 15.4% | 9.2% | 11.3% | 47.9 | 16.6% |
| Total sales (US$ million) | $ 339.2 | 100% | 17.8% | 17.1% | $ 288.0 | 100% |

## LIKE FOR LIKE SALES BY THERAPEUTIC AREA*

| | Twelve Months Ended December 31, 2001 | | | | Twelve Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % Change $ | % change L/C | $ million | % of sales |
| Reproductive Health (a) | 571.9 | 46.2% | 1.2% | 3.7% | 564.8 | 51.3% |
| Multiple Sclerosis | 379.6 | 30.7% | 49.3% | 54.1% | 254.2 | 23.1% |
| AIDS Wasting | 125.3 | 10.1% | (8.6%) | (8.5%) | 137.1 | 12.4% |
| Growth | 107.3 | 8.7% | 19.2% | 23.0% | 90.0 | 8.2% |
| Others (b) | 52.5 | 4.2% | (4.8%) | (2.8%) | 55.2 | 5.0% |
| Total sales (US$ million) | $ 1,236.6 | 100% | 12.3% | 15.0% | $ 1,101.3 | 100% |

## LIKE FOR LIKE SALES BY GEOGRAPHIC REGION*

| | Twelve Months Ended December 31, 2001 | | | | Twelve Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
| | $ million | % of sales | % change $ | % change L/C | $ million | % of sales |
| Europe | 531.2 | 43.0% | 21.1% | 26.2% | 438.8 | 39.8% |
| North America | 389.4 | 31.5% | 2.0% | 2.5% | 382.0 | 34.7% |
| Latin America | 130.6 | 10.6% | 16.1% | 16.1% | 112.4 | 10.2% |
| Others | 185.4 | 14.9% | 10.3% | 14.3% | 168.1 | 15.3% |
| Total sales (US$ million) | $ 1,236.6 | 100% | 12.3% | 15.0% | $ 1,101.3 | 100% |

-more-

*Like-for-like sales exclude
(a)   Crinone® of ($0.8m) in the fourth quarter of 2001 and $7.7m in the same period of 2000, $2.4m for the year of 2001 and $27.4m in the same period of 2000
(b)   Curosurf® of $0.0m in the fourth quarter of 2001 and $4.6m in the same period of 2000, $10.4m for the year of 2001 and $18.3m in the same period of 2000

# TOP TEN PRODUCTS

| | * TA | Three Months Ended December 31, 2001 | | | | Three Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|---|
| | | $ million | % of sales | % Change $ | % change L/C | $ million | % of sales |
| Rebif® | MS | 110.5 | 32.6% | 48.3% | 46.4% | 74.5 | 24.8% |
| Gonal-F® | RH | 109.7 | 32.4% | 17.8% | 16.4% | 93.1 | 31.0% |
| Saizen® | Growth | 28.9 | 8.5% | 30.4% | 28.8% | 22.1 | 7.4% |
| Serostim® | Wasting | 27.0 | 8.0% | (20.3%) | (20.2%) | 33.8 | 11.3% |
| Metrodin HP® | RH | 17.3 | 5.1% | (23.9%) | (22.5%) | 22.8 | 7.6% |
| Pergonal® | RH | 11.9 | 3.5% | (36.3%) | (35.7%) | 18.7 | 6.2% |
| Profasi® | RH | 6.5 | 1.9% | 18.2% | 18.2% | 5.5 | 1.8% |
| Stilamin® | Other | 5.0 | 1.5% | 64.1% | 63.2% | 3.0 | 1.0% |
| Cetrotide® | RH | 3.9 | 1.2% | 666.6% | 637.8% | 0.5 | 0.2% |
| Serophene® | RH | 1.6 | 0.5% | 3.2% | 5.9% | 1.5 | 0.5% |

| | * TA | Twelve Months Ended December 31, 2001 | | | | Twelve Months Ended December 31, 2000 | |
|---|---|---|---|---|---|---|---|
| | | $ million | % of sales | % Change $ | % change L/C | $ million | % of sales |
| Gonal-F® | RH | 410.5 | 32.9% | 12.2% | 14.7% | 365.9 | 31.9% |
| Rebif® | MS | 379.6 | 30.4% | 49.3% | 54.1% | 254.2 | 22.2% |
| Serostim® | Wasting | 125.3 | 10.0% | (8.6%) | (8.5%) | 137.1 | 12.0% |
| Saizen® | Growth | 107.3 | 8.6% | 19.2% | 23.0% | 90.0 | 7.8% |
| Metrodin HP® | RH | 67.1 | 5.4% | (30.1%) | (26.8%) | 96.1 | 8.4% |
| Pergonal® | RH | 38.1 | 3.0% | (31.3%) | (30.6%) | 55.4 | 4.8% |
| Profasi® | RH | 23.8 | 1.9% | 2.2% | 4.1% | 23.3 | 2.0% |
| Stilamin® | Other | 16.9 | 1.4% | 10.7% | 13.5% | 15.3 | 1.3% |
| Cetrotide® | RH | 10.6 | 0.8% | 1568.1% | 1536.3% | 0.6 | 0.1% |
| Serophene® | RH | 5.7 | 0.5% | (16.2%) | (12.6%) | 6.8 | 0.6% |

* Therapeutic Areas

| | | | |
|---|---|---|---|
| RH | = Reproductive Health | Wasting | = AIDS Wasting |
| MS | = Multiple Sclerosis | Growth | = Growth Retardation |

# Consolidated Income Statements

| Three months ended December 31 | 2001*  US$'000 | % of  Sales | % change | 2000  US$'000 | % of  Sales |
|---|---|---|---|---|---|
| Revenues | | | | | |
| Product sales | 338'440 | 100.0% | 12.7% | 300'261 | 100.0% |
| Royalty and license income | 27'186 | | 6.8% | 25'465 | |
| Total Revenues | 365'626 | | 12.2% | 325'726 | |
| Operating Expenses | | | | | |
| Cost of product sales | 51'985 | 15.4% | (1.6%) | 52'822 | 17.6% |
| Selling, general and administrative | 126'702 | 37.4% | 27.9% | 99'090 | 33.0% |
| Research and development | 80'042 | 23.7% | 16.2% | 68'889 | 22.9% |
| Other operating expense, net | 18'792 | 5.6% | 26.4% | 14'872 | 5.0% |
| Total Operating Expenses | 277'521 | 82.0% | 17.8% | 235'673 | 78.5% |
| **Operating Income** | 88'105 | 26.0% | (2.2%) | 90'053 | 30.0% |
| Financial income, net | 2'944 | | (82.4%) | 16'762 | |
| Other expense, net | 722 | | | 482 | |
| Total Non Operating Income, Net | 2'222 | | | 16'280 | |
| Income Before Taxes and Minority Interests | 90'327 | 26.7% | (15.1%) | 106'333 | 35.4% |
| Taxes | 13'546 | | | 15'492 | |
| Income Before Minority Interests | 76'781 | | | 90'841 | |
| Minority interests | 42 | | | 176 | |
| **Net Income** | 76'739 | 22.7% | (15.4%) | 90'665 | 30.2% |

*Unaudited

| | 2001 | % Change | 2000 |
|---|---|---|---|
| Basic Earnings per Share (in U.S. dollars) | | | |
| - Bearer shares | 4.78 | (15.3%) | 5.64 |
| - Registered shares | 1.91 | (15.3%) | 2.26 |
| - American depositary shares | 0.12 | (15.3%) | 0.14 |
| | | | |
| Diluted Earnings per Share (in U.S. dollars) | | | |
| - Bearer shares | 4.77 | (15.3%) | 5.63 |
| - Registered shares | 1.91 | (15.3%) | 2.25 |
| - American depositary shares | 0.12 | (15.3%) | 0.14 |

Basic earnings per share are calculated in accordance with IAS 33 (Earnings per Share) by dividing the net income of the group, US$76.7 million (2000 US$90.7 million), by an appropriate number of shares. This is 11,655,237 bearer shares (2000 11,660,897) and 11,013,040 registered shares (2000 11,013,040). The total weighted average equivalent number of bearer shares is 16,060,453 (2000 16,066,113) for the three months ended December 31, 2001. As each American depositary share represents ownership interest in one fortieth of a bearer share, basic and diluted earnings per American depositary share is calculated as one fortieth of the earnings per bearer share.

For diluted earnings per share, the total number of bearer shares is adjusted to assume conversion of all share options granted to employees and directors. The number of bearer shares used to calculate diluted earnings per share is 11,679,571 (2000 11,693,861).

-more-

# Consolidated Income Statements

| Twelve months ended December 31 | 2001*<br>US$'000 | % of<br>Sales | % change | 2000<br>US$'000 | % of<br>Sales |
|---|---|---|---|---|---|
| Revenues | | | | | |
| Product sales | 1'249'405 | 100.0% | 8.9% | 1'146'998 | 100.0% |
| Royalty and license income | 127'065 | | 37.1% | 92'656 | |
| **Total Revenues** | 1'376'470 | | 11.0% | 1'239'654 | |
| Operating Expenses | | | | | |
| Cost of product sales | 213'160 | 17.1% | (7.3%) | 229'907 | 20.0% |
| Selling, general and administrative | 446'945 | 35.8% | 13.5% | 393'716 | 34.3% |
| Research and development | 308'561 | 24.7% | 17.3% | 263'152 | 22.9% |
| Other operating expense, net | 70'152 | 5.6% | 125.2% | 31'147 | 2.7% |
| Total Operating Expenses | 1'038'818 | 83.1% | 13.2% | 917'922 | 80.0% |
| **Operating Income** | 337'652 | 27.0% | 4.9% | 321'732 | 28.0% |
| Financial income, net | 51'381 | | (1.7%) | 52'277 | |
| Other expense, net | 2'548 | | | 2'411 | |
| Total Non Operating Income, Net | 48'833 | | | 49'866 | |
| Income Before Taxes and Minority Interests | 386'485 | 30.9% | 4.0% | 371'598 | 32.4% |
| Taxes | 69'816 | | | 70'384 | |
| Income Before Minority Interests | 316'669 | | | 301'214 | |
| Minority interests | (52) | | | 174 | |
| **Net Income** | 316'721 | 25.3% | 5.2% | 301'040 | 26.2% |

*Unaudited

| | 2001 | % Change | 2000 |
|---|---|---|---|
| Basic Earnings per Share (in U.S. dollars) | | | |
| - Bearer shares | 19.72 | 1.1% | 19.50 |
| - Registered shares | 7.89 | 1.1% | 7.80 |
| - American depositary shares | 0.49 | 1.1% | 0.49 |
| Diluted Earnings per Share (in U.S. dollars) | | | |
| - Bearer shares | 19.68 | 1.1% | 19.46 |
| - Registered shares | 7.87 | 1.1% | 7.78 |
| - American depositary shares | 0.49 | 1.1% | 0.49 |

Basic earnings per share are calculated in accordance with IAS 33 (Earnings per Share) by dividing the net income of the group, US$316.7 million (2000 US$301.0 million), by an appropriate number of shares. This is 11,658,108 bearer shares (2000 11,032,835) and 11,013,040 registered shares (2000 11,013,040). The total weighted average equivalent number of bearer shares is 16,063,324 (2000 15,438,051) for the twelve months ended December 31, 2001. As each American depositary share represents ownership interest in one fortieth of a bearer share, basic and diluted earnings per American depositary share is calculated as one fortieth of the earnings per bearer share.

For diluted earnings per share, the total number of bearer shares is adjusted to assume conversion of all share options granted to employees and directors. The number of bearer shares used to calculate diluted earnings per share is 11,693,861 (2000 11,063,889).

-more-

# Consolidated Balance Sheets

| As of December 31 | 2001* | 2000 |
|---|---:|---:|
| | US$ 000 | US$ 000 |
| **Assets** | | |
| Current Assets | | |
| Cash and cash equivalents | 1'131'091 | 223'009 |
| Short-term investments | 344'413 | 1'215'476 |
| Trade accounts receivable | 234'490 | 233'957 |
| Inventories | 196'063 | 164'995 |
| Prepaid expenses | 21'857 | 30'436 |
| Other current assets | 134'955 | 167'181 |
| Total Current Assets | 2'062'869 | 2'035'054 |
| | | |
| Long-term Assets | | |
| Property, plant and equipment | 460'767 | 462'425 |
| Other long-term assets | 388'018 | 203'297 |
| Deferred tax assets | 107'115 | 94'001 |
| Total Long-Term Assets | 955'900 | 759'723 |
| **Total Assets** | 3'018'769 | 2'794'777 |
| | | |
| **Liabilities** | | |
| Current Liabilities | | |
| Bank advances | 154'295 | 162'084 |
| Trade accounts payable | 60'151 | 56'402 |
| Other current liabilities | 246'157 | 202'952 |
| Current portion of long-term debt | 18'959 | 76'501 |
| Income taxes | 55'948 | 31'581 |
| Total Current Liabilities | 535'510 | 529'520 |
| | | |
| Long-Term Liabilities | | |
| Long-term debt | 37'325 | 56'626 |
| Other long-term liabilities | 217'430 | 191'019 |
| Deferred tax liabilities | 9'003 | 10'456 |
| Total Long-Term Liabilities | 263'758 | 258'101 |
| Total Liabilities | 799'268 | 787'621 |
| | | |
| Minority Interests | 587 | 740 |
| | | |
| **Shareholders' Equity** | | |
| Share capital | 252'955 | 252'992 |
| Share premium | 966'295 | 968'581 |
| Retained earnings | 1'082'951 | 845'124 |
| Cumulative foreign currency translation adjustments | (83'287) | (60'281) |
| Total Shareholders' Equity | 2'218'914 | 2'006'416 |
| | | |
| **Total Liabilities, Minority Interests and Shareholders' Equity** | 3'018'769 | 2'794'777 |

*Unaudited

# Consolidated Statements of Cash Flows

| Twelve months ended December 31 | 2001*<br>US$ 000 | 2000<br>US$ 000 |
|---|---|---|
| Cash Flows From Operating Activities | | |
| Income before taxes and minority interests | 386'485 | 371'598 |
| Depreciation and amortization | 98'906 | 86'266 |
| Financial income | (75'858) | (72'354) |
| Financial expense | 14'709 | 17'867 |
| Other non-cash items | 25'595 | (23'788) |
| Cash Flows From Operating Activities Before Working Capital Changes | 449'837 | 379'589 |
| | | |
| Working Capital Changes | | |
| Trade accounts payable, other current liabilities and deferred income | 20'530 | 13'648 |
| Trade accounts receivable | (22'231) | (34'042) |
| Inventories | (37'335) | 5'734 |
| Prepaid expenses and other current assets | 34'879 | (62'264) |
| Taxes paid | (40'730) | (47'222) |
| **Net Cash Flow From Operating Activities** | 404'950 | 255'443 |
| | | |
| Cash Flows From Investing Activities | | |
| Short-term investments | 871'343 | (945'681) |
| Intangible and other long-term assets | (233'205) | (35'225) |
| Capital expenditures | (78'565) | (63'617) |
| Disposals of fixed assets | 11'033 | 5'367 |
| Other non-current liabilities | 1'653 | 1'370 |
| Interest received | 76'076 | 33'031 |
| Net Cash From Investing Activities | 648'335 | (1'004'755) |
| | | |
| Cash Flows From Financing Activities | | |
| Bank advances | 639 | (9'156) |
| Payments on long-term debt | (73'701) | (36'783) |
| Proceeds from issuance of share capital | - | 951'774 |
| Proceeds from exercises of stock options | 1'825 | 3'445 |
| Purchase of treasury shares | (5'578) | (4'750) |
| Interest paid | (13'810) | (12'746) |
| Withholding tax paid on free share dividend | - | (59'755) |
| Dividend paid | (53'759) | (17'755) |
| Net Cash From Financing Activities | (144'384) | 814'274 |
| Effect of Exchange Rate Changes on Cash and Cash Equivalents | (819) | (3'423) |
| Net Increase in Cash and Cash Equivalents | 908'082 | 61'539 |
| | | |
| Cash and Cash Equivalents | | |
| - Beginning of period | 223'009 | 161'470 |
| - End of period | 1'131'091 | 223'009 |

*Unaudited

-end-

Document: 1213299 v.1



# serono
## biotech & beyond

This presentation may contain forward looking statements that reflect management's current views as to the company's collaborative arrangements, clinical trials, product developments, regulatory approvals, manufacturing scale-up, and other future events and operations. These forward-looking statements involve uncertainties and other risks that are detailed in Serono's filings with the U.S. Securities and Exchange Commission, including the "Risk Factors" and "Operating and Financial Review and Prospects" sections of Serono's Annual Report on Form 20-F filed on April 23, 2001. Actual results could differ materially from these forward-looking statements.

This presentation is intended only for the purpose of providing information relevant to the investment community and should not be used for any other purposes

Slide 2

**serono**
biotech & beyond

Slide 3

## 2001 Revenues

- Q401 Product sales $338m (+17.1% like-for-like**)

- 2001 Royalty and license income: $127m (+37.2%*)

- 2001 Total revenues: $1,376m (+13.5%*)

- 2001 Product sales $1,249m (+15.0% like-for-like**)
  - Neurology: $379.6m (+54.1%*)
  - Reproductive Health: $574.3m (+3.7%**)
  - Growth & Metabolism: $232.6m (+3.9%*)

* in local currencies
** in local currencies and excluding sales of Crinone (temporarily withdrawn) and Curosurf (sold to Chiesi)

**serono**
biotech & beyond

# Rebif - 2001 Milestones

- Q101: EU Commission recognizes 44mg / 3 times a week as recommended dose of Rebif

- Q401: EU Commission approves expansion of Rebif labelling to include treatment of early secondary progressive patients

- June 01: EVIDENCE data presented at the World Congress of Neurology

- Q301: EVIDENCE data filed with FDA – expecting decision during March 2002; 48 week data from EVIDENCE study will be presented at AAN in April

- H201: $30m invested for launch of Rebif in the US

- Q401: Rebif strengthens its leading position outside of the US with a 38% market share in US$ terms

Slide 4





## Reproductive Health

**serono**
biotech & beyond

- ■ Q4 RH Sales
  - • $154.8m (+5.9%** like-for-like)
  - • Gonal-F: $109.7m (+16.4%*)
  - • Strong performance in Europe (sales +17%**)
  - • Unfavourable US market environment (sales –4.4%**)
- ■ 2001 RH Sales
  - • $574.3m (+3.7%** like-for-like)
  - • Gonal-F: $410.5m (+14.7%*)

* In local currencies
** in local currencies and excluding sales of Crinone (temporarily withdrawn)

Slide 7





# Reproductive Health - 2001 Milestones

- Launch of Gonal-F multi-dose
  - 10% of 2001 Gonal-F sales
  - 20% of December sales
- Launch of Ovidrel (r-hCG) and Luveris (r-LH) late 2001
- Serono is the only company with 3 infertility hormones derived from recombinant technology (r-FSH, r-LH, r-hCG) on the market
- In line with our strategy, 72% of RH product sales are now derived from recombinant products (2000: 62%)

Slide 9





# On Target with Consensus for FY01

≡serono
biotech & beyond

| Analyst Consensus | Mean | Highest Estimate | Lowest Estimate |
|---|---|---|---|
| Total Product Sales | $1'242.6m | $1'290.4m | $1'206.3m |
| Gross margin as a % of product sales | 82.6% | 83.3% | 81.0% |
| EBIT | $337.6m | $358.6m | $325.7m |
| Net profit | $318.0m | $326.3m | $308.2m |

■ **Participants:** Actien Bank, Bear Stearns, Chevreux Indosuez, Commerzbank, Credit Suisse FB, Deutsche Bank, Enskilda, Exane, Fortis, Goldman, Sachs, Gottardo, HSBC, JP Morgan Securities, Lehman Bros, Lombard Odier, Merrill Lynch, Morgan Stanley, Oddo Pinatton, Pictet & Cie, Prudential Securities, Robertson Stephens, Sarasin, Schroder Salomon Smith Barney, UBS Warburg, Vontobel)

Slide 12









## 2002 – Good Growth Expected

serono
biotech & beyond

Slide 16

- Sales — Around +15% Lcy (excludes Rebif US sales)
- Gross margin — 84 – 85%
- SG&A — 33 – 35% (includes Rebif US costs)
- R&D — 23 – 25%
- Operating Income — +20 – 22%
- Tax rate — 18 –19% of profit before tax
- Net Income — Around +15% (includes Rebif US costs)

≣ **serono**
biotech & beyond

Slide 17

# 2001 Highlights

- Sales: $1,249m up 15.0% (like-for-like, in local currencies)

- Rebif sales: +54.1% in local currencies

- Rebif now ranks as #1 MS treatment outside of the US

- EVIDENCE data filed with FDA in Q3

- Launch of Gonal-F multidose, Ovidrel and Luveris

- 72% of RH sales now derived from recombinant products

- Launch of Saizen in adult GH deficiency

- Rollout of new GH delivery devices

- 7 new molecules entered pre-clinical development

- Gross margin increases further to 82.9%

- Net income: +5.2% to $316.7m

- EPS: $19.72 per bearer share; $0.49 per ADS

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SERONO S.A.
a Swiss corporation
(Registrant)

February 13, 2002

By:   /s/ Jacques Theurillat
Name:  Jacques Theurillat
Title:   Chief Financial Officer

Document #: 1213487 v.1

# EXHIBIT 78

DEPARTMENT OF HEALTH & HUMAN SERVICES                           PUBLIC HEALTH SERVICE
_____

**Memorandum**

Food and Drug Administration

Center for Biologics Evaluation and Research
1401 Rockville Pike
Rockville, MD 20852

Division of Clinical Trial Design and Analysis
HFM-576

| | |
|---|---|
| Date: | March 7, 2002 |
| From: | C. Rask, E. Unger, M. Walton, DCTDA |
| Subject: | BLA STN 103780 / 0<br>Comparative Study of Rebif to Avonex and Orphan Exclusivity |
| Through: | K.  Weiss, Director, DCTDA |
| To: | BLA STN 103780 / 0 File |

## Summary

This memorandum provides, describes, and summarizes FDA's analyses of the direct comparative clinical trial that Serono conducted comparing Serono's Rebif to Biogen's Avonex.  Both of these products are interferon betas for the treatment of multiple sclerosis (MS), a disabling and degenerative autoimmune disease characterized by inflammation and scarring of the myelin, or tissue that covers nerve fibers, in the brain and spinal cord.  Avonex is FDA-licensed and has orphan drug exclusivity.

Serono conducted the comparative study in order to demonstrate that Rebif is clinically superior to Avonex so that FDA can license Rebif.  Serono sought to show that Rebif provides a significant therapeutic advantage over and above that provided by Avonex, due to Rebif having greater effectiveness.  The primary measurement of effectiveness that Serono used was the frequency of MS exacerbations or flare-ups.  The secondary measurement of effectiveness was the number of MRI brain lesions.

CBER has reviewed the results of the study and has consulted extensively with FDA's Office of Orphan Product Development (OOPD) concerning the study, the interpretation of the results, and applicable standards under the orphan drug regulations.  As described below, the comparative clinical study demonstrates that Rebif is more effective that Avonex such that it provides a significant therapeutic advantage over Avonex: 74.9% of study subjects taking Rebif were exacerbation-free versus 63.3% of Avonex subjects.  This is a meaningful difference, because it means, among other things, that a patient on Rebif is 32% less likely to experience an MS exacerbation, which can substantially lower his or her quality of life for weeks or months.  MS exacerbations can be manifested by paralysis, loss of vision, loss of control of bladder and bowel function, as well as other impairments.  Furthermore, subjects on Rebif had fewer MRI brain lesions than subjects on Avonex.

FDA has considered a number of other issues concerning the adequacy of the comparative study and the safety and effectiveness of Rebif. As described below in the body of this memorandum, FDA has fully evaluated these issues and has determined that Rebif is clinically superior to Avonex.

Among other things, the design (including the baseline characteristics of the study population and endpoints) and the duration of the comparative study are adequate. The 6 month duration was sufficient to generate results that demonstrate that Rebif is clinically superior. As explained below, prior experience with interferon betas indicates that an effect of exacerbation reduction observed early in a clinical trial persists beyond 6 months. Furthermore, Serono has submitted the results from the comparative study through one year. These results confirm the data and effects observed at 6 months in the trial.

As detailed below, CBER has examined neutralizing antibody formation and its impact on effectiveness as seen in the comparative trial. The data do not establish that antibodies impair effectiveness. Moreover, patients on Rebif who developed antibodies were more likely to remain exacerbation-free than patients on Avonex.

The dose and frequency of Rebif administration that Serono studied in the comparative trial does not call into question the results of the trial. The argument that Serono simply gave subjects a higher dose of Rebif which generated short term effects, compared to Avonex, is not valid. Although Avonex and Rebif have been previously regarded as the same drug for orphan drug purposes, they are not biochemically comparable for purposes of non-orphan drug comparison.

Finally, FDA has fully considered the safety profile of Rebif. As described below, although Rebif may cause certain adverse events (AEs) more frequently than Avonex, FDA has determined that the severity and frequency of such AEs do not render Rebif unlicensable under Section 351 of the Public Health Service Act. Furthermore, under the orphan drug regulations, if Serono demonstrates that Rebif is clinically superior to Avonex on the basis of efficacy, Serono does not have to show that Rebif is safer than, or as safe as, Avonex.

## Background: Interferon Beta use in Multiple Sclerosis

The first interferon beta for treatment of relapsing remitting multiple sclerosis (RRMS) became commercially available in July 1993 when Betaseron (interferon beta-1b) received marketing approval for this use. Betaseron was shown to be effective in reducing the incidence of exacerbations. Subsequently, a second interferon beta, Avonex (an interferon beta-1a) was shown to be effective for reducing the incidence of exacerbations and reducing the accumulation of physical disability. Betaseron received orphan drug designation prior to approval, and was still within the 7 year period of marketing exclusivity at the time Avonex was under review. However, Biogen, the manufacturer of Avonex, provided evidence that Avonex was not the same drug within the meaning of the orphan drug regulations, by showing Avonex was clinically superior over Betaseron. Specifically, Biogen supplied evidence showing a significant difference between the safety profiles of the two products with regard to skin necrosis at injection sites. Because Avonex and Betaseron were then deemed to be different drugs, Biogen received marketing approval for Avonex in May 1996. Biogen also has orphan drug designation for Avonex for this use and has a 7 year period of marketing exclusivity which expires in May 2003.

Serono, a third manufacturer of an interferon beta product, Rebif (an interferon beta-1a) also conducted clinical studies in relapsing-remitting MS. Serono completed their studies and submitted a Biologics License Application (BLA) for Rebif for use in MS in February 1998. The major safety and efficacy data came from the study XXXXXXXXXX, a three-group, controlled, randomized, double-blind study of doses of 22 μg or 44 μg vs. placebo. Based on review of the information supplied in the license application, FDA concluded that Rebif was safe and effective for use in the treatment of RRMS (see clinical review of J. Kaiser). However, under the framework of the orphan drug regulations, Rebif was regarded as a "same drug" as both Betaseron and Avonex. Serono was not able to supply evidence at that time that was sufficient to establish that Rebif was not the "same drug." As a consequence, Rebif could not be granted marketing approval until the bar of marketing exclusivity was removed, either by expiration of the exclusivity time period, or by Serono providing evidence that Rebif was not the "same drug."

Serono recognized that the Betaseron period of exclusivity would expire in July 2000, leaving only the Avonex marketing exclusivity as an issue after that date. Thus, in late 1999 Serono commenced a clinical study (Study XXXXXXXXXX), intended to be adequate and well-controlled, to show superior clinical efficacy of Rebif compared to Avonex. Serono's objective was to have this study provide sufficient evidence to enable marketing of Rebif prior to the expiration of Avonex's exclusivity period.

## Orphan Drug Regulations

In implementing the Orphan Drug Act of 1983, the orphan drug regulations (21 CFR Part 316) allow a sponsor of an orphan-designated drug a 7 year period of marketing exclusivity for the "same drug" for the same approved indication. The regulations describe how to assess two products on a physical-chemical basis to determine if they should be regarded as the "same drug" for purposes of these regulations. The regulations further provide that even if the physical-chemical criteria for "same drug" are met, a demonstration of clinical superiority of the subsequent product compared to the originator product will enable a determination that the two products are in fact not the "same drug." Thus, the subsequent product may be given immediate marketing approval.

The regulations also describe the circumstances for determining clinical superiority. A new product can be considered clinically superior if greater effectiveness has been shown. Alternatively, a new product can also be considered clinically superior on the basis of greater safety in a substantial portion of the target populations. Lastly, "in unusual cases," a demonstration of some other form of a major contribution to patient care can be sufficient to regard the subsequent product as clinically superior.

An important aspect of this determination is that, per the regulations, demonstration of greater effectiveness will in most cases entail direct comparative clinical trials, whereas direct comparative trials for a demonstration of superior safety are expected to be necessary in only some cases. The regulations permit a determination of clinical superiority if the subsequent drug is shown to provide a significant therapeutic advantage over the approved drug in either safety or effectiveness. Additionally, the regulations do not state that clinical superiority must be based on overall risk-benefit being deemed superior for the subsequent product compared to the prior product. In fact,

the regulations indicate that only a selected aspect may constitute a sufficient basis to reach a conclusion of clinical superiority.  That is, the aspects not selected by the sponsor for focus (e.g., safety when efficacy is selected; efficacy when safety is selected) do not require a comparative assessment.  The regulations require neither that all aspects of known efficacy nor all aspects of safety be shown to be superior.  Nor do the regulations indicate that other aspects of safety or efficacy be shown "comparable" when only one specific aspect of safety or efficacy is shown to be superior.  Many other aspects of clinical performance of the drug may not be possible to compare.  For example, while the regulations clearly indicate that direct, randomized clinical trials will usually be needed for a valid efficacy comparison, they indicate that a clinical superiority determination for superior safety may well be feasible without such direct comparisons.  Consequently, knowledge of the comparison of efficacy could be entirely lacking (and somewhat inferior efficacy a real potential), yet a clinical superiority determination, based on safety, can be reached.

This last point is well-illustrated by the prior orphan drug history of the interferon beta products.  When Biogen provided evidence to permit a determination that Avonex was not the same drug as Betaseron and gain marketing approval for Avonex, it was on the basis of a single specific AE .  Apart from orphan drug considerations, FDA would have deemed Avonex safe and effective for approval.  Because there were no direct comparative studies, many other aspects of comparative safety remain unevaluated, and a comparison with regard to efficacy has not been performed.  Avonex may be as efficacious as Betaseron, or more or less efficacious .  Thus, although a specific safety difference is known, most comparative aspects of safety, and all comparative aspects of efficacy, are unknown between Avonex and Betaseron .

## Objective and Design of Serono Study XXXXXXXXXX

The objective of this study was to demonstrate whether Rebif was superior to Avonex in decreasing the incidence of exacerbations.  See the BLA review of C. Rask for complete details and assessment.  Briefly, this was a multicenter randomized two group study of Rebif at 44 μg subcutaneously (SC) 3 times per week (tiw) compared to Avonex at 30 μg intramuscularly (IM) weekly (qw).  The primary efficacy outcome was the incidence of exacerbations through week 24, but all subjects were to continue in the controlled study through 48 weeks.  Avonex was directed to be given according the recommended regimen in the FDA-approved labeling for Avonex, and Rebif according to the recommended regimen in Serono's proposed labeling.  Commercially purchased Avonex was used in the study.

Serono noted that the difference in the administration route IM vs SC would require a double dummy design with 4 injections per week in an attempt to fully mask drug administration.  This could make the study unpleasant for subjects, potentially decreasing subject compliance and retention for the full study, and yet might not actually achieve patient blinding as to group assignment due to the local skin reactions and systemic symptoms that would be physically and temporally associated with only one of the injection route regimens in each patient.  Therefore, Serono elected to conduct the study open label, but with a blinded clinical evaluator.  Each site operated with a treating physician who was, like the subjects, unblinded to treatment group.  In addition, each site had an evaluating physician who remained blinded to assignment and had the responsibility for deciding whether changes in signs or symptoms qualified as an exacerbation.

Patients were to have complete neurological examinations by the evaluating physician every 12 weeks. However, in order to ensure that ascertainment of exacerbations was complete, subjects were instructed to telephone the clinical site in the event of any change in clinical status that might indicate a new exacerbation. When a subject called, and the site perceived that the reported changes had the potential to indicate a new exacerbation, the subject was told to come to the clinic to be evaluated. Additionally, so as to not rely solely upon the subject's perception in this unblinded study, during the first 6 months of the study the subjects were seen by the treating physician every month, and received phone calls from the site coordinator in the middle of each 4 week period between clinic visits. Thus, the study design provided for contact between the subject and the site every two weeks. During these phone calls or visits an assessment was made as to whether the subject had a change in symptoms suggesting the possibility of a new exacerbation. If so, the subject was instructed to come in to the site and the evaluating physician assessed the subject to confirm or reject the change in status as being an exacerbation. The change in frequency of clinical contacts after month 6 was related to the study objective, which was primarily to show the clinical superiority during a 6 month comparison period, with continuation of the observed effect through 12 months only as a secondary objective.

MRI scans were performed in addition to the clinical examinations. Patients had monthly T2 and Gadolinium-enhancing (Gd)-T1 scans during the first 6 months, and an additional T2 scan at month 12. Again, the change in frequency of scanning was related to the 6 month period as the primary focus of the study. MRI scan reading was performed blinded to group assignment. In order to permit an evaluation of Combined Unique (CU) lesions (see next paragraph) at baseline, a MRI scan set was obtained at screening and at baseline.

The primary endpoint of the study was the comparison of the proportion of patients who were exacerbation free during the first 6 months of the study. The major secondary endpoint was the chief MRI outcome of the number of CU active lesions per scan by subject. A CU active lesion was a lesion on either the T1 or T2 scan which was new or enlarging compared to the prior scan. A persistent Gd-enhancing lesion also qualified as an active lesion, and lesions in the same location on the T1 and T2 scans were counted as only a single active lesion. For each subject, the primary analysis consisted of averaging the number of CU active lesions on each of the monthly scans to provide an average number of CU active lesions per month for that patient.

## Conduct of Study XXXXXXXXXX

Study XXXXXXXXXX enrolled 677 subjects at 56 study centers, 338 patients were randomized to receive Avonex and 339 patients were randomized to receive Rebif. The 37 study sites in the US enrolled 65% of the subjects. There were 15 sites in Europe enrolling 24% of subjects and 4 sites in Canada enrolling 11% of subjects. A small number of patients had a variety of eligibility violations (3 subjects) or conduct deviations (29 subjects). These were largely not of a serious nature. These deviations do not lead to any limitations in accepting or interpreting the study results.

After conclusion of the study, one site informed Serono of a systematic deviation from protocol procedures due to misconduct by the site's study coordinator. No indication of treatment group-related bias was apparent, but certain kinds of data from this site could not be independently substantiated from verifiable medical records. This site enrolled 11 patients, and study results were

not different whether or not these 11 patients were included in the analysis. Serono reported no other sites with significant conduct deviations. FDA's audit of 3 sites verified the data reported from these sites and revealed no significant deficiencies in conduct. Therefore, the study conduct was regarded as adequate and the study results accurate as reported.

The subjective aspect of exacerbations and the open label nature of the study lead to use of the between-visit telephone contacts as part of the study design, as described above. These were completed approximately 84% of the time in each treatment group (i.e., an average of 1 missed phone call per subject).

Over the first 6 month period, 95% of Rebif-assigned subjects, and 96% of Avonex-assigned subjects completed treatment. A few of the early treatment-termination subjects continued in the study for evaluations, so that missing data due to subject dropout was less than 3% of subjects. During the course of the 6 months there were intended to be 24 Avonex injections or 72 Rebif injections, depending on assignment. Compliance with at least 90% of planned injections was achieved by 95% of Rebif subjects and 96% of Avonex subjects.

## Results of Study XXXXXXXXXX

Baseline

The study was balanced between groups for demographic and baseline characteristics. Most subjects were between the ages of 30 to 49, and 75% were women. The baseline EDSS was predominantly between 1 to 3.5, but ranged from 0 to 5.5 in both groups. Slightly more than half the subjects in each group had exactly 2 exacerbations within the year prior to enrollment, with only a small fraction having 4 or more. The median number of CU active lesions at baseline was 1 in both groups. The mean number of CU lesions at baseline was 2.4 in the Rebif group and 2.9 in the Avonex group. However, this difference in mean values was substantially related to a single subject in the Avonex group with 83 CU lesions at baseline. With exclusion of this subject, the Avonex group mean was 2.6, not substantially different from the Rebif group. Of note, CU lesion count is not a normally-distributed measure within this population; therefore, the median provides a more informative measure of central tendency. The median CU lesion count was the same in the two groups (1.0). Thus, there was not an important imbalance observed between groups on any baseline evaluation.

Results at 6 Months

At the end of the 6 month period 74.9% of the Rebif subjects and 63.3% of the Avonex subjects were exacerbation-free. Thus, the relative risk of *not* having an exacerbation was 1.18 (i.e., Rebif-treated patients were 1.18 times more likely to be relapse-free). This outcome was statistically significant between the groups ($p<0.001$) when tested according to the prospectively-planned logistic regression method. Most subjects who experienced an exacerbation had only one during the 6-month period; there were 98 exacerbations occurring in 85 Rebif-treated subjects and 132 exacerbations occurring in 124 Avonex-treated subjects. Sensitivity analyses for the small amounts of missing data do not indicate any important differences from the primary result.

The percentages of subjects *with* an exacerbation (a more commonly used parameter) were 25.1% in the Rebif group and 36.7% in the Avonex group. The relative risk of having at least one exacerbation was 0.68 (i.e., Rebif-treated patients were 0.68 times as likely to experience an exacerbation). Another frequently used parameter in many MS studies is the exacerbation rate. Patients who had more than one exacerbation would be considered as being more affected (less favorable) than those who had experienced just one exacerbation. In this study, the exacerbation rate (per patient) per 6 months was 0.39 in the Avonex group versus 0.29 in the Rebif group, with a relative rate of Rebif/Avonex of 0.74.

Most exacerbations were ascertained at planned subject visits to the study site. However, roughly 40% of confirmed exacerbations (41% Rebif, 36% Avonex) were ascertained on the basis of unscheduled examinations prompted by either spontaneous patient calls or planned visit-intermediate phone calls. The between-group difference in exacerbation incidence was observed both in those exacerbations ascertained at the scheduled evaluating physician exams, and in those ascertained from symptom-prompted unscheduled exams. The treatment effect on exacerbations was generally consistent within subject subsets based on gender, age, geographic region, and time-frame of enrollment into the study. There were also consistent effects on subsets based on baseline MRI findings. As noted above, there were unequal mean values for the baseline CU lesion count, although in totality, the groups were adequately balanced at baseline with regard to this parameter. The baseline MRI lesion activity modestly predicts the propensity to have a future exacerbation. Nonetheless, the fraction of exacerbation-free patients in the Rebif-treated group exceeded that in the Avonex-treated group in both the higher and lower baseline lesion count subsets, whether categorized on the basis of baseline CU lesion count, T1-active lesion count, or T2-active lesion count. The distribution of exacerbations by severity (mild, moderate, severe) was similar in both groups (28 and 30% mild; 40 and 37% moderate; 24 and 23% severe, for Rebif and Avonex, respectively, with approximately 10% not adequately recorded), but with reduced incidence of exacerbations in the Rebif group compared to the Avonex group for all three severities. In summary, the primary endpoint of the proportion of patients who were exacerbation-free was greater in the Rebif group compared to the Avonex group. This finding was robust to various explorations of the data, and was not due to any known imbalances at baseline between the groups.

The main secondary endpoint was the effect on CU active lesions on MRI. A small number of study sites were prospectively identified as unable to perform the MRI scans, so that there were 650 subjects (325 patients per treatment group) included in the MRI assessments. After the planned 6 monthly MRI scan sets were analyzed, the mean number of CU active lesions per scan was 0.7 in the Rebif group and 1.3 in the Avonex group. This was statiscally significantl ($p<0.001$) according to the prospectively-planned nonparametric ANCOVA method, which included the baseline number of CU lesions as a covariate. Unlike the baseline analysis (which was based on a single set of scans, rather than the average across 6), there were no extreme outliers in the 6 month results (range 0 to 16.3 Rebif; 0 to 19.8 Avonex). The difference between groups in the number of CU active lesions became progressively larger during the course of the 6-month period.

Safety analyses did not reveal any adverse reactions of a nature not previously recognized to be a potential risk associated with the use of interferon beta. There were, however, differences in the frequency of certain adverse reactions between the two groups. Injection site reactions were much more frequent in the Rebif group than the Avonex group. This difference was not unexpected,

given that Rebif is administered subcutaneously, whereas Avonex is administered intramuscularly. Skin reactions are much more readily observable than reactions within muscle. Hepatic enzyme increases and leukopenia or lymphopenia were also observed more frequently in the Rebif group. As discussed in Dr. Rask's review, these differences were not of a significant nature.

Study results at 1 year

Serono continued Study XXXXXXXXXX in a controlled manner through 48 weeks. Quality Assurance (QA) procedures were applied to study data from the first 24 weeks while the succeeding portion of the study was ongoing. After QA procedures were completed, the 24-week database was locked and study analyses were conducted, unblinding that portion of the study. The 24 week results were made known to the investigators prior to completion of the entire study. However, most patients had completed or were nearing completion of the 48 week study participation by the time the 24 week results were revealed. Thus, there is, at most, very limited potential impact upon the study results from the slightly early unblinding of study results. Serono has supplied analyses of the 48-week results to the BLA along with datasets supporting these analyses. However, the complete, final study report for the period through week 48 has not been completed by Serono as of yet. The results supplied to CBER have received preliminary review. At this time, they provide supportive data, particularly concerning specific limited issues. The primary evidence for the comparison between the two products is the data through Week 24. The 48-week results of this study are illustrated in the summary tables included in the Appendix of this document.

Through the 48-week timepoint, 62% and 52% of Rebif- and Avonex-treated subjects were exacerbation free, respectively (table A1). This difference was statistically significant (p=0.006) when tested according the prospective analytic method of logistic regression. For the subset of patients who were exacerbation-free at 24 weeks, the proportions that remained exacerbation-free through 48 weeks were essentially the same in both treatment groups (82-83%). Thus, the treatment effect observed during the initial 24 weeks on study was maintained during the succeeding 6 months. For the second 24-week period, the similarity of exacerbation events between the two groups is further supported by the distribution of exacerbation severities, which was again essentially the same across the two groups (Table A4).

During the second 6 months of the study, subject retention was adequate. Fewer patients discontinued treatment than had during the first 6 months (8 Rebif, 9 Avonex). Patient contacts were less frequent, and as expected, the fraction of exacerbations ascertained at the scheduled neurological exams (every 3 months) was slightly higher than during the prior 24 weeks (Table A2). However, the number of neurological exams on unscheduled visits were similar between the two groups, as was the fraction of these unscheduled exams that lead to confirmation of an exacerbation. There were somewhat larger numbers of unscheduled patient visits not prompting a neurological exam, such as for AE evaluation or clinical laboratory repeat evaluation. This is consistent with expectations from the first 24 weeks, where modestly higher AE rates and laboratory abnormalities were seen.

Only a T2 MRI was conducted at the 48-week timepoint. To enhance the interpretation of the 48 week results, the Week 24 T2 MRI and the Week 48 T2 MRI were assessed for T2 active lesions, using identical intervals for each (i.e., active lesions at week 24 compared to baseline and active

lesions at week 48 compared to week 24). The result is shown in table A5, which shows a mean number of T2 active lesions lower in the Rebif group than in the Avonex group at both the Week 24 and Week 48 evaluation. The apparently larger mean difference between groups over the first 24 weeks than over the next 24 weeks was dependent in part upon a single Avonex subject with an unusually large number of active lesions (43) seen on the Week 24 examination. MRI scan data from MS trials are generally not normally distributed, and parameters such as mean must be interpreted with attention to the effect of outliers. The percentage of subjects with their scan showing at least 1 active lesion was also lower in the Rebif group than in the Avonex group. This analysis is insensitive to any outlier effect from a few scans with a large numbers of lesions. Of note, the between-group difference observed in comparing T2 active lesions at week 24 and week 0 is slightly larger than that seen by the 6 sequential scan average of CU lesions through week 24 noted above (1.3 CU lesions Avonex, 0.7 Rebif).

As discussed, more new or enlarging lesions were observed in the first 24 weeks in Avonex-treated patients than in Rebif-treated patients. During the second 24 weeks, the development of similar numbers of lesions in the 2 groups would have been consistent with maintenance of the treatment effect. Instead, these data show additional differences favoring Rebif in new or enlarging lesions during the second 24 weeks. As with exacerbations, there is no suggestion of any reversal in the treatment effect.

Study Results on Antibody Formation

Samples for evaluation of antibody formation were obtained at baseline, Week 24 and Week 48. Serono completed the Week 48 samples only, and supplied these analyses. The antibody assay procedure consisted of an initial ELISA screen on all samples. Only the samples showing binding antibodies by ELISA were assessed with the neutralizing assay. Antibody formation rates were higher in the Rebif group, as shown in table A3. Importantly, however, the rates of antibody formation to these molecules are not directly comparable, because the assays performed by Serono measured antibodies by their ability to bind Rebif. It is possible that some patients who received Avonex developed antibodies to Avonex but not Rebif. Such antibodies would not be identified in the assays used by Serono. Thus, there was the potential to differentially underestimate the rate of antibody formation in the Avonex group.

In the Rebif group, there was no association between antibody status and the probability of remaining exacerbation-free, for either the Week 0–24 or the Week 24–48 period (Table A6). Comparisons between the 2 treatment groups with respect to antibody status and clinical outcome demonstrated that all subsets of Rebif-treated patients, categorized by antibody titer, experienced lower exacerbation rates than Avonex-treated patients.

MRI outcome was also examined by antibody status. Rebif patients with antibodies had higher mean CU lesion counts over the first 24 weeks than did Rebif patients without antibodies; however, the median values suggest this difference may be related to several patients with unusually large CU lesion counts (Table A7). Of note, the mean and median CU lesion counts in the Rebif group subset with higher titers were lower than CU lesion counts in the Avonex group as a whole, and in the subset who were antibody-negative.

Examination of the single T2 scan results at Week 24 (compared to baseline) and Week 48 (compared to the Week 24 T2 scan) yielded similar findings (Table A8). This is a useful observation, as it might be hypothesized that an antibody-related effect on MRI lesion outcome would be more likely apparent in the second half of this study, given that it takes time for antibodies to develop in response to treatment. Thus, data through 48 weeks suggest that antibody formation does not affect either clinical or MRI outcomes.

Regardless of any potential effects that might be hypothesized for antibodies, patients on Rebif were more likely to remain free of clinical exacerbations at 24 and 48 weeks; and, importantly, patients on Rebif who developed antibodies (as well as those who did not) were more likely to remain exacerbation-free than patients on Avonex.

## Assessment of Study XXXXXXXXXX Design and Results

It is important to view the design and results of Study XXXXXXXXXX in proper context. Several large, multicenter trials of interferon betas have been conducted in MS over the past 10 years, and the effects of beta interferons in MS have been well-characterized. These studies have provided both FDA and the medical community with considerable experience in evaluating the design and results of clinical studies. Betaseron and Avonex, the two interferon betas presently approved for treatment of MS, were shown to decrease the frequency of clinical exacerbations, compared to placebo, by approximately one-third. Study XXXXXXXXXX was the first clinical trial to directly compare the effects of interferon betas, Rebif and Avonex, in a large multicenter clinical study, and it is useful to consider the study design and results within the framework of the prior placebo-controlled experience.

<u>Selection of Primary Endpoint</u>

Serono selected the occurrence of clinical exacerbations as the primary efficacy outcome. The Avonex approved labeling indicates benefit on both disability and exacerbations, and Serono's proposed Rebif labeling indicates the same claimed benefits. Thus, a focus solely upon exacerbations does not address the outcome of disability. However, exacerbations are important events to patients, and the agency has an established regulatory history acknowledging an effect on exacerbations alone as a clinically meaningful benefit. Betaseron was approved in 1993 based solely on showing a reduction in exacerbations. Several years later CDER approved glatiramer acetate (Copaxone) based only on exacerbation reduction. Additionally, as noted above, the labeled indicated benefits of Avonex include reduction in exacerbations. These products have all gained support in the medical community. Patients in earlier stages of MS can experience substantial remission in impairment over time. However, complete remission can require weeks to months, and in many cases remission is not complete. Thus, exacerbations are a relevant aspect of the disease for study, and reduction in exacerbations is a meaningful benefit.

This study was not designed to assess the broad range of actions of Rebif. It was designed to address the requirements of orphan drug regulations to gain early marketing approval. The regulations state that "Clinically superior means that a drug is shown to provide a significant therapeutic advantage" and may be accomplished in one of three ways, including "… as assessed by an effect on a clinically meaningful endpoint …". Orphan drug regulations do not state that all

known clinical actions of a product must be shown superior to the competitor. Rather, superior effectiveness as shown on a single meaningful clinical endpoint is sufficient. Serono's selected study endpoint is clinically meaningful, and appears to be fully in keeping with the intent and requirements of the orphan drug regulations.

Open Label Study Design and Ascertainment of Exacerbations

Exacerbation assessments are somewhat subjective. Exacerbations are best assessed within 1 to 2 days from onset. In the context of a clinical study, this requires that subjects bring symptoms that are potential exacerbations to the attention of the study investigators. Study investigators must then examine subjects to determine whether clinical symptoms and signs more likely represent a temporary worsening of the subject's existing neurologic impairment, or whether the change represents a new impairment that should be classified as an exacerbation. There is a subjective component to this assessment, particularly when the exacerbation is of mild severity. For the reasons cited previously (see "Objective and Design of Serono Study XXXXXXXXXX"), this study was open-label. Knowledge of treatment assignment had the potential to bias the results. Serono addressed this issue in two ways:

1) The study employed frequent contacts between study subjects and site personnel to reduce the potential for study subjects to influence the ascertainment of new exacerbations by the investigators. There were monthly visits and phone contacts midway between visits. Study personnel would actively inquire as to any change in clinical status and have the subject seen by the evaluating physician if there was potential for an exacerbation to be in progress. Thus, even if the subject minimized the import of their symptoms to themselves and did not notify the study site, the subject would be seen by the investigator to ascertain whether the symptoms met the protocol definition of an exacerbation. Mild exacerbations that appeared and fully resolved within the two week period between contacts remain a possible gap in ascertainment. However, such exacerbations constitute a small fraction of all exacerbations, and of the least importance. Of note, differences between treatment groups in the incidences of mild, moderate as well as severe exacerbations were observed.

2) To reduce the potential for study investigator bias in confirming or rejecting a potential exacerbation, there were separate treating and evaluating investigators, with the evaluating investigator blinded to treatment assignment. In order to maintain the blind during contact with evaluating investigators, subjects kept their injection sites fully covered and did not discuss AEs. Thus, bias due to knowledge of the treatment assignment should not have entered into the process of confirming exacerbations.

The degree of subject bias in Study XXXXXXXXXX is unknown. Both groups were treated with active agents believed to be effective (as opposed to treatment with a known inactive substance as in placebo-controlled studies), and patient preference may not necessarily have favored Rebif, given the difference in the frequency of injections. Subjects in both treatment groups were substantially compliant with injection regimens, indicating a willingness to comply with study procedures in both groups.

Prior experience with MS studies is relevant. Studies of interferon betas and other products for MS have included exacerbation occurrence as either a primary or secondary endpoint. All the interferon

betas, irrespective of injection frequency or route, cause local injection site and systemic flu-like symptoms that likely lead to patient unblinding. This is well-recognized in the neurologic community. In order to address the potential for bias related to investigator unblinding due to adverse effects, these studies have commonly employed blinded, separate evaluating physicians. Procedures such as limiting subject discussion of AEs with the evaluating physician and having the subjects fully covered to hide injection sites have also been employed to protect the evaluating physician's blinding. As noted above, several of these studies have contributed to the central demonstration of effectiveness in reducing exacerbations and have led to labeling claims. Serono's Study XXXXXXXXXX employed these accepted techniques to reduce the potential for bias, and included subject contact every two weeks to ensure robust ascertainment of exacerbations. Most other studies used less frequent scheduled site contacts and greater reliance on spontaneous call-in by subjects to report potential exacerbations. Therefore, while exacerbation ascertainment and assessment contain subjective elements potentially biased by unblinding, Study XXXXXXXXXX employed standard, accepted techniques to minimize these sources of bias, and scheduling that was more rigorous than used in prior studies to maximize ascertainment.

Duration of Study

Multiple sclerosis is a chronic disease, and warrants long-term treatment. Phase 3 studies of beta interferons in MS, including prior studies of Rebif and Avonex, have generally been of 2 years duration or longer. Although the primary endpoint assessment in this study occurred after 6 months, prior experience has shown that early salutary effects of interferons on exacerbations persist. Consistent with prior experience, there was no suggestion that the early efficacy of Rebif diminished over time in the 2-year placebo-controlled trial. Similarly, preliminary analysis of the 48-week data in Study XXXXXXXXXX indicates persistence of effect. Therefore, a 6-month primary study period constitutes an adequate examination of the relative efficacy of two beta interferons, when each has previously demonstrated persistent efficacy throughout a two year study period.

Effect on Exacerbations

The observed difference in the incidence of exacerbations in this study was robust to exploration of the data. No geographic region or single site drove the results, and no anomalous subsets were identified. The treatment effect was apparent on severe, as well as mild exacerbations, and was observed in subject subsets both with and without active MRI lesions at baseline. Table 1 summarizes the experience with interferon betas in major randomized controlled studies. None of the interferon betas completely eliminate exacerbations. The relative reduction in incidence of exacerbations (or relative exacerbation rates) seen in Study XXXXXXXXXX is slightly less than that observed in studies of Betaseron or Rebif compared to placebo, somewhat larger than seen with Avonex vs. placebo in the initial phase 3 study, and comparable to the effect size observed in the Avonex study of Early MS. Moreover, the relative reduction in exacerbation rates observed with Rebif in Study XXXXXXXXXX was larger than that typically observed in investigations designed to assess various dose levels of a single interferon beta.

MRI Endpoints

MRI studies can be analyzed in a fully blinded manner; therefore, MRI outcomes are less subject to bias.  MRI results have consistently provided objective evidence of the activity of interferon betas on brain lesions in MS.  In Study XXXXXXXXXX, the demonstration of differences between groups on MRI endpoints was robust to multiple exploratory analyses.  It is also important to note that the differential effect of the two products on MRI lesions persisted through the second 24-week study period.

A summary of results of major studies with interferon betas is shown in Tables 1 and 2.  All of the MRI techniques are regarded as useful and supportive, and the technique employed by Serono was fully adequate for the intended purpose.

**Tbl 1:  Major Randomized Controlled Studies of Interferon Beta in Multiple Sclerosis -- Exacerbation and MRI Lesion Rates**

| Specific Drug Study ID | Doses Studied | Result Source | Exacerbations | | | | MRI Active Lesion Rate | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Pbo | IFN1 | IFN2 | Notes | Pbo | IFN1 | IFN2 | Notes |
| **RRMS or Early MS** | | | | | | | | | | |
| Betaseron Orig. Ph 3 Study | Pbo, 1.6MIU, 8MIU qod | 1 & 2 | 1.31 | 1.14 | 0.9 | Ann Exac. Rate over 2 yrs | 4.9 | 1.8 | 2 | Active lesions per yr in small subset |
| AVONEX Orig. Ph 3 Study | Pbo, 30ug qw | 1 & 2 | 0.82 | 0.67 | | Over 2 yrs Ann rate | 4.8 | 3.2 | | Only 2 yr subjects |
| AVONEX CHAMPS | Pbo, 30ug qw | 2 | 50% | 35% | | Proportion with at least 1 exacerbation | 2.8 | 1.5 | | No. of active lesions in first 6 months |
| Rebif GF6719 | Pbo, 22ug, 44ug tiw | 2 | 2.56 | 1.82 | 1.73 | Rate of relapses over 2 years | 0.88 | 0.17 | 0.11 | CU lesions freq. MRI subset |
| Rebif GF7480 (Early MS) | Pbo, 22ug qw | 2 | 0.43 | 0.33 | | Ann relapse rate over 2 yrs | 3 | 2 | | median # T2 active lesions |
| Rebif OWIMS | Pbo, 22, 44 ug qw | 2 | 1.08 | 1.08 | 0.87 | relapse rate over 1 year | 1.7 | 1.3 | 0.8 | 6mo MRI CU lesion |
| **SPMS** | | | | | | | | | | |
| Betaseron N.American Study | Pbo, 5MIU/m2; 8MIU qod | 3 | 0.28 | 0.2 | 0.16 | ann relapse rate across 3 years | 17 | 4 | 6 | Annual rate of new enhancing lesions during 3 yrs |
| Betaseron European Study | Pbo, 8MIU qod | 2 | 0.57 | 0.42 | | Ann relapse rate across 3 yrs | 8.82 | 3.77 | | # new or enlarging lesions during first 6 mo, freq MRI subject subset |
| Rebif SPECTRIMS | Pbo, 22, 44 ug tiw | 2 | 0.71 | 0.5 | 0.5 | Ann relapse rate | 1 | 0.22 | 0.11 | CU lesions in freq MRI subset |

Results Source Notes:     1 – According to approved label; 2 – According to study publication;
                          3 – Results approximate, taken from figures of scientific meeting presentation

Overall Note:     MRI results based on differing methods between studies, and differing parameters reported in publications (e.g., mean vs median)

| Specific Drug Study ID | Doses Studied | Result Source | Relative Rates of Exacerbation | | | Relative rates of MRI Lesions | | |
|---|---|---|---|---|---|---|---|---|
| | | | IFN1/Pbo | IFN2/Pbo | IFN2/IFN1 | IFN1/Pbo | IFN2/Pbo | IFN2/IFN1 |
| **RRMS or Early MS** | | | | | | | | |
| Betaseron Orig. Ph 3 Study | Pbo, 1.6MIU, 8MIU qod | 1 & 2 | 0.87 | 0.69 | 0.79 | 0.37 | 0.41 | 1.11 |
| AVONEX Orig. Ph 3 Study | Pbo, 30ug qw | 1 & 2 | 0.82 | | | 0.67 | | |
| AVONEX CHAMPS (Early MS) | Pbo, 30ug qw | 2 | 0.70 | | | 0.54 | | |
| Rebif GF6719 | Pbo, 22ug, 44ug tiw | 2 | 0.71 | 0.68 | 0.95 | 0.19 | 0.13 | 0.65 |
| Rebif GF7480 (Early MS) | Pbo, 22ug qw | 2 | 0.77 | | | 0.67 | | |
| Rebif OWIMS | Pbo, 22, 44 ug qw | 2 | 1.00 | 0.81 | 0.81 | 0.76 | 0.47 | 0.62 |
| **SPMS** | | | | | | | | |
| Betaseron N.American Study | Pbo, 5MIU/m2: 8MIU qod | 3 | 0.71 | 0.57 | 0.80 | 0.24 | 0.35 | 1.50 |
| Betaseron European Study | Pbo, 8MIU qod | 2 | 0.74 | | | 0.43 | | |
| Rebif SPECTRIMS | Pbo, 22, 44 ug tiw | 2 | 0.70 | 0.70 | 1.00 | 0.22 | 0.11 | 0.50 |

**Tbl 2:  Major Randomized Controlled Studies of IFN-beta in MS -- Relative Rates Treatment Effect**

Results Source Notes:     1 – According to approved label; 2 – According to study publication;
3 – Results approximate, taken from figures of scientific meeting presentation
Overall Note:     MRI results based on differing methods between studies, and differing parameters reported
in publications (e.g., mean vs median).  Relative rates calculated from available parameters.

<u>Concordance of MRI Endpoints and Clinical Exacerbations</u>

For the specific product class of interferon betas, multiple studies have shown a general concordance of effects on exacerbations and MRI lesions. The relative reduction in rates of MRI active lesions has generally been more than the relative reduction in exacerbation rates (Table 2). MRI concordance in the direction of relative effects can provide supportive evidence regarding the treatment effect, but MRI results alone do not constitute evidence of clinical efficacy. MRI results cannot be given equal weight to the clinical evidence, nor can the results be used to estimate the actual clinical effect size.

## Assessment of Study XXXXXXXXXX as Evidence of Effectiveness

The FDA Guidance for Industry Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products, May 1998, addresses the quality and quantity of evidence to support a proposed claim. While the Agency sometimes seeks two independent studies to support a demonstration of effectiveness, the document also recognizes that a single phase 3 clinical study of an appropriate design with persuasive results, when accompanied by supportive evidence, can be sufficient, as has been the case for interferon betas in MS.

Study XXXXXXXXXX was a multicenter trial, with good uniformity of results across centers and across a number of different subject subsets. The findings were statistically robust, internally consistent, and substantiated on sensitivity analyses. Treatment effects were apparent both on exacerbations overall, as well as on exacerbations subdivided by severity. The MRI results were supportive and also statistically robust.

Interferon betas have been investigated in MS for over a decade and there is substantial experience in the design of adequate studies with these products. Betaseron and Avonex were each approved based upon a single phase 3 study that incorporated many of the attributes that the guidance describes as conveying strength to the evidence. The Betaseron study, much as Study XXXXXXXXXX, showed benefits on the same endpoints: exacerbation rates and MRI lesions. Assessment of the adequacy of Study XXXXXXXXXX may be influenced by the fact that the investigation compared two previously well-studied interferon betas in MS.

The placebo-controlled study of Rebif provides additional evidence of effectiveness, including the finding that efficacy of Rebif persists unabated beyond the 6- to 12-month period.

## Assessment of Specific Orphan Drug Issues

The objective of this study was to provide evidence to reach a finding that Avonex and Rebif should not be regarded as the same drug for purposes of orphan drug regulations. This would permit marketing approval to be granted to Serono for Rebif at the present time, rather than waiting until May 2003 when Avonex's exclusivity period expires. To this end, review of the issues required to reach this conclusion is warranted.

<u>Same Drug Issues</u>

Interferon betas are proteins and macromolecules (large molecules). Under orphan drug regulations, a macromolecular drug that contains the same principal molecular structural features but not necessarily all the structural features of another drug could be considered the same drug if not shown to be clinically superior. For proteins, it is noted that minor differences in amino acid sequence and other potentially important differences do not per se exclude a drug from being considered the same if not shown to be clinically superior. These provisions reflect an important reality about proteins–some very small modifications in these large molecules have no effect on the activities, whereas other minor modifications have large effects, potentially resulting in substantial benefits to patients. Similarly, differences in how the active moiety is formulated or administered could make no clinical difference or a very large one. Therefore, under the regulations, such differences do not automatically make the drug a different drug for orphan purposes, but the drug is considered different if shown to be clinically superior (See 21CFR Part 316).

Some have questioned whether a different dose of the identical active agent, if shown superior, should be considered not to be the same drug. That question is not relevant here, because for non-orphan comparability purposes, Avonex and Rebif are not the same drug. Analytic methodology does not provide us with a method to determine that two protein drugs such as Rebif and Avonex from two separate manufacturers are, in fact, identical. The demonstrated clinical superiority of Rebif over Avonex might result from chemical differences in the active molecule, physical differences such as microaggregation, differences in impurities, differences in formulation, differences in route, differences in the injection schedule, differences in the amount of protein given, or any combination of the above. There is no way to determine which of these factors contribute to the observed clinical differences, and under the orphan drug regulatory scheme, there is no need to do so. Recognizing these issues, the orphan drug regulations state that real or potential small physicochemical differences between proteins and macromolecules do not make them different drugs for orphan purposes but, even absent detectable differences, a demonstration of clinical superiority does. Appropriately, Rebif was compared to the formulation, route, dose, and schedule of Avonex currently approved as effective and indicated in the approved labeling of Avonex, and Rebif was found to be superior.

<u>Significant Therapeutic Advantage</u>

<u>*Endpoint Selected for the Study*</u>

Serono studied a specific clinical efficacy outcome in Study XXXXXXXXXX. A comprehensive study of all previously known efficacy benefits (or of potential, but as yet unproven benefits) was not performed. Again, this is in keeping with the requirements of the orphan drug regulations. The regulations explicitly state that greater effectiveness is "as assessed by effect on a clinically meaningful endpoint." The regulations do not state "all" endpoints, only "a" endpoint. Thus, selection of one appropriate endpoint is sufficient.

As discussed above, exacerbations are a clinically meaningful and important endpoint. An MS exacerbation can substantially lower quality of life for weeks or months. Exacerbations vary greatly in nature and intensity of impairment and can involve partial or complete paralysis, difficulty

walking or inability to walk, significant loss of vision, or loss of bowel and bladder control. The general acceptance of the clinical importance of reducing exacerbations was evidenced by the fact that, based on a study in which the only clinical benefit shown was reduction of exacerbations and no effect was demonstrated on lasting disability, an FDA expert advisory committee recommended approval of Betaseron, FDA licensed Betaseron, and many physicians and patients began to use it.

Study XXXXXXXXXX demonstrated an advantage on exacerbations. This advantage was demonstrated on a 24-week endpoint, observed to be maintained on the 48-week outcomes, and can be reasonably expected to persist beyond that time frame, given the prior experience with interferon betas in many large studies.

*Effects of Neutralizing Antibodies*

A concern regarding this extrapolation is the notable difference in antibody formation rates suggested by the data obtained. However, as described in detail above, the 1-year results are reassuring in this regard. In evaluating whether antibodies might later cause a disappearance of Rebif advantages observed over the first 6 months, the data at one year are quite relevant. The Rebif subjects with the highest antibody titers continued to have fewer exacerbations in the second 6 months than did the Avonex group as a whole, or the Avonex antibody-negative subgroup. Additionally, neither the exacerbation data nor the MRI outcomes at one year suggest that the advantages of Rebif observed at 6 months were reversing.

Some published studies have suggested that the development of anti-interferon antibodies has a negative impact on clinical outcome. However, as discussed above, these trials can not actually distinguish between the possibility that antibody development causes a less favorable clinical course, versus the possibility that subjects who develop interferon antibodies intrinsically have a more active immune systems, leading to a less favorable clinical course. The published analyses are also obfuscated by the fact that many patients who develop antibodies at one point in time will later fail to have antibodies detected, and may remain persistently interferon antibody-negative.

Additionally, there are conflicting study outcomes regarding the impact of antibody formation on efficacy of interferons. In some study subset analyses, no impact was observed. In recognition of this uncertainty, a recent "Report of the Therapeutics and Technology Assessment Subcommittee" of the Academy of Neurology and the MS Council for Clinical Practice Guidelines concluded that the biological effect of neutralizing antibodies is uncertain, although it is possible that antibodies will have some effect on reducing effectiveness. They do not recommend clinical monitoring of patients for antibodies, or make any recommendation regarding treatment of patients who develop antibodies. Consequently, while antibodies are of some concern to the field, there is not adequate evidence to conclude that antibodies lead to a major loss of efficacy, or that the impact of antibodies, if any, will be long lasting.

*Magnitude of Treatment Effect Differences*

Given that the difference between the two therapies is on a clinically significant and meaningful endpoint, one might also ask whether the proportion of patients benefited (or other measures of the magnitude of benefit on the endpoint) is sufficient to qualify as significant. In Study

XXXXXXXXXX, patients on Rebif had a 32% lower risk of having an exacerbation than patients on Avonex, with 37% of patients on Avonex and 25% of patients on Rebif experiencing relapses in 6 months.  While there is no minimum effect size predetermined for trials in MS, the magnitude of this effect is substantial.  Comparisons of effects across different trials should be made with great caution because they involve effects observed in different studies, with different sets of patients, over different periods of time, and observed and measured differently over different intervals. Furthermore, comparisons of the same endpoint, i.e., percent of patients without an exacerbation, can be made in various ways, such as absolute difference between groups, ratio of proportions having an exacerbation, and ratio of proportions remaining exacerbation-free.  That said, we would note that, viewed in terms of a commonly used and appropriate measure, the relative reduction in exacerbations, the size of the difference in effect between Rebif and Avonex in this trial is on the same order as the size of differences observed in earlier trials between Avonex and placebo and between Betaseron and placebo.  Clearly, FDA precedent has recognized that a reduction in exacerbations of the approximate size seen in this study is meaningful by providing labeling for Avonex and Betaseron with a stated claim of benefit on exacerbations.  In this matter, this reduction in exacerbations also represents a significant therapeutic benefit to MS patients.

It could be argued that the absolute difference between proportions of patients with exacerbations at 6 months on Rebif and Avonex (37% minus 25%, or 12%) is smaller than differences observed in some placebo-controlled studies.  Absolute differences in rates are likely to be particularly sensitive to study differences, including severity of illness in the patient population and study duration, and therefore, especially problematic for cross-study comparisons.  Also, absolute differences are likely to be smaller when comparing a superior drug to an already effective drug than when comparing a drug to placebo.  For example, suppose the first drug prevents an important morbidity in 90% of patients.  Even if the new drug were completely (100%) effective, the absolute difference compared with the first drug would be only 10%, small compared with the absolute effect of the first drug, but likely a very important advance.  Finally, and most importantly, independent of findings of any other study, 12% of patients is a substantial portion of patients to benefit.  Consequently, a significant therapeutic advantage has been shown by Serono for Rebif over Avonex.

<u>Safety</u>

A final consideration is safety.  A biological product such as Rebif must be both safe and effective to warrant approval.  Apart from any orphan drug considerations, Rebif has been adequately demonstrated to be safe in the placebo controlled study (see Dr. J. Kaiser's review) in order to be licensable under the Public Health Service Act (PHS Act).

Based on FDA's knowledge of interferon betas in general, and Rebif and Avonex in particular, FDA anticipated differences in the incidence of injection site reactions in the comparative trial. The injection site skin necrosis associated with use of Rebif was not observed with Avonex. However, Rebif-induced skin necrosis is less frequent than observed with Betaseron, and does not seem to pose a serious limitation to the use of the product. No patients required skin grafting or debridement (as seen with Betaseron), and most are able to continue use of the product (see, for example, the narrative in the publication by Radziwill and Courvoisier JNNP, 1999; 67:115).

Unanticipated differences were observed in the incidences of hepatic enzyme elevations and hematologic abnormalities; however, none of these AEs were of sufficient magnitude to alter FDA's previous determination that Rebif is licensable under the PHS Act. Neither hepatic enzyme elevations nor hematologic abnormalities have posed significant problems in clinical studies (see Dr. C. Rask's review). Finally, neither Biogen nor Serono have submitted any data to CBER regarding brain atrophy that would render Rebif unlicensable under the PHS Act.

As discussed above, the orphan drug regulations do not require that safety be superior or even identical between two drugs when a clinical efficacy comparison is employed for the demonstration of being not the "same drug." Therefore, safety considerations do not limit the ability of FDA to make a determination in the present case. The discussion of AEs in the preceding paragraph is not directly relevant to the clinical superiority comparison between Rebif and Avonex. Rather, it is relevant to whether Rebif is licensable. FDA determined in 1998 that Rebif is licensable under the PHS act.

## Recommendation

Serono has provided evidence that Rebif is clinically superior to Avonex in reducing exacerbations in MS. Consequently, this review recommends that FDA find Rebif to be not the "same drug" as Avonex, and recommends that Rebif be granted marketing approval at this time.

## Appendix: Summary Tables of Results through Week 48

| Tbl A1: Exacerbation Status Through Week 48 | | | | | | |
|---|---|---|---|---|---|---|
| | To Week 24 | | To Week 48 | | From Wk 24 to Wk 48 | |
| | Avonex n=338 | Rebif n=339 | Avonex n=338 | Rebif n=339 | Avonex n=214 | Rebif n = 254 |
| No Exacerbation | 214 (63%) | 254 (75%) | 177 (52%) | 209 (62%) | 177 (83%) | 209 (82%) |
| 1 or more Exac. | 124 (37%) | 85 (25%) | 161 (48%) | 130 (38%) | 37 (17%) | 45 (18%) |
| Relative Rate of at least 1 exac. (Rebif / Avonex) | 0.68 | | 0.81 | | 1.02 | |

| Tbl A2: Numbers of Unscheduled Visits and Exacerbation Outcome | | | | |
|---|---|---|---|---|
| | Avonex n=338 | | Rebif n=339 | |
| Unscheduled visits | 105 | | 142 | |
| No Neuro exam | 40 | | 85 | |
| U.Visit with Neuro exam | 65 | 62% | 57 | 40% |
| U. Visit with Exacerbation Confirmed (%of exams) | 44 | 68% | 39 | 68% |
| Steroid use at U.Visit with Exac (% of Exac) | 16 | 36% | 20 | 51% |
| Scheduled Neuro exam with Exac Confirmed | 35 | | 42 | |

| Tbl A3: Antibody Development at Week 48 | | |
|---|---|---|
| Ab Status | Avonex | Rebif |
| ELISA positive | 38 / 294 13% | 146 / 299 49% |
| Neutralizing Pos (any titer) | 15 / 294 5% | 103 / 298 35% |
| Neutr. Pos titer >= 5 | 15 / 294 5% | 99 / 298 33% |
| Neutr pos titer >= 20 | 7 / 294 2% | 75 / 298 25% |

| Tbl A4:  Exacerbations by Severity | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | To Week 24 | | | | To Week 48 | | | | From Wk 24 to Wk 48 | | | |
| | Avonex | | Rebif | | Avonex | | Rebif | | Avonex | | Rebif | |
| | n | % | n | % | n | % | n | % | n | % | n | % |
| Total # Exac. | 132 | | 98 | | 212 | | 180 | | 80 | | 82 | |
| Mild | 40 | 30% | 27 | 28% | 66 | 31% | 52 | 29% | 26 | 33% | 25 | 30% |
| Moderate | 49 | 37% | 39 | 40% | 82 | 39% | 78 | 43% | 33 | 41% | 39 | 48% |
| Severe | 30 | 23% | 23 | 23% | 40 | 19% | 34 | 19% | 10 | 13% | 11 | 13% |
| Grade N. Avail | 13 | 10% | 9 | 9% | 24 | 11% | 16 | 9% | 11 | 14% | 7 | 9% |

| Tbl A5:  T2 MRI Results at Week 24 and 48 | | | | |
|---|---|---|---|---|
| Study Time | parameter | Number of New Active T2 Lesions (compared with 24 wks earlier) | | % of Patients with Active Scan |
| | | Avonex | Rebif | Avonex | Rebif |
| Week 24 | n | 312 | 315 | 312 | 315 |
| | mean | 1.7 | 0.9 | 51% | 31% |
| | median | 1 | 0 | | |
| Week 48 | n | 303 | 304 | 303 | 304 |
| | mean | 1.2 | 0.9 | 37% | 25% |
| | median | 0 | 0 | | |

| Tbl A6:  Exacerbation Free Status By Subsets based on Week 48 Neutralizing Ab Status | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Neutr. Ab Status | Weeks 0 to 24 | | | | | | Weeks 0 to 48 | | | | | | Weeks 25 to 48 | | | | | |
| | Avonex | | | Rebif | | | Avonex | | | Rebif | | | Avonex | | | Rebif | | |
| | # at risk | # Exac Free | % | # at risk | # Exac Free | % | # at risk | # Exac Free | % | # at risk | # Exac Free | % | # at risk | # Exac Free | % | # at risk | # Exac Free | % |
| Neg | 279 | 171 | 61% | 195 | 146 | 75% | 279 | 139 | 50% | 195 | 123 | 63% | 171 | 139 | 81% | 146 | 123 | 84% |
| Any Pos | 15 | 13 | 87% | 103 | 78 | 76% | 15 | 12 | 80% | 103 | 62 | 60% | 13 | 12 | 92% | 78 | 62 | 79% |
| + titer <20 | 8 | 7 | 88% | 28 | 21 | 75% | 8 | 6 | 75% | 28 | 16 | 57% | 7 | 6 | 86% | 21 | 16 | 76% |
| + titer >=20 | 7 | 6 | 86% | 75 | 57 | 76% | 7 | 6 | 86% | 75 | 46 | 61% | 6 | 6 | 100% | 57 | 46 | 81% |
| + titer >=100 | 1 | 1 | 100% | 49 | 40 | 82% | 1 | 1 | 100% | 49 | 32 | 65% | 1 | 1 | 100% | 40 | 32 | 80% |
| + titer >=500 | 1 | 1 | 100% | 21 | 14 | 67% | 1 | 1 | 100% | 21 | 12 | 57% | 1 | 1 | 100% | 14 | 12 | 86% |

| Tbl A7:  CU MRI Lesion Outcome By Neutr. Ab Status  - 24 weeks | | | |
|---|---|---|---|
| Neutralizing Ab Status | parameter | Avonex n = 294 | Rebif n = 298 |
| Negative | n | 269 | 185 |
| | mean | 1.33 | 0.48 |
| | median | 0.33 | 0.17 |
| Any Pos | n | 15 | 101 |
| | mean | 0.82 | 1.04 |
| | median | 0.4 | 0 |
| Positive titer < 20 | n | 8 | 27 |
| | mean | 0.64 | 0.93 |
| | median | 0.37 | 0 |
| Positive titer >= 20 | n | 7 | 74 |
| | mean | 1.03 | 1.08 |
| | median | 0.67 | 0.17 |

| Tbl A8:  T2 MRI Active Lesions Single Scan Outcome by Neutr. Ab Status | | | | | |
|---|---|---|---|---|---|
| Neutralizing Ab Status | parameter | Avonex Wk 24 scan | Wk 48 scan | Rebif Wk 24 scan | Wk 48 scan |
| Negative | n | 264 | 260 | 182 | 180 |
| | mean | 1.69 | 1.08 | 0.66 | 0.51 |
| | median | 1 | 0 | 0 | 0 |
| Any Pos | n | 15 | 15 | 101 | 98 |
| | mean | 1.2 | 1.2 | 1.3 | 1.33 |
| | median | 0 | 0 | 0 | 0 |
| Positive titer < 20 | n | 8 | 8 | 27 | 26 |
| | mean | 1 | 0.13 | 0.7 | 0.19 |
| | median | 0 | 0 | 0 | 0 |
| Positive titer >= 20 | n | 7 | 7 | 74 | 72 |
| | mean | 1.43 | 2.43 | 1.51 | 1.74 |
| | median | 1 | 0 | 0 | 0 |

# EXHIBIT 79

| DEPARTMENT OF HEALTH & HUMAN SERVICES | Public Health Service |
|---|---|
| | Food and Drug Administration |
| | Orphan Products Development |

## Memorandum

DATE:       March 7, 2002

FROM:       Marlene E. Haffner, MD, MPH, RADM USPHS, Director

SUBJECT:    Office of Orphan Products Development (OOPD) Analysis of
            Exclusivity Issues Raised in the Serono BLA for Rebif

TO:         Jay Siegel, MD, Director, Office of Therapeutics Research and Review, CBER

            and

            BLA  STN 10378 / 0 FILE

Background

The Orphan Drug Act (the Act) grants seven years of exclusive marketing rights to a specific drug[1] for a specific orphan indication.   The marketing exclusivity bars FDA approval during this period of the "same drug" from another sponsor for the same orphan indication.  Experience has shown that this exclusivity is one of the strongest incentives in the Act for encouraging research and development of treatments for rare diseases and conditions. The importance FDA places on appropriately maintaining the value of the exclusivity incentive of the Act is reflected in the implementing regulations at 21 CFR Part 316.  These same regulations also recognize the equally important need to accommodate improvements in a drug, so as to make available treatments that provide significant medical benefit.

The "Same Drug"

The orphan drug regulations adopt a definition of "same drug" that recognizes the need to give meaning to orphan exclusivity and recognition to significant therapeutic advances. Therefore, the regulations create a presumption that two drugs with similar physical/chemical characteristics are the same, and that exclusivity granted to one drug will block approval of the subsequent drug for the same indication.  However, this presumption may be overcome by evidence to show that, despite the physical/chemical

---

[1] The Orphan Drug Act applies to both drugs approved under Section 505 of the Food, Drug, and Cosmetic Act (FDCA), and to biological products licensed under section 351 of the Public Health Service Act (PHSA). The interferon-beta products at issue are regulated under Section 351 of the PHSA.  Most biological products licensed under the PHSA also meet the definition of "drug" under the FDCA.  The term "drug" is used through this memo to discuss the principles of the Orphan Drug Act and the regulations.

similarity, the subsequent drug is clinically superior, and therefore is not barred by the exclusivity.  Even though differences in formulation, dose, or other product characteristics by themselves do not render a drug different (that is, not the "same drug") within the orphan drug regulations, they may result in a drug being found to be different if the difference makes it clinically superior, in that it provides a significant therapeutic advantage over the product with exclusivity.   The courts have found that FDA's interpretation and application of these concepts are consistent with the Orphan Drug Act. *See Baker-Norton Pharmaceuticals, Inc. v. FDA and Bristol-Myers Squibb*, 132 F.Supp. 2d 30 (D.D.C. 2001);  *Berlex Laboratories, Inc. v. FDA*, 942 F.Supp. 19 (D..D.C. 1996).

Interferon beta Products

The orphan drug issues associated with the exclusivity and approval of the multiple interferon beta products for the treatment of relapsing-remitting multiple sclerosis are an example of the need to balance the value of the orphan exclusivity incentive with the availability of improved treatments for patients.  The Office of Orphan Products Development (OOPD) has worked closely with CBER in the resolution of these matters. CBER's comprehensive review of the comparative study of Rebif to Avonex and orphan exclusivity describes the regulatory history of these drug products and the related orphan drug issues.   OOPD believes this review correctly describes and applies the orphan drug regulations to the comparison between Biogen's Avonex and Serono's Rebif.  Only a few points warrant additional discussion.

Head-to-Head Trials

Because of the agency's commitment to maintain the value of the exclusivity incentive, the requirements for demonstrating clinical superiority are stringent.  The regulations require head-to-head trials in most cases for a demonstration of increased effectiveness. The requirements for safety comparisons are somewhat less rigorous because comparisons of profound adverse events may be made without a direct head-to-head clinical trial.  Direct comparison trials are the standard because they eliminate the use of anecdotal evidence and prevent "apples and oranges" comparisons of dissimilar factors. However, they place a significant financial and technical burden on the sponsor of a second product.  The rigor of this requirement is probably best illustrated by the fact that in the nineteen years the Act has been in existence, this matter involving multiple interferon beta treatments for relapsing-remitting multiple sclerosis is the first instance where a sponsor has attempted to challenge the exclusivity of a product by showing that its drug was more effective in a direct comparison trial.

It is also important to note that, until review of the Rebif/Avonex data, no drug product had been determined to be a different drug as a result of a head-to-head comparative trial. Avonex was found to be a different product than Betaseron based on a comparison of the safety findings in two different studies used in the approval process of two different drugs.  This was possible because of the distinct nature of the adverse event at issue, and the marked difference between the two products with respect to the severity of the adverse event.  However, there is no doubt Serono's study has met the more stringent standard of the type of study necessary to assess comparative efficacy.

Clinical Superiority

The orphan drug regulations clearly separate the categories of effectiveness and safety for purposes of showing clinical superiority, allowing the Agency to distinguish between two drugs by a finding of superiority in either of these categories. There is no additional requirement that the subsequent product, although clinically superior in one parameter, must also be shown to be at least equal in all others. This would set an inappropriate and nearly impossible burden (in terms of clinical trial design) on the sponsor of a second product. A more meaningful standard is a significant therapeutic benefit in terms of increased effectiveness and adequate safety, or increased safety and adequate effectiveness. The balancing of risks and benefits embodied in a drug product as a whole is done when the agency determines whether the drug may be approved for the particular use.

There is also a third approach described in the regulations for showing a significant therapeutic advantage. This requires a demonstration that, in an unusual case where neither greater effectiveness or safety has been shown, a drug otherwise makes a major contribution to patient care. This analysis may involve multiple aspects of the drug product, since the benefit to the patient is likely to be greater convenience or less discomfort, and the very term "major contribution to patient care" implies a more global assessment. So, for example, an assessment of the safety or effectiveness of the new form of the subsequent product might be considered in determining whether the drug made a major contribution to patient care. However, even in this instance, there can not be an infinite number of comparison criteria if this provision of the regulation is to be meaningful.

Given the conclusions in CBER's review, and the considerations above, OOPD believes that Serono has met the burden of establishing Rebif as not "the same drug" as Avonex because it is clinically superior in terms of efficacy. OOPD agrees that the data show a significant difference in the number of exacerbations between patients treated with Avonex and those treated with Rebif. The use of exacerbations also is a clinically meaningful measurement because these episodes represent significant suffering and hardship to the patients. As described in detail in CBER's review memorandum, the number of exacerbations is an endpoint used to establish efficacy for multiple interferon beta products and thus is well-recognized as clinically meaningful. Moreover, OOPD agrees with the CBER conclusion that the magnitude of the benefit in terms of reduced exacerbations in patients treated with Rebif represents a significant therapeutic advantage.

Safety

The difference in adverse events between Avonex and Rebif is real.  For example, the injection-site necrosis observed with Rebif is not observed with Avonex.  However, the adverse events do not appear to pose a serious limitation on Rebif's use.  Both Rebif and Avonex would represent reasonable alternatives for the prescribing physicians and their patients.

Conclusion

OOPD concurs with CBER that Serono's Rebif may be approved for treatment of relapsing remitting multiple sclerosis because it is not the same drug as Biogen's Avonex.

5

cc:      OPD  Precedent file
         J.Fritz, OPD HF35
         OTRR:BLA STN 10378 / 0 file

# EXHIBIT 80

patent term restoration. In a letter dated November 7, 1997, FDA advised the Patent and Trademark Office that this animal drug product had undergone a regulatory review period and that the approval of Anipryl® represented the first permitted commercial marketing or use of the product. Shortly thereafter, the Patent and Trademark Office requested that FDA determine the product's regulatory review period.

FDA has determined that the applicable regulatory review period for Anipryl® is 2,329 days. Of this time, 2,275 days occurred during the testing phase of the regulatory review period, 54 days occurred during the approval phase. These periods of time were derived from the following dates:

1. *The date an exemption under section 512(j) of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 360b(j)) became effective*: January 15, 1991. The applicant claims December 21, 1990, as the date the investigational new animal drug application (INAD) became effective. However, FDA records indicate that the date of FDA's letter assigning a number to the INAD was January 15, 1991, which is considered to be the effective date for the INAD.

2. *The date the application was initially submitted with respect to the animal drug product under section 512(b) of the act*: April 7, 1997. The applicant claims April 2, 1997, as the date the new animal drug application (NADA) for Anipryl® (NADA 141–080) was initially submitted. However, a review of FDA records reveals that the date of FDA's official acknowledgement letter assigning a number to NADA 141–080 was April 7, 1997, which is considered to be the initially submitted date for NADA 141–080.

3. *The date the application was approved*: May 30, 1997. FDA has verified the applicant's claim that NADA 141–080 was approved on May 30, 1997.

This determination of the regulatory review period establishes the maximum potential length of a patent extension. However, the U.S. Patent and Trademark Office applies several statutory limitations in its calculations of the actual period for patent extension. In its application for patent extension, this applicant seeks 448 days of patent term extension.

Anyone with knowledge that any of the dates as published is incorrect may, on or before October 5, 1998, submit to the Dockets Management Branch (address above) written comments and ask for a redetermination. Furthermore, any interested person may petition FDA, on or before February 1, 1999, for a determination regarding whether the applicant for extension acted with due diligence during the regulatory review period. To meet its burden, the petition must contain sufficient facts to merit an FDA investigation. (See H. Rept. 857, part 1, 98th Cong., 2d sess., pp. 41–42, 1984.) Petitions should be in the format specified in 21 CFR 10.30.

Comments and petitions should be submitted to the Dockets Management Branch (address above) in three copies (except that individuals may submit single copies) and identified with the docket number found in brackets in the heading of this document. Comments and petitions may be seen in the Dockets Management Branch between 9 a.m. and 4 p.m., Monday through Friday.

Dated: July 8, 1998.

**Thomas J. McGinnis,**

*Deputy Associate Commissioner for Health Affairs.*

[FR Doc. 98–20708 Filed 8–3–98; 8:45 am]

**BILLING CODE 4160–01–F**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

**[Docket No. 97E–0168]**

## Determination of Regulatory Review Period for Purposes of Patent Extension; BeneFIX™

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) has determined the regulatory review period for BeneFIX™ and is publishing this notice of that determination as required by law. FDA has made the determination because of the submission of an application to the Commissioner of Patents and Trademarks, Department of Commerce, for the extension of a patent which claims that human biological product.

**ADDRESSES:** Written comments and petitions should be directed to the Dockets Management Branch (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Brian J. Malkin, Office of Health Affairs (HFY–20), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–6620.

**SUPPLEMENTARY INFORMATION:** The Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) and the Generic Animal Drug and Patent Term Restoration Act (Pub. L. 100–670) generally provide that a patent may be extended for a period of up to 5 years so long as the patented item (human drug product, animal drug product, medical device, food additive, or color additive) was subject to regulatory review by FDA before the item was marketed. Under these acts, a product's regulatory review period forms the basis for determining the amount of extension an applicant may receive.

A regulatory review period consists of two periods of time: A testing phase and an approval phase. For human biological products, the testing phase begins when the exemption to permit the clinical investigations of the biological becomes effective and runs until the approval phase begins. The approval phase starts with the initial submission of an application to market the human biological product and continues until FDA grants permission to market the biological product. Although only a portion of a regulatory review period may count toward the actual amount of extension that the Commissioner of Patents and Trademarks may award (for example, half the testing phase must be subtracted as well as any time that may have occurred before the patent was issued), FDA's determination of the length of a regulatory review period for a human biological product will include all of the testing phase and approval phase as specified in 35 U.S.C. 156(g)(1)(B).

FDA recently approved for marketing the human biological product BeneFIX™ (coagulation factor IX (Recombinant)). BeneFIX™ is indicated for the control and prevention of hemorrhagic episodes in patients with hemophilia B, including the perioperative management of hemophilia B patients undergoing surgery. Subsequent to this approval, the Patent and Trademark Office received a patent term restoration application for BeneFIX™ (U.S. Patent No. 5,171,569) from British Technology Group Ltd., and the Patent and Trademark Office requested FDA's assistance in determining this patent's eligibility for patent term restoration. In a letter dated May 21, 1997, FDA advised the Patent and Trademark Office that this human biological product had undergone a regulatory review period and that the approval of BeneFIX™ represented the first permitted commercial marketing or use of the product. Shortly thereafter, the Patent and Trademark Office requested that FDA determine the product's regulatory review period.

FDA has determined that the applicable regulatory review period for

BeneFIX™ is 749 days. Of this time, 583 days occurred during the testing phase of the regulatory review period, while 166 days occurred during the approval phase. These periods of time were derived from the following dates:

1. *The date an exemption under section 351 of the Public Health Service Act became effective*: January 26, 1995. FDA has verified the applicant's claim that the date the investigational new drug application became effective was on January 26, 1995.

2. *The date the application was initially submitted with respect to the human biological product under section 351 of the Public Health Service Act*: August 30, 1996. The applicant claims August 29, 1996, as the date the Product License Application (PLA) for BeneFIX™ (PLA 96–1048) was initially submitted. However, PLA records indicate that PLA 96–1048 was submitted on August 30, 1996.

3. *The date the application was approved*: February 11, 1997. FDA has verified the applicant's claim that PLA 96–1048 was approved on February 11, 1997.

This determination of the regulatory review period establishes the maximum potential length of an extension. However, the U.S. Patent and Trademark Office applies several statutory limitations in its calculations of the actual period for patent extension. In its application for patent extension, this applicant seeks 423 days of patent term extension.

Anyone with knowledge that any of the dates as published is incorrect may, on or before October 5, 1998, submit to the Dockets Management Branch (address above) written comments and ask for a redetermination. Furthermore, any interested person may petition FDA, on or before February 1, 1999, for a determination regarding whether the applicant for extension acted with due diligence during the regulatory review period. To meet its burden, the petition must contain sufficient facts to merit an FDA investigation. (See H. Rept. 857, part 1, 98th Cong., 2d sess., pp. 41–42, 1984.) Petitions should be in the format specified in 21 CFR 10.30.

Comments and petitions should be submitted to the Dockets Management Branch (address above) in three copies (except that individuals may submit single copies) and identified with the docket number found in brackets in the heading of this document. Comments and petitions may be seen in the Dockets Management Branch between 9 a.m. and 4 p.m., Monday through Friday.

Dated: July 8, 1998.

**Thomas J. McGinnis,**
*Deputy Associate Commissioner for Health Affairs.*

[FR Doc. 98–20742 Filed 8–3–98; 8:45 am]

BILLING CODE 4160–01–F

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. 97E–0292]

### Determination of Regulatory Review Period for Purposes of Patent Extension; AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) has determined the regulatory review period for AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION and is publishing this notice of that determination as required by law. FDA has made the determination because of the submission of an application to the Commissioner of Patents and Trademarks, Department of Commerce, for the extension of a patent which claims that food additive.

**ADDRESSES:** Written comments and petitions should be directed to the Dockets Management Branch (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Brian J. Malkin, Office of Health Affairs (HFY–20), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–6620.

**SUPPLEMENTARY INFORMATION:** The Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) and the Generic Animal Drug and Patent Term Restoration Act (Pub. L. 100–670) generally provide that a patent may be extended for a period of up to 5 years so long as the patented item (human drug product, animal drug product, medical device, food additive, or color additive) was subject to regulatory review by FDA before the item was marketed. Under these acts, a product's regulatory review period forms the basis for determining the amount of extension an applicant may receive.

A regulatory review period consists of two periods of time: A testing phase and an approval phase. For food additives, the testing phase begins when a major health or environmental effects test involving the food additive begins and runs until the approval phase begins. The approval phase starts with the initial submission of a petition requesting the issuance of a regulation for use of the food additive and continues until FDA grants permission to market the food additive product. Although only a portion of a regulatory review period may count toward the actual amount of extension that the Commissioner of Patents and Trademarks may award (for example, half the testing phase must be subtracted as well as any time that may have occurred before the patent was issued), FDA's determination of the length of a regulatory review period for a food additive will include all of the testing phase and approval phase as specified in 35 U.S.C. 156(g)(2)(B).

FDA recently approved for marketing the food additive AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION (2,2′-ethylidenebis(4,6-di-tertbutylpheny)fluorophosphonite). AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION is used as an antioxidant in adhesives and in the preparation of polymers intended for contact with food. Subsequent to this approval, the Patent and Trademark Office received a patent term restoration application for AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION (U.S. Patent No. 4,867,907) from Albemarle Corp., and the Patent and Trademark Office requested FDA's assistance in determining this patent's eligibility for patent term restoration. In a letter dated October 21, 1997, FDA advised the Patent and Trademark Office that this food additive had undergone a regulatory review period and that the approval of AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION represented the first permitted commercial marketing or use of the product. Shortly thereafter, the Patent and Trademark Office requested that FDA determine the product's regulatory review period.

FDA has determined that the applicable regulatory review period for AQUEOUS ARYL FLUOROPHOSPHITE SUSPENSION is 2,930 days. Of this time, 935 days occurred during the testing phase of the regulatory review period, 1,995 days occurred during the approval phase. These periods of time were derived from the following dates:

1. *The date a major health or environmental effects test was begun*: January 9, 1989. The applicant claims July 21, 1986, as the date the test was begun. However, FDA records indicate that the test was begun on January 9, 1989.

# EXHIBIT 81

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 82

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 83

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 84

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 85

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 86

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 87

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 88

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 89

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 90

Paper No.___
Filed: June 3, 2016


UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

AMNEAL PHARMACEUTICALS LLC and PAR PHARMACEUTICAL, INC.

Petitioner,

v.

JAZZ PHARMACEUTICALS, INC.

Patent Owner

————————————

Case IPR2015-01903
Patent 8,731,963

————————————


**PATENT OWNER RESPONSE
PURSUANT TO 37 C.F.R. § 42.120**

Paper No.___
Filed: June 3, 2016

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ........................................................................1

II.   BACKGROUND .........................................................................2

III.  ARGUMENT................................................................................3

      A.    Petitioners have failed to show, by a preponderance of the evidence, that the ACA (Exs. 1003-1006) is prior art ..........................3

      B.    Claim Construction.................................................................3

      C.    Petitioners have failed to prove, by a preponderance of the evidence, that the ACA in view of Korfhage would have rendered claims 24, 26, and 27 of the '963 patent obvious .................9

            1.    A POSA would not have been motivated to combine the ACA and Korfhage to arrive at the claimed "central computer database being distributed over multiple computers" ...................................................................9

            2.    The ACA would not have disclosed, taught, or suggested the claimed periodic reports....................................................15

IV.   CONCLUSION............................................................................20

Patent Owner Response                                      Case IPR2015-01903
                                                          Patent 8,731,963

## I.    INTRODUCTION

Amneal Pharmaceuticals LLC and Par Pharmaceutical, Inc. ("Petitioners")

filed an IPR petition ("Petition" or "Pet.") seeking cancelation of claims 1-28 of

U.S. Patent No. 8,731,963 (the "'963 patent"). Petitioners presented two grounds

of unpatentability: Ground 1 – claims 1-7 and 9-23 as allegedly obvious over the

Advisory Committee Art (Exs. 1003-1006) (the "ACA"); and Ground 2 – claims 8

and 24-28 as allegedly obvious over ACA in view of Korfhage (Ex. 1037). *See*

Pet. 9. The Board rejected Ground 1 in its entirety, and partially instituted review

on Ground 2 as it relates to claims 24, 26, and 27. *See* Paper 10. As explained

below, claims 24, 26, and 27 would not have been obvious.

*First*, Petitioners have failed to meet their burden of proving that the ACA is

prior art to the '963 patent.

*Second*, even assuming that the ACA is prior art—it is not—Petitioners have

failed to meet their burden of showing that the ACA in view of Korfhage would

have rendered the challenged claims obvious.

Accordingly, Jazz respectfully requests that the Board confirm the

patentability of claims 24, 26, and 27 of the '963 patent.

Patent Owner Response

IPR2015-01903
Patent 8,731,963

## II.    BACKGROUND

Petitioners are defendants in a Hatch-Waxman lawsuit involving the

'963 patent; Petitioners are seeking to make generic versions of Xyrem® which are

covered by the '963 patent.  Xyrem is the only FDA-approved treatment for

cataplexy and excessive daytime sleepiness, both debilitating symptoms of

narcolepsy.  Ex. 2001 at 1; Ex. 2002 at 1.  Xyrem's active ingredient is a sodium

salt of gammahydroxybutyric acid ("GHB"), a substance which has been

legislatively defined as a "date rape" drug.  Ex. 2003 at 1; Ex. 2004 at 3.

FDA would not have approved Xyrem without a method of restricting access

to the drug that could ensure that its benefits would outweigh the risks to patients

and third parties.  In fact, FDA approved Xyrem under 21 CFR § 314.520

("Subpart H"), which allows FDA to approve drugs that are effective, but can only

be used safely under restricted conditions.  Ex. 2001 at 1; Ex. 2002 at 1.

Claims 24, 26, and 27 of the '963 patent claim computer-implemented

systems for treating a narcoleptic patient with a prescription drug that has a

potential for misuse, abuse, or diversion, while preventing that misuse, abuse, and

diversion by means of various controls.  *See* 1001 at 11:7-12:10, 12:23-33; *see also*

*id.* at Abstract, 1:41-45.  Each of these claims requires a central computer database

to be distributed over multiple computers, and a query that operates over the

distributed databases.  *See id.* at 11:7-12:10, 12:23-33.  Claim 27 additionally

Patent Owner Response                                        IPR2015-01903
                                                            Patent 8,731,963

requires using periodic reports, generated from the single computer database, to

identify a current pattern or an anticipated pattern of abuse of the prescription drug.

*See id.* at 12:23-33.

## III.    ARGUMENT

### A.    Petitioners have failed to show, by a preponderance of the evidence, that the ACA (Exs. 1003-1006) is prior art

The parties have briefed and argued Petitioners' failure to show that the

ACA qualifies as prior art in related IPRs 2015-00545, -546, -547, -548, -551, and

-554.  Jazz submits that the Board should apply the decision it reaches in those

IPRs here.

### B.    Claim Construction

In an IPR, claims are to be given their broadest reasonable interpretation in

light of the specification in which they appear.  *See* 37 C.F.R. § 42.100(b).  Claim

terms are also to be given their ordinary and customary meaning as would be

understood by a POSA, in the context of the entire patent's disclosure, at the time

of the invention.  *In re Translogic Tech.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

In the Institution Decision, the Board "determine[d] that no claim terms

require express construction for purposes of this Decision."  Paper 10 at 8.  Jazz

respectfully submits, however, that the phrase "wherein the current pattern or the

anticipated pattern [of abuse] are identified using periodic reports generated from

the single computer database" in dependent claim 27 requires construction.

Patent Owner Response                                          IPR2015-01903
                                                              Patent 8,731,963

Specifically, the phrase requires that the reports are generated:  (1) from the single

computer database; and (2) on a periodic basis, i.e., at regular frequencies or

intervals, as opposed to intermittently or upon request.

Accordingly, Jazz submits that the phrase "wherein the current pattern or the

anticipated pattern [of abuse] are identified using periodic reports generated from

the single computer database" in claim 27 should be construed to mean:  querying

the single computer database to generate, ***at regular frequencies or intervals, as***

***opposed to intermittently or upon request***, reports containing prescriber, patient,

and/or prescription related information to identify a current pattern or an

anticipated pattern of abuse of the prescription drug.  *See* Ex. 2005 ¶¶ 26-33;

Ex. 2006 ¶¶ 25-31.  Jazz's construction gives meaning to the word "periodic" and

is supported by the '963 patent's specification, a POSA's understanding of the

term, and the plain and ordinary meaning of the word periodic.

*First*, the specification supports Jazz's construction.  *See* Ex. 2005 ¶¶ 27, 29-

31; Ex. 2006 ¶¶ 26, 28-29.  Specifically, the specification explains that Figures

13A-C are "reports obtained by querying a central database having the fields

represented in Fig. 7."[1]  Ex. 1001 at 8:23-25; *see also id.* at 8:29-30 ("The reports

are obtained by running queries against the database. . . .").  The specification

---

[1]  The fields in Fig. 7 contain prescriber, patient, and/or prescription related

information.  *See* Ex. 1001 at Fig. 7.

Patent Owner Response                                    IPR2015-01903
                                                    Patent 8,731,963

further explains: ***"Each report has an associated frequency or frequencies."*** *Id.*

at 8:28-29 (emphasis added). Figures 13A-C of the '963 patent also show that

reports regarding prescriber, patient, and/or prescription related information—that

allow for identification of a current pattern or an anticipated pattern of abuse of the

prescription drug—are run at regular frequencies or intervals, as opposed to

intermittently or upon request. *Id.* at Figs. 13A-C. Thus, the specification supports

Jazz's construction. *See* Ex. 2005 ¶ 30; Ex. 2006 ¶ 28; *Enpat, Inc. v. Microsoft*

*Corp.*, 26 F. Supp. 2d 806, 808-09 (E.D. Va. 1998) (construing "periodic" to mean

"fixed intervals, rather than intermittently or on request" where the specification

disclosed the task being performed on a "pre-determined frequency").

   *Second*, Jazz's construction is also supported by the understanding of a

POSA. As Petitioners' expert, Dr. Valuck, testified during deposition, reports to

investigate abuse can be generated on either "an ad hoc basis or on a regular

basis." Ex. 2007 at 184:8-16.[2] A POSA would understand that ad hoc reports are

done for a particular purpose. 2005 ¶ 28; Ex. 2006 ¶ 27. A POSA would not

consider "ad hoc" reports to be "periodic." *Id.*; *see also* Ex. 2007 at 184:8-16.

_____

[2]  The parties have agreed that the expert depositions from IPRs 2015-00545, -546,

-547, -548, -551, and -554 can be used in this proceeding. *See* Ex. 2009.

Patent Owner Response                                          IPR2015-01903
                                                              Patent 8,731,963

*Third*, the plain and ordinary meaning of the word periodic supports Jazz's

construction.  Merriam-Webster's Collegiate Dictionary defines "periodic" as:

pe·ri·od·ic \,pir-ē-'ä-dik\ *adj* (1642)  **1** : occurring or recurring at regular intervals  **2 a** : consisting of or containing a series of repeated stages, processes, or digits : CYCLIC ⟨~ decimals⟩ ⟨a ~ vibration⟩  **b** : being a function any value of which recurs at regular intervals  **3** : expressed in or characterized by periodic sentences

Ex. 2010 at 3.  The dictionary reinforces the concept that "periodic" requires

events to occur at regular intervals.  *See* Ex. 2005 ¶ 32; Ex. 2006 ¶ 30.

Jazz notes that, in related IPRs, the Board cited Figure 4B as illustrative of

"a refill request process that permits a pharmacist to identify an early refill request,

generate a 'risk diversion report,' and evaluate 'possible product diversion, misuse

or over-use' of a prescription drug."  *See, e.g.*, IPR2015-00551, Paper 19 at 22-23.

As mentioned above, however, Dr. Valuck explained at his deposition that

diversion reports can be generated on either "an ad hoc basis or on a regular basis."

Ex. 2007 at 184:8-16.  A POSA would understand that the reports generated in

Figure 4B are "ad hoc" reports done for the particular purpose of investigating

specific early refill requests, and ***not*** "regular" or "periodic" reports as set forth in

claim 27.  Ex. 2005 ¶ 31; Ex. 2006 ¶ 29.

In reply, Petitioners may argue that the '963 patent's parent application's file

history supports a finding that Figure 4B should be considered a periodic report

because the '963 applicants cited select portions of Figure 4B as support for a

- 6 -

Patent Owner Response                                         IPR2015-01903
                                                             Patent 8,731,963

similar periodic report claim element.  That portion of the file history is reproduced

below.

> generating periodic reports via the exclusive computer database to evaluate potential
> diversion patterns. [page 2, lines 24-27; page 11, lines 10-22; page 9, lines 12-19; FIG. 4 436;
> FIG. 8, 800, 810, 820, 830, 840]

Ex. 2011 at 8.

    But, as Dr. Bergeron explained at his deposition, the claim element in the

parent application's file history has two parts – a generating reports part and an

evaluation of potential diversion patterns part.  *See* Ex. 2012 at 342:6-343:23.

Dr. Bergeron further explained that a POSA would understand that the portions of

Figure 4B that the applicants relied upon during prosecution do not say anything

about generating reports.  *See id.* at 339:8-23, 323:25-347:11.  Instead, the portions

the applicants cited refer only to the evaluation step.  *See id.*  Further, the only

portion of Figure 4B that discloses any type of report is Box 434, and the

applicants chose ***not*** to cite that box during prosecution as support for the periodic

report claim element.  As Dr. Bergeron explained, a POSA would expect that Box

434 was not cited because Figure 4B did not provide support for the generating

periodic report part of the claim term.  *See id.* at 347:21-348:20.  Thus, the

'963 patent's parent application's file history does not support a finding that Figure

4B should be considered a periodic report.

Patent Owner Response                                    IPR2015-01903
                                                         Patent 8,731,963

Accordingly, the distinction between running "ad hoc" reports (Ex. 1001 at Fig. 4B) and running set-frequency/periodic reports (Ex. 1001 at Figs. 13A-C) in the '963 patent's specification further supports Jazz's construction. *See* Ex. 2005 ¶¶ 29-31; Ex. 2006 ¶¶ 28-29; *Enpat*, 26 F. Supp. 2d at 808 (holding that the specification distinguishing between periodic and on request tasks supported a construction of periodic that means "fixed intervals, rather than intermittently or on request").[3]

For the reasons set forth above, the Board should adopt Jazz's construction.

---

[3]   "[R]ead in the context of the specification, the claims of the patent need not encompass all disclosed embodiments." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008). Indeed, "[Federal Circuit] precedent is replete with examples of subject matter that is included in the specification, but is not claimed." *Id.* (holding that "the mere fact that there is an alternative embodiment disclosed in the [patent-in-suit]" does not mean it is encompassed by the claims); *see also Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1359 (Fed. Cir. 2006); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108 (Fed. Cir. 1996); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562-63 (Fed. Cir. 1991). The diversion reports in Figure 4B are an unclaimed embodiment.

Patent Owner Response

IPR2015-01903
Patent 8,731,963

## C.    Petitioners have failed to prove, by a preponderance of the evidence, that the ACA in view of Korfhage would have <u>rendered claims 24, 26, and 27 of the '963 patent obvious</u>

Petitioners have failed to meet their burden of showing that the ACA

qualifies as prior art.  Even assuming, however, that the ACA is prior art,

Petitioners have not met their burden of proving that the ACA in view of Korfhage

would have rendered claims 24, 26, and 27 obvious.  Specifically, Petitioners have

failed to meet their burden of showing that:  (1) a POSA would have been

motivated to combine the ACA with Korfhage to arrive at the "central computer

database being distributed over multiple computers" required for claims 24, 26,

and 27 and (2) the ACA would have disclosed, taught, or suggested the periodic

reports in dependent claim 27.

### 1.    A POSA would not have been motivated to combine the ACA and Korfhage to arrive at the claimed "central computer database being distributed over multiple computers"

Claims 24, 26, and 27 each require that the central computer database is

distributed over multiple computers.  Ex. 1001 at claims 24, 26, 27.  Petitioners do

not identify anything in the ACA that would have disclosed, taught, or suggested a

central computer database being distributed over multiple computers.  *See*

*generally* Pet; Ex. 1007; Ex. 2006 ¶ 43.  To the contrary, Petitioners and

Dr. Valuck admit that this limitation does not appear in the ACA.  *See* Pet. 52;

Patent Owner Response

IPR2015-01903
Patent 8,731,963

Ex. 1007 ¶ 144.  Thus, Petitioners argue that a POSA would have combined the

ACA with Korfhage.  *See* Pet. 52.  Petitioners are wrong.

Without the benefit of hindsight and the claimed inventions in hand, a POSA

would not have been motivated to look to Korfhage, much less single out the one

page discussing a distributed computer architecture.  Ex. 2006 ¶ 44.  Korfhage is a

treatise on Information Storage and Retrieval within computer systems.  *See*

*generally* Ex. 1037.  Nothing in Korfhage relates to drug distribution or pharmacy

practice generally, and nothing relates to drug abuse, misuse, or diversion.  *See*

*generally* Ex. 1037; Ex. 2006 ¶ 45.  The general concepts simply never appear.

*See generally* Ex. 1037.[4]  Petitioners cherry-pick two passages from page 276 of

the 349 page treatise that relate to "Distributed Document Systems," but their only

explanation for doing so is to "increase the efficiency of the distribution of

Xyrem."  Pet. 52.  Elsewhere in the Petition, however, Petitioners argue that large

numbers of Xyrem prescriptions can be handled in an "acelerate[d]" manner using

a "***conventional*** computer," and that the ACA discloses the use of such a

conventional computer.  Pet. 22, 29 (emphasis added).  Indeed, a POSA would

have understood that any computer database would sufficiently accommodate drug

distribution by the central pharmacy.  Ex. 2006 ¶¶ 46-47.

---

[4]  Thus, Dr. Valuck's testimony that Korfhage "appl[ies] to pharmacy practice" is

entirely unsupported.  *See* Ex. 2007 at 206:10-207:3.

In short, Petitioners have not identified any problem with the centralized

(i.e., non-distributed) database disclosed in the ACA.  *See generally* Pet; Ex. 1007;

Ex. 2006 ¶ 47.  Thus, a POSA would not have been motivated to look for any

substitution, let alone the specific distributed-database architecture in Korfhage.

*See Leo Pharm. Prods. v. Rea*, 726 F.3d 1346, 1354 (Fed. Cir. 2013) ("Only after

recognizing the existence of the problem would an artisan *then* turn to the prior

art. . . .") (emphasis in original).

Further, even if there was a known problem in the prior art, Korfhage

discloses too many options for database architectures to a POSA and provides no

guidance on which option to choose.  *See* Ex. 2006 ¶ 48.  Indeed, Petitioners'

declarant admitted that Korfhage "would suggest a lot of possibilities."  Ex. 2008

at 286:11-17; *see also id.* at 316:23-317:8 (Dr. Valuck admitting that distributed

database document systems are not the only database architecture for handling

documents for pharmacies), 317:12-14 (Dr. Valuck admitting that Korfhage

"covers a host of possibilities for systems"), 318:3-15 (Dr. Valuck testifying that

there are "various forms and different architectures for accomplishing the same

tasks in different ways").  Dr. Valuck further admitted that "all these different

forms were . . . existing in the art and existing in practice for many years in various

systems and various permutations and forms."  *Id.* at 317:16-23; *see also id.* at

320:3-4 ("[T]here are different architectures and [] a POSA would know that.").

Thus, rather than showing a "finite number of identified, predictable solutions"

(*KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 421(2007)), Dr. Valuck admitted that the

prior art was replete with a host of possible database architectures.

Notably, Dr. Valuck admitted that he did not consider these other systems

because he "was not asked to opine on . . . all of the different possibilities."

Ex. 2008 at 316:15-22.  Instead, Dr. Valuck admitted that his "whole obviousness

opinion" was based on impermissible hindsight:

> A.  Again, I looked for where the claim elements were disclosed in the
> prior art.
>
> . . .
>
> Q.  Right.  So you used the patent as a guide to pick the elements out
> of the prior art.
>
> A.  Well, again, my – *my whole obviousness opinion is based on
> starting with the elements* and referring to prior art and all available
> prior art through the eyes of a person of ordinary skill.  That was the
> process I used.

Ex. 2007 at 198:6-22 (emphasis added).  It  is improper, however, to pick and

choose in hindsight from the prior art.  *See Bausch & Lomb, Inc. v. Barnes-*

*Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986) (reversing obviousness

holding and explaining that the prior art must be considered as a whole); *KSR*, 550

U.S. at 421 (noting that fact finders must guard against "the distortion caused by

hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning");

Patent Owner Response                                         IPR2015-01903
                                                             Patent 8,731,963

*In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use hindsight

reconstruction to pick and choose among isolated disclosures in the prior art to

deprecate the claimed invention."). Thus, Petitioners' obviousness analysis fails

because it provides no reason to arrive at the specific distributed database

architecture in Korfhage. *See* Ex. 2006 ¶ 49.

 Further, Petitioners and Dr. Valuck ignore that Korfhage teaches away

from using distributed databases and, therefore, teaches away from combining

Korfhage with the ACA, because it discloses to a POSA that "three ***major***

***problems*** arise" when a user attempts to have a single query operate over multiple

physical databases. *See* Ex. 1037 at 276-277 (describing problems); *see also* Ex.

2006 ¶¶ 50-53. While Dr. Valuck testified that he "wasn't asked to provide an

opinion on problems associated with distributed database systems for . . . [his]

declarations" (Ex. 2008 at 320:24-321:5), he eventually conceded that Korfhage

expressly discloses such problems. *See id.* at 323:15-324:15; *see also id.* at

321:21-322:8 (Dr. Valuck testifying that the "problems arise from the situation

described where the user . . . is interested in locating and obtaining a document

regardless of where it resides, either physically or within a computer system").

 A POSA would have understood that the second "major problem" in

Korfhage would have been particularly relevant to the distribution system

disclosed in the ACA. Ex. 2006 ¶¶ 51-52. Specifically, Korfhage explains that

- 13 -

Patent Owner Response                                                    IPR2015-01903
                                                                        Patent 8,731,963

"[t]he second problem is that of data redundancy. Different databases may include

copies of the same or equivalent document." Ex. 1037 at 276. Korfhage suggests

that "eliminating the duplication requires relatively little work," but "in some

instances the documents may be sufficiently different to cause problems." *Id.* As

Petitioners admit, the ACA explains that the "central data repository 'allows for the

identification of duplicate prescriptions.'" Pet. 31. The return of redundant data in

the distributed databases might create a false indication of duplicate prescriptions

that could prevent a patient from receiving her prescription drug. Ex. 2006 ¶ 52.

On the other hand, if the duplicate prescription data is "eliminat[ed]" because a

pharmacist believes it was caused by data redundancy, then a potential abuse

situation would be overlooked. *Id.*

The "major problems" disclosed in Korfhage would have expressly taught a

POSA away from combining it with the ACA and modifying the distribution

system disclosed in the ACA. *Id.* ¶ 53. "[R]eferences that teach away cannot

serve to create a prima facie case of obviousness." *McGinley v. Franklin Sports,

Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001).

Accordingly, Petitioners have failed to meet their burden of proving that

claims 24, 26, and 27 would have been obvious.

- 14 -

### 2.    The ACA would not have disclosed, taught, or suggested the claimed periodic reports

Petitioners' challenge also fails for claim 27 because they failed to meet their burden of showing that the ACA would have disclosed, taught, or suggested the additional limitation of claim 27:  "wherein the current pattern or the anticipated pattern [of abuse] are identified using periodic reports generated from the single computer database."   Petitioners rely on the ACA alone for alleged disclosure of this claim limitation.  *See* Pet. 53-54, *see also id.* at 41-43 (citing only the ACA and not Korfhage).

As discussed above, "wherein the current pattern or the anticipated pattern [of abuse] are identified using periodic reports generated from the single computer database" should be construed to mean:  querying the single computer database to generate, at regular frequencies or intervals, as opposed to intermittently or upon request, reports containing prescriber, patient, and/or prescription related information to identify a current pattern or an anticipated pattern of abuse of the prescription drug. *See supra* at pp. 3-8.  The ACA does not teach this limitation because it does not teach reports to identify current or anticipated patterns of abuse that are generated:  (1) periodically, i.e., at regular frequencies or intervals, as opposed to intermittently or upon request; and (2) by querying the single computer database. *See* Ex. 2005 ¶¶ 34-36, 38-42; Ex. 2006 ¶¶ 32-41.

Patent Owner Response                                    IPR2015-01903
                                                      Patent 8,731,963

*First*, Petitioners argue that the "ACA discloses using the central data repository to identify patterns of abuse and diversion." Pet. 42 (citing Ex. 1003 at 184:24-185:7, Slides at 158; Ex. 1005 at 304, 310-11); *see also* Ex. 1007 ¶ 121 (citing same). While these disclosures specify the information available in the "central data repository," none disclose, teach, or suggest running queries on that data to generate any types of reports, much less periodic reports. *See* Ex. 1003 at 184:24-185:7, Slides at 158; Ex. 1005 at 304, 310-11; Ex. 2006 ¶ 34.

*Second*, Petitioners argue that "the ACA describes preventing diversion and illicit use, as well as providing assistance to 'law enforcement for investigation and prosecution efforts,' as a goal of the system." Pet. 42 (citing Ex. 1003 at 15:6-8; Ex. 1004 at 110; Ex. 1005 at 298, 301, 306-308); *see also* Ex. 1007 ¶ 121 (citing same). Petitioners also argue that the central pharmacy "employs numerous mechanisms, controls, and verification procedures to ensure that Xyrem is not obtained fraudulently or abused or diverted by the patient or prescriber." Pet. 41 (citing Ex. 1003 at 184:24-185:7, Slides at 158; Ex. 1004 at 110; Ex. 1005 at 304, 310, 311; Ex. 1006 at 4 n.14, 8 nn. 29, 33 and 9 n.38); *see also* Ex. 1007 ¶ 120 (citing same). Petitioners further argue that "[i]t would have been obvious to a POSA that, for the database to determine such abuse or patterns of abuse . . . it must be queried periodically to generate reports" and that a POSA "would have understood that such data generation obtained through querying via the central data

- 16 -

repository is synonymous with generating periodic reports via the computer

database to evaluate potential diversion patterns." Pet. 41-43 (citing Ex. 1003 at

24:21-24; Ex. 1004 at 110, 115; Ex. 1005 at cover letter, 304, 310, 311; Ex. 1006

at 4 n.14, 7 n.25, 8 nn.29, 33, 9 n.38, 10 nn.41-42; V5 00:10-00:27, V13 00:17-

00:31; Ex. 1003 at 24:21-24); *see also* Ex. 1007 ¶¶ 120, 122 (citing same).

Petitioners are wrong.  The cited evidence would not have disclosed, taught,

or suggested generating periodic reports.  *See* Ex. 1003 at 15:6-8, 24:21-24,

184:24-185:7, Slides at 158; Ex. 1004 at 110, 115; Ex. 1005 at cover letter, 298,

301, 304, 306-308, 310, 311; Ex. 1006 at 4 n.14, 7 n.25, 8 nn.29, 33, 9 n.38, 10

nn.41-42; V5 00:10-00:27, V13 00:17-00:31; Ex. 1003 at 24:21-24; Ex. 2006 ¶¶

35-36.  Instead, the evidence cited discloses that "[t]he database will be made

available for review by the DEA as well as other federal and state agencies ***upon***

***request***."  Ex. 1004 at 110 (emphasis added); *see also* Ex. 2006 ¶ 36.  A POSA

would understand reports generated "upon request" are "ad hoc" reports, ***not***

"periodic" reports.  Ex. 2006 ¶ 36; *see also id.* ¶ 27; Ex. 2005 ¶ 28.  Further, as

discussed in detail below, the ACA discloses that the proposed system "preserves

[the] important feature" of ***not*** having the central pharmacy police medicine.

Instead, the ACA contemplated having the central pharmacy become involved in

an investigation of abuse only on an ad hoc basis, after authorities asked for its

Patent Owner Response                                        IPR2015-01903
                                                            Patent 8,731,963

assistance.  *See infra* at pp. 19-20.  In other words, the ACA only taught the

generation of ad hoc reports.

   *Third*, Petitioners argue that "the ACA discloses generating data by

'recording prescribers, patients, and dosing that could provide information for any

possible investigations and prosecutions for state and federal authorities' using a

computer."  Pet. 32 (citing Ex. 1006 at 4 nn.13-14; V5 00:10-00:27); *see also* Ex.

1007 ¶ 122 (citing same).  Petitioners also argue that the ACA discloses that "[a]ll

data collected will be available to state and federal authorities, on whatever

timeframe they determine appropriate," and imply that "timeframe" refers to

periodic reporting.  Pet. 42 (citing Ex. 1005 at 307); Ex. 1007 ¶ 122.

   But Petitioners ignore that "[g]enerating data . . . for any possible

investigations and prosecutions" is not the same as generating periodic reports.

*See* Ex. 2005 ¶¶ 38-41; Ex. 2006 ¶¶ 37-40.  The ACA's full disclosure teaches a

POSA that any reports generated for state or federal agencies are done so "upon

request" to assist the authorities with cases of abuse, which the ACA indicates will

be rare.  Ex. 2005 ¶ 39; Ex. 2006 ¶ 38; Ex. 1004 at 110; Ex. 1005 at 306

("Available data … will assist appropriate authorities in an investigation, ***should

one become necessary***.  The centralized, real-time nature of these data will allow

for ***rapid identification in the rare case of diversion***.") (emphasis added).)  Thus,

the ACA only discloses generating retrospective reports to aid in investigations of

- 18 -

abuse. The ACA would not have disclosed, taught, or suggested the claimed

prospective reports to identify current or anticipated patterns of abuse. Ex. 2005

¶ 39; Ex. 2006 ¶ 38

Indeed, the ACA discloses to a POSA that the pharmacy can only assist with

an investigation once it becomes necessary and has begun. Ex. 2005 ¶ 40.

Specifically, the ACA discloses that "[t]he practicalities of how prescriptions are

filled in the U.S. do not allow for a specialty pharmacy to 'police' the practice of

medicine." Ex. 1005 at 307. Instead, "the current system used in the U.S. for

managing the risks associated with controlled substances allows for appropriate

stakeholders to police individual physician and patient behavior. The Xyrem

system preserves this important feature." *Id.*; *see also id.* (noting the pharmacy

will cooperate with the appropriate stakeholders—"state and federal authorities,

including State Medical Boards, DEA and FDA, in any investigation dealing with

physician or patient behavior").

Based on the ACA's disclosures, a POSA would have understood that the

"timeframe" statement cited by Petitioners is similar to the statement in Ex. 1005

that the centralized data "allow[s] for rapid identification in the rare case of

diversion." Ex. 1005 at 306. Specifically, a POSA would have understood that the

statement boasts the benefit of centralized data being available in real-time, which

is that potential investigations will be able to proceed without delay from the

pharmacy.  Ex. 2005 ¶ 41; Ex. 2006 ¶¶ 39-40.  The timeframe is contingent on

particular events.  It is not an implication of periodic reporting.  *Id.*

    Accordingly, Petitioners have failed to meet their burden of proving that

claim 27 would have been obvious for this additional reason.

## IV.    CONCLUSION

    For the foregoing reasons, Petitioners have failed to prove, by a

preponderance of the evidence, that claims 24, 26, and 27 of the '963 patent would

have been obvious.


Date:  June 3, 2016                          Respectfully submitted,

                                  By: /F. Dominic Cerrito (Reg. No. 38,100)/
                                      F. Dominic Cerrito (Reg. No. 38,100)
                                      Eric C. Stops (Reg. No. 51,163)
                                      Evangeline Shih (Reg. No. 50,170)
                                      Frank C. Calvosa (Reg. No. 69,064)
                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
                                      51 Madison Avenue, 22nd Floor
                                      New York, NY 10010
                                      General Tel:  (212) 849-7000
                                      Fax:  (212) 849-7100
                                      nickcerrito@quinnemanuel.com
                                      ericstops@quinnemanuel.com
                                      evangelineshih@quinnemanuel.com
                                      frankcalvosa@quinnemanuel.com

                                      John V. Biernacki
                                      Reg. No. 40,511
                                      JONES DAY
                                      North Point

Patent Owner Response

IPR2015-01903
Patent 8,731,963

901 Lakeside Avenue
Cleveland, Ohio 44114
General Tel:  (216) 586-3939
Direct Tel:  (216) 586-7747
Fax:  (216) 579-0212
jvbiernacki@jonesday.com
*Attorneys for Jazz Pharmaceuticals, Inc.*

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

AMNEAL PHARMACEUTICALS LLC and PAR PHARMACEUTICAL, INC.,

Petitioners,

v.

JAZZ PHARMACEUTICALS, INC.

Patent Owner

_____

Case IPR2015-01903
Patent 8,731,963

_____

**CERTIFICATE OF SERVICE**

# **CERTIFICATE OF SERVICE**

Pursuant to 37 C.F.R. § 42.6(e), the undersigned hereby certifies that

PATENT OWNER RESPONSE PURSUANT TO 37 C.F.R. § 42.120 and Exhibits

(2001-2013) were served on June 3, 2016 by filing these documents through the

Patent Review Processing System, as well as e-mailing copies to

bradford.frese@arentfox.com, janine.carlan@arentfox.com,

richard.berman@arentfox.com, and XYREM@arentfox.com.

Date: June 3, 2016                    Respectfully submitted,

                             By: /F. Dominic Cerrito (Reg. No. 38,100)/
                                 F. Dominic Cerrito (Reg. No. 38,100)
                                 QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP
                                 51 Madison Avenue, 22nd Floor
                                 New York, NY 10010
                                 General Tel: (212) 849-7000
                                 Fax: (212) 849-7100
                                 nickcerrito@quinnemanuel.com

                                 *Lead counsel for Jazz Pharmaceuticals,
                                 Inc.*

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO 37 C.F.R. § 42.24</u>

This paper complies with the type-volume limitation of 37 C.F.R. § 42.24.

The paper contains 4,439 words, excluding the parts of the paper exempted by

§ 42.24(a).

This paper also complies with the typeface requirements of 37 C.F.R.

§ 42.6(a)(ii) and the type style requirements of § 42.6(a)(iii)-(iv).

Date:  June 3, 2016                          Respectfully submitted,

By: /F. Dominic Cerrito (Reg. No. 38,100)/
    F. Dominic Cerrito (Reg. No. 38,100)
    QUINN EMANUEL URQUHART &
    SULLIVAN LLP
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    Tel:  (212) 849-7000
    Fax:  (212) 849-7100
    nickcerrito@quinnemanuel.com

*Lead counsel for Jazz Pharmaceuticals Ireland Ltd. and Jazz Pharmaceuticals, Inc.*

# EXHIBIT 91

**S&P Global**
Market Intelligence

# Jazz Pharmaceuticals plc NasdaqGS:JAZZ FQ1 2016 Earnings Call Transcripts

## Tuesday, May 10, 2016 8:30 PM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ1 2016- | | | -FQ2 2016- | -FY 2016- | -FY 2017- |
|---|---|---|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** | **CONSENSUS** | **CONSENSUS** | **CONSENSUS** |
| **EPS Normalized** | 2.32 | 2.26 | ▼ (2.59 %) | 2.76 | 11.14 | 12.98 |
| **Revenue (mm)** | 340.17 | 336.01 | ▼ (1.22 %) | 377.21 | 1525.32 | 1727.46 |

Currency: USD
Consensus as of May-06-2016 5:18 AM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

| | -EPS NORMALIZED - | | |
|---|---|---|---|
| | **CONSENSUS** | **ACTUAL** | **SURPRISE** |
| **FQ2 2015** | 2.41 | 2.41 | ❶ 0.00 % |
| **FQ3 2015** | 2.56 | 2.52 | ❷▼ (1.56 %) |
| **FQ4 2015** | 2.60 | 2.60 | ❸ 0.00 % |
| **FQ1 2016** | 2.32 | 2.26 | ❹▼ (2.59 %) |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | .................................................................................... | 3 |
| Presentation | .................................................................................... | 4 |
| Question and Answer | .................................................................................... | 9 |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

## EXECUTIVES

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

**Katherine A. Littrell**
*Vice President of Investor Relations*

**Matthew P. Young**
*Executive VP & CFO*

**Michael P. Miller**
*Executive Vice President of US Commercial*

## ANALYSTS

**Aaron Gal**
*Sanford C. Bernstein & Co., LLC., Research Division*

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**David A. Amsellem**
*Piper Jaffray Companies, Research Division*

**David George Buck**
*Northland Capital Markets, Research Division*

**David William Maris**
*Wells Fargo Securities, LLC, Research Division*

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

**Gregory B. Gilbert**
*Deutsche Bank AG, Research Division*

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

**Jason Matthew Gerberry**
*SVB Leerink LLC, Research Division*

**Jessica Macomber Fye**
*JP Morgan Chase & Co, Research Division*

**Kenneth Charles Cacciatore**
*Cowen and Company, LLC, Research Division*

**Liav Abraham**
*Citigroup Inc, Research Division*

**Louise Alesandra Chen**
*Guggenheim Securities, LLC, Research Division*

**Marc Harold Goodman**
*UBS Investment Bank, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Welcome to the Jazz Pharmaceuticals plc First Quarter 2016 Earnings Conference Call. Following an introduction from the company, we will open the call to questions.

I will now turn the call over to Kathee Littrell, Head of Investor Relations at Jazz Pharmaceuticals.

**Katherine A. Littrell**
*Vice President of Investor Relations*

Thank you, Carmen, and thank you very much for joining us today on our investor call. Today, we reported our first quarter 2016 financial results and updated financial guidance in the press release. The release and the slide presentation accompanying this call are available in the Investors section of our website.

With me for today's call are Bruce Cozadd, Chairman of the Board and CEO; Matt Young, our Chief Financial Officer; Russ Cox, our Chief Operating Officer; Mike Miller, our Head of U.S. Commercial; and Karen Smith, our Global Head of R&D and Chief Medical Officer. Following some comments, we'll open the call for your questions.

I'd like to remind you that some of the statements we will make on this call relate to future events and future performance rather than historical facts and are forward-looking statements.

Examples of forward-looking statements include statements related to our 2016 financial guidance and goals, our corporate development efforts, future product sales and volume due to litigations and intellectual property related events, ongoing and future clinical trials and other product development activities and the timing of such events and activities.

These forward-looking statements involve numerous risks and uncertainties that could cause actual events, performance and results to differ materially. These risks and uncertainties are identified and described in today's press release, the slide presentation accompanying this call and under Risk Factors in our Form 10-K for the year ended December 31, 2015, and our Form 10-Q for the quarter ended March 31, 2016, which we expect to file shortly. We undertake no duty or obligation to update any forward-looking statements we make today.

On this call, we will discuss several non-GAAP financial measures, including historical and expected 2016 adjusted net income attributable to Jazz Pharmaceuticals and the related per share measures and historical and expected 2016 adjusted SG&A and R&D expenses.

We believe that these non-GAAP financial measures are helpful in understanding our past financial performance and potential future results. They are not meant to be considered in isolation or as a substitute for comparable reported GAAP measures.

Reconciliations of GAAP to non-GAAP financial measures discussed on this call are included in today's press release and the slide presentation accompanying this call. Both are posted in the Investors section of our website.

I'll now turn the call over to you, Bruce.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Thanks, Kathee. Good afternoon, everyone, and thank you for joining us. The highlight of the first quarter of 2016 was our receipt of FDA approval of Defitelio on March 30 and our commercial launch in the U.S. in the days following approval.

We delivered strong top and bottom line growth in the first quarter and remain well positioned to broaden our business through corporate development. Market conditions during the first quarter allowed us to

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

accelerate share repurchases under our existing $300 million repurchase program, while maintaining our strong balance sheet. We remain focused on achieving our 2016 goals, which are generating increasing shareholder value, while continuing to execute on our mission of improving patients' lives.

I'll now update you on key commercial, legal and clinical development activities in the first quarter; highlight some upcoming key events that we expect in 2016; and then turn the call over to Matt to review our financial results for the quarter and provide 2016 financial guidance.

I'll start my comments with our SLEEP therapeutic area and our lead product, Xyrem. During the first quarter of 2016, we observed sound underlying organic demand for Xyrem. In the first quarter, the average number of active Xyrem patients grew to approximately 12,775 from 12,375 in the same period of 2015. Xyrem bottle volume growth was 4% versus the prior year's strong first quarter.

We have worked closely with SDS since the launch of the final Xyrem REMS in August of last year and are pleased that the improved processes and increased staffing at SDS minimized operational disruptions and resulted in a smooth transition through the payer churn that is common in our industry in the early part of the year. We continue to expect high single-digit volume growth for the full year.

Turning to key Xyrem growth opportunities. Our sales representatives continue to actively educate healthcare providers on narcolepsy and the use of Xyrem, with a focus on physicians with high narcolepsy potential and low Xyrem utilization. We will host nationwide satellite symposia for health care providers during 2016, including our May program entitled, Navigating Narcolepsy: A Case-Based Clinical Series.

Our past year's Xyrem promotional symposia have been well attended, with more than 1,500 attendees in 2015 and successful in generating new start patients for Xyrem. Our narcolepsy market expansion efforts include consumer-facing, web-based disease education to increase the awareness and diagnosis of narcolepsy in the U.S. as well as physician-directed disease education.

We are also looking forward to another great APSS SLEEP meeting for Xyrem. SLEEP 2016 will take place next month in Denver with 5 Xyrem-related posters and one oral presentation.

Turning to a brief legal and intellectual property update on Xyrem. Patent litigation continues in the District Court in New Jersey. No trial dates have yet been set in any of the cases. We anticipate the trial of a portion of the case against the first filer, Roxane Laboratories, would not occur any earlier than the third quarter of 2016.

We recently executed confidential settlement agreements with 2 of the 7 ANDA filers: Wockhardt Bio AG and Ranbaxy. Under these settlement agreements, we granted Wockhardt and Ranbaxy licenses to manufacture, market and sell generic versions of Xyrem on or after December 31, 2025, or earlier depending on the occurrence of certain events customary for settlement agreements with so-called second filers.

Activity on challenges to our patents with the U.S. Patent and Trademark Office, Patent Trial and Appeal Board, or PTAB, is continuing. In March, PTAB instituted IPR proceedings on only 3 claims out of the 28 claims included in our 963 patent, a restricted -- distribution system patent listed in the Orange Book. PTAB earlier instituted IPR proceedings on 6 other patents in this family. A hearing on those 6 patents was held last month, and we expect a decision in late July.

In April, PTAB instituted IPR proceedings on only a limited number of claims in our 306 patent, a patent with claims related to the safe use of Xyrem for patients receiving concomitant administration of divalproex sodium or valproate. There are 2 other pending IPR petitions on patents in this family, and we expect PTAB to issue decisions on whether to institute these IPR proceedings in the third quarter. For additional detail, please see our Form 10-Q, which we will file shortly.

Now turning to our development program for JZP-110. The enrollment of patients in our Phase III safety and efficacy studies is ongoing, and we recently broadened the inclusion criteria to capture more real-world patients and to accelerate the enrollment rate. Our goal is to have preliminary efficacy results from our Phase III studies by the end of 2016, though this is dependent on our ability to drive increased

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

enrollment rates. We are focused on doing what we can to accelerate and complete enrollment at all of our trials.

Subject to the results of these Phase III trials, we anticipate submitting an NDA in the second half of 2017. We look forward to sharing the JZP-110 human abuse and liability results next month. The data were accepted for presentation at both the SLEEP 2016 meeting and at the College of Problems on Drug Dependence meeting in Palm Springs.

Now on to the hematology/oncology franchise. We believe that Erwinaze has the potential to help more patients in the adolescent and young adult population with ALL. And in 2016, we continued to see additional first-time orders from adult accounts for Erwinaze. With this said, I'll remind you that because of constrained manufacturing capacity we have not been able to build sufficient inventory levels to absorb any supply disruptions.

In the first quarter, we experienced product quality and other supply challenges; and as a result, we did not ship drug in the U.S. for a 5-day period following a delay in product release. These challenges are ongoing, and we anticipate that we may experience further disruptions in our ability to supply certain markets, including the U.S., in the current and future quarters. We are very focused on minimizing any supply disruptions and are working closely with the healthcare community and our distributors to prioritize available supply for use by patients who are currently undergoing or initiating treatment. Recently, the manufacturer has increased shift work to expand production capacity, and longer-term efforts are focused on improving manufacturing processes and optimizing product deals to further increase capacity.

Now I'll turn to Defitelio. Our sales force was well prepared and began promotion of Defitelio in the U.S. immediately following FDA approval on March 30. We will be providing more specifics on sales performance for Defitelio with our second quarter results. However, we have observed hospitals both initially stocking and reordering the product. The sales force is focused on increasing the recognition and diagnosis of VOD, and we are pleased with the level of interest from healthcare providers and institutions.

Our reimbursement account managers are meeting with key hospital decision makers, such as pharmacy and therapeutics committee members, pharmacists, transplant specialists and payers, to increase their understanding of the clinical value and the cost effectiveness of Defitelio, with a focus on educating these decision makers about the importance of rapid formulary approval to ensure patients have access immediately upon diagnosis. To date, we have not seen any issues with patients receiving access to Defitelio, although it is still very early in the launch.

We have a commitment to providing medical education for healthcare providers and believe this is an important initiative in the Defitelio launch. During the February ASBMT meeting in Hawaii, there were over 650 attendees of the Jazz-sponsored CME symposium entitled Solving the Problem of VOD in HSCT Patients: Case-Based Insight on Risk, Recognition and Treatment. We also presented Defitelio budget and cost-effectiveness data at the AMCP Managed Care and Specialty Pharmacy Annual Meeting in April.

Our work on the Defitelio prevention of VOD in high-risk patients post-HSCT study has continued, and we now anticipate the study start-up in the third quarter and first patient in by fourth quarter 2016.

Our efforts in the EU remain focused on providing medical education on early identification of the warning signs of VOD, VOD pathophysiology, appropriate diagnosis and the importance of prompt treatment with Defitelio.

During the remainder of 2016, we look forward to delivering on key financial, commercial and R&D goals that have the potential to drive significant value creation. We will continue to invest in our key products, Xyrem, Erwinaze and Defitelio, and our product candidate, JZP-110, and to pursue focused development programs that have the potential to generate important new therapeutic options for patients. Finally, we remain enthusiastic about opportunities to further enhance and diversify our portfolio in 2016.

Matt, let me now turn the call over to you.

**Matthew P. Young**
*Executive VP & CFO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Thanks, Bruce, and good afternoon, everyone. We are pleased with our strong growth in the first quarter of 2016 compared to the same period in 2015, with increases in adjusted net income of 13% and adjusted EPS of 14%.

Revenue in the quarter compared to the same period in 2015 grew by 9%, driven primarily by higher sales of Xyrem, partially offset by supply constraints on Erwinaze and lower sales of other products, including the divestiture of certain assets in the first quarter of 2015. We expect continued strong top and bottom line growth for 2016 and are maintaining our total revenue guidance in the range of $1.49 billion to $1.55 billion.

Due to first quarter market conditions, we opted to accelerate our share repurchases, which reduced our estimated weighted average shares outstanding for calculating EPS to approximately 62 million for 2016. As a result, we are increasing our guidance for adjusted EPS, which is now expected to be in the range of $11.10 to $11.50 per diluted share compared to prior guidance of $10.90 to $11.30.

Net sales of Xyrem for the fourth -- for the quarter were $250 million, up 17% from $213 million in the first quarter of last year. We are maintaining our guidance for Xyrem net product sales in the range of $1.095 billion to $1.13 billion and continue to expect high single-digit volume growth during 2016.

Turning to Erwinaze. First quarter worldwide net sales were $51 million, up 2% compared to net sales of $50 million in the first quarter of 2015. The increase in sales was partially offset by higher chargebacks and rebates from increased utilization of 340B and Medicaid programs and continued supply challenges, which led to a brief period of supply outage in the first quarter. We are maintaining our guidance for Erwinaze net sales in the range of $200 million to $225 million for 2016.

Defitelio first quarter worldwide net sales were $18 million, up 3% from $17 million in the first quarter of 2015. We began shipment of commercial product to U.S. institutions on April 4, 2016. The impact of foreign currency exchange to Defitelio and Erwinaze net sales in 2016 is expected to decrease as compared to 2015. We are maintaining our guidance for Defitelio net sales for 2016 in the range of $100 million to $125 million, with approximately $20 million to $35 million in the U.S. and $80 million to $90 million in ex U.S. sales.

Prialt net sales for the first quarter of 2016 decreased to $6 million compared to $7 million in the same period in 2015.

Turning to operating expenses. Adjusted SG&A expenses for the first quarter of 2016 were $103 million or 31% of revenue compared to $95 million, also 31% of revenue in the same period of 2015. The increase in adjusted SG&A was primarily due to higher headcount and an increase in other expenses resulting from the expansion of Jazz' business, including Defitelio launch expenses.

As you recall, our adjusted SG&A expenses as a percentage of revenue historically are higher during the first quarter, consistent with our typical pattern of spend and the payer churn that can negatively impact Xyrem revenues.

Adjusted R&D expenses for the first quarter of 2016 were $28 million or 8% of total revenues as compared to $24 million or 8% of total revenues for 2015. The increase in R&D expenses was primarily due to higher costs of clinical studies and outside services for the development of our product candidate, JZP-110, and line extensions for the company's existing products.

Our 2016 guidance for adjusted SG&A expenses remains in the range of $390 million to $410 million, and guidance for adjusted R&D expenses remains in the range of $115 million to $130 million.

In the first quarter of 2016, the company spent $134 million to repurchase shares at an average cost of $123.77 per ordinary share, leaving us with approximately $125 million remaining under our $300 million share repurchase program.

As of March 31, 2016, the outstanding principal balance of the company's long-term debt was $1.3 billion; and cash, cash equivalents and investments were $981 million.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

In March 2016, we recorded a $150 million milestone owed to Sigma-Tau Pharmaceuticals, which was triggered by the FDA approval of Defitelio on March 30, 2016. The milestone was capitalized as intangible asset and was paid in April of this year.

In closing, we are pleased with our strong start to the year. We expect our positive momentum to continue into 2016 with the launch of Defitelio in the U.S. and through continued investments in our key marketed products, including the exploration of new indications in our clinical development pipeline.

We believe the environment is favorable and are highly focused on corporate development transactions that allow us to bring meaningful products to patients and, as a result, have the potential to deliver long-term growth and returns to our shareholders.

Thank you for joining us on the call today. I'll now ask Kathee to make a brief comment about our Q&A session.

**Katherine A. Littrell**
*Vice President of Investor Relations*
Thank you, Matt. [Operator Instructions] With that said, I'll turn the call back to the operator to open the line for your questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And our first question is from the line of David Amsellem with Piper Jaffray.

**David A. Amsellem**
*Piper Jaffray Companies, Research Division*

I guess I'll get the biz dev/M&A question out of the way. So maybe -- the way I'll put it is this. Do you -- in your discussions, in your conversations with potential targets, are you getting the sense that companies/ targets have -- are not -- have not adjusted to new market realities and, I guess, are overly price sensitive? Maybe talk to the extent to which there is price sensitivity and a disconnect between what an acquirer would be willing to pay and what targets would ask for.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, David, good question. I don't necessarily feel that people have not adjusted to new market realities. I often think that for situations we're interested, whether that's marketed products, newer market products or development programs, valuation expectations relate as much to the stage of that particular program or product and what's been accomplished there than just to changes in market valuations. As we've said a couple of times over the last couple of quarters, I think the move down in valuations relative to some of the peaks of last year is helpful to us. But I would also say the timing of transactions we do tends to be around key milestones in development, commercialization, regulatory or otherwise, and I don't feel that some reluctance to look at current market valuations is particularly important to us at this time.

**Operator**

And our next question is from the line of Jessica Fye with JPMorgan.

**Jessica Macomber Fye**
*JP Morgan Chase & Co, Research Division*

I'm not sure if I missed this in the prepared remarks, but you bought a lot of stock back in the quarter. Did you comment on whether or not you've bought any back in second quarter? And how you're thinking about the remainder of that repurchase authorization?

**Matthew P. Young**
*Executive VP & CFO*

Yes. Jess, it's Matt. We did not comment on what we've done in the second quarter, but we remain active under our repurchase program. We are pleased to be able to take advantage of stock prices in the first quarter to be more aggressive than we initially anticipated and, as noted, we're able to reduce our share count by roughly 1 million shares this year in our guidance. We used much of our free cash flow in the first quarter on those repurchases. And again, subject to alternative uses of cash and market conditions, we'll continue to buy under our authorization. So we'll comment more as we get to the end of the next quarter.

**Operator**

And our next question is from the line of Gregg Gilbert with Deutsche Bank.

**Gregory B. Gilbert**
*Deutsche Bank AG, Research Division*

Bruce, some time has passed since the first-to-file generic Xyrem application has changed hands. So I was hoping to catch you on a -- in a talkative mood today. Wondering if you feel confident that a reasonable compromise can be reached under these -- this new set of conditions where litigation stands, what we've learned in litigation so far. So throw us a bone, if you would.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Gregg, I hate to disappoint you. I won't comment as to whether I'm in a talkative mood generally, but on this topic probably not. Tough for us to comment specifically on any conversations that might be happening with any of the generic filers. I think it was significant that we reached settlement agreements with 2 of the second filers since last we spoke. In the case of the first-to-file, Roxane, yes, there was a change in ownership there during the last few months. There is a lot going on with respect to Xyrem. We referenced litigation. We referenced what's going on the IPR side with PTAB. There are regulatory issues, and I can't specifically say what will make sense to both parties when. We have said for a long time we remain very confident that in the upcoming trial, which does continue to get pushed out, we're ready to go to trial, and we're confident in our position. Whether there is a different or better outcome than going to trial, we'll wait and see, but we're preparing that we're ready to do that.

**Gregory B. Gilbert**
*Deutsche Bank AG, Research Division*

I guess, right now you're not going to settle if you settle for later till 2025. So we know that much now.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

I think that's probably a sensible comment, Gregg, of course.

**Operator**

And our next question is from Douglas Tsao with Barclays.

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

So just maybe following up, asking Gregg's question in a different way. Bruce, maybe would you think of 2025 as a little bit of a line in the sand for you in terms of how you're thinking about settlement and your position -- on terms of Xyrem IP? And then just also in terms of life cycle management, obviously, for the first quarter -- when you reported 4Q, you sort of indicated that you might be in position at some point this year to talk a little bit more about those ongoing efforts. Just curious if there's been incremental progress and is that feeling like a greater certainty to you at this point?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, Doug. Thanks for the questions. I'll point out I said December 31, 2025. So most of us look at that as 2026 as being the relevant way to think about it. What we would do with respect to other settlements, just can't comment, but we thought resolving a couple of these with nearly a decade remaining before that date was a smart thing for us to do under the circumstances. On what else we're doing with sodium oxybate, you're right about my prior comments. We have said we could be in a position depending on how things play out to share more information later this year. I'd still say the same thing, but no specific update there.

**Operator**

And our next question is from the line of Annabel Samimy with Stifel.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

I just wanted to go back to a comment you made with regard to enrolling real-world patients into JZP-110. What exactly did you mean by real-world patients? And what's going on with the enrollment that you need to sort of enlarge it like that?

**Bruce C. Cozadd**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Co-Founder, Chairman & CEO*

Yes, good question. And all of our patients are real-world patients, so I got to be careful on my terminology there, but we did slightly broaden the inclusion criteria. And as you know, the more you restrict who gets into a trial the more you can be criticized later that, that doesn't line up well with the broader population that might use the trial -- or I'm sorry, use the drug after approval. So I think this is a good thing for us to do. We are interested in speed here. We're very excited about this drug based on what we saw in the Phase II data. We'll be sharing human abuse liability data next month at a couple of key meetings. We're excited to get to the answer here and start looking at a regulatory filing. So anything we can do to speed that up, we'd like to do. Karen, do you want to add anything on what we're doing here?

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

Yes, it's not unusual to broaden inclusion and exclusion criteria on a clinical study as you learn more about the molecule along the way. Certainly this is done in conjunction with discussions with the FDA, and they were supportive of broadening that criteria, and I think at the end of the day, it's about bringing this product to market for those patients. And so the quicker that we can enroll and complete these studies then, that's a good thing for the patients.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Can you just describe what you broadened it to and from what it was broadened to from.

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

So we broadened a lot of the inclusion and exclusion criteria. So, for example, I'm looking at things like BMI or cardiovascular or concomitant medications. I mean, there are lots of areas where a patient would be excluded with. In discussions with the FDA, we agreed that those patients could actually be included in the trial.

**Operator**

And our next question is from the line of Louise Chen with Guggenheim.

**Louise Alesandra Chen**
*Guggenheim Securities, LLC, Research Division*

So with respect to your settlement with Wockhardt and Ranbaxy, do they have to get their own approvals for launch? Or will you supply them with product? And now that you've got potentially a longer runway for Xyrem until at least 2025 potentially, how should we think about the volume growth for your product? How much broader can you go in terms of prescribing base? How many doctors do you target today? And what's the potential universe for Xyrem?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. So Louise, I need to be a little careful on how much I say just because terms of the settlements are confidential. I think I said in my remarks to launch their generic versions of the product. So I'll just leave that there. Maybe I can ask Mike to comment on what we're seeing in the way of volume growth and possibilities for Xyrem in the prescriber base.

**Michael P. Miller**
*Executive Vice President of US Commercial*

Sure, Bruce. The 4% growth -- volume growth that we saw in Q1 was compared to a strong first quarter last year. We feel very good about where we have given our guidance, and we're excited about some of the initiatives that we're undertaking actually this week. As a matter of fact, we're doing our satellite

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

symposium. So we will continue to drive volume on Xyrem, and the SDS pharmacy is operating well. And to your question on the audience, it's about 4,000 physicians.

**Louise Alesandra Chen**
*Guggenheim Securities, LLC, Research Division*

Right. But I was just curious on how we think about volume growth longer term for Xyrem now that you have the potential longer runway. Is there any color you can provide there? Or maybe from users, potential patient users or maybe not just the doctor [indiscernible]?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. Well, we -- our overall view continues to be that narcolepsy is under-recognized and under-diagnosed, and we think with better education, both at the physician level but also potentially out to the patient level, helping people recognize this sleep disorder that often takes years to properly diagnose, we could in fact drive better treatment over time. So we certainly don't feel like our work is done on expanding use of the product.

**Operator**

And our next question is from the line of Jason Gerberry with Leerink Partners.

**Jason Matthew Gerberry**
*SVB Leerink LLC, Research Division*

Bruce, there was some comments maybe a year ago around some additional pending IP for Xyrem that could be issued. And kind of curious where that stands? Have we sort of gotten the last Orange Book listable patent put in the Orange Book? Or is there a possibility there is some additional IP in the works?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, probably I'm going to essentially no comment on that. We specifically were highlighting -- and I think when people weren't focused on the fact that we could end up with multiple patents in multiple families with different expiration dates and -- I won't say we'll never see additional IP around Xyrem, but I think with the 20 issued patents in the 3 different patent families, we feel very confident in the IP protection around Xyrem.

**Operator**

And our next question is from the line of Ken Cacciatore with Cowen and Company.

**Kenneth Charles Cacciatore**
*Cowen and Company, LLC, Research Division*

On the '306 patent, the valproate combination patent, you discussed that there is some remaining IPRs. Can you just discuss if it's similar arguments that are being made and in front of the same set of judges who've made that decision?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So generally, yes and yes would be the answers to the question, Ken.

**Operator**

And our next question is from the line of Marc Goodman with UBS.

**Marc Harold Goodman**
*UBS Investment Bank, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, the Erwinaze supply issues, can you just tell us how much that impacted revenues in the quarter and how you're thinking about that impact for the full year? And then can you also just -- was there -- did you tell us the FX impact? Maybe I missed it in the press release, just FX on total sales.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. Thanks, Marc. We did not comment on the FX. So I'll get to that in a second. As it relates to Erwinaze in the first quarter, it was roughly $1 million in terms of impact to sales with respect to our temporary supply gap. The FX differential or impact for the first quarter would have been about $1.7 million across Defitelio and Erwinaze for the first quarter. Yes, and it probably goes without saying here for everyone on the call, but our urgency in this company to solve this problem is not driven by financial impact. It's driven by the fact that this is the drug that these patients need, particularly kids being treated with ALL. And so even though the financial impact may not be great, we are doing everything we can to make sure that patients don't go without this therapy. So part of the reason we're highlighting this is just to make people aware of it, but you should know the internal effort here, which really is our #1 priority right now, is just ensuring we don't, in fact, impact a patient therapy.

**Operator**

And our next question is from the line of Liav Abraham with Citi.

**Liav Abraham**
*Citigroup Inc, Research Division*

Just a follow-up question on M&A. Bruce, can you just remind us of your willingness to enter into new therapeutic areas and whether you have the capabilities either from an R&D perspective or from a commercial perspective to do this?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, Liav, good question. We've historically said that while our focus is primarily around sleep, HemOnc and pain, which are the areas we're in now, that we would contemplate going into an additional therapeutic category. We certainly think we have skills at this company that would be broadly applicable to other areas as well, a lot of the expertise we have that, in fact, we do use over our current different business units. The interesting part of your question, as you referenced R&D in particular, and I think we would grant you that it's harder to parlay expertise in R&D broadly across therapeutic categories, and that's why historically we've said we probably wouldn't enter a new therapeutic area through an R&D program. We'd probably do it through commercial first and follow that market expertise by building additional R&D expertise, but we are open to entering another therapeutic area if we see both an attractive on-market or near-market opportunity that we do think is a fit with what we do well, along with the opportunity to build out that therapeutic area over time through additional products and/or R&D programs.

**Operator**

And our next question is from the line of Irina Koffler with Mizuho.

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

Just to go back to the 2 settlements. So because you've settled with 2 parties, I'm guessing, at some point shared REMS discussions have come up, and I was just -- I know you probably don't want to comment on it, but can you comment on whether the settlements included a shared REMS and also whether at least the contemplation of the shared REMS has now been expedited such that other settlements can come quicker because you might have a pathway with that now?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, Irina, good question. So the settlements are really around IP, not REMS. With respect to the REMS, we remain interested in moving forward as appropriate with shared system discussions. As we note in our SEC filings, it's not particularly clear the generics feel similarly about that. So no particular other update on that front for now.

**Operator**

And our next question is a follow-up from Gregg Gilbert with Deutsche Bank.

**Gregory B. Gilbert**
*Deutsche Bank AG, Research Division*

Couldn't help myself with this one question. Matt, can you give us cash flow from ops from the quarter? And then, Bruce or Mike, if Flamel begins an enrollment for its oxybate as planned later this year, would you expect to see a noticeable effect on volume growth at least temporarily for Xyrem?

**Matthew P. Young**
*Executive VP & CFO*

I'll start, Gregg, with the cash flow question. So our adjusted net income of $141 million, again, we repurchased shares at $134 million, and we had through a small IP-related acquisition $9 million of expenditure there. The rest is effectively close to neutral on the balance sheet, with another $2 million in CapEx. So increase in cash and cash equivalents was $4 million. But again, the vast majority of that was cash spent on share repurchases.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And then on the question of whether someone else's clinical trial could impact our volume growth, maybe I'll let Mike comment on that.

**Michael P. Miller**
*Executive Vice President of US Commercial*

Sure. The -- I believe the Flamel study is about 300 patients. I don't think we even know the mix between EU and U.S. These would likely not be patients on Xyrem currently. So I do not think they're going to impact our existing patient load or have a great deal of impact on our ability to grow the product.

**Operator**

And our next question is a follow-up from Douglas Tsao with Barclays.

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

So just maybe one final clarification to your answer to Irina's question just -- in terms of the settlement, it is around the IP. So does that presume that the generics would still need to somehow get their own REMS put into place, albeit shared or individual?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

It does mean, Doug, that they would need to get a product approved, and getting a product approved involves having a distribution system, whether that's a shared system or a waived REMS.

**Douglas Dylan Tsao**
*Barclays Bank PLC, Research Division*

And -- but that does not necessarily -- right, you still have your own intellectual property that's not necessarily patents, right, in terms of the patient database, et cetera? And that is not included in the settlement, correct?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Can't comment on that, Doug.

**Operator**

And we have a follow-up from the line of Annabel Samimy with Stifel.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Just really quickly. You gave us the FX impact on Defitelio and Erwinaze. Can you just tell us what the volume growth was for Defitelio in Europe this quarter? Is it still on the same trajectory?

**Matthew P. Young**
*Executive VP & CFO*

Yes. I can comment that Defitelio, in general, is on the same trajectory that what we've seen. We saw a little bit of wider first quarter, but in general, guidance is exactly the same. And we're feeling confident about Defitelio in Europe.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And I would just follow on to that it's a product. Again, it's a small number of patients with different patients between pediatric and adult and weight-based dose drug. So you get some intra-quarter variability as we've seen in the past with Erwinaze. So while you have a timing differential there that can perhaps look on a particular quarter-over-quarter comparison as less robust, I think we feel good about the business and how it's going.

And before we go to the next question, in case Ken is already writing up his note based on my prior answers, I was just handed a note that we don't know that the PTAB panel for the '306 decision would necessarily be the same. We do think the arguments are similar, but I said it would be the same. I don't know that. Sorry, about that.

**Operator**

And our next question is from the line of David Buck with Northland Capital Markets.

**David George Buck**
*Northland Capital Markets, Research Division*

Just a quick one on the timing of the settlement, Bruce, is it fair to read that the timing of settlements with the next filers being announced that there was some additional certainty or confidence that yourselves got after the PTAB decisions or the other parties that listed that coming to a conclusion? And then just a quick one on Defitelio. You mentioned there's been no patient access issues. Has there been any early reimbursement issues with the centers actually getting reimbursed for the drug?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So 2 sort of different questions there. The -- some of the back and forth around IPRs and PTAB over the last couple of months, I think, has been interesting just because if you look at it from the generics point of view, where they want to use these proceedings obviously to potentially get rid of patents, the failure to pick up those patents for review or pick up all claims in the patents, I think, from a practical standpoint just means there remains some uncertainty that will have to be dealt with through litigation, which I think is generally a positive development for us. On access, Mike, on Defitelio?

**Michael P. Miller**
*Executive Vice President of US Commercial*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Sure. So Defitelio has been doing very well this month. We are not seeing any push back on -- yet on payer, but it's early. The P&T committee meetings have gone well. Our health economic model works well in those settings. Payer discussions have been positive, but really it's early, and it's a lot of education going on right now, but we're pleased.

**Operator**

And our last question is from the line of Ronny Gal with Bernstein.

**Aaron Gal**
*Sanford C. Bernstein & Co., LLC., Research Division*

I have one about Xyrem access. First, you kind of noticed the cyclicality on the earnings. Can you just help us understand how you guys think about co-pay reimbursement in terms of patients being on co-insurance? Is this a rising trend? Roughly how many of the patients you have in the commercial area actually have co-insurance that you are reimbursing? And last, just wondering how you're handling the Medicare population. I know you guys use a foundation and not do it directly, but given that you got the only drug in the category with Xyrem, how do you avoid the regulations that require you to have multiple drugs in the category reimbursed?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. So the question varies a lot across products. The population of patients that get our different drugs varies considerably in terms of percentage of coverage that comes through commercial pay, government pay and otherwise. So the characteristics are different. Have we seen big changes in how coverage works, particularly Commercial coverage with respect to Xyrem? I would say, in general, no. We have disclosed that under that coverage we tend to see more prior authorization, reauthorization, but that's different from saying that the patient-level impact of co-pay is changing meaningfully. In the case of Erwinaze, we certainly talked about the potential for more 340B use over time as a trend. In terms of the assistance we do provide, that varies depending on what set of patients we're dealing with. Your comment was how do we avoid regulations. We don't avoid regulations. We operate within regulations, and there is pretty clear guidance on how these things should work, and we believe we follow that guidance.

**Operator**

And our last question is from David Maris with Wells Fargo.

**David William Maris**
*Wells Fargo Securities, LLC, Research Division*

Is there anything, Bruce, on the regulatory front that you're watching that we should be watching other than things that you've mentioned so far? And specifically around the REMS programs or anything else on the regulatory front that you're watching?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Well, we watch lots of things on the regulatory front all the time. We're particularly interested in things that affect our ability to rapidly develop drugs for small patient populations. Obviously, we operate in many markets around the world. When we can see more harmonization, that's a positive for us. I'm looking around the room here to see who wants to volunteer anything. The sort of demonstration project changes in Part B I'm not sure our position will be different from anyone else in our industry, which is we think the proposals are not particularly well thought through in terms of ultimately what they'll do in terms of providing health care to people. I think sometimes people get awfully focused on the cost of a therapy rather than are we providing good outcomes for patients across all the ways we can intervene, with drugs being just one of those ways. So I think sometimes that debate is a little off track. You mentioned REMS in particular, David. I would say there has been a pendulum swing maybe a couple of different ways over a long period of time about whether REMS are a good thing or a bad thing, and I think honestly there's a little bit of both. REMS are designed to help change the risk-benefit equation on a particular drug in

favor of allowing effective use of that drug for the right patients. I would argue that's a good thing for the healthcare system, but there have been complaints that REMS can make certain things more difficult for generic competitors, including getting access to drug. And so there is a -- there is often in commentary you read either demonization of REMS as all bad or talk of REMS as all good, and I'd just like to remind people there are real balance. We're involved in multiple REMS across multiple of our products, and I think we have a pretty good feel for that. So I think people just need to take into account the totality of that situation. When used correctly, I think REMS really do benefit the health care system and patients.

**Operator**

And ladies and gentlemen, this concludes our Q&A session for today. I will now turn the call back over to Kathee Littrell for final remarks.

**Katherine A. Littrell**
*Vice President of Investor Relations*

Thank you, Carmen. Thanks to each of you for joining us today on the call. We will be participating this quarter in the UBS healthcare conference this month and Goldman Sachs healthcare conference in June, and we hope to see many of you at the conferences. This now ends our call.

**Operator**
And ladies and gentlemen, thank you for participating. You may all disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 92

**S&P Global**
Market Intelligence

# Jazz Pharmaceuticals plc NasdaqGS:JAZZ
# FQ2 2016 Earnings Call Transcripts

## Tuesday, August 09, 2016 8:30 PM GMT

## S&P Global Market Intelligence Estimates

|  | -FQ2 2016- | | | -FQ3 2016- | -FY 2016- | -FY 2017- |
|---|---|---|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** | **CONSENSUS** | **CONSENSUS** | **CONSENSUS** |
| **EPS Normalized** | 2.81 | 2.63 | ▼(6.41 %) | 2.98 | 11.17 | 12.85 |
| **Revenue (mm)** | 376.45 | 381.16 | ▲1.25 | 395.00 | 1519.72 | 1726.32 |

Currency: USD
Consensus as of Aug-08-2016 9:51 PM GMT



| | **CONSENSUS** | **ACTUAL** | **SURPRISE** |
|---|---|---|---|
| **FQ3 2015** | 2.56 | 2.52 | ▼(1.56 %) |
| **FQ4 2015** | 2.60 | 2.60 | ●0.00 % |
| **FQ1 2016** | 2.32 | 2.26 | ▼(2.59 %) |
| **FQ2 2016** | 2.81 | 2.63 | ▼(6.41 %) |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................... | 3 |
| Presentation | ................................................................... | 4 |
| Question and Answer | ................................................................... | 10 |

# Call Participants

## EXECUTIVES

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

**Karen L. Smith**
*Former Chief Medical Officer and
Executive Vice President of R&D*

**Katherine A. Littrell**
*Vice President of Investor
Relations*

**Matthew P. Young**
*Executive VP & CFO*

**Michael P. Miller**
*Executive Vice President of US
Commercial*

**Russell J. Cox**
*Former Executive VP & COO*

## ANALYSTS

**Ami Fadia**
*UBS Investment Bank, Research
Division*

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company,
Incorporated, Research Division*

**David A. Amsellem**
*Piper Jaffray Companies, Research
Division*

**David George Buck**
*Northland Capital Markets,
Research Division*

**Gary Jay Nachman**
*BMO Capital Markets Equity
Research*

**Gregory B. Gilbert**
*Deutsche Bank AG, Research
Division*

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC,
Research Division*

**Jason Matthew Gerberry**
*SVB Leerink LLC, Research Division*

**Jessica Macomber Fye**
*JP Morgan Chase & Co, Research
Division*

**John Thomas Boris**
*SunTrust Robinson Humphrey,
Inc., Research Division*

**Kathryn Tracy Brennan-Kerfoot**
*BMO Capital Markets Equity
Research*

**Kenneth Charles Cacciatore**
*Cowen and Company, LLC,
Research Division*

**Louise Alesandra Chen**
*Guggenheim Securities, LLC,
Research Division*

**Morgan G. Williams Sanford**
*Barclays Bank PLC, Research
Division*

**Stephan Stewart**
*Goldman Sachs Group Inc.,
Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Welcome to the Jazz Pharmaceuticals Second Quarter 2016 Earnings Conference Call. [Operator Instructions] .

I'll now turn the call over to Kathy Littrell, Head of Investor Relations at Jazz Pharmaceuticals.

**Katherine A. Littrell**
*Vice President of Investor Relations*

Thank you, Vance, and thank you for joining our investor call. Today, we reported our second quarter 2016 financial results and updated financial guidance in the press release. The release and the slide presentation accompanying this call are available on the Investors section of our website.

With me for today's call are Bruce Cozadd, Chairman and CEO; Matt Young, our Chief Financial Officer; Russ Cox, our Chief Operating Officer; Mike Miller, our Head of U.S. Commercial; and Karen Smith, our Global Head of R&D and our Chief Medical Officer.

Following some remarks, we'll open the call for your questions.

I'd like to remind you that some of the statements we will make on this call relate to future events and future performance rather than historical facts, and are forward-looking statements.

Examples of forward-looking statements include statements related to our 2016 financial guidance and goals, our corporate development efforts, future product sales and volume, future litigation and intellectual property-related events, our manufacturing plans, future share repurchases, ongoing and future clinical trials and other product development activities, including regulatory events, and the timing of such events and activities.

These forward-looking statements involve numerous risks and uncertainties that could cause actual events, performance and results to differ materially. These risks and uncertainties are identified and described in today's press release, the slide presentation accompanying this call under Risk Factors in our Form 10-Q for the quarter ended March 31, and our Form 10-Q for the quarter ended June 30, which we will file shortly.

We undertake no duty or obligation to update any forward-looking statements we make today.

On this call, we will discuss several non-GAAP financial measures, including historical and expected 2016 adjusted net income, and the related per share measures, historical and expected 2016 adjusted SG&A and R&D expenses, and adjusted income tax provision, and expected 2016 net adjusted income expense.

We believe that these non-GAAP financial measures are helpful in understanding our past financial performance and potential future results. They are not meant to be considered in isolation or as a substitute for comparable reported GAAP measures.

Reconciliations of GAAP to non-GAAP financial measures discussed on this call are included in today's press release, and the slide presentation accompanying this call. Both are posted in the Investors section of our website.

I'll now turn the call over to Bruce.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Thanks, Kathy. Good afternoon, everyone, and thank you for joining us. We had a strong 2016 thus far, as we continue to build the foundation for future growth by advancing and broadening our portfolio. This has been a successful year on the corporate development front. Last month, we acquired Celator, which brings

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights Reserved.

a near-to-market product candidate, VYXEOS to our portfolio, as well as Celator's proprietary nanoscale combination drug delivery technology platform, CombiPlex.

We completed additional transactions with a license and option agreement with Phoenix, and an investment with Arrivo Bioventures that provide us with opportunities to access attractive product candidates on a worldwide basis to further expand our R&D portfolio.

These transactions complement our R&D and commercial expertise in our key therapeutic areas, and have the potential to bring innovative products to patients with unmet medical needs. We're also successfully executing on the early stages of the Defitelio U.S. launch, with product orders from accounts, representing over half of the bone marrow transplantation volume in the U.S.

We continue to drive toward the accomplishment of our 2016 corporate goals of delivering strong top and bottom line growth, expanding and advancing our development pipeline, and identifying further innovative assets through corporate development efforts. We remain well positioned to accomplish these goals, which are focused on generating increased shareholder value, while executing on our mission of improving patients lives.

I'll now update you on key commercial, legal, regulatory, and clinical development activities; highlighting some upcoming key events; and then turn the call over to Matt to review our financial results for the quarter, and provide updated financial guidance.

I'll start my comments with our sleep therapeutic area, and our lead product, Xyrem. During the second quarter, we delivered strong Xyrem sales growth. The average number of active Xyrem patients grew to approximately 12,850 in 2Q '16 from 12,475 in 2Q '15. Xyrem volume growth was 4% versus the same quarter in 2015.

We believe Xyrem has further growth potential, and note that both bottle volume and patient growth for Xyrem can vary from quarter-to-quarter. That said, we have observed some recent slowing of narcolepsy diagnosis growth in insurance claims databases. We also see managed-care trends that apply increasingly stringent requirements for prior authorizations and reauthorizations for treatment.

As we've mentioned, this trend is prevalent in the specialty pharmaceutical or orphan space, and has necessitated increased physician office workload to obtain approval for patients to receive their prescriptions. We believe that our marketing plans, such as the unbranded web-based disease awareness programs, utilization of the Swiss Narcolepsy Scale, and our overall focus on healthcare provider education, remain effective tools to foster expansion of narcolepsy diagnosis, and we will be further increasing these efforts.

Also this quarter, we've implemented a new Xyrem field reimbursement support team, that will offer expertise to physician practices in navigating the prior authorization and reauthorization payer processes, for both the diagnosis and treatment of narcolepsy. We believe this dedicated field support team, along with our clinically focused sales force physician-targeting program, branded advertising, and our satellite symposia are the most effective approaches to driving Xyrem growth for the remainder of the year.

Turning to a brief legal and intellectual property update on Xyrem. Patent litigation continues in the District Court in New Jersey. Recently, the District Court determined that it would try all of the patents at issue, in the first and second Roxane Laboratories cases together, including patents that were previously bifurcated in-state, and set trial on this consolidated case for the second quarter of 2017. A separate consolidated case, that includes the remaining and the litigants is also proceeding. No trial date has been set in that case.

With respect to challenges to our patents through the U.S. Patent and Trademark Office Patent Trial and Appeal Board, or PTAB, we were disappointed that PTAB decided last month that all the claims contained in 6 patents directed to the Xyrem restricted distribution system were considered unpatentable. We are reviewing the decisions to determine whether a request for rehearing by PTAB is warranted, and we expect to appeal these decisions to United States Court of Appeals for the Federal Circuit. The applet -- the appellate process typically takes 12 to 18 months.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Recall that earlier this year, an IPR petition on the 7th Orange Book listed patent directed to the restricted distribution system for Xyrem, the 963 patent, was submitted to PTAB and PTAB instituted review on only 3 of its 28 claims. As a result, the remaining 25 claims of the 963 patent continue to be in force. I'd like to remind you that the 963 patent is not yet at issue in litigation with Roxanne.

And finally, last month, we received a decision from PTAB to deny institution of an IPR on our 306 patent, covering a method to avoid drug-to-drug interaction between Xyrem and valproate, removing the only remaining pending IPR challenge to the DDI family of patents. We are pleased with this outcome, and remain confident in the strength of our Xyrem patent estate.

Now turning to our development program for JZP-110. We have observed an increase in the enrollment rate in our Phase III OSA studies, following the protocol amendments that we implemented earlier this year. We are now expecting preliminary data from the 2 Phase III OSA studies in first quarter '17. The enrollment rate in the Phase III narcolepsy study is improving or progressing slower than our earlier projections. We now anticipate preliminary data in this trial mid-year 2017.

Subject to the results of these Phase III trials, we anticipate an NDA submission for narcolepsy and OSA in late 2017.

Now on to the hematology/oncology franchise. Erwinaze, although, the demand for Erwinaze remains strong, I'll remind you that because of the constrained manufacturing capacity, we have not been able to build sufficient inventory levels to absorb potential supply disruptions. During the second quarter, we continued to experience supply challenges, although, we were able to meet patient demand. We expect that we will continue to experience inventory and supply challenges, which may result in temporary disruptions, and our ability to supply certain markets, including the U.S. from time to time.

Now I'll turn to Defitelio. Our sales force was well-prepared for the U.S. launch, and stocking and initial demand in the second quarter was strong. We received positive responses from healthcare providers, payers and institutions following the launch, as they recognized the value that Defitelio brings to patients diagnosed with veno-occlusive disease, or VOD, with multi-organ disfunction, or MOD. We had 83 accounts order product. These accounts represent approximately 55% of the total transplant volume in the U.S. 75% of these accounts reordered in the second quarter, an indication of patient on-drug versus initial stocking.

While we don't have patient level data, based on the institutions ordering, we believe that the majority of patients receiving Defitelio are pediatric, as expected.

While nearly 80% of the accounts were part of the treatment IND study, it is a positive sign to see early adoption in multiple sites that did not have previous experience in the T-IND.

This quarter, U.S. sales initiatives were focused on educating healthcare providers on the recognition of the signs and symptoms of VOD, diagnosis and treatment of VOD with MOD, and the clinical benefits of Defitelio. Our market access group also focused on educating payers and institutional stakeholders on the health economics and value of Defitelio.

Last week, the U.S. centers for Medicare and Medicaid services approved a new technology add-on payment, or NTAP, for Defitelio after determining that the product met the NTAP criteria for newness, substantial clinical improvement relative to existing therapies, and specific cost thresholds. Beginning October 1, NTAP will provide incremental reimbursement to the standard diagnosis-related group-based reimbursement, which should support Medicare beneficiaries access to Defitelio. We believe that the NTAP approval reinforces the benefit of Defitelio across the payer landscape.

Our efforts in the EU remained focused on providing medical education on early identification of the warning signs of VOD, VOD pathophysiology, appropriate diagnosis, and the importance of prompt treatment of severe VOD with Defitelio.

We observed strong EU rest-of-world growth in the second quarter, and increased use of Defitelio in line with the labeled indication for the treatment of severe VOD. We observed strong growth in EU rest-of-world sales for first '16 versus first half of '15.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

In May, the European Society for Blood and Marrow Transplantation released revised diagnostic and severity guidelines for VOD. We believe these guidelines will be helpful to healthcare providers in the EU, as they define 1 standard diagnostic set of criteria for adult patients, and importantly, provide physicians with objective criteria for defining the severity of VOD.

Finally, we are in the process of startup activities for the global Defitelio study and prevention of VOD in high-risk patients following HSCT, and we anticipate that the 1st patient will be enrolled into the study, in the fourth quarter.

Now some comments on VYXEOS. We welcomed over 20 new employees from Celator to Jazz. At this point, our primary goal, as a combined company is to remain focused on bringing VYXEOS to patients, as quickly as possible. Therefore, we are working together towards the completion of a high-quality NDA submission package for VYXEOS for the treatment of AML. We are planning to initiate a rolling NDA submission later this quarter, and anticipate completing this submission in late 2016 or early 2017.

VYXEOS has Fast Track Designation in the U.S., and we plan to request priority review. I'll remind you that VYXEOS was granted breakthrough therapy designation by the FDA for the treatment of adults with therapy-related AML or AML with mild dysplasia-related changes. We are currently evaluating the timing for our European submission, and we'll provide an update on expected timing later this year.

Additionally, we will be conducting a full assessment of the multiple development opportunities in our integrated development portfolio to make thoughtful decisions on future development of the Celator product candidates, and the use of the CombiPlex technology platform. We'll provide updates after we work through this process.

Now a brief manufacturing update. In June, we received FDA approval for our manufacturing facility in Athlone, Ireland, where we plan to manufacture Xyrem and materials for development activities. This facility provides a secondary source for Xyrem manufacturing, and we expect that shipments of Xyrem from this facility to the U.S. will begin this quarter.

We look forward to the rest of 2016, as we continue to execute on key financial, commercial, and R&D goals that have the potential to create significant value. We continue to invest in our key products, Xyrem, Erwinaze, Defitelio and Prialt, our product candidates JZP-110 and VYXEOS, and other focused development programs that have the potential to generate important new therapeutic options for patients.

Matt, let me now turn the call over to you.

**Matthew P. Young**
*Executive VP & CFO*

Thanks, Bruce, and good afternoon, everyone. We're pleased with our financial performance in the second quarter of 2016, as total revenues increased 14%, driven primarily by higher sales of Xyrem, Erwinaze and Defitelio compared to the second quarter of 2015.

We expect strong top line growth for 2016, and are updating our total revenue guidance in the range of 1.45 billion to 1.53 billion compared to previous guidance of $1.49 billion to $1.55 billion. Net sales of Xyrem for the first quarter were $281 million, up 13% from $248 million in the second quarter of last year. We are maintaining our guidance for Xyrem net product sales in the range of 1.095 billion to 1.13 billion, and now expect mid- to high-single digit volume growth during 2016.

Turning to Erwinaze, second quarter worldwide net sales were $50 million, up 8% compared to net sales of $46 million in the second quarter of 2015. As Bruce noted, while we successfully managed patient supply during the second quarter, we anticipate that we will continue to experience supply constraints for the remainder of 2016. As a result, we are lowering our guidance for Erwinaze net sales to a range of $190 million to $215 million compared to previous guidance of $200 million to $225 million for 2016.

Worldwide Defitelio net sales were $33 million in the second quarter, an increase of $18 million compared to $15 million in the second quarter of 2015. Sales were driven by strong Europe and Rest of World volume growth, and a $9.5 million contribution from the initial launch of Defitelio in the U.S. We are

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

updating our guidance for Defitelio Defibrotide net sales for 2016 to a range of $105 million to $125 million compared to previous guidance of $100 million to $125 million, with approximately $80 million to $90 million in Europe and Rest of World sales and $25 million to $35 million in U.S. sales.

As a reminder, Defitelio treats patients with an ultra rare disease and dosing is weight-based, which can increase intra-quarter variability, just as we have seen with Erwinaze.

Prialt net sales for the second quarter of 2016 increased to $8 million compared to $7 million in the same period of 2015.

Turning to operating expenses. Adjusted SG&A expenses for the second quarter of 2016 were $99 million or 26% of revenue compared to $88 million or 27% of revenue in the same period of 2015. The increase in adjusted SG&A was primarily due to higher headcount, and an increase in other expenses resulting from expansion of our business, including Defitelio launch expenses. Adjusted R&D expenses for the second quarter of 2016 were $36 million or 9% of revenues compared to $24 million or 7% of revenues for 2015.

The increase in R&D expenses was due primarily to higher costs of clinical studies and outside services for the development of our product candidates, JZP-110, and line extensions for our existing products.

As a result of the Celator acquisition, we anticipate increasing operating expenses, as we prepare for U.S. and European regulatory submissions, and start preparations for the potential 2017 launch of VYXEOS in the U.S. Therefore, we are increasing our 2016 guidance for adjusted SG&A expenses to a range of $400 million to $415 million from a previous range of $390 million to $410 million, and are also increasing 2016 guidance for adjusted R&D expenses to a range of $135 million to $145 million from previous range of $115 million to $130 million.

In the second quarter, we spent 29 million to repurchase shares at an average cost of $142.65 per ordinary share, leaving us with approximately 97 million under our 300 million share repurchase program. We temporarily suspended share repurchases, when we announced the Celator transaction. The timing and amount of any future share repurchases will depend on a variety of factors, including the price of our ordinary shares, alternative investment opportunities and market conditions.

As of June 30, the outstanding principal balance of our long-term debt was $1.3 billion. Cash, cash equivalents and investments were $916 million.

On July 12, we completed the Celator Pharmaceuticals acquisition for approximately $1.5 billion. We also amended our existing credit agreement in conjunction with the closing, increasing the borrowings available under our revolving credit facility from $750 million to $1.25 billion, and extending the maturity date of both of the term loan and revolving credit facilities to July 2021.

We used borrowings of $1 million under the revolving credit facility and cash on hand to fund the acquisition of Celator.

As a result, the outstanding principal balance of our long-term debt increased to $2.3 billion, and we had approximately $700 million in total cash, investments and undrawn revolver available following the finances.

With the $1 billion increase in our debt outstanding following the Celator acquisition and reduced cash balance, we expect our net adjusted interest expense for 2016 to be approximately $40 million.

Turning to adjusted net income and EPS. We have modified the calculation of our non-GAAP income tax provision in connection with the SEC's May 2016 guidance regarding non-GAAP financial measures. We've updated our 2015 and 2016 non-GAAP interim period results, and full year 2016 financial guidance to reflect this modification.

The modified calculation no longer includes the cash tax benefits we realized during the year, from net operating losses and credits and deductible share-based compensation, and now includes other deferred taxes, and changes in unrecognized tax benefits. This modification does not change the amount of cash taxes that we expect to pay in 2015 or in the future or impact our future expected cash flows.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Using this modified calculation, adjusted net income was $163 million or $2.63 per diluted share for the second quarter of 2016. Adjusted net income using our prior method for calculating the non-GAAP income tax provision would have been $174 million or $2.82 per diluted share, a difference of $11 million or $0.19 per diluted share.

Adjusted net income for the second quarter of 2015 was $144 million or $2.28 per diluted share. Under our prior method, for this calculation, adjusted net income for the second quarter of 2015, was reported as $152 million or $2.41 per diluted share.

We are updating our guidance for adjusted EPS to a range of $9.90 to $10.30 per diluted share compared to prior guidance of $11.10 to $11.50. This reflects a reduction in 2016 adjusted EPS guidance of $1.20 due to increased expenses following the Celator acquisition, including the increase in SG&A and R&D expenses as well as increase in net interest expense, totaling approximately $0.55 per diluted share. The modification of the reported non-GAAP income tax provision, which reduced our estimated EPS by a further approximately $0.55 per diluted share, and the impact of global supply constraints for Erwinaze, and slightly higher R&D expenses associated with JZP-110 and line extension programs.

In closing, we are pleased with our progress year-to-date. We remain focused on opportunities to provide organic growth of our key products and advanced our current product pipeline. We continued to evaluate opportunities to diversify our portfolio.

We're excited to work with our new colleagues from Celator to maximize the value of VYXEOS and the CombiPlex platform. The Celator acquisition brings another source of diversification and growth, consistent with our strategy, and we believe that this is yet another step to further our mission of providing meaningful products to patients, while delivering long-term growth and returns to our shareholders.

Thank you for joining us on the call today, and I'll now ask Kathee to make a brief comment about our Q&A session.

**Katherine A. Littrell**
*Vice President of Investor Relations*
Thanks, Matt. [Operator Instructions] With that said, I'll turn the call back to the operator to open the line for your questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question is from Louise Chen of Guggenheim.

**Louise Alesandra Chen**
*Guggenheim Securities, LLC, Research Division*

So I was just curious, more color on the Xyrem volume growth this quarter. Some of the comments that you made regarding that. So how should we think about narcolepsy diagnosis and prior offs for the remainder of the year? And how that reconciles with your Xyrem volume growth objective of mid- to high-single digits?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, so Louise, this is Bruce. The guidance we're giving of mid- to high-single digits reflects all the information we have right now. At 4% volume growth for the first half of the year, we're now heading for a back half of the year, where we have a little bit easier comparison to last year, if you remember the implementation of our REMS that started in late August of 2015. So I think that gets us to the growth rate that we're projecting. But we are having to work harder for the growth of Xyrem. We don't see the tailwind of a rapid increase in diagnosis in narcolepsy, which, honestly, is what we've seen over some of the recent years, perhaps, I would say in part due to our focused investments in that area. And then we noted the continuing trend we see, and increased scrutiny, I think across the board for specialty pharmaceuticals, not specific to Xyrem. So we are growing. We expect to continue to grow, but we just did want to note some of those additional pressures.

**Operator**

Our next question is from David Buck of Northland Capital Markets.

**David George Buck**
*Northland Capital Markets, Research Division*

If I could just maybe sneak in 2 quick ones. First on Erwinaze supply. Can you talk a little bit about what the impact there was on sales in the quarter? And what's the ability to think about a backup supply for that, looking out the next 12 months? And from that, just a quick question on the changing tax rate. What's the implications for actual, [indiscernible] from operations that you expect from there going forward?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Okay, so David, let me take the first part on Erwinaze supply in terms of what impact that has on our sales. At this point, I think supply sort of limits the growth we can expect in sales. Any vial we can produce, we can sell. So our real job is to make sure we do satisfy product demand. I think we were able to do that in the second quarter. That doesn't allow us to build up as much inventory at quarter end, as we would like to have on hand, to make it easy for people to order. And our ability to do that at the end of each of the next couple of quarters, I think will be similarly constrained, so it's very dependent on ongoing production. In terms of your question about a backup supply, and how we handle this over the next 12 months. We and our partner on the supply side are working very hard to make improvements in production processes, better utilize available capacity, bring all resources to bear, to make sure we do our primary job, which is helping patients with acute lymphoblastic leukemia who are allergic to Oncaspar, and therefore, require treatment with Erwinaze.

Sourcing Erwinaze from a separate manufacturing facility is not something that would be possible in any short period of time. That will be a very much a longer term effort. So all of our efforts for near-term

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

supply really revolve around a cooperative effort with our existing supplier. And Matt, let me hand the question about, cash impact of the tax accounting change, over to you.

**Matthew P. Young**
*Executive VP & CFO*

Yes, David. There is no impact in the cash tax, we expect to pay nor impact on cash flow. So it's merely, again, complying with the SEC's guidance as it relates to an accounting convention here, which will lead to some increased volatility in our adjusted cash tax, or our adjusted tax rate, as it will more closely track GAAP as a result, which means you'll have one-time events in discrete items that may influence quarter-over-quarter reporting. But in general, the relative difference between the previously reported cash tax number and this new number will be fairly consistent over a longer period of time, meaning 4% or 5% differential. Though, again, the actual cash taxes we will pay are completely unaffected.

**David George Buck**
*Northland Capital Markets, Research Division*

And just to recap, I guess, now there -- what -- so the cash tax rate you expect to pay for '16 is what the versus the new non-GAAP tax rate?

**Matthew P. Young**
*Executive VP & CFO*

So roughly a 5 percentage point difference. It would have been in the 19.5% range for this quarter versus, again, a 24.9%, and again, for the year, that's -- the difference is fairly similar, but we would have been in the 19% to 20% range for the year, and we'll still be from a cash tax perspective, but the number for the year on the new basis will be in the low 20s.

**Operator**

Our next question is from Greg Gilbert of Deutsche Bank.

**Gregory B. Gilbert**
*Deutsche Bank AG, Research Division*

Couple on VYXEOS. Can you help us with any context around pricing for a product like this, and the number of cycles you'd expect? How soon could you be ready to ship the product if it's approved ahead of schedule? And what are your thoughts for now on combination therapy trials to consider for the future?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So couple parts to your questions there, Greg. On the first one, pricing. Just too early for us to comment on pricing at this point. As you saw with the U.S. launch of Defitelio, that's probably the information we'll provide at the time of launch, and I suspect not before then. On being ready to ship, our goal is, as I said, is to get product to patients, as soon as we can, and I'm confident the combined Celator-Jazz team is doing everything it can, in that regard. Part of that is putting together a high-quality NDA submission. But as you point out, it's really getting ready for all of it, supplying product to patients among those things. I'm really proud of how we did that on Defitelio. We've got approval of the product, and had it available for shipment just days later. So we'll try to do the same with this product. Again, we think it's a product with an important survival benefit, and we're going to want to get that to patients as soon as we can.

In terms of the potential for combination trials, probably too early to comment at this point, having just completed the acquisition last month, and with everyone very focused on moving quickly to that regulatory submission. I think we'll take a little more time to think about that, and give a more thoughtful response on a future call.

**Operator**

Our next question is from Jason Gerberry of Leerink Partners.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Jason Matthew Gerberry**
*SVB Leerink LLC, Research Division*

Bruce, just curious, you -- I think on the 1Q call, you mentioned that we might get an update on Xyrem lifecycle programs by the end of the year. Just kind of curious, as you think about a settlement process that's unresolved. How you reconcile those 2 things? And if you're still planning on providing that update by end of year.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. Jason, good question. I think I've said a couple of times this year, that this might be a year where we get more color on some of our sodium oxybate-related lifecycle management programs. And that was really driven by 2 things, where we might be in the process of litigation on the endo side or potential settlement of that litigation. But it was also driven by the fact that enough progress on those programs might also prompt us to want to or need to do more disclosure around that. So I would say that's still the case, as we head toward the latter half of 2016, that it is certainly a possibility that there'd be more color about what we're doing on sodium-oxybate beyond existing product, as we move to the back half of the year.

**Operator**

Our next question is from Marc Goodman of UBS.

**Ami Fadia**
*UBS Investment Bank, Research Division*

This is Ami on behalf of Marc. Could you give us some more clarity around Defitelio with respect to where you're seeing utilization of the drug? And what's sort of the composition of the types of patients that are using the drug, and also from an insurance coverage perspective? And the NTAP additional support, how does that impact either utilization or the net price realization on the drug?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Okay, Ami, let me hand that over to Mike, at least with respect to the U.S. commercialization of Defitelio.

**Michael P. Miller**
*Executive Vice President of US Commercial*

Thanks, Bruce. As we said, there are 83 unique accounts that initially ordered Defitelio in Q2, and about 75% of them reordered. Typically in these accounts, they don't -- they only reorder when there is a patient, so it's pretty indicative of drug inpatient. We don't have the information yet down to a patient level basis on adult versus ped. We believe that the majority is ped. We do that by looking at the type of centers that are ordering or reordering.

**Matthew P. Young**
*Executive VP & CFO*

On the formulary side, with regard to -- at the institution, the PNT committees have gone very well. We haven't had any pushback on that. I think our preparation, in terms of having our health economic, and our budget impact model ready at launch, helped us a great deal in that regard. We have been successful so far. And then lastly on NTAP, and NTAP, as Bruce touched on it, it's a supplemental payment to for about a period of 2 to 3 years, during the DRG catch up period. It takes 2 years for the DRG to catch up on it. It accounts for about half the costs. So a supplemental payment for about half the cost. And so on adult, it's about $75,000 for a 21-day treatment. That is not anything -- in other words, we realize the full top line effect of that use in the patient, the CMS supplements that payment to the institution.

**Ami Fadia**
*UBS Investment Bank, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

So if I could just a clarification question. So the CMS supplement is 50% and the other 50% is paid by?

**Matthew P. Young**
*Executive VP & CFO*

The institution.

**Ami Fadia**
*UBS Investment Bank, Research Division*

The institution?

**Matthew P. Young**
*Executive VP & CFO*

Correct.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, and Ami, just important to remember in that, that the institution has paid generally, for these patients on a per transplant basis. Of course, not all of the transplant patients develop severe VOD and require treatment with Defitelio. So in those patients, where Defitelio treatment is required, this helps them cover some of that cost. Of course, we think it also produces better outcomes for those patients and for that transplant center, and that's an important source of, I think, business for those transplant centers is to be able to show their payers what kind of outcomes they're getting all together.

**Michael P. Miller**
*Executive Vice President of US Commercial*

And -- that's right, Bruce. And the other is that there are not that many Medicare aged patients in that patient group, but I do think the spill over to private and commercial pay is important, and it's a real validation of the drug.

**Operator**

Our next question is from Douglas Tsao of Barclays.

**Morgan G. Williams Sanford**
*Barclays Bank PLC, Research Division*

This is Morgan Williams on for Doug. I just wanted to ask a few questions. So number one, does the approval and subsequent, I guess, launch of the Ireland Manufacturing Facility have any implications in terms of the tax impact? And then number two, I know that Bruce, it sounded like you were confident in the potential success about the educational tools around Xyrem reimbursement, but has the kind of slowing in the diagnosis of narcolepsy impacted your thinking around potential contracting for the product, going forward? And then finally, if you could just offer some thoughts on the relative strength of the 963 patent, and whether that provides some sort of comfort in the go-forward durability of Xyrem?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Okay. Couple of parts to the question there. On tax impact of supply of Xyrem out of the Athlon, Ireland plant. This gives us an additional sources of supply, it won't be our primary source of supply, and I wouldn't expect to see any meaningful change in our overall economics there. On the Xyrem reimbursement-related efforts, we've made -- our goal here is to make sure that patients who are properly diagnosed with narcolepsy for whom Xyrem would be good treatment, do have access to the drug. We want to make sure we do everything we can to enable physicians to provide the best therapy to their patients, and we think those tools matter. I don't think that specifically relates to anything we would consider in the form of contracting. On the 963 patent, I certainly can't and don't want to comment on the strength of particular patents while we're in the midst of litigation with multiple parties. It is helpful to us

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to have many patents, patents in multiple families, patents that have already survived PTAB challenge, either not been picked up or only picked up in part. And we think all of that contributes to our confidence that we have a durable asset in Xyrem.

**Operator**

Our next question is from Gary Nachman from BMO Capital Markets.

**Gary Jay Nachman**
*BMO Capital Markets Equity Research*

Bruce, Defitelio ex U.S. had a really nice uptick. Could you give a little more color on where you're getting the most traction there? And how sustainable you think that is, going forward understanding there is some fluctuations quarter-to-quarter? And any new countries you plan to enter sometime soon?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, Gary. Thanks for the question. I'm really proud of our ex U.S. team, and their efforts around Defitelio. It's nice to be able to talk about our early success with the U.S. launch. Of course, our European team has been at this for a couple of years, and I think all of their efforts are really paying off. Maybe I can have Russ comment a little bit on what we're seeing over there, that's contributing to the strength, and what we might expect going forward.

**Russell J. Cox**
*Former Executive VP & COO*

Yes. Gary, one area particular that's doing quite well this year, as we saw a lot of movements from prophylaxis last year in the U.K. And the U.K. is actually now focused on what they can do for treatment, and we're seeing that pick up in a pretty dramatic way. I think the team has done a really nice job of identifying how to do that, and something that they've built that sustainable going forward for the U.K. So that's where a lot of improvement is going on. I'd also say, there's a number of other countries that had sort of been waxing and waning that are picking up nicely as well. So very nice effort.

**Gary Jay Nachman**
*BMO Capital Markets Equity Research*

Okay. And any new countries that you plan on entering sometime soon? Or do you think you've sort of maxed out in Europe?

**Russell J. Cox**
*Former Executive VP & COO*

Nothing substantial that we'll be announcing soon.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And just remember, Gary, part of this process was really converting patients over to commercial over time with full pricing and reimbursement approvals country-by-country. It wasn't necessarily thinking about it as off-to-on, country-by-country.

**Operator**

Our next question is from David Amsellem of Piper Jaffray.

**David A. Amsellem**
*Piper Jaffray Companies, Research Division*

So a question on 110. So you cited the pace of the enrollment and the timeline. Just wondering if you're contemplating any changes to the patient-inclusion criteria for any of the studies? And also, if you're contemplating any new sites?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So maybe I'll have Karen answer that question on JZP-110.

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

Sure. So the studies are obviously blinded randomized placebo-based controlled studies, and then I will say, narcolepsy patients. And narcolepsy in particular are -- it's a rare disease, so they're difficult to recruit studies. So originally, I think when we design the studies, they had very strick enrollment criteria and this led to screen study rates that we immediately identified and addressed. So we put in place a number of modifications that did include such things as increasing the number of sites, and it also included such things as broadening the inclusion and exclusion criteria. And what we had seen is an increase in the OSA study enrollment rate. And while we did also see an increase in the narcolepsy enrollment rate. This was slower than earlier projections, and it is not where we would like it to be at this point in time. So we have made the modifications that we believe are appropriate to continue to recruit at a good pace and hit our timelines for the studies and our filings.

**David A. Amsellem**
*Piper Jaffray Companies, Research Division*

Okay. Can you maybe elaborate on just what the issues were on the narcolepsy studies, and what do you think from the -- single biggest thing you've done to get enrollment back on track?

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

Look, the narcolepsy studies in particular, where things like BMI that we increased to enable patients to enroll that may have otherwise been excluded. There are also cardiovascular parameters that we brought in to enable those patients to be enrolled. One of the mitigation strategies we deployed was to go back and look at the patients who had previously been excluded and invite them to reenter the trial, assuming that they met the other criteria and the number of those patients did actually do that. And we did also open additional sites.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. And just as a reminder, if it's helpful, David, to think about this, particularly, on the OSA side. When we give you a timelines to get to top line data, of course, you got to backup from that data analysis. You got to backup from that -- the treatment period, which were a number of these trials was 12 weeks. So we're actually pretty close to finishing the input side of the equation or at least on the OSA side. So we've got pretty good confidence around that. As Karen said, narcolepsy, a little bit behind that.

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

It's also very difficult to narcolepsy patients who might be stable on a given treatment, and the potential to go into a placebo arm could be concerning to some patients and could be a deterrent, for example, to entering into a clinical trial. So I think, in particular, the narcolepsy patients, once it's stable, it's often taken a while to actually get them beyond their reticence to potentially take themselves off the treatment.

**Operator**

Our next question is from Steven Stewart of Goldman Sachs.

**Stephan Stewart**
*Goldman Sachs Group Inc., Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I just wanted to follow up on Defitelio U.S. launch. Any early feedback you might have around physician education? I know, that the defection was one area that may be needed some work. Just wondering how that's been going?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

So maybe I'll let Mike address that.

**Michael P. Miller**
*Executive Vice President of US Commercial*

Thanks, Bruce. We had a very, very nicely attended symposia -- satellite symposia that right after we saw a nice uptick in with some centers. So we do believe that our educational objectives are on target. That is now getting expanded quite a bit this quarter with speaker programs and other things in terms of reach out to the community, reach out to patient advocacy groups and transplant support, the staff support, that really I think raised the awareness around the signs and symptoms of VOD for early detection.

**Operator**

Our next question is from Annabel Samimy of Stifel.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

I had a quick question on VYXEOS. And, I guess, it originally, it's some sort of targeted to elderly high-risk patients coming out of [indiscernible], some physicians were talking about how it should have potentially a much broader utility in this population, given the toxicity of current therapy. So I just want to get your sense on that. And if I can quickly ask on Defitelio in the U.S. What exactly is the reason behind more pediatric patients right now? And will the anti-ped help with adult population at all? Can you just give us a little bit of color, when you might do the transition to the adult population since it's a weight-based test and has an impact?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

All right. On the first question, Annabel on VYXEOS and the right patient population for that, maybe I'll have Karen comment on that.

**Karen L. Smith**
*Former Chief Medical Officer and Executive Vice President of R&D*

Thanks, Bruce. So VYXEOS is a fixed dose [indiscernible] formulation. It's synergistic 5 to 1 molar ratio of cytarabine and daunorubicin. Two well-established chemotherapeutic agents. The studies of the Phase III registration study was conducted in older patients that's between the ages of 60 and 75 years, which is aligned to the actual disease of AML itself, where the average age is around 67 years. So these are generally older patients. And remembering also that this study was in high risk or secondary AML patients. So I think that the overall results were extremely good. There was certainly overall survival with the primary endpoints, and there was a [indiscernible] significant achieved for VYXEOS compared to Senna Plus III, which is the standardized free drug, if you like, of cytarabine and daunorubicin. So in terms of could you apply this in other patient groups or other patient populations or other diseases, I think the actual VYXEOS itself is definitely something we would consider likewise for the platform because it is utilized more broadly. It's definitely something that we are currently looking at.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And Mike, maybe you could comment on the rationale for more early uptake in pediatric, and the potential for the adult side, including any impact?

**Michael P. Miller**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Executive Vice President of US Commercial*

Sure. So first, VOD actually happens at a higher rate in pediatric transplant patients than it happens in adults. And so that is 1 factor. The other is that because of our success with Erwinaze, we have good relationships in the ped centers. And I think naturally, those relationships are working to the extent that we can get in there and get face-to-face with our customers more efficiently. The NTAP does not present a huge swath of new patients for us. I think it did creates very nice access for those Medicare patients, but I think that, as I said earlier, I think the spillover to private and commercial pay will be equally or more beneficial for the brand, and our ability for more patients to access the drug.

**Operator**

Our next question is from Ken Cacciatore of Cowen & Company.

**Kenneth Charles Cacciatore**
*Cowen and Company, LLC, Research Division*

Bruce, just wondering with the recent PTAB decisions. What possibly is left for all parties to know about ahead of litigation? I know you have to -- or there will be appeals to these PTAB decisions, but just trying to understand you've gone now a few years, and clearly having these PTAB out there and discovery out there, I would imagine all parties didn't fully understand what they were dealing with. But can you give us a sense now that the PTAB decisions have been issued, really what is outstanding for all parties to know about this litigation before you hit the trial?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. So I think we've talked about the importance of patents. We've talked about the importance of the IPR process at PTAB is separate from about having an impact on the litigation. We've also talked about on the regulatory side, the process for getting approval. The need to have a REMS, either a single-shared system or a wave REMS. I think all of those pieces go into the mix. And thinking about the relative parties -- physicians, as we go through this, and there are lots of moving pieces there. I think the recent IPR decisions and the non-pickup of an IPR challenge on the DDI side are a couple more pieces of the puzzle coming together. There's a lot that goes on in litigation, motions different parties have. And we've got some new pieces of the puzzle moving forward in litigation that previously hadn't been a part of what we thought would be the first Roxanne trial. It's sort of been consolidated now, so there is some more work to do, which is one of the reasons the trial date is now pushed back to second quarter of next year. Remember, we had previously been saying it could be as early as third quarter this year. Well, frankly, we started the year saying it could be much earlier than that. So there are still, Ken, a number of moving pieces here that could have an impact on how the parties view this situation.

**Operator**

Our next question is from David Maris of Wells Fargo.

**Kathryn Tracy Brennan-Kerfoot**
*BMO Capital Markets Equity Research*

This is Katie Brennan in for David. I don't mean to knock, you've credit where it's due, but I will throw a corporate development question your way. Following the progress you guys made in the past few months, what are your thoughts on business development, going forward? And if I can ask just one clarification from Matt. I'm not sure, if I missed it. But I did see that there is a $0.55 impact from the tax reporting change that is a difference between your previous guidance, and your current guidance. How much of the rest of that $0.65 change in the midpoint is from Celator? And how much is from the other changes in the business that you mentioned?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, Katie, maybe I'll ask Matt to just take that second one first. That's a pretty easy factual answer. And then we'll come back to BD, and no problem with your question. You don't just have to give us credit for a past deals. As you know, our appetite remains strong to continue to invest our cash flow, use our balance sheet to bring additional assets into the company, and I think it's a great question. So Matt, you want to hit the breakdown of the $0.65 first and then take that?

**Matthew P. Young**
*Executive VP & CFO*

Yes. So there's $1.20 adjustment to our prior guidance to our current guidance. Again, $0.55 was related to the change in the patent non-GAAP tax ETR. There was also $0.55 related to the Celator transaction. And then you'd have the remaining $0.10 related again to Erwinaze supply issues, which as you saw in our revenue guidance, we took down Erwinaze revenue guidance for the year. And some related -- some slightly higher R&D expense related to JZP-110 and some other line up extension programs would make up the remainder.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Matt, you want to take the bus-dev part of the question?

**Matthew P. Young**
*Executive VP & CFO*

Sure. Just as it relates to BD, again, we're very excited to have completed a few acquisitions, licensing transactions and investments this year between both Celator being the largest or most notable of those, but also with the trend transactions of Phoenix that we're doing otherwise. So we're deeply committed to continuing to bring new products to market, and are very active in evaluating new opportunities. You may have also seen, we did increase our revolver by $500 million. So while we did use some of our cash and balance sheet capacity, we continue to believe we have the firepower to do some meaningful transactions and also believe it's a favorable business development environment. So we are certainly going to make sure we get the value out of the things we buy, and are excited to be working with the Celator team to move VYXEOS along toward patients as fast as we can, but we fully intend to continue to add growth and diversification drivers to the business.

**Operator**

Our next question is from John Boris of SunTrust.

**John Thomas Boris**
*SunTrust Robinson Humphrey, Inc., Research Division*

On VYXEOS, there was some pretty good data that was presented in Europe at one of the conferences on some subgroup analysis that were done on the product, or is there any plan to present additional data at ASH? And then it seems like the timeline of Celator had with the filing in 3Q, I think you're filing in Q4. Any read-through on that? And then just back to a question on the REMS patents on Xyrem. FDA obviously has an ability to potentially help the company develop an alternative REMS, especially the product could potentially be safer. Just your thoughts around that and linking it to your strategy to develop your line extension on Xyrem, and how you're thinking about that, going forward, the competitive threat, and your own strategy to develop your own assets going forward.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. So maybe I'll take those in reverse order. On the REMS side, we have a REMS that we believe is very effective at doing what REMS are supposed to do, which is balancing the benefit of bringing an important treatment to patients who can benefit from that treatment while also minimizing the risk, in this case, both the risk to potential patients, albeit inappropriate use or risk to others through misuse of this particular product. So we've got a lot of experience with our REMS, and we've recently upgraded to the final REMS in the third quarter of last year. We continue to collect data on the performance of our

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

REMS, both that we submit FDA as part of our ongoing assessment, but also to make sure we're doing our job well, and we believe that REMS does that. Are there alternative REMS that could also successfully balance benefit and risk of Xyrem? Xyrem-like products? Conceivably. But I would say we have high confidence that our particular approach works very well. On VYXEOSs' timing, it is true that Celator have been working toward a goal of a third quarter submission. We've revised that time line in consultation with Celator to look to start a rolling submission in the third quarter, but get all of it in by the end of the year or early next year. We think that's the best strategy to achieve our real objective, which is a product on market, as opposed to just getting the fastest submission in. And a lot of credit to the Celator team for the great work they did during the time that they were unblinding, analyzing data, going through an M&A process, integrating companies and continuing to move this program forward. We think they've done a really nice job, but all I would say is together, we've determined that this is the best strategy to achieve the ultimate goal, which is product available to patients.

On VYXEOS and ASH, I would say you can count on us being at ASH, on VYXEOS, on Erwinaze, and Defitelio. It's a really, really important meeting for us. I think in addition to having some good data across products, we'll be featuring a team on the hemon [ph] side that we've continued to strengthen over time. Even just since last year's ASH, I think, we've made a tremendous amount of progress on many fronts. And if any of you are at ASH, I hope you get a chance to see that in person.

**Operator**

Our next question is from Irina Koffler of Mizuho.

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

I was wondering if you could comment on the Xyrem pricing environment, as we head into next year. Do you feel it's a little bit more restrictive or about the same? And then with respect to the additional expense for Celator, as we ramp into the back half of the year, is it going to be kind of mostly higher in the fourth quarter, lower in the third quarter? Lumpy? How should we think about the build?

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes, Irina, thanks for the questions. On Xyrem, I would say no particular change in our view of the pricing environment for that product. Mike, anything you want to add there?

**Michael P. Miller**
*Executive Vice President of US Commercial*

No. I'd say that I think as with all specialty and drugs in the orphan space, there is increasingly stringent PAs and reops, but this is the space. What is good is that the -- our approval rate is still very steady at 80%. So we're very pleased with that. And Bruce touched on the field reimbursement team. That'll be out this quarter. We're very excited about that, helping practices with the PAs and the reops. So, for both diagnosis and treatment.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And then on your question on Celator-related expense, Irina, I would say the interest expense part of that is pretty straightforward to figure out. Us taking on additional expense associated with Celator, and now expanding some of our capabilities to finish off this program and then prepare for a launch. Some of that expense will ramp up, as we get through the back end of the year. And certainly, as we head into 2017, to be ready to do a high-quality launch. I can't say there won't be any lumpiness in there, but I think that's the best way to think about it is calculate the financial impact of the increase in debt, and the reduction in cash and then factor in some level of ongoing expense. There is some expense that goes away, a little lack of duplicate of this expense across the 2 organizations. But I think in general, we'll be adding some expense, as we push this to the market.

**Katherine A. Littrell**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Vice President of Investor Relations*

Operator, this will be our last question now.

**Operator**

Our last question is from Jessica Fye of JPMorgan.

**Jessica Macomber Fye**
*JP Morgan Chase & Co, Research Division*

I had a couple. First, based on the comments you had about bus dev and still having a strong appetite, can you just remind us what your highest kind of net debt-to-EBITDA ratio you would go up to is? Second, both on hemon [ph] space. What's the idea label you would like to see for VYXEOS? Might you try to get a broader label than what you studied and is that even possible? Also on Defitelio, just trying to reconcile the patient numbers. When you say the majority of use is coming from peds, and I see that they get VOD more often, but they're just so many fewer stem cell transplants in peds. I'm just trying to kind of reconcile that, and maybe I'll stop there.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

Yes. Maybe I'll have Mike take that last one first in terms of the comment on pediatric use of Defitelio.

**Michael P. Miller**
*Executive Vice President of US Commercial*

Sure. Yes, so I said the incidents in peds is higher in VOD, but there are fewer patients. I would agree with that. And also keep in mind that this is a weight-based drug, and so you're going to use less vials per patient in the ped space. But in the pediatric transplant, they are aggressive with their treatment, and that's what drives a lot of the VOD that you see in kids, and these peds are primarily, ALL, but some AML. And so it's certainly a beginning for us that we're very proud of. I think going back again to our access and knowledge in the ped space. But more importantly, we're looking forward to driving that adoption in the adult space.

**Bruce C. Cozadd**
*Co-Founder, Chairman & CEO*

And I would say, Jess, on this, remember that as we get ready to launch, we sort of forecast that we expected more uptake quickly in the pediatric side. And just a reminder that under the treatment IND, we also saw a little more waiting toward the pediatric side.

**Michael P. Miller**
*Executive Vice President of US Commercial*

On the question about potential label for VYXEOS, I think since we're headed for an ongoing dialogue from FDA, probably won't comment publicly on that. Again, this is, we think, a pretty important clinical result that we saw in a disease where we haven't seen a lot of meaningful improvements in objective data, in this case, survival. So we'll certainly be focused on appropriate label for the product, but again, the goal is get it to patients as soon as we can. And maybe I'll have, Matt, address your comment on capacity for additional business development activity.

**Matthew P. Young**
*Executive VP & CFO*

Yes, as it relates to that, Jessica, we have mentioned before, and we'd still say we'd be comfortable pushing up our leverage to, as we've said, as high as 5x or so for the right transaction. I do think it's quite dependent on the type of acquisition we're doing and the types of reliability and predictability of the cash flows of that acquisition and sort of what would be deleveraging profile of course, and as we've said before, we reflect on what consideration to use based on sort of the risk and size associated with any particular asset, but we're absolutely prepared to lever up in the right situation.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Katherine A. Littrell**
*Vice President of Investor Relations*
All right, operator. Thank you for joining us today for this call. We will be participating in the Morgan
Stanley Healthcare Conference next month, and we hope to see many of you there. This now will end our
call.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 93

CONFIDENTIAL

**OFFICE OF CLINICAL PHARMACOLOGY**

**Clinical Pharmacology Review**

| | |
|---|---|
| NDA or BLA Number | 214755 |
| Link to EDR | \\CDSESUB1\evsprod\NDA214755\0001 |
| Submission Date(s) | 15-Dec-2020 |
| Submission Type | 505(b)(2) (Standard Review) |
| Brand Name | Lumryz (FT218) |
| Generic Name | Sodium oxybate |
| Formulation and Strength | Extended-release powder for oral suspension, 4.5, 6, 7.5, and 9 g |
| Route of Administration | Oral Administration |
| Proposed Indication | Cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy |
| Applicant | Avadel Pharmaceuticals |
| Associated IND | IND 126321 |
| Reviewers | Dawei Li, Ph.D. |
| Team Leader | Bilal AbuAsal, Ph.D. |
| OCP Division | Division of Neuropsychiatric Pharmacology |
| Division Director | Mehul Mehta, Ph.D. |

1

FDA-Jazz-000081

# Table of Contents

**Table of Contents** **2**

**1      Executive Summary** **3**

**1.1      Recommendation** **4**

**1.2      Post-marketing Requirement** **4**

**2      Summary of Clinical Pharmacology Assessment** **4**

**2.1      The Pharmacology and Clinical Pharmacokinetics** **4**

**2.2      Dosing and Therapeutic Individualization** **5**

**2.3      Outstanding Issues** **6**

**2.4      Summary of Labeling Recommendations** **6**

**3      Comprehensive Clinical Pharmacology Review** **6**

**3.1      General Pharmacological and Pharmacokinetic Characteristics** **6**

**3.2      Clinical Pharmacology Review Questions** **6**

**3.2.1      To what extent does the available clinical pharmacology information provide pivotal or supportive evidence of effectiveness.** **6**

**3.2.2      Is the proposed dosing regimen appropriate for the general patient population for which the indication is being sought?** **9**

**3.2.3      What is the relative bioavailability of the proposed to-be-marketed formulation to the reference product?** **10**

**3.2.4      Is an alternative dosing regimen and/or management strategy required for subpopulations based on intrinsic factors?** **11**

**3.2.5      Are there clinically relevant food-drug or drug-drug interactions** **12**

**4      APPENDICES** **14**

**4.1      Summary of Bioanalytical Method Validation** **14**

Reference ID: 4872699

FDA-Jazz-000082

# 1    Executive Summary

Avadel Pharmaceuticals is seeking approval for Lumryz (Sodium oxybate ER oral suspension) for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy under the 505(b)(2) pathway using Xyrem as the reference product[1]. Avadel's rationale for the development of Lumrys was to create an oral suspension of sodium oxybate that could be dosed once at bedtime rather than by the divided dosing scheme of Xyrem®. Lumryz has been developed using controlled-release technology designed to extend and/or delay the absorption time of the drug.

The proposed Lumryz starting dosage is 4.5 grams (g) per night administered orally, then titrate to effect in increments of 1.5 g per night at weekly intervals to effective dosage range of 6 g to 9 g per night.

The clinical efficacy and safety of Lumryz for the treatment of cataplexy and excessive daytime sleepiness in narcolepsy has been established based on results from phase 3 double-blind, randomized, placebo-controlled study (CLFT218-1501). The co-primary endpoints for evaluating EDS in both NT1 and NT2 narcolepsy subjects were the mean sleep latency on the Maintenance of Wakefulness (MWT) and the CGI-Improvement (CGI-I). The primary endpoint for evaluating cataplexy was the number of cataplexy attacks (NCA, NT1 subjects only). Per the applicant conducted analysis, once-nightly Lumryz treatment at all tested dose (6 g, 7.5 g and 9 g) demonstrated statistically significant improvement compared to placebo on the three co-primary endpoints.

The application package also included the following key clinical pharmacology studies:

- Study PKFT218-1801 is a relative bioavailability pharmacokinetic study at the dose of 6 g to bridge Lumryz to the listed drug (Xyrem, NDA 21196). While the shape of the PK profile after the daily dosing is different, results from this study showed comparable total exposure (AUC) between Lumryz and the reference product Xyrem which supported the efficacy and safety of Lumryz.

- Study PKFT218-1601 is a PK study to assess the dose proportionality of Lumryz at doses of 4.5 g, 7.5 g and 9 g

- Study PKFT218-1901 is a drug-drug interaction study to assess the effect of divalproex sodium at steady state on the PK of Lumryz. Results from this study showed no significant PK interaction with divalproex sodium. However, since divalproex sodium is a sedative anti-epileptic drug that may lead to CNS depression, the PD interaction can't be ruled out. The PD interaction was not evaluated in this study and hence, no specific dose adjustment recommendation can be made. Accordingly, the review team recommends adding divalproex sodium as an example of sedating anti-epileptic drugs in section 5.1 to warn the risk of the concurrent use of Lumryz with divalproex sodium.

- Study PKFT218-1603 is a food effect study to assess the impact of high-fat food on the PK of Lumryz. Results from this study showed that food decreases Cmax and delays Tmax of

---

[1] Xyrem USPI: https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/021196s032lbl.pdf

3

FDA-Jazz-000083

Lumryz. Accordingly, the review team recommends that Lumryz should be taken at least 2 hours after eating, consistent with dosing recommendation in the pivotal efficacy study CLFT218

The primary focus of this review is to evaluate the adequacy of the bridging information and clinical pharmacology information to support the labeling of Lumryz.

The Office of Study Integrity and Surveillance (OSIS) was consulted for analytical site inspection for study PKFT218-1801. On 09/23/2021, OSIS concluded that the data from study PKFT218-1801 are reliable.

## 1.1    Recommendation

The Division of Neuropsychiatric Pharmacology has reviewed the submitted application and has found it acceptable for approval of Lumryz from a clinical pharmacology standpoint.

## 1.2    Post-marketing Requirement

None

## 2    Summary of Clinical Pharmacology Assessment

## 2.1    The Pharmacology and Clinical Pharmacokinetics

### *Mechanism of Action*

The mechanism of action of Lumryz in the treatment of narcolepsy is unknown. Sodium oxybate is the sodium salt of gamma-hydroxybutyrate (GHB), an endogenous compound and metabolite of the neurotransmitter GABA. It is hypothesized that the therapeutic effects of Lumryz on cataplexy and excessive daytime sleepiness are mediated through GABAB actions at noradrenergic and dopaminergic neurons, as well as at thalamocortical neurons.[1]

### *Absorption*

Following oral administration of Lumryz, the time to peak plasma concentration (Tmax) was 1.5 hours.

Following oral administration of Lumryz, the plasma levels of GHB increased more than dose-proportionally, with Cmax increasing approximately 2-fold and AUC increasing 2.3-fold as total daily dose is doubled from 4.5 g to 9 g.

Administration of Lumryz immediately after a high-fat meal resulted in a mean reduction in Cmax and AUC of GHB by 33% and 14% respectively, and average Tmax increased from 0.5 hr to 1.5 hr.

### *Distribution*

GHB is a hydrophilic compound with an apparent volume of distribution averaging 190 mL/kg to 384 mL/kg. At GHB concentrations ranging from 3 mcg/mL to 300 mcg/mL, less than 1% is bound to plasma proteins.[1]

### *Metabolism and Excretion*

---

[1]  Xyrem USPI: https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/021196s032lbl.pdf

4

FDA-Jazz-000084

Animal studies indicate that metabolism is the major elimination pathway for GHB, producing carbon dioxide and water via the tricarboxylic acid (Krebs) cycle and secondarily by beta-oxidation. No active metabolites have been identified.[1]

The clearance of GHB is almost entirely by biotransformation to carbon dioxide, which is then eliminated by expiration. On average, less than 5% of unchanged drug appears in human urine within 6 to 8 hours after dosing. Fecal excretion is negligible. GHB has a mean terminal elimination half-life of 0.5 to 1 hour.[1]

*Specific Population*

Lumryz should not be initiated in patients with hepatic impairment because appropriate dosage adjustments for initiation of Lumryz cannot be made with the available dosage strengths. Patients with hepatic impairment who have been titrated to a maintenance dosage of another oxybate product can be switched to Lumryz if the appropriate dosage strength is available (see section 3.2.4).

No pharmacokinetic study in patients with renal impairment has been conducted.

*Drug-Drug Interaction*

Studies *in vitro* with pooled human liver microsomes indicate that sodium oxybate does not significantly inhibit the activities of the human isoenzymes CYP1A2, CYP2C9, CYP2C19, CYP2D6, CYP2E1, or CYP3A, up to the concentration of 3 mM (378 mcg/mL), a level considerably higher than levels achieved with recommended doses.[1]

Co-administration of a single dose of Lumryz (6 g) with divalproex sodium ER at steady state resulted in comparable systemic exposure to GHB as shown by plasma Cmax and AUC values. A single dose of Lumryz (6 g) did not appear to affect the pharmacokinetics of divalproex sodium. However, since divalproex sodium is a sedative anti-epileptic drug that may lead to CNS depression, the potential of pharmacodynamic interaction between Lumryz and divalproex sodium cannot be ruled out (see section 3.2.5). The review team recommends adding divalproex sodium as an example of sedating anti-epileptic drugs in section 5.1.

## 2.2    Dosing and Therapeutic Individualization

*General dosing*

The proposed Lumryz starting dosage is 4.5 grams (g) per night administered orally, then titrate to effect in increments of 1.5 g per night at weekly intervals to effective dosage range of 6 g to 9 g per night orally.

*Therapeutic individualization*

The sponsor proposed that Lumryz is contraindicated for use in patients with hepatic impairment because appropriate dosage adjustments for initiation of Lumryz in patients with hepatic impairment cannot be made with the available dosage strengths. The review team recommends that patients with hepatic impairment who have been titrated to a maintenance dosage of another oxybate product can be switched to Lumryz. No therapeutic individualization

---

[1] Xyrem USPI: https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/021196s032lbl.pdf

5

**FDA-Jazz-000085**

CONFIDENTIAL

for other intrinsic or extrinsic factors is recommended (e.g. renal impairment).

## 2.3    Outstanding Issues

None.

## 2.4    Summary of Labeling Recommendations

The Office of Clinical Pharmacology review team accepts the labeling concepts proposed by the applicant, except for their proposal in the following sections.

Section 2.2

The applicant proposed that Lumryz can be given without regard for meals. The review team recommends that Lumryz should be taken at least 2 hours after eating, consistent with dosing recommendation in the pivotal efficacy study CLFT218-. Please refer section 3.2.5 for additional details.

Section 5.1 and 12.3

The applicant proposed that no dose adjustment is recommended for the concomitant use of Lumryz and divalproex sodium based on the pharmacokinetic observation in the DDI study (PKFT218-1901). As the pharmacodynamic interaction between Lumryz and divalproex sodium cannot be ruled out, the review team recommends revising the DDI study description in section 12.3, deleting the description of lack of interaction after Lumryz and divalproex sodium co-administration in section 5.1. The review team recommended combining divalproex sodium with  phenytoin, divalproex sodium, levetiracetam as examples of sedating anti-epileptic drugs in section 5.1. In this section there is warning language about the risk of concomitant use of this class of medications with Lumryz. Please refer section 3.2.5 for additional details.

Section 4 and 8.6

As the dose adjustment for patients with hepatic impairment cannot be made with the available dosage strengths. The sponsor proposed that Lumryz is contraindicated for use in patients with hepatic impairment. The review team recommends that Lumryz should not be initiated in patients with hepatic impairment. However, patients with hepatic impairment who have been titrated to a maintenance dosage of another oxybate product can be switched to Lumryz if the appropriate dose strength is available.

## 3    Comprehensive Clinical Pharmacology Review

## 3.1    General Pharmacological and Pharmacokinetic Characteristics

Please refer to the general clinical pharmacology information included in the USPI for the listed drug (Xyrem, NDA 21196) for additional details on distribution, metabolism and excretion of GHB.

## 3.2    Clinical Pharmacology Review Questions

### 3.2.1    To what extent does the available clinical pharmacology information provide pivotal or supportive evidence of effectiveness.

The evidence of effectiveness of Lumryz is primarily based on one phase 3 pivotal, multicenter,

FDA-Jazz-000086

CONFIDENTIAL

randomized, double-blind (DB), placebo-controlled, study (CLFT218-1501). Two populations of narcoleptic subjects (NT1 and NT2) were studied in a single parallel group design. Randomization methods stratified eligible subjects by narcolepsy type in a 1:1 ratio to treatment with either Lumryz or placebo. Subjects were randomized to achieve ≥ 70 completers per arm with EDS and ≥ 50 subjects per arm with both EDS and cataplexy. The study schematic is presented in Figure 1.

**Figure 1. CLFT218-1501 Study Schematic**



Abbreviations: D = day; EOS = end of study; EOSc = End of Screening; FU = Follow-up; Pbo = placebo; Rand = randomization; W = week; W/O = Washout
*Study visits where baseline assessment or full efficacy assessment were done extend into the following day and are thus indicated
**Up to 6 days were allowed between randomization (which occurred up to 2 days after the end of the screening period) and dosing to allow shipment of study drug to site. (Duration between end of screening period and dosing was to be ≤ seven days).

*Source: CLFT218-1501 CSR Figure 2 on page19;*

Three therapeutic doses were tested under forced up-titration (6.0, 7.5, and 9.0 g). The study design allowed for forced dose increments at fixed times from 4.5 g/night followed by 1.5 g/night increments until the final 9.0 g dose was reached. Subjects remained on the 4.5 g dose for 1 week, the 6.0 g dose for 2 weeks, the 7.5 g dose for 5 weeks, and the 9.0 g dose for 5 weeks, with safety and efficacy evaluations conducted over a 12-week period (total of 13 weeks on study drug).

The co-primary endpoints for evaluating EDS in both NT1 and NT2 narcolepsy subjects were the mean sleep latency on the MWT and the CGI for sleepiness. The primary endpoint for evaluating cataplexy was the NCA (NT1 subjects only).

Per the applicant conducted analysis in a hierarchical manner, study CLFT218-1501 met the pre-specified statistical criteria for 3 co-primary endpoint (summarized in Table 1-3 below) and six out of seven secondary endpoints (No significant differences in the Number of Hypnogogic Hallucinations were observed after treatment with any dose of Lumryz when compared to placebo). Additionally, the same patients were up-titrated from 4.5 g to 9.0 g, dose-response analysis indicated that higher efficacy was associated with increased doses in the same patients. Please refer to the clinical review and statistical review for further details.

7

FDA-Jazz-000087

**Table 1. MWT Mean Sleep Latency Change from Baseline (mITT Population)**

| Visit Treatment Group | N | Observed mean (SD) | LS mean (SE) of change from baseline | Difference from placebo | | |
|---|---|---|---|---|---|---|
| | | | | LS mean difference | 95% CI | P value[1] |
| Baseline | | | | | | |
| FT218 | 97 | 5.0 (3.15) | — | — | — | — |
| Placebo | 93 | 4.7 (2.58) | — | — | — | — |
| Change to Visit 4 (Week 3) | | | | | | |
| 6.0 g FT218 | 87 | 8.1 (8.38) | 8.1 (0.75) | 4.98 | 2.90, 7.05 | < 0.001 |
| Placebo | 88 | 3.1 (5.15) | 3.1 (0.74) | — | — | — |
| Change to Visit 6 (Week 8) | | | | | | |
| 7.5 g FT218 | 76 | 9.6 (9.24) | 9.6 (0.86) | 6.21 | 3.84, 8.58 | < 0.001 |
| Placebo | 78 | 3.0 (5.63) | 3.3 (0.84) | — | — | — |
| Change to Visit 8 (Week 13) | | | | | | |
| 9.0 g FT218 | 68 | 10.5 (8.89) | 10.8 (0.96) | 6.13 | 3.52, 8.75 | < 0.001 |
| Placebo | 78 | 4.5 (7.40) | 4.7 (0.92) | — | — | — |

**Table 2. Summary of CGI of Sleepiness over Time (mITT Population)**

| Visit Treatment Group | N | Observed mean (SD) | Response rate (% much improved or very much improved) | Odds ratio | 95% CI | P value[1] |
|---|---|---|---|---|---|---|
| CGI-Severity at baseline[2] | | | | | | |
| FT218 | 96 | 5.1 (1.12) | — | — | — | — |
| Placebo | 92 | 5.1 (1.15) | — | — | — | — |
| CGI-Improvement at Visit 4 (Week 3) | | | | | | |
| 6.0 g FT218 | 87 | 2.7 (0.89) | 40.1 | 10.29 | 3.93, 26.92 | < 0.001 |
| Placebo | 87 | 3.6 (0.87) | 6.1 | — | — | — |
| CGI-Improvement at Visit 6 (Week 8) | | | | | | |
| 7.5 g FT218 | 75 | 2.4 (0.90) | 62.6 | 5.67 | 2.82, 11.40 | < 0.001 |
| Placebo | 81 | 3.3 (1.10) | 22.8 | — | — | — |
| CGI-Improvement at Visit 8 (Week 13) | | | | | | |
| 9.0 g FT218 | 69 | 2.1 (0.89) | 72.0 | 5.56 | 2.76, 11.23 | < 0.001 |
| Placebo | 79 | 3.1 (1.07) | 31.6 | — | — | — |

Reference ID: 4872699

FDA-Jazz-000088

CONFIDENTIAL

**Table 3. Summary of CGI of Sleepiness over Time (mITT Population)**

| Visit Treatment group | N | Observed mean (SD) | N | LS mean (SE) of change from baseline | Difference from placebo | | |
|---|---|---|---|---|---|---|---|
| | | | | | LS mean difference | 95% CI | P value[1] |
| Baseline | | | | | | | |
| FT218 | 73 | 18.9 (8.70) | — | — | — | — | — |
| Placebo | 72 | 19.8 (8.87) | — | — | — | — | — |
| Change to Visit 4 (Week 3) | | | | | | | |
| 6.0 g FT218 | 73 | −7.1 (6.68) | 73 | −7.4 (0.79) | −4.83 | −7.04, −2.62 | < 0.001 |
| Placebo | 72 | −2.7 (7.40) | 72 | −2.6 (0.79) | — | — | — |
| Change to Visit 6 (Week 8) | | | | | | | |
| 7.5 g FT218 | 62 | −10.4 (8.36) | 66 | −10.0 (0.89) | −6.27 | −8.74, −3.81 | < 0.001 |
| Placebo | 66 | −4.1 (8.40) | 69 | −3.7 (0.88) | — | — | — |
| Change to Visit 8 (Week 13) | | | | | | | |
| 9.0 g FT218 | 54 | −11.5 (9.22) | 55 | −11.5 (0.96) | −6.65 | −9.32, −3.98 | < 0.001 |
| Placebo | 62 | −4.9 (8.67) | 62 | −4.9 (0.95) | — | — | — |

*Source: CLFT218-1501 CSR Figure 18, 19 and 20 on pages 70, 71 and 72;*

### 3.2.2  Is the proposed dosing regimen appropriate for the general patient population for which the indication is being sought?

In study CLFT218-1501, the efficacy and safety of the following dosing regimen were evaluated in narcoleptic subjects (NT1 and NT2): starting dose of 4.5 g per night for 1 week, followed by increments of 1.5 g per night to 6 g per night for 2 weeks, then increased to 7.5 g dose per night for 5 weeks, and the 9.0 g dose per night for 5 weeks.

The proposed dosing regimen is similar to those evaluated in the pivotal phase 3 study where they demonstrated efficacy by meeting the pre-specified statistical criteria 3 co-primary endpoints (summarized in Table 1-3, section 3.2.1).

Lumryz was generally safe and tolerated for all doses evaluated in study CLFT218-1501. The most common AEs and adverse reactions were nausea, headache, vomiting, dizziness, enuresis, and decreased appetite. In general, these findings are consistent with the known safety profile of sodium oxybate.  Please refer to the clinical safety review by Dr. Ranjit Mani for further details.

It should also be noted that the total daily exposures for the proposed doses for Lumryz are similar to exposures obtained from Xyrem. Study PKFT218-1801 suggested that the overall (AUC0-t and AUC0-inf) and peak (Cmax) exposures of GHB following treatment with 6.0 g Lumryz as a single dose were comparable to those after two doses of US Xyrem 3.0 g four hours apart with the 90% CI of geometric mean ratios for AUCs and Cmax were within the limits of 80%-125%. Please refer to section 3.2.3 for more details. In addition, results from study PKFT218-1601 showed that following oral administration of Lumryz, the plasma levels of GHB increased more than dose-proportional manner. Cmax increasing approximately 2-fold and AUC increasing 2.3-fold as total daily dose is doubled from 4.5 g to 9 g. With Xyrem  (immediate

9

FDA-Jazz-000089

CONFIDENTIAL

release formulation of GHB), the plasma levels of GHB also increased more than dose-proportionally, with blood levels increasing 3.7-fold as total daily dose is doubled from 4.5 g (2.25g administered twice 4h apart) to 9 g (4.5g administered twice 4h apart). Based on this information the exposures of GHB following oral administration of Lumryz at 6 g, 7.5 g and 9 g are expected to be comparable (for daily doses equal or lower than 6 gm) or lower (for higher doses) when compared to corresponding Xyrem dose levels (administered twice 4h apart). Therefore, the safety of Lumryz at 6 g, 7.5 g and 9 g can be covered by the safety findings of Xyrem at the same doses.

Overall, the proposed dosing regimen is supported by the efficacy and safety results in study CLFT218-1501 and clinical pharmacology studies (PKFT218-1801 and PKFT218-1601).

### 3.2.3 What is the relative bioavailability of the proposed to-be-marketed formulation to the reference product?

A Phase 1 comparative pharmacokinetic study (PKFT218-1801) was conducted to evaluate the relative bioavailability of Lumryz compared with the reference listed product (US Xyrem). Results from this relative bioavailability study was used to bridge the safety of Lumryz to the reference listed product (US Xyrem). In study PKFT218-1801, healthy adult volunteers received a single oral dose of 6.0 g of Lumryz (taken two hours after an evening meal) and two oral doses of 3.0 g of US Xyrem (taken two hours after an evening meal and again four hours later). Plasma GHB concentrations vs. time profiles for both treatments are illustrated in [Figure 2](#). Lumryz showed different shape of GHB concentrations vs. time profile as compared to Xyrem. Therefore, the sponsor conducted a phase 3 study (CLFT218-1501) as confirmatory efficacy study.

**Figure 2. Mean (SD) Plasma GHB Concentration vs. Time Profiles for 6.0 g FT218 and 6.0 g USXyrem, Linear Scale**



*Source: PKFT218-1801 CSR Figure 1 on 41;*

The geometric means of AUC0-t, AUC0-inf, and Cmax following treatment with 6.0 g Lumryz as a

Reference ID: 4872699

FDA-Jazz-000090

single dose were comparable to those following two doses of US Xyrem 3.0 g four hours apart with 90% CIs were contained within the 80% to 125% range (see Table 4). However, at higher doses (e.g., 7.5 and 9 g), the exposures of GHB following oral administration of Lumryz are expected to be lower than those after oral administration of Xyrem at the same doses (administered twice 4h apart), as Lumryz demonstrates different dose proportionality profile as compared to Xyrem (see section 3.2.2 for further details).

**Table 4. Summary of Relative Bioavailability Study (PKFT218-1801)**

| PK parameter (unit) | Geometric LS means | | | | Geometric mean ratio | 90% CI | Intra-subject %CV |
|---|---|---|---|---|---|---|---|
| | n | Test (A) | n | Reference (B) | | | |
| $AUC_{0-t}$ (µg•h/mL) | 23 | 241.09 | 23 | 234.37 | 102.87 | 97.96, 108.02 | 9.58 |
| $AUC_{0-inf}$ (µg•h/mL) | 23 | 241.83 | 23 | 235.10 | 102.87 | 97.96, 108.02 | 9.57 |
| $C_{max}$ (µg/mL) | 23 | 62.80 | 23 | 71.09 | 88.34 | 80.48, 96.96 | 18.36 |
| $C_{8h}$ (µg/mL) | 20 | 2.2642 | 23 | 3.6720 | 61.66 | 45.82, 82.98 | 58.23 |

*Source: PKFT218-1801 CSR Table 12 on 45;*

### 3.2.4 Is an alternative dosing regimen and/or management strategy required for subpopulations based on intrinsic factors?

According to the USPI of Xyrem, AUC values were double in patients with hepatic impairment compared to healthy adults, hence starting dosage in patients with hepatic impairment is one-half of the original dosage per night due to the increased exposure in patients with hepatic impairment. However, appropriate dosage adjustments for initiation of Lumryz in patients with hepatic impairment cannot be made with the available dosage strengths. Therefore, the sponsor proposed to contraindicate the use of Lumryz in patients with hepatic impairment. The review team recommended that Lumryz should not be initiated in patients with hepatic impairment. However, patients with hepatic impairment who have been titrated to a maintenance dosage of another oxybate product can be switched to Lumryz if the appropriate dose strength is available. Dose proportionality data from study PKFT218-1601 suggested Lumryz exhibited different dose proportionality profile from that of Xyrem, the exposure of GHB following oral administration of Lumryz at 9 g are expected to be slightly lower than the corresponding equivalent daily dose of Xyrem (4.5 g X2) (section 3.2.2). However, patients with hepatic impairment should not be exposed to 9 g of Lumryz because those patients are expected to have doubled exposure compared to patients with normal hepatic function. 4.5 g dose of Lumryz in patients with hepatic impairment should yield similar exposure to the highest approved dose (9 g) for patients with normal hepatic function. 4.5 g dose of Lumryz is expected to give the exposure comparable to that of 2.25 gX2 dose of the reference product (Xyrem, NDA 21196). It should be noted that the exposure of the 9 gm Lumryz dose was shown to be effective based on results from study CLFT218-1501.

11

FDA-Jazz-000091

CONFIDENTIAL

### 3.2.5   Are there clinically relevant food-drug or drug-drug interactions

***Food-drug interactions***

Food-effect study conducted in healthy subjects indicated that high fat food reduced the Cmax and AUC of GHB by 33% and 14%, respectively (Study PKFT218-1603). Tmax was delayed (approximately 1 hour's delay) in the presence of high fat food. As the geometric means ratio for Cmax was 66.74%, with the associated 90% CI of 58.2%-76.5%, which was not contained in the standard equivalence limits of 80.00%-125.00%. The food effect study results are not adequate to support the sponsor proposed recommendation that Lumryz may be taken without regard to meals. The review team recommends that Lumryz should be administered at least 2 hours after taking food, which is the same recommendation as the listed drug (Xyrem, NDA 21196). Additionally, this dose instruction was based on the dosing instructions for the pivotal efficacy study (CLFT218-1501), in which study subjects were instructed to take their nightly dose at least 2 hours after eating.

***Drug-drug interaction***

In a single-center, open-label, sequential drug-drug interaction study (PKFT218-1901), the pharmacokinetics (PK) of a single 6-g dose of Lumryz with or without 1250 mg/day divalproex sodium ER at steady-state were evaluated in 24 healthy male subjects. All enrolled subjects received three sequential treatments: 6 g Lumryz (Day 1), daily administration of 1250 mg/day divalproex sodium ER to reach steady-state (Day 2 to Day 11), and co-administration of 1250 mg divalproex sodium ER and 6 g Lumryz, with divalproex sodium ER administered first (Day 12). The PK parameters for GHB were calculated for Lumryz treatments without and with divalproex sodium ER on Day 1 and Day 12, respectively, with blood samples collected pre-dose and 10, 20, and 30 minutes, and 1, 1.5, 2, 2.5, 3, 3.5, 4, 4.5, 5, 5.5, 6, 7, 8, 10, 12, and 14 hours post-dose.

The PK parameters for GHB were calculated for Lumryz treatments without and with divalproex sodium ER in the evening of Day 1 and Day 12, respectively (see Table 5). The Cmax, AUC0-inf, and AUC0-t for GHB following co-administration of 6 g Lumryz and 1250 mg divalproex sodium ER (Test [T]) were compared to administration of 6 g Lumryz (Reference [R]). As shown in Table 6, the 90% CIs of the ratio of the mean of Cmax, AUC0-inf, and AUC0-t were within the accepted 80% to 125% equivalence range with T/R [90% CI]: 98.46 [91.58-105.85], T/R [90% CI]: 117.52 [111.99-123.32], and T/R [90% CI]: 117.42 [112.09-123.01], respectively. Mean tmax was delayed by approximately 0.4 hour.

Reference ID: 4872699

FDA-Jazz-000092

CONFIDENTIAL

**Table 5: Summary of GHB Plasma Pharmacokinetic Parameters**

| Parameter (unit) | Statistic | Day 1 | Day 12 |
|---|---|---|---|
| $C_{max}$ (µg/mL) | n | 24 | 23 |
| | Geometric mean | 77.2 | 75.6 |
| | Mean | 79.8 | 77.8 |
| | Min - Max | 36.9 - 128 | 50.8 - 119 |
| $t_{max}$ (h) | n | 24 | 23 |
| | Median | 1.26 | 2.00 |
| | Mean | 1.33 | 1.74 |
| | Min - Max | 0.33 - 3.00 | 0.33 - 3.50 |
| $C_{8h}$ (µg/mL) | n | 24 | 23 |
| | Geometric mean | 2.25 | 5.45 |
| | Mean | 4.01 | 10.6 |
| | Min - Max | 0.208 - 16.7 | 0.296 - 41.6 |
| $AUC_{0-8h}$ (h·µg/mL) | n | 24 | 23 |
| | Geometric mean | 285 | 331 |
| | Mean | 304 | 356 |
| | Min - Max | 104 - 581 | 105 - 680 |
| $AUC_{0-t}$ (h·µg/mL) | n | 24 | 23 |
| | Geometric mean | 288 | 340 |
| | Mean | 307 | 368 |
| | Min - Max | 104 - 595 | 105 - 749 |
| $AUC_{0-inf}$ (h·µg/mL) | n | 23 | 22 |
| | Geometric mean | 293 | 347 |
| | Mean | 312 | 375 |
| | Min - Max | 104 - 595 | 107 - 749 |
| $t_{1/2}$ (h) | n | 23 | 22 |
| | Geometric mean | 0.591 | 0.699 |
| | Mean | 0.608 | 0.716 |
| | Min - Max | 0.409 - 1.11 | 0.435 - 1.23 |

GHB=gamma-hydroxybutyric acid; Max=maximum; Min=minimum; n=number of subjects in this category

*Source: PKFT218-1901 CSR Table 8 on 59;*

13

FDA-Jazz-000093

**Table 6. Drug-Drug Interaction Statistical Analysis of GHB Pharmacokinetic Parameters**

| Treatment Comparison (Test vs. Reference) | PK Parameter | Geometric LS means | | | | Ratio Test/Reference 90% CI | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Test | n | Reference | n | Estimate % | Lower % | Upper % | ISCV% |
| DVP+FT218 vs. FT218 | $C_{max}$ (µg/mL) | 75.6 | 23 | 76.8 | 23 | 98.46 | 91.58 | 105.85 | 14.4 |
| | $AUC_{0-inf}$ (h·µg/mL) | 347 | 22 | 295 | 22 | 117.52 | 111.99 | 123.32 | 9.3 |
| | $AUC_{0-t}$ (h·µg/mL) | 340 | 23 | 289 | 23 | 117.42 | 112.09 | 123.01 | 9.2 |

*Source: PKFT218-1901 CSR Table S3 on 12;*

Based on the PK results from study PKFT218-1901, the review team concluded that the impact of divalproex sodium at steady state on the pharmacokinetics of Lumryz was not significant. However, the pharmacodynamic interactions between Lumryz and divalproex sodium were not evaluated in this study, the pharmacodynamic based interactions cannot be ruled out. According to clinical experience, co-administration of sodium oxybate and sedating anti-epileptic drugs may increase the risk of certain adverse reactions. Therefore, the review team recommends adding divalproex sodium as an example of sedating anti-epileptic drugs in section 5.1 to warn that the concurrent use of Lumryz with sedating anti-epileptic drugs (e.g., phenytoin, divalproex sodium, levetiracetam), may increase the risk of respiratory depression, hypotension, profound sedation, syncope, and death. If use of the CNS depressants (including sedating anti-epileptic drugs) in combination with Lumryz is required, dose reduction or discontinuation of one or more CNS depressants should be considered. Please refer to the clinical review for further details.

## 4    APPENDICES

### 4.1    Summary of Bioanalytical Method Validation

A validated liquid chromatography with tandem mass spectrometry (LC-MS-MS) method with GHB-D6 as internal standard was employed for determining the concentrations of gamma-hydroxybutyric acid (GHB) in human plasma. The sample analysis was conducted in accordance with the FDA Guidance for the Industry, Bioanalytical Method Validation. Summary of bioanalytical methods validation is provided in Table 7.

**Table 7. Summary of the GHB Assay Analytical Method Validation in Human Plasma**

| Validation Parameters | Results: |
|---|---|
| Lower Limit of Quantitation (LLOQ) | 0.200 ug/mL |
| Calibration Concentrations (ug/mL) | 0.200; 0.600; 2.00; 10.0; 25.0; 75.0; 120; 150 |
| QC concentrations (ug/mL) | 0.200; 0.600; 75.0; 120 |

14

FDA-Jazz-000094

CONFIDENTIAL

| Inter-Run Accuracy and Precision | Biases: -3.1 to 10.8%; CV: 3.6 to 6.8% |
|---|---|
| Intra-Run Accuracy and Precision | Biases: -7.8 to 19.1%; CV: 1.0 to 4.6% |
| Stability Period at Automatic Sampler Temperature | Stable for 311 hours 37 minutes at + 4°C |
| Bench Top Stability | Stable for 2 hours at room temperature in plasma |
| 3 Freeze and Thaw Stability | Stable after 3 cycles freeze (at -80°C) and thaw (room temperature) cycles |
| Short-Term Stability of Analyte in Matrix | Stable 4 hours at room temperature (after a freezing period at -80°C) |
| Long-term storage stability in Matrix | Stable 44 days at -80°C |

*Source: PKH/MOA/294 method validation report*

The validated assay performance was reviewed individually for the key clinical pharmacology studies. Accuracy and precision of QC samples were ≤15% (and ≤20% at LLQ), and calibration curves for the LC-MS/MS bioanalytical assay were within acceptable limits.

Reference ID: 4872699

FDA-Jazz-000095

CONFIDENTIAL

--------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

------------------------------------------------------------

DAWEI LI
10/14/2021 09:34:24 PM

BILAL S ABU ASAL
10/14/2021 09:36:48 PM

FDA-Jazz-000096

# EXHIBIT 94

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 95

# REDACTED

# IN ITS ENTIRETY

# EXHIBIT 96

# REDACTED

# IN ITS ENTIRETY