**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

JAZZ PHARMACEUTICALS, INC.,

     Plaintiff and Counter-Defendant,

     v.

AVADEL CNS PHARMACEUTICALS, LLC,

     Defendant and Counter-Plaintiff

C.A. No. 22-941-GBW



PUBLIC VERSION FILED: June 20, 2025

**AVADEL'S REPLY BRIEF IN SUPPORT OF ITS
<u>SUMMARY JUDGMENT AND *DAUBERT* MOTIONS</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     AVADEL'S REPLIES IN SUPPORT OF ITS MOTIONS FOR PARTIAL
        SUMMARY JUDGMENT ................................................................................. 1

        A.      Motion No. 1: The Court Should Grant Partial Summary Judgment on
                Jazz's Regulatory Compliance Defense.................................................. 1

        B.      Motion No. 2: The Court Should Grant Partial Summary Judgment That
                Jazz Engaged in Anticompetitive Conduct by Improperly Listing the '963
                Patent...................................................................................................... 10

III.    AVADEL'S REPLIES IN SUPPORT OF ITS *DAUBERT* MOTIONS ......................... 15

        A.      Anupam Jena............................................................................................ 15

        B.      Iain Cockburn........................................................................................... 18

        C.      Jonathan Singer........................................................................................ 20

        D.      Daniel Troy .............................................................................................. 22

IV.     CONCLUSION................................................................................................. 25

ME1\53522277.v1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
   806 F.3d 162 (3d Cir. 2015)....................................................................................11

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006)..................................................................................2, 5

*Bouriez v. Carnegie Mellon Univ.*,
   585 F.3d 765 (3d Cir. 2009)......................................................................................2

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)..............................................................................11, 14

*Crawford v. George & Lynch, Inc.*,
   19 F. Supp. 3d 546 (D. Del. 2013)............................................................................4

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
   2014 WL 1343254 (D.N.J. Mar. 28, 2014).............................................................12

*In re Actos Antitrust Litig.*,
   2025 WL 1001259 (S.D.N.Y. Mar. 31, 2025) ............................................... *passim*

*In re Actos End-Payor Antitrust Litig.*,
   848 F.3d 89 (2d Cir. 2017)......................................................................................13

*In re Androgel Antitrust Litig. (No. II)*,
   2018 WL 2984873 (N.D. Ga. June 14, 2018).........................................................12

*In re Lantus Direct Purchaser Antitrust Litig.*,
   No. 1:16-cv-12652-LTS-JCB (D. Mass. Mar. 21, 2025).........................................5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   No. 15-2005 (1st Cir. 2016)....................................................................................12

*In re Wellbutrin XL Antitrust Litig.*,
   No. 15-3559 (3rd Cir. 2016) ...................................................................................12

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
   549 F. Supp. 3d 362 (D. Del. 2021)..........................................................................7

*Le Page's Inc. v. 3M*,
   324 F.3d 141 (3rd Cir. 2003) ..................................................................................14

## TABLE OF AUTHORITIES
(continued)

**Page**

*Mikulan v. Allegheny Cnty.*,
  2017 WL 2374430 (W.D. Pa. May 31, 2017)..............................................................5

*Paxton v. Provention Bio, Inc.*,
  2022 WL 3098236 (D.N.J. Aug. 4, 2022) ..................................................................8

*Phonetele, Inc. v. Am. Tel. & Tel. Co.*,
  664 F.2d 716 (9th Cir. 1981), *modified*, 1982 WL 11277 (9th Cir. Mar. 15, 1982) ........................................................................................................................10

*Read v. Profeta*,
  397 F. Supp. 3d 597 (D.N.J. 2019) ............................................................................7

*United Healthcare Services, Inc. v. Gilead Sciences, Inc.*,
  No. 24-1585 (N.D. Cal. 2024) ..................................................................................12

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc) ....................................................................11

*Upsher-Smith Lab'ys, LLC v. Zydus Pharms. (USA) Inc.*,
  2024 WL 3487935 (D. Del. July 18, 2024) ............................................................2, 5

## STATUTES

15 U.S.C. §§ 2.............................................................................................................11

15 U.S.C. §§ 15, 26...................................................................................................11

## RULES

Fed. R. Civ. P. 26(e)(1)................................................................................................7

Fed. R. Civ. P. 37(c)(1)................................................................................................7

Fed. R. Civ. P. 30(b)(6)................................................................................................4

Fed. R. Evid. 702 ........................................................................................................1

## I.    INTRODUCTION

Jazz cannot avoid summary judgment on the two discrete grounds raised in Avadel's motions. First, as to Jazz's regulatory compliance defense, the record makes clear that Jazz invoked privilege to shield from discovery all evidence that could establish its purported good-faith belief that it was required by law to list and maintain the '963 patent in the Orange Book. Jazz cannot now use the privilege as a sword to create a genuine factual dispute. In any event, Jazz has failed to (and cannot now) produce any admissible evidence showing that the individuals with actual knowledge—its in-house and outside counsel—held or communicated any good-faith belief about the propriety of listing the '963 patent. Absent such evidence, Jazz's defense necessarily fails. Second, this Court's holding that Jazz's listing was improper is dispositive of the anticompetitive conduct element of Avadel's monopolization claims. Jazz is simply wrong as a matter of law that Avadel must prove causation or monopoly power to be entitled to partial summary judgment on that element.

Jazz's opposition also fails to salvage the opinions of its four challenged experts, each of whom offers inadmissible testimony that should be excluded under Rule 702. Jazz's arguments cannot cure the fundamental defects in these opinions: Dr. Jena and Dr. Cockburn provide irrelevant and speculative commentary untethered to the challenged conduct; Mr. Singer's opinions rest on legal interpretations directly foreclosed by the Federal Circuit; and Mr. Troy's opinions are both circular and premised on legal error.

## II.    AVADEL'S REPLIES IN SUPPORT OF ITS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A.    Motion No. 1: The Court Should Grant Partial Summary Judgment on Jazz's Regulatory Compliance Defense

In moving for partial summary judgment on Jazz's regulatory compliance defense, Avadel demonstrated that Jazz must show that its decision to list—and refusal to delist—the '963 patent

1

reflected a genuine, subjective good-faith belief that it was required to do so in order to comply with the law. D.I. 267 at 8-10. Notably, at the outset of this case, Jazz wrongly insisted that "it is improper to import a requirement of subjective good faith into an antitrust case alleging an improper Orange Book listing."[1] D.I. 28 at 6. Jazz now concedes, however, that its defense requires evidence of subjective good faith. D.I. 287 at 4-9.

To create a triable issue on its good-faith defense, Jazz must identify admissible evidence that would support a jury finding in its favor. *See Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770-71 (3d Cir. 2009) (there must be "sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted"). Jazz does not come close to doing so.

> 1. **Jazz cannot use attorney-client privilege as a sword and a shield to create a disputed question of fact.**

Jazz tries to weaponize attorney-client privilege by pointing to deposition testimony and claiming that Jazz "***believed*** its REMS patents qualified as method-of-use patents," "was trying to comply with its regulatory obligations," and its "decision was made based on whether the patent 'met the requirements for listing.'" D.I. 287 at 5-6. This effort, its lead argument, fails for multiple reasons.

***First***, as a matter of law, Jazz may not assert belief in a legal conclusion, while blocking discovery of the source of that belief. This is the very definition of using attorney-client privilege as a sword and a shield, which courts strictly prohibit on account of the manifest injustice and prejudice that would otherwise be inflicted on the other party. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 221 n.24 (3d Cir. 2006) (at summary judgment, "the attorney-client privilege

---

[1] Unless otherwise noted, all quoted material is cleaned up, and emphases are added.

cannot be used as both a 'shield' and a 'sword'"); *Upsher-Smith Lab'ys, LLC v. Zydus Pharms. (USA) Inc.*, 2024 WL 3487935, at *2 (D. Del. July 18, 2024) (Williams, J.) ("[A] party cannot take a position in litigation and then erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position.").

Discovery has established that legal advice is the only source for Jazz's "belief" as to whether the '963 patent claimed a method of using Xyrem and thus had to be listed. In responding to an interrogatory that asked it ███████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████. In short, Jazz made a binding admission that its lawyers are the only people who have relevant substantive knowledge. ████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████.

Jazz imposed a complete block on any discovery into the legal advice that it received from its outside or in-house counsel, thus concealing the grounds for any ostensible good faith "belief" that the law requires the listing of the '963 patent. In pleading its affirmative defense, Jazz stressed: "For avoidance of doubt, Jazz does not invoke advice of counsel or waive privilege by asserting this defense." D.I. 99 at 63. ████████████████████████████████████ ███████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

Lest there be any doubt, when Avadel deposed Jazz's 30(b)(6) witness, he was instructed

not to provide any information regarding Jazz's subjective intent in listing the '963 patent: ██

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████. That Rule 30(b)(6) testimony is binding on

Jazz. *See Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 554 (D. Del. 2013).

4

While a defendant might in some cases be able to point to evidence of good faith that did not take the form of legal advice, Jazz cannot do so here.[2] That is because its binding admissions in discovery establish that the **only** people (in Jazz's words) to "have knowledge regarding Jazz's basis for concluding that it was required to list the '963 patent in the Orange Book" are attorneys. It is Jazz's right to shut off discovery into what advice four different outside law firms and two in-house counsel actually provided. But, having made that decision, Jazz cannot also point to the asserted existence of a "belief" stemming from that undisclosed advice and use it to create a genuine dispute of material fact. The courts do not allow defendants to have it both ways in invoking privilege. *See Berckeley*, 455 F.3d at 221 n.24; *Upsher-Smith Lab'ys*, 2024 WL 3487935, at *2; *see also Mikulan v. Allegheny Cnty.*, 2017 WL 2374430, at *6 (W.D. Pa. May 31, 2017) ("It would be extremely unfair to allow the [defendant] to withhold [certain] evidence from [the plaintiff] in discovery and then allow the [defendant] to turn around and argue that it did not discriminate against [the plaintiff] based on the withheld legal advice."). In short, having utilized the attorney-client privilege as a shield, Jazz is estopped from asserting that it possesses other, ostensibly non-privileged evidence of good faith.

**Second**, none of the evidence to which Jazz cites could **possibly** qualify as showing subjective good faith, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* D.I. 287 at 5-9. Jazz has proffered no testimony from either employee—nor could it, given its emphatic and repeated invocation of privilege. Thus, given Jazz's admissions on the issue, the proffered "evidence" from Jazz

---

[2] Naturally, privileged communications are the most direct and commonly used form of evidence for this purpose in antitrust cases involving improper Orange Book listings. *See, e.g.*, *In re Actos Antitrust Litig.*, 2025 WL 1001259, at *6-8, 30 (S.D.N.Y. Mar. 31, 2025); Ex. 100, *In re Lantus Direct Purchaser Antitrust Litig.*, No. 1:16-cv-12652-LTS-JCB (D. Mass. Mar. 21, 2025), D.I. 585 at 29-30.

axiomatically cannot establish subjective good faith as it does not come from the only actors who Jazz has asserted possessed the requisite and subjective good-faith belief.

**Third**, even if the testimony that it cites were taken at face value, Jazz does not identify any evidence that Jazz or any of its witnesses held any belief that **the '963 patent**—specifically—claimed a method of using Xyrem. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ D.I. 287 at 5-6. But that testimony is generic and divorced from the '963 patent. When questioned on that specific issue—the lone pertinent issue to Jazz's defense—Jazz refused to permit its corporate designee to provide **any** substantive answer:

████████████████████████████████████. In short, Jazz's belief as to whether other patents qualified for listing is beside the point for purposes of this motion. This motion turns on whether Jazz can point to admissible evidence that would allow a jury to find that Jazz listed and refused to delist the '963 patent, specifically, in good faith. As to that question, Jazz prevented its witnesses—including its corporate designee—from providing any such evidence.

**Finally**, in discovery, Avadel served an interrogatory asking Jazz to █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 101, Jazz's Resps. to Avadel's First Set of Rogs. at 7. ████████████████████████ ████████████████████████████. *See id.* at 7-9. Jazz did not disclose, whether at the time or through timely supplementation, **any** of the deposition testimony that it now

cites in opposing summary judgment—or the other "circumstantial" evidence addressed below—even though discovery closed almost two months ago. *See* Fed. R. Civ. P. 26(e)(1) (requiring timely supplementation or correction of interrogatory responses). This failure requires preclusion because there is no justification for Jazz's attempt to prejudicially spring this "evidence" upon Avadel at the close of dispositive briefing. Fed. R. Civ. P. 37(c)(1); *see Intuitive Surgical, Inc. v. Auris Health, Inc.*, 549 F. Supp. 3d 362, 378 n.13 (D. Del. 2021) (a party's "failure to disclose [certain] information during discovery precludes [that party's] use of the information to oppose [a] motion for summary judgment"); *see also Read v. Profeta*, 397 F. Supp. 3d 597, 648 (D.N.J. 2019).

The lone exceptions are (1) Jazz's listing form for the '963 patent, and (2) its letter disputing Avadel's delisting request. Ex. 101 (Jazz's Responses and Objections to Rog. 3) at 7-9. Neither creates a genuine dispute, however. Most fundamentally, Avadel alleges that **both** actions constitute exclusionary and wrongful conduct, and a wrongful act can hardly qualify as evidence of good faith for that very act. D.I. 14 ¶¶ 54-55. Indeed, neither even remotely qualifies as evidence of subjective belief. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████. Having precluded examination as to any substantive basis for either act—and having failed to offer a subjective good-faith rationale for those acts—Jazz is estopped from invoking those improper actions as evidence of its subjective beliefs.

### 2. Jazz's non-deposition, "circumstantial" evidence does not create a triable issue as to Jazz's subjective intent.

Jazz's "circumstantial" evidence fails to establish a genuine factual dispute that it listed and refused to delist the '963 patent based on a good-faith belief that it was required to do so by law.

*First*, Jazz points to "contemporaneous public statements" as "evidence from which a

reasonable jury could find Jazz's subjective good faith" because "Jazz *consistently* stated that it believed its REMS patents qualified for listing as method-of-use patents." D.I. 287 at 6. Even if Jazz were correct that it had "consistently" adhered to this public view—which it did not (D.I. 293 at 26-27)—such a fact would not in itself support a jury finding in its favor. The only case that Jazz cites in support of its proposition, *Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *17 (D.N.J. Aug. 4, 2022), has no bearing on this situation at all. *Paxton* was an alleged securities-fraud case in which the court found that the defendants "expressly acknowledged" the facts that they were alleged to have improperly concealed, undercutting an inference of scienter. *Id.* Here, the inquiry is whether Jazz "acted out of a subjective belief that its conduct was required by regulatory law, as opposed to for 'competitive' reasons." *In re Actos Antitrust Litig.*, 2025 WL 1001259, at *20 (S.D.N.Y. Mar. 31, 2025) ("*Actos II*"). Jazz's public characterizations of the '963 patent are not probative of Jazz's actual "subjective intent." Nor are these statements colorable evidence that Jazz did not list and refuse to delist the '963 patent for "competitive reasons." *Id.*

**Second**, Jazz argues that the "law required Jazz to list all patents it **believed** eligible for listing in the Orange Book within 30 days of issuance." D.I. 287 at 6. This argument depends on a predicate showing that Jazz actually "believed" that the '963 patent claimed a method of use—i.e., it requires showing that Jazz acted in good faith in listing the patent. Jazz cannot present this argument as an independent evidentiary basis to support a jury finding of good faith. It is purely circular. And, as discussed above, having invoked privilege to prevent discovery into the basis for its belief, Jazz cannot now use that undisclosed belief to create a factual dispute on good faith.

**Third**, Jazz claims that "there is no evidence that Jazz knew [the '963 patent listing] would provide any bar to any drug approval or any other alleged competitive advantage" or that "Jazz knew there would necessarily be any additional ANDA or 505(b)(2) filers at all" when it listed the

patent in 2014. D.I. 287 at 6-7. But the question at this juncture, when Avadel has moved for summary judgment on an affirmative defense for which Jazz bears the burden of proof, is whether *Jazz* can identify admissible evidence showing that it subjectively believed listing and maintaining the '963 patent in the Orange Book was compelled by law. Jazz has emphatically and repeatedly asserted that all evidence on that question is privileged.

In any event, the fact that Jazz had "already eleven patents listed in the Orange Book for Xyrem" with some "set to expire . . . *after* the '963 patent," D.I. 287 at 6-7, does not support Jazz's desired inference. It is a non sequitur to suggest that Jazz's practice of listing REMS patents (a practice challenged as anticompetitive before the '963 patent listing) "supports a finding that Jazz listed the patent for regulatory compliance reasons, as opposed to commercial reasons[.]" *Id.* at 7. And, although this is the wrong question for purposes of Avadel's summary judgment motion, Jazz is incorrect to claim that "there is no evidence that Jazz knew [the '963 patent listing] would provide any bar to any drug approval or any other alleged competitive advantage." D.I. 287 at 6. Again, setting aside the fact that Jazz again improperly seeks to shift the burden to Avadel, there is a wealth of such evidence. *See* D.I. 269 ¶¶ A-5, A-6, A-10, A-11. And the same is true regarding Jazz's baseless suggestion that Jazz would not have "necessarily" faced new competitors. There is abundant evidence that Jazz was aware at the time that Avadel (then Flamel) was progressing a once-nightly oxybate drug. *See, e.g.*, Ex. 102 at 12, Jazz 2016 Form 10-K; Ex. 103 at JP-COMP-000659026, Cozadd Dep. Ex. 104; D.I. 268-2, Ex. 12 at 29-32. Jazz cannot deny that it knew when listing the '963 patent that it faced potential future competition from new sources, including from Avadel.

### 3. Jazz offers no evidence at all to support any jury finding that it acted in good faith in refusing to delist the '963 patent.

Even if Jazz had raised sufficient material facts regarding its initial decision to list the '963

ME1\53522277.v1

patent in 2014—which it certainly has not done—its invocation of the regulatory compliance defense would still fail. That is because Jazz does not even try to point to evidence that it believed in good faith that regulations required it to **maintain** its listing until February 2023.

For the regulatory compliance defense to immunize Jazz's conduct from liability, Jazz must establish that it was acting in subjective good faith *each time* it declined to delist the patent. *See Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.2d 716, 737-38 (9th Cir. 1981), *modified*, 1982 WL 11277 (9th Cir. Mar. 15, 1982) ("If a defendant can establish that, at the time the various anticompetitive acts alleged here were taken, it had a reasonable basis to conclude that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority, then its actions did not violate the antitrust laws.").

One such instance arose when Avadel brought a patent listing dispute over the '963 patent in 2019. At that point, in order to truthfully provide a response, Jazz would have by necessity analyzed whether regulations required the patent to be listed. At that point, there were clear claims that not only was Jazz not *required* to list the '963 patent, but that the listing was improper. Yet, Jazz offers no evidence addressing its decision to maintain the listing, let alone showing that decision was made in subjective good faith. Jazz's failure to offer any argument or evidence on this point means that there is no dispute as to a material fact—providing an independent ground for summary judgment.

### B. Motion No. 2: The Court Should Grant Partial Summary Judgment That Jazz Engaged in Anticompetitive Conduct by Improperly Listing the '963 Patent

Jazz does not—and cannot—dispute that its patent listing was wrongful.  Nor did its improper listing exist a vacuum. It led to an automatic stay on the FDA's ability to approve LUMRYZ. D.I. 269 ¶¶ A-21, A-22. The Court need find nothing more to grant summary judgment to Avadel on one element of its antitrust claims, namely, anticompetitive conduct. D.I. 267 at 12-

14.

It is black-letter law that anticompetitive conduct under Section 2 of the Sherman Act does ***not*** require a showing of actual exclusion—it captures "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way[.]" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007). A wrongful patent listing, not least when triggering an automatic stay, obviously "impairs the opportunities of rivals" and "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power." *Id.*; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc). Despite Avadel's prominent reliance on *Microsoft* (D.I. 267 at 12), which is perhaps the leading case on monopolization law, Jazz ignores it entirely.

Sections 4 and 16 of the Clayton Act, which create causes of action for private plaintiffs like Avadel, impose elements beyond those found in Section 2 of the Sherman Act. *Compare* 15 U.S.C. §§ 15, 26 *with* 15 U.S.C. § 2. In particular, an action under Section 4 of the Clayton Act requires a plaintiff not simply to show an antitrust violation (i.e., a violation of the Sherman Act), but also injury-in-fact, antitrust injury, and antitrust standing. *See, e.g.*, *3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171-72 (3d Cir. 2015) (explaining the difference between these elements). Avadel will prove at trial that it suffered antitrust injury by showing that, but for Jazz's anticompetitive conduct in violation of Section 2 of the Sherman Act, Avadel would likely have entered the relevant market sooner and that its delayed entry actually caused injury to Avadel and harm to competition. *See* D.I. 299 at 6 (finding that "[t]he facts of the instant action plausibly present an instance of alleged anticompetitive conduct and antitrust injury which the antitrust laws were designed to prevent and, therefore, create antitrust standing").

Avadel is ***not*** moving for summary judgment on its antitrust-injury element under the

Clayton Act—it merely seeks summary judgment as to anticompetitive conduct under Section 2 of the Sherman Act. The difference is important, as the FTC has repeatedly emphasized in other cases.[3] Showing anticompetitive conduct does not require that the action "actually caused a delay." *In re Androgel Antitrust Litig. (No. II)*, 2018 WL 2984873, at *9 (N.D. Ga. June 14, 2018).

Jazz's opposition misses the mark entirely, wrongly conflating anticompetitive conduct under Section 2 of the Sherman Act with antitrust injury under Sections 4 and 16 of the Clayton Act. It fails to cite—much less distinguish—*Microsoft* and other black-letter law governing Avadel's motion. Instead, it cites ***antitrust-injury cases*** in support of its incorrect assertion that "[c]onduct is only 'exclusionary' in the antitrust sense if it caused an exclusion." D.I. 287 at 11. As support for its misstatement of the law, Jazz characterizes its lead case, *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *32 (D.N.J. Mar. 28, 2014), as "finding there was no exclusion where the court was not persuaded that the conduct at issues actually excluded the plaintiff 'as opposed to a multitude of other factors.'" D.I. 287 at 11. But the paragraph that Jazz quotes expressly begins: "The Court finds that Eisai's claims must fail because Eisai cannot satisfy the ***antitrust-injury*** requirement." *Eisai*, 2014 WL 1343254, at *32 (emphasis added).

Jazz continues by citing other authorities that clearly go to antitrust injury. D.I. 287 at 11-12. To that end, it quotes the Areeda & Hovenkamp treatise as requiring that "treble damages be limited to those aspects of a plaintiff's injury that were in fact caused by an unlawful exploitation of market power." *Id.* But treble damages are only available to Avadel if it demonstrates ***both*** a

---

[3] *See, e.g.*, Ex. 107, Brief of the Federal Trade Commission as Amicus Curiae in Support of No Party, *In re Wellbutrin XL Antitrust Litig.*, No. 15-3559 (3rd Cir. 2016); Ex. 108, Brief of Amicus Curiae Federal Trade Commission in Support of No Party, *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 15-2005 (1st Cir. 2016); Ex. 109, Brief for the Federal Trade Commission as Amicus Curiae in Support of Neither Party, *United Healthcare Services, Inc. v. Gilead Sciences, Inc.*, No. 24-1585 (N.D. Cal. 2024).

Sherman Act violation and antitrust injury under Section 4 of the Clayton Act. The latter requires a showing of causation; the former does not. D.I. 267 at 12-14. Next, Jazz points to *Actos I* as "most salient." D.I. 267 at 13 (citing *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89 (2d Cir. 2017) ("*Actos I*")). But that case focused on "[c]ausation in fact" with respect to whether "a defendant's anticompetitive act was a 'material' and 'but-for' cause of plaintiff's ***injury***[.]" *Actos I*, 848 F.3d at 97 (emphasis added).

Jazz next claims that "causation is not only considered as part of the analysis of whether a plaintiff has antitrust standing, as Avadel insists, but is also, as *Actos I* recognized, a 'necessary element of any claim for relief." D.I. 287 at 14. But no private plaintiff ever has a "claim for relief" under the Sherman Act. A private party's cause of action based on an antitrust violation arises under the Clayton Act, which, as explained above, requires a showing of injury-in-fact and antitrust injury (and this injury requires proof of causation). Jazz's brief plainly invites legal error.

The remainder of Jazz's opposition is premised on creating a disputed question of fact as to whether the wrongful patent listing "indisputably caused the alleged exclusion." D.I. 287 at 12. That argument, and all the various evidence that Jazz cites throughout its brief on that proposition, is irrelevant to Avadel's motion and should be disregarded.

*Actos II* clearly supports Avadel's motion. 2025 WL 1001259. As Jazz notes, the *Actos II* court denied partial summary judgment with respect to certain listing misstatements. D.I. 287 at 13. But in doing so, *Actos II* never reached the question of exclusionary conduct because plaintiffs' theory was rejected on separate causation (i.e., antitrust-injury) grounds. *Actos II*, 2025 WL 1001259, at *14. In other words, the law of the case resolved the claim before the *Actos II* court could examine whether the misstatements were exclusionary. As to other misstatements for which causation had not already been determined, however, the *Actos II* court granted partial summary

on exclusionary conduct because it found "no genuine dispute that [the Orange Book listings] were (1) incorrect and (2) did or likely led to price control or exclusion of competition." *Id.* at *15. This is exactly the situation here. *See id.* at *19 (granting partial summary judgment on anticompetitive conduct because defendant "misdescribed" its Orange Book–listed patents, which was "likely" to exclude competition).

Finally, Jazz argues that Avadel cannot show exclusionary conduct without showing that Jazz's exclusion actually created or maintained "monopoly power." D.I. 287 at 16-17. But monopoly power is a separate element, *see Broadcom*, 501 F.3d at 306-07, which courts analyze independently from exclusionary conduct. *See, e.g.*, *id.* at 315; *Le Page's Inc. v. 3M*, 324 F.3d 141, 146-47, 152-59 (3rd Cir. 2003). And courts properly grant partial summary judgment on anticompetitive conduct without entering judgment on monopoly power. *See, e.g.*, *Actos II*, 2025 WL 1001259, at *11 (granting partial summary judgment on the "willful maintenance" element of a monopolization claim while denying summary judgment as to possession of monopoly power). Jazz's lengthy discussion of market definition and monopoly power concepts introduces no genuine issue of material fact for Avadel's motion on anticompetitive conduct. D.I. 287 at 17-22.[4]

---

[4] Avadel did not move for summary judgment on monopoly power, a fact-intensive element almost always left for the jury. But the evidence that Jazz possessed monopoly power is compelling. By way of example, ██████████████████████████████████████████████████ ██████████████████████████████████████████████. Ex. 104 at 8, Cozadd Dep. Ex. 97; Ex. 105 at 3, Cozadd Dep. Ex. 98. ████████████████████████████████████████████. ████████████████████████████████████████████" Ex. 104 at 8, Cozadd Dep. Ex. 97. Jazz took full advantage of its decade-plus monopoly in the oxybate market, ██████████████████████ ████████████████████████████████████████████.

## III.    AVADEL'S REPLIES IN SUPPORT OF ITS *DAUBERT* MOTIONS

### A.    Anupam Jena

Avadel filed a narrow *Daubert* motion directed at specific aspects of Dr. Jena's expert report that have no bearing on the issues in this case—i.e., Dr. Jena's generalized discussions of innovation in the pharmaceutical industry and Jazz's investments in drug development. As he admitted at deposition, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████. Dr. Jena's opinions thus have no probative value and would risk jury confusion.

Jazz cannot defend its refusal to delist the '963 patent by invoking alleged procompetitive benefits flowing from unrelated conduct. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1073 n.17 (9th Cir. 2015) (a factfinder can "only consider the benefits of the . . . [challenged conduct]"); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 412 (E.D. Pa. 2015) (a defendant bears the burden "to show that *the challenged conduct* promotes a sufficiently pro-competitive objective"). Nowhere in his discussion of Jazz's alleged investments does Dr. Jena offer any explanation of how listing and maintaining the '963 patent in the Orange Book yielded any procompetitive benefit, and he concedes that he conducted no analysis of the challenged conduct. Instead, Dr. Jena focuses on the role of innovation in spurring competition in the pharmaceutical industry. D.I. 287 at 27-28. But that is irrelevant to "whether [Jazz] harmed competition in a relevant market," *id.* at 27, because, again, Dr. Jena proffers no opinion that Jazz's challenged actions **in this case** increased competition or innovation in any way. *See* A4809 at 104:20-105:10.

Jazz tries to justify Dr. Jena's innovation discussion by arguing that it goes to whether "the narcolepsy market was characterized by monopolization." D.I. 287 at 29. Putting aside that the

relevant market alleged by Avadel is no broader than oxybate and pitolisant drugs approved by the FDA to treat Type 1 narcolepsy, *see generally* D.I. 14, Jazz is incorrect. Dr. Jena apparently intends to testify that Jazz lacked monopoly power because it invested in innovation. Not only is that wrong as a matter of economics— ██████████████████ ████████████ ████████████████████████ —it is wrong as a matter of law. *See, e.g.*, *U. S. v. Google LLC*, 747 F. Supp. 3d 1, 171 (D.D.C. 2024) (a defendant's "penchant for innovation is consistent with the behavior of a monopolist") (citing *Microsoft*, 253 F.3d 34).

Contrary to Jazz's insinuation, Avadel has not sought to exclude testimony from Dr. Jena that "the market has been expanding and growing." D.I. 287 at 29. At trial, Jazz is free to elicit any disclosed testimony from Dr. Jena regarding factors that the law deems potentially relevant to the presence or absence of monopoly power, including the share of the relevant market defined by reasonable interchangeability of use between drugs in treating Type 1 narcolepsy (for which only oxybate and pitolisant are FDA-approved), the existence of supranormal profits, entry barriers, and other relevant factors. *See Broadcom*, 501 F.3d at 307; *U. S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). What Jazz may not do is elicit testimony to confuse the jury by claiming that Jazz's investments—which have no bearing whatsoever on the conduct challenged in this case and that every firm, monopolist or otherwise, is incentivized to make in pursuit of profit—is somehow evidence that Jazz lacked monopoly power.

Jazz cites various cases, but fails to identify ***a single case*** that would justify allowing Dr. Jena to testify to the jury that Jazz's investments that are not tied to the listing and maintenance of the '963 patent in the Orange Book were evidence of a lack of monopoly power. Nor could it, because as explained above, cases under Section 2 of the Sherman Act have consistently rejected arguments that R&D or innovation undermines an inference of monopoly power.

*First*, Jazz cites *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 70 (E.D. Pa. 2022), for the proposition that "[a]ntitrust analysis must always be attuned to the particular structure and circumstance of the industry at issue." D.I. 287 at 27. However, *Suboxone* does not suggest that it is appropriate for an expert to confuse a jury by pointing to investments that were unrelated to conduct at issue in the case. There, the court simply noted that it was required to "look to the FDA's marketing rules to determine whether [the defendant's] safety statements were indeed 'false' or misleading." 622 F. Supp. 3d at 70. The court did not endorse admitting an expert's opinion on irrelevant topics. Jazz also points to *Actos II*, where the court determined that expert opinions regarding "upfront costs like R&D and marketing" might be relevant to supracompetitive pricing. 2025 WL 1001259 at *12. But Avadel's *Daubert* motion would not stop Dr. Jena from testifying at trial that drug prices should be considered in light of the cost required to develop them. By contrast, the court's finding in *Actos II* does not license Dr. Jena to engage in a lengthy and irrelevant discussion of Jazz's purported innovation in the pharmaceutical industry—especially where, as here, he fails to tie any such innovation to the '963 patent, let alone to quantify Jazz's R&D costs associated with Xyrem or Xywav and explain how those costs affected Xyrem or Xywav's pricing. *See* A4799 at 63-18:19; A4801 at 70:2-7.

Furthermore, Jazz does not dispute that it never invested in the development of Xyrem, which Jazz acknowledges it "acquired" from another company (Orphan Medical). Instead, Jazz claims that it invested in the Xyrem REMS. D.I. 287 at 31. Yet Jazz acknowledges that Orphan Medical "developed the initial risk management program for Xyrem" and that Jazz simply operated that program. *Id.*; *see also* A4805 at 87:23-88:10. The costs that Jazz incurred in operating the Xyrem REMS were not "investments" in any meaningful sense; they were merely costs necessary for Jazz to continue lawfully marketing Xyrem and Xywav in the United States. *See*

17

A4805 at 88:20-89:23.

Accordingly, the Court should exclude Dr. Jena's testimony regarding Jazz's alleged innovation and investments in the pharmaceutical industry.

### B. Iain Cockburn

As Avadel explained in its opening brief, Dr. Cockburn's opinions regarding Jazz's allegedly "procompetitive" investments unrelated to the conduct at issue should be excluded as irrelevant and unreliable. D.I. 267 at 16-19. Jazz's arguments to the contrary are meritless.

*First*, Jazz asserts that Dr. Cockburn's discussion of Jazz's purportedly "procompetitive" investments is "relevant to help the trier of fact [understand] industry dynamics." D.I. 287 at 33. But the various "risks and investments" taken by Jazz in marketing oxybate products are unrelated to the anticompetitive conduct at issue (i.e., the listing of the '963 patent in the Orange Book). *Id.* at 32-33. ███████████████████████████ ███████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████████[5]

The cases Jazz relies upon actually underscore why Dr. Cockburn's opinions are not relevant. *Suboxone* discusses the consideration of procompetitive effects *of the alleged anticompetitive conduct*. 622 F. Supp. 3d at 50. Offsetting procompetitive effects are not at issue

---

[5] This is equally true as a matter of law. *See O'Bannon*, 802 F.3d at 1073 n.17 (a factfinder can "only consider the benefits of the . . . [challenged conduct]"); *King Drug Co.*, 88 F. Supp. 3d at 412 (defendant bears the burden "to show that *the challenged conduct* promotes a sufficiently pro-competitive objective").

here because Dr. Cockburn offers no opinion that Jazz's improper listing of the '963 patent was somehow procompetitive. *Actos II* stands only for the proposition that evidence of high margins are not conclusive evidence of monopoly power at the summary judgment stage. 2025 WL 1001259, at \*12. On this point, ████████████████████████████████████████

████████████████████████████████████████████████████████████; *see also Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). ████████

████████████████████████████████████████████████ A4974

at 31:12-21.

    ***Second***, Jazz insists that Dr. Cockburn need not offer any analysis of his own to support his opinion and, even if he did, that his listing of factors he believes Mr. Orszag should have considered constitutes an "analysis" sufficient to make his opinion reliable. D.I. 287 at 34-35. Jazz is wrong on both counts. While rebuttal experts need not develop their own model, they still must apply a testable methodology and explain how it would affect the answer to the relevant question. *See, e.g.*, *Advanced Telemedia, LLC v. Charter Commc'ns, Inc.*, 2008 WL 6808442, at \*1, 4 (N.D. Ga. July 17, 2008) (excluding opinion of expert that offered only criticism of another expert's analysis without testing own methodology or contending that the methodology would yield different results). Jazz's cases do not suggest otherwise. For example, the court in *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC* declined to exclude a rebuttal expert because that expert was not required to construct a market definition from scratch. 232 F. Supp. 3d 632, 636 (D. Del. 2017). Dr. Cockburn failed to present *any* kind of analysis of the relevant issues that could pass muster under Rule 702. He therefore lacks "good grounds" for his criticism, which do not "fit the facts" of the case. *Cohen v. Cohen*, 125 F.4th 454, 461, 464 (3d Cir. 2025).

    Rather than offer his own analysis, Dr. Cockburn critiques Mr. Orszag by invoking

19

"dynamic competition." But Dr. Cockburn has not explained (and Jazz cannot identify) how consideration of dynamic competition would be applied here or affect the scope of Mr. Orszag's opinion. Jazz points to Dr. Cockburn's testimony about "outcomes research," which supposedly can be used to "test the economic benefits of taking a drug." D.I. 287 at 35. But that has nothing to do with Jazz's decision to list the '963 patent and to refuse to delist it. Jazz also points to Dr. Cockburn's statement that he "laid out 'how one could assess whether a market was dynamically competitive'" or not. *Id.*. But Dr. Cockburn never assessed how the "dynamic competition" framework applies to evaluating the anticompetitive effects *of the alleged conduct here*—in fact, he admitted that he did not do so. *See*, *supra*, at 18. His testimony is therefore irrelevant and unreliable.

### C.  Jonathan Singer

Mr. Singer's opinions regarding the reasonableness of Jazz's listing and maintenance of the '963 patent in the Orange Book are legally erroneous and speculative. D.I. 267 at 19-21. Jazz's arguments to the contrary are unavailing, and the Court should exclude Mr. Singer's testimony.

Jazz does not (and cannot) dispute that Mr. Singer's opinions are premised on legal error. In his report, Mr. Singer opined that ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████. But that opinion is legal error. The Federal Circuit explicitly rejected Mr. Singer's interpretation, concluding that Section 314.53 "does not broaden the term 'method' such that reciting a condition of use turns a system patent into a listable method-of-use patent." *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373, 1380 (Fed. Cir. 2023).

Jazz's lone retort is the notion that Mr. Singer is not "contradict[ing] a decision that did not

exist until after the time period he addresses." D.I. 287 at 37. But that is likewise legal error. The meaning of an unambiguous statute or regulation has no temporal aspect—the Federal Circuit's ruling reflects what Section 314.53 "has meant continuously" since being enacted or promulgated. *Franklin v. Navient, Inc.*, 534 F. Supp. 3d 341, 345 (D. Del. 2021) ("[F]ederal courts cannot change the law; they can only, in deciding cases, say what a law has meant continuously since the date when it became law.") (quoting *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 n.12 (1994)); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning," and "every statute's meaning is fixed at the time of enactment"). The Federal Circuit's ruling thus recites the only legally permissible interpretation of the pertinent provisions as of 2014, and it would be error to permit Mr. Singer to suggest otherwise to a jury.

Mr. Singer indisputably may not proffer an opinion "premised on a misunderstanding of the law." *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022); *see also Martinez v. Porta*, 601 F. Supp. 2d 865, 866 (N.D. Tex. 2009) (an expert's opinion "cannot be based on an erroneous legal premise"). Jazz's suggestion that an expert can offer testimony directed to an erroneous legal opinion in hopes of convincing the jury that the opinion may have been reasonable before a court ruling would effectively swallow the foregoing rule. Jazz cites no authority—and Avadel is not aware of any—admitting such testimony.

Mr. Singer's testimony should also be excluded for the independent reason that he improperly opines on Jazz's state of mind. Although Jazz posits that Mr. Singer confines his opinions to that of a "reasonable patent attorney," his report goes further and opines on Jazz's beliefs. *See* D.I. 268-4, Ex. 35 ¶ 104 ███████████████████████

████████████████████████████████████████████

████████████████████████████████████. Such testimony is speculative and inadmissible. *See Persawvere, Inc. v. Milwaukee Elec. Tool Corp.*, 2023 WL 8019085, at *14 (D. Del. Nov. 20, 2023) ("Expert witnesses are 'not permitted to testify . . . regarding [a company's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.'"). Jazz notes that, in *Persawvere*, the court held that an expert could testify about "the patent application process as well as the policies, practices, and procedures of the PTO." D.I. 287 at 38. But Mr. Singer is not opining on the "policies, practices, and procedures" of any agency (or even Jazz). Instead, he opines that ████████████████████████████████ ████████████████████████████

### D. Daniel Troy

Mr. Troy's opinions regarding Jazz's listing and maintenance of the '963 patent in the Orange Book are circular and unreliable. *See* D.I. 267 at 21-24. Jazz's arguments to the contrary are meritless, and the Court should exclude Mr. Troy's testimony.

*First*, Jazz argues that Mr. Troy's opinions "are not circular because he is not offering any opinions about patent law." D.I. 287 at 40. That is a non-sequitur. Mr. Troy's express premise (i.e., that the '963 patent claims a method of use) presupposes his conclusion (i.e., that Jazz acted reasonably in listing it).[6] *See* D.I. 267 at 21-22. Put differently, Mr. Troy opines that it was reasonable for Jazz to list a patent that he presumes Jazz was statutorily required to list. That opinion should be excluded—not only because it is meaningless and unhelpful to the jury, but also

---

[6] Jazz argues Mr. Troy "assumed only that '*Jazz decided* that [the '963 patent] was a method of us[e] patent.'" D.I. 287 at 40. Not so. Mr. Troy testified that his ██████████████████████████ ███████████. Regardless, even if Jazz were correct, Mr. Troy's reasoning would remain circular and unhelpful—i.e., he concluded that Jazz acted reasonably in listing a patent that he assumed Jazz thought was reasonably listable.

because it is false in light of this Court's and the Federal Circuit's ruling that the '963 patent does not claim a method. *See Sec'y U. S. Dep't of Labor v. Nursing Home Care Mgmt. Inc.*, 128 F.4th 146, 162 (3d Cir. 2025) (affirming exclusion of expert testimony that "rest[ed] on a false premise").[7]

Jazz claims that, in his opening report, Mr. Troy "did not opine that it was 'reasonable' for Jazz to list and maintain the '963 patent." D.I. 287 at 40. That is simply not true. Mr. Troy made clear in that report that he was ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████. It is pure semantics to claim that, in disagreeing with the proposition that Jazz should have known that the '963 patent did not qualify for listing, Mr. Troy proffered no view as to the reasonableness, from Jazz's viewpoint, of listing that patent.

Indeed, Mr. Troy's opinions necessarily implicate the "reasonableness" of Jazz's listing and maintenance of the '963 patent, as Mr. Troy made clear at deposition. ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████. And it will be of no help to the jury to hear testimony that Jazz reasonably listed a patent that the sponsoring witness merely "assumed" to be eligible for listing.

---

[7] Jazz states that Mr. Troy "is not offering any legal opinions at all, much less that the '963 patent should remain listed in defiance of the Court's order." D.I. 287 at 43. That is misleading, at best. Jazz does not dispute that Mr. Troy offers opinions whose premise both this Court and the Federal Circuit have rejected, which necessitates excluding those opinions.

***Second***, Jazz contends that Mr. Troy's rebuttal opinions "were not intended to construe the claims of the '963 patent or address the legal question of whether the specific patent was listable." D.I. 287 at 43. But Mr. Troy's failure to evaluate what the claims of the '963 patent encompass is precisely what renders his opinions inadmissible. He assumed, without verifying, that the '963 patent claims a method of using a drug (which it does not); and, on that basis, he concluded that Jazz reasonably listed the '963 patent. Given that Jazz does not—and cannot—dispute that "[a]n inquiry into whether a patent may be properly listed or delisted from the Orange Book [ ] ***clearly*** requires a determination of what that patent claims," Mr. Troy's methodology is unreliable. *Jazz Pharms.*, 60 F.4th at 1379. Jazz's concession that "Troy was putting the claim construction issue to the side," D.I. 287 at 40, is a fatal admission that his proposed testimony is inadmissible for lacking a reliable methodology.

Mr. Troy's "assumption" and corollary opinions also rest on legal error, rendering them inadmissible for that reason. *See Exela Pharma*, 2022 WL 806524, at *3; *Martinez*, 601 F. Supp. 2d at 866. Jazz's suggestion that Mr. Troy can opine on "ambiguity within the regulatory landscape," D.I. 287 at 43, is tantamount to an explicit repudiation of the Federal Circuit's rejections of Jazz's regulatory arguments. Indeed, the Federal Circuit said no such ambiguity existed. *See Jazz Pharms.*, 60 F.4th at 1380. Again, the Federal Circuit's ruling reflects what the law "has meant continuously" since being enacted. *Franklin*, 534 F. Supp. 3d at 345. Jazz's assertion that Mr. Singer can opine "that Jazz had to make the listing decision before it could have known how the specific claim construction disputes would be resolved" is similarly incorrect. D.I. 287 at 43. "Claim construction is a question of law . . . ." *Jazz Pharms.*, 60 F.4th at 1379. As such, the legal meaning of the claims has no temporal component, and the proposed testimony is legally flawed. *See PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005)

("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date."). But Mr. Troy pretends instead that the meaning of the '963 claims somehow ***changed*** in 2022 with the Federal Circuit's decision, which is plain error. *See* A4890 at 88:5-9; *see also* A4893 at 101:10-18. Jazz cites no authority supporting the notion that an expert can offer such opinions. Again, Jazz seeks an exception that effectively would swallow the rule that experts may not testify as to the law (let alone to opinions premised on legal error).

*Third*, Jazz states that Mr. Troy does not "opine about Jazz's state of mind" but merely "respond[s] to specific arguments by Avadel's experts that certain events would have demonstrated to a reasonable company that the listing was wrong or could not be maintained." D.I. 287 at 43-44. However, Mr. Troy's opening report demonstrates that he did, in fact, opine on Jazz's state of mind by offering conclusions that Jazz ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████. Courts routinely exclude opinions about what a company knew or could have known at a given time as speculative. *See Persavvere*, 2023 WL 8019085, at *14; *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 295 & n.27 (E.D. Pa. 2016) (a company's "knowledge" or "state of mind . . . are not appropriate subjects of expert testimony" because "[t]he reasonableness of conduct and a party's then-existing state of mind 'are the sort of questions that lay jurors have been answering without expert assistance from time immemorial'").

## IV. CONCLUSION

For the foregoing reasons, the Court should grant Avadel's motions for partial summary judgment and *Daubert* motions.

25

Respectfully submitted,

Dated: June 13, 2025

MCCARTER & ENGLISH, LLP

/s/ Daniel M. Silver

OF COUNSEL:

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Sarah W. Wang
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

*Attorneys for Defendant*

Ian R. Conner
Alan J. Devlin
Anna Rathbun
Christopher J. Brown
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, D.C. 20004
(202) 637-2200
ian.conner@lw.com
alan.devlin@lw.com
anna.rathbun@lw.com
christopher.brown@lw.com

Herman Yue
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
herman.yue@lw.com

Alfred C. Pfeiffer
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 395-8898
al.pfeiffer@lw.com

ME1\53522277.v1

Daralyn J. Durie
Rebecca E. Weires
Tannyr Pasvantis
Eliot A. Adelson
Margaret A. Webb
Helen He
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6055
ddurie@mofo.com
rweires@mofo.com
tpasvantis@mofo.com
eadelson@mofo.com
mwebb@mofo.com
hhe@mofo.com

Kira A. Davis
Henry Huttinger
Katherine E. McNutt
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5200
kiradavis@mofo.com
hhuttinger@mofo.com
kmcnutt@mofo.com

Alexander Okuliar
Haydn Forrest
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037, USA
(202) 887-1500
aokuliar@mofo.com
hforrest@mofo.com

Matthew C. Has
POLSINELLI
100 South Fourth Street, Suite 1000
St. Louis, MO 63102
mhans@polsinelli.com

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on June 13, 2025 on the following counsel in the manner indicated below.

### <u>VIA EMAIL:</u>
Jack B. Blumenfeld
Jeremy Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

William R. Sears
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Willsears@quinnemanuel.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Steig D. Olson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Avenue
New York, NY 10016
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
steigolson@quinnemanuel.com

*Attorneys for Plaintiff Jazz Pharmaceuticals, Inc.*

Dated: June 13, 2025

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1\53519120.v1