# EXHIBITS 160-163
# REDACTED IN THEIR ENTIRETY

# EXHIBIT  164

---

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAZZ PHARMACEUTICALS, INC.,  )
                             )
          Plaintiff,         )
                             ) C.A. No. 21-691(MN)
v.                           )
                             )
AVADEL PHARMACEUTICALS PLC,  )
et al.,                      )
                             )
          Defendants.        )

Friday, July 30, 2021
2:00 p.m.
Teleconference

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

        MORRIS NICHOLS ARSHT & TUNNEL LLP
        BY:  JEREMY TIGAN, ESQ.

        -and-

        QUINN EMANUEL URQUHART & SULLIVAN
        BY:  DOMINIC A. CERRITO, ESQ.
        BY:  FRANK CALVOSA, ESQ.
        BY:  GABRIEL P. BRIER, ESQ.

                Counsel for the Plaintiff

---

2

1    APPEARANCES CONTINUED:

2

3        McCARTER & ENGLISH
         BY:  DANIEL SILVER, ESQ.

4

5        -and-

6        LATHAM & WATKINS
         BY:  KENNETH SCHULER, ESQ.

7

8        -and-

9        DURIE & TANGRI
         BY:  DARALYN DURIE, ESQ.

10           Counsel for the Defendants

11

12       _ _ _ _ _ _ _ _ _ _ _

13

14       THE COURT:  Good afternoon, counsel.  Who is
15   there, please?
16       MR. TIGAN:  This is Jeremy Tigan with Morris
17   Nichols on behalf of Jazz.  I am joined by Dominic Cerrito,
18   Frank Calvosa and Gabriel Brier of Quinn Emanuel.
19   Mr. Cerrito will speak for us today.
20       THE COURT:  Good afternoon.
21       MR. SILVER:  Good afternoon, Your Honor.  Dan
22   Silver from McCarter & English on behalf of the Avadel
23   defendant.  And I'm joined by Kent Schuler from Latham &
24   Watkins and Daralyn Durie from Durie Tangri.
25       THE COURT:  Good afternoon to you as well.

---

3

1        So I have the proposed scheduling order.  One
2    thing that I am going to say before we begin is this is a
3    public transcript.  We have had calls asking for access
4    information for this call.  I know that some letters were
5    filed under seal.  So I'm going to ask that we try to
6    discuss the issues without referring to confidential
7    information so that we don't need to shut down the call to
8    others.  If it turns out that we can't do this, then
9    addressing confidential information, then we will have to
10   close the line.  But I want to see if we can try and do it
11   without doing that before we make that decision.
12       So we have the schedule that was proposed and it
13   seems like everyone agrees on all of the issues in the
14   schedule other than the preliminary injunction stuff.  Is
15   that right?
16       MR. CERRITO:  Your Honor, Nick Cerrito from
17   Quinn Emanuel on behalf of Jazz.  That is essentially
18   correct, Your Honor.  I think we have come together on most
19   issues.  There may be one or two other nits on the list, but
20   I don't think anything of substance.
21       THE COURT:  If there are nits, can you point
22   them out so we can make sure we address it?  I didn't see
23   it, but I might have missed it.
24       MR. SILVER:  I think we resolved everything
25   except for that paragraph 2 dealing with the preliminary

---

4

1    injunction stuff.
2        THE COURT:  Okay.  So with that, let's get the
3    normal scheduling stuff out of the way.  I'm going to give
4    you the dates for the issues that needed to be filled in.
5        For claim construction hearing, that will be
6    August 2nd of 2022 at 10:00 a.m.  Any Daubert motions will
7    be due on July 7th, 2023.  And those will be briefed
8    according to the local rules.  The pretrial conference will
9    be October 23rd, 2023, at 4:30.  And we will have a five-day
10   bench trial beginning on October 30th, 2023, and we'll
11   decide how many days you actually get closer to trial, but
12   for now we will schedule it for five days.
13       Any issues with any of that before we get to the
14   preliminary injunction issue?
15       Mr. Cerrito?
16       MR. CERRITO:  Not from plaintiff, Your Honor.
17       THE COURT:  Mr. Silver?
18       MR. SCHULER:  I don't believe so, Your Honor.
19   Ken Schuler from Latham & Watkins.  We have no issues with
20   any of those.
21       THE COURT:  All right.  So now we have the issue
22   on the preliminary injunction.  Let me hear -- I read the
23   excerpts, the short statements that I got, but I'll hear
24   briefly from the parties and then I have a few questions.
25       So Mr. Cerrito, what is the likelihood that

---

A-6435

5

1  we're going to need a PI here?

2  MR. CERRITO: I'm not sure, Your Honor.

3  Unfortunately I can't be more definitive than that. It's

4  possible, certainly. Under what context and in what

5  circumstance, I'm not sure. Sitting here today obviously

6  approval is an issue. Launching is another issue. When we

7  discover may dictate, assuming we're going to get their NDA

8  relatively quickly and then relative correspondence goes

9  along with it. You know, I just don't know. That's why we

10  have -- the parties have been talking for a little, I guess

11  over a month or so now about this issue. And we have been

12  seeking the NDA as soon as possible, an action which is

13  electronically filed and it's a matter of pushing a button,

14  so that could have been and should have been provided as

15  quickly as possible in my view. At that point we would have

16  had hopefully a better view and a better course to present

17  to the Court today. Unfortunately we are where we are.

18  You know, I think our schedule does permit

19  plenty of time before -- I have to be careful now because I

20  don't want to say anything I don't want to say. Your Honor

21  is aware of certain dates in the documents that may or may

22  not be coming up. I'm trying to be careful, Your Honor. So

23  --

24  THE COURT: My understanding is you're saying

25  that your schedule for a preliminary injunction would

6

1  provide everyone with time to deal with the preliminary

2  injunction before it became emergent that the Court do so.

3  Is that your position?

4  MR. CERRITO: That certainly is, Your Honor.

5  Like we put in our schedule, upon service of our contention

6  interrogatories -- I'm sorry, our contentions, we would then

7  have a meet and confer with defendants and want one, to see

8  if PI was even necessary and if so what are the parameters

9  of that, and provide the Court with an update and

10  potentially a schedule if we decide, in fact, to go forward.

11  THE COURT: Let me hear from the defendant,

12  Mr. Silver, Mr. Schuler, why can't we just get the NDA's

13  produced? We have a local rule in this district that says

14  if there is no protective order in place or no

15  confidentiality order in place, you produce things attorneys

16  eyes only. And I know we have to deal with the one expert.

17  But why is this -- why are we talking about producing an NDA

18  in a month from now?

19  MR. SCHULER: Your Honor, it's Mr. Schuler.

20  I think the date has been agreed to. I think

21  it's just the provision --

22  THE COURT: Yes, but it hasn't been agreed to by

23  me if you all want a schedule that deals with a preliminary

24  injunction. So my question isn't the agreed upon dates, my

25  question is why isn't it being produced?

7

1  MR. SCHULER: I think that in our view, Your

2  Honor, that we are looking at what they characterize as

3  Mr. Cerrito says he doesn't exactly know, but it's at least

4  something that it's enough of a substantial possibility that

5  they have raised it. Our view is the principles that should

6  govern the situation should be fourfold. One is that we

7  should have the basis -- by the way, the date of

8  October 15th, Your Honor, is not confidential. That's

9  publicly known. So that date is in the complaint. So our

10  view is that they should file shortly after that date, if

11  there is approval.

12  The second principle is there should be

13  reciprocal discovery disclosure. It shouldn't be one sided.

14  Third, there should be time for expert

15  discovery. And lastly and importantly the schedule should

16  afford the Court adequate time to consider the issues.

17  That's how we came about a comprehensive schedule that

18  included not just the production of the NDA and the other

19  materials, also reciprocity getting to our overarching

20  thought we have roughly, I'm going to say roughly because of

21  the concern you noted at the outset, roughly eighteen weeks

22  to deal with the situation and it occurs to us that the

23  Jazz proposal would have effectively erased ten of those

24  weeks. Our view is that if we adopt a schedule that we

25  have, it will be productive because the discovery we're

8

1  going to seek goes to validity and infringement and will be

2  undertaken in any event.

3  THE COURT: Mr. Schuler, what I didn't

4  understand from your proposal was how that gives me any time

5  to decide the issues.

6  MR. SCHULER: Well, to be honest, Your Honor,

7  that was my biggest concern was to make sure you had

8  adequate time. And if it is not adequate, then I think the

9  parties need to go back and negotiate even shorter deadlines

10  --

11  THE COURT: I mean, I got to tell you, I don't

12  see how you have given me a day, so how much time do you

13  think you have given me?

14  MR. SCHULER: As I understood it, up to -- I'm

15  sorry, Your Honor, I think I can't because of public -- I

16  don't want to misstate something, but I think that the date

17  that we put in was the entire month, and perhaps it was

18  stated in a way that I understand what you're saying, that

19  you would --

20  THE COURT: Let me just tell you this, if you

21  guys all get as much time as you profess to need, you're not

22  getting an opinion from me on the timeline that you have

23  given me given what I have on my calendar in that month. So

24  let's go back and think, rethink this.

25  This is what I'm thinking, okay? I don't know

A-6436

9

14:11:22  1   if a preliminary injunction -- first of all, I think that
14:11:26  2   the defendants need to produce the NDA as soon as possible,
14:11:32  3   and I don't mean August 27th, I mean now.  They need to
14:11:41  4   produce it.  They can produce it under local Rule 26.2 and I
14:11:46  5   think that it is fair for the plaintiff to be allowed one
14:11:49  6   expert to review the material in the NDA.
14:11:55  7            So I think also that the parties need to agree
14:11:59  8   to an expedited exchange of infringement and validity
14:12:03  9   contentions, and whatever other discovery is needed, so
14:12:09 10   you're going to have to talk to about that.  If a
14:12:11 11   preliminary injunction is necessary, the parties need to let
14:12:13 12   me know by October 18th.  So that means that anything that
14:12:19 13   is done by the public October date needs to be shared.  If
14:12:25 14   it's not, if the response from the FDA is not public it
14:12:30 15   needs to be shared so that a determination can be made by
14:12:34 16   October 18th.  My preliminary injunction motion with support
14:12:38 17   needs to be filed by October 22nd.  Hold on, let me just
14:12:44 18   look at the date here.  Yes, needs to be filed by
14:12:48 19   October 22nd.  And we're going to brief it under the
14:12:51 20   Delaware local rules, that means the response in
14:12:55 21   fourteen days and a reply seven days later.  And we're going
14:12:58 22   to have a hearing, if we need one, on November 23rd,
14:13:02 23   starting at 10:00 a.m.
14:13:05 24            So if a preliminary injunction is necessary, you
14:13:08 25   guys need to get done what you need to get done by October.

10

14:13:15  1   As for the likelihood of success because I have given you
14:13:19  2   kind of constrained timing and we all have constrained time,
14:13:22  3   for likelihood of success, we're going to limit the issues
14:13:26  4   in the preliminary injunction so that I can rule on it
14:13:29  5   expeditiously.  Plaintiff, that means you are going to need
14:13:33  6   to pick your best claim.  I know there are four patents and
14:13:36  7   about 80 claims.  You're going to have to take your best
14:13:40  8   one.
14:13:41  9            Defendant, you can assert non-infringement, but
14:13:43 10   if you are challenging nonvalidity, you too are going to
14:13:48 11   have to pick your best validity defense to assert.  So
14:13:51 12   that's what I'm thinking.
14:13:53 13            Thoughts?  Plaintiff?
14:13:55 14            MR. CERRITO:  Yes, Your Honor, Mr. Cerrito from
14:13:58 15   Quinn Emanuel on behalf of Jazz.
14:14:02 16            I'm not assuming and maybe I am incorrect that
14:14:06 17   this is not somehow a preclusive order, meaning if my client
14:14:14 18   chooses not to file on the 22nd we're not precluded at any
14:14:18 19   point in time in the future from filing.
14:14:20 20            THE COURT:  I don't know about that,
14:14:22 21   Mr. Cerrito, because certainly if we're talking about the
14:14:25 22   particular dates here, then, yes, you would be precluded.
14:14:30 23   If this is the circumstance where it turns out that, you
14:14:35 24   know, I'm just going to throw out dates that, you know, in
14:14:39 25   October of this year that the defendant finds out that it

11

14:14:44  1   has to go back and start from scratch and we wind up three
14:14:48  2   years out you needing a PI, that's different, but if you're
14:14:53  3   suggesting that you're not going to file on October 22nd,
14:14:56  4   but you might file on November 10th, that's not going to
14:14:59  5   work.
14:14:59  6            MR. CERRITO:  Well, Your Honor, I certainly
14:15:02  7   don't want duress on the Court or me for that, that's what I
14:15:07  8   was suggesting.  The way it was written, they use the word
14:15:14  9   "shall", perhaps it's a due process problem.  My client has
14:15:18 10   a right to file, perhaps at the detriment of themselves, but
14:15:22 11   this Court not having time to deal with it, but you know,
14:15:29 12   there is a lot of things that can come up in discovery, we
14:15:29 13   have other patents in prosecution that should be issued
14:15:32 14   shortly, so I just want to make sure.  And if Your Honor is
14:15:37 15   saying otherwise, then I guess we may need to submit a brief
14:15:43 16   to Your Honor, I believe, because I actually had this issue
14:15:48 17   come up in another case this year in which we argued that
14:15:53 18   due process.
14:15:53 19            THE COURT:  Mr. Cerrito, let me tell you this,
14:15:56 20   if you are saying your client may want to file in November,
14:15:59 21   then what I can tell you is in looking at the likelihood of
14:16:02 22   success, in looking at the likelihood of success the fact
14:16:06 23   that it was delayed is going to be found against you.  And
14:16:09 24   if you don't give me enough time to decide it and they want
14:16:12 25   to come on the market while the motion is pending, that's

12

14:16:16  1   going to be to your client -- that's going to be a risk your
14:16:20  2   client takes.
14:16:21  3            So you need to tell me, though, you need to tell
14:16:24  4   me in advance, I don't just want a preliminary injunction
14:16:28  5   motion plopping down on my plate when I have no time to deal
14:16:33  6   with it, I want to know it's coming.  So you need to give me
14:16:37  7   advanced notice that you're going to file it.  If you can't
14:16:40  8   file it by the 22nd and you say, but Your Honor, we're going
14:16:43  9   to be filing it, you better make that known because if you
14:16:47 10   don't file it by the 22nd, chances of you getting a decision
14:16:51 11   that will actually be a grant of a preliminary injunction if
14:16:56 12   that's what your client wants, they're going down and down
14:16:59 13   and down.  So I'm not going to say you can't file it after.
14:17:02 14            MR. CERRITO:  Well --
14:17:03 15            THE COURT:  Stop.  I'm not going to say you
14:17:05 16   can't file it after that date, but you are going to waive
14:17:09 17   due process, but I'm also telling you it might be pointless
14:17:12 18   to file it after that date if I do not have time to deal
14:17:16 19   with it.  Do you understand?
14:17:17 20            MR. CERRITO:  I totally understand, Your Honor.
14:17:19 21   And that's not what I was suggesting.  They may not get
14:17:23 22   approval on the date that they said they would get it, so if
14:17:27 23   they don't, and Your Honor knows this from practice, there
14:17:31 24   may be a whole host of instances, I would not know whether
14:17:35 25   it's a five-day delay or a five-month delay, so we will

A-6437

13

| | |
|---|---|
| 14:17:39 1 | update you as much as possible, but there are circumstances |
| 14:17:42 2 | in which there would not be approval if my client would not |
| 14:17:46 3 | want to file. |
| 14:17:47 4 | THE COURT:  I understand.  But then there is a |
| 14:17:49 5 | risk to that, so you guys need to be in communication so |
| 14:17:53 6 | that we can address it and that I know when it's coming |
| 14:17:56 7 | because, you know, I have three trials a week scheduled for |
| 14:18:00 8 | parts of next year, and sitting in a preliminary injunction |
| 14:18:06 9 | hearing and ruling on it, you're going to have a hard time |
| 14:18:08 10 | doing it.  So I'm setting up a time to do it.  If you can't |
| 14:18:13 11 | do it, then let me know on the 18th that no preliminary |
| 14:18:17 12 | injunction is coming.  If you think one is going to come |
| 14:18:19 13 | later, you better tell me or else it's going to be a problem |
| 14:18:22 14 | for you. |
| 14:18:23 15 | Any other issues that you wanted to raise? |
| 14:18:33 16 | MR. SILVER:  Your Honor, this is Dan Silver -- |
| 14:18:37 17 | MR. CERRITO:  One other issue with regard to the |
| 14:18:45 18 | NDA.  We also obviously ask for correspondence, we ask for a |
| 14:18:50 19 | seven-day turn around on any new correspondence that |
| 14:18:54 20 | obviously will go -- |
| 14:18:56 21 | THE COURT:  That all makes sense to me.  That |
| 14:18:59 22 | should be done. |
| 14:19:01 23 | MR. CERRITO:  Thank you, Your Honor. |
| 14:19:02 24 | THE COURT:  All right. |
| 14:19:03 25 | MR. SILVER:  Your Honor, this is Dan Silver.  We |

14

| | |
|---|---|
| 14:19:06 1 | hear you loud and clear on the NDA and the correspondence of |
| 14:19:10 2 | production.  We will expedite that.  However, I don't know |
| 14:19:13 3 | if Your Honor has had a chance to look at our counterclaims, |
| 14:19:17 4 | I don't know if they're fresh in Your Honor's mind, but we |
| 14:19:21 5 | have a specific concern with the plaintiff here trying to |
| 14:19:25 6 | patent -- use existing patent applications to try to cover |
| 14:19:29 7 | our product and so this is a case where we were very |
| 14:19:33 8 | concerned about getting in place a protective order with the |
| 14:19:36 9 | prosecution bar and an FDA prosecution bar so that our |
| 14:19:41 10 | confidential information isn't being used against us.  And I |
| 14:19:44 11 | understand -- |
| 14:19:45 12 | THE COURT:  Then Mr. Silver, you should then |
| 14:19:48 13 | already have sent them a draft of a protective order if it's |
| 14:19:52 14 | that much of a concern.  So if you guys want to do that, |
| 14:19:56 15 | that's great.  The local rules says that it can only be used |
| 14:20:00 16 | for purposes of this litigation, and so for these purposes, |
| 14:20:04 17 | I guess that's going to have to do.  You have to do until |
| 14:20:08 18 | you get a protective order, but if it's that important to |
| 14:20:11 19 | your client, I suggest you get a draft out there.  The |
| 14:20:14 20 | provisions that you suggest sound reasonable, but I don't |
| 14:20:18 21 | know how reasonable they are if there is no draft out there, |
| 14:20:23 22 | so you better get talking about that. |
| 14:20:25 23 | MR. SILVER:  Thank you, Your Honor.  We'll send |
| 14:20:28 24 | them a draft next week.  Thank you. |
| 14:20:30 25 | THE COURT:  Anything else? |

15

| | |
|---|---|
| 14:20:33 1 | MR. CERRITO:  Not from plaintiffs, Your Honor. |
| 14:20:36 2 | THE COURT:  All right.  I do have one question |
| 14:20:39 3 | and that is I see I have a motion in front of me, and there |
| 14:20:43 4 | is a stipulation on the briefing on the delisting.  What's |
| 14:20:48 5 | the practical implication of delisting that patent? |
| 14:20:53 6 | MR. CERRITO:  From plaintiff's position, Your |
| 14:20:58 7 | Honor, there is -- we believe, we don't know because we |
| 14:20:58 8 | haven't seen the documentation yet, that the FDA is |
| 14:21:01 9 | requiring them, them being Avadel to certify against the one |
| 14:21:06 10 | patent that deals with the method of treatment.  They have |
| 14:21:09 11 | yet to do that.  I believe that motion is intended, if the |
| 14:21:13 12 | patent was, assuming this issue is ripe and they have |
| 14:21:13 13 | standing, assuming it was delisted then they wouldn't have |
| 14:21:21 14 | to certify, but if it's not and the FDA has told them they |
| 14:21:24 15 | have to as a condition to approval, then of course they |
| 14:21:27 16 | would have to certify and all this discussion of PI goes |
| 14:21:30 17 | away because the thirty-month stay kicks in. |
| 14:21:33 18 | As Your Honor may not know, this is a sodium |
| 14:21:39 19 | oxalate product, it's called the date rape drug basically |
| 14:21:40 20 | and there is a restricted distribution system involved.  My |
| 14:21:43 21 | client cannot believe that any system would be approved |
| 14:21:46 22 | without a restricted distribution system put in place and as |
| 14:21:50 23 | a result we believe the FDA has told them they have to |
| 14:21:53 24 | certify, but they have filed this motion in an attempt to |
| 14:21:58 25 | circumvent that. |

16

| | |
|---|---|
| 14:21:58 1 | THE COURT:  Let me ask you this.  The briefing, |
| 14:22:01 2 | the stipulation I just got now says the briefing isn't going |
| 14:22:05 3 | to be done until September.  I need to understand, there is |
| 14:22:09 4 | no way I am going to turn to that briefing, that motion |
| 14:22:13 5 | between September and October.  So I guess I need to hear |
| 14:22:20 6 | from defendant, is that really going to be -- preclude any |
| 14:22:25 7 | approval if I don't delist it by October? |
| 14:22:32 8 | MR. SCHULER:  No, no, Your Honor, the rationale, |
| 14:22:35 9 | the rationale for the motion has more to do with their claim |
| 14:22:39 10 | that they're entitled to an automatic injunction under the |
| 14:22:39 11 | Hatch Waxman Act. |
| 14:22:47 12 | MR. CERRITO:  Your Honor, I apologize -- sorry. |
| 14:22:50 13 | THE COURT:  Could we also -- wait.  Hold on.  My |
| 14:22:53 14 | court reporter is not able to discern whose voice is whose, |
| 14:22:59 15 | so let me ask each time you begin speaking if you say your |
| 14:23:04 16 | name.  So I don't know if that was Mr. Silver or |
| 14:23:08 17 | Mr. Schuler, but you were speaking. |
| 14:23:09 18 | MR. SCHULER:  I'm sorry, Your Honor, that was |
| 14:23:11 19 | Mr. Schuler and I believe Mr. Cerrito wanted to speak next. |
| 14:23:16 20 | MR. CERRITO:  Yes.  I'm sorry to interrupt. |
| 14:23:18 21 | THE COURT:  Go ahead. |
| 14:23:19 22 | MR. CERRITO:  Your Honor, I guess I would -- |
| 14:23:21 23 | sorry, Mr. Cerrito on behalf of Jazz. |
| 14:23:24 24 | I'm simply pointing out our situation on that. |
| 14:23:27 25 | Let's play that out for a second.  The FDA says you have to |

A-6438

17

| | | |
|---|---|---|
| 14:23:31 | 1 | certify for approval, they say okay, we'll certify then the |
| 14:23:34 | 2 | motion may be ripe and Your Honor's decision whether it's |
| 14:23:37 | 3 | today or six months from now if it is to delist, then the |
| 14:23:41 | 4 | stay would simply go away and we proceed accordingly.  If |
| 14:23:45 | 5 | Your Honor's decision is that it is appropriate, then there |
| 14:23:51 | 6 | is nothing for this Court to do beyond making that decision. |
| 14:23:54 | 7 | The criticality of that decision in the next weeks or months |
| 14:23:58 | 8 | is not as vital as everyone thinks. |
| 14:24:04 | 9 | THE COURT:  Okay.  All right.  So then I'll |
| 14:24:06 | 10 | grant the stipulation for the extension.  And I will ask |
| 14:24:14 | 11 | that you all submit a revised scheduling order.  Do that by |
| 14:24:22 | 12 | the end of next week, and include the dates that I have |
| 14:24:28 | 13 | given you on this and the limitations of any preliminary |
| 14:24:32 | 14 | injunction. |
| 14:24:32 | 15 | And just so we're clear, to the extent that a |
| 14:24:36 | 16 | preliminary injunction is filed at some point later than |
| 14:24:42 | 17 | October 22nd because, you know, there are good reasons for |
| 14:24:45 | 18 | that, the other limitations that I imposed such as the |
| 14:24:52 | 19 | plaintiff would need to take its best claim and defendant if |
| 14:24:57 | 20 | it's challenging validity, take its best validity defense, |
| 14:25:03 | 21 | they would still be enforced as would saying that any |
| 14:25:06 | 22 | preliminary injunction motion unless there is an order from |
| 14:25:09 | 23 | me would need to be briefed under the Delaware local rules. |
| 14:25:15 | 24 | Understood? |
| 14:25:17 | 25 | MR. CERRITO:  Yes, Your Honor. |

18

| | | |
|---|---|---|
| 14:25:19 | 1 | MR. SCHULER:  Yes, Your Honor. |
| 14:25:20 | 2 | THE COURT:  Okay.  With that, I will say |
| 14:25:23 | 3 | good-bye and everyone have a good weekend. |
| | 4 | (Teleconference concluded at 2:25 p.m.) |
| | 5 | |
| | 6 | I hereby certify the foregoing is a true and |
| | 7 | accurate transcript from my stenographic notes in the proceeding. |
| | 8 | /s/ Dale C. Hawkins |
| | | Official Court Reporter |
| | 9 | U.S. District Court |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

A-6439

## /

**/s** [1] - 18:8

## 1

**10:00** [2] - 4:6, 9:23
**10th** [1] - 11:4
**15th** [1] - 7:8
**18th** [3] - 9:12, 9:16, 13:11

## 2

**2** [1] - 3:25
**2021** [1] - 1:9
**2022** [1] - 4:6
**2023** [3] - 4:7, 4:9, 4:10
**21-691(MN** [1] - 1:5
**22nd** [7] - 9:17, 9:19, 10:18, 11:3, 12:8, 12:10, 17:17
**23rd** [2] - 4:9, 9:22
**26.2** [1] - 9:4
**27th** [1] - 9:3
**2:00** [1] - 1:10
**2:25** [1] - 18:4
**2nd** [1] - 4:6

## 3

**30** [1] - 1:9
**30th** [1] - 4:10

## 4

**4:30** [1] - 4:9

## 7

**7th** [1] - 4:7

## 8

**80** [1] - 10:7
**844** [1] - 1:12

## A

**a.m** [2] - 4:6, 9:23
**able** [1] - 16:14
**access** [1] - 3:3
**according** [1] - 4:8
**accordingly** [1] - 17:4
**accurate** [1] - 18:6
**Act** [1] - 16:11
**action** [1] - 5:12
**address** [2] - 3:22, 13:6

**addressing** [1] - 3:9
**adequate** [3] - 7:16, 8:8
**adopt** [1] - 7:24
**advance** [1] - 12:4
**advanced** [1] - 12:7
**afford** [1] - 7:16
**afternoon** [4] - 2:14, 2:20, 2:21, 2:25
**agree** [1] - 9:7
**agreed** [3] - 6:20, 6:22, 6:24
**agrees** [1] - 3:13
**ahead** [1] - 16:21
**al** [1] - 1:7
**allowed** [1] - 9:5
**apologize** [1] - 16:12
**APPEARANCES** [2] - 1:17, 2:1
**applications** [1] - 14:6
**appropriate** [1] - 17:5
**approval** [7] - 5:6, 7:11, 12:22, 13:2, 15:15, 16:7, 17:1
**approved** [1] - 15:21
**argued** [1] - 11:17
**ARSHT** [1] - 1:18
**assert** [2] - 10:9, 10:11
**assuming** [4] - 5:7, 10:16, 15:12, 15:13
**attempt** [1] - 15:24
**attorneys** [1] - 6:15
**August** [2] - 4:6, 9:3
**automatic** [1] - 16:10
**AVADEL** [1] - 1:6
**Avadel** [2] - 2:22, 15:9
**aware** [1] - 5:21

## B

**bar** [2] - 14:9
**basis** [1] - 7:7
**became** [1] - 6:2
**BEFORE** [1] - 1:14
**begin** [2] - 3:2, 16:15
**beginning** [1] - 4:10
**behalf** [3] - 2:17, 2:22, 3:17, 10:15, 16:23
**bench** [1] - 4:10
**best** [5] - 10:6, 10:7, 10:11, 17:19, 17:20
**better** [5] - 5:16, 12:9, 13:13, 14:22
**between** [1] - 16:5
**beyond** [1] - 17:6
**biggest** [1] - 8:7
**brief** [2] - 9:19, 11:15
**briefed** [2] - 4:7, 17:23
**briefing** [4] - 15:4,

16:1, 16:2, 16:4
**briefly** [1] - 4:24
**Brier** [1] - 2:18
**BRIER** [1] - 1:22
**button** [1] - 5:13
**BY** [7] - 1:19, 1:21, 1:22, 1:22, 2:3, 2:6, 2:8
**bye** [1] - 18:3

## C

**C.A** [1] - 1:5
**calendar** [1] - 8:23
**CALVOSA** [1] - 1:22
**Calvosa** [1] - 2:18
**cannot** [1] - 15:21
**careful** [1] - 5:19, 5:22
**case** [2] - 11:17, 14:7
**Cerrito** [11] - 2:17, 2:19, 3:16, 4:15, 4:25, 7:3, 10:14, 10:21, 11:19, 16:19, 16:23
**CERRITO** [17] - 1:21, 3:16, 4:16, 5:2, 6:4, 6:14, 11:6, 12:14, 12:20, 13:17, 13:23, 15:1, 15:6, 16:12, 16:20, 16:22, 17:25
**certain** [1] - 5:21
**certainly** [4] - 5:4, 6:4, 10:21, 11:6
**certify** [7] - 15:9, 15:14, 15:16, 15:24, 17:1, 18:6
**challenging** [2] - 10:10, 17:20
**chance** [1] - 14:3
**chances** [1] - 12:10
**characterize** [1] - 7:2
**chooses** [1] - 10:18
**circumstance** [2] - 5:5, 10:23
**circumstances** [1] - 13:1
**circumvent** [1] - 15:25
**claim** [4] - 4:5, 10:6, 16:9, 17:19
**claims** [1] - 10:7
**clear** [2] - 14:1, 17:15
**client** [9] - 10:17, 11:9, 11:20, 12:1, 12:2, 12:12, 13:2, 14:19, 15:21
**close** [1] - 3:10
**closer** [1] - 4:11
**coming** [4] - 5:22, 12:6, 13:6, 13:12
**communication** [1] -

13:5
**complaint** [1] - 7:9
**comprehensive** [1] - 7:17
**concern** [4] - 7:21, 8:7, 14:5, 14:14
**concerned** [1] - 14:8
**concluded** [1] - 18:4
**condition** [1] - 15:15
**confer** [1] - 6:7
**conference** [1] - 4:8
**confidential** [4] - 3:6, 3:9, 7:8, 14:10
**confidentiality** [1] - 6:15
**consider** [1] - 7:16
**constrained** [2] - 10:2
**construction** [1] - 4:5
**contention** [1] - 6:5
**contentions** [2] - 6:6, 9:9
**context** [1] - 5:4
**CONTINUED** [1] - 2:1
**correct** [1] - 3:18
**correspondence** [4] - 5:8, 13:18, 13:19, 14:1
**counsel** [1] - 2:14
**Counsel** [1] - 1:24, 2:10
**counterclaims** [1] - 14:3
**course** [2] - 5:16, 15:15
**court** [1] - 16:14
**COURT** [28] - 1:1, 2:14, 2:20, 2:25, 3:21, 4:2, 4:17, 4:21, 5:24, 6:11, 6:22, 8:3, 8:11, 8:20, 10:20, 11:19, 12:15, 13:4, 13:21, 13:24, 14:12, 14:25, 15:2, 16:1, 16:13, 16:21, 17:9, 18:2
**Court** [10] - 1:14, 5:17, 6:2, 6:9, 7:16, 11:7, 11:11, 17:6, 18:8, 18:9
**cover** [1] - 14:6
**criticality** [1] - 17:7

## D

**Dale** [1] - 18:8
**Dan** [3] - 2:21, 13:16, 13:25
**DANIEL** [1] - 2:3
**DARALYN** [1] - 2:8
**Daralyn** [1] - 2:24

**date** [11] - 6:20, 7:7, 7:9, 7:10, 8:16, 9:13, 9:18, 12:16, 12:18, 12:22, 15:19
**dates** [6] - 4:4, 5:21, 6:24, 10:22, 10:24, 17:12
**Daubert** [1] - 4:6
**days** [4] - 4:11, 4:12, 9:21
**deadlines** [1] - 8:9
**deal** [6] - 6:1, 6:16, 7:22, 11:11, 12:5, 12:18
**dealing** [1] - 3:25
**deals** [2] - 6:23, 15:10
**decide** [4] - 4:11, 6:10, 8:5, 11:24
**decision** [6] - 3:11, 12:10, 17:2, 17:5, 17:6, 17:7
**defendant** [6] - 2:23, 6:11, 10:9, 10:25, 16:6, 17:19
**Defendants** [2] - 1:8, 2:10
**defendants** [2] - 6:7, 9:2
**defense** [2] - 10:11, 17:20
**definitive** [1] - 5:3
**DELAWARE** [1] - 1:2
**Delaware** [3] - 1:12, 9:20, 17:23
**delay** [2] - 12:25
**delayed** [1] - 11:23
**delist** [2] - 16:7, 17:3
**delisted** [1] - 15:13
**delisting** [2] - 15:4, 15:5
**determination** [1] - 9:15
**detriment** [1] - 11:10
**dictate** [1] - 5:7
**different** [1] - 11:2
**discern** [1] - 16:14
**disclosure** [1] - 7:13
**discover** [1] - 5:7
**discovery** [5] - 7:13, 7:15, 7:25, 9:9, 11:12
**discuss** [1] - 3:6
**discussion** [1] - 15:16
**distribution** [2] - 15:20, 15:22
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 6:13
**District** [2] - 1:14, 18:9
**documentation** [1] - 15:8

**documents** [1] - 5:21
**DOMINIC** [1] - 1:21
**Dominic** [1] - 2:17
**done** [5] - 9:13, 9:25, 13:22, 16:3
**down** [5] - 3:7, 12:5, 12:12, 12:13
**draft** [4] - 14:13, 14:19, 14:21, 14:24
**drug** [1] - 15:19
**due** [4] - 4:7, 11:9, 11:18, 12:17
**duress** [1] - 11:7
**DURIE** [2] - 2:8, 2:8
**Durie** [2] - 2:24

**E**

**effectively** [1] - 7:23
**eighteen** [1] - 7:21
**electronically** [1] - 5:13
**Emanuel** [3] - 2:18, 3:17, 10:15
**EMANUEL** [1] - 1:21
**emergent** [1] - 6:2
**end** [1] - 17:12
**enforced** [1] - 17:21
**ENGLISH** [1] - 2:3
**English** [1] - 2:22
**entire** [1] - 8:17
**entitled** [1] - 16:10
**erased** [1] - 7:23
**ESQ** [7] - 1:19, 1:21, 1:22, 1:22, 2:3, 2:6, 2:8
**essentially** [1] - 3:17
**et** [1] - 1:7
**event** [1] - 8:2
**exactly** [1] - 7:3
**except** [1] - 3:25
**excerpts** [1] - 4:23
**exchange** [1] - 9:8
**existing** [1] - 14:6
**expedite** [1] - 14:2
**expedited** [1] - 9:8
**expeditiously** [1] - 10:5
**expert** [3] - 6:16, 7:14, 9:6
**extension** [1] - 17:10
**extent** [1] - 17:15
**eyes** [1] - 6:16

**F**

**fact** [2] - 6:10, 11:22
**fair** [1] - 9:5
**FDA** [6] - 9:14, 14:9, 15:8, 15:14, 15:23,

16:25
**few** [1] - 4:24
**file** [13] - 7:10, 10:18, 11:3, 11:4, 11:10, 11:20, 12:7, 12:8, 12:10, 12:13, 12:16, 12:18, 13:3
**filed** [6] - 3:5, 5:13, 9:17, 9:18, 15:24, 17:16
**filing** [2] - 10:19, 12:9
**filled** [1] - 4:4
**first** [1] - 9:1
**five** [4] - 4:9, 4:12, 12:25
**five-day** [2] - 4:9, 12:25
**five-month** [1] - 12:25
**FOR** [1] - 1:2
**foregoing** [1] - 18:6
**forward** [1] - 6:10
**four** [1] - 10:6
**fourfold** [1] - 7:6
**fourteen** [1] - 9:21
**Frank** [1] - 2:18
**FRANK** [1] - 1:22
**fresh** [1] - 14:4
**Friday** [1] - 1:9
**front** [1] - 15:3
**future** [1] - 10:19

**G**

**GABRIEL** [1] - 1:22
**Gabriel** [1] - 2:18
**given** [6] - 8:12, 8:13, 8:23, 10:1, 17:13
**good-bye** [1] - 18:3
**govern** [1] - 7:6
**grant** [2] - 12:11, 17:10
**great** [1] - 14:15
**guess** [5] - 5:10, 11:15, 14:17, 16:5, 16:22
**guys** [4] - 8:21, 9:25, 13:5, 14:14

**H**

**hard** [1] - 13:9
**Hatch** [1] - 16:11
**Hawkins** [1] - 18:8
**hear** [5] - 4:22, 4:23, 6:11, 14:1, 16:5
**hearing** [3] - 4:5, 9:22, 13:9
**hereby** [1] - 18:6
**hold** [2] - 9:17, 16:13
**honest** [1] - 8:6

**Honor** [35] - 2:21, 3:16, 3:18, 4:16, 4:18, 5:2, 5:20, 5:22, 6:4, 6:19, 7:2, 7:8, 8:6, 8:15, 10:14, 11:6, 11:14, 11:16, 12:8, 12:20, 12:23, 13:16, 13:23, 13:25, 14:3, 14:23, 15:1, 15:7, 15:18, 16:8, 16:12, 16:18, 16:22, 17:25, 18:1
**Honor's** [3] - 14:4, 17:2, 17:5
**HONORABLE** [1] - 1:14
**hopefully** [1] - 5:16
**host** [1] - 12:24

**I**

**implication** [1] - 15:5
**important** [1] - 14:18
**importantly** [1] - 7:15
**imposed** [1] - 17:18
**IN** [1] - 1:1
**INC** [1] - 1:3
**include** [1] - 17:12
**included** [1] - 7:18
**incorrect** [1] - 10:16
**information** [4] - 3:4, 3:7, 3:9, 14:10
**infringement** [3] - 8:1, 9:8, 10:9
**injunction** [20] - 3:14, 4:1, 4:14, 4:22, 5:25, 6:2, 6:24, 9:1, 9:11, 9:16, 9:24, 10:4, 12:4, 12:11, 13:8, 13:12, 16:10, 17:14, 17:16, 17:22
**instances** [1] - 12:24
**intended** [1] - 15:11
**interrogatories** [1] - 6:6
**interrupt** [1] - 16:20
**involved** [1] - 15:20
**issue** [8] - 4:14, 4:21, 5:6, 5:11, 11:16, 13:17, 15:12
**issued** [1] - 11:13
**issues** [10] - 3:6, 3:13, 3:19, 4:4, 4:13, 4:19, 7:16, 8:5, 10:3, 13:15

**J**

**JAZZ** [1] - 1:3
**Jazz** [5] - 2:17, 3:17,

7:23, 10:15, 16:23
**JEREMY** [1] - 1:19
**Jeremy** [1] - 2:16
**joined** [2] - 2:17, 2:23
**Judge** [1] - 1:14
**July** [2] - 1:9, 4:7

**K**

**Ken** [1] - 4:19
**KENNETH** [1] - 2:6
**Kent** [1] - 2:23
**kicks** [1] - 15:17
**kind** [1] - 10:2
**King** [1] - 1:12
**known** [2] - 7:9, 12:9
**knows** [1] - 12:23

**L**

**lastly** [1] - 7:15
**LATHAM** [1] - 2:5
**Latham** [2] - 2:23, 4:19
**launching** [1] - 5:6
**least** [1] - 7:3
**letters** [1] - 3:4
**likelihood** [5] - 4:25, 10:1, 10:3, 11:21, 11:22
**limit** [1] - 10:3
**limitations** [2] - 17:13, 17:18
**line** [1] - 3:10
**list** [1] - 3:19
**litigation** [1] - 14:16
**LLP** [1] - 1:18
**local** [6] - 4:8, 6:13, 9:4, 9:20, 14:15, 17:23
**look** [2] - 9:18, 14:3
**looking** [3] - 7:2, 11:21, 11:22
**loud** [1] - 14:1

**M**

**market** [1] - 11:25
**MARYELLEN** [1] - 1:14
**material** [1] - 9:6
**materials** [1] - 7:19
**matter** [1] - 5:13
**McCarter** [2] - 2:3, 2:22
**mean** [3] - 8:11, 9:3
**meaning** [1] - 10:17
**means** [3] - 9:12, 9:20, 10:5
**meet** [1] - 6:7

**method** [1] - 15:10
**might** [3] - 3:23, 11:4, 12:17
**mind** [1] - 14:4
**missed** [1] - 3:23
**misstate** [1] - 8:16
**month** [6] - 5:11, 6:18, 8:17, 8:23, 12:25, 15:17
**months** [2] - 17:3, 17:7
**Morris** [1] - 2:16
**MORRIS** [1] - 1:18
**most** [1] - 3:18
**motion** [10] - 9:16, 11:25, 12:5, 15:3, 15:11, 15:24, 16:4, 16:9, 17:2, 17:22
**motions** [1] - 4:6
**MR** [30] - 2:16, 2:21, 3:16, 3:24, 4:16, 4:18, 5:2, 6:4, 6:19, 7:1, 8:6, 8:14, 10:14, 11:6, 12:14, 12:20, 13:16, 13:17, 13:23, 13:25, 14:23, 15:1, 15:6, 16:8, 16:12, 16:18, 16:20, 16:22, 17:25, 18:1

**N**

**name** [1] - 16:16
**NDA** [8] - 5:7, 5:12, 6:17, 7:18, 9:2, 9:6, 13:18, 14:1
**NDA's** [1] - 6:12
**necessary** [3] - 6:8, 9:11, 9:24
**need** [21] - 3:7, 5:1, 8:9, 8:21, 9:2, 9:3, 9:7, 9:11, 9:22, 9:25, 10:5, 11:15, 12:3, 12:6, 13:5, 16:3, 16:5, 17:19, 17:23
**needed** [2] - 4:4, 9:9
**needing** [1] - 11:2
**needs** [4] - 9:13, 9:15, 9:17, 9:18
**negotiate** [1] - 8:9
**new** [1] - 13:19
**next** [5] - 13:8, 14:24, 16:19, 17:7, 17:12
**Nichols** [1] - 2:17
**NICHOLS** [1] - 1:18
**Nick** [1] - 3:16
**nits** [2] - 3:19, 3:21
**non** [1] - 10:9
**non-infringement** [1] - 10:9

**nonvalidity** [1] - 10:10
**NOREIKA** [1] - 1:14
**normal** [1] - 4:3
**noted** [1] - 7:21
**notes** [1] - 18:6
**nothing** [1] - 17:6
**notice** [1] - 12:7
**November** [3] - 9:22, 11:4, 11:20

**O**

**obviously** [3] - 5:5, 13:18, 13:20
**occurs** [1] - 7:22
**October** [14] - 4:9, 4:10, 7:8, 9:12, 9:13, 9:16, 9:17, 9:19, 9:25, 10:25, 11:3, 16:5, 16:7, 17:17
**OF** [1] - 1:2
**Official** [1] - 18:8
**one** [13] - 3:1, 3:19, 6:7, 6:16, 7:6, 7:13, 9:5, 9:22, 10:8, 13:12, 13:17, 15:2, 15:9
**opinion** [1] - 8:22
**order** [9] - 3:1, 6:14, 6:15, 10:17, 14:8, 14:13, 14:18, 17:11, 17:22
**otherwise** [1] - 11:15
**outset** [1] - 7:21
**overarching** [1] - 7:19
**oxalate** [1] - 15:19

**P**

**p.m** [2] - 1:10, 18:4
**paragraph** [1] - 3:25
**parameters** [1] - 6:8
**particular** [1] - 10:22
**parties** [5] - 4:24, 5:10, 8:9, 9:7, 9:11
**parts** [1] - 13:8
**patent** [5] - 14:6, 15:5, 15:10, 15:12
**patents** [2] - 10:6, 11:13
**pending** [1] - 11:25
**perhaps** [4] - 8:17, 11:9, 11:10
**permit** [1] - 5:18
**PHARMACEUTICALS** [2] - 1:3, 1:6
**PI** [4] - 5:1, 6:8, 11:2, 15:16
**pick** [2] - 10:6, 10:11
**place** [4] - 6:14, 6:15,

14:8, 15:22
**plaintiff** [6] - 4:16, 9:5, 10:5, 10:13, 14:5, 17:19
**Plaintiff** [2] - 1:4, 1:24
**plaintiff's** [1] - 15:6
**plaintiffs** [1] - 15:1
**plate** [1] - 12:5
**play** [1] - 16:25
**PLC** [1] - 1:6
**plenty** [1] - 5:19
**plopping** [1] - 12:5
**point** [4] - 3:21, 5:15, 10:19, 17:16
**pointing** [1] - 16:24
**pointless** [1] - 12:17
**position** [2] - 6:3, 15:6
**possibility** [1] - 7:4
**possible** [5] - 5:4, 5:12, 5:15, 9:2, 13:1
**potentially** [1] - 6:10
**practical** [1] - 15:5
**practice** [1] - 12:23
**preclude** [1] - 16:6
**precluded** [2] - 10:18, 10:22
**preclusive** [1] - 10:17
**preliminary** [19] - 3:14, 3:25, 4:14, 4:22, 5:25, 6:1, 6:23, 9:1, 9:11, 9:16, 9:24, 10:4, 12:4, 12:11, 13:8, 13:11, 17:13, 17:16, 17:22
**present** [1] - 5:16
**pretrial** [1] - 4:8
**principle** [1] - 7:12
**principles** [1] - 7:5
**problem** [2] - 11:9, 13:13
**proceed** [1] - 17:4
**proceeding** [1] - 18:6
**process** [3] - 11:9, 11:18, 12:17
**produce** [4] - 6:15, 9:2, 9:4
**produced** [2] - 6:13, 6:25
**producing** [1] - 6:17
**product** [2] - 14:7, 15:19
**production** [2] - 7:18, 14:2
**productive** [1] - 7:25
**profess** [1] - 8:21
**proposal** [2] - 7:23, 8:4
**proposed** [2] - 3:1, 3:12
**prosecution** [3] -

11:13, 14:9
**protective** [6] - 6:14, 14:8, 14:13, 14:18
**provide** [2] - 6:1, 6:9
**provided** [1] - 5:14
**provision** [1] - 6:21
**provisions** [1] - 14:20
**public** [4] - 3:3, 8:15, 9:13, 9:14
**publicly** [1] - 7:9
**purposes** [2] - 14:16
**pushing** [1] - 5:13
**put** [2] - 6:5, 8:17, 15:22

**Q**

**questions** [1] - 4:24
**quickly** [2] - 5:8, 5:15
**Quinn** [3] - 2:18, 3:17, 10:15
**QUINN** [1] - 1:21

**R**

**raise** [1] - 13:15
**raised** [1] - 7:5
**rape** [1] - 15:19
**rationale** [2] - 16:8, 16:9
**read** [1] - 4:22
**really** [1] - 16:6
**reasonable** [2] - 14:20, 14:21
**reasons** [1] - 17:17
**reciprocal** [1] - 7:13
**reciprocity** [1] - 7:19
**referring** [1] - 3:6
**regard** [1] - 13:17
**relative** [1] - 5:8
**relatively** [1] - 5:8
**reply** [1] - 9:21
**reporter** [1] - 16:14
**Reporter** [1] - 18:8
**requiring** [1] - 15:9
**resolved** [1] - 3:24
**response** [2] - 9:14, 9:20
**restricted** [2] - 15:20, 15:22
**result** [1] - 15:23
**rethink** [1] - 8:24
**review** [1] - 9:6
**revised** [1] - 17:11
**ripe** [2] - 15:12, 17:2
**risk** [2] - 12:1, 13:5
**roughly** [2] - 7:20, 7:21
**rule** [2] - 6:13, 10:4
**Rule** [1] - 9:4

**rules** [4] - 4:8, 9:20, 14:15, 17:23
**ruling** [1] - 13:9

**S**

**schedule** [11] - 3:12, 3:14, 4:12, 5:18, 5:25, 6:5, 6:10, 6:23, 7:15, 7:17, 7:24
**scheduled** [1] - 13:7
**scheduling** [3] - 3:1, 4:3, 17:11
**SCHULER** [9] - 2:6, 4:18, 6:19, 7:1, 8:6, 8:14, 16:8, 16:18, 18:1
**Schuler** [7] - 2:23, 4:19, 6:12, 6:19, 8:3, 16:17, 16:19
**scratch** [1] - 11:1
**seal** [1] - 3:5
**second** [2] - 7:12, 16:25
**see** [5] - 3:10, 3:22, 6:7, 8:12, 15:3
**seek** [1] - 8:1
**seeking** [1] - 5:12
**send** [1] - 14:23
**sense** [1] - 13:21
**sent** [1] - 14:13
**September** [2] - 16:3, 16:5
**service** [1] - 6:5
**setting** [1] - 13:10
**seven** [2] - 9:21, 13:19
**seven-day** [1] - 13:19
**shall** [1] - 11:9
**shared** [2] - 9:13, 9:15
**short** [1] - 4:23
**shorter** [1] - 8:9
**shortly** [2] - 7:10, 11:14
**shut** [1] - 3:7
**sided** [1] - 7:13
**silver** [3] - 4:17, 6:12, 14:12
**SILVER** [6] - 2:3, 2:21, 3:24, 13:16, 13:25, 14:23
**Silver** [4] - 2:22, 13:16, 13:25, 16:16
**simply** [2] - 16:24, 17:4
**sitting** [2] - 5:5, 13:8
**situation** [2] - 7:6, 7:22, 16:24
**six** [1] - 17:3
**sodium** [1] - 15:18
**soon** [2] - 5:12, 9:2

**sorry** [6] - 6:6, 8:15, 16:12, 16:18, 16:20, 16:23
**sound** [1] - 14:20
**speaking** [2] - 16:15, 16:17
**specific** [1] - 14:5
**standing** [1] - 15:13
**start** [1] - 11:1
**starting** [1] - 9:23
**statements** [1] - 4:23
**STATES** [1] - 1:1
**States** [1] - 1:14
**stay** [2] - 15:17, 17:4
**stenographic** [1] - 18:6
**still** [1] - 17:21
**stipulation** [3] - 15:4, 16:2, 17:10
**stop** [1] - 12:15
**Street** [1] - 1:12
**stuff** [3] - 3:14, 4:1, 4:3
**submit** [2] - 11:15, 17:11
**substance** [1] - 3:20
**substantial** [1] - 7:4
**success** [4] - 10:1, 10:3, 11:22
**suggest** [2] - 14:19, 14:20
**suggesting** [3] - 11:3, 11:8, 12:21
**SULLIVAN** [1] - 1:21
**support** [1] - 9:16
**system** [3] - 15:20, 15:21, 15:22

**T**

**TANGRI** [1] - 2:8
**Tangri** [1] - 2:24
**Teleconference** [2] - 1:10, 18:4
**ten** [1] - 7:23
**THE** [30] - 1:1, 1:2, 1:14, 2:14, 2:20, 2:25, 3:21, 4:2, 4:17, 4:21, 5:24, 6:11, 6:22, 8:3, 8:11, 8:20, 10:20, 11:19, 12:15, 13:4, 13:21, 13:24, 14:12, 14:25, 15:2, 16:1, 16:13, 16:21, 17:9, 18:2
**themselves** [1] - 11:10
**thinking** [2] - 8:25, 10:12
**thinks** [1] - 17:8
**third** [1] - 7:14

**thirty** [1] - 15:17
**thirty-month** [1] - 15:17
**thoughts** [1] - 10:13
**three** [2] - 11:1, 13:7
**throw** [1] - 10:24
**TIGAN** [2] - 1:19, 2:16
**Tigan** [1] - 2:16
**timeline** [1] - 8:22
**timing** [1] - 10:2
**today** [4] - 2:19, 5:5, 5:17, 17:3
**together** [1] - 3:18
**totally** [1] - 12:20
**transcript** [2] - 3:3, 18:6
**treatment** [1] - 15:10
**trial** [2] - 4:10, 4:11
**trials** [1] - 13:7
**true** [1] - 18:6
**try** [3] - 3:5, 3:10, 14:6
**trying** [2] - 5:22, 14:5
**TUNNEL** [1] - 1:18
**turn** [2] - 13:19, 16:4
**turns** [2] - 3:8, 10:23
**two** [1] - 3:19

## U

**U.S** [1] - 18:9
**under** [6] - 3:5, 5:4, 9:4, 9:19, 16:10, 17:23
**understood** [2] - 8:14, 17:24
**undertaken** [1] - 8:2
**unfortunately** [2] - 5:3, 5:17
**UNITED** [1] - 1:1
**United** [1] - 1:14
**unless** [1] - 17:22
**up** [6] - 5:22, 8:14, 11:1, 11:12, 11:17, 13:10
**update** [2] - 6:9, 13:1
**URQUHART** [1] - 1:21

## V

**validity** [5] - 8:1, 9:8, 10:11, 17:20
**view** [6] - 5:15, 5:16, 7:1, 7:5, 7:10, 7:24
**vital** [1] - 17:8
**voice** [1] - 16:14

## W

**wait** [1] - 16:13
**waive** [1] - 12:16

**wants** [1] - 12:12
**WATKINS** [1] - 2:5
**Watkins** [2] - 2:24, 4:19
**Waxman** [1] - 16:11
**week** [3] - 13:7, 14:24, 17:12
**weekend** [1] - 18:3
**weeks** [3] - 7:21, 7:24, 17:7
**whole** [1] - 12:24
**Wilmington** [1] - 1:12
**wind** [1] - 11:1
**word** [1] - 11:8
**written** [1] - 11:8

## Y

**year** [3] - 10:25, 11:17, 13:8
**years** [1] - 11:2

# EXHIBIT 165

# Clinical Superiority Findings

In accordance with section 527(e)(2) of the FD&C Act (21 U.S.C. 360cc(e)(2)), FDA will publish a summary of the clinical superiority findings when a drug is eligible for orphan-drug exclusivity on the basis of a demonstration of clinical superiority. This page will only include the clinical superiority findings for those drugs approved on or after August 18, 2017, the date that the FDA Reauthorization Act of 2017 added section 527(e)(2) to the FD&C Act. "Clinical superiority," is used here only within the meaning of that term under FDA's orphan drug regulations at 21 CFR Part 316 and section 527(c) of the FD&C Act. For the definition of "clinically superior," for the purposes of determining eligibility for orphan-drug exclusivity when the same drug has been previously approved for the same use or indication, see 21 CFR 316.3(b)(3). For the definition of "same drug," see 21 CFR 316.3(b)(14).

The summary is organized by approval date.

## 2024

### Flamel Ireland Limited dba Avadel Ireland for Lumryz (sodium oxybate)

| | |
|---|---|
| **Approval Date** | 10/16/2024 |
| **NDA/BLA** | NDA 214755/S-006 |
| **Sponsor** | Flamel Ireland Limited dba Avadel Ireland |
| **Drug** | Lumryz (sodium oxybate) for extended-release oral suspension |
| **Orphan Designation** | Treatment of narcolepsy |
| **Approved Labeled Indication** | Treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy |

| Exclusivity Protected Indication | Treatment of cataplexy or excessive daytime sleepiness (EDS) in pediatric patients 7 years of age and older with narcolepsy |
|---|---|
| Summary of Clinical Superiority Findings | The active moiety, oxybate, was previously approved as Xyrem (sodium oxybate) and Xywav (calcium, magnesium, potassium, and sodium oxybates) for the treatment of cataplexy or EDS in pediatric patients 7 years of age and older with narcolepsy. The benefits of Lumryz's once-nightly dosing rise to the level of making a major contribution to patient care because Lumryz's dosing provides an opportunity to minimize sleep fragmentation and disruption of sleep architecture in a way that is not possible for a patient on a twice-nightly dosing regimen of oxybate. This is medically relevant because the goal for treating patients with sleep disorders is to restore a normal sleep pattern and a healthier sleep physiology. Aside from the medical benefits of not having to awaken to take a second dose, it is inherently more convenient, easier, and less burdensome for patients to forgo awakening to take a second dose on a nightly basis. Importantly, this is in the context of a chronic neurological condition that requires potentially lifelong treatment. |

## 2023

### Flamel Ireland Limited dba Avadel Ireland for Lumryz (sodium oxybate)

| Approval Date | 5/01/2023 |
|---|---|
| NDA/BLA | NDA 214755 |
| Sponsor | Flamel Ireland Limited dba Avadel Ireland |
| Drug | Lumryz (sodium oxybate) for extended-release oral suspension |
| Orphan Designation | Treatment of narcolepsy |
| Approved Labeled Indication | Treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy |

| Exclusivity Protected Indication | Treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy |
|---|---|
| **Summary of Clinical Superiority Findings** | The active moiety, oxybate, was previously approved as Xyrem (sodium oxybate) and Xywav (calcium, magnesium, potassium, and sodium oxybates) for the treatment of cataplexy or EDS in adults with narcolepsy.  The benefits of Lumryz's once-nightly dosing rise to the level of making a major contribution to patient care because Lumryz's dosing provides for oxybate therapy that does not involve disrupting or fragmenting sleep, whereas Xyrem and Xywav necessitate a nocturnal awakening to take a second dose, which disrupts sleep architecture in patients with a known sleep disorder.  Aside from the medical benefits of not having to awaken to take a second dose, it is inherently more convenient, easier, and less burdensome for patients to forgo awakening to take a second dose on a nightly basis.  Importantly, this is in the context of a chronic neurological condition that requires potentially lifelong treatment. |

## **2022**

### **Mitsubishi Tanabe Pharma Corporation for Radicava ORS (edaraone) oral suspension**

| Approval Date | 5/12/2022 |
|---|---|
| **NDA/BLA** | NDA 215446 |
| **Sponsor** | Mitsubishi Tanabe Pharma Corporation |
| **Drug** | Radicava ORS (edaraone) oral suspension |
| **Orphan Designation** | Treatment of amyotrophic lateral sclerosis |
| **Approved Labeled Indication** | Treatment of amyotrophic lateral sclerosis (ALS) |
| **Exclusivity Protected Indication** | Treatment of amyotrophic lateral sclerosis (ALS) |

A-6447

| Summary of Clinical Superiority Findings | The active moiety, edaravone, was previously approved as Radicava (edaravone) injection, for intravenous (IV) use for the treatment of amyotrophic lateral sclerosis (ALS). Radicava ORS makes a major contribution to patient care by providing an oral suspension route of administration that avoids the burdens of IV administration. IV administration requires the involvement of a healthcare professional to establish IV access and is inherently painful. Additionally, in some individuals IV access is difficult to obtain and is associated with potentially serious or life-threatening risks of infection. Radicava ORS is given orally or by feeding tube and can be self-administered.  Overall, Radicava's oral suspension route of administration advances the ease and comfort of administration without the complications and risks associated with IV administration. Importantly, this is in the context of a chronic and severe neurodegenerative disease that requires long-term treatment. |
|---|---|

## 2020

### Jazz Pharmaceuticals Ireland Limited for Xywav (calcium, magnesium, potassium, and sodium oxybates)

| Approval Date | 7/21/2020 |
|---|---|
| NDA/BLA | 212690 |
| Sponsor | Jazz Pharmaceuticals Ireland Limited |
| Drug | Xywav (calcium, magnesium, potassium, and sodium oxybates) |
| Orphan Designation | Treatment of narcolepsy |
| Approved Labeled Indication | Indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy |

| Exclusivity Protected Indication | Indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy |
| --- | --- |
| Summary of Clinical Superiority Findings | The active moiety, oxybate was previously approved as Xyrem (sodium oxybate) for the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy. Xywav (calcium, magnesium, potassium, and sodium oxybates) is clinically superior to Xyrem by means of greater safety because Xywav provides a greatly reduced chronic sodium burden compared to Xyrem. The differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated. |

## Chiesi USA, Inc. for Mycapssa

| Approval Date | 6/26/2020 |
| --- | --- |
| NDA/BLA | NDA 208232 |
| Sponsor | Chiesi USA, Inc. |
| Drug | Mycapssa (octreotide) delayed-release capsules, for oral use |
| Orphan Designation | The oral treatment of acromegaly |
| Approved Labeled Indication | Long-term maintenance treatment in acromegaly patients who have responded to and tolerated treatment with octreotide or lanreotide |
| Exclusivity Protected Indication | Long-term maintenance treatment in acromegaly patients who have responded to and tolerated treatment with octreotide or lanreotide |

| Summary of Clinical Superiority Findings | The active moiety, octreotide, was previously approved as Sandostatin (octreotide acetate) injection and Sandostatin LAR Depot (octreotide acetate) for injectable suspension, both for parenteral use in the treatment of acromegaly.  Mycapssa makes a major contribution to patient care by providing an orally administered delayed-release capsule dosage form.  Oral administration avoids the pain and risk of infection associated with parenteral administration.  Additionally, Sandostatin LAR must be administered by a healthcare provider, while Mycapssa can be self-administered.  Overall, Mycapssa improves patient comfort, reduces treatment burden, and advances the ease and comfort of drug administration.  Importantly, this is in the context of a chronic and severe disease that may require long-term treatment. |

## 2019

## Neurelis Pharmaceuticals, Inc. for Valtoco (diazepam nasal spray)

| | |
|---|---|
| Approval Date | 01/10/2020 |
| NDA/BLA | NDA 211635 |
| Sponsor | Neurelis Pharmaceuticals, Inc. |
| Drug | Valtoco (diazepam nasal spray) |
| Orphan Designation | Management of acute repetitive seizures |
| Approved Labeled Indication | Indicated for the acute treatment of intermittent, stereotypic episodes of frequent seizure activity (i.e., seizure clusters, acute repetitive seizures) that are distinct from a patient's usual seizure pattern in patients with epilepsy 6 years of age and older. |
| Exclusivity Protected Indication | Indicated for the acute treatment of intermittent, stereotypic episodes of frequent seizure activity (i.e., seizure clusters, acute repetitive seizures) that are distinct from a patient's usual seizure pattern in patients with epilepsy 6 years of age and older. |

A-6450

| Summary of Clinical Superiority Findings | Diazepam was previously approved as a gel that is administered rectally for the same use as Valtoco (i.e., acute repetitive seizures). Valtoco's intranasal route of administration provides a major contribution to patient care over the rectal route of administration by providing a significantly improved ease of use. Rectal administration is inherently invasive for the patient and difficult to administer, whereas it is inherently more comfortable for the patient to receive the drug intranasally than rectally. In the context of when this drug is to be given, typically in the middle of a seizure event, it is inherently easier to administer the drug to a patient intranasally than rectally. |
|---|---|

## 2018

## CSL Behring for Hizentra

| Approval Date | 03/15/2018 |
|---|---|
| NDA/BLA | BLA 125350/S-641 |
| Sponsor | CSL Behring |
| Drug | Hizentra (Immune Globulin Subcutaneous (Human), 20% Liquid) |
| Orphan Designation | Treatment of chronic inflammatory demyelinating polyneuropathy (CIDP) |
| Approved Labeled Indication | Indicated for the treatment of adult patients with chronic inflammatory demyelinating polyneuropathy (CIDP) as maintenance therapy to prevent relapse of neuromuscular disability and impairment |

A-6451

| Summary of Clinical Superiority Findings | Immune Globulin (Human) was previously approved in an intravenous (IGIV) formulation for the same use as Hizentra (Immune Globulin Subcutaneous (Human), 20% Liquid). A substantial portion of CIDP patients receiving IGIV require a central venous access device (CVAD), which is associated with an increased risk of thromboembolic events and access-associated infections. These risks can be serious and/or life-threatening and the risks are long-term because CIDP is a chronic condition. Data demonstrated that patients treated with Hizentra subcutaneously had fewer of these adverse events than patients treated with IGIV via CVADs. Therefore, Hizentra provides greater safety than the previously approved IGIV formulation of immune globulin for CIDP as maintenance therapy for the purposes of orphan-drug exclusivity. |

## Astellas Pharma Global Development, Inc. for Prograf

| Approval Date | 05/24/2018 |
| --- | --- |
| NDA/BLA | 210115 |
| Sponsor | Astellas Pharma Global Development, Inc. |
| Drug | Prograf (tacrolimus granules for oral suspension) |
| Orphan Designation | Prevention of rejection in kidney, liver, or heart transplant in pediatric patients |
| Approved Labeled Indication | The prophylaxis of organ rejection, in patients receiving allogeneic kidney transplant, liver transplants, and heart transplant, in combination with other immunosuppressants. |

| Summary of Clinical Superiority Findings | Tacrolimus has been previously approved for the same use in capsule and injection dosage forms. Pediatric patients who were unable to swallow capsules received extemporaneously compounded oral liquid tacrolimus preparations, which have not undergone product quality or clinical testing and have been associated with severe risks due to compounding errors. Because tacrolimus granules for oral suspension provides an age appropriate formulation for pediatric patients that avoids the severe risks associated with erroneously compounded tacrolimus, it provides greater safety than tacrolimus capsules for that population, for the purposes of orphan-drug exclusivity.

Tacrolimus injection contains castor oil as an inactive ingredient, which exposes patients to the serious risk of anaphylaxis. Because tacrolimus granules for oral suspension does not contain castor oil that exposes patients to the risk of anaphylaxis, it provides greater safety than tacrolimus injection for the purposes of orphan-drug exclusivity. |

## Novartis Pharmaceuticals Corporation for Signifor LAR

| | |
|---|---|
| **Approval Date** | 06/29/2018 |
| **NDA/BLA** | 203255/S-004 |
| **Sponsor** | Novartis Pharmaceuticals Corporation |
| **Drug** | Signifor LAR (pasireotide) |
| **Orphan Designation** | Treatment of Cushing's disease |
| **Approved Labeled Indication** | Treatment of patients with Cushing's disease for whom pituitary surgery is not an option or has not been curative. |

| Summary of Clinical Superiority Findings | Signifor (pasireotide) was previously approved as an immediate release formulation for treatment of patients with Cushing's disease for whom pituitary surgery is not an option or has not been curative. There are no notable differences in the safety and efficacy profiles between the immediate release and long-acting formulations. The immediate release formulation requires twice daily subcutaneous injections. Signifor (pasireotide) long-acting release (LAR) is dosed once monthly by intramuscular (IM) injection. The dosing regimen of the LAR (once monthly) provides a major contribution to patient care over the dosing regimen of the immediate release (twice daily) due to the greatly reduced injections per month. |
|---|---|

## Leadiant Biosciences, Inc. for Revcovi (elapegademase-lvlr)

| Approval Date | 10/05/2018 |
|---|---|
| NDA/BLA | BLA 761092 |
| Sponsor | Leadiant Biosciencess, Inc. |
| Drug | Revcovi (elapegademase-lvlr) |
| Orphan Designation | Treatment of adenosine deaminase deficiency in patients with severe combined immunodeficiency |
| Approved Labeled Indication | Indicated for the treatment of adenosine deaminase severe combined immune deficiency (ADA-SCID) in pediatric and adult patients |
| Exclusivity Protected Indication | Indicated for the treatment of adenosine deaminase severe combined immune deficiency (ADA-SCID) in pediatric and adult patients |

| Summary of Clinical Superiority Findings | As defined in the orphan drug regulations, Revcovi (elapegademase-lvr) is the same drug as Adagen (pegademase bovine). Adagen was previously approved for the same indication as Revcovi. Compared to Adagen, Revcovi provides more stable adenosine deaminase (ADA) activity that is more consistently above the therapeutic threshold associated with clinical benefit. Also, at equivalent dose, patients converted from Adagen to Revcovi experience higher and more consistent ADA plasma activity. Furthermore, it has been determined that maintaining the plasma ADA activity above the therapeutic threshold is associated with long term survival in patients with ADA-SCID. Therefore, Revcovi is clinically superior to Adagen based on greater effectiveness. |
|---|---|

## Alexion Pharmaceuticals, Inc. for Ultomiris (ravulizumab-cwvz)

| Approval Date | 12/21/2018 |
|---|---|
| NDA/BLA | BLA 761108 |
| Sponsor | Alexion Pharmaceuticals, Inc. |
| Drug | Ultomiris (ravulizumab-cwvz) |
| Orphan Designation | Treatment of paroxysmal nocturnal hemoglobinuria |
| Approved Labeled Indication | Indicated for the treatment of adult patients with paroxysmal nocturnal hemoglobinuria (PNH) |
| Exclusivity Protected Indication | Indicated for the treatment of adult patients with paroxysmal nocturnal hemoglobinuria (PNH) |
| Summary of Clinical Superiority Findings | Under the definition of "same drug" in the orphan drug regulations, Ultomiris (ravulizumab-cwvz) is the same drug as Soliris (eculizumab), which was previously approved for treatment of PNH. The recommended maintenance dosing regimen for Ultomiris is every eight weeks, while the recommended maintenance dosing regimen for Soliris is every two weeks. Because each treatment session of the drug is associated with heavy treatment burdens, and because PNH is a chronic illness, the extended dosing interval of Ultomiris provides a major contribution to patient care over Soliris. |

## 2017

### Wyeth Pharmaceuticals, Inc., a Pfizer Company for Mylotarg

| | |
|---|---|
| **Approval Date** | 09/01/2017 |
| **NDA/BLA** | BLA 761060 |
| **Sponsor** | Wyeth Pharmaceuticals, Inc., a Pfizer Company |
| **Drug** | Mylotarg (gemtuzumab ozogamicin) |
| **Orphan Designation** | Treatment of acute myeloid leukemia |
| **Approved Labeled Indication** | 1. Treatment of newly-diagnosed CD33-positive acute myeloid leukemia in adults, and<br><br>2. Treatment of relapsed or refractory CD33-positive acute myeloid leukemia in adults and in pediatric patients 2 years and older |

| | |
|---|---|
| **Summary of Clinical Superiority Findings** | Mylotarg (gemtuzumab ozogamicin) received accelerated approval in 2000, under NDA 21174, for treatment of patients with CD33 positive acute myeloid leukemia in first relapse who are 60 years of age or older and who are not considered candidates for other cytotoxic chemotherapy. Post-approval studies identified safety concerns including veno-occlusive disease, myelosuppression, infusion-related reactions, and early deaths. As a result, FDA requested that Wyeth voluntarily withdraw approval of Mylotarg from the market and Wyeth complied. <br><br> The new approval for Mylotarg is for a lower dose and different schedule than the previous approval. In a cross-study analysis of clinical outcomes for patients with relapsed or refractory acute myeloid leukemia treated with single-agent Mylotarg, in comparison to the regimens using the previously approved regimen, patients treated with the new dosing regimen had less early mortality, less hepatotoxicity, less veno-occlusive disease, more rapid platelet recovery and less hemorrhage. Therefore, the sponsor has demonstrated that the newly approved dosing regimen is safer than the previously approved dosing regimen, and thus clinically superior for the purposes of orphan-drug exclusivity. |